## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF MICHIGAN, ROGER J. BRDAK, FREDERICK C. DURHAL, JR., JACK E. ELLIS, DONNA E. FARRIS, WILLIAM "BILL" J. GRASHA, ROSA L. HOLLIDAY, DIANA L. KETOLA, JON "JACK" G. LASALLE, RICHARD "DICK" W. LONG, LORENZO RIVERA and RASHIDA H. TLAIB, | ) ) ) ) ) ) ) ) ) ) ) ) ) | No._____ |
| Plaintiffs, | ) ) | Three-Judge Court Requested 28 U.S.C. § 2284(a) |
| v. | ) ) | |
| RUTH JOHNSON, in her official Capacity as Michigan Secretary of State, | ) ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT FOR DECLARATORY
## <u>AND INJUNCTIVE RELIEF</u>

Plaintiffs League of Women Voters of Michigan ("League"), Roger J.

Brdak, Frederick C. Durhal, Jr., Jack E. Ellis, Donna E. Farris, William "Bill" J.

Grasha, Rosa L. Holliday, Diana L. Ketola, Jon "Jack" G. LaSalle, Richard "Dick"

W. Long, Lorenzo Rivera, and Rashida H. Tlaib (collectively, "Plaintiffs"), for

US.115653190.03

their complaint for declaratory and injunctive relief against Defendant Ruth Johnson, in her official capacity as Michigan Secretary of State, state as follows:

## Introduction

1.     Michigan's durable and severe partisan gerrymander of state legislative and congressional districts violates individual Plaintiffs' First Amendment free speech and association rights and Fourteenth Amendment equal protection rights.  It singles out the individual Plaintiffs and hundreds of thousands of other similarly-situated Michigan Democrats based on their political affiliation, and intentionally places them in voting districts that reduce or eliminate the power of their votes.  Plaintiff League is harmed in its mission, and its Democratic members are harmed in the same fashion as the individual Plaintiffs.

2.     Partisan gerrymandering inverts the Constitutional order by allowing those in power to treat voters as pawns to be shuffled back and forth based on their political allegiances, manipulating the electoral process in order to preserve and enhance the controlling party's power.  Because this serves no valid governmental interest, let alone a compelling interest, this violates individual Plaintiffs' rights to associate and speak freely, and individual Plaintiffs' rights to equal protection. The rights of League members who are Democrats are similarly violated.

3.     The 2011 Michigan redistricting process was a particularly egregious example of partisan gerrymandering. Congressional and state legislative districting

plans were developed in a private, secret process by Republican consultants, legislative staff and legislators to the exclusion of Democrats and the public.

4.     The current Michigan maps are not only extreme by Michigan standards but by national standards as well.  Based on the 2012 election results, Michigan's gerrymander of the State House creates more bias toward one political party than the bias observed in 99% of 786 U.S. state legislative lower house elections held over the past 45 years for which data is available.  Likewise, based on 2014 election results, the Michigan state senate map is more biased toward one political party than the bias observed in 95% of 727 U.S. legislative upper house elections for which data is available dating back to 1972.  And based on the 2012 election results, the Michigan congressional map is more biased toward one political party than the bias observed in 98% of congressional elections in states with at least 10 congressional districts based on available election data dating back to 1972.

5.     The Supreme Court recognizes the constitutional ramifications of this problem.  "[P]artisan gerrymanders [are incompatible] with democratic principles." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015) (internal quotations omitted) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality opinion) (alteration in original); *id.* at 316 (Kennedy, J., concurring)); *see also Vieth*, 541 U.S. at 293 ("[A]n excessive injection of politics

US.115653190.03

is unlawful").  As Justice Ginsberg recently wrote for a majority of the Court,

gerrymandering threatens a "'core principle of republican government,' namely,

'that the voters should choose their representatives, not the other way around.'"

*Ariz. State Legislature*, 135 S. Ct. at 2677 (internal citations omitted).

6.     Plaintiffs will show by competent direct, circumstantial, and expert

evidence Michigan's intentional and effective suppression of Plaintiffs' and other

Democratic voters' representational rights contrary to well-established First

Amendment and Equal Protection standards.

## Parties

7.     Plaintiff League of Women Voters of Michigan is a nonpartisan

community-based statewide organization formed in April, 1919 after Michigan

voters granted women suffrage in November, 1918.  The League is affiliated with

the League of Women Voters of the United States, which was founded in 1920.

The League is dedicated to encouraging its members and the people of Michigan to

exercise their right to vote as protected by the federal Constitution, Michigan

Constitution, and federal and state law.  The mission of the League is to promote

political responsibility through informed and active participation in government

and to act on selected governmental issues.  The League impacts public policies,

promotes citizen education, and makes democracy work by, among other things,

removing unnecessary barriers to full participation in the electoral process.

Currently, the League has 21 local leagues and over 2420 members, each of whom, upon information and belief, is a registered voter in Michigan.  The League has members in almost every county in the State, including Democrats, Republicans and independents.  The League's local leagues are engaged in numerous activities, including hosting public forums and open discussions on issues of importance to the community, including partisan gerrymandering.  Individual League members invest substantial time and effort in voter training and civic engagement activities, including voter registration and non-partisan voter guides.  As a result, the League has developed a particular interest in reform of the Michigan redistricting process. In 2011-12, local Leagues studied how redistricting was conducted in Michigan and other states.

8.     The League has standing to challenge the 2011 Michigan congressional and legislative districting plans.  Those plans discriminate against Michigan Democratic voters by diluting their votes for the purposes of maintaining a Republican advantage in the Michigan Legislature and congressional delegation. Those plans thus directly impair the League's mission of encouraging civic engagement and nonpartisan redistricting reform.  Additionally, the League is a membership organization and its Democratic members are harmed by the plans because they dilute Democratic votes and impair Democratic voters' ability to elect their preferred legislative and congressional candidates.  The League's members'

US.115653190.03

rights to participate freely and equally in the political process is burdened as well by the plans, which in many cases deny the ability to cast a meaningful vote altogether.

9. Each individual Plaintiff is a citizen of the United States and a resident of the State of Michigan.

10. Each individual Plaintiff is a Democrat who votes for Democratic candidates and assists them in their election efforts, and has for many years associated with the Democratic Party. Each is a registered voter. As detailed below, individual Plaintiffs are being harmed by the Michigan Legislature's gerrymandering of their individual congressional and legislative districts. The gerrymander also injures individual Plaintiffs, and all Michigan Democratic voters, by diluting the collective value of their votes statewide.

   a. Plaintiff Roger J. Brdak is a resident and a registered voter in the 32nd House District and 8th Senate District and the 10th congressional District in Chesterfield Township, Macomb County, Michigan. He and neighboring Democratic voters have been cracked by moving from House District 32 in 2001-2010 to a gerrymandered House District 32 in 2011.

   b. Plaintiff Frederick C. Durhal, Jr. is a resident and a registered voter in the 5th House District, 4th Senate District and 13th congressional District in Detroit, Wayne County, Michigan.

6

c.     Plaintiff Jack E. Ellis is a resident and a registered voter in the 18th House District, 8th Senate District and 9th Congressional District in St. Clair Shores, Macomb County, Michigan.  Mr. Ellis and neighboring Democratic voters have been cracked by being moved from a Democratic Senate District 9 in 2001-2010, to Senate District 8, a gerrymandered Republican district, in 2011.  Conversely, those same Democratic voters, including Mr. Ellis, have been packed by being moved from House District 24 in 2001-2010, to Democratic House District 18 in 2011.

d.     Plaintiff Donna E. Farris is a resident and a registered voter in the 76th House District, 29th Senate District and 3rd Congressional District in Grand Rapids, Kent County, Michigan.  She and neighboring Democratic voters have been cracked in House District 76.  Other Grand Rapids Democrats have been packed in House District 75.

e.     Plaintiff William "Bill" J. Grasha is a resident and a registered voter in the 26th House District, 11th Senate District and 9th Congressional District in Madison Heights, Oakland County, Michigan.  He and neighboring Democratic voters were packed by being removed in 2011 from Senate District 13 to Senate District 11, which is overwhelmingly Democratic.

US.115653190.03

      f.      Plaintiff Rosa L. Holliday is a resident and a registered voter in the 96th House District, 31st Senate District and 5th Congressional District in Frankenlust Township, Bay County, Michigan.

      g.      Plaintiff Diana L. Ketola is a resident and a registered voter in the 104th House District, 37th Senate District and 1st Congressional District in Traverse City, Grand Traverse County, Michigan.

      h.      Plaintiff Jon "Jack" G. LaSalle is a resident and a registered voter in the 109th House District, 38th Senate District and 1st Congressional District in Marquette, Marquette County, Michigan.

      i.      Plaintiff Richard "Dick" W. Long is a resident and a registered voter in the 43rd House District, 14th Senate District and 11th Congressional District in Waterford Township, Oakland County, Michigan.  He and neighboring Democratic voters have been cracked by being moved from Democratic Senate District 26 in 2001-10, to Senate District 14, a Republican district, in 2011.

      j.      Plaintiff Lorenzo Rivera is a resident and a registered voter in the 46th House District, 12th Senate District and 8th Congressional District in Oxford, Oakland County, Michigan.

US.115653190.03

k.      Plaintiff Rashida H. Tlaib is a resident and a registered voter in

the 6th House District, 1st Senate District and 14th Congressional District in

Detroit, Wayne County, Michigan.

11.     Plaintiffs sue Defendant Ruth Johnson in her official capacity as

Secretary of State for the State of Michigan.  Under Mich. Comp. Laws § 168.21,

she is the "chief election officer" of Michigan responsible for the conduct of

Michigan elections.  In this capacity, she enforces the unconstitutional

gerrymander described below.

## Jurisdiction and Venue

12.     This Court has jurisdiction over this case pursuant to 28 U.S.C.

§ 2201; 28 U.S.C. § 2202; 42 U.S.C. § 1983; 28 U.S.C. § 1331; 28 U.S.C.

§§ 1343(a)(3) & (4); 28 U.S.C. § 1357; 28 U.S.C. § 2284; and 42 U.S.C. § 1988.

13.     Pursuant to 28 U.S.C. § 2284(a), a three-judge court should be

convened to hear this case.

14.     Venue is proper to this Court pursuant to 28 U.S.C. § 1391(b).

## General Allegations

## How Gerrymandering Works

15.     The core purpose of legislative district line-drawing is "fair and

effective representation for all citizens . . . ."  *Reynolds v. Sims*, 377 U.S. 533, 565-

66 (1964).

16.     By contrast, gerrymandering rigs elections.  Legislators create a gerrymander by tilting the map to favor their party and dilute opposing votes.  They draw district lines that "pack" as many opposing party voters as possible into a few supermajority districts, while "cracking" the rest of those voters into a large number of districts where the gerrymandering party can command a safe but more modest majority of the vote.  "Computer assisted districting has become so routine and sophisticated that legislatures, experts, and courts can use databases to map electoral districts in a matter of hours, not months."   *Vieth*, 541 U.S. at 312 (Kennedy, J., concurring).

17.     A party gerrymanders by increasing the number of the opposing party's "wasted" votes and minimizing its own wasted votes.  Wasted votes are votes cast either for a losing candidate, or for a winning candidate, but in excess of what he or she needed to prevail.  Those in control minimize their own party's wasted votes by drawing the districts to evenly distribute their own voters across the state while cracking and packing the opposing party's voters.  Gerrymandering dilutes the voting strength of the party out of power and destroys fair and effective representation, minimizing that party's voters' ability to influence elections and to have a fair chance to affect the political process.

US.115653190.03

## Michigan's 2011 Legislature Gerrymandered
## the State's Legislative and Congressional Maps

18.     The Michigan Legislature enacts new districting plans by statute after every 10-year census in bills signed or vetoed by the Governor

19.     The Michigan Legislature and Governorship were controlled by Republicans in 2001, leading to adoption of GOP-leaning maps for the following decade.  The 2001 plans are no longer in effect.  This history does however provide an example of how one effective gerrymander can have profound effects beyond its ten-year life, as the subsequent plans start not from neutral but from already tilted maps.  The 2001 gerrymander left the Republican-controlled legislature and Republican governor elected in 2010 in a position to extend one-party control by redistricting for the next decade.

20.     In 2011, a Republican-controlled Legislature enacted legislative and congressional districting plans following the 2010 census – S.B. 498 and H.B. 4780 – that were signed into law by a Republican Governor on August 9, 2011. *See* 2011 P.A. 128 and 129, codified as MCL 3.51-3.55 (congressional) and 4.2001-4.2006 (legislative).  These plans further tilted already-gerrymandered legislative and congressional maps to additionally favor the Republican Party.

21.     As detailed below, in S.B. 498 and H.B. 4780 the Republican Legislature intentionally, effectively and severely gerrymandered the State House, Senate, and congressional maps to benefit Republican voters, officeholders, and

US.115653190.03

candidates, and diminish the effect of the votes of Democratic voters throughout

the 10-year life of the maps.

*The Michigan Process was Flawed*

22.    The Republican legislative majority created a façade of transparency,

but in reality worked privately and secretly to create maps that further tilted the

existing Republican-favored maps by hiring Republican political operatives to

manipulate the district lines to further advantage Republicans.  Republican

operatives have publicly boasted that the maps were intended to maintain

Republican control over the State Legislature for the entire decade.

23.    Democrats and non-partisan organizations such as Plaintiff League

attempted to make the process more open and fair by calling for statewide public

hearings and public input before and after the Republican-drawn maps were

publicly introduced.  The Republicans ignored these efforts.

24.    The Republican majority pushed S.B. 498 and H.B. 4780 through the

Legislature in 13 calendar days from the date it publicly revealed the maps to the

final votes, including two weekends and a state constitutionally mandated five-day

waiting period.  Partisan Republican staff and political operatives drafted the bills

in secret meetings not open to the public, only allowing input from certain selected

Republican members of the Legislature.  Republican legislators secretly reviewed

and approved the plans in S.B. 498 and H.B. 4780 before they were publicly revealed on June 17, 2011.

25.     Republican amendments were made to S.B. 498 during the process with almost no time for the public or Democratic legislators to review, let alone provide any input.  The maps were even amended on the House floor by the Republicans and then immediately passed, making it nearly impossible to review how those changes would affect voters.  Proposed Democratic amendments to S.B. 498 and H.B. 4780 were defeated or ignored.  Democratic legislators were threatened with unfavorable districts if they refused to vote for S.B. 498, or were promised favorable districts in return for their vote.

26.     S.B. 498 sets forth the district lines for the election of both houses of the Michigan Legislature.  H.B. 4780 sets forth the congressional district lines. Absent any other judicial or legislative action, these will be the governing law providing the operative districting maps through and including 2020.  S.B. 498's maps will be referred to herein as the "Current House Plan," or "Current Senate Plan".  H.B. 4780's maps will be referred to as the "Current Congressional Plan". Collectively, all three plans will be referred to as the "Current Apportionment Plan."

13

27.     Copies of the Current House Plan, Current Senate Plan and Current Congressional Plan are attached hereto as Exhibits A, B and C, respectively.[1]

28.     The Michigan Legislature intentionally tilted the Current Apportionment Plan heavily against Democrats and in favor of Republicans.  In each of the state legislative bodies and the congressional delegation, Democratic candidates now have to win many more votes statewide than Republican candidates in order for their party to win the same number of seats.  The Legislature accomplished this by cracking and packing Democratic voters, while spreading Republican voters efficiently across safe Republican districts.

29.     The Current House Plan disproportionately pitted more Democratic incumbents against one another than Republican incumbents were paired against each other, another indication of intentional partisan manipulation.

*The Gerrymander Created Oddly Shaped Districts*
*Contrary to Neutral Redistricting Principles*

30.     Although cracking and packing can be accomplished without odd-shaped districts, irregular shapes are common indicia of partisan gerrymanders. *See, e.g.*, *Larios v. Cox*, 300 F. Supp. 2d 1320, 1330 (N.D. Ga. 2004) (*per curiam*), *aff'd*, 542 U.S. 947 (2004); *Miller v. Johnson*, 515 U.S. 900, 913 (1995) (holding in racial gerrymandering context that a district's shape may be "persuasive

---

[1] They are also available at https://www.michigan.gov/documents/cgi/house10statewide_371473_7.pdf, http://www.michigan.gov/documents/cgi/senate10statewide_371479_7.pdf, and http://www.michigan.gov/documents/cgi/congress10statewide_371463_7.pdf.

US.115653190.03

circumstantial evidence" of a constitutional violation).  Michigan's Current

Apportionment Plan has precisely such districts.

31.     Some of the districts in the Current Apportionment Plan are oddly

shaped as a result of the gerrymander.

32.     Michigan's Current Apportionment Plan gerrymanders by cracking

and packing Democratic voters, including Plaintiffs.

33.     For instance, Michigan House District 76 is barely contiguous in

places and almost completely surrounds House District 75, in the City of Grand

Rapids:



34.     House District 76 is essentially the modern-day mirror image of the

classic 1812 Massachusetts legislative district shaped like a salamander and

sanctioned by Governor Elbridge Gerry, giving rise to the very term

"gerrymander":

15



**Massachusetts 1812**          **Michigan 2012**

35.     Senate District 8 sprawls across Macomb County, a populous

suburban county of Detroit, touching each of its north, south, east and west borders

in the shape of a large question mark:



36.     Plaintiffs challenge the Current Apportionment Plan district by district

and in its entirety.

US.115653190.03

*Objective Data Confirm the Gerrymander's Continuing Durable and*
*Severe Burden on Michigan Democrats*

37.   The gerrymander worked.  Democrats' voting strength was diluted
and their representational rights were burdened because of their party affiliation.
This reduces not only Plaintiffs' ability to elect representatives in their own
districts, but also reduces Plaintiffs' ability to elect Democratic representatives
across the State.

38.   Subsequent history has shown the Michigan gerrymander to be
durable.  The respective Democratic vote shares and seat shares for the Michigan
state and house maps and Michigan congressional map are as follows:

**Disparities in Votes Cast vs. Seats Won:  United States House General Elections 2002-2016**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2002 | 48.2% | 60.0% |
| 2004 | 49.9% | 60.0% |
| 2006 | 46.2% | 60.0% |
| 2008 | 46.4% | 46.7% |
| 2010 | 52.3% | 60.0% |
| 2012 | 45.6% | 64.3% |
| 2014 | 47.5% | 64.3% |
| 2016 | 50.5% | 64.3% |

**Disparities in Votes Cast vs. Seats Won:  Michigan Senate General Elections 2002-2014**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2002 | 50.0% | 57.9% |
| 2006 | 45.0% | 55.3% |
| 2010 | 53.6% | 68.4% |
| 2014 | 50.4% | 71.1% |

17

**Disparities in Votes Cast vs. Seats Won:  Michigan House General Elections 2002-2016**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2002 | 50.0%. | 56.4% |
| 2004 | 48.1% | 52.7% |
| 2006 | 44.8% | 47.3% |
| 2008 | 41.6% | 39.0% |
| 2010 | 52.8% | 57.3% |
| 2012 | 45.5% | 53.6% |
| 2014 | 48.9% | 57.3% |
| 2016 | 50.3% | 57.3% |

39.    For example, in the 2014 State House elections Democrats won the statewide 2-party popular vote 50.98% to 48.93%.  Yet Democrats won only 47 seats (42.7%) in the House compared to the Republicans' 63 seats (57.3%).

40.    For the 2014 State Senate races, the statewide popular vote was just as close with Democrats winning 49.23% and Republicans garnering 50.67%.  Yet the Republican-drawn Current Senate Plan turned that narrow 1.44% vote margin into a 42%  seat advantage in the Senate.  Republicans hold 27 seats (71%) to the Democrats' 11 (29%).

41.    The same pattern holds true in congressional elections.  In 2012, Democratic congressional candidates won nearly 51% of the statewide popular vote, but won only 35% of the seats – five of fourteen.

42.    True to the nature of partisan gerrymandering, since enacting the Current Apportionment Plan Republicans have had significantly fewer wasted votes compared to the excessive number of wasted Democratic votes.  The

Legislature accomplished this, in part, by creating lopsided Democratic districts where the winning candidates receive far more votes than is necessary to win, thus wasting the surplus Democratic votes. For instance, in 2012 Republicans won seven State House districts with 65% or more of the vote, whereas Democrats won 30 State House districts with 65% or more of the vote. In 2014, Republicans won only two Senate districts with 65% or more of the vote, whereas Democrats won ten Senate districts with 65% or more of the vote. Similarly, Republicans won just 17 State House districts with 65% or more of the vote, whereas Democrats won 31 State House districts with 65% or more of the vote.

43. The Republican-controlled Legislature, by their intentional manipulation of district boundaries, successfully gerrymandered Michigan. These intentional gerrymanders injure the individual Plaintiffs and all Michigan Democratic voters by diluting the value of their votes statewide.

44. Advancements in technology now enable more effective and sophisticated gerrymanders. They also, however, provide tools for political scientists, and the courts, to quantify and measure the effect of the gerrymander on voters. Justice Kennedy predicted both developments in 2004:

> Technology is both a threat and a promise. On the one hand, if courts refuse to entertain any claims of partisan gerrymandering, the temptation to use partisan favoritism in districting in an unconstitutional manner will grow. On the other hand, these new technologies may produce new methods of analysis that make more evident the

19

> precise nature of the burdens gerrymanders impose on the
> representational rights of voters and parties.  That would
> facilitate court efforts to identify and remedy the burdens,
> with judicial intervention limited by the derived
> standards.

*Vieth*, 541 U.S. at 312-13 (Kennedy, J., concurring).  Justice Kennedy's words

were prescient.

45.     The burden a gerrymandered legislature imposes on the

representational rights of voters in a given election can be quantified in a variety of

ways.  The "efficiency gap" compares the number of votes each party wastes for

any election.  *See* Eric M. McGhee, *Measuring Partisan Bias in Single-Member

District Electoral Systems,* 39 Legis. Stud. Q. 55 (2014); Nicholas O.

Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency

Gap,* 82 U. Chi. L. Rev. 101 (2015); *Whitford v. Gill*, 218 F. Supp. 3d 837, 903-10

(W.D. Wis. 2016)  (holding that Wisconsin's State House map was

unconstitutionally gerrymandered, relying in part on the efficiency gap).

46.     In the statistical sense, all of the votes for a losing party's candidate in

every district are wasted in that those votes do not contribute to the election of

those voters' preferred candidate.  All of the votes for a winning candidate in

excess of what he or she needed to prevail are in the same sense also wasted.

47.     For each party's candidates, the statewide wasted votes include all the

votes for losing candidates, plus any votes for winning candidates over and above

the 50%-plus-one vote needed to win the district.  The relative burden on the representational rights of the voters of each political party can be measured by comparing the wasted votes of each political party.  Political scientists have named this differential[2] the efficiency gap.  *See generally* Stephanopoulos & McGhee, and *Whitford*, 218 F. Supp. 3d at 903.

48.     The efficiency gap measures departures from partisan symmetry. Partisan symmetry is the simple democratic principle that fair maps generally give a vote for one party the same weight as it gives a vote for the other party.  *See LULAC v. Perry*, 548 U.S. 399, 466 (2006) (Stevens, J., concurring) (describing the symmetry standard).

49.     Political scientists have adopted the convention that an efficiency gap value of less than zero (*i.e.,* negative) means that a particular plan tilts Republican (*i.e.*, more Democratic votes are wasted than Republican votes).  A positive efficiency gap value means that a particular plan tilts Democratic, allowing Democrats to convert their votes to seats more efficiently than Republicans. The size of an efficiency gap measure can support an inference of intentional manipulation of district boundaries (i.e., partisan gerrymandering).

50.     The efficiency gap does not measure, and Plaintiffs do not seek, proportional representation.  For example, Plaintiffs do not complain that 60% of

---

[2] Expressed as a proportion of the total vote.

votes might capture 70% of the seats for one party.  Instead, Plaintiffs argue that the Constitution prohibits a state from acting for partisan reasons to increase the partisan asymmetry of its maps.  In other words, the disproportionate results of a victory at the polls should be roughly the same regardless of which party achieves that victory.  Thus, if one party receives 60% of the vote and receives 70% of the seats, the other party should also receive 70% of the seats when it earns 60% of the vote.  That is partisan symmetry.

51.     The Current Apportionment Plan is the most pro-Republican partisan gerrymander in modern Michigan history.  The actual efficiency gaps for the 2012, 2014 and 2016 elections under the Current House Plan were -.14,-.13, and -.10, respectively.  These are among the widest efficiency gaps in all of the existing Michigan House data, going back over 40 years.  They are also among the widest efficiency gap measures out of the elections nationwide for which data exist since the 2011 round of redistricting.

52.     The actual efficiency gap for the Current Senate Plan in 2014 was even more extreme, at -.22, the widest in the country for upper houses with single-member districts in the current decade for which we have election data.

53.     The actual efficiency gaps for the Current Congressional Plan in 2012, 2014, and 2016 were -.20, -.18, and -.15, among the very widest in the country.

54.     More than almost every apportionment plan in the last 40 years across the United States, the Current Apportionment Plan imposes on Michigan Democrats higher burdens of converting votes to seats and injures all Michigan Democrats by diluting the significance of their individual votes at a statewide level.

55.     There is a near zero chance that the efficiency gaps for the Current Apportionment Plan will neutralize during this decade, let alone "switch signs" to favor Democrats.

*The Michigan Plan Cannot Be*
*Justified by Legitimate State Interests*

56.     The United States Supreme Court has recognized several constitutionally allowable traditional principles that a state may use in redistricting, including compactness, contiguity and respect for political subdivisions.  *See, e.g.*, *Reynolds,* 377 U.S. at 578.  The Court has never held that these criteria allow a state to act unconstitutionally.  And, none of these principles justify Michigan's Current Apportionment Plan in any event.

57.     The current Michigan redistricting guidelines originated in a 1982 Michigan Supreme Court legislative redistricting decision concerning legislative districts for the 1980s.  *See In re Apportionment of State Legislature – 1982*, 321 N.W.2d 565 (Mich. 1982) (per curiam), *app. dism'd sub nom. Kleiner v. Sanderson*, 459 U.S. 900 (1982).  The Court acted when the state's Commission on

23

Legislative Apportionment deadlocked and failed to adopt legislative districts.  The Court held that the Commission would no longer redistrict the State and that the Court would do so until the Legislature, Governor and/or people provided an alternative.

58.     The Court appointed Bernard J. Apol, a former director of the Michigan Bureau of Elections, to create a new legislative plan using Court-created criteria.  *See id.* at 583.

59.     In 1996, the Republican-controlled Michigan Legislature revised and codified those criteria for use in legislative redistricting.  *See* Mich. Comp. Laws § 4.261.  In 1999, the Republican-controlled Michigan Legislature revised and codified the guidelines for use in congressional districting.  *See* Mich. Comp. Laws § 3.63.  These guidelines in their codified form have come to be known as the Apol guidelines.

60.     Under these guidelines the Legislature is to create legislative and congressional districts that meet federal constitutional population standards, are contiguous, "break" as few municipal and county boundaries as possible, and comply with the Voting Rights Act.  These guidelines are not always observed and have been impliedly amended by subsequent Republican legislatures.  *See LeRoux v. Sec'y of State*, 640 N.W.2d 849 (Mich. 2002) (holding Legislature not bound by MCL § 3.63).

24

61.     The pro-Republican bias of Michigan's Current Apportionment Plan did not result either from the Apol guidelines or from natural demographics.  To the contrary, the Legislature could easily have enacted alternative maps that would have made districts more compact, paid equal or greater respect to boundaries of political subdivisions, and treated members of both parties similarly.  Nor did the Voting Rights Act compel the partisan bias; its requirements also could have been satisfied by one or more fairer alternative maps, with better partisan symmetry and narrower efficiency gaps.

62.     Exhibit D is an Alternative House Plan that satisfies Michigan statutory criteria and the Voting Rights Act as well as or better than the Current House Plan.  The Alternative House Plan was drawn without any intent to favor members of one party over another.  For example, simply using actual 2014 election results, it has much lower partisan asymmetry than the Current House Plan, as reflected in an efficiency gap of only -.109 compared with -.14 for the Current House Plan, as calculated based on 2012 election data.  *See* ¶ 51 above.

63.     Likewise, Exhibit E is an Alternative Senate Plan that satisfies Michigan statutory criteria and the Voting Rights Act as well as or better than the Current Senate Plan.   The Alternative Senate Plan was drawn without any intent to favor members of one party over another.  It has much lower partisan asymmetry than the Current Senate Plan, as reflected in an efficiency gap of only .025

compared with -.22 for the Current Senate Plan, based on 2014 election results.
*See* ¶ 52 above.

64.     Similarly, Exhibit F is an Alternative Congressional Plan that satisfies
Michigan statutory criteria and the Voting Rights Act as well as or better than the
Current Congressional Plan.  The Alternative Congressional Plan was drawn
without any intent to favor members of one party over another.  Again, using
actual 2014 results, it has much lower partisan asymmetry than the Current
Congressional Plan, as reflected in an efficiency gap of only -.127 compared with
-.20 for the Current Congressional Plan, based on 2012 election results.  *See* ¶ 53
above.

65.     Plaintiffs offer the Alternative Maps referenced above solely as
examples of the multitude of fairer maps the Legislature could have drawn.  The
Court will ultimately determine the remedy for the constitutional violations of
which Plaintiffs complain.

**Michigan's Current Apportionment Plan
Violates the Constitution**

66.     Partisan gerrymandering cases are justiciable.  *See Davis v.
Bandemer*, 478 U.S. 109, 113 (1986) ("[W]e find such political gerrymandering to
be justiciable…."); *see also LULAC*, 548 U.S. at 415 ("Although the legislative
branch plays the primary role in congressional redistricting, our precedents
recognize an important role for the courts when a districting plan violates the

26

Constitution.").  A three-judge federal court found that plaintiffs alleging partisan gerrymandering based on an Efficiency Gap analysis had "stated a claim for relief that is plausible on its face…." *Whitford v. Nichol,* No. 15-cv-421-bbc, 2015 WL 9239016, at *9 (W.D. Wis. Dec. 17, 2015) (order denying motion to dismiss).

67.     The Supreme Court recognizes that excessive use of partisanship in redistricting raises grave constitutional concerns.  *See, e.g.*, *Vieth*, 541 U.S. at 292 ("[P]artisan gerrymanders [are incompatible] with democratic principles.") (plurality); *id.* at 316 (alteration in original) (Kennedy, J., concurring); *see also LULAC*, 548 U.S. at 418.

68.     Excessive partisan gerrymandering violates both the First and Fourteenth Amendments.  *See, e.g.*, *Vieth*, 541 U.S. at 314 ("[T]hese allegations involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views.") (Kennedy, J., concurring); *Bandemer*, 478 U.S. at 127 ("[P]laintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group. … Further, we are confident that if the law challenged here had discriminatory effects on Democrats, this record would support a finding that the discrimination was intentional.") (internal citations omitted); *Whitford*, 218 F. Supp. 3d at 883-84 ("It is clear that the First

27

Amendment and the Equal Protection Clause protect a citizen against state

discrimination as to the weight of his or her vote when that discrimination is based

on the political preferences of the voter.")

69.     The Current Apportionment Plan severely burdens Democratic voters'

exercise of their First Amendment rights of free association and expression without

furthering any state interest, let alone a compelling one.  "First Amendment

concerns arise where a State enacts a law that has the purpose and effect of

subjecting a group of voters or their party to disfavored treatment by reason of

their views."  *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring).  The government

action here is no more justified than in other political-expression-based

government actions already found unconstitutional in, for example, patronage and

candidate ballot access cases.

70.     In the same way, the Current Apportionment Plan treats Republican

voters differently from non-Republican voters for no legitimate reason, contrary to

the Equal Protection Clause of the Fourteenth Amendment.

71.     Where as here the facts show partisan intent to disadvantage the party

out of power, and partisan effect, and where the State cannot rebut either based on

legitimate or compelling state interests, the Constitution has been violated.

72.     Taken together, all the foregoing facts demonstrate that the Michigan

Legislature intentionally drew legislative lines invidiously, to marginalize

Democratic voters and dilute their votes solely because they were not Republicans. This violates legitimate redistricting principles and reflects no legitimate legislative objective. *See, e.g.*, *Vieth*, 541 U.S. at 307 ("A determination that a gerrymander violates the law must rest . . . on a conclusion that the classifications, though generally permissible, were applied in an invidious manner or in a way unrelated to any legitimate legislative objective.") (Kennedy, J., concurring).

73.     Further, the Current Apportionment Plan's extreme efficiency gaps, the 2012, 2014 and 2016 election results, and the excessive number of Democratic supermajority districts show the partisan effect and discriminatory burden on Democratic voters' representational rights.  The 2012, 2014 and 2016 election results show how the intentional gerrymander injured Plaintiffs, and all Michigan Democratic voters, by diluting the value of their votes statewide.  The excessive number of Democratic supermajority districts indicates just how effectively and durably the Republicans packed Democrats.  Plaintiffs and other non-Republicans have been harmed.  Their representational rights have been burdened, their voting strength diluted, and their ability to influence the political process unfairly diminished as compared to Republican voters.

## Count I – First Amendment

74.     Plaintiffs incorporate and re-allege paragraphs 1 through 73 above.

75.     Plaintiffs and all Democratic voters in the State of Michigan have a

First Amendment right to associate freely with each other without discrimination

by the State based on that association; to participate in the political process and

vote in favor of Democratic candidates without discrimination by the State because

of the way they vote; and to express their political views without discrimination by

the State because of the expression of those views or the content of their

expression.

76.     The Current Apportionment Plan violates the First Amendment

because it intentionally diminishes and marginalizes the votes of the individual

Plaintiffs, Democratic members of the League, and other voters based on partisan

affiliation.  The Current Apportionment Plan burdens and penalizes Democratic

voters because of their participation in the electoral process as Democrats, their

voting history for Democratic candidates, their association with the Democratic

Party and their expression of political views as Democrats.  In other words,

Plaintiffs have been discriminated against because of their views and the content of

their expression.

77.     The magnitude of the partisan gerrymander of the Current

Apportionment Plan, as demonstrated by the wide efficiency gaps and other

evidence, shows that the Current Apportionment Plan denies individual Plaintiffs

and other Democratic voters in Michigan their rights to free association and freedom of expression guaranteed by the Constitution.

78.    No legitimate, let alone compelling, state interest justifies these state actions.  The Current Apportionment Plan is not narrowly tailored to minimize intrusion on individual Plaintiffs' First Amendment rights.

79.    For these reasons, and because the Current Apportionment Plan has the purpose and effect of subjecting Democrats to disfavored treatment, including burdening their representational rights by reason of their views, the Current Apportionment Plan is subject to strict scrutiny and cannot be upheld because it is not narrowly tailored to serve a compelling government interest.

80.    Accordingly, the Current Apportionment Plan deprives Plaintiffs of their civil rights under color of state law in violation of 42 U.S.C. §§ 1983 and 1988.

## Count II – Equal Protection

81.    Plaintiffs incorporate and re-allege paragraphs 1 through 80, as if fully set forth herein.

82.    The Current Apportionment Plan uses political classifications in an invidious manner and in a way unrelated to any legitimate, let alone compelling, legislative objective.

31

83.     The Current Apportionment Plan is a partisan gerrymander that violates individual Plaintiffs' as well as Democratic League members' Fourteenth Amendment right to Equal Protection of the laws.  The Current Apportionment Plan intentionally and materially packs and cracks Democratic voters, thus diluting their votes, even though non-gerrymandered maps could have been drawn instead.

84.     The Current Apportionment Plan is unrelated to any legitimate, or compelling, legislative objective.  This redistricting was motivated by the primary or sole purpose of discriminating on a partisan basis.  The efficiency gap and other evidence demonstrate the invidious discrimination of the Current Apportionment Plan in violation of the Equal Protection Clause of the Fourteenth Amendment.

85.     Thus, the Current Apportionment Plan deprives plaintiffs of their civil rights under color of state law in violation of 42 U.S.C. §§ 1983 and 1988.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

(a)     Convene a three-judge court to hear this case pursuant to 28 U.S.C. § 2284(a);

(b)     Declare Michigan's Current Apportionment Plan unconstitutional and invalid, and the maintenance of the Current Apportionment Plan for any primary, general, special, or recall election a violation of Plaintiffs' constitutional rights;

US.115653190.03

(c)     Enjoin Defendant and her employees and agents from administering, preparing for, and in any way permitting the nomination or election of members of Michigan's Legislature and Michigan Members of Congress from the unconstitutional Current Apportionment Plan that now exists;

(d)     In the absence of a state law establishing a constitutional apportionment plan adopted by the Legislature and signed by the Governor in a timely fashion, establish legislative and congressional apportionment plans that meet the requirements of the U.S. Constitution and other applicable law;

(e)     Award Plaintiffs their reasonable attorneys' fees, costs, and litigation expenses incurred in bringing this action; and

(f)     Grant further relief as the Court deems just and proper.

US.115653190.03

Respectfully submitted,


/s/ Joseph H. Yeager, Jr.

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone:  248-483-5000
Fax:  248-483-3131
MBrewer@goodmanacker.com

Joseph H. Yeager, Jr. (IN Bar No. 2083-49)
Harmony A. Mappes (IN Bar No. 27237-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone:  317-237-0300
Fax:  317-237-1000
Jay.Yeager@FaegreBD.com
Harmony.Mappes@FaegreBD.com

*Counsel for Plaintiffs*

Dated:   December 22, 2017