# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, ROGER J. BRDAK,
FREDERICK C. DURHAL, JR., JACK
E. ELLIS, DONNA E. FARRIS, WILLIAM        Case No. 17-cv-14148
"BILL" J. GRASHA, ROSA L. HOLLIDAY,
DIANA L. KETOLA, JON "JACK" G.            Hon. Eric L. Clay
LASALLE, RICHARD "DICK" W. LONG,          Hon. Denise Page Hood
LORENZO RIVERA and RASHIDA                Hon. Gordon J. Quist
H. TLAIB,

       Plaintiffs,                       **Defendant's Motion to**
v.                                        **Stay and to Dismiss for**
                                        **Lack of Standing**
RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

       Defendant.

_____/

| | |
|---|---|
| Michigan Dep't of the Attorney General | Dickinson Wright PLLC |
| B. Eric Restuccia (P49550) | Robert P. Young, Jr. (P28789) |
| Chief Legal Counsel | Peter H. Ellsworth (P23657) |
| P.O. Box 30212 | *Special Assistant Attorneys General* |
| Lansing, MI 48909 | 215 S. Washington Sq., Suite 200 |
| (517) 373-1124 | Lansing, MI 48933 |
| RestucciaE@michigan.gov | (517) 371-1700 |
| *Attorney for Defendant* | RYoung@dickinsonwright.com |
| | PEllsworth@dickinsonwright.com |
| | *Attorneys for Defendant* |

_____/

1

## **Defendant's Motion to Stay and to Dismiss for Lack of Standing**

Defendant Ruth Johnson, through her attorneys, Dickinson Wright PLLC, moves for an Order staying further proceedings in this matter and dismissing Plaintiffs' challenge to Michigan's statewide redistricting plans pursuant to Fed. R. Civ. P. 12(b)(1).

This Court need not presently address Defendant's Motion to Dismiss if it stays further proceedings and Defendant hereby requests a stay of proceedings in this case until the resolution of *Gill v. Whitford*, U.S. Supreme Court Dkt. No. 16-1161, and *Benisek v. Lamone*, United States Supreme Court Dkt. No. 17-333. In both matters, the Supreme Court is asked to address fundamental issues presented by this litigation, including whether claims of partisan gerrymandering are justiciable and, if so, under what standards. A stay would preserve judicial economy and works no prejudice to Plaintiffs as it is already well past the date by which this litigation could have affected Michigan's 2018 election cycle.

If this Court does not stay further proceedings, it should dismiss Plaintiffs' claims as Plaintiffs have no standing to bring a statewide partisan gerrymander challenge because they cannot allege particularized harm.

In support of its Motions, Defendant relies on Fed. R. Civ. P. 12(b)(1), the pleadings on file with the Court, the facts, law and arguments contained in the

accompanying Brief in Support of Defendant's Motion, and the exhibits attached thereto.

Pursuant to LR 7.1(a), on January 22, 2017, the undersigned counsel sought concurrence in the relief sought under this Motion from Counsel for Plaintiffs. Despite reasonable efforts, Plaintiff's counsel advised that concurrence would not be given, thus necessitating the filing of this Motion.

Respectfully submitted,

DICKINSON WRIGHT PLLC

/s/ Robert P. Young
Robert P. Young
Attorneys for Defendant

Dated: January 23, 2018

## Certificate of Service

I hereby certify that on January 23, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

Respectfully submitted,

/s/Robert P. Young

Dated: January 23, 2018

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, ROGER J. BRDAK,
FREDERICK C. DURHAL, JR., JACK
E. ELLIS, DONNA E. FARRIS, WILLIAM
"BILL" J. GRASHA, ROSA L. HOLLIDAY,       Case No. 17-cv-14148
DIANA L. KETOLA, JON "JACK" G.
LASALLE, RICHARD "DICK" W. LONG,          Hon. Eric L. Clay
LORENZO RIVERA and RASHIDA                Hon. Denise Page Hood
H. TLAIB,                                 Hon. Gordon J. Quist

       Plaintiffs,                      **Brief in Support of**
v.                                        **Defendant's Motion to**
                                        **Stay and to Dismiss**
RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

       Defendant.

_____/

## Defendant's Brief in Support of Her
## Motion to Stay and to Dismiss for Lack of Standing

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ ii

INDEX OF AUTHORITIES ................................................................ iii

ISSUES PRESENTED ......................................................................... vi

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................. vii

I.    INTRODUCTION ..................................................................... 1

II.   STATEMENT OF FACTS ......................................................... 4

    A.    Background of statutory provisions governing redistricting in Michigan. ...................................................................................... 4

    B.    Plaintiffs' Allegations ............................................................ 6

        1.    The Parties ...................................................................... 7

        2.    The Claims ...................................................................... 8

III.  ARGUMENT ........................................................................... 9

    A.    This Court should stay further proceedings pending the outcome of *Whitford* and *Benisek*. ............................................................. 9

        1.    Standard of Review ......................................................... 9

        2.    Judicial economy as well as the resources of the parties will be best preserved by awaiting the Supreme Court's decisions in *Whitford* and *Benisek*. .................................................. 10

        3.    As there is insufficient time for this litigation to impact the 2018 election cycle, there is no reason for this Court to proceed before the decisions in *Whitford* and *Benisek*. ................. 11

    B.    This Court should dismiss Plaintiffs' claims as Plaintiffs do not have standing to challenge statewide redistricting plans. ........................ 14

        1.    Standard of Review ....................................................... 15

        2.    Plaintiffs lack standing to mount a statewide challenge of the type asserted in the Complaint. ....................................... 16

        3.    The League lacks associational standing. ........................... 21

IV.   CONCLUSION ..................................................................... 25

# INDEX OF AUTHORITIES

## Cases

*Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) ............... 17, 18

*Am. Life Ins. Co. v. Stewart*, 300 U.S. 203 (1937) ....................................9

*Benisek v. Lamone*, 266 F. Supp. 3d 799 (D. Md. 2017)........................14

*Benisek v. Lamone*, U.S. Supreme Court Dkt. No. 17-333............................ passim

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012) ...........................15

*Cartwright v. Garner*, 751 F.3d 752 (6th Cir. 2014)................................15

*Gill v. Whitford*, U.S. Supreme Court Dkt. No. 16-1161 ............................... passim

*Gillis v. U.S. Dep't of Health and Human Services*, 759 F.2d 565 (6th Cir. 1985) ..................................................................................22

*Gorin v. Karpan*, 775 F. Supp. 1430 (D. Wyo. 1991)..............................13

*Greater Cincinnati Coalition for the Homeless v City of Cincinnati.*, 56 F.3d 710 (6th Cir. 1994)................................................................23

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)........................23

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) .................. 21, 22

*In re Apportionment of State Legislature—1982*, 321 N.W.2d 565 (Mich. 1982) ..................................................................................5

*In re Apportionment of State Legislature—1992*, 486 N.W.2d 639 (Mich. 1992) ..................................................................................5

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936) ................................................9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................17

*Michael v. Ghee*, 325 F. Supp. 2d 829 (N.D. Ohio 2004) ........................9

*Michigan v United States*, Order, No. 1:11-cv-01938 (D.D.C. Feb. 28, 2012).........5

*Miller v. Johnson,* 515 U.S. 900 (1995)............................................................. 15, 16

*Mobile v. Bolden*, 446 U.S. 55 (1980) ...................................................................18

*NAACP v. Snyder*, 879 F. Supp. 2d 662 (2012)......................................................5

*Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856 (7th Cir. 1996) …22

*Reynolds v. Sims*, 377 U.S. 533 (1964)....................................................................4

*Rucho v. Common Cause*, Supreme Court Dkt. No. 17A745............................ 2, 14

*Shaw v. Reno*, 509 U.S. 630 (1993) ........................................................... 17, 18, 19

*Shelby County v. Holder*, 570 U.S. 529 (2013) .......................................................5

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ..................................................... 23, 25

*United States v. Hays,* 515 U.S. 737 (1995) ............................................... 17, 18, 19

*Vieth v. Jubelirer*, 541 U.S. 267 (2004).................................................... 10, 18, 19

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................ 17, 21

*Wesberry v. Sanders*, 376 U.S. 1 (1964)..................................................................4

*Wise v. Lipscomb*, 437 U.S. 535 (1978)................................................................13

*Wittman v. Personhuballah*, 136 S. Ct. 1732 (2016)..............................................17

**Statutes**

52 U.S.C. § 10304 (formerly 42 U.S.C. § 1973c) ...................................................4

Mich. Comp. Laws § 168.133...............................................................................11

Mich. Comp. Laws § 168.163...............................................................................11

Mich. Comp. Laws § 168.53.................................................................................11

Mich. Comp. Laws § 168.552...............................................................................11

Mich. Comp. Laws § 168.674...............................................................................12

Mich. Comp. Laws § 168.714...............................................................................12

Mich. Comp. Laws § 168.759a ....................................................................12

Mich. Comp. Laws § 168.93 .......................................................................11

Mich. Comp. Laws § 3.62 .............................................................................4

Mich. Comp. Laws § 3.63 ..........................................................................5, 6

Mich. Comp. Laws § 4.261 ...................................................................... 4, 5, 6

**Other Authorities**

1996 Mich. Pub. Acts 463 .............................................................................5

1999 Mich. Pub. Acts 221 .............................................................................5

Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1346 (3d.) ....................................20

**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................14

## ISSUES PRESENTED

On August 9, 2011, Governor Snyder signed legislative redistricting plans into law for the Michigan House and Senate, and for the Michigan Congressional delegation, as Public Acts 128 and 129 of 2011 (collectively, the "Redistricting Plan"). Plaintiffs—the League of Women Voters and eleven individual voters—seek to challenge the Redistricting Plan as a partisan gerrymander in violation of their Equal Protection and First Amendment rights.

I.    Should this Court stay proceedings pending the outcome of the Supreme Court's review of *Gill v. Whitford* and *Benisek v. Lamone* as the resolution of the issues pending in those two matters is likely to substantially affect or even prove dispositive of the issues presented by this litigation?

II.   Do the eleven individual Plaintiffs lack standing, as individual voters in 11 State House districts, 10 State Senate Districts, and 9 Congressional districts, to challenge the Redistricting Plan as a statewide, undivided whole?

III.  Does the Plaintiff League of Women Voters, which has alleged no impediment to carrying out its mission relative to the Redistricting Plan, lack standing to bring partisan gerrymandering claims?

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Greater Cincinnati Coalition for the Homeless v. City of Cincinnati,* 56 F.3d
    710 (6th Cir 1994)

*Miller v. Johnson,* 515 U.S. 900 (1995)

*Sierra Club v. Morton*, 405 U.S. 727 (1972)

*United States v. Hays*, 515 U.S. 737 (1995)

## I.    INTRODUCTION

Plaintiffs—the League of Women Voters (the "League") and eleven individual Democratic voters—filed a Complaint setting forth two causes of action against Secretary of State Ruth Johnson (the "Secretary") in her official capacity as a state election officer.  Plaintiffs challenge the validity, on Equal Protection and First Amendment grounds, of the electoral boundaries established by PA 128 and 129 of 2011, which established the State House and Senate district maps and the U.S. Congressional district maps used in Michigan starting with the 2012 election cycle.  (Collectively, those maps are referred to here as the "Redistricting Plan.")

The justiciability of partisan gerrymandering claims, the appropriate standards to apply to such claims, and the standing of voters to challenge statewide gerrymanders are *all* issues presented and pending before the United States Supreme Court in *Gill v. Whitford*, U.S. Supreme Court Dkt. No. 16-1161.  *Whitford* was argued before the Supreme Court on October 3, 2017 and a decision is anticipated this Term.  In its resolution of *Whitford* and another pending case—*Benisek v. Lamone*, U.S. Supreme Court Dkt. No. 17-333, which concerns the viability of First Amendment gerrymandering claims similar to those Plaintiffs seek to allege here—it is highly likely that the Supreme Court will provide judicial principles having significant impact on how this matter proceeds.

Candidate nominating petitions in Michigan are due on April 24, 2018. Thus, it is far too late for this Court to reach a resolution and implement a redistricting plan that will impact the 2018 election cycle. Consequently, there is every reason for this Court to stay further proceedings in this matter until the Supreme Court resolves *Whitford* and *Benisek*. Illustrative of this point is the Supreme Court's recent action in *Rucho v. Common Cause*, Supreme Court Dkt. No. 17A745, where, on January 18, 2018, it stayed an order of a three-judge panel that had compelled the North Carolina Legislature to develop replacement maps. In *Rucho*, the three-judge panel had *already* made a finding that the existing map was unconstitutional—still, the Supreme Court entered a stay forestalling the potential of a remedial plan being implemented for the 2018 election cycle in North Carolina.

In the event a stay is not granted, Defendant also here moves to dismiss Plaintiffs' claims for want of standing. Accepting the facts in Plaintiffs' Complaint as true for the purposes of this Motion, this Court should dismiss the Complaint because it is plain that Plaintiffs lack standing as a matter of law to bring a statewide challenge to the Redistricting Plan. At the pleading stage, standing requires allegations of a particularized and specific injury. Plaintiffs have pleaded none, instead alleging a nebulous harm because they are Democrats and not as many Democrats are elected statewide as Plaintiffs would prefer. While the Supreme Court has affirmed that voters alleging gerrymanders may do so on the basis of

harms pleaded with respect to their *own* specific district, it has not recognized standing with respect to an individual voter as to a statewide map.  Plaintiffs notably make no district-specific allegations of harm—they do not allege, for example, any individual legislator's indifference to the concerns of their constituents or that statewide gerrymandering has resulted in any legislator believing that their primary obligation is to represent only Republicans rather than all constituents.

The League cannot show standing through its members for the same reason. But further, the League lacks standing for its own part because it has not pleaded any specific impediment to its mission of educating voters and fostering civic engagement.  There is no allegation in the Complaint that the League has been hindered in reaching voters, in promoting its views on redistricting reform, or otherwise in engaging in the civic and political processes.  That the League has an "interest" in gerrymandering is insufficient to support Article III standing to challenge the Redistricting Plan.

This Court should dismiss Plaintiffs' statewide challenge to the Redistricting Plan for want of standing.

## II.   STATEMENT OF FACTS

### A.   Background of statutory provisions governing redistricting in Michigan.[1]

Michigan law required that the Legislature adopt redistricting plans no later than November 1, 2011.  Mich. Comp. Laws § 4.261; *see also* Mich. Comp. Laws § 3.62.  The Michigan Legislature proposed redistricting plans for the Michigan House and Senate in Senate Bill 498, and for the Michigan U.S. Congressional delegation in House Bill 4780.  On August 9, 2011, Governor Snyder signed the plans into law as Public Acts 128 and 129 of 2011.

Michigan's redistricting process is governed by both federal and state law.  Under federal law, Congressional districts must be approximately equal in population.  *See Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).  State House and Senate districts must similarly be relatively equal in population.  *Reynolds v. Sims*, 377 U.S. 533, 568-69 (1964).  Michigan's redistricting plans were further required to comply with the Voting Rights Act.  In 2011, this included the requirement, under § 5 of the Act, that Michigan's three redistricting plans each be submitted and "precleared" by federal authorities as not having the effect of abridging or denying minorities' rights to vote.  *See* 52 U.S.C. § 10304 (formerly 42 U.S.C. § 1973c).  On

---

[1] The history set forth in this section of the Brief is provided for background and context.  It is not necessary for the Court's resolution of the Motion.

4

February 28, 2012, a three-judge panel precleared[2] Michigan's plans for implementation. *See Michigan v United States*, Order, No. 1:11-cv-01938 (D.D.C. Feb. 28, 2012).[3]

Michigan statutory criteria also govern redistricting. Mich. Comp. Laws § 4.261. These criteria, based on principles stated in the Michigan Constitution, were recognized by the Michigan Supreme Court in 1982, and are known as the "Apol Standards" after the former director of elections, Bernard J. Apol, who drew maps for the Michigan Supreme Court that year. *See In re Apportionment of State Legislature—1982*, 321 N.W.2d 565, 583 (Mich. 1982); *see also In re Apportionment of State Legislature—1992*, 486 N.W.2d 639, 643-44 (Mich. 1992). The Apol Standards' application to State House and Senate districts was codified in

---

[2] Prior to the invalidation of preclearance requirements under Section 5 of the Voting Rights Act in *Shelby County v. Holder*, 570 U.S. 529 (2013), the Department of Justice mandated under its interpretation of the Voting Rights Act that approval would only be given to those plans maintaining, at a minimum, the existing number of majority-minority districts. This policy was applicable to the Redistricting Plan because, in 2011, statewide voting changes in Michigan required preclearance (as a result of the designation of two Michigan townships—Buena Vista Township and Allegan Township—as preclearance jurisdictions under the Voting Rights Act).

[3] In late 2011, the Detroit Branch of the NAACP and one of the individual Plaintiffs here—Frederick C. Durhal Jr. (then in his capacity as Chair of the Michigan Legislative Black Caucus)—filed a Complaint challenging the State House districts in the Redistricting Plan. That challenge was nominally brought under the Voting Rights Act, the Constitution's Equal Protection Clause, and the Constitution's One-Person, One-Vote standard. *See NAACP v. Snyder*, 879 F. Supp. 2d 662, 665 (2012). A three-judge panel dismissed those claims on the pleadings in 2012. *Id.*

1996.  1996 Mich. Pub. Acts 463.  Congressional redistricting follows largely the same standards.  *See* Mich. Comp. Laws § 3.63 (1999 Mich. Pub. Acts 221).

The Apol Standards require single member districts, and require districts to be areas of convenient territory contiguous by land.  Mich. Comp. Laws § 4.261(a)-(c); *see also* Mich. Comp. Laws § 3.63(c)(i).  They further specify that State House and Senate districts shall have population not exceeding 105% and no less than 95% of the ideal district size, with even smaller variation (102% to 98%) permitted in cities or townships with more than one district.  Mich. Comp. Laws § 4.261(d), (i).  The Apol Standards establish a hierarchy for their application.  Mich. Comp. Laws § 4.261(e)-(h); *see also* Mich. Comp. Laws § 3.63(c)(i)-(ix).  First, "district lines shall preserve county lines with the least cost to the principle of equality of population."  Mich. Comp. Laws § 4.261(e); *see also* Mich. Comp. Laws 3.63(c)(ii) ("Congressional district lines shall break as few county boundaries as is reasonably possible.")  Second, the Legislature should avoid breaking municipal boundaries to the extent possible.  Mich. Comp. Laws § 4.261(f)-(g); *see also* Mich. Comp. Laws § 3.63(c)(iv).  Only when necessary to stay within the range of allowable population divergence may the Legislature break municipal lines.  Mich. Comp. Laws § 4.261(h); *see also* Mich. Comp. Laws § 3.63(c)(v).

### B.    Plaintiffs' Allegations

The remainder of the Statement of Facts is taken from Plaintiffs' Complaint.

6

### 1.    The Parties

Plaintiffs fall into two categories.   First are the eleven named individual voters.  (Compl. ¶ 10, ECF No. 1.)  Each is alleged to be a U.S. citizen, Michigan resident, registered voter, and Democrat who votes for Democratic candidates and assists such candidates in their election efforts.  (*Id.* at ¶¶ 9-10.)  Plaintiffs reside in 11 of the State of Michigan's 110 House districts, 10 of Michigan's 38 Senate Districts, and 9 of Michigan's 14 Congressional districts.  (*Id.* at ¶ 10.)   Though Plaintiffs make no allegations concerning responsiveness or effectiveness of their actual elected representatives, these individual Plaintiffs allege that they "are being harmed by the Michigan Legislature's gerrymandering of their *individual* congressional and legislative districts" and that the "gerrymander also injures individual Plaintiffs, and all Michigan Democratic voters by diluting the collective value of their votes *statewide*."  (*Id.* (emphasis added).)

Second is the League of Women Voters ("League") which asserts that it has been "harmed in its mission, and its Democratic members are harmed in the same fashion as the individual Plaintiffs."  (Compl. ¶ 1.)  The League alleges that it is a "nonpartisan community-based statewide organization," and that its mission includes "encouraging civic engagement and nonpartisan redistricting reform."  (*Id.* at ¶¶ 7-8.)  It premises its standing on the notion that the Redistricting Plan impairs its mission by discriminating against Democratic voters by diluting their votes for

the purposes of maintaining a Republican advantage in the Michigan Legislature and congressional delegation. (*Id.* at ¶ 8.) It also asserts that the League's "Democratic members are harmed by the plans" in the same manner as the individual plaintiffs. (*Id.*) The League asserts that it has members "in almost every county in the State, including Democrats, Republicans, and independents." (*Id.* at ¶ 7.)

### 2.    The Claims

Plaintiffs' core allegation is that the Redistricting Plan diluted Democrats' voting strength, and burdened "their representational rights" because of their party affiliation. (Compl. ¶ 37.) Based on this, Plaintiffs seek to challenge the Redistricting Plan on First Amendment grounds for interference with Democratic voters' rights to free association, and on Equal Protection Grounds under the Fourteenth Amendment. The League makes no averments about how its Republican and independent members (*id.* at ¶ 7), might be harmed or why the interests of those members are not in conflict with those of its Democratic members.

Plaintiffs assert that they "challenge the Current Apportionment Plan district by district *and* in its entirety." (Compl. ¶ 36 (emphasis added).) But there are exceedingly few allegations concerning individual districts or how voters have been harmed in these individual districts. Plaintiffs complain about the shape of two House Districts and one Senate District in paragraphs 33-35 of their Complaint. (*Id.* at ¶¶ 33-35.) And some of the individual Plaintiffs (but not all) nakedly assert they

8

and other Democratic voters have been "cracked" or "packed" into three new State House or four new State Senate districts in the Redistricting Plan when compared with a plan in the prior cycle.  (*Id.* at ¶ 10.)

## III.    ARGUMENT

### A.    This Court should stay further proceedings pending the outcome of *Whitford* and *Benisek*.

#### 1.    Standard of Review

Courts have the inherent power to stay proceedings while awaiting the outcome of another matter which may have substantial effect or be dispositive.  *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 215 (1937).  The power to stay a case "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  A court considering a motion to stay should weigh the following factors: "[1] the potentiality of another case having a dispositive effect on the case to be stayed, [2] the judicial economy to be saved by waiting on a dispositive decision, [3] the public welfare, and [4] the hardship/prejudice to the party opposing the stay, given its duration."  *Michael v. Ghee*, 325 F. Supp. 2d 829, 831 (N.D. Ohio 2004).

      **2.**    **Judicial economy as well as the resources of the parties will be best preserved by awaiting the Supreme Court's decisions in *Whitford* and *Benisek*.**

The Supreme Court has two cases before it (*Gill v. Whitford*, U.S. Supreme Court Dkt. No. 16-1161, and *Benisek v. Lamone*, U.S. Supreme Court Dkt. No. 17-333) in which the very issues present here will be considered—issues that may be dispositive, or at the very least, have significant impact on the partisan gerrymandering claims asserted in the Complaint.

After the Supreme Court was unable in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), to identify constitutional standards applicable to partisan gerrymanders (but nonetheless continued to consider that there *may* be justiciable controversies), the judiciary has struggled with how to adjudicate such matters. In *Whitford*, the Supreme Court has before it an appeal from the divided three-judge panel redistricting decision in Wisconsin; the Supreme Court held oral argument on October 3, 2017. Dozens of briefs amici curiae have since been filed, and a decision is expected before the end of the term. More recently, on December 8, 2017, an appeal was filed in *Benisek*. The Supreme Court has indicated that it will set the case for argument but that has not yet been scheduled.

The issues before the Court in *Whitford* and *Benisek* include not only whether partisan gerrymander plaintiffs have standing to challenge statewide redistricting plans (the core issue in Defendant's Motion to Dismiss), but also:

- Whether partisan gerrymander claims (like Plaintiffs') are justiciable;

- If justiciable, whether manageable and appropriate standards exist to assess such claims; and

- Whether First Amendment claims are viable with respect to alleged partisan gerrymanders.

Judicial economy is well served by awaiting instruction. The resolutions in *Whitford* and *Benisek* are likely to impact every stage of these proceedings, from discovery to dispositive motions to trial. If this matter proceeds to trial, it will most likely require expert witnesses, cross-examinations, and the collaborative scheduling of the three different chambers of the judges assigned to this Panel. For these reasons, both the parties and the Panel are best served by awaiting the Supreme Court's guidance.

> **3.   As there is insufficient time for this litigation to impact the 2018 election cycle, there is no reason for this Court to proceed before the decisions in *Whitford* and *Benisek*.**

Whether this Court delays consideration in this matter until after the Supreme Court issues its decisions or not, the Redistricting Plan cannot be revised for the 2018 cycle. There is simply no way this Panel can conclude this litigation and (assuming a favorable result to Plaintiffs) develop a remedy in time for Michigan's 2018 election cycle. There is thus no reason to expedite this litigation and every reason to hold it in abeyance until the Supreme Court resolves *Whitford* and *Benisek*.

Though the 2018 general election will not be held until November 6, district plans must be in place long before then as a myriad of requirements depend on those

plans. In truth, the primary election process is already well underway. Candidates must file nominating petitions in a mere three months—*i.e.*, by April 24, 2018 (*see* Mich. Comp. Laws §§ 168.53, .93, .133, .163)—and thus candidates and party strategists have already relied on the Redistricting Plan in fundraising, circulating candidate nominating petitions, campaigning, and otherwise making plans for 2018.[4]

The April 24 nominating deadline is merely the first of a number of choreographed acts that must occur in the state well in advance of the general election. The board of state canvassers has until June 5 to entertain challenges to nominating petitions and to complete its canvass of nominating petitions; the Secretary of State must then certify candidates by June 8. Mich. Comp. Laws § 168.552. Polling places must be established by June 8, and military and overseas ballots must be printed by June 23 for the August 7 primary election. Mich. Comp. Laws § 168.759a. Absentee ballots must be printed and delivered to local clerks by the same date. Mich. Comp. Laws § 168.714. Well before the August 7 primary election, local precinct inspectors must be appointed by local election commissions, and election supplies including ballots must be distributed to local clerks. Mich. Comp. Laws §§ 168.674, .714.

---

[4] The Michigan Secretary of State publishes a guide listing Filing Requirements for Federal and State Elective Offices. That guide sets forth a more complete summary of Michigan's election timeline. A copy is available to the public at the following address: http://www.michigan.gov/documents/sos/2018_Dates_600221_7.pdf (last accessed January 19, 2018).

In short, Michigan's statutorily-defined election calendar for the statewide primary election has already commenced. If this matter requires a trial (with discovery, experts, and cross-examination as was true in *Whitford*), it is impossible for that trial to be concluded, this Court to render a decision, and for a remedy to be developed and implemented without fatal disruption to the 2018 election calendar.

The longstanding principle of judicial deference to redistricting by state legislatures is also crucially important to understanding *why* Plaintiffs' Complaint is too late to affect the 2018 election cycle. Ultimately, the state legislature, and not the federal court, is "the best institution to identify and then reconcile traditional state policies within the constitutionally mandated framework" identified by the court. *Gorin v. Karpan*, 775 F. Supp. 1430, 1445-46 (D. Wyo. 1991) (quotation omitted). The Supreme Court has thus made it plain that "[w]hen a federal court declares an existing apportionment scheme unconstitutional, it is . . . appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978).

Redistricting through the legislative process takes time. Assuring that maps comply with the multifaceted rubric of federal and state requirements, *as well as* any new standards that might be announced by this Court, *takes time*.

13

The Supreme Court stayed the district court's order in *Whitford*, which had directed the state legislature to enact a remedial plan by November 1, 2017. The district court in *Benisek* also stayed further proceedings, in part to await the decision in *Whitford*, but also because it did not see sufficient time in August of 2017 to develop and implement a remedy before the 2018 election cycle in Maryland. *Benisek v. Lamone*, 266 F. Supp. 3d 799, 815 (D. Md. 2017).

The Supreme Court has further signaled that district courts should await instruction before proceeding in partisan gerrymandering disputes. Just days before this Motion was filed, on January 18, 2018, the Supreme Court issued a stay in *Rucho v. Common Cause*, U.S. Supreme Court Dkt. No. 17A745, forestalling another three judge panel's recent order that had required the North Carolina Legislature to replace maps, which were held unconstitutional, before the 2018 election cycle in that state.

Of particular importance, Plaintiffs' Complaint *does not specifically ask this Court for relief in the 2018 cycle*. To the extent Plaintiffs had hoped for same, they have filed too late. Given the late date that this Complaint was filed, there is no reason for this Court to proceed before the Supreme Court has spoken.

**B.    This Court should dismiss Plaintiffs' claims as Plaintiffs do not have standing to challenge statewide redistricting plans.**

For the reasons stated above, this Court should hold this matter in abeyance. Further evaluation by this Court of the arguments in this Motion to Dismiss is unnecessary at this time if the Court issues the requested stay.

14

### 1.    Standard of Review

Fed. R. Civ. P. 12(b)(1) provides the means for a party to assert lack of subject matter jurisdiction as a defense to a Complaint and to seek dismissal. In a "facial" attack (as opposed to a "factual" attack), a Rule 12(b)(1) motion challenges the sufficiency of the pleading itself. *See Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). In a standing challenge, a "facial" attack goes to the question of "whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for the purposes of Rule 12(b)(1) analysis." *Id.* Though standing must ultimately be assessed at all stages of the litigation, to survive a facial challenge and allege jurisdiction, the Complaint "must contain non-conclusory facts which, if true, establish that the district court ha[s] jurisdiction over the dispute." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012).

In a redistricting case, courts must presume the Legislature's good faith and "exercise extraordinary caution" when deciding to review adopted plans. *Miller v. Johnson,* 515 U.S. 900, 915-16 (1995). As redistricting is "primarily the duty and responsibility of the State," judicial review of state redistricting legislation "represents a serious intrusion on the most vital of local functions." *Id.* at 915 (quotation omitted). "[C]ourts must . . . recognize . . . the intrusive potential of judicial intervention into the legislative realm, when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages

of litigation and determining whether to permit discovery or trial to proceed." *Id.* at 916-17.

### 2. Plaintiffs lack standing to mount a statewide challenge of the type asserted in the Complaint.

As noted above, though Plaintiffs assert that they challenge the Redistricting Plan "district by district" and as a statewide whole (*see* Compl. ¶ 36), Plaintiffs have in fact made no effort to plead a "district by district" challenge. There is no allegation of district-specific harm. Plaintiffs do not allege, for example, that any particular legislator has been or will be indifferent to their Democratic constituents, or that any Plaintiff has been stigmatized by classification as a Democrat. (Michigan notably does not require or for that matter permit voters to register by party.) Further, of the 30 voter districts in which individual Plaintiffs reside, fully 14 are currently represented by (or in the last election cycle elected) Democrats.

Plaintiffs could not possibly bring particularized claims "district by district" in any event, as they do not allege that they reside in every district in the State. Individual Plaintiffs live in only 11 of Michigan's 110 House districts, 10 of its 38 Senate Districts, and 9 of Michigan's 14 Congressional districts. (Compl. ¶ 10.) The League asserts that it has members in "almost" every county (*Id.* at ¶ 5), but it has not pleaded that it has members in each district capable of mounting a "district by district" challenge of the nature asserted (and regardless, the League has not identified particularized harms suffered by its members in any district in the State).

16

Standing is the "threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  A party invoking jurisdiction can establish Article III standing only by showing that he or she has suffered an "injury in fact," that the injury is "fairly traceable" to the challenged conduct, and that the injury is likely to be "redressed" by a favorable decision. *Wittman v. Personhuballah*, 136 S. Ct. 1732, 1733 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). To establish an "injury in fact," a plaintiff must allege an "actual or imminent" invasion of a legally protected interest which is "concrete *and particularized*" in that it "affect[s] the plaintiff in a personal and individual way." *Lujan,* 504 U.S. at 560 & n.1 (emphasis added) (quotation omitted).

The Supreme Court has never recognized particularized harm—and thus has never recognized standing—to exist for a statewide gerrymandering claim.  On repeated occasions, voters seeking to challenge statewide redistricting maps on the basis of gerrymandering (albeit in the racial gerrymandering context) have been rebuffed for the simple reason that they cannot, as a matter of law, allege a particularized injury as to the entire plan. *See United States v. Hays,* 515 U.S. 737, 744 (1995); *Shaw v. Reno*, 509 U.S. 630, 648 (1993); *see also Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015).

The Supreme Court has explained that "[d]emonstrating the individualized harm our standing doctrine requires" is not easy in the gerrymandering context

17

because it will "frequently be difficult to discern why a particular citizen was put in one district or another." *Hays*, 515 U.S. at 744.  The only voter harms recognized to support standing in such cases are: (1) impermissible racial classification, and (2) representation harms where a legislator misperceives that his or her primary obligation is to represent only the members of a particular group or the party drawing the district's maps, rather than the district's voters.  *See Ala. Legislative Black Caucus,* 135 S. Ct. at 1265; *Shaw*, 509 U.S. at 648.  These harms are necessarily district-specific—*i.e.*, they only directly harm "voter[s] who live[] in the district attacked," and thus plaintiffs in such cases only have standing to challenge their gerrymandering as to their own districts, and not an entire plan as an "undifferentiated whole." *Ala. Legislative Black Caucus*, 135 S. Ct. at 1265-66 (emphasis omitted).

The same harm analysis must apply in partisan gerrymandering cases.[5]  *See Vieth*, 541 U.S. at 327-28 (Stevens, J., dissenting).  It would be bizarre to permit partisan-gerrymandering plaintiffs to assert a statewide challenge but limit racial-gerrymandering challenges to district-by-district challenges.  *See id.* As to

---

[5] As Justice Stevens noted in *Vieth* and elsewhere, "[g]errymanders necessarily rest on legislators' predictions that 'members of certain identifiable groups will vote in the same way. . . . In the line drawing process, racial, religious, ethnic, and economic gerrymanders are all species of political gerrymanders.'"  *Vieth*, 541 U.S. at 326 (Stevens, J., dissenting) (quoting *Mobile v. Bolden*, 446 U.S. 55, 87 (1980) (Stevens, J., concurring)).

18

classification (equal protection) harms, only a voter living in a district that is a result of partisan-gerrymandering could possibly be "denied equal treatment because of the legislature's reliance on" partisan criteria. *Hays*, 515 U.S. at 744-45.

A similar analysis applies to Plaintiffs' First Amendment associational claims. That is, in racial gerrymandering cases, plaintiffs allege that they have been deprived of the ability—due to racial gerrymandering—to come together with other persons of their own race to elect their preferred representatives. The resulting harm is representational: "[w]hen a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Shaw*, 509 U.S. at 648. And this "disruption of the representative process" is necessarily district specific. *Vieth*, 541 U.S. at 330 (Stevens, J., dissenting) (citing, *inter alia*, *Hays*, 515 U.S. at 745).

Plaintiffs' First Amendment claims start from the same representational injury premise—*i.e.*, that Democrats cannot, in a gerrymandered district, associate with other Democrats to elect their preferred candidate. The harm analysis must follow suit. As with racial gerrymandering, the only cognizable harm is a district-specific "disruption" when a representative misapprehends that their primary purpose is to represent, e.g., only Republicans (rather than their entire constituency). Without district-specific representational harm, Democrats seeking to complain about

19

"statewide" harms from associational limitations make only a generalized grievance, insufficient to support Article III standing. *See id.* at 328-30 (Stevens, J., dissenting.)

Michigan voters, including Plaintiffs and the League's members, vote for individual representatives, senators, and congressional delegates—not for parties. Voters are not required or permitted to report party affiliation when voting in Michigan, and even those voters that identify with one party or another may split their ballot or change allegiances from election to election. Plaintiffs' Complaint is devoid of allegations that the representatives elected in their districts are inaccessible or ineffective on behalf of their constituents as a result of a partisan gerrymandering. Each district has its own history, its own interests, and its own political role to play in its respective legislative body. Against this backdrop, Plaintiffs cannot maintain a challenge to the Redistricting Plan on a statewide[6] basis.

The claims alleged are premised on precisely the type of generalized harms long found insufficient to maintain gerrymandering claims, and should be dismissed.

---

[6] Though Plaintiffs facially assert that they challenge the entirety of the Redistricting Plan "district by district," (*see* Compl. ¶ 36), the two counts in Plaintiffs' complaint are addressed to challenging the constitutionality of the entire Senate, House and Congressional districting plans. As noted above, Plaintiffs make no allegations of district-specific harm to support standing even on their district-specific claims, but to the extent Plaintiffs can be said to have *thinly* pleaded claims as to one or more of the districts in which they reside, Defendant believes her obligation to respond to such claims are tolled by this Motion. *See* Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1346 (3d.). If this Court believes particularized district claims are not tolled by this motion, Defendant asks that this Court grant an extension of time to answer after the Court has resolved Defendant's Motion to Dismiss for want of standing.

20

### 3.     The League lacks associational standing.

#### a)     The League lacks standing to sue on behalf of its members.

The League lacks standing to sue on behalf of its members.  An organization has standing to sue on behalf of its members where (1) "its members would otherwise have standing to sue in their own right," (2) the interests the organization "seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  As stated above, individual voters lack standing to bring statewide partisan-gerrymandering challenges because they cannot allege particularized harms outside of their own districts.  Because no single voter member can allege statewide standing, the League cannot rely on the standing of its individual members to satisfy the first prong.  *See Warth*, 422 U.S. at 511 (1975) ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case *had the members themselves* brought suit.") (emphasis added).

Further, the League alleges in the Complaint that it has independent and Republican members.  (Compl. ¶ 7.)  It is no great leap of logic that its Republican members may oppose the League's position here and may seek to intervene in this

21

suit to protect their interests, contrary to the third prong in *Hunt*.[7]  The League makes no allegations that even the majority of its members support this litigation (which suggests it cannot satisfy the germaneness requirement), and no allegation that its involvement in this litigation was approved through its normal procedures. *See Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 865 (7th Cir. 1996) ("A plaintiff can defeat a . . . conflict challenge by showing that the litigation . . . was properly authorized.")  Notwithstanding that the League cannot satisfy the first prong of the *Hunt* test as it has no individual voters capable of establishing Article III standing for a statewide gerrymandering claim, the conflicts suggested by the League's pleadings and the existence of its Republican and independent membership demonstrate that the League also cannot establish other requirements for associational standing.

b)    **The League lacks standing to sue on its own behalf.**

Where an organization cannot establish standing through its individual members, an organization may nonetheless premise standing on a particularized institutional harm to *itself*.  But to do so, it must establish that its ability to further

---

[7] This case is thus *unlike* the factual predicate set forth in *Gillis v. U.S. Dep't of Health and Human Services*, where there was but a speculative and theoretical conflict between different industry members in a trade group.  759 F.2d 565, 572 (6th Cir. 1985).  Republicans and Democrats have an obvious and substantial conflict in litigation over partisan gerrymandering claims.

22

its organizational goals has been "perceptibly impaired" so as to "constitute[] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding institutional harm where an association providing counseling and referral services for low- and moderate-income home-seekers had to devote significant resources to identify and counteract racially discriminatory steering practices by defendant). Thus, for example, a coalition with the mission of providing relief to the homeless or educating the public about the plight of the homeless does not have standing on that basis alone to challenge a municipal ordinance that restricts panhandling. *Greater Cincinnati Coalition for the Homeless v City of Cincinnati*., 56 F.3d 710, 716-17 (6th Cir. 1994). While such an association may wish that panhandling was permitted or see harm to those it seeks to serve as a result of a panhandling ban, as the Supreme Court has long recognized, a mere interest in a problem is not sufficient to confer standing upon an organization. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

The League here fails to allege any impairment in its mission. Like the coalition in *Greater Cincinnati*, the League may have a broad interest in the issue of partisan gerrymandering, but it has alleged no specific harm to the organization or inability to advance its stated purposes.

The League defines its mission in the Complaint as "encouraging its members and the people of Michigan to exercise their right to vote." (Compl. ¶ 7.) The

Redistricting Plan does not restrict the League's ability to continue to do so in any sense. (A gerrymandered map, regardless, does not affect the franchise—*i.e.*, a voter in a district that is allegedly gerrymandered is not prevented from accessing or casting a ballot.) The League asserts further that its mission "is to promote political responsibility through informed and active participation in government and to act on selected governmental issues." (*Id.*) Again, nothing about a partisan-gerrymander prevents the League from seeking to encourage voter participation or from acting in the political sphere on governmental issues. With or without a partisan gerrymander, the League may still, as before the 2011 Redistricting Plan came into effect, "act on selected governmental issues" through the political process.

The League finally alleges that its local leagues "host[] public forums and open discussions on issues of importance to the community, including partisan gerrymandering," and that "[i]ndividual League members invest substantial time and effort in voter training and civic engagement activities, including voter registration and non-partisan voter guides." (Compl. ¶ 7.) There is no allegation in the Complaint whatsoever that the League's efforts in this regard (or those of its individual members) are hampered by the existence of a partisan gerrymander (either statewide or in any particular district). Whether a partisan gerrymander exists or not, the League can continue to host forums, educate the public on gerrymanders, and encourage voters to participate in the civic process. Like any other interest

group, the League could encourage voters to act through the political process to promote political reforms (including reforms to the redistricting process). Whether or not the League is successful in these endeavors is irrelevant to whether it has suffered harm sufficient to challenge a statewide Redistricting Plan as a partisan gerrymander. The League's "particular interest" in gerrymandering is still a mere interest in a problem, and not a particularized harm sufficient to support Article III standing. *See Sierra Club*, 405 U.S. at 739.

The League's claims should be dismissed for lack of standing as well.

## IV.    CONCLUSION

Wherefore, for the reasons set forth herein, Defendant Ruth Johnson respectfully requests that this Court stay this action pending a final decision in *Whitford* and *Benisek*, or, in the alternative, that her Motion to Dismiss be granted.

Respectfully submitted,

DICKINSON WRIGHT PLLC

/s/ Robert P. Young
Robert P. Young
Attorneys for Defendant

Dated: January 23, 2018

25

**Certificate of Service**

I hereby certify that on January 23, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

Respectfully submitted,

/s/Robert P. Young (P28789)

Dated: January 23, 2018

LANSING 529490

26