# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF MICHIGAN, ROGER J. BRDAK, FREDERICK C. DURHAL, JR., JACK E. ELLIS, DONNA E. FARRIS, WILLIAM "BILL" J. GRASHA, ROSA L. HOLLIDAY, DIANA L. KETOLA, JON "JACK" G. LASALLE, RICHARD "DICK" W. LONG, LORENZO RIVERA and RASHIDA H. TLAIB, | ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:17-cv-14148 <br><br> Hon. Eric L. Clay <br> Hon. Denise Page Hood <br> Hon. Gordon J. Quist <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO STAY AND TO DISMISS** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| RUTH JOHNSON, in her official Capacity as Michigan Secretary of State, | ) ) ) ) | |
| Defendant. | ) ) | |

Joseph H. Yeager, Jr. (IN 2083-49)
Harmony A. Mappes (IN 27237-49)
Jeffrey P. Justman (MN 390413)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Fax: 317-237-1000
Jay.Yeager@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
Fax: 248-483-3131
MBrewer@goodmanacker.com

*Counsel for Plaintiffs*

## Plaintiffs' Response to Defendant's
## Motion to Stay and to Dismiss for Lack of Standing

Defendant, Secretary of State Ruth Johnson, in her official capacity, moved to stay further proceedings in this matter and to dismiss Plaintiffs' challenge to Michigan's redistricting plans for lack of standing to challenge a statewide plan. (Doc. No. 11.) Plaintiffs oppose both motions.

A stay is not necessary or appropriate. The Secretary argues that the case should be stayed until the Supreme Court decides *Gill v. Whitford*, U.S. Supreme Court Dkt. No. 16-1161, and *Benisek v. Lamone*, United States Supreme Court Dkt. No. 17-333. While the Court's resolution of those cases will likely be relevant, the mere fact that those cases are currently before the Court does not satisfy the high burden of entirely halting this litigation, potentially for many months. And there is, of course, no guarantee that the decisions in *Whitford* and *Benisek* will provide any concrete guidance at all. The delay the Secretary seeks will all but ensure that relief cannot be afforded in time to impact the 2020 elections. Moreover, even assuming the outcome of *Whitford* or *Benisek* is instructive here, that is no reason to delay fact discovery, which will be focused on the issue of intent and which is extremely likely to be relevant under any standard announced by the Court.

The Secretary's motion to dismiss is equally unfounded. Both the individual plaintiffs and the League of Women Voters of Michigan have stated a sufficiently concrete and particularized injury in fact. The Supreme Court has already expressly

held that a statewide challenge to a partisan gerrymander was justiciable, and other recent district court decisions have upheld a plaintiff's standing to challenge partisan gerrymanders on a statewide basis in circumstances similar to this case. This Court should reach the same conclusion.

For these reasons, explained more fully in the brief filed herewith, the Secretary's Motion to Stay and Motion to Dismiss should be denied. In support of this Response, Plaintiffs rely on the pleadings on file with the Court, and the facts, law and arguments contained in the accompanying Brief in Support of Plaintiffs' Response.

Respectfully submitted,

Date:  February 6, 2018          /s/ Joseph H. Yeager, Jr.

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
Fax: 248-483-3131
MBrewer@goodmanacker.com

Joseph H. Yeager, Jr. (IN Bar No. 2083-49)
Harmony A. Mappes (IN Bar No. 27237-49)
Jeffrey P. Justman (MN Bar No. 390413)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Fax: 317-237-1000
Jay.Yeager@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

*Counsel for Plaintiffs*

### Certificate of Service

I hereby certify that on February 6, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

Respectfully submitted,

/s/ Joseph H. Yeager, Jr.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS )
OF MICHIGAN, ROGER J. BRDAK,)
FREDERICK C. DURHAL, JR., )
JACK E. ELLIS, DONNA E. )
FARRIS, WILLIAM "BILL" J. )
GRASHA, ROSA L. HOLLIDAY, )
DIANA L. KETOLA, JON "JACK" )
G. LASALLE, RICHARD "DICK" )
W. LONG, LORENZO RIVERA )
and RASHIDA H. TLAIB, )
                                          )
                    Plaintiffs, )
                                          )
        v.                              )
                                          )
RUTH JOHNSON, in her official )
Capacity as Michigan )
Secretary of State, )
                                          )
                    Defendant. )

No. 2:17-cv-14148

Hon. Eric L. Clay
Hon. Denise Page Hood
Hon. Gordon J. Quist

**PLAINTIFFS' BRIEF IN
SUPPORT OF RESPONSE TO
DEFENDANT'S MOTION TO
STAY OR DISMISS**

---

Joseph H. Yeager, Jr. (IN 2083-49)
Harmony A. Mappes (IN 27237-49)
Jeffrey P. Justman (MN 390413)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Fax: 317-237-1000
Jay.Yeager@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
Fax: 248-483-3131
MBrewer@goodmanacker.com

*Counsel for Plaintiffs*

# Table of Contents

Issues Presented.................................................................................... vii

Controlling or Most Appropriate Authorities.................................... viii

I.    The Motion to Stay should be denied. ...................................... 3

    A.    Staying the case would impose a hardship on the Voters and none on the Secretary. ............................................................... 5

        1.    Granting a stay would cause extreme hardship to the Voters by making it extremely unlikely that they could secure a remedy in time to impact the 2020 elections. ........................................ 6

        2.    Allowing the case to proceed will not work a hardship to the Secretary.......................................................................... 10

    B.    The potential effect of *Whitford* and *Benisek* is no reason to grant a stay................................................................................... 11

    C.    A stay would not promote judicial economy. ............................. 13

    D.    It is in the public interest to allow the Voters to vindicate their constitutional rights................................................................. 13

II.   The Voters have standing; the Motion to Dismiss should be denied. ................. 14

    A.    The Secretary misstates the legal standard. ................................. 14

    B.    The individual Voters have standing under both the First Amendment and the Equal Protection Clause. ............................ 15

        1.    The individual Voters have standing to assert their equal protection claim. ................................................................. 18

        2.    The individual Voters have standing to assert their First Amendment claim. ............................................................. 25

        3.    The racial gerrymandering cases the Secretary relies on are inapposite.......................................................................... 27

    C.    The League of Women Voters has associational standing........................ 30

        1.    The League has standing as a representative of its members............. 31

        2.    The League has standing in its own right. ............................... 34

    CONCLUSION ...................................................................... 36

US.116378776.02

# Table of Authorities

**Page(s)**

**FEDERAL CASES**

*ACLU v. Nat'l Security Agency,*
  493 F.3d 644 (6th Cir. 2007) ...................................................................... 15

*Ala. Legislative Black Caucus v. Alabama,*
  135 S. Ct. 1257 (2015) ....................................................... 27, 28, 29, 36

*Alley v. Little,*
  181 F. App'x 509 (6th Cir. 2012) .............................................................. 10

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) .................................................................................. 26

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
  135 S. Ct. 2652 (2015) ........................................................................ 1, 22

*Baker v. Carr,*
  369 U.S. 186 (1962) ............................................................................. 3, 20

*Bd. of Estimate of City of N.Y. v. Morris,*
  489 U.S. 688 (1989) .................................................................................. 26

*Binno v. Am. Bar Ass'n,*
  826 F.3d 338 (6th Cir. 2016) .................................................................... 14

*Brown v. Board of Ed. of Topeka,*
  347 U.S. 483 (1954) .................................................................................. 28

*Carrington v. Rash,*
  380 U.S. 89 (1965) .................................................................................... 20

*Caspar v. Snyder,*
  77 F. Supp. 3d 616 (E.D. Mich. 2015) ............................................ 4, 11, 13

*Citizens for Legislative Choice v. Miller,*
  144 F.3d 916 (6th Cir. 1998) .................................................................... 32

*Coal for Educ. In Dist. One v. Bd. of Elections,*
  370 F. Supp. 42 (S.D.N.Y. 1974) ................................................................ 9

US.116378776.02

*Common Cause v. Rucho*,
    2017 WL 3981300 (M.D.N.C. Sept. 8, 2017) .................................................. 8, 9, 12

*Daubenmire v. City of Columbus*,
    507 F.3d 383 (6th Cir. 2007) ....................................................................... 14

*Davis v. Bandemer*,
    478 U.S. 109 (1986) ............................................................................... passim

*Doe v. Porter*,
    370 F.3d 558 (6th Cir. 2004) ....................................................................... 31

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................... 25, 26

*F.T.C. v. E.M.A. Nationwide, Inc.*,
    767 F.3d 611 (6th Cir. 2014) ......................................................................... 5

*Fla. State Conference of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ................................................................... 35

*Flast v. Cohen*,
    392 U.S. 83 (1968) ..................................................................................... 21

*Ga. State Conference of NAACP v. State*,
    269 F. Supp. 3d 1266 (N.D. Ga. 2017) ....................................................... 12

*Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*,
    56 F.3d 710 (6th Cir. 1994) ......................................................................... 34

*Green Party of Tenn. v. Hargett*,
    767 F.3d 533 (6th Cir. 2014) ....................................................................... 26

*Hager v. Pike Cnty. Bd. of Educ.*,
    286 F.3d 366 (6th Cir. 2002) ....................................................................... 25

*Hartman v. Moore*,
    547 U.S. 250 (2006) ................................................................................... 25

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ................................................................................... 34

*Int'l B'hood of Elec. Workers, Local Union No. 20 v. AT & T Network Sys.*,
    879 F.2d 864, 1989 WL 78212 (6th Cir. 1989) ................................... 5, 10, 11

US.116378776.02

*Johnson v. Mortham,*
915 F. Supp. 1529 (N.D. Fla. 1995) ................................................................. 8

*Kardules v. City of Columbus,*
95 F.3d 1335 (6th Cir. 1996) ........................................................................... 18

*Landis v. North American Co.,*
299 U.S. 248 (1936) ..................................................................... 3, 4, 10, 11

*Larios v. Cox,*
305 F. Supp. 2d 1335 (N.D. Ga. 2004) ............................................................ 8

*League of United Latin Am. Citizens (LULAC) v. Perry,*
548 U.S. 399 (2006) ..................................................................... 12, 23, 29

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ................................................................................. 14, 16

*Mich. Bldg. & Const. Trades Council, AFL-CIO v. Snyder,*
846 F. Supp. 2d 766 (E.D. Mich. 2012) ......................................................... 32

*Miller v. Johnson,*
515 U.S. 900 (1995) ................................................................................. 14, 15

*MX Grp., Inc. v. City of Covington,*
293 F.3d 326 (6th Cir. 2002) .......................................................................... 30

*NAACP, Detroit Branch v. Detroit Police Officers Ass'n,*
525 F. Supp. 1215 (E.D. Mich. 1981) ............................................................. 33

*Nat'l Council of La Raza v. Cegavske,*
800 F.3d 1032 (9th Cir. 2015) ......................................................................... 35

*Nat'l Lime Ass'n v. EPA,*
233 F.3d 625 (D.C. Cir. 2000) ........................................................................ 32

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
508 U.S. 656 (1993) ......................................................................................... 18

*Ohio Envtl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.,*
565 F.2d 393 (6th Cir. 1977) ......................................................................... 4, 9

US.116378776.02

*Parsons v. U.S. Dep't of Justice,*
    801 F.3d 701 (6th Cir. 2015) ........................................................................ 14

*Personhuballah v. Alcorn,*
    155 F. Supp. 3d 552 (E.D. Va. 2016) ............................................................. 9

*Retired Chi. Police Ass'n v. City of Chi.,*
    76 F.3d 856 (7th Cir. 1996) .......................................................................... 33

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ..............................................................................passim

*Roe v. Snyder,*
    240 F. Supp. 3d 697 (E.D. Mich. 2017) .............................................9, 10, 13

*Rucho v. Common Cause,*
    240 F. Supp. 3d 376 (M.D.N.C. 2017) ....................................................passim

*Rutan v. Republican Party of Ill.,*
    497 U.S. 62 (1990) ........................................................................................ 25

*Sandusky Cnty. Democratic Party v. Blackwell,*
    387 F.3d 565 (6th Cir. 2004) ........................................................................ 33

*Shapiro v. McManus,*
    203 F. Supp. 3d 579 (D. Md. 2016) .............................................................. 25

*Shaw v. Hunt,*
    517 U.S. 899 (1996) (Stevens, J., dissenting) (*Shaw II*) ....................28, 31, 32

*Shaw v. Reno,*
    509 U.S. 630 (1993) (*Shaw I*)..................................................................27, 28

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ........................................................................................ 15

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ..................................................................................21, 29

*United States v. Hays,*
    515 U.S. 737 (1995) ......................................................................27, 28, 29, 30

*Vieth v. Jubelirer,*
    541 U.S. 267 (2004) ..............................................................................passim

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................ 14, 31

*Wesberry v. Sanders*,
    376 U.S. 1 (1964) ......................................................................... 18

*Whitcomb v. Chavis*,
    403 U.S. 124 (1971) ...................................................................... 18

*Whitford v. Gill*,
    218 F. Supp. 3d 837 (W.D. Wis. 2016) ................................... passim

*Whitford v. Nichol*,
    151 F. Supp. 3d 918 (E.D. Wis. 2015) ..................................... 23, 24

*Williams v. Rhodes*,
    393 U.S. 23 (1968) ....................................................................... 26

**STATE STATUTES**

Mich. Comp. Laws Ann. §§ 168.133 ..................................................... 7

Mich. Comp. Laws § 168.534 ............................................................... 7

**RULES**

Fed. R. Civ. P. 1 ................................................................................. 4

Fed. R. Civ. P. 12(b)(1) ..................................................................... 14

**CONSTITUTIONAL PROVISIONS**

First Amendment ....................................................................... passim

Fourteenth Amendment .................................................................... 20

**OTHER AUTHORITIES**

http://www.michigan.gov/documents/sos/2018_Dates_600221_7.pdf
    (last visited Feb. 6, 2018) ............................................................... 7

US.116378776.02

## Issues Presented

The League of Women Voters of Michigan (the "League") and eleven individual plaintiffs (collectively, the "Voters") filed this case against the Michigan Secretary of State in her official capacity alleging that the redistricting maps she administers for the state senate, the state house, and the federal congressional districts each constitute an unconstitutional partisan gerrymander in violation of both the Equal Protection Clause and the First Amendment of the United States Constitution. Finding that "Plaintiffs have sufficiently stated substantial constitutional claims in their Complaint," a three-judge panel has been appointed to hear the case. The Secretary moved to stay the case or, in the alternative, dismiss the case for lack of standing. The Voters oppose both motions.

1. The motion to stay should be denied because the Secretary has not met her high burden to make out a clear case of hardship or inequity in being required to go forward with the litigation and show that neither the other party nor the public will suffer harm from a stay. This is so particularly in light of the relatively short timeline to the 2020 elections and the nature of the discovery, which will constitute the first phase of the case.

2. The motion to dismiss the individual Voters' claims should be denied because the Complaint alleges that they have suffered a particularized and specific injury sufficient to confer standing to challenge the redistricting maps on a statewide basis.

3. The motion to dismiss the League's claims should be denied because the Complaint alleges both standing derivatively as the representative of its members and in its own right by virtue of an injury to the League's organizational interests.

US.116378776.02

## Controlling or Most Appropriate Authorities

*Davis v. Bandemer,* 478 U.S. 109, 125 (1986)

*Landis v. North American Co.*, 299 U.S. 248 (1936)

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)

*Reynolds v. Sims,* 377 U.S. 533, 565 (1964)

*Vieth v. Jubelirer*, 541 U.S. 267 (2004)

*Ohio Envtl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393 (6th Cir. 1977)

*Common Cause v. Rucho,* --- F. Supp. 3d ---, 2018 WL 341658 (M.D.N.C. Jan. 9, 2018), *stayed pending appeal*, 2018 WL 472142 (2018)

*Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016), *stayed pending appeal,* 137 S. Ct. 2289 (2017)

US.116378776.02

**Voters' Brief in Support of Response to the
Secretary's Motion to Stay and Motion to Dismiss for Lack of Standing**

In this case, justice delayed would truly be justice denied. After administering Michigan elections since 2012 under unconstitutional partisan gerrymanders of the legislative and congressional districts, the Secretary of State now seeks to "run out the clock" and deny millions of Michigan voters relief from those gerrymanders for the entire decade.

The League of Women Voters of Michigan (the "League") and eleven individual plaintiffs (collectively, the "Voters") have pled in detail how the Michigan legislature abused the power of the state in 2011 to entrench the party in power and to dilute the voting power of the opposing party. The 2011 gerrymanders have worked as designed. Because of them, the party in power has maintained consistent control of both houses of the legislature by large margins (in one house, a supermajority), and has consistently held nine of the fourteen seats in the Michigan congressional delegation, despite the fact that the party in power has only occasionally won even the barest majority of the vote in this competitive two-party state. This is precisely the problem that Justice Ginsberg described recently when, writing for a majority of the Court, she explained that gerrymandering threatens a "'core principle of republican government,' namely, 'that the voters should choose their representatives, not the other way around.'" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015) (internal citations omitted).

US.116378776.02

The Voters ask for the Court's aid in remedying this wrong – which by its nature is not subject to the usual correctives of the electoral process. They seek a remedy for the 2020 election, not the 2018 election. The State, acting through the Defendant (the "Secretary"), has predictably asked the Court either to stay the case until a remedy for the critical year of 2020 cannot be implemented, or to dismiss the case altogether on the often-tried-but-never-successful defense that voters do not have constitutional standing to challenge partisan gerrymanders.

The Voters detail below why the law offers no basis to stay this case. That other gerrymandering cases are now before the Supreme Court means only that the law will be clarified soon, not that the wheels of justice in this Court must creak to a halt with the effect of depriving the Voters of their remedy merely by delay. To the contrary, whatever the Supreme Court says in the coming weeks or months, intent will likely remain highly relevant to these cases. It is at that issue that the great majority of the Voters' initial discovery in this case will be aimed. The Secretary has not rebutted the strong presumption against a stay pending other litigation.

Finally, the Secretary's challenge to the Voters' standing should be rejected out of hand. More than half a century of federal decisions reflect the reality that voters have standing to challenge deprivations of representational rights arising from unconstitutional statewide redistricting plans. From the early 1960s through the present, federal courts have always implicitly or expressly recognized voters' standing

2

to challenge a state's violation of their rights in creating unfair statewide maps.[1] The

Secretary cites only two of these six decisions, and only one – dicta in a dissent in

*Vieth* – on standing. The Secretary's motion flies into the teeth of these decisions. The

Constitution grants this Court jurisdiction where there is a case or controversy, and

the Voters have shown their intense interests necessary to demonstrate that there is

indeed a real case and controversy to be decided here.

## I.      The Motion to Stay should be denied.

The Voters agree that the Supreme Court's decision in *Landis v. North American*

*Co.*, 299 U.S. 248 (1936), sets the standard for whether a stay should be granted

pending the outcome of proceedings in a different court. Def.'s Br. in Support of

Mot. to Stay and to Dismiss for Lack of Standing ("Def.'s Br.") at 9. But as an initial

matter, the Secretary understates the high burden she must meet to secure a stay

under *Landis*.

In *Landis*, the Supreme Court considered the "propriety" of staying

proceedings "in one suit until the decision of another." *Id.* at 249. The Court held that

the party asking for the stay "must make out a clear case of hardship or inequity in

being required to go forward," as there is a "fair possibility that the stay for which he

---

[1] Discussed below at p. 17-24: *Baker v. Carr*, 369 U.S. 186 (1962); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Davis v. Bandemer*, 478 U.S. 109 (1986); and *Vieth v. Jubelirer*, 541 U.S. 267 (2004) in the Supreme Court; and recent district court decisions in *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016) and *Rucho v. Common Cause*, 240 F. Supp. 3d 376 (M.D.N.C. 2017).

US.116378776.02

prays will work damage to someone else." *Id.* at 254-55. The Court also stressed that stays pending other proceedings should be the rare exception, not the rule: "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Id.* at 255. And the burden of securing a stay lies "heavily" on the party seeking it. *Id.* at 256.

The Sixth Circuit has explained that, under *Landis*, district courts must "tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liabilities without undue delay." *Ohio Envtl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977). The "burden is on the party seeking the stay to show that there is a pressing need for delay, and *that neither the other party nor the public will suffer harm from entry of the order*." *Id.* (emphasis added); *see also* Fed. R. Civ. P. 1 (requiring that the Rules be "construed" and "administered … to secure the just, speedy and inexpensive determination of every action and proceeding."). The Secretary's Motion ignores all these principles.

Ultimately, where (as here) the motion to stay is "premised on the alleged significance of another case's imminent disposition, courts have considered" the following factors in determining whether the party seeking the stay has met its heavy burden: (1) the "relative hardships to the parties created by withholding judgment"; (2) the "potential dispositive effect of the other case"; (3) "judicial economy achieved by awaiting adjudication of the other case"; and (4) the public welfare. *Caspar v. Snyder*, 77 F. Supp. 3d 616, 644 (E.D. Mich. 2015) (denying stay of case challenging

constitutionality of Michigan's prohibition on same-sex marriage pending the outcome of a case pending at the U.S. Supreme Court). Applied here, all factors favor denying a stay.

### A. Staying the case would impose a hardship on the Voters and none on the Secretary.

"[T]he burden is on the party seeking the stay to show that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 627-28 (6th Cir. 2014) (internal quotation marks and citation omitted) (noting that "[t]he most important factor [in the stay analysis] is the balance of the hardships.") (citing *Int'l B'hood of Elec. Workers, Local Union No. 20 v. AT & T Network Sys.*, 879 F.2d 864, 1989 WL 78212, at *8 (6th Cir. 1989) (unpublished table opinion)) ("[The] most important consideration [in whether to grant or deny a stay] is the balance of hardships; the moving party has the burden of proving that it will suffer irreparable injury if the case moves forward, and that the non-moving party will not be injured by a stay."). This criterion weighs strongly against a stay, primarily for a reason the Secretary completely ignores: the 2020 election.[2]

---

[2] Not the 2018 elections. *Compare with* Def.'s Mot. at 2.

1.    **Granting a stay would cause extreme hardship to the Voters by making it extremely unlikely that they could secure a remedy in time to impact the 2020 elections.**

The hardship to the Voters from granting a stay is tied directly to the type of relief the Voters seek and the amount of time it typically takes to secure it. The Voters claim that Michigan state and federal representatives are elected based on an unconstitutional partisan gerrymander. As relief, the Voters request, *inter alia*, that the Court enter an order that "establish[es] legislative and congressional apportionment plans that meet the requirements of the U.S. Constitution." Compl. at 33, ¶ (d). Securing such relief, including proceeding through the discovery process, dispositive motion practice, trial, direct appeal to the Supreme Court, and ultimately an order requiring the drawing of three remedial maps, will take a significant amount of time.

The progression of *Whitford* may be instructive here. That case was filed in July 2015 and went to trial on May 24, 2016. *Whitford v. Nichol*, No. 3:15-cv-00421-bbc, ECF No. 1 (July 8, 2015), ECF No. 141 (May 24, 2016). The court decided the case on November 21, 2016, and an amended judgment was entered on February 22, 2017, ordering the Wisconsin defendants to put a "remedial redistricting plan" in place for the "November 2018 election." *Id.*, ECF No. 166 (Nov. 21, 2016), ECF No. 190 (Feb. 22, 2017). The defendants appealed directly to the Supreme Court, where the case was argued in October 2017. Thirty months have already passed since the filing of the complaint and the Wisconsin plaintiffs' rights are still not vindicated. The Court should not risk the same outcome for Michigan's 2020 election cycle by staying this

6

case now and adding more delay at the outset to an already inherently protracted process.

The Secretary's website[3] explains that candidates wanting to run for office must either pay a fee or obtain and file petition signatures. As a practical matter, that means that this case must be concluded with new districts in place by late March 2020,[4] just over two years from now. If the Court stays this case until the decisions in *Whitford* and/or *Benisek*—which could come as late as June 2018—the parties will potentially lose five months, or 20% of the time available, to resolve this case. But that time is already at a premium. This case will see dozens of witnesses deposed; potential disputes over document production; expert reports and discovery; other pre-trial motion practice; a trial; and arguments over remedies with respect to the three different maps at issue. A stay would jeopardize the very viability of the remedy the Voters seek.

---

[3] *See* http://www.michigan.gov/documents/sos/2018_Dates_600221_7.pdf (last visited Feb. 6, 2018).

[4] The Michigan 2020 primaries will be held on August 4, 2020. *See* Mich. Comp. Laws § 168.534 (primaries held "on the Tuesday after the first Monday in August before every general November election"). Nominating petitions for the primaries are due "no later than 4 p.m. of the fifteenth Tuesday before the August primary" for congressional candidates, and no later than "4 p.m. of the twelfth Tuesday preceding the August primary" for state senator and representative candidates. Mich. Comp. Laws Ann. §§ 168.133; 168.163(1). To be meaningful, redrawn maps must be in place by early-March 2020 in order to allow candidates to obtain necessary signatures for the nominating petitions.

US.116378776.02

Other courts considering whether to stay redistricting cases pending *Whitford* (or other Supreme Court redistricting cases pending at the time of motions to stay) have denied stays. As a North Carolina court recently explained in denying a stay, delaying the case at the outset creates a "substantial risk that, in the event Plaintiffs prevail, this Court will not have adequate time to afford Plaintiffs the relief they seek—constitutionally compliant districting maps for use in the 2020 election." *Common Cause v. Rucho*, 2017 WL 3981300, at *7 (M.D.N.C. Sept. 8, 2017) (three judge court denying request to stay gerrymandering case pending *Whitford*). This Court has a "responsibility to ensure that future elections will not be conducted under unconstitutional plans," *Larios v. Cox*, 305 F. Supp. 2d 1335, 1344 (N.D. Ga. 2004), and—just as in *Rucho*—the months of delay the Secretary seeks creates a substantial risk that "weighs strongly against granting the requested stay." *Rucho*, 2017 WL 3981300, at *7; *see also Johnson v. Mortham*, 915 F. Supp. 1529, 1549-50 (N.D. Fla. 1995) ("[T]he public welfare will be better promoted by the immediate consideration of this cause, since any forthcoming Supreme Court decisions will be too untimely to effectively give this court an ample opportunity to adjudicate the case at bar without potentially disrupting the [next] elections").

A stay would reward those who enacted the unconstitutional gerrymander by keeping that plan in place through another election cycle, and an important cycle at that. Representatives elected in 2020 will create and enact the *next* redistricting maps in Michigan. The Court should not effectively moot this case by entering a stay at this

8

early stage. *See Rucho*, 2017 WL 3981300, at *7 (denying stay in part because granting one would have allowed the defendants to "reap 'the fruits of victory for another election cycle.'") (quoting *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 560 (E.D. Va. 2016)). In other words, granting a stay "would send a troubling message to state legislatures that there is little downside to engaging in unlawful districting practices because 'the federal courts are powerless to effectively redress [voters'] grievances'" in time to make a difference. *Id.* (citing *Coal for Educ. In Dist. One v. Bd. of Elections*, 370 F. Supp. 42, 58 (S.D.N.Y. 1974)).

In short, "[d]enying [the Secretary's] stay motion ensures that this Court can definitively resolve the constitutionality of the [Michigan] Plan in adequate time to provide Plaintiffs meaningful relief, should this Court find that the Plan violates the Constitution." *Id.* Avoiding the sort of hardship that comes with a stay is a reason Michigan courts commonly give in denying stays. *See Roe v. Snyder*, 240 F. Supp. 3d 697, 703 (E.D. Mich. 2017) (denying stay in part because allegation of "ongoing harm" in the complaint meant that a stay would pose a hardship to the non-movant); *cf. Ohio Envtl. Council*, 565 F.2d at 396 (reversing stay as abuse of discretion, and noting that courts should be "particularly hesitant" to issue a stay when doing so "will disrupt a statutory or administrative timetable").

US.116378776.02

### 2. Allowing the case to proceed will not work a hardship to the Secretary.

The Court must also examine any potential hardship to the Secretary, which has the "burden of proving that it will suffer irreparable injury if the case moves forward" without a stay. *Int'l B'hood of Elec. Workers,* 1989 WL 78212, at *8; *see also Snyder*, 240 F. Supp. 3d at 703 ("A party seeking to stay proceedings in one case for the resolution of another must 'make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else.'") (quoting *Landis*, 299 U.S. at 255). The Secretary points to the work she will have to invest in defending the case, but as the Court explained in *Roe*, "additional work on this case," is "not cognizable prejudice to the defendant" so as to warrant a stay. 240 F. Supp. 3d at 703. This makes sense, because if additional work on a case were enough to cause "hardship" to a defendant, then a stay would be justified in *every* case in which a party claimed that a Supreme Court decision might affect the outcome. That is not the law; all actions in the lower federal courts do not simply freeze when the Supreme Court takes up a case. *Cf. Alley v. Little*, 181 F. App'x 509, 511-12 (6th Cir. 2012) (in case of a death row inmate who was challenging constitutionality of lethal injection protocol, reversing grant of a stay that was issued pending the Supreme Court's review of a similar challenge, in part because it was "wrong as a matter of law" to "freeze in place all actions in the lower federal courts" pending the Supreme Court's review).

In any event, the Secretary has not satisfied her burden to "spell out what specific harm may result" if a stay is not granted, which means that the Court should not grant one. *Caspar*, 77 F. Supp. 3d at 645 (denying stay, in part because the hardship to the party seeking the stay was "insubstantial" when compared with the hardship to plaintiffs). Thus, the Court should deny a stay here because the Secretary has not established that she is "likely to suffer irreparable injury" without one. *Int'l Brotherhood*, 1989 WL 78212, at *8.

### B.   The potential effect of *Whitford* and *Benisek* is no reason to grant a stay.

The Secretary's motion rests almost entirely on the second factor in the *Landis* analysis—whether the "potential dispositive effect" of *Whitford* and/or *Benisek* counsels in favor of a stay. The Secretary overstates her argument.

Although neither is on all fours with this case, both *Whitford* and *Benisek* do involve issues that may overlap with the issues here. But the mere possibility that the Supreme Court could rule in such a way as to limit or eliminate partisan-gerrymandering claims is no reason to stay the case. That is what this Court held in *Caspar*, which denied a motion to stay a case brought against state officials challenging Michigan's prohibition on same-sex marriage. 77 F. Supp. 3d at 644. The Court explained that the mere possibility of a Supreme Court ruling in favor of one party is "not sufficient to justify placing this litigation on hold." *Id.* So too here.

It is also possible that the Supreme Court's decisions in *Whitford* and *Benisek* might *not* resolve the legal issues present here. That uncertainty was a reason courts in Georgia and North Carolina denied motions to stay pending *Whitford*—because there is a "distinct possibility that the Supreme Court could resolve *Whitford* without reaching the merits, meaning that *Whitford* would provide this Court with no additional guidance as to how to resolve Plaintiffs' claims." *Rucho*, 2017 WL 3981300, at *6.

> The Supreme Court's jurisprudence on partisan gerrymandering teaches us that the Court could rule in a variety of ways on the issues before it in *Whitford*, including not ruling on them at all. We will not delay consideration of this case for possibly a year or more, waiting for a decision that may not ultimately affect it. If the Supreme Court's ruling in *Whitford* impacts any ruling in this case, that ruling can be adjusted accordingly.

*Ga. State Conference of NAACP v. State*, 269 F. Supp. 3d 1266, 1283 (N.D. Ga. 2017). The same reasoning applies here.

Finally, the Supreme Court's earlier partisan gerrymandering decisions have never reached the sort of conclusion that would have the "dispositive effect" the Secretary touts in her motion. *Whitford* and *Benisek* could only be dispositive of this case if they determine that partisan-gerrymandering claims are not justiciable at all, under any scenario. The Supreme Court's decisions in *Davis v. Bandemer*, 478 U.S. 109 (1986), *Vieth v. Jubelirer*, 541 U.S. 267 (2004), and *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006) did not so conclude. Indeed, Justice Kennedy has indicated that "new technologies" such as those underpinning the allegations in

the Complaint might produce "new methods of analysis" such that a workable

standard can emerge. *Vieth*, 541 U.S. at 312-13 (concurring opinion). It is more likely

that *Whitford* and *Benisek* will articulate a standard that will govern partisan-

gerrymandering claims, which the parties can apply as the case moves forward.

> **C.     A stay would not promote judicial economy.**

The Secretary also claims that a stay would "preserve judicial economy," Def.'s

Mot. at 2, by allowing this Court to "await instruction," Def.'s Br. at 11, from the

Supreme Court in *Whitford* and *Benisek*. This argument is also unpersuasive.

Denying a stay will not cause the Court to risk spending inordinate amounts of

judicial time reviewing summary judgment motions or at trial considering issues on an

outdated standard. By those phases of this case, any new standard the Supreme Court

articulates will be in place. What is crucial is that discovery start now, focused on

things that will be in play regardless of any standard the Supreme Court may

articulate. For example, under any standard, intent will likely remain an issue – were

the Michigan maps in fact created to further partisan aims? The Voters intend to

focus the first phase of discovery on that issue.

> **D.     It is in the public interest to allow the Voters to vindicate their constitutional rights.**

Voters seek enforcement of constitutional guarantees of every Michigan

resident eligible to vote. Under these circumstances (and as Michigan courts have

held), the public interest counsels against a stay, because the "public interest is always

US.116378776.02

served by robust protection of constitutional guarantees." *Caspar*, 77 F. Supp. 3d at 644; *see Roe*, 240 F. Supp. 3d at 703-04 (same).

Tellingly, the Secretary does not even argue that the public interest favors a stay, making this factor unequivocally weigh against one.

## II.     The Voters have standing; the Motion to Dismiss should be denied.

### A.     The Secretary misstates the legal standard.

Standing is a "threshold requirement for federal jurisdiction" derived from Article III of the United States Constitution. *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016). To establish Article III standing, a plaintiff must allege that: (1) he has suffered an injury-in-fact that is both "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is fairly traceable to the defendant's conduct; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted); *Binno*, 826 F.3d at 344. While the Voters bear the burden of demonstrating that they have standing, *see Daubenmire v. City of Columbus*, 507 F.3d 383, 388 (6th Cir. 2007), this Court, in evaluating this Motion to Dismiss for lack of standing, "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501 (1975); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015).

The Secretary's statement of the standard of review misstates the Court's limited task at this stage. Although she seeks dismissal only under Fed. R. Civ. P.

US.116378776.02

12(b)(1), the Secretary nonetheless cites *Miller v. Johnson,* 515 U.S. 900 (1995), for the proposition that the Court must "exercise extraordinary caution" in reviewing state redistricting plans because judicial review in this area "represents a serious intrusion on the most vital of local functions." Def.'s Br. at 15 (quoting *Miller,* 515 U.S. at 915–16). The Secretary has jumped the gun: neither the language she quotes nor the *Miller* decision as a whole addressed standing at all, and there is no support for the notion that a more exacting test for standing inherently applies simply because a plaintiff challenges a redistricting scheme. *See Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 38 (1976) ("[S]tanding focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.") (internal quotation marks and citation omitted). Regardless of what considerations may weigh for or against the merits of the Voters' claims or impact other aspects of the justiciability analysis, the Supreme Court's three-part test for Article III standing—an "irreducible constitutional minimum"—applies "to every claim sought to be litigated in federal court." *ACLU v. Nat'l Security Agency*, 493 F.3d 644, 659 (6th Cir. 2007).

**B.    The individual Voters have standing under both the First Amendment and the Equal Protection Clause.**

The individual Voters are Democrats who vote for Democratic candidates and assist those candidates in their election efforts. Compl. ¶ 10. Each individual Voter is registered to vote and has for many years associated with the Democratic Party. *Id.*

US.116378776.02

The Complaint details the house, senate and congressional districts in which each individual Voter resides. *Id.*

The Complaint further alleges that Michigan's gerrymandered 2011 redistricting plans directly and tangibly harmed the individual Voters as Michigan citizens and as Democrats. The individual Voters state that their "voting strength was diluted and their representational rights were burdened because of their party affiliation," and that the gerrymander "reduces not only their ability to elect representatives in their own districts, but also reduces the Voters' ability to elect Democratic representatives across the State." Compl. ¶ 37. The Complaint's two claims—under the Fourteenth Amendment's Equal Protection Clause and the First Amendment—arise from this concrete, measurable, and wrongful dilution of voting strength the individual Voters have suffered. *Id.* at ¶¶ 1–2, 74–85.

The Secretary's Motion never squarely addresses the form of injury that the Voters allege. Nor does it contend that their injury is not "fairly traceable" to the State's redistricting plans, or that a favorable decision would be unable to redress the harm. *Cf. Lujan,* 504 U.S. at 560–61. Instead, the Secretary asserts broadly—and wholly incorrectly—that the "Supreme Court has never . . . recognized standing[] to exist for a statewide gerrymandering claim." Def.'s Br. at 17. In doing so, she relies entirely on Supreme Court precedent in *racial* gerrymandering cases, eliding the crucial distinction between the district-specific stigmatic harm suffered by minority voters in racial gerrymanders and the vote dilution underlying *partisan* gerrymandering claims.

The only authority she cites on the subject of standing in a partisan gerrymandering case is, in fact, no authority at all: Justice Stevens' dissent in *Vieth v. Jubelirer*, 541 U.S. 267 (2004).

The Secretary's argument obfuscates the limited question presented by her Motion. To be sure, the Supreme Court's political gerrymandering doctrine is still developing. But this Court need not venture into uncharted territory to determine whether the targets of a political gerrymander have standing to challenge it in federal court. The Supreme Court has already expressly held that a statewide challenge to a partisan gerrymander was justiciable. *See Davis v. Bandemer*, 478 U.S. 109, 125 (1986). The Court has never disavowed that holding. And the only two decisions that have squarely considered the narrower standing question now before this Court have upheld the plaintiffs' standing to challenge political gerrymanders on a statewide basis. *See Rucho*, --- F. Supp. 3d ----, 2018 WL 341658, at *11–13 (M.D.N.C. Jan. 9, 2018), *stayed pending appeal*, 2018 WL 472142 (U.S. Jan. 18, 2018); *Whitford v. Gill*, 218 F. Supp. 3d 837, 927–30 (W.D. Wis. 2016), *stayed pending appeal*, 137 S. Ct. 2289 (2017).

It is this precedent—rather than misguided analogies to distinct classes of lawsuit or extrapolations from a dissenting opinion—that must guide this Court in denying this Motion.

17

US.116378776.02

### 1.   The individual Voters have standing to assert their equal protection claim.

The Supreme Court long recognized that every United States citizen has an "inalienable right to full and effective participation in the political processes of his State's legislative bodies." *Whitcomb v. Chavis*, 403 U.S. 124, 141 (1971) (quoting *Reynolds v. Sims,* 377 U.S. 533, 565 (1964)). Since most Americans exercise their right of participation solely by voting, full and effective participation requires that "each citizen have an *equally effective voice* in the election of members of his state legislature." *Id.* (emphasis added). In *Reynolds v. Sims*, the Court accordingly held that a voter suffers a cognizable injury under the Equal Protection Clause when the weight of her vote is "in a substantial fashion diluted when compared with votes of citizens living [i]n other parts of the State." 377 U.S. at 568.

The Court expressly embraced this principle in the early malapportionment cases, where it applied the "one person, one vote" rule as a metric for redressing unequally populated electoral districts, *see id.* at 566–67; *Wesberry v. Sanders,* 376 U.S. 1, 7–8 (1964).  Subsequent courts have followed this lead. *See generally Kardules v. City of Columbus,* 95 F.3d 1335, 1348 (6th Cir. 1996) (several courts of appeals, including the Sixth Circuit, have "at least implicitly recognized dilution of voting power as an injury sufficient to confer standing"). The basis on which the state discriminates—whether arbitrary geographic criteria, military status, race, political party, or some other factor—determines the nature of the equal protection claim and may implicate the

Court's prudential justiciability considerations. But the *injury* giving rise to core Article III standing is the same: a scheme of classification that substantially dilutes the plaintiff's voting power and denies her the "equally effective voice" that the Constitution promises all citizens. *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("The '*injury in fact*' in an equal protection case of this variety *is the denial of equal treatment* resulting from the imposition of the barrier, *not the ultimate inability to obtain the benefit*." (emphasis added)).

The Voters here allege that Michigan's 2011 redistricting plan impermissibly dilutes their voting strength as Democrats in order to entrench Republican majorities in the state legislature and in Michigan's congressional delegation. Specifically, they allege that the plan "cracks" and "packs" Democratic voters so that Republican voters can more efficiently translate their votes into seats than can the opposition. Compl. ¶¶ 37–44. All the individual Voters have been deprived of equal protection, and all have suffered a cognizable injury. *Id.* at ¶ 43. Whether packed into non-competitive Democratic districts or dispersed into non-competitive Republican ones, they have all seen their voting power diminished by a redistricting scheme that draws a classification on the basis of their political affiliation. The harm to the Voters is therefore concrete and measurable. The Complaint pleads a rigorous statistical analysis, known as the "efficiency gap," that quantifies the extent to which Michigan Democrats' voting strength is diluted statewide by the redistricting schemes for the Michigan House, the Michigan Senate, and the U.S. House alike. *Id.* at ¶¶ 45–50. The

data reflects qualitatively and quantitatively that all three of the maps drawn by the 2011 redistricting plans are outliers with respect to the degree of the burden they impose on the opposition party's voters. *Id.* at ¶¶ 51–55.

The dilution of the Voters' voting power on account of their political affiliation as Democrats is a cognizable injury under the Equal Protection Clause. In an early application of the principles it had enunciated in *Baker v. Carr* and in *Reynolds*, the Supreme Court ruled in *Carrington v. Rash,* 380 U.S. 89 (1965), that a Texas statute barring active-duty military service members who moved into the state from voting in local elections violated the Fourteenth Amendment. The state defended the statute on the grounds that an influx of service members, who might vote in conformity with the perceived wishes of their commanders, could cause a "takeover" of local communities. 380 U.S. at 93–94. Citing all citizens' "right to an equal opportunity for political representation," the Court overturned the statute and held that "'fencing out' from the franchise a sector of the population *because of the way they may vote* is constitutionally impermissible" under the Equal Protection Clause. *Id.* at 94 (emphasis added).

Some two decades later, the Supreme Court applied these principals to hold that constitutional challenges to gerrymandering schemes on the basis of political affiliation are justiciable. In *Davis v. Bandemer,* 478 U.S. 109 (1986), the Court addressed a claim by Indiana Democratic voters that the state's 1981 redistricting plan "discriminate[d] against Democrats on a *statewide* basis." 478 U.S. at 127 (emphasis

20

added). "[T]he appellees' claim, as we understand it, is that Democratic voters over the State as a whole, not Democratic voters in particular districts, have been subjected to unconstitutional discrimination." *Id.* The Court squarely held that the claim was justiciable, rejecting the argument that political gerrymanders, unlike racial gerrymanders, present a political question as to which the federal judiciary should decline to exercise jurisdiction on prudential grounds. "That the characteristics of the complaining group are not immutable or that the group has not been subject to the same historical stigma [as have racial minorities] may be relevant to the manner in which the case is adjudicated, but these differences do not justify a refusal to entertain such a case." *Id.* at 125.

Because standing is an element of justiciability, the Court's ruling that a political gerrymandering claim was justiciable necessarily endorsed the *Bandemer* plaintiffs' standing to challenge Indiana's statewide redistricting scheme. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102 (1998) ("Standing to sue is part of the common understanding of what it takes to make a justiciable case."); *Flast v. Cohen,* 392 U.S. 83, 98–99 (1968) ("Standing is an aspect of justiciability[.]"). A plurality of justices in *Bandemer* went on to announce a standard by which to judge "statewide political gerrymandering" claims alleging "vote dilution": "[U]nconstitutional discrimination occurs . . . when the electoral system is arranged in a manner that will consistently

degrade a voter's or a group of voters' influence on the political process as a whole."[5]
478 U.S. at 132.

In the years since, the Supreme Court has never retreated from the core justiciability holding of *Bandemer. See Ariz. State Legislature*, 135 S. Ct. at 2658 ("[P]artisan gerrymanders [are incompatible] with democratic principles.") (internal quotation marks and citation omitted). A fractured Court revisited political gerrymandering in *Vieth v. Jubelirer,* 541 U.S. 267 (2004), but provided no clear guidance to the lower courts. Four justices in *Vieth* would have overturned *Bandemer* and held that political gerrymandering claims are non-justiciable because federal courts lack judicially manageable standards for adjudicating them. 541 U.S. at 277–81 (Scalia, J., plurality opinion). In his controlling concurrence, however, Justice Kennedy—while agreeing with the plurality that the claim *then before the Court* did not supply a manageable standard—refused to conclude that judicially manageable standards would not emerge in future cases:

> Allegations of unconstitutional bias in apportionment are most serious claims, for we have long believed that "the right to vote" is one of 'those political processes ordinarily to be relied upon to protect minorities." If a state passed an enactment that declared "All future apportionment shall be drawn so as most to burden Party X's rights to fair and effective representation, though still in accord with one-person, one-vote principles," we would surely conclude the Constitution had been

---

[5] The Court ultimately reversed the district panel's ruling that the Indiana redistricting plan was unconstitutional, but unlike on the question of justiciability, no opinion on the merits commanded a majority of the justices. *See* 478 U.S. at 129–34 (plurality opinion).

> violated. If that is so, we should admit the possibility remains that in another case a standard might emerge that suitably demonstrates how an apportionment's *de facto* incorporation of partisan classifications burdens rights of fair and effective representation[.]

*Id.* at 311–12 (Kennedy, J., concurring) (citation omitted). Justice Kennedy and the four dissenting justices in *Vieth* constituted a majority in favor of preserving *Bandemer*'s holding on the justiciability of political gerrymandering claims. *See id.* at 317 (Stevens, J., dissenting) ("The central question presented by this case is whether political gerrymandering claims are justiciable. . . . [F]ive Members of the Court are convinced that the plurality's answer to that question is erroneous.").

Neither in *Vieth* nor in its other decisions since has the Supreme Court called such standing into question. *See, e.g., LULAC*, 548 U.S. at 414 (declining to revisit the justiciability holding of *Bandemer*).[6] Two district court panels have, however, considered the precise question presented by the Secretary's motion, and both have affirmed the plaintiffs' standing. In *Whitford v. Gill*, a three-judge panel of the Eastern District of Wisconsin addressed a group of Democratic voters' claims that the state's 2011 political gerrymandering scheme systematically and unconstitutionally diluted their voting power. 218 F. Supp. 3d at 854–55. Having earlier rejected the defendants' standing argument at the motion to dismiss stage, *Whitford v. Nichol*, 151 F. Supp. 3d

---

[6] Justice Stevens' *Vieth* dissent concluded that voters have standing to challenge political gerrymanders only on a district-by-district basis. 541 U.S. at 327–28. As explained below, *see infra,* § II(B)(3), Justice Stevens' opinion, which was joined by no other justice, rested on an analysis of the direction of the Court's gerrymandering jurisprudence that subsequent developments have shown to be unfounded.

23

918, 924–27 (W.D. Wis. 2015), the court concluded after a bench trial that the plaintiffs possessed standing and that their claims were justiciable. *Whitford v. Gill,* 218 F. Supp. 3d at 927–930. It found that the injury—like the remedy—was necessarily statewide rather than "localized," because "the efficacy of [plaintiffs'] vote in securing a political voice depends on the efficacy of the votes of Democrats statewide." *Id.* at 930.

The Middle District of North Carolina recently considered a parallel claim in *Rucho*, and it likewise concluded that the plaintiffs possessed standing for both equal protection and First Amendment claims. 2018 WL 341658, at *12–16.

*Reynolds* and its progeny recognized that a substantial dilution of citizens' voting power by an impermissible classification deprives them of their equally effective voice in the democratic process, in violation of the Equal Protection Clause. *Bandemer* applied this principle to political gerrymanders and recognized them as justiciable. Controlling precedent endorses voters' standing to assert this type of claim, as do the only district court decisions to have grappled with the issue. This Court should join the district-court three-judge panels in *Whitford* and *Rucho* in recognizing that the essential injury caused to voters in a partisan gerrymander derives from the redistricting scheme as a whole—and must be redressed on that basis as well.

### 2.   The individual Voters have standing to assert their First Amendment claim.

The deeply personal harms individual Voters allege in the Complaint also support their standing to assert a claim under the First Amendment. The Complaint alleges that Michigan's 2011 redistricting plan "burdens and penalizes Democratic voters because of their participation in the electoral process as Democrats, their voting history for Democratic candidates, their association with the Democratic Party and their expression of political views as candidates." Compl. ¶ 76; *see also id.* at ¶¶ 45–54. These actions directly violate their First Amendment rights of political expression and of association. *See Shapiro v. McManus*, 203 F. Supp. 3d 579, 594–96 (D. Md. 2016).

The First Amendment's prohibition on retaliation bars a state government from penalizing a citizen or depriving her of a benefit on account of her constitutionally protected speech or conduct. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74–76 (1990). "Official reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise" of individuals' protected rights. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal quotation marks and citation omitted). Chief among those rights, of course, are those of political expression and association, which the Supreme Court has described as lying at "'the core of those activities protected by the First Amendment.'" *Rutan*, 497 U.S. at 69 (quoting *Elrod v. Burns*, 427 U.S. 347, 356 (1976)); *see also Hager v. Pike Cnty. Bd. of Educ.*, 286 F.3d 366, 371 (6th Cir. 2002).

US.116378776.02

Because the right to vote is preservative of all other rights, the First Amendment accords especially strong protection to speech associated with the electoral process. The "right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively . . . rank among our most precious freedoms." *Anderson v. Celebrezze,* 460 U.S. 780, 787 (1983) (quoting *Williams v. Rhodes,* 393 U.S. 23, 30–31 (1968)) (striking down an early filing deadline for political candidates on First Amendment grounds). A state law that "restrict[s] the plaintiffs' political activities within the state and . . . limit[s] their ability to associate as political organizations" accordingly gives rise to an injury sufficient to confer First Amendment standing. *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014).

Claims by the targets of a political gerrymander implicate the "First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring) (citing *Elrod*, 427 U.S. at 347). Indeed, because it "concentrates on whether the legislation burdens the representational rights of the complaining party's voters for reasons of ideology, beliefs, or political association," Justice Kennedy signaled in *Vieth* that "the First Amendment may offer a sounder and more prudential basis for intervention than does the Equal Protection Clause." *Id.* at 315. When a citizen's "voting power" is diluted on the basis of his partisan affiliation, the political

26

viewpoint he expresses by the act of voting is "debased" in corresponding measure. *Bd. of Estimate of City of N.Y. v. Morris*, 489 U.S. 688, 693–94 (1989).

Because Michigan's redistricting plan targets the individual Voters on account of their protected conduct—voting for Democratic candidates and associating themselves with the Democratic Party—they have suffered an injury sufficient to confer First Amendment standing to challenge that scheme as a whole. *Accord Rucho*, 2018 WL 341658, at *14 ("[P]artisan gerrymandering claims under the First Amendment need not be asserted on a district-by-district basis.").

### 3. The racial gerrymandering cases the Secretary relies on are inapposite.

The Secretary's sole argument in support of her Motion to Dismiss against the individual Voters' standing—as to both the equal protection and First Amendment theories—is that the necessary "particularized harm" can never exist in the context of a "statewide gerrymandering claim." Def.'s Br. at 17. In support of this notion, she cites three Supreme Court decisions that addressed only the question of standing for challenges to *racial* gerrymanders. *Id.* (citing *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015); *United States v. Hays*, 515 U.S. 737 (1995); & *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*)). This precedent, she asserts, recognizes only two cognizable harms supporting standing: (1) impermissible *racial* classification, and (2) "representation harms where a legislator misperceives that his or her primary obligation is to represent only the members of a particular group or the party drawing

the district's maps, rather than the district's voters." *Id.* at 18. Political gerrymandering claims, however, have a different judicial pedigree, and they redress different constitutional harms.

Sorting citizens into particular voting districts on the basis of race is "by [its] very nature odious," because such classifications "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw I,* 509 U.S. at 643 (citations omitted). In this historically resonant context, the residents of a particular district drawn using such an improper classification have been stamped with a "badge of inferiority" in a way that residents of other districts in the state have not. *See Shaw v. Hunt,* 517 U.S. 899, 924 (1996) (Stevens, J., dissenting) (*Shaw II*). *See also Brown v. Board of Ed. of Topeka*, 347 U.S. 483, 494 (1954) ("[T]he policy of separating the races is usually interpreted as denoting the inferiority of the [racial minority] group."). Because of the stigmatic nature of this harm, and the district-specific "representational" injury that results from an elected representative's distorted incentives to cater to only one discrete segment of the electorate, it is reasonable to limit standing to those voters actually residing within the impacted district. *See Hays*, 515 U.S. at 745 (noting that voters outside of a racially gerrymandered district will generally lack standing because they not have "personally been subjected to a racial classification").

The Supreme Court treats racial gerrymandering claims as distinct from other constitutional claims that are derived from the "one person, one vote" principle. *See*

US.116378776.02

*Vieth*, 541 U.S. at 307 (Kennedy, J., concurring) (noting that racial and political gerrymandering cases "implicate a different inquiry" from one another). The Court has "consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*," *Ala. Legislative Black Caucus*, 135 S. Ct. at 1265 (emphasis original), while in the meantime it has addressed a string of *political* gerrymandering cases challenging statewide redistricting schemes without invoking any such limiting principle. *See LULAC*, 548 U.S. at 416–17; *Vieth*, 541 U.S. at 272–73; *Bandemer*, 478 U.S. at 127.

The only support the Secretary musters for her theory that the racial gerrymandering analysis "must apply in partisan gerrymandering cases" is a portion of Justice Stevens' dissent in *Vieth*. Def.'s Br. at 18. Justice Stevens interpreted the racial gerrymandering cases that had been decided since *Bandemer*—chiefly *Hays* in 1995—as a signal that the Court had "shifted its focus" from statewide to district-wide standing; he believed this purported shift to be binding, even though he disagreed with its premises. 541 U.S. at 327 & n. 16 (characterizing the Court's jurisprudence as "illogical" and clarifying that, for his part, he "surely would not suggest that a plaintiff would never have standing to litigate a statewide claim"). The reasoning of this dissent, which was joined by no other justice (and, of course, has no precedential weight), has been undermined by subsequent developments. First, the Court has since reaffirmed the distinct "geographical nature" of the harm alleged in racial gerrymandering cases. *Ala. Legislative Black Caucus*, 135 S. Ct. at 1265. Second—

29

notwithstanding its "special obligation to satisfy itself . . . of its own jurisdiction," *see Steel Co.*, 523 U.S. at 95 (internal quotation marks and citations omitted)—the Court has subsequently declined to disturb the *Bandemer* holding that statewide political gerrymandering claims are justiciable. *LULAC*, 548 U.S. at 414. Justice Stevens, himself a consistent believer in the justiciability of political gerrymandering claims, simply predicted incorrectly in 2004.

The Secretary's Motion never mentions the Supreme Court's controlling holding in *Bandemer*, and it disregards the type of injury actually pled in the Complaint, asking the Court instead to ignore distinctions recognized by precedent and apply a separate body of law divorced of context. Like the courts in *Whitford* and *Rucho*, this Court should reject that invitation and affirm the individual Voters' standing to sue under the Equal Protection Clause and the First Amendment. *See Rucho*, 2018 WL 341658, at *13 ("Given the differences between partisan gerrymandering and racial gerrymandering claims . . . we conclude that the Supreme Court's approach to standing in one-person, one-vote cases should guide the standing inquiry in partisan gerrymandering cases."); *Whitford*, 218 F. Supp. 3d at 929 ("The rationale and holding of *Hays* have no application here.").

## C.  The League of Women Voters has associational standing.

A voluntary association like the League may possess standing either derivatively as the representative of its members, or in its own right by virtue of an injury to its organizational interests. *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33

30

(6th Cir. 2002). The League has standing to challenge Michigan's political gerrymander, on a statewide basis, under both theories. Compl. ¶ 8.

### 1.     The League has standing as a representative of its members.

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth*, 422 U.S. at 511. In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court distilled a three-part test for derivative associational standing: "[A]n association has standing to bring suit on behalf of its members when . . . (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343 (1977); *Doe v. Porter*, 370 F.3d 558, 561–62 (6th Cir. 2004). The Complaint pleads facts sufficient to satisfy the three *Hunt* criteria.

*First*, the League states that it has 2,420 members who reside in almost every Michigan county, all of whom are Michigan registered voters. Compl. ¶ 7. Its many Democratic members are "harmed by the [redistricting] plans because they dilute Democratic votes and impair Democratic voters' ability to elect their preferred legislative and congressional candidates." *Id.* at ¶ 8. As discussed above, these League members, like all other Michigan Democratic voters, have standing to challenge Michigan's political gerrymander.

31

*Second,* these constitutional claims are germane to the League's purpose, which is to "promote political responsibility through informed and active participation in government and to act on selected governmental issues." *Id.* at ¶ 7. The League and its members host public forums on topics including gerrymandering, organize voter registration drives and voter training events, and engage in other activities aimed at "removing unnecessary barriers to full participation in the electoral process." *Id.* at ¶¶ 7–8. The germaneness requirement of *Hunt* is "undemanding," requiring "mere pertinence between litigation subject and organization purpose." *Mich. Bldg. & Const. Trades Council, AFL-CIO v. Snyder,* 846 F. Supp. 2d 766, 778 (E.D. Mich. 2012) (quoting *Nat'l Lime Ass'n v. EPA,* 233 F.3d 625, 636–37 (D.C. Cir. 2000)). Vote dilution and distortions of democratic accountability created by gerrymanders lie squarely within the League's mission profile. *See, e.g., Citizens for Legislative Choice v. Miller,* 144 F.3d 916, 920 (6th Cir. 1998) (concluding that organizations promoting "voting rights" and "voting choice" had purposes germane to their challenge to a term-limit provision).

*Third,* the participation of its individual members is not necessary for the prosecution of the suit or for the declaratory and injunctive relief the League seeks. The Secretary argues that the League cannot satisfy this criterion because "it is no great leap of logic" to assume that some of its Republican or independent members may oppose its position or even seek to intervene on the other side of the fight. Def.'s Br. at 21–22. This objection is unpersuasive, for two reasons.

One, it misconstrues the primary purpose of *Hunt*'s third prong, which is to ensure that the type of relief sought is fitted to an organization as a whole and does not require the presence of individual plaintiffs. Indeed, several courts in the Sixth Circuit have applied the third prong as a simple rule of thumb: an association satisfies the criterion so long as it seeks injunctive relief rather than money damages and its claim does not require findings of fact particular to individual members. *See Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) ("The individual participation of an organization's members is not normally necessary when an association seeks prospective or injunctive relief for its members.") (internal quotation marks and citation omitted); *NAACP, Detroit Branch v. Detroit Police Officers Ass'n*, 525 F. Supp. 1215, 1219–20 (E.D. Mich. 1981) ("Since the plaintiffs have requested predominately injunctive relief, and since the basic liability issues can be appropriately resolved in a group context, the participation of the individual members of the NAACP is not indispensable to a proper resolution of this case.").

Two, the pleadings give no indication of any conflict among the League's members with respect to the claims asserted—let alone the kind of "profound" division required to defeat standing; dissent from some members would change nothing. *Retired Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 865 (7th Cir. 1996).[7]

---

[7] This Seventh Circuit decision, cited by the Secretary, also clarifies that questions of conflicts among members are properly considered under *Hunt*'s second "germaneness" prong rather than its third. 76 F.3d at 867.

US.116378776.02

## 2.      The League has standing in its own right.

Alternatively, the League also has standing in its own right. An organization can show an "injury in fact" sufficient to support standing where its mission has been "perceptibly impaired" by the challenged provision—in other words, where it has suffered "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).

The Complaint satisfies these elements, including by pleading that the Michigan redistricting plans "directly impair the League's mission of encouraging civic engagement and nonpartisan districting reform"—a mission the League carries out by investing "substantial time and effort in voter training and civic engagement activities, including voter registration and non-partisan voter guides." Compl. ¶¶ 7–8.

In *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710 (6th Cir. 1994), the only Sixth Circuit case the Secretary cites, the court considered whether a homeless advocacy organization had standing to challenge a local panhandling ordinance. The court determined that the coalition's stated mission to "educate the public of the plight of the homeless" had not been concretely harmed by an ordinance that prohibited panhandlers from "reckless[ly]" interfering with traffic. 56 F.3d at 716–17. Without disputing that other ordinances targeting the homeless population could confer standing, the court ruled that the nexus to the coalition's activities was too attenuated. *Id.* By contrast, courts have routinely held that an advocacy

organization has standing to challenge a state action that forces it to divert its resources from one activity to another, or requires it to funnel more funds to its existing activities redressing the burden. The Florida NAACP, for instance, had standing to challenge a new voter ID law in that state, because it "reasonably anticipate[d] that [it would] have to divert personnel and time to educating volunteers and voters on compliance" with the restriction. *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008); *see also Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (ruling that an organization had standing to challenge a voter registration law where its complaint pled that it had "expended additional resources that [it] would not otherwise have expended, and in ways that [it] would not have expended them").

Unconstitutional dilution of Michigan residents' voting power by a political gerrymander, by denying those citizens an "equally effective voice" in the democratic process, *Reynolds*, 377 U.S. at 565, burdens the League's activities and diverts resources toward combating the gerrymandering obstacle to civic engagement rather than others. *Accord Rucho*, 2018 WL 341658, at *16-17 (finding that the League of Women Voters had associational standing to challenge a North Carolina partisan gerrymander that had required it to engage in "increase[d]. . . educational efforts" and "incur[] additional costs").

Whether as a representative of its many members who are Michigan voters or by virtue of its direct organizational involvement in the issue of redistricting, the League has standing to bring its claims.[8]

## CONCLUSION

For the reasons outlined above, the Secretary's Motion to Stay and alternative Motion to Dismiss should both be denied.

---

[8] If for any reason the Court finds that the Complaint's allegations are insufficient to establish the League's standing, Plaintiffs request that the Court give the League an opportunity to supplement the record with evidence necessary to redress the deficiency. *See Ala. Legislative Black Caucus*, 135 S. Ct. at 1269 (ruling that a district court should have allowed the plaintiff to supplement the record on the question of associational standing before dismissing action).

36

Respectfully submitted,

Date:  February 6, 2018                    /s/ Joseph H. Yeager, Jr.

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
Fax: 248-483-3131
MBrewer@goodmanacker.com

Joseph H. Yeager, Jr. (IN Bar No. 2083-49)
Harmony A. Mappes (IN Bar No. 27237-49)
Jeffrey P. Justman (MN Bar No. 390413)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Fax: 317-237-1000
Jay.Yeager@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

*Counsel for Plaintiffs*

37

## Certificate of Service

I hereby certify that on February 6, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

Respectfully submitted,


<u>/s/ Joseph H. Yeager, Jr.</u>