UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, ROGER J. BRDAK,
FREDERICK C. DURHAL, JR., JACK
E. ELLIS, DONNA E. FARRIS, WILLIAM
"BILL" J. GRASHA, ROSA L. HOLLIDAY,
DIANA L. KETOLA, JON "JACK" G.
LASALLE, RICHARD "DICK" W. LONG,
LORENZO RIVERA and RASHIDA
H. TLAIB,

      Plaintiffs,

v.

RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

      Defendant.

Case No. 17-cv-14148

Hon. Eric L. Clay
Hon. Denise Page Hood
Hon. Gordon J. Quist

_____/

## DEFENDANT'S REPLY IN FURTHER SUPPORT OF HER MOTION TO STAY OR TO DISMISS

Defendant, Secretary of State Ruth Johnson ("Defendant"), by and through her attorneys, states as follows for her Reply to Plaintiffs' Response to Defendant's Motion to Stay and to Dismiss and Brief in Support:

**I.    Plaintiffs understate the importance to this case of the questions presented in *Whitford* and *Benisek*.**

Plaintiffs oppose a stay—which is not likely to exceed four months' duration—until the Supreme Court decides *Whitford* (Supreme Court Dkt. No. 16-1161) and *Benisek* (Supreme Court Dkt. No. 17-333). The Supreme Court has

already heard *Whitford*, and *Bensiek* is set for oral argument on March 28—both decisions are anticipated by the end of June.  Despite the imminent release of these decisions, which concern the core issues presented here (of standing, justiciability of partisan gerrymandering claims, and the standards to apply to such claims *if* justiciable), Plaintiffs assert that there is no reason to delay discovery.  Indeed, Plaintiffs have already started discovery, serving notice on Defendants of subpoenas Plaintiffs plan to issue to *76 nonparties*, including Defendant's counsel and his law firm. (See Exhibit 1.)  Plaintiffs thus desire to immediately commence discovery of various state actors (as well as possible litigation over that discovery with third parties) without knowing what standards will apply, whether they have standing to challenge the entire state and Congressional plans, or whether their cause of action is viable in the first instance.

According to Plaintiffs, "intent . . . is extremely likely to be relevant under any standard announced by the Court."  (Resp., ECF 50, PageID.120.)  Plaintiffs' statement regarding intent incorrectly assumes that the Supreme Court will announce standards at all, and ignores that the Court may well find partisan gerrymandering cases to be nonjusticiable (a prospect Plaintiffs do ultimately acknowledge).  (*See* Resp. Br., ECF 50, PageID.144.)  The last time the Supreme Court visited questions of standing and justiciability in partisan gerrymandering cases—in 2004's *Vieth v. Jubelirer*, 541 U.S. 267 (2004)—it declined to provide

such standards.  A majority of the justices then agreed that the partisan gerrymandering claims of individual Democrats *could not* be heard, either because (as Defendant has argued here) individual plaintiffs lacked standing, *id.* at 328 (Stevens, J., dissenting), there was no workable standard then available, *id.* at 306-07 (Kennedy, J., concurring), or the question itself was nonjusticiable, *id.* at 305-06 (plurality opinion) (Scalia, Rehnquist, O'Connor, and Thomas, JJ.).

And if the Supreme Court does find the question nonjusticiable, it may do so on the basis that the question is inappropriate for the judiciary in the first place—regardless of articulable standards.  The Constitution facially reserves control over partisan gerrymandering to Congress rather than the Courts.  *See Vieth*, 541 U.S. at 277 (plurality opinion) (citing *Nixon v. United States*, 506 U.S. 224 (1993)).  As detailed by Justice Scalia writing for the plurality in *Vieth*:

> It is significant that the Framers provided a remedy for [partisan gerrymanders] in the Constitution.  Article I, § 4, while leaving in state legislatures the initial power to draw districts …, permitted Congress to "make or alter" those districts if it wished.  Many objected to the congressional oversight established by this provision. . . .  James Madison responded in defense of the provision that Congress must be given the power to check partisan manipulation of the election process by the States. . . .  [*Id.* at 275 (plurality opinion) (footnote omitted).]

Notwithstanding Plaintiffs' optimism, the Supreme Court has been unable to answer the question of justiciability for decades; it is well within possibility that it will finally do so in the negative.  Apart from a district court that has approved a

3

novel theory concerning existence of justiciable standards (the Western District of Wisconsin in *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016)) or speculation on causes of action arising under the First Amendment (in the stayed proceedings before the District Court of Maryland in *Benisek v. Lamone*, 266 F. Supp. 3d 799 (D. Md. 2017)), the justiciability and standing questions left open by *Vieth* have not been answered. Plaintiffs frame justiciability as an afterthought, when it has been and remains the core question before the Court.

While the Supreme Court considers the questions[1] in *Whitford* and *Benisek—including the question of standing of individual plaintiffs* as raised by Defendant's motion—the Supreme Court has stayed other partisan gerrymandering challenges, even when doing so threatens relief in the upcoming election. The Court thus stayed the district court's order requiring new plans in *Whitford*, and as noted in Defendant's primary brief, on January 18, 2018, it stayed remedial proceedings in *Rucho v. Common Cause* (Supreme Court Dkt. No. 17A745). (Plaintiffs do not discuss the Supreme Court's stay in *Rucho*, focusing instead on the district court's earlier denial of a requested stay).

Even if justiciability is ultimately determined in their favor, Plaintiffs' claim that intent is "extremely likely to be relevant," (Resp., ECF 50, PageID.120), is

---

[1] Copies of the Questions Presented in these cases are attached as **Exhibits 2** and **3**, respectively.

still nothing but hopeful prognostication. The Supreme Court may find that intent need not be proven, is irrelevant, or is to be presumed but rebuttable (*e.g.*, as is the framework established in equal population challenges where districts deviate from average by more than 10%). *See Brown v. Thompson*, 462 U.S. 835, 842 (1983).

In sum, the factors that will govern partisan gerrymandering claims (of both varieties pleaded here) are not some footnote in *Whitford* and *Benisek*—they are the core questions presented. In four months' time (three months by the time this Court hears argument as preliminarily scheduled on March 20), the Court and the parties will know with certainty whether the Supreme Court has decided that a cause of action exists in this case at all—and if so, what the contours of such claims might be. All parties would benefit from knowing these contours before facing the risk of unnecessary proceedings and expending public and private resources in formulating, responding to, and possibly litigating discovery.

II.     **Plaintiffs overstate the urgency of commencing discovery as concerns relief for the November 2020 election cycle.**

Plaintiffs' application of the stay analysis factors from *Landis v. North American Co.*, 299 U.S. 248 (1936), begins from a faulty proposition: that Plaintiffs' ability to obtain relief in the *2020* election cycle will be threatened by waiting until June for the Supreme Court to hand down guidance in *Whitford* and *Benisek*. (Resp. Br., ECF 50, PageID. 138-141.) Contrary to Plaintiffs' formulation, *Landis* only requires the Secretary to show hardship or inequity where

5

there is a "fair possibility" the stay will also harm Plaintiffs or the public, *see Landis*, 299 U.S. at 255—but there is no such "fair possibility" here. Without such "fair possibility," Courts routinely find that judicial economy and the avoidance of discovery burdens on the parties are sufficient to support a stay of limited duration. *See Arab Am. Civil Rights League v. Trump*, No. 17-10310, 2017 WL 2501060, at *1-2 (E.D. Mich. June 9, 2017) (staying challenge to immigration order pending Supreme Court's decision as guidance was anticipated to "simplify these proceedings"); *Schartel v. OneSource Tech., LLC*, No. 1:15 CV 1434, 2015 WL 7430056, at *2 (N.D. Ohio Nov. 17, 2015) ("[A]ll parties face the risk of unnecessary proceedings and expenses if the case is not stayed. In the event one of the two cases [pending before the Supreme Court] results in this Court losing jurisdiction over this matter, the Court and the parties will have engaged in unnecessary and extensive discovery and motion practice. In addition, judicial resources will be spared." (footnote omitted)). This is especially true where a higher court has signaled that lower courts should await instruction before proceeding, as is the case here in that the Supreme Court stayed further proceedings in *Rucho*. *See, e.g.*, *United States v. Pary*, No. 13-20142, 2016 WL 4376207, at *1 (E.D. Mich. Aug. 17, 2016) (Hood, J.) (at suggestion of Sixth Circuit, staying prisoner's motion under the Fifth Amendment Due Process Clause

until Supreme Court decided then pending case of *Beckles v. United States*, 136 S. Ct. 2510 (2016) (Mem.)).

By Plaintiffs' accounting, replacement maps (if required) must be in place by March of 2020—some 21 months after decision is anticipated in *Whitford* and *Benisek*. Plaintiffs rely on *Whitford* to develop a multi-year timeframe for relief in gerrymandering cases, but *Whitford* is a test case. It concerns novel theories of harm and new standards for assessing gerrymandering while trying to attract the majority decision that eluded redistricting plaintiffs over a decade ago in *Vieth*. Once *Whitford* and *Benisek* are decided, and the viability (as well as the standards, if any) of a cause of action for partisan gerrymandering are known, 21 months will be ample time for the parties to engage in discovery, motion practice, trial, and to develop and implement remedial measures in this case if necessary.

The authorities Plaintiffs cite in which courts refused to grant stays in redistricting cases are also distinguishable in that the timing of the requests for stay and upcoming elections were fundamentally different than the timeline presented here. The request for a stay in *Georgia State Conference of the NAACP v. Georgia*, 269 F. Supp. 3d 1266 (N.D. Ga. 2017), for example, (Resp. Br., ECF 50, PageID.144), was made in August of 2017, before the parties in *Whitford* had even engaged in oral argument. (Here, conversely, a decision could issue in mere months but in all events is expected by June of 2018). In *Johnson v. Mortham*,

(Resp. Br., ECF 50, PageID.140), the request for stay was evaluated in November of 1995 and denied in view of the upcoming 1996 congressional elections, *Johnson*, 915 F. Supp. 1529, 1549-50 (N.D. Fla. 1995)—here, the equivalent would be considering a stay in November of *2019*, not February of 2018. Finally, in *Larios v. Cox*, (Resp. Br., ECF 50, PageID.140), the stay was considered in February 2004 and denied given the potential impact on the *November 2004* election later that same year. *Larios*, 305 F. Supp. 2d 1335, 1344 (N.D. Ga. 2004).

Plaintiffs' specter of harm is derived by making multiple unsupported assumptions about the results in this case and the Supreme Court's actions in an appeal. Plaintiffs assume that they will win, that the Supreme Court will grant a full hearing on another partisan gerrymandering case the year *after* deciding *Whitford* and *Benisek* (though the vast majority of redistricting cases are not set for a full hearing), and that the Supreme Court would stay this Court's order pending appeal in the face of 2020 elections. If the timeline is assessed without tacking on additional time for the unlikely scenario of a full hearing at the Supreme Court, it is plain that 21 months is ample time for the parties to engage in discovery, conduct, trial, and devise a remedy. In *Whitford*, trial was complete within a year of the filing of the Complaint; in *Rucho*, the complaint was filed in September of 2016, trial was in October of 2017, and opinions were issued requiring a replacement map in January of 2018—within 18 months. If this Court reaches a

decision within the next year and a half, there is no reason to think a remedy could not be developed and implemented in time for 2020.

Plaintiffs' claims of urgency are further belied by their own delay in filing this action. If the loss of four months while awaiting the Supreme Court's direction is so harmful, there can be no reason for Plaintiffs' 15 month delay in filing their suit after the November 2016 election. A full year ago, in February of 2017, Plaintiffs' counsel sent letters to roughly 60 persons (including state legislators and others) demanding they preserve evidence and alleging that Michigan's redistricting maps were the result of a partisan gerrymander. At that time, Plaintiff's counsel reported his plans to file suit to news media. (*See* Jonathan Oosting, *Dems to challenge 'partisan gerrymander' in Michigan*, THE DETROIT NEWS, Feb. 1, 2017, http://www.detroitnews.com/story/news/local/michigan/2017/02/01/dems-challenge-partisan-gerrymander-michigan/97340740/.) If proceeding with discovery is so urgent, Plaintiffs made it so.

In sum, the motion for stay should be granted because the stay would be for limited duration and the Court as well as the parties would avoid significant burdens by awaiting the imminent instruction of the Supreme Court. There is no "fair possibility" of harm in a limited delay. In view of the potential dispositive effect, or at least simplification of issues, there is more than sufficient justification to await the decisions in *Whitford* and *Benisek*.

**III.       Plaintiffs' standing discussion gives no plausible basis for departing from *Hays*.**

In seeking to support the existence of individual voter standing for their statewide claims, Plaintiffs focus this Court's attention on *Davis v. Bandemer*, 478 U.S. 109 (1986)—a 1986 decision in which Article III standing is never discussed. (Standing also was not discussed by the district court in the underlying decision. *See Bandemer v. Davis*, 603 F. Supp. 1479 (S.D. Ind. 1984)). Plaintiffs assert that *Bandemer* stands for the proposition that individuals have standing to attack a statewide map—it does not. Plaintiffs' argument is that *Bandemer* found partisan gerrymandering claims to be justiciable and that "standing is an element of justiciability." (Resp. Br., ECF 50, PageID.153.) Plaintiffs make the assertion that the Supreme Court "has never disavowed" the finding of justiciability in *Bandemer*. (Resp. Br., ECF 50, PageID.149.)

Consideration of *Vieth* and *United States v. Hays*, 515 U.S. 737 (1995), shows why Plaintiffs are incorrect. Starting from Plaintiffs' premise that "standing is an element of justiciability," *five justices* agreed in *Vieth* that individual voters' partisan gerrymandering claims were nonjusticiable—four (Scalia, Rehnquist, O'Connor, and Thomas, JJ.) on the basis that standards cannot be elucidated, *Vieth*, 541 U.S. at 305-06 (plurality opinion), and a fifth (Stevens, J.) on the basis that individual plaintiffs lack standing to challenge statewide maps. *Id.* at 328 (Stevens, J., dissenting). "[E]ither the absence of standing *or* the presence of a political

10

question suffices to prevent the power of the federal judiciary from being invoked." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974). When at least five justices agree in a result, albeit one or more does so in a dissent or concurrence, lower courts must reach that result as well. *See, e.g.*, *United States v. Jacobsen*, 466 U.S. 109, 115-18 & n.12 (1984).

The justiciability determination in *Bandemer* on which Plaintiffs rely further came a decade *before* the Supreme Court found plaintiffs in racial gerrymandering cases lack standing to challenge statewide maps in *Hays*. Plaintiffs do not provide sufficient argument against the application of *Hays*, premising their assertion that *Hays* is limited to racial gerrymandering cases on subsequent judicial silence. (*See* Resp. Br., ECF 50, PageID.162.) Plaintiffs cite district court decisions in *Rucho* and *Whitford* for the proposition that *Hays* should not apply, ignoring that other federal panelists have held just the opposite. That is, even after the district court decision in *Whitford,* a three judge panel in the Middle District of Alabama held that *Hays*—not *Bandemer*—controlled the issue of standing in partisan gerrymandering cases. *Ala. Legislative Black Caucus v. Alabama*, Nos. 2:12-CV-691, 2:12-CV-1081, 2017 WL 4563868, at *4-5 (M.D. Ala. Oct. 12, 2017). In dismissing partisan gerrymandering claims brought with respect to districts in which no plaintiffs resided, the *Alabama Legislative Black Caucus* Panel expressly disagreed with the Western District of Wisconsin's decision in *Whitford*:

11

In *Hays*, the Supreme Court reasoned that alleged victims of racial gerrymandering could establish individual harm either by living in an affected district or by proving that they had been personally classified on the basis of race. Assuming that partisan classifications are also constitutionally suspect, an alleged victim of partisan gerrymandering must make the same showing of residency or individual harm. . . . Like racial gerrymandering, partisan gerrymandering has the effect of muting the voices of certain voters within a given district. Although these district-specific power allocations have consequences for statewide politics, the *Hays* Court required that plaintiffs establish an individual harm that directly stems from an unconstitutional classification.

We acknowledge that the Western District of Wisconsin reached a different conclusion in *Whitford v. Gill*, 218 F. Supp. 3d 837, 927 (W.D. Wis. 2016). . . . The court distinguished *Hays*, reasoning that *Hays* addressed the harm caused "not when the racial group's voting strength has been diluted, but when race has been used as a basis for separating voters into districts." *Id.* at 929 (internal quotation marks omitted). According to the district court, this individual racial stigma is different from the "statewide" injury of being unable to "translate votes into seats." *Id*. The court also cited *Baker v. Carr*, 369 U.S. 186, 207-08 (1962), a pre-*Hays* decision that held that voters in "disfavored" counties had standing to challenge a statewide apportionment statute. *Whitford*, 218 F. Supp. 3d at 928.

We respectfully disagree. The *Whitford* court distinguished the inherent harm an individual suffers when he is categorized on the basis of race from the universal injury all Wisconsin Democrats suffered when the redistricting plan hindered their efforts to "translate their votes into seats." *Id*. at 929. According to the court, the first kind of harm affects only the residents of a race-based district, while the latter injury has statewide

12

> repercussions. This reasoning would be persuasive if the only harm *Hays* addressed was the stigma of racial classification. But the *Hays* court also found that racial gerrymandering creates the "special representational harm" of a district's "elected officials being more likely to believe that their primary obligation is to represent only the members of that racial group." *Hays*, 515 U.S. at 744-45 (quoting [*Shaw v. Reno*, 509 U.S. 630, 648 (1993)]). *Hays* specifically tied racial classifications to the political injuries that emerge when members of a group lack influence within their district. And when "a plaintiff does not live in such a district, he or she does not suffer those special harms" absent specific evidence that the plaintiff personally has been the subject of an unconstitutional classification. *Id*. at 745. Under this analysis, the . . . plaintiffs lack standing to challenge districts in which they do not live because they cannot establish an individual constitutional injury. [*Ala. Legislative Black Caucus*, 2017 WL 4563868, at *4-5.]

The court correctly summarizes what Justice Stevens concluded in *Vieth* as well—that there is no logical basis within standing analysis to preclude statewide suit by plaintiffs in racial cases while permitting those in partisan cases. *Id.*

In one breath, Plaintiffs chide the Secretary for citing to standing analysis in racial gerrymandering cases, and in the next, they quote and cite to various *equipopulation* cases for the proposition that individual voters should have standing to sue for vote dilution. (*Compare* Resp. Br., ECF 50, PageID.148, *and* Resp. Br., ECF 50, PageID.150 (citing *Reynolds v. Sims*, 377 U.S. 533 (1964); *Wesberry v. Sanders*, 376 U.S. 1 (1964).) The harms in equipopulation vote dilution cases, however, are fundamentally different from those in gerrymandering

13

cases. The harm in equipopulation cases is concrete and mathematically ascertainable based on comparison of the relative value of votes against an ideal *statewide* average. A person in an overpopulated district is harmed because their votes are worth less than voters in other districts throughout the entire state. In gerrymandering cases, conversely, the harm is both more nebulous and necessarily district-specific—party preferences, the effectiveness and responsiveness of individual representatives, natural geography, and district history, among other factors, all may play a role in assessing harm.

In conclusion, five justices in *Vieth* agreed that individual partisan gerrymandering claims cannot proceed. This Court should not depart from that conclusion, or from *Hays*, by allowing such claims to proceed here.

## IV. Conclusion

Defendant Ruth Johnson respectfully requests that this Court stay this action or, in the alternative, that her Motion to Dismiss be granted.

        Respectfully submitted,

        DICKINSON WRIGHT PLLC

Dated: February 20, 2018        /s/ Robert P. Young
        Robert P. Young
        Attorneys for Defendant
        215 S. Washington Sq., Suite 200
        Lansing, MI 48933
        (517) 371-1730

## Certificate of Service

I hereby certify that on February 20, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

                                    Respectfully submitted,

                                    <u>/s/ Robert P. Young</u>

Dated: February 20, 2018

LANSING 56620-2 530414v3