UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MICHIGAN, et al., ) ) ) Plaintiffs, ) ) v. ) ) RUTH JOHNSON, in her official capacity as Michigan Secretary of State, ) ) ) ) ) Defendant. ) ) ) | No. 2:17-cv-14148 OPINION AND ORDER |

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS FOR LACK OF STANDING

Before the Court is Defendant's Motion to Stay and to Dismiss for Lack of Standing. [Dkt. No. 11.] On March 14, 2018, this Court issued an order severing and disposing of the portion of Defendant's motion that requested a stay of proceedings. [Dkt. No. 35.] The remainder of Defendant's motion, which we refer to as Defendant's Motion to Dismiss for Lack of Standing, is now fully briefed and argued. For the reasons that follow, we **GRANT IN PART** and **DENY IN PART** Defendant's Motion to Dismiss for Lack of Standing.

BACKGROUND

On December 22, 2017, the League of Women Voters of Michigan, along with several individuals, (collectively "Plaintiffs") filed a Complaint for Declaratory and Injunctive Relief [Dkt. No. 1] against Defendant Ruth Johnson, in her official capacity as Secretary of State for the State of Michigan. Plaintiffs challenge Michigan's current apportionment plan, which was

1

implemented by the state legislature as Michigan Public Act 129 of 2011. Plaintiffs bring claims under 42 U.S.C. §§ 1983 and 1988, alleging that the current apportionment plan violates Plaintiffs' constitutional rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs challenge the current apportionment plan "district by district and in its entirety." [Dkt. No. 1, Compl. ¶ 36, at PageID #16.]

## DISCUSSION

Defendant invokes Rule 12(b)(1) of the Federal Rules of Civil Procedure to challenge this Court's subject matter jurisdiction. Specifically, Defendant argues that Plaintiffs lack standing on the face of their complaint. Defendant distinguishes between Plaintiffs' attempts to challenge the current apportionment plan on a statewide basis and on a district by district basis, focusing the majority of her arguments on Plaintiffs' statewide claims. We agree with Defendant that Plaintiffs lack standing to bring their claims on a statewide basis. However, we reject Defendant's arguments that Plaintiffs lack standing to bring their claims on a district by district basis.

**I.      Standard of Review**

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of an action for lack of subject matter jurisdiction. "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). A facial attack, raised here, "goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.*

## II.    Analysis

"Standing includes three constitutional requirements: 'a plaintiff must show: (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 793 (6th Cir. 2009).  "A plaintiff bears the burden of demonstrating standing and must plead its components with specificity."  *Id.* (quoting *Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 645 (6th Cir. 2004)).

### A.  Standing of Individual Plaintiffs

#### 1.    Statewide Standing

Defendant first argues that the individual Plaintiffs lack standing to bring their claims on a statewide basis, asserting that the injuries the individual Plaintiffs allege are "necessarily district specific."  [Dkt. No. 20 at PageID #194.]   In other words, Defendant argues that Plaintiffs' alleged injuries are traceable only to their districts and not to the apportionment plan as a whole.  The Supreme Court has not provided guidance regarding the geographic nature of political gerrymandering injuries.  In two separate cases, the Supreme Court has analyzed political gerrymandering claims and found that the plaintiffs had failed to articulate a satisfactory method of measuring and redressing their claimed injuries.  *See generally Vieth v. Jubelirer*, 541 U.S. 267 (2004); *Davis v. Bandemer*, 478 U.S. 109, 113 (1986).  Neither case resolved the question now before this Court.

However, the Supreme Court recently analyzed the nature of a plaintiff's injury in the analogous context of racial gerrymandering.  In *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1262, 1265 (2015), the Supreme Court reviewed a challenge to Alabama's

3

redistricting plan for both houses of the Alabama legislature. Justice Breyer, writing for the majority, opened his analysis by examining the "geographic nature of the racial gerrymandering claims":

> The District Court repeatedly referred to the racial gerrymandering claims as claims that race improperly motivated the drawing of boundary lines of the State considered as a whole.
>
> A racial gerrymandering claim, however, applies to the boundaries of individual districts. It applies district-by-district. It does not apply to a State considered as an undifferentiated "whole." We have consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more specific electoral districts. We have described the plaintiff's evidentiary burden similarly.
>
> Our district-specific language makes sense in light of the nature of the harms that underlie a racial gerrymandering claim. Those harms are personal. They include being "personally ... subjected to [a] racial classification," as well as being represented by a legislator who believes his "primary obligation is to represent only the members" of a particular racial group. They directly threaten a voter who lives in the district attacked. But they do not so keenly threaten a voter who lives elsewhere in the State. Indeed, the latter voter normally lacks standing to pursue a racial gerrymandering claim.
>
> Voters, of course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district. And voters might make the claim that every individual district in a State suffers from racial gerrymandering. But this latter claim is not the claim that the District Court, when using the phrase "as a whole," considered here.

*Id.* (citations omitted).

We find that the geographic nature of political gerrymandering claims is susceptible to the same analysis. Although the level of scrutiny that applies to the merits of a given gerrymandering case will vary depending on the nature of the discriminatory motivation alleged, *see United States v. Carolene Prod. Co.*, 304 U.S. 144, 153 n.4 (1938), the standing analysis remains the same because we measure injury based on discriminatory effect and not discriminatory motivation.

4

The two discriminatory harms described in *Alabama Legislative Black Caucus* pertain equally to political gerrymandering cases. *See* 135 S. Ct. at 1265. The first such harm is being personally subjected to a discriminatory classification. *Id.* In the context of a gerrymandered apportionment plan, an individual is subjected to a discriminatory classification when she is placed in a particular congressional or legislative district with the purpose and effect of impeding her political success. *See White v. Regester*, 412 U.S. 755, 765–66 (1973). Historically, states have achieved this effect by creating a small number of districts that are saturated ("packed") with members of the targeted group and scattering ("cracking") the remaining members across many other districts. *See Ala. Legislative Black Caucus*, 135 S. Ct. at 1280–82 (Scalia, J., dissenting). The targeted group's political power is thereby minimized; its power is highly concentrated in a few districts that are politically impotent on a statewide level (or, in the case of congressional districts, less represented on the national level), and the group's power is diluted in the remaining districts such that its members have no realistic opportunity to elect a candidate of their choice. *See id.*; *White*, 412 U.S. at 765–66; *Karcher v. Daggett*, 462 U.S. 725, 789 n.13 (1983) (Stevens, J., concurring) ("Depending on the circumstances, vote dilution may be demonstrated if a population concentration of group members has been fragmented among districts, or if members of the group have been overconcentrated in a single district greatly in excess of the percentage needed to elect a candidate of their choice."). In this way, discriminatory gerrymandering removes individuals from their natural communities of interest and places them into artificial communities held together first and foremost by the targeted characteristic. The "communities that our Constitution seeks to weld together as one become separatist." *See Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 648 (1993) (quoting *Wright v. Rockefeller*, 376 U.S. 52, 66–67 (1964) (Douglas, J., dissenting)). Each individual member of

the targeted group is harmed by this process to the extent that it eliminates his or her opportunity to vote with and belong to a natural community of interest.

The second harm that the Supreme Court describes in *Alabama Legislative Black Caucus* is the flipside of the first; it arises when a member of the targeted group is represented by a politician who has come to "believe that their primary obligation is to represent only the members of that group[.]" *See* 135 S. Ct. at 1265 (quoting *Shaw I*, 509 U.S. at 648). When cracked and packed districts pave over natural striations of community interests, political candidates are faced with constituencies that have little in common aside from their membership in the targeted group. In order to appeal to these voters who have been stripped away from their natural communities of interest, candidates must seek the common ground; successful candidates must subject their very own constituents to discriminatory classifications. *See Shaw I*, 509 U.S. at 648. The paradigm that follows—that districts come to be represented by caricatures of the targeted race, political party, or other arbitrary characteristic—is "altogether antithetical to our system of representative democracy." *Id.* And because this paradigm robs citizens of the chance to be represented as multifaceted individuals, it is a cognizable injury under the Constitution. *See Ala. Legislative Black Caucus*, 135 S. Ct. at 1265; *Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("[T]he Government must treat citizens 'as individuals, not "as simply components of a racial, religious, sexual or national class."'") (quoting *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 602 (1990) (O'Connor, J., dissenting)).

Because the discriminatory harms in racial and political gerrymandering cases are so similar, we find that the geographic nature of the alleged injury in this case is indistinguishable from that of the plaintiffs in *Alabama Legislative Black Caucus*. *See* 135 S. Ct. at 1265. Those injuries, the Supreme Court explained, were distinctly personal, with their epicenter located in

each individual district allegedly drawn with purpose and effect of inflicting discriminatory harm. *See id.* A political gerrymandering injury is therefore traceable to an individual's own district but not to the state's apportionment plan as an "undifferentiated 'whole.'" *See id.* It follows that an individual may obtain standing to challenge his or her own legislative and congressional districts but may not obtain standing to challenge an apportionment plan in its entirety.

The individual Plaintiffs in this case concede the crux of this matter, articulately explaining that "the injury giving rise to core Article III standing is the same" regardless of the alleged "basis on which the state discriminates—whether arbitrary geographic criteria, military status, race, political party, or some other factor." [Dkt. No. 15 at PageID #150–51.] Nevertheless, the individual Plaintiffs attempt to escape the inevitable consequence of this fact by raising two arguments, neither of which is persuasive. We address each in turn.

*First*, the individual Plaintiffs argue that the Supreme Court upheld standing to challenge apportionment schemes on a statewide basis in *Davis v. Bandemer*, a political gerrymandering case. [Dkt. No. 15 at PageID #152–53 (citing *Bandemer*, 478 U.S. at 127).] But Plaintiffs' argument relies on a mischaracterization of *Bandemer*; the Supreme Court did not resolve the question of standing in that case, and indeed, the Court's fractured opinions left numerous issues unresolved. Plaintiffs refer to Part III of Justice White's opinion, in which he discussed the nature of a political gerrymandering injury:

> [W]e agree with the District Court that the claim made by the appellees in this case is a claim that the 1981 apportionment discriminates against Democrats on a statewide basis. . . . Although the statewide discrimination asserted here was allegedly accomplished through the manipulation of individual district lines, the focus of the equal protection inquiry is necessarily somewhat different from that involved in the review of individual districts.

7

*Bandemer*, 478 U.S. at 127. But this Part of *Bandemer*, which was joined by only four justices, is not controlling. The majority in *Bandemer* resolved only whether a political gerrymandering claim "presents a justiciable controversy or a nonjusticiable political question." *Bandemer*, 478 U.S. at 118. Plaintiffs repeatedly suggest, incorrectly, that the majority's justiciability holding also resolved the "narrower standing question now before this Court," [Dkt. No. 15 at PageID #149; *see also id.* at 154, 155, 162], and that it "necessarily endorsed the *Bandemer* plaintiffs' standing to challenge Indiana's statewide redistricting scheme." [Dkt. No. 15 at PageID #153.] The question of whether a case presents an unjusticiable political question is wholly separate from the question of standing. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 205–08, 208–37 (1962) (conducting separate standing and justiciability inquiries). We reject Plaintiffs' attempt to conflate the two analyses.

*Second*, Plaintiffs argue that this Court should issue a ruling that is consistent with *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 2018 WL 341658 (M.D.N.C. 2018) and *Whitford v. Nichol*, 151 F. Supp. 3d 918 (W.D. Wis. 2015), two recent cases in which Plaintiffs assert that district courts upheld challenges to apportionment plans on a statewide basis. Again, however, Plaintiffs misconstrue their cited cases. In *Rucho*, the district court specifically noted that it was permitting a group of plaintiffs to challenge an entire state apportionment plan only because the plaintiffs hailed from every district in the state—*not* because any individual plaintiff had standing to bring a statewide claim:

> Although we conclude that Plaintiffs may assert their partisan gerrymandering claims on a statewide basis, Plaintiffs' *standing to challenge the plan as a whole does not rest on that conclusion*. In particular, individual Plaintiffs have suffered cognizable injuries-in-fact and reside in each of the congressional districts included in 2016 Plan. Plaintiffs, therefore, have standing to assert *district-by-district challenges to the Plan as a whole*.

8

*Rucho*, 2018 WL 341658, at *14 n. 9 (emphases added) (internal citation omitted).  Thus, *Rucho* presented the precise circumstances discussed in *Alabama Legislative Black Caucus*, where "voters might make the claim that every individual district in a State suffers from . . . gerrymandering."  135 S. Ct. 1257, 1265 (2015).  Meanwhile, the *Whitford* court indeed permitted a group of plaintiffs to challenge an apportionment plan on a statewide basis, but in doing so the court recognized the likelihood that its decision could be overturned:

> Although it may be that ultimately the Supreme Court decides to limit standing in all gerrymandering cases the same way it has limited racial gerrymandering claims under the equal protection clause, we believe that, under current law, plaintiffs have adequately alleged an injury in fact.

*Whitford*, 151 F. Supp. 3d at 926–27.  We conclude that the individual Plaintiffs in this case lack standing to challenge the Michigan apportionment plan on a statewide basis.  If the Supreme Court holds otherwise, Plaintiffs may seek leave to amend their filings as appropriate.

### 2. District by District Standing

Defendant brings a vague challenge to the individual Plaintiffs' standing to bring their claims on a district by district basis, arguing that "Plaintiffs have in fact made no effort to plead a 'district by district' challenge" and that the complaint contains "no allegation of district-specific harm."  [Dkt. No. 11 at PageID #99.]  Defendant asserts that district-specific harm includes, "for example, that any particular legislator has been or will be indifferent to their Democratic constituents, or that any Plaintiff has been stigmatized by classification as a Democrat."  [*Id.*] But the concept of harm in a gerrymandering case has never been so limited, with the Supreme Court recognizing from its earliest gerrymandering cases that the reduction or elimination of voting power is a cognizable injury:

> We hold that the appellants do have standing to maintain this suit. Our decisions plainly support this conclusion. . . . [Appellants'] constitutional claim is, in substance, that the 1901 statute constitutes arbitrary and capricious state action,

9

> offensive to the Fourteenth Amendment in its irrational disregard of the standard of apportionment prescribed by the State's Constitution or of any standard, effecting a gross disproportion of representation to voting population. The injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a-vis voters in irrationally favored counties. A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution[.]

*Baker*, 369 U.S. at 206–08 (citations omitted).

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

*Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

In the first paragraph of their complaint, Plaintiffs allege that they are experiencing archetypal gerrymandering injuries:

> Michigan's durable and severe partisan gerrymander of state legislative and congressional districts violates individual Plaintiffs' First Amendment free speech and association rights and Fourteenth Amendment equal protection rights. It singles out the individual Plaintiffs and hundreds of thousands of other similarly-situated Michigan Democrats based on their political affiliation, and *intentionally places them in voting districts that reduce or eliminate the power of their votes*.

[Dkt. No. 1, Compl. ¶ 1, at PageID #2 (emphasis added).] Plaintiffs then detail an exhaustive theory of how their injury allegedly arose and how it can be measured. In the process, Plaintiffs repeatedly reiterate their central claim of injury and allege that the current apportionment plan "injures *all* Michigan Democrats by diluting the significance of their individual votes at a statewide level." [*Id.* at ¶ 54, PageID #23 (emphasis added).]

The individual Plaintiffs do not lack standing to challenge their own legislative or congressional districts merely because they assert that other Democrats in other districts have also been harmed. *See Ala. Legislative Black Caucus*, 135 S. Ct. 1257 at 1265 ("Voters, of

10

course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district." (citing *Miller*, 515 U.S. at 913, 916)). We therefore reject Defendant's argument that Plaintiffs' complaint lacks any allegation of district-specific harm.

### B. Standing of The League of Women Voters of Michigan

Defendant also argues that the League lacks standing to challenge the Michigan apportionment plan, both on a statewide and district by district basis. We address these two arguments in turn.

#### 1. Statewide Standing

An association like the League must satisfy the same three constitutional requirements that apply to individuals; that is, an association must allege an (1) injury in fact that is (2) fairly traceable to the conduct of the defendants and (3) redressable by a favorable judicial decision. *See Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004). An association may satisfy the first requirement, injury in fact, by asserting an injury suffered by its members. *Id.*; *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975). Alternatively, "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511. The League asserts in its complaint that it has standing to sue as a representative of its members and on its own behalf. [*See* Dkt. No. 1, Compl. ¶ 8, at PageID #5.]

Defendant first argues that the League lacks standing to bring statewide claims on behalf of its members. An association may have standing to sue on behalf of its members if, among other things, the members themselves "would otherwise have standing to sue in their own right." *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 341–43 (1977) (explaining that an association may sue on behalf of its members when (1) its members would otherwise have

11

standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit). In this case, the League may not step into the shoes of its members to bring a statewide claim because its members would lack standing as individual plaintiffs to challenge the apportionment plan on a statewide basis. *See supra*, Part I.A.1. Accordingly, the League lacks standing to bring statewide claims on behalf of its members.

Defendant next argues that the League lacks standing to bring statewide claims on its own behalf. An association may have standing to sue on its own behalf if the association independently satisfies the three previously described constitutional standing requirements. *See Am. Canoe*, 389 F.3d at 544. In order to satisfy the injury in fact requirement, an association must show that its mission has been "perceptibly impaired" by the challenged action, as shown by a "concrete and demonstrable injury to the organization's activities" and a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). The League states that its mission is "to promote political responsibility through informed and active participation in government and to act on selected governmental issues." [Dkt. No. 1, Compl. ¶ 7, at PageID #4.] The League further states that it is "dedicated to encouraging its members and the people of Michigan to exercise their right to vote as protected by the federal Constitution, Michigan Constitution, and federal and state law." [*Id.*] The League describes its activities as including voter training, voter registration, and the development of non-partisan voter guides. [*Id.* ¶ 7, at PageID #5.] In support of its claim of injury, the League alleges that Michigan's current apportionment plan "directly impair[s] the League's mission" because it "discriminate[s] against Michigan Democratic voters by diluting their votes for the

12

purposes of maintaining a Republican advantage in the Michigan Legislature and congressional delegation." [*Id.* ¶ 8, at PageID #5.]

The League has adequately pleaded injury in fact. There are many approaches by which the League might attempt to prove that the current apportionment plan impairs its mission, and this Court does not lack jurisdiction merely because an association's path to proving an alleged injury to its mission is uncharted. "[N]ew technologies may produce new methods of analysis that make more evident the precise nature of the burdens gerrymanders impose on the representational rights of voters and parties." *Vieth*, 541 U.S. at 312–13 (Kennedy, J., concurring).

For instance, the League's mission of increasing engagement in the political process could be plausibly impaired if, as the League alleges, Defendant retaliated against a large segment of the populace for participating in the political process. [*See* Dkt. No. 15 at PageID #157.] Indeed, one of the core definitions of retaliation in this Circuit is "an adverse action . . . that would deter a person of ordinary firmness from continuing to engage in [protected] conduct" and that "was motivated at least in part by the . . . protected conduct." *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). If the League successfully proves its allegation that the current apportionment map deters Michigan residents from participating in the political process, the League will have shown that the current apportionment map has impaired its mission. Alternatively, the League might plausibly demonstrate that the dilution of individuals' political power impairs its mission insofar as it seeks to increase the informed exercise of political power.

Defendant challenges the League's theory of injury, asserting that "nothing about a partisan-gerrymander prevents the League from seeking to encourage voter participation or from

acting in the political sphere on governmental issues." [Dkt. No. 11 at PageID #107.] But this argument misstates the operative question under the associational standing inquiry, which is whether the challenged conduct hampers the association's "ability to *further* its goals"—not merely its ability to pursue them. *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (quoting *Havens*, 455 U.S. at 379); *see Am. Canoe*, 389 F.3d at 546. Defendant's argument therefore fails, and we find that the League has adequately pleaded injury in fact.

We next look to whether the League has adequately pleaded that its injury is traceable to Defendant's conduct.[1] The inquiry is whether the League has alleged "a causal connection between the injury and the conduct complained of." *Shearson v. Holder*, 725 F.3d 588, 592 (6th Cir. 2013) (quoting *Lujan*, 504 U.S. at 560 (1992)). The League alleges that the injury to its mission is caused by the apportionment plan's purpose and effect of "discriminat[ing] against Michigan Democratic voters by diluting their votes for the purposes of maintaining a Republican advantage in the Michigan Legislature and congressional delegation." [Dkt. No. 1, Compl. ¶ 8, at PageID #5.] The League therefore draws a clear link between its alleged injury and the current apportionment plan's alleged purpose and effect.

However, the League's alleged injury arises from the alleged injuries of individual citizens. The League alleges that the dilution of votes and deterrence of political participation impair its mission "to promote political responsibility through informed and active participation in government and to act on selected governmental issues." [Dkt. No. 1, Compl. ¶ 7, at PageID #4.] Thus, the League's mission is traceable to individual injuries, which are in turn traceable only to the lines of individual districts—not the statewide apportionment plan as an

---

[1] Defendant has not challenged traceability. However, a district court has "an independent obligation to confirm its jurisdiction, even in the absence of a state challenge." *Ala. Legislative Black Caucus*, 135 S. Ct. at 1269.

14

"undifferentiated 'whole.'" *See Ala. Legislative Black Caucus*, 135 S. Ct. at 1265. Accordingly, we conclude that the League lacks standing to bring statewide claims on its own behalf.

### 2. District by District Standing

Finally, Defendant attacks the League's standing to challenge Michigan's apportionment plan on a district by district basis, arguing that the League "make[s] no allegations of district-specific harm to support standing[.]" We disagree. The League alleges harm that is specific to each individual district where it performs its outreach activities and where its members reside, which includes "almost every county in the State." [Dkt. No. 1, Compl. ¶ 7, at PageID #5.] The lines of Michigan's legislative and congressional districts bear little if any relationship to Michigan's county lines, with the vast majority of districts including portions of multiple counties. [*See* Dkt. 1-1, Mich. House Dist. Map, at PageID #36; Dkt. 1-2, Mich. Senate Dist. Map, at PageID #38; Dkt. 1-3, Mich. Cong. Dist. Map, at PageID #40.] The Supreme Court found similar pleadings sufficient to support the "common sense inference" that an "organization with members in 'almost every county' . . . will have members in each [challenged] district." *See Ala. Legislative Black Caucus*, 135 S. Ct. at 1269. We find the same logic applicable in this case and are therefore satisfied that the League has standing to challenge the current apportionment plan on a district by district basis. If the League is unable to support its allegations of injury as to any particular district, Defendant may revisit her argument.

**ORDER**

It is hereby ORDERED as follows:

1. Defendant's Motion to Dismiss for Lack of Standing is GRANTED IN PART and DENIED IN PART.

2. Plaintiffs' statewide claims are DISMISSED.

3. Plaintiffs may seek leave to refile their claims on a statewide basis if the Supreme Court issues a decision that upholds standing to assert such claims.

4. Defendant must file an answer to Plaintiff's complaint insofar as it challenges Michigan's apportionment plan on a district by district basis within 14 days after entry of this order.

ENTERED:   May 16, 2018

S/Eric L. Clay
Signed for and on behalf of the panel:

HONORABLE ERIC L. CLAY
United States Circuit Judge

HONORABLE DENISE PAGE HOOD
United States District Judge

HONORABLE GORDON J. QUIST
United States District Judge

**DENISE PAGE HOOD, Chief District Judge, concurring.** I concur. I write specifically to note that inasmuch as the Plaintiffs have not shown that individual Plaintiffs reside in each district included in the Plan, Plaintiffs have no standing to raise a statewide claim. If such can be shown, I believe Plaintiffs together would have standing to raise a statewide claim. In the *Rucho* case, as cited in the opinion above, "individual Plaintiffs have suffered cognizable injuries-in-fact *and reside in each of the congressional districts* included in 2016 Plan." *Common Cause v. Rucho,* 279 F.Supp.3d 587, 615, n.9 (M.D.N.C. 2018) (emphasis added). The *Rucho* panel noted,

> Given the differences between partisan gerrymandering and racial gerrymandering claims—and the similarities between the harms associated with partisan gerrymandering and malapportionment, particularly in the case of congressional districts—we conclude that the Supreme Court's approach to standing in one-person, one-vote cases should guide the standing inquiry in partisan gerrymandering cases (footnote 8 omitted). Under that approach, we find that *groups of Plaintiffs*, some of whom reside in districts in which their votes have been diluted, have standing to challenge the 2016 Plan as a whole. *Accord Whitford v. Gill*, 218 F.Supp.3d 837, 927–28 (W.D. Wis. 2016) (three-judge panel) (concluding that partisan gerrymandering plaintiffs, who resided in a small minority of the districts established by a redistricting plan, had standing to challenge the redistricting plan as a whole), *appeal docketed*, 137 S.Ct. 2289 (2017).

*Id.* at 612–13 (emphasis added).

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 16, 2018, by electronic and/or ordinary mail.

S/Diane R. Marion
Administrative Manager
