# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, ROGER J. BRDAK,
FREDERICK C. DURHAL, JR., JACK
E. ELLIS, DONNA E. FARRIS, WILLIAM
"BILL" J. GRASHA, ROSA L. HOLLIDAY,
DIANA L. KETOLA, JON "JACK" G.
LASALLE, RICHARD "DICK" W. LONG,
LORENZO RIVERA and RASHIDA H.
TLAIB,

        Plaintiffs,

v.

RUTH JOHNSON, in her official capacity as
Michigan Secretary of State,

        Defendant.

_____/

Case No. 17-cv-14148

Hon. Eric L. Clay
Hon. Denise Page Hood
Hon. Gordon J. Quist

| | |
|---|---|
| Dickinson Wright PLLC | Jones Day |
| Peter H. Ellsworth (P23657) | Michael A. Carvin |
| Ryan M. Shannon (P74535) | *Special Assistant Attorney General* |
| *Special Assistant Attorneys General* | 51 Louisiana Ave., NW |
| 215 S. Washington Sq., Suite 200 | Washington D.C. 20001 |
| Lansing, MI 48933 | (202) 879-3939 |
| (517) 371-1700 | macarvin@jonesday.com |
| PEllsworth@dickinsonwright.com | *Attorney for Defendant, Ruth Johnson* |
| RShannon@dickinsonwright.com | |
| *Attorneys for Defendant, Ruth Johnson* | |

_____/

# DEFENDANT SECRETARY OF STATE RUTH JOHNSON'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendant, Michigan Secretary of State Ruth Johnson ("Defendant" or "Secretary"), respectfully moves, pursuant to Fed. R. Civ. P. 56, for summary judgment. In the alternative, the Secretary moves to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(c).

In support of her Motion, the Secretary relies on the accompanying Brief in Support, and the reasons set forth therein.

Pursuant to Local Rule 7.1, the undersigned states that there was a conference between the parties' counsel on September 19, 2018 in which counsel for the Secretary explained the nature of this motion and its legal basis and requested but did not obtain concurrence in the relief sought.

WHEREFORE, the Secretary respectfully requests that this Court grant her Motion and dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

DICKINSON WRIGHT PLLC              JONES DAY

/s/ Peter H. Ellsworth
Peter H. Ellsworth (P23657)         Michael Carvin
Ryan M. Shannon (P74535)            Attorneys for Defendant
Attorneys for Defendant


Dated: September 21, 2018

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, ROGER J. BRDAK,          Case No. 17-cv-14148
FREDERICK C. DURHAL, JR., JACK
E. ELLIS, DONNA E. FARRIS, WILLIAM   Hon. Eric L. Clay
"BILL" J. GRASHA, ROSA L. HOLLIDAY,   Hon. Denise Page Hood
DIANA L. KETOLA, JON "JACK" G.        Hon. Gordon J. Quist
LASALLE, RICHARD "DICK" W. LONG,
LORENZO RIVERA and RASHIDA  H.
TLAIB,

        Plaintiffs,

v.

RUTH JOHNSON, in her official capacity as
Michigan Secretary of State,

        Defendant.

_____/

Dickinson Wright PLLC            Jones Day
Peter H. Ellsworth (P23657)      Michael A. Carvin
Ryan M. Shannon (P74535)         *Special Assistant Attorney General*
*Special Assistant Attorneys General*  51 Louisiana Ave., NW
215 S. Washington Sq., Suite 200  Washington D.C. 20001
Lansing, MI 48933                (202) 879-3939
(517) 371-1700                   macarvin@jonesday.com
PEllsworth@dickinsonwright.com   *Attorney for Defendant, Ruth Johnson*
RShannon@dickinsonwright.com
*Attorneys for Defendant, Ruth Johnson*

_____/

## DEFENDANT SECRETARY OF STATE RUTH JOHNSON'S
## BRIEF IN SUPPORT OF HER MOTION TO
## DISMISS AND FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities ............................................................................iv

Concise Statement of Issues Presented ................................................. viii

Most Appropriate or Controlling Authority................................................x

I.      Introduction.................................................................................1

II.     Facts and procedural history ........................................................3

III.    Standard of review in redistricting cases......................................4

IV.     Plaintiffs' claims must be dismissed under Rule 12........................5

        A.      Standard of review.........................................................5

        B.      Plaintiffs' Complaint did not set forth district-specific claims as
                required under *Gill.* ........................................................5

                1.      Plaintiffs did not plead "cracking" or "packing" as to 155
                        of 162 districts......................................................5

                2.      Dismissal of the remaining district-specific claims is
                        warranted because the Complaint omits allegations of
                        district-specific burden...........................................8

        C.      After the 2018 election, Plaintiffs' three Senate claims should be
                reviewed for mootness. ...................................................9

V.      Plaintiffs' claims are non-justiciable. ........................................10

        A.      Placement of a voter in a district where the voter's party is
                unlikely to prevail is not a constitutional harm....................10

        B.      Supreme Court jurisprudence on partisan gerrymandering claims
                ......................................................................................13

                1.      *Davis v. Bandemer* (1986) ....................................13

                2.      *Vieth v. Jubelirer* (2004) ......................................15

                3.      *LULAC v. Perry* (2006).........................................15

4.     *Gill v. Whitford* (2018) ............................................................16

C.     No workable standard exists to support justiciability. .........................17

VI.    Plaintiffs' claims must be dismissed under Rule 56 ......................................22

A.     Standard of review ...............................................................................23

B.     Plaintiffs have not supported the existence of a cognizable burden as required under *Gill.* ..............................................................24

1.     Plaintiffs have provided no alternative district configurations or explanation of how configurations would support the existence of, or remedy, their harms. ..........28

a)     Plaintiffs failed to support district-specific dilution in lay discovery. ..............................................................28

b)     Plaintiffs' expert reports do not support district-specific dilution. ..........................................................31

C.     Plaintiffs have not presented manageable or well-accepted measures for assessing whether gerrymandering has occurred or is cognizably burdensome. ...............................................................35

1.     The "efficiency gap" test provides no relevant information for district-specific dilution ....................................................38

2.     Dr. Chen's simulation test is not a "well-accepted" measure, even of statewide harm. ...........................................40

D.     The League has not supported its standing. ..........................................42

1.     The League has not supported independent associational standing. ..............................................................................42

2.     The League has not supported standing through its membership. ...................................................................................45

E.     Plaintiffs' harms are speculative and conjectural; no evidence supports that concrete injury in fact will occur in 2020 .....................47

VII.   Conclusion ....................................................................................................49

iii

# TABLE OF AUTHORITIES

## Cases

*Alabama Legislative Black Caucus v. Alabama*, 135 S.Ct. 1257 (2015) ................................................................................................. 19

*Alabama Legislative Black Caucus v. Alabama*, 988 F. Supp.2d 1285 (M.D. Ala. 2013) .................................................................................. 18

*American Canoe Ass'n Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536 (6th Cir. 2004) ......................................................... 43

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................... 23, 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................. 5

*Bush v. Vera*, 517 U.S. 952 (1996) ............................................................. 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................... 23, 28

*Colegrove v. Green*, 328 U. S. 549 (1946) ................................................. 1

*Davis v. Bandemer*, 478 U.S. 109 (1986) ................................................. 2, 11

*Easley v. Cromartie*, 532 U.S. 234 (2001) ................................................ 19

*Gaffney v. Cummings*, 412 U.S. 735 (1973) .............................................. 12, 13, 36

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ................................................. passim

*Greater Cincinnati Coalition for the Homeless v. City of Cincinnati.*, 56 F.3d 710 (6th Cir. 1994) ....................................................... 42

*Harris v. Cooper*, 138 S. Ct. 2711 (June 28, 2018) ................................... 16

*Harris v. McCrory*, 2016 WL 3129213, No. 1:13-cv-949 (M.D. N.C. June 2, 2016) ......................................................................... 16, 18

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .............................. 43

iv

*Klepper v. First Am. Bank*, 916 F.2d 337 (6th Cir. 1990) ......................................23

*LeRoux v. Sec'y of State*, 640 N.W.2d 849 (Mich. 2002)........................................32

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .......................... 22, 28, 35, 48

*LULAC v. Perry*, 548  U.S. 399 (2006) ........................................................... passim

*Mandel v. Bradley*, 432 U.S. 173 (1977) ..................................................................14

*Miller v. Johnson*, 515 U.S. 900 (1995).............................................................. 4, 49

*Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294 (6th Cir. 2008)..................................6

*O'Lear v Miller*, 222. F. Supp.2d 850 (E.D. Mich. 2002).......................................14

*O'Lear v. Miller,* 222 F. Supp. 2d 862 (E.D. Mich. 2002)......................................14

*O'Lear v. Miller*, 537 U.S. 997 (2002) ...................................................................14

*Poplar Creek Development v. Chesapeake Appalachia,* 636 F.3d 235
    (6th Cir. 2011).......................................................................................................5

*R&B Fallon Corp. v. American Exploration Co.,* 154 F. Supp. 2d 969
    (S.D. Tex. 2001) ....................................................................................................6

*Radogno v. Illinois State Bd. of Elections*, 2011 WL 5868225, at *2
    (N.D. Ill., November 22, 2011) ........................................................... 18, 20, 21

*Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997)...........................................27

*Reynolds v. Sims,* 377 U.S. 533 (1964)....................................................................11

*United Parcel Service, Inc. v. U.S. Postal Service*, 184 F. 3d 827 (D.C.
    Cir. 1999) .............................................................................................................41

*Vieth v. Jubelirer*, 541 U.S. 267 (2004).......................................................... passim

*Wise v. Lipscomb*, 437 U.S. 535 (1978)....................................................................4

**Statutes**

Mich. Comp. Laws § 3.63(b)(vi) ...............................................................................32

Mich. Comp. Laws § 4.261................................................................................ 26, 32

**Other Authorities**

Benjamin Fifield et al., A New Automated Redistricting Simulator Using Markov Chain Monte Carlo, *forthcoming* (May 24, 2018 draft, p. 2), https://imai.fas.harvard.edu/research/files/redist.pdf.......................41

General Election Results, Michigan Sec'y of State, https://www.michigan.gov/sos/0,4670,7-127-1633_8722---,00.html (last accessed September 19, 2018).......................................26

Jowei Chen & Jonathan Rodden, Cutting Through the Thicket: Redistricting Simulations and the Detection of Partisan Gerrymanders, 14:4 Election L. Journal 331 (2015)..........................................40

Paul Egan, *Voter turnout shatters recent records for Michigan primary elections,* Detroit Free Press (August 8, 2018), available at: https://www.freep.com/story/news/local/michigan/2018/08/08/turnout-shatters-recent-records-michigan-primary-elections/932623002/ ............................................................................44

Stephanopolous & McGhee, The Measure of a Metric, 70 Stanford L. Rev. 1503, 1508 (2018) ......................................................................38

U.S. Const., Art. I, § 4 ..............................................................................2

Wendy K. Tam Cho & Yan Liu, Sampling from complicated and unknown distributions: Monte Carlo and Markov Chain Monte Carlo methods for redistricting, 506 Physica A 170 (September 2018) ......................................................................................41

**Rules**

Fed. R. Civ. P. 12...............................................................................49

Fed. R. Civ. P. 12(b)(1)................................................................ 3, 6, 9

Fed. R. Civ. P. 12(b)(6)........................................................................5

Fed. R. Civ. P. 12(c).................................................................. viii, 5

Fed. R. Civ. P. 56 ................................................................... 5, 23, 49

Fed. R. Civ. P. 56(a)................................................................................23

Fed. R. Civ. P. 56(c)(1)(A) ....................................................................23

Fed. R. Civ. P. 8(f) ..................................................................................6

# CONCISE STATEMENT OF ISSUES PRESENTED

## I

Plaintiffs allege that they challenge the 2011 Apportionment Plan as to all Congressional, Senate, and State House districts (a total of 162 seats) on a district-by-district basis.  (Compl, ¶ 36.)  Should Defendant Ruth Johnson, in her official capacity as Michigan Secretary of State (Secretary), be granted judgment on the pleadings pursuant to Rule 12(c) as to all Congressional, State Senate, and State House districts with the exception of 4 State House districts (18, 32, 75 and 76), and 3 State Senate districts (8, 11, and 14); where:

- In *Gill v. Whitford*, 138 S. Ct. 1916 (2018), the Supreme Court determined that a partisan gerrymandering plaintiff must plead a district-specific claim in a particularized manner – i.e., a voter must allege in the *pleadings* that he or she resides and votes in a district and that the district is either cracked or packed.  *Id*. at 1931; and

- With the exception of State House districts 18, 32, 75, and 76 and State Senate districts 8, 11, and 14, Plaintiffs have made no particularized allegations as to cracking and packing in any other districts?

## II

Should Plaintiffs' claims as to Senate Districts 18, 11, and 14 be dismissed as moot where:

- The Secretary previously moved to dismiss on the basis that the Senate will never again be elected under the 2011 Apportionment Plan after 2018;

- This Court denied that motion as premature because the 2018 November elections had not passed; and

- The November 2018 elections will have passed at the time of argument, and these claims should again be reviewed for mootness?

III

Should Plaintiffs' claims be dismissed because they are non-justiciable?

IV

Is the Secretary entitled to summary judgment under Rule 56 where:

- *Gill* and this Court's previous opinion provide that gerrymandering plaintiffs have standing only to vindicate their distinctly personal injuries in avoiding the negative "effect that a gerrymander has on the votes of particular citizens." *Gill*, 138 S. Ct. at 1933;

    To sustain a potentially cognizable Article III injury, gerrymandering plaintiffs must "demonstrate a burden on their individual votes."  *Gill*, 138 S. Ct. at 1934.

    This requires that a plaintiff must show that the configuration of his own district "causes his vote – having been packed or cracked – to carry less weight than it would carry in another hypothetical district."  *Id*. at 1931.

    A plaintiff cannot show cognizable injury is caused by living "in a cracked or packed district" unless the "plaintiffs' own demonstration map" puts the same plaintiff in a district that is not cracked or packed. *Id.* at 1931, 1933; *see also id.* at 1936 (Kagan, J. concurring).

- Plaintiffs have not identified or provided *any* alternative district configurations that would support the existence of, or would remedy, the harm to any voter;

- Plaintiffs have failed to identify any manageable or well-accepted measure to support the notion that a particular district is gerrymandered; and

- Plaintiff League of Women Voters of Michigan has no independent First Amendment or Equal Protection injury, and it has not supported standing through its membership?

# MOST APPROPRIATE OR CONTROLLING AUTHORITY

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................... 23, 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..................................5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................... 23, 28

*Davis v. Bandemer,* 478 U.S. 109 (1986) ........................................... 2, 11

*Gaffney v. Cummings*, 412 U.S. 735 (1973) ......................................... 12, 13, 35, 36

*Gill v. Whitford*, 138 S. Ct. 1916 (2018).......................................... passim

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).........................42

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ........................... 22, 28, 35, 48

*LULAC v. Perry*, 548  U.S. 399 (2006) ............................................ passim

*Miller v. Johnson*, 515 U.S. 900 (1995).............................................. 4, 49

*O'Lear v Miller*, 222. F. Supp.2d 850 (E.D. Mich. 2002)......................14

*Vieth v. Jubelirer*, 541 U.S. 267 (2004)........................................... passim

# I.    INTRODUCTION

Plaintiffs seek to invalidate Michigan Public Acts 128 and 129 (collectively, the "2011 Apportionment Plan") on the basis that the legislative districts established by those laws create an unconstitutional partisan gerrymander against Democrats.

There is no accepted or manageable standard for such claims.  The Supreme Court has rejected every formulation put forward over the last five decades.

Further, while this case was pending, the Supreme Court issued its decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018).  It held, among other things, that Article III standing in partisan gerrymandering cases only exists for voters pleading and showing *district-specific* harms.  Under *Gill,* statewide evidence of group political harms is not sufficient, but that is precisely (and solely) what Plaintiffs have offered. Starting from the Complaint (where Plaintiffs allege only 7 of 162 districts are "cracked" or "packed"—a dispositive deficiency under *Gill*), and continuing through discovery and their service of expert reports, Plaintiffs have failed to heed *Gill's* command for district-specific evidence.

This Court should be particularly skeptical of Plaintiffs' exhortations to wade into the "political thicket"[1] of redistricting to come to the aid of members of the alleged majority party in Michigan.  "Courts need not intervene often to prevent

---

[1] *Colegrove v. Green*, 328 U. S. 549, 556 (1946) (opinion of Frankfurter, J.).

1

[partisan gerrymandering], because those harmed constitute a political majority, and a majority normally can work its political will."[2]   This is not like a racial gerrymandering case, where a historically-oppressed minority group is incapable of accessing political solutions: the major political parties are perfectly capable of "fending for themselves."[3]   Democrats have ample political solutions[4] and other avenues[5] for which (alleged) gerrymandering can present no obstacle.

The Secretary ultimately disputes any claim that any district drawn in the 2011 Apportionment Plan resulted from improper partisan intent.  But before this Court

---

[2] *Vieth v. Jubelirer*, 541 U.S. 267, 362 (2004) (Breyer, J. dissenting).

[3] *Davis v. Bandemer,* 478 U.S. 109, 152 (1986) (O'Connor, J., concurring) ("There is no proof before us that political gerrymandering is an evil that cannot be checked or cured by the people or by the parties themselves. Absent such proof, I see no basis for concluding that there is a need, let alone a constitutional basis, for judicial intervention.").

[4] E.g., electing a Democrat Governor who can veto plans in the 2020 redistricting cycle; submitting their own plan directly to statewide votes as a proposed initiated law; or amending the State Constitution to transfer the redistricting task from the Legislature to a commission.  (Such a proposal will appear on the 2018 Michigan General Election Ballot.)

[5] There is another political solution: the Framers of the U.S. Constitution provided for regulation of state redistricting to occur in Congress.  U.S. Const., Art. I, § 4. *See Vieth*, 541 U.S. at 275 (plurality opinion) ("It is significant that the Framers provided a remedy for such practices in the Constitution. Article I, § 4, while leaving in state legislatures the initial power to draw districts for federal elections, permitted Congress to 'make or alter' those districts if it wished.")

considers such questions, it must have a manageable standard, and a plaintiff before it with a cognizable injury.  Having neither, dismissal is required.

## II.   FACTS AND PROCEDURAL HISTORY

On August 9, 2011, Michigan Governor Snyder signed into law Public Acts 128 and 129 of 2011.   These Acts codified, respectively, the boundaries of Michigan's 14 Congressional, 38 State Senate, and 110 State House districts.

Plaintiffs—eleven individual voters and the League of Women Voters of Michigan (the "League")—filed their Complaint on December 22, 2017.  (Dkt. # 1.) The Complaint alleges that the 2011 Apportionment Plan constitutes an impermissible partisan gerrymander and violates Plaintiffs' rights as protected by the First Amendment and Equal Protection Clause.

Defendant, Michigan Secretary of State Ruth Johnson, moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1) on the basis that Plaintiffs lacked standing to pursue statewide claims; Defendant also moved to stay proceedings pending the Supreme Court's determination in *Gill v. Whitford*.  (Dkt. # 11.)  The Court denied Defendant's Motion to Stay on March 14, 2018. (Dkt. # 35.)  The Court dismissed Plaintiffs' statewide claims on May 16, 2018 (Dkt. # 54), but held that Plaintiffs had standing to pursue district-specific claims.

The Supreme Court issued its decision in *Gill* on June 18, 2018.

On June 6, 2018, Defendant filed a Motion to Dismiss Plaintiffs' claims concerning the Michigan Senate, as the 2011 Apportionment Plan will not be used to again elect the Senate after November 6, 2018.  (Dkt. # 63.)  The Court denied that motion, without prejudice, on August 3, 2018.  (Dkt. # 88.)

Under the Court's Case Management Order, discovery closed on August 24, 2018.  (Dkt. # 53, PgID.939.)  Dispositive motions were due less than a month later, on September 21, 2018.  (*Id.,* PgID.940.)

Additional facts germane to this Motion are set forth below.

### III.   STANDARD OF REVIEW IN REDISTRICTING CASES

The Supreme Court has "repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt."  *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978).  Courts must presume the legislature's good faith and "exercise extraordinary caution."  *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995).  As redistricting is "primarily the duty and responsibility of the State," judicial review "represents a serious intrusion on the most vital of local functions."  *Id*. at 915 (quotation marks and citation omitted).  "[C]ourts must … recognize … the intrusive potential of judicial intervention into the legislative realm, when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages of litigation and determining whether to permit discovery or trial to proceed."  *Id*. at 916-17.

4

## IV.   PLAINTIFFS' CLAIMS MUST BE DISMISSED UNDER RULE 12.

### A.   Standard of review

A motion for judgment on the pleadings brought pursuant to Rule 12(c) is determined using the same standard that applies to a review of a motion to dismiss under Rule 12(b)(6).  *See Poplar Creek Development v. Chesapeake Appalachia,* 636 F.3d 235, 240 (6th Cir. 2011).  Pursuant to Fed. R. Civ. P. 12(b)(6), a court should dismiss a complaint if the alleged facts, even if true, do not entitle a plaintiff to relief on the theories asserted. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.").

### B.   Plaintiffs' Complaint did not set forth district-specific claims as required under *Gill.*

#### 1.   Plaintiffs did not plead "cracking" or "packing" as to 155 of 162 districts.

Before turning to Plaintiffs' failure to support their allegations (and why summary judgment is thus appropriate under Rule 56), the Secretary turns to the allegations themselves.  The Complaint controls what claims are before this Court; *i.e.*, if Plaintiffs did not sufficiently *plead* a claim, there is no claim to support with evidence at the Rule 56 stage.  *See Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294,

5

307 (6th Cir. 2008).  Rule 8(f) "accords a pleading liberal construction" but "this should not be construed as a requirement that the court construct a claim that the plaintiff has not spelled out…."  *R&B Fallon Corp. v. American Exploration Co.,* 154 F. Supp. 2d 969, 973 (S.D. Tex. 2001).

On May 16, 2018, this Court dismissed Plaintiffs' statewide claims.  (Dkt. # 54 (the "Statewide Order")).[6]  This left only, potentially, district-specific claims.

Though Plaintiffs purport to challenge the entire 2011 Apportionment Plan "district-by-district," (Compl. ¶ 36, PgID.16), *Plaintiffs have only specifically alleged that 7 districts* (out of 162) are either "cracked" or "packed."  Under *Gill,* for a district to be in controversy in a partisan gerrymandering case, a complaint must contain a specific allegation of "cracking" or "packing" in that district:

> The sum of the standing principles articulated here … is that the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes.  In this gerrymandering context that burden arises through a voter's placement in a 'cracked' or 'packed' district.  … Four of the plaintiffs in this case—Mary Lynne Donohue, Wendy Sue Johnson, Janet Mitchell, and Jerome Wallace—*pleaded a particularized burden along such lines*.  They alleged that Act 43 had 'dilut[ed] the influence' of their votes as a result of packing or cracking in *their* legislative districts. The facts *necessary to establish standing*, however, must *not only be alleged at the pleading stage*,

---

[6] The Statewide Order was issued in relation to the Secretary's standing arguments under 12(b)(1).  The Secretary did not previously move to dismiss Plaintiffs' claims—statewide or district specific—on the basis that those claims had been insufficiently pled.  She now does so.

but also proved at trial. … [*Gill*, 138 S. Ct. at 1931 (emphasis added).]

It is plain that Plaintiffs expected to pursue *only* statewide claims when they filed the Complaint. The Complaint focuses repeatedly on statewide allegations—Plaintiffs allege, for example:

- That the "gerrymander… injures individual Plaintiffs, and all Michigan Democratic voters, by diluting the *collective* value of their votes *statewide*." (Compl. ¶ 10, PgID.6-9 (emphasis added).)

- That Democrats obtained more *statewide* vote, but a minority of seats. (Compl. ¶¶ 39-41, Pg.ID.18 (emphasis added).)

- That "gerrymanders injure the individual Plaintiffs and all Michigan Democratic voters by diluting the value of their votes *statewide*." (Compl. ¶ 43, PgID.19 (emphasis added).)

- That the Current Apportionment Plan "injures all Michigan Democrats by diluting the significance of their individual votes at a *statewide* level." (Compl. ¶ 54, PgID.23 (emphasis added).)

Plaintiffs allege further that their theory of constitutional harm is that the 2011 Apportionment Plan deviates from "partisan symmetry"—a concept, they explain, as being that "the disproportionate results of a victory at the polls should be roughly the same regardless of which party achieves that victory." (Compl. ¶ 50, PgID.21-22.) Partisan asymmetry can *only* be assessed on a *statewide* basis—as a theory, it provides no insight as to whether any particular district is cracked or packed. That is why the unanimous court in *Gill* rejected measures of partisan asymmetry, holding them insufficient to establish Article III harms. *Gill*, 138 S. Ct. at 1933.

7

As noted, Michigan has 162 total districts: 110 House districts, 38 Senate districts, and 14 Congressional districts. A *searching* review of the Complaint shows that the Plaintiffs have only come close to making *particularized* allegations regarding "packing" or "cracking" in 7 of these: House districts 18, 32, 75,[7] and 76, and Senate districts 8, 11, and 14. (*See* Compl. ¶¶ 10a, 10c, 10d, 10e, and 10i, 33, 34, and 35, PgID.6-8, 15-16).[8] Crucially, *Plaintiffs have not alleged that even one particular Congressional district is cracked or packed.*

This Court should dismiss Plaintiffs' claims as to all 155 districts for which Plaintiffs have made no particularized claims of packing or cracking.

2.   **Dismissal of the remaining district-specific claims is warranted because the Complaint omits allegations of district-specific burden.**

Plaintiffs' claims as to the seven remaining House and Senate districts specifically alleged to have been packed or cracked should also be dismissed because

---

[7] This can be further reduced to six districts, as there is no allegation that an individual voter Plaintiff lives or votes in House district 75. As discussed further below, the League has failed to support organizational standing as to any district-specific challenge.

[8] Critically, though Plaintiffs list in paragraph 10 each of the districts in which the eleven individual Plaintiffs live and vote, they conspicuously omit allegations as to cracking or packing for the significant majority of these districts. See, e.g., Compl. ¶ 10d (alleging that Plaintiff Grasha *lives* and *votes* in House district 26, Senate District 11, and Congressional district 9, but only alleging *packing* in Senate district 11.)

it is plain that the *only* harms Plaintiffs raised in the Complaint are based on notions of *statewide* asymmetry in terms of group political fortunes.  Plaintiffs have *not* alleged in the Complaint, conversely, that any particular Plaintiff's vote is "diluted" because of an artificially political "cracked" or "packed" configuration of their particular district.  Party members may be packed "naturally" because, e.g., there are more of them living in a particular geographic area.  (Plaintiffs do not specifically allege that any particular district is packed for political reasons rather than "natural" reasons.)  After *Gill*, statewide harms are neither cognizable nor sufficient to support Article III standing.  138 *S. Ct.* at 1931-1933.

## C.   After the 2018 election, Plaintiffs' three Senate claims should be reviewed for mootness.

The Secretary previously moved to dismiss Plaintiffs' Senate claims because the Michigan Senate will never again be elected under the Current Apportionment Plan after 2018.  In denying the Secretary's motion under Fed. R. Civ. P. 12(b)(1), this Court found the motion to be "premature" and stated that "the November 6, 2018 elections have not passed;" it further stated that "[t]his case could end before that date." (Dkt. # 88, PgID.2053.)  By the time this Motion is heard—which is currently scheduled for November 9, 2018—the 2018 election will have passed.

As to Senate Districts 8, 11, and 14 (*i.e.*, the three districts in the Senate alleged in the Complaint to have been "packed" or "cracked"), the Secretary requests that the Court review whether claims as to these districts are moot.

9

## V.   PLAINTIFFS' CLAIMS ARE NON-JUSTICIABLE.

Notwithstanding pleading deficiencies, Plaintiffs' claims should be dismissed as non-justiciable. *See Vieth*, 541 U.S. 267, 281 (2004) (plurality) ("political gerrymandering claims are nonjusticiable."). The reason for this is simple: a court has no power to render judgment in a dispute if there is no standard. *Id.* at 277-278.

### A.   Placement of a voter in a district where the voter's party is unlikely to prevail is not a constitutional harm.

As more fully explored below, the Supreme Court has opined several times on partisan gerrymandering claims in the last five decades, but at present:

- There is no recognized judicial framework for evaluating such claims, and no resolution as to whether such claims are even justiciable;

- There is no recognized standard measure for assessing when politically conscious gerrymandering becomes impermissible; and

- There is no recognized theory of cognizable harm for partisan gerrymandering plaintiffs.

As concerns this last point, it is significant that the theory of "vote dilution" in partisan gerrymandering cases is wholly unlike the theory in "one-person, one-vote" cases.  Plaintiffs here purport to be arguing the former.[9]

---

[9] *See* Compl. ¶ 54, PgID.23 ("[T]he Current Apportionment Plan imposes on Michigan Democrats higher burdens of converting votes to seats and injures all Michigan Democrats by diluting the significance of their individual votes …."); Compl. ¶ 73, PgID.29 ("[Plaintiffs'] representational rights have been burdened, their voting strength diluted, and their ability to influence the political process unfairly diminished as compared to Republican voters.").

In the classic "one person, one vote" challenge (*see, e.g., Reynolds v. Sims,* 377 U.S. 533 (1964)), a plaintiff's claim arises from the burden on representational rights present in the unequal population of co-equal districts.   A voter in an overpopulated district obtains less *representation* than a voter in an average or underpopulated district, whether that voter's candidate of choice is ultimately successful or not.   Conversely, a gerrymandering plaintiff's vote is not "diluted" in terms of ultimate representational weight. A plaintiff's elected representative in a gerrymandering case will represent approximately the same number of constituents as exist in other districts (as distinguished from a representative in an overpopulated district, who will represent more voters than one in an underpopulated district). Further, someone "who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district."   *Davis v. Bandemer*, 478 U.S. 109, 132 (1986).

Plaintiffs' theory of dilution is, instead, that their vote is worth less because of its relative impact on the election *result*.   That is, in a packed Democrat district, the winning Democrat candidate collects far more votes than necessary to win; these "extra" votes are not determinative of the outcome, and are thus "wasted."   (Compl. ¶ 46, PgID.20.)   In a cracked district, conversely, it is alleged that Democrat voters are unlikely to be able to elect a Democrat because there are too few of them in the

11

district; their votes are (under Plaintiffs' theory) "wasted"—again—because those votes are not determinative of the outcome. (*Id.*, ¶¶ 46-47, PgID.20-21.) Plaintiffs characterize this "extra" or "wasted" category as a form of vote "dilution." (*Id.*, ¶ 54, PgID.23.) To the extent this can be, in theory, a form of "dilution," the logical extension of this theory is that a voter's vote carries the most weight—i.e., is most "undiluted"—in a competitive district, where the vote is most likely to impact an election outcome.

There is no constitutional right, however, to an ability to cast a decisive vote or to live in a competitive district. Nor is there a constitutional right to have districts drawn without consideration of political consequences. In *Gaffney v. Cummings*, 412 U.S. 735, 752 (1973), the Supreme Court held that the purposeful, partisan-conscious creation of "safe" Republican or Democrat districts does not offend the Constitution.[10]   The Court rejected precisely the theoretical premise on which Plaintiffs' claims must depend: that an individual voter's representational rights are unconstitutionally burdened by their politically-conscious placement in a district where that voter's candidate of choice is unlikely to ever prevail (in a cracked

---

[10] The Court explained: "It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. … Politics and political considerations are inseparable from districting and apportionment. … The reality is that districting inevitably has and is intended to have substantial political consequences." *Id.* at 752-753.

district), or, conversely, unlikely to ever need their vote to prevail (in a packed district).

Since *Gaffney*, partisan gerrymandering plaintiffs have repeatedly sought to propose standards and metrics to show cognizable harm through this form of vote "dilution," but they have universally failed in that endeavor.

## B. Supreme Court jurisprudence on partisan gerrymandering claims

The following summary is provided to place Defendant's Motion in context.

### 1. *Davis v. Bandemer* (1986)

In *Bandemer*, 478 U.S. at 132, the Supreme Court elaborated on the principle that followed from *Gaffney*: there is no constitutional right to proportional representation. The statewide share of a party's vote is not constitutionally assured to equal the party's share of seats in the legislature. *Id.*

Though the *Bandemer* Court rejected the partisan gerrymandering claims before it, it held that such claims were justiciable and even formulated a test. The test required plaintiffs to show discrimination against an identifiable group, and in such a degree to deny the group its chance to "effectively influence the political process." 478 U.S. at 127, 131-133. For the next 18 years, however, *every partisan gerrymandering claim was rejected,* many on the pleadings. *See Vieth v. Jubelirer*, 541 U.S. 267, 279-280 n. 6 (2004) (gathering authorities).

13

This included an Equal Protection and First Amendment challenge brought by Democrat voters with respect to Michigan's 2001 Congressional Apportionment Plan. *O'Lear v Miller*, 222. F. Supp.2d 850 (E.D. Mich. 2002).   Like Plaintiffs here, those voters claimed that Democrats would win only 33% of the seats despite constituting a majority of the statewide vote share. *Id.* at 853.   Given the political solutions available to Democrats, the *O'Lear* panel had little hesitation in dismissing the claims on the pleadings (even though plaintiffs "ha[d] alleged disproportionality in abundance" and even though the complaint contained "ample charges of discriminatory motive and procedural irregularities."). *Id.* at 859.

Of particular significance here, the *O'Lear* panel further dismissed the plaintiffs' First Amendment claims, stating unequivocally that "Partisan gerrymandering ... does not support either a freedom of speech or a freedom of association claim." *Id.* at 860 (citations omitted.)[11]

---

[11] An amended complaint was also dismissed.  *O'Lear v. Miller,* 222 F. Supp. 2d 862 (E.D. Mich. 2002).  The Supreme Court summarily affirmed.  *O'Lear v. Miller*, 537 U.S. 997 (2002).  A summary affirmance by the Supreme Court, pursuant to the exercise of its appellate jurisdiction, creates precedential authority binding on the lower courts.  *See Mandel v. Bradley*, 432 U.S. 173, 176 (1977).  While *O'Lear*'s equal protection holding was made under the *Bandemer* standard, which has since been overturned, the district court's First Amendment holding should be significant to this Court, sitting in the same district and considering the same type of claims.

### 2.    *Vieth v. Jubelirer* (2004)

Eighteen years after *Bandemer,* in *Vieth*, the Supreme Court affirmed dismissal of partisan-gerrymandering, equal protection claims brought by Democrat voters in Pennsylvania. 541 U.S. at 305-306. Four justices found partisan gerrymandering claims to be non-justiciable; Justice Kennedy declined to find non-justiciability, holding open the possibility that some limited and specific theory might yet be found. *Id.* He nonetheless concurred in the result. *Id.*

In his concurrence, Justice Kennedy rejected the *Bandemer* framework as "unmanageable." *Id.* at 308. Justice Kennedy explained that a partisan gerrymandering plaintiff must show a workable standard, including "principled, well-accepted rules of fairness that should govern districting." *Id.* (Kennedy, J., concurring). After *Vieth*, Lower courts were without a framework to assess partisan gerrymandering claims.

### 3.    *LULAC v. Perry* (2006)

The Supreme Court revisited the question of a workable standard just two years later in *LULAC v. Perry*, 548 U.S. 399 (2006). Since *LULAC* involved a mid-cycle redistricting that could *only* logically have been designed to disadvantage Democrats, the *LULAC* plaintiffs argued this alone should be enough to establish a viable claim without any need to allege or prove actual discriminatory effects. *Id.* at 413-417. The Supreme Court flatly rejected this standard, explaining that "[a]

15

successful claim attempting to identify unconstitutional acts of partisan gerrymandering must do what appellants' sole-motivation theory explicitly disavows: *show a burden, as measured by a reliable standard, on the complainants' representational rights*." *Id.* at 418 (emphasis added).

### 4. *Gill v. Whitford* (2018)

During the pendency of this case, the Supreme Court issued its decision in *Gill v. Whitford,* 138 S. Ct. 1916 (2018), vacating the district court's decision and again holding in favor of state defendants. (Ten days after issuing *Gill*, the Supreme Court summarily affirmed a three-judge panel's decision dismissing partisan gerrymandering as non-justiciable.)[12]

The themes from *Vieth* and *LULAC* were repeated: partisan gerrymandering claims, *assuming* they are justiciable, require a strong demonstration of representational harm, measured by a reliable standard. The *Gill* plaintiffs—who had focused at trial on proving intent and on their statewide theories of harm (similar to the focus of Plaintiffs here)—had not addressed representational harms of the nature required to support Article III standing. The *Gill* decision refined that point: to support Article III standing, the representational harm *must be district specific*— a cognizable, unconstitutional burden cannot be based on statewide effects or the

---

[12] *Harris v. Cooper*, 138 S. Ct. 2711 (June 28, 2018), summarily affirming *Harris v. McCrory*, 2016 WL 3129213, No. 1:13-cv-949 (M.D. N.C. June 2, 2016) (Ex. 1).

inability of a party's voters to translate vote share into seats.  The Court in *Gill* specifically rejected measures of statewide partisan asymmetry as being sufficient to support standing or demonstrate cognizable burden. *Id.* at 1931-1933.

The Supreme Court's decision in *Gill* narrows the opportunity left open by Justice Kennedy in *Vieth* to the eye of a needle—one that Plaintiffs here have not attempted to thread.  Under *Gill*, demonstration of dilutive effect must occur on a district-specific basis; it is insufficient for a voter to show that her *party* has been unable to attain a majority of seats in an elected body (something a great number of voters suffer in each election).  Instead, Plaintiffs must show and prove standing on a district-by-district basis by demonstrating—under a workable and manageable standard that has not previously been rejected by the Supreme Court—an unconstitutional burden on individual representational rights.

### C.   No workable standard exists to support justiciability.

Between the pluralities, concurrences, and dissents in *Vieth, Bandemer*, and *LULAC*, the Supreme Court has provided fifteen fractured opinions—none of these has presented a standard for partisan gerrymandering claims that has garnered support from a majority of the Justices.  In *Vieth*, the four-justice plurality together with Justice Kennedy rejected the political gerrymandering claim before the Court because there were no judicially discernable and manageable standards.  *See Vieth,* 541 U.S. at 281-306; *id.* at 307-309 (Kennedy, J. concurring).  Justice Kennedy

17

wrote in his concurrence that "[o]ur attention has not been drawn to statements of principled, well-accepted rules of fairness that should govern districting, or to helpful formulations of the legislature's duty in drawing district lines." *Id.* at 308.[13] The lack of such a standard, according to Justice Kennedy, "make[s] our intervention improper."  *Id.* at 306, 317 (Kennedy, J. concurring).

No standard has emerged since *Vieth* that would make intervention proper here.  Other subordinate courts, lacking guidance and in the face of confusion over which standard *could possibly* govern partisan gerrymandering claims, have repeatedly dismissed claims in favor of non-justiciability.[14]  In dismissing partisan gerrymandering claims brought in Illinois by Republicans in 2011, a three judge panel provided the following, apt summary of the problem:

> [P]olitical gerrymandering claims remain justiciable in principle but are currently "unsolvable" .... The crucial theoretical problem

---

[13] Moreover, the plurality and Justice Kennedy opined that recognizing a political gerrymandering claim without judicially discernable and manageable standards would endlessly insert federal and state courts into redistricting and thereby thwart the political process, bringing "partisan enmity" upon the courts.  *Id.* at 301 (plurality opinion); see *id.* at 316 (Kennedy, J., concurring).

[14] *See*, *e.g., Harris*, 2016 WL 3129213 (Ex. 1), *summarily aff'd*, 138 S. Ct. 2711 (June 28, 2018); *Alabama Legislative Black Caucus v. Alabama*, 988 F. Supp.2d 1285, 1296 (M.D. Ala. 2013) (dismissing partisan gerrymandering claim because the standard was "unknowable"); *Radogno v. Illinois State Bd. of Elections*, 2011 WL 5868225, at *2 (N.D. Ill., November 22, 2011) (Ex. 2).

18

is that partisanship will always play some role[15] in the redistricting process. As a matter of fact, the use of partisan considerations is inevitable; as a matter of law, the practice is constitutionally acceptable. *See Vieth*, 541 U.S. at 286–88 (plurality opinion); *id.* at 313 (Kennedy, J., concurring in the judgment). The relevant question is not whether a partisan gerrymander has occurred, but whether it is so excessive or burdensome as to rise to the level of an actionable equal-protection violation. How much is too much, and why?

…To illustrate concretely the enormity of this challenge, it is useful to identify the standards that a majority of the Supreme Court has rejected:

• A showing of intent to discriminate, plus denial of a political group's chance to influence the political process as a whole (offered by the plurality in *Bandemer*, 478 U.S. at 132–22 (plurality opinion), rejected by a majority in *Vieth*, 541 U.S. at 281–82 (plurality opinion)).

• Whether boundaries were drawn for partisan ends to the exclusion of fair, neutral factors (offered by Justice Powell's concurrence in *Bandemer*, 478 U.S. at 161, 173 (Powell, J., concurring in part and dissenting in part), rejected by a majority in *Vieth*, 541 U.S. at 290–91 (plurality opinion)).

• Whether mapmakers acted with the "predominant intent" to achieve partisan advantage and subordinated neutral criteria; for example, where the map "packs" and "cracks" the rival party's

---

[15] Political affiliation has been described by the Supreme Court as being a traditional race-neutral districting consideration that can defeat a claim of *racial* gerrymandering. *See, e.g., Alabama Legislative Black Caucus v. Alabama*, 135 S.Ct. 1257, 1270 (2015) (stating that traditional race-neutral districting principles include "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation") (quotation and citation omitted); *Bush v. Vera*, 517 U.S. 952, 964, 968 (1996) (plurality opinion) (recognizing political affiliation as a traditional race-neutral districting principle); *Easley v. Cromartie*, 532 U.S. 234, 257-58 (2001) (*Cromartie II*) (same).

voters and thwarts its ability to translate a majority of votes into a majority of seats (offered by the appellants in *Vieth*, *id*. at 284–90, rejected by a majority in *Vieth*, *id*.).

• Whether, at a district-to-district level, a district's lines are so irrational as to be understood only as an effort to discriminate against a political minority (offered by Justice Stevens's dissent in *Vieth*, *id*. at 321–27 (Stevens, J., dissenting), rejected by a majority in *Vieth*, *id*. at 292–95 (plurality opinion)).

• Application of a five-part test requiring a plaintiff to show (1) that he is a member of a cohesive political group; (2) that the district of his residence paid little or no heed to traditional districting principles; (3) that there were specific correlations between the district's deviations from traditional districting principles and the distribution of the population of his group; (4) that a hypothetical district exists which includes the plaintiff's residence, remedies the "packing" or "cracking" of the plaintiff's group, and deviates less from traditional districting principles; and (5) that the defendants acted intentionally to manipulate the shape of the district in order to pack or crack his group (offered by Justice Souter's dissent in *Vieth*, *id*. at 347–51 (Souter, J., dissenting), rejected by a majority in *Vieth*, *id*. at 295–98 (plurality opinion)).

• Whether a statewide plan results in unjustified entrenchment, such that a party's hold on power is purely the result of partisan manipulation and not other factors (offered by Justice Breyer's dissent in *Vieth*, *id*. at 360–62 (Breyer, J., dissenting), rejected by a majority in *Vieth*, *id*. at 298–301 (plurality opinion)).

• Whether the sole intent of a redistricting plan is to pursue partisan advantage (offered by appellants in *LULAC*, 548 U.S. at 416–20 (Kennedy, J., announcing the judgment of the Court), effectively rejected by a majority in *LULAC*, *id*.). [*Radogno*, 2011 WL 5868225, at *2-3.]

The panel concluded: "[T]he challenge is to explain how facts fit together to

violate an administrable and non-arbitrary standard for governing political

20

gerrymandering claims generally. 'I know it when I see it,' ... will not do." *Id.* (citation and quotation omitted).

The only document before this Court that purports to enunciate Plaintiffs' proposed standard for adjudication is the Complaint.  The Complaint, however, commits to no specific standard, vacillating internally, for example, on whether Plaintiffs intend that the State should have to show a "legitimate" reason for its districting choices or a "compelling state interest."  (Compl. ¶¶ 70-71, PgID.28.) Further, the Complaint, as noted above, focuses on measures of statewide "wasted votes" under the efficiency gap and notions of partisan *asymmetry*—concepts that are ultimately no different from "rough proportionality."[16]  In *Gill*, the Supreme Court forcefully rejected such measures as being supportive of cognizable Article III harm; those same measures thus cannot be sufficient to show cognizable Fourteenth or First Amendment burdens either.  Indeed, a plain majority of Justices

---

[16] See *LULAC*, 548 U.S. at 419 (Kennedy, J., concurring) ("[T]here is no constitutional requirement of proportional representation, and equating a party's statewide share of the vote with its portion of the congressional delegation is a rough measure at best.").

in both *Bandemer* (7 of 9) and *Vieth* (8 of 9) rejected the notion that the Constitution requires proportional representation.[17]

Plaintiffs' allegations (and the evidence they have presented, as is discussed below) all pertain to tests that have been *rejected* by the Supreme Court.  Because there is no workable standard presented, much less evidence to meet it, Plaintiffs' claims must thus be dismissed.

## VI.   PLAINTIFFS' CLAIMS MUST BE DISMISSED UNDER RULE 56.

Plaintiffs have utterly failed to support standing as required by *Gill* and *Lujan*.[18]  Because Plaintiffs have focused on statewide, group interests, rather than district-specific, individual voter interests, Plaintiffs have failed to offer evidence supporting district-specific harms, including, most crucially, an "undiluted" alternative district plan for any one of the individual voters before this Court.

Plaintiffs' experts fail to provide district-specific analysis.  Further, even if district-specific evidence had been presented, the League has failed to support its

---

[17] In *Bandemer,* the Court stated that "our cases … clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be."  *Bandemer*, 478 U.S. at 130 (plurality opinion); *see also id.* at 155 (O'Connor, J., concurring, joined by Burger, C.J., and Rehnquist, J.).  In *Vieth*, the plurality stated: appellants' "standard rests upon the principle that groups (or at least political-action groups) have a right to proportional representation.  But the Constitution contains no such principle." *Vieth*, 541 U.S. at 288.

[18] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992).

standing either through its members or through its own organizational interests to challenge any districts in which individual Plaintiffs do not reside.

Finally, Plaintiffs have provided no evidence that any theoretical harm under the 2011 Apportionment Plan will persist, or impact the results of the only remaining election to be held under that Plan in 2020.

### A.   Standard of review

Pursuant to Rule 56, a party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" on the basis of "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(a) and (c)(1)(A).  A non-movant must show sufficient evidence to create a genuine issue of material fact.  *See Klepper v. First Am. Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  A mere scintilla of evidence is insufficient.  *Id.* at 342.  Rather, "there must be evidence on which the jury could reasonably find" for the non-moving party.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Summary judgment is appropriate "against a party who fails to make a showing … essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

**B.    Plaintiffs have not supported the existence of a cognizable burden as required under *Gill*.**

As discussed above, under *Gill,* gerrymandering plaintiffs suffer no cognizable injury based on the "effect that a gerrymander has on the fortunes of political parties" statewide.  138 S. Ct. at 1933.  The general "interest in the overall composition of the legislature" simply reflects an unprotected "group political interest" rather than a protected "individual legal right."  138 S. Ct. at 1932-1933.

Conversely, *Gill* and this Court's Statewide Opinion make plain that gerrymandering plaintiffs have standing only to vindicate their "distinctly personal" injuries (Dkt. # 54, PgID.947) in avoiding the negative "effect that a gerrymander has on the votes of particular citizens," and thus the only *potentially* cognizable Article III injury is a "burden on those plaintiffs' own votes."  138 S. Ct. at 1931, 1933.  Consequently, gerrymandering plaintiffs must "demonstrate a burden on their individual votes" with reference to their own district.  138 S. Ct. at 1934.

Demonstrating this harm necessarily depends on a voter showing that the configuration of his own district, for impermissible purposes, "causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district."  *Id.* at 1931.  That being so, a plaintiff cannot show cognizable injury is caused by "liv[ing] in a cracked or packed district" *unless* the "plaintiffs' own demonstration map" puts the same plaintiff in a district that is not cracked or packed.  *Id.* at 1932-1933; *see also id.* at 1936 (Kagan, J. concurring).    (And

24

ultimately, Plaintiffs must show that such cracking or packing was the result of impermissible reasons, and not the result of, e.g., natural political geography.)

In *Gill*, the Court held that Plaintiff Professor Whitford could have no possible claim because he admitted that a district including the City of Madison—where he lived—would likely be a packed Democrat district under *any* configuration (due to the natural concentration of Democratic voters there). *Id.* at 1933. Similarly, in performing analysis of the Current Apportionment Plan (and in preparing the "thousands" of alternative maps Plaintiffs presented to Defendant in discovery), Plaintiffs' experts "froze" the heavily-Democrat majority-minority Voting Rights Act ("VRA") districts.[19] That is, each of these "alternative" maps contain no variation from the 2011 Apportionment Plan in these VRA districts. A voter living in such a district would necessarily be "packed" in a heavily Democrat district under both the Current Apportionment Plan and any potential replacement. Like Professor Whitford, these voters would find it impossible to show an "undiluted" alternative, and thus impossible to establish dilution.[20]

---

[19] (*See* Chen Dep., Ex. 3, 90:11-90:13.)

[20] Even where a proposed undiluted neutral configuration could reduce "packing," the burden of showing individual harm is particularly difficult, if not impossible, in "packed" districts because, from the individual voter perspective—the only perspective relevant to standing under *Gill*—Democrats in those districts are *benefitted* by the theoretically guaranteed election of their representative of choice.

Another example can be found in two of the seven districts Plaintiffs specifically pleaded in the Complaint to be "packed" or "cracked." Plaintiffs allege that Plaintiff Donna E. Farris lives in District 76, and that "she and neighboring Democratic voters have been cracked in House District 76. Other Grand Rapids Democrats have been packed in House District 75." (Compl. ¶ 10d, PgID.7.) House districts 75 and 76 are drawn—in both the 2011 Apportionment Plan, and in Plaintiffs' "Alternative" House Plan attached to the Complaint (Dkt. # 1-4, PgID.41-42)—entirely within the City of Grand Rapids.   This is a result of Michigan's statutory redistricting criteria.[21]

Both House Districts 75 and 76 have *consistently elected Democrats under the 2011 Apportionment Plan.*  House district 76, where Plaintiff Farris resides, and which she alleges to be "cracked," voted for the Democrat candidate by margins of 52.06 to 27.3% in 2012, 52.13 to 45.59% in 2014, and 56.72 to 38.74% in 2016.[22]

"Cracking," by definition, is supposed to result in the minority party being submerged, with little chance of electing a candidate in the district. A district that

---

[21] These criteria prefer configurations of districts that avoid breaks in municipal boundaries. See Mich. Comp. Laws § 4.261. Since Grand Rapids will support two House districts within its boundaries, both districts 75 and 76 should be drawn in Grand Rapids without including any portion of neighboring environs.

[22] See General Election Results, Michigan Sec'y of State, https://www.michigan.gov/sos/0,4670,7-127-1633_8722---,00.html (last accessed September 19, 2018).

consistently elects a Democrat plainly cannot be one in which Democrats are "cracked."  Plaintiffs could not possibly present an "undiluted" alternative for these two districts by drawing two *other* districts in which Democrats remain a majority.

In sum, to establish, even *theoretically,* the existence of redressable injury, the Plaintiffs need to prove that they reside in an artificial politically packed or cracked *district* that can be cured by the implementation of a neutrally drawn *district*.[23]   An alternative district configuration is therefore *essential* to establishing *standing*.  That is, "the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured …." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997) (*Bossier I*) (citation omitted).

Plaintiffs' showing in this regard contains two key deficiencies:

*First,* Plaintiffs have purportedly identified "thousands" of "neutral" plans that, on a *statewide* basis, improve asymmetry scores or other statewide metrics. But, as described below, they have refused, when given ample opportunity, to commit to an alleged "undiluted" alternative configuration for any particular voter in any particular district.

---

[23] Conversely, Plaintiffs may not prove redressable injury merely by showing that the 2011 Apportionment Plan as a whole is gerrymandered or that statewide asymmetry can be reduced by a neutrally drawn plan.

*Second*, Plaintiffs have failed to identify a well-accepted measure to support a conclusion that a particular district is unconstitutionally gerrymandered. The measures they have put forth in their expert reports are universally focused on statewide group political outcomes—not district-specific voter harms, and *none of these* is supported by a consensus in the academic community that it is a correct or appropriate tool for reaching even *those* types of statewide conclusions.

These deficiencies constitute complete failures to support standing under *Lujan,* 504 U.S. at 561. It is Plaintiffs' burden to show they have made a prima facie case of standing at the summary judgment stage. Under *Liberty Lobby* and *Celotex,* Plaintiffs must come forward with facts to avoid summary judgment; it does not suffice to merely say that there is a dispute.

> **1.    Plaintiffs have provided no alternative district configurations or explanation of how configurations would support the existence of, or remedy, their harms.**
>
> **a)    Plaintiffs failed to support district-specific dilution in lay discovery.**

As stated above, Plaintiffs have refused to commit to any particular district configuration to support the existence of dilution in any particular district. Their positions in pleadings and discovery have been wavering and inconstant even as to which *statewide* plan they might use to show harm:

- Plaintiffs attached to the Complaint a set of alternative maps (the "Complaint Maps") which, they claimed, improved upon the *statewide*

partisan asymmetry of the 2011 Plans. They alleged that these were referenced "solely as *examples* of the multitude of fairer maps the Legislature could have drawn." (*See* Compl. ¶ 65, PgID.26 (emphasis added).)[24]

- Plaintiffs identified a second set of alternative maps in the report produced by one of their proposed experts, Dr. Mayer, and ultimately produced shape files for these maps on August 16, 2018 (*after* Dr. Mayer's deposition—despite being requested two months before.)

- Another of Plaintiffs' proposed experts—Dr. Chen—reported that he generated at least a *thousand* sets of alternative plans. Plaintiffs have not, despite requests, identified on which set of maps they intend to rely to show district-specific dilution. (As detailed below, Dr. Chen's report focused on *statewide*, rather than district-specific, measures of gerrymandering.)

---

[24] Despite being requested three months ago, and despite assurances that production would be forthcoming, Plaintiffs have failed to provide shape files (i.e. geography-specific files necessary for district-specific review) as to these Complaint Maps. These were specifically requested in discovery on June 12, 2018 (Dkt. # 73-1, First Discovery Requests, Doc Request # 10, PgID.1428). (*See* 7/19 e-mail, Ex. 4-A, (Plaintiffs' counsel advising of response as to production by 7/24; *see* 7/24 e-mail, Ex. 4-B (advising shape files would be provided "next week"); *see* 8/15 e-mail, Ex. 4-C (Defendant requesting shape files); *see* 9/4 e-mail, Ex. 4-D (Defendant's counsel advising shape files provided by Plaintiffs' counsel on 8/16 were not for the Complaint maps); *see* 9/8 e-mail, Ex. 4-E (Plaintiffs' counsel advising that he would "do [his] best" to produce the shape files "subject to the demands of next week's deposition schedule.") This failure to provide shape files during discovery has deprived Defendant of the ability to analyze Plaintiffs' statewide claims for those maps.

In addition to interrogatories and document production requests designed to elicit district-specific responses,[25] on August 2, 2018, Defendant requested that the League provide 30(b)(6) testimony on the "proposed alternative district plan" for each Plaintiff or League member harmed by the 2011 Apportionment Plan,[26] as well as on the topic of "[h]ow such proposed alternative district plan would redress the injury suffered by the member." (*See* 30(b)(6) Notice, Ex. 6.) At Plaintiffs' request, that deposition was scheduled on September 11 (after the discovery cutoff); despite Plaintiffs' counsel advising on September 3, 2018 that Plaintiffs were searching for a deponent to sit for such inquiries,[27] Plaintiff ultimately refused on September 11 to provide testimony on these topics and objected to doing so (though it provided testimony on other topics). (*See* League Dep., Ex. 8, 6:12-8:8.)

---

[25] Defendant requested that Plaintiffs identify district-specific facts on which they intended to rely to show that gerrymandering had occurred. (*See* Dkt. # 73-1, First Discovery Requests, Interrogatory #1, PgID.1421.) Though Defendant's request was unequivocally district-specific, and notwithstanding the Court's order compelling Plaintiffs' full response (Dkt. # 95), Plaintiffs responded by repeated reference to *statewide* "partisan asymmetry." (*See,* e.g., Dkt. # 73-2, First Response, PgID.1434.) Plaintiffs did not identify evidence of dilution by reference to "undiluted" configurations in any post-discovery supplement.

[26] *See* 8/2 e-mail and draft notice, Ex. 5.

[27] *See* 9/3 e-mail, Ex. 7.

### b)   Plaintiffs' expert reports do not support district-specific dilution.

Plaintiffs have provided three proposed expert reports in this matter: those of Drs. Mayer, Warshaw, and Chen.  Each of these reports focuses on *statewide* group party success metrics—not district-specific voter harms.[28]  Dr. Warshaw conceded in his deposition, for example, that "there's no metric, … that is going to be perfect at trying to characterize individual districts[.]"  (Warshaw Dep., Ex. 9, 133:16-133:20; *see also* 137:6-137:9, 139:10-139:15.)

Dr. Mayer applied five different tests related to assessing *statewide* partisan bias or asymmetry.  (*See* Mayer Report, Ex. 10, pp. 15-25.).  While he calculated vote shares for districts under the 2011 Apportionment Plan as compared to a "demonstration plan," he made no assessments as to whether a particular district is "cracked" or "packed," or whether any voter before the Court would have their district "undiluted" by adoption of the demonstration plan he reviewed.

Dr. Warshaw's report uses three of the same *statewide* "group political success" measures used by Dr. Mayer, (Warshaw Report, Ex. 11, pp. 6-12), but focuses on the efficiency gap—the very same *statewide* measure found insufficient to support individual voter standing in *Gill*.  Dr. Warshaw stated in his deposition

---

[28] *See*, *e.g.,* Mayer Dep., Ex. 12, 168:9-168:11, 168:24-168.25 ("An efficiency gap is not calculated for a single district.").

that "I don't think I made a characterization in my report of which districts precisely were packed and cracked, and I'm reluctant to do so now."  (Warshaw Dep., Ex. 9, 196:17-196:20.)

Dr. Chen's report compares the 2011 Apportionment Plan against 1,000 non-random, non-representative[29] computer simulations drawn to adhere to a rigid (albeit inaccurate)[30] set of traditional redistricting criteria.  (Chen Report, Ex. 13, pp. 1-3.) Like Drs. Mayer and Warshaw, Dr. Chen's analysis proceeds on a *statewide* "group harm" basis—i.e., adding up the number of "Republican" districts (which he defines as *any* district showing a vote total of 50.1% or more in favor of Republicans, even

---

[29] *See* Chen Dep., Ex. 3, 157:23-158:5 ("I was not even interested in characterizing the universe of all possible nonpartisan plans.").

[30] Dr. Chen, for example, instructed his simulations to seek compactness in all districts.  (Chen Report, Ex. 13, pp. 59-60.)  This is inconsistent with Michigan's redistricting statutes, which only require consideration of compactness where more than a single district is drawn in the same city or township.  Mich. Comp. Laws § 4.261(i); Mich. Comp. Laws § 3.63(b)(vi).  Further, Dr. Chen did not include in his simulations the state legislative criteria that, when a county line must be broken to achieve equal population, the fewest and smallest whole townships and cities shall be shifted between districts.  *See* Mich. Comp. Laws § 4.261(f); Chen Report, Ex. 13, pp. 59-60; Chen Dep., Ex. 3, 103:12-106:5.  Finally, Dr. Chen incorrectly believed that Michigan's statutory criteria were exclusionary and mandatory.  (Chen Report, Ex. 13, pp. 59-60 ("It is clear that both statutes not only specify the five districting criteria … but they also prohibit any other considerations ….").)  The Michigan Supreme Court long ago decided that a plan that failed to strictly comply with the statutory criteria (e.g., by minimizing county or municipal breaks) was not legally invalid as a result.  *LeRoux v. Sec'y of State*, 640 N.W.2d 849, 860-861 (Mich. 2002).

though such districts would be considered by political scientists to be competitive and responsive to the electorate) compared to Democrat districts—and condemning entire *plans* (not districts)—on this basis.  (See Chen Report, Ex. 13, p. 59; Chen Dep., Ex. 3, 189:14-189:25.)

Unlike Plaintiffs' other two experts, Dr. Chen at one point in his report identifies specific districts that he claims to be "partisan outliers."  (*See* Chen Report, Ex. 13, p. 56.)  In his deposition, however, he admitted that he had no independent understanding or commonly-understood meaning to apply as to whether any of these districts were, in fact, "cracked" or "packed."  (Chen Dep., Ex. 3, 200:5-202:20.) His "outlier" determination for these districts was based solely on whether a district in the enacted map fell within the narrow metrics of his non-random, non-representative simulations.  (*Id.*, 151:24-152:7.)  Thus, if a district in the enacted map had a 53% Democrat vote share and Dr. Chen's simulations of districts in generally the same geographic area of the map had only 52% Democrat vote share, Dr. Chen would label the district in the 2011 Apportionment Plan "packed" and a "partisan outlier," even though such a district would otherwise be competitive and responsive to the electorate.[31]  (*Id.*, 200:5-202:22; 204:2-204:5.)   In short, Dr.

---

[31] These are only a selected number of the serious deficiencies with Dr. Chen's report.  Defendant intends to present others in a subsequent motion concerning expert reports.

Chen's "outlier" finding has no connection to the degree of burden imposed by the contours of a specific district, and he plainly does not address whether that burden would be fixed if one of his simulations were to be adopted.  In short, Dr. Chen's analysis did not include whether any particular voter actually *before this Court* would have their district improved under any one of his simulations.[32]

As an example of why Dr. Chen's maps utterly fail to answer the key "district-specific" dilution question posed by *Gill* can be found by reference to his simulated versions of Congressional District 1.  Though not identified in the Complaint as being "cracked" or "packed," Plaintiffs purport, based on their discovery responses, to challenge Congressional District 1 as a gerrymandered district.  (*See* Plaintiffs' August 31 Supplemental Response, p. 2, Ex. 14.)

According to Dr. Chen, Congressional District 1 in the 2011 Apportionment Plan has approximately a 55% Republican vote share.  (*See* Chen Report, Ex. 13, p. 75.)  This district cannot be a "packed" Democrat district since Democrats are a minority.  It could in theory be a "cracked" district, but every single version of Congressional District 1 drawn in Dr. Chen's simulations has a *higher* Republican vote share than the same district as it appears in the 2011 Apportionment Plan.  (*See* Chen Report, Ex. 13, p. 75; Chen Dep., Ex. 3, 271:9-273:6.)  Dr. Chen's simulated

---

[32] Defendant notes that none of Dr. Chen's simulations was presented to the Michigan Legislature in 2011.

plans thus cannot possibly be used to show an "undiluted" alternative for Congressional District 1 when, according to Dr. Chen's own metrics, every one of those plans makes Congressional District 1 *worse* for its Democratic voters.  On these facts, the 2011 Apportionment Plan would paradoxically be the "undiluted" version of *Dr. Chen's* plans.

Crucial in this regard is that redistricting is a zero-sum game.  Changing one district necessarily impacts at least one other district—what may be "good" for one Plaintiff in one district in terms of "undiluting" their vote (e.g., by adding Democrats from a neighboring district) may in fact harm another Plaintiff in an adjoining district (by *further* reducing the number of Democrats in the second Plaintiff's district). Plaintiffs have not shown that it is possible to "undilute" *any* individual Plaintiff's district, much less that it is possible to "undilute" *all* of them at once.

Standing must be assessed voter by voter, district by district—Plaintiffs' failure to commit to a set of complementary district configurations for each challenged district prevents them from showing harm *or* redressability for any particular Plaintiff.  Under *Lujan*, their Complaint must be dismissed.

### C.   Plaintiffs have not presented manageable or well-accepted measures for assessing whether gerrymandering has occurred or is cognizably burdensome.

Even if Plaintiffs had come forth with district-specific configurations, they would still need to present "principled, well-accepted rules of fairness that should

govern districting[.]"  *Vieth*, 541 U.S. at 308 (Kennedy, J. concurring).  It is not enough to show that a Legislature intentionally favored a political group—i.e., created a "political classification" (as noted above, the Supreme Court in *Gaffney* ruled out such a claim)—the "inquiry instead is whether the political classifications were *used to burden* a group's representational rights."  *Id.* at 315.  But "of course," measuring such a burden "depends first on courts having available a manageable standard by which to measure the effect of the apportionment and so to conclude that the state did impose a burden or restriction on the rights of a party's voters."  *Id.*

As noted above, each of Plaintiffs' three experts employed some combination of five different social science metrics to assess the statewide "partisan bias" of the 2011 Apportionment Plan.  Dr. Mayer employed all five: partisan bias (as expressed in seats-votes curves), partisan symmetry, the efficiency gap test, mean-median vote, and the declination test. (*See* Mayer Report, Ex. 10, pp. 15-25.).  Drs. Warshaw and Chen both employed some subset of these five, but emphasized the efficiency gap.

Each of these five measures, however, is just a variation on two previously rejected themes: i.e., they measure *political party* success by statewide asymmetry

(which was rejected in *LULAC* and *Gill*),[33] or statewide disproportionality (which was rejected as a measure of political fairness in *Bandemer* and *Vieth*).[34]

     Further, none of these measures represents a "well-accepted" measure of partisan fairness. (*See* Warshaw Dep., Ex. 9, 49:7-49:18) ("I think there are differences of opinions about whether we've arrived at" the "point" where the profession has "some uniform generally accepted measure of partisan asymmetry or partisan bias."). Dr. Warshaw acknowledged in his deposition that there is no well-accepted view in the academic community regarding what score on any given metric demonstrates that a plan is unacceptable or an extreme partisan gerrymander. (*Id.*, 57:5-57:7, 57:19-57:23, 57:24-58:3.)  He specifically conceded that "there's certainly no wide scholarly acceptance of mean-median as the best or proper measure of partisan gerrymanders," acknowledging that "it's been subject to serious criticism by respected political scientists." (*Id.*, 170:24-171:7.)  Similarly, he acknowledged that the declination test—which only emerged in 2018—has not been

---

[33] *LULAC*, 548 U.S. at 419-420; *Gill*, 138 S. Ct. at 1932-1933.

[34] *Bandemer*, 478 U.S. at 129-130; *Vieth*, 541 U.S. at 287-288 (plurality opinion); *Id.* at 308 (Kennedy, J. concurring) ("There is no authority for this precept.  Even if the novelty of the proposed principle were accompanied by a convincing rationale for its adoption, there is no obvious way to draw a satisfactory standard from it for measuring an alleged burden on representational rights.").

subject to any scholarly commentary or consensus either.  (*Id.,* 176:17-176:23, 177:3-177:8.)

> **1.    The "efficiency gap" test provides no relevant information for district-specific dilution.**

The most emphasized of the five tests in Plaintiffs' expert reports—the efficiency gap test—was invented only four years ago in the Chicago Law Review (which is not a peer-reviewed journal).  (*See id.*, 51:10-52:14.)   It has been heavily criticized by the academic community, and is still being developed by its original authors.  *See* Stephanopolous & McGhee, The Measure of a Metric, 70 Stanford L. Rev. 1503, 1508 (2018).  In an article earlier this year, its authors identified recent publications criticizing the measure's flaws:

- Professor Benjamin Cover (Univ. of Idaho) contends that the test "favors uncompetitive elections, discourages proportional representation, and incentivizes voter suppression." [*Id.*]

- Professor Cover and Professor John Nagle (Carnegie Mellon Univ.): "object to some of the methodological choices …: how wasted votes are defined and weighted, how imputations are made for uncontested races, and how variations in district-level turnout are addressed." [*Id.*]

- Professors Wendy Tam Cho (Univ. of Ill.), Robin Best (Binghamton Univ.), and Jonathan Krasno (Binghamton)  "complain about the metric's variability from election to election." [*Id.*]

- Professor Christopher Chambers (Georgetown Univ.) "observe[s] that the efficiency gap does not distinguish between moderate and extreme legislators." [*Id.*]

Plaintiffs' own expert acknowledges that these critiques are by respected political scientists.  (Warshaw Dep., Ex. 9, 53:6-53:19.)

The efficiency gap is particularly ill-suited to making the kind of district-specific assessments required by *Gill*.  (Mayer Dep., Ex. 12, 168:9-168:11, 168:24-168.25 ("An efficiency gap is not calculated for a single district.").)

The metric, again, characterizes a party's votes in excess of the number (50.1%) needed to win, as well as those cast by the losing party, as "wasted."  It then "nets out" the wasted votes to provide a score, with the "best" score (i.e. no net wasted votes) being zero.  Examples of efficiency gap scores[35] for different types of districts are shown below:

| D Vote % | Rep Vote % | "Wasted" Net | "Efficiency Gap" Score |
|----------|-----------|--------------|------------------------|
| 25 | 75 | 24R - 25D = | -1 |
| 49 | 51 | 1R - 49D = | -48 |
| 35 | 65 | 15R - 35D = | -20 |

The third example is taken from Justice Kagan's concurrence in *Gill*, where she suggests that "a Democratic plaintiff residing in a 35%-Democratic district could prove she was cracked by offering an alternative, neutrally drawn map putting her in a 50-50 district."  138 S. Ct. at 1936.  Under the efficiency gap test, the "neutral"

---

[35] There is no well-accepted view in the academic community about what efficiency gap score renders a redistricting plan unacceptable or an extreme partisan gerrymander.  (Warshaw Dep., Ex. 9, 57:19-57:23.)

50-50 district in Justice Kagan's example would have the worst efficiency-gap score;[36] the original "cracked" 65-35 district would score much better, and an even *more* unbalanced, non-competitive 75-25 district would score nearly perfect.  Dr. Warshaw acknowledge this outcome.  (*See* Warshaw Dep., Ex. 9, 67:5-67:21.)

In sum, the efficiency gap test's inherent flaw is that it punishes competitive districts when those districts are the ones in which an individual's vote is *most* likely to have a determinative impact.[37]   This is in direct conflict with a district-specific vote dilution theory, which Plaintiffs must advance under *Gill*.

### 2.   Dr. Chen's simulation test is not a "well-accepted" measure, even of statewide harm.

Finally, Dr. Chen's simulation test is neither well-accepted nor relevant to showing unconstitutional, district-specific burden.   Dr. Chen first published his simulation exercise just three years ago, in 2015.[38]   Two different critiques have emerged within the last year, both noting that Dr. Chen's simulation technique has "no theoretical justification," and is "unlikely to yield a representative sample of

---

[36] Only a district that favored one party 100%-0% could result in a worse efficiency gap score of 49.

[37] *See* Mayer Dep., Ex. 12, 41:14-41:16 (agreeing that competitive districts are normatively good things); *Gill*, 138 S.Ct. 1916, 1936 (Kagan, J., concurring).

[38] *See* Jowei Chen & Jonathan Rodden, Cutting Through the Thicket: Redistricting Simulations and the Detection of Partisan Gerrymanders, 14:4 Election L. Journal 331 (2015).

redistricting plans" which is necessary to perform rigorous statistical analysis.[39]  Dr. Chen admitted as much in his deposition, stating that he was not interested in finding a representative sample of legally valid maps.  (Chen Dep., Ex. 3, 157:23-158:5.) The flaw in this approach is patently obvious: if Dr. Chen cannot accurately characterize the universe of potentially legally valid maps, he cannot possibly make statistical conclusions about whether any specific map is a partisan outlier.[40]

Further, Dr. Chen never purports to be in search of a measure of unconstitutional burden.  His report is framed entirely with respect to ferreting out *intent*, and thus is beside the point.  The demands of Justice Kennedy in *Vieth* were not for a test to identify or measure the likelihood of intent, but instead that the courts were in need of a well-accepted, manageable standard of unacceptable *effect*.  *Vieth*, 541 U.S. at 315 (Kennedy, J., concurring.)

---

[39] *See* Benjamin Fifield et al., A New Automated Redistricting Simulator Using Markov Chain Monte Carlo, *forthcoming* (May 24, 2018 draft, p. 2).  Available here: https://imai.fas.harvard.edu/research/files/redist.pdf.  *See also* Wendy K. Tam Cho & Yan Liu, Sampling from complicated and unknown distributions: Monte Carlo and Markov Chain Monte Carlo methods for redistricting, 506 *Physica A* 170 (September 2018).

[40] *See generally, United Parcel Service, Inc. v. U.S. Postal Service,* 184 F. 3d 827, 840, n 14 (D.C. Cir. 1999) (describing principles of inferential statistics).  Without a representative sample, statistical conclusions—e.g., that a map is an "extreme" gerrymander or even an "outlier," are fundamentally undermined.

In sum, the right to vote does *not* include a constitutional right to a certain number of seats in the legislature, or the constitutional right to win elections. Every one of Plaintiffs' experts' theories, however, is that Democrats win fewer elections and have less representation than they "should" have, *i.e.,* representation that is *roughly* equivalent to their statewide vote share (proportionality) or to what Republicans would garner with a vote share equivalent to that of Democrats (asymmetry). Thus, Plaintiffs are advancing a quintessential group right to a certain level of representation, which *Gill* condemns and every Justice in *Gill* rejected.

If statewide measures of group party proportionality and asymmetry are insufficient to establish Article III standing under *Gill*, they are plainly insufficient to prove cognizable First Amendment and Equal Protection burdens as well. Plaintiffs have pleaded and produced *no other evidence* of burden. Given this record, Plaintiffs should not be permitted to proceed further.

### D.   The League has not supported its standing.

#### 1.   The League has not supported independent associational standing.

An organization's standing may be premised on either harm the organization suffers itself, or on harm suffered by its members. *See Greater Cincinnati Coalition for the Homeless v. City of Cincinnati.*, 56 F.3d 710, 716-717 (6th Cir. 1994).

Crucial here, in assessing direct associational harm, the Court must "conduct the *same inquiry as in the case of an individual*[.]" *Havens Realty Corp. v. Coleman*,

455 U.S. 363, 378 (1982) (emphasis added).  Since the League does not vote (and thus cannot have its own vote diluted), and since Public Acts 128 and 129 do not regulate the League's speech or associational conduct (or otherwise classify the League directly or indirectly),[41] the League's harms still must be connected to the harms of its members or Michigan's voters—and thus must still depend on district-specific showings for those members or voters.[42]  The League's presentation thus suffers from the same deficiencies identified above.

Further, in this Court's Statewide Order, the Court held that the League had standing—at the pleading stage—because the League had sufficiently alleged that its mission had been "perceptibly impaired" by the challenged actions of the State. (Dkt. # 54, PgID.953.)  The Court laid out a road map for the League, advising that the League's "injury in fact" could be potentially supported by a showing that, e.g., the League's stated mission of increasing engagement in the political process had

---

[41] The League alleges it is nonpartisan. (Dkt. # 1, Compl. ¶ 7, PgID.4.)

[42] In contrast, in *American Canoe Ass'n Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544-546 (6th Cir. 2004), the court found independent organizational standing to exist because the American Canoe Association was being denied information required to be made public under the Clean Water Act.  The organization's inability to use the information supported the existence of "injury in fact" to the organization, but the organization still had a direct right to the information under the Clean Water Act on par with any member of the public.  Here, the League has no direct right to vote, and it has not been denied Equal Protection or been prevented from exercising its own First Amendment rights.

been hampered because "a large segment of the populace" had been retaliated against for participating in the political process, or, e.g., by showing that "dilution of individuals' political power impairs its mission insofar as it seeks to increase the informed exercise of political power."

The League has not supported either of these showings.  It presented no expert report to show, e.g., that the 2011 Apportionment Plan has resulted in decreased engagement in the political process or decreased exercise of political power by *anyone*.   It has provided no analysis showing that, e.g., *but for* the 2011 Apportionment Plan, more people would have voted, or engaged in political issues, or "increased engagement" if not for district-specific harms they suffered.  Notably, the League's own membership has rapidly increased in recent years (e.g., the League has gained more than 500 members in the last three years alone, from less than 2,000 to perhaps as many as 2,500).  (League Dep., Ex. 8, 24:11-24:19.)  Also notable is that metrics of political engagement generally show increased levels: Michigan voter turnout in the 2018 primary elections recently broke a 40-year old record.[43]

In short, the League can possibly have standing only through its members.  As set forth in the next section, it fails to support standing in this regard as well.

---

[43] See Paul Egan, *Voter turnout shatters recent records for Michigan primary elections,* Detroit Free Press (August 8, 2018), available at: https://www.freep.com/story/news/local/michigan/2018/08/08/turnout-shatters-recent-records-michigan-primary-elections/932623002/ (last accessed 9/20/18).

### 2.   The League has not supported standing through its membership.

As stated above, the Complaint in this matter only alleges the existence of "packing" or "cracking" relative to seven districts.  (*See generally,* Dkt. # 1, Compl. ¶ 10, PgID.6-9.)  Plaintiffs have plainly failed to make particularized claims as to the remaining 155 State House, State Senate, and Congressional districts in the 2011 Apportionment Plan.

The League and individual Plaintiffs have nonetheless proceeded under the fiction that they pleaded something more—i.e., Plaintiffs ultimately responded to Defendant's discovery requests as if many more than the seven "cracked" or "packed" districts were actually at issue.  On July 24—a month before the close of discovery and eight months after filing the Complaint—Plaintiffs supplied to Defendant an "initial" list of the additional districts they intended to challenge.  (See 7/24 E-mail, Ex. 4-B.)  It included not 7, but 77 districts, and Plaintiffs would not even then commit to those being the *only* 77 they intended to challenge.

The individual Plaintiffs live in only 16 of these 77 districts (to say nothing of the fact that the Complaint makes no particularized "cracking" or "packing" allegation as to 9 of these 16 districts).  The only potential voters before this Court that live in the remaining 61 districts—and thus who might have the ability to challenge such districts—are the League's members.

In discovery, on June 12, Defendant requested that the Plaintiffs provide all facts and documents on which they intended to rely to support the League's standing as to each identified district. (*See* First Discovery Requests, Interrogatory #2(c), Dkt. # 73-1, PgID.1422.) Plaintiffs responded to the Interrogatory, but gave no information on any specific League members or any facts that might support the League members' standing in any specific district. (*See* Dkt. # 73-2, First Responses, PgId.1440-1441.) They did not supplement this response at any point before discovery closed. Crucially, such information is solely within the purview of the League—it did not need to await production of materials from Defendant or third party subpoena recipients, for example.

As detailed above, on August 2, 2018, Defendant requested testimony from the League identifying which members were harmed, and how. (*See* 30(b)(6) Notice and 8/2 e-mail, Ex. 5.) At the September 11 deposition, the League could not identify *any* member,[44] in *any* district, that (1) felt he or she had inadequate

---

[44] At the September 11 deposition, for the first time (and well after the close of discovery), the League produced a list of members purporting to be Democrats in many of the districts identified in Plaintiffs' discovery supplements as being under challenge. Plaintiffs' "13th Hour" production of this list is highly prejudicial to Defendant if considered to support standing, however, given the late date of production. Though requested in discovery by Defendant on June 12, though plainly falling within the scope of Defendant's Interrogatory No. 2 in her first discovery requests, and though completed by Plaintiffs' in August of 2018, the list was not produced until 20 days after the close of discovery and in the context of a delayed 30(b)(6) deposition. (*See* League Dep., Ex. 8, 34:2.)

representation, (2) was unable to access or express themselves to their elected official, (3) felt stereotyped by their representative in any way as a Democrat or otherwise, or (4) had been separated from their natural community of interest.[45] (League Dep., Ex. 8, 55:25-58:2, 61:6-66:6, 66:23-67:24, 69:3-70:1, and 70:18-72:14.)

Even if the League could identify particular members[46] in particular districts they seek to challenge, Plaintiffs still must provide district-specific evidence of dilution in each such district, and they have not.   Dismissal of the League's claims—including claims as to all districts in which no individual voter Plaintiff resides—is thus warranted.

### E.   Plaintiffs' harms are speculative and conjectural; no evidence supports that concrete injury in fact will occur in 2020.

It is incontrovertible that, after the 2018 election passes (which will occur while this Motion is pending hearing) there is only one remaining election—the 2020 election—that will be held under any portion of the 2011 Apportionment Plan.

---

[45] These latter two harms are the harms identified by this Court as potentially supporting standing of partisan gerrymandering claimants by analogy to racial gerrymandering cases. (*See* Dkt. #54, Statewide Order, PgID.946-948.)

[46] From the League's deposition testimony, it is apparent that the League has collected no information from its members on whether they intend to vote in the future, whether they voted in the general election in 2016 rather than the primary, and whether the voters even voted in their current district in 2016.  (League Dep., Ex. 8, 30:21-31:6; 31:28-33:23.).

It is also incontrovertible that none of Plaintiffs' experts makes any predictions about the outcome of the 2020 elections in any particular district, much less the potential harms Plaintiffs may suffer in the 2020 election.  That is, in deposition, each of Plaintiffs' three experts categorically disavowed that they were making any predictions relative to the 2020 elections, either plan-wide, or as to any specific district.  (*See* Chen Dep., Ex. 3, 170:14-170:20, 174:5-174:8; Mayer Dep., Ex. 12, 96:4-96:20; Warshaw Dep., Ex. 9, 45:24-46:12; 76:10-76:14).

Dr. Warshaw conceded in his deposition that "it's long been known that the consequences of a gerrymander decay somewhat over time due to changing election circumstances" such that "no one can predict the future precisely."  (Warshaw Dep., Ex. 9, 83:19-83:22.)[47]  The 2020 election is thus the least likely election of the 2010 decennial redistricting cycle to be impacted by any initial "gerrymandering" effect following the implementation of the 2011 Apportionment Plan.

An injury-in-fact must be concrete and particularized, not conjectural or hypothetical.  *Lujan*, 504 U.S. at 560-61.  Since Plaintiffs' claims of harm in the

---

[47] He stated further that "I think the consensus in the literature is that the effects of gerrymandering decay somewhat over time."  (*Id.* 125:20-125:23.)  Dr. Warshaw also concedes that a high efficiency gap in one cycle is not particularly predictive of whether there will continue to be a high efficiency gap in a later cycle.  (*Id.,* 75:6-75:10, 83:8-83:12; 97:15-97:21).

2020 election are conjectural, and Plaintiffs have no proposed expert making predictions as to 2020 otherwise, Plaintiffs' claims should be dismissed.

## VII.   CONCLUSION

Plaintiffs myopically focused their discovery efforts on finding evidence of partisan intent or consciousness of political outcomes by the Legislature and its staff in the 2011 redistricting process.  While Defendant expects to dispute much of what Plaintiff will claim on issues of intent, intent has rarely been the issue in gerrymandering jurisprudence.

Plaintiffs failed to focus on the key issue that has resulted in the dismissal of the vast number of partisan gerrymandering claims: standing.  Standing must be district-specific, and tied to an individual voter's representational rights—Plaintiffs have ignored this Court's Statewide Order and *Gill*, and proceeded as if statewide evidence would save their claims.  It cannot be so.

Plaintiffs have failed at both the pleadings stage and at the Rule 56 stage. Under *Miller's* admonition that "[C]ourts must … recognize … the intrusive potential of judicial intervention into the legislative realm, when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages of litigation," 515 U.S. at 916-917, and, after applying Rule 12 and Rule 56 standards, dismissal is appropriate.

49

WHEREFORE, the Secretary requests that the Court dismiss the Complaint with prejudice, and provide such further relief as is appropriate.

Respectfully submitted,

DICKINSON WRIGHT PLLC        JONES DAY

/s/ Peter H. Ellsworth
Peter H. Ellsworth (P23657)        Michael Carvin
Ryan M. Shannon (P74535)        Attorneys for Defendant
Attorneys for Defendant

Dated: September 21, 2018

50

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.


/s/ Ryan M. Shannon


LANSING 537032

51