Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 1

1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF MICHIGAN

3                        SOUTHERN DIVISION

4     LEAGUE OF WOMEN VOTERS OF

5     MICHIGAN, ROGER J. BRDAK,

6     FREDERICK C. DURHAL, JR., JACK

7     E. ELLIS, DONNA E. FARRIS,        Case No. 2:17-cv-14148-DPH-SDD

8     WILLIAM "BILL" J. GRASHA, ROSA

9     L. HOLLIDAY, DIANA L. KETOLA,

10    JON "JACK" G. LASALLE, RICHARD

11    "DICK" W. LONG, LORENZO RIVERA,

12    and RASHIDA H. TLAIB,

13            Plaintiffs,

14        vs

15    RUTH JOHNSON, in her official

16    capacity as Michigan Secretary

17    Of State,

18            Defendant.

19

20            DEPOSITION OF JOWEI CHEN,

21

22    Taken by the Defendants on Friday, September 7, 2018, at the

23    offices of Dickinson Wright, PLLC, 350 South Main Street,

24    Suite 300, Ann Arbor, Michigan, at 9:34 a.m.

25

Deposition of Jowei Chen - 9/7/2018
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 2

```
1        APPEARANCES:
2
         Counsel for the Plaintiffs:
3                    MR. JOSEPH H. YEAGER, JR. (IN 2083-49)
                     MR. KEVIN M. TONER
4                    Faegre Baker Daniels, LLP
                     300 North Meridian Street
5                    Suite 2700
                     Indianapolis, Indiana 46204
6                    317-237-0300
                     Jay.Yeager@FaegreBD.com
7                    Kevin.Toner@FaegreBD.com
8
         Counsel for the Defendant:
9                    MR. MICHAEL A. CARVIN
                     Jones Day
10                   51 Louisiana Avenue, N.W.
                     Washington, D.C. 20001-2113
11                   202-879-3939
                     macarvin@jonesday.com
12
13       Co-Counsel for the Congressional Delegation, Intervener:
                     MR. JASON TORCHINSKY
14                   45 North Hill Drive
                     Suite 100
15                   Warrenton, Virginia 20186
                     540-341-8808
16                   Jtorchinsky@hvjt.law
17
         Co-Counsel for the Congressional Delegation, Intervener:
18                   MR. BRIAN D. SHEKELL (P75327)
                     Clark Hill
19                   500 Woodward Avenue
                     Suite 3500
20                   Detroit, Michigan 48226
                     313-965-8803
21                   Bshekell@clarkhill.com
22
         REPORTED BY:     Ms. Marjorie Covey, CSR-2616
23
24
25
```

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 3

1                          TABLE OF CONTENTS

2

3

4       WITNESS:                                    PAGE

5

6       JOWIE CHEN

7            Examination By Mr. Carvin                    4

8

9

10

11

12

13      EXHIBITS                              MARKED

14           Exhibit 1 (Expert Report of Jowei Chen, Ph.D.)      4

15           Exhibit 2 (Redistricting Plans - Excerpt)        98

16

17

18

19

20           (EXHIBITS WERE RETAINED BY THE COURT REPORTER FOR INCLUSION

21           IN THE TRANSCRIPT.)

22

23

24

25

Page 4

1      Ann Arbor, Michigan

2      September 7, 2018 - 9:34 a.m.

3      THE REPORTER:  Do you solemnly swear the testimony

4   you are about to give will be the truth, the whole truth and

5   nothing but the truth?

6      MR. JOWIE CHEN:  Yes.

7                   JOWIE CHEN,

8   HAVING BEEN CALLED BY THE DEFENDANT AND SWORN:

9                   EXAMINATION

10  BY MR. YEAGER:

11  Q.   Good morning, Professor Chen.  How are you?

12  A.   Good morning, sir, I'm doing well.

13  Q.   I know you had your deposition taken before, I just want to

14       make two points at the beginning.  The court reporter will

15       need a verbal response, not a nod or something like that to

16       make the record clear.  And if there is any questions that

17       I'm asking that you are confused about, please ask me to

18       clarify.

19            Will you swear on that?

20  A.   Yes, sir.

21  Q.   Okay.  Is there any reason, medications or otherwise that you

22       can't testify fully or truthfully today?

23  A.   No, sir.

24            (At 9:35 a.m. Exhibit 1 marked.)

25  Q.   Okay.  If you could look at what's been marked as Chen

Page 90

1      question.

2    Q.   What does your algorithm do with respect to the requirements

3         of the Voting Rights Act?

4    A.   I did not explicitly program the algorithm to try and

5         interpret and account for the Voting Rights Act in any

6         particular way.

7              As you -- as my report explains, I dealt with a

8         number of majority-minority districts in surrounding areas in

9         a particular way.  And obviously I'm happy to go through that

10        if that's responsive to your question.

11   Q.   Basically you just froze all the majority-minority districts

12        in the state and the Senate, House and Congressional plans?

13   A.   That's a part of what I did.

14   Q.   What else did you do?

15   A.   Okay.  I'll start -- I'm going to have to start with each

16        plan individually.  So I'll go through in detail and maybe

17        you can stop me if this isn't responsive to your question.

18             So I guess I'll start with the Congressional plan.

19        And certainly for the Congressional plan --

20   Q.   Maybe this will be simpler, did you do anything other than

21        freezing the majority-minority districts to account for the

22        requirements of the Voting Rights Act?

23             MR. YEAGER:  Just to clarify, are you withdrawing

24        the prior question?

25             MR. CARVIN:  I'm just trying to cut to the chase.

Page 103

1       so as to try to not break, not break counties.

2   Q.   This will be my last question on this.  It's quite clear that

3        the 95 to 105 percent threshold predominates over county

4        lines regardless, right, because of the priorities you said?

5   A.   Well I gather that from (e), among other parts of the statute

6        here.

7   Q.   Okay.  All right.  Let's turn to (f), right after that, okay?

8   A.   Okay.

9   Q.   Do you see (f) right underneath (e) that we were talking

10       about?

11  A.   Yes.

12  Q.   It says, does it not, if it is necessary to break county

13       lines to stay within the range of allowable population

14       divergence provided for in subdivision (d), the fewer whole

15       cities or whole townships necessary shall be shifted between

16       two cities or townships, both of which will bring the

17       districts into compliance with subdivision (d) and (h), the

18       city or township with the lesser population shall be diluted,

19       do you see that?

20  A.   Yes, I see that.

21  Q.   If you could turn to page 62 and 63 of your report.

22  A.   (Witness complied).

23  Q.   This describes what the algorithm does with county and

24       municipal breaks.  But it contains no discussion of the

25       provision, or the concept I just talked about that in the

Page 104

1    event of a county or municipal line break, the fewest whole

2    cities or whole townships necessary shall be shifted.

3         Was that something you put in your algorithm?

4  A.  What the algorithm does is when it's going through, say,

5    iterative changes and redrawing the boundaries between

6    districts --

7  Q.  Right.

8  A.  -- it will build up a district, first in order to fill up a

9    county.  And then, say, it has to intrude into a neighboring

10   county in order to complete the district, it will start

11   randomly adding municipalities --

12 Q.  Right.

13 A.  -- cities and townships, and add just enough to achieve an

14   equally populated district.  So that's what the algorithm

15   does.

16 Q.  Right.  But it doesn't -- there is nothing in the algorithm

17   that says shift as few as possible, right?  If you had one

18   district -- well, is there any provision that says shift as

19   few as possible?

20 A.  You're asking me to read (f), is that right?

21 Q.  Yes.

22 A.  I see that on the second line there is the phrase, the fewest

23   whole cities or whole townships necessary.

24 Q.  Right.  And is there a provision in the algorithm that

25   requires the shifting of the fewest whole cities or townships

Page 105

1        when a county line is broken?

2   A.   Well what I'm explaining is what the algorithm does is like I

3        said when it intrudes into a new county, it adds -- it keeps

4        on adding municipalities chosen at random and adds enough to

5        bring it to an equally populated district.

6   Q.   So just so we're clear, you didn't have any specific

7        directions in the algorithm to shift the fewest; you're just

8        saying that that's what you think the result --

9   A.   It's not going to, say, create an equally populated district

10       and then keep on adding municipalities is what I'm

11       clarifying.

12  Q.   Right.  Okay.  But there is no specific directive in the

13       algorithm to shift the fewest counties, is that correct?

14  A.   Well I'm just clarifying what the algorithm does.

15  Q.   Right.

16  A.   It adds enough just to get to an equally populated district,

17       and then stops.

18  Q.   Right.  And you're saying --

19  A.   So I think you're asking, are there are any extra steps

20       beyond that, the answer is no.

21  Q.   Okay.  Now let's assume that, for example, if you could go to

22       the last sentence of (f), between two cities or townships,

23       both of which will bring the districts into compliance with

24       subdivision (d) and (h), the city or township with the lesser

25       population shall be shifted.

Page 106

1           Was the algorithm directed, when it had a choice,

2       to bring it into the population threshold to choose the city

3       or township with the lesser population?

4    A.   It was not intentionally, say, advantaging the city or the

5          township with the lesser population.

6    Q.   Okay.  All right.  Do you know if you -- so you didn't get

7          into that at all.

8           Do you know how many cities or townships were

9       shifted, for example, in the House plans?

10   A.   You're asking how many cities or townships were shifted in

11         counties that are broken, is that right?

12   Q.   Well obviously, yes, that would be the context in which it

13         would arise.

14   A.   Okay.  And the answer is that I did not systematically go and

15         analyze that with the enacted or simulated maps.

16   Q.   Okay.  With respect to the Senate and the House plans, do you

17         know how close to perfect population equality the simulated

18         plans were?

19   A.   Let me take that one at a time.

20          With respect to the Senate and the House maps,

21      perfect -- how close to perfect population, the simulated or

22      the enacted?

23   Q.   Simulated.

24   A.   The simulated maps.

25          Well, I followed the criteria, the statutory

Page 151

1    A.   Okay, I'll explain the basis of my answer.

2              I am comparing two situations here and putting

3         together two sets of findings.  And obviously I'm putting

4         together findings regarding the partisan outlying nature of

5         the enacted plan as compared to the computer-simulated

6         processed plans.

7              And then I'm putting together that with my finding

8         regarding the statistically outlying nature of the Reock

9         score and the compactness scores as defined by the statutory

10        criteria.  And as we talked about sometime earlier today,

11        those Reock and compactness scores that I calculated, so I'm

12        putting together those two findings.

13             And I'm saying that it is -- how likely it is that

14        the plan that we're seeing here was one that was produced by

15        the sort of nonpartisan process that the computer was

16        programmed to follow, and I'm finding that to be very

17        statistically unlikely because of its partisan outlying

18        nature.

19             So putting those findings together leads me to

20        conclude that it's something to do with the partisan outlying

21        nature of the plan, that was related to the statistically

22        outlying nature of the compactness scores that I was

23        reporting on.

24   Q.   Right.  But they could have lower or worse compactness scores

25        simply because they didn't emphasize compactness as much as

Deposition of Jowei Chen - 9/7/2018
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 152

1          your algorithm, right?

2     A.   I wasn't analyzing that hypothetical as a, say an alternative

3          hypothesis.

4     Q.   So the answer to me is, yes, it's certainly possible?

5     A.   I have no basis for saying that it is or is not.  I'm just

6          telling you that I did not analyze that hypothetical that

7          you're putting forward to me.

8     Q.   But nonetheless, you wrote down in your report that you can

9          state with over 99.9 percent statistical certainty that the

10         enacted Congressional plan created districts less compact

11         than that would have reasonably emerged from a districting

12         process not driven by partisan intent.

13    A.   Yes.

14    Q.   Well what if it was a process that was not driven by partisan

15         intent, but wasn't driven by compactness?

16    A.   Same answer as before.  That is not what, the analysis I'm

17         referring to right here.

18              What I was saying before is that what I mean in

19         that last sentence, when I'm saying emerged from a

20         districting process not driven by partisan intent, I'm

21         describing the process I programmed.

22    Q.   So really what you're saying is that reasonably would have

23         emerged from your districting process that was not driven by

24         partisan intent.  Is that right?

25    A.   That's what I said sometime ago and that's what I'm saying

Page 157

1   A.   The point is obviously not that I am saying that this

2         computer code is the exhaustive list of all possible ways, as

3         somehow the only way that anybody could ever produce a

4         nonpartisan districting plan.

5   Q.   Okay.  So then what is your statistical certainty analysis

6         based on, whether it's the 95 percent confidence, other than

7         a comparison of your simulated plans to the enacted plan?

8   A.   Well it is actually just that, it's a comparison of a

9         simulated to the enacted plan.

10             Are you asking me about the methodology or are you

11         just asking me about the fact that I'm comparing simulations

12         to the enacted plan?

13   Q.   And that your levels of statistical certainty are based on

14         comparison of the simulated plans to the enacted plan, which

15         I think you just answered.

16   A.   It is.  What I was trying to clarify a moment ago is that I

17         don't think you had quite correctly described the statistical

18         methodology by which I'm arriving at, say, the statement on

19         page 14 about 99.9 percent statistical certainty.

20             But I think you got it correct with respect to the

21         fact that I'm obviously comparing simulated plans to the

22         enacted plan.

23   Q.   Okay.  Are you contending that the thousand simulations are a

24         random sample of all nonpartisan plans?

25   A.   I was not even interested in characterizing the whole

Deposition of Jowei Chen - 9/7/2018
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 158

1          universe of all possible nonpartisan plans, especially if

2          they're not drawn pursuant to the criteria that I am building

3          into my computer code.

4                  So that's not a question I would have been

5          interested in seeking to analyze.

6     Q.   So you didn't use any of the methods that people could use to

7          figure out whether your thousand simulated plans are a

8          representative sample of all potential nonpartisan

9          redistricting configurations?

10                 MR. YEAGER:  Objection, assumes facts not in

11         evidence.

12                 You may answer.

13                 THE WITNESS:  Okay.  Compared to all possible

14         nonpartisan redistricting plans.

15                 I don't know if your question is seeking to include

16         even plans that are not drawn with pursuit of the criteria

17         that I programmed into my algorithm.  Obviously I was only

18         trying to produce the sort of plans that followed the

19         criteria as I've laid out in my computer code and as I've

20         described in my report.

21                 So I'm not interested in, for example, the broader

22         set -- the broader universe of plans that are not drawn in

23         pursuit of these criteria.  It's just not something I

24         analyzed.

25    BY MR. CARVIN:

Page 170

1      about political geography.

2   Q.   And you've never been hired as a consultant outside of this

3        context on optimization methods more generally?

4   A.   On optimization methods?

5   Q.   The kind of thing you described with the Fed Ex, for example.

6   A.   Oh, yeah, I'm not a consultant for Fed Ex or any entity like

7        that.

8   Q.   Okay.

9   A.   If I were, I probably couldn't have given you that example.

10  Q.   Right.  So you've presented a number of analyses in your

11       report here of districts, particularly in the past elections,

12       right?  The 2006 through 2010 statewide elections, and the

13       2012 through 2016 elections.

14            My question is are you doing any analysis or making

15       any forecasts about results that will reasonably occur in

16       2018 or 2020 relative to the three offices at issue in this

17       case?

18  A.   I did not make any forecasts regarding specifically what I

19       expect to happen in 2018 or 2020, beyond generally just

20       analyzing the enacted districts.

21  Q.   Right.  But you're not making any predictions in terms of the

22       number of Republican congressman, Republican state

23       legislators that are going to be elected in 2018?

24  A.   Not beyond just generally analyzing the partisan of the

25       districts.  So I think I'm generally not trying to say, for

Page 171

1    example, that somehow I think that in November 2018, the

2    Republican party will win three more House seats than it has

3    in the previous election, nothing like that where I'm making

4    a new prediction relative to past partisan performance,

5    nothing specific to 2018.

6  Q.   But even generally, you're not making any prediction about

7    whether or not Democrats will achieve at least proportional

8    representation in the Congressional delegation, Senate

9    delegation and House delegation in 2018 or 2020, right?

10  A.   Okay.  That's a little bit of a different question.  I

11    definitely am not analyzing whether either party will achieve

12    proportional representation in any election really.

13  Q.   All right.  And you're not making any predictions about

14    whether Democrats will achieve any level of representation in

15    the 2018 or 2020 elections with respect to the three offices

16    at issue?

17  A.   Again, only insofar as I've generally analyzed and reported

18    on the partisanship of the enacted districting plans.

19  Q.   Right.

20  A.   So I've generally characterized the partisanship of those

21    plans and obviously that is a characterization that could

22    apply in an election like 2018 or 2020.  But it's not a

23    characterization that is specific to 2018, as opposed to

24    2016, as opposed to 2014.

25  Q.   Well all your other things are backward looking, all the

Page 172

1    analyses are of the elections that have already occurred.  My

2    question is are you inferring from what has occurred in the

3    past any predictions or statements to a reasonable degree of

4    professional certainty about what will occur in the 2018

5    elections under these redistricting plans?

6         MR. YEAGER:  Asked and answered.

7         You may answer.

8         THE WITNESS:  Like I said, all I'm doing is

9    characterizing the general partisan performance of those

10   districts.  That characterization is generally going to be

11   valid as -- if the districting plan continues to be in place.

12   BY MR. CARVIN:

13   Q.   So you are -- what do you mean by likely to be valid?  You're

14        saying that the numbers produced in 2018 will be very similar

15        to, identical to the numbers in your report?

16        MR. YEAGER:  Asked and answered.

17        You may answer.

18        THE WITNESS:  No.  I certainly am not predicting

19   that because -- I'll just throw out a random example.  I

20   calculated that in the enacted Congressional plan, using

21   recent past statewide election results, you can see that nine

22   districts favor Republicans and five favor Democrats.  It's

23   not saying that I'm specifically guarantying or predicting

24   that there will be exactly nine districts going for

25   Republicans in 2018.

Deposition of Jowei Chen - 9/7/2018
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 173

1          It's a general characterization of the partisanship

2      of that districting plan which, if that districting plan is

3      still in place in November 2018, then it's still an accurate

4      characterization of that districting plan for the purpose of

5      2018, as it was for 2016, as it was for all earlier years.

6          It's just a characterization.  I'm not saying, for

7      example, that I think there is going to be a two percent

8      Republican tide in 2018 relative to 2016.  That would be I

9      think what an election specific prediction does.

10   BY MR. CARVIN:

11   Q.   I don't want to focus on the word specific.  Are you opining

12      on the likelihood of electing seven Democrats in the

13      Congressional delegation in 2018 based on all the numbers in

14      your report?

15   A.   Only insofar as in general, what I am opining on is that, for

16      example, the enacted Congressional plan is a nine-five plan,

17      meaning that what my opinion is is that the long-run average

18      is going to be, over any number of elections, is going to be

19      that an expectation that the Republicans will win nine

20      districts out of 14 in the Congressional plan.

21          Now I'm not characterizing that as a 2018 specific

22      prediction, but obviously you can see how that prediction

23      could cover the 2018 election year.  I just want to make that

24      distinction.

25   Q.   I'll ask you again.  What percentage likelihood is there of

Page 174

1    electing seven Democrats in 2018 or 2020 based on your

2    analysis in this report?  Are you opining on that?

3         MR. YEAGER:  Asked and answered.

4         You can answer.

5         THE WITNESS:  I'm not arriving at a prediction to

6    say there is X percent probability that the Republicans will

7    win seven, Y percent probability that the Republicans will

8    win eight, nothing like that.

9         As I said, I'm characterizing the partisanship

10   which I take to mean -- to say that in the long-run

11   expectations Republicans are going to win in the enacted

12   Congressional plan nine seats and Democrats will win five.

13   BY MR. CARVIN:

14   Q.  The long-run expectation in this case is the 2020 elections,

15       you understand that, right?

16   A.  Well I'm trying to analyze really all elections for a number

17       of years.

18        And I understand that some of those are in the

19       past, and I appreciate your making this distinction that we

20       only have 2018 and 2020 ahead of us.

21   Q.  Okay.  But you don't think that this litigation is going to

22       affect the 2018 elections, do you?

23   A.  That's completely outside of my expertise.

24   Q.  Do you have a calendar?  You don't really --

25   A.  All right.  I'll grant you that we're pretty darn close to

Page 189

1          So you got the number -- the statewide elections

2     predict the number of Republican seats in the Congressional

3     elections, right?

4          MR. YEAGER:  Objection, incompletely states the

5     document.

6          You may answer.

7          THE WITNESS:  What I'm reporting here is that there

8     are nine districts that, using the statewide elections, are

9     favoring Republicans over Democrats in both the 2006 and

10    2010, as well as the '12 to '16 statewide elections.  And I

11    can see that obviously those nine districts are the same ones

12    that have been electing Republicans.

13    BY MR. CARVIN:

14    Q.  And you would count a Republican district as anything that's

15        a 50.1 percent district under the statewide, correct?

16    A.  That's correct.  I'm simply characterizing them as having

17        more Republican votes or more Democratic votes as a share of

18        the total summed up aggregated two-party votes across all

19        those statewide elections.

20    Q.  So you would equate a 51 percent Republican district as a

21        Republican district, as well as a 65 percent Republican

22        district?

23    A.  I wasn't really equating them other than saying I'm

24        characterizing them as Republicans.

25    Q.  Right.

**Deposition of Jowei Chen - 9/7/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 200

1        of an outlier or red flag automatically by virtue of being

2        above X percent.

3    Q.    I can give you examples, but in your report you use the words

4        Democratic districts have been packed and cracked.  And I'm

5        just trying to get your definition of those terms.  What's

6        your definition of a packed district?

7    A.    So because you're talking about when I use those terms at the

8        end of my report, right?

9    Q.    Certainly at the end, but I think there was a couple of

10        occasions before that.  But regardless --

11    A.    Okay.

12    Q.    -- what's your definition --

13    A.    Of packing and cracking, okay.

14            I'll give you my best shot.  I'll qualify in

15        general that by saying that as a political scientist I don't

16        understand those terms to mean anything precise in any

17        academic sense.  Meaning that there is no standard or set

18        political science definition of how do you quantify what

19        rises to the level of clear cracking or packing.  There is

20        just not an objective scientific definition of that.

21            And so when I use the term cracking and packing,

22        those are terms that are really just borrowed from what

23        people use colloquially, from what the popular press uses,

24        from what journalists use.  Obviously journalists use those

25        terms.

Page 201

1          And I generally understand what the popular media

2     means when it uses those terms.  Again, I don't have a

3     precise academic objective definition of crack and packing.

4     But I tried to operationalize that in the context of my

5     analysis here by taking what I understand others to mean by

6     those terms, by the terms crack and packing.

7          So I'll give you now my best shot at explaining how

8     I operationalized and defined those terms here in my report.

9     So I just wanted to make all those qualifications first.

10         What I call a -- we will just start with packing.

11    What I operationalize a packed district to be, and again this

12    is just my best shot at trying to put an operation to what

13    others mean by the term, is to say if there is a district

14    that is a certain percentage Democratic vote share, just as

15    an example, and it's an enacted district, and it has a

16    certain percentage Democratic vote share, and then I go look

17    at alternative computer-simulated districting plans, and look

18    at the same district in that same geographic area, as the

19    enacted district, and I look at several simulated districts

20    in that same geographic area, and I look at the partisan vote

21    share, the Democratic vote share of those alternative

22    computer-simulated districts, and I see that the vast

23    majority of those alternative computer-simulated districts in

24    that same geographic area are less Democratic leaning, have a

25    lower Democratic vote share, in other words, a higher

Page 202

1      Republican vote share, than that enacted district, that I

2      just for shorthand call packed.

3            Again, not a scientific term in any way, just

4      trying to operationalize it.

5  Q.  I'm confused.  You're saying that if the alternative plans

6      have a lower Democratic percentage, then anything above that

7      percentage is packed?

8  A.  No.  I got it backwards.  And I apologize if I misspoke and

9      mislead you there.  I'll put some actual numbers to try to

10     make this clearer.

11          So let's suppose that the enacted district number

12     one, hypothetical district, has a 70 percent Democratic vote

13     share.  And then we look at the computer-simulated districts

14     in that same geographic area, covering the same geographic

15     area, and they all have lower than a 70 percent Democratic

16     vote share, that I just label packing.

17  Q.  All right.  Let's assume district one has got a 53 percent

18     Democratic vote share, and all the alternatives are at 52.

19     Are you arguing that the 53 percent is a packed district?

20  A.  If it's one thousand out of one thousand, I'm applying that

21     same shorthand label packing.  It's just a purely

22     mathematical operationalization.

23  Q.  So any time an enacted plan in this case has a higher

24     Democratic percentage than the simulated plans, it's a packed

25     district?

Page 203

1    A.   Than virtually all the simulated districts in that same

2         geographic area, I'm labeling that packing.

3    Q.   And that's for above 50 percent.

4              For below 50 percent, is the district cracked when

5         the enacted plan has a lower Democratic percentage than the

6         simulated plans?

7    A.   Let me -- if I could, let me just review my report and I want

8         to make sure I get this absolutely right, so if you could

9         allow me a moment.

10   Q.   Yes.

11   A.   Okay, thank you for that.

12             Yeah, I think your characterization there was --

13        basically I'm going to put it in my own terms to make sure I

14        got it right, but I think this is the same thing as what

15        you're saying.

16             So for cracking, what we're describing here is if

17        there was a district where, and I believe I used 95 percent,

18        if 95 percent of the simulated districts are on the other

19        side, in terms of partisan vote share, then it's

20        characterized as, with the label crack, cracking.

21   Q.   Just to be clear, when you say on the other side, you don't

22        necessarily mean that the seat switches, but are on the other

23        side in terms of the higher Democratic percentage?

24   A.   Correct.  I'm not necessarily saying anything about the seat

25        flipping above or over 50 percent.  It's purely relative to

Page 204

1      the enacted district comparison.

2   Q.   So you would call any Democratic district cracked at 48

3      percent if the middle 95 percent was 48.5 or higher?

4   A.   Right.  The 50 percent cutoff that I think you're thinking

5      about, that's not relevant here.

6   Q.   No, but can you answer my question?

7   A.   Sure, I apologize.  That's right.

8         I mean you're just looking at whether there are,

9      say, something like 95 percent or more of the simulated

10      districts that are all on one side or the other.

11   Q.   Okay.  So you're using packed and cracked in a very specific

12      way that applies only to your simulation analysis.  You're

13      not using it in the way that's used in most political science

14      literature, is that what I understand?

15   A.   Well I'm not going to try to characterize how, quote, most

16      political science literature uses it.  I don't have the basis

17      for answering that.

18         I am acknowledging that this is an

19      operationalization of the cracking and packing terms that is

20      specific to my analysis here.

21   Q.   Do you have an understanding of how the term is generally

22      used in political science, packed for example?

23   A.   Well the reason I gave that caveat, that long caveat at the

24      beginning, I'm saying look, I don't understand the terms

25      packing and cracking to mean anything very precise in

Deposition of Jowei Chen - 9/7/2018
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 271

1    of these rows was inside or outside of that 95 percent

2    interval.

3    Q.   Okay.  So let's look at D3 in your appendix, D3, okay.  And

4    you may have to go back, I apologize, to make sure I'm not

5    misleading you.  But you listed District 1 on page 56 as one

6    of these partisan outliers.  You can keep going back if you

7    need to, it's page 56.

8    A.   I gotcha.

9    Q.   So I want to ask you some questions about CD-1.

10          The only thing I see on your graph there is a more

11   Republican district, a somewhat safer Republican district.

12   Why would that be a packed or cracked partisan outlier?  Am I

13   misunderstanding?  The star is the enacted plan district,

14   right?

15   A.   Correct.

16   Q.   And the thing to its right, meaning more Republican, is the

17   50 percent of the enacted plan -- the simulated plans that

18   overlap by 50 percent.

19          So how could CD-1, if it's less Republican, be a

20   pro-Republican district?

21   A.   Okay.  Well all I'm doing here as I said a moment ago is I am

22   just looking at -- and this is a purely technical exercise.

23   Q.   Okay.

24   A.   I'm just looking at the middle 95 percent range.  And I'm

25   just asking is that red star representing the enacted

Page 272

1      Congressional District 1, each Congressional district here,

2      is it inside or outside of that range.  And if it's outside,

3      I'm listing that in that paragraph.

4   Q.   Okay.

5   A.   And all I meant to say is I didn't -- I obviously didn't

6      intend to, and I apologize if I accidentally misled you with

7      that paragraph regarding the partisan direction of that.  I

8      simply said what's a 95 percent interval, and if it was

9      outside of that, then it would be listed.

10  Q.   All right.  So I had a lot of those questions along those

11     lines, but I'm again going to cut to the chase with you.

12          If I understand what you just said correctly, if

13     the enacted plan is outside of the range represented by

14     these, I don't know what else to call it, the concentrated

15     circles, I don't want to call them blobs, but if they're

16     outside of that, then that's the decision-making process that

17     led you to include them among the districts that you

18     categorized as partisan outliers; whereas if the star appears

19     within those districts, within the blobs, then you don't

20     characterize them that way?

21  A.   That's basically right .  Again, it is a purely statistical

22     exercise here.  And obviously you and I talked quite a bit at

23     length earlier today about how I was attempting to just

24     operationalize, even though I don't have a particular

25     scientific understanding of the terms cracking and packing, I

Page 273

1        just took a very specific statistical identification here

2        where I said, what's the 95 percent interval, that middle 95

3        percent range, and is the enacted district within or outside

4        of it.

5             That's it.  I just wanted to make sure that was

6        clear.

7   Q.   Okay.  Well even in light of that, I thank you because that

8        saved us a boat load of time.

9             I'm still a little confused.

10            If you could turn to Appendix D6 on page 78, right?

11       And again, check me on page 56, but I think you list District

12       8 as one of these partisan outliers, that Senate District 8

13       if you want to check me on page 56?

14  A.   On 56.

15  Q.   I'm representing to you that you listed SD-8 as one of the

16       partisan outliers.  If you want to check my veracity you can

17       look at page 56 and see if I got that right.

18  A.   I gotcha.

19  Q.   So now I have a question about SD-8 based on the thing on

20       page 78.

21            I would have thought that that circle would have

22       been between the two blobs, so it wouldn't have been a

23       partisan outlier under the mechanistic view that you just

24       described.  So how did SD-8 wind up on this list?

25  A.   Right.  I think what you're saying is you're seeing two

Page 281

1          CERTIFICATION OF COURT REPORTER AND NOTARY PUBLIC

2                        _____

3

4    STATE OF MICHIGAN  )

5                        )  SS

6    COUNTY OF MUSKEGON )

7

8          I certify that this transcript, consisting of 281

9    pages, is a complete, true and correct record of the

10   testimony of JOWIE CHEN held in this case on September 7,

11   2018.

12         I also certify that prior to taking this deposition

13   JOWIE CHEN was duly sworn to tell the truth.

14

15

16   DATE:  September 9, 2018

17

18

     _____

19   MARJORIE A. COVEY, CSR-2616

     141 East Michigan Avenue, Suite 206

20   Kalamazoo, MI 49007

     1.800.878.8750

21

            Notary Public Expires:  October 14, 2021, Muskegon

22   County, Michigan/Acting in the State of Michigan.

23

24

25