Page 1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2                    SOUTHERN DIVISION
3     LEAGUE OF WOMEN VOTERS OF
      MICHIGAN, ROGER J. BRDAK,
4     FREDERICK C. DURHAL, JR., JACK E.
      ELLIS, DONNA E. FARRIS, WILLIAM
5     "BILL" J. GRASHA, ROSA L.
      HOLLIDAY, DIANA L. KETOLA, JON
6     "JACK" G. LASALLE, RICHARD "DICK"
      W. LONG, LORENZO RIVERA, and
7     RASHIDA H. TLAIB,
8             Plaintiffs,
9     -v-                      Case No.
                               2:17-cv-14148-DPH-SDD
10    RUTH JOHNSON, in her official
      capacity as Michigan Secretary of
11    State,
12            Defendant.
13    _____
14        The 30(b)(6) deposition of League of Women Voters
15    of Michigan, by and through SUSAN K. SMITH, taken
16    before Ms. Suzanne Duda, CSR-3199, RPR, CRR, Notary
17    Public, at 350 South Main Street, Suite 300, Ann Arbor,
18    Michigan, on Tuesday, September 11, 2018, commencing at
19    9:00 a.m.
20    APPEARANCES:
21        MR. JOSEPH H. YEAGER, JR.
          FAEGRE BAKER DANIELS, LLP
22        300 North Meridian Street
          Suite 2700
23        Indianapolis, Indiana 46204
          (317)237-0300
24        jay.yeager@FaegreBD.com
25            Appearing on Behalf of Plaintiffs

Page 2

```
 1      APPEARANCES, CONTINUED:
 2          MR. RYAN M. SHANNON (P74535)
            DICKINSON WRIGHT, PLLC
 3          215 South Washington Square
            Suite 200
 4          Lansing, Michigan 48933
            (517)487-4719
 5          RShannon@dickinsonwright.com
 6              Appearing on Behalf of Defendant
 7          MR. PHILLIP M. GORDON
            (via conference call)
 8          HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC
            45 North Hill Drive
 9          Suite 100
            Warrenton, Virginia 20186
10          (540)341-8808
            PGordon@HVJT.law
11
                Appearing on Behalf of Congressional
12              Intervenors
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                     TABLE OF CONTENTS

2     WITNESS:  SUSAN K. SMITH              PAGE

3     Examination by Mr. Shannon             4

4     Examination by Mr. Yeager              74

5                 *    *    *    *    *

6                    INDEX OF EXHIBITS

7     EXHIBIT                          PAGE

8     Deposition Exhibit Number 1            9

9     (Amended Notice of Taking 30(b)(6) Deposition

10    of the League of Women Voters of Michigan)

11    Deposition Exhibit Number 2           22

12    (Membership Application Form)

13    Deposition Exhibit Number 3           25

14    (New Member Handbook: League of Women Voters

15    Michigan 2017)

16    Deposition Exhibit Number 4           35

17    (Spreadsheet of League Members)

18    Deposition Exhibit Number 5           42

19    (Complaint for Declaratory and Injunctive

20    Relief)

21    Deposition Exhibit Number 6           74

22    (Two-Page List of League Members)

23    (Deposition Exhibit Numbers 1-6 are attached.)

24                 *    *    *    *    *

25

Page 4

1              Tuesday, September 11, 2018

2              Ann Arbor, Michigan

3              9:00 a.m.

4          R E C O R D

5          THE COURT REPORTER:  Do you swear or

6      affirm to tell the truth, the whole truth, and

7      nothing but the truth, so help you God?

8          MS. SMITH:  I do.

9              SUSAN K. SMITH,

10     a witness herein, was called for examination, and

11     after having been sworn, was examined and testified

12     on her oath as follows:

13         MR. SHANNON:  Thank you and good morning.

14         THE WITNESS:  Good morning.

15         MR. SHANNON:  My name is Ryan Shannon and

16     I'm counsel for the defendant in this matter, the

17     Michigan Secretary of State, on the phone we have

18     Phillip Gordon, who is counsel for the

19     congressional intervenors in the case, and we're

20     here today to take your deposition, which is a

21     30(b)(6) deposition.

22             EXAMINATION

23     BY MR. SHANNON:

24     Q    Could you please state your name for the record.

25     A    Susan K. Smith.

Page 6

1          MR. SHANNON:  Okay.  Before we jump into

2     the questioning here, I understand that plaintiffs

3     are not designating today a witness on Topics 2(a)

4     or 2(b) -- I'm sorry -- Topics 2(b) or 2(c) in the

5     deposition notice that we sent out.  I'd ask

6     plaintiffs' counsel to make a statement on the

7     record regarding that.

8          MR. YEAGER:  Thank you.  And I'd like to

9     just state our objections for the record, as we

10    discussed.

11         MR. SHANNON:  Sure.

12         MR. YEAGER:  As to the designation,

13    subject to the objections that we are -- will state

14    here in a moment and as previously discussed

15    between me and Mr. Shannon, we are designating

16    Ms. Smith as to Topic 2(a), again, subject to the

17    objections.  We are not at this time designating a

18    witness for 2(b) and 2(c).

19         As to the notice itself, the plaintiffs

20    object that the notice attempts to use the 30(b)(6)

21    and, in general, the deposition process under Rule

22    30 as a procedure to conduct contention-style

23    interrogatory -- I'm sorry, contention-style

24    discovery -- and we object to that.  We think it is

25    inappropriate for a deposition setting, and there's

Page 7

1       authority on that that we have discussed in

2       general.

3              That type of discovery has been conducted

4       in this case.  There's an interrogatory that we

5       responded to and supplemented twice in some detail

6       that's a contention-style interrogatory.  Those

7       types of inquiries from this kind of

8       contention-style discovery are properly directed to

9       the lawyers, not to a witness, or even a 30(b)(6)

10      witness.

11             We are designating Ms. Smith today to

12      testify as to facts, not as to legal conclusions

13      and not as to matters of mixed law and fact.  The

14      witness is not a lawyer.  She is testifying as to

15      Topic 2(a) only and only subject to the prior

16      direction and objection that was stated.  We

17      believe there are contention-style elements to 2(a)

18      but there are also factual elements as to what

19      she's prepared to testify.

20             In addition, we'd object that the

21      deposition notice is overbroad, it is unduly

22      burdensome, the burdens it would propose to impose

23      are disproportionate to the needs of the case given

24      the other discovery that has been conducted and is

25      being conducted, it's duplicative of other

Page 8

1      discovery and in particular with regard to remedial

2      maps of which we have provided several thousand.

3              And, finally, we also think that the

4      discovery as to the remedial maps is premature as

5      they are a sort of remedy before the Court has

6      decided which districts were drawn in violation of

7      the 14th and the 1st Amendments to the Constitution

8      of the United States.

9              Thank you for the time, Mr. Shannon.

10             MR. SHANNON:  All right.  Thank you, Jay.

11     I will -- we have talked at some length about how

12     we considered the maps to be an issue regarding

13     redressability, and in particular whether there is

14     a map known to plaintiffs that will satisfy the --

15     actually provide a remedy to all of the plaintiffs

16     in this matter.  We'll get into that more later

17     between the lawyers.  I don't plan on making those

18     arguments in a deposition context certainly, but

19     we've had some discussions, and I'm sure we'll

20     be -- we'll have some more on that later.

21             MR. YEAGER:  I think both sides have

22     preserved their positions well on that.

23             MR. SHANNON:  That's correct.

24             And just at the outset, you're not

25     directing Ms. Smith not to answer any questions at

Page 24

1    of clarification, not to change her answer, that we

2    did produce a roster of League members in our

3    interrogatory responses that was current at that

4    time.

5              I'm sorry to interrupt.

6              THE WITNESS:  Thank you.

7              MR. SHANNON:  Thank you, Jay.

8    Q   (MR. SHANNON) Do you know how that compares, that

9        number -- you said between 2,000 and 2,500?

10   A   Uh-huh.

11   Q   Do you know how that compares to, say, two years

12       ago?

13   A   It's higher.

14   Q   How much higher, do you know?

15   A   I can't give you the exact number.  I know that

16       it's significantly higher than it has been, say, in

17       2015 for an example.

18   Q   Would you say 500 more members, roughly?

19   A   Probably, at least.

20   Q   Okay.  Does the League require that members

21       identify their political affiliation as a condition

22       of joining the League?

23   A   No, it does not.

24   Q   Okay.  Other than the exercise you talked about

25       where various League members reached out to -- I'm

Page 30

1      during the time that I hold office in the League.

2           The constraints for board members who are

3      not officers are different than they are for the

4      officers.

5    Q   I want to return to the exercise that you described

6      earlier wherein personnel from the League contacted

7      members of the League.

8    A   Uh-huh.

9    Q   I asked you if you had brought the script today and

10     you said you have not.

11   A   Correct.

12   Q   Can you tell me what questions were in the script?

13   A   I can tell you what I remember, I can't tell you

14     whether it's an exhaustive list or not.

15   Q   Please do.

16   A   One of the questions was, of course, to confirm

17     their name and address.  We asked them if they were

18     a registered voter.  No, I don't know that I -- I'm

19     sorry, let's strike that.  I don't remember that.

20     I know you asked me, and I don't know for sure.

21          We did ask them if they voted in the 2016

22     election, which would certainly imply that they

23     were a registered voter, but -- especially at

24     the -- on the state races, and did they vote for

25     Democrats in the state races in 2016, and if they

Page 31

1    said yes, then we asked them about their level of

2    participation.  Were they a member of the

3    Democratic Party?  Did they support Democratic

4    candidates with money or time?  Did they attend

5    activities sponsored by the Democratic Party?  So

6    forth.

7  Q   Do you recall, did you ask -- not you personally I

8    mean but the League --

9  A   Uh-huh.

10 Q   -- did they ask anything concerning prior elections

11   to 2016?

12 A   I think there were, in some instances, conversation

13   about the 2014 election.

14 Q   Were there any questions about the -- I'm sorry, I

15   didn't mean to cut you off.

16 A   Go ahead.

17 Q   Was that your complete answer?

18 A   Yes.

19 Q   2014?  Okay.  Were there any questions about the

20   2018 election and their intent to vote in 2018?

21 A   No.

22 Q   What about in 2020?

23 A   No.

24 Q   Were there questions about particular candidates

25   they had voted for or merely whether they had

Page 32

1          voted?

2     A    It was the statewide races.

3     Q    There were no questions about individual

4          congressional races?

5     A    Well, when I say state races, I'm referring to

6          votes for the state Legislature, the House or the

7          Senate.  Certainly, when you vote for your

8          congressional representative, it's a representative

9          from Michigan, so that would -- that would have

10         been included.

11    Q    So to clarify, when you said state -- you made

12         inquiry as to state races or statewide races,

13         you're talking about inquiries as to whether they

14         voted for a particular candidate --

15    A    No.

16    Q    No.  You asked them whether they voted for state

17         representative?

18    A    We asked them if they voted for a Democrat in the

19         state races such as the State House, State Senate,

20         congressional race.  We were differentiating

21         between those races and a federal race, like the

22         president for example.

23    Q    Well, Congress would be a federal race.  Did you

24         ask them if they voted for a Democrat for Congress?

25              MR. YEAGER:  Objection, asked and

**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 33

1       answered.

2               You may answer.

3               THE WITNESS:  Again, as I -- and we, as

4       discussed, I don't have the script in front of me

5       so I don't have the exact questions.  It was

6       certainly our intent to find out if they voted for

7       Democrats, the State House, the State Senate, the

8       U.S. Congress.

9    Q   (MR. SHANNON) Did you ask them if they voted for a

10      party nominee or did they write in a Democrat?

11   A   We just said did they vote for a Democrat.

12   Q   Did you ask them if they voted in the general or in

13      the primary?

14   A   Again, I'd have to go back and look at the question

15      to be sure whether there was a differentiation

16      about that or not.

17   Q   Did you ask them if they split their ticket at all?

18   A   No, we just asked them did you vote Democrat in

19      those elections that I've already described.

20   Q   Did you ask them about their political affiliation

21      as of December of 2017?

22   A   December of 2017?

23   Q   Correct.

24   A   No.

25   Q   Can you tell me the time frame when this exercise

Page 34

1      took place?

2   A   July and August of 2018.

3   Q   Do you recall if it started in early July or late

4      July?

5   A   I'd have to look at my notes to see when that

6      actually started.

7   Q   Did you ask any members if they were Republicans in

8      that exercise?

9      MR. YEAGER:  Objection, asked and

10      answered.

11      You may ask -- or you may answer.

12      THE WITNESS:  Pardon me?

13      MR. YEAGER:  You may answer.

14      THE WITNESS:  The question was "Did you

15      vote for a Democrat in the 2016 elections," as I

16      have already described, and if you did, if they

17      said yes, then we asked them other questions

18      related to their possible activity as Democrats.

19   Q   (MR. SHANNON) So if the answer was no, there wasn't

20      a follow-up question --

21   A   Correct.

22   Q   Just for the sake of the court reporter, when I'm

23      asking a question, if you could wait until it's all

24      the way out, that way we don't have overlap.

25   A   Thank you.

Page 55

1    A    I take your word for it in terms of the math.

2    Q    Okay.  And I'm sure we can move forward on the

3         basis that there are a large number of League

4         members in House District 69?

5    A    There are.

6    Q    Okay.  Does that district, House District 69 which

7         covers Lansing and East Lansing, does that district

8         typically vote Democrat or Republican, if you know?

9    A    I don't know.

10   Q    Okay.  So I'm going to define a term for you now.

11        I'm going to use the word "inadequate," and I'm

12        going to use that in reference to a representative,

13        an elected official.

14   A    As an inadequate representative?

15   Q    Correct.

16   A    Are you talking about the person?

17   Q    The person.  And so by inadequate, I'm meaning that

18        the representative is not responsive to a voter or

19        ignores issues that are important to that voter,

20        okay?

21             Do you know if any of the League members

22        listed in House District 69 feel that their

23        representative is inadequate?

24   A    I don't know.

25   Q    Do you know if any League member in any district

Page 56

1     feels their representative is inadequate?

2   A   Any League member in any district in the state

3     feels their representative -- are we talking about

4     the House representative?

5   Q   Just the House, yes.

6   A   I have heard general conversations, but I can't

7     give you specifics.

8   Q   Do you know which League members those

9     conversations involved?

10   A   I do not.

11   Q   What about for the State Senate?  Same question.

12     Do you know if any League members in any Senate

13     district feel their representative is inadequate?

14   A   I have heard comments to that effect, yes.

15   Q   Specifically, do you know which League members?

16   A   I cannot tell you which League members said that to

17     me.

18   Q   Same for Congress.  Do you know of any League

19     members in any congressional district who feel

20     their congressperson is inadequate?

21   A   I have heard the comment.

22   Q   Specifically do you know which League members?

23   A   I cannot give you a name.

24   Q   Do you know if any of the 103-odd League members

25     living in House District 69 feel that they have

Page 57

1        been unable to access their representative or to

2        express their views to their representative?

3     A   Do I know of any League members in House

4        District 69 who feel that -- that they want -- they

5        couldn't . . .

6     Q   I'll repeat the question in full.

7     A   Okay.

8     Q   Do you know of any League members living in House

9        District 69 that feel they have been unable to

10       access their representative or to express their

11       views to their representative?

12    A   I don't know of any specific League members.

13    Q   Do you know even generally if there's a feeling

14       among League members of that nature in House

15       District 69?

16    A   I don't know of any.

17    Q   Do you know if any League members in any district

18       feel that way?  And I'm talking specifically about

19       the House.

20    A   I have heard League members say that.

21    Q   Which ones?

22    A   I can't give you specific names.

23    Q   Do you know which districts they lived in?

24    A   I would have to sit down and look at the districts

25       and think about where I heard those comments.

30(b)(6) Deposition of Susan K. Smith - 9/11/2018
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 58

1      Right off the top of my head, I don't think I could

2      do that for you.

3    Q   Well, we've got a list of districts here with the

4      members.

5    A   Correct.

6    Q   And so I understand it may take a moment, but I'd

7      like to ask you to take that exercise and tell me

8      which districts you've heard members complain about

9      inability to access their representatives.

10          THE WITNESS:  Is this a reasonable

11      question?

12          MR. YEAGER:  Well, I object because I

13      think the question assumes facts not in evidence.

14      The witness has testified that she can't identify

15      an individual who made the comments that you had

16      asked about, and so I think that asking her to look

17      through a list of individuals is going to be a

18      fruitless exercise.

19          If you want her to look through and see

20      if it reminds her, that's -- that's up to you, but

21      I object to the question as stated.

22    Q   (MR. SHANNON) My specific question is as to

23      districts, not individuals.  You said that you

24      would have to look at the list of districts and

25      think about whether or not you had ever had any

Page 61

1    Q    Okay.  So I think, actually, I'm going to cut this

2         exercise short by just repeating the question and

3         making sure I have your testimony correct.  And

4         your lawyer will probably object on an

5         asked-and-answered basis, and that's fine.

6              Do you recall any specific concern

7         expressed by any member in any district regarding

8         their ability to access their representative or

9         express their views to their representative in the

10        Michigan House?

11             MR. YEAGER:  Asked and answered.  And I'd

12        ask that the question be read back, if it's okay

13        with you, so the witness may hear the entire

14        question again.

15             MR. SHANNON:  That's fine.

16             (The record was read back by the court

17             reporter as follows:

18             "QUESTION:  Do you recall any specific

19             concern expressed by any member in any

20             district regarding their ability to

21             access their representative or express

22             their views to their representative in

23             the Michigan House?")

24             THE WITNESS:  Yes, I do.

25    Q    (MR. SHANNON) Which specific member?

Page 62

1   A   I told you I can't give you names of specific

2        members.  You asked me did I recall any member.  I

3        remember conversations at League meetings, people

4        expressing their opinions about their relationships

5        with their representatives.  I do not and cannot

6        give you specific names.

7   Q   Do you recall which specific representative?

8   A   Talking just the House?

9   Q   Just the House.

10   A   No.

11   Q   What about for the Senate, the same question.  Do

12        you recall any specific member of the League

13        expressing concern to the League or others about

14        their ability to access or express their views to

15        any member of the Michigan Senate?

16             MR. YEAGER:  The same objection.

17             You may answer.

18             THE WITNESS:  I recall people expressing

19        frustration over their ability to access their

20        senator, but I do not recall the names of those

21        individuals.

22   Q   (MR. SHANNON) And, finally, for Congress, same

23        question.

24   A   Yes, I recall League members expressing frustration

25        over their ability to access their U.S.

Page 63

1       congressperson.

2   Q   Do you recall which specific League members?

3   A   I do not recall which specific League members.

4   Q   Do you recall which specific congressmen?

5   A   Hmm.  He was over from the west side of the state.

6       Can't remember his name.

7           Do you have a list of the senators?

8   Q   The congressmen?

9   A   I mean the congresspeople?

10   Q   I don't have one with me.

11   A   Somebody that's over on the west side of the state.

12   Q   Do you remember the specific concern expressed

13       regarding access?

14   A   Yes, and, actually, it's a concern that League

15       members have expressed to me in a number of places

16       across the state, and that there are two instances

17       where League members interact with people who are

18       their representatives in the House or the State

19       Senate or the U.S. Congress.  One of those times

20       when they interact is when we hold candidate

21       forums, such as we've been holding this past summer

22       and will hold this fall, where those who are

23       running for office -- and, of course, many of them

24       are incumbents -- are invited to come and do a

25       public meeting and present their views and their

Page 64

1     responses to League members' questions.  And in

2     some instances, their representative or their

3     congressperson or their senator has refused to

4     participate in the candidate forum.

5          The other instance where League members

6     interact in a formal way as League members is at

7     the beginning of each session, either legislative

8     or congressional, we provide a list of suggested

9     interview questions and suggest that League members

10    reach out to their representative, senator or

11    congressperson over an informal meeting, over a cup

12    of coffee, get acquainted, talk about the League if

13    they don't -- if they're not familiar with the

14    League, find out, you know, what the League -- what

15    that candidate -- I'm sorry -- what that

16    officeholder's point of view might be, how they

17    look at various issues that are coming up before

18    the state or the federal Congress, and to really

19    try to develop a relationship with that person so

20    that in the future, if there is legislation either

21    coming up in the state Legislature or in the U.S.

22    Congress that the League is interested in

23    expressing either -- some kind of advocacy either

24    in support of a particular bill or in opposition to

25    a particular bill, that that League would already

Page 65

1    have established a relationship with their

2    representative.

3   Q   So at these various forums when someone expressed a

4    concern about a representative's accessibility or

5    an elected official not listening or refusing to

6    listen to concerns --

7   A   Or refusing to participate.

8   Q   -- or refusing to participate -- do you know was

9    the person expressing that concern a registered

10    voter?

11   A   I'm assuming they are because voter registration is

12    extremely important to the League.  It's part of

13    our mission.  It would be very unusual for any

14    League member to not be a registered voter.  I do

15    not know of any League member that I ever had

16    reason to believe they're not a registered voter.

17   Q   Persons under the age of 18 can be League members.

18    You testified to that before.

19   A   This is correct, this is a new change to the

20    membership, and so, yes, it's certainly possible.

21    But the -- the people that I interact with who are

22    part of these candidate forums tend to be older

23    members of the League who are clearly eligible to

24    vote.

25   Q   The persons expressing these concerns?

Page 66

1    A    Yes.

2    Q    Again, you don't know -- you don't know

3         specifically any names of these people?

4    A    Correct.

5    Q    Do you know if they are Democrats?

6    A    I don't know because the League doesn't ask.

7    Q    Okay.  So returning to House District 69 --

8    A    Uh-huh.

9    Q    -- and the large number of League members living in

10        House District 69, do you know if any of them were

11        prevented from voting for the candidate of their

12        choice in House District 69 due to the shape of

13        their district?

14   A    I don't know.

15   Q    Do you know that for any House district?

16   A    I'm sure that that is true of a number of House

17        districts, but without going through the documents

18        that I didn't bring with me, I would have to say

19        that I can't really guess, because I am not

20        familiar enough with the district maps to be able

21        to say that I know where each of these districts is

22        located or what they look like.

23   Q    Do you know of any member of the League in any

24        district who was not able to vote for the candidate

25        of their choice?

Page 67

1   A   Well, if they -- it depends on what district they

2       lived in.  If they lived in a district where it was

3       one-sided, well -- so you asked me do I know of

4       someone who lives in a House district who -- what

5       was that again?  Who couldn't vote . . .

6   Q   For the candidate of their choice.

7   A   You can always vote for the candidate of your

8       choice, the question is whether that person has a

9       chance of winning or not.

10  Q   Okay.  What about State Senate districts?  Same

11      question.

12  A   Uh-huh.  Unless there's some barrier to voting,

13      which is a different issue, to having access to the

14      polls or whatever, a person can always vote for a

15      candidate of their choice.  Whether that person has

16      any chance of actually being elected is a second

17      issue.

18  Q   And same for Congress, congressional district?

19  A   Again, unless there is some barrier to a person's

20      having access to a ballot, there is no reason why a

21      person couldn't vote for a candidate of their

22      choice.  Whether that vote means anything in terms

23      of that person having a chance to get elected is

24      another issue.

25  Q   Okay.  I'm going to define another term for you.

Page 69

1          THE WITNESS:  Oh.

2             Would you repeat the question, please?

3    Q   (MR. SHANNON) Since 2011, do you know of any League

4          member who feels they were stereotyped by their

5          elected House member?

6    A   I have not heard that from any specific League

7          member.

8    Q   What about state senator?  Same question.

9    A   I have not heard that complaint by any specific

10         League member.

11   Q   What about with respect to congressional

12         representatives?  Same question.

13   A   I have not heard that complaint by any specific

14         League member.

15   Q   Was a question regarding stereotyping or anything

16         similar included within the script used when voters

17         were contacted, members were contacted, to

18         determine how they voted?

19   A   They were asked whether or not they voted in a

20         certain way and they were asked if they

21         participated in certain Democratic Party

22         activities.

23   Q   Were there any questions whatsoever concerning

24         their specific district and how they interacted

25         with their elected representative?

Page 70

 1    A   No.

 2    Q   All right.  Just one more set of questions here and

 3        I think we'll be done.

 4            I'm going to define one more term for

 5        you.  I'm going to use the term "community of

 6        interest."  By community of interest I mean people

 7        who share a common interest or a passion in a

 8        particular matter.

 9    A   Such as?

10    Q   I gave you the example before of farmworkers, union

11        members.  Those aren't exclusive examples, there

12        can be many different types of communities of

13        interest, but I'm talking generally about people

14        who share a common interest or a common trait and

15        might work together as a community.  Do you

16        understand?

17    A   Yes.

18    Q   Okay.  Do you know of any Democrat League member

19        who as a result of the 2011 redistricting plans was

20        cut off from their natural community of interest?

21    A   Yes, I've heard --

22    Q   Which League member?

23    A   I cannot give you a name.  I've heard many

24        complaints about the 2011 maps, and its often been

25        that communities have been broken up.

Page 71

1   Q   Communities of interest or communities --

2   A   Both.

3   Q   Both.  I'm referring to -- in the latter to

4       municipalities and townships, so the more

5       colloquial use of the word "community."

6           You've heard complaints that both types

7       of communities have been broken up?

8   A   Correct.

9   Q   Okay.  Can you give me any specific examples?

10  A   Well, the example that I -- that comes to mind when

11      you ask that question is I hear complaints from the

12      people who live in what's referred to as the

13      Pointes, I believe there are five of them --

14      Grosse Pointe this, that and the other, Woods,

15      East, so forth -- who apparently were divided up so

16      that people who live in some of the Pointes have a

17      different representative than people who live in

18      some of the other Pointes.  And so I've heard

19      people complain about that in terms of I guess you

20      would call it dividing it up, dividing up a

21      governmental unit in a way.

22           I'm sure there are other examples.

23      That's the one that comes to mind because I've

24      heard people complain about that.

25           I can't give you any examples of the

Page 72

1         other community of interest definition that you

2         were using where people are sharing a common

3         interest or goal or something.

4    Q   So the only examples that come to mind are breaking

5         up of political boundaries or -- I'm sorry --

6         municipal or government boundaries?

7    A   Those are the ones that I'm thinking of at the

8         moment when you ask me the question, yes.

9    Q   And you're not aware of any other examples?

10   A   Of those type of communities?

11   Q   I'm talking about anything besides governmental

12        boundaries.

13   A   I see.  I'm not remembering any at this moment.

14        Doesn't mean that I wouldn't at another time.

15   Q   What about the named plaintiffs in the case, do you

16        know if any were separated from natural communities

17        of interest?

18   A   I don't know anything about the other named.

19   Q   And what about stereotyping like we talked about

20        before?  Do you know if any of the named plaintiffs

21        feel that they've been stereotyped by any of their

22        elected officials?

23   A   I can't speak for them.  I don't know.

24            MR. SHANNON:  Okay.  Give me just a

25        moment.  We might want to take a break, actually,

Page 73

1      we're about another hour through, and then I'll see

2      if I have any more questions, and if not, we'll

3      wrap.

4              THE WITNESS:  Okay.

5              (Break taken at 11:02 a.m.)

6              (Break concluded at 11:15 a.m.)

7              MR. SHANNON:  I don't have any further

8      questions.

9              I did want to place a request on the

10     record that Mr. Yeager produce to us the script

11     that was used by the League's personnel in

12     contacting its members as was referenced in the

13     deposition.

14             I'll represent that Mr. Yeager provided

15     to me a two-page list which we've referenced as the

16     short list in this deposition.

17             MR. YEAGER:  Does Mr. Gordon have any

18     questions?

19             MR. SHANNON:  Mr. Gordon, anything

20     further?

21             MR. GORDON:  No.  I concur in those

22     requests, and nothing further from congressional

23     intervenors.

24             MR. YEAGER:  Could I please have this

25     marked as -- I think we're on Number 5?

Page 75

1              CERTIFICATE OF NOTARY PUBLIC

2

3              I certify that this transcript is a

4    complete, true, and correct record of the testimony

5    of SUSAN K. SMITH held in this case on

6    September 11, 2018.

7              I also certify that prior to taking this

8    deposition the deponent was duly sworn to tell the

9    truth.

10              I also certify that I am not a relative

11    or employee of or an attorney for a party; or a

12    relative or employee of an attorney for a party; or

13    financially interested in the action.

14

15    September 11, 2018

16

17

18

19    _____

          Suzanne Duda (CSR-3199)

20          Registered Professional Reporter

          Certified Realtime Reporter

21          Notary Public, Clinton County, Michigan

          Acting in the County of Washtenaw

22          My commission expires:  May 6, 2019

23

24

25