Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4
 5     _____
                                    )
 6     LEAGUE OF WOMEN VOTERS OF     )     Case Number
       MICHIGAN, ROGER J. BRDAK,     )
 7     FREDERICK C. DURHAL, JR.,     )     17-cv-14148
       JACK E. ELLIS, DONNA E.       )
 8     FARRIS, WILLIAM "BILL" J.     )
       GRASHA, ROSA L. HOLLIDAY,     )
 9     DIANA L. KETOLA, JON "JACK"   )
       G. LASALLE, RICHARD "DICK"    )
10     W. LONG, LORENZO RIVERA       )
       AND RASHIDA H. TLAIB,         )
11                                   )
              Plaintiffs,            )
12                                   )
       vs.                           )
13                                   )
       RUTH JOHNSON, in her          )
14     official capacity as          )
       Michigan Secretary of State,  )
15                                   )
              Defendant.             )
16     _____)
17
18       DEPOSITION OF CHRISTOPHER WARSHAW, Ph.D.
19                  Washington, D.C.
20             Wednesday, August 8, 2018
21
22
23
24     Reported by:  John L. Harmonson, RPR
25     Job No. 145530
```

Page 2

1

2

3

4

5                                       August 8, 2018

6                                       9:25 a.m.

7

8

9          Deposition of CHRISTOPHER WARSHAW, Ph.D.,

10   held at the offices of Faegre Baker Daniels LLP,

11   1050 K Street, N.W., Washington, D.C., pursuant

12   to the Federal Rules of Civil Procedure, subject

13   to such stipulations as may be recited herein or

14   attached hereto, before John L. Harmonson, a

15   Registered Professional Reporter and Notary

16   Public of the District of Columbia, who

17   officiated in administering the oath to the

18   witness.

19

20

21

22

23

24

25

1            A P P E A R A N C E S

2

3   On behalf of the Plaintiffs:

4        FAEGRE BAKER DANIELS

5        300 North Meridian Street

6        Indianapolis, IN  46204

7        BY:  JAY YEAGER, JR., ESQ.

8

9

10

11   On behalf of the Defendant:

12        JONES DAY

13        51 Louisiana Avenue, N.W.

14        Washington, D.C.  20001

15        BY:  MICHAEL CARVIN, ESQ.

16

17

18

19

20

21

22

23

24

25

1                          C. WARSHAW

2    ------------------------------------------------

3                 P R O C E E D I N G S

4                       9:25 a.m.

5    ------------------------------------------------

6    Whereupon,

7                CHRISTOPHER WARSHAW, Ph.D.,

8    after having been first duly sworn or affirmed,

9    was examined and did testify under oath as

10   follows:

11                      EXAMINATION

12   BY MR. CARVIN:

13        Q.    Good morning, Professor.  How are you?

14        A.    Good morning, sir.

15        Q.    My name is Mike Carvin.  I'm

16   representing the defendants in this case.

17              Have you ever had your deposition

18   taken before?

19        A.    I have not.

20        Q.    Okay.  You were not deposed in the

21   Pennsylvania litigation?

22        A.    I was not.

23        Q.    Did you provide in-court testimony in

24   that case?

25        A.    I did.

Page 45

C. WARSHAW

1  don't know who led that effort.  But Professor

2  Klarner has been the lead in recent years.

3

4      Q.    And I don't see anything here about

5  collecting information on incumbency status with

6  respect to state legislative elections like you

7  reference with respect to congressional

8  elections.  Why is that?

9      A.    That data is in the Klarner dataset.

10  It was, I guess, a typographical omission on my

11  part.  But it's in the Klarner dataset.  It's all

12  part of it.  I didn't quite do that for

13  presidential elections because the election

14  results and the incumbency status come from

15  different datasets, whereas here they all come

16  from one integrated dataset.  But I should have

17  said that explicitly.

18      Q.    Just so I understand the general gist

19  of your report, you analyzed the efficiency gap

20  and these other measures for the 2012, 2014, and

21  2016 elections, correct?

22      A.    Yes.  However, I also calculated them

23  for all elections between 1972 and 2016.

24      Q.    Fair enough.  But what I'm getting at

25  is these are backward-looking calculations.  You

Page 46

C. WARSHAW

1    haven't made any projections for vote totals in

2    the 2018 Michigan congressional or state

3    legislative elections, correct?

4    

5         A.    That's correct.

6         Q.    You haven't estimated the Democratic

7    vote share statewide for any of the three offices

8    at issue, right?

9         A.    No.

10        Q.    And you're not making any

11   district-specific projections?

12        A.    I am not.

13        Q.    Okay.  Now, if you could turn to

14   page 6 of your report, please.

15             MR. CARVIN:  Off the record.

16             (Off the record.)

17   BY MR. CARVIN:

18        Q.    So at various points here you produce

19   various estimates of, for example, where the

20   Michigan redistricting compares to the

21   mean-median difference for prior elections

22   throughout the nation and various other things.

23   Are you representing to me that all of the data

24   underlying this analysis has been provided to the

25   defendant?

Page 49

C. WARSHAW

1

2    Q.    And in recent years, at least ten

3  different approaches have been proposed, correct?

4    A.    That's what McGhee asserts in this

5  article.  I think -- I believe that's true,

6  although I couldn't name all ten.

7    Q.    But it's fair to say that the

8  profession is striving for some uniform generally

9  accepted measure of partisan asymmetry or

10  partisan bias?

11    A.    I think the profession is trying to

12  improve our metrics.  I think whether we will

13  ever have one single metric remains to be seen.

14    Q.    But we haven't arrived at that point

15  yet?

16    A.    I think there's differences of

17  opinions about whether we've arrived at that

18  point.

19    Q.    Now, previously it was my

20  understanding that the most accepted consensus

21  measure was the partisan symmetry analysis

22  championed largely by Gary King and Grofman.  Is

23  that fair?

24    A.    Yes.

25    Q.    Has that fallen out of favor in recent

Page 51

C. WARSHAW

1

2    proxies for this theoretical concept.

3            And indeed, you know, none -- we'll

4    never have an approach that is exactly perfect,

5    but that's true for most political science

6    concepts that we're trying to measure.  You know,

7    all social science measurements are

8    simplifications of some theoretical concept we're

9    trying to measure.

10        Q.    Okay.  And you're using the efficiency

11   gap as your main measure of this theoretical

12   concept?

13        A.    That's correct.

14        Q.    And that was first proposed by

15   Stephanopoulos and McGhee in the 2015 University

16   of Chicago Law Review article?

17        A.    That's not exactly right.  It was

18   actually proposed by Eric McGhee in a

19   peer-reviewed article in the Journal of

20   Legislative Studies Quarterly in 2014.

21        Q.    Okay.  And --

22        A.    And then the Stephanopoulos and McGhee

23   article focused on expanding the description of

24   it and then applying it, trying to build a legal

25   standard that they advocated.  But the

Page 52

C. WARSHAW

1   original -- the original measure was actually

2   developed by Eric McGhee.

3   Q.    Okay.  And the Chicago Law Review is

4   not a peer-reviewed journal, right?

5   A.    That's correct.

6   Q.    And during the two and a half years or

7   three years since its proposal it's received a

8   lot of scholarly criticism in the Political

9   Science Academy.  Is that correct?

10  A.    I think there has been a robust

11  discussion of the merits of different measures

12  with some of that centering around criticism of

13  the efficiency gap.

14  Q.    Okay.  If you could turn back to

15  Exhibit 2.

16  A.    Which one is that?

17  Q.    I'm sorry.  The Stanford Law Review

18  article.

19  A.    Great.

20  Q.    And again, this is the Stanford Law

21  Review article by Stephanopoulos and McGhee

22  themselves, right?  And at the top of 1508 they

23  say --

24  MR. YEAGER:  Hold on just one moment,

Page 53

1                          C. WARSHAW

2       please.

3                 MR. CARVIN:  Sure.

4                 MR. YEAGER:  Thank you.

5  BY MR. CARVIN:

6       Q.    Stephanopoulos and McGhee say that

7  "The academic discussion of the efficiency gap

8  includes a number of criticisms of the measure."

9  Is that accurate?

10      A.    Yes.

11      Q.    And then they list, I believe, at

12 least five scholarly articles criticizing the

13 efficiency gap?

14      A.    Yes, that's correct.

15      Q.    And they cite an article by Cho, by

16 Best, by Krasno and colleagues, by John Nagle.

17            Are these critics well-respected

18 political scientists?

19      A.    Yes, sir.

20      Q.    And then also by Christopher Chambers.

21 Is he a well-respected political scientist?

22      A.    I don't know him, to be honest.  I

23 couldn't say.  I assume -- I'll take it as a

24 supposition.

25            MR. YEAGER:  Could I just clarify.  I

1                          C. WARSHAW

2    gap has no secure baseline for establishing the

3    degree of wasted votes that indicates a

4    gerrymander?

5         A.    In my view, there's no bright line for

6    any of the metrics that would establish a

7    gerrymander based on one metric alone.

8         Q.    So as to the efficiency gap, the

9    mean-median difference and declination, there's

10   no baseline for separating an impermissible

11   gerrymander from a tolerable result?

12        A.    I think you have to look at a number

13   of different factors.  As in Michigan, I think

14   that all of those point in the same direction,

15   that this is an extreme partisan gerrymander.

16   But there's no single number where I would say

17   above 5 percent or something is definitely a

18   gerrymander.

19        Q.    So there is no well-accepted view in

20   the profession about what efficiency gap score

21   renders a redistricting plan unacceptable or an

22   extreme partisan gerrymander?

23        A.    That's correct.

24        Q.    And the same is true of both the

25   mean-median difference and the declination

1          C. WARSHAW

2   scores?

3        A.    That's correct.

4        Q.    Then it discusses effectiveness

5   difficulties -- I'm now back to the preceding

6   paragraph -- arise for three reasons.  And the

7   first reason they give are votes are wasted for

8   reasons other than gerrymandering.

9              Do you agree with that?

10       A.    Yes.  Certainly I think that a number

11  of factors affect election results, and those can

12  influence the efficiency gap estimates as they do

13  any of the other metrics to some degree.

14       Q.    Then it says:  "The wasted vote gap

15  co-varies with a party's vote percentage."

16             Do you agree with that?

17       A.    I don't necessarily agree.  I haven't

18  run a regression that tests that statement,

19  although I certainly -- we certainly -- I

20  certainly could.  My -- I know in the

21  Stephanopoulos and McGhee, in their article they

22  argue that's not necessarily true, in their

23  Stanford Law Review article.

24             And in my qualitative assessment of

25  just spending a lot of time with the data,

Page 67

C. WARSHAW

1

2  that's -- that's ignoring the fact that the most

3  likely outcome in most scenarios is the favored

4  party will win that election.

5       Q.    Fair enough.  But just to get to the

6  two points we can agree on, a 52/48 district has

7  a very poor efficiency gap score, right?  It says

8  that the disadvantaged party has wasted 46 votes

9  in that?

10      A.    I think 48 in the hypothetical you

11 just gave.

12      Q.    48.  And in relative terms, 46 because

13 the majority party is only --

14      A.    I see what you're saying.

15      Q.    -- wasting two points.  Is that fair?

16      A.    Yes, sir.

17      Q.    Okay.  So we agree that those kinds of

18 districts perform very poorly in terms of the

19 efficiency gap, correct?

20      A.    Sure.  The disfavored party is wasting

21 a lot of votes in those districts.  Which is one

22 of the reasons why cracking voters across these

23 district is such a good strategy for the favored

24 party.

25      Q.    Right.  Well, it could be a good

Page 75

1                          C. WARSHAW

2          A.    Yes, that's true in theory.  But the

3     efficiency gap in Michigan has stayed relatively

4     stable over the past three election cycles.

5          Q.    We're going to discuss that.

6                But the authors of this article stress

7     that a plan's efficiency gap may change

8     substantially from one election to the next.  Do

9     you disagree with that as a general proposition?

10         A.    No.

11         Q.    We'll come back to how much it's

12    changed in Michigan.

13               They recommend the sensitivity test is

14    to take into account whether under realistic

15    voter shifts the efficiency gap could actually

16    favor in this case the Democrats, correct?

17    That's their sensitivity test?

18         A.    I believe that's true.

19         Q.    And you've not done any sensitivity

20    testing to determine whether or not the

21    efficiency gap could be zero or close to zero in

22    the 2018 or 2020 elections, right?

23         A.    I have not.  My entire report focuses

24    on actual observed elections, where we now have

25    three elections since the 2011 plan went into

1                           C. WARSHAW

2    place.

3         Q.    Right.

4         A.    I don't look at hypothetical

5    elections.

6         Q.    Right.  Well, the fact that there's

7    elections in 2018 is not hypothetical; they just

8    haven't occurred yet.  Right?

9         A.    Fair.  Yes.

10        Q.    And you're not making any projections

11   about what will happen --

12        A.    That's correct.

13        Q.    -- in future elections?

14        A.    That's correct.

15        Q.    If you turn to page 864 of this

16   article.  If you read the fourth sentence in the

17   first full paragraph on 864, it says:

18   "Specifically, a plan's efficiency gap in one

19   election is a relatively weak predictor of its

20   gap in the next election (coefficient equals

21   0.23) in a model that also includes a variety of

22   other factors."

23              Is that correct?

24        A.    I haven't -- I couldn't say for sure.

25   I haven't looked at -- what I say -- what I show

Page 83

1                              C. WARSHAW

2    metric is perfect, including the efficiency gap.

3         Q.    Right.

4         A.    I think all of these metrics have

5    weaknesses, and that's one of the weakness,

6    perhaps the most important weakness of the

7    efficiency gap.

8         Q.    Okay.  So you agree with the

9    efficiency gap's potentially more important

10   limitation is instability as the authors state at

11   page 864?

12        A.    I do think that's a weakness.  But I

13   think one -- one area where I would disagree with

14   the authors is that elections have consequences.

15   Even if a measure is -- even if -- even if future

16   elections can't be predicted precisely -- and I

17   also think, you know, going back to even the

18   Gelman and King 1994 article, it's

19   longstanding -- it's long been known that the

20   consequences of a gerrymander decay somewhat over

21   time due to changing election circumstances.  No

22   one can predict the future precisely.  So I don't

23   think that's necessarily a new point.

24              So, for instance, in Michigan the

25   efficiency gap decreases a little bit.  And

Page 97

C. WARSHAW

1    THE WITNESS:  I think quantitatively

2    those are not wholly dissimilar, but I think

3    the context is very different.  Whereas 13.2

4    indicates to me a very clear -- clear

5    evidence of partisan bias, once you go down

6    to 5 or 6 percent then I think that would

7    be -- I would need -- the efficiency gap by

8    itself probably wouldn't be dispositive.  It

9    wouldn't be like -- no piece of evidence is

10   dispositive, but I think it would be less

11   significant evidence in favor of a partisan

12   bias.

13   BY MR. CARVIN:

14   Q.    So if this trend continues of the

15   efficiency gap decreasing by 6.5 percent, then it

16   would be roughly 6.7 percent in 2020, correct, if

17   this trend continues?

18   A.    Yes.  But I think there is no evidence

19   either way that the trend is going to continue,

20   and certainly not that it's going to be linear.

21   In fact, what we've seen in prior decades in

22   Michigan is the efficiency gap -- you know, there

23   hasn't been a linear trend in the efficiency gap.

24        So for instance in the 1990s, in

C. WARSHAW

1
Michigan was right in the middle.

2   Q.   So for purposes of that statement,

3 you're looking at the efficiency gaps at the end

4 of the decade, not the efficiency gap immediately

5 following the decennial redistricting, right?

6   A.   Yes.  I mean, in part because I think

7 the 2002 efficiency gaps could have been

8 pro-Republican because of gerrymandering in 2001.

9   Q.   Right.

10   A.   So I think certainly for any kind of,

11 like, long-term geographic kind of assessment

12 it's useful both to look at the long-term -- the

13 long-term average as well as the average right

14 before the new plan went into place.

15        I think looking at the 2002 efficiency

16 gap, just like so too -- just like the 2012

17 efficiency gap, is going to be the one that's

18 most affected by intentional gerrymandering.

19   Q.   And that will wane over time?

20   A.   Yes.  The literature -- I think the

21 consensus in the literature is that the effects

22 of gerrymandering decay somewhat over time.  They

23 do not decay away completely.  They are still, in

24 general, consequential, as I show, six years

Page 133

C. WARSHAW

1

2      packed district wastes more of the party

3      that's being packed votes.  And I think that

4      if instead of 75/25 you had had a -- you had

5      drawn a hypothetical that was 80/20, I

6      think -- you know, so for instance, in

7      Michigan, two of the seats that are most

8      packed are 84 percent Democratic and

9      86 percent Democratic.  So those seats have

10     more wasted Democratic votes than wasted

11     Republican votes.

12  BY MR. CARVIN:

13     Q.    Right.

14     A.    But I think, you know -- like I said,

15  I haven't thought about it in quite these terms.

16  But I do think this is the quirk of thinking

17  about things district by district, is -- you

18  know, there's no metric, and the efficiency gap

19  included, that is going to be perfect at trying

20  to characterize individual districts and -- you

21  know, for every imaginable vote share, the

22  relative advantaging of each party.

23     Q.    Does a packed 75 percent district

24  waste Democratic votes relative to Republican?

25          MR. YEAGER:  Asked and answered.

C. WARSHAW

think all of these metrics are simplifications of
reality.  And at the statewide level, the
efficiency gap characterizes a legislative map
that is a partisan bias fairly well -- or very
well.  But none of these are perfect, and I think
the goal of the efficiency gap is not to, you
know, precisely characterize which districts are
packed.

Instead, the goal is to make sure that
the metric of gerrymandering at the statewide
level comports with what McGhee and
Stephanopoulos call the efficiency principle.

Q.    Right.

A.    Which is that if you win -- you
shouldn't win more seats in the legislature
without winning more votes.  And if you win more
seats in the legislature without winning more
votes, then you should have a metric that
reflects that.  And the efficiency gap does.

Q.    You think the efficiency gap
corresponds to a rough equivalence between
statewide vote and statewide seat share?

A.    No, I do not.  It's not a proportional
metric.

Page 139

C. WARSHAW

1

2      infinitesimally, you know, .1 or something

3      more wasted Republican votes there than

4      wasted Democratic votes.

5           I don't have -- personally, I don't

6      have a view of exactly what the threshold is

7      for a packed district.  Probably I would say

8      75/25 would be above that threshold.  So it

9      seems that this is a little idiosyncratic as

10     to the efficiency gap in this case.  But the

11     goal of the efficiency gap is to capture

12     gerrymandering at a statewide level; it's

13     not to give a precise characterization of

14     individual districts that are packed or

15     cracked.

16  BY MR. CARVIN:

17     Q.    All right.  Now, in a 51 percent

18  Republican and 49 percent Democratic district,

19  the Democrats have wasted 49 percent of the

20  votes, right?

21     A.    Yes.

22     Q.    And the Republicans have wasted

23  1 percent of the votes?

24     A.    Right.

25     Q.    So the efficiency gap in a 51/49

1      C. WARSHAW

2  district is 48, right?

3      A.   Yes.

4      Q.   Okay.  And the efficiency gap in a

5  75 --

6      A.   Well, the difference in wasted votes,

7  to be more precise.  That's not the efficiency

8  gap, but the difference in wasted votes would be

9  48.

10      Q.   And that's an extraordinarily high

11  amount of wasted votes in a district, right?

12      A.   Correct.  Well, it's an

13  extraordinarily high differential in the wasted

14  votes.

15      Q.   And so a 51/49 gets a worse efficiency

16  gap or wasted votes measure than a 75/25

17  district.  Is that right?

18      A.   Well, it certainly suggests that when

19  one party would be much more disadvantaged --

20  there's much more of a differential in the wasted

21  votes than in a 75/25.

22      Q.   Okay.  So let's go back to your

23  example.  The efficiency gap in this plan right

24  now is 20 percent pro-Republican?

25      A.   In this illustrative plan in Table 1,

C. WARSHAW

1

2    election where one party gets 60 or 65 percent,

3    say, of the statewide vote, you know, then the

4    different metrics will diverge a little bit more.

5    But we don't observe that very much in the modern

6    U.S., and we certainly don't observe it in

7    Michigan.

8         Q.    Right.  So in the modern era, when

9    there are competitive elections, there's

10   virtually never or very rarely any divergence

11   between efficiency gap, mean-median, and

12   declination, correct?

13        A.    I would agree with that.

14        Q.    Okay.  Why don't we discuss the

15   mean-median.  That was first proposed in a 2015

16   Election Law Journal by Best and McDonald?

17        A.    I believe that's true.

18        Q.    And the Election Law Journal, is that

19   a peer-reviewed journal?

20        A.    Generally speaking, it is.  I think

21   they do publish occasionally doctrinal articles

22   that might not be peer-reviewed, but their social

23   science articles are peer-reviewed.

24        Q.    Okay.  There's certainly no wide

25   scholarly acceptance of mean-median as the best

Page 171

C. WARSHAW

1

2      or proper measure of partisan gerrymanders,

3      correct?

4           A.    Correct.

5           Q.    And it's been subject to serious

6      criticism by respected political scientists?

7           A.    Correct.

8           Q.    Including Stephanopoulos and McGhee?

9           A.    Correct.  I think I discuss some of

10     those criticisms in my report.

11          Q.    Yeah, why don't we turn to that.  If

12     you could turn to page 9 of your report.

13          A.    Yes.

14          Q.    One problem with it is it is possible

15     for packing and cracking to occur without any

16     change in the mean-median difference, right?

17          A.    Correct.  I think McGhee in his 2017

18     article shows this, demonstrates this empirically

19     with simulations.

20          Q.    And therefore a party could gain seats

21     in the legislature without the mean-median gap

22     changing, correct?

23          A.    Correct.

24          Q.    Another problem with it is it's

25     sensitive to the outcome in the median districts?

C. WARSHAW

1

by definition because the median has to be less

than 50 percent?

    A.    I think that's true in a situation
with equal turnout.

    Q.    And how about if a party got
53 percent of the statewide vote and won all ten
of the seats, so 53/47.  53 percent of the vote
would capture 100 percent of the seats but the
mean-median difference would be zero, correct?

    A.    If they got -- if the median -- if all
of the seats were 53 percent and they had a mean
across them of 53 percent, then yes, I believe in
that case -- I haven't thought about this before
this conversation.  But I believe in that case
that would be a mean-median of zero.

    Q.    Okay.  And this declination theory,
this was published this year by this fellow named
Warrington?

    A.    Correct.

    Q.    Has there been any scholarly
commentary on this?

    A.    No.  I think it's a new metric and
there's been -- to my knowledge, there's been no
explicit response or critique, although I'm not

C. WARSHAW

1  100 percent sure of that.

3      Q.    So obviously there hasn't been wide

4  acceptance of this measure in the political

5  science community as a proper measure of partisan

6  bias or gerrymander?

7      A.    Just because it's so new.  I don't

8  think there's a consensus either way.

9      Q.    Okay.  Again, to the extent I can

10  understand this thing, it's you look at the

11  difference between the two vote lines or

12  something like that?

13      A.    Yeah, correct.

14      Q.    All right.  My first question is:  Do

15  you really expect the judges to understand this

16  thing?

17          But in any event, again, if you're

18  getting a minority of the vote and a majority of

19  the seats, this declination is going to be -- is

20  going to show a problem, right?

21          MR. YEAGER:  Object to the prior

22      comment which is part of the question I

23      think.  I'm sure the judges can understand

24      this perfectly well.

25          You can answer.

C. WARSHAW

1
2    in a state where one party or another is more

3    likely to have wasted votes, they're less likely

4    to have views that are congruent with their

5    legislator.

6        Q.    Well, in Michigan you claim there were

7    five Democratic packed districts in Congress,

8    right?

9        A.    I believe that's true.

10       Q.    Okay.  And there was only two or three

11   cracked districts because under any seats-votes

12   analysis they would only be expected to get seven

13   or eight seats, right?

14           MR. YEAGER:  Objection; misstates the

15       record.

16           You may answer.

17           THE WITNESS:  I don't think I made a

18       characterization in my report of which

19       districts precisely were packed and cracked,

20       and I'm reluctant to do so now.

21   BY MR. CARVIN:

22       Q.    So we don't know which districts they

23   are, but whichever they are, there can only be

24   three cracked districts where there's five packed

25   districts, right?  You're not expecting Democrats

Page 255

C. WARSHAW

C E R T I F I C A T E

DISTRICT OF COLUMBIA

1
2
3
4
5        I, JOHN L. HARMONSON, a Notary Public
6   within and for the District of Columbia, do
7   hereby certify:
8        That CHRISTOPHER WARSHAW, the witness
9   whose deposition is hereinbefore set forth, was
10  duly sworn or affirmed by me and that such
11  deposition is a true record of the testimony
12  given by such witness.
13       That if the foregoing pertains to a
14  federal case, before completion of the
15  proceedings, review and signature of the
16  transcript [X] was [ ] was not requested.
17       I further certify that I am not related
18  to any of the parties to this action by blood or
19  marriage; and that I am in no way interested in
20  the outcome of this matter.
21       IN WITNESS WHEREOF, I have hereunto set
22  my hand this 15th day of August, 2018.
23
24       _____
25       JOHN L. HARMONSON, RPR