# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| LEAGUE OF WOMEN VOTERS<br>OF MICHIGAN, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 17-cv-14148 |
| | : | |
| v. | : | Hon. Eric L. Clay |
| | : | Hon. Denise Page Hood |
| | : | Hon. Gordon J. Quist |
| RUTH JOHNSON, in her official | : | |
| capacity as Michigan Secretary of State | : | |
| | : | |
| Defendant. | : | |
| | : | |

## CONGRESSIONAL INTERVENORS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(a), Congressional Intervenors hereby move this honorable Court to issue summary judgment on the grounds that Plaintiffs' claims are barred by laches and that Plaintiffs lack standing to pursue their claims.

Pursuant to Local Rule 7.1, counsel for Plaintiffs and counsel for Congressional Intervenors conferred via telephone on September 21, 2018. Plaintiffs do not concur to the relief sought.

Respectfully Submitted,


**HOLTZMAN VOGEL JOSEFIAK**　　　　**CLARK HILL PLC**
**TORCHINSKY PLLC**


/s/  *Jason Torchinsky*　　　　　　　　　/s/ *Charles R. Spies*

Jason B. Torchinsky　　　　　　　　　　Charles R. Spies
Shawn T. Sheehy　　　　　　　　　　　　Brian D. Shekell
Phillip M. Gordon
Dennis W. Polio
45 North Hill Drive, Suite 100　　　　　　500 Woodward Avenue, S3500
Warrenton, Virginia 20186　　　　　　　Detroit, Michigan 48226
Phone: 540-341-8808　　　　　　　　　P: (313) 965-8300
Email: JTorchinsky@hvjt.law　　　　　　E: cspies@clarkhill.com


Dated: September 21, 2018

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS<br>OF MICHIGAN, et al., | **:** | |
| | **:** | |
| | **:** | |
| Plaintiffs, | **:** | Civil Action No. 17-cv-14148 |
| | **:** | |
| v. | **:** | Hon. Eric L. Clay |
| | **:** | Hon. Denise Page Hood |
| | **:** | Hon. Gordon J. Quist |
| RUTH JOHNSON, in her official | **:** | |
| capacity as Michigan Secretary of State | **:** | |
| | **:** | |
| Defendant. | **:** | |
| | **:** | |
| | **:** | |

## CONGRESSIONAL INTERVENORS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## <u>CONCISE STATEMENT OF THE ISSUE PRESENTED</u>

WHETHER THIS COURT SHOULD GRANT SUMMARY JUDGMENT
IN FAVOR OF CONGRESSIONAL INTERVENORS.

Movants answer: Yes

Plaintiffs answer: No

This Court should answer: Yes

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

## Rules

Fed. R. Civ. P. 56(a)

## Cases

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018)

*Costello v. United States*, 365 U.S. 265 (1961)

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)

*ACLU of Ohio v. Taft*, 385 F.3d 641 (6th Cir. 2004)

*Common Cause v. Rucho*, No. 16-CV-1026; 16-CV-1164,  2018 U.S. Dist. LEXIS 146635 (M.D.N.C. Aug. 27, 2018)

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56, Congressional Intervenors ("Intervenors") respectfully move for summary judgment. While Intervenors fully join the Secretary's motion, Intervenors specifically address standing and laches.

First, Plaintiffs lack standing because they failed to demonstrate individual harm to a plaintiff from every congressional district in the state. *Gill v. Whitford*, 138 S. Ct. 1916 (2018). Second, their claims are barred by the equitable doctrine of laches: Plaintiffs waited until mere months before the fourth congressional elections were to be held under the current Michigan apportionment plan, and seek a new plan for only the fifth and last election to be held under the current plan.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The facts at summary judgment are viewed in the light most favorable to the nonmoving party. However, the nonmoving party only obtains this standard if there is a genuine dispute as to those facts. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). A dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Facts are material only if those facts "might affect the outcome of the suit under the governing law[,] . . . [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id*. This Court's function at this stage of the proceedings is to determine whether there is a "genuine issue for trial." *See* 477 U.S. at 249. There is no such issue absent "sufficient evidence favoring the nonmoving party" that would allow "for a jury to return a verdict for that party." *Id*. Thus, if the nonmoving party presents evidence that is only "merely colorable" or "not significantly probative," the Court may grant Intervenors' Motion. *Id*. at 249-250.

## I.    PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS.

Article III of the U.S. Constitution limits the jurisdiction of federal courts to cases or controversies. *See* U.S. Const. art. III, § 2; *Allen v. Wright*, 468 U.S. 737, 750 (1984). The doctrine of standing is the most important facet of this prerequisite. The doctrine prevents litigants from "raising another person's legal rights," and prohibits the adjudication of generalized grievances "more appropriately addressed in the representative branches…." *Id*. at 750-51. To invoke the power of federal courts, plaintiffs bear the burden of demonstrating that the plaintiff suffers an injury to a legally protected interest that is both concrete and particularized, and is one that the court can redress. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 & n.1 (1992).

The most important requirement is injury in fact. *Gill*, 138 S. Ct. at 1929. A plaintiff must plead *and prove* that "he has suffered the invasion of a legally protected interest that is concrete and particularized, i.e., which affects the plaintiff in a *personal and individual way*." *Id.* (internal quotation marks omitted, emphasis added). The Court explained that the standing doctrine ensures "[t]hat the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society...a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy." *Id.* (internal citations and quotation marks omitted). This "ensures that [courts] act as *judges*, and do not engage in policymaking properly left to elected representatives." *Id.* at 1923 (emphasis in the original). Plaintiffs lack standing to pursue their claims because they have not proven a personal and particularized injury.

### A.    **Plaintiffs Claims And Proofs Are Nearly Identical To The *Gill* Plaintiffs' Claims; The Result Should Be The Same.**

Plaintiffs here have followed the *Gill* playbook from the beginning. They should be bound to the same result. Plaintiffs allege that Republican legislators and Republican consultants intended to devise a redistricting plan that would maximize the number of Republican congressional representatives. *Compare* Compl. ¶¶ 3, 19-21, *with Whitford v. Gill,* 218 F. Supp. 3d 837, 854 (W.D. Wis. 2016) (stating plaintiffs are all supporters of the Democratic party, almost always vote for Democrat candidates, and alleging the plan was devised to dilute the power of

Democrats statewide) *vacated and remanded on other grounds*, 138 S. Ct. 1916 (2018).

To prove a constitutional violation, Plaintiffs propose the same two-part test that the plaintiffs proposed in *Whitford*, namely, that the plan (1) was adopted with partisan intent and (2) had a partisan effect. *Compare* Compl. ¶ 71, *with Whitford*, 218 F. Supp. 3d at 837, 854.  Concerning partisan intent, Plaintiffs allege that Republicans utilized an opaque process that resulted in "packing" and "cracking" Democratic voters.  *Compare* Compl. ¶¶ 3, 21, 22-24, 28, 76, 73-74, *with Whitford*, 218 F. Supp. 3d at 846-853 (describing drafting process as involving only Republican hired consultants and stating that Republicans both "cracked" and "packed" Democratic voters); *see also id.* at 932, 958-59 (Griesbach, J., dissenting) (describing drafting process as both "secretive" and "one-sided" and that the plaintiffs theory was that Republicans had "cracked" Democrats into several districts).  According to Plaintiffs, these Republican  drawn districts were an effort to entrench Republicans in the U.S. House of Representatives. Compl. ¶¶ 19-21.

Plaintiffs then allege the redistricting plan had the intended effect, i.e. entrenchment. In their effort to depict entrenchment, they assert that since 2002, Republicans have consistently received more congressional seats than the total number of votes statewide. *Compare* Compl. ¶¶ 38 (*e.g.*, in 2016 Republican vote share was 50.5% and Republicans held 64.3% of the seats), *with Whitford*, 218 F.

Supp. 3d at 853 (noting that in 2012, Republicans won 48.6% of the statewide Assembly vote but won nearly 60% of the Assembly seats, and in 2014 Republicans received 52% of the statewide Assembly vote and won nearly 63% of the Assembly seats).

In terms of partisan effect, Plaintiffs rely in part on an "efficiency gap" analysis similar to that relied upon in *Whitford.* Compl. ¶¶ 45, 48, 53. The efficiency gap helps demonstrate, according to Plaintiffs, that Democrats were "packed" and "cracked" on a large scale, depriving voters of the ability to elect officials of their choice. *Compare* Compl. ¶ 28, *with Whitford*, 218 F. Supp. 3d at 854-55. Plaintiffs claim that accordingly, the 2011 redistricting plan violates Equal Protection Clause because it was enacted with discriminatory intent and has a discriminatory effect. *Compare* Compl. ¶¶ 83-84, *with Whitford*, 218 F. Supp. 3d at 855.

Plaintiffs followed *Gill*'s playbook step-by-step. The Supreme Court held that the *Gill* plaintiffs lacked standing. Accordingly, this Court should grant summary judgment for lack of standing.

**B.      In Partisan Gerrymandering Cases, The Supreme Court Requires Each Plaintiff Prove Harm Specific To That Plaintiff.**

"A person's right to vote is individual and personal in nature." *Gill*, 138 S. Ct. at 1929. Therefore, to have standing to bring a constitutional challenge to a

redistricting scheme, a plaintiff must allege and prove facts demonstrating that the redistricting plan places *the voter* at a disadvantage. *Id.* at 1929, 1931. It is insufficient for standing purposes to prove a "shared interest in the composition of the legislature as a whole." *Id.* at 1924-25, 1932. it is insufficient for Plaintiffs to merely adduce statistical analyses of partisan asymmetry, namely that here Democratic voters cannot translate votes as efficiently as Republican voters, because these statistical analyses are averages. *Id.* at 1933. Because these analyses are merely statistical averages, they "do not address the effect that a gerrymander has on the votes of particular citizens." *Id*.[1]

Accordingly, the harm in redistricting cases, particularly those involving alleged voter dilution, is district specific. *Id.* at 1930.[2] This is because an individual voter is placed in a single district, votes for a single representative, and the remedy would be addressed to the boundaries of that single district. *Id.* The harm to an individual voter "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than

---

[1] As the Court noted, whether claims of partisan gerrymandering presented by the Plaintiffs in this case are even justiciable remains undetermined. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (stating that two threshold questions remain in partisan gerrymandering claims, justiciability and standing, and the Court declined to address justiciability because plaintiffs did not have standing). This discussion of standing in no way concedes the justiciability of partisan gerrymandering cases in the federal courts. Defendants' motion addresses this issue, and Intervenors fully join that motion.

[2] In deciding this, the Supreme Court explicitly tied partisan gerrymandering standing to its racial gerrymandering jurisprudence. *Id*. at 1930.

it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931. To satisfy

*Gill's* standing requirement each plaintiff must plead and prove an injury that is

individual and personal in nature. *Id.* at 1929-31.

### C.       *Gill* Imposes A Heavy Burden On Plaintiffs.

In *Common Cause v. Rucho*, No. 16-1026 and 16-1164, 2018 U.S. Dist.

LEXIS 146635 (M.D.N.C. Aug. 27, 2018) (three-judge court), that court applied

*Gill* to the same claims Plaintiffs bring here. That court ruled in the plaintiffs'

favor but the Supreme Court vacated and remanded back to the district court for

further consideration consistent with *Gill*. *Id.* at *43-44.

The district court then requested briefing from the parties on how *Gill*

impacted the case. *Id.* at *44. The League of Women Voters of North Carolina

subsequently *admitted* that the current factual record was insufficient to establish

standing. *See Common Cause*, No. 16-1026 (M.D.N.C. July 11, 2018) (ECF 129)

at 7. The League also admitted that the record did not demonstrate that "particular

Democratic voters, living in particular cracked or packed districts, could have been

placed in uncracked or unpacked districts by a fair map." *Id.* at 9.

Importantly, however, the North Carolina League brought forward

substantially more evidence than what the Michigan League adduced here. The

North Carolina League presented evidence purporting to show how the vote shares

in the Democratic and Republican congressional districts were evidence of packing

and cracking, that the cracking and packing of Democratic voters was systematically achieved, that the deliberate cracking and packing of Democratic voters into various districts achieved the desired result, and that they had one individual plaintiff in each district. *Id.* at 7-9. Furthermore, the North Carolina League adduced evidence that the defendants' expert "included or excluded counties and parts of counties in particular districts or divided counties between particular districts in order to achieve the General Assembly's partisan objective . . ." *Common Cause*, 2018 U.S. Dist. LEXIS 146635 at *53. During the deposition of the defendants' expert, the plaintiffs asked why "boundaries for specific districts were drawn in a specific location and the political consequence of those boundaries." *Id.* at *54. Moreover, the North Carolina League adduced county or county group maps that were color-coded "on a precinct-by-precinct" basis to demonstrate the cracking and packing of Democratic voters. *Id.* at *57-58. Finally, North Carolina League adduced evidence that one district in Mecklenburg County was drawn to make it less competitive for Democratic voters. *Id.* at *58.

Despite all of the evidence in the record, the North Carolina League admitted the record did not include "*individualized* information about any of Professor Chen's maps, let alone the districts comprising each" of those maps with respect to individual Plaintiffs. *See Common Cause*, No. 16-1026 (M.D.N.C. July 11, 2018) (ECF 129) at 9. (emphasis in the original). According to the North

Carolina League, the record lacked evidence of how any specific district performed, and without this evidence, the court could not conclude that "cracked or packed Democratic voters could not have been uncracked or unpacked by a map that satisfies North Carolina's nonpartisan criteria yet treats the major parties fairly without supplemental information." *Id*. at 9-10. The North Carolina League then requested that the three-judge court reopen the record so that the League could supplement it with evidence of standing. *Id*. In supplementing, the North Carolina League adduced a declaration by Dr. Chen that the votes of those League members in each of North Carolina's thirteen congressional districts would have carried more weight under his simulated plan than under the enacted plan. *Id*. at *60.

For the *Common Cause* three-judge court, what distinguished that case from *Gill* is that there were plaintiffs who resided and voted in each of the thirteen congressional districts "testified to, introduced evidence to support, and, in all but one case, ultimately proved the type of dilutionary injury the Supreme Court recognized in *Gill*." *Id*. The three-judge court spent several pages detailing the district-by-district injuries to plaintiffs. *See id*. at *61-76.

Unlike the *Common Cause* plaintiffs, Plaintiffs here do not provide this type of evidence. In fact, the evidence provided falls far short of what the North Carolina League adduced in light of *Gill*.

**D.**  **Plaintiffs Have Not Proven Particularized And Individualized Harm To Each Plaintiff In Each District Challenged.**

Plaintiffs have not proven sufficiently particularized and individualized harm. Plaintiffs challenge Congressional Districts 1 and 4 through 12, however none of the allegations contained in Plaintiffs' Complaint actually allege that any plaintiff was cracked or packed into a *congressional* district. Pls.' Second Suppl. Resp. to Def.'s Interog. No. 1 at 2 (App. A). In fact, there are no specific allegations of injury suffered by any of the named individual plaintiffs relating to their congressional districts. *See* Compl. ¶¶ 10(a)-(k). Some allegations contain averments to injuries specific to plaintiffs in certain other districts, such as Michigan State House districts, *Id.* ¶¶ 10(a),(c)-(d), 33-34, and Michigan State Senate districts, *Id.* ¶¶ 10(c),(e),(i), 35. However, no Plaintiff alleges that they were packed or cracked into a *congressional* District.

The actual evidence adduced in discovery does not provide any specific district-by-district details required under *Gill*. Unlike Chen's report in *Common Cause*, his report here does not provide any detailed analysis of each individual congressional district, nor does he outline the harm the individual plaintiffs residing in the challenged congressional districts. In fact, Chen does not even mention a single plaintiffs name. *Compare generally* Chen Report (App. B), *with Common Cause*, 2018 U.S. Dist. LEXIS 146635 at *60 (stating that Chen's

supplemental report went district-by-district demonstrating that the dilution of each plaintiff's vote due to the enacted congressional plan).

Dr. Kenneth Mayer's report relies on the efficiency gap and other statistical measures to demonstrate that Michigan's Congressional Redistricting Plan is an alleged extreme partisan gerrymander. Mayer at 15-28, 30-35 (App. C). He does not, however, provide any district-by-district analysis or demonstrate individual and personalized harm to each individual plaintiff. Furthermore, these statistical measures only provide an average of the plaintiffs' ability to translate votes into seats. *Gill*, 138 S. Ct. at 1933. These statistical measures "do not address the effect that a gerrymander has on the votes of particular citizens." *Id*. Additionally, Mayer does not provide the efficiency gap on a district-by-district basis, unlike the *Common Cause* plaintiffs. *Common Cause*, 2018 U.S. Dist. LEXIS 146635 at *54 ("And Common Cause Plaintiffs' statistical evidence provides not only an "average measure" of the 2016 Plan's cracking and packing, but also district-specific evidence of cracking and packing.").

When Plaintiffs deposed Jeffery Timmer, the Republican redistricting consultant tasked with drafting the Congressional Districts, (Dep. of Timmer, 12:7-10; 16:13-17; 59:18-25; 123:7-13; 127:16-22) (App. D), counsel for Plaintiffs did not ask the reasons why specific congressional district lines were drawn. In fact, counsel for Plaintiffs did not mention any of the individual Plaintiffs in the

deposition to obtain evidence of harm to those individual plaintiffs. *Compare Common Cause*, 2018 U.S. Dist. LEXIS 146635 at *53 ("Common Cause Plaintiffs deposed Dr. Hofeller and Representative Lewis regarding why boundaries for specific districts were drawn in a specific location and the political consequence of those boundaries."), *with* (Dep. of Timmer, 126:1-25; 127:1-10) (Plaintiffs' counsel inquired about county and municipal splits on congressional map but without inquiring as to reason for splits insteading limiting inquiry to only the partisan composition of county or municipality).

Plaintiffs' response to Secretary Johnson's Interrogatory 1 does not adduce evidence of district-by-district harm. Instead it refers the reader to the Expert Reports of Warshaw, Mayer, and Chen. *See* Pls.' Response to Interrogatory 1 at 5 (App. E). Plaintiffs contend that these reports will demonstrate that the congressional districts—as a whole—were packed and cracked "to benefit the Republican party in 2011." *Id*. This is proven through social science metrics. *Id*. Of course, these social science metrics are averages and not sufficiently specific to each individual district. This is precisely the type of evidence rejected by the Supreme Court. *Gill*, 138 S. Ct. at 1933. Furthermore, this Court does not sit as arbiter of "group political interests" but instead determines individual legal rights. *Id*. at 1933. The fact that Plaintiffs' experts may demonstrate that districts were drawn to benefit the Republican party is irrelevant for standing purposes. *Id*.

Plaintiffs must demonstrate that the particular composition of each plaintiff's district carries less weight "than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931. Plaintiffs do not satisfy this burden.

Even then, the Supplemental Response to Interrogatory 1 does not suffice. Plaintiffs do not adduce evidence that the votes of any individual plaintiff are diluted. The evidence adduced purports to demonstrate that the enacted map forces "thousands of wasted Democratic votes . . . ." Pls.' Supplemental Response to Def.'s Interrogatory 1 at 7 (App. A). Again, this Court does not determine the rights of persons and individuals not before it. *Gill*, 138 S. Ct. at 1933. Plaintiffs must show injury to their rights and that their voting power was diluted in a personal and particularized way. *See id*. at 1929-30; *see also Common Cause*, No. 16-1026 at 9 (stating that the current record did not demonstrate that "particular Democratic voters, living in particular cracked or packed districts, could have been placed in uncracked or unpacked districts by a fair map.").

Although Chen's report, 54-56 (App. B), notes individual Congressional Districts that allegedly pack and crack Democratic voters and provides hypothetical maps he claims do not crack and pack Democratic voters, Chen does not make a specific and individual showing that the individual Plaintiffs' votes are diluted. He only attempts to show that specific districts harmed the Democratic Party as a group, not the individual plaintiffs. *Cf. Common Cause*, 2018 U.S. Dist.

LEXIS 146635 at *60 (stating that Chen's supplemental report went district-by-district demonstrating that the weight of that district's *voter plaintiff* was diluted due to the enacted congressional plan). Chen must analyze the impact on each specific voter and draw hypothetical maps that would remedy the specific voter's injury. This is because a voter must prove both concrete injury and redressability. *See Gill*, 138 S. Ct. at 1924-25 (stating that plaintiff Whitford did not have standing because he lived in the city of Madison, Wisconsin where under the enacted plan his district had 81.9% Democratic voter share and under plaintiffs proposed map, it was 82%); *see also* Chen Report Appendix D1 (App. B) (some proposed plans are more pro-Republican than the enacted plan and some are slightly less pro-Republican but none of these proposed plans shows where the specific plaintiffs would be located and thus does not prove standing). The lack of any such evidence is fatal to the Plaintiffs' claim in light of *Gill*.

Finally, the Fed. R. Civ. P. 30(b)(6) deposition of The League of Women Voters of Michigan provided no specific evidence of harm to an individual plaintiff in a specific district. The League permits persons who are under 18 to become members and also allows non-citizens to become members. LOWV of Mich. Dep. Tr. at 27:25-28:1-12 (App. F). But the League did not verify with potential member plaintiffs if they were registered voters. *Id*. at 30:17-20. Furthermore, The League did not verify if the member plaintiffs were likely to vote

for the Democratic Party in 2018 or 2020. *Id.* at 31:19-23. The League could not even remember if they asked potential member plaintiffs if they voted in congressional elections and if they voted for a Democratic congressional candidate. *Id.* 31:24-25-33:3-8. Even the list that the League provided had the congressional district field blank. The League was also not sure whether member Tim Killeen was in Congressional District 14*, see id.* at 52:4-15, and was unable to identify any member who thought their congressional representative was inadequate and unresponsive. *Id.* at 55:17-25; 56:18-23; 62:1-6; 62:22-25, 63:1-3.[3] Finally, the League also did not know the identity of any Democratic League Member who was cut off from their natural community of interest. *Id.* at 70:22-23.

Although at the motion to dismiss stage, standing is determined on the basis of the Complaint and the factual averments are taken as true, *Cartwright v. Garner*,

---

[3] The *Gill* dissenters contended that the unanimous opinion of the Court holding that the *Gill* plaintiffs lacked standing was limited to only the plaintiffs' vote dilution claim under the Fourteenth Amendment's Equal Protection Clause claim. *Gill,* 138 S. Ct. at 1934 (Kagan, J., concurring). But the opinion of the Court on what is needed to establish standing in partisan gerrymandering cases is not limited to just the Fourteenth Amendment claim. *See id.* at 1925 (noting that the three-judge district court held that the Wisconsin redistricting plan violated *both* the First Amendment and the Fourteenth Amendment). But if this Court agrees with the *Gill* dissenters, The League and individual Plaintiffs do not establish standing because they did not adduce evidence that their representatives were unresponsive or that their speech was regulated. League Dep. at 55:17-25; 56:18-23; 62:1-6; 62:22-25, 63:1-3. For First Amendment partisan gerrymandering claims, this is required. *See, e.g., Badham v. March Fong Eu,* 694 F. Supp. 664, 675 (N.D. Cal. 1988) *sum. aff.'d* 486 U.S. 1021.

751 F.3d 752, 759 (6th Cir. 2014), now at the summary judgment stage, Plaintiffs

bear the burden of proving that there is no genuine issue of material fact regarding

standing. *Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329

(1999) ("To prevail on a...motion for summary judgment—as opposed to a motion

to dismiss –however, mere allegations of injury are insufficient. Rather, a plaintiff

must establish that there exists no genuine issue of material fact as to justiciability

or the merits."); *Gill*, 138 S. Ct. at 1931 ("The facts necessary to establish standing,

however, must not only be alleged at the pleading stage, but also proved at trial.").

Plaintiffs were required to prove that the particular composition of each plaintiffs'

district carries less weight "than it would carry in another, hypothetical district."

*Gill*, 138 S. Ct. at 1931. Plaintiffs were required to prove Michigan's enacted plan

harmed the Plaintiffs in a personal and particularized way and they failed to do so.

*Id*. at 1929-31. Therefore, this Court must dismiss Plaintiffs claims for lack of

standing.

## II.     DEMOCRATIC VOTERS CLAIMS ARE BARRED UNDER THE EQUITABLE DEFENSE OF LACHES.

Plaintiffs waited an inexcusable six years to bring their claims. Further, it is

uncontroverted that Plaintiffs waited three years to bring their claims after they

retained an expert. Even if the current congressional map is an impermissible

partisan gerrymander that is justiciable in federal courts—which it is not—

Plaintiffs could have, and in fact should have, brought their claims much earlier

than they did. Plaintiffs' unreasonable delay has significantly prejudiced Intervenors and the Defendant Secretary of States rights.

When "a plaintiff seeks solely equitable relief, his action may be barred by the equitable defense of laches." *ACLU of Ohio v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004). The "[d]octrine of laches is based upon the maxim that equity aids the vigilant and not those who slumber on their rights." *Kansas v. Colorado*, 514 U.S. 673, 687 (1995). "The law of laches . . . was dictated by experience, and is founded in a salutary policy. The lapse of time carries with it the memory and life of witnesses, the muniments of evidence, and other means of proof." *Brown v. Cty. of Buena Vista*, 95 U.S. 157, 161 (1877); *see also Costello v. United States*, 365 U.S. 265, 282 (1961). The doctrine of laches exists because "[n]othing can call forth a court of equity into activity but conscience, good faith, and reasonable diligence. . . . Laches and neglect are always discountenanced...." *Brown*, 95 U.S. at 161 (internal alterations omitted). This is especially true in cases involving elections as "[i]t is well established that in election-related matters, extreme diligence and promptness are required." *McCafferty v. Portage Cty. Bd. of Elections*, 661 F. Supp. 826, 839 (N.D. Ohio 2009). Laches applies when "(1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." *ACLU of Ohio*, 385 F.3d at 647; *see also Costello,* 365 U.S. at 282.

### a. **The Supreme Court's Holding In *Benisek v. Lamone* Is Applicable to this Case.**

The plaintiffs in *Benisek* alleged that Maryland's Sixth Congressional District is gerrymandered and a continuing violation of their constitutional rights. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam). The plaintiffs sought a preliminary injunction, which the district court denied. *Id*. In affirming the district court, the Supreme Court relied on the lack of "reasonable diligence" shown by plaintiffs. *Id*. at 1944. Among the evidence the Court relied upon when making this determination was a "failure to plead the claims giving rise to their request for preliminary injunctive relief until 2016" and the fact that plaintiffs could have sought relief much earlier. *Id*.

Here, the Plaintiffs will no doubt attempt to distinguish *Benisek* on account of its differing posture as a preliminary injunction case. The procedural differences are not as distinguishing as Plaintiffs wish they were. The *Benisek* Court analyzed "reasonable diligence" as part of the "balance of the equities" analysis for a preliminary injunction. *Id*. The laches defense is in essence a balancing of the equities. For laches, the court looks to the unreasonable delay of the plaintiffs and then weighs any such delay against the harm done to the defendants. *ACLU of Ohio*, 385 F.3d at 647. "Laches arises from an extended failure to exercise a right to the detriment of another party." *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d 634, 639 n.6 (6th Cir. 2009). This is the same type of analysis that was done in

*Benisek* when the Court said, "[i]n considering the balance of the equities among the parties, we think the plaintiffs' unnecessary, years-long delay in asking for a preliminary injunctive relief weighed against their request." *Benisek*, 138 S. Ct. at 1944. Just as in *Benisek*, the Plaintiffs' years-long delay in pursuing their permanent[4] injunctive relief, should weigh against their request. *Cf. Benisek*, 138 S. Ct. at 1944.

### b.  The Plaintiffs Unreasonably Delayed in Bringing their Claims.

The first element of laches is that there was an "unreasonable delay in asserting one's rights." *Brown-Graves Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 206 F.3d 680 (6th Cir. 2000). There is simply no question that the Plaintiffs (1) delayed in bringing the present case, and (2) that the delay was unreasonable. The Plaintiffs should not be rewarded for sleeping on their rights.

Plaintiffs hired Mayer on January 16, 2015 and he "began his work at approximately the same date. . . ." Plfs' Obj. and Resp. to First Set of Interrogatories at 14 (App. E), Attachment 10 (App. G). Plaintiffs hired Chen on February 17, 2016 and he began work at approximately the same time. Plfs' Obj.

---

[4] In this case, "permanent injunctive relief" is a bit of a misnomer. As Plaintiffs are well aware, congressional districts *must* be drawn after the next census. *See Wesberry v. Sanders,* 376 U.S. 1 (1964). The practical effect of this is that, should Plaintiffs prevail, there will only be a single election cycle held under the new maps.

and Resp. to First Set of Interrogatories at 15 (App. E), Attachment 11 (App. H).

Chen testified at his deposition that he was producing draft simulations as early as

2016. Dep. of Chen 40:22-23; 41:1-2 (App. I).

The congressional plan was passed by the Michigan legislature in 2011.

Plaintiffs—including the League of Women Voters, which is a sophisticated non-

profit entity that regularly files lawsuits alleging partisan gerrymanders—should

have been on notice at the time the plan was passed that their rights were harmed.

If not, then certainly the Plaintiffs were on notice of their claims at the time they

began retaining expert witnesses in January of 2015. *See* Apps. G, H). However,

rather than promptly bringing their claims and work to preserve evidence, they

waited. *Compare* Apps. E, and G, and H, *with* Complaint (ECF No. 1) (filed on

12/22/17). This wait has resulted in severe harms to Defendants as many

documents have been lost and destroyed and the witnesses to the most vital facts

on the case can no longer remember them.

### c. **The Plaintiffs' Delay Has Prejudiced Defendants.**

"[O]ne general category of prejudice that may flow from unreasonable delay

is 'prejudice at trial due to loss of evidence or memory of witnesses.'" *Natron*

*Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002). "Given this

litigation's temporal proximity to the next installment of census data and

associated redistricting, the amount of time that has elapsed since the cause of

action arose . . . less prejudice is required to show laches in such an instance than had Plaintiffs expeditiously asserted their rights." *Maxwell v. Foster*, 1999 U.S. Dist. LEXIS 23447, *6-7 (W.D. La 1994) (three-judge court) (dismissing racial gerrymandering claims based on laches) (citing *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990)). Irrespective of how much prejudice the Defendants are required to show, there can be no question that the prejudice is serious, if not extreme.

Intervenors have reviewed the various depositions taken in this case and have unsurprisingly found that, due to the length of time the Plaintiffs slept on their rights, it will be exceedingly difficult to mount a defense. Jeff Timmer, the principal drafter of the congressional map, has forgotten significant details of the meetings, discussions, and events related to the development and passage of the 2011 plan. *See generally* Dep. of Timmer (App. D). For example, Timmer was asked by Plaintiffs' counsel "Q: [a]s part of the redistricting process that you performed or were – observed, did you have any communications with elected Democrats? A: Possibly. I'm trying to recall who was – who would have been elected at that time. Term limits makes it a bit fuzzy. So possibly." Dep. of Timmer 110:2-7 (App. D). Remembering the extent to which Democrats may have been involved is important information that could go to several defenses and factual

assertions.[5] By counsel's count, there are over one-hundred and ninety (190) questions that Timmer could not recall the answer to. *See e.g.*, *id*. The passage of time has affected the memories of *every* deponent.[6] These are the exact "muniments of evidence," *Brown*, 95 U.S. at 161, and "loss of . . . memory," *Natron Corp.*, 305 F.3d at 412, that laches is intended to protect against. It is impossible to know at this point what the factual record in this case would be if Plaintiffs brought their claims when they arose. What is apparent from the record, however, is that Plaintiffs' delay is prejudicing Intervenors' ability to defend the maps.

### i. Laches Is Available as a Defense to Injunctive Relief.

There is a line of cases within the Sixth Circuit that stands for the proposition that laches "does not prevent plaintiffs from obtaining injunctive relief

---

[5] Another relevant interaction occurred as follows: "Q: Did you have any communications with anyone from Common Cause during 2011? A: I don't know who was involved with Common Cause. I don't – I couldn't answer that. Q: so if there were any, you don't recall them? A: Yeah, right. Right." Dep. of Timmer 111:7-12 (App. D).

[6] *See e.g.,* Dep. of Began 29:9-13, 55:15-56:1, 67:9-25, 77:5-78:12, 93:4-15, 181:21-182:10 (could not recall the answers to over 150 questions) (App. J); Dep. of McMaster 221:21-222:2, 222:6-10, 225:12-15 (could not recall the answers to over 150 questions) (App. K); Dep. of Lund 33:25-34:7, 48:5-11, 74:3-6, 74:23-76:4, 88:1-11, 98:25-99:6, (could not recall answers to over 150 questions) (App. L); Dep. of Bolger 134:2-9 (could not recall the answers to over 140 questions) (App. M); Dep. of Marquardt 14:19-16:4, 59:6-10, 74:17-23, 197:8-20 (could not recall the answers to over 130 questions) (App. N); Dep. of Hune 110:9-111:3, 111:17-20, 162:1-5 (could not recall the answers to over 70 questions) (App. N); Dep. of LaBrant 29:12-18, 138:1-4, 154:5-10, 214:11-15, 216:10-12 (could not recall the answers to over 50 questions) (App. O).

. . . ." *Id.*; *Ohio A. Philip Randolph Inst.*, 2018 U.S. Dist. LEXIS 137734, *24-25 (S.D. Ohio Aug. 15, 2018) (three-judge court) (hereinafter *Randolph*). According to this line of cases, "[l]aches only bars damages that occurred before the filing date of the lawsuit." *Natron Corp.*, 305 F.3d at 412; *see also Kellogg Co. v. Exxon Corp.*, 209 F.3d 562 (6th Cir. 2000)[7]. In fact, as recently as this year *Natron Corp.* was relied upon by a three-judge panel to deny a motion to dismiss in an Ohio redistricting case. *See Randolph*, 2018 U.S. Dist. LEXIS 137734, *24-25. The Ohio district court's reasoning is based on a misunderstanding of this Circuit's precedent and, in any event, is contrary to Supreme Court precedent.

The first issue with the Ohio district court's reasoning is that both of the cases referenced are *trademark* cases. *Compare Randolph*, 2018 U.S. Dist. LEXIS 137734, *24-25 (denying laches in a motion to dismiss); *with Natron Corp.*, 305 F.3d at 412 (discussing issues of trademark law); *and Kellogg Co.*, 209 F.3 562 (same). While the language of some of the statements are broad, they are still only applicable to the case in front of them at that time. *Cf. Hinkle v. Norfolk S. Ry. Co.*, 2006 U.S. Dist. LEXIS 92515, *15-17 (S.D. Ohio 2006) (discussing an overly broad statement of law that was inessential to the holding of Supreme Court). It is

---

[7] *Kellogg* also appears to impose estoppel as a requirement of showing laches in the injunctive relief context. *See Kellogg Co.*, 209 F.3d at 574. As shown *infra* this requirement is contrary to established precedent. However, even if this Court feels that principals of estoppel are applicable, the Congressional Intervenors still prevail due to Plaintiffs' "intentional misleading silence." *See id.*

obvious that the broad statements found in *Natron* and *Kellogg* that laches is unavailable for "injunctive relief or post-filing damages," *Randolph*, 2018 U.S. Dist. LEXIS 137734, *24-25, is context dependent.

Second, and more fundamentally, any broad assertion that laches is not applicable to injunctive relief is contrary to Supreme Court precedent. According to the Supreme Court, "[a] constitutional claim can become time-barred *just as any other claim can*." *U.S. v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 9 (2008) (Roberts, C.J. for a unanimous court) (emphasis added). "That is true in election law cases as elsewhere." *Benisek*, 138 S. Ct. at 1944. This serves the purposes of laches as an equitable remedy—just as permanent and preliminary injunctions serve their purpose as an equitable remedy. This makes sense given the overarching purposes of laches in American jurisprudence because "[e]quity eschews mechanical rules; it depends on flexibility." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). In fact, there is no limit to the reach of the defense of laches. *See Clintwood Elkhorn Mining Co.*, 533 U.S. at 9; *see also Maxwell*, 1999 U.S. Dist. LEXIS 23447, *6-7 (applying laches to election law claims on a motion for summary judgment).

Furthermore, a key feature of a preliminary injunction is an analysis of the lack of "reasonable diligence" shown by plaintiffs. *See Benisek*, 138 S. Ct. at 1944. As discussed *supra*, the reasoning in *Benisek* is just as applicable to permanent

injunctions as it is to preliminary injunctions. *See supra* at 18-19. At minimum, *Benisek* stands for the proposition that laches is applicable to injunctive relief of some stripe. *See Benisek*, 138 S. Ct. at 1944. Therefore, laches can, and must, prevent Plaintiffs from seeking injunctive relief because their own delay harmed the ability of Defendants and Intervenors to defend against the allegations.

## CONCLUSION

For the aforementioned reasons, this Court should grant Congressional Intervenors Motion for Summary Judgment.

Dated: September 21, 2018                          Respectfully Submitted,


**HOLTZMAN VOGEL JOSEFIAK**          **CLARK HILL PLC**
**TORCHINSKY PLLC**


/s/  *Jason Torchinsky*                    /s/ *Brian D. Shekell*
Jason B. Torchinsky                Brian D. Shekell
Shawn T. Sheehy                    Charles R. Spies.
Phillip M. Gordon                  500 Woodward Avenue, S3500
Dennis W. Polio                    Detroit, Michigan 48226
45 North Hill Drive, Suite 100     P: (313) 965-8300
Warrenton, Virginia 20186          E: bshekell@clarkhill.com
Phone: 540-341-8808
Email: JTorchinsky@hvjt.law

## Certificate Of Service

I hereby certify that on September 21, 2018 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all of the parties of record.

**HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC**

/s/ Jason Torchinsky
Jason Torchinsky