# APPENDIX A

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LEAGUE OF WOMEN VOTERS )
OF MICHIGAN, ROGER J. BRDAK,)     No. 2:17-cv-14148
FREDERICK C. DURHAL, JR., )
JACK E. ELLIS, DONNA E. )          Hon. Eric L. Clay
FARRIS, WILLIAM "BILL" J. )        Hon. Denise Page Hood
GRASHA, ROSA L. HOLLIDAY, )        Hon. Gordon J. Quist
DIANA L. KETOLA, JON "JACK" )
G. LASALLE, RICHARD "DICK" )      **PLAINTIFFS' SECOND**
W. LONG, LORENZO RIVERA, )        **SUPPLEMENTAL RESPONSE**
and RASHIDA H. TLAIB, )           **TO DEFENDANT'S**
                       )          **INTERROGATORY NO. 1**
                       )
         Plaintiffs, )
                       )
         v.            )
                       )
RUTH JOHNSON, in her official )
Capacity as Michigan )
Secretary of State, )
                       )
         Defendant.  )

Joseph H. Yeager, Jr. (IN 2083-49)     Mark Brewer (P35661)
Kevin M. Toner (IN 11343-49)           GOODMAN ACKER P.C.
Harmony A. Mappes (IN 27237-49)        17000 West Ten Mile, Second Floor
Jeffrey P. Justman (MN 390413)         Southfield, MI 48075
FAEGRE BAKER DANIELS LLP               Telephone: 248-483-5000
300 North Meridian Street, Suite 2700  Fax:        248-483-3131
Indianapolis, IN 46204                 MBrewer@goodmanacker.com
Telephone: 317-237-0300
Fax:        317-237-1000
Jay.Yeager@FaegreBD.com
Kevin.Toner@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

*Counsel for Plaintiffs*

Plaintiffs served their initial response and objections to defendant's Interrogatory No. 1 ("Interrogatory 1") in defendant's "First Set of Interrogatories and Document Requests to Plaintiffs" ("Initial Response") on July 10, 2018, and served plaintiffs' first supplemental response ("First Supplemental Response") July 24, 2018. Plaintiffs submit this second supplemental response ("Second Supplemental Response") as contemplated by the Court's August 17, 2018 "Order Granting in Part and Denying in Part Defendant's Motion to Compel" (Dkt. No. 95).

Plaintiffs incorporate herein by reference all the responses and objections stated in plaintiffs' Initial Response and First Supplemental Response.   Plaintiffs reserve the right to supplement this Second Supplemental Response based upon future depositions, documents yet to be produced by defendant or by recipients of non-party subpoenas, final deposition transcripts, and after reasonable time to review a large volume of documents recently produced by Legislative Bodies and Legislative Personnel.[1]

Interrogatory 1 requests that plaintiffs, *inter alia,*

- identify "all facts of which you are aware that support your claims … ,"
- identify "all facts of which you are aware that relate to your claims in the complaint … ,"
- identify "all witnesses you intend to call as to a particular subject … ,"
- "provide a detailed summary of their anticipated testimony and the documents they will refer to or use … ,"

---

[1]  As defined in Dkt. No. 58 at page ID #985, footnotes 1-2.

- identify all documentary evidence "on which you intend to rely to establish [certain] facts … ," and
- otherwise to identify every document "of which you are aware that relates to your claims in the complaint."

Interrogatory 1 as a whole, and in particular the foregoing parts of Interrogatory 1, is unreasonably burdensome, overbroad and disproportionate to the needs of this case. Plaintiffs also object to the invasion of the attorney-client privilege, work product protection, and the protection of trial preparation materials under Fed.R.Civ.P. 26.

## RESPONSE

Subject to all of the foregoing, and without waiving or limiting any of the above objections, plaintiffs say in further response to Interrogatory 1:

## Districts

Based on information available today, plaintiffs intend to challenge the following as gerrymandered districts violating plaintiffs' rights under the First and Fourteenth Amendments to the Constitution of the United States:

| Congress | 1, 4-12 |
|---|---|
| State Senate | 7-15, 18, 22-24, 27, 29, 32, 36 |
| State House | 11, 12, 14, 16, 18-21, 24, 25, 30-32, 36, 39, 40, 43-45, 48-55, 57, 60, 62, 63, 65, 67-69, 75, 76, 80, 83, 87, 91, 92, 94-96, 98, 103, 105-107 |

2

US.119506026.02

## Evidence

The great majority of the evidence for the gerrymandering of these districts is already known to defendant.  It falls generally into the following categories:

(a)    **Public and stipulated data.**  Stipulated and/or public census and election data reflect the partisan asymmetry of the 2001 and 2011 redistricting maps for Michigan's congressional delegation, the Michigan House, and the Michigan Senate and the durability of the resulting gerrymanders.

(b)    **Experts.** The expert opinions of plaintiffs' three experts—Professors Kenneth Mayer, Jowei Chen, and Christopher Warshaw demonstrate the partisan gerrymandering of the challenged districts.  Their anticipated testimony is summarized in their respective reports and related exhibits/documents.  In particular, plaintiffs call out the following portions of the experts' analyses to establish further that the above-identified-districts are gerrymandered:  The analysis of Professor Jowei Chen demonstrates that certain of the challenged districts are statistical outliers when compared to similar districts in redistricting maps that comply with applicable laws but were drawn without reference to partisan considerations.  *See* Chen Report at 54-56, Appendix D1-D16.  Professor Chen has also provided detailed data regarding thousands of alternative maps and will likely testify at trial about some of those maps in detail. The expert report of Professor Kenneth Mayer at pages 84-89 evaluates the baseline partisanship of each district included in the 2011 maps, identifying those with

3

large Democratic majorities and the others with much smaller but safe and efficient

Republican majorities.  The reports of Professors Chen, Warshaw and Mayer also all

provide statewide evidence and certain district-specific evidence of (i) severe partisan

asymmetry of the Michigan maps, leading more often than not to minority rule, (ii)

the outlier nature of the Michigan maps compared to other Michigan maps and other

maps nationwide going back nearly 50 years, and (iii) the impact of high asymmetry

on the public policy process.

> (c)      **Documents produced during discovery and/or used at depositions and testimony from legislators and their staff, consultants, and affiliates**.  The

documents produced during discovery demonstrate that the above-identified districts

were gerrymandered for partisan purposes favoring Michigan Republican Legislators

and the Michigan Republican congressional caucus.  Republican members controlled

both chambers of the Michigan legislature and the governor's office during the 2001

and 2011 redistricting.  Deposition witnesses, persons previously identified,  and

produced documents prove the intent and conduct of the Michigan Republican

legislators, Republican caucuses, and their retained consultants, and demonstrate the

following:  a pattern, practice and process of drawing districts to favor Republicans;

the asymmetry of the 2010 election results and predominance of Republican seat

share in 2011; the secrecy and partisan control of the redistricting process; the

exclusion of the public and Democrats in particular from the process; the use of

4

extensive  historical partisan data to assess proposed districts and maps; false statements intended to mislead the public about the process; involvement of Michigan and national Republican organizations such as the Michigan Republican Party, RNC, RSLC, RNCC, and others; input from Republican donors such as Dick and Betsy Devos, Peter Secchia, Jon Cotton, and many others; drawing of districts for anticipated Republican candidates; disproportionate pairing of Democratic incumbents; and general animus towards Democrats, which they often referred to as "opponents" or "the opposition" sometimes using pejorative and/or obscene language.

The documents and testimony also reflect Republican legislators, staff, consultants and leadership statements regarding particular districts, the characterization of the partisanship of areas affected by the particular configurations chosen for the challenged districts, pressure by Republican incumbents to make particular districts safer and easier for reelection, possible alternative configurations for districts, and extensive use of political data to assess and shape proposed districts.

The anticipated scope and substance of these witnesses' trial testimony is largely reflected in the depositions that have occurred in the case and the exhibits used during those depositions.

(d)     **Documents and testimony from other witnesses.** The testimony of persons identified in plaintiffs' Initial Response and First Supplemental Response,

US.119506026.02

plaintiffs' Initial Disclosures and the 7/24/2018 email supplement to those disclosures and additional documents reflect Republican staff and member statements regarding particular districts, the history of line-drawing in the area of the challenged districts, the partisanship of areas affected by the particular configurations chosen for the challenged districts, destruction of documents, political threats made to certain Democratic legislators, and possible alternative configurations for districts. Previously identified witnesses will also testify regarding district-specific Michigan redistricting and electoral history and factors influencing district configuration and possible alternative configurations.

* * *

By way of further response, plaintiffs provide the following narrative summary, incorporating several non-exhaustive, specific examples of the above-described evidence, of the bases their claims that the challenged districts were unconstitutionally gerrymandered:

The State of Michigan violated the First and Fourteenth Amendment rights of plaintiffs and other Michiganders when in 2011 it gerrymandered its legislative and congressional maps to rig the next decade's elections for Republicans.  The Legislature intended to and did dilute the votes of Democratic voters in Michigan, perpetuating a system of elections that, more often than not, led to minority rule.

6

As this Court recognized in its "Order Granting In Part And Denying In Part Defendant's Motion to Dismiss For Lack of Standing" (Dkt. No. 54) and as the Supreme Court recognized *Alabama Legislative Black Caucus*, 135 S.Ct. 1257, 1265 (2015), statewide evidence as well as district-specific evidence is admissible to support claims of gerrymandering on a district-by-district basis.  The witnesses identified by plaintiffs provide detailed statewide and district-by-district evidence to support their claims.

Republican staff and consultants prepared maps in 2011 that both packed Democratic voters into a few districts, forcing thousands of wasted Democratic votes, and carefully spread, or cracked, Republican voters and remaining Democrats across many remaining districts.  In each of those cracked districts, Democrats represent minorities of the voters and Republican voters composed majorities not so large as to waste many votes, but large enough to be safe for Republican candidates in all but a large Democratic wave election.

The gerrymanderers set out from a favorable starting point:  severely tilted Michigan maps, in place since 2001, which had led to large Republican majorities in most years in the Congressional delegation.  *See, e.g.*, McMaster (describing the 2001 map-drawing as "power hungry" on the part of the Republicans – "being very [selfish] and drawing a map so they could – they could see maybe how high they could get; could they get to 65 seats, could they get to 70 seats.").  The tables below show the

7

results under both the 2001 maps and the 2011 maps. In 9 of the 20 elections the Republicans lost the electoral vote but won a majority of the legislative seats – in other words, minority rule. In another four elections very small electoral majorities translated into very large legislative majorities.

**Disparities in Votes Cast vs. Seats Won: United States House General Elections 2002-2016**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|------|------|
| 2002 | 48.2% | 60.0% |
| 2004 | 49.9% | 60.0% |
| 2006 | 46.2% | 60.0% |
| 2008 | 46.4% | 46.7% |
| 2010 | 52.3% | 60.0% |
| 2012 | 45.6% | 64.3% |
| 2014 | 47.5% | 64.3% |
| 2016 | 50.5% | 64.3% |

**Disparities in Votes Cast vs. Seats Won: Michigan Senate General Elections 2002-2014**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|------|------|
| 2002 | 50.0% | 57.9% |
| 2006 | 45.0% | 55.3% |
| 2010 | 53.6% | 68.4% |
| 2014 | 50.4% | 71.1% |

**Disparities in Votes Cast vs. Seats Won: Michigan House General Elections 2002-2016**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|------|------|
| 2002 | 50.0%. | 56.4% |
| 2004 | 48.1% | 52.7% |
| 2006 | 44.8% | 47.3% |
| 2008 | 41.6% | 39.0% |
| 2010 | 52.8% | 57.3% |

US.119506026.02

| 2012 | 45.5% | 53.6% |
| 2014 | 48.9% | 57.3% |
| 2016 | 50.3% | 57.3% |

The already-tilted incumbent structure in 2011, combined with favorable election results in the 2010 Republican wave year, had Republicans holding 60% of the Michigan congressional seats, 68.4% of the Michigan Senate seats, and 57.3% of the Michigan House seats.  The deposition testimony shows that Michigan line drawers took advantage of this heavy load of Republican incumbents as a starting point for their 2011 maps.  There was a concerted effort to preserve the boundaries of previously gerrymandered districts that contained majorities of Republican voters since 2001.  *See, e.g.*, Timmer (testifying that Congressional District 5 was drawn to preserve within its boundaries the Republican voters who were put there during the 2001 redistricting.); *id.* (District 9 was similarly drawn to preserve the core of a district draw to favor Republican candidates.); Timmer000043-44 (LaBrant and Timmer discussing that Timmer's draft would protect the nine Republican U.S. House incumbents); *cf.* Marquardt (explaining the effort and need to make sitting senators happy with the maps).

The deposition testimony and documents reflect that the Michigan legislature carried out its 2011 redistricting in a highly controlled and confidential environment. The House map, for example, was drawn in locked quarters not generally accessible to anyone other than Republican leadership and line-drawing staff and consultants.  *See*

9

Began & McMaster. The congressional maps were outsourced to private Republican consultants, including one consultant, Jeff Timmer, who defendant now identifies as a testifying expert for her in this case. The public and Democratic legislators were wholly excluded from the redistricting process, except when Republicans applied some arm-twisting to procure votes and blunt future race-based map challenges. *See, e.g.* Began (acknowledging deals cut with certain Democrats to provide more favorable districts in exchange for votes).

Not only Democrats, but even most Republican members of the legislature, were excluded from the process until close to its very end. Neither Democratic representatives, nor Republican rank and file members, saw the draft maps until they were released to the public in July. Republicans, but not Democrats, were given district-by-district previews of only their own districts before the rollout, to assure their votes. Even then, those documents were only shown at individual meetings— copies were not provided or allowed to be taken from the meetings.

By contrast, certain Republican members of the legislature, Republican legislative staff, the Chair of the Michigan Republican party, the Republican-aligned Michigan Chamber of Commerce, the secretly-funded Michigan Redistricting Resource Institute (created to finance the legal defense of Republican drawn maps), Republican donors, and partisan-line-drawing consultants from the Sterling Corporation, were all deeply involved in the redistricting process. Members of this

10

US.119506026.02

elite group participated in what were often weekly or more frequent private meetings throughout the redistricting process.  They met at Dickinson Wright's offices in Lansing where they discussed the map drawing, including sharing of draft maps and discussion of partisan data and requests from influential Republican legislators and donors.[2]

The evidence shows the common occurrence of individual incumbents seeking themselves or through intermediaries to favorably influence their new districts.  For example, Timmer identified the following as it relates to the Congressional map:

- Clinton Township in Macomb County was split at the request of Republican lawmakers in violation of the Apol criteria.
- Congressional District 4 was altered to accommodate the partisan requests of Representative David Camp and his staff.
- Congressional District 10 was drawn to split the community of Sterling Heights at the request of Republican Congresswoman Candace Miller and her staff.
- Congressional District 11 was drawn to split Rochester Hills and otherwise drawn in a manner requested by Republican Congressman Thad McCotter and his Chief of Staff Jack Daley.

*See also, e.g.*, Began (discussing changes to several House districts).  The documents produced and authenticated by Sterling Corporation[3] consultant Jeff Timmer[4] contain a multitude of emails demonstrating proposals and drafts designed to increase

---

[2] The substantive details of these "map drawer" meetings, however, remain a mystery as the defendant has asserted a blanket "common interest" privilege over most of these meetings, despite the hodgepodge of attendees.  Plaintiffs challenge this assertion of privilege.

[3] Sterling Corporation touts itself as a Lansing, Michigan "Republican Political Consulting Firm" that is "relentlessly committed to success" and that has raised at least $500 million for Republican campaigns, causes, and ballot initiatives.  http://www.sterlingcorporation.com/ (August 31, 2018).

[4] Of the three map drawers – Timmer, Marquardt, and McMaster – plaintiffs have received next to nothing by way of document production from either Marquardt or McMaster, ostensibly because none of their emails have been preserved.  It appears that none of the participants used their official state email addresses and instead used private email addresses almost exclusively to discuss redistrict matters.

11

Republican vote share in certain districts and/or make adjustments at the request of staffers, oftentimes expressly using political data in his analysis. *See, e.g.*, Timmer0083-88, 001043, 1088-93, 000348-49, 000058-63, 000301-05, 000107, 001046-54, 000150-51, 000115-16, 000944-51, 00110, 000208-12, 000237-239, 001137-38, 000164-65.

Even Republican witnesses could not deny that these approaches were typically for the purpose of seeking a higher baseline partisanship to make them easier for Republican incumbents to retain, or for new Republican candidates to win, certain districts. *See, e.g.*, McMaster (describing the outside pressure he and Began were under as House map-drawers: "Every staffer's political future, every representative's political future, depended on how the lines turned out, and you constantly had people coming up with these crazy ideas of what their districts should look like.")  Individual Republicans competed for lines that would increase the baseline of the Republican vote in their individual districts.  Staff, and occasionally Republican leadership, refereed these requests, helping members where possible and seeking to preserve strong Republican districts, but not at the expense of unduly weakening nearby districts by removing Republican voters from or sending too many Democrats to a neighboring Republican district.  *See, e.g.*, McMaster & Began (describing several instances where requests for changes were made, some of which were implemented and some of which were not); Timmer794-98; Timmer606-07.  Where Democratic

12

US.119506026.02

districts are nearby the task may be easier, as extra Democrats can be packed off into those neighboring districts.

The result of this horse trading are maps that force incumbents to share Republican votes to preserve the large seat majorities described above, cracking, or spreading, Republicans to create as many safe seats as possible and cracking or spreading Democrats to keep them in the minority in the districts to be occupied by the Republican incumbents or their successors.

Indeed, while the map drawers' mantra was that the maps "drew themselves" because they religiously applied the Apol criteria, they conceded that in certain geographies, particularly those with large or dense populations, the just-described process of taking into account partisanship to tilt the map was a reality.  For example, Marqaurdt (the architect of the Senate map) testified as follows:

> Q.    Did you intend for the map that you drew for the Senate to be for[sic] favorable for Republicans than Democrats?
> A.    Did I consider that?
> Q.    You were the drawer, so did you have that in mind as you're drawing it, that where you've got choices to make, you're going to make the map more favorable for Republicans than Democrats?
> A.    In the few choices that we had, I would say that's true, but the choices are very few.

Marquardt went on to identify these "few" geographies as Oakland County, Kent County, and Macomb County, which combined represent over 25% of Michigan's

13

US.119506026.02

total population.[5]  *See also* Hune (conceding the same geographies were susceptible to more than one configuration while still complying with Apol); *id.* (acknowledging that in Senate District 24 "the placement of [Webberville] was a use of political data in the drawing of a district."); Began (acknowledging that one of the aims of the map drawing was to keep the Republicans in the majority); McMaster (conceding that a map drawn to maximize partisan advantage can, on his definition, be "fair and legal."); Timmer (conceding on page 38 of his June 29, 2018 Expert Report that Plaintiffs' demonstration congressional plan map and Dr. Chen's simulation maps of District 1 have fewer county breaks under Apol than the enacted map does); LaBrant (testifying that map drawers have "latitude" to draw "less safe and more safe" districts consistent with Apol).

In fact, contrary to the Apol criteria, the drafters took great pains to understand the partisan makeup of each district.  Exhibit after exhibit and several witnesses' testimony reflects line-drawers' use of historical Michigan statewide election data to evaluate and predict the partisanship of proposed districts within each map.  Multiple witnesses agree that that data was used to evaluate the partisanship of proposed maps.  *See, e.g.* LaBrant (explaining that they looked at base party vote , which "means based upon votes for various offices that are on the partisan ballot, you know, how that particular precinct … might perform…over a ten-year period of

---

[5] Looking at the map:  Portions of Oakland County are in the following Senate districts: 11, 12, 13, 14, 15.  Portions of Kent County are in the following Senate districts: 26, 28, 29.  Portions of Macomb County are in the following Senate districts: 8, 9, 10.

US.119506026.02

time"); Marquardt ("What were you looking at to determine whether they would get re-elected?" "There was political data in the program, so you could look at political data." "What political data in particular would you look at?" "Past election results.").

Marquardt also created demonstrative exhibits of *each* Republican senator's district to show him or her in the private meeting among Marquardt, Senate majority leader, and the individual senator. These documents compared the district from the previous cycle to the new proposed district and also included political data for the former and proposed districts. *See* Deposition Exhibits 81-108. When asked why that political data was included, Marquardt testified that "the Senators obviously would be interested in knowing whether their district got better or worse" – where "better" meant "more Republican."

The line drawers were also focused on the statewide implications of their efforts for the entire 2011-2021 apportionment cycle.

Robert LaBrant, Chairman of the Chamber of Commerce, Chairman of the Michigan Redistricting Resource Institute (MRRI), and an old hand in Michigan redistricting, took the lead along with his consultants Sterling Corporation and Jeffrey Timmer in drawing the Congressional maps. Mr. LaBrant wrote to colleagues towards the end of the process, "We've spent a lot of time providing options to ensure we have a solid 9-5 delegation in 2012 and beyond." Timmer 132.

15

The Michigan legislators and line drawers, who carried out the above process in close collaboration with Republican party officials in a carefully controlled confidential process, told the public a different story.  A news release from House redistricting committee chair Pete Lund told the public among other things that the maps would "essentially draw themselves".  House 2780.  Lund admitted in his deposition that this was an exaggeration, and of course it was.  Though as Lund acknowledged the Republican caucus chose the term "fair and legal" to describe the process externally, the legislators and line drawers saw the APOL criteria as in part valuable for PR purposes *See, e.g.,* Timmer000043-44; Timmer000066-68.  Contrary to the impression given the public, the Apol criteria and the Voting Rights Act left map drawers with thousands of alternatives for legislative maps, every one of which was materially fairer and treated the parties more equally than the enacted plans.  *See, e.g.,* Chen report at 15-17, 19-20, 22, 24, 27-29, 31-32, 35, 37, 40-42, 44-45, 48, 50, and Appendix D1-D16.

Given the process described above, it is no surprise that three separate highly qualified experts, Kenneth Mayer, Jowei Chen and Christopher Warshaw, have each independently found that the resulting maps, including the challenged districts identified above, are extreme partisan gerrymanders.

16

**As to Objections and Contention Interrogatories and Requests**:

I hereby verify that the information supplied above in response to the contentions that are the subject of Interrogatory number 1 is true and accurate to the best of my information, knowledge and belief. I also sign as regards all stated objections.

Counsel for Plaintiffs

/s/ *Joseph H. Yeager, Jr.*
Joseph H. Yeager, Jr. (Ind. Bar No. 2083-49)

## Certificate of Service

I hereby certify that on August 31, 2018, copies of the foregoing were served on counsel named below via email and first-class U.S. mail:

Peter H. Ellsworth
Ryan M. Shannon
DICKINSON WRIGHT PLLC
215 S. Washington Sq., Suite 200
Lansing, MI 48933

Jason Torchinsky
45 North Hill Drive, Suite 100
Warrenton, Virginia 20186
JTorchinsky@hvjt.law

Brian Shekell
500 Woodward Ave., Suite 3500
Detroit, MI 48226
bshekell@clarkhill.com

/s/ Harmony Mappes

US.119506026.02