# APPENDIX J

Case 2:17-cv-14148-ELC-DPH-GJQ ECF No. 121-11, PageID.3176 Filed 09/21/18 Page 2 of 9

Deposition of Brian Began - 8/14/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 26

1  redistricting process?
2  **A. Yes.**
3  Q. And why did you want to be involved in that?
4  **A. It was interesting.**
5  Q. How so?
6  **A. It was unique and it was legislative and I**
7  **had not done legislative work policywise.**
8  Q. How was it unique?
9  **A. It happens once every ten years.**
10  Q. That -- that's what you mean by unique?
11  **A. Yes.**
12  Q. Had you talked to anyone who had previously
13  been involved before you kind of reached out
14  to get involved in that aspect?
15  **A. That summer, 2010, I asked Jeff Timmer about**
16  **it.**
17  Q. Who is Jeff Timmer?
18  **A. He was also a map drawer.**
19  Q. In 2010, he was a map drawer?
20  **A. Yes.**
21  Q. How do you know Jeff Timmer?
22  **A. He was my boss at Michigan Republican Party.**
23  Q. And what was your general discussion with
24  him in the summer of 2010?
25  **A. I would like to be involved; do you know how**

Page 27

1  **I can get involved?**
2  Q. You would like to be involved in what?
3  **A. Redistricting. I was trying to get back**
4  **into politics.**
5  Q. And what did he tell you?
6  **A. He gave me no answer.**
7  Q. Well, how did he respond?
8  **A. Just sort of, (indicating), I don't know.**
9  **That was it. He did not commit one way or**
10  **the other.**
11  Q. Well, did you -- did you have a sense that
12  he was going to be involved in it in 2010?
13  **A. Yes.**
14  Q. How did you come to that understanding?
15  **A. He had mentioned his involvement.**
16  Q. Okay. So, what did he tell you he was doing
17  in the summer of 2010?
18  **A. That he was getting ready for redistricting.**
19  Q. What was he doing to get ready for it?
20  **A. I don't know.**
21  Q. You didn't asked?
22  **A. No.**
23  Q. He didn't tell you?
24  **A. No.**
25  Q. Did he tell you with whom he was working at

Page 28

1  that time?
2  **A. With whom he was working with?**
3  Q. Right.
4  **A. No.**
5  Q. So, did you have any understanding of what
6  he was doing in the summer of 2010?
7  **A. No.**
8  Q. What was your reaction to his kind of answer
9  to you?
10  **A. Just sort of okay.**
11  Q. Well, really? I mean, this was your former
12  boss, right?
13  **A. Yes.**
14  Q. And you're asking him to kind of get
15  involved in something and he just says
16  (indicating), is noncommittal, and you're
17  not disappointed at all?
18  **A. It was August. I didn't know what -- where**
19  **life would take me.**
20  Q. Did you have any followup discussions with
21  him after August of 2010?
22  **A. With Jeff Timmer?**
23  Q. Yes.
24  **A. No.**
25  Q. Well, at some point you did, though, right?

Page 29

1  I mean, you've spoken to him since August of
2  2010, haven't you?
3  **A. Yes.**
4  Q. Okay. When did you kind of re-engage in
5  discussions with him?
6  **A. Around April 2011.**
7  Q. Before or after you were hired?
8  **A. After I was hired.**
9  Q. Other than Jeff Timmer, is there anyone else
10  you talked to in 2010 who mentioned that
11  they were getting ready for the
12  redistricting plan?
13  **A. I don't recall.**
14  Q. Did you -- in your communications with
15  Jeff Timmer, were they -- did you email him
16  ever --
17  **A. No.**
18  Q. -- before -- I'm sorry, let me just --
19  **A. Okay, sorry.**
20  Q. It's somewhat of a broad question.
21  Before April of 2011 and after you
22  left the position in 2008, did you ever
23  email with Jeff Timmer?
24  **A. No.**
25  Q. While working at the House of Republicans

Case 2:17-cv-14148-ELC-DPH-GJQ ECF No. 121-11, PageID.3177 Filed 09/21/18 Page 3 of 9

Deposition of Brian Began - 8/14/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 54

1 that what you're saying?
2 A. Correct.
3 Q. And you have no idea what he spoke to them
4 about?
5 A. Correct.
6 Q. And when you say that was his position, what
7 do you mean by that? That was one of his
8 job responsibilities?
9 A. He --
10 MR. GORDON: You're asking him to
11 speculate what Marquardt's responsibilities
12 are, but go ahead and answer.
13 MS. BUNDY: No, I'm just asking him
14 to -- he said that was what he was supposed
15 to do, and I'm trying to understand what he
16 means by that.
17 THE WITNESS: His role was similar
18 to that of Dan McMaster's.
19 BY MS. BUNDY:
20 Q. And -- and my question is: What did you
21 mean when you say his role is to speak to
22 legislators about the maps? What do you
23 mean by that?
24 A. That his employers are interested in what
25 their future districts will look like.

Page 55

1 Q. And is it your understanding that his role
2 was to make sure that they are satisfied?
3 A. I don't know.
4 Q. Okay. Well, I guess we'll get a chance to
5 ask him about that.
6 Now, did you have any interactions
7 with Mr. LaBrant during the map process?
8 MR. ELLSWORTH: Mr. Who?
9 MS. BUNDY: LaBrant.
10 MR. ELLSWORTH: LaBrant? You can
11 answer.
12 THE WITNESS: Okay. Can you repeat
13 the question?
14 BY MS. BUNDY:
15 Q. Yeah. Did you have any discussions with
16 Mr. LaBrant during the map-drawing process?
17 A. I don't recall any specifics.
18 Q. Well, do you think you spoke with him at all
19 during that process?
20 A. Yes.
21 Q. Okay. And what do you recall about those
22 discussions generally?
23 A. I don't know.
24 Q. You have no recollection?
25 A. What we discussed seven and a half years ago

Page 56

1 would be speculative.
2 Q. Well, what's the basis for thinking that --
3 for you thinking that you talked to him
4 during that time?
5 A. We -- I had seen him at meetings.
6 Q. Okay. So, you attended meetings with him
7 but you don't recall having direct
8 discussions with him; is that you're
9 saying -- what when you're saying?
10 A. I -- I would not recall anything specific
11 related to redistricting.
12 Q. You saw him at redistricting meetings?
13 A. Yes.
14 Q. Did you ever have a one-on-one discussion
15 with him?
16 A. Not that I recall.
17 Q. And when you saw him at redistricting
18 meetings, were you in the presence of
19 lawyers?
20 A. Yes. Mr. LaBrant is a lawyer and my -- and
21 Mr. Stuckey and my -- my identified
22 attorneys were there.
23 MS. BUNDY: So I'm assuming then,
24 Counsel, that any questions I ask about the
25 substance of those discussions you're going

Page 57

1 to object to?
2 MR. ELLSWORTH: Yes.
3 MS. BUNDY: As attorney/client
4 privilege?
5 MR. ELLSWORTH: I beg your pardon?
6 MS. BUNDY: As attorney/client
7 privilege?
8 MR. ELLSWORTH: Yes.
9 BY MS. BUNDY:
10 Q. And you're going to follow your lawyer's
11 advice?
12 A. Yes.
13 Q. As I understand your testimony, you never --
14 you do not recall speaking with Mr. LaBrant
15 without other attorneys present; is that
16 correct?
17 A. That is what I recall.
18 Q. Okay. What about during the map-drawing
19 process, did you ever interact with
20 Mr. Lund?
21 A. Yes.
22 Q. Okay. And in what -- what would lead you to
23 interact with him?
24 A. He would come into our office and ask how
25 things were going.

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-11, PageID.3178   Filed 09/21/18   Page 4 of 9

Deposition of Brian Began - 8/14/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

### Page 66

1  would be able to fit in Washtenaw County.
2  However, only one of those districts would
3  be winnable -- well, I won't say winnable,
4  but more favorable to avoid a showdown
5  between him and Mr. Rick Olson because both
6  Republicans lived in Washtenaw County.
7  Q. So what was done to remedy that?
8  A. Rick Olson was in a separate district from
9  Mr. Ouimet.
10  Q. You changed it?
11  A. I was asked to make that change.
12  Q. And who asked you?
13  A. I don't remember exactly.
14  Q. Is there anyone else it could have possibly
15  been other than McMaster or Lund?
16  A. Those were the only two that I reported to
17  directly.
18  Q. Well, did anyone, I guess, other than
19  McMaster or Lund, ever ask you to make a
20  change to the drawing?
21  A. Any change I was asked to make came through
22  primarily Mr. McMaster.
23  Q. Okay. Primarily Mr. McMaster. Who were the
24  others?
25  A. Mr. Lund may have had a suggestion at one

### Page 67

1  time that I cannot be certain about, but no
2  one else would tell me what I needed to do.
3  Q. And I just want to try and contain the box
4  here. No one else would make a suggestion
5  to you other than Lund or McMaster; is that
6  what you're saying?
7  A. They are the only ones whose directive I
8  would follow.
9  Q. Well, did someone else make a suggestion to
10  you other than them?
11  A. I don't recall.
12  Q. Did you follow all of the directives that
13  Mr. McMaster made to you?
14  A. As far as I can recall.
15  Q. Did you ever disagree with a suggestion made
16  by Mr. McMaster?
17  A. I don't recall.
18  Q. Do you recall disagreeing with a suggestion
19  made by Mr. Lund?
20  A. I don't recall.
21  Q. And when you say you don't recall to that,
22  is it you don't recall one way or another?
23  A. It would become speculative. I cannot
24  accurately, you know, transcribe the events
25  of seven and a half years ago.

### Page 68

1  Q. Did you communicate by email with Mr. Lund?
2  A. I emailed him at some time. I just don't
3  know if it was related to redistricting.
4  Q. Did you communicate with email -- did you
5  communicate by email with Mr. McMaster about
6  redistricting?
7  A. I provide -- yes, I emailed him.
8  Q. Okay. And would you provide memos to him on
9  any of your analysis? And when I say
10  "memos," I don't mean necessarily just a
11  formal memo. I mean, did you provide any
12  substantive text to him by email?
13  A. Yes.
14  Q. And what would be the nature of those
15  emails?
16  A. Analyzing plans that were submitted.
17  Q. You mean public plans?
18  A. Yes.
19  Q. Any other substantive text that you would
20  send to Mr. McMaster by email?
21  A. I don't remember the specifics.
22  Q. So, for instance, we talked a little bit
23  about James Township in Saginaw County being
24  removed so Stacy Erwin Oakes would vote.
25      Is that the sort of communication

### Page 69

1  you would have by email with Mr. McMaster or
2  would that be just in person?
3  A. I don't know. Is there an email?
4  Q. I don't know.
5  A. Neither do I. I don't know where the
6  conversation was had, if it was an email.
7  Q. Well, were there any rules put in place
8  about what you could or could not email?
9  A. I don't -- I don't believe so.
10  Q. You didn't feel like you were restricted
11  from placing certain information in emails
12  as opposed to just having conversations?
13  A. Well, I believe that anything that I emailed
14  my attorneys was protected under privilege.
15  Q. Yeah, fair enough. I'm talking about you
16  felt as though you could email Mr. McMaster
17  freely as opposed to staying away from
18  emails; is that what you're saying?
19  A. That we talk in person versus sending
20  emails?
21  Q. Right.
22  A. Again, I don't recall how many emails that I
23  sent or what the content was.
24  Q. Well, what was your general practice? Was
25  your general practice let's talk in person,

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-11, PageID.3179   Filed 09/21/18   Page 5 of 9

Deposition of Brian Began - 8/14/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 74

1  you're going over the same territory. He's
2  tried to answer your -- your question, but
3  I -- I object to your re-asking the question
4  over and over again.
5      BY MS. BUNDY:
6  Q. Can you answer the question, please.
7  **A. I answered the question about Mr. Bolger**
8  **previously.**
9  Q. I've asked a different question.
10         MR. ELLSWORTH: No, you're asking
11     the same question over and over again --
12         MS. BUNDY: Well --
13         MR. ELLSWORTH: -- so I object.
14         MS. BUNDY: -- you can make your
15     objection. I'm going to ask the question,
16     and he's going to answer it, or we're going
17     to get on the phone and call somebody.
18     Understood?
19         Now, can you please read back the
20     question.
21         MR. GORDON: And limited to factual
22     data --
23         MS. BUNDY: Exactly.
24         MR. GORDON: -- without breach of
25     any legislative privilege.

Page 75

1      (Question read back as requested as
2  follows:
3      "Q. Anything relating to -- did you
4  have any discussion with either Speaker
5  Bolger or Suzanne Miller Allen about the
6  district in which the Speaker resided?")
7      THE WITNESS: I did not speak
8  directly to him.
9  BY MS. BUNDY:
10 Q. Who did you speak with about that?
11 **A. Dan McMaster relayed information.**
12 Q. Okay. Yeah, my question -- that's fine.
13     MS. BUNDY: Now I understand
14     potentially your objection, but still.
15     BY MS. BUNDY:
16 Q. My question was just discussions directly
17    with Bolger or Suzanne Miller Allen, and you
18    did not have those discussions about that
19    district; is that right?
20 **A. Correct.**
21 Q. Okay. How many Democrats voted for the
22    House map; do you remember?
23 **A. I don't remember exactly.**
24 Q. Were there any Democrats who a deal was
25    attempted to be made with them to vote for

Page 76

1  the map that they rejected?
2  **A. I was not involved in legislative**
3  **discussions.**
4  Q. Well, do you know?
5  **A. I couldn't speak to anything specifically.**
6  Q. So, you have no idea about -- you have no
7     knowledge as to whether a Democrat rejected
8     a deal relating to redistricting; is that
9     your testimony?
10 **A. Yes, I was not involved in that process.**
11 Q. Yeah, but as we've talked earlier, you did
12    learn some things even though you weren't
13    directly talking to legislators, right?
14 **A. Yes, but I would not recall that -- those**
15    **specific conversations.**
16 Q. Yeah, and I'm not asking for the specific
17    conversation. I'm just asking for the
18    results.
19 **A. I would not know who was directly offered a**
20    **deal.**
21         MS. BUNDY: Can you mark this,
22     please.
23         (Exhibit 49 was marked.)
24         MS. BUNDY: Let me have you mark
25     this one, too, as 50.

Page 77

1      (Exhibit 50 was marked.)
2      BY MS. BUNDY:
3  Q. Have you had a chance to look at Exhibit 49?
4  **A. Yes, I'm reading it.**
5  Q. Okay. So, this is an email that you're
6     sending to Jeff Timmer and Terry Marquardt,
7     correct?
8  **A. Correct.**
9  Q. This is June of 2011?
10 **A. Yes.**
11 Q. Is this -- what is being referenced here --
12    when it says: "Here is the map that we will
13    likely use as it doesn't primary two Dems in
14    Wayne County so long as they vote our way;"
15    what is being referenced here?
16 **A. I don't remember the context of the**
17    **conversation.**
18 Q. Well, we're talking about Wayne County,
19    right?
20 **A. Yes.**
21 Q. Are we talking about Doug Geiss and
22    Paul Clemente?
23 **A. I don't know because it does not indicate**
24    **that.**
25 Q. Okay. Well, do you recall why you're

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-11, PageID.3180   Filed 09/21/18   Page 6 of 9

**Deposition of Brian Began - 8/14/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 78

1  speaking with Mr. Timmer about this?
2  **A. I don't remember exactly why.**
3  Q. Well, Mr. Timmer was responsible for the
4  congressional map, right?
5  **A. Yes.**
6  Q. To your knowledge, was he involved in
7  discussions about the House map?
8  **A. Not -- I don't believe so.**
9  Q. So sitting here today, you don't know why
10  you emailed him?
11  **A. I don't remember why I emailed him in this**
12  **context.**
13  Q. How about Terry Marquardt, do you know why
14  you were emailing him?
15  **A. I don't remember.**
16  Q. When it says, "no Wayne primary.ab9," what
17  does the ab9 mean?
18  **A. I don't remember. All I know is ab was how**
19  **things were saved in AutoBound, like Excel,**
20  **which is xls, ab is related to AutoBound.**
21  Q. Now, you say here that, "Here's the map that
22  we'll likely use," and then you say, "so
23  long as they vote our way." Do you see
24  that?
25  **A. Yes, I see that.**

Page 79

1  Q. Okay. And -- and was that you making that
2  decision that this will be the map so long
3  as they vote our way?
4  **A. I would not make that final decision.**
5  Q. So who had told you that?
6  **A. I don't remember who would have told me that**
7  **or if anyone.**
8  Q. Well, what you wrote here, you weren't lying
9  when you wrote this, were you?
10  **A. I don't believe I was. Again, it may just**
11  **be my opinion.**
12  Q. Was there discussion about essentially
13  telling certain legislators that if they
14  didn't support the plan, there would be
15  adverse consequences to them?
16  **A. I would not be involved in those**
17  **discussions.**
18  Q. And I'm not asking about whether you were
19  involved in discussions with legislators.
20  I'm saying, based on what you knew
21  going on and this email, were certain
22  Democrats being told that if they don't
23  adopt the Republican plan, there would be
24  adverse consequences to them?
25  **A. That would be speculation that I would not**

Page 80

1  be able to accurately recall.
2  Q. So you didn't hear anything of that nature
3  internally amongst your team?
4  **A. Not that I recall.**
5  Q. Okay. So, you would agree with me, though,
6  that your email suggests that there could be
7  adverse consequences if these two Dems in
8  Wayne County don't vote Republicans' way,
9  correct?
10  **A. When you say "adverse," do you mean that**
11  **they would have a primary?**
12  Q. Yeah.
13  **A. So that if they didn't vote for it, there**
14  **would be adverse consequences that they**
15  **would be in a primary?**
16  Q. With another Democrat, yeah.
17  **A. Yes.**
18  Q. Okay. I mean, are you -- are you suggesting
19  that a rep who wouldn't have a primary, but
20  if they didn't vote a way would have a
21  primary, that that wouldn't be an adverse
22  consequence?
23  **A. How -- can you rephrase the question?**
24  Q. Yeah. I mean, if -- if you're a Democratic
25  legislator and you have a choice between

Page 81

1  having another Democrat run in a primary or
2  not, you'd prefer not to have to run in the
3  primary, right?
4  **A. Yes.**
5  Q. And so that would be an adverse consequence;
6  wouldn't it?
7  **A. Yes.**
8  Q. Let me have you look at Exhibit 50. Now,
9  there wasn't an attachment to Exhibit 49,
10  but we did some metadata searching. We
11  think that this might be the exhibit, but I
12  want to know whether you know that or not.
13  **A. What is it that I'm looking at? And also,**
14  **the text is illegible.**
15  Q. Yeah, I know.
16  **A. Yeah.**
17  Q. So, you -- I'm just wondering whether you
18  can verify or not whether this is the
19  attachment to Exhibit 49. And if you can't,
20  you can't.
21  **A. I can't.**
22  Q. Does it look like Wayne County to you?
23  **A. Yes.**
24  Q. Is there anything you can ascertain from
25  Exhibit 50 that might help us understand

Case 2:17-cv-14148-ELC-DPH-GJQ ECF No. 121-11, PageID.3181 Filed 09/21/18 Page 7 of 9

**Deposition of Brian Began - 8/14/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 90

1 the information and you would have the
2 running count of what the population was and
3 other Census information regarding, like,
4 black -- you know, minority representation.
5 Q. Could you -- could the software draw a map?
6 A. Like are you saying that you just said draw
7 110 maps?
8 Q. Yeah. Well, you knew you had to have 110
9 districts, right?
10 A. Correct.
11 Q. And could you just tell the software, I want
12 you to slice-and-dice, you know, 110
13 districts so that the population is plus or
14 minus 5 percent?
15 A. I don't believe that was possible.
16 Q. So, then, how did you use the software to
17 help you draw the lines?
18 A. It provided the Census information so that
19 we would know total population of the
20 districts.
21 Q. Maybe it will help if we have an example.
22     (Exhibit 52 was marked.)
23 BY MS. BUNDY:
24 Q. Okay. So, I'm showing you what's been
25 marked Exhibit 52. This would have been --

Page 91

1 this is, again, just what we pulled from the
2 Secretary of State Website. It's from 2001,
3 the 2001 map.
4     I want to focus on District 62 and
5 63 as an example, okay?
6 A. Okay.
7 Q. So, you were involved in drawing the lines
8 for 2011 for these two districts?
9 A. Yes.
10 Q. All right. So, this is what you received
11 for 62 and 63 from 2001?
12 A. Yes.
13 Q. It looks different in 2011?
14 A. Correct.
15 Q. Okay. Take -- did you have different
16 iterations of 62 and 63 from your initial to
17 your final draft?
18 A. I would -- I would imagine so.
19 Q. Okay. So, just -- I want to just figure out
20 how you looked at a 2001 map and came up
21 with your first draft for 62 and 63.
22     And if that's not a good example,
23 if there's another district on here you want
24 to pick instead, that's fine. I just want
25 to understand what -- what you did.

Page 92

1 A. The majority of what we're looking at is
2 unchanged from -- from the 2011/2001, so
3 this section looks mostly the same because
4 if we were to look at the 2011 map. So
5 again, a lot of these districts stayed
6 consistent.
7     Now, I will say that in Kalamazoo,
8 the population grew, which is why those two
9 districts had a change. Kalamazoo increased
10 in their population between the 10-year
11 period.
12 Q. Okay. So, then you had the Census data
13 before you did the first draft?
14 A. I couldn't have drawn anything without the
15 Census data.
16 Q. Yeah, I'm just -- you told me earlier that
17 you didn't have it when you drew the first
18 draft. I just want to make sure --
19 A. I don't believe that is what I said.
20 Q. Okay. That's fine. You had the Census
21 data. Okay. So, you --
22 A. Yeah.
23 Q. -- had the Census data, you had this map,
24 you had the Apol standard.
25     So how did you draw the first

Page 93

1 draft, which relates to 62 and 63?
2 A. I don't remember how it looked the first
3 time.
4 Q. Well, but take me through the steps.
5 Regardless of how it looked, take me through
6 the steps. You have the population data,
7 you have what it looks like.
8     How do you decide where to draw the
9 lines for your first draft?
10 A. I would not be able -- I don't recall
11 clearly of the methodology of what I did
12 seven and a half years ago.
13 Q. Okay. Is there any document that would help
14 you recall that?
15 A. I don't know.
16 Q. Well, let's -- let's pick a different --
17 let's pick a different number, then. Let's
18 look at Monroe.
19 A. Okay.
20 Q. Monroe looks different between 2001 and
21 2011, right?
22 A. Correct.
23 Q. Okay. Same questions. And if this is not a
24 good example, tell me. I'm just looking for
25 what might be a good example to help me

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-11, PageID.3182   Filed 09/21/18   Page 8 of 9

**Deposition of Brian Began - 8/14/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 178

1  A. I don't recall.
2  Q. Are you familiar with District 14 identified
3     there?
4  A. Yes.
5  Q. And who holds that seat?
6  A. Brenda Lawrence.
7  Q. What party is she with?
8  A. Democrat.
9  Q. And are you -- have you talked to anyone
10    about the shape of that district?
11 A. Not that I recall.
12 Q. Would you agree with me that that's an
13    odd-shaped district?
14 A. I don't know if -- I can't really define
15    what's odd and not.
16 Q. Well, that was part of your job was drawing
17    compact districts, right?
18        MR. GORDON:  Objection.  He stated
19    that he has no knowledge of why this was
20    drawn that way.  Go ahead and answer if you
21    know.
22    BY MS. BUNDY:
23 Q. Part of your job was to draw compact
24    districts if you could, right?
25 A. That was -- that was -- that was on the

Page 179

1     checklist, but it was lower on the scale
2     compared to meeting VRA, and also I did not
3     draw this district.
4  Q. I know.  I'm not asking -- I'm just -- what
5     you're telling me is you can form no opinion
6     about whether this district -- based on your
7     experience map drawing, whether this
8     district looks odd to you or not --
9     odd-shaped or not; is that what you're
10    saying?
11 A. I'm not in a position to make any comment on
12    it.
13 Q. Just by looking at it, you don't want to
14    comment on it; is that what you're saying?
15 A. Correct.
16 Q. Did you receive -- did Jeff Timmer do any
17    drawings that you ultimately ended up
18    receiving?
19 A. What do you mean?
20 Q. Did he draw any districts that you
21    ultimately ended up receiving?
22 A. For the State House?
23 Q. For any -- for any district or House -- for
24    any district in Michigan, whether House,
25    Senate or congressional?

Page 180

1        MR. GORDON:  I'm sorry.  Is your --
2     your question is whether Timmer drew any of
3     those?
4        MS. BUNDY:  That ended up in his
5     possession.
6        MR. GORDON:  Thank you.
7        MR. ELLSWORTH:  I'm sorry, that
8     ended up in his what?
9        MS. BUNDY:  Possession.
10       THE WITNESS:  Anything that he drew
11    that I received a copy of?
12    BY MS. BUNDY:
13 Q. Yeah.
14 A. Like in terms of the final product?
15 Q. At any point in time, did he draw something,
16    before the maps were finalized -- okay.
17       Before all the maps were finalized,
18    did Timmer draw any district and that
19    drawing made its way to you?
20 A. I don't recall.
21       (Exhibit 69 was marked.)
22       (Exhibit 70 was marked.)
23    BY MS. BUNDY:
24 Q. Showing you Exhibit 70, this is an email
25    between Jeff Timmer and your boss,

Page 181

1     Dan McMaster, as well as Bob LaBrant, and it
2     says:  "A gift from my friends in the House
3     GOP."  Let me know when you've had a chance
4     to read what he writes there.
5  A. (Perusing.)  Yes, I've read it.
6  Q. Okay.  Do you remember receiving this email?
7  A. I was not on this email chain.
8  Q. Yeah, I know.  What I don't know is whether
9     this email made its way to you.
10 A. I don't know about the email but the
11    specifics of the district described, yes.
12 Q. And what do you recall about that?
13 A. What I recall specifically about the
14    district?  I have to check with previous
15    drafts and kind of compare the two notes
16    but --
17 Q. So, you had a draft of the map at the
18    time -- around end of May; is that what
19    you're saying?
20 A. Yes.
21 Q. Okay.  So, we know that, kind of putting
22    that timeline together, at least you had
23    your first draft by May 27th, right?
24 A. There was a draft, right.
25 Q. So, it may have been a second draft?

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-11, PageID.3183   Filed 09/21/18   Page 9 of 9

**Deposition of Brian Began - 8/14/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

### Page 182

1  A. I don't remember.
2  Q. Right. And do you recall Mr. Timmer making
3     the suggestion of how Districts 91 and 92
4     should look?
5  A. I don't remember that conversation.
6  Q. Well, do you remember a conversation where
7     Mr. Timmer had been suggesting how Muskegan
8     should look?
9  A. Again, going back seven and a half years,
10    I'm not sure I can recall that conversation.
11 Q. Do you recall this concept being discussed?
12 A. Yes.
13 Q. Who do you recall discussing this with,
14    Mr. McMaster?
15 A. Yes.
16 Q. Okay. And did you ultimately implement a
17    map that splits no MSDs in Muskegan, keeps
18    Muskegan, Muskegan Heights, Muskegan
19    Township in a Dem district, keeps White
20    River Township in the 91st, and also gives
21    Holly Hughes a new district?
22 A. Yes.
23 Q. And do we see that reflected in Exhibit 69?
24 A. Yes.
25 Q. And is Holly Hughes, then, a Republican?

### Page 183

1  A. Yes.
2  Q. Do you recall any other instances where
3     Mr. Timmer suggested or provided a map of a
4     district for House GOP?
5  A. Outside of what you should showed me, I
6     cannot recall any specific instance.
7  Q. Do you recall what the map looked like
8     before you enacted the changes that are
9     reflected in Exhibit 70?
10 A. No.
11 Q. Let's talk about Kent County since we're on
12    Exhibit 69. Grand Rapids contains two whole
13    districts, right?
14 A. Correct.
15 Q. So why was it drawn this way?
16 A. I don't remember why.
17 Q. Do you remember any discussions with anyone
18    about it being drawn this way?
19 A. No.
20 Q. Let's look at -- I think it's Ingham County?
21 A. Yes.
22 Q. The Lansing box on the right of Exhibit 69;
23    do you see that?
24 A. Yes.
25 Q. Would you agree with me that District 67 is

### Page 184

1     drawn here as made up of the most Republican
2     areas of the county?
3  A. Exactly -- are you saying that it's a
4     Republican district or --
5  Q. I'm saying if you look at the precinct
6     information for --
7  A. District.
8  Q. -- District 67, 68 and 69, Ingham County,
9     that the most Republican areas of that
10    county are found within 67 as drafted?
11 A. Correct.
12 Q. Can you just find -- I don't remember the
13    exhibit number -- the 2011 Detroit and
14    vicinity map?
15       MR. GORDON: 68.
16       MS. BUNDY: 68, thank you.
17 BY MS. BUNDY:
18 Q. So, we talked earlier about District 25. If
19    you want to just look at it quickly there.
20 A. Yeah.
21 Q. Do you know where Mr. Clark resides in this
22    county -- or in this district?
23 A. Mr. Clark?
24       MR. GORDON: I'm sorry, I directed
25    him to the congressional map. I'm sorry.

### Page 185

1  BY MS. BUNDY:
2  Q. Okay. Let's --
3        MR. GORDON: It's 69, I believe.
4  BY MS. BUNDY:
5  Q. It is 51, actually. Do you see District 25?
6  A. Yes.
7  Q. Do you know where Mr. Clark resides in
8     District 25?
9  A. No.
10 Q. Would it surprise you to learn that he
11    actually lives at the very southern tip of
12    that?
13 A. I did not know that.
14 Q. So, that isn't why you were surprised that
15    he lost?
16 A. I'm surprised that he lost because of
17    polling.
18 Q. Okay. What did you use the incumbent list
19    of addresses for?
20 A. The incumbent list of addresses? To see
21    where people popped up in terms of on the
22    map.
23 Q. And how did that factor into how you drew
24    things?
25 A. The map had already been drawn by the time