# APPENDIX L

**Deposition of Pete Lund - 8/13/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

Page 30

1  may or may not be around partisan
2  gerrymandering?
3  A. I believe there were some discussions on it.
4  Q. Do you recall anything about what was said?
5  A. The one thing I recall the most dealing with
6  that is how sometimes people think it's
7  redistricting -- gerrymandering but it's
8  really just trying to abide by the laws.
9       I specifically remember a part
10  where they put in some outrageously looking
11  districts and then they started explaining
12  why they had to look that way to follow the
13  Voting Rights Act.
14       I remember, you know, there was one
15  district -- I believe it was in Illinois --
16  that looked just crazy, and they were
17  explaining how they had to look that way in
18  order to become a Hispanic majority/minority
19  seat.
20       So, that was my first exposure to
21  those things and a lot of other terms that I
22  hadn't heard before.
23  Q. Did you come away with an understanding from
24  this conference about whether -- aside from
25  the examples that you've given, that parts

Page 31

1  of gerrymandering was the subject of any
2  legal constraint; in other words, is there
3  some law, constitutional or otherwise,
4  against partisan gerrymandering?
5  A. Yes, I believe that there was -- I would say
6  that -- I knew you couldn't -- I'm trying
7  to -- sorry, I'm struggling for the words.
8  I'm trying to get this as accurate as I
9  possibly can here.
10  Q. And I don't want you to guess, sir, just
11  what you can remember.
12  A. I remember that there were many laws
13  involved, and the biggest thing I came out
14  of there understanding is that there are --
15  it's an unbelievably technical and legal
16  process, as well as a political process.
17  And by "political," I mean legislative
18  political. I should say legislative more
19  than a political process.
20       There were so many laws that we had
21  to abide by and follow, I knew that I needed
22  to rely on lawyers quite a bit.
23  Q. So, you could understand the legal
24  guardrail, so to speak?
25  A. Yes.

Page 32

1  Q. Okay. And you mentioned the Voting Rights
2  Act?
3  A. Yes.
4  Q. We'll talk some more about state law but
5  you're familiar with the Apol criteria
6  obviously in Michigan?
7  A. Yes.
8  Q. What's your understanding of what the Apol
9  criteria are?
10  A. Criteria that limit how you can draw the
11  lines, there are rules, and I don't remember
12  all the rules. I don't think I remembered
13  all the rules when the process was ongoing,
14  but trying to reduce the number of breaks of
15  county lines, municipal lines, basically
16  guidelines that would be looked at in the
17  approval process if the courts looked into
18  it.
19  Q. So, you understood that you were constrained
20  by the Voting Rights Act; you understood
21  that you were constrained by the Apol
22  criteria, which are statutory, correct, in
23  Michigan?
24  A. I don't remember if it's statutory or
25  judicial fiat or -- I mean, the one thing I

Page 33

1  remember is there were laws created by the
2  legislature, both the State and the Federal,
3  that you had to follow, as well as there
4  were court rulings, both State and Federal,
5  that you had to follow.
6  Q. Regardless of whether they were statutory or
7  court-made, or some combination, you
8  understood there was such a thing as the
9  Apol criteria --
10  A. Yes.
11  Q. -- as you've described them?
12  A. Sorry, yes.
13  Q. And you, with the help of your lawyers,
14  sought to follow those?
15  A. Yes.
16  Q. And the same thing with regard to the Voting
17  Rights Act, with the help of the lawyers,
18  you sought to follow the Voting Rights Act?
19  A. Yes.
20  Q. Aside from the Apol criteria and the Voting
21  Rights Act, did you have any understanding
22  there were other constraints, legal
23  constraints, on how you could draw your
24  district?
25  A. I tell you, I can't remember all the

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-13, PageID.3189   Filed 09/21/18   Page 3 of 7

Deposition of Pete Lund - 8/13/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 34

1    constraints that there were. We're talking
2    over seven years ago. I don't remember all
3    the things. Those are the ones that stand
4    out to me now looking back seven years ago,
5    but I -- I'm sure there were other
6    constraints involved as well but I just
7    don't remember everything.
8    Q. And you mentioned lawyers helping with this.
9    Could you just tell me what lawyers you were
10    consulting at that time during the
11    redistricting process to help you with these
12    process regarding the legality of proposed
13    matters?
14    A. Joe Baumann, as I said, was the counsel for
15    the legislature. He was the person I worked
16    with on a more regular basis.
17    Peter Ellsworth, I dealt with quite a bit;
18    Mr. Stuckey, Mr. Ellsworth's partner -- or
19    colleague.
20    There were others that came in and
21    out but I don't really remember all the
22    names. Those were the three that I dealt
23    the most with.
24    Q. So, tell me who was involved on the House
25    side in the redistricting process and what

Page 35

1    they did. And I know that's kind of a broad
2    question, and we'll work through it. Let's
3    start with the names of folks. Let me
4    narrow that down. Let's figure out who was
5    involved in the process.
6    So you mentioned yourself, you
7    mentioned Mr. Baumann, and I think you
8    mentioned Mr. McMaster?
9    A. Yes.
10    Q. Tell me what his job was.
11    A. He was the person who was actually going to
12    draw the maps.
13    Q. What did you understand his experience to be
14    in map drawing, if any?
15    A. I don't remember at all. I don't know if
16    he was involved in maps or not.
17    Q. But he knew how to --
18    (Reporter clarification.)
19    THE WITNESS: I don't know if he --
20    you talk about me that time. You can't
21    blame me for that one. I don't know if he
22    had any experience drawing maps or not. It
23    was a long -- you know, it was ten years
24    before, so I don't remember now if he did or
25    not.

Page 36

1    BY MR. YEAGER:
2    Q. I assume, correct me if this is wrong, that
3    one way or the other, you got confidence
4    that he knew how to draw maps?
5    A. I had confidence that he would be able to
6    figure it out.
7    Q. Do you know what equipment he used to draw
8    maps?
9    A. I know the State provided computers to both
10    the House, the Senate, the Republicans and
11    the Democrats, they were all provided the
12    same hardware and software and data. At
13    least that's what I was told.
14    Q. And who told you that?
15    A. I don't recall.
16    Q. To your recollection -- we'll get into some
17    documents later, but just as you sit here,
18    to your recollection, did the data that the
19    State provided to both sides include
20    historical election date?
21    A. I don't recall. I didn't deal with the data
22    personally so I don't remember.
23    Q. So we talked about briefly Mr. McMaster,
24    Mr. Baumann and yourself.
25    Who else was involved -- directly

Page 37

1    involved in the line drawing?
2    A. Brian Began.
3    Q. And tell me who he was and what his job was.
4    A. He worked under Dan McMaster.
5    Q. Do you have an understanding of what his
6    experience was, if any, in line drawing?
7    A. I don't think he had any but I can't tell
8    you for sure.
9    Q. Were these folks that you hired or did
10    somebody else hire them?
11    A. If I recall right, Dan was somebody that we
12    with talked about. Suzanne Miller Allen,
13    who was the Chief of Staff for the Speaker,
14    I believe she and I, along possibly with the
15    Speaker, talked about hiring him.
16    Q. Both Mr. McMaster and Mr. Began?
17    A. Yeah, I don't remember the hiring of Began
18    as much as I do McMaster.
19    Q. Do you know if those gentlemen were hired
20    after you became Chair or before?
21    A. I have no idea.
22    Q. So you may not have even before involved in
23    their hiring?
24    A. One thing you have to understand is
25    everybody in the House, other than the

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-13, PageID.3190   Filed 09/21/18   Page 4 of 7

Deposition of Pete Lund - 8/13/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

### Page 46

1  as I understand it, a judgement about who
2  would have access to that information, and
3  that was you, Mr. McMaster, Mr. Began, the
4  lawyers.
5       Was there anyone else in that
6  group?
7  **A. The Speaker and Chief of Staff I'm pretty**
8  **sure saw the maps.**
9  Q. Anyone else you can remember? Anyone else
10 you can remember?
11 **A. I'm thinking.**
12 Q. Oh, I'm sorry.
13 **A. That's okay. I don't think so.**
14 Q. As Committee Chair, it was your decision as
15 to who would and would not have access to
16 the draft products?
17 **A. I would say they were mine but any time I**
18 **could make a decision, the Speaker could**
19 **overrule it.**
20 Q. Did he overrule on subjects around the
21 confidentiality of the drafting process?
22 **A. Not that I recall.**
23 Q. And why did you believe it was better for
24 the process to have that information kept
25 among that group you've decided during the

### Page 47

1  drafting process rather than sharing it as
2  you went along with your members of your
3  committee?
4  **A. I don't think they had the relationship with**
5  **the attorneys, I don't think they saw the**
6  **process the way that I necessarily did.**
7  **They hadn't been to the conferences. They**
8  **hadn't been in all the meetings with the**
9  **attorneys.**
10      **It's a pretty tough -- I mean, it**
11 **is so different -- it was so different than**
12 **what I had expected it to be. I didn't**
13 **realize just how many legal constraints**
14 **there were and I felt like if we started**
15 **talking to these people and showing other**
16 **people parts of it before we were near the**
17 **end, then it would potentially just get out**
18 **of place and people would start complaining**
19 **about this and that and not understanding**
20 **the legal constraints that there were.**
21 Q. And did you, as Chair, instruct your staff
22 to follow the same practice, keeping that
23 information within that group rather than
24 sharing it with the committee members or
25 other folks?

### Page 48

1  **A. I think that was an agreed-to rule.**
2  Q. Agreed to among this group of folks that
3  you've identified?
4  **A. I think so, yes.**
5  Q. Do you know of any instance in which any of
6  that information leaked out from your --
7  from the House side before the final map was
8  released?
9  **A. I don't think so but I -- again, seven and a**
10 **half years ago, I could have missed**
11 **something.**
12 Q. But as you sit here today, your
13 recollection, it sounds like, is that you
14 kept the information in that group fairly
15 successfully pending the final map?
16 **A. I think so, yes.**
17 Q. And that was what you intended?
18 **A. Until we were ready to release it, yes.**
19 Q. And where did Mr. McMaster work? Where did
20 he do this line drawing?
21 **A. In the House of Representatives, everybody**
22 **gets -- all the representatives have an**
23 **office assigned to them based on their**
24 **district number. So I had one, I believe it**
25 **was the eighth floor of the House office**

### Page 49

1  **building. My office that I used was in The**
2  **Capitol Building, so that office was**
3  **available. So we thought it was best to use**
4  **that as the office for redistricting since**
5  **it wasn't used by me but I still had control**
6  **of it.**
7  Q. As Committee Chair?
8  **A. I had control of that office because my**
9  **district number was 36, my predecessor who**
10 **had 36 was in that office and my successor**
11 **who had 36 was in that office. So since I**
12 **wasn't using it actively for day-to-day**
13 **parts of my job, it was available and we**
14 **chose to use that one.**
15 Q. So, was Mr. McMaster physically located
16 there?
17 **A. Yes.**
18 Q. And that's the eighth floor of the
19 House office?
20 **A. I believe it was the eighth floor.**
21 Q. Is that just nearby here, nearby the
22 State --
23 **A. Across the street from the Capitol.**
24 Q. And who else had access to that office --
25 **A. I believe it was -- sorry. Go ahead.**

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-13, PageID.3191   Filed 09/21/18   Page 5 of 7

Deposition of Pete Lund - 8/13/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 74

1    could move to a better district or exactly
2    what it was.
3    Q. Was she upset about this?
4    A. I don't remember her being upset but, again,
5    that was -- that meeting was seven years
6    ago. I --
7    Q. So, when you told her this about the map
8    that you were preparing and what the choice
9    is that you described, what was her response
10   to you?
11   A. She wasn't interested. She was going to be
12   running for county clerk.
13   Q. Did you get her vote?
14   A. No.
15   Q. Now, she told you she didn't care because
16   she was going to run for county clerk and it
17   didn't matter, or did she run for county
18   clerk because of the map that was being
19   drawn?
20   A. I really don't remember. I think it was
21   rumored at least that she was planning on
22   running for clerk.
23   Q. What about Mr. Stallworth? Tell me about
24   your meeting with Mr. Stallworth.
25   A. I remember meeting with the Democrats from

## Page 75

1    Detroit overall -- not all of them, but
2    several of them representing multiple ones.
3    I'm not sure if they represented all of them
4    or not, I don't recall, but we tried to come
5    up with a plan where we could get their
6    support for the maps.
7    Q. So, Mr. Stallworth was in that kind of
8    collective meeting?
9    A. I believe so.
10   Q. Mr. Durhal was in that meeting?
11   A. I believe so.
12   Q. Who else was in that meeting from the
13   Democratic side?
14   A. I think there was one or two more. We had
15   multiple meetings, so I don't remember who
16   all came in and out.
17   Q. And on your side, it was you and who else?
18   Was it Mr. Bolger?
19   A. I don't remember.
20   Q. You don't remember ever meeting at all with
21   Mr. Bolger with the Detroit Democrats to --
22   A. I --
23   Q. Excuse me.
24   A. Okay.
25   Q. You don't remember ever meeting together

## Page 76

1    with Mr. Bolger with Detroit Democrats to
2    talk about the redistricting maps?
3    A. I don't remember if that happened or didn't
4    happen.
5    Q. What do you remember about those meetings?
6    A. Trying to explain that we would be more than
7    willing to let them draw the lines in
8    Detroit as long as they followed the rules
9    and they wouldn't hurt us legally from
10   getting passed if they were willing to
11   support the map as -- you know, with their
12   version of Detroit.
13   Q. So the deal that you were offering was your
14   group would draw the rest of the map in the
15   way you wanted to draw it, they could draw
16   Detroit in the way they wanted to draw it as
17   long as it's all within the law and that
18   would be the deal?
19   A. Yes.
20   Q. And was that with regard just to the House
21   map, or was it with regard to other maps?
22   A. State House.
23   Q. State House only?
24   A. (Nodding.)
25   Q. And how was that offer received?

## Page 77

1    A. They seemed open to it and they tried -- and
2    drew several versions of maps.
3    Q. And were they -- were those adopted?
4    A. No.
5    Q. Why not?
6    A. Legally, we were told that they would not
7    stand up.
8    Q. And this came from whom?
9    A. I believe our attorneys.
10   Q. And what was -- what were you told the
11   problem would be with the maps that were --
12         MR. ELLSWORTH: Objection: Calls
13   for privileged information.
14   BY MR. YEAGER:
15   Q. Did you end up then not making this deal
16   with the Detroit Democrats?
17   A. Correct.
18   Q. And it's your testimony that it's simply
19   because their proposed districts, based on
20   the advice you got, would not be legal?
21   A. Correct.
22   Q. That's the only reason?
23   A. Yes.
24   Q. Did you communicate back to them that they
25   needed to draw a legal map so that you could

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-13, PageID.3192   Filed 09/21/18   Page 6 of 7

Deposition of Pete Lund - 8/13/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 86

1  A. From Representative Paul Scott.
2  Q. Okay. Tell me about that.
3  A. He was upset with his district. He wanted
4     things that we didn't feel were legal but
5     would be better for him politically. There
6     were some things that the map drawers I
7     believe changed that made him a little bit
8     happier but not anywhere near what he
9     wanted.
10 Q. I assume -- did the changes that the map
11    drawers made in response to Mr. Scott's
12    comments still result in a legal map?
13 A. Yes, I believe so.
14 Q. Well, you didn't propose a map that you
15    didn't believe was legal?
16 A. Correct.
17 Q. Okay. And if I hear you right, you did what
18    you could for him politically within the
19    bounds of the law?
20 A. There were some accommodations made.
21 Q. What -- what were the accommodations?
22 A. I don't recall the details, but it was the
23    overall map design for his district changed
24    a little bit, I believe.
25 Q. When you had these meetings with these

Page 87

1     members, did you have data on the political
2     makeup of the old and new districts?
3  A. I only remember showing them the map. I
4     don't remember if that contained any data or
5     not.
6  Q. Okay. So we know that the map makers --
7     well, let me start over.
8        Did you yourself know that the line
9     drawers had, you know, statewide political
10    historical data that they could use to judge
11    draft maps and existing maps?
12 A. I don't recall what they had and didn't
13    have.
14 Q. Do you recall that they had political data
15    that they could make judgments about maps?
16 A. Don't recall what data they had and didn't
17    have.
18 Q. So, you think when -- do you think that when
19    the map makers would draw a draft map, they
20    just didn't have any way to judge how that
21    district had performed in the past or would
22    have performed in the past or might perform
23    in the future?
24 A. I'm sure they could have figured it out if
25    they didn't have the data available.

Page 88

1  Q. But you didn't look at that data?
2  A. I don't recall looking at that data.
3  Q. And you don't recall sharing that data in
4     these meetings with these members?
5  A. I don't but again, it's over seven years
6     ago, and just don't remember all the details
7     like that. I remember there being the
8     map -- I remember showing them the old map
9     and the new map. I don't recall there being
10    any other data associated with it. It could
11    have been. Again, it's over seven years.
12 Q. So assuming that there was no political data
13    shown to those members in those meetings
14    that you're describing, assuming that's the
15    way it happened, they would just be -- they
16    would just have to make their own judgments
17    about how their new district might compare
18    to their old district politically?
19 A. Yes.
20 Q. And they would have to do that based on
21    whatever information they had about the lie
22    of the land so to speak?
23 A. I believe so, yes.
24 Q. Because you don't recall the caucus giving
25    them that information?

Page 89

1  A. I don't recall it, no.
2  Q. So Mr. Scott, when you talked to him and
3     made the changes that you described, what
4     was his specific complaint?
5  A. I don't remember the specifics of what he
6     didn't like about it. I just remember him
7     being very upset with it.
8  Q. He was very upset, you say?
9  A. Yes, um-hmm.
10 Q. Did his complaint have anything to do with
11    how hard he thought it would be for him to
12    win in that district?
13 A. I believe so.
14 Q. Had he been paired with some other
15    incumbent?
16 A. I don't think so.
17 Q. So it was more directed towards the
18    political makeup of the new district?
19 A. I believe so.
20 Q. And that problem was mitigated somewhat by
21    these changes that you described?
22 A. I believe somewhat.
23 Q. And how many times did that happen either
24    earlier in the process informally or towards
25    this part of the process where the district

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-13, PageID.3193   Filed 09/21/18   Page 7 of 7

Deposition of Pete Lund - 8/13/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 98

1  there was some legal constraint on your and
2  your caucus' use of political
3  considerations, by which I mean
4  Democrat/Republican considerations in
5  drawing the maps?
6       MR. ELLSWORTH:  And I'm going to
7  object to the extent that that might call
8  for attorney/client privileged information.
9  Go ahead and answer it, but, Mr. Lund, don't
10 discuss any advice that you got from
11 lawyers.
12      MR. YEAGER:  Let's go one step at a
13 time to make this workable.
14 BY MR. YEAGER:
15 Q.  So, let me -- if you could answer that
16 question maybe yes or no and then we'll go
17 on?
18      MR. YEAGER:  Could you read the
19 question back.
20      (Question read back.)
21      THE WITNESS:  I don't recall what
22 considerations like that there were
23 politically or not politically.
24 BY MR. YEAGER:
25 Q.  You don't recall having that concern?

Page 99

1  **A.  I -- again, it's over seven years ago.  I**
2  **don't remember all of those.  You know,**
3  **again, I tried to rely on legal things.  I**
4  **had my attorney next to me in almost all of**
5  **these meetings to make sure that we followed**
6  **the law as we understood it.**
7  Q.  All right.  I'm going to ask you another --
8  this time really a yes-or-no question, so
9  your lawyer can -- can manage this.
10      Did any -- given what you just told
11 me, did any of the lawyers, your lawyers or
12 anybody else's lawyers, ever indicate to you
13 that you had some legal constraint on
14 drawing maps that favored Republicans more
15 than Democrats?
16      MR. ELLSWORTH:  Objection:  Calls
17 for privileged information.
18      MR. YEAGER:  Well, if the answer
19 is --
20      MR. ELLSWORTH:  I'm instructing him
21 not to answer.
22      MR. YEAGER:  Well, if the answer is
23 no, there's no privileged communication.  If
24 the answer is yes, then I'm cut off.
25      MR. ELLSWORTH:  You're asking if he

Page 100

1  had a conversation, not what the
2  conversation was?
3       MR. YEAGER:  Correct.
4       MR. ELLSWORTH:  Okay.  That's fine.
5  Do you understand that, Mr. Lund?
6       THE WITNESS:  Could you repeat it,
7  please.
8       MR. YEAGER:  (Indicating.)
9       (Question read back.)
10      THE WITNESS:  I don't recall the
11 specifics of constraints that way one way or
12 the other.
13 BY MR. YEAGER:
14 Q.  Do you recall that indication having been
15 given to you generally?  You say the
16 specifics --
17 **A.  I don't recall one way or the other**
18 **generally.**
19      **(Discussion off the record.)**
20      **(A recess was taken.)**
21 BY MR. YEAGER:
22 Q.  So, Mr. Lund, we've talked quite a bit about
23 the process of drawing the House maps.  Did
24 you have any involvement in the drawing of
25 the State Senate maps?

Page 101

1  **A.  No.**
2  Q.  So, obviously both Houses ultimately had to
3  vote on the maps as adopted.
4       Was there negotiation that you were
5  involved in with members in the House to get
6  votes for the Senate map or did that somehow
7  work differently?
8  **A.  They were in the same bill.**
9  Q.  So, these conversations that you were having
10 with folks to -- to get votes were aimed at
11 getting votes for the -- for both House
12 maps -- I'm sorry, for both chambers' maps?
13 **A.  The bill that contained both the two**
14 **chambers' maps, yes.**
15 Q.  And what about the bill that contained the
16 congressional map, was that a subject of
17 discussion in those same meetings?
18 **A.  I don't believe so.**
19 Q.  Who was out trying to get votes for that
20 map?
21 **A.  I don't recall there being specific**
22 **discussions with members on the US House**
23 **map.**
24 Q.  So, you just don't know who, so to speak,
25 whipped those votes?