# APPENDIX O

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-16, PageID.3202   Filed 09/21/18   Page 2 of 3

Deposition of Joe Hune - 8/22/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

**Page 110**

1  then the next line says "And he said it with a
2  straight face."
3    What do you understand that to mean?
4  A  I have no idea. I don't even know who wrote it.
5  Q  Okay. Well, as you read it here today, what do you
6  understand the implication to be?
7  A  Well, I said earlier I'm an awful jovial fellow,
8  and I'm always smiling, so maybe that's it.
9  Q  Okay. You can put that one aside.
10    What discussions have you had with Thad
11  McCotter about the Apol standards?
12    And you rolled your eyes. Why did you do
13  that?
14  A  I don't know Thad well, but if you ever talked to
15  him, he's always the smartest man in the room.
16  Q  Okay. So that answers the question why you rolled
17  your eyes.
18    What discussions did you have with him
19  about the Apol standards?
20  A  I don't recall any specifics. I believe I chatted
21  with the congressman once on the issue.
22  Q  What do you recall about that conversation?
23  A  He was more interested in talking about labor law.
24  The most bizarre fellow you could probably ever
25  meet.

**Page 111**

1  Q  But what do you recall about your conversation with
2  him about Apol criteria?
3  A  I don't recall any specifics.
4    (Deposition Exhibit Number 255
5    was marked for identification.)
6  Q  (MR. KELLEY) Okay. I'm going to hand you a
7  document that's been marked as Exhibit 255 which
8  has a Bates number Timmer000747. Take a look at
9  that -- and you're not on this email, so don't look
10  for your email address -- but I'm going to ask you
11  some questions about what Mr. McCotter had to say.
12    Have you seen this document before?
13  A  I don't think so.
14  Q  Have you ever talked with Mr. LaBrant about Apol
15  criteria?
16  A  Sure.
17  Q  Okay. Specifically with reference to what
18  Mr. McCotter is referencing in this email, have you
19  talked to Mr. LaBrant about Apol criteria?
20  A  I don't recall any specifics or anything.
21  Q  Do you have an understanding of what Mr. McCotter
22  was referencing when he said "the left's BS line on
23  Apol"? Do you have any idea what that means?
24  A  No.
25  Q  Do you agree with Mr. McCotter that there is,

**Page 112**

1  quote, wide discretion in lines, close quote?
2  A  My testimony has been just contrary to that all
3  day.
4  Q  Okay. So it's fair to say that you and he have a
5  fundamental disagreement about the Apol criteria
6  and what they do or do not allow?
7  A  Absolutely.
8  Q  Okay. The last sentence of his email is "You may
9  need to help educate them before they say too many
10  regrettable things publicly."
11    Did anyone ever talk to you about the way
12  that you spoke about Apol criteria?
13  A  I don't think so.
14    MR. KELLEY: Okay. You can put that one
15  aside.
16    Let's take a quick break if it's okay.
17    MR. HANSELMAN: Yeah.
18    (Break taken at 1:45 p.m.)
19    (Break concluded at 1:56 p.m.)
20  Q  (MR. KELLEY) Senator, we're back from a quick
21  break. You understand you're still under oath?
22  A  Yes.
23  Q  The process for actually drawing the maps that came
24  out of the 2011 redistricting effort, I believe you
25  testified earlier that it was Mr. Marquardt who did

**Page 113**

1  the bulk of that work to draw the maps. Is that
2  correct?
3  A  Correct.
4  Q  When did that effort begin? Do you know when he
5  began working on the maps?
6  A  I don't.
7  Q  From my review of some of the documents, it appears
8  that it may have begun around the time that the
9  census data were delivered. Is that generally
10  consistent with your recollection?
11  A  Sure.
12  Q  It's not inconsistent with your recollection?
13  A  Correct.
14  Q  Okay. I'm going to show you a document that will
15  be marked as Exhibit 256.
16    (Deposition Exhibit Number 256
17    was marked for identification.)
18  Q  (MR. KELLEY) Document 256 has a Bates number of
19  SENATE0006121. Just take a moment, please, and
20  review that document, and let me know when you've
21  had a chance to do so.
22  A  Okay.
23  Q  First of all, do you have any recollection of
24  seeing this email before?
25  A  Vague.

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-16, PageID.3203   Filed 09/21/18   Page 3 of 3

Deposition of Joe Hune - 8/22/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

### Page 162

1  Q   Okay. What do you recall about the content of that
2      hearing, specifically about Mr. Gordon's testimony?
3  **A   I remember seeing Gary. Of course, this was seven**
4  **    years ago. I remember seeing Gary. I don't**
5  **    remember the content, details of the content.**
6  Q   What was the purpose of Mr. Gordon testifying at
7      the hearing about the Apol criteria?
8  **A   To discuss the standards we have in place.**
9  Q   This is just a yes or no question. Yes or no: You
10     were receiving legal advice about the application
11     of the Apol criteria to the maps that were being
12     drawn in the 2011 redistricting process, correct?
13     Well, yes or no?
14 **A   I don't know if you can call that legal advice**
15 **    when -- because he's an attorney but testifies in**
16 **    front of a committee, gives you a dissertation,**
17 **    some --**
18 Q   That's fair. I asked a bad question.
19     Not speaking about the hearing in
20     particular, at these, for example, at the Dickinson
21     Wright meetings where Mr. Ellsworth and Mr. Stuckey
22     were present, you from time to time received legal
23     advice about the application of the Apol standards
24     to the maps that were being drawn, correct?
25     MR. SHANNON: I'm going to object on the

### Page 163

1   basis of attorney-client privilege and instruct my
2   client not to answer.
3       MR. KELLEY: I mean, that would appear on
4   a privilege log, right, communication about Apol
5   standards?
6       MR. SHANNON: But you asked the follow-up
7   which was application to the maps at issue.
8       MR. KELLEY: Well, they don't apply in a
9   vacuum.
10      MR. SHANNON: But you're asking a more
11  specific question here.
12      MR. KELLEY: Okay.
13 Q  (MR. KELLEY) Did you receive legal advice about the
14     Apol criteria at any of these Dickinson Wright
15     meetings?
16      MR. KELLEY: Can he . . .?
17      MR. SHANNON: (Moves head up and down.)
18      THE WITNESS: Yes.
19 Q  (MR. KELLEY) Okay. So if you were receiving legal
20     advice in private at these Dickinson Wright
21     meetings, then why did you need Mr. Gordon to speak
22     at the hearing about the Apol criteria?
23 **A   We had multiple members on the Redistricting**
24 **    Committee, and the public needed to be educated as**
25 **    well that needed to be informed of the Apol**

### Page 164

1      standards.
2  Q   So is that part of the building a record that we
3      talked about?
4  **A   I'm not sure what you're referring to.**
5  Q   Exhibit 259, which is LEGR005291, there's a
6      handwritten notation to, in the upper right-hand
7      corner, building a record.
8  **A   I think it's building a record and informing and**
9  **    educating my committee members and educating the**
10 **    public.**
11 Q   Okay. Back to Exhibit 261. Next to Number 2,
12     which is "database status update and political
13     data," there's some handwritten notations including
14     "Do it right - not fast."
15     Do you recall being at a meeting in which
16     that message was conveyed, do it right, not fast?
17     MR. SHANNON: I'm going to object on the
18     basis of attorney-client privilege and instruct my
19     client not to answer to the extent the meeting
20     involved attorneys and was for the purpose of
21     seeking legal advice.
22 Q  (MR. KELLEY) Well, let's just break it down.
23     Did you ever receive that message, "Do it
24     right, not fast," in connection with the
25     redistricting process?

### Page 165

1       MR. HUGHES: Object to the extent that an
2   attorney -- that it was advice from an attorney in
3   a meeting, subject to attorney-client privilege.
4       MR. KELLEY: Yeah, but we need --
5       MR. HUGHES: Breaking it down does not --
6       MR. KELLEY: We need to determine whether
7   an attorney was there, and you're not letting him
8   answer the question to get to whether an attorney
9   was there.
10      If he had -- I mean, we disagree the mere
11  presence of an attorney cloaks the entire
12  conversation with privilege, but accepting that for
13  the moment, we need to decide whether a lawyer was
14  there or not, right? So, I mean, he needs to be
15  able to answer that question, does he not?
16      MR. HUGHES: He can answer to the extent
17  that it does not involve a communication subject to
18  the attorney-client privilege.
19      MR. KELLEY: And a yes or no answer won't
20  involve a communication that's subject to the
21  attorney-client privilege.
22      MR. SHANNON: It may well. So to the
23  extent it involved an attorney-client privilege, my
24  instruction is not to answer. To the extent that
25  it did not, then the instruction is you may answer