# APPENDIX P

Deposition of Robert LaBrant - 8/10/2018
League of Women Voters of Michigan Et Al. v. Ruth Johnson

### Page 26

1  MR. GORDON: That's correct.
2  MR. YEAGER: Okay. Give me one moment. This is
3  going to be an exhibit. It has a cover sheet, Exhibit A,
4  because it was filed somewhere. Mark this as LaBrant 1.
5  MR. GORDON: I thought you were going to use
6  Bates numbers.
7  MR. YEAGER: Right. This one doesn't have Bates
8  numbers.
9  (At 9:09 a.m., Deposition Exhibit Number 1 and
10  Number 2 were marked.)
11  MR. YEAGER: Let's mark this as LaBrant 2.
12  BY MR. YEAGER:
13  Q. So, Mr. LaBrant, I'm gonna put in front of you two
14  documents marked as Exhibit 1 and Exhibit 2, and I know
15  it's a little confusing because the document itself has a
16  boldface Exhibit A. You can ignore that for now.
17  A. Okay.
18  Q. When I refer to Exhibits 1 and 2, I'm referring to the
19  stickers that the reporter has just put on.
20  Exhibit 1, LaBrant 1, do you recognize that
21  document?
22  A. Yes, I do.
23  Q. And what is that, sir?
24  A. It's a subpoena.
25  Q. Okay. It's a subpoena to you?

### Page 27

1  A. That's correct.
2  Q. Now, this particular copy I see doesn't have the attached
3  list, so we'll stipulate that it doesn't have the list.
4  When this exhibit was served -- when this
5  subpoena was served on you, it had a list of documents
6  attached?
7  A. Uh-huh.
8  Q. And tell me what you did in response to that subpoena.
9  A. I contacted Gary and we discussed the matter. I had a
10  conversation about where the computer in the Michigan
11  Chamber of Commerce might be and I was told that that
12  computer was no longer in the possession of the Michigan
13  Chamber of Commerce.
14  Q. And was that a conversation that you had with Mr. Gordon
15  about the location of that computer, where you learned
16  that, or did you talk to somebody at the Chamber?
17  A. I think either I had a conversation with Jim Holcomb, or
18  Gary had a conversation with Jim Holcomb. I can't recall.
19  Q. And can you tell us who Jim Holcomb is?
20  A. He's the Vice President at the Michigan Chamber of
21  Commerce.
22  Q. And what computer are you referring to?
23  A. When I was at the Michigan Chamber of Commerce, I had a
24  desktop computer, and when I left the Chamber in March of
25  2012, I just left it and so whatever, you know, emails I

### Page 28

1  might have had on that computer stayed on that computer.
2  I didn't take any with me. So that's -- the Chamber has
3  and I.T. person that basically, you know, kinda gets rid
4  of things periodically, I think once every, you know,
5  certain number of years.
6  Q. And so the understanding you got back from Mr. Holcomb,
7  either directly or through Mr. Gordon, was that that
8  computer no longer was in the possession of the Chamber?
9  A. That's correct.
10  Q. Okay. And at the time that you were there and using the
11  computer that you described, was that computer networked
12  within the Chamber to other computers?
13  A. I believe it was.
14  Q. Do you know whether there was a server that the Chamber
15  had that served that network?
16  A. I -- I was not the I.T. person, but I'm sure that there
17  was a server that did that function.
18  Q. And do you know anything about where that server is today?
19  A. I have no idea.
20  Q. You didn't discuss that with Mr. Holcomb directly?
21  A. I think he indicated that they did a search, because they
22  were also under some similar subpoena, and they did a
23  search of all of their computer system and it was no
24  longer there.
25  Q. Okay. And as you talk about this, do you remember whether

### Page 29

1  that was a conversation that you had yourself with
2  Mr. Holcomb or whether you learned this through an
3  intermediary?
4  A. I don't remember.
5  Q. So you've mentioned a subpoena that the Chamber got.
6  Would you look at Exhibit 2, LaBrant 2?
7  A. Oh, okay.
8  Q. Have you ever seen that before?
9  A. No.
10  Q. You were not at the Chamber at the time?
11  A. No, I wasn't.
12  Q. Did you have any documents yourself that were responsive
13  to the subpoena?
14  A. No. I think over the last six-and-a-half years since I
15  left the Michigan Chamber, things that related to
16  redistricting I think got tossed. I mean we'd already
17  gone through three different election cycles since that
18  time. And --
19  Q. Did you have that?
20  When you left the Chamber, did you take
21  documents, either electronically or physically, with you?
22  A. No. I took a lot of books.
23  MR. YEAGER: Call that Number 3.
24  (At 9:16 a.m., Deposition Exhibit Number 3 was
25  marked.)

**Deposition of Robert LaBrant - 8/10/2018**
**League of Women Voters of Michigan Et Al. v. Ruth Johnson**

Page 138

1  Q.  Did you ever have any discussion with Mr. Timmer about
2      pairing Republicans rather than the two Democrats that
3      were paired?
4  A.  I don't recall a conversation.
5  Q.  It wouldn't be realistic to expect that to happen, given
6      Republican control of the process; isn't that fair to say?
7  A.  You still need 56 votes in the House and 20 votes in the
8      Senate to pass a bill.
9  Q.  Okay. What do you mean by that?
10 A.  Well, I mean, you know --
11 Q.  It takes Republicans to pass it because Republicans
12     controlled the legislature in the Governor's Office;
13     right?
14 A.  That's correct.
15 Q.  It wouldn't be realistic to think, under those
16     circumstances, that the Republican, the Republican
17     Congress people would be paired rather than the two
18     Democrats; is that fair to say?
19 A.  Oh, I, I don't disagree.
20 Q.  Okay.
21         (At 1:27 p.m., Deposition Exhibit Number Timmer
22         415 was marked.)
23 BY MR. YEAGER:
24 Q.  So, Mr. LaBrant, we just handed you what's marked as
25     Exhibit Timmer 415, which is a several-page memorandum

Page 139

1  identified as coming from Jeff Timmer and Steve Linder to
2  you, December 22nd, 2010.
3         I'll just ask you, as a preliminary matter,
4  whether you remember this document?
5  A.  I remember he had some ridiculous price that he wanted to
6      charge me.
7  Q.  This is his proposal, Mr. Timmer's proposal to be hired?
8  A.  That's correct.
9  Q.  Where's the ridiculous price?
10 A.  Oh, back on the last page, I think it was.
11 Q.  So it was -- did you end up negotiating that price?
12 A.  I'm sure we did. I didn't pay that kinda money.
13 Q.  Okay. So his fees would be a matter of negotiation at the
14     outset?
15 A.  Yes.
16 Q.  Okay.
17 A.  Yes.
18 Q.  Okay. Do you recall whether this was the proposal that
19     was specifically accepted or whether there was another
20     version or a contract entered into?
21 A.  There was another version. I mean I think they wanted to
22     do a heck of a lot more than I wanted them to do.
23 Q.  What did they want to do that you didn't want them to do?
24 A.  I don't know. But all I wanted them to do was draw a map.
25 Q.  Okay. And what did they want to do?

Page 140

1  A.  They wanted to do everything, I think, you know.
2  Q.  So are you, are you telling me that the scope of work --
3  A.  The scope of the proposal was narrowly compressed.
4  Q.  From what we see here in Exhibit 415?
5  A.  Yes.
6  Q.  Okay. And your recollection is that the scope ended up
7      being drawing the maps -- I'm sorry -- drawing the map and
8      this would be the congressional map?
9  A.  That was the scope of Jeff Timmer's activity was primarily
10     to draw the congressional map.
11 Q.  Okay. Were there others at Sterling that did other
12     things?
13 A.  Linder was involved in some fundraising activities.
14 Q.  Okay. And why were, why were -- why was Sterling, I'll
15     say, making a proposal to Bob LaBrant rather than a
16     proposal to Republican caucus leaders or Republican
17     staffers or other entities?
18 A.  I don't know. Probably because they had a relationship
19     with me.
20 Q.  Did you understand this proposal to be made to you in your
21     role as President of MRRI?
22 A.  Yes.
23 Q.  Okay. So it was MRRI that handled -- that hired Sterling?
24 A.  That was the -- yeah, MRRI, you know, hired Sterling for
25     some fundraising activities and also for some

Page 141

1  redistricting activities as it related to the
2  congressional map.
3  Q.  Right. And that was what you described a moment ago, map
4      drawing?
5  A.  Yes.
6  Q.  Was Sterling hired but for anything else, that you're
7      aware of?
8  A.  Not beyond those two activities that I just talked about.
9  Q.  Were they hired to give legal advice?
10 A.  No.
11 Q.  Okay.
12 A.  Then we could hit them with practicing law without a
13     license.
14 Q.  Oh, they're not lawyers.
15         And you'd already hired laws, right, to get the
16  legal advice?
17 A.  Uh-huh.
18 Q.  Okay. Now, at the first paragraph of Mr. Timmer and
19     Mr. Linder's memorandum of December 22nd, 2010 --
20 A.  Which page are we talking about, sir?
21 Q.  It's the first paragraph on Exhibit -- I'm sorry. Page 1,
22     the first page.
23 A.  Yeah.
24 Q.  They say, in the second sentence, "The table is set in
25     similar fashion to the last decade", and it goes on from

**Deposition of Robert LaBrant - 8/10/2018**
**League of Women Voters of Michigan Et Al. v. Ruth Johnson**

### Page 154

1    or whole cities or whole townships and just basically
2    doing, you know, census geography, put together a district
3    that didn't conform with political subdivisions, I mean we
4    weren't interested.
5  Q. Did you ever see this 10/4 map?
6  A. I don't remember. I think I just heard that they had a
7    10/4 map.
8  Q. So you don't know how compact the districts were or were
9    not on that map?
10 A. To tell you the truth, I don't recall.
11 Q. Okay. Do you agree that one could have a gerrymander, a
12    partisan gerrymander of a map without obviously noncompact
13    districts?
14 A. I think Sandra Day O'Connor would say that if it was a
15    strange-looking district, that was kind of an obvious
16    gerrymander.
17 Q. Right. I'm asking the next question --
18 A. Okay.
19 Q. -- which is if you don't have that obvious district and
20    you have districts that are, in some sense, sort of
21    visibly more or less compact --
22 A. I think the question is, you know, if you employ
23    traditional redistricting criteria, okay, that basically
24    uses counties and cities and townships, you know, is that,
25    you know, is that basically a gerrymander even though it

### Page 155

1    basically adheres to traditional redistricting criteria.
2    And that's what basically I think the, the, the
3    redistricting litigation of 2015 through '18 was all
4    about, and, and frankly we have no answer to that
5    question.
6  Q. Let me ask a better question.
7  A. Okay.
8  Q. I mean better, more, more understandable, I hope.
9      Do you agree or disagree that even absent
10    drawing visibly noncompact districts, one could still draw
11    a map that increases the seat share the Republican party
12    would get for the same vote share?
13 A. The question again was?
14 Q. Do you agree or disagree that even absent using visibly
15    noncompact, gerrymandered-looking districts, one could
16    still draw maps, complying with Apol criteria, that would
17    materially increase the number of seats that the
18    Republican party would get let's say in Michigan for the
19    same number of votes?
20 A. I don't think a map that adhered to traditional
21    redistricting criteria and maintained political
22    subdivision boundary lines is unconstitutional.
23 Q. That wasn't my question.
24 A. Okay.
25 Q. My question was do you agree or disagree that the map you

### Page 156

1    just described could nonetheless -- regardless of whether
2    it's constitutional or not, we can argue about that --
3    could nonetheless increase, materially, the vote share
4    that the Republicans would get for a particular seat
5    chair -- I'm sorry, let me start over -- would increase
6    the seat chair that the Republicans would get for a
7    particular vote share?
8      MR. ELLSWORTH: I'm sorry. You said the map.
9    What is that map?
10     MR. YEAGER: Well, the map he was referring to,
11   but let's start --
12     MR. ELLSWORTH: The 10/4 map?
13     THE WITNESS: The 10/4 map?
14     MR. YEAGER: No, no. No, no. Let's start over.
15 BY MR. YEAGER:
16 Q. This is a hypothetical map.
17 A. Okay, a hypothetical map.
18 Q. And we were talking about -- you used the term here
19    obvious gerrymandering, and I'm trying to ask about that a
20    little bit.
21 A. Okay.
22 Q. I thought I understood you to say, in referring to a map
23    that did not look like an obvious gerrymander, I thought I
24    understood you to say that you meant a map you could look
25    at and see districts that looked like they're

### Page 157

1    gerrymandered because they were irregular.
2      Is that what you meant?
3  A. Well, in this particular paragraph, I said, you know, if
4    you got an obviously-looking gerrymandered plan, okay,
5    that's, you know, that's, that's subject to getting tossed
6    by the court. If it's, if it's not compact, it violates,
7    you know, traditional redistricting criteria. That's,
8    that's an obvious gerrymander that frankly is susceptible
9    to, to being challenged.
10 Q. You said something a moment ago about you thought a
11    particular kind of map was not unconstitutional. Let me
12    ask you about that.
13     What is your understanding of what the
14    constitutional limits are on, on map drawing for partisan
15    advantage?
16     MR. ELLSWORTH: I'm going to object because I
17   think that calls for a legal conclusion. He is a lawyer,
18   but I don't know, I don't know that he's ever looked at
19   that kind of question. But --
20 BY MR. YEAGER:
21 Q. You can answer. And I should add I don't mean to presume
22    that you have an opinion on that. I guess I did. If you
23    just don't have an opinion on that, you can say that as
24    well.
25 A. Well, I don't have an opinion on that.

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 121-17, PageID.3208   Filed 09/21/18   Page 5 of 6

Deposition of Robert LaBrant, Vol.II - 8/20/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, the Secretary of the State of Michigan

## Page 211

1  A. That's correct.
2  Q. So Amash didn't like --
3  A. Well, I mean, he expressed some dissatisfaction with it. But
4     he didn't go crazy.
5  Q. Okay. So let's make sure the record is clear because I had
6     misunderstood what you were trying to tell me.
7        So Representative Amash who was the incumbent in
8     the 3rd district towards the end of the process expressed
9     some unhappiness with that configuration of the 3rd district?
10 A. That's my understanding.
11 Q. Okay.
12 A. I mean I had no conversation with him, but I think --
13 Q. So when the -- when you look at the parts of the 2nd -- I'm
14    sorry. When you look at the parts of Kent County that are
15    moved into the 2nd district, if those were Republican areas
16    that were taken out of Kent County and put in the 2nd
17    district instead of the third, that might be a reason that
18    representative Amash would be unhappy?
19 A. Could be.
20 Q. Okay. Do you recall any reason --
21 A. I don't recall.
22 Q. Anything else you remember about the drawing in the 3rd
23    district?
24 A. That's about it.
25 Q. Okay.

## Page 212

1  A. I mean other than the fact that Calhoun was added to this
2     configuration (indicating).
3  Q. And what's the partisanship of Calhoun County? It looks like
4     Battle Creek is part of that county?
5  A. I think historically Calhoun County is obviously Battle Creek
6     and Albion, are kind of Democratic areas. Marshall has
7     traditionally been a Republican area. But Battle Creek is
8     the population base of the county.
9  Q. Do you recall Mr. Amash having any comment about Battle Creek
10    and/or the other parts of the Calhoun County being put into
11    his district?
12 A. I'm sure that that was one reason that he wasn't enthusiastic
13    about this configuration.
14 Q. And what do you recall about him -- we have some documents on
15    this, what do you recall about the partisanship, the baseline
16    partisanship of the 3rd district as it was drawn, about
17    what --
18 A. As this (indicating).
19 Q. Yes, sir, about what percentage, do you remember?
20 A. It was definitely a very Republican district, maybe not as
21    Republican as the second, but still a very Republican
22    district.
23 Q. And would it be your view that Mr. Amash did have some
24    comfort that he would be able to be okay in that district?
25 A. Yes.

## Page 213

1  Q. Okay. Fourth district, do you remember anything about the
2     4th district?
3  A. This is a district, the incumbent in this district was Dave
4     Camp. And I also happen to live in Shiawassee county. So I
5     was enthusiastic about having Dave Camp as my congressman
6     since he was, I think either the -- he might have been the
7     ranking chairman -- the ranking member on the Ways and Means.
8     Not looking for a tax break, but --
9  Q. Was he your congressman under the old map?
10 A. No. Mike Rogers was my congressman under the old map.
11 Q. So --
12 A. So there was a split in Shiawassee county which would have
13    been a needless split. And as a result, according to the
14    congressional redistricting guidelines legislation, this was
15    all wholly-contained counties, except for a portion of
16    Montcalm (indicating), and around Saginaw (indicating),
17    Saginaw County.
18 Q. Now the little, I'm going to a finger but it has a crook on
19    it here on the east end that goes up to Frankenmuth, how did
20    that come about?
21 A. Well we knew that there was always going to be a break in
22    Saginaw, population wise. I think you have an e-mail that
23    Mr. Timmer indicated that we could give Dave Camp
24    Frankenmuth.
25 Q. And why would that --

## Page 214

1  A. Just because I think he'd like -- it was a nice touristy kind
2     of community. I don't know, Camp probably wasn't German.
3        MR. YEAGER: Off the record.
4        (At 6:02 p.m. went off the record.)
5        (At 6:02 p.m. went on the record.)
6        MR. YEAGER: Okay, let's go back on.
7  BY MR. YEAGER:
8  Q. Okay. So you gave Mr. Camp Frankenmuth. Is it a Republican
9     area or Democratic area?
10 A. I think Frankenmuth is probably Republican.
11 Q. Okay. And then how were the lines drawn around Saginaw in
12    the manner they were drawn, what do you remember about that?
13    And I do mean Saginaw the city.
14 A. Frankly I don't recall. Timmer was the guy who was sitting
15    behind the computer.
16 Q. Okay. So the partisanship of the 4th district is fairly
17    Republican?
18 A. It's traditionally been Republican for, except for a very
19    short period of time when Don Albosta was a member of
20    Congress representing a significant portion of the 4th
21    district.
22 Q. I didn't ask a very clear question. This 4th district, the
23    2011 4th district, would you say that is a baseline
24    Republican county -- district?
25 A. Yeah. I think it's probably a baseline Republican district.

Case 2:17-cv-14148-ELC-DPH-GJQ ECF No. 121-17, PageID.3209 Filed 09/21/18 Page 6 of 6

Deposition of Robert LaBrant, Vol.II - 8/20/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, the Secretary of the State of Michigan

## Page 215

1. Q. Do you have any idea about what the baseline would be?
2. A. I have no idea.
3. Q. We'd just have to look to the numbers to see that?
4. A. Yeah.
5. Q. Fifth district, what do you remember about that? We talked
6.    about it a little bit from the other side, do you remember
7.    anything about the drawing of the 5th district?
8. A. Well one of the things we were able to accomplish by not
9.    splitting Shiawassee county was putting Iosco and Arenac in
10.    the 5th. And again no county split in Shiawassee, and
11.    these were wholly-contained counties, Iosco and Arenac in the
12.    5th.
13. Q. Where had they been before?
14. A. I believe that this would have been in the 4th district.
15. Q. Iosco?
16. A. The Iosco, Arenac.
17.    Or in previous redistricting this area might have
18.    been encompassed in the 1st district, when it was represented
19.    by Bart Stupak.
20. Q. And what's the partisanship, the baseline partisanship of the
21.    5th district, as drawn, the 2011 district?
22. A. Which year are you talking about?
23. Q. I'm sorry, the district we're looking at, the 5th district in
24.    the 2011 map, what kind of partisanship did that district
25.    have?

## Page 216

1. A. Well because you have it wholly contained in this district,
2.    Genesee County, it's quite -- it's Democratic. It has the
3.    City of Saginaw, Flint, Bay City.
4. Q. Those are three Democratic cities generally?
5. A. Yes.
6. Q. Okay.
7. A. And historically I think those communities have generally
8.    comprised -- have been included in a particular congressional
9.    district.
10. Q. And do you remember anything else about why that district was
11.    drawn the way it's drawn in 2011?
12. A. I don't recall anything beyond that.
13. Q. Okay. How about the 6th district, what do you remember about
14.    the way the 6th district was drawn?
15. A. With the exception of this little tiny portion of Allegan
16.    County that goes into Ottawa, (indicating), which was done in
17.    large measure to zero out the plan, you know,
18.    wholly-contained counties, you know, comprised the 6th. This
19.    is a district that Fred Upton was the incumbent going in, and
20.    he continues to represent the 6th district.
21. Q. And how would you describe the baseline partisanship of the
22.    6th district under this plan?
23. A. Well it's a district that has, Kalamazoo and Benton Harbor is
24.    contained in this district. It's, you know, it's a district
25.    that I think Democrats sometimes have some illusion they

## Page 217

1.    might win it. But I suspect as long as Fred Upton decides to
2.    run, he would be very difficult to defeat.
3. Q. And that little county line break there between Ottawa and
4.    Allegan, you said that was just done to zero out the
5.    population?
6. A. Pretty much, I think. Or maybe this is a wholly-contained
7.    city (indicating), that accomplishes that end. I'm not sure.
8. Q. Do you recall anything else about -- I'm sorry, I didn't mean
9.    to interrupt you.
10. A. I don't know. I suspect you can get a little more detail on
11.    that if you talk to Mr. Timmer.
12. Q. Okay. Do you remember anything else about why the 6th was
13.    drawn the way it is?
14. A. Because it looks pretty nice.
15. Q. You mean compact or --
16. A. Yeah.
17. Q. Okay. What about the 7th district, what do you remember
18.    about the 7th district?
19. A. The 7th district is a district that kind of went back and
20.    forth between Tim Walberg and Mark Schauer during that
21.    decade. Joe Schwarz represented that district for one term,
22.    and for also one term Nick Smith represented that district.
23. Q. And where did Mr. Schauer live, if you know?
24. A. He lived in Calhoun.
25. Q. So he was taken out of that district?

## Page 218

1. A. That's correct.
2. Q. And put over into the 3rd?
3. A. Yes.
4. Q. And was Mr. Walberg involved in that decision?
5. A. I never had a conversation with him about it.
6. Q. He didn't complain about it, did he?
7. A. I don't think so.
8. Q. Okay. What would you say the partisanship of the 7th
9.    district is as drawn on this map?
10. A. I don't know, it's -- I think it's one of the more marginal
11.    districts in the state. I mean, you know, when Calhoun went
12.    up here (indicating), Monroe, which had been represented by
13.    John Dingell, was put into the 7th district.
14. Q. Is Monroe county itself more Democrat or more Republican?
15. A. I think it's more Democrat, at least all of the county
16.    officials.
17. Q. Is it a big county by population?
18. A. It's a decent-size county. I don't know what the exact
19.    population is.
20. Q. Okay. Besides moving Calhoun out of that district and adding
21.    Monroe, do you recall anything else about why that district
22.    was drawn the way it was?
23. A. Well a lot of these districts, particularly in southeastern
24.    Michigan, had to kind of shrink. And --
25. Q. Why would it have to shrink?