# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS
OF MICHIGAN, et al.,

            Plaintiffs,

        v.

RUTH JOHNSON, in her official
Capacity as Michigan
Secretary of State, et al.,

            Defendants.

Case No. 2:17-cv-14148

Hon. Eric L. Clay
Hon. Denise Page Hood
Hon. Gordon J. Quist

**VOTERS' COMBINED
RESPONSE TO DEFENDANT
SECRETARY JOHNSON'S
MOTION TO DISMISS AND
MOTION FOR SUMMARY
JUDGMENT AND
CONGRESSIONAL
INTERVENORS' MOTION FOR
SUMMARY JUDGMENT**

Joseph H. Yeager, Jr. (IN 2083-49)
Kevin M. Toner (IN 11343-49)
Harmony A. Mappes (IN 27237-49)
Jeffrey P. Justman (MN 390413)
Daniel R. Kelley (IN 30706-49)
Matthew K. Giffin (IN 31603-49)
Matthew R. Kinsman (IN 32032-71)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Jay.Yeager@FaegreBD.com
Kevin.Toner@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com
Daniel.Kelley@FaegreBD.com
Matt.Giffin@FaegreBD.com
Matthew.Kinsman@FaegreBD.com

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
MBrewer@goodmanacker.com

*Counsel for Voters*

**VOTERS' COMBINED RESPONSE TO DEFENDANT SECRETARY JOHNSON'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT AND CONGRESSIONAL INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

In 2011 the Michigan legislature ruthlessly targeted Democratic voters by carefully drawing State Senate, State House, and Congressional district lines so as to dilute Democratic votes and maximize Republican votes. As a result, Democrats in district after district have had their voting power diluted, and their party has been unable to gain control of the legislature or the congressional caucus despite having over or very close to over half of the statewide vote. The Republicans weaponized the restricting process in order to target and dilute Democratic votes throughout Michigan. The results have proved durable and powerful for Republicans, but they have meanwhile undermined the most fundamental and cherished rights in our democracy.

In the wake of this Court's ruling on the Secretary's motion to dismiss, and of the Supreme Court's ruling in *Gill v. Whitford*, the Plaintiffs in this case, individual voters ("Voters") and the League of Women Voters of Michigan ("League") respectfully offer the Court detailed statistical, expert, testimonial, and documentary evidence showing the legislature's intent and the mechanics, district-by-district, of how the legislature accomplished that intent, and the impact on Michigan voters.  The factual record and the legal authorities discussed in the attached brief, and catalogued

1

in Exhibits 1-3, prove that by any standard the Voters in this case deserve their day in

Court.

Respectfully submitted,

Date:  October 12, 2018                    /s/ Joseph H. Yeager, Jr

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
Fax: 248-483-3131
MBrewer@goodmanacker.com

Joseph H. Yeager, Jr. (IN Bar No. 2083-49)
Kevin M. Toner (IN Bar No. 11343-49)
Harmony A. Mappes (IN Bar No. 27237-49)
Jeffrey P. Justman (MN Bar No. 390413)
Daniel R. Kelley (IN 30706-49)
Matthew K. Giffin (IN 31603-49)
Matthew R. Kinsman (IN 32032-71)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Fax: 317-237-1000
Jay.Yeager@FaegreBD.com
Kevin.Toner@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com
Daniel.Kelley@FaegreBD.com
Matt.Giffin@FaegreBD.com
Matthew.Kinsman@FaegreBD.com

*Counsel for Plaintiffs*

jsdavis.120126899.4.DOCX

**Certificate of Service**

I hereby certify that on October 12, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

Respectfully submitted,


/s/ Joseph H. Yeager, Jr.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF MICHIGAN, et al., | ) ) | Case No. 2:17-cv-14148 |
| | ) | |
| Plaintiffs, | ) | Hon. Eric L. Clay |
| | ) | Hon. Denise Page Hood |
| | ) | Hon. Gordon J. Quist |
| v. | ) | |
| | ) | **VOTERS' COMBINED BRIEF IN** |
| | ) | **RESPONSE TO DEFENDANT** |
| RUTH JOHNSON, in her official | ) | **SECRETARY JOHNSON'S** |
| Capacity as Michigan | ) | **MOTION TO DISMISS AND** |
| Secretary of State, et al., | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT AND** |
| Defendants. | ) | **CONGRESSIONAL** |
| | ) | **INTERVENORS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |

Joseph H. Yeager, Jr. (IN 2083-49)
Kevin M. Toner (IN 11343-49)
Harmony A. Mappes (IN 27237-49)
Jeffrey P. Justman (MN 390413)
Daniel R. Kelley (IN 30706-49)
Matthew K. Giffin (IN 31603-49)
Matthew R. Kinsman (IN 32032-71)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Jay.Yeager@FaegreBD.com
Kevin.Toner@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com
Daniel.Kelley@FaegreBD.com
Matt.Giffin@FaegreBD.com
Matthew.Kinsman@FaegreBD.com

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
MBrewer@goodmanacker.com

*Counsel for Voters*

## Issues Presented

This response addresses two motions for summary judgment and one motion to dismiss.  All should be denied in the face of the evidence amassed by plaintiffs establishing district-by-district harm and under the governing law, all of which demonstrate that the plaintiffs have viable, valid legal theories and substantial, concrete evidence to support them.  More specifically, these issues are before the Court:

- Whether the Court should deny the Secretary's and Congressional Intervenors' motion for summary judgment and the Secretary's motion to dismiss with respect to standing in light of the body of evidence showing concrete harm to individual Democratic voters who have been drawn into intentionally cracked and packed districts for purposes of diluting their individual votes and weakening their natural political strength as Democrats.

- Whether the Court should deny the Secretary's motion for summary judgment with respect to justiciability when there are workable and manageable standards, as the Voters demonstrate and satisfy, under both the Fourteenth Amendment and First Amendment theories.

- Whether the Court should deny as a matter of law Congressional Intervenors' motion for summary judgment on laches when the law of laches does not apply to this constitutional case seeking prospective, injunctive relief and when the evidence establishes genuine issues of fact with respect to the purported assertions of delay and resulting prejudice.

## Controlling or Most Appropriate Authorities

As to Defendants' Motion for Judgment on the Pleadings

*Ala. State Conference of NAACP v. State*, 264 F. Supp. 3d 1280, 1290 (M.D. Ala. 2017)

As to Defendants' Motion for Summary Judgment on Standing

*Gill v. Whitford,* 138 S. Ct. 1916, 1923 (2018)

*Common Cause v. Rucho*, 318 F. Supp. 3d 777 (M.D.N.C. 2018)

As to Defendants' Motion for Summary Judgment on Justiciability

*Gill v. Whitford,* 138 S. Ct. 1916, 1923 (2018)

*Common Cause v. Rucho*, 318 F. Supp. 3d 777 (M.D.N.C. 2018)

As to Congressional Intervenors' Motion for Summary Judgment on Laches

*Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997)

*France Mfg. Co. v. Jefferson Elec. Co.*, 106 F.2d 605, 609 (6th Cir. 1939)

*Ohio A. Phillip Randolph Institute v. Smith*, No. 1:18CV357, 2018 WL 3872330 (S.D. Ohio Aug. 15, 2018))

## Table of Contents

Background Facts and Admissible Evidence ..................................................................1

A.     The Republicans started with an advantage. ...........................................1

B.     The map drawing process in 2011 demonstrates partisan intent. .........................3

       1.     The Republicans effected a secretive, shielded, partisan process on
              an artificially abbreviated timeline. ...............................................4

       2.     The map drawers and the Republican members of the legislature
              used political data to draw, re-draw, and fine tune the partisanship
              of the proposed maps..........................................................8

C.     The Republicans crafted an effective and durable gerrymander. ........................13

D.     The gerrymander imposes real and concrete harm on Michigan citizens,
       including the Voters. .......................................................................19

Standard of Review ...........................................................................................22

Argument .....................................................................................................24

       I.     Gerrymandering is a scourge on democracy. ..............................................24

       II.    Voters have demonstrated their Article III standing. ................................25

              A.     Persons with a personal stake in a case have access to
                     Article III Courts.................................................................25
                     1.     Standing under the Equal Protection Clause ......................26
                     2.     Standing under the First Amendment...................................29

              B.     Voters properly pled the individualized harm necessary to
                     support standing..................................................................31
                     1.     The Court previously found that the Voters'
                            Complaint properly pled district-by-district standing.........32
                     2.     There is no reason to revisit the Court's ruling that
                            Voters' Complaint properly alleges standing. ......................34

              C.     Voters have demonstrated a genuine issue of material fact
                     as to standing under the Equal Protection Clause. .........................35
                     1.     Voters' evidence is sufficient under *Gill*. .............................35
                     2.     The Secretary misapplies *Gill*...........................................39
                            a.     The Secretary overstates the Voters' summary
                                   judgment burden in demonstrating vote
                                   dilution. ........................................................39
                            b.     The Secretary overstates the Voters' burden
                                   with respect to alternative district maps..................43

D.     Voters have demonstrated a genuine issue of material fact as to standing under the First Amendment. ....................................46

III.    Voters' First Amendment and Equal Protection gerrymandering claims are justiciable............................................................46

A.     Partisan gerrymandering claims are justiciable. ...............................47

B.     Judicially manageable standards exist for adjudicating First Amendment partisan gerrymandering claims. ...............................50

1.     Intent ......................................................................51
2.     Burden and Effects ...............................................52
3.     Causation ................................................................52

C.     Judicially manageable standards exist to adjudicate Voters' Fourteenth Amendment partisan gerrymander claims...................53

D.     The Secretary wrongly suggests this problem will fix itself...........58

IV.    The League has standing to bring constitutional claims for itself and on behalf of its members.................................................................59

A.     The gerrymandered districts have impaired the League's mission. .................................................................................60

B.     The League also has derivative standing through its membership.........................................................................63

V.    The affirmative defense of laches fails as a matter of law. .......................64

A.     Voters, not Congressional Intervenors, are entitled to summary judgment on laches..................................................65

1.     Laches does not apply to continuing constitutional harms. ....................................................................65
2.     Laches does not apply to claims seeking declaratory and prospective relief........................................................67

B.     Genuine issues of material fact also preclude summary judgment for Congressional Intervenors..........................................68

Conclusion...............................................................................72

# Table of Authorities

**Page(s)**

**FEDERAL CASES**

*A. Philip Randolph Institute v. Smith*,
  2018 WL 3872330 (S.D. Ohio Aug. 15, 2018) ...............................35, 62, 65, 69

*ACLU v. Nat'l Security Agency*,
  493 F.3d 644 (6th Cir. 2007) ...............................................................................23

*Air Line Pilots Ass'n v. O'Neill*,
  499 U.S. 65 (1991)................................................................................................54

*Ala. State Conference of NAACP v. State*,
  264 F. Supp. 3d 1280 (M.D. Ala. 2017)...............................................................33

*Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*,
  511 Fed. Appx. 398 (6th Cir. 2013)......................................................................66

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)..............................................................................................29

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................22

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*,
  135 S. Ct. 2652 (2015).............................................................................24, 48, 55

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................23

*Bailey v. Floyd County Bd. of Educ. By and Through Towler*,
  106 F.3d 135 (6th Cir. 1997) ...............................................................................22

*Baker v. Carr*,
  369 U.S. 186 (1962)......................................................................................passim

*Beame v. Friends of the Earth*,
  434 U.S. 1310 (1977)............................................................................................66

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................23

*Benisek v. Lamone*,
　138 S. Ct. 1942 (2018) ................................................................66, 68

*Bennett v. City of Eastpointe*,
　410 F.3d 810 (6th Cir. 2005) ...............................................................22

*Buckley v. Valeo*,
　424 U.S. 1 (1976) ...........................................................................47, 53

*Burdick v. Takushi*,
　504 U.S. 428 (1992) .............................................................................52

*Celotex Corp. v. Catrett*,
　477 U.S. 317 (1986) .......................................................................22, 63

*Citizens United v. Fed'l Election Com'n*,
　558 U.S. 310 (2010) .............................................................................50

*Common Cause v. Rucho*,
　318 F. Supp. 3d 777 (M.D.N.C. 2018) ........................................passim

*Common Cause/Georgia v. Billups*,
　554 F.3d 1340 (11th Cir. 2009) ...........................................................42

*Community Treatment Centers, Inc. v. City of Westland*,
　970 F. Supp. 1197 (E.D. Mich. 1997) ..................................................26

*Concerned Citizens of S. Ohio, Inc. v. Pine Creek Conservancy Dist.*,
　429 U.S. 651 (1977) .............................................................................65

*Cooper v. Harris*,
　137 S. Ct. 1455 (2017) .........................................................................44

*Crawford v. Marion Cnty. Election Bd.*,
　553 U.S. 181 (2008) .............................................................................52

*Davis v. Bandemer*,
　478 U.S. 109 (1986) ...........................................................47, 48, 49, 57

*Davis v. Federal Election Comm'n*,
　554 U.S. 724 (2008) .............................................................................50

*Dickinson v. Ind. State Election Bd.*,
  933 F.2d 497 (7th Cir. 1991) ...............................................................69

*Dillery v. City of Sandusky*,
  398 F.3d 562 (6th Cir. 2005) ...............................................................46

*Doe v. Porter*,
  370 F.3d 558 (6th Cir. 2004) ...............................................................63

*Erickson v. Pardus*,
  551 U.S. 89 (2007)...............................................................................23

*France Mfg. Co. v. Jefferson Elec. Co.*,
  106 F.2d 605 (6th Cir. 1939) ...............................................................65

*Gaffney v. Cummings*,
  412 U.S. 735 (1973)......................................................................passim

*Garza v. Cty. of Los Angeles*,
  918 F.2d 763 (9th Cir. 1990) .........................................................66, 69

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)..................................................................passim

*Gilligan v. Morgan*,
  413 U.S. 1 (1973)..................................................................................50

*GMC v. Lanard Toys, Inc.*,
  468 F.3d 405 (6th Cir. 2006) ...............................................................71

*Green Party of Tenn. v. Hargett*,
  767 F.3d 533 (6th Cir. 2014) ...............................................................29

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971)................................................................................54

*Harris v. McCrory*,
  No. 1:13-CV-949, 2016 WL 3129213 (M.D.N.C. June 2, 2016).......57

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982).............................................................................60

*Hunt v. Wash. State Apple Advert. Comm.*,
    432 U.S. 333 (1977) ............................................................................63

*Innovation Ventures, LLC. v. Custom Nutrition Labs., LLC*,
    256 F. Supp. 3d 696 (E.D. Mich. 2017) ...........................................71

*Jeffers v. Clinton*,
    730 F. Supp. 196 (E.D. Ark. 1989) ...................................................69

*Karcher v. Daggett*,
    462 U.S. 725 (1983) ............................................................................54

*Kuhnle Bros., Inc. v. Cty. of Geauga*,
    103 F.3d 516 (6th Cir. 1997) ......................................................65, 68

*League of United Latin Am. Citizens v. Perry* (*LULAC*),
    548 U.S. 399 (2006) ......................................................................49, 50

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................................45

*Little Hocking Water Ass'n, Inc. v. E.I. Du Pont de Nemours & Co.*,
    90 F. Supp. 3d 746 (S.D. Ohio 2015) ...............................................18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................................................26, 28

*Mich. St. A. Philip Randolph Inst. v. Johnson*,
    209 F. Supp. 3d 935 (E.D. Mich. 2016) ............................................41

*Miller v. Johnson*,
    515 U.S. 900 (1995) ......................................................................23, 54

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ......................................................................51, 52

*MX Grp., Inc. v. City of Covington*,
    293 F.3d 326 (6th Cir. 2002) .............................................................60

*Nat'l Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) .......................................................................50

*Nixon v. United States*,
 506 U.S. 224 (1993)......................................................................................49

*Radogno v. Illinois State Bd. of Elections*,
 No. 1:11-CV-04884, 2011 WL 5868225 (N.D. Ill. Nov. 22, 2011)...................58

*Reno v. Bossier Parish Sch. Bd.*,
 520 U.S. 471 (1997)......................................................................................39

*Reynolds v. Sims*,
 377 U.S. 533 (1964).................................................................................passim

*Rodgers v. Lodge*,
 458 U.S. 613 (1982)......................................................................................54

*Rutan v. Republican Party of Ill.*,
 497 U.S. 62 (1990)........................................................................................29

*Shapiro v. Maryland*,
 336 F. Supp. 1205 (D. Md. 1972)..............................................................46, 65

*Sierra Club v. U.S. Dep't of Transp.*,
 245 F. Supp. 2d 1109 (D. Nev. 2003)............................................................70

*Smith v. Clinton*,
 687 F. Supp. 1310 (E.D. Ark. 1988)..............................................................69

*Spokeo, Inc. v. Robins*,
 136 S. Ct. 1540 (2016)..................................................................................25

*Steel Co. v. Citizens for Better Envt.*,
 523 U.S. 83 (1998)........................................................................................26

*Stewart v. Blackwell*,
 444 F.3d 843 (6th Cir. 2006) .......................................................................41

*Sunseri v. Proctor*,
 461 F. Supp. 2d 551 (E.D. Mich. 2006) ........................................................46

*Thaddeus-X v. Blatter*,
 175 F.3d 378 (6th Cir. 1999) (en banc) .........................................................52

jsdavis.120126899.4.DOCX

*TRW Fin. Sys., Inc. v. Unisys Corp.*,
    835 F. Supp. 994 (E.D. Mich. 1993) ...................................................32

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ...........................................................................50

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995) ...........................................................................47

*United States v. Clintwood Elkhorn Mining Co.*,
    553 U.S. 1 (2008) ...........................................................................67, 68

*United States v. Students Challenging Regulatory Agency Procedures
    (SCRAP)*,
    412 U.S. 669 (1973) ...........................................................................42

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) ...................................................................passim

*Warth v. Seldin*,
    422 U.S. 490 (1975) ......................................................................26, 60

*Washington v. Davis*,
    426 U.S. 229 (1976) ...........................................................................54

*Williams v. Rhodes*,
    393 U.S. 23 (1968) .............................................................................29

STATE STATUTES

Mich. Comp. Laws §§ 3.62, 4.261...........................................................7

RULES

Fed. R. Civ. P. 56(C)(1)(A) ...................................................................63

Rule 8(a)(2) ...........................................................................................23

Rule 12 ....................................................................................22, 28, 34

Rule 56 ..............................................................................22, 32, 63, 72

**CONSTITUTIONAL PROVISIONS**

First Amendment...............................................................................passim

Fourteenth Amendment ....................................................................passim

**VOTERS' COMBINED BRIEF IN RESPONSE TO DEFENDANT SECRETARY JOHNSON'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT AND CONGRESSIONAL INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

## Background Facts and Admissible Evidence

### A.    The Republicans started with an advantage.

The map drawers for the 2011 redistricting cycle did not start with a clean slate. The districts in place for the previous decade in the Michigan House, Senate, and the Michigan delegation to the U.S. House of Representatives heavily favored Republicans. As the following charts show in turquoise, in most of these elections, the Republicans failed to win the electoral vote but nevertheless won a majority of seats. Even where the Republicans had a narrow majority among the electorate, as shown in green, they were able to translate votes into seats far in excess of their vote share.

**Disparities in Votes Cast vs. Seats Won: United States House General Elections 2002-2010**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2002 | 48.2% | 60.0% |
| 2004 | 49.9% | 60.0% |
| 2006 | 46.2% | 60.0% |
| 2008 | 46.4% | 46.7% |
| 2010 | 52.3% | 60.0% |

**Disparities in Votes Cast vs. Seats Won: Michigan Senate General Elections 2002-2010**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2002 | 50.0% | 57.9% |
| 2006 | 45.0% | 55.3% |
| 2010 | 53.6% | 68.4% |

1

**Disparities in Votes Cast vs. Seats Won: Michigan House General Elections 2002-2010**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2002 | 50.0%. | 56.4% |
| 2004 | 48.1% | 52.7% |
| 2006 | 44.8% | 47.3% |
| 2008 | 41.6% | 39.0% |
| 2010 | 52.8% | 57.3% |

Previous Election Information, Mich. Sec. of St. Website;[1] *see also* Warshaw Report at 17 ("In the 2000s, Republicans gained an advantage, likely in part due to their control of the redistricting process in 2001."); McMaster Dep. 76:2-15 (describing the 2001 Republican map drawers as "selfish" and "power-hungry," trying to see how many seats they could get).

The partisan advantage from the 2001 cycle ensured the Republicans maintained control of the next redistricting cycle via the 2010 election. McMaster Dep. 33:23-34:2 (testifying that it was important for Republicans to win in 2010 because there is a "belief or idea or assumption" that the party who wins will play a role in redistricting for the next decade). Indeed, in anticipation of the 2010 Census data and corollary redistricting cycle, the Republican State Leadership Committee (RSLC) began its planning at a national level. That effort became known as REDMAP (for the "REDistricting MAjority Project"). *Id.*

> The rationale was straightforward: Controlling the redistricting process in these states would have the greatest impact on determining how both state legislative and congressional district boundaries would be drawn. Drawing new district lines in states with the most redistricting activity

---

[1] https://www.michigan.gov/sos/0,4670,7-127-1633_8722---,00.html (Oct. 11, 2018)(information for individual elections can be found under the "General Election Results" dropdown, which was compiled to reach these percentages and totals).

> presented the opportunity to solidify conservative policymaking at the state level and maintain a Republican stronghold in the U.S. House of Representatives for the next decade.

Ex. 4 at 12; Ex. 5 ("During the 2010, RSLC launched REDMAP, wildly heralded as one of the most innovative and successful plans for ensuring Republican dominance of state legislatures and Congress through gaining control of the once in a decade 2010 redistricting processes, a function of the party in control of state legislatures."). The RSLC raised over $30 million in 2009-10. Ex. 4 at 2. And it spent "$1 million in Michigan working with the Michigan House Republican Campaign Committee and Michigan Republican Party to pick up 20 seats." *Id.* Just as the RSLC intended, the Michigan Republicans leveraged that majority to draw extreme partisan gerrymanders in 2011 to lock in Republican control for the next decade. *E.g.*, Ex. 7 (describing 2011 process as "déjà vu" with respect to the 2001 process "with a GOP governor, control of both chambers of the legislature, and a majority on the Supreme Court").

### B. The map drawing process in 2011 demonstrates partisan intent.

The actual process of drawing the districts for the 2011 cycle provides both circumstantial and direct evidence that the map drawers were in fact exploiting the existing advantage in every possible way, preserving successful districts and expanding the Republican stronghold wherever feasible.

### 1. The Republicans effected a secretive, shielded, partisan process on an artificially abbreviated timeline.

Experienced map-drawer Terry Marquardt was a senior Senate staffer charged with drawing Senate districts for the 2011 cycle. Marquardt Dep. 31:3-6; 24:22. Dan McMaster was a Senior Policy Advisor for the House who sought out the assignment to draw the House districts. McMaster Dep. 36:4; 49:14. Brian Began was hired to assist McMaster in this process. *Id.* 50:4-51:6. McMaster and Began worked in a private office "which was locked, no one was allowed in." *Id.* 51:22-24; 61:23-25; 65:4-9 (explaining that they put paper over the door window and that they would not answer the door). Even though the Congressional map was technically proposed and quickly passed by the Michigan Legislature, no legislative staffer or consultant hired by the legislature actually drew the districts. The Michigan Redistricting Resource Institute ("MRRI") hired Sterling Corporation, a for-profit Republican consulting and fundraising firm, to draw the Congressional districts. LaBrant Dep. I 140:23-141:5.

MRRI is a secretly-funded[2] partisan organization that is the successor organization to the Michigan Reapportionment Fund, which was created by Robert LaBrant in 1989 to raise money to defend Republican maps in redistricting litigation. LaBrant Dep. I 8:17-22, 85:16, 40:9-12. The Fund morphed into MRRI in 2005. *Id.* 72:21-22; 74:21-24; 90:9-11; *see also* MRRI Motion to Quash [Dkt. 76, at 3]. MRRI

---

[2] Witnesses have been instructed by counsel not to reveal the identities of any MRRI donors. *E.g.*, LaBrant Dep. I 78:21-81:25.

employed Sterling Corporation, specifically Jeff Timmer, in connection with the 2011 redistricting process. LaBrant Dep. I 140:23-141:2; Timmer Dep. I 16:14-17, 23:7-14; *see also* Ex. 6 (proposing services to be provided by Sterling). Timmer was an experienced Republican map drawer in Michigan. *See* Ex. 6 (identifying Timmer as the principal map drawer in 1991-92 and the "chief map drawer" for 2001-02).

Timmer, Marquardt, McMaster, and Began participated in weekly "map drawer meetings" at the Dickinson Wright law firm in Lansing. Also participating in the meetings were Republican legislators, their counsel, and others. This exclusive group included Pete Ellsworth (lawyer), Jeff Stuckey (lawyer), Joe Baumann (counsel for House Republicans), Fred Hall (counsel for Senate Republicans), Dave Murley (counsel for Governor's office), Bob LaBrant (Chamber of Commerce/MRRI) and Randy Richardville (Senate majority leader). *See, e.g.*, McMaster Dep. 53:13-54:8; Marquardt Dep. 86:25-92:4; LaBrant Dep. II 236:19-238-17.[3]

At the map drawer meetings, in addition to discussing the Apol criteria and the Voting Rights Act, the map drawers shared and discussed draft districts among

---

[3] In addition, separate weekly meetings occurred at Dickinson Wright among the same lawyers and Republican political leaders during the redistricting process, *without* the map drawers. These meetings included the Chair of the Michigan Republican Party (whose presence at the meeting, according to Senator Joe Hune who claimed the Senate Redistricting committee would have been to "insert himself in the process" for "Political gain." Hune Dep. 71:3-21), select Republican members of the legislature, the Republican-aligned Michigan Chamber of Commerce, MRRI, counsel from the Governor's office and outside lawyers. *See, e.g.*, Ex. 8 (agendas). Topics included timing, applicable standards, "database status update and political data," and specific proposals. *Id.*

themselves. Timmer Dep. I 55:22-57:24; Marquardt Dep. 82:18-22, 90:5-91:11;

McMaster Dep. 52:9-19 (describing that each map drawer would give a report and

discuss any problems they were having); *id.* 90:24-91:13. LaBrant Dep. I 186:19-

187:19; *see also* Ex. 9 (emails back and forth among map drawers); Ex. 10 (email from

Began to Timmer and Marquardt: "Here is the map, that we will likely use as it

doesn't primary two Dems in Wayne County so long as they vote our way."); Ex. 11

(email from Marquardt to Timmer: "Which numbers did you use to come up with the

5-4-5 political breakdown?").

No one else was allowed in these meetings. Timmer Dep. I 56:19-22; Timmer

Dep. II 256:18-23 (meetings were "confidential"). Even now, post-discovery, the

specific content of these meetings remains a mystery shielded by an alleged "common

interest" privilege among the executive branch (including both the Secretary and the

Governor's office), the Michigan Republican Party, MRRI, Sterling Corporation, and

the Republican caucuses of both houses of Michigan's legislature.[4]

After the maps were essentially complete, they were still held close to the vest

by the Republican leadership. For example, Marquardt participated in meetings with

individual Senate Republican caucus members and Senate majority leader Randy

Richardville in April and June of 2011. Marquardt Dep. 82:23-85:5. The Republican

caucus members were shown only their own districts; no one saw the map in its

---

[4] *See, e.g.*, Response to Ellsworth Deposition Topics [Dkt. 27]; LaBrant Dep. I 24:12-
26:1.

entirety, and no one was allowed to keep a copy of the materials showing his or her district. Marquardt Dep. 127:23-128:2. The caucus leaders talked to Democratic members only to strongarm them. Began Dep. 80:5-81:7. McMaster participated in similar meetings with Republican members of the Michigan House, where each member was shown only his or her proposed district. These documents were also collected back at the end of the meeting. McMaster Dep. 133:23-137:13.

By statute, the Legislature was allotted roughly seven months from the March release of the census data through November 1 to complete redistricting. Mich. Comp. Laws §§ 3.62, 4.261. Rather than use that seven-month window to engage, for example, in a bipartisan process or to interact with constituent or public interest groups, after the release of census data on March 22, 2011 the process was crammed into three months.[5] The districts were unveiled around Friday, June 17, 2011. But even this unveiling was not as transparent as one might expect. *See, e.g.*, Sue Smith Declaration ¶¶ 13-17 ("Smith Decl."). Then-League-president Sue Smith attended a Senate Redistricting Committee hearing on June 22, 2011. Previously, only shell bills had been introduced, and it had been announced that the 2011 redistrict plans would be unveiled at this meeting. Just before the meeting, copies were placed on a table at the back of the room for the meeting attendees. To Smith's surprise, there were no

---

[5] Each of the map drawers, however, got a head start and began drawing districts based on census estimates as early as 2009. Ex. 6 ("Jeff has engaged in population forecasting and preliminary map drawing in preparation for 2011-2012"); Marquardt Dep. 34:4-35:23; McMaster Dep. 58:21-59:16.

maps—only a list of numbered census tracts and blocks. Maps approximately 30" by 36" were placed on easels. "It was impossible to determine with any precision what the proposed districts would look like from the information provided during the meeting." *Id.*

There was no true opportunity for legislators or the public to react to or lobby against the Republican maps. The following day, June 23, the Senate passed the bills containing the redistricting plans. The House passed an amended bill on June 28th. The Senate adopted the amended bill on June 29th. The entire process in the legislature took fewer than two weeks, leaving almost three months to spare under the statutory time frame.[6] The bill was sent to the Governor on July 26th, which he signed on August 9, 2011.

> ### 2.    The map drawers and the Republican members of the legislature used political data to draw, re-draw, and fine tune the partisanship of the proposed maps.

Michigan has a statutory scheme that outlines certain requirements for how redistricting is done, commonly known as the Apol standards. But the map drawers testified that even while adhering to that regime there are many alternative maps that

---

[6] The legislative timelines for House Bill 4780 and Senate Bill 0498 are made available by the Michigan Legislature at http://legislature.mi.gov/(S(33x5mdy35cguhibeapc1snhk))/mileg.aspx?page=getObject&objectName=2011-HB-4780 (House) and http://www.legislature.mi.gov/(S(dwptsuluhz4gdh5u0ecixhsv))/mileg.aspx?page=getobject&objectname=2011-SB-0498 (Senate).

could be drawn, allowing for other considerations, including partisanship, to play a

role in drawing specific districts. For example, Marquardt testified as follows:

> Q.    Did you intend for the map that you drew for the Senate to be
>        for[sic] favorable for Republicans than Democrats?
> A.    Did I consider that?
> Q.    You were the drawer, so did you have that in mind as you're
>        drawing it, that where you've got choices to make, you're going to
>        make the map more favorable for Republicans than Democrats?
> A.    In the few choices that we had, I would say that's true, but the
>        choices are very few.

Marquardt Dep. 73:10-74:3. Marquardt went on to identify these "few" geographies as

Oakland County, Kent County, Macomb County, and Wayne County which

combined represent over 45% of Michigan's total population.[7] *Id.* 74:5-76:22; *see also*

Hune Dep. 102:12-104:1 (conceding that Wayne, Macomb, Kent, and Livingston

Counties were susceptible to more than one configuration while still complying with

Apol); Began Dep. 153:5-12 (acknowledging that one of the aims of the map drawing

was to keep the Republicans in the majority); McMaster Dep. 80:4-11 (conceding that

a map drawn to maximize partisan advantage can, on his definition, still be "fair and

legal."); Timmer Dep. I 49:12-50:8 (testifying that where it did not impact the Apol

---

[7] Mich. Annual Estimates of Resident Population, U.S. Census Bureau American Quick Fact Finder, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=CF (Oct. 11, 2018)(showing that Michigan's total population in 2010 census was 9,883,640 and that Oakland, Kent, Macomb and Wayne Counties contain 4,466,546 residents, or 45.19% of the population). Portions of Oakland County are in the following Senate districts: 11, 12, 13, 14, 15. Portions of Kent County are in the following Senate districts: 26, 28, 29. Portions of Macomb County are in the following Senate districts: 8, 9, 10, 25.

criteria or the Voting Rights Act the concerns of the Republican members of

Congress were taken into account); Timmer Dep. II 259:24-260:13 (testifying that

protecting incumbents was taken into account to secure votes for the passage of the

plan); LaBrant Dep. I 62:16-19 (testifying that map drawers have "latitude" to draw

districts consistent with Apol); LaBrant Dep. II 250:24-251:2 (agreeing that Apol

standards have not eliminated partisan gerrymandering entirely); *see also generally* Chen

Report (drawing 1000 legal maps each for the Michigan Congressional delegation, the

Michigan House, and the Michigan Senate, each less partisan than the existing maps).

The technical process utilized by the map drawers confirms they relied on

political data and applied it at an almost microscopic level. For example, once the

census data was released, Timmer used a software package called Maptitude to draw

Senate districts again and again. Timmer Dep. I 28:17-20. The software contained

both population and political data. Timmer Dep. I 29:14-17; LaBrant Dep. I 16:8-

17:15 (explaining that they looked at base party vote, which "means based upon votes

for various offices that are on the partisan ballot, you know, how that particular

precinct … might perform over … a ten-year period of time"). Marquardt drew the

Senate districts using Autobound software. In addition to Census data, political data

were also loaded into the software with "political data" being "election results through

the years." Marquardt Dep. 43:5-12; *see also* Began Dep. 31:17-19 (McMaster and

Began used the same software program to draw House districts). The Autobound

program allows the map drawer to have a spreadsheet or matrix constantly visible at

the bottom of the screen while drawing districts. The matrix shows selected data and updates for the proposed districts as they are drawn. Marquardt Dep. 195:16-196:7. Marquardt opted to have population data *and political data* visible (and where necessary racial data). *Id.* 196:8-198:7; *cf.* McMaster Dep. 166:4-19 (explaining that in a certain geography he could not draw a "winnable district" and that "everyone" has tried to do so).

Each of the map drawers testified that after satisfying legal requirements, like the VRA, the overarching objective was to have a map that was enacted. In other words, districts that satisfied the Republican majority. *E.g.*, Marquardt Dep. 56:21-57:13 (explaining that 20 senators have to be happy with the map – "that's kind of an unwritten criteria"); *id.* 62:25-63:3 ("I think I just had a general knowledge of what would be acceptable to many of the sitting senators that were going to vote on the plan."); *id.* 63:9-13 ("[S]itting, you know, representatives or senators, you know, obviously in many cases want to be re-elected, so that was probably the major consideration as far as getting the vote"); McMaster Dep. 83:6-7; *id.* 125:18-24; *id.* 201:10-11 *id.* 216:13-16; Began Dep. 151:22-153:12; Timmer Dep. II 92:12-23; *id.* 218:7-10; *id.* 257:3-7. The use of political data and the partisan analysis ensured those votes. *E.g.*, Marquardt Dep. 69:11-22.

Indeed, for each of the meetings described above with the Senate Republican caucus members, Marquardt directed the preparation of a one-page document.[8] Marquardt Dep. 101:1-2, 10-11. These documents each showed the district as it existed under the 2001 redistricting – labeled the "Current District" – and the district for the 2011 cycle – labeled the "Proposed District." The document included four data points for the current district: the 2000 population, the 2010 population, and two sets of *political* data – the average from the last three governor's races and MRBD data.[9] Marquardt Dep. 101:10-105:16. Similarly, for the proposed district, Marquardt included the 2010 population for the district, a calculation of the "percent of the new district represented currently" and the same two political data points. *Id*.

Q. These two numbers at the bottom that you said were political data, why is political data on this document?

A. Because the senators obviously would be interested in knowing whether their district got better or worse.

Q. So you think these numbers help show whether it got better or worse?

A. They help. I mean, as I mentioned earlier, different political climates in different election years certainly change but it gives you a bit of a guideline.

Q. And to be clear, by "better or worse," better would mean more Republican?

A. From my perspective, yes.

Q. And then worse would be either less Republican or more Democrat?

A. Correct.

---

[8] These documents for the Republican Senate districts that Voters are challenging are collected at Ex. 12.

[9] MRBD data is the average of all of the education board elections in Michigan, which was used as a proxy for partisan affiliation. *E.g.*, Marquardt Dep. 103:2-22.

Marquardt Dep. 103:23-104:15.

Timmer also produced many emails[10] which further demonstrate reliance on political data for purposes of drawing districts, communicating with incumbents and their staffs about the draft districts and their partisan tilt, making revisions to specific districts, and otherwise preserving and increasing the existing Republican advantage. These emails reflect:

- Mapmakers' extensive use of statewide historical political data to assess partisanship of draft maps. *E.g.*, Ex. 13, 14, 16, 18, 20, 22, 24, 25, 27, 28, 30.
- Aspiration "for legal and PR purposes" to "a good looking map that did not look like an obvious gerrymander." Ex. 23.
- A Congressional staffer saying a draft map is "perfect. It's giving the finger to Sandy Levin. I love it." [sic] Ex. 29.
- "Cram[ing]" "ALL of the Dem garbage" "into only four districts …" in a "glorious way." Ex. 17.
- Trading voters between seats to make one "slightly more [Republican]" Ex. 30.
- Republican donors asking for a "favorable Republican district" and a staffer agreeing subject to others' input. Ex. 186; *see also* Ex. 15.

### C.     The Republicans crafted an effective and durable gerrymander.

The gerrymander was successful in every sense. The Republicans maintained their partisan advantage, as shown below, continuing to capture large seat majorities even while losing most elections and barely winning others.

---

[10] Similar emails were not produced by any of the other map drawers as none of them preserved their relevant emails. *See* Began Dep. 118:7-120:13; Marquardt Dep. 232:6-233:14, 237:18-23; McMaster Dep. 221:15-225:4.

**Disparities in Votes Cast vs. Seats Won: United States House General Elections 2012-2016**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2012 | 45.6% | 64.3% |
| 2014 | 47.5% | 64.3% |
| 2016 | 50.5% | 64.3% |

**Disparities in Votes Cast vs. Seats Won: Michigan Senate General Elections 2014**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2014 | 50.4% | 71.1% |

**Disparities in Votes Cast vs. Seats Won: Michigan House General Elections 2012-2016**

| Year | Rep. Vote Share | Rep. Seat Share |
|------|-----------------|-----------------|
| 2012 | 45.5% | 53.6% |
| 2014 | 48.9% | 57.3% |
| 2016 | 50.3% | 57.3% |

Previous Election Information, Mich. Sec. of St. Website,

https://www.michigan.gov/sos/0,4670,7-127-1633_8722---,00.html (Oct. 11, 2018).

As the RSLC boasted with respect to its REDMAP success : in 2012, "Michiganders

cast over 240,000 more votes for Democratic congressional candidates than

Republicans, but still elected a 9-5 Republican delegation to Congress." Ex. 5.

> The effectiveness of REDMAP is perhaps most clear in the state of
> Michigan. In 2010, the RSLC put $1 million into state legislative races,
> contributing to a GOP pick-up of 20 seats in the House and Republican
> majorities in both the House and Senate. Republican Rick Snyder won
> the gubernatorial race, and with it Republicans gained control of
> redrawing Michigan's 148 legislative and 14 congressional districts. The
> 2012 election was a huge success for Democrats at the statewide level in
> Michigan: voters elected a Democratic U.S. Senator by more than 20
> points and reelected President Obama by almost 10 points. But
> Republicans at the state level maintained majorities in both chambers of
> the legislature and voters elected a 9-5 Republican majority to represent
> them in Congress.

14

*Id.* at 3-4; *see also* Ex. 32 (LaBrant tells Republican Congressional staffers "We've spent a lot of time providing options to ensure we have a solid 9-5 delegation in 2012 and beyond."). LaBrant Dep. I at 184.

Voters' experts similarly confirm what the Republicans already knew first hand—that they had intentionally created a successful, durable gerrymander in the Michigan Senate and House and in Michigan's Congressional delegation.

Testimonial, documentary and statistical evidence show the legislature's intent to pack and crack specific districts, and the results. In Exhibits 1-3 Voters summarize this evidence. Their summary includes:

> 1.     The findings of Professor Chen comparing each challenged enacted district[11] to one thousand simulated non-partisan districts, showing each challenged district to be a cracked or packed[12] partisan outlier. Chen Report at 54-56 & Appendix D at 73-88.

---

[11] Voters have narrowed their list of challenged districts since the conclusion of discovery, review of evidence, and service of the Defendants' motion for summary judgment. Voters challenge the following nine Congressional districts 1,4,5,7-12; the following ten Senate districts: 8,10-12,14,18,22,27,32,36; and the following fifteen House Districts: 24,32,51,52,55,60,62,63,75,76,83,91,92,94,95.

[12] The Secretary defines cracking as resulting "in the minority party being submerged, with little chance of electing a candidate in the district." Defendant Secretary of State Ruth Johnson's Motion to Dismiss and for Summary Judgment [Dkt. 119] ("Sec.'s Br.") 26. The Secretary impliedly but correctly acknowledges that even in a cracked district there is at least some chance, in a wave election, that the cracking will be overcome by wave election results. Hence the House results above for 2006 and 2008 – Democratic wave years – do not rebut the notion of a gerrymander."

2.      Further review of Dr. Chen's simulated districts by Professor Christopher Warshaw, showing that each individual Voter and Democratic League member in each challenged district would himself or herself live in a less cracked or packed district absent the gerrymander.  Declaration of C. Warshaw ¶¶ 6-7 ("Warshaw Decl.").

3.      Detailed district level packing and cracking evidence from Michael Vatter, a long-time Michigan legislative staffer. Declaration of Michael Vatter ¶¶ 21-50 ("Vatter Decl.").

4.      Documents related to district-level gerrymandering.

5.      Deposition testimony related to district-level gerrymandering.

Professor Kenneth Mayer, political science faculty at the University of Wisconsin-Madison, summarized his conclusions as follows:

> By every metric used to evaluate the partisan effects of district plans and detect the presence of partisan gerrymandering – partisan bias, seat-bias, vote-bias, partisan symmetry, the Efficiency Gap, mean-median, and declination – the Michigan district plans for all levels of elected offices are extreme gerrymanders.

Mayer Report at 4; *id*. at 81 ("[W]ithout exception in any of the plans, Democratic voters have been packed into districts where they constitute safe majorities, while they have been cracked in others to allow Republicans to win with comfortable but not overwhelming margins. These patterns are observed both prospectively, using data from 2006 to 2010 elections, and empirically, using data from 2012 to 2016. Over a ten year period and 6 electoral cycles, the asymmetry and bias have persisted.").

16

Professor Jowei Chen, Associate Professor in the Department of Political Science at the University of Michigan, came to the same conclusion. He used a computer process to create 1,000 simulated maps for each house that satisfy the legal criteria – in fact, they outperform the current maps in this regard – but do not take partisanship into account when drawing districts. Chen Report at 5 & Appendix A at 59-64. He then compared those simulations to the enacted map. With respect to the Congressional map, the enacted plan created a partisan outcome that exceeded all of the 1,000 alternatives he generated using a non-partisan computer algorithm. Dr. Chen also utilized mean-median and efficiency-gap analyses to confirm these conclusions. *Id.* at 21. ("I thus conclude, with extremely strong statistical certainty, that the enacted plan's extreme Median-Mean Difference is clearly not the result of Michigan's natural political geography, combined with the application of Michigan's statutory redistricting guidelines. It is the result of partisan intent."); *id.* at 25 ("[T]he level of electoral bias in the enacted congressional plan … is far more biased than even most biased of the 1,000 simulated plans." Dr. Chen reached parallel conclusions with respect to the Michigan House and Senate, each of which he concludes with high statistical certainty, is a map driven by partisan intent. *Id.* at 26 (Senate), 39, 43 (House).[13]

---

[13] Beginning at page 40, the Secretary begins a general academic critique of Dr. Chen's work. The critique is not well-founded, and moreover has no place in that brief. At this time there is no *Daubert* or other motion to limit the use of any expert's testimony

The Secretary embarks on a misleading analysis of the efficiency gap[14] starting at page 39 of her brief. After acknowledging that "an efficiency gap is not calculated for a single district" – it is calculated on a statewide basis – the Secretary goes on to argue, complete with a table, that a single district "efficiency gap score" can be calculated and is meaningful. Dr. Warshaw explained why a single district score – which is no more than an accounting of the wasted votes in a particular district by each party – is not meaningful because the efficiency gap is a statewide measure. Warshaw Dep. 133:14-22, 140:6-9. The notion of a "efficiency gap score" for one district is simply a made-up effort to caricature an academic measure.

Professor Christopher Warshaw, Assistant Professor of Political Science at George Washington University, independently came to similar conclusions:

---

or opinion. Voters respectfully refer the Court to Dr. Chen's extensive qualifications and his record of acceptance as an expert and of being credited by courts in a variety of cases. *See* Chen Report at 1. Moreover, the Secretary grossly mischaracterizes the Chen Report: "His report is framed entirely with respect to ferreting out *intent*, and thus is beside the point." Sec.'s Br. 41. This is incorrect. Dr. Chen's report certainly demonstrates the legislature's intent, but primarily it discusses and analyzes discriminatory effects, in great detail, specifically the effect of gerrymander on the unfairness of districts in Michigan.

[14] Warshaw corrected the Secretary's brief at page 51 of the Warshaw deposition regarding the efficiency gap being proposed by McGhee in the *Journal of Legislative Studies Quarterly* or peer-reviewed journal, in 2014, not by Stephanopoulos in McGhee in the *University of Chicago Law Review*. Warshaw Dep. 51:10-52:6. But the Secretary nonetheless directly misstates this evidence. Sec.'s Br. 38. Moreover, this critique of the efficiency gap goes to weight, not to admissibility. *See, e.g., Little Hocking Water Ass'n, Inc. v. E.I. Du Pont de Nemours & Co.*, 90 F. Supp. 3d 746, 762 (S.D. Ohio 2015) (noting that, under the *Daubert* framework, "questions about the accuracy of test results go to the weight of the evidence, not its admissibility") (quotations omitted).

> Michigan's 2011 redistricting plan does indeed disadvantage one party compared to the other, and does so in ways that are historically extreme. … The Efficiency Gaps in Michigan in the past three elections were among the most Republican-leaning Efficiency Gaps the nation has ever seen. Michigan's congressional districts had a larger pro-Republican bias after its 2011 redistricting plan took effect in 2012 than 98% of the congressional election maps over the past 45 years. Its state house districts were also more pro-Republican than 98% of previous plans and its state senate districts were more pro-Republican than 99.7% of previous plans over the past five decades. It exhibited a similarly large pro-Republican bias using other quantitative measures of gerrymandering, such as the mean-median and declination metrics ….Moreover, recent Efficiency Gaps are quite durable. This suggests that partisan gerrymandering is unlikely to be remedied through the normal electoral process.

Warshaw Report at 5.

### D. The gerrymander imposes real and concrete harm on Michigan citizens, including the Voters.

The gerrymander can be measured and observed at the state-wide level from both the raw election results and through the more robust political science analyses. But this is not just a theoretical measure of a state-wide Republican tilt; the harm is very real and concrete to individual citizens of Michigan. "If the relationship between votes and seats systematically advantages one party over another, then some citizens will enjoy more influence—more voice—over political outcomes than others." Warshaw Report at 4. The Democratic voters in Michigan "effectively have no political voice." *Id.*; *see also id.* 20-29. "Only about 23% of Michigan residents trust their representatives [in Congress], which is one of the lowest of any state in the country." *Id.* at 29; *id.* at 36-41 (reaching similar conclusions for both state houses); *see*

*also* Smith Decl. ¶ 31(c) ("The entrenched conservative Republicans refuse to pass or even consider the bills supported by our organization. This makes our mission of protecting democracy much more difficult because the election laws and other policies that have been passed since 2011 no longer comport with the will of a majority of the people.").

The individual named plaintiffs and the League's Democratic members have in fact suffered these harms. *See* Ketola Decl. ¶¶ 6-9; Long Decl. ¶¶ 6-9; Farris Decl. ¶¶ 6-9; Ellis Decl. ¶¶ 6-12; LaSalle Decl. ¶¶ 6-9; Rivera Decl. ¶¶ 6-9; Brdak Decl. ¶¶ 6-9; Holliday Decl. ¶ ¶ 6-8; Grasha Decl. ¶¶ 6-8. The League itself has suffered harm as well, making the organization's "mission of education and engagement much harder in a variety of ways." Smith Decl. ¶¶ 25-31. For example, it is difficult to get Republican candidates to participate in candidate forums because "so many Republican candidates are no longer running in competitive races." *Id.* ¶ 26. The Michigan Democratic Party has likewise seen the effect of the gerrymander materialize in the challenged districts—voter turnout is lower, it is more difficult to recruit candidates, and it is harder to raise money and mobilize volunteers. Dillon Decl. at 12-16.

These harms to Michigan's citizens are a direct result of the gerrymander. Had the lines been drawn in any of a thousand different ways, these individuals would not have found themselves in an unnaturally cracked or packed district. Using the simulation maps created by Dr. Chen and the addresses of the individual named

plaintiffs as well exemplar League members, Dr. Warshaw showed, with respect to each voter, that had he or she been placed in a district under a neutrally drawn map, that specific voter would reside in a district that is demonstrably less partisan. Declaration of C. Warshaw ("Warshaw Decl.") at ¶ 7; Ex. 37.

For example, League member John Helsom lives in House District 51. *Id.* Under the current configuration of districts, that district favors Republicans and has resulted in a Republican office holder in each election since 2011. Yet under all of the simulation plans, Helsom would reside in a district with a partisan leaning that is demonstrably less Republican or outright Democratic. *Id.* As depicted in the graph below, the red "x" reflects the partisanship of the enacted House District 51 and the gray dots represent the partisanship of Dr. Chen's simulated districts for similar geographies, with the black center line being 50/50, as follows:



Each individual plaintiff and League member identified on Ex. 37 would experience a similar outcome when placed in a neutrally drawn district as compared to his or her current cracked or packed district.

Dr. Chen also performed a district-level analysis to identify the packed and cracked districts. Chen Report at 54-56 & Appendix D. He did so by comparing the geographies of districts in each of the enacted maps to similar geographies in his non-

partisan simulated maps. *Id.* at 54. Most of the challenged districts are also either cracked or packed under Chen's analysis. Chen Report at 56.

For the Court's reference, Exhibits 1 through 3 summarize the district specific evidence for individual Plaintiff/League members in each challenged district.

## Standard of Review

When moving for summary judgment under Rule 56, the movant must show the district court that "no genuine issue of material fact exists," viewing all evidence "in the light most favorable to the nonmoving party," and drawing all justifiable inferences in the nonmoving party's favor. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The test for determining whether there is a dispute over a material fact is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Examples of appropriate evidence include admissible documents or attested testimony, such as that found in affidavits or depositions. *Bailey v. Floyd County Bd. of Educ. By and Through Towler*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, (1986) (explaining that the proffered evidence need not be in admissible form, merely its content must be admissible).

A motion for judgment on the pleadings brought pursuant to Rule 12(c) is treated similarly to a Rule 12(b)(6) motion. The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). Rule 8(a)(2) pleading standards remain "liberal." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (2007)(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

And yet the Secretary suggests the Court should more readily grant her motion simply because this case is a constitutional challenge. She cites *Miller v. Johnson*, 515 U.S. 900 (1995), for the proposition that, when assessing the "adequacy of a plaintiff's showing at the various stages of litigation and determining whether to permit discovery or trial to proceed," courts should keep in mind the "intrusive potential of judicial intervention into the legislative realm." Sec.'s Br. 16 (quoting 515 U.S. at 916-17). *Miller* was a racial gerrymandering case. The court's comment referred in context to the particular sensitivity with which courts should approach the question of whether a criterion like race was the "predominant factor motivating the legislatures' decision," *id.* at 916—an element of the Voters' proof that is not at issue on these motions. On the questions of standing and justiciability that lie at the heart of Defendants' motions, the Voters bear the same pleading and evidentiary burdens as any other plaintiffs. *See, e.g.*, *ACLU v. Nat'l Security Agency*, 493 F.3d 644, 659 (6th Cir.

2007). The Secretary's request for a judicial thumb on her side of the scale is not well taken.[15]

**Argument**

## I.     Gerrymandering is a scourge on democracy.

The stakes in this case are difficult to exaggerate. A wide variety of voices on the Supreme Court and elsewhere, of all political stripes, have condemned partisan gerrymandering as a structural threat to the legitimacy of American elections.

Partisan gerrymandering is inimical to the "core principle of republican government . . . that the voters should choose their representatives, not the other way around." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015) (internal quotation marks omitted).[16]

---

[15] The Secretary also argues that the Court should review under Rule 12(c) whether the Voters' claims are moot as to the challenged Michigan Senate districts, because by the time these summary judgment motions are heard (currently scheduled for November 9, 2018), the 2018 elections will have passed and there will be no more regularly scheduled Senate elections before the maps are redrawn following the 2020 Census. Sec.'s Br. 9. The Secretary acknowledges that the Court has already denied her motion to dismiss on these grounds, but her recollection that the Court denied the motion solely because it was "premature" is faulty. The Court did indeed note that the motion was premature because the 2018 election had not yet passed, but it *also* accepted the Voters' argument that the 2018 elections will not necessarily moot the Senate map's constitutionality because the map could be "redrawn for use in a special election of the Michigan Senate." [Dkt. No. 88]. The Secretary has supplied the Court no reason to deviate from the opinion it expressed in its Order rejecting the Secretary's mootness argument as ill-founded *and* premature.

[16] The Secretary misleadingly cites *Gaffney v. Cummings*, 412 U.S. 735 (1973), for the proposition that "the purposeful, partisan-conscious creation of 'safe' Republican or Democrat districts does not offend the Constitution." Sec's. Br. 12 (citing *Gaffney*, 412

24

The democratic harm of unjustified entrenchment is obvious. As this Court has written in respect to popularly based electoral districts: "Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State's legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will." *Reynolds*, 377 U.S. at 565, 84 S.Ct. 1362.

*Vieth*, 541 U.S. at 361 (Breyer, J., dissenting).

## II.  Voters have demonstrated their Article III standing.

### A.  Persons with a personal stake in a case have access to Article III Courts.

The doctrine of standing measures whether a plaintiff has enough of a "personal stake in the outcome" of a suit to invoke the Court's jurisdiction. *Gill v. Whitford,* 138 S. Ct. 1916, 1923 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v.*

---

U.S. at 753). In fact, *Gaffney* stands for the far more limited principle that a redistricting scheme is not *per se* invalid simply because "any political consideration [was] taken into account" in crafting it. 412 U.S. at 752; *see also Common Cause v. Rucho*, 318 F. Supp. 3d 777, 850–51 (M.D.N.C. 2018) ("*Rucho*") (distinguishing *Gaffney* and noting that "the Supreme Court's acceptance of state legislatures' reliance on partisan considerations and political data for certain purposes does not establish that a state legislature may pursue *any* political or partisan objective, as Legislative Defendants contend") (emphasis in original).

*Robins*, 136 S. Ct. 1540, 1547 (2016); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). Injury in fact is the "first and foremost of standing's three elements." *See Steel Co. v. Citizens for Better Envt.*, 523 U.S. 83, 103 (1998). To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560.

The burden of establishing standing should not be conflated with the plaintiff's ultimate burden of proving her entitlement to relief. "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also Community Treatment Centers, Inc. v. City of Westland*, 970 F. Supp. 1197, 1208–09 (E.D. Mich. 1997) (discussing the importance of disentangling injury-in-fact in a constitutional case from the merits of the underlying claim, quoting *Warth*).

### 1.    Standing under the Equal Protection Clause

Vote dilution is an injury sufficient to support standing for an equal protection claim under the Fourteenth Amendment. The Supreme Court has recognized for more than a half century that citizens have a constitutional right to an "equally effective voice" in electing their government representatives, and that a voter suffers an injury to that right when the weight of her vote is "in a substantial fashion *diluted* when compared with votes of citizens living [i]n other parts of the State." *Reynolds v. Sims,* 377 U.S. 533, 568 (1964) (emphasis supplied); *see also Baker*, 369 U.S. at 208 ("A

26

citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution[.]'").

*Gill v. Whitford* confirmed more clearly than ever before that voters who have had their voting strength diluted by a partisan gerrymander have standing to mount an equal protection challenge to that scheme. Writing for the majority, Chief Justice Roberts spelled out the critical facts giving rise to a voter's personal injury from vote dilution:

> We have long recognized that a person's right to vote is "individual and personal in nature." *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Baker*, 369 U.S., at 206, 82 S.Ct. 691.

*Gill*, 138 S.Ct. at 1929.

"Here," the *Gill* Court went on to explain, "the plaintiffs' partisan gerrymandering claims turn on allegations that their votes have been diluted. That harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Id.* at 1930–31. The Court concluded that as in racial gerrymandering cases, the injury suffered by a voter is "district specific," and that "[t]he boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked." *Id.* at 1930. The Court held that a voter showed standing by pleading and proving that she lives in a "cracked" or "packed" district whose gerrymandered boundaries have placed a

27

"burden on [her] individual vote[.]" *Id.* at 1931, 1934; *see also id.* at 1932 (specifying pertinent statewide evidence).

In a concurring opinion, Justice Kagan added that when a voter "shows that her district has been packed or cracked, she proves, as she must to establish standing, that she is an 'among the injured.'" *Gill* 138 S.Ct. at 1936 (Kagan, J., concurring) (citing *Lujan*, 504 U.S. at 563).

In moving under Rule 12, the Secretary wishfully suggests that *Gill* has narrowed a plaintiff's opportunity to demonstrate constitutional harm to "the eye of a needle." Sec's. Br. 17. Under *Gill*, she posits, "Plaintiffs must show and prove standing on a district-by-district basis by demonstrating—under a workable and manageable standard that has not previously been rejected by the Supreme Court—an unconstitutional burden on individual representational rights." *Id.* But *Gill* said no such thing. The Secretary wrongly conflates the Supreme Court's jurisprudence on justiciability with *Gill*'s much clearer guidance on standing.[17] Contrary to the Secretary's view, *Gill* expressly left the question of justiciability for another day, even as it affirmed that several of the Wisconsin voters in that case had pleaded facts sufficient for standing.[18]

---

[17] This confusion extends to the structure of the Secretary's brief. Her analysis of *Gill*'s purported impact on standing appears in the midst of her discussion of the broader issue of justiciability. *See* Sec.'s Br. 10–22.

[18] The Court ultimately found that the *Gill* plaintiffs—whose evidence is distinguishable from the evidence the Voters here have brought to bear, *see infra*—had

This Court's order on the Secretary's motion to dismiss fully anticipated the central holding of *Gill* on district-by-district standing. Order Granting in Part and Denying in Part Defendant's Motion to Dismiss [Dkt. 54 at 3-9] ("MTD Order"). Far from narrowing or blocking the path to standing for challenges to unconstitutional partisan gerrymanders, the Supreme Court has provided a roadmap. The evidence before the Court does prove this district-level injury.

## 2.    Standing under the First Amendment

The First Amendment's prohibition on retaliation bars a state government from penalizing a citizen or depriving her of a benefit on account of her constitutionally protected speech or conduct. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74–76 (1990). Of course, the "right of qualified voters, regardless of their political persuasion, to cast their votes effectively" lies near the core of protected First Amendment freedoms. *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (quoting *Williams v. Rhodes,* 393 U.S. 23, 30–31 (1968)). Accordingly, a state law that "restrict[s] the plaintiffs' political activities within the state and . . . limit[s] their ability to associate as political organizations" gives rise to an injury sufficient to confer First Amendment standing. *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014).

---

failed to *prove* their standing at the trial stage and therefore remanded. *See* 136 S. Ct. at 1931–33. The Court remanded so that other voters could prove district-by-district standing.

These familiar First Amendment standing principles apply with full force in the

gerrymandering context. In his *Vieth* concurrence, Justice Kennedy observed that,

while most partisan gerrymander claims to that date had invoked the Equal Protection

Clause, the First Amendment "may be the more relevant constitutional provision in

future cases." 541 U.S. at 314. Justice Kennedy explained:

> First Amendment concerns arise where a State enacts a law that has the
> purpose and effect of subjecting a group of voters or their party to
> disfavored treatment by reason of their views. In the context of partisan
> gerrymandering, that means that First Amendment concerns arise where
> an apportionment has the purpose and effect of burdening a group of
> voters' representational rights.

*Id.* In her *Gill* concurrence, Justice Kagan, writing for four justices, elaborated:

> As so formulated, the associational harm of a partisan gerrymander is
> distinct from vote dilution. . . . [I]f the gerrymander ravaged the party he
> works to support, then he indeed suffers harm, as do all other involved
> members of that party. This is the kind of "burden" to "a group of
> voters' representational rights" Justice Kennedy spoke of [in *Vieth*].
> Members of the "disfavored party" in the State, deprived of their natural
> political strength by a partisan gerrymander, may face difficulties
> fundraising, registering voters, attracting volunteers, generating support
> from independents, and recruiting candidates to run for office (not to
> mention eventually accomplishing their policy objectives).

138. S. Ct. at 1938 (internal citations omitted).

Justice Kagan's language leaves open that standing for a First Amendment

challenge to a partisan gerrymander may flow from a broader class of harms than that

required for equal protection standing. But until more explicit guidance arrives, this

much is clear: federal decisions both before and after *Gill* have applied a First

Amendment framework that recognizes the same *individual* harm as furnishing

standing under the Fourteenth Amendment and First Amendment alike.[19] In *Shapiro v. McManus*, the court recognized that "[t]he practice of <u>purposefully</u> diluting the weight of certain citizens' votes to make it more difficult for them to achieve electoral success <u>because of</u> the political views they have expressed through their voting histories and party affiliations" injures a citizen's First Amendment "representational right." 203 F. Supp. 3d 579, 595–96 (D. Md. 2016) (emphasis in original). Likewise, in. *Rucho*, the Middle District of North Carolina, relying on the *Vieth* and *Gill* concurrences, found individual voters' First Amendment claims to be cognizable and ruled that the "injury associated with partisan gerrymandering echoes the district-specific injury giving rise to a partisan vote dilution claim under the Equal Protection Clause." 318 F. Supp. 3d at 829. Thus, while the merits of First Amendment and equal protection claims brought by the individual voters will differ, the standing inquiries overlap.

### B.   Voters properly pled the individualized harm necessary to support standing.

The Secretary seeks judgment on the pleadings on the question of Voters' standing, contending that they have not alleged the individualized, district-based harm mandated by *Gill*. Sec.'s Br. 5–9. The Secretary overstates her case by claiming, in

---

[19] As discussed in Section IV below, associational standing under the Equal Protection Clause and the First Amendment is a somewhat different analysis.

italics no less, that "*Plaintiffs have not alleged that even one* particular Congressional district is cracked or packed." *Id.* 8; *see also id.* 9.

This Court previously found the opposite. It denied the Secretary's motion to dismiss the Voters' district-by-district claims for lack of standing in May.  MTD Order.

Even if the Secretary's belated motion for judgment on the pleadings is taken at face value,[20] it is unpersuasive. The Court has already decided that the Complaint adequately alleges district-by-district standing, and the Secretary has presented the Court no reason to cast aside its prior ruling on the question.

### 1. The Court previously found that the Voters' Complaint properly pled district-by-district standing.

Applying the standing analysis borrowed from racial gerrymandering cases, as the *Gill* Court would soon do--this Court held that the Voters had adequately pled standing to pursue political gerrymandering claims in their individual districts. The Court found that the Voters properly alleged that they experienced "archetypal gerrymandering injuries" to their rights under the First and Fourteenth Amendments, such as "being singled out based on political affiliation, and 'intentionally place[d] … in voting districts that reduce or eliminate the power of their votes.'" MTD Order at

---

[20] At this advanced stage, where "discovery . . . has been exhaustive" and "numerous matters outside the pleadings have been presented to the Court throughout the course of litigation," the Court should treat the motion as a summary judgment motion under Rule 56. *See TRW Fin. Sys., Inc. v. Unisys Corp.*, 835 F. Supp. 994, 1011 (E.D. Mich. 1993).

10 (citing Compl. [Dkt. 1] ¶ 1). The Court further explained: "The individual Plaintiffs do not lack standing to challenge their own legislative or congressional districts merely because they assert that other Democrats in other districts have also been harmed." *Id.*

This was the correct conclusion. It was clear then, as it is clear now, that the Voters cleared the low pleading hurdle. In the Complaint, the Voters alleged:

- "As detailed below, individual Plaintiffs are being harmed by the Michigan Legislature's gerrymandering of their individual congressional and legislative districts." Compl. ¶ 10.
- "Michigan's Current Apportionment Plan gerrymanders by cracking and packing Democratic voters, including Plaintiffs." *Id.* ¶ 32.
- "Plaintiffs challenge the Current Apportionment Plan district by district and in its entirety." *Id.* ¶ 36.
- "Michigan's durable and severe partisan gerrymander of state legislative and congressional districts violates individual Plaintiffs' First Amendment free speech and association rights and Fourteenth Amendment equal protection rights. It singles out the individual Plaintiffs and hundreds of thousands of other similarly-situated Michigan Democrats based on their political affiliation, and *intentionally places them in voting districts that reduce or eliminate the power of their votes.*" *Id.* ¶ 1 (Court's emphasis at MTD Order at 10).

While the Complaint might not describe specifically which districts are packed or cracked for every district, it clearly alleges that *each* district, including the individual Plaintiffs' districts, has been gerrymandered and all of the Voters' voting power has been diluted. *See, e.g., Ala. State Conference of NAACP v. State*, 264 F. Supp. 3d 1280, 1290 (M.D. Ala. 2017) (holding that succinct allegations of vote dilution injury in the

challenged districts sufficed to plead standing under Rule 12 in the context of a racial gerrymandering challenge).[21] These allegations are sufficient to allege standing.

### 2. There is no reason to revisit the Court's ruling that Voters' Complaint properly alleges standing.

The Secretary asks the Court essentially to reconsider its Order, suggesting that the Supreme Court's intervening decision in *Gill* requires a fresh appraisal on the question of standing. Sec.'s Br. 5–6. But no reappraisal is necessary.  This Court correctly anticipated the standing analysis in *Gill*.

The Court's MTD Order and the Supreme Court's decision in *Gill* are remarkably parallel. Both looked to racial gerrymandering cases to judge standing in political gerrymandering cases. *Compare* MTD Order at 3-4 with *Gill*, 138 S. Ct. at 1931 (both citing *Alabama Legislative Black Caucus*, 135 S.Ct. 1257 (2015)). Both courts held that a political gerrymandering claim, like a racial gerrymandering claim, applies district-by-district, not statewide. *See* MTD Order at 4-5; *see also Gill*, 138 S.Ct. at 1920-21.

Both courts also found that voters can present statewide *evidence* in order to prove gerrymandering in a particular district. *Id.* Nothing in *Gill* contradicted the MTD Order and there is no need to revisit the standing issue under Rule 12 now.

---

[21] In any event, Voters have narrowed their list of challenged districts since the close of discovery.

### C.   Voters have demonstrated a genuine issue of material fact as to standing under the Equal Protection Clause.

The Secretary and Congressional Intervenors argue that Voters have no evidence that they have suffered the cognizable constitutional harms necessary for standing. They insist that Voters have not come forward with evidence of individualized harm as required under *Gill*—and in particular, that Voters have not identified an "'undiluted' alternative configuration for any particular voter in any particular district." Sec.'s Br. 24–35; Congressional Intervenors' Motion for Summary Judgment [Dkt. 121] ("Intervenors' Br.") 10–14. These arguments ignore the evidence.

### 1.   Voters' evidence is sufficient under *Gill*.

The Secretary seems to claim that *Gill* bars the Voters' "vote dilution" theory. Sec.'s Br. 10. But *Gill* said just the opposite. *Gill* expressly recognized the dilution of votes as a "district specific" harm: "to the extent the plaintiff's alleged harm is the dilution of their votes, that injury is district specific." 138 S.Ct. at 1930. The Supreme Court recognized that that dilution arose from packing and cracking and even described the remedy as creating "uncracked" or "unpacked" districts. *Id.* at 1930-31 (citing *Baker,* 369 U.S. at 206); *see also Ohio A. Philip Randolph Institute v. Smith*, 2018 WL 3872330, at *6 (S.D. Ohio Aug. 15, 2018) ("[T]he individual plaintiffs must allege sufficient facts establishing that they live in a packed or cracked district[.]"). *Gill* applied this standard to conclude that four Wisconsin voters who had adequately

pleaded their standing ultimately failed to prove it because they had presented evidence *only* of statewide harm.[22] *Gill,* 138 S. Ct. at 1932-33.

The Secretary insists that Voters' evidence of statewide partisan intent and statewide partisan effect is analogous to that which *Gill* found insufficient. *See* Intervenors' Br. 3; Sec.'s Br. 24–27, 31. The Secretary also incorrectly claims at page 35 that Voters have not shown it is possible to "undilute" any Plaintiff's district. This is not correct.

Voters have assembled a wealth of testimony, documents, and expert evidence demonstrating that Michigan's Republican map-drawers intentionally created a powerful, durable state-wide gerrymander in the 2011 redistricting process. But, unlike in *Gill*, and contrary to the Secretary's claims, Voters here have *also* come forward with substantiated district-level evidence that individual voters have been placed in cracked or packed districts.

Having focused the scope of their claims after completing substantial discovery, Voters challenge the following 35 districts as cracked or packed: U.S. Congressional districts 1, 4, 5, and 7 through 12; Michigan Senate districts 8, 10 through 12, 14, 18, 22, 27, 32, and 36; and Michigan House districts 24, 32, 51, 52, 55,

---

[22] The Secretary's attempts to confine district-specific harm to legislator indifference or stigmatization (Sec.'s Br. 7) caricature the gerrymandering harm in a way "that has never been so limited, with the Supreme Court recognizing from its earliest gerrymandering cases that the reduction or elimination of voting power is a cognizable injury." Sec.'s Br. 46-47; MTD Order at 9.

36

60, 62, 63, 75, 76, 83, 91, 92, 94, and 95. As to *each* of these districts, Voters have designated specific evidence of the burden imposed on Democratic-voting League members in that district. *See generally*, Ex. 1-3.

For example, comparing the full spectrum of alternative districts generated by Dr. Chen in which an individual voter could have been placed to his or her actual district under the enacted 2011 Plans, Dr. Chen's data provides compelling evidence of the extent to which the as-enacted district is politically biased. Professor Warshaw's analysis of that data illustrates starkly the extent to which individual Plaintiffs or League members in Congressional districts 7, 8, and 10; Senate districts 8, 10, 14, and 22; and House districts 32, 51, 52, 63, 76, 83, 91, and 94 have suffered dilution of their voting strength as Democrats by being placed in districts where Democratic candidates have *consistently* been less likely to win than they would be in the vast majority of alternative districts that encompass their individual addresses. *See Gill,* 138 S.Ct. at 1931 (noting that a cracking claim requires the plaintiff to show that, because of the gerrymander, her vote "carr[ies] less weight than it would carry in another, hypothetical district"). The same data shows, conversely, that individual Plaintiffs or League members in congressional districts 5, 9, and 12; Senate districts 11, 18, and 27; and House districts 60, 62, 75, 92, and 95 have had their votes wasted—and their voting strength thus diluted—by being packed in districts that are consistently "safer" Democratic seats than they would be in the majority of nonpartisan, Apol-compliant

alternative maps. This is the district-level packing and cracking of the sort the *Gill*

opinion referred as a proper basis for voter standing.

This evidence stands in stark contrast to the wholly statewide effect evidence

on which the *Gill* plaintiffs relied. Here, the disparate, complementary harms of

cracking and packing can be visualized in stark relief: while the efficiency gap

measures the cumulative toll of the gerrymander, Voters' data illuminates the degree

to which individual voters have suffered harm to their respective voting rights in their

specific districts.

The only federal merits decision to apply the *Gill* standard on standing thus far,

*Rucho*, found analogous evidence sufficient to establish standing at *trial*. In finding that

the plaintiffs there had met their burden of demonstrating cracking or packing of

Democratic voters in North Carolina's congressional districts, the court found

Dr. Chen's analysis comparing the plaintiffs' districts to politically neutral, state-law-

compliant alternative maps to be probative. *See, e.g.*, 318 F. Supp. 3d at 821 (finding

plaintiffs' claim that North Carolina congressional district 1 was "packed" to be

buttressed by the fact that "of 2,000 simulated districting plans generated by Dr. Chen

. . . all but 3 of the plans . . . would have placed [the voter] into a less Democratic-

leaning district"). Unlike the *Rucho* plaintiffs, the Voters need not *prove* that they have

suffered a vote dilution injury.[23] The evidence they have introduced gives rise to a reasonable inference that they have suffered individualized, redressable injury caused by the districts lines being where they are, and that suffices at this stage.

### 2.    The Secretary misapplies *Gill*.

The Secretary challenges Voters' evidence of standing on two related grounds. First, she asserts that Voters' quantitative evidence that individuals' districts are partisan outliers cannot establish that these individuals' voting power has been *diluted*. Second, she urges that Voters' alternative maps fail to carry their burden with respect to the redressability of the harm they have suffered. Each argument is unfounded.

### a.    The Secretary overstates the Voters' summary judgment burden in demonstrating vote dilution.

As the Secretary acknowledges, the concept of vote dilution "implies—and indeed necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured." Sec's. Br. 27 (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997)). The Secretary also observes that a plaintiff's standing ultimately depends on showing that the vote dilution she suffered can be redressed by a neutrally

---

[23] The Congressional Intervenors argue that this Court should distinguish *Rucho* because the plaintiffs there produced a greater quantity of evidence substantiating their vote dilution injuries. Intervenors' Br. 7-9. Besides being inaccurate, they fail to take into account the different postures of the two cases. But even leaving aside this key difference, and as noted above, *Rucho* explicitly and repeatedly found Dr. Chen's data as to the partisanship of specific districts, generated from a methodology similar to that he employed in analyzing the Michigan gerrymander, to be persuasive evidence that plaintiffs in individual districts had suffered an injury in fact. *See Rucho*, 318 F. Supp. 3d at 821–826.

drawn district. *Id.* The Secretary goes astray, however, in suggesting that a voter has suffered cognizable harm only if her preferred candidate or party would prevail in a given alternative configuration.

The Secretary chooses a pair of Michigan House districts—districts 75 and 76 in Grand Rapids—to illustrate her point. Sec.'s Br. 26. The Complaint alleges that Voter Donna Farris and other Democrats have been placed in a cracked district 76, while the Democratic voters in neighboring portions of Grand Rapids have been packed in district 75. Compl. ¶ 10(d). The documentary evidence amply buttresses this allegation, *see* Ex. 3, as does Dr. Chen's district-level data. Enacted District 75 produces *far* more safely Democratic election results than *any* of the 1,000 neutral alternative districts that would include League member Ellanna Bootzin's residence, thus packing her into a district that wastes her Democratic vote. District 76 is just as extreme an outlier in the other direction, producing election results that skew far more Republican than Dr. Chen's host of alternatives. *See* Ex. 37. Without citing any support for the proposition, the Secretary insists that district 76 cannot be cracked because it—like its packed neighbor district 75—has elected Democratic house members. Sec.'s Br. 26–27 ("A district that consistently elects a Democrat plainly cannot be one in which Democrats are 'cracked.'").[24]

---

[24] The Secretary also contends that because Dr. Chen's simulations "freeze" districts whose composition is subject to the Voting Rights Act, Voters cannot demonstrate that any vote dilution is redressable. Sec.'s. Br. 25. This argument is a red herring, because Voters do not challenge these VRA districts.

*Gill* does not command such an interpretation. A plaintiff's voting power has been diluted if "the composition of the voter's own district . . . causes his vote— having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931. Here, the evidence indicates that district 76 was drawn to be as Republican-friendly as possible, and that Ms. Farris has suffered the consequences of that partisan line-drawing by being placed in a district that votes significantly more Republican than other neutrally drawn districts encompassing her home address would be. *See also* Vatter Decl. ¶¶ 45-47 (discussing districts 75 and 76). The fact that district 76 has not yet elected a Republican House member under the current configuration does not mean that the district was not gerrymandered and it does not negate the real, quantifiable impact that the district map has had on the probability that the preferences of Ms. Farris and her like-minded neighbors will be outweighed. *See Mich. St. A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 944 (E.D. Mich. 2016) ("Courts have continued to recognize that the increased risk of harm constitutes an injury sufficient to support standing.") (quoting *Stewart v. Blackwell,* 444 F.3d 843, 854 (6th Cir. 2006)).

The Secretary denies that Dr. Chen's data can substantiate whether certain districts are "partisan outliers." Sec.'s Br. 33–34. This is so, she contends, because the only criterion Dr. Chen uses in determining whether a district is a packed or cracked "outlier" is "whether a district in the enacted map fell within the narrow metrics of his non-random, non-representative simulations." *Id.* at 33. Though the Secretary is

41

assuredly wrong, that issue is not before the Court. For purposes of these motions, the Voters are entitled to the inferences that can be reasonably drawn from the expert evidence, and that evidence speaks clearly. Dr. Chen derived his metric for measuring the partisanship of districting plans, what he called the Republican Vote Share, from a rich database consisting of the results of 40 Michigan statewide races over two time frames: 2016 through 2010, and 2012 through 2016. Chen Report at 5–9. When analyzing the partisanship of individual districts in Appendix D to his report, Dr. Chen explained that whether a district was a partisan outlier depended on whether its Republican Vote Share diverged to a statistically significant degree from the range of results produced by the 1,000 computer-generated nonpartisan districts. *Id.* at 54–56. Dr. Warshaw's analysis of the same dataset, but using individual voters' addresses rather than the district as a whole as its comparison point, only reinforces Dr. Chen's conclusions. Warshaw Decl. ¶¶ 4-7 and Ex. 37.

To show a cognizable injury, Voters are not required to prove that the packing and cracking scheme is insurmountable or fool-proof—only that it has imposed a burden on them. *See, e.g., Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) ("The Supreme Court has rejected the argument that an injury must be 'significant'; a small injury, 'an identifiable trifle,' is sufficient to confer standing.") (citing *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). Voters' expert evidence passes that threshold test, easily: it identifies 35 districts, containing hundreds of thousands of voters, in which a one-

42

party-controlled legislature has blatantly used the power of government to dilute the votes of members of the opposing party.

A trifle this is not. *See Rucho*, 318 F. Supp. 3d at 821–26 (finding Dr. Chen's data comparing district-by-district Republican Vote Share against 2,000 alternative maps supported Plaintiffs' standing).

### b. The Secretary overstates the Voters' burden with respect to alternative district maps.

The standing elements of injury-in-fact and redressability are intertwined in gerrymandering cases. No voter lives in a perfect district that maximizes her voting power, and a showing of injury thus necessarily depends on the availability of *some* alternative configuration in which the strength of the plaintiff's vote has not been intentionally diluted for partisan advantage. Relying on the *Gill* decision, the court in *Rucho* explicitly analogized to racial gerrymandering cases in which a plaintiff

> can establish a burden on her Fourteenth Amendment rights by introducing an alternative districting plan, which conforms to a legislature's legitimate districting objectives and traditional redistricting criteria, under which the plaintiff's vote would not have been diluted based on her race.

*Rucho*, 318 F. Supp. 3d at 816.

The *Gill* Court found that plaintiff William Whitford, a resident of heavily Democratic Madison, had failed to prove that he suffered an individualized injury at trial, because he had not shown that a gerrymander diluted his vote. "[E]ven plaintiffs' own demonstration map resulted in a virtually identical district for him," and the

plaintiffs in that case had pointed to *no* remedial map under which Whitford's district would have been "unpacked" and his voting power enhanced. *Gill*, 138 S. Ct. at 1933.

Voters' evidence here suffers from no such shortcoming. Indeed, some of the same evidence that helps establish that individual districts are cracked or packed—the district-level analyses conducted by Drs. Chen and Warshaw against 1,000 neutrally drawn alternative districts—show the availability of *multiple* alternative districts that redress the injury suffered by a plaintiff in that district.

The Secretary faults Voters for their "refus[al]" to "*commit* to an alleged 'undiluted' alternative configuration for any particular voter in any particular district." Sec's. Br. 27 (emphasis added). The Secretary's theory that a plaintiff must "commit" to a single, ideal remedial district in order to have standing is unsupported by precedent. Without a doubt, plaintiffs in many racial or partisan gerrymandering challenges have pinned their claim for redressability on a single demonstration map; when a constitutional challenge is asserted against a single district, such a showing will be sufficient. *See, e.g., Cooper v. Harris,* 137 S. Ct. 1455, 1479 (2017) (noting, in the context of a racial gerrymandering case, that there is "no doubt that an alternative districting plan, of the kind North Carolina describes, can serve as key evidence"). But *Gill* does mandate, either implicitly or explicitly, that a plaintiff demonstrate her burden is redressable by pointing to a *single* alternative—it speaks instead of "another, hypothetical district." *Gill*, 138 S. Ct. at 1931. There is no reason why a collection of

1,000 unbiased alternatives is any less persuasive than a single one. Indeed, multiple maps are, if anything, better evidence of the underlying gerrymander.

Moreover, the Secretary's theory stands the principle of district-by-district proof on its head. As the Secretary rightfully notes, the shapes of Michigan's districts are interconnected, and it is possible that redressing a constitutional violation in one district will produce ripple effects elsewhere in the map. *See* Sec.'s Br. 35. The conclusion she draws from this observation, however, is illogical. She asserts that "Plaintiffs have not shown that it is possible to 'undilute' *any* individual Plaintiff's district, much less that it is possible to 'undilute' *all* of them at once." *Id.* In other words, she urges that no plaintiff has standing to challenge a particular district until Voters provide the Court with an alternative map that fixes the constitutional infirmities of *all* districts. This is the opposite of what *Gill* teaches—that the remedy must be "limited to the inadequacy that produced [the] injury in fact," and that "the remedy that is proper and *sufficient* lies in the revision of the boundaries of the individual's own district." 138 S. Ct. at 1930 (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996)) (emphasis added). Perfection is unattainable in redistricting. An individual plaintiff's standing to challenge their district-by-district harm does not depend on the simultaneous redressability of *other* voters' injuries, and it subverts the holding of *Gill* to suggest otherwise.

45

**D.      Voters have demonstrated a genuine issue of material fact as to standing under the First Amendment.**

Defendants' motions have little to say about Voters' First Amendment claim. Congressional Intervenors do not mention the claim at all, and the Secretary criticizes it only in passing, asserting summarily in four lines that the purported standing and justiciability shortcomings of Voters' Equal Protection claim should apply equally to Voters' First Amendment claim. Sec.'s Br. 42.

If this is an argument for summary judgment, it is a perfunctory one that the Court need not consider. *Sunseri v. Proctor*, 461 F. Supp. 2d 551, 573 (E.D. Mich. 2006) ("The Court need not consider arguments raised in a perfunctory manner, unaccompanied by some effort at developed argumentation.") (citing *Dillery v. City of Sandusky,* 398 F.3d 562, 569 (6th Cir. 2005)). Moreover, as discussed above, Voters have created a genuine issue of material fact with respect to the individualized, redressable harm they have suffered to their voting rights, and this same evidence carries their burden to demonstrate First Amendment standing. *See Rucho*, 318 F. Supp. 3d at 829; *Shapiro*, 203 F. Supp. 3d at 595–96.

**III.   Voters' First Amendment and Equal Protection gerrymandering claims are justiciable.**

Judicially manageable standards for adjudicating both types of partisan gerrymandering claims exist. The Secretary incorrectly asserts that no workable standards exist and mischaracterizes existing Supreme Court precedent. The appropriate standard for determining the merits of Voters' Equal Protection claims is

46

whether the legislative body's intent in redistricting was to invidiously discriminate against a disfavored party, and whether it effectively did so. The appropriate standard for determining the merits of Voters' First Amendment claim differs in that the Court must evaluate whether the configuration of districts was intended to, and did in fact, burden individuals that support a particular candidate or political party, and whether a causal relationship exists between the legislature's discriminatory motivation and the First Amendment burdens imposed by the districting plan.

### A. Partisan gerrymandering claims are justiciable.

The Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill*, 138 S.Ct. at 1929 (quoting *Reynolds*, 377 U.S. at 561). So critical is this right to our republican government and the survival of our democracy that at least three parts of our Constitution ensure its protection and prohibit intentional discrimination based on partisanship. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995) (Article I bars states from enacting regulations that dictate electoral outcomes or disfavor classes of candidates); *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976) (per curiam) (First Amendment prohibits election regulations that restrict speech or enhance relative voice of others); *Davis v. Bandemer*, 478 U.S. 109, 166 (1986) (Powell, J., concurring in part and dissenting in part) (Equal Protection Clause mandates that states treat its voters the same, regardless of political belief or affiliation). Partisan gerrymandering violates "the core principle of republican

government . . . that the voters should choose their representatives, not the other way around." *Ariz. State Leg.*, 135 S. Ct. at 2677 (internal quotations omitted).

The justiciability of partisan gerrymandering claims derives from the justiciability of one-person, one-vote and racial gerrymandering cases. In *Baker v. Carr*, the Supreme Court held that one-person, one-vote apportionment claims are justiciable. *See* 369 U.S. 186, 217 (1962). The *Baker* Court explained that an issue poses a political question if, among other things, there is "a lack of judicially discoverable and manageable standards for resolving it." *Id.* The Court concluded that one-person, one-vote claims were judicially manageable because "[j]udicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action." *Id.* at 226.

In *Davis v. Bandemer*, 478 U.S. 109, the Supreme Court extended *Baker*'s justiciability framework to partisan gerrymandering claims, holding that such claims do <u>not</u> raise nonjusticiable political questions, *see id.* at 123 (plurality op.); *id.* at 161-65 (Powell, J., concurring in part and dissenting in part). Writing for the Court, Justice White emphasized that the Court had previously concluded that one-person, one-vote and racial gerrymandering claims were justiciable, thereby establishing that apportionment claims implicating "issue[s] of representation" are justiciable. *Id.* at 124 (plurality op.). Justice White further stated that there was no reason to believe that the

"standards . . . for adjudicating this political gerrymandering claim are less manageable than the standards that have been developed for racial gerrymandering claims." *Id.* at 125.

The Supreme Court revisited the justiciability of partisan gerrymandering claims in *Vieth v. Jubelirer*, 541 U.S. 267 (2004). The Secretary cites *Vieth* to argue that the Voters' claims are nonjusticiable. Sec.'s Br. 10. This is simply incorrect. *Vieth* held no such thing, with Justice Kennedy, the fifth vote, refusing to join the four-justice majority whose blanket rejection of *Bandemer* on justiciability did not carry the day. *See Vieth*, 541 U.S. at 311 (Kennedy, Jr., concurring) (expressly rejecting "the plurality's conclusions as to nonjusticiability.")

Two years later, the Supreme Court again refused to revisit *Bandemer*'s holding that partisan gerrymandering claims are justiciable. *League of United Latin Am. Citizens v. Perry (LULAC)*, 548 U.S. 399, 414 (2006).[25]

Therefore, under controlling Supreme Court precedent, a challenge to an alleged partisan gerrymander presents a justiciable case or controversy. In *Rucho*, the district court correctly noted that the Supreme Court has *never* found that a claim raised a nonjusticiable political question solely due to the alleged absence of a judicially manageable standard. 318 F. Supp. 3d at 866 n.19 (citing *Nixon v. United*

---

[25] Most recently the *Gill* Court, 138 S. Ct. 1916, expressly declined to address the justiciability of such claims, *id.* at 1929 (majority op.), with Justice Kagan, joined by three other Justices, reaffirming that "[c]ourts have a critical role to play in curbing partisan gerrymandering," *id.* at 1941 (Kagan, J., concurring).

*States*, 506 U.S. 224, 228–36 (1993); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). As Justice Kennedy explained in *Vieth*, it is difficult to establish "proof of a categorical negative," or "proof that no standard could exist." *Vieth*, 541 U.S. at 311 (Kennedy, J., concurring).

### B. Judicially manageable standards exist for adjudicating First Amendment partisan gerrymandering claims.

Generally, strict scrutiny has been applied to First Amendment claims across a variety of contexts, including election regulations and content-based regulations of speech. *See, e.g.*, *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372–76 (2018) (invalidating content-based regulation); *Citizens United v. Fed'l Election Com'n*, 558 U.S. 310, 339–43, 365 (2010) (invalidating election disclosure regulation); *Davis v. Federal Election Comm'n,* 554 U.S. 724, 744 (2008) (invalidating election fundraising limit). However, Voters do not argue that intent to interfere with First Amendment rights is alone sufficient to state a partisan gerrymandering claim under the First Amendment. *See LULAC*, 548 U.S. at 418 (Kennedy, J., concurring) (viable partisan gerrymandering claim must "show a burden"). If a court considers the effects of a challenged law to determine its constitutionality, then it applies intermediate scrutiny under the First Amendment. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994).

Voters propose that the Court adopt the *Rucho* Court's intermediate scrutiny standard for adjudicating First Amendment partisan gerrymandering claims. *See Rucho*,

318 F. Supp. 3d at 928-99. The court there set forth the following three-prong test: (1) whether the challenged districting plan was intended to burden individuals or entities that support a disfavored candidate or political party, (2) whether the districting plan in fact did burden the political speech or associational rights of such individuals or entities, and (3) whether a causal relationship existed between the governmental actor's discriminatory motive and the First Amendment burdens imposed. *Id.*

### 1.     Intent

First Amendment retaliation claims frame the intent element, wherein a plaintiff must prove that the governmental actor was motivated to retaliate because it sought to interfere with her protected First Amendment rights. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The First Amendment prohibits "burdening or penalizing citizens because of . . . their voting history [or] their association with a political party." *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment).

The facts discussed above demonstrate that the Michigan legislature intended to infringe on Voters' First Amendment rights. Republican legislative staff and consultants were seeking to stop Democratic voters from using their voting power to elect Democratic representatives by drawing lines throughout the state, and in the challenged districts, that diluted their votes.

51

### 2.      Burden and Effects

Governmental action chills speech and burdens First Amendment rights if it "would deter a person of ordinary firmness from continuing to engage in [First Amendment protected] conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The burden in a partisan vote dilution claim "arises through a voter's placement in a 'cracked' or 'packed' district." *See, e.g.*, *Gill*, 138 S. Ct. at 1931. Even a "slight" burden on "a political party, an individual voter, or a discrete class of voters" violates the First Amendment if the burden is not supported by a justification of commensurate magnitude—as is the case here. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (Stevens, J., plurality op.).

The 2011 Michigan redistricting chilled and burdened the First Amendment activities of reasonable people in Voters' positions. The plan not only chilled political speech and associational rights, it also diluted the electoral speech and power of voters who support non-Republican candidates. *See, e.g.*, Dillon Decl. ¶¶ 12-16.

### 3.      Causation

Finally, the causation requirement derives from First Amendment retaliation and election regulation cases which permit a defendant to avoid liability if it demonstrates that it would have taken the same action "even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287; *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (balancing the State's interests against the rights of the individual). Here, it is evident that but-for the effect the redistricting plan had on Democrats in each district,

the Legislature would not have drawn the districts in this way. It is "axiomatic that the government has no legitimate interest in 'restrict[ing] the speech of elements of our society in order to enhance the relative voice of others.'" *Rucho*, 318 F. Supp. 3d at 935 (quoting *Valeo*, 424 U.S. at 48-49).

### C. Judicially manageable standards exist to adjudicate Voters' Fourteenth Amendment partisan gerrymander claims.

A judicially manageable standard also exists to adjudicate Equal Protection partisan gerrymandering claims. In *Vieth*, Justice Kennedy explained the perhaps self-evident point: the "standards that guide analysis of all Fourteenth Amendment claims" also apply when courts are analyzing partisan gerrymandering claims as well. *Vieth*, 541 U.S. at 310 (Kennedy, J., concurring). The Fourteenth Amendment bars classifications that are applied in an "<u>invidious</u> manner" or "in a way unrelated to any legitimate [] objective." *Id.* at 307 (Kennedy, J., concurring) (emphasis added). Although Justice Kennedy accepted the invidious intent standard, he expressed concern that intent alone was insufficient, and he noted that the plaintiffs in that case had failed to state a claim because the record did not demonstrate even that the legislature had burdened a party or its supporters. *Id.* at 313.

Voters propose the following standard for adjudicating Fourteenth Amendment partisan gerrymandering claims: if a state legislative body is motivated by invidious partisan considerations when drawing district lines, and the redistricting has

the effect of discriminating against a disfavored political party or its supporters, then the redistricting is unconstitutional. *See Rucho*, 318 F. Supp. 3d at 852.

Federal courts are perfectly capable of applying the legal standard of invidious conduct to the facts before them in a wide variety of claims. *See, e.g., Gaffney v. Cummings*, 412 U.S. 735, 752 (1973) (districting claim); *Rodgers v. Lodge*, 458 U.S. 613, 622 (1982) (same); *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 81 (1991) (union/fair representation claim); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (conspiracy to interfere with civil rights claims); *Washington v. Davis*, 426 U.S. 229, 241 (1976) (equal protection claim).

As in these other contexts, the Court is tasked with determining whether the legislature simply considered the classification at issue, or actually discriminated improperly <u>because</u> of it. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995); *Gaffney*, 412 U.S. at 752. Where, as here, a government draws district lines for the express purpose of subordinating a political party, it acts invidiously. But the State would not violate the intent prong if it "fairly [] allocate[d] political power to the parties in accordance with their voting strength," *Gaffney*, 412 U.S. at 754, or if it simply sought to "preserv[e] the cores of prior districts" and "avoid[] contests between incumbent Representatives," as long as those goals were pursued in a "nondiscriminatory" manner, *Karcher v. Daggett,* 462 U.S. 725, 740 (1983).

Similarly, a consistent preference for competitive districts would also be permissible. *See Vieth,* 541 U.S. at 346 (Souter, J., dissenting). For instance, in *Gaffney*,

the Supreme Court held that the Connecticut legislature did not invidiously discriminate because the State's "admitted" goal was to create a "plan that would achieve a rough approximation of the statewide political strengths" of the two parties, which was a constitutionally permissible purpose. 412 U.S. at 752.

The Secretary incorrectly argues that some degree of invidious, partisan gerrymandering is constitutional. Sec.'s Br. 19 n.15. She identifies no cases, and Voters are likewise aware of none, holding that the Constitution allows a legislature to draw district lines for the purpose of diminishing or minimizing the natural voting strength of supporters of a particular party. To the contrary, the Supreme Court recently wrote that such actions are "incompatible with democratic principles." *Ariz. State Leg.*, 135 S.Ct. at 2658 (alteration omitted). While the Supreme Court approved "proportionality" line-drawing, it distinguished that practice from gerrymanders that seek "to minimize or eliminate the political strength of any group or party . . . ." *Gaffney*, 412 U.S. at 754; *see also Vieth*, 541 U.S. at 316 (Kennedy, J., concurring).

Throughout, the Secretary mis-cites *Gaffney* to defend the Michigan gerrymander. *See, e.g.*, Sec.'s Br. 12-13, 36. To be precise, the premise the *Gaffney* Court accepted was that politically conscious voter placement *for the purpose of promoting fairness* did not present a *per se* constitutional problem. *Gaffney*, 412 U.S. at 748–53. Here the problem is just the opposite: Voter placement *for the purpose of gaining partisan political advantage*. In relying on *Gaffney*, the Secretary argues that a holding that the Constitution embraces fair representation should incorrectly, and indeed perversely,

be read to sanction the Michigan legislature's proven and successful effort to do just the opposite.

Voters have satisfied the standard for justiciability of their Fourteenth Amendment claim. Described above is overwhelming evidence of the legislature's invidious intent and the district by district impact. Unlike the Connecticut legislature in *Gaffney*, the Michigan legislature did not use partisan factors to advance fair representation. *Cf. Gaffney*, 412 U.S. at 752.[26] Michigan Republican legislators, Republican caucuses, their consultants and their lawyers drew districts to favor Republicans by drawing districts for anticipated Republican candidates, pairing Democratic incumbents, and expressing a general animus toward Democrats who they referred to as "opponents," "the opposition," and "garbage." *See, e.g.*, Ex. 17.

The Secretary erroneously argues that Plaintiffs' Complaint and evidence focuses only on statewide gerrymandering claims. Plaintiffs' evidence and Complaint expressly incorporate district-by-district gerrymandering claims. *See* Compl. ¶ 36; Chen Report at 54-56 & Appendix D at 73-88. And this Court recognized that Voters sufficiently pled district-by-district claims. *See* MTD Order at 10-11, 15.

The Secretary also conflates the very distinct notions of partisan asymmetry and proportionality. Sec.'s Br. 21. The Supreme Court has indeed said that there is no

---

[26] The Secretary correctly acknowledges that the Supreme Court in *Gaffney* addressed not the question of whether politics were used, but "whether the political classifications were *used to burden* a group's representational rights." Sec.'s Br. 36 (quoting *Vieth,* 541 U.S. at 315 (Kennedy, J., concurring).

jsdavis.120126899.4.DOCX

constitutional right to proportionality: *i.e.*, that a vote share of x% will result in a seat share of X%. *See, e.g.*, *Bandemer*, 478 U.S. at 132. But the Supreme Court has never made the very different statement that intentional, material partisan *asymmetry* which dilutes voters and prevents proportional outcomes is beyond constitutional scrutiny. Asymmetry arises when the map is rigged so that one party is heavily favored in translating its votes into seats. *See* Mayer Report at 18. The districts that Voters challenge here are grossly uneven and worthy of the Court's careful scrutiny.

The Secretary incorrectly analogizes this case to other cases in which courts have dismissed partisan gerrymandering claims for failing to set forth a judicially manageable standard. In *Harris v. McCrory*, No. 1:13-CV-949, 2016 WL 3129213, at *2 (M.D.N.C. June 2, 2016), *aff'd sub nom. Harris v. Cooper*, 138 S. Ct. 2711 (2018), the plaintiffs failed to put forth any standard whatsoever for adjudicating political gerrymandering claims. They merely claimed that "whatever the standard may be that would govern all partisan gerrymandering claims," North Carolina's redistricting map was un constitutional. *See* Pl.'s Obj. & Memo. L. Re. Remedial Redistricting Plan, *McCrory*, 2016 WL 3129213 (M.D.N.C. June 2, 2016), 2016 WL 3537185, at *15. Here, however, Plaintiffs have proposed manageable standards, which courts have successfully applied in analogous contexts. *Alabama Legislative Black Caucus v. Alabama* is also distinguishable because there, the plaintiffs *conceded* at oral argument that they believed the standard for partisan gerrymandering is "unknowable" and they "don't even know what evidence [they can] marshal to either support it or reject it." 988 F.

57

Supp. 2d 1285, 1295–96 (M.D. Ala. 2013). In stark contrast, Voters are firm in their assertion that a judicially manageable standard is knowable and applicable in partisan gerrymandering cases, as evidenced by the direct, circumstantial, and statistical evidence discussed above.

Finally, the Secretary erroneously analogizes this case to *Radogno v. Illinois State Bd. of Elections*, No. 1:11-CV-04884, 2011 WL 5868225, at *4 (N.D. Ill. Nov. 22, 2011), *aff'd sub nom. Radogno v. Illinois State Bd. of Elections*, 568 U.S. 801 (2012). In *Radogno*, the plaintiffs proposed a six-factor test for determining the constitutionality of partisan gerrymanders under the Equal Protection Clause. The court held that the test was fundamentally flawed because it arbitrarily utilized numerical values. *Id.* Here, however, Voters do not hang their hat on arbitrary numerical valuations; they instead rely on the invidious discrimination standard, which the Supreme Court has cited with approval and federal courts commonly apply.

### D.    The Secretary wrongly suggests this problem will fix itself.

Interestingly, the Secretary cites the Justice Breyer's dissent in *Vieth* for the proposition that those harmed in partisan gerrymandering "constitute a political majority, and a majority *normally* can work its political will." Sec.'s Br. 2 (emphasis added). Of course Justice Breyer was stating this general rule only as the starting point from which a justiciable gerrymander is the departure.

Similarly, at footnote 5 the Secretary suggests the Court should be unconcerned because of the "political solution" under Article I, Section 4 allowing Congress to

draw districts for federal elections. Voters take no comfort that such congressional authority, never before exercised, will bestow a solution in coming years, and in any event, the congressional power extends only to federal elections, not to the state elections, also at issue here. There is abundant evidence that Michigan is in just the tough spot that Justice Breyer described and the Founders feared.

The Secretary bemoans the unpleasantness "of judicial intervention into the legislative realm." Sec.'s Br. 4. But she overlooks that the Constitution plainly imposes guardrails that the courts in redistricting cases alone have enforced for over 50 years. Both *Baker v. Carr* and *Reynolds v. Sims* prove that the Constitution does not constrain judicial activity in redistricting.  In *Reynolds*, for example, the Supreme Court rendered a decision that required redistricting of almost every state in the Union. The court vindicated the constitutional command of equal protection where voting rights, the core of the democratic process, were being subverted.

## IV.    The League has standing to bring constitutional claims for itself and on behalf of its members.

Contrary to the Secretary's arguments (Sec.'s Br. 42-49), the League has standing to challenge districts identified above. The current configuration injures the League's own organizational interests (independent associational standing), and the League is an appropriate organization to pursue claims on behalf of its Democratic members in the challenged districts (derivative associational standing). It is well recognized that either form of associational standing is sufficient to satisfy the injury-

59

in-fact requirement for constitutional claims seeking injunctive or declaratory relief. *See Warth v. Seldin,* 422 U.S. 490, 511 (1975); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332-33 (6th Cir. 2002); and MTD Order at 11.

### A. The gerrymandered districts have impaired the League's mission.

The Secretary first argues that the League failed to follow an associational standing "road map" in the Court's Order. Sec.'s Br. 43-44. Contrary to the Secretary's suggestion that the League may only show impairment in two ways, the Court noted that "[t]here are *many approaches* by which the League might" show impairment. MTD Order at 13 (emphasis added). The evidence discussed above and detailed in the Declarations of Susan K. Smith and other League members, tendered herewith, demonstrates that the League's mission has been "perceptibly impaired" by a "concrete and demonstrable injury to the organization's activities" and a "consequent drain on the organization's resources." MTD Order at 12 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)).

Specifically, the League has evidence that its mission of "empowering voters, defending democracy" has been impaired by the challenged plans' intentional packing and cracking of Democratic voters in the challenged districts. Smith Decl. ¶¶ 4, 30. The League has had difficulty getting candidates to attend candidate forums because of the lack of competitive races following the plans' implementation. *Id.* ¶ 26. The League has been unable to get access to Republican legislators in "safe districts" and cannot make progress on voter registration and access legislation because elected

representatives have become less responsive and unwilling to even allow hearings on such measures. *Id.* ¶¶ 27, 29; League 30(b)(6) Dep. 63:12-65:7. Perhaps most troubling, the configuration of the challenged districts has created and supported cynicism in the Michigan voting population, such that the League's members and other voters they encounter increasingly believe that their votes do not count. Smith Decl. ¶ 30;[27] *see also* Warshaw Report at 20-29, 36-41.

Other courts have concluded that these types of harms are sufficient to establish associational standing, especially with respect to First Amendment claims. On this point, *Rucho* is instructive. 318 F. Supp. 3d at 777. There, the court analyzed whether plaintiffs, including the League of Women Voters of North Carolina, had standing to assert First Amendment claims challenging partisan gerrymandering. While noting that First Amendment harm associated with voter dilution "echoes the district-specific injury giving rise to a partisan vote dilution claim under the Equal Protection Clause," the court found that "[p]artisan gerrymandering also implicates 'distinct,' non-dilutionary First Amendment injuries, such as infringing on 'the ability

---

[27] The Secretary claims that the League mission has not been impaired because the League has gained approximately 500 members in the last three years. Sec.'s Br. 44. Current membership is not a meaningful metric for measuring the impacts on and viability of the League's mission. In fact, the League provided deposition testimony explaining why membership numbers are a particularly poor measure of the gerrymandering's effects. Membership fluctuates up and down from month to month and year to year, and moreover, the League recently increased its ranks by allowing noncitizens and young people aged 16-18 to join as members. League 30(b)(6) Dep. 23:11-22; 27:25-28:22; 43:20-45:22; 46:6-16.

of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects.'" 318 F. Supp. 3d at 828-29 (citing *Gill*, 138 S.Ct. at 1938-39 (Kagan, J. concurring) (noting that "the associational harm of a partisan gerrymander is distinct from vote dilution" and such associational harms "ha[ve] nothing to do with the packing or cracking of any single district's lines")). Because the North Carolina League presented trial testimony that it "had difficulty providing opportunities for its members . . . to interact with candidate[s]" and witnesses observed an increased "lack of voter interest" in the challenged congressional districts, the court found that the plan's invidious partisan discrimination burdened the organization's mission. 318 F. Supp. 3d at 830-31.

Here, the current districts likewise infringe the Michigan League's Democratic members' ability to affiliate in their political party and to associate and advance their political beliefs. *See* League 30(b)(6) Dep. 70:18-72:3 (describing member complaints about how communities of interest have been broken up). The League is having difficulty engaging voters and providing them with opportunities to interact with candidates. *Id.* 63:12-65:7; Smith Decl. ¶¶ 16-17, 20.

Other district courts considering partisan gerrymandering challenges brought by state chapters of the League of Women Voters have held that these sister organizations have independent associational standing. *Rucho*, 318 F. Supp. 3d at 830; *Ohio A. Philip Randolph Inst. v. Smith*, No. 1:18cv3357, 2018 WL 3872330, at *4-5 (S.D. Ohio Aug. 15, 2018) (finding that League of Women Voters of Ohio had standing

because voter engagement was deterred). This Court should likewise reject the Secretary's challenge to the League's standing.

### B.     The League also has derivative standing through its membership.

The Secretary also challenges the League's derivative standing—specifically, whether any identified League member has standing to sue in her or his own right.[28] The Secretary argues that Plaintiffs have not provided information on any specific League members who would have standing or facts that support the League members' standing in any specific district. Sec.'s Br. 45-47. Her assertions are incorrect.

As shown above, the League has ample evidence that its Democratic members in the challenged districts have standing to bring their own claims. The identity of those members is no mystery. The League produced the names and addresses of League members registered as Democrats in each of the challenged districts.[29] Months

---

[28] The following three-part test governs derivative associational standing: "[A]n association has standing to bring suit on behalf of its members when . . . (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm.*, 432 U.S. 333, 343 (1977); *Doe v. Porter*, 370 F.3d 558, 561-62 (6th Cir. 2004).

[29] The Secretary criticizes the list of Democratic members produced at the League's deposition because of "the late date of production." Sec.'s Br. 46, n.44. However, such evidence is properly considered in opposition to the Secretary's motion. The League may submit "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp.*, 477 U.S. at 324. The League's list is squarely within the scope of materials outlined in Rule 56(c) (i.e., a part of the record as a deposition exhibit and electronically stored information). *See* Fed. R. Civ. P. 56(C)(1)(A).

ago, the League also produced in discovery a district-by-district list of League members and descriptions of the events, presentations and programs that League members have held in each district. Smith Decl. ¶¶ 10, 11, Ex. 33, 34.[30]

This case differs from the facts of *Gill*, which did not involve organizational standing and where "plaintiffs failed to meaningfully pursue their allegations of individual harm." *Gill*, 138 S.Ct. at 1917. *Rucho* again provides helpful guidance. There, the court held that the League of Women Voters of North Carolina (and most of the individual plaintiffs) had standing to pursue claims where the League identified "specific precincts in each of the [challenged] thirteen congressional districts in which at least one League member is registered to vote and regularly votes as a [d]emocrat" and where the League introduced evidence that the challenged plans packed and cracked Democratic voters. *Rucho*, 318 F. Supp. 3d at 829-31. Here, the League has introduced similar evidence and, at the very least, created a genuine issue of material fact as to its members' standing.

## V.   The affirmative defense of laches fails as a matter of law.

Defendants also move for summary judgment on laches. Intervenors' Br. 16.[31] Their motion fails because (1) the *Voters,* not the Congressional Intervenors, are entitled to summary judgment—as separately argued in the Voters' motion for partial

---

[30] These lists were produced in response to the Secretary's discovery requests on July 10, 2018.

[31] The Secretary joined the Congressional Intervenors' motion on October 12, 2018.

summary judgment [Dkt. 117] ("Voters' Laches Motion"); and (2) even if the legal issue were not resolved in the Voters' favor, genuine issues of fact surround their claims of prejudice and unreasonable delay.

## A.   Voters, not Congressional Intervenors, are entitled to summary judgment on laches.

Congressional Intervenors' motion ignores at least two controlling, threshold issues of law that require summary judgment in *Voters*' favor: (1) continuing harms; and (2) Voters' requests for prospective relief.

### 1.   Laches does not apply to continuing constitutional harms.

The Sixth Circuit and other courts hold that the laches defense does not bar constitutional claims.  *See* Voters' Laches Motion at 10-12; *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997); *Ohio A. Phillip Randolph Institute v. Smith*, No. 1:18CV357, 2018 WL 3872330, at *8 (S.D. Ohio Aug. 15, 2018)); *see also Concerned Citizens of S. Ohio, Inc. v. Pine Creek Conservancy Dist.*, 429 U.S. 651, 653, 656 (1977); and *Shapiro v. Maryland*, 336 F. Supp. 1205, 1210 (D. Md. 1972) (questioning whether it is ever appropriate to dismiss a suit on the grounds of laches "and thus forever bar an appropriate judicial inquiry into the merits of an otherwise properly alleged cause of action" challenging unconstitutional gerrymandering).

That is especially true where the harms complained of are continuing. *See* Voters' Laches Motion at 12-14; *France Mfg. Co. v. Jefferson Elec. Co.*, 106 F.2d 605, 609 (6th Cir. 1939) (rejecting laches defense in patent suit where continuing violation at

issue); *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990). When plaintiffs

suffer new injuries, courts recognize that they are usually entitled to new remedies.

Congressional Intervenors claim that *Benisek v. Lamone*, 138 S. Ct. 1942, 1943

(2018) (per curiam), establishes that laches can extinguish a constitutional claim.

Intervenors' Br. 18. But *Benisek* does not even mention laches as a defense. 138 S.Ct..

at 1943-45. The Supreme Court addressed the issue of irreparable harm in the context

of a request for a preliminary injunction, where delay can militate against a finding of

harm. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) ("The applicants'

delay in filing their petition and seeking a stay vitiates much of the force of their

allegations of irreparable harm."); *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip.*

*& Mfg., Inc.,* 511 Fed. Appx. 398, 405 (6th Cir. 2013) ("[A]n unreasonable delay in

filing for injunctive relief will weigh against a finding of irreparable harm."). Denying a

*preliminary* injunction because of delay is a far cry from entering final judgment as to all

remedies. *See Benisek*, 138 S. Ct. at 1944. Notably, the Supreme Court did not find the

"years-long delay" affected plaintiffs' ultimate right to relief. Since *Benisek* did not

mention the laches doctrine, it has no bearing on Voters' claims for declaratory and

*permanent* injunctive relief.

The Congressional Intervenors also cite no law dismissing a constitutional

claim with ongoing harms based on laches. The cases they do cite are inapposite. For

example, in *McClafferty v. Portage County Board of Elections*, the court found an

unreasonable delay where "the election [was] already underway." 661 F. Supp. 2d 826,

841 (N.D. Ohio 2009). There is no support for the Congressional Intervenors'

argument that constitutional claims with ongoing harms may be dismissed—at any

time—on the basis of a laches defense.

### 2. Laches does not apply to claims seeking declaratory and prospective relief.

The laches doctrine also does not apply because they seek only declaratory and

prospective injunctive relief in this case. *See* Voters' Laches Motion at 12-14.

Congressional Intervenors erroneously disagree.

Congressional Intervenors first argue that the legal authorities on which Voters

rely were decided in contexts different from gerrymandering claims. Intervenors' Br.

23. But it does not matter. Whether a claim seeks a declaration or permanent

injunction to prevent further trademark infringement or further violations of

constitutional rights, the legal principle is the same. The laches doctrine should not be

applied to bar a declaration that certain marks, if they continue to be used, will

constitute infringement nor should the doctrine ever bar a declaration that it would be

unconstitutional to conduct future elections based on current district boundaries.

Equitable relief should be freely available to prevent unlawful conduct from

continuing.

Congressional Intervenors go on to challenge "any broad assertion that laches

is not applicable to injunctive relief" as "contrary to Supreme Court precedent."

Intervenors' Br. 24 (citing *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1

(2008)). But as with *Benisek*, their reliance on *Clintwood Elkhorn* is misplaced. That decision never once mentions laches. It involved a statute of limitations. More significantly, the plaintiff alleged a single injury arising from a discrete act. 553 U.S. at 4 (discussing the triggering of the statute of limitations with reference to the filing of a single tax return). That precedent says nothing about the laches doctrine, nor does it speak to preventing expected future injuries. Ongoing violations of statutory or constitutional law inherently are not stale claims and should not be barred. *See, e.g., Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997) (holding that a "law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it" during the limitations period).

### B. Genuine issues of material fact also preclude summary judgment for Congressional Intervenors.

Even if the Court were to hold that a laches defense is legally or theoretically possible for defendants to prove, summary judgment would not be appropriate. There are genuine fact questions about whether this action was unreasonably delayed and whether defendants have suffered sufficient prejudice to prohibit Voters from protecting their constitutional rights.

With regard to unreasonable delay, the first element of laches, the Court should reject any suggestion it would be per se unreasonable to allow this case to continue to trial. The case is not exceptionally tardy. Other court decisions have rejected laches

challenges in similar or more extreme circumstances. Those courts recognized the

public importance of the claims and they noted that gerrymandering challenges take

time to evaluate, marshal evidence, and present claims for judicial review. *See, e.g.*,

*Garza*, 918 F.2d at 772 (holding that challenge to 1981 reapportionment filed in 1988

was not barred by laches because the injury "has been getting progressively worse");

*Smith*, 2018 WL 3872330, at *8 (denying motion to dismiss for laches where

redistricting map was in effect for eight years, or three election cycles); *Dickinson v. Ind.*

*State Election Bd.*, 933 F.2d 497, 502 (7th Cir. 1991) (reversing the grant of summary

judgment to defendants under the laches doctrine where voters challenged

apportionment ten years after it went into effect).

Voters brought this lawsuit once they had marshalled sufficient evidence to

show that the 2011 districts not only effected severe harms on the League's members

but also that those harms were also durable through multiple elections. Much time,

effort, and expense were then required to secure thorough expert analysis of potential

claims. Courts have long recognized that the laches doctrine should not apply when

plaintiffs needed time to gather evidence necessary to draft proper claims. *See, e.g.*,

*Jeffers v. Clinton*, 730 F. Supp. 196, 202-03 (E.D. Ark. 1989) (rejecting the argument that

plaintiffs had unreasonably delayed bringing their case, in part because they were

required to gather data about the results of the gerrymander to confirm the

unconstitutionality of the redistricting), *aff'd*, 498 U.S. 1019 (1991); *Smith v. Clinton*, 687

F. Supp. 1310, 1313 (E.D. Ark. 1988) (recognizing the need to wait until elections

occur to determine if the structure or redistricting is unconstitutional); *Sierra Club v. U.S. Dep't of Transp.*, 245 F. Supp. 2d 1109, 1116 (D. Nev. 2003) ("Unlike cases where plaintiffs sat on their rights, Sierra Club's delay in filing suit was caused by Sierra Club's efforts to gather the necessary information . . . .").

Voters' claims rest on data obtained from multiple election cycles. The expert opinions that support Voters' claims rely on that data and on analytical techniques that have recently been accepted by political science academics and the federal courts. The Court should reject defendants' invitation to enter a summary judgment that would discourage litigants' thorough pre-filing investigation and preparedness.

As to the second element of laches, prejudice to defendants, the Congressional Intervenors' arguments also would require the Court to resolve genuine issues of fact. The only type of prejudice Congressional Intervenors have identified is "loss of evidence or memory of witnesses." Intervenors' Br. 20. Their vague descriptions of missing documents and their counts of unanswered deposition questions do not support summary judgment in their favor. Voters deserve an opportunity to address such assertions at trial.

In fact, Congressional Intervenors cannot plausibly claim that critical evidence was lost solely because of the delay in filing the lawsuit. This is so because the Republicans who carried out the 2011 redistricting project anticipated litigation from the very outset and had every incentive to preserve documents and recollections that would show that their actions pass constitutional muster. As just two examples, both

the Michigan House Speaker and the Senate Majority Leader warned colleagues to expect litigation as early as June 2011, before redistricting was completed.

Ex. 36 ("I have seen some fantastic comments by members who are understandably not excited (even unhappy) about their maps. That level of class is impressive. I urge everyone to be careful in commenting on redistricting; everything we say and do can end up in court on this issue."). This 2011 memo evidences a direct order to avoid creating evidence that might later be incriminating. Similarly, the Senate Majority Leader prepared "talking points" in June 2011, one of which addressed the possibility of a "court challenge." Ex. 35. Because they were *expecting* litigation, they already had incentives to preserve only those documents that might not incriminate them, or at least those that might support their claims that the plans are constitutional.

Congressional Intervenors also cite faded memories as evidence of prejudice. Intervenors' Br. 21-22. They highlight one witness's sudden inability to recall (following a break in his deposition) whether the legislature consulted any Democrats in redrawing the maps. Many other witnesses' testimony, and documents, however, show that no Democrats were ever invited or permitted in the rooms where their maps were drawn and debated. At the very least, the extent of any prejudice is a question of disputed fact. Courts have recognized that this issue is usually best left for trial. *See Innovation Ventures, LLC. v. Custom Nutrition Labs., LLC*, 256 F. Supp. 3d 696, 704 (E.D. Mich. 2017) (denying summary judgment to allow a jury "to consider the factual disputes" relating to prejudice "in Defendants' laches defense") (quoting *GMC*

71

*v. Lanard Toys, Inc.*, 468 F.3d 405, 421 (6th Cir. 2006)). Summary judgment for the defendants on their laches defense would be contrary to the requirements of Rule 56.

## Conclusion

For the foregoing reasons, the Secretary's and the Congressional Intervenors' motions for summary judgment should be denied as both a matter of law and a matter of disputed material facts.

Date:  October 12, 2018                    /s/ Joseph H. Yeager, Jr

                                           Mark Brewer (P35661)
                                           GOODMAN ACKER P.C.
                                           17000 West Ten Mile, Second Floor
                                           Southfield, MI 48075
                                           Telephone: 248-483-5000
                                           Fax: 248-483-3131
                                           MBrewer@goodmanacker.com

                                           Joseph H. Yeager, Jr. (IN Bar No. 2083-49)
                                           Kevin M. Toner (IN Bar No. 11343-49)
                                           Harmony A. Mappes (IN Bar No. 27237-49)
                                           Jeffrey P. Justman (MN Bar No. 390413)
                                           Daniel R. Kelley (IN 30706-49)
                                           Matthew K. Giffin (IN 31603-49)
                                           Matthew R. Kinsman (IN 32032-71)
                                           FAEGRE BAKER DANIELS LLP
                                           300 North Meridian Street, Suite 2700
                                           Indianapolis, IN 46204
                                           Telephone: 317-237-0300
                                           Fax: 317-237-1000
                                           Jay.Yeager@FaegreBD.com
                                           Kevin.Toner@FaegreBD.com
                                           Harmony.Mappes@FaegreBD.com
                                           Jeff.Justman@FaegreBD.com
                                           Daniel.Kelley@FaegreBD.com
                                           Matt.Giffin@FaegreBD.com
                                           Matthew.Kinsman@FaegreBD.com

                                           *Counsel for Plaintiffs*

jsdavis.120126899.4.DOCX

**Certificate of Service**

I hereby certify that on October 12, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

Respectfully submitted,

/s/ Joseph H. Yeager, Jr.