# Exhibit 7



*Memorandum from*
Jeff Timmer & Steve Linder

To: Bob LaBrant
Regarding: Redistricting
Date: December 22, 2010

---

Let's make Redistricting (Version-2011) – in the words of the immortal poet Yogi Berra, "it's déjà vu all over again." The table is set in similar fashion to last decade; with a GOP governor, control of both chambers of the legislature, and a majority on the Supreme Court. However, navigating the process to a successful conclusion in 2001 required far more than merely having Republican control of the process. It required painstaking preparation, expert guidance and skill, remarkable political leadership, superior legal advice, and a fair amount of luck.

Even though the political landscape in 2011 is similar to 2001, success this time will likely prove to be more difficult to achieve. The political leadership is comparatively far less experienced than in 2001. The governor, majority leader, and speaker will all be new in their positions (compared to only the speaker being a rookie in 2001). The caucus members in both the Senate and House will collectively have far less experience than those ten years ago. Combine these factors with the proliferation of technology and tools with which every legislator, county commissioner, and political science student in the state can fairly easily produce redistricting plans (though, they may have difficulty adequately meeting the statutory guidelines and precedents governing map drawing) – things can very quickly devolve into a mess.

There will be much that tests the collective Republican leadership in 2011; Redistricting may prove to be the single greatest test they face. Maintaining cohesive caucuses in the House or Senate is difficult enough without the added complexity of literally pitting the political ambitions, careers, and livelihoods of members against their Republican colleagues. Add to that the unknown style of a new governor and the uncertainty for a smooth process, at least at this time, is considerable.

Managing all the aspects of this process – legislative, political, legal, personal, technical, public relations – is going to take a great deal of planning, strategy, expertise, money, skill, attention to detail, arm-twisting, money, stamina, patience, money, luck, and money.

Thank you for the opportunity to present you with this proposal outlining The Sterling Corporation's approach, as well as the unique experiences that make us ideally positioned to help us realize our objectives (there's no learning curve) and will assist the collective effort to successfully accomplish our objectives in the most effective, fair, and efficient manner possible.

## Situational Analysis

We face several hurdles to overcome, each requiring both technical skill and hands-on political expertise. The Sterling Corporation will help the collective effort clear each of these hurdles. Here is a synopsis of the largest impediments:

**Strategies & Solutions *for* Leaders**
112 East Allegan, Ste. 700 | Lansing, MI 48933 | 517 267 9012 Phone | 517 267 9078 Fax | www.SterlingCorporation.com

1. **Existing Laws and Legal Precedent**
   The first hurdle faced will be the existing laws and legal precedent. That isn't meant to imply at all that we will in any way look to circumvent either. Rather, it is mentioned to underscore that carving our House, Senate, and Congressional plans that comply with state and federal case law and statute is a difficult task in and of itself. And this may prove most tricky because of the variety of additional hurdles that all have the ability to topple this critical first one.

2. **House Approval**
   Another hurdle will be to create House, Senate, and Congressional plans that will achieve at least fifty-six votes in the House – without causing the first hurdle to fall. Statute leaves very little latitude for maps to be drawn without the wiggle room for negotiations that are usually part of assembling the votes to pass complex or controversial legislation. Census figure have yet to be released, but various members (and wanna-be members) have already approached me about cutting local deals for this or that township to be included in this or that district. Whatever plans are passed will almost certainly force caucus members to either run against each other in a primary, retire rather than face a difficult election, move to avoid a primary election battle or to keep representing the bulk of their current district, or run in largely unfamiliar territory. Then there's the additional complexity of House members looking down the road at Senate district runs in 2014 – against each other or against a sitting Republican senator. Yet the chore of garnering fifty-six votes remains unchanged, and it won't be easy.

3. **Senate Approval**
   Another hurdle will be enacting House, Senate, and Congressional plans that will gain at least twenty votes in the Senate. Twenty-two Republicans will be eligible to run for re-election to the Senate in 2014. They'll all be keeping a keen eye on ambitious GOPers in the House. Many will also be looking at opportunities to draw advantageous Congressional district boundaries (so too may the House members as well as senators who will be termed-out in 2014). Satisfying twenty-six senators will be no easy task and deft guidance will be required.

4. **Governor and Congressional Delegation**
   The next hurdle to clear will be presenting plans that not only attain majorities in both chambers, but also meet the satisfaction of the governor and don't cause the congressional delegation (and their staffs) to become apoplectic. This could prove sticky (or maybe not) even though the congressmen have no official vote in the process. They could, however, if they don't like the plans that are presented, squawk quite loudly to the governor, major donors, the press, legislators, and PACS in both Washington and Lansing. Simply put, the congressmen cannot be ignored or easily overrun in the redistricting process – nor should there be any effort to do so.

5. **Legal Challenge – Michigan Supreme Court**
   Withstanding a Michigan Supreme Court challenge(s) is the next hurdle. Statute gives until November 1, 2011 for all the above to be accomplished and signed into law or the matter is remanded to the Court. Failure to enact timely plans is one sure way to end up in court. The next (and equally as certain) way to end up in court is to enact timely plans. Simply put, whatever plans are enacted are likely to be litigated (that the legislative plans weren't challenged in 2001 is amazing). This takes us back to the initial hurdle: making sure the plans that pass meet statutory and precedential requirements and that clearing any of the other hurdles didn't violate that first hurdle. The goal needs to be to make sure the plans that go before the Court meet criteria as well as gain a majority of votes.

6. **Legal Challenge – Federal Court**
   The next hurdle will most certainly be a challenge(s) in federal court. The Congressional plan will be challenged. The legislative plans may be challenged too. It will be a huge task to make sure the

likelihood of those challenges being successful is minimized. The bottom line with regard to either the state or federal court challenges is not to try avoiding them – we can't. Rather, our goal should be to minimize the risk any court would take remedial action. This will require the diligent leadership and expertise of skilled veterans.

7. **Population/Demographic Forecasting**
Another large hurdle will be to expertly forecast the changing demographic and political changes in these new districts that are likely to occur over the ensuing decade. Precedent and statute remove a good deal of subjectivity from the map drawers; but some subjectivity remains. Creating a reliable crystal ball that will portray these districts in 2014, 2018 or 2020 will be extraordinarily valuable, yet very difficult to do.

## Sterling's Expertise

You cannot surpass the combined talents of Jeff Timmer and Steve Linder as they relate to redistricting in Michigan. As you are well aware, Jeff was a principle map drawer and resource to the old Michigan Reapportionment Fund and team of legal advisors in 1991-1992; and again a chief map drawer and consultant to the combined effort in 2001-2002. Jeff has engaged in population forecasting and preliminary map drawing in preparation for 2011-2012. Linder has been providing services related to the fundraising for the redistricting project for more than a decade. In addition, Lansing veteran Mark Pischea will be responsible for the issue management component of the work, ensuring that we are building support and mitigating against opposition public relations activity.

Not only do we help raise the funds that pay the legal fees and other bills, we have to raise the money by which we receive our compensation for both the fundraising and technical/consulting aspects of the project. **We not only provide invaluable expertise, we pay for ourselves.**

The specific services and tasks we will perform include:

1. **Fundraising**

    We have an unofficial goal of accumulating an additional $1.8 million to $2.1 million on top of the money raised to date. The overwhelming bulk of the money raised will be allocated to cover costs related to litigation. We will devote the necessary experienced fundraising manpower to ensure fulfillment of the funds needed to pay for the legal and technical expertise required.

2. **Technical Coordination between House, Senate, Executive Office, Congressional Delegation and Michigan Republican Party**

    The job is akin to herding cats and will require us to be armed with data and information in order to effectively keep potentially competing interests working in concert. Not only will we help arm our team with all we need to build support and unify the effort, we will also work directly with the

leadership within the Senate and House, executive office, congressional delegation, and MRP to keep the process running smoothly. This applies to keeping the various parties from stepping on each other with fundraising, working with the map drawers and analysts in the House and Senate to ensure plans are legally and technically sound, and working with the collective political leadership to clear the hurdles necessary to attain passage of the plans.

3. **Development of Congressional Plans**

The Senate and House will each assume primary responsibility for developing the plans for each chamber. Timmer will assume primary responsibility for developing the congressional plan, of course working in concert with the legislative and executive leadership, co-del, and MRP. This will include experimenting with scores of contingency and alternative plans.

4. **Drafting Legislative Plan Contingencies**

This is an ace-in-the-hole that needn't be widely discussed (or acknowledged at all); but it is only prudent that Timmer experiment with producing both House and Senate plans. Doing this in 2001 allowed us to be ready with a 5-County Break Senate plan when it was thought that only a 6-Break plan could be achieved. The intent of this function isn't to sucker punch anyone, just to make sure that you and the collective leadership with skin in the game are armed with as much necessary information as can be provided. The more experienced hands are used to draw maps, the better off the entire process will be. (Besides everyone is going to be drawing secret contingency plans beyond their particular area of responsibility)

5. **Congressional and Legislative Plan Criteria Verification**

We will oversee and coordinate the process by which the various plans are evaluated and measured with regard to statutory criteria and legal precedent. We will also oversee the technical conveyance of necessary plan data to the bill drafters in hope of mitigating and eliminating any technical or drafting errors.

6. **Congressional and Legislative Plan Demographic and Political Analyses**

We will oversee and coordinate the analysis of demographic and political data related to the new districts in the House, Senate, and Congressional plans.

7. **Coordinating Congressional and Legislative Plan Forecasting**

We will oversee and coordinate the development of a "crystal ball" statistical forecasting model that will project the changing demographic and political make-up of the new districts in the House, Senate, and Congressional plans.

8. **Coordination with Legal Team**

We will oversee and coordinate the information, advice, and guidelines imparted by the legal team to the political leaders and map drawers. Conversely, we will be responsible for translating the information and data coming from the map drawer and political leadership back to the legal team.

9. **Assisting with Litigation Preparation and Trials**

We will be a resource to the Legal Team as they prepare for and engage in litigation stemming from the plans. We will assist with the coordination of these efforts with the political leadership and other stakeholders.

10. **Public Relations**

Sterling will also work with the team to develop and execute a public relations strategic communications plan. While our chief concern is winning in the legislature, the opposition will certainly take their case beyond the Michigan Supreme Court and Federal Court to the Court of Public Opinion. While the public does not have a vote in the process, they can influence their legislators and judicial opinion. We don't necessarily have to win public support, but we must stop the opposition of gaining any traction with the electorate.

## Sterling's Fee

The fundraising demands over the next two years are considerable and will require Linder's steady guidance and skill. The technical and analytical needs will be even greater and involve a great percentage of Timmer's time during much of the next 12-16 months, as well as the time of others at Sterling who will provide support. The massive time aspect will not be limited to the legislative portion of the project but extend indefinitely through the certain litigation that will ensue following passage of plans by the legislature and signing into law by the governor.

We anticipate that this project will require no less than 100 man-hours per month and often require 200 or more man-hours per month over the next 12-16 months.

Rather than a fluctuating hourly billing that results in unpredictability for all involved, **we are proposing a flat fee for the combined services of The Sterling Corporation (primarily Timmer and Linder – and Pischea as needed).** Further we are proposing that the flat fee be divided into monthly installments and spread out over two years in order to ease some of the competing funding pressures and demands.

We propose a fee of $300,000 to be spread in equal monthly installments over 2011 and 2012. **This equates to $12,500 per month.** When considering the $3,500/month fundraising fee Sterling has been being paid, this $12,500/month fee works out to $9,000 additional per month for the technical and consulting expertise Timmer add – and the support of Sterling's award-winning team – to the project and for the heightened demands of fundraising that will be required over these next two years.

Additionally, we will provide regular invoicing for reimbursement for reasonable and necessary out-of-pocket expenditures incurred carrying out our duties. These particulars will be spelled out in a letter of agreement when we finalize our relationship.

---

On behalf of the entire Sterling Team, we hope this proposal and these terms meet your expectations and approval.

We usually conclude these proposals with something to the effect of "we're eager to get to work." However, as you know, we already are hard at work on this and are grateful for the opportunity to continue our work.

If you have any questions, or to set up a meeting to discuss further, please give Steve or myself a call at 517-267-9012.

Thank you again, and we're looking forward to working with you and creating and passing the fairest plan possible...

Timmer000420