UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MICHIGAN, ROGER J. BRDAK, FREDERICK C. DURHAL, JR., JACK E. ELLIS, DONNA E. FARRIS, WILLIAM "BILL" J. GRASHA, ROSA L. HOLLIDAY, DIANA L. KETOLA, JON "JACK" G. LASALLE, RICHARD "DICK" W. LONG, LORENZO RIVERA and RASHIDA H. TLAIB,<br><br>           Plaintiffs,<br><br>v.<br><br>RUTH JOHNSON, in her official capacity as Michigan Secretary of State,<br><br>           Defendant.<br>_____/ | Case No. 17-cv-14148<br><br>Hon. Eric L. Clay<br>Hon. Denise Page Hood<br>Hon. Gordon J. Quist |

| | |
|---|---|
| Dickinson Wright PLLC<br>Peter H. Ellsworth (P23657)<br>Ryan M. Shannon (P74535)<br>*Special Assistant Attorneys General*<br>215 S. Washington Sq., Suite 200<br>Lansing, MI 48933<br>(517) 371-1700<br>PEllsworth@dickinsonwright.com<br>RShannon@dickinsonwright.com<br>*Attorneys for Defendant, Ruth Johnson* | Jones Day<br>Michael A. Carvin<br>*Special Assistant Attorney General*<br>51 Louisiana Ave., NW<br>Washington D.C. 20001<br>(202) 879-3939<br>macarvin@jonesday.com<br>*Attorney for Defendant, Ruth Johnson* |

**DEFENDANT SECRETARY OF STATE RUTH JOHNSON'S REPLY IN FURTHER SUPPORT OF HER MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

## I.  Plaintiffs have not shown any harm will occur in 2020.

Plaintiffs do not seek relief for alleged past harms. Since they seek prospective relief *only*, the sole *potentially* live controversy before this Court is whether Plaintiffs will suffer cognizable and redressable harm in the 2020 election. The Secretary moved for summary judgment on this basis, (*see* ECF 119, PageID.2438-40); Plaintiffs did not respond, conceding the point and this case.

Article III standing requires demonstration of a redressable injury in fact that is "concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted). Crucially, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. . . ." *Id.* at 564 (quotations omitted). Instead, a plaintiff must present evidence that a "predicted result is actual or imminent." *Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters v. Airborne, Inc.*, 332 F.3d 983, 987 (6th Cir. 2003) (quotations omitted).

Plaintiffs focus exclusively on *prior* harms. Nothing in the record connects these to the 2020 election. The word "2020" does not appear even once in any of Plaintiffs' proposed expert reports.[1] (*See* ECF 129-50, -51 -52.) Plaintiffs not only failed to show that harm is likely to occur in 2020, but also that a proposed alternative

---

[1] Each of Plaintiffs' experts expressly *disavowed* in their depositions that they were making any predictions relative to 2020. (ECF 119, PageID.2439.)

1

plan could *prevent* harm.  The Secretary sought such evidence in a Rule 30(b)(6) deposition,[2] but Plaintiffs declined to testify.  (*See* ECF 119, PageID.2439.)

## II. Plaintiffs present no cracking or packing analysis to support their claims.

Both *Gill v. Whitford*, 138 S. Ct. 1916 (2018), and this Court's May 16, 2018 Opinion and Order (ECF 54) require that Plaintiffs show *district-specific* harm.

But, Plaintiffs' proposed experts have sought to establish precisely the type of statewide defects that were held insufficient in *Gill*.  Their reports were exclusively devoted to this systematic issue.  No expert report provided the required analysis: *i.e.*, not one explains: (i) when cracking or packing becomes unacceptable, (ii) which districts are unacceptably cracked and packed, or (iii) whether an alternative configuration exists that would unpack or uncrack districts in an acceptable way.

In addition to no expert analysis, Plaintiffs did not provide an alternative map which cured Plaintiffs' district-specific injury by showing how each cracked or packed district becomes "uncracked" or "unpacked."  *See Gill,* 138 S.Ct. at 1933; *see also* 138 S.Ct. at 1936 (Kagan, J., concurring).  After attaching one set of "alternative" maps to the Complaint, and having Dr. Mayer perform a *statewide* analysis of another set, (*see* ECF 119, PageID.2419-20), Plaintiffs now abandon

---

[2] The Secretary sought testimony as to the alternative district for each member harmed, and testimony on "how such proposed alternative district plan would redress the injury suffered. . . ."  (*See* ECF 119, PageID.2421 (quotations omitted).)

2

those plans, stating instead in their Response that they rely on the "full spectrum" of Dr. Chen's 3,000 simulated plans.  (*See* ECF 129, PageID.3371.)

Like Drs. Mayer and Warshaw, however, Dr. Chen performed only *statewide* analyses.  More directly, his 3,000 maps were never presented as "undiluted" alternatives, but to demonstrate that the Current Apportionment Map did not result from application of Michigan's traditional redistricting criteria (and instead resulted from partisan intent).[3]  Obviously, this general discussion of statewide *intent* says nothing about whether a district-specific effect is remedied through an alternative.

As the Secretary noted, Dr. Chen lists a number of districts in his report (p. 56) that he calls "partisan outliers" based on comparisons with his simulations.  (ECF 119, PageID.2424.)  But Dr. Chen specifically disavowed at his deposition that he had any standard or sense of what it means for a district to be "cracked" or "packed."  (*See id.*; ECF 119-4, PageID.2472-74.)  The "partisan outliers" at page 56 simply reflect that their composition is *different* than that of the 3,000 simulations, not that they are "packed" or "cracked."  (*See id.,* ECF 119-4, PageID.2474-76.)

---

[3] As earlier noted, Dr. Chen woefully misapplied those criteria, ignoring some and inventing others.  (*See* ECF 119, PageID.2423 n.30.)  Dr. Chen's report discusses his conclusions as to legislative *intent* at pages 14, 21, 26, 30, 34, 39, 43, 47, and 51. (*See* ECF 129-50, PageID.4721, 4728, 4733, 4737, 4741, 4746, 4750, 4754, 4758.) Conversely, the words "burden," "harm," and "injury" never appear in his report.

3

For example, the enacted Congressional District 1, designated a "partisan outlier," is purportedly 56% Republican, while Dr. Chen's simulations for that district are *more* Republican–57%. Making a district more Republican obviously cannot cure a cracked 44% Democrat district, so it is quite clear that Dr. Chen's identification of "partisan outliers" says nothing about whether a district is cracked or packed, or whether any simulation would cure that district-specific problem.

Faced with this evidentiary abyss, Plaintiffs have made an eleventh-hour, *post-discovery* attempt to convert Dr. Chen's idiosyncratic simulation exercise into a "cracking" and "packing" analysis and redressability showing. In addition to being procedurally defective because produced after discovery, that belated attempt falls woefully short on the merits. Plaintiffs submitted the declaration of Dr. Warshaw and attached six charts purporting to show how specific districts in the Current Apportionment Plan compare to Dr. Chen's simulations for the same districts. (*See* ECF 129-37, -56.) But Dr. Warshaw gives no cracking or packing analysis *whatsoever* in his declaration. He never explains which districts are cracked, packed, or whether any of Dr. Chen's alternatives "cure" this; he merely explains how he prepared the charts. The numbers in the charts, standing in isolation, tell this Court nothing about cracking, packing, or redressability.

Even Plaintiffs do not believe that Dr. Chen's simulations identify or cure "diluted" districts. They challenge districts he identified as *not* being "partisan

4

outliers"[4] and *do not* challenge other, purported "outliers." (Compare Chen Report, ECF 129-50, PageID.4763, with Plaintiffs' Response, ECF 129, PageID.3349 n.11.)

As there is no testimony on non-dilutive alternatives, Plaintiffs' conception of packing and cracking must be inferred from their pleadings and analysis of Dr. Chen's simulations. But that simply reveals that Plaintiffs' definition of "cracking" is absurd. In their Response, Plaintiffs defend their challenge to House District 76. (*See* ECF 129, PageID.3374.) Using statewide 2012-2016 data, House District 76 has a partisan composition of approximately 53%D, which Plaintiffs characterize as "cracked." (*Id.*) First, it is nonsensical to characterize a 53% Democratic district that consistently has elected a Democrat as "cracked"–this shows that Plaintiffs' definition of "cracked" districts is untenable.

Moreover, Dr. Chen's simulations for this district—which Plaintiffs claim show redressability—range in composition from approximately 68%D to 54%D:



(*See* ECF 129-37, PageID.3385 (excerpt above taken from Plaintiffs' exhibit 37.))

---

[4] This includes Congressional District 7, Senate Districts 8, 10, and 36, and House Districts 24, 83, and 95. In a Court-ordered, post-discovery supplement, Plaintiffs narrowed their purported 162-district challenge in the Complaint to a 77-district challenge, and now apparently further narrow that challenge. Plaintiffs identify 34 districts as being under challenge in footnote 11 of their Response (but later state that "35" are now under challenge). (Compare ECF 129, PageID.3349 n.11 (listing 34 districts) to PageID.3370 (stating 35 districts remain under challenge.)

5

From this, it appears that Plaintiffs believe that a district between 68%D to 54%D is perfectly fine—and that one above 68%D is packed or below 54%D is cracked. But many challenged districts already fall within the 68%D-54%D safe harbor (including House Districts 55 and 92, and Congressional Districts 5, 9, and 12). These thus are not "packed" or "cracked." With respect to redressability, a large number of "cracked" districts are not "uncracked" by Dr. Chen's simulations since these all provide a Democratic vote share of 53% or less—which is the "cracking" threshold Plaintiffs use for House District 76. (These include House Districts 32, 60, 62, 63, 83, and 91, and Senate Districts 8, 12, 32, and 36.) Indeed, as noted, the "cracking" in some districts, like Congressional District 1, is in fact *exacerbated* by Dr. Chen's Simulations which make the districts *less* Democratic.

Plaintiffs offer no district-specific "cracking" or "packing" analysis, much less one that is a "clear, manageable, and politically neutral standard[]" to assess when cracking or packing has occurred. *See Vieth*, 541 U.S. at 307-08 (Kennedy, J., concurring). Dismissal is thus appropriate.

### III. Plaintiffs' proposed standards for partisan gerrymandering fail to satisfy the dictates of the Supreme Court, and thus fail to show justiciability.

Essentially, under the First Amendment and the Equal Protection Clause, Plaintiffs would find a violation if there is (1) discriminatory purpose, and (2)

discriminatory effect.  (*See* ECF 129, PageID.3381.)   But this "test" is no test at all—it offers *no* guidance on what constitutes an impermissibly burdensome effect.[5]

In *Vieth*, Justice Kennedy affirmed dismissal precisely because there was no "agreed upon substantive principles of fairness in districting" and thus no "basis on which to define clear, manageable, and politically neutral standards for *measuring the particular burden* a given partisan classification imposes. . . ."  541 U.S. at 307-08 (Kennedy, J., concurring) (emphasis added).  "Suitable standards for *measuring this burden* . . . are *critical* to our intervention."  *Id.* at 308 (Kennedy, J., concurring) (emphasis added).  Plaintiffs' proposed test is essentially: if there is a burden, there is a violation.  That standard is no standard at all—it measures nothing.

Since Plaintiffs do not even attempt to answer the question of "how much is too much?" the Court and the Secretary are left to look to the Response to see if a measure can be inferred from Plaintiffs' discussion.  Plaintiffs concede that there is no constitutional right to proportionality.  (ECF 129, PageID.3390-91 (citing *Davis v. Bandemer*, 478 U.S. 109, 132 (1986)).)  But they affirmatively assert that politically-motivated plans that produce "rough" proportionality and

---

[5] The test is similar in material respects to the test already rejected by a majority of the Court in *Vieth*. *See* 541 U.S. at 284-90 (rejecting proposed test of (1) whether mapmakers acted with *predominant* intent to achieve partisan advantage and (2) whether the plan had the discriminatory effect of "packing" and "cracking" the rival party's voters to thwart translation of majority votes to majority seats).

7

"'proportionality' line-drawing" are "approved." (ECF 129, PageID.3389.) Thus, proportionality is their touchstone for "approval" and they provide no suggestion that a *disproportionate* plan would *not* have a proscribed effect (or, alternatively, how much disproportionality is too much).

Similarly, they erroneously assert that partisan asymmetry is still viable. (*Id.* at PageID.3391.) But Justice Kennedy expressly rejected partisan asymmetry as a valid measure of burden in *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 419-20 (2006) (Kennedy, J.) (stating that asymmetry fails to "provide[] a standard for deciding how much partisan dominance is too much").[6] When partisan-gerrymandering plaintiffs later presented asymmetry studies in *Gill*—including the efficiency gap—the Court again forcefully rejected those measures: asymmetry analyses "do not address the effect that a gerrymander has on the votes of particular citizens. Partisan-asymmetry metrics such as the efficiency gap measure something else entirely: the effect that a gerrymander has on the fortunes of political parties." *Gill*, 138 S. Ct. at 1931-33. Plaintiffs' experts have addressed the wrong questions.

Even if there were some constitutional right to proportional or symmetrical redistricting plans—and there is not—Plaintiffs' experts provide no "well-accepted"

---

[6] As four other justices in *LULAC* would have continued to hold gerrymandering claims nonjusticiable—as they had done in *Vieth*—Justice Kennedy's opinion constituted a majority. *See LULAC,* 458 U.S. at 407.

8

measures of either proportionality or symmetry. The Secretary argued this point at length in her opening Brief (ECF 119, PageID.2426-33), and Plaintiffs left it unrebutted. This is a Kennedy (not a *Daubert*) issue: Justice Kennedy instructed in *Vieth* that a justiciable standard must include a "well-accepted" measure of partisan fairness,[7] and Plaintiffs have offered only nascent metrics that are still under heavy debate in the academia and that do not answer the core question of when a particularized, district-specific burden becomes too much.

Nothing in the Response suggests that Plaintiffs' claims are "judicially cognizable," *i.e.*, "traditionally thought to be capable of resolution through the judicial process." *See Raines v. Byrd*, 521 U.S. 811, 819 (1997).

## IV. The League's standing presentation relies on inadmissible evidence and makes no redressability showing.

Plaintiffs' attempts to support standing for the League through its members, or through harms to its institutional mission, fall woefully short. Plaintiffs provided:

- no declaration or report showing that any voter is currently discouraged from voting but would vote in 2020 if another plan were adopted;

- no evidence that any donor, volunteer, or candidate is discouraged now, *but would not* be discouraged if another plan were adopted; and

- no evidence that any person has been frustrated in joining the League, getting particular candidates to show up to forums, or otherwise in carrying

---

[7] *Vieth*, 541 U.S. at 308 (Kennedy, J., concurring); *see id.* (a test for partisan gerrymandering claims must be "limited and precise.")

9

out the mission of the League, much less that any such frustration would change if an alternative were adopted.

Plaintiffs' post-discovery[8] attempts to shore up standing are unavailing. As to derivative standing, the League provides a list of League members who told League staff (over the phone) that they voted for Democrats in challenged districts in 2014 or 2016. (ECF 129-38.) There are no declarations from these members; not one has alleged that their preferred candidate lost or is likely to lose, much less that their district was cracked, packed, or would be cured by some unseen alternative plan. Since the League's members do not have standing, the League cannot somehow convert this into standing for the League itself. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (derivative standing requires that an organization's members "would otherwise have standing to sue in their own right").

Even if the Plaintiffs *had* gathered information to support harm or redressability, their newly-produced list is inadmissible anyway. "Evidence submitted in opposition to a motion for summary judgment *must be admissible*" and that "[h]earsay evidence must be disregarded." *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quotations omitted) (emphasis added). "A court cannot

---

[8] The Secretary specifically sought such evidence in a Rule 30(b)(6) deposition, but Plaintiffs provided none. (*See* ECF 119, PageID.2421.)

rely on unsworn inadmissible hearsay when ruling on a summary judgment motion." *Hoover v. Walsh*, 682 F.3d 481, 491 n.34 (6th Cir. 2012) (quotations omitted).

The League also fails the second prong of derivative standing because the "interest[]" of its members that it "seeks to protect" is *not* "germane to the organization's purpose." *Hunt*, 432 U.S. at 343. The non-partisan League's interest is not in electing Democrats—it is to eliminate electoral systems that do not protect "democracy" or otherwise cause "voter apathy." Here, however, none of the League members have alleged that the redistricting scheme somehow undermines democracy or instills apathy *in them* (which they could not assert, since these members apparently remain enthusiastic participants in the electoral process).

Finally, it must be shown that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* Here, both the claim and the relief requires the participation of individual members, so that they can be examined about what injury they have suffered and how an alternative would alleviate that injury. Associational standing is not a convenient device to avoid the adversarial process by establishing (through hearsay first produced post-discovery) a purported injury about which the members are never even questioned.

For its direct, associational standing, the League relies on the declarations of Susan K. Smith and Brandon Dillon. These declarations simply recite what third parties said or believe: *i.e.*, that Republican legislators are less responsive to requests

to participate in candidate forums, less receptive to voter reform legislation, or that "members and many other voters have told [Ms. Smith] that they now believe their votes do not count." (ECF 129-53, PageID.4976-78, ¶¶ 26-31; ECF 129-55, PageID.4994, ¶¶ 12-15.) These statements about what third parties say or believe are, again, inadmissible hearsay.

Further, any injury to the League is concededly indirect. The League is non-partisan, and discriminating against Democrats does not directly injure it; it could only *indirectly* do so in fulfilling its "good government" mission. This is inadequate because "[a]n alleged injury must be 'direct' to constitute an injury sufficient to support standing." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999).[9]

Anyway, the League also has not shown any "concrete, particularized" or "redressable" direct or indirect injury to itself as an association. To do so, as this Court has already made clear, the League was required to show that it had been "perceptibly impaired" by a "concrete and demonstrable injury to the organization's activities" and a "consequent drain on the organization's resources." (ECF 54,

---

[9] "[A] plaintiff who complains of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts is generally said to stand at too remote a distance to recover." *Coyne*, 183 F.3d at 495 (quotations omitted). The League is entirely different from the plaintiffs in *Green Party of Tennessee v. Hargett*, 767 F.3d 533 (6th Cir. 2014), where the plaintiff challenged the exclusion of *itself* from the ballot, and thus "suffered a *unique*, individualized harm" that was "peculiar to them." *See id.* at 544 (quotations omitted) (emphasis added).

PageID.953.) The League has provided nothing in this regard. The only reference to the League's non-lobbying[10] "activities" is the Smith Declaration's general assertion that the League has had an "increasingly . . . hard time getting Republican candidates" from "safe" districts to participate in candidate forums. (ECF 129-53, PageID.4976-78, ¶¶ 26-31.) This is manifestly not a sufficient allegation of particularized harm: there is no identification of any Republican candidates who are reluctant, no identification of "safe districts," no comparison of candidate participation prior to or after 2011, and no attempt to tie the allegedly reluctant candidates to the districts that Plaintiffs challenge. As to redressability, there is no hint in the declaration that any Republican who now does not attend forums would be more engaged if this Court ordered an alternative plan into effect for 2020.

The League's other purported injuries have nothing to do with its "activities," but allegedly occur because (1) voters *generally*—*i.e.*, "members and many *other voters*"—are apathetic and (2) the redistricting legislation impedes the League's mission of "empowering voters and defending democracy." *Id.* Both of these interests are quintessential examples of "general interest[s] common to all members

---

[10] As to the League's purported difficulty in persuading Republican legislators to support voting reforms, *Gill* itself squarely held that the failure to secure desired policies from the legislature is a non-cognizable Article III injury: an "abstract interest in policies adopted by the legislature . . . is a non-justiciable general interest common to all members of the public." *Gill*, 138 S. Ct. at 1931 (quotations omitted).

13

of the public," *Gill*, 138 S.Ct. at 1931 (quotations omitted), and are merely "undifferentiated, generalized grievance[s] about the conduct of government."[11] *Green Party*, 763 F.3d at 543 (quotations omitted). Individual *citizens* who do not allege district-specific harm to themselves do not have standing based on their desire to overcome voter apathy[12] and defend democracy, and neither does the League. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) (associational harm standing requires the "same inquiry as in the case of an individual").

## V. Conclusion

For the foregoing reasons, the Secretary requests that the Court dismiss the Complaint with prejudice, and provide such further relief as is appropriate.

| DICKINSON WRIGHT PLLC | JONES DAY |
|---|---|
| /s/ Peter H. Ellsworth | Michael Carvin |
| Peter H. Ellsworth (P23657) | Attorneys for Defendant |
| Ryan M. Shannon (P74535) | |
| Attorneys for Defendant | Dated: October 26, 2018 |

---

[11] Any cognizable injury must constitute invasion of a "*legally* protected" interest. *Lujan*, 504 U.S. at 560 (emphasis added). A generalized interest in an engaged electorate is obviously not protected. Organizations cannot convert an interest that is not legally protected into cognizable injury simply by saying that the unprotected interest is the organization's "mission." A hypothetical "Proportional Representation League" would not have standing by simply asserting that the absence of proportional representation in the Michigan legislature frustrates their "mission."

[12] Indeed, the League members have not suffered the alleged apathy because *all* identified members voted in the allegedly gerrymandered districts in 2014 and 2016. (And of course, the alleged apathy is demonstrably untrue because voting participation is at an all-time high. (*See* ECF 119, PageID.2435 n.43.))

## CERTIFICATE OF SERVICE

      I hereby certify that on October 26, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

                                    /s/ Ryan M. Shannon

538089