# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS )
OF MICHIGAN, et al., )
                        )
      Plaintiffs, )
                        )
v. )      **No. 2:17-cv-14148**
                        )
RUTH JOHNSON, in her official )      **OPINION AND ORDER**
capacity as Michigan Secretary of )
State, et al., )
                        )
      Defendants. )
                        )
_____ )

**BEFORE:**     **CLAY, Circuit Judge; HOOD and QUIST, District Judges.**

     **CLAY, Circuit Judge.** The League of Women Voters ("the League") and the Individual

Plaintiffs (together "Plaintiffs") bring suit under 42 U.S.C. §§ 1983 and 1988, alleging that

Michigan's current apportionment plan (the "Apportionment Plan"), which the state legislature

implemented as Michigan Public Acts 128 and 129 of 2011, violates (1) Plaintiffs' Fourteenth

Amendment equal protection rights and (2) Plaintiffs' First Amendment free speech and

association rights. (*See* Compl., ECF No. 1.)

     There are three dispositive motions currently pending before the court: (1) the Motion to

Dismiss and Motion for Summary Judgment filed by Defendant Ruth Johnson, the Secretary of

State of Michigan in her official capacity ("Johnson") (ECF No. 119); (2) the Motion for

Summary Judgment filed by the Republican Congressional Intervenors ("Congressional

Intervenors") (ECF No. 121); and (3) Plaintiffs' Motion for Partial Summary Judgment on Laches (ECF No. 117).[1] The motions have been fully briefed and are ripe for disposition.

The parties spend hundreds of pages briefing their motions and attach an even greater number of pages of exhibits. But the motions present only three issues for decision: (1) whether Plaintiffs have standing; (2) whether Plaintiffs' political gerrymandering claims are justiciable; and (3) whether laches bars Plaintiffs' claims.

For the reasons that follow, we **DENY** Johnson's Motion to Dismiss and Motion for Summary Judgment (ECF No. 119), **DENY** the Congressional Intervenors' Motion for Summary Judgment (ECF No. 121), and **DENY** Plaintiffs' Motion for Partial Summary Judgment on Laches (ECF No. 117).

## STATEMENT OF FACTS

### A.    Factual History[2]

The Apportionment Plan was signed into law by the governor of Michigan on August 11, 2011, after being passed by both chambers of the Michigan legislature. The Michigan State Senate map was primarily drawn by Terry Marquardt, a senior Republican Senate staffer. (Marquardt Dep., ECF No. 129-46 at 23:1–25:2; 31:2–15.) The task of redistricting the Michigan State House map fell to Daniel McMaster, a senior Republican advisor in the House, who later retained Brian Began to assist him. (McMaster Dep., ECF No. 129-47 at 36:4–5, 49:14, 50:4–51:24.) Republican lawmakers outsourced the drawing of the Congressional Districts to the

---

[1] Both Defendants asserted an affirmative defense of laches. (*See* Johnson Answer, ECF No. 59; Congressional Intervenors Answer, ECF No. 116.)

[2] While Defendants dispute the validity of Plaintiffs' expert reports and the statistical analyses contained therein, they do not cite to any of their own experts to counter Plaintiffs' expert evidence, present any affidavits in opposition to Plaintiffs' experts, or otherwise present evidence to dispute the expert evidence presented by Plaintiffs.

Michigan Redistricting Resource Institute, which in turn hired Jeff Timmer of Sterling Corporation, a Republican consulting firm. (Labrant Dep., ECF No. 129-44 at 140:23–141:05.)

Marquardt, McMaster, Began, and Timmer participated in weekly meetings at the Dickinson Wright law firm where they reported on the maps upon which they were working and strategized about the mapmaking process. (*See* Timmer Dep., ECF No. 129-49 at 56:17–18; Marquardt Dep., ECF No. 129-46 at 82:18–22; McMaster Dep., ECF No. 129-47 at 52:9–54:15; Labrant Dep., ECF No. 129-44 at 235:5–237:19.) Attorneys for Republican legislators also attended the meetings to provide legal counsel to the mapmakers. (Labrant Dep., ECF No. 129-44 at 235:5–2:37:19; McMaster Dep., ECF No. 129-47 at 53:14–54:8; Timmer Dep., ECF No. 129-49 at 256:24–257:2.) Bob Labrant, the founder of the Michigan Redistricting Resource Institute, also participated. (Labrant Dep., ECF No. 129-44 at 236:25–237:11.) These meetings were "confidential." (Timmer Dep., ECF No. 129-49 at 256:18–23.) No Democratic representative or interest group ever attended the meetings. (Timmer Dep., ECF No. 129-49 at 56:19–22.)

The maps were also highly secretive. During meetings where McMaster showed individual Republican legislators copies of their districts' maps, he collected the maps after the meetings "for security." (McMaster Dep., ECF No. 129-47 at 136:25–137:16.) Even the Republican Senate Majority Leader was "just shown" the maps at one of the mapmakers' weekly meetings—he was "not allowed to keep a copy." (Marquardt Dep., ECF No. 129-46 at 83:1–9, 127:23–128:2.) And at a Senate Redistricting Committee meeting that took place on June 22, 2011—the day before the Senate passed the Apportionment Plan—the copies of the Apportionment Plan made available to members of the public "consisted entirely of census data" and "did not contain any maps." (Smith Decl., ECF No. 129-54 at PageID #4974.)

The mapmakers relied on political data to draw the maps. For the Congressional Districts,[3] Timmer used software called "Maptitude" which contained "population . . . and election data." (Timmer Dep., ECF No. 129-49 at 29:10–17.) Marquardt, drawer of the Senate Districts, used software called "AutoBound" that "digitize[d] all the political data," i.e., "election results through the years," all the way "down to the block level." (Marquardt Dep., ECF No. 129-46 at 40:5–43:8.) Marquardt elected to have AutoBound automatically update the partisan composition of the districts as he drew the maps. (Marquardt Dep., ECF No. 129-46 at 195:16– 197:20.) McMaster and Began, who drew the House Districts, also used AutoBound to create their maps. (Began Dep., ECF No. 129-41 at 31:17.)

The "underlying factor" for the mapmakers was that "if the plans don't pass the legislature . . . you've done your work for nothing." (Marquardt Dep., ECF No. 129-46 at 56:23– 57:4.) The "major consideration as far as getting the [legislature's] vote" was the fact that "sitting . . . senators or representatives . . . want to be re-elected." (Marquardt Dep., ECF No. 129-46 at 69:9–14.) With these considerations in mind, Marquardt prepared reports for every Republican caucus member that showed his or her current district and his or her proposed district. (Marquardt Dep., ECF No. 129-46 at 101:1–104:15.) The reports contained two sets of political data for each current and proposed district: (1) the percentage of voters who voted for the Republican candidate in the previous three governors' races and (2) the percentage of voters who voted in the last three elections for the statewide education boards, a "guideline" for the partisan makeup of the districts. (Marquardt Dep., ECF No. 129-46 at 102:3–103:22.) Marquardt provided these political data points to Republican senators "[b]ecause the senators obviously

---

[3] The Court refers to U.S. Congressional Districts as "Congressional Districts" throughout. The terms "Senate Districts" and "House Districts" refer to Michigan state legislative districts.

would be interested in knowing whether their district got better or worse," better being more Republican or less Democrat. (Marquardt Dep., ECF No. 129-46 at 104:1–15.)

Emails that the mapmakers exchanged illustrate the profound extent to which partisan political considerations played into their redistricting efforts. For example, a staffer wrote Timmer about "a glorious way that makes it easier to cram ALL of the Dem garbage in Wayne, Washtenaw, Oakland, and Macomb counties into only four districts." (ECF No. 129-18 at PageID #3557.) Timmer responded, "[i]nteresting numbers overall. Detroit being 150k less than projected shakes things up." (ECF No. 129-18 at PageID #3557.) In a different email, a staffer approved of one of Timmer's proposed maps, saying it was "perfect" because "it's giving the finger to [S]andy [L]evin," a long-time Democratic United States Congressman. (ECF No. 129-30 at PageID #3606.) In another email, Timmer remarked that a proposed district "is a bit less GOP, but not so much less so that it is in jeopardy of going south on us." (ECF No. 129-31 at PageID #3611.) In the same email, Timmer explained that, under the new districts, "the new 3rd would become slightly less Republican" to allow another seat "to become slightly more so." (ECF No. 129-31 at PageID #3611.)

The mapmakers' efforts proved extremely successful. In each of the three statewide elections held under the Apportionment Plan between 2012 and 2016, the Republicans won 64% of Michigan's Congressional Districts (i.e., 9 of Michigan's 14 seats) despite never winning more than 50.5% of the statewide vote.[4] Similarly, Republicans won at least 53.6% of the House Districts while never winning more than 50.3% of the total vote share.[5] And in 2014, the only

---

[4] *See* https://mielections.us/election/results/2016GEN_CENR.html (2016); https://mielections.us/election/results/14GEN/ (2014); https://mielections.us/election/results/12GEN/ (2012).
[5] *See* https://mielections.us/election/results/2016GEN_CENR.html (2016); https://mielections.us/election/results/14GEN/ (2014); https://mielections.us/election/results/12GEN/ (2012).

year an election was held under the Apportionment Plan's Senate Districts, Republicans won only 50.4% of the vote but collected 71.1% of the seats.[6]

In the 2018 midterm elections, Democrats won 50% of the Congressional Districts despite winning approximately 55.8% of the vote.[7] Similarly, Democrats won only 52 of the 110 House Districts despite securing 52.6% of the vote.[8] Elections were not held for Senate Districts.

**B. Procedural History**

Plaintiffs filed a Complaint for Declaratory and Injunctive Relief against Johnson on December 22, 2017. (ECF. No. 1.) Johnson filed a Motion to Dismiss for Lack of Standing on January 23, 2018 (ECF No. 11), which this Court granted in part and denied in part on May 16, 2018. (*See* Op. & Order, ECF No. 54.) The Court held that Plaintiffs lacked standing to challenge the Apportionment Plain "on a statewide basis" and dismissed Plaintiffs' statewide claims. (*Id.* at PageID #957.) However, the Court concluded that Plaintiffs had adequately pleaded standing on a district-by-district basis because they had alleged they each had been placed in a district drawn to intentionally reduce the power of their votes. (*Id.* at PageID #950.) Thus, the Court denied Johnson's Motion to Dismiss for Lack of Standing with regard to Plaintiffs' district-by-district claims. (*Id.*)

This Court's Opinion and Order anticipated the Supreme Court's decision in *Gill v. Whitford*, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018). In *Gill*, the Supreme Court held that plaintiffs cannot establish standing on political gerrymandering claims alleging vote dilution in violation of the Fourteenth Amendment's Equal Protection Clause by showing a generalized statewide injury because "the injury is district specific." *Id.* at 1930. Instead, plaintiffs must show "a burden on their individual votes." *Id.* at 1934.

---

[6] *See* https://mielections.us/election/results/14GEN/ (2014).
[7] *See* https://mielections.us/election/results/2018GEN_CENR.html (2018).
[8] *See id.*

The Congressional Intervenors joined the case as permissive intervenors on August 30, 2018. (*See* ECF No. 103.)

While Plaintiffs originally challenged the entire Apportionment Plan (*see* Compl., ECF No. 1), Plaintiffs have "narrowed their list of challenged districts." (Pl. Resp. Br., ECF No. 129 at 15, fn. 11.) Plaintiffs currently challenge Congressional Districts 1, 4, 5, and 7–12; Senate Districts 8, 10–12, 14, 18, 22, 27, 32, and 36; and House Districts 24, 32, 51, 52, 55, 60, 62 63, 75, 76, 83, 91, 92, 94, and 95. (*Id.*) Individual Plaintiffs or League members live in each of the challenged districts.[9]

The parties moved for summary judgment. As noted above, three motions for summary judgment are pending before the Court: (1) Johnson's Motion to Dismiss[10] and Motion for

---

[9] For Individual Plaintiffs, *see* Ketola Decl., ECF No. 129-68 (resident of 1st Congressional District); Long Decl., ECF No. 129-69 (resident of 11th Congressional District and 14th Senate District); Ellis Decl., ECF No. 129-70 (resident of 9th Congressional District and 8th Senate District); Farris Decl., ECF No. 129-67 (resident of 76th House District); LaSalle Decl., ECF No. 129-66 (resident of 1st Congressional District); Holliday Decl., ECF No. 129-65 (resident of 5th Congressional District); Rivera Decl., ECF No. 129-64 (resident of 8th Congressional District and 12th Senate District); Brdak Decl., ECF No. 129-63 (resident of 10th Congressional District, 8th Senate District, and 32nd House District); Grasha Decl., ECF No. 129-62 (resident of 9th Congressional District and 11th Senate District). For League members, *see* Warshaw Charts, ECF No. 129-38 at PageID #3881 (providing names of League members residing in Congressional Districts 1, 4, 5, 7, 8, 9, 10, 11, and 12), at PageID #3883 (providing names of League members residing in Senate Districts 8, 10, 11, 12, 14, 18, 22, 27, 32, and 36), and at PageID #3885 (providing names of League members residing in House Districts 24, 32, 51, 52, 55, 60, 62, 63, 75, 76, 83, 91, 92, 94, and 95).

[10] In addition to moving for summary judgment on Plaintiffs' claims under Rule 56, Johnson moves to dismiss Plaintiffs' claims on the pleadings under Rule 12(c). Johnson contends that the Court should dismiss Plaintiffs' claims on the pleadings because Plaintiffs' Complaint does not allege district-specific harms, but instead asserts only statewide injuries that, after *Gill*, 138 S. Ct. 1916, cannot give rise to an injury in fact. (*See* Johnson Br., ECF No. 119 at 5–9.) Johnson's argument is unpersuasive. Contrary to Johnson's contention, Plaintiffs pleaded district-specific harms. For example, they alleged that "individual Plaintiffs are being harmed by the Michigan Legislature's gerrymandering of their *individual congressional and legislative districts*." (Compl., ECF No. 1 at 6) (emphasis added). Furthermore, the Complaint alleges that the Apportionment Plan "singles out the individual Plaintiffs and hundreds of thousands of other similarly-situated Michigan Democrats based on their political affiliation, and *intentionally places them in voting districts that reduce or eliminate the power of their votes*." (*Id.* at 2)

Summary Judgment; (2) the Congressional Intervenors' Motion for Summary Judgment; and (3) Plaintiffs' Motion for Partial Summary Judgment on Laches.

## DISCUSSION

### Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists where evidence would allow "a reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, the court must "view[] [the evidence] in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must also "draw all reasonable inferences" in favor of the non-moving party. *Babcock & Wilcox Co. v. Cormetech, Inc.*, 848 F.3d 754, 758 (6th Cir. 2017) (citing *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013)).

The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). But "'[t]he party opposing the motion may not rely solely on his pleadings and must present more than a mere scintilla of evidence; if the nonmoving party fails to make a sufficient showing on an essential element of the case with

---

(emphasis added). Plaintiffs also alleged a "challenge [to] the Current Apportionment Plan *district by district* and in its entirety." (*Id* at 16) (emphasis added). Furthermore, this Court has *already held* that Plaintiffs' Complaint sufficiently alleged district-specific harms at the motion to dismiss stage. (*See* Op. & Order, ECF No. 54.) Johnson's contention that the Court should revisit its prior determination is without merit. The Court also rejects Johnson's argument that Plaintiffs' challenges to the Senate Districts should be denied as moot now that the 2018 elections have occurred. (*See* Johnson Br., ECF No. 119 at 9.) As the Court previously explained, remedial special elections may be required to remedy the constitutional harms that Plaintiffs allege. (*See* Op. & Ord., ECF No. 88 at 8.) In other words, "Plaintiffs have requested a possible relief" with regards to the Senate Districts. (*Id.*) Accordingly, Plaintiffs' challenge to these districts is not moot. (*See id.*)

respect to which the nonmovant has the burden, the moving party is entitled to summary judgment as a matter of law.'" *Hayes v. City of Mt. Washington*, 43 F. App'x 838, 840 (6th Cir. 2002) (quoting *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001)).

## I.      Standing

### Analysis

This Court concludes that Individual Plaintiffs and the League have standing to bring their Fourteenth Amendment and First Amendment claims. The Court's conclusion that Plaintiffs have standing is based on the standard of review at the summary judgment stage. The Court is not deciding the ultimate issue of whether Plaintiffs have definitively established standing for each challenged district. The Court will determine the ultimate issue of whether Plaintiffs have established standing for each challenged district at trial.

### A.      Relevant Legal Principles

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies,' and 'Article III standing . . . enforces the Constitution's case-or-controversy requirement.'" *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597–98 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). "In essence, the standing doctrine prompts courts to inquire 'whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" *McKay v. Federspiel*, 823 F.3d 862, 866–67 (6th Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

To establish standing, a plaintiff must satisfy three elements. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Federspiel*, 823 F.3d at 866–67. First, a plaintiff must establish that she suffered an "injury in fact" that is "concrete and particularized" and "actual or

imminent" rather than "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations omitted). Second, a plaintiff must demonstrate "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* (alteration in original) (internal citation omitted). Third, a plaintiff must show that a favorable decision will "likely," not just "speculative[ly]," redress her injury. *Id.* at 561 (internal citation omitted). Courts often refer to these elements as the "'injury-in-fact,' 'causation,' and 'redressability' requirements." *Phillips v. DeWine*, 841 F.3d 405, 414 (6th Cir. 2016) (citing *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

The first element of standing—injury in fact—does not impose a particularly heavy burden on plaintiffs. "The Supreme Court has rejected the argument that an injury must be 'significant'; a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973)); *accord Sierra Club v. U.S. Army Corps of Eng'rs.*, 645 F.3d 978, 988 (8th Cir. 2011) ("Injury in fact necessary for standing 'need not be large[;] an identifiable trifle will suffice.'") (internal citation omitted); *Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 925 (7th Cir. 2008) (explaining that the "injury-in-fact necessary for standing need not be large" and that "an identifiable trifle will suffice") (internal quotation marks and citation omitted); *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) ("[A]n identifiable trifle will suffice" to demonstrate injury in fact for purposes of standing) (internal quotation marks and citation omitted); *Joint*

*Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 177 (3d Cir. 2001) ("All that the Article III's injury-in-fact element requires is 'an identifiable trifle' of harm.") (internal citation omitted); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) ("The claimed injury need not be great or substantial; an identifiable trifle, if actual and genuine, gives rise to standing.") (internal quotation marks and citation omitted); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 557 (5th Cir. 1996) (recognizing that "an identifiable trifle will suffice" to establish the "low threshold requirement" for injury in fact) (internal quotation marks and citation omitted).

Because standing is "an indispensable part of the plaintiff's case" rather than a "mere pleading requirement[]," the plaintiff must support each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (internal citation omitted). Accordingly, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (internal citations omitted). At the summary judgment stage, the plaintiff must "'set forth' by affidavit or other evidence 'specific facts' . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)).

"[A] plaintiff must demonstrate standing for each claim." *Cuno*, 547 U.S. at 352; *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 652 (6th Cir. 2007) (quoting *Cuno*, 547 U.S. at 352); *see also Gill*, 138 S. Ct. at 1934 ("[S]tanding is not dispensed in gross.")

**B.      Application to the Matter at Hand**

The Court will first analyze whether Plaintiffs have standing to bring their Fourteenth Amendment claims. Thereafter, the Court will examine whether Plaintiffs have standing to bring their First Amendment claims.

**1.      Fourteenth Amendment**

First, the Court will determine whether the Individual Plaintiffs have standing. Second, the Court will evaluate whether the League has standing. The Court concludes that both the Individual Plaintiffs and the League have standing to bring their Fourteenth Amendment claims.

**a.      Individual Plaintiffs**

**i.      Injury in Fact**

The parties correctly focus on the Supreme Court's recent decision in *Gill* to support their arguments concerning whether the Individual Plaintiffs satisfied the injury in fact requirement. Accordingly, the Court will first analyze the Supreme Court's decision in *Gill*. The Court will then apply *Gill* to the facts of this case. As explained below, the Court concludes that Individual Plaintiffs have satisfied *Gill*'s injury in fact requirement.

In *Gill*, the Supreme Court described its primary task as answering the "threshold" question, which had still not been resolved, "what is necessary to show standing in a case" where the plaintiffs allege a political gerrymandering claim based on vote dilution? *Gill*, 138 S. Ct. at 1929. In answering this question, the Supreme Court focused on the "foremost" requirement of standing—injury in fact. *Id.* The Supreme Court noted that it had "long recognized that a person's right to vote is 'individual and personal in nature.'" *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). Accordingly, individuals must show "disadvantage to themselves as individuals" to establish standing. *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).

The Supreme Court explained that when plaintiffs allege that their voting power has been unconstitutionally diluted because they have been placed in "packed" or "cracked" districts, "that injury is district specific." *Id.* at 1930. This is because "[t]he boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked." *Id.* Therefore, any injury a voter suffers from vote dilution "results from the boundaries of the particular district in which he resides." *Id.* And any remedy must also be specific to the voter's individual harm, i.e., "revision of the boundaries of the individual's own district." *Id.*

The plaintiffs in *Gill* argued that "their legal injury is not limited to the injury that they have suffered as individual voters, but extends also to the statewide harm to their interest in their collective representation in the legislature, and in influencing the legislature's overall composition and policymaking." *Id.* at 1931 (internal quotations and citations omitted). The Supreme Court rejected the plaintiffs' argument. As the Supreme Court explained, the plaintiffs' statewide injury theory was "the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." *Id.* (internal quotation marks and citation omitted).

The Supreme Court unanimously held that the plaintiffs failed to establish standing because they asserted statewide injuries rather than district-specific harms. The Supreme Court explained that "[f]our of the plaintiffs" had sufficiently "pleaded a particularized burden" to their individual right to vote by alleging that the challenged districting scheme "'dilut[ed] the influence' of their votes as a result of packing or cracking in their legislative districts." *Id.* (alteration in original) (citations omitted). But, as the Supreme Court explained, "[t]he facts necessary to establish standing . . . must not only be alleged at the pleading stage, but also proved

at trial." *Id.* After the pleading stage, "the plaintiffs failed to meaningfully pursue their allegations of individual harm." *Id.* at 1932. In fact, "not a single plaintiff sought to prove that he or she lives in a cracked or packed district." *Id.* Instead, the plaintiffs "rested their case at trial— and their arguments before [the Supreme] Court—on their theory of statewide injury to Wisconsin Democrats" which did not demonstrate harm to an individual voter in that voter's district. *Id.*

After concluding that plaintiffs could not establish standing based on their statewide theory of injury, the Supreme Court specifically explained why the evidence presented by plaintiffs failed to establish standing. The plaintiffs in *Gill* had presented three types of evidence in an attempt to show standing: (1) the testimony of Professor Whitford, the lead plaintiff; (2) evidence of the partisan intent of the mapmakers; and (3) social scientific data indicating that the statewide maps were gerrymandered to favor Republicans. *Id* at 1932–33. The plaintiffs' first theory failed because Whitford merely pointed "to his hope of achieving a Democratic majority in the legislature"—a purported statewide interest. *Id.* at 1932. Whitford did not present any evidence that he *actually lived* in a packed or cracked district and thus failed to show a burden on his individual voting rights. *Id.*[11] The plaintiffs' second theory failed because evidence about the mapmakers' partisan motivations pointed only to intent—not effect—and therefore did not demonstrate an actual injury to any particular plaintiff. *Id.* The plaintiffs' final theory failed because the plaintiffs' social scientific evidence of statewide gerrymandering only provided "an average measure" that "d[id] not address the effect that a  gerrymander has on the votes of particular citizens." *Id.* at 1933.

---

[11] In fact, Whitford could not have proven an individual injury even if he had tried because the "plaintiffs' own demonstration map resulted in a virtually identical district for him." *Id.* at 1933.

The Supreme Court concluded that the "plaintiffs' case as presented on this record . . . is a case about group political interests, not individual legal rights." *Id.* Because the plaintiffs failed to present any evidence of individual injury or district-specific harm, they failed to establish standing. *Id.* But the Supreme Court recognized that the plaintiffs, except Whitford, could achieve standing if they proved "concrete and particularized injuries" by presenting evidence "that would tend to demonstrate a burden on their individual votes." *Id.* at 1934. Accordingly, the Supreme Court remanded the case to the district court to give the plaintiffs an opportunity to present the requisite evidence of individual, district-specific harm. *Id.*

For purposes of the pending motions, the Individual Plaintiffs have satisfied the injury in fact requirement from *Gill*. Individual Plaintiffs have submitted evidence of district-specific injuries to their individual votes through an expert report prepared by Dr. Jowei Chen, Ph.D. (ECF No. 129-51) and a declaration and charts submitted by Dr. Christopher Warshaw that elaborate on Dr. Chen's findings. (ECF No. 129-57.)

Dr. Chen analyzed whether the Apportionment Plan produced "an extreme partisan outcome that diverges from possible alternative maps." (Chen Rep., ECF No. 129-51 at PageID #4709.) In his analysis, Dr. Chen used a simulation process that, according to him, "ignores all partisan and racial considerations when drawing districts" and instead "optimize[s] districts with respect to various traditional districting goals, such as equalizing population, maximizing geographic compactness, and preserving county, municipal, and ward boundaries."[12] (*Id.*) Using these non-partisan criteria, Dr. Chen generated 3,000 "randomly drawn districting plans that closely follow and optimize on these traditional districting criteria"—1,000 alternative Congressional districting plans, 1,000 alternative State House districting plans, and 1,000

---

[12] *See* Mich. Comp. Laws § 3.63 (Congressional Districts) and § 4.261 (Senate and House Districts).

alternative State Senate districting plans. (*Id.*) Dr. Chen then compared these simulated plans to the enacted Apportionment Plan on a district-by-district level by "align[ing] the districts from each enacted and computer-simulated plan from least to most Republican" and "directly compar[ing] . . . the partisanship" of each real-life district under the Apportionment Plan to the 1,000 alternative districts generated for each type of map. (*Id.* at PageID #4761.) By comparing individual districts under the Apportionment Plan to the corresponding alternative districts generated using traditional non-partisan criteria, Dr. Chen could opine whether a district under the Apportionment Plan is "a partisan outlier compared to the simulated districts that cover the same geographic area." (*Id.*) Dr. Chen defined a "partisan outlier" as a district whose "partisanship," based on all statewide elections held between 2012 and 2016, falls outside "the middle 95% range of the simulated geographically overlapping districts." (*Id.* at PageID #4762.) In other words, these districts are more partisan than 95% of simulated districts drawn using traditional non-partisan criteria. (*Id.*)

Dr. Chen concluded that nine of the Apportionment Plan's Congressional Districts are partisan outliers. (*Id.* at PageID #4762–63.) Congressional Districts 5, 9, and 12 are partisan outliers because they "pack[] together Democrats to an unusual degree." (*Id.* at PageID #4762.) Each of these Congressional Districts packs Democrats together more tightly than *any* of the 1,000 computer-generated simulation districts drawn using traditional non-partisan criteria. (*Id.*; *see* Appendix D2, *id.* at PageID #4781.) Congressional Districts 4, 7, 8, and 10 are partisan outliers because they crack Democratic voters. (*Id.* at PageID #4762.) In the vast majority of the simulations, each of these Congressional Districts would be "more partisan competitive or

perhaps even a slightly Democratic-leaning district."[13] (*Id.*) Congressional Districts 1 and 11 are also partisan outliers. (*Id.* at PageID #4763). It appears that Congressional Districts 1 and 11, which are majority Republican districts, would contain even more Republican voters than they currently do in many of the simulations. (*See* Appendix D2, *id.* at PageID #4871.) Accordingly, these districts "crack" Democratic voters; an artificially high number of Democrats are placed there to dilute their voting power compared to other possible districts. Dr. Chan also found that numerous Michigan House and Michigan Senate districts are partisan outliers.[14]

Dr. Chen's analysis and opinion provide evidence of district-specific vote dilution. But Dr. Chen does not name any Individual Plaintiff or League member in his expert report. (*See generally,* Chen Rep., ECF No. 129-51.) Accordingly, Plaintiffs cannot establish injury in fact from Dr. Chen's report by itself—his report does not show "disadvantage to [Individual Plaintiffs or League members] as individuals" because it does not provide any evidence that any Individual Plaintiff or League member actually lives in a district where his or her vote has been diluted. *Gill*, 138 S. Ct. at 1929 (internal citation and quotation marks omitted). If Plaintiffs relied solely on Dr. Chen's report, they would fail to satisfy *Gill*'s requirement that they demonstrate "the effect that a gerrymander has on the votes of particular citizens" and would therefore lack standing for failure to establish injury in fact. *Id.* at 1933.

But Plaintiffs do not rely solely on Dr. Chen's report. They also present evidence that tends to establish the crucial link between the gerrymandered districts identified by Dr. Chen and

---

[13] It appears from Appendix D2 that in a relatively small number of simulations, Congressional Districts 4, 7, and 8 would be more Republican-leaning than they are currently. (*See* ECF No. 129-51 at PageID #4781.)

[14] Dr. Chen found that House Districts 11, 12, 14, 16, 19, 20, 21, 30, 31, 32, 36, 43, 44, 45, 51, 52, 53, 55, 57, 60, 62, 63, 65, 69, 75, 76, 80, 87, 91, 92, 94, 98, 103, 105, 106, and 107 are "partisan outliers," as are Senate Districts 8, 9, 22, 24, 27, and 32. (*Id.* at PageID #4763; *see* Appendix D11, Appendix D12, Appendix D13, Appendix D14, Appendix D15, Appendix D16 (Michigan House); *see* Appendix D5 and Appendix D6, *id.* at PageID #4784–85 (Michigan Senate).)

the district-specific harm to each Plaintiff. This evidence comes in the form of a declaration and several charts from Dr. Warshaw, one of Plaintiffs' experts. (*See* ECF No. 129-57 (Warshaw Declaration), ECF No. 129-38 (Warshaw Charts).) Dr. Warshaw (1) obtained each Individual Plaintiff and League member's address, (2) determined in which district each Individual Plaintiff and League member lives under the current Apportionment Plan, and (3) using Dr. Chen's data, compared the partisanship of the districts in which each Individual Plaintiff and League member currently lives with the partisanship of all simulated districts that contain the same address. (Warshaw Decl., ECF No. 129-57, at PageID #4997.) Dr. Warshaw then created charts which he asserts visually depict how partisan a particular Plaintiff's current district is compared to all the simulated districts that contain that Plaintiff's same address.[15]

If after trial this Court accepts the Chen-Warshaw testimony and conclusions, Dr. Chen's report and Dr. Warshaw's charts could show an injury in fact to each Individual Plaintiff. Dr. Chen's report asserts that several Congressional Districts, Senate Districts, and House Districts are gerrymandered "partisan outliers" that crack or pack Democratic voters and dilute their votes. Dr. Warshaw connects each Individual Plaintiff to an individual, district-specific harm by (1) determining in which district each Individual Plaintiff currently resides and (2) comparing the level of partisanship in each Individual Plaintiff's actual district to the level of partisanship in each simulated district that would contain each Individual Plaintiff.

Individual Plaintiffs have presented evidence that they actually live in allegedly packed or cracked districts. Accordingly, they have asserted, with sufficient proof under rule 56, district-specific harms, injuries to themselves "as individuals," *Gill*, 138 S. Ct. at 1929, and "the effect that [the] gerrymander has on the votes of particular citizens." *Gill*, 138 S. Ct. at 1933.

---

[15] Dr. Warshaw created charts for the Congressional Districts (ECF No. 129-38 at PageID #3881), the Michigan Senate districts (*id.* at PageID #3885), and the Michigan House districts (*id.* at PageID #3885).

Accordingly, Plaintiffs have presented sufficient evidence for a fact-finder to conclude that Individual Plaintiffs have suffered an injury in fact. *See Gill*, 138 S. Ct. at 1929–30.

Johnson argues that the Individual Plaintiffs failed to demonstrate injury in fact because they rely on a large number of alternative simulated districts rather than on a single alternative district plan for each district they challenge. (*See* Johnson Br., ECF No. 119 at PageID #2415–22.) But *Gill* does not require a plaintiff to rely on a single alternative map. In *Gill*, the Supreme Court explained that the harm in political gerrymandering cases "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in *another, hypothetical district*." *Gill*, 138 S. Ct. at 1931 (emphasis added). Here, each Individual Plaintiff has shown that because of packing or cracking, her vote currently—in 2018—carries less weight than it would carry in *thousands of hypothetical districts*. Evidence of vote dilution based on thousands of alternative districts, rather than on a single alternative map, can be considered at trial.

Johnson next contends that Individual Plaintiffs failed to show injury in fact because Dr. Chen "performed only *statewide* analyses" that may demonstrate "statewide" partisan "intent" but do not show that a given district is gerrymandered or could be remedied by an alternative map. (Johnson Reply Br., ECF No. 132 at PageID #5405) (emphasis in original). Dr. Chen did create simulated districts for each challenged district, which in his analysis *does* show that district-specific injuries could be remedied by alternative configurations drawn using non-partisan criteria.

Johnson also contends that Individual Plaintiffs cannot demonstrate injury in fact because, according to Johnson, Dr. Chen testified that he did not have a clear sense of what it means for a district to be "cracked" or "packed." (Johnson Reply Br. at PageID #5045.)

However, in the passage cited by Johnson, Dr. Chen explains that existing academic literature does not provide a clear definition for when the partisan makeup of a given district rises to the level of "packing" or "cracking." (Chen Dep., ECF No. 119-4 at PageID #2472.) Importantly, Dr. Chen then explains that, for the purposes of *his analysis*, he considered a district to be "packed" or "cracked" if 95% of the alternative simulated districts had a less partisan vote share than the current district. (*Id.* at PageID #2475.) A reasonable fact-finder could conclude that Dr. Chen knew what he meant when he concluded that the districts he identified as "partisan outliers" had been "packed" or "cracked."

Johnson additionally argues that Plaintiffs lack standing because they only speculate about hypothetical future harms and because none of their experts stated that Plaintiffs' harms would reoccur in the 2020 election cycle. (Johnson Br., ECF No. 119 at 48; Johnson Reply Br., ECF No. 132 at 1.) However, just as an example, Kenneth Mayer, Ph.D., one of Plaintiffs' experts, opined that the gerrymander has persisted "over a ten year period and 6 electoral cycles." (Mayer Rep., ECF No. 129-52 at PageID #4881.) At this stage, the Court must view the evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in Plaintiffs' favor. *Matsushita*, 475 U.S. at 587; *Babcock & Wilcox Co.*, 848 F.3d at 758. The Court draws the reasonable inference that Plaintiffs have presented sufficient evidence that the partisan gerrymander—which has persisted through multiple election cycles over an extended period of time—could harm Plaintiffs again in the 2020 elections. *See generally*, *Babcock & Wilcox Co.*, 848 F.3d at 758.

Finally, Defendants repeatedly asserted at oral argument that Plaintiffs cannot demonstrate injury in fact because Democratic candidates won the same number of Congressional seats as Republican candidates in the 2018 midterm election. However, focusing

entirely on only one election is inappropriate given that Plaintiffs have presented evidence that the Apportionment Plan is a durable partisan gerrymander that has existed for, and persisted over, several election cycles. Furthermore, the fact that Democrats and Republicans won an equal number of Congressional seats does not foreclose a finding that the Apportionment Plan is an unconstitutional partisan gerrymander. For instance, it is possible that Democrats would have won an even greater number of seats in the 2018 midterm election but for the unconstitutional gerrymander they allege. Taking Defendants' argument to its logical conclusion illustrates the flaw in Defendants' argument. Under Defendants' theory, a voter whose party received 99% of the vote—but only won half of the seats—could not prevail on her partisan gerrymandering claim, even if she showed individualized, district-specific harm. This outcome would be at odds with *Gill*, which only requires a showing of district-specific harm. *See Gill*, 138 S. Ct. at 1931.

### ii.        Causation and Redressability

Individual Plaintiffs have presented evidence that the Apportionment Plan caused their individual injuries by diluting their votes. (*See, e.g.*, Chen Rep., ECF No. 129-51, Warshaw Charts, ECF No. 129-38 at PageID #3880–86.) Individual Plaintiffs have also presented evidence that their individual injuries are likely to be redressed by a favorable decision; they seek an injunction that bars Michigan from using the Apportionment Plan in future elections and ask this Court to implement an alternative districting plan that does not dilute their votes.

### iii.        Summary

The Individual Plaintiffs have presented sufficient evidence at this stage of the proceedings to establish injury, causation, and redressability. *See Lujan*, 504 U.S. 555. Accordingly, Individual Plaintiffs have satisfied the Court that they have standing to challenge their respective districts on Fourteenth Amendment grounds. *Id.*

### b.     The League

"An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 524 (6th Cir. 2001). In partisan gerrymandering cases, an organization such as the League has standing to challenge a district in which one of its members lives whose vote "was diluted on the basis of invidious partisanship." *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 827 (M.D.N.C. 2018) (three judge panel) (finding that the League of Women Voters of North Carolina had standing to bring a Fourteenth Amendment challenge to any gerrymandered district in which its members lived.)

The League has established derivative associational standing at this stage. First, the League's members have shown standing to sue in their own right. In *Gill*, 138 S. Ct. 1916, the Supreme Court explained that when plaintiffs allege that their voting power has been unconstitutionally diluted because they have been placed in "packed" or "cracked" districts, "that injury is district specific." *Id.* at 1930. The League members have satisfied *Gill*'s requirement that they show individualized, district-specific harms. *Id*. At least one League member lives in each challenged district.[16] Plaintiffs have presented sufficient evidence for a fact-finder to conclude that each challenged district is a "partisan outlier" where the power of Democratic

---

[16] *See* Warshaw Chart, ECF No. 129-38 at PageID #3881 (providing names of League members residing in Congressional Districts 1, 4, 5, 7, 8, 9, 10, 11, and 12), at PageID #3883 (providing names of League members residing in Senate Districts 8, 10, 11, 12, 14, 18, 22, 27, 32, and 36), and at PageID #3885 (providing names of League members residing in House Districts 24, 32, 51, 52, 55, 60, 62, 63, 75, 76, 83, 91, 92, 94, and 95).

votes is diluted. *See Rucho*, 318 F. Supp. 3d at 827. Dr. Warshaw's charts show that each League member lives in a district that is considerably more partisan than many—or in some cases all— of the 1,000 simulated districts for each type of map that contain the same address. (*See* ECF No. 129-38 at PageID #3880–86 (Warshaw Charts); ECF No. 129-34 (League Member List).) This showing of individual, district-specific harm through vote dilution satisfies the injury in fact requirement articulated by the Supreme Court in *Gill*, 138 S. Ct. 1916. Accordingly, the League members have standing to sue in their own right.

Second, the interests at stake are germane to the League's purpose of promoting civic engagement, increasing voter participation, and defending democracy. The League has presented an affidavit from Susan Smith, who has been an active League member for 48 years. (Smith Decl., ECF No. 129-54 at PageID #4973.) Smith served as the League's First Vice President from 2007 to 2011, as its President from 2011 to 2015, as its First Vice President again from 2015 to 2017 "with special responsibilities for redistricting," and, since May 2017, as the Redistricting Director on the Board of Directors. (*Id.*) Smith's responsibilities "include making frequent educational presentations about redistricting topics and issues." (*Id.* at PageID #4975.) "Since June 2011, [Smith has] presented educational redistricting information to the public at many town hall meetings across the state [of Michigan]." (*Id.*) Smith has also "personally trained more than eighty (80) League members across the state in how to use the League's PowerPoint presentation and handouts to educate voters about redistricting in Michigan and how the 2011 maps affected the various communities in the State of Michigan." (*Id.* at PageID #4976.)

According to Smith, the Apportionment Plan has "made [the League's] mission of education and engagement much harder in a variety of ways." (*Id.*) The Apportionment Plan has made it more difficult for the League to convince Republican candidates to participate in

"candidate forums" because "so many Republican candidates are no longer running in competitive races" and do not feel a need to engage with the electorate. (*Id.*) Moreover, the Apportionment Plan has caused elected representatives to "become less responsive" to the League's legislative proposals because many representatives possess "safe seats." (*Id.*) Further, the Apportionment Plan has caused many Michigan voters to experience "voter apathy and cynicism," which "directly challenges [the League's] mission of empowering voters and defending democracy." (*Id.* at PageID #4977.) Smith "often encounter[s] voters and fellow [League] members who have concluded that their votes do not count." (*Id.* at PageID #4978.) Through Smith's first-hand account, the League has presented evidence of the deleterious impacts that the Apportionment Plan has had on the League's mission and purpose.

Third, the League's claims and the relief it requests do not require the participation of any individual League member. When an "association seeks a declaration, injunction, or some other form of prospective relief . . . the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Here, the League seeks declaratory and injunctive relief. Accordingly, the League members need not participate in the litigation. *Id.*

In sum, the League has satisfied all three requirements for derivative associational standing. The League has shown (1) that its members have standing to sue in their own right, (2) that the interests at stake in the litigation are germane to the League's purpose, and (3) that the individual members need not participate in the lawsuit. *See Friends of the Earth*, 528 U.S. at 181; *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 524. Accordingly, the League has derivative associational standing to challenge the Apportionment Plan under the Fourteenth Amendment.

*See Rucho*, 318 F. Supp. 3d at 827 (finding that the League of Women Voters of North Carolina had derivative associational standing under the Fourteenth Amendment).

Johnson contends that the League erroneously relies on inadmissible hearsay in its attempt to show standing based on its membership. (Johnson Reply Br., ECF No. 132 at 10–11.) It is true that the League submitted a list of members who voted for Democratic candidates in 2014 and 2016 elections and that this list constitutes hearsay. (*See* ECF No. 129-38.) But it is well-established that "[t]he submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Instead, a non-moving party must only "lay[] out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander*, 576 F.3d at 558. The League has met its burden. Furthermore, the League presented sworn affidavits from Margaret Leary, Julie Caroff, Mark Brewer, and Judy Karandjeff, the four people who contacted the individuals named in the list, who affirm that the list accurately reflects the information they collected through phone calls with League members. (*See* ECF No. 129-58, 129-59, 129-60, and 129-61.) Therefore, these affidavits satisfy Rule 56(e)'s requirement that "an affidavit offered in opposition to summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(e)).

### c.    Defendants' Remaining Arguments

Congressional Intervenors argue that Plaintiffs lack standing to challenge Congressional Districts 1, 4, 7, and 11 because in some of Dr. Chen's simulated plans, Plaintiffs who currently

live in these districts would be placed in districts that would be even more Republican. (Cong. Intervenors Reply Br., ECF No. 133 at 4.) It is true that some of these Congressional Districts would become more Republican under some of Dr. Chen's simulations. (*See* Warshaw Chart, ECF No. 129-38 at PageID #3881.) But each of these Congressional Districts would become *less Republican* under some of—or, in some cases, most of—Dr. Chen's simulations. (*See id.*) A plaintiff has standing to challenge a district if she shows that she has suffered harm because her vote is diluted compared to "*another, hypothetical district.*" *Gill*, 138 S. Ct. at 1931 (emphasis added). Because Plaintiffs have presented evidence that their votes would be less diluted in at least some of the alternative districts for Congressional Districts 1, 4, 7, and 11, Defendants are not entitled to summary judgment on Plaintiffs' claims regarding these districts. *See id.*

Congressional Intervenors next argue that Plaintiffs living in Congressional Districts 5, 9, and 12 cannot demonstrate injury in fact because "as long time Democratic voters, they have been able to consistently elect Democrats to represent them in Congress." (Cong. Intervenors Reply Br., ECF No. 133 at 4.) In other words, Congressional Intervenors argue that a "packed" voter cannot, as a matter of law, prevail on a gerrymandering claim alleging vote dilution.[17] But in *Gill*, the Supreme Court explicitly stated that the "harm arises from . . . [a voter's] vote—having been *packed* or cracked—to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931 (emphasis added). The Supreme Court has recognized that being placed in a packed district can injure a voter by diluting her vote, even if packing allows her preferred party to prevail in her district. *Id.* Accordingly, Congressional Intervenors' argument fails.

---

[17] Johnson makes a similar argument with regards to Plaintiffs who reside in House Districts 75 and 76. (Johnson Br., ECF No. 119, at 25–27.)

### d. Conclusion: Fourteenth Amendment

In sum, Individual Plaintiffs have standing to challenge each of the districts in which they live. And the League has standing to challenge each district in which one of its members lives. Collectively, Plaintiffs have standing to challenge every <u>contested</u> district on Fourteenth Amendment grounds.

### 2. First Amendment

Partisan gerrymandering implicates the First Amendment in two ways. First, partisan gerrymandering creates a dilutionary injury; "[t]he practice of *purposefully* diluting the weight of certain citizens' votes to make it more difficult for them to achieve electoral success *because of* the political views they have expressed through their voting histories and party affiliations thus infringes this [First Amendment] representational right." *Shapiro v. McManus*, 203 F. Supp. 3d 579, 595 (D. Md. 2016) (three judge panel) (emphasis in original) (citing *Vieth v. Jubelirer*, 541 U.S. 267, 314–15 (2004) (Kennedy, J., concurring in the judgment)). Second, partisan gerrymandering creates non-dilutionary First Amendment injuries. As one three judge panel recently stated:

> In her concurrence in *Gill*, Justice Kagan—joined by three other Justices— explained the standing requirements for a partisan gerrymandering First Amendment claim. Justice Kagan stated that the injury arising under this theory of harm is "that the gerrymander has burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects." *Gill*, 138 S.Ct. at 1939 (Kagan, J., concurring).

*Ohio A. Philip Randolph Inst. v. Smith*, No. 1:18CV357, 2018 WL 3872330, at *4 (S.D. Ohio Aug. 15, 2018) (three judge panel); *see Gill*, 138 S. Ct. at 1938 ("[T]he associational harm of a partisan gerrymander is distinct from vote dilution.") (Kagan, J., concurring); *Rucho*, 318 F. Supp. 3d at 829 ("Partisan gerrymandering also implicates 'distinct,' non-dilutionary First Amendment injuries.") (quoting *Gill*, 138 S. Ct. at 1939) (Kagan, J., concurring). "[T]he

associational injury flowing from a statewide partisan gerrymander, whether alleged by a party member or the party itself, has nothing to do with the packing or cracking of any single district's lines." *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring). Instead, under a non-dilutionary First Amendment challenge, "the valued association and the injury to it are statewide [and] so too is the relevant standing requirement." *Id.* at 1939. Accordingly, plaintiffs do not need to demonstrate a district-specific injury to their First Amendment rights to demonstrate injury in fact. *Id.*; *see Rucho*, 318 F. Supp. 3d at 829.

### a.  Individual Plaintiffs

Individual Plaintiffs contend that they have standing to bring their First Amendment claim, arguing that the "same evidence" of "individualized, redressable harm suffered to their voting rights" that supports their Fourteenth Amendment claim also satisfies the injury in fact requirement of their First Amendment claim. (Pl. Resp. Br., ECF No. 129 at 62.) Johnson argues that Individual Plaintiffs lack First Amendment standing for the same reasons they lack Fourteenth Amendment standing. (*See* Johnson Br., ECF No. 119 at 54.) The Congressional Intervenors assert in a footnote that Plaintiffs lack First Amendment standing because they have not presented evidence that their First Amendment rights were harmed by the alleged gerrymander. (*See* Cong. Intervenors Br., ECF No. 121 at 20, fn. 3.)

Individual Plaintiffs have established First Amendment standing. The "dilutionary aspect of the First Amendment injury associated with partisan gerrymandering echoes the district-specific injury giving rise to a partisan vote dilution claim under the Equal Protection Clause." *Rucho*, 318 F. Supp. 3d at 829 (citing *Shapiro*, 203 F. Supp. 3d. at 595). As discussed above, Individual Plaintiffs have presented sufficient evidence of individualized, district-specific dilutionary harm to satisfy standing under the Fourteenth Amendment. This evidence also

suffices to give Individual Plaintiffs standing under the First Amendment. *Rucho*, 318 F. Supp. 3d at 829.

### b.    The League

"[A]n association may have standing to assert an injury to itself regardless of whether its members also have standing." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004) (internal citation omitted). An organization suffers an injury in fact when its mission is "perceptibly impaired" by the challenged action, which it may show through a "demonstrable injury to the organization's activities" and a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Fair Elections Ohio v. Husted*, 770 F.3d 456, 462 (6th Cir. 2014) ("An organization may have standing to sue if its interests are directly impaired.")

In *Rucho*, a three judge panel found that the League of Women Voters of North Carolina ("North Carolina League") had standing to assert a statewide First Amendment challenge to the state's districting plan. *Rucho*, 318 F. Supp. 3d at 830–31. The court reasoned that the gerrymander "burden[ed] [the North Carolina League's] mission" because it caused a lack of voter interest that hampered the North Carolina League's "get out the vote" efforts, prevented the North Carolina League from "fulfilling its mission of inform[ing] . . . [and] engag[ing] voters," and caused the North Carolina League to experience "difficulty providing opportunities for its members and other voters to interact" with candidates because they had little incentive to actively engage with the electorate in districts whose results were effectively preordained. *Id.* (internal quotation marks and citations omitted) (alterations in original).

The League has independent associational standing based on non-dilutionary injuries to its own First Amendment rights. *See Gill*, 138 S. Ct. at 1939; *Rucho*, 318 F. Supp. 3d at 829.

Like the North Carolina League in *Rucho*, the League has presented evidence that the Apportionment Plan impairs its mission. As discussed in detail above, the Apportionment Plan has "made [the League's] mission of education and engagement much harder in a variety of ways." (Smith Decl., ECF No. 129-54 at PageID #4976.) The evidence that the League has presented of harm to its mission is *exactly the same evidence* that the *Rucho* court found sufficient to establish a First Amendment injury to the North Carolina League. *See Rucho* 318 F. Supp. 3d at 830–31. Because the League has presented evidence that the Apportionment Plan has "perceptibly impaired" its mission, the League has established that it suffered an injury in fact to its own First Amendment rights. *See Havens Realty Corp.*, 455 U.S. at 379; *Rucho*, 318 F. Supp. 3d at 830–31. This injury is certainly more than a "trifle"—it impairs the League's very ability to carry out its purpose as an organization. *See, e.g.*, *Billups*, 554 F.3d at 1351. Accordingly, the League has standing to challenge each contested district. *See Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring); *Rucho*, 318 F. Supp. 3d at 831.

## Summary: Standing

The Court finds that both Individual Plaintiffs and the League have standing to bring their Fourteenth Amendment challenges to the Apportionment Plan because they have presented evidence of individual injuries and district-specific harms. The Court also finds that Individual Plaintiffs and the League have standing to bring their First Amendment claims.

## II.    Justiciability

## Analysis

As explained below, The Court finds that Plaintiffs' Fourteenth Amendment and First Amendment partisan gerrymandering claims are justiciable because judicially manageable standards exist to adjudicate these claims.

A.    **Fourteenth Amendment**

1.    **Relevant Legal Principles**

Partisan gerrymandering is "incompatible with democratic principles." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658, 192 L. Ed. 2d 704 (2015) (quoting *Vieth*, 541 U.S. at 292). "On its most fundamental level, partisan gerrymandering violates 'the core principle of republican government . . . that the voters should choose their representatives, not the other way around.'" *Rucho*, 318 F. Supp. 3d at 838 (quoting *Ariz. State Leg.*, 135 S.Ct. at 2677).

In *Davis v. Bandemer*, 478 U.S. 109 (1986), the Supreme Court found "political gerrymandering to be justiciable" under the Equal Protection Clause of the Fourteenth Amendment. But while the Supreme Court held that political gerrymandering claims present justiciable controversies, it "could not, however, settle on a standard for what constitutes an unconstitutional partisan gerrymander." *Gill*, 138 S. Ct. at 1927 (discussing *Bandemer*, 478 U.S. 109).

The Supreme Court has never overturned *Bandemer*'s holding that political gerrymandering claims are justiciable. It is true that, in *Vieth*, a four-justice plurality concluded that political gerrymandering claims were not justiciable because of the lack of a "judicially manageable standard." *Vieth*, 541 U.S. at 291. But Justice Kennedy, while concurring in the judgment, declined to hold that partisan gerrymandering claims are *per se* non-justiciable. *Id.* at 310 (Kennedy, J., concurring in the judgment) (stating that "[o]ur willingness to enter the political thicket of the apportionment process with respect to one-person, one-vote claims makes it particularly difficult to justify a categorical refusal to entertain claims against this other type of gerrymandering" and describing *Bandemer*'s holding as "controlling precedent on the question

of justiciability"). Furthermore, in *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) and *Gill*, 138 S. Ct. 1916, the Supreme Court declined to reconsider whether partisan gerrymandering claims are justiciable. *See Perry*, 548 U.S. at 414; *Gill*, 138 S. Ct. at 1929. Therefore, "under controlling Supreme Court precedent, a challenge to an alleged partisan gerrymander presents a justiciable case or controversy." *Rucho*, 318 F. Supp. 3d at 838 (internal citations omitted).

In *Rucho*, a three judge panel held that the plaintiffs' partisan gerrymandering claims were justiciable. *Rucho*, 318 F. Supp. 3d at 860. The defendants in *Rucho*, just as Defendants here, contended that the plaintiffs' claims were not justiciable because the plaintiffs did not present a "judicially manageable standard" and failed to resolve the fundamental question, "how much politics is too much in redistricting?" *Id.* at 844. The *Rucho* court rejected the defendants' argument because it "rests on the premise that some degree of invidious partisan gerrymandering . . . is constitutionally permissible." *Id.* The court found no support for the defendants' claim "that it is sometimes permissible for a state redistricting body to draw district lines for the sole purpose of diminishing the electoral power of voters who supported or are likely to support a disfavored party or candidate." *Id.* at 851.

The court concluded that "'[a] determination that a gerrymander violates the law must rest . . . on a conclusion that [political] classifications, though generally permissible, were applied in an invidious manner or in a way unrelated to any legitimate legislative objective.'" *Id.* at 852 (quoting *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring in the judgment)). The Court explained that this conclusion "*does not rest* on our determination that States lack authority to engage in partisan gerrymandering—the intentional drawing of district lines to undermine the electoral prospects of candidates of a disfavored party and entrench a favored party in power—in

drawing congressional districts." *Id.* (emphasis in original). Instead, the court held that "a congressional district amounts to an unconstitutional partisan gerrymander *only if* the legislative body's *predominant* purpose in drawing the district was to subordinate the interests of supporters of a disfavored party and entrench a representative from a favored party in power." *Id.* (emphasis in original). In other words, "a state legislative body may engage in some degree of partisan gerrymandering, so long as it was not predominantly motivated by invidious considerations."[18] *Id.*

The *Rucho* court articulated a three-part standard for Fourteenth Amendment partisan gerrymandering claims. *Id.* at 861. First, a plaintiff must prove two elements: (1) discriminatory intent under the predominant purpose standard, i.e., that "a legislative mapdrawer's predominant purpose in drawing the lines of a particular district was to 'subordinate adherents of one political party and entrench a rival party in power,'" *Id.* at 864 (quoting *Ariz. State Leg.*, 135 S.Ct. at

---

[18] As the *Rucho* court noted, the Supreme Court has long used the predominance standard in the context of racial gerrymandering claims:

> [T]he Supreme Court has treated predominance as a judicially manageable standard in the gerrymandering context. In particular, the Court has endorsed predominance as the standard for determining how much consideration of race is "too much" in the drawing of legislative district lines. *See Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (recognizing that "[t]he distinction between being aware of racial considerations and being motivated by them may be difficult to make," but nonetheless holding that a racial gerrymandering plaintiff may prevail by showing "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district"). Given that *Gill* expressly analogized partisan gerrymandering claims to racial gerrymandering claims, 138 S.Ct. at 1930, and that predominance is a judicially manageable standard for distinguishing acceptable consideration of race from "too much" consideration of race, the predominance standard we apply constitutes a judicially manageable standard from distinguishing "too much" partisan gerrymandering from an acceptable level of partisan gerrymandering, to the extent that partisan gerrymandering ever is constitutionally acceptable.

*Rucho*, 318 F. Supp. 3d at 852.

2658), and (2) discriminatory effects, i.e., that "the lines of a particular district have the effect of discriminating against—or subordinating—voters who support candidates of a disfavored party, if the district dilutes such voters' votes by virtue of cracking or packing." *Id.* at 867. *See Gill*, 138 S.Ct. at 1931 and *Ariz. State Leg.*, 135 S.Ct at 2658. If a plaintiff proves these elements, the burden shifts to the government to prove "that a legitimate state interest or other neutral factor justified such discrimination." *Id.* (citing *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (applying burden shifting framework to racial gerrymandering claims) and *Brown v. Thomson*, 462 U.S. 835, 843 (1983) (one-person, one-vote claims)).

## 2. Application to the Matter at Hand

Plaintiffs propose that the Court adopt the *Rucho* test.[19] (*See* Pl. Resp. Br., ECF No. 129 at 53–54.) In response, Johnson contends that Plaintiffs' claims are not justiciable because Plaintiffs failed to present workable standards. (*See* Johnson Br., ECF No. 119 at 17–22.) Johnson also argues that Plaintiffs' social scientific metrics that do not constitute viable standards. (Johnson Reply Br., ECF No. 132 at 6–9.)

The Court will adopt the three-part discriminatory intent, discriminatory effects, and lack of justification test for Fourteenth Amendment partisan gerrymandering claims. *See Rucho*, 318 F. Supp. 3d at 861–68. Under this framework, Plaintiffs' vote dilution claims "must proceed on a district-by-district basis." *Id.* at 868 (citing *Gill*, 138 S.Ct. at 1930). The Court will evaluate the intent prong using the "predominant purpose" test, under which "a congressional district

---

[19] Plaintiffs incorrectly state that *Rucho* adopted an "invidious partisan consideration" test for the intent prong of its analysis. (*See* Pl. Resp. Br., ECF No. 129 at 53.) While *Rucho* entertained the possibility of applying a less stringent "invidious purpose" test, it ultimately concluded that, under *Gill*, the Supreme Court would require that a plaintiff satisfy "the heightened burden of proving that a legislative mapdrawer's predominant purpose in drawing the lines of a particular district was to 'subordinate adherents of one political party and entrench a rival party in power.'" *Rucho*, 318 F. Supp. 3d at 864 (quoting *Ariz. State Leg.*, 135 S.Ct. at 2658).

amounts to an unconstitutional partisan gerrymander *only if* the legislative body's *predominant* purpose in drawing the district was to subordinate the interests of supporters of a disfavored party and entrench a representative from a favored party in power." *Id.* at 852 (emphasis in original). The Court adopts the "predominant purpose" test because, in *Gill*, the Supreme Court directly analogized partisan gerrymandering claims and racial gerrymandering claims, *see Gill*, 138 S.Ct. at 1930, and because federal courts regularly apply the "predominant purpose" standard to racial gerrymandering claims. *See, e.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017); *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1270 (2015); *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

Plaintiffs have presented sufficient evidence for a fact-finder to conclude that the mapmakers violated their Fourteenth Amendment rights with respect to each challenged district. Plaintiffs have presented evidence that the mapmakers were predominantly motivated by a desire to dilute Democratic votes and entrench Republican control.[20] *Rucho*, 318 F. Supp. 3d at 864. Plaintiffs have also presented evidence of discriminatory effect; they have produced a large number of simulations for each challenged district, drawn using traditional non-partisan criteria, in which their votes would not be diluted. *Id.* at 867. And Plaintiffs have presented evidence that the mapmakers drew the districts without a legitimate state interest or non-discriminatory justification.[21] *Id.* Accordingly, Plaintiffs have satisfied their evidentiary burden at this stage in the proceedings and are entitled to a trial on their claims. *See Liberty Lobby*, 477 U.S. at 248; *Matsushita*, 475 U.S. at 587.

---

[20] *See, e.g.*, Marquardt Dep., ECF No. 129-46 at 104:1–15 (discussing overarching need to make district "better" for sitting Republican legislators); Marquardt Dep., ECF No. 129-46 at 40:5–43:8 (explaining use of detailed political data in map-drawing process); ECF No. 129-18 at PageID #3557, ECF No. 129-30 at PageID #3606, and ECF No. 129-31 at PageID #3611 (Timmer emails).

[21] *See, e.g.*, fn. 20, *supra*.

The Court rejects Johnson's argument that partisan gerrymandering claims are non-justiciable for lack of a judicially manageable standard. The Court notes that the panel in *Rucho* held that Fourteenth Amendment partisan gerrymandering claims are justiciable under the same standard that the Court adopts here. Second, Johnson fails to convincingly explain why the tests articulated by the Court above are not judicially manageable.

At this stage in the case, the Court is similarly unpersuaded by Johnson's argument that Plaintiffs cannot show a judicially manageable standard because they rely on social science data to support their claims. "Plaintiffs do not seek to constitutionalize any of the empirical analyses they have put forward to support their claims, nor does this Court do so." *Rucho*, 318 F. Supp. 3d at 853. Plaintiffs provide social science analyses as evidence to support their constitutional claims. "In the context of the Equal Protection Clause, in particular, the Supreme Court has relied on statistical and social science evidence as proof that a government action was motivated by discriminatory intent or had a discriminatory effect—the same purposes for which Plaintiffs seek to use such evidence here." *Rucho*, 318 F. Supp. 3d at 853. *See, e.g.*, *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483 (1954). Accordingly, Johnson's argument fails.

## B. First Amendment

### 1. Relevant Legal Principles

"Notwithstanding the evident applicability of the First Amendment to partisan gerrymandering . . . neither the Supreme Court nor lower courts have settled on a framework for determining whether a partisan gerrymander violates the First Amendment." *Rucho*, 318 F. Supp. 3d at 927. But the Supreme Court has explicitly rejected a test that focused only on partisan intent. *See Perry*, 548 U.S. at 418.

In recent years, two lower federal courts have held that a judicially manageable standard exists for adjudicating First Amendment partisan gerrymandering claims. *See Shapiro*, 203 F. Supp. 3d at 597; *Rucho*, 318 F. Supp. 3d at 929.[22] In *Shapiro*, the district court formulated a three-part standard for First Amendment partisan gerrymandering claims:

> When applying First Amendment jurisprudence to redistricting, we conclude that, to state a claim, the plaintiff must allege that those responsible for the map redrew the lines of his district with the *specific intent* to impose a burden on him and similarly situated citizens because of how they voted or the political party with which they were affiliated. In the context of redistricting, this burden is the *injury* that usually takes the form of *vote dilution*. But vote dilution is a matter of degree, and a *de minimis* amount of vote dilution, even if intentionally imposed, may not result in a sufficiently adverse effect on the exercise of First Amendment rights to constitute a cognizable injury. Instead, to establish the injury element of a retaliation claim, the plaintiff must show that the challenged map diluted the votes of the targeted citizens to such a degree that it resulted in a tangible and concrete adverse effect. In other words, the vote dilution must make some practical difference. Finally, the plaintiff must allege *causation*—that, absent the mapmakers' intent to burden a particular group of voters by reason of their views, the concrete adverse impact would not have occurred.

*Shapiro*, 203 F. Supp. 3d at 596–97 (emphasis in original). The district court in *Rucho* articulated a similar three-part standard that requires plaintiffs to prove:

> (1) that the challenged districting plan was intended to burden individuals or entities that support a disfavored candidate or political party, (2) that the districting plan in fact burdened the political speech or associational rights of such individuals or entities, and (3) that a causal relationship existed between the governmental actor's discriminatory motivation and the First Amendment burdens imposed by the districting plan.

*Rucho*, 318 F. Supp. 3d at 929.

---

[22] The courts in *Shapiro* and *Rucho* provided compelling justifications for why they settled on the three-part intent, injury, and causation standard. *See Shapiro*, 203 F. Supp. 3d at 594–98; *Rucho*, 318 F. Supp. 3d at 923–35. The *Shapiro* court drew heavily on "well-established First Amendment jurisprudence" regarding retaliation. *See Shapiro*, 203 F. Supp. 3d at 596. The *Rucho* court similarly derived its test from familiar First Amendment retaliation principles. *See Rucho*, 318 F. Supp. 3d at 923–35. The Court directs readers to *Shapiro*, 203 F. Supp. 3d at 594–98 and *Rucho*, 318 F. Supp. 3d at 923–35 for a more extensive examination of these justifications.

## 2. Application to the Matter at Hand

Plaintiffs ask the Court to evaluate their First Amendment claims under the three-part test from *Rucho*. (Pl. Resp. Br., ECF No. 129 at 50–51.) Defendants do not respond directly to Plaintiffs' proposed standard. Instead, they argue that partisan gerrymandering claims are not justiciable for the reasons the Court already rejected in the above discussion of Plaintiffs' Fourteenth Amendment claims. (*See* Johnson Br., ECF No. 119 at 17–22; Johnson Reply Br., ECF No. 132 at 6–9.)

With *Shapiro* and *Rucho* as guidance, the Court finds that a judicially manageable standard exists for adjudicating First Amendment partisan gerrymandering claims. A plaintiff must satisfy three elements. First, the plaintiff must demonstrate that those who drew the districts did so with the "specific intent" to "burden individuals or entities that support a disfavored candidate or political party." *Shapiro*, 203 F. Supp. 3d at 597; *Rucho*, 318 F. Supp. 3d at 929. Second, the plaintiff must show that the challenged districting plan actually caused an injury, i.e., "that the districting plan in fact burdened the political speech or associational rights of such individuals or entities." *Rucho*, 318 F. Supp. 3d at 929. Third, the plaintiff must show causation, i.e., that "absent the mapmakers' intent to burden a particular group of voters by reason of their views, the concrete adverse impact would not have occurred." *Shapiro*, 203 F. Supp. 3d at 598.

Plaintiffs have presented sufficient evidence for a fact-finder to conclude that the Apportionment Plan violates their First Amendment rights. Plaintiffs have satisfied the first element of their claim because they have presented evidence that the mapmakers deliberately drew the districts with the "specific intent" to "burden" disfavored Democratic voters. *See Shapiro*, 203 F. Supp. 3d at 597; *Rucho*, 318 F. Supp. 3d at 929. Plaintiffs have satisfied the second element because they have presented evidence that the Apportionment Plan has injured

their First Amendment rights, either by diluting their votes through packing or cracking (Individual Plaintiffs) or by damaging their ability to carry out their organizational mission (the League). *See Rucho*, 318 F. Supp. 3d at 929. And Plaintiffs have presented evidence that the Apportionment Plan caused their First Amendment injuries. *See Shapiro*, 203 F. Supp. 3d at 598. Therefore, Plaintiffs have satisfied each element of their First Amendment partisan gerrymandering claims. *See Shapiro*, 203 F. Supp. 3d at 596–97; *Rucho*, 318 F. Supp. 3d at 929.

## Summary: Justiciability

The Court finds that Fourteenth Amendment and First Amendment partisan gerrymandering claims are justiciable because judicially manageable standards exist for adjudicating such claims. In the Fourteenth Amendment context, the Court will apply the three-part discriminatory intent, discriminatory effect, and lack of justification framework from *Rucho*, including the "predominant purpose" test for intent that federal courts regularly use to evaluate racial gerrymandering claims. *See Rucho*, 318 F. Supp. 3d at 852. In the First Amendment context, the Court will apply the three-part intent, injury, and causation test that other federal courts have applied to First Amendment partisan gerrymandering claims. *See Shapiro*, 203 F. Supp. 3d at 596–97; *Rucho*, 318 F. Supp. 3d at 929.

## III.    Laches

### Analysis

Plaintiffs and Congressional Intervenors filed cross motions for summary judgment on Defendants' affirmative defense of laches. Plaintiffs assert that laches does not apply, as a matter of law, to claims involving ongoing violations of constitutional rights, including partisan gerrymandering claims. (Pl. Br., ECF No. 117 at 9–14.) Plaintiffs rely heavily on *Smith*, where a three judge panel recently held that laches does not apply as a matter of law to partisan

gerrymandering claims. *Smith*, 2018 WL 3872330. In response, Congressional Intervenors argue that federal courts have repeatedly recognized laches in redistricting cases. (Cong. Intervenors Resp. Br., ECF No. 127 at 11–16.) Congressional Intervenors also argue that *Smith* was wrongly decided because it relied on intellectual property cases and contradicted Supreme Court precedent holding that laches applies to constitutional cases involving election law. (*Id.* at 23–24.) Congressional Intervenors further assert that they are entitled to summary judgment on laches because Plaintiffs unreasonably delayed in bringing their claims and that this delay prejudiced Defendants. (*Id.* at 19–22.)

### A.     Relevant Legal Principles

The three judge panel in *Smith* recently held that laches does not apply as a matter of law to partisan gerrymandering claims. *See Smith*, 2018 WL 3872330, at *8. The court explained that,

> "Where a plaintiff seeks solely equitable relief, his action may be barred by the equitable defense of laches if (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." *ACLU of Ohio, Inc. v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004). However, "[l]aches only bars damages that occurred before the filing date of the lawsuit." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002). "It does not prevent plaintiff[s] from obtaining injunctive relief or post-filing damages." *Id.*; *accord Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959–60 (9th Cir. 2001) ("Laches stems from prejudice to the defendant occasioned by the plaintiff's past delay, but almost by definition, the plaintiff's past dilatoriness is unrelated to a defendant's ongoing behavior that threatens future harm."); *see also Concerned Citizens of S. Ohio, Inc. v. Pine Creek Conservancy Dist.*, 429 U.S. 651, 653, 656, 97 S.Ct. 828, 51 L.Ed.2d 116 (1977) (allowing a party to proceed with its constitutional challenges against a conservation district over a dissenting opinion in which Justice Rehnquist argued that the case should have been barred by laches because the district was formed in 1966 and the lawsuit was not filed until 1975); *cf. Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997) ("A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time" by a statute of limitations.).

*Id.* The court held that laches did not bar the plaintiffs' claims as a matter of law because the plaintiffs sought only declaratory and injunctive relief, not a remedy for harms that occurred before they filed suit. *Id.*

As Congressional Intervenors note, *Smith* relied heavily on intellectual property cases, not election law cases. *See id.* Furthermore, *Smith* is in tension with three cases cited by Johnson: *Sanders v. Dooly County, GA*, 245 F.3d 1289 (11th Cir. 2001) (per curiam), *Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (three judge panel), and *White v. Daniel*, 909 F.2d 99 (4th Cir. 1990).[23] However, as Plaintiffs note, many of the cases Congressional Intervenors rely on are inapposite. For example, Congressional Intervenors cite *Benisek v. Lamone*, 138 S. Ct. 1942, 1944, 201 L. Ed. 2d 398 (2018), but that case involved a preliminary injunction and did not directly address laches. Congressional Intervenors also cite *Michigan Chamber of Commerce v. Land*, 725 F. Supp. 2d 665 (W.D. Mich. 2010), but that case also involved a preliminary injunction and, in any case, undermines Congressional Intervenors' argument; the *Land* court *denied* the defendants' laches affirmative defense for failure to show prejudice. And the last case that Congressional Intervenors characterize as "particularly informative"—*Block v. North Dakota ex rel. Board of University and School Lands*, 461 U.S. 273 (1983)—is completely inapposite because it involved title to the bed of a river, not gerrymandering.

B.      **Application to the Matter at Hand**

After carefully considering the parties' arguments, the Court will not decide the laches issue at this juncture. The parties may raise the laches issue again at trial, if they so choose. If the parties raise the laches issue at trial, the Court will address the issue at that time.

---

[23] Johnson cites these cases in her Response to Plaintiffs' Motion for Partial Summary Judgment on Laches. (*See* ECF No. 127 at 12–16.)

## CONCLUSION

The Court concludes that both the Individual Plaintiffs and the League have standing to bring their Fourteenth Amendment and First Amendment claims. The Court further finds that Plaintiffs' claims are justiciable. The Court will defer a decision on the laches issue until trial.

In accordance with the attached Opinion, it is **HEREBY ORDERED** as follows:

1. Johnson's Motion to Dismiss and Motion for Summary Judgment (ECF No. 119) is **DENIED.**

2. The Congressional Intervenors' Motion for Summary Judgment (ECF No. 121) is **DENIED.**

3. Plaintiffs' Motion for Partial Summary Judgment on Laches (ECF No. 117) is **DENIED.**

4. Plaintiffs' Motion for Leave to File Notice of Supplemental Authority in Opposition to Defendants' Motions for Summary Judgment (ECF No. 141) and Johnson's Motion for Leave to File Supplemental Brief in Support of Motion for Summary Judgment (ECF No. 142) are **GRANTED.** The Court considered the supplemental filings in rendering its decision on the motions for summary judgment, and this opinion constitutes this Court's ruling on the arguments presented by the parties' supplemental briefing.

ENTERED:    November 30, 2018

S/ Eric L. Clay
Signed for and on behalf of the panel:

HONORABLE ERIC L. CLAY
United States Circuit Judge

HONORABLE DENISE PAGE HOOD
United States District Judge

HONORABLE GORDON J. QUIST[*]
United States District Judge

---

[*] Judge Quist joins the majority opinion with the exception of section I.B.2, which he addresses in his separate writing concurring in part and dissenting in part.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 30, 2018, by electronic and/or ordinary mail.

S/Diane R. Marion
Administrative Manager