# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, ROGER J. BRDAK,
FREDERICK C. DURHAL, JR., JACK
E. ELLIS, DONNA E. FARRIS, WILLIAM
"BILL" J. GRASHA, ROSA L. HOLLIDAY,
DIANA L. KETOLA, JON "JACK" G.
LASALLE, RICHARD "DICK" W. LONG,
LORENZO RIVERA and RASHIDA  H.
TLAIB,

Case No. 17-cv-14148

Hon. Eric L. Clay
Hon. Denise Page Hood
Hon. Gordon J. Quist

       Plaintiffs,

v.

RUTH JOHNSON, in her official capacity as
Michigan Secretary of State,

       Defendant.

_____/

| | |
|---|---|
| Dickinson Wright PLLC | Jones Day |
| Peter H. Ellsworth (P23657) | Michael A. Carvin |
| Ryan M. Shannon (P74535) | *Special Assistant Attorney General* |
| *Special Assistant Attorneys General* | 51 Louisiana Ave., NW |
| 215 S. Washington Sq., Suite 200 | Washington D.C. 20001 |
| Lansing, MI 48933 | (202) 879-3939 |
| (517) 371-1700 | macarvin@jonesday.com |
| PEllsworth@dickinsonwright.com | *Attorney for Defendant, Ruth Johnson* |
| RShannon@dickinsonwright.com | |
| *Attorneys for Defendant, Ruth Johnson* | |

_____/

# DEFENDANT SECRETARY OF STATE RUTH JOHNSON'S
## MOTION IN LIMINE TO EXCLUDE TESTIMONY CONCERNING
## VARIOUS PROFFERED GERRYMANDERING METRICS

Defendant, Michigan Secretary of State Ruth Johnson ("Defendant" or "Secretary"), respectfully moves for an order prohibiting Plaintiffs from introducing testimony at trial concerning various proffered gerrymandering metrics. She makes her motion on the basis that such testimony fails to satisfy the requirements of Fed. R. Evid. 702. In support of her Motion, the Secretary relies on the accompanying Brief in Support.

Pursuant to Local Rule 7.1, there was a conference between the parties' counsel on December 3, 2018, in which counsel for the Secretary explained the nature of this motion and its legal basis and requested but did not obtain concurrence in the relief sought.

WHEREFORE, the Secretary respectfully requests that this Court grant her Motion and enter an order prohibiting from introduction at trial testimony or other evidence concerning: (i) Partisan Bias analysis (as expressed in seats-votes curves); (ii) Partisan Symmetry analysis; (iii) the Efficiency Gap; (iv) The Mean-Median Vote Test; and (v) the Declination Test.

Respectfully submitted,

DICKINSON WRIGHT PLLC          JONES DAY

/s/ Peter H. Ellsworth
Peter H. Ellsworth (P23657)          Michael Carvin
Ryan M. Shannon (P74535)          Attorneys for Defendant
Attorneys for Defendant
Dated: December 4, 2018

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MICHIGAN, ROGER J. BRDAK, FREDERICK C. DURHAL, JR., JACK E. ELLIS, DONNA E. FARRIS, WILLIAM "BILL" J. GRASHA, ROSA L. HOLLIDAY, DIANA L. KETOLA, JON "JACK" G. LASALLE, RICHARD "DICK" W. LONG, LORENZO RIVERA and RASHIDA H. TLAIB, | Case No. 17-cv-14148<br><br>Hon. Eric L. Clay<br>Hon. Denise Page Hood<br>Hon. Gordon J. Quist |

        Plaintiffs,

v.

RUTH JOHNSON, in her official capacity as Michigan Secretary of State,

        Defendant.

_____/

| | |
|---|---|
| Dickinson Wright PLLC<br>Peter H. Ellsworth (P23657)<br>Ryan M. Shannon (P74535)<br>*Special Assistant Attorneys General*<br>215 S. Washington Sq., Suite 200<br>Lansing, MI 48933<br>(517) 371-1700<br>PEllsworth@dickinsonwright.com<br>RShannon@dickinsonwright.com<br>*Attorneys for Defendant, Ruth Johnson* | Jones Day<br>Michael A. Carvin<br>*Special Assistant Attorney General*<br>51 Louisiana Ave., NW<br>Washington D.C. 20001<br>(202) 879-3939<br>macarvin@jonesday.com<br>*Attorney for Defendant, Ruth Johnson* |

_____/

## DEFENDANT SECRETARY OF STATE RUTH JOHNSON'S BRIEF IN SUPPORT OF HER MOTION IN LIMINE TO EXCLUDE TESTIMONY CONCERNING VARIOUS PROFFERED GERRYMANDERING METRICS

# TABLE OF CONTENTS

Table of Authorities ..................................................................................... iii

Concise Statement of Issues Presented ......................................................... v

Most Appropriate or Controlling Authority.................................................. vi

I.    Introduction................................................................................. 1

II.   Factual Summary ......................................................................... 3

      A.    The Experts' Tests................................................................. 3

      B.    The Experts' Depositions. ..................................................... 4

            1.    Dr. Mayer's Deposition. ............................................... 4

            2.    Dr. Warshaw's Deposition............................................ 5

            3.    Dr. Chen's Deposition. ................................................. 7

      C.    The Literature Shows a Field in Flux..................................... 7

III.  Argument ..................................................................................... 12

      A.    Standard of Review .............................................................. 12

      B.    The Five Social Science Metrics Employed by Plaintiffs' Experts
            Are Not Generally Accepted or Reliable. ............................... 13

IV.   Conclusion ................................................................................... 15

# TABLE OF AUTHORITIES

## Cases

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)  12, 13, 14, 15

*Gill v. Whitford,* 138 S. Ct. 1916 (2018)...................................................................4

*Henricksen v. ConocoPhillips Co.,* 605 F. Supp.2d 1142 (E.D. Wash. 2009) ........................................................................................................ 4, 14

*King v. Enter. Rent-A-Car Co.*, 231 F.R.D. 255 (E.D. Mich. 2004) ......................13

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).............................................12

*LULAC v. Perry*, 548 U.S. 399 (2006) .....................................................................8

*Muzzey v. Kerr-McGee Chemical Corp.*, 921 F. Supp. 511 (N.D. Ill. 1996) ...............................................................................................................13

*Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244  (6th Cir. 2001) ..................12

*Vieth v. Jubelirer,* 541 U.S. 267 (2004)...................................................................15

*Whiting v. Boston Edison Co.,* 891 F. Supp. 12 (D. Mass. 1995) ...........................14

## Other Authorities

McGhee, Rejoinder, 17 Election L. Journal 1, 73 (2018) (available at https://doi.org/10.1089/elj.2017.0461.) .................................................. 9, 10, 11

Stephanoplous and McGhee, *The Measure of a Metric*, 70 Stan. L. Rev. 1503, 1505 (2018) .......................................................................8

Stephanopolous and McGhee, 70 Stan. L. Rev. at 1508 .........................................9

Stephanopolous and McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015) .....................................................8

## Rules

Fed. R. Evid. 702 .......................................................................... 2, v, 2, 12

Local Rule 7.1 ..................................................................................2

## CONCISE STATEMENT OF ISSUES PRESENTED

Plaintiffs' proposed experts have served reports that include gerrymandering analysis under five different social science metrics.   At deposition, these experts conceded that there is no consensus on which metrics are appropriate to show gerrymandering, or what results under those metrics indicate when gerrymandering is or should be considered unacceptable.   Should the Court exclude testimony on those tests under Fed. R. Evid. 702?

## MOST APPROPRIATE OR CONTROLLING AUTHORITY

Fed. R. Evid. 702 ......................................................................... 2, v, 2, 12


*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)  12, 13, 14, 15

*Henricksen v. ConocoPhillips Co.,* 605 F. Supp.2d 1142 (E.D. Wash. 2009) ........................................................................................... 4, 14

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..............................................12

*Nelson v. Tennessee Gas Pipeline Co*., 243 F.3d 244  (6th Cir. 2001) ...................12

## I.    INTRODUCTION

In this matter, Plaintiffs seek to show that Michigan's Current Apportionment Plan (the "Enacted Plan") is an unconstitutional gerrymander, and thus that it should be enjoined from use in the 2020 election.

Plaintiffs have served three proposed expert reports in ostensible support of their claims: those of Drs. Chen, Mayer, and Warshaw.

These three experts have employed one or more of five different social science metrics (but no more than those five) that purport to identify whether and to what extent partisan gerrymandering is present in an apportionment plan.   These five metrics include:

(1) Partisan Bias (as expressed in seats-votes curves);

(2) Partisan Symmetry;

(3) The Efficiency Gap;

(4) The Mean-Median Vote Test; and

(5) The Declination Test.

There are two key problems with the use of these metrics by Plaintiffs' proposed experts:

First, none of the metrics has gained general acceptance in the social science or political science academic communities (the "Academy").   Each of the five tests has only recently been proposed.  Members of the Academy are presently scrambling

to be the "first" to find a new potential standard that might be used in the courts; each of the tests is either so new as to have no peer review, or has been the subject of severe and widespread criticism.  Plaintiffs' own experts admit that there is no consensus view within the Academy as to which of the tests is preferable or appropriate for detecting gerrymanders.

Second, in applying these tests in their reports, not one of Plaintiffs' experts could identify a threshold regarding when a particular score on any of the metrics supports a conclusion that a plan is unacceptable or should be recognized as an improper gerrymander.  That is, Plaintiffs' experts purport to show that the Enacted Plan scores in a certain range on one or more of these metrics, but they each disavow that there is any recognized rubric for when a score indicates that gerrymandering has occurred, that gerrymandering is severe, or even that the purported gerrymander is burdensome on the rights of voters.

Because the tests lack general acceptance, and because Plaintiffs' experts employed these tests without a reliably established threshold for determining whether a particular plan is gerrymandered in the first instance, the tests should be excluded under Fed. R. Evid. 702.

2

## II.    FACTUAL SUMMARY

### A.    The Experts' Tests.

On June 1, 2018, Plaintiffs served three proposed expert reports, employing

five social science tests:

- Dr. Mayer's report included analysis under all five social science metrics: Partisan Bias (as expressed in seats-votes curves); Partisan Symmetry; the Efficiency Gap; the Mean-Median Vote Test; and the Declination Test.  (ECF No. 129-51, Mayer Report, PageID.4815-4825.)

- Dr. Chen's report included analysis under the Mean-Median Vote Test and the Efficiency Gap.  (ECF No. 129-50, Chen Report, PageID.4718-4720.)

- Dr. Warshaw's report included analysis under the Efficiency Gap, the Mean-Median Vote Test, and the Declination Test. (ECF No. 129-52, PageID.4916-4922.)

These tests are described more fully at the above-cited pages of the proposed

expert reports (which were previously filed in the docket as attachments to Plaintiffs'

response to the Secretary's Motion for Summary Judgment as ECF Nos. 129-50, -

51, and -52.)

Each of the metrics provides a statewide figure—i.e., the measures do not

provide information on a specific district, but look to all districts in a state in the

aggregate.

The metrics are not designed to address the core question posed in this case

of whether there is district-specific harm or whether such harm can be remedied by

3

the adoption of a revised districting plan for that district.  Of note in this regard is that Plaintiffs' proposed expert reports were all served on the Secretary prior to the Supreme Court's admonition in *Gill v. Whitford,* 138 S. Ct. 1916, 1934 (2018), that a gerrymandering plaintiff's claims must proceed on a district-by-district, rather than statewide, basis.

### B.   The Experts' Depositions.

The Secretary deposed each of Plaintiffs' proposed experts.

### 1.   Dr. Mayer's Deposition.

The first of Plaintiffs' experts to be deposed was Dr. Mayer, on August 1, 2018.  A copy of his deposition transcript is attached as Exhibit 1.

On test after test, Dr. Mayer admitted that there has not been widespread acceptance of a test as being preferred or appropriate in evaluating gerrymanders, and he admitted that there is no consensus within the political science community over what particular results under any particular test are acceptable or unacceptable from a political science perspective.  (*Id.,* 59:3-61:19, 143:19-150:15.)  He also specifically acknowledged that "there are some differences of opinion in the literature about the different measures" he employed.  (*Id.*, 115:24-115:25.)  He agreed that there had not been any serious scholarly reaction or analysis, e.g, of the Declination Test, and that there is no Partisan Bias gap that is widely viewed by a

consensus of academics in the political science community as being unacceptable or indicative of an impermissible partisan gerrymander.  (*Id.* at 148:16-148:20.)

Even on the Efficiency Gap—the test which had initially been found to support standing by the district court in *Whitford* before the unanimous Supreme Court decision rejected the test's use for that purpose—Dr. Mayer admitted that there was no academic consensus as to what level of efficiency gap is acceptable or unacceptable from a political science perspective.  (*Id.*, Mayer Dep. 149:21-150:1.)

Dr. Mayer also admitted that even neutrally-drawn plans can give indications of partisan bias—i.e., false positives.  His own demonstration plan, which he claimed to have been neutrally drawn, showed apparent anti-Democrat bias under the efficiency gap, for example.  (*Id.*, 175:8-175:19, 177:17-177:21.)

Because of this high level of uncertainty and lack of standards, it is not surprising that Dr. Mayer ultimately admitted that, other than the brand new Declination Test (which, as noted, Dr. Mayer stated has not been subject to serious study), his various tests do not permit an inference of intent by legislators to crack or pack districts.  (Mayer Dep., 187:7-187:17.)

### 2.    Dr. Warshaw's Deposition.

The Secretary deposed Dr. Warshaw next.  A copy of his August 8, 2018 deposition transcript is attached as Exhibit 2.

In his deposition, Dr. Warhsaw testified that: "I think there are differences of opinion about whether we've arrived at" the "point" where the Academy has "some uniform generally accepted measure of partisan asymmetry or partisan bias." (*See* Warshaw Dep., Ex. 2, 49:7-49:18.)  He specifically conceded that "there's certainly no wide scholarly acceptance of mean-median as the best or proper measure of partisan gerrymanders," acknowledging that "it's been subject to serious criticism by respected political scientists." (*Id.*, 170:24-171:7.).  He conceded as well that there has been no scholarly commentary on the Declination Test. (*Id.*, 176:17-176:23; 177:3-177:8.)  Concerning the Efficiency Gap, he acknowledged that "[t]he academic discussion of the efficiency gap includes a number of criticisms of the measure" by "well-respected political scientists," and stated further that "there's been a robust discussion of the merits of different measures with some of that centering around criticism of the efficiency gap." (*Id.*, 51:10-52:14.).

Dr. Warshaw also acknowledged in his deposition that there is no well-accepted view in the Academy regarding what score on any given metric demonstrates that a plan is unacceptable or an extreme partisan gerrymander. (*Id.*, 57:5-57:7, 57:19-57:23, 57:24-58:3.)  He conceded, for example, with respect to the efficiency gap test employed by all three of Plaintiffs' proposed experts, that "there is no consensus in the political science community about either a bright line or a range of percentages that crosses some threshold." (*Id.*, 119:6-119:12.)

He also acknowledged that scores as to these metrics can change from election to election, and that "it's long been known that the consequences of a gerrymander decay somewhat over time due to changing election circumstances." (*Id.*, 83:19-83:22.) Indeed, this is one of the few items Dr. Warshaw identified for which there *is* a "consensus in the literature." (*Id.*, 125:20-125:23.)

### 3.    Dr. Chen's Deposition.

The Secretary deposed Dr. Chen last. A copy of his September 11, 2018 deposition transcript is attached as Exhibit 3.

Like Drs. Mayer and Warshaw, Dr. Chen acknowledged that there is a diversity of opinion in the Academy at present concerning what efficiency gap scores constitute extreme or unacceptable partisan bias. (Chen Dep., Ex. 3, 198:8-199:4.) He further stated that he was not aware of any consensus or well-accepted view about what constituted an unacceptable or extreme score on the Mean-Median Vote Test. (*Id.*, 199:13-199:17.)

### C.    The Literature Shows a Field in Flux.

The authors of the Efficiency Gap—Nicholas Stephanopolous and Eric McGhee—included the following summary in a 2018 article describing their ongoing work to develop that metric:

> For several decades there was "virtually a consensus [in] the scholarly community" about how to measure partisan gerrymandering. An analyst would estimate the seat shares the major parties would win in a state if

7

(hypothetically) they each received the same vote share. The greater the divergence between the parties' seat shares for the same (counterfactual) vote share, the larger a district plan's partisan bias, and the more gerrymandered the plan.

Despite the metric's wide acceptance among academics, the U.S. Supreme Court's pivotal member, Justice Kennedy, has expressed misgivings about partisan bias.  In a 2006 case [*LULAC v. Perry*, 548 U.S. 399, 420 (2006) (opinion of Kennedy, J.)], he did not "altogether discount[] its utility in redistricting planning and litigation," but he did worry that "the existence or degree of [bias] may in large part depend about conjecture about where possible vote-switchers will reside."  He noted "[W]e are wary of adopting a constitutional standard that invalidates a map based on unfair results that would occur in a hypothetical state of affairs."

The two of us agree with Justice Kennedy that it is odd to measure partisan gerrymandering based on how the major parties *would have* performed in counterfactual elections. [Stephanoplous and McGhee, *The Measure of a Metric*, 70 Stan. L. Rev. 1503, 1505 (2018).]

Indeed, after Justice Kennedy's expression of concern over the partisan symmetry test in *LULAC*, a free-for-all commenced with different scholars each trying to be the "first" to fill the void.  Stephanopolous and McGhee were among the first to propose a new test when they published their Efficiency Gap metric in the University of Chicago Law Review in 2015.  *See* Stephanopolous and McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015).

In their 2018 summary of their subsequent efforts to develop and refine the Efficiency Gap metric, Stephanopolous and McGhee explain that there has been significant debate over their measure, as well as others, in the last three years:

> The academic discussion of the efficiency gap includes a number of criticisms of the measure. Writing in this journal's pages, Benjamin Cover [University of Idaho] contends that the efficiency gap is in tension with important democratic values. In his view, it favors uncompetitive elections, discourages proportional representation, and incentivizes voter suppression. Cover and John Nagle [Carnegie Mellon University] also object to some of the methodological choices underpinning the efficiency gap: how wasted votes are defined and weighted, how imputations are made for uncontested races, and how variations in district-level turnout are addressed. Wendy Tam Cho [University of Illinois], Robin Best [Binghampton University] and colleagues, and Jonathan Krasno [Binghampton University] and colleagues further complain about the metric's variability from election to election. These scholars present both toy examples of one or two districts and actual district plans that they argue demonstrate this variability. And Christopher Chambers [Georgetown University] and colleagues observe that the efficiency gap does not distinguish between moderate and extreme legislators. This oversight may allegedly lead to odd conclusions about certain maps.
>
> We find these criticisms unpersuasive, and we explain why later in this Essay. *We are also skeptical of the measures other scholars have recently advanced.* [Stephanopolous and McGhee, 70 Stan. L. Rev. at 1508 (emphasis added).]

In March of 2018, Eric McGhee published a "Rejoinder" in the Election Law Journal, heavily criticizing Robin E. Best's article in the same journal entitled

9

"Considering the Prospects for Establishing a Packing Gerrymandering Standard."[1] Dr. McGhee complained that even recent attempts to assess the validity of different measures started from the wrong premise: "A proper assessment of these measures would start by identifying the normative principles that could be measured," which would "involve weighing the normative principles against other interests, identifying problems with the metric as applied, and setting thresholds." *Id.* He complained that "[t]here are now so many measurement options that some clarity is needed." *Id.*

In concluding that Dr. Best's summary and attempts to classify different measures had failed to address key questions present in the Academy, Dr. McGhee stated as follows:

> Knowing which measure of gerrymandering to use requires first carefully defining what one means by a gerrymander. Then one needs to know what each measure of gerrymandering does capture. Finally one needs to consider how to apply the measure or measures one has chosen in the real world. The first point ought to be subject to robust debate, and I doubt there are easy answers. The second is mostly about identifying the logical and mathematical underpinnings of the measures one considers. The last is a matter of deciding whether the measure is workable as a governing principle: can it tell us anything of interest, and can its weaknesses be shored up?

---

[1] *See* 17 Election L. Journal 1, 73 (2018) (available at https://doi.org/10.1089/elj.2017.0461.) (Dr. Best is the author of the Median-Mean Vote Test employed by all three of Plaintiffs' proposed experts.)

Best et al.'s arguments are ultimately disappointing because they do none of these things. … They fall back on a "know it when we see it" standard of gerrymandering and make analytical choices that badly compromise their conclusions.

I would welcome a debate about the concept or concepts of fairness that we want to measure and which of the metrics discussed here should therefore be preferred.  I would also welcome debate about the precise thresholds and standards that must inevitably become a part of any legal test based on these metrics.  *Indeed, I have left entirely open the possibility that any of the measures discussed here, either alone or in combination, could be a test of gerrymandering under the right conditions*.  But Best et al.'s argument does not engage in any of those debates.  [*Id.* at 81 (emphasis added).]

These articles, among others, show a field in flux.  There is no consensus about what can or should be measured, which measures are most useful, or even whether any of the measures are or could be a test of gerrymandering in a legal setting.  There are even disputes about what underlying data to use when applying the tests.  Dr. Warshaw, for example, chose in his report to use different election information than recommended or suggested by the authors of the Efficiency Gap and Mean-Median Vote Tests.  (Warshaw Dep., Ex. 2, 35:15-38:1.)

Far from any of these tests being "well accepted," the Academy is presently engaged in a heavy debate.  The Secretary finds herself facing five different facets of that ongoing debate at once.

## III.   ARGUMENT

### A.   Standard of Review

This Court has broad discretion in deciding whether to admit or exclude expert

testimony.  *See Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir.

2001) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  This

discretion, however, must be guided by the legal principles set forth in Fed. R. Evid.

702, which provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in the
> form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles
> and methods; and
>
> (d)   the expert has reliably applied the principles and
> methods to the facts of the case.

Rule 702 reflects the trial court's "task of ensuring that an expert's testimony both

rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

In addition to ensuring that the witness is qualified to give an expert opinion,

the court's "gate-keeping" obligation "entails a preliminary assessment of whether

the reasoning or methodology underlying the testimony is scientifically valid and of

whether that reasoning or methodology properly can be applied to the facts in issue."

*Daubert,* 509 U.S. at 592-93. In making that determination, the Court should

consider the following criteria:

> The testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community. [*King v. Enter. Rent-A-Car Co.*, 231 F.R.D. 255, 267 (E.D. Mich. 2004) (citations omitted).]

Ultimately, *Daubert* requires that "any and all scientific testimony or evidence

admitted [must be] not only relevant, but reliable." *Daubert*, 509 U.S. at 589.

The burden of demonstrating the admissibility of expert testimony rests

squarely on the party offering it. *Muzzey v. Kerr-McGee Chemical Corp.*, 921 F.

Supp. 511, 518 (N.D. Ill. 1996). Plaintiffs cannot carry this burden as to the five

social science metrics contained in their proposed expert reports.

**B.    The Five Social Science Metrics Employed by Plaintiffs' Experts Are Not Generally Accepted or Reliable.**

As the factual discussion above plainly supports, there is no current consensus

or general acceptance within the Academy of any particular gerrymandering metric.

The authors and supporters of different metrics are presently at odds with one

another about which metric is best, which metrics are useful (and under what

circumstances), and further, how a particular metric is to be employed in the first

instance.  These new tests require significant further study and debate before they are ready for the Court's consideration under *Daubert.*

In related vein, there is no consensus in the literature as to which particular score on any of the metrics employed demonstrates when a particular plan's partisanship crosses the line into the realm of being an improper gerrymander. Plaintiffs' own experts all expressly disavowed that *they* had any bright line test or threshold under any of the tests they applied.

Courts have repeatedly excluded this type of non-threshold testimony in other settings.  *See e.g., Henricksen v. ConocoPhillips Co.,* 605 F. Supp.2d 1142, 1165-1166 (E.D. Wash. 2009) (noting multiple authorities).  Thus, in toxic torts cases, it is not enough for an expert to claim that exposure to "some" or "a lot" of pollution will cause cancer—the expert must provide a threshold, supported by the scientific community, and known to support causation.  *Id.; see also Whiting v. Boston Edison Co.,* 891 F. Supp. 12, 25 (D. Mass. 1995) ("In laymens' terms, the model assumes that if a lot of something is bad for you, a little of the same thing, while perhaps not equally bad, must be so in some degree.  The model rejects the idea that there might be a threshold at which the neutral or benign effects of a substance become toxic.") Without a threshold, a model "cannot be falsified, nor can it be validated."  *Id.*

Plaintiffs' proposed experts have provided only *relative* measures of partisanship in their reports.  They thus can only compare the Enacted Plan to purely

14

hypothetical plans or to plans that were adopted in other states with other traditional districting criteria, geographical limitations, and features.   Their reports have identified no independent basis for saying that a score of "X" on any particular test indicates a gerrymander having occurred in Michigan.   For this same reason, they have no ability to identify the potential for false positives under such tests.   Their analysis necessarily depends on a "know-it-when-we-see-it" approach to gerrymandering causation of the type that must be rejected under *Daubert*.

In *Vieth v. Jubelirer,* 541 U.S. 267, 307-308 (2004) (Kennedy, J., concurring), Justice Kennedy required "agreed upon substantive principles of fairness" that would support a "clear, manageable and politically neutral standard for measuring the particular burden a given classification imposes."   The tests used by Plaintiffs' proposed experts start without any "agreed upon" principles of fairness; they offer no "sure guidance."   *Id.*   Because the Academy has not reached any consensus or built its models around recognized standards of fairness to govern the redistricting process, this Court should not indulge these new tests.

Testimony concerning the five tests in Plaintiffs' expert reports should thus be excluded.

## IV.      CONCLUSION

WHEREFORE, the Secretary respectfully requests that this Court grant her Motion and enter an order prohibiting from introduction at trial testimony or other

evidence concerning: (i) Partisan Bias analysis (as expressed in seats-votes curves);

(ii) Partisan Symmetry analysis; (iii) the Efficiency Gap; (iv) The Mean-Median

Vote Test; and (v) the Declination Test.

Respectfully submitted,

DICKINSON WRIGHT PLLC            JONES DAY

/s/ Peter H. Ellsworth
Peter H. Ellsworth (P23657)          Michael Carvin
Ryan M. Shannon (P74535)           Attorneys for Defendant
Attorneys for Defendant

Dated: December 4, 2018

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

/s/ Ryan M. Shannon

539153

17