# In The Matter Of:

*League of Women Voters of Michigan, et al. v.*
*Ruth Johnson*

---

*Deposition of Kenneth R. Mayer, Ph.D.*
*August 1, 2018*

---



Excellence In Court Reporting

*Original File Mayer Kenneth 8-1-18.txt*
*Min-U-Script® with Word Index*

Page 3

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MICHIGAN
                 SOUTHERN DIVISION


LEAGUE OF WOMEN VOTERS OF
MICHIGAN, ROGER J. BRDAK,
FREDERICK C. DURHAL, JR., JACK E.
ELLIS, DONNA E. FARRIS, WILLIAM
"BILL" J. GRASHA, ROSA L.            Case No. 17-CV-14148
HOLLIDAY, DIANA L. KETOLA, JON
"JACK" G. LASALLE, RICHARD "DICK"    Hon. Eric L. Clay
W. LONG, LORENZO RIVERA and          Hon. Denise Page Hood
RASHIDA H. TLAIB,                    Hon. Gordon J. Quist

              Plaintiffs,

         -vs-

RUTH JOHNSON, in her official
capacity as Michigan Secretary of
State,

              Defendant.


       Deposition of KENNETH R. MAYER, Ph.D.,

taken at the instance of the Defendant, under and

pursuant to the Federal Rules of Civil Procedure, before

Tammy L. Uhl, RPR, CRR, CRC, a Notary Public in and for

the State of Wisconsin, at Quarles & Brady LLP,

33 East Main Street, Suite 900, Madison, Wisconsin, on

August 1, 2018, commencing at 9:27 a.m. and concluding at

3:40 p.m.
```

---

Page 3

```
 1              I N D E X

 2   Examination:                              Page

 3   By Mr. Carvin                                4

 4

 5   Exhibits Identified:                      Page

 6   1    Evaluation of Michigan Congressional and    5
          State Legislative District Plans by
 7        Kenneth R. Mayer, Ph.D., dated June 1, 2018

 8   2    The University of Chicago Law Review      119
          article titled Partisan Gerrymandering and
 9        the Efficiency Gap

10

11   Requests:                                 Page

12   1    Files sent from Professor Chen to Professor  159
          Mayer

13

14

15   (The original exhibits were attached to the original
          transcript and PDFs were provided to counsel)

16

17

18        (The original transcript was filed with
             Attorney Peter H. Ellsworth)

19

20

21

22

23

24

25
```

---

Page 2

```
 1      A P P E A R A N C E S

 2

 3   FAEGRE BAKER DANIELS LLP, by
     MR. JOSEPH H. YEAGER, JR. and MR. KEVIN M. TONER,
 4   300 N. Meridian Street, Suite 2700,
     Indianapolis, Indiana  46204-1750,
 5        appeared on behalf of the Plaintiffs.

 6   JONES DAY, by
     MR. MICHAEL A. CARVIN,
 7   51 Louisiana Avenue, N.W.,
     Washington, D.C. 20001-2113,
 8        appeared on behalf of the Defendant.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Page 4

```
 1        KENNETH R. MAYER, Ph.D., called as
 2   a witness, being first duly sworn, testified
 3   on oath as follows:
 4            EXAMINATION
 5   BY MR. CARVIN:
 6   Q   Good morning, Professor Mayer.
 7   A   Good morning.
 8   Q   Have you had your deposition taken before?
 9   A   Yes.
10   Q   How many times?
11   A   Probably ten.
12   Q   And has that always been in an expert witness
13       capacity?
14   A   Yes.
15   Q   Okay.  So you know how this works.  I'll just go
16       through a couple of preliminaries.  You're not
17       under any medication or any other reason that you
18       can't testify fully and truthfully today; is that
19       correct?
20   A   That's correct.
21   Q   And because the court reporter -- I'm going to
22       need verbal responses from you, either yes or no,
23       rather than nodding your head.  Do you understand
24       that?
25   A   I understand.
```

League of Women Voters of Michigan, et al. v.
Ruth Johnson

Deposition of Kenneth R. Mayer, Ph.D.
August 1, 2018

Page 5

1   Q   And if any of my questions are unclear or
2       confusing to you, please don't hesitate to ask me
3       to clarify the question.  Do you understand that?
4   A   Understood.
5   Q   Okay.  And you filed an expert report in this
6       case?
7   A   Yes.
8           MR. CARVIN:  Oh, before that, my
9       opposing counsel asked me to clarify that my
10      name is Mike Carvin.  I work for Jones Day.
11      I will be representing the secretary of state
12      in this case, but apparently I haven't
13      formally entered an appearance yet.  That's
14      just to clarify for the record.
15          THE WITNESS:  Okay.
16          MR. YAEGER:  No objection.  If I --
17      just back to the last question.  I don't mean
18      to interrupt you.  You asked if he filed a
19      report.  Of course the reports aren't filed.
20      They were served.
21          MR. CARVIN:  Fair enough.  Okay.
22      I'm going to have this marked as Exhibit 1.
23          (Exhibit No. 1 marked for
24          identification)
25  BY MR. CARVIN:

Page 6

1   Q   Again, just to clarify the record, you prepared a
2       report in this case that has been served on
3       defendants; is that right?
4   A   That's correct.
5   Q   And I've handed you a document that's dated
6       June 1, 2018.  Is that the expert report you
7       prepared in connection with this case?
8   A   Yes.
9   Q   Okay.  And who contacted you in regards to
10      preparing this report?
11  A   I believe it was counsel.
12  Q   And counsel for plaintiffs?
13  A   Yes.
14  Q   And do you recall the particular attorney that
15      contacted you?
16  A   It was Mr. Jaeger.
17  Q   Okay.  And when did he contact you?
18  A   For this report, it was -- I believe it was early
19      2018.
20  Q   Can you be a bit a more specific?
21  A   Not without checking my e-mails.
22  Q   February or March, that neighborhood?
23  A   That's what I remember.
24  Q   Okay.  And you've worked with Mr. Jaeger before in
25      other litigation?

Page 7

1   A   Not other than this case.
2   Q   Okay.  And you were asked to analyze whether or
3       not the state house, state senate, and
4       congressional plans enacted in Michigan were
5       extreme partisan gerrymanders; is that correct?
6   A   I don't believe the request was framed in those
7       terms, but I was asked to analyze the
8       partisanship, analyze the district plan.
9   Q   In what regard?
10  A   To see whether it was -- to assess the
11      partisanship of the redistricting plans.
12  Q   Okay.  And you're being paid $300 an hour?
13  A   Correct.
14  Q   And if you could turn to the bottom of page 2 of
15      your report -- I apologize -- page 3 of your
16      report.  And that lists other cases where you've
17      testified as an expert witness in trial or
18      deposition, is that correct, going on to the top
19      of page 4?
20  A   There is one addition that has occurred since I
21      filed this report, which is Tyson vs. Richardson
22      Independent School District.
23  Q   And where is that?  What state?
24  A   Texas.
25  Q   And what's the issue there?

Page 8

1   A   The at-large nature of elections to the Richardson
2       School Board or what they call the board of
3       trustees.
4   Q   And those are alleged to violate Section 2 of the
5       Voting Rights Act?
6   A   I don't know the specifics of the complaint, but
7       what I did was analyze the effects of the at-large
8       plans on minority voters.
9   Q   Was that Hispanic or black or both?
10  A   Both.
11  Q   And you were analyzing the ability of Hispanic and
12      black voters in this school district to elect
13      their candidate of choice under an at-large
14      scheme?
15  A   More or less.
16  Q   Please elaborate.
17  A   It was to basically conduct a voting rights
18      analysis of the at-large system so that's
19      essentially what it is.  The ability to
20      participate equally in the election process and
21      elect candidates of choice.
22  Q   And has this case gone to trial?
23  A   No.
24  Q   Do you know when it will?
25  A   No.

Page 9

1  Q   Have you filed an expert report in that case?
2  A   Yes.
3  Q   Okay.  And have you been deposed in that case?
4  A   No.
5  Q   And this is more for lawyers than for you.  Do you
6      know what district in Texas the case is scheduled?
7  A   I think it's the northern district in federal
8      court, but I'm not certain.
9  Q   Is Richardson in the northern part of Texas?
10 A   It's a suburb of Dallas.
11 Q   Dallas.  Okay.  Thank you.  All right.  And then
12     I'd like to turn first to -- you testified in
13     Whitford v. Gill; is that correct?
14 A   That's correct.
15 Q   And the issue there was whether or not there was a
16     partisan gerrymander against democrats in the
17     state of Wisconsin; is that correct?
18 A   Yes.
19 Q   Okay.  And did you draw demonstration maps or
20     plans in that case?
21 A   I drew one demonstration map.
22 Q   And just to clarify, you were testifying on behalf
23     of the plaintiffs who were alleging the democratic
24     gerrymander; is that correct?
25            MR. YAEGER: Objection.  Misstates

Page 10

1          that case.
2  A   It was a republican gerrymander, a republican
3      drawn plan in that case, not a democratic one.
4  Q   If I was unclear in my question, I apologize.  You
5      were testifying on behalf of the people
6      challenging the alleged republican gerrymander?
7  A   That's correct.
8  Q   And those people were affiliated with the
9      democratic party?
10 A   Not to parse words that the -- as I understand it,
11     some of the plaintiffs were democrats, but I don't
12     know if the democratic party was involved in the
13     litigation.
14 Q   Fair enough.  Okay.  But in all events, the party
15     on behalf of whom you testified was alleging that
16     the republicans had unfairly and
17     unconstitutionally gerrymandered democrats in the
18     state of Wisconsin; is that correct?
19 A   That's correct.
20 Q   And what offices were at issue in that case?
21 A   In that case, the offices were elections to the
22     state assembly, which here is the lower house of
23     the state legislature.
24 Q   And a minute ago you said you drew a demonstration
25     map --

Page 11

1  A   Yes.
2  Q   -- in that case?  And that was a map that in your
3      opinion was a neutral map that did not have a
4      partisan motivation?
5  A   That's correct.
6  Q   And in your opinion, that map complied with
7      traditional districting principles?
8  A   That's correct.
9  Q   And what traditional districting principles did
10     you use to guide you in the preparation of that
11     demonstration map?
12 A   The principles that I used were population
13     deviation or equal population, preservation of
14     municipal boundaries, and I believe compactness,
15     and obviously contiguity and so those were the
16     ones that -- the traditional districting
17     principles that drove that map.
18 Q   How about the Voting Rights Act?
19 A   That as well.
20 Q   And how about preserving the cores of existing
21     districts, was that a principle that you looked
22     to?
23 A   In the demonstration map, that was not one of the
24     factors.
25 Q   To the best of your knowledge is preserving the

Page 12

1      cores of existing districts a traditional
2      districting principle in Wisconsin?
3  A   It can be.  It's not always adhered to as much as
4      the other criteria.
5  Q   Okay.  How about incumbency, protecting
6      incumbents?
7  A   I did not consider where incumbents lived or who
8      the incumbents were.
9  Q   So you were unaware of, for example, whether or
10     not two incumbents were paired in the same
11     district when you prepared your demonstration map;
12     is that correct?
13 A   That's correct.
14 Q   Do you know in retrospect whether or not any
15     incumbents were placed in the same district?
16 A   There were some.  I don't know sitting here which
17     districts.
18 Q   And I take it from your testimony that when you
19     were actually preparing the map, you were
20     uninformed as to the residences of the current
21     incumbents?
22 A   That's correct.
23 Q   Did you do -- what was your testimony regarding
24     this demonstration map?
25 A   The testimony, as I recall it, was that the --

Page 13

1      MR. YAEGER: I object that's
2   overbroad and compound, but you may answer.
3 A   Was to demonstrate that it was possible to draw a
4   more neutral map while complying with traditional
5   redistricting principles.
6 Q   And did you do any substantive analysis of the
7   partisan fairness or bias of the enacted plan in
8   that case?
9 A   Yes. There was a supplemental filing. I don't
10   know whether it was called a report.
11 Q   And what was the basic conclusion of that
12   supplemental filing?
13 A   It was updating some of the conclusions and also
14   responding to some questions that the Court had,
15   but it's been almost two years since that
16   happened, so without having the report in front of
17   me, I couldn't be specific.
18 Q   Fair enough. And to be clear, I'm not asking you
19   for the specific details. I'm just asking you for
20   the general gist of your opinion relative to the
21   partisan fairness or bias of the plan at issue.
22 A   Okay.
23 Q   And what was that?
24 A   My conclusions were not affected. They were the
25   same. But it was some additional analysis

Page 14

1   regarding a question that the Court had asked. I
2   think it may -- it was the three-judge panel that
3   heard the case.
4 Q   And what question did they ask?
5 A   I recall it was about the effect of the new wards
6   that were drawn, but I don't remember
7   specifically.
8 Q   When you say wards, do you mean voting precincts?
9 A   Correct. In Wisconsin, they're called wards.
10 Q   Right. And other than the effect of the new
11   precincts or wards, did you opine on the partisan
12   fairness or bias of the enacted plan in Wisconsin?
13 A   In the original report, yes.
14 Q   And what was your conclusion?
15 A   That it was -- well, let me back up. So my report
16   in that case I don't believe offered an opinion
17   about whether the map was a gerrymander. My
18   report analyzed the partisanship in a way that
19   allowed you to compare the existing -- in the
20   enacted plan with the demonstration plan in
21   comparison sensitivity analyses of the two plans.
22 Q   Okay.
23 A   But I don't recall whether I offered a specific
24   opinion about whether the map was a gerrymander.
25   I might have. I don't remember.

Page 15

1 Q   Just so I understand your testimony correctly, you
2   opine that the neutral demonstration map that you
3   had prepared was less disadvantageous to democrats
4   than the enacted map; is that correct?
5 A   The way that I would describe it is that the
6   demonstration map was more neutral and fair
7   between the two parties.
8 Q   Okay. But you may or may not have opined as to
9   whether or not the enacted plan was itself
10   unconstitutionally unfair or extreme partisan
11   gerrymander. Am I understanding your answers
12   correctly?
13      MR. YAEGER: Objection. Asked and
14   answered. You can answer.
15 A   I believe that's true but without having the
16   report in front of me --
17 Q   Just to be clear, I'm just asking you to the best
18   of your recollection. We can go dig out the
19   testimony. What I'm really trying to figure out
20   is what metrics did you use to assess the partisan
21   fairness or disadvantage to democrats in that
22   testimony?
23 A   In that case, I performed the efficiency gap
24   calculations and also analyzed the distribution of
25   the state assembly districts in terms of districts

Page 16

1   that were packed and cracked.
2 Q   When you say you analyzed the distribution, does
3   that comport with any of the five metrics you used
4   in this case? Would that be declination or --
5 A   The metric that I used in that case was the
6   efficiency gap.
7 Q   And then what, if anything, did you say about
8   packing or cracking in that plan?
9 A   Again, I would rather have the report in
10   front of me because it's been a while since I
11   looked at it. I do recall that I did reach
12   conclusions about the nature of packing and
13   cracking from the distribution histograms of the
14   enacted map and the demonstration district --
15   demonstration plan.
16 Q   Just so I'm clear, did you analyze the
17   concentration or clustering of democratic voters
18   in various counties or municipalities throughout
19   Wisconsin? Was that something that you looked at
20   specifically?
21 A   That is.
22 Q   Okay. And what, if any, conclusions did you draw
23   in that regard?
24 A   The conclusion that I drew using some measures of
25   geographic concentration were that the democrats

Page 17

1    and republicans were -- based on those measures,
2    that the overall concentration and distribution of
3    partisans was equivalent.
4  Q  Meaning they were equally dispersed, republicans
5    and democrats, throughout the state?
6  A  Again, using the different ways of measuring
7    concentration, that the way in which democrats and
8    republicans were distributed was roughly
9    equivalent.  It wasn't the case that democrats
10    were concentrated and republicans were not
11    concentrated.  There were different patterns
12    around the state.
13  Q  Do you recall how your testimony was accepted or
14    not accepted or mentioned by the three-judge court
15    in that case?
16  A  As I recall, the Court did not use the analysis of
17    geographic concentration.
18  Q  Did not use it or did not accept it?
19  A  I don't know what the difference is.
20  Q  Did they refer to it in their opinion as best you
21    can recall?
22  A  Yes.
23  Q  And what, if anything, did they say about it?
24  A  They -- I would have to look at the decision but
25    they -- as I recall, the Court was not persuaded

Page 18

1    by that part of the report.
2  Q  How about the part of the report dealing with --
3    or your testimony dealing with the efficiency gap.
4    What, if anything, did the Court say about that?
5  A  That -- again, it's been a while since I looked at
6    the decision, but the other analysis that I did,
7    they seemed to find that persuasive or took that
8    into account in their decision of accepting the
9    results of that.
10  Q  Of the efficiency gap?
11  A  Of the analysis that I did.
12  Q  The efficiency gap?
13  A  I did more than just calculate the efficiency gap.
14  Q  What else did you do?
15  A  I explained -- I looked at the distribution of
16    districts, estimated the underlying partisanship
17    of particular districts, and conducted sensitivity
18    analysis.
19  Q  Oh, I may have misunderstood that.  What was the
20    sensitivity analysis that you did in that case?
21  A  It was a sensitivity analysis that looked at the
22    enduring nature of the redistricting plan in the
23    face of vote swings.
24  Q  Okay.  Did you use the uniform swing analysis that
25    you employed in this case?

Page 19

1  A  Yes.
2  Q  Then if I could switch to One Wisconsin Institute,
3    which is the first case you've listed at the
4    bottom of page 3.  That was a challenge to voter
5    ID absentee ballot law in Wisconsin; is that
6    correct?
7  A  It was more than that, but it was a challenge to a
8    number of changes in election administration that
9    had been enacted since 2011.
10  Q  And that was enacted by a republican legislature
11    and signed by a republican governor?
12  A  That's correct.
13  Q  And you were retained by the Perkins Coie law firm
14    in that case?
15  A  That's correct.
16  Q  And was the allegation that these changes,
17    including voter ID and absentee ballot,
18    discriminated against minorities or democrats or
19    both?
20  A  So I can talk about the questions that I analyzed.
21  Q  That would be fine.  Sure.
22  A  My analysis was the effect of the voter ID
23    requirement, certain changes in registration laws,
24    and how they affected minorities, student
25    populations.  My analysis did not focus on the

Page 20

1    partisan consequences of that, but it was the
2    effect of the changes on different populations.  I
3    believe it was minority populations, students.  I
4    might have done something about elderly voters.
5  Q  Okay.  And do you recall -- I assume you found
6    that this had an exclusionary effect on the groups
7    that you just listed?
8  A  That's correct.
9  Q  And do you recall if the Court accepted your
10    conclusions or said anything about them?
11  A  They did say -- the court decision did mention the
12    analysis that I did.  I was one of a large number
13    of experts in that case.
14  Q  Okay.  I can read the opinion and find out where
15    it came out.  You also mentioned this Baldus v.
16    Brennan case which was in the Eastern District of
17    Wisconsin in 2012.  Do you recall that case?
18  A  Yes.
19  Q  Was that a challenge to the congressional
20    redistricting in Wisconsin?
21  A  The part of the case that I worked on was, again,
22    on the state legislature.  Primarily the assembly.
23  Q  And just to be clear, the assembly was the lower
24    house?
25  A  That's correct.

Page 21

1 Q   And were you retained by the Baldus plaintiffs
2     or -- as I understand, some democratic congressmen
3     intervened in that case.  Do you recall who
4     retained you to provide your testimony?
5 A   Again, when I am contacted, it's by law firms.  So
6     I was contacted by lawyers for the plaintiffs, and
7     I know there were a lot of different plaintiffs
8     who had gotten involved.
9 Q   The Baldus plaintiffs?
10 A  Correct.
11 Q  And do you recall the name of the law firm?
12 A  Godfrey Kahn.  It's K-a-h-n.
13 Q  And what was the gist of your testimony in that
14     case?
15 A  So there were two pieces of that analysis.  One of
16     them was analyzed the overall effects and
17     population shifts and municipal splits in the
18     enacted plan.  The other part was analyzing the
19     affect of the districts drawn in the Hispanic
20     parts of Milwaukee, which comprised two assembly
21     districts.
22 Q  Okay.  And the first piece of testimony went to
23     the effect on Hispanics or on democrats?
24 A  The first part was the effect on populations.  I
25     don't recall doing anything specifically about

Page 22

1     democrats versus republicans and voters.  There
2     may have -- I may have done an analysis showing
3     that districts that were represented by democrats
4     were treated differently or drawn differently than
5     districts represented by republicans, but it
6     wasn't looking at the underlying partisanship of
7     the plan.
8 Q   And was your testimony that the legislature did
9     not preserve the core of some of the districts?
10 A  In terms of population shifts, that's correct.
11 Q  And that was -- you criticized the plan on that
12     basis?
13 A  That's correct.
14 Q  And then with respect to -- I believe you said
15     there were Hispanics in a certain municipality?
16     There was another aspect to your testimony?
17 A  Correct.
18 Q  And what was the gist of that testimony?
19 A  That there was a population -- a citizen voting
20     age population in part of Milwaukee that satisfied
21     the requirements of Section 2 of the Voting Rights
22     Act and that the enacted plan split that community
23     in ways that prevented equal participation in the
24     political process.
25 Q  To be precise, the Hispanic community was

Page 23

1     essentially compact to compromise a majority in a
2     single-member district, but the redistricting plan
3     split that community, and so they were not a
4     majority in either district?
5           MR. YAEGER: Objection.  Compound.
6     You may answer.
7 A   So in one of the districts there may have been a
8     small numerical majority, but my conclusion is
9     that it was insufficient for the purposes of
10     Section 2 of the Voting Rights Act.
11 Q  Okay.  And just so I'm clear on your prior answer,
12     you did not do a formal partisan fairness analysis
13     of the overall effect on the democratic party in
14     that case; is that right?
15 A  That's correct.  I'm thinking.  It's been six
16     years since that case.  I believe that's correct.
17 Q  Okay.  As I said, I'm trying to do this as quickly
18     as I can.  You've listed a number of other cases
19     here.  My first question with respect to all of
20     them is did you do a partisan fairness or partisan
21     gerrymandering analysis with respect to any of
22     those cases?
23           MR. YAEGER: Referring to the cases
24     on pages 3 and 4?
25           MR. CARVIN: Yes.

Page 24

1           MR. YAEGER: Thank you.
2 A   That's correct.
3 Q   All right.  If we could -- I'm just going to try
4     to get through this quickly.  Do you remember what
5     topics you testified on or prepared a report on in
6     McComish v. Brewer?
7 A   McComish v. Brewer was a case that involved the
8     public funding program for state candidates in
9     Arizona and it was -- I believe that the analysis
10     was in response to reports that experts for the
11     plaintiffs had submitted.
12 Q  And what was the gist of your testimony?
13 A  The gist of the testimony is that the -- of my
14     report was that the law did not have an effect on
15     the way that privately funded candidates timed
16     their spending or the amount that they spent.
17 Q  And did you give trial testimony in that case?
18 A  No.
19 Q  Just a deposition?
20 A  A report and a deposition.
21 Q  And do you recall what the court decided in that
22     case?
23 A  Believe that the district court decided for the
24     state.  And that case, I think, turned into
25     Arizona Free Enterprise PAC vs. Bennett, which

Page 25

1    went to the Supreme Court.
2  Q   What happened in the Supreme Court?
3  A   The Supreme Court overturned the law.
4  Q   And Milwaukee Branch of the NAACP v. Walker, what
5      was the case there?
6  A   That was a state court specifically about voter
7      ID.
8  Q   Voter ID. Okay. And what was the gist of your
9      testimony there?
10 A   The gist of the testimony was that there were a
11     large number of eligible voters affected and who
12     did not possess forms of -- an ID that would allow
13     them to vote under the law.
14 Q   Do you recall what the court's decision was in
15     that case?
16 A   The district court ruled for the plaintiffs and
17     that went to the state supreme court where the
18     state supreme court upheld the law.
19 Q   And how about -- did you testify in trial at that
20     case?
21 A   Yes.
22 Q   Okay. And then Kenosha County vs. City of
23     Kenosha, what was the issue there, please?
24 A   That was a dispute between the city and county
25     over the agreement between the county board of

Page 26

1      supervisors districts and the wards that the City
2      of Kenosha had drawn.
3  Q   And what was the alleged problem with the lines
4      they drew?
5  A   The problem or the issue was that the lines did
6      not match, that there were county districts that
7      cut through the wards that the municipality of the
8      City of Kenosha drew and the county insisted that
9      the city change its ward boundaries, and the city
10     insisted the county change its district
11     boundaries.
12 Q   And whose side did you testify for?
13 A   I testified for the city.
14 Q   And what was the gist of your testimony there?
15 A   The gist of the testimony -- I'd have to look at
16     my report. It's been a while. I don't quite
17     remember every aspect of that. I know how the
18     case was ultimately resolved is that it was
19     possible under state law for the city to redraw or
20     to split off parts of wards that didn't comply
21     with the population requirements under state law,
22     but when there was a dispute between the city and
23     county, it was allowable for a city to do that.
24 Q   Do you recall how the case was resolved?
25 A   I don't think -- I don't think the court reached a

Page 27

1      decision. I think once that solution was
2      identified that that's what the city did, and it
3      sort of removed the issue in dispute.
4  Q   Okay. You mentioned this Tyson vs. Richardson
5      School District at the beginning of this
6      conversation. With that case in mind, is there
7      any other case that you've offered expert witness
8      testimony in other than the cases listed at the
9      bottom of page 3 and top of page 4 of your report?
10 A   There was one case from 2001, which was a
11     redistricting case. That one was called
12     Baumgart vs. Wendelberger.
13 Q   Could you spell that for me?
14 A   B-a-u-m-g-a-r-t. And I believe Wendelberger is
15     W-e-n-d-e-l-b-e-r-g-e-r.
16 Q   Okay. And what was the issue with respect to
17     redistricting there?
18 A   In that case there was divided control of state
19     government, so a three-judge panel was convened to
20     draw the district lines after an impasse had been
21     reached. And so in that case you had the
22     democrats submitting one set of plans and the
23     republicans submitting a different set of plans
24     and the panel drew a map.
25 Q   And what testimony did you offer in that regard?

Page 28

1  A   My testimony was that the maps proposed by the
2      democrats were better than the maps proposed by
3      the republicans.
4  Q   In what way?
5  A   I would have to go back and -- it's been almost
6      20 years since that case, but in that case I did
7      analyze the partisanship of the districts using
8      similar methods to what I did in Whitford.
9  Q   Well, in Whitford, just so I understand it, the
10     formal analysis used was the efficiency gap?
11 A   Right.
12 Q   Did you use that in Baumgart?
13 A   No.
14 Q   So what were you analyzing there?
15 A   So in that case, I recall looking at things like
16     competitiveness and looking at the relationship
17     between seats and votes, but there was no single
18     metric that was at issue there.
19 Q   Okay. Fair enough. And what offices were at
20     issue in Baumgart? State house, state senate,
21     congress?
22 A   I believe in that case it was the state assembly
23     and the state senate.
24 Q   Okay. Not congress as best as you can recall?
25 A   That's correct.

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 148-1, PageID.5528   Filed 12/04/18   Page 9 of
53
League of Women Voters of Michigan, et al. v.
Ruth Johnson
Deposition of Kenneth R. Mayer, Ph.D.
August 1, 2018

Page 29

1  Q   Okay.  And then at some point there was a court
2      drawn plan?
3  A   That's correct.
4  Q   And that was used throughout the 2000
5      redistricting cycle?
6  A   That's correct.
7  Q   And your report was -- you have a CV at the end of
8      your report.  It's page 96, I believe.
9  A   Correct.
10 Q   And that's current as of June 1st, 2018?
11 A   There are a couple of minor changes.  There's one
12     article that's listed as forthcoming that I
13     believe has now been published.
14 Q   Which one is that, please?
15 A   Learning from Recounts.  It's the first one.  And
16     there's one additional conference paper, which has
17     investigated the effect of voter ID laws and
18     turnout.
19 Q   Okay.  In terms of your books or book chapters or
20     articles or monographs, do any of them deal with
21     the methods or metrics for measuring partisan
22     gerrymandering?
23 A   I'm sorry.  Could you ask the question again?
24 Q   Well, you list here books, book chapters,
25     monographs, articles, and I was wondering if any

Page 30

1      of them dealt with the issue of methods or metrics
2      for measuring partisan gerrymandering?
3  A   So there are articles that touch on partisanship,
4      but I don't recall anything that focused
5      specifically on that particular question.
6  Q   How about any articles, books, book chapters, or
7      monographs on traditional districting principles
8      in drawing maps?
9  A   In terms of published work, no.
10 Q   Okay.  How about any articles, books, monographs,
11     or book chapters on the clustering or partisan
12     concentration of citizens in states or
13     municipalities?
14 A   No.
15 Q   Okay.  Have you ever written anything about
16     whether or not republicans have a natural
17     advantage in producing more seats than votes due
18     to demographic concentrations?
19         MR. YAEGER: Well --
20 A   No.
21         MR. YAEGER: Go ahead.
22 A   Sorry.
23 Q   Have you ever written anything on the Voting
24     Rights Act?
25 A   Not specifically.

Page 31

1  Q   Okay.  If you could turn to page 5 of your report,
2      please.  I'd like to direct your attention to the
3      third paragraph where you state, do you not, that
4      Partisan gerrymandering is the practice of drawing
5      those lines so that a party wins a larger number
6      and share of seats than it would have won under
7      non-gerrymandered lines; is that correct?
8  A   That's correct.
9  Q   And just to get more specific about that, if you
10     could turn to page 8 of your report at the bottom.
11     And I'll read you that paragraph and then ask you
12     a couple questions.  Okay.
13         You write, do you not, The defining
14     characteristic of a partisan gerrymander is that
15     it allows a political party to win more seats than
16     it would have if districts were drawn in a neutral
17     fashion.  "Neutral" in this context means
18     districts drawn in accordance with traditional
19     restricting criteria without regard to
20     partisanship: equal population, contiguity,
21     compactness, preservation of political
22     subdivisions, and compliance with the Voting
23     Rights Act.  Is that what you wrote?
24         MR. YAEGER: Objection.  Misread
25     the exhibit.  You left a word out in the

Page 32

1      second line that may change the meaning.  So
2      I just want the record to be clear.
3  Q   I'm more than happy -- I believe I skipped, sir,
4      win more seats than it would have to if districts
5      were drawn in a neutral fashion.
6         MR. YAEGER: Thank you.
7  Q   Just to be clear, let's clarify the record, I
8      assume the word to in that sentence was a typo?
9  A   That's correct.
10 Q   Okay.  So just to clarify, which I think is
11     relatively straightforward, your definition of a
12     neutral plan is one that is drawn in accordance
13     with traditional redistricting criteria without
14     regard to partisanship; is that correct?
15 A   That's generally true although I do note that
16     there are other criteria that can be involved.
17 Q   Okay.  Well, let's go to those.  I think you're
18     referring to footnote 1 on page 6 of your report?
19 A   That's correct.
20 Q   Okay.  And these other traditional districting
21     principles include preserving communities of
22     interest, core district retention, and in a few
23     instances creating electorally competitive
24     districts or specifically protecting incumbents;
25     is that correct?

Page 33

1     MR. YAEGER: I object to the
2   incomplete reading of the footnote omitting
3   material information.  You may answer.
4 A  So those refer to some specific requirements that
5   are imposed in either state constitutions or state
6   statutes.
7 Q  Yes.  And those would -- were those the other
8   traditional districting principles that you
9   referenced a minute ago?
10 A  Well, so there are standards that are generally
11   considered to be the traditional redistricting
12   principles, and there are others that are
13   specifically required at times in states, but I
14   would not regard competitiveness or incumbent
15   protection as traditional redistricting principles
16   generally.
17 Q  Okay.  And you mentioned state constitutions and
18   statutes.  To your knowledge, courts recognize
19   competitive districts or protecting incumbents as
20   traditional districting principles?
21 A  I haven't read every court decision that's dealt
22   with this, but, again, as a general rule, the
23   first set are ones that you start with as
24   traditional principles and sometimes others are
25   added in depending on what state you're in.

Page 34

1 Q  Okay.  And have you looked at Michigan
2   specifically to figure out whether or not any or
3   all of these criteria are the principles that have
4   guided plans in the past?
5 A  In Michigan, my recollection is that the
6   traditional criteria apply.  The one thing that
7   Michigan does is allows higher population
8   deviations up to plus or minus 5 percent.
9 Q  Just to clarify, you say the traditional ones
10   apply.  Are those the ones you listed on page 8 or
11   also the ones in footnote 1 of page 6?
12 A  So in Michigan I believe it's the one on page 8.
13 Q  And what's the basis for that assertion?
14 A  The fact that those are the ones that are
15   generally applicable, and I do know from Michigan
16   that they do permit up to a plus or minus
17   5 percent population deviation.
18 Q  Is that atypical?
19 A  That's the maximum that the Supreme Court has
20   allowed as presumptively allowable.
21 Q  In state legislation?  State legislative
22   districts?
23 A  Correct.
24 Q  And what's the basis for your assertion that these
25   other districting principles that you list guide

Page 35

1   redistricting in Michigan?
2 A  It's the academic literature and my understanding
3   of how Michigan does it.
4 Q  What academic literature?
5 A  There's a general academic literature on
6   redistricting and that's where those come from.
7 Q  Right.  But I'm asking about Michigan.  What's
8   your understanding of the traditional
9   redistricting principles used in Michigan based
10   on?
11 A  My understanding is those are the same ones used
12   in Michigan, again, with some specifics on things
13   like population deviation.
14 Q  And what's the basis for your assertion that
15   Michigan follows the redistricting principles that
16   you list on page 8?
17 A  It's the general understanding of how states do
18   it.  I have looked at -- I believe it's called the
19   Apol guidelines, which were produced in the 1980s
20   or 1990s sort of laying out principles for the
21   legislature.
22 Q  Laying out principles for the legislature to draw
23   congressional and state legislative districts?
24 A  That's my understanding.
25 Q  And what are those standards?

Page 36

1 A  I would have to see the report to give you the
2   specifics.
3 Q  Just generally describe the Apol Standards.
4 A  Again, the two specifics of the Apol Standards are
5   the population -- allowable population deviation
6   and emphasis on preserving municipal boundaries.
7 Q  And do you know what, if anything, it said about
8   preserving municipal boundaries?
9     MR. YAEGER: I'm going to object.
10   The witness has testified that he would like
11   to look at the document before he could
12   answer that question, so I'm going to object
13   that you're now calling for speculation.  You
14   may answer.
15 A  I don't have the entire document in my head, so I
16   couldn't tell you which specific section or
17   paragraph mentions that.
18 Q  Do you know what takes priority under the Apol
19   Standards, compactness or preserving municipal
20   boundaries?
21 A  I couldn't say without looking at the report.
22 Q  Do you know whether Apol gives greater credence to
23   county boundaries than municipal boundaries?
24 A  I would have to look at the report.
25 Q  Okay.  And do you know whether or not

**Page 37**

1 redistricting in Michigan has used its traditional
2 districting principle protecting incumbents?
3 A  I would have to look at the report.
4 Q  I'm just asking generally wholly apart from the
5 Apol report, do you know whether or not protecting
6 incumbents has been a traditional districting
7 principle in Michigan?
8 A  That I can't say.
9 Q  Okay.  Can you say whether or not preserving the
10 cores of districts has been a traditional
11 districting principle in Michigan?
12 A  My understanding is that -- actually, I'm not
13 going to speculate without having, you know, the
14 specific statutes in front of me.  I can't say.
15 Q  And I'm not -- just to be clear, I'm not just
16 asking you about what's in the statutes.  I'm
17 asking you what principles have been followed
18 either by courts entering redistricting plans or
19 by the legislature drawing redistricting plans
20 over the last three decades?
21 A  Well, Michigan, like most states, depending on who
22 is in the legislature when they draw the plans,
23 they can apply these criteria because a number of
24 them are actually pretty ambiguous.  There is no
25 formal definition of a community of interest.

**Page 38**

1 It's a judgment that the people who draw the maps
2 make, and it's not something where you can look at
3 it and say, well, this community is not being kept
4 together and that one is and so, you know, there
5 is a lot of flexibility that legislators have in
6 doing this about which ones they are going to
7 apply in a specific instance.
8 Q  Right.  And I'm asking you have they, for example,
9 applied the principle of retaining the cores of
10 existing districts in Michigan to your knowledge?
11 A  I can't -- not to my knowledge.
12 Q  And what about whether or not preserving
13 communities of interest has been a traditional
14 districting principle in Michigan?
15 A  Again, it's something that's generally applicable.
16 I can't say the degree to which in this plan in
17 that district it was applied.
18 Q  And what about creating electorally competitive
19 districts.  Is that a traditional districting
20 principle in Michigan?
21 A  That is not -- my understanding is that's not a
22 traditional redistricting criteria that's applied
23 in Michigan.
24 Q  How would you define what a competitive district
25 is?

**Page 39**

1 A  There are different ways of doing it.  One would
2 be a district that both parties have a plausible
3 opportunity to win.  Sometimes it's defined as a
4 district that is within 10 percentage points.
5 Q  And just to be clear, when you say 10 percentage
6 points meaning the estimated partisan range is
7 between 45 and 55 or between 40 and 50?
8 A  I would say 45 and 55.
9 Q  And that's generally accepted in the --
10 A  It depends very much on the context.
11 Q  What would the contextual factors be?
12 A  Things like whether an incumbent has been in the
13 district for a long time, the nature of swings
14 that you see.
15 Q  And incumbency matters because typically
16 incumbents have an advantage of being reelected?
17 A  That's correct.
18 Q  Have you estimated the incumbency advantage in
19 Michigan?
20 A  No.
21 Q  Did you factor incumbency when you were doing your
22 analysis of the partisan fairness of these plans?
23 A  No.  The baseline method is designed to
24 essentially remove the effects of incumbency,
25 which is how you compare different redistricting

**Page 40**

1 plans.
2 Q  And roughly how much would you say an incumbent
3 has an advantage over a nonincumbent?  What does
4 the literature say on that?
5 A  It depends on what office we're talking about.  I
6 don't know that it's possible to give a specific
7 number "X" percentage points.
8 Q  Well, has typical incumbency advantage in
9 congressional offices been estimated in the
10 literature?
11 A  Yes.
12 Q  And what would that advantage be in percentage
13 terms?
14 A  I don't know what it would be in 2012 to 2016.
15 Q  What would it have been prior to that?
16 A  I would have to check.  I know that people have
17 estimated it.  I don't know specifically what it
18 is.
19 Q  Roughly 6 to 10 percent?
20      MR. YAEGER: Objection.
21 A  It would have -- it would be referring to a
22 specific study, so I would have to look at the
23 literature.
24 Q  You're not an expert on that literature?
25 A  Not to the point where I can identify a specific

Page 41

1     number in a specific article.
2 Q  No.  Just specific number generally?
3         MR. YAEGER: Objection.  Vague and
4     ambiguous.
5 A  I mean, I can't tell you specifically whether the
6     advantage is 4.5 or 5.3, but it is positive.  It
7     is correct to say that incumbents -- I would say
8     not usually.  They almost always win when they run
9     for reelection.
10 Q  And competitive districts are generally viewed as
11     beneficial?
12 A  That depends on who you ask.
13 Q  I'm asking your opinion.
14 A  I think generally speaking a district that is
15     competitive, those are generally considered to be
16     normatively good things.
17 Q  All right.  Let's turn to that specific issue, I
18     guess, at this point.  If you could turn to page 9
19     of your report.  I'm going to start reading.  This
20     is the second -- third full paragraph on page 9.
21       The primary effect of gerrymandering is that
22     it violates both principles.  It disrupts the
23     relationship between the number of votes a party
24     receives and the number of seats it wins, and
25     violates the core democratic principle that the

Page 42

1     two quantities should be related (even though the
2     goal is not proportional representation).  I'm
3     going to stop there.
4       There's a core democratic principle that the
5     number of votes a party receives should relate to
6     the number of seats it wins; is that correct?
7         MR. YAEGER: I object to the
8     incomplete reading of that sentence.  You may
9     answer.
10 A  So I would reverse that and say that the number of
11     seats a party wins ought to be related to the
12     number of votes it receives, which is different
13     from saying that they should be equal.
14 Q  Right.  Okay.  And you say that one of the
15     problems with that is that It distorts the
16     relationship between support in the electorate and
17     the size of a legislative majority, and frequently
18     violates the majoritarian principle, because a
19     political party can win a majority or
20     supermajority of legislative seats even though it
21     receives less than 50% of the overall vote.  Did I
22     read that correctly?
23 A  That's correct.
24 Q  Okay.  And if you could describe the majoritarian
25     principle, this is a doctrine that a party that

Page 43

1     receives less than the majority of votes should
2     not receive the majority of seats?
3 A  As a general matter, the majoritarian principle
4     holds that to have a majority in the legislature,
5     that a party -- the majoritarian principle holds
6     that the party that holds a majority in the
7     legislature should get that through majority
8     support in the electorate.
9 Q  And that is a principle with which you agree?
10 A  Generally, yes.
11 Q  And that is one of the flaws in the enacted plan
12     in this case?
13 A  Based on the metrics, that is one of the
14     indicators of asymmetry and to form my conclusion.
15 Q  Just so we can make this specific rather than
16     general, if you could turn to page 40 of your
17     report.  So you have a column there or a row there
18     listed Partisan Bias, actual; right?  Do you see
19     that?
20 A  Yes.
21 Q  And I'm going to direct your attention to the row
22     underneath, column underneath 2012 to 2016
23     elections, and you have a partisan bias, actual
24     there of minus 7.8; is that correct?
25 A  Yes.

Page 44

1 Q  And that minus 7.8 reflects the difference between
2     the fact that democrats got 52.3 percent of the
3     statewide vote under your analysis and only
4     received 44.5 percent of the seats; is that
5     correct?
6 A  That's correct.
7 Q  52.3 minus 44.5 equals 7.8?
8 A  Correct.
9 Q  And so what you're analyzing there is the
10     difference between the demographics proportion of
11     the statewide vote and their proportion of the
12     statewide seats; right?
13 A  Correct.
14 Q  Why is that different from making the goal
15     proportional representation?
16 A  Because that's only one indicator, and so if the
17     partisan bias is zero, it reflects the fact that
18     the percentage of the vote is equal to the
19     percentage of the seats.
20 Q  Right.  Okay.  But that is essentially -- the
21     difference between -- the partisan bias, actual,
22     is a measure of the difference between the
23     proportion of statewide votes and the proportion
24     of seats gained; correct?
25 A  Correct.

Page 45

1 Q   And then you have -- let me ask you just a general
2       question.  Why would one expect the proportion of
3       statewide vote to be roughly equivalent to the
4       proportion of statewide seats?  Let me give you a
5       hypothetical if I could.
6           If voters were randomly distributed
7       throughout the state and one party enjoyed a
8       53 percent statewide vote, we would expect them to
9       win all of the seats, wouldn't we?
10          MR. YAEGER:  Objection.  Incomplete
11          hypothetical.  Compound.  You may answer.
12 A   I would say the answer is no because it is the
13       process of drawing districts where individual
14       votes are aggregated in ways that will -- well,
15       let me put it this way.  The hypothetical doesn't
16       make sense because we know that you do not have
17       perfectly uniform distributions of voters.
18 Q   Right.  So the reason we think that there's going
19       to not be 100 percent success is because we
20       understand that voters are not randomly
21       distributed throughout the state.  There's certain
22       concentrations where certain voters live; right?
23 A   Well, it's more complicated than that because in a
24       legislative system, those voters are aggregated
25       into districts and it is that aggregation process

Page 46

1       in which --
2 Q   Maybe I'm not making myself clear.
3          MR. YAEGER:  Objection.  Please
4          finish.
5 Q   Please finish.
6 A   It's that aggregation process that can introduce
7       its own effect.
8 Q   Right.  But I'm positive in my hypothetical
9       completely neutral distribution and line drawing
10       process.  If, for example, a state was 53 percent
11       women, you would not be surprised to see them in
12       all of the districts they would be comprised of 51
13       to 55 percent women, would you, because women are
14       randomly distributed throughout the population?
15          MR. YAEGER:  Objection.  Compound.
16          Incomplete hypothetical.  You may answer.
17 A   I don't know that you could make that statement.
18 Q   Is it not the case that if you have a random
19       distribution of any subset and you divvy up the
20       subset, then you're generally going to achieve a
21       proportion equal to the statewide overall
22       representation?  Is that not mathematically
23       obvious?
24 A   If individuals are truly randomly distributed both
25       in terms of whatever characteristic that you are

Page 47

1       hypothesizing about and their sort of spacial
2       distribution is equal, then in that case a
3       district -- aggregating those votes into districts
4       would, again subject to the distributional effects
5       of random distribution, it's likely to produce
6       districts that were within that range or within a
7       relatively narrow range.  We would have to know
8       the specifics of how they were distributed and how
9       that varies.
10 Q   Right.
11 A   But that's correct.  If you had a perfectly
12       uniform distribution of individuals, then
13       aggregating those individuals should not make a
14       difference.
15 Q   And that's why, I assume, you thought the measure
16       of a partisan gerrymander is that they win more
17       seats than it would have if districts were drawn
18       in a neutral fashion?
19 A   Well, you're conflating two different things.
20 Q   Well, let me ask you -- go ahead.
21 A   As the examples I give demonstrate, it's the
22       process of drawing lines when voters are not
23       randomly distributing that introduces a sort of
24       self-evident opportunity to bias those results to
25       a particular set of outcomes.

Page 48

1 Q   Right.  And that is why I thought you were saying
2       that the benchmark for measuring a partisan
3       gerrymander should be compared to a neutral plan
4       drawn without any partisan intent and adhering to
5       traditional districting principles?
6          MR. YAEGER:  Objection.  Vague and
7          ambiguous, and it's not a question.
8 A   Can you just rephrase that?  I just want to make
9       sure I understand it.
10 Q   I think it would be controversial, so why don't
11       you just turn to page 8 of your report.  Okay.
12       I'm just reading your words, am I not, The
13       defining characteristic of a partisan gerrymander
14       is it allows a political party to win more seats
15       than it would have if districts were drawn in a
16       neutral fashion.
17          I infer from that that your view is that the
18       measure of a partisan gerrymander is the
19       difference between how many seats a political
20       party gets under the enacted plan and how many
21       they would be if the plan were drawn in a neutral
22       fashion; is that correct?
23 A   That's one measure.  It's not the only one.
24 Q   Well, I thought it was the defining
25       characteristic?

Page 49

1 A   That's correct.  But the metrics involve more than
2      just simply looking at seats.  There are measures
3      of where that bias originates and how it is
4      implemented.
5 Q   No.  That's all fair.  That's how you measure a
6      gerrymander.  And I'll get to that in a minute.
7      I'm just trying to figure out what a gerrymander
8      is.
9          Are you now retracting your testimony that
10     the defining characteristic of a partisan
11     gerrymander is that it allows a political party to
12     win more seats than it would have if districts
13     were drawn in a neutral fashion?
14 A   No.  That's a true statement.
15 Q   If that's the defining characteristic, then the
16     relevant comparison would be, however measured,
17     the partisan bias or efficiency gap of the enacted
18     plan relative to a neutral plan; correct?
19 A   That's generally true.
20 Q   Okay.
21          THE WITNESS:  Can we take a quick
22     break in a little bit?
23          MR. CARVIN:  Sure.  If you want,
24     right now is fine.
25          MR. YAEGER:  Is it a convenient

Page 50

1      time for you?
2          MR. CARVIN:  Sure.
3          (Recess taken)
4 BY MR. CARVIN:
5 Q   Before the break we were looking at page 8 of your
6      report, Professor Mayer.  And I'd like to -- well,
7      you say here, do you not, that the two classic,
8      and reciprocal, gerrymandering techniques are
9      packing and cracking; is that correct?
10 A   I'm just trying to find the spot on the report.
11 Q   I apologize.  I'm reading from the second
12     sentence, second line in the second paragraph on
13     page 8.
14 A   Yes.  That's what I wrote.
15 Q   Okay.  And you agree with that?
16 A   Yes.
17 Q   And packing involves concentrating party
18     supporters into a small number of districts where
19     they constitute overwhelming majorities; is that
20     right?
21 A   That's correct.
22 Q   And what would a generally accepted definition of
23     the percentage needed to constitute a packed
24     district be?
25 A   There's no universal definition of that.  Often a

Page 51

1      general rule would be above 60 percent,
2      65 percent.  I mean, there's no specific rule or
3      formula.  Generally what it means is that voters
4      are packed into a district where they constitute a
5      sufficient majority that it is -- you know, they
6      constitute generally an overwhelming majority.
7 Q   So certainly 75 percent would be --
8 A   Probably.  Yes.  I mean -- yes.
9 Q   And then you say Cracking -- again, I'm now
10     reading from the same paragraph -- involves
11     distributing a party's supporters voters in such a
12     way that they constitute minorities in other
13     districts; is that right?
14 A   That's correct.
15 Q   Well, would that literally be true -- would you
16     consider a district that's 49 percent democratic a
17     cracked district?
18 A   It depends.  It depends on what the alternatives
19     would be.  It depends on things -- on some of the
20     specifics.  So a 49 percent district, that number
21     by itself, I think, would not generally be
22     considered a cracked district, but it depends.
23          I mean, if you do it in a way that that
24     concentrates or splits voters in a way that allows
25     the party drawing the district to pick up an

Page 52

1      additional seat, it could meet the definition of
2      cracking.
3 Q   Well, what if you had had ten districts that were
4      51 percent republican and 49 percent democratic,
5      you would say all those are cracked?
6 A   Again, it depends on some contextual factors.  How
7      many seats are in the legislature.  You know,
8      under many conditions, a 49 percent district would
9      not be considered cracked, but there are
10     circumstances in which you would look at that and
11     say that district was designed in a way to pick up
12     an additional seat.
13 Q   Right.  What if the legislature or constitution
14     said we want to maximize the number of competitive
15     districts and the result was districts that are in
16     the range of 51 to 49 for both parties, would you
17     consider that a gerrymander?
18 A   So let me see if I understand this.  I'm not
19     trying to be excessively parsing here, but the
20     precision matters.  If you had ten districts in a
21     legislature and you drew all of them so that one
22     party had 51 percent of the vote -- and that
23     statement implies that you have a metric of
24     measuring that.  But if you had a system in which
25     one party wins all of the seats by very small

Page 53

1   majorities, there are circumstances in which that
2   could -- the metrics of that could show that it
3   was -- that it could be a gerrymander because in
4   that case, the party that has 49 percent of the
5   vote gets zero seats, and the party that gets
6   51 percent wins all of them.  That's a purely
7   hypothetical circumstance because in legislatures,
8   that's not how it is done.
9 Q   Right.  In the real world, it would depend on how
10  accurate your prediction of 51 percent is, it
11  would depend on whether there was an incumbent
12  there, and all sorts of things might produce a
13  different result than a baseline measure of 51 to
14  49; right?
15 A  Well, again, you're comparing apples and oranges
16  because a baseline estimate is designed to remove
17  those extraneous factors so that you have --
18  that's your starting point, and it allows you to
19  compare alternative plans to give you an apples to
20  apples comparison when all of these other factors
21  can affect the results.
22 Q   All right.  Let's assume the baseline measure
23  shows that the relevant share in all ten districts
24  is 51 percent republican and 49 percent democrat.
25  In five of those districts, there's democratic

Page 54

1   incumbents.  So given the incumbency advantage,
2   those five districts would really be 52,
3   53 percent democratic.  So you'd have ten
4   competitive districts where the likely winners are
5   five democrats and five republicans.  Would you
6   consider that a cracked -- a plan where democrats
7   vote is cracked or where there's a strong degree
8   of partisan bias?
9          MR. YAEGER: Objection.  Incomplete
10         hypothetical.  You can answer.
11 A  So can you read that back?
12 Q   I'll do it again for you.  Ask it again.  Ten
13  districts with a baseline measure shows 51 percent
14  republican, 49 percent democrat.  But in five of
15  those districts, there's already democratic
16  incumbents.  So in the real world opposed to
17  baseline measure, five of those districts are
18  likely to elect a democrat.  Would you consider
19  that a plan that has cracked the democratic vote
20  or which is biased against democrats?
21         MR. YAEGER: Same objection.
22 A  Well, in that example, the democrats would
23  presumably win five districts and so that's
24  unlikely to meet the standards for bias or
25  asymmetry, but, again, it would depend on some

Page 55

1   other factors that are unspecified.  Were those
2   districts specifically drawn to isolate democrats
3   or republicans in a particular way to aggregate
4   them in a particular way?
5 Q   Okay.  Let's turn to your other important
6   principle in terms of what defines a partisan
7   gerrymandering scheme.  In the second full
8   paragraph on page 9, you quote an article saying
9   that any electoral system had to pass two tests if
10  it is to be minimally democratic.  The first is
11  The districting should yield an electoral system
12  that is responsive to changes in votes.  If many
13  citizens shift their votes from one party to
14  another, then the advantaged party should win an
15  increased share of legislative seats.  And you
16  agree with that as a test of partisan fairness of
17  a plan; correct?
18 A  Well, I cited Tufte because I agree with these
19  definitions.
20 Q   Okay.  So a plan should be responsive to change in
21  votes.  If many people shift their votes to one
22  party, then that party should also see an increase
23  in seats during the redistricting cycle; correct?
24         MR. YAEGER: Objection.  Misstates
25         the document.  You may answer.

Page 56

1 A  There's nothing specific about a redistricting
2   cycle, but as a general principle that as the
3   share for a party goes up, the number of seats
4   should reflect that.
5 Q   Okay.  But that's certainly true in a
6   redistricting cycle.  If you increase your vote
7   share by 5 to 10 percent during the decade, then
8   you would argue that a fair system should show a
9   relatively similar increase in your seat share;
10  correct?
11 A  That's incorrect.  The issue is not does the
12  increase in seat share need to match the increase
13  in vote share.  The issue is there ought to be
14  some level of responsiveness.  That if the party's
15  vote changes and there is not a change, then
16  that's a problem.
17 Q   Right.  So we are agreeing that an increase in
18  vote share during a decade should result in
19  increase in seat share, which is roughly
20  proportional?
21 A  The proportional problem -- or the proportional
22  statement is the hitch here.  There's no
23  requirement that it be proportional.
24 Q   Okay.  What do you consider an acceptable level of
25  seat change relative to vote change?

Page 57

1 A   I don't have a particular threshold in mind.
2     Generally it should be true.
3 Q   And what relationship should there be between an
4     increase vote share and an increase seat share
5     generally?
6         MR. YAEGER: Asked and answered.
7 A   Again, the principle is that the representation in
8     a legislature should be responsive to changes in
9     the votes as a general principle.
10 Q   Right. And gerrymandering makes election results
11    and, therefore, legislative membership
12    unresponsive to changes in electoral support;
13    correct?
14 A   Again, I want to make sure I understand exactly
15    what you're asking.
16 Q   The problem with gerrymandering is that increases
17    in support for the uncontrolling party don't
18    translate to increases in the number of seats;
19    right?
20        MR. YAEGER: Forgive me. I'm going
21    to object. It looks like you're reading and
22    I think the witness is confused because you
23    appear to be reading from his report. Could
24    you point to him what you're reading, please.
25 Q   Sure. It makes the point six different times, but

Page 58

1     sure. Turn to the paragraph at the bottom of
2     page 9.
3 A   Yes. So that's what I wrote, yes.
4 Q   Right. Okay. And I'm just trying to figure out,
5     therefore, the hallmark of a gerrymandered plan is
6     that increases in support for the noncontrolling
7     party do not translate into increasing in the
8     number of seats; is that correct?
9 A   That's one of the characteristics. It's not the
10    only one.
11 Q   But it's one of the important characteristics.
12    It's one of the two?
13 A   Generally, that's correct.
14 Q   Okay. And now I'm asking you how much of a
15    relationship does there need to be between
16    increases in support for the noncontrolling party
17    into increases in the number of seats?
18        MR. YAEGER: Asked and answered.
19    You may answer.
20 A   It depends on a lot of other things. I can't give
21    you a number that a 1 percent increase in the vote
22    should lead to a -- it depends on a lot of
23    factors. Are you crossing over the 50 percent
24    mark? So there is -- or I did not have a specific
25    threshold value that says on this side or that

Page 59

1     side of those close calls that one constitutes a
2     gerrymander and one does not.
3 Q   So there's no well accepted political science
4     principle about what level of responsiveness or
5     nonresponsiveness distinguishes a gerrymander from
6     another plan; correct?
7 A   Well, not exactly because much depends on how
8     things relate to other examples and where the
9     metrics are. So there is not in the literature a
10    specific number, but again --
11 Q   Is there --
12        MR. YAEGER: I'm sorry. The
13    witness is still talking.
14 A   But we're talking about comparing different
15    systems. If this is a system where the change in
16    seats is larger when the vote changes, that that
17    would be considered more responsive to one where
18    the change in seats is smaller or goes in the
19    opposite direction. It depends on what points in
20    time you're comparing.
21    But, again, this is a general principle that
22    is general so it is -- I did not have in mind
23    that -- you know, when we're salami slicing that
24    this number is not a gerrymander and you change
25    that by a small amount that things flip.

Page 60

1 Q   Is there a range of numbers that distinguishes
2     between a gerrymander and a non-gerrymander?
3 A   Well, there are comparisons that you can make, but
4     it depends on a number of different factors.
5 Q   So you can't identify a range of numbers in terms
6     of seat responsiveness to vote changes that
7     distinguishes a gerrymander from a
8     non-gerrymander?
9 A   Well, so the distinction is that if we are talking
10    about a very narrow range of numbers, a
11    responsiveness of a tenth of a percentage point or
12    something, in that respect, there's no number out
13    to three or four significant digits. But it is
14    possible to look at plans and identify the markers
15    of things that are consistent with partisan
16    gerrymanders. If we're looking at one party with
17    double the number of seats that the other party
18    has with the equivalent share of the vote, that
19    hits you between the eyes.
20 Q   No. I understand what we're looking at. I'm
21    wondering if there's either political science
22    consensus or your view as to what distinguishes
23    between a gerrymander and a non-gerrymander in
24    terms of seat vote responsiveness?
25 A   Again, I'm not trying to fight you excessively,

Page 61

1    but it depends.  It depends on whether the bias
2    and asymmetry of a plan is enduring or whether it
3    flips dramatically from one election to the next.
4    It depends on the size of the vote shift.  If
5    we're talking about a 1 percent vote shift or a
6    7 percent vote shift that would be required.  It
7    depends on what percentage of the vote the
8    disadvantaged party would need to get in order to
9    secure a majority of the seats.
10        So, again, this is establishing the general
11    principles.  You know, Tufte does not.  There is
12    not a specific number attached to this.  It's a
13    general principle just like there are -- well,
14    I'll stop there.
15 Q  There's neither a specific number nor a general
16    number attached to that given the number of
17    different variables you just discussed?
18 A  Given this way of expressing that principle, I
19    would say that's correct.
20 Q  So if in one state the democratic vote share
21    increased by 10 percent over a redistricting cycle
22    but the number of seats only increased by
23    1 percent, you would not argue that there's a
24    political science consensus that that's too little
25    responsiveness?

Page 62

1        MR. YAEGER: Objection.  Incomplete
2    hypothetical.
3 A  It depends.  It depends on other factors that go
4    beyond merely what percentage of the vote -- I
5    mean, a lot of it depends on the general character
6    of the seats votes curve where when you're close
7    to 50 percent historically, the responsiveness
8    tends to be higher.  And if you're at the higher
9    or lower ends, you know, of 75 or 25, there's less
10    responsiveness.
11 Q  Okay.  Now, to go back to the packing situation,
12    just so I'm clear, we'll use democrats as the
13    disadvantaged party in my hypothetical.  If a
14    democratic district was packed at, say,
15    75 percent, that would not be harmful to the
16    democratic residents of that district.  It would
17    be harmful to the democrats overall vote share in
18    the legislature; correct?
19 A  So now you're talking about specific harms?
20 Q  Yeah.
21 A  There could be harms to the people in a packed
22    district because if their votes generically or
23    systematically are distributed in a way that
24    secures an advantage for the other party, it can
25    hurt their representation.

Page 63

1 Q  Right.  That's what I'm trying to figure out.
2    Therefore, democrats are harmed in the plan as a
3    whole.  But I now want to reduce it to the
4    district level.  The democrats in a particular
5    district that are packed democrat are not
6    themselves harmed?
7 A  That's not necessarily true.
8 Q  All right.  How are they harmed?
9 A  Well, if individuals are generally packed -- so a
10    single district, again, the effects of a
11    gerrymander are a function of how voters are
12    aggregated into districts and how votes are
13    translated into seats.  And the way that
14    individuals or voters are aggregated into a
15    district even if their representative shares their
16    party identification, there can still be a harm if
17    their views or their partisanship is the basis for
18    drawing district lines generally that results in
19    less representation overall than they would
20    otherwise get under a neutral plan.
21 Q  Right.  So that's fair enough.  So their ability
22    to elect their candidate of choice to cast a
23    winning vote is not affected adversely for
24    democrats in packed democratic districts.  What's
25    adversely affected is the fact that fewer of their

Page 64

1    partisans are serving in the legislature; correct?
2 A  That's not the only one.  It could also be the
3    case that --
4 Q  Could you answer that one first?
5        MR. YAEGER: Objection.  Asked and
6    answered.
7 A  What I'm saying is that there are additional --
8    there are additional possible harms to people
9    because if -- again, this is the basis of things
10    like the efficiency gap.  That if I am packed into
11    a district, my vote has less influence on the
12    outcome in that district, which means it's
13    weighted less, than if I were in a district that
14    was not packed.
15        This is the basis of the mean-median that
16    voters are not counted equally if they -- if my
17    vote changes the outcome from 75 to 76 or from 80
18    to 90 opposed to if my vote changes the vote from
19    51 to 52 or if my vote is decisive, so there could
20    be additional harms.
21 Q  I want to make it clear.  Then they would want to
22    be in competitive districts?  They would want to
23    be in a 51 percent democratic district rather than
24    a 75 percent democratic district, that's your
25    testimony?

Page 65

1  A  No.
2  Q  They're harmed?
3  A  No.  I mean, it depends.
4  Q  You just said, did you not, that their vote is not
5     equally weighted if they get 75 percent of the
6     vote support for their preferred candidate than if
7     they were the 51st -- if their preferred candidate
8     got 51 percent of the vote?
9  A  In terms of how the votes are weighted, that is
10    true.
11 Q  So you're saying that somebody who is in a
12    district that has 75 percent vote for his
13    preferred party is treated unequally from somebody
14    where candidates of his preferred party get
15    51 percent of the vote?
16 A  What I'm saying is that in terms of how the votes
17    are translated into outcomes, they are weighted
18    differently.
19 Q  Right.  Why do we care about that?
20 A  Well, that actually gets into a broader question
21    about the effects of gerrymandering because if
22    people are packed and cracked, it means that their
23    votes are weighted differently than people who are
24    not packed and cracked because the way that those
25    votes are aggregated, it is less efficient than

Page 66

1     the advantaged party.
2  Q  It's less efficient in turning votes into seats in
3     the legislature; right?
4  A  That is a true statement.
5  Q  Okay.  Now I'm going to ask you wholly apart from
6     the statewide representation of the party in the
7     legislature, is a democrat residing in the
8     75 percent democratic district harmed?
9  A  Here's the answer.  If that district was drawn in
10    a way to pack democrats into a district in a way
11    that secures an advantage for the other party and
12    puts them at a disadvantage, that it means that
13    their votes are weighted differently than the
14    other party's and that's a harm.
15 Q  Right.  Because if you reduce the democratic
16    percentage in District 1, you could spread it to
17    adjacent districts, and therefore, they would be
18    more efficient about translating votes into seats
19    on a statewide basis; right?
20 A  So it depends on where you put them, but in a
21    district that is unpacked, to redistribute voters
22    in a more neutral fashion, it increases the weight
23    of those votes in terms of how they are aggregated
24    into outcomes.
25 Q  Right.  And would this unpacking help the people

Page 67

1     in the packed district, or would it help their
2     partisan affiliates in adjacent districts?
3  A  It could do both.
4  Q  How would it help somebody who wants to elect a
5     democratic representative from having his very
6     safe opportunity to elect a representative of his
7     choice become an unsafe opportunity to elect the
8     representative of his choice?
9  A  Well, the premise of the question assumes that
10    moving voters changes a safe district into an
11    unsafe district, and that's not necessarily true.
12 Q  Okay.  Well, let's break it down.  If the
13    unpacking turned a safe district into a
14    competitive district, would that harm or help the
15    democratic voter in the packed district?
16 A  It depends.
17 Q  On what?
18 A  It depends on the degree of unpacking.  It depends
19    on whether that redistribution results in
20    additional seats or more efficient translating
21    into votes to seats.  I'm not trying to fight you
22    on this but --
23 Q  You keep looking at the redistribution of the
24    votes helping the party generally.  I'm just
25    asking you if you look at it exclusively from the

Page 68

1     perspective of the voter in the 75 percent
2     democratic district, has he been deprived in any
3     meaningful constitutional value or harmed in any
4     tangible way?
5        MR. YEAGER:  Objection.  Misstates
6        the prior testimony.  Seeks a legal opinion.
7        You may answer.
8  A  That asks for a legal opinion, and that's not
9     something I'm going to offer.
10 Q  All right.  Has he been harmed in any way that the
11    political science community would recognize?
12       MR. YEAGER:  Same objection
13       regarding characterization of prior testimony
14       and incorporate the prior question.  You may
15       answer.
16 A  I would say, yes, there is a harm that is
17    recognized in the literature, which is the unequal
18    weighting of votes.
19 Q  Relative to other districts.  I'll try it one last
20    time.  If Madison is 75 percent democratic, is
21    that bad or good for democrats in Madison?
22 A  Well, it depends.  It depends on what level of
23    representation we're talking about.  It depends
24    on --
25 Q  Living in a community where 75 percent of the

League of Women Voters of Michigan, et al. v.
Ruth Johnson

Deposition of Kenneth R. Mayer, Ph.D.
August 1, 2018

Page 69

1    voters want to support your candidate of choice is
2    not harmful for you; correct?
3  A  Well, you know, again, you are taking a general
4    principle and forcing it into a small box where
5    the answer is it depends.  If we are talking
6    about, you know, a candidate running only in
7    Madison, then that can be true.  But if we're
8    talking about Madison being put into a district or
9    set of districts where the votes of that
10   75 percent are weighted unequally, then the
11   blanket statement that no one is ever harmed or
12   can't be harmed by being in a district in which
13   75 percent of that jurisdiction share their party
14   identification sort of depends on what we're
15   talking about.
16 Q  Right.  I'll try one last time.  The unequal
17   weighting comes from the statewide distribution,
18   or are you arguing that a democrat who casts a
19   vote in a 75 percent democratic district is harmed
20   relative to a democrat casting a vote in a
21   55 percent district?  His vote counts for less?
22          MR. YAEGER: Objection.  Incomplete
23      hypothetical.  You may answer.
24 A  I would say it depends on how the districts were
25   drawn.  If they were drawn with the intention of

Page 70

1    packing voters into districts, then, yes, there is
2    a harm.
3  Q  Okay.  But absent that partisan intent, you can't
4    identify harm?
5  A  Well, that's not what I said.
6  Q  It's what you just said.
7          MR. YAEGER: Well, wait.
8      Objection.  Fortunately, we have a court
9      reporter.  We'll see what the record said
10     with regard to the witness's testimony.
11 A  Well --
12          MR. YAEGER: There's not a question
13     on the table.  Wait for a question.
14 Q  Why don't we turn to Table 7 on page 40.
15 A  Page 40?
16 Q  Yeah.  Of your report.  I want to make sure I'm
17   understanding the basics of this.  You have two
18   measures at the top, Democratic Share of Statewide
19   Vote 53.2 percent and 52.3 percent; correct?
20 A  Correct.
21 Q  Okay.  Do those numbers reflect -- or does
22   anything else in your report reflect a prediction
23   about democratic statewide vote in the 2018 or
24   2020 elections?
25 A  So you're asking whether this number is a forecast

Page 71

1    of what will happen in 2018 or 2020?
2  Q  I'm making it broader than that.  Is there
3    anything in your report that constitutes a
4    forecast about democratic vote share in state
5    lower house elections in 2018 or 2020?
6  A  To the extent that this is a baseline, it does.
7    It presumes that that's the starting point.
8  Q  No.  But maybe I don't understand.  I thought a
9    baseline was not a prediction -- okay.  Let me ask
10   it this way.  Well, what do you mean by baseline?
11 A  Well, that gives you the starting point of what
12   the partisanship of districts are, which gives you
13   an idea of what is likely or a set of plausible
14   outcomes in those districts.
15 Q  Okay.  It gives you a starting point.  It gives
16   you an idea.  But there's a difference between a
17   starting point and an end point; correct?
18 A  Correct.
19 Q  And are you predicting anywhere in this report
20   that the democratic vote share in actual real
21   world state house elections in 2018 or 2020 will
22   be 53.2 percent?
23 A  That's not what this number is designed to do.
24   What this number is designed to do is to give you
25   a baseline for districts.

Page 72

1  Q  Right.
2  A  It will be the case that the actual result in a
3    district will be in most circumstances pretty
4    close to that vote and also gives you a very good
5    idea of who the winner is going to be.  So the
6    statement that this is uninformative or gives you
7    no idea of what an outcome may be overall or in a
8    particular district, it actually does.
9  Q  Okay.  So you say that 53.2 percent will be pretty
10   close to the actual election results in state
11   house elections in 2018.  How close?
12          MR. YAEGER: Objection.  Misstates
13     the testimony.  You may answer.
14 A  So that 53.2 is a statewide average.
15 Q  Right.
16 A  A statewide total.  The totals in districts is
17   obviously going to be different depending on what
18   the measure is and what the votes are in those
19   districts.
20 Q  Let's go through it one at a time.  How close is
21   the 53.2 percent to what the actual vote statewide
22   will be in state house elections in the real world
23   in 2018?
24 A  So, again, are you asking what the vote will be in
25   any particular district?

Page 73

1 Q   I'll try it again.  Statewide.  53.2 percent, you
2       said, will be pretty close to the 2018 election
3       results.  Now I'm trying to figure out how close
4       in the real world state house elections in 2018
5       will the statewide democratic percentage be to
6       53.2 percent?
7                   MR. YAEGER: Objection.  Misstates
8            the prior testimony materially.  You may
9            answer.
10 A   Again, this is a baseline.  The statewide results
11      are likely to be close to this.  But this is not
12      a -- this is not a forecast of what the actual
13      result will be.  It depends on the configurations
14      that are external to this number.  But it is
15      unlikely to be significantly different.
16 Q   Well, have you done any analysis to figure out how
17      likely there will be no significant differences
18      between 53.2 percent and house elections in the
19      real world?
20 A   One of the ways of looking at that would be
21      looking at the vote share under this method that
22      the democrats would need to win in order to win a
23      majority of the seats.  And if you look at the --
24      if, for example, you look at Table A2, which shows
25      the baseline votes for specific districts --

Page 74

1              MR. YAEGER: I'm sorry.  What page
2          is that?
3              THE WITNESS: This is on page 85.
4 A   This gives you a way of organizing or thinking
5       about what is a plausible set of outcomes in those
6       districts.  And it will be a function of the
7       underlying partisanship and the overall context of
8       the election.
9 Q   Just to be clear, it's not a forecast either on a
10      statewide level or with respect to any of these
11      districts?
12 A   Yes, it is.  Because if I look at these districts,
13      I look at District 5 under the plan, you look from
14      2006 to 2010, and the numbers don't change much.
15      That district is vanishingly unlikely to go from a
16      95 percent district to a 60 percent district
17      because you don't see swings of that nature.  So
18      the idea that the baseline estimate of the
19      partisanship gives you no information about what
20      is a plausible outcome in 2018 is incorrect.  It
21      does.
22 Q   It gives you plausible information.  What I'm
23      asking you is whether it's a forecast within plus
24      or minus any margin of error as to the actual
25      election results that you anticipate in 2018 or

Page 75

1       2020?
2 A   Well, I would say that the result in 2018 is going
3       to be close.  I can't give you --
4 Q   Within plus or minus five?
5 A   It doesn't have the statistical properties to give
6       you a margin of error of plus or minus three or
7       plus or minus five.
8 Q   And that's how we do it all the time; right?  We
9       have standard areas of measure.  We have
10      confidence intervals that we put around particular
11      data points.  You haven't done any of that
12      analysis with respect to the 2018 or 2020
13      elections to inform the Court about how close the
14      numbers on these pages will be with what you
15      anticipate will be the actual election results in
16      2018 or 2020; correct?
17 A   Incorrect.
18 Q   Okay.
19              MR. YAEGER: Objection.
20 Q   Go ahead.
21 A   There are two pieces of that question.  The first
22      part is that margins of error and statistical
23      properties are commonly used.  They're used all
24      the time.  That's true.  But that's not the only
25      thing that you look at.

Page 76

1       If I look at a district that's 96.4 percent
2       democratic or pick a -- there aren't that many
3       heavily republican districts.  One that's 36.3.
4       You know, based on history and the likelihood or
5       the probability that that district flipped from
6       one party to the other is basically zero.  There
7       are circumstances in which a strongly democratic
8       or strongly republican district does flip, but it
9       requires an unusual set of circumstances.
10 Q   Right.
11 A   So, again, the fact that these numbers as I used
12      them -- this is not a sample drawn from a
13      distribution that allows you or me to identify a
14      specific confidence interval or credible interval.
15      But that doesn't make this uninformative.  This
16      method is very widely used in the political
17      science literature.  One of the things that this
18      is used for is to estimate not just vote
19      percentages but also who the winner is going to
20      be.  In that respect, this gives you the correct
21      answer a very large percentage of the time.
22 Q   Okay.  How often?
23 A   I don't specifically remember what Professor Chen
24      wrote in his report but I think he predicted --
25 Q   I'm asking about your report.

---

Page 77

1 A  My report is based on data that he generated, and
2    I believe that his numbers correctly predicted the
3    winner something on the order of in excess of
4    96 percent of the time, but I would have to look
5    specifically at the report.
6 Q  You haven't done that analysis?
7 A  I did not do that here.
8 Q  Right.  You didn't compare the numbers on your
9    baseline partisan measures to real world election
10   results in the house, the senate, or congress;
11   correct?
12 A  Well, Professor Chen did that.
13 Q  I'm going to ask you again.  Did you do an
14   analysis comparing the baseline election results
15   to the real world election results in the house,
16   the senate, or congress?
17 A  Not in my report.
18 Q  Anywhere else?
19 A  That work had been done.
20 Q  Not by you?
21 A  Not by me.
22 Q  So the answer is no?
23 A  As far as what I did, that's correct.
24 Q  Okay.  So to get back to your point, let's stay on
25   page 85.  You have for District 24, House

---

Page 78

1    District 24, a 48.2 percent democratic vote share;
2    correct?
3 A  Correct.
4 Q  And that would in the democratic loss column;
5    correct?
6 A  Correct.
7 Q  How likely, do you have a professional opinion, is
8    it that the actual democratic vote share in the
9    District 24 in 2018 or 2020 will be within plus or
10   minus 1 percent of 48.2?
11 A  I can't give your a specific number.
12 Q  Okay.  How likely is it that the vote share in the
13   real world election in House District 24 will be
14   within plus or minus 5 percent of 48.2 percent?
15 A  I can't give you a probability.
16 Q  Can you give me a probability at plus or minus
17   10 percent?
18 A  Plus or minus 10 percent, I would say that's
19   unlikely to switch.
20 Q  Because of any particular features in District 24
21   or your general notion that baseline is probably
22   not more than 10 percent different than the real
23   world elections?
24 A  So that's based on the general property of
25   baseline elections is that they give you an

---

Page 79

1    accurate idea of what the vote is.  In a district
2    that's 10 percent, it would take a large swing to
3    convert that from one party to another.
4 Q  What does the political science literature tell
5    you about potential swings during a redistricting
6    cycle in state house elections in terms of
7    statewide votes?
8 A  Clearly the results that a particular election can
9    change from one year to the next, and you can see
10   a statewide swing.
11 Q  And what does the literature tell you about how
12   much swing you can anticipate during a
13   redistricting cycle in state house elections
14   generally?
15 A  It depends.  It depends on the state.  It depends
16   on conditions.  It depends on whether we're
17   talking about a presidential year or a midterm
18   year and the party control.  It depends.
19 Q  Right.  So you don't have a general sense of what
20   a plausible swing in state house election
21   statewide votes is?
22 A  Well, you can look at history.  You can look at
23   swings that have actually occurred plus or minus,
24   and that gives you some idea of what plausible
25   swing range would be.

---

Page 80

1 Q  And there's a lot of articles on this, and what
2    would that plausible swing range be?
3 A  It depends.  I don't know that the literature has
4    a specific number.  It depends on the state.  The
5    swings that you get in Michigan are likely to be
6    different than what you get in Texas or
7    California.
8 Q  Nationally, is an 8 percent swing implausible?
9 A  Well, precision matters here.  8 percent in terms
10   of what?  Are we talking about an 8 percent --
11 Q  Share of the two party democratic/republican vote
12   during the life of a redistricting cycle?
13 A  There may be work that identifies that, but it
14   depends.  I mean, if you were looking at a state
15   where the swings or the percentage vote that one
16   party tends to get is within a narrower range,
17   then that would be the kind of number that you
18   looked at.
19 Q  You are not aware generally of plausible swing
20   share votes in congressional or house or senate
21   elections during the life of a redistricting cycle
22   nationally --
23 A  Well, there is a --
24 Q  Let me finish.
25 A  Sorry.  You know, there is a literature on that --

---

Page 81

1       MR. YAEGER: I'm sorry, but I'm not
2  sure he was finished.
3       THE WITNESS: I'm sorry.
4       MR. YAEGER: I'm confused as to
5  what the question was, so let's let him
6  finish his question.
7 Q  Are you aware of what the literature says about
8  plausible statewide vote shifts in congressional,
9  senate, and state house elections during a
10  redistricting cycle?
11 A  There is a literature about that that I could
12  find, but sitting here I don't recall what that
13  number is.
14 Q  Have you ever analyzed Michigan specifically to
15  identify plausible swing shifts in congress,
16  senate, or the house?
17 A  I have.
18 Q  And what's that?
19 A  Well, one of the metrics that I use in my report
20  is what percentage of the statewide vote democrats
21  would need to win in order to capture a majority
22  of the seat.  And I haven't -- the data that I
23  have doesn't permit me exactly to go back in time.
24  I have data from 2006 to 2016.
25      But I'll give you just one example.  And this

Page 82

1  comes from Table 5 on page 30, which shows that
2  the democratic share -- the democratic share of
3  the statewide vote is going to be the same in
4  every table because that's a statewide number that
5  doesn't depend on any district configuration.  But
6  if you look at -- this is the eighth row where it
7  shows the democratic vote share needed to win a
8  majority of seats of 57.2 percent.  So that is the
9  estimated statewide vote share that democrats
10  would need to get in order to capture 8 of 14
11  seats.
12 Q  How likely is it they'll get 57.2 percent
13  of the --
14 A  The last time --
15 Q  Excuse me.  In the 2018 or 2020 elections?
16 A  This is a baseline.  A baseline has particular
17  characteristics which evens things out.  And the
18  closest analogy I can identify would be that the
19  baseline is generally going to be pretty close to
20  the baseline presidential results averaged over a
21  four-year period.  The last time the democrats
22  received an average of 57.2 percent of the
23  statewide vote in two presidential elections was
24  1964 and 1968.
25 Q  Right.

Page 83

1 A  So it doesn't happen often.
2 Q  Right.
3 A  So it would take an unusual set of conditions for
4  the democrats to achieve that kind of swing in the
5  statewide vote as reflected in this baseline.
6 Q  That's presidential elections.  My question is
7  congress, house, state senate.  Have you analyzed
8  for Michigan the percentage changes in statewide
9  vote shares for those offices throughout the last
10  30 to 40 years?
11 A  Well, I just looked at the presidential result
12  averaged over two elections.
13 Q  Right.
14 A  Which is a roughly comparable to the baseline.
15 Q  Right.
16 A  So we're looking the last time the democrats got a
17  baseline statewide vote share of 57.5 percent or
18  57.2 percent was 50 years ago.  So it can happen,
19  but it would take an unusual set of circumstances
20  for the democrats to get that share of the
21  statewide vote in the form of a baseline.
22 Q  For the third time, that's presidential elections.
23  Have you looked at comparable phenomenon relative
24  to congressional, state house, and senate
25  elections in Michigan over the last 30 to 40

Page 84

1  years?
2      MR. YAEGER: Objection to form.
3  You may answer.
4 A  Not using actual election results.  I was
5  referring to the baseline.
6 Q  Yes.  Okay.  And we are trying to analyze bias in
7  the congressional house and senate elections;
8  right?
9 A  Among other things, yes.
10 Q  And whether those elections are biassed against
11  democrats?
12 A  Correct.
13 Q  And your baseline vote doesn't look at real world
14  congressional, house, or senate elections;
15  correct?
16 A  Well, again, that's the purpose of a baseline is
17  to average those effects out.
18 Q  Right.  And the answer to my question is no.  The
19  baseline doesn't reflect or incorporate any real
20  world congressional, house, or senate elections;
21  correct?
22 A  I believe that's incorrect.  I think the baseline
23  does incorporate those elections.
24 Q  Oh, okay.  Did you prepare the baseline?
25 A  I did not.  That was Professor Chen who did that.

Page 85

1  Q   What elections did he use?
2  A   You would need to put that to him.  It was a
3       series of elections, federal, state, university
4       boards of trustees.  It was a baseline comprised
5       of multiple races.
6  Q   Right.  It's your understanding he also looked at
7       congressional, house, and senate elections?
8  A   You'd have to put that to him.  I don't remember
9       sitting here -- I don't recall all of the specific
10      elections that went into that.
11 Q   All right.  Would there have been anything
12      improper or inappropriate about using
13      congressional house and senate elections in the
14      forecast for the democratic share of the statewide
15      vote?
16              MR. YAEGER: Objection.
17 Q   Or the estimate?
18 A   I don't think there would be anything improper in
19      doing that.  That's a common set of metrics that
20      are used to generate these estimates.
21 Q   Just to be clear, it would not have been improper
22      to use the endogenous elections?
23 A   I'm just thinking about the way in which I have
24      done it that I don't think it would have been
25      improper to use those.  I'm not sure if he did or

Page 86

1       not, but that would be informative into what the
2       baseline partisanship would be.
3  Q   Okay.  And you used these baseline measures
4       because you said they factor out certain external
5       things or maybe I don't understand.  Why would
6       you use a baseline measure?  Assume with me that
7       it is exogenous statewide elections like the
8       Michigan Board of Trustees, governor, attorney
9       general, and president, why would you use those to
10      analyze the fairness of state legislative and
11      congressional districts?
12 A   Because the purpose of using a baseline in
13      addition to giving you accurate information about
14      outcomes, it allows you to compare alternate
15      district plans using a common metric because when
16      you -- when you take an enacted plan and compare
17      it to a different plan, the boundaries change and
18      many of the underlying factors change.  Who the
19      incumbent is, whether an incumbent in a previous
20      district is an incumbent in the areas of a new
21      district, whether a race is meaningfully contested
22      or not, and so this gives you a mechanism of
23      comparing different configurations.
24 Q   And incumbency and campaign specific spending and
25      those issues affect elections in the real world?

Page 87

1  A   That's correct.  And what a baseline gives you is
2       the underlying characteristic of a district that
3       is less dependent -- or not dependent on those
4       specific factors.
5  Q   So it factors out things like incumbency, campaign
6       spending, and other specific factors that affect
7       elections in the real world to give you some
8       generic idea of the baseline partisanship?
9  A   Well, the way that you're characterizing it is
10      incorrect.  It is not a generic sort of hand
11      waving stab.  It gives you an informative
12      meaningful estimate of what the partisanship of a
13      district is that allows you to identify or to
14      estimate winners and so it's not as if this is
15      throwing at a dart board coming up with -- it
16      gives you an accurate, informative picture of what
17      the partisanship of a district is.
18 Q   Okay.  If you could turn to the bottom of page 14,
19      you say that these baseline measures -- I'm just
20      going to quote the last half of your last sentence
21      there -- are not affected by specific
22      district-level factors such as incumbency, whether
23      a seat is contested, or local variations in
24      turnout; correct?
25 A   Correct.

Page 88

1  Q   So your baseline analysis doesn't measure those
2       factors?
3  A   Well, it controls for them.
4  Q   What's that mean?
5  A   It means it averages them out.
6  Q   Right.  So it eliminates district by district
7       variations in incumbency, turnout, things like
8       that; right?
9  A   Correct.
10 Q   And all of those things affect election outcomes
11      in the real world at the district level,
12      incumbency, turnout, et cetera; right?
13 A   Correct.
14 Q   And just to be clear, you say -- go to page 15.  A
15      properly constructed baseline model using a
16      combination of prior exogenous elections is --
17      you're discussing that.  So does that refresh your
18      recollection on whether Dr. Chen was using prior
19      exogenous elections or was he using endogenous
20      elections?
21 A   So the way that I was using that word, I believe,
22      was referring to higher levels of aggregation.
23      Again, I don't remember or recall specifically
24      whether Professor Chen used state legislative or
25      congressional elections.  My recollection is he

Page 89

1     was using statewide.
2 Q  Okay.  And on page 14, you say it's okay to use
3     these exogenous elections for different offices
4     because to quote your third line there, Nearly all
5     voters cast their ballots consistently for one
6     party or the other, even if they do not identify
7     as members of that party.  Is that what you said?
8 A  That's what I wrote.
9 Q  What percentage of voters cast their ballots
10    consistently for one party for all offices?
11 A  I would have to look at specifically.  I believe
12    it's in excess of 90 percent.  But I would have to
13    check the particulars of those references.
14 Q  That's at the national level, in excess of
15    90 percent?
16 A  Again, I would have to look at that to give you a
17    specific number.
18 Q  Do you know what the number in Michigan is?
19 A  No.
20 Q  Do you know how many people are registered as
21    independents in Michigan?
22 A  Not specifically.
23 Q  Do you know the percentage of ticket splitters in
24    Michigan?
25 A  Not specifically.

Page 90

1 Q  Can you give me a general range?
2 A  It will vary in time.  I would say it's lower now
3    than it was previously, but I can't give you a
4    number of whether it's 3 percent or 5 percent or
5    7 percent.
6 Q  15 percent?
7 A  I don't know.
8 Q  20 percent?
9 A  I don't know.
10 Q  You say that The presidential vote has always been
11    a good predictor of down-ticket voting (especially
12    for non-southern states); correct?
13 A  That sounds like -- I'm just trying to figure out
14    whether those are my words or a citation.
15 Q  It's your report.  I'm reading from it.  The
16    presidential vote has always been a good predictor
17    of down-ticket voting (especially for non-southern
18    states).
19         MR. YAEGER: Could you please point
20     out where it is.
21 Q  Oh, I apologize.  It's two sentences after I read
22    what you read.  I apologize.
23         Page 14, second full paragraph, fourth
24    sentence.  The presidential vote has always been a
25    good predictor of down-ticket voting (especially

Page 91

1     for non-southern states).  Do you see that?
2         MR. YAEGER: May I point to the --
3         MR. CARVIN: Sure.
4 A  I see that, yes.  That looks like something that
5    was taken specifically from the literature.
6 Q  Okay.  So you don't know whether or not it's been
7    a good predictor in Michigan?
8 A  Whether the presidential vote is a good predictor
9    of lower ticket races?
10 Q  State house, state senate, or congressional races
11    in Michigan?
12 A  Yeah.  I can't give you a number of what the
13    correlation is.  I suspect it's quite high.
14 Q  But that's just an uninformed suspicion?
15 A  It's not an uninformed suspicion.  It's based
16    on the --
17 Q  What's based on?
18 A  -- literature.  It's based on my experience and
19    the general literature.  In Wisconsin, it was
20    probably 98 percent, 96 percent.
21 Q  Again, Michigan.
22 A  So in Michigan, I don't know what the exact
23    correlation is.
24 Q  You haven't looked at it?
25 A  I suspect it's quite high.

Page 92

1 Q  You haven't looked at it?
2 A  I can't say.  I have not looked specifically at
3    the correlation between the presidential vote and
4    lower ticket races in Michigan.
5 Q  Did you look at the comparison between Obama in
6    2008 and Trump in 2016?
7 A  In terms of what?
8 Q  How good a predictor those votes were for the
9    state house, state senate, and congress?
10 A  No.
11 Q  Okay.  You say Jacobson and Carson found that
12    ticket splitting in 2012 reached its "lowest
13    levels...in five decades"; correct?
14 A  Yes.  That's what I wrote.
15 Q  And what was that level?
16 A  I would have to look at it.  I don't know what the
17    specific number is.
18 Q  Okay.  You say on page 15 A properly constructed
19    baseline model using a combination of prior
20    exogenous elections is, for all practical
21    purposes, identical to more complex regression
22    models, and yield similar results for predictive
23    estimates.  Is that what you wrote?
24 A  That's what I wrote.
25 Q  Okay.  What are these more complex regression

Page 93

1  models you're referring to?
2 A  In the Whitford case, I used a regression model to
3  construct the baseline estimate using the
4  presidential vote and demographic features and
5  summaries, campaign specific features, to generate
6  baseline estimates.
7  An expert for the state had concluded that a
8  regression model was equivalent to using the
9  baseline model, and if you compared his estimates,
10  his district level estimates of partisanship with
11  mine, they were almost perfectly correlated.
12 Q  What did he use?
13 A  He used statewide elections so essentially the
14  Chen -- the statewide baseline method.
15 Q  And that was Gaddie?
16 A  Correct.
17 Q  And Gaddie uses the Chen method statewide baseline
18  and you used a more complex regression model?
19 A  That's correct.
20 Q  And you included in that more complex regressive
21  model demographic data?
22 A  That's correct.
23 Q  What demographic data?
24 A  The percentage of white, African-American, and
25  Hispanic. I believe it was the citizen voting age

Page 94

1  population in districts.
2 Q  Anything else?
3 A  I would have to look at the report. There were
4  some fixed effects. County level fixed effects.
5  Presidential effects, incumbency effects. So I
6  could remove them from the estimates to construct
7  the baseline but I believe that was -- that's it.
8 Q  Okay. And then what were your geographic fixed
9  effects?
10 A  Dummy variables for counties.
11 Q  Okay. What's that mean? What's a dummy variable?
12 A  It is a variable that takes the value of one if
13  the election occurred in a particular county, zero
14  otherwise, so it picks up features that are not
15  captured by the other variables.
16 Q  And you thought obviously that this method of
17  analyzing election results was perfectly
18  appropriate and the best way to do the analysis?
19 A  Well, perfectly appropriate. That's the way I did
20  it. It turned out that it didn't make any
21  material difference. It didn't improve much over
22  the baseline estimates. So I concluded that
23  baseline estimates are sufficiently accurate to do
24  these kind of analysis.
25 Q  Okay. But neither you nor Gaddie in Whitford

Page 95

1  looked at actual endogenous elections; right?
2 A  Well, not exactly because the coefficients in my
3  regression model, the dependent variable, was the
4  vote in state legislative districts. So in that
5  respect, that part was endogenous, but the purpose
6  of that was to establish the relationship between
7  the independent variables and legislative election
8  outcomes.
9 Q  And you haven't done that analysis in this case?
10 A  That's correct.
11 Q  And as far as you know, Chen didn't do it either?
12 A  I don't know.
13 Q  Okay. So these baseline models are not trying to
14  access the actual vote that will occur in actual
15  elections. It's trying to give you the underlying
16  partisan measure for comparison purposes. Do I
17  understand you correctly?
18 A  That part is correct. And it also gives you -- it
19  gives you the ability to predict who is going to
20  win, which party is going to win in a district.
21 Q  Okay. But if I asked you today to tell me within
22  a reasonable degree of professional certainty how
23  many seats are democrats likely to win in the
24  state house in 2018, there's nothing in your
25  report that does that; right?

Page 96

1 A  I think that's incorrect. As we've talked about
2  before, the baseline gives you the starting point.
3 Q  Right. And now I'm asking you about the end
4  point. In the real word, have you made any
5  predictions or done any analysis with any of these
6  standard errors of measure about how many seats
7  democrats are likely to win in the 2018 or 2020
8  elections in the state house anywhere in your
9  report?
10 A  In terms of a forecast, specific forecast of
11  district level outcomes, no.
12 Q  Okay. And in terms of a general forecast for
13  statewide voting, you haven't made a prediction
14  with a standard error of measure about what their
15  statewide voting percentage will be in the state
16  house elections in 2018 or 2020; is that correct?
17 A  That's correct.
18 Q  And the answer is the same for both state senate
19  and congress?
20 A  That's correct.
21 Q  So you're saying it's widely accepted in the
22  political science community not to use endogenous
23  races to assess or predict elections outcomes?
24 A  Again, it depends. When I was using the term,
25  again, my recollection is that it was a

Page 97

1 combination of statewide results, not district
2 specific. So I believe it's true that the
3 elections that went into the baseline were all
4 statewide elections, which by definition would
5 mean they were not endogenous.
6 Q Right. Okay. And do you have a view as to which
7 way is better?
8 A Which way is -- district level outcomes or
9 statewide baselines; that's what you're asking?
10 Q Yeah.
11 A I'm sorry. I didn't hear.
12 Q Yes.
13 A It depends on what you're intending to use them
14 for. For the purposes that I used in the report,
15 which was comparing alternative district plans, I
16 would think that the baseline measure would be
17 better because even the methods that often use
18 endogenous elections, as I did in the Whitford
19 case, use that to control for these factors, to
20 remove those district level effects so you can
21 identify a baseline.
22 Q Why would you rather know the baseline that's
23 roughly comparable to the 2018 elections in, say,
24 the house than make a forecast as to the real
25 world elections in the 2018 house elections? Why

Page 98

1 wouldn't you try and make the forecast as accurate
2 as possible?
3     MR. YAEGER: Objection. Compound.
4 You may answer.
5 A Because I did not do a forecast. I was analyzing
6 existing and demonstration plans I am not making a
7 statement about what the statewide vote is
8 specifically going to be in 2018. Because this is
9 a baseline, it is likely to be close to the
10 numbers that we see because that variation from
11 election to election has already been taken into
12 account and forms the basis for these measures,
13 but I did not use the baseline measure to make a
14 prospective forecast in time about what will
15 happen in 2018 or 2020.
16 Q Right. And you're not putting forward your report
17 in any way purporting to do that other than your
18 general sense that the percentages on your page
19 will be close to that?
20 A Well, and it's also that the percentage that will
21 be necessary for democrats to win a majority of
22 the seat, but that's an estimate of what would be
23 required, which is different than what is going to
24 happen in 2018.
25 Q Just to be clear though, all of these numbers that

Page 99

1 you pointed me to -- I guess it was on Table 5 or
2 Table 7 on page 40, all of these numbers are based
3 on exogenous statewide elections; right?
4 A I believe so.
5 Q So all of these numbers are based on baselines and
6 you don't know the correlation between the
7 baseline projections and actual real world
8 elections that have already occurred; right?
9 A I believe Professor Chen has done that, but I did
10 not do that.
11 Q You did not do that, and you don't know how close
12 the correlation is?
13 A I can't give you a number.
14 Q And just to clarify, you're not making any
15 forecasts relative to either statewide or district
16 specific results for any of the three offices
17 we're interested in for 2018 or 2020; correct?
18 A Well, again, there's a difference between making a
19 specific forecast of what the statewide percentage
20 is going to be in 2018. Nobody knows that.
21 Q But there's --
22 A Please let me finish. The advantage of a baseline
23 estimate is that it gives you information about
24 the underlying partisanship, which is unlikely to
25 change dramatically from one election to the next,

Page 100

1 and it does give you accurate, informative
2 information about who is likely to win in a
3 particular district and allows you to conduct
4 sensitivity testing to see what happens under
5 plausible ranges of shifts in the statewide vote,
6 so it is not specifically a prospective forecast
7 of what the vote share will be in 2018, but it
8 does give you information about the plausibility
9 of a particular statewide shift leading to changes
10 in the seat share through the uniform swing
11 method.
12 Q It gives you information. You have not figured
13 out how close the information presented on the
14 exogenous elections correlates with the endogenous
15 elections; correct?
16 A I have not performed that analysis.
17 Q You have not provided any standard errors of
18 measure about any of the numbers on these pages in
19 terms of how likely they are to occur in 2018 or
20 2020; correct?
21 A The standard error is a particular metric of
22 accuracy. That does not mean that these numbers
23 are guesses. I can't tell you that the plus or
24 minus range in the democratic share of the voters
25 plus or minus two, but that does not reduce the

Page 101

1    value and information that you obtain from these
2    estimates, which, again, is widely used in the
3    discipline and is accepted as an accurate way of
4    analyzing underlying partisanship in districts.
5  Q   Right.  But it's not used to predict actual
6    election results in the future; right?
7  A   Well, it is.  Because if I have -- I think we're
8    talking past each other in terms of what's a
9    prospective forecast and what is a meaningful
10   prediction of who is going to win a district.  If
11   the baseline partisanship is 90 percent, it is
12   vanishingly unlikely that that number changes
13   sufficient to allow the other party to capture the
14   seat.
15       So in that sense, it's not a forecast of
16   saying the actual result in 2018 is going to be
17   90 percent.  It is very likely that the actual
18   result will be close to that.
19  Q   That's true.  Anybody could tell you that a
20   90 percent district is not going to swing.  I get
21   that.  But you're not making any predictions on
22   numbers between, say, 60 and 40 in terms of their
23   likelihood of a democrat or republican winning
24   those seats in 2018 or 2020, is that correct, yes
25   or no?

Page 102

1  A   That is incorrect.  Because if I'm looking at --
2  Q   What is the probability that a number on your
3    tables between 40 and 60 will produce a winner of
4    one party or another?
5         MR. YAEGER:  Objection.  Let's hold
6       off for a second.  We have a siren going off.
7       We have the -- the last question you
8       interrupted the witness.  So I'd like to ask
9       that the witness be allowed to answer the
10      last question after the siren goes off.
11        (Last question read)
12  A   So a number between 50 and 60 would tell you or
13   tell me is what statewide swing would be required
14   to change the party that controls that seat.  And
15   that gives you an ability to estimate what would
16   happen if the statewide vote swings by a
17   particular range.  But as a forecast of what that
18   swing would be, this is not a forecast of that.
19  Q   Right.  Nor is it a forecast of the predicted
20   election outcome in 2018 wholly apart from swing?
21  A   It is a prediction.  It tells you the party that
22   has a majority of the seat is the party that would
23   be regarded as winning that seat.
24  Q   If you could turn back to the table that we looked
25   at before on page 85.  Just to make the record as

Page 103

1    clear as possible.  If you look at A2 on page 85,
2    District 24, you have the number 48.2 percent
3    democratic vote share; right?
4  A   Correct.
5  Q   Is that a projection for the likely democratic
6    vote share in District 24 for the 2018 or 2020
7    election?
8  A   That number is not a forecast of what the vote
9    share would specifically be in that district.  It
10   would depend on what the swing is.
11  Q   And it's not a prediction of the likely vote share
12   in that district within a certain margin of error,
13   say, plus or minus 5; correct?
14  A   The way that a baseline is interpreted is that
15   that is understood to be a measure of the
16   underlying partisanship of a district, and in
17   terms of how it is calculated here, I did not
18   assign a margin of error.  But certainly smaller
19   swings are more likely than larger swings by the
20   nature of -- the nature of elections.
21  Q   And you don't know how closely 48.2 percent in
22   District 24 correlates with the vote, say, in
23   2016?
24  A   I do not.
25  Q   Or any time between 2006 and 2014?

Page 104

1  A   Again, based on the general characteristics of
2    baselines, I can say absent any other information
3    that this is likely to be close.
4  Q   Right.  But you haven't put that hypothesis to the
5    test in Michigan for these seats?
6  A   Not in my report, no.
7  Q   Or anywhere else?
8  A   That I did, that's correct.
9  Q   Okay.
10        THE WITNESS:  I'm okay going for
11      some more but if we're going to go before
12      breaking for lunch, I need to take a --
13        MR. CARVIN:  I tell you what --
14        MR. YEAGER:  Is this a place for
15      you to --
16        MR. CARVIN:  Yeah.  Again, I know
17      we've -- we're off the record.
18        (Lunch recess taken)
19  BY MR. CARVIN:
20  Q   Good seeing you in the afternoon, Professor Mayer.
21   So just to finish up the analysis that we were
22   beginning before the lunch break, did you ever
23   compare the actual election results in terms of
24   total seats gained with the actual seats projected
25   by your baseline analysis?

Page 105

1      Maybe I can make it a little bit clearer.
2  Just turn to page 40; okay?  This is Table 7.
3  Okay.  And you have, for example, seats won by
4  democrats.  You have 49 under either measure;
5  right?
6 A  That's correct.
7 Q  Okay.  Do you know how many seats were actually
8  won by democrats in the relevant years?
9 A  I do not.
10 Q  Okay.  So you never compared the baseline
11  projections for seats won with the actual seats
12  won?
13 A  That's correct.
14 Q  And that would be true for the senate and congress
15  as well?
16 A  That's correct.
17 Q  Okay.  And we'll get back into this, but the swing
18  analysis that you did when you were, you know,
19  trying to figure out parts and bias at 50 percent,
20  you didn't deduct the relevant percentages from
21  the actual election results, you deducted them
22  from the baseline projected results; right?
23 A  That's correct.
24 Q  And in your view, which is more probative of
25  partisan gerrymandering intent or effect, 2006

Page 106

1  through 2010 election results or the 2012 through
2  2016 baseline election results?
3 A  So can you define what you mean by probative in
4  this context?
5 Q  Well, you come to a conclusion that this is
6  extreme partisan gerrymander and which is more
7  probative evidence of that conclusion, the
8  election results produced in 2006 through 2010 or
9  the election results produced in 2012 through
10  2016?
11 A  They both give you information.  So I don't know
12  whether you can specify which one is superior.  As
13  I put it in the report, the 2006 and 2010 data
14  provides an estimate that the line drawers had at
15  the time of what would happen, and 2012 and 2016
16  gives you an estimate of what did happen.
17 Q  Right.  And which one is more probative?  Do I
18  take it from your answer that 2006 to 2010 is more
19  probative of intent, but 2012 through 2016 is more
20  probative of effect?
21 A  I wouldn't put it that way.  They give you two
22  pieces of information.  And I don't think it's a
23  question of which one is more probative.  They're
24  both probative.
25 Q  Okay.  Just to be clear, you have never written an

Page 107

1  article, or a monograph, or a book chapter about
2  whether baseline measures of partisanship based on
3  exogenous elections should be used to assess
4  partisan fairness or bias; correct?
5 A  Other than testifying in federal court, I have not
6  written an article or book chapter specifically on
7  baseline methods.  Although I've written a number
8  of things about district level election outcomes.
9 Q  And the one in your testimony in the Wisconsin
10  case, you did not use a baseline partisanship
11  measure derived from exogenous elections; correct?
12  You used that regression model you previously
13  described?
14 A  Right.  Which was based on the presidential
15  election results.  And, again, it was, for all
16  practical purposes, the equivalent of the baseline
17  model.
18 Q  Right.  Okay.  So in your report more generally,
19  you give five different tests or metrics for
20  measuring partisan bias gerrymandering; correct?
21 A  Not precisely because partisan bias refers to
22  something specific.  There are other measures of
23  asymmetry and other metrics that capture that
24  asymmetry, so there were multiple measures, some
25  of which are measures of partisan bias.  Others

Page 108

1  which are not specifically about partisan bias but
2  capture things like asymmetry and wasted votes.
3 Q  You list five different metrics.  Partisan bias,
4  partisan symmetry, efficiency gap, mean-median
5  vote, and declination; correct?
6 A  I just want to make sure that I've got that part
7  of my report.  Partisan bias, partisan symmetry,
8  efficiency gap, mean-median, and declination,
9  which is five.
10 Q  Okay.  And which of those five is the best metric
11  or indicator of partisan unfairness or partisan
12  gerrymandering?
13 A  They're all useful.  The important thing about my
14  analysis is that they all line up in the same
15  direction.  There are different precise things
16  that different measures capture even though most
17  of them are the same or the same underlying
18  phenomenon but if I thought that there was one
19  that was -- well, I'll just leave it there.
20 Q  So as to these five, you can't say any one is more
21  widely accepted in the political science
22  profession than another?
23 A  I can say which ones have longer histories and
24  which ones have been used and which ones are more
25  recent.

League of Women Voters of Michigan, et al. v.
Ruth Johnson

Deposition of Kenneth R. Mayer, Ph.D.
August 1, 2018

Page 109

1 Q   We'll come to that in a second.  But which ones in
2     your view are more widely accepted in the
3     political science profession?
4 A   Widely accepted captures something specific.  Some
5     of them have been used for longer, but they've all
6     been proposed by serious academics and students of
7     redistricting, and they all have their value.
8 Q   But none of them are more or less widely accepted
9     in the political science profession than the
10    others?
11 A   Some of them have been used for longer.
12 Q   Does that suggest that they're more widely
13    accepted?
14 A   Not necessarily.  It means that they've been
15    around for longer.  That they were proposed --
16    some of them have been around for 50 years.
17    Others are more recent.  People have been looking
18    at this and the literature has been developing for
19    50 years or longer, and the process of analyzing
20    this is ongoing.
21 Q   Right.  And in light of that, not withstanding
22    their more recent or ancient vintage, you can't
23    say that any one of the five is more or less
24    widely accepted than any of the other measures;
25    correct?

Page 110

1 A   I'm not sure I can give a meaningful answer to
2     that because you have -- people have proposed
3     different ways of capturing this, and there are
4     some underlying common features that all of them
5     capture aspects of bias and asymmetry.  I think
6     they are -- all of these are informative.
7 Q   Okay.  So you can't point to one as more widely
8     accepted than the others in the political science
9     profession?
10 A   Well, I've answered the question as best I can.
11 Q   The answer is no?
12 A   The answer is that they are all informative.  The
13    use depends on in some cases what it is that
14    you're trying to measure and capture.  Partisan
15    bias has been around for the longest.  Asymmetry,
16    the efficiency gap, mean-median, and average win
17    percentage have a shorter history.
18 Q   Partisan bias we've talked about is the difference
19    between seats and votes.  That's the one that's
20    been around the longest?
21 A   That's generally what bias is.  Again, there are
22    different ways of capturing that.
23 Q   Right.  And then we'll come back to partisan
24    symmetry and the differences, but before I do
25    that, if you could turn to page 27 of your report,

Page 111

1     please.
2         I'm going to read the third full paragraph to
3     you, the first sentence.  You say While there may
4     be differences in opinion about which quantity (or
5     variant, or combination of measures) is the best
6     indicator of gerrymandering, and analysts
7     preferring one over the others in specific
8     instances, they all capture the same underlying
9     phenomenon: the partisan imbalance in how votes
10    are converted into seats; is that correct?
11 A   That's what I wrote.
12 Q   And you agree with that?
13 A   Yes.
14 Q   And you agree with Stephanopoulos -- I'm now
15    reading from the next sentence.  Stephanopoulos
16    and McGhee conclude that the metrics are all
17    linked mathematically to each other, can be
18    exactly equivalent under some conditions or are
19    easily transformed from one form to another; is
20    that correct?
21 A   That's what I wrote.
22 Q   And do you agree with that?
23 A   Yes.
24 Q   So if there is a situation where a party capturing
25    a minority of the votes captures a majority of the

Page 112

1     seats, each one of these measures will reflect
2     that plan is biassed or unfair or gerrymandering;
3     correct?
4 A   The qualifier is that they are equivalent under
5     some conditions and under some conditions are
6     easily transformed.  They're not always going to
7     give you the same answer.  The reason I did the
8     analysis the way that I did is that when they line
9     up and they all give you the same answer, that
10    means there's no ambiguity here.  If one gave you
11    one suggested asymmetry and bias and another one
12    didn't, then the evidence would be less
13    unambiguous.
14 Q   But in the circumstances present here where
15    republicans purportedly are getting a minority of
16    the statewide votes and are receiving a majority
17    of the statewide seats, all of these measures will
18    come back that the plan is biassed against
19    democrats in favor of republicans; correct?
20 A   I don't know that that specific statement is true
21    because I haven't calculated these measures for
22    all possible permutations.  And again, if you're
23    referring to district level outcomes, you're going
24    to get different answers depending on the
25    competitiveness of elections, whether an election

Page 113

1     is contested, so I don't know under every possible
2     permutation whether a minority of votes would
3     translate into values of all of these metrics that
4     suggest a gerrymander.
5  Q  Right.  In terms of the statewide, is there a
6     situation you can even hypothesize where if a
7     party received the minority of the statewide vote
8     and a majority of the seats one of these metrics
9     would not suggest a partisan imbalance or a
10    partisan bias?
11 A  Having not done the calculations, I can't say.
12 Q  Okay.
13 A  Given the qualities of them, things like the
14    efficiency gap probably would, but you're
15    describing a hypothetical, which is different from
16    what I did.
17 Q  You say at the bottom that in many circumstances;
18    quote, "all of the measures produce similar
19    results," in large part because they all are
20    different ways of assessing partisan symmetry;
21    correct?
22 A  And one --
23 Q  And one of the examples they give -- I won't even
24    quote them.  One of the examples where they'll all
25    produce the same results are the situation where a

Page 114

1     party captures a minority of the statewide vote
2     but captures a majority of the statewide seats;
3     isn't that correct?
4  A  I don't have the article in front of me.  I can't
5     say whether that's something they specifically
6     argued in that.
7  Q  All right.  Do you have an opinion as to whether
8     that is certainly one of the circumstances in
9     which all of the measures would produce a result
10    of bias or unfairness, i.e., when a party captures
11    a minority of the statewide vote but a majority of
12    the statewide seats?
13         MR. YAEGER: Objection.  Asked and
14    answered.  You may answer.
15 A  I don't know having not done those calculations,
16    but, again, the citations here and the use of this
17    reflect the fact that they are -- they all capture
18    pieces of this asymmetry and whether in an
19    election where a party captures 49.9 percent of
20    the vote and captures 51 percent of the seats that
21    all of these would show unambiguously, I don't
22    know.
23 Q  Okay.  If any of the metrics are in conflict,
24    which ones should you follow?
25 A  I would say it depends on the magnitudes and what

Page 115

1     it is that you're trying to measure.
2  Q  Okay.  Give me examples of when you follow one or
3     will follow the other.
4  A  Depends on the magnitude.  Depends on what it is
5     that you're specifically interested in examining.
6     Most of the time I can state that they give you
7     the same answer in strong cases.  In the cases
8     where they give conflicting answers as they do in
9     some cases in my report, it requires more analysis
10    of what may be going on.
11 Q  Okay.  And they give conflicting answers, for
12    example, with respect to the demonstration plans?
13 A  Sometimes.
14 Q  Okay.  We'll come back to that.  As a general
15    matter, you can't say if the metrics are in
16    conflict, which one should be followed?
17 A  Well, again, that's presuming that there is one
18    metric that is uniformly superior to all of them.
19    And, again, I regard them as all informative.
20 Q  So there's no one of these metrics that's widely
21    accepted as either the best or bright line
22    indicator of identifying a partisan gerrymander;
23    is that correct?
24 A  There are some differences of opinion in the
25    literature about the different measures.

Page 116

1  Q  If you could turn to page 19 of your report.
2     Actually, if we can begin at the bottom of page
3     18.  Okay.  And you're discussing partisan
4     symmetry as a measure of gerrymandering and then
5     you have this extensive quote from Grofman and
6     King on the next page.
7         Is it fair to say that the partisan symmetry
8     analysis championed or begun by Grofman and King
9     is universally recognized indicator of fairness?
10 A  I would say it's a universally regarded indicator
11    of fairness.
12 Q  And your quote on the top of page 19 is that --
13    again, quoting from Grofman and King, Social
14    scientists have long recognized partisan symmetry
15    as the appropriate way to define partisan fairness
16    in the American system of plurality-based
17    elections, and for many years such a view has been
18    virtually a consensus position of the scholarly
19    community.  Do you agree with Grofman and King's
20    statement?
21 A  That's an accurate quotation.
22 Q  And do you agree with it?
23 A  I cited it.
24 Q  So you agree with it?
25 A  Yes.

Page 117

1 Q   And We are aware of no published disagreement on
2     or even clear misunderstanding of partisan
3     symmetry as a standard for partisan fairness.  Is
4     that still true?
5 A   I would agree with that.
6 Q   And then you describe in this paragraph, which I
7     am going to paraphrase just to -- you describe how
8     you do calculate partisan symmetry.  You use the
9     election results -- and then I'm going to go to
10    the second sentence.  Then conduct a uniform swing
11    analysis, shifting the statewide vote by the
12    amount needed to give the other party the
13    equivalent vote share, and applying the shift in
14    each district, determining the winner of each
15    district election at the shifted vote percentage;
16    right?
17 A  Correct.
18 Q  And King has done a software package, has he not,
19    to engage in this partisan symmetry uniform swing
20    analysis?
21 A  It is a software package that allows you to do
22    this type of analysis.  I wouldn't regard it as a
23    direct measure of this, but it gives you
24    the capability of doing this kind of analysis.
25 Q  Right.  And that's called the JudgeIt software?

Page 118

1 A   That's correct.
2 Q   And you didn't use that here?
3 A   No.
4 Q   Why not?
5 A   Because I was satisfied that the baseline method
6     was sufficient to give reliable answers to the
7     questions that I was analyzing.
8 Q   Okay.  And you also rely on the efficiency gap as
9     a measure?
10 A  That's correct.
11 Q  And that's a well accepted measure?
12 A  I'd say that's generally true.
13 Q  Okay.  And that was developed by Stephanopoulos
14    and McGhee in a University of Chicago article in
15    2015 which you cite at the end of your report; is
16    that correct?
17 A  That's generally true.  It was actually developed
18    by McGhee in an earlier piece, but this is where
19    it was generally analyzed.
20        MR. CARVIN: Could you mark that as
21    Exhibit 2, please.
22        (Exhibit No. 2 marked for
23        identification)
24 BY MR. CARVIN:
25 Q  I've handed you Exhibit 2.  This is the law review

Page 119

1     article we were just discussing where
2     Stephanopoulos and McGhee lay out the efficiency
3     gap analysis?
4 A   That's correct.
5 Q   Okay.  If you could turn to page 862 of this
6     article.
7        MR. CARVIN: Actually, I tell you
8     what, I got another copy for you guys.
9        MR. YAEGER: Thank you very much.
10       MR. CARVIN: Sure.
11       MR. YAEGER: If you need this back,
12    that's okay.
13       MR. CARVIN: Let me just find my
14    copy.  Just one second.  That way everyone
15    can read along.
16 Q  I believe I directed you to page 862,
17    Professor Mayer.
18 A  Okay.
19 Q  If you look at the paragraph immediately under the
20    table on page 862, Stephanopoulos and McGhee say,
21    do they not, that there is no good reason to use
22    partisan bias as a measure of gerrymandering.  And
23    this is in reference to the Grofman and King
24    analysis.  It is conceptually flawed because it
25    focuses on hypothetical rather than actual

Page 120

1     election results?
2 A   The important thing is that the next sentence
3     refers to the fact that it converges on the
4     efficiency gap as systems become more competitive.
5     One of the objections that Stephanopoulos and
6     McGhee have to partisan bias, which is also
7     reflected in Figure 2, is that as election systems
8     become less competitive as reflected in this
9     statewide distribution of votes, partisan bias
10    becomes less informative.  But here in Michigan,
11    the statewide percentages are within the range
12    that they would consider as where the efficiency
13    gap and partisan bias will give you similar
14    results or that they converge as they put it.
15 Q  So you skipped to the second sentence, and I'm
16    happy to deal with that.  They say partisan bias
17    is -- partisan symmetry is not a good measure in
18    uncompetitive states, but you think that Michigan
19    is a competitive state?
20 A  As measured by the baseline, it fits the
21    definition of within the range that you would use
22    to calculate or to rely on partisan bias in
23    addition to these other measures, which again is
24    different from a state where competitiveness means
25    a probability of flipping back and forth.

Page 121

1 Q  Right.  That's their second criticism, but their
2    first criticism that I read to you is It is
3    conceptually flawed because it focuses on
4    hypothetical rather than actual election results;
5    correct?
6 A  That's what they wrote, but you have to read this
7    in the context of the whole paragraph that as the
8    results get more competitive, efficiency gap and
9    partisan bias converge on -- they converge.  And,
10   again, their criticism of partisan bias is it
11   becomes less accurate as you have more uncontested
12   seats and that the vote shares depart from
13   50 percent.
14 Q  Is that what you really think they're saying?
15   Here's what they're really saying.  What they're
16   saying is that to engage is partisan symmetry, you
17   have to hypothesize that in this case democrats
18   have the same vote share as republicans, and you
19   do that through the uniform swing analysis as you
20   did here, and that is the hypothetical election
21   result they're referring to, is it not?
22          MR. YAEGER: Objection.  You refer
23      to partisan symmetry rather than partisan
24      bias which is what's here.
25          MR. CARVIN: Don't give a talking

Page 122

1    objection.  Your objection is on the record.
2    Can you answer the question?
3          MR. YAEGER: Objection.  Misstates
4      the record.
5          MR. CARVIN: Okay.
6 A  The fact that they wrote this does not render the
7    use of partisan symmetry as useless.
8 Q  No.  But it is fair to say that the scholarly
9    consensus on the Grofman and King measure of
10   partisan symmetry has broken down in recent years;
11   isn't that true?
12 A  I think that's an incorrect way of stating that.
13 Q  I'll just ask you and we can go through the
14   article at great length, but you have obviously
15   read it.  Do Stephanopoulos and McGhee criticize
16   Grofman and King's partisan symmetry measure of
17   gerrymandering?
18 A  I don't know that they are specifically attacking
19   Grofman and King.  They refer to it.  But this
20   is -- it is true that there is not unanimous
21   agreement on each one of these metrics, but
22   Stephanopoulos and McGhee have also subsequently
23   written that they all capture the same underlying
24   phenomenon.
25 Q  Right.  All right.  Well, let's figure out what

Page 123

1    they're talking about and let's go through it.  As
2    you describe it on page 19, a key part of the
3    partisan symmetry analysis under Grofman and King
4    is you conduct a uniform swing analysis which
5    shifts the statewide vote by the amount needed to
6    give the other party the equivalent vote share;
7    right?
8 A  That's correct.
9 Q  So if, say, your hypothesizing a 4 percent
10   increase in republican vote share, what you would
11   do is assign 4 percent to each district in the
12   state and then figure out the results there;
13   right?
14 A  You would add 4 percent to each district.
15 Q  To each district, right.  So you wouldn't make any
16   adjustments for turnout differences in those
17   districts.  You would just assign 4 percent?
18 A  That's correct.
19 Q  And each district would increase exactly the same
20   amount as the increase in the statewide vote
21   share; correct?
22 A  That's what the uniform swing method does.
23 Q  Has that ever happened in the history of the
24   United States?
25 A  The point is not whether it happens exactly.

Page 124

1 Q  If you could answer my questions and then go and
2    explain to me why they're irrelevant, that would
3    be very helpful.  So I'm going to again ask you a
4    question.  Has that ever happened in the history
5    of the United States?  You can answer and then
6    elaborate.
7          MR. YAEGER: I'm going to object to
8      that question and instruction.  The witness
9      can answer.
10 A  So if the question is have there been cases where
11   to three significant digits whether a statewide
12   shift has exactly been replicated in every
13   district in a legislative system, the answer is
14   no.  But that's not the relevant question.  The
15   relevant question is whether the method gives you
16   sufficiently accurate information of the
17   underlying quantities of interest to allow you to
18   make meaningful statements about what is happening
19   in districts.  And as far as that question goes,
20   the answer is, yes, it does.
21 Q  And how closely -- if there's a 4 percent increase
22   in a statewide vote, historically what's the range
23   of increases in individual districts within the
24   state?
25 A  Well, I can refer you to the citations in my

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 148-1, PageID.5552   Filed 12/04/18   Page 33 of
53
League of Women Voters of Michigan, et al. v.
Ruth Johnson
Deposition of Kenneth R. Mayer, Ph.D.
August 1, 2018

Page 125

1  report where in the peer review literature other
2  scholars have analyzed this and have concluded
3  that it is an accurate way of analyzing partisan
4  effects.
5 Q  Okay.  If you would turn to page 13 of your
6  report.  Okay.  And I think the cite you gave that
7  you're now referencing is the fourth sentence says
8  The uniform swing assumption is a reasonable
9  approximation to what actually occurs when
10  aggregate vote shares change citing Jackman in
11  2014; is that correct?
12 A  That's correct.
13 Q  Do you have any other citation support to that?
14 A  There are others.  This is the one that I cited.
15 Q  Can you name the others?
16 A  I would have to look.
17 Q  Okay.  Right now you can't name anybody else?
18 A  I actually can.  I know that Dr. Brunell has used
19  it in his own work.
20 Q  Okay.  I'm talking about scholarly articles.
21 A  He's a scholar, and this is a scholarly article
22  that he and Grofman wrote.
23 Q  Okay.  So you're citing Brunell and Grofman.  You
24  didn't cite that.  Okay.  Anybody else?
25 A  I didn't cite in my report and I could -- I mean,

Page 126

1  it is an accepted method of studying this.
2 Q  How reasonable approximation is it?  How close
3  percentage-wise in each district is the vote swing
4  to the statewide vote swing?
5 A  Sitting here, I can't give you a general statement
6  of that.  The point is that it is accurate enough
7  to allow you to make inferences about the effects
8  of statewide shifts on the results in a
9  legislative district.
10 Q  How accurate is accurate enough?  Does it happen
11  within one or two percentage points?  Three
12  percentage points?
13 A  Sitting here, I can't give you a specific number.
14 Q  Okay.  Well, have you analyzed it in Michigan how
15  much swings in statewide vote shares are
16  replicated approximately or precisely in each
17  district in the state?
18 A  I have not done that analysis.
19 Q  Are you aware that President Trump increased the
20  republican vote share for president in 2016
21  relative to the republican vote share for
22  president in 2012?
23 A  Yes.
24 Q  And that happened uniformly across all state house
25  districts?

Page 127

1 A  I don't know.
2 Q  Did it happen in reasonable approximation in all
3  state house districts?
4 A  I haven't looked specifically at that.
5 Q  Have you ever looked at this in any state?
6 A  Yes.
7 Q  What state?
8 A  Wisconsin.
9 Q  And what was the -- give me the results in
10  Wisconsin.
11 A  The results are that it is accurate enough to
12  allow you to make meaningful inferences.  It
13  doesn't matter whether it's .2 percent or
14  .4 percent.  What matters is does it capture the
15  underlying quantity of interest and it does.
16 Q  I'm not asking you for generic description of what
17  happened in Wisconsin.  I'm asking you what the
18  results were.  You said you actually did this in
19  Wisconsin.  What race did you look at?
20 A  State legislative races.
21 Q  And you looked at the swing in what years?
22 A  I would have to go back and look at my report.
23 Q  When you looked at the statewide swing, you
24  noticed what relative to each district swing?
25 A  Again, what I have done and the literature shows

Page 128

1  is that this is an accurate way of drawing
2  inferences.
3 Q  If there was a 4 percent increase statewide, was
4  there some increase in 90 percent of the state
5  house districts?
6 A  I can't give you that number.
7 Q  70 percent?
8 A  I can't give you that number.
9 Q  So reasonable approximation, we don't really know
10  what that means; right?
11 A  That's untrue because --
12 Q  But you won't tell me what you mean anymore than
13  it's accurate enough and reasonable approximation.
14  You can't provide anymore detail than that, can
15  you?
16 A  Not specifically in Michigan between 2012 and
17  2016.
18 Q  If you could turn to page 837 of The University of
19  Chicago Law Review, please.
20      MR. YAEGER:  Did you mark this as
21  an exhibit?
22      MR. TONER:  Yeah.  It's Exhibit 2.
23 Q  I'm sorry.  Page 835.  All right.  If you want,
24  you can read the first paragraph.  They describe
25  the uniform vote swing in the same way that you're

Page 129

1  calculating it here.
2      For example, Party A's vote shares in each
3  district would be reduced by 5 percent (since it
4  won 55 percent of the statewide vote), while
5  Party B's vote shares would be increased by
6  5 percent.
7      Then it says, does it not, The shifting is
8  troubling for several reasons.  First, it relies
9  on what is known as the "uniform swing
10 assumption," the premise that vote switchers are
11 present in equal numbers in each district.  Given
12 the clustering that characterizes modern
13 residential patterns, this assumption is often
14 inaccurate.  Is that what they say?
15 A  That is what they say.
16 Q  Do you disagree with their conclusion?
17 A  In the sense that this criticism does not fatally
18 undermine the use of the uniform swing because
19 there is other evidence that it actually is an
20 accurate assumption or, again, that it is accurate
21 to the degree that it gives you the ability to
22 make meaningful estimates, and it is also the case
23 that it is often, if not usually, the way that
24 people who draw districts think about estimating
25 the effect of swings in the statewide vote.

Page 130

1 Q  Okay.  Given -- you say -- do you disagree with
2  their assertion that this assumption of a uniform
3  swing is often inaccurate.  Do you agree or
4  disagree with that assumption?
5 A  I would say for the purposes to which I used it
6  that I would disagree with that.
7 Q  I'm asking you whether or not it's true, not for
8  the purposes you used it.  You used it for
9  precisely the same purposes they're describing,
10 which is to assess the partisan symmetry of the
11 plan, and I'm asking you whether or not you agree
12 or disagree with the assertion that they make,
13 which is this uniform swing assumption is often
14 inaccurate.
15 A  Again, this is an argument and I would -- I would
16 say that I disagree with this particular
17 statement.
18 Q  All right.
19 A  Or this particular argument.
20 Q  You've never used the King software for doing
21 partisan symmetry analysis?
22 A  That is incorrect.
23 Q  Okay.  Where did you use that?
24 A  I used it in 2001, and I used it in 2012.
25 Q  Where in 2012?

Page 131

1 A  In the Baldus vs. Brennan case.
2 Q  And you used it in 2001 in the --
3 A  In the Baumgart case.
4 Q  So that's well respected, but you chose not to use
5  it here?
6 A  That's correct.
7 Q  And since you've used it, you're aware that they
8  have an approximate uniform partisan swing
9  analysis embodied in that software; right?
10 A  That's correct.
11 Q  And you didn't use that approximate uniform
12 partisan swing analysis?
13 A  I didn't use the software.
14 Q  Right.  And they claim that the approximate
15 uniform partisan swing analysis conforms a lot
16 more with reality than just the straight uniform
17 swing analysis.  Have you examined that question?
18 A  I would have to look specifically.
19 Q  Okay.  But you can't dispute that measure?
20 A  I mean, sitting here, I can't specifically say
21 whether that's something that they've argued.
22 Q  Okay.  All right.  If you could turn to page 859
23 of the Chicago Law Review.  Okay.  And then the
24 first full paragraph again is talking about the
25 calculation of partisan bias or partisan asymmetry

Page 132

1  under Grofman and King.
2      And they say Turning next to the calculation
3  of partisan bias, it is problematic because it
4  relies on the uniform swing assumption; the
5  premise that vote switchers are present in equal
6  numbers in each district.  Even the more advanced
7  version of the metric introduced by Professors
8  Gelman and King "requires the statistical
9  assumption of approximate uniform partisan swing"
10 and then it explains why that.
11     And they say that assumption unfortunately --
12 I'm going to the next paragraph.  Unfortunately,
13 the assumption of uniformity is often inaccurate,
14 even in its approximate version.  Do you disagree
15 with that assertion?
16 A  Again, the notion that it is often inaccurate, I
17 mean, this is an argument that they're making.
18 And so I would not -- I did not look at this and
19 conclude from this that that fatally undermines
20 the method so there's no point in using it because
21 there are other high quality scholars who have
22 looked at this and have concluded that it is an
23 accurate method.
24     And the King and Gelman method, what it does
25 is add a small error term to it, so it can vary

Page 133

1 around the statewide swing.  Again, I do not read
2 this and did not read this and conclude that this
3 means that the uniform swing method is not
4 informative.
5 Q  Well, the reason they think it's often inaccurate
6 is because they say in the last sentence The
7 geographic distribution of the parties' supporters
8 are highly heterogeneous.  Do you disagree with
9 that?
10 A  It depends on the state.
11 Q  Okay.  Do you disagree with that in Michigan?
12 A  I have not done a specific analysis of the
13 distribution of voters other than in the voting
14 rights districts.
15 Q  So you don't have any opinion on that relative
16 to -- you don't have any opinion on that in
17 Michigan?
18 A  Well, as I said in the report, conducting the
19 analysis outside of the Voting Rights Act
20 districts gives you information outside the areas
21 of the highest concentrations of democratic
22 voters.  So, again, the analysis is informative.
23 Q  Maybe I'll try it one more time.  They say here
24 that The geographic distributions of the parties'
25 supporters are highly heterogeneous meaning that a

Page 134

1 given shift of the statewide vote is likely to
2 result in variable shifts at the district level.
3 Do you agree or disagree with that with respect to
4 Michigan?
5 A  You know, again, we can go through this sentence
6 by sentence about their view of this.  I've read
7 this article.  I'm familiar with it.  I do not
8 read this criticism as leading me to conclude that
9 the uniform swing method is not useful.
10 Q  I understand your opinion.  You've repeated that a
11 number of times.  I'm asking you as a factual
12 matter, they claim that The geographic
13 distributions of the parties' supporters are
14 highly heterogeneous meaning that a given shift in
15 the statewide vote is likely to result in variable
16 shifts at the district level.  Do you agree or
17 disagree with that factual assertion for Michigan?
18 A  Again, it is an assertion.  It depends.
19 Q  Okay.  And you have not examined the extent to
20 which a given shift in the statewide vote results
21 in variable shifts at the district level for
22 Michigan; correct?
23 A  That's correct.
24 Q  Okay.  And you say that you've got people who
25 support you on this question.  If you could look

Page 135

1 at footnote 137 in the Chicago Law Review article.
2 They cite Chen and Rodden's article for the
3 heterogeneous and variable levels of changes.
4 Have you read that article?
5       MR. YAEGER: Objection.  Misstates
6       the document.  Go ahead.
7 A  I think so.
8 Q  Okay.  And is Chen a well respected political
9 scientist in this area?
10 A  Yes.
11 Q  Okay.  And then they cite Jackman, 24 British
12 Journal political scientist.  When we estimate
13 bias...we measure manipulation of the electoral
14 system conditional on a spatial distribution of
15 partisan support.  As the spacial distribution
16 changes, so too will the bias...of the electoral
17 system.
18     Is Jackman a well respected political
19 scientist in this area?
20 A  Yes.
21 Q  And do you agree with the citation and the quote
22 from Jackman?
23 A  I haven't seen the article.  I don't have it in
24 front of me.
25 Q  Now, in terms of the difference between, as I

Page 136

1 understand it, you know, proportional
2 representation between seats and votes and
3 partisan symmetry is you don't ask what's the
4 difference between, say, the democratic statewide
5 share of the vote and the democratic statewide
6 share of seats, what I think you call partisan
7 bias, actual; right?
8 A  I'm sorry.  I'm losing track of the questions.
9 Q  I'm actually just trying to get to a point.
10 A  Okay.
11 Q  One question would be what's the difference
12 between the democratic statewide share of the vote
13 and the democratic statewide share of the seats in
14 the relevant office?  They get 53 percent of the
15 vote, but they only get 45 percent of the seats;
16 correct?
17 A  That difference is the measure of partisan bias.
18 Q  But that's not the measure of partisan symmetry as
19 I understand it.  They don't ask what's the
20 difference between 53 percent and 45 percent?
21 They ask themselves the question how many seats
22 would republicans get if they got 53 percent of
23 the vote, and the difference between what they
24 could get and what the democrats get is what they
25 would call the asymmetry.  Do I have that right?

Page 137

1  A  That's generally correct.
2  Q  Okay.  And you only measured this -- and that's
3     why you go through the uniform swing analysis,
4     right, because you're engaging in the
5     counterfactual hypothesis, well, what if instead
6     of getting 47 percent of the vote, what if
7     republicans got 50 percent of the vote, how much
8     of relevant seats would they capture?  Is that
9     what you're trying to figure out?
10 A  Generally, that's correct.
11 Q  You add to their 47 percent as you describe a
12    certain percentage in each district and you
13    calculate the amount of the vote; right?
14 A  Correct.
15 Q  And you, in your report, if you want to go to,
16    like, page 40 again, you only calculate that at
17    50 percent; right?
18 A  No.  That's incorrect.  The republican seat share
19    at the democratic vote share also relies on that.
20 Q  That's fair enough.  The only one you report in
21    terms of partisan bias is 50 percent; right?
22 A  No.  There are two measures of partisan bias.
23    There's the actual bias and then there's the shift
24    at 50 percent, and then the symmetry is measured
25    by the seats the republicans win at the democratic

Page 138

1     vote share.
2  Q  Okay.  And when you're doing partisan bias at
3     50 percent though, just so I'm clear, you're
4     getting to the 50 percent through the uniform
5     swing analysis?
6  A  That's correct.
7  Q  And are you not asking yourself the question how
8     much do democrats get at 50 percent and how much
9     do republicans get at 50 percent?  I don't want to
10    make this anymore complicated than it is.  Just
11    tell me partisan bias at 50 percent, that means
12    that republicans at 50 percent get 60.9 percent of
13    the seats and democrats get 39.1 percent of the
14    seats at 50 percent?
15 A  Not quite.  You would have to divide that number
16    by two.  So at 50 percent of the vote, republicans
17    would get 55.4 percent of the seats.  The
18    difference is 55.4 and 46.6 would be the 10.9.
19 Q  Okay.  So that's helpful.  So you're telling me
20    that 50 percent -- so just so I understand this
21    then.  At 50 percent of the vote, give me that
22    again.  Republicans would win 55.45 percent of the
23    seats?
24 A  I believe that's correct.
25 Q  And then democrats would win, what, 46 --

Page 139

1     45.5 percent of the seats and that's the
2     10.9 percent difference that you're measuring
3     there?
4  A  I believe so.
5  Q  So what you're basically at -- at 50 percent,
6     that's just like the seats vote curve
7     differential; right?
8  A  At 50 percent.
9  Q  Yes.  Okay.  And then you were going to tell me, I
10    think, that you did another measure, which wasn't
11    at 50 percent.  You were estimating what
12    republicans would get -- you have republican seats
13    won at democratic vote share, you have 72; right?
14 A  Correct.  That's the -- right.
15 Q  I apologize.  I just want to make sure we're all
16    on the same page.  You're telling me they're going
17    to win 72 house seats in the count of factual
18    hypothetical that they won 53.2 percent of the
19    statewide vote?
20 A  Using the baseline measure, that's correct.
21 Q  And what is the partisan asymmetry at that point?
22    Do I just compare the -- tell me what --
23 A  Well, a common way of doing it is you look at the
24    difference in seats.  So you would look at the
25    republicans pick up 72 minus 49 or 23 seats.

Page 140

1  Q  Maybe we can do it with percentages so we're
2     comparing apples and oranges.  Because the next
3     one you have, that means 65.5 percent of the
4     seats.  72?
5  A  Correct.
6  Q  And democrats win 44.5 percent at 53.2 if you look
7     at the third column, third row?
8  A  Correct.
9  Q  So what are you telling me there?
10 A  One significant digit.  23 seats divided by 110,
11    that's almost exactly one-fifth.  20 percent.
12 Q  Okay.  And then --
13 A  It's actually a little bit more because it's 65.5
14    minus 45.5 so it's 21 percent.
15 Q  Say again?
16 A  23 divided by 110 is a little more than a fifth so
17    it's actually 21 percent.  65.5 minus 44.5.
18 Q  Okay.  All right.  We can go through this, but you
19    read the Best and McDonald article as well.  And
20    did they not also say that one of the problems
21    with the partisan symmetry analysis is it relies
22    on counterfactual hypotheticals?
23 A  That's correct.
24 Q  All right.  Just so I'm clear on Table 40, how
25    likely is it that republicans will win 50 percent

Page 141

1    of the vote in the 2018 or 2020 election for house
2    or congress or senate?
3         MR. YAEGER: Table 7?
4  Q  I'm actually asking for all three.
5         MR. YAEGER: You said Table 40.  I
6    think you meant Table 7.
7  Q  That's fair enough.  I was just using it for
8    illustrative purposes, which was to make the point
9    you do a calculation of partisan bias at
10   50 percent for the house, the senate, and the
11   congress?
12 A  Correct.
13 Q  And I'm asking how likely is it that republicans
14   are going to get 50 percent of the vote for any of
15   those offices in 2018 or 2020?
16 A  I can't give you a specific number.
17 Q  Is it likely, unlikely, highly likely, highly
18   unlikely?
19 A  Well, according to this it would be a 3.2 percent
20   swing, so it's possible.
21 Q  But just possible?
22 A  I mean, I --
23 Q  Is it more likely than not?
24 A  I don't know.
25 Q  How likely is it they get 53.2 percent of the vote

Page 142

1    under your analysis?
2  A  It would be less likely than getting 50 percent.
3  Q  So remotely possible but probably not?
4  A  I couldn't give you a specific probability.
5  Q  And you've never sought to assess that?
6  A  That's correct.
7  Q  Okay.  All right.  Now, you did rely on the
8    efficiency gap as well; right?
9  A  Correct.
10 Q  And this was outlined in detail and the results
11   were reported for the first time in this 2015
12   University of Chicago Law Review article?
13 A  Again, I think McGhee had proposed it in an
14   earlier article but this is -- as I understand it,
15   this was the general explanation of the concept
16   and calculations.
17 Q  And this Chicago Law Review is not a peer reviewed
18   scientific journal; is that correct?
19 A  I think it is peer reviewed.  Some law reviews are
20   peer reviewed, but I know in the article that
21   McGhee proposed, that was a social science
22   journal, which would have been peer reviewed.
23 Q  But this article, as far as you know, was not peer
24   reviewed by any political scientists?
25 A  I can't say.  I don't know.

Page 143

1  Q  And Stephanopoulos is a law professor?
2  A  That's correct.
3  Q  And has this achieved wide acceptance in the
4    political science community?
5  A  Depends on what you mean wide.  I think it is
6    accepted.  Not universally or not unanimously.
7  Q  Okay.  And it's been subject to relatively intense
8    criticism by reputable political scientists,
9    hasn't it?
10 A  That's correct.
11 Q  So it's fair to say that the scholarly community
12   is at least at this point somewhat divided on the
13   efficiency gap?
14 A  I would say it's not unanimous.  Divided implies
15   somewhat split 50-50.  I don't think that's true.
16 Q  Okay.  But there's a substantial code of well
17   respected political scientists who have raised
18   reservations about the efficacy of --
19 A  There are people who have raised reservations.  I
20   don't know whether I would qualify it as
21   substantial, but there are people who have
22   criticized it.
23 Q  Okay.  And we can go through this mean-median
24   analysis that was proposed, what, two and a half
25   years ago in the Election Law Journal by McDonald

Page 144

1    and Best?
2  A  I'm just going to just check the date, but that
3    sounds correct.  So 2015.  So three years ago.
4  Q  And has that garnered wide acceptance in the
5    political science community?
6  A  I'm not aware of a substantial criticism of it,
7    but it is a metric that is used.  I think it's --
8    I have not seen a literature that specifically
9    criticizes it.
10 Q  You cite the McGhee article right underneath that,
11   Rejoinder to "Considering the Prospects for
12   Establishing a Packing Gerrymandering Standard."
13   Again, we can go through this in detail, but
14   didn't he criticize McDonald and Best, this
15   mean-median distinction?
16 A  I believe that's correct.
17 Q  And this published -- now back to the McDonald and
18   Best article.  This was published in the Election
19   Law Journal?
20 A  Correct.
21 Q  Is that a peer reviewed scientific journal?
22 A  Yes.
23 Q  So the fact that I've got an article published in
24   the Election Law Journal somehow makes me --
25 A  It means it was peer reviewed.

Page 145

1 Q  Okay.
2 A  The editor is actually a colleague of mine.  It is
3    considered the gold standard in election law so
4    congratulations.
5         MR. YAEGER: I told you not to be
6         nice to him.
7 Q  A minute ago you said there wasn't wide criticism
8    of this other than the one we mentioned, but has
9    this been universally accepted as, you know, the
10   best measure or one of the best measures of
11   measuring partisan gerrymandering?
12 A  Universally accepted, I would say no.
13 Q  Can you list, I don't know, five articles that
14   have embraced this mean-median standard as the
15   best?
16 A  I don't think I could list five.  There are some.
17 Q  Okay.  All right.  So you look at the -- let's
18   turn to page 31.  I just want to understand how
19   this works.  I'm sorry.  Page 21.
20       So I'll just focus on the last sentence on
21   page 21.  By definition, the median vote for the
22   party holding a majority of seats must be greater
23   than 50% (since the party must have at least this
24   share of the vote in half of the districts), while
25   the minority party median vote must be below 50%.

Page 146

1    Is that accurate?
2 A  Yes.
3 Q  So if the statewide vote for republicans is under
4    50 percent and they have a majority of the seats,
5    then the mean-median will always be negative
6    relative to democrats, correct, by definition?
7 A  I'm sorry.  Can you say that again?
8 Q  Maybe I can make it even easier.  If democrats
9    have more than 50 percent of the statewide vote
10   but fewer than 50 percent of the statewide seats,
11   the mean-median measure will always be negative
12   for democrats?
13 A  As captured by the baseline, that's true.
14 Q  And, therefore, this is a measure of what I
15   believe you referred to as the majoritarian
16   principle that if you capture a majority of the
17   vote, all else being equal, you should be
18   capturing the majority of the seats?
19 A  It's a measure of that.
20 Q  But in terms of measuring other things --
21 A  Actually, hold on a second.  I'm thinking about
22   the question.  I would have to work out whether a
23   state -- you cannot make an inference about simply
24   using the statewide vote percentage as to directly
25   calculate what the percentage would be in each

Page 147

1    district because the process in which those votes
2    were aggregated matters.  So it is conceivable
3    that a party could get more than 50 percent of the
4    vote and have that be -- that doesn't mean that
5    the median vote in each district will be greater
6    than 50 percent.
7 Q  I confess I didn't understand your answer.
8 A  I guess I want to --
9 Q  I just want to make sure -- are you disavowing the
10   point you made in your report that By definition,
11   the median vote for the party holding a majority
12   of seats must be greater than 50%?  That's true,
13   isn't it?
14 A  That's true.
15 Q  And while the minority party median vote must be
16   below 50 percent obviously; right?
17 A  No.  That's correct.
18 Q  Okay.  And then maybe -- so then if you turn the
19   page, right, you say When partisans are packed or
20   cracked - the essence of a partisan gerrymander -
21   the mean vote for the minority party will always
22   be larger than the mean.  I took it to be a typo
23   that you meant the median vote but --
24 A  That's correct.  That is a typo.
25 Q  Okay.

Page 148

1 A  So if a party wins a majority of seats with a
2    minority of the vote, again using the baseline,
3    the median will always be greater than the mean.
4 Q  Okay.  And this declination, this fifth one, this
5    was published in, like, 2018, this year?
6 A  That's correct.
7 Q  All right.  I assume there hasn't been any serious
8    scholarly reaction or analysis of this declination
9    literature?
10 A  Not that I'm aware of.
11 Q  All right.  Well, with respect to all of these
12   measures, and we can go through them one at a time
13   if you like, is there a consensus or widely
14   accepted view on how much is too much in terms of
15   partisan bias?
16 A  Is there a threshold that has been proposed?
17 Q  Well, to be precise, is there a partisan bias gap
18   that is widely or consensus viewed as unacceptable
19   in the political science community?
20 A  Not as a threshold that I'm aware of.
21 Q  Same question for partisan asymmetry or the Gilman
22   King analysis.  Is there a uniform or virtually
23   uniform consensus on how much of a symmetry gap is
24   unacceptable?
25 A  Not that I'm aware of.

Page 149

1 Q  Same question for the efficiency gap.  Is there a
2    uniform or nearly uniform consensus on how much of
3    an efficiency gap is too large to be acceptable?
4 A  Stephanopoulos and McGhee proposed 8 percent as a
5    threshold because in their view that is a level
6    that is likely to endure over the life of a
7    redistricting plan.  In the Whitford case, Simon
8    Jackman did an analysis where he actually
9    concluded that the correct -- or that the
10    threshold value is 7 percent so there is -- or,
11    again, based on the probability that an efficiency
12    gap that exceeds that is likely to endure over the
13    life of a plan.
14 Q  So Jackman says 7 percent.  Stephanopoulos and
15    McGhee say 8 percent.  Is there a consensus or
16    near consensus in the political science community
17    about whether either of those numbers or any
18    number renders an efficiency gap unacceptable?
19 A  The 7 to 8 percent range is the number that I'm
20    familiar with.
21 Q  Right.  But has there been a collection of
22    scholarly articles saying that anything beyond 7
23    to 8 percent is unacceptable other than
24    Stephanopoulos's article and Jackman's testimony
25    in Wisconsin?

Page 150

1 A  Not that I'm aware of.
2 Q  Same question for the mean-median.  Is there any
3    scholarly widely accepted view or consensus how
4    much of a mean-median gap is unacceptable?
5 A  So McDonald and Best did examine different
6    redistricting plans that are generally considered
7    to be gerrymanders, but I can't, sitting here,
8    give you a specific number.
9 Q  That would be the one that was contained in the
10    McDonald/Best article itself.  They give you the
11    number?
12 A  I think there may have been some other work.
13 Q  Okay.  Is there a uniform consensus on how much of
14    this mean-median gap is unacceptable?
15 A  I couldn't give you a number.
16 Q  How about declination?
17 A  Warrington proposes a threshold -- we will get
18    into the weeds here -- which is the declination
19    times the number -- times the log of the number of
20    seats divided by two of roughly .38.  Again, as
21    his estimate of the number -- where the initial
22    declination exceeds that, it is likely to endure
23    over the life of the plan.
24 Q  Okay.  But the fact -- first of all, do you expect
25    judges to do this kind of computation?  Strike

Page 151

1    that.
2        I'm just trying to figure out even if it
3    could endure over the life of a plan, if it's not
4    that big of a deal to begin with, why would you
5    care if it endures over the life of the plan?
6        MR. YAEGER:  Objection.  Calls for
7    a legal conclusion.  You may answer.
8 A  I think there are evaluations that you can make
9    where it is clear where the bias and asymmetry are
10    large, and we can get to examples.
11        You know, one of the ways that you could
12    examine that is to take those measures and convert
13    them into seats.  How many additional seats does
14    the party secure through the drawing of district
15    lines and through partisan symmetry?  The analysis
16    I did showed that the results in five extra
17    congressional seats, 11 extra state legislative
18    seats.  And so those numbers are objectively
19    large.
20 Q  All right.  Let's start with the 11.  Do you know
21    how many house seats there are?
22 A  110.
23 Q  Right.  Is there any scholarly or widely accepted
24    view that a 10 percent gap in seats under the
25    efficiency gap is unacceptable?

Page 152

1 A  So Stephanopoulos -- well, we're comparing apples
2    and oranges here.  Stephanopoulos and McGhee
3    propose 8 percent, or the other standard that they
4    propose is two seats in congressional elections,
5    which is the efficiency gap multiplied by the
6    number of seats in a delegation.
7        And, again, the reason for that proposed
8    number is that's -- empirically that's the level
9    above which the efficiency gap or the asymmetry is
10    likely to endure over the life of a plan.
11 Q  Okay.  But, again, is there a generally accepted
12    or scholarly consensus that any gap that endures
13    over the life of plan is unacceptable?
14 A  So I'm trying to make sure I understand.  Is the
15    question is there a premium of seats that a party
16    secures through gerrymandering that is considered
17    unacceptable over the life of a plan?  That's the
18    wrong question.  The question is whether that
19    advantage endures with the metric being the
20    calculation of the efficiency gap or the other
21    metrics where a critical value has been offered.
22 Q  Just make sure I understand you correctly.  It's
23    not the size of the gap.  It's the potential
24    duration of the gap that matters?
25 A  Which is going to be a function of the size of the

Page 153

1   gap.
2 Q   Right.  But what you're really focusing on --
3     there's no generally accepted view in terms of the
4     size of the gap.  You've indicated that
5     Stephanopoulos and McGhee are arguing for the
6     endurance of a gap being the relative
7     consideration; is that right?
8 A   Well, let me phrase it more generally.  When we
9     are looking at things like a two-to-one premium in
10    seats where the party that drew the lines secures
11    twice as many seats as it would have under a
12    neutral map, the importance of a critical value or
13    a threshold is that when you approach that value
14    and epsilon on either side of that, which side are
15    you on, but which side of that threshold are you
16    on but when we're dealing with numbers two to
17    three times the size of those possible values or
18    when we're looking at the number of seats that are
19    involved, that's less of a matter of thresholds
20    within that epsilon as opposed to seems
21    objectively obvious that that's a large number of
22    seats.
23 Q   So two things.  You're comparing the gap between
24    what's achieved under the plan being challenged
25    and what would be achieved under a neutral plan?

Page 154

1 A   That's one standard of comparison.
2 Q   And is there any consensus view on how large that
3     gap needs to be under any of the metrics to be
4     invalid?
5 A   Well, again, to the extent that those thresholds
6     have been proposed, it's a function of the size of
7     the initial asymmetry or bias enduring over the
8     life of a plan.
9 Q   Right.  And that was the proposal that
10    Stephanopoulos and McGhee made with respect to the
11    efficiency gap.  That's how they derived the
12    8 percent?
13 A   And that is also, I believe, what Warrington did.
14 Q   Okay.  Was that true with respect to partisan
15    bias, partisan symmetry, or mean-median?
16 A   I don't know that a specific threshold has been
17    identified but there is, I think, unanimous
18    agreement that higher values are -- lower values
19    are preferable to higher values.
20 Q   Right.  And there's no consensus, however, on how
21    much is too much other than the Stephanopoulos and
22    McGhee and Jackman 7 to 8 percent for the
23    efficiency gap?
24 A   And again --
25 Q   Is the answer yes before you go on?

Page 155

1 A   That's not the only measure where such a value --
2     again, I did not have a threshold in mind when I
3     did this analysis and reached this conclusion.
4 Q   Okay.  And there is no such value recognized in
5     the political science literature?  Some basic
6     threshold value which distinguishes however
7     measured between unacceptable and acceptable level
8     of political fairness or gerrymandering?
9 A   As a function of those critical values, I'm not
10    aware that a threshold has been set.
11             MR. CARVIN:  Okay.  It's 2:15.  Did
12       you want to take, like, a real five-minute
13       break, and then I'm really rushing to try and
14       get us out of here so the more I can go
15       through this --
16             MR. YAEGER:  Sure.  We're driving
17       back to Indiana tonight.  I'm all with you.
18       (Recess taken)
19  BY MR. CARVIN:
20 Q   All right.  Professor Mayer, could you turn,
21    please, to page 59 of your report.  Do you have
22    that in front of you?  Okay.  You say here you do
23    evaluation of demonstration maps.  So my first
24    question is are these demonstration maps the ones
25    that were attached to plaintiff's complaint?

Page 156

1 A   I don't know.
2             MR. CARVIN:  Counsel, can you help
3       me on this?  Do you know if that's what was
4       proposed by the parties as --
5             MR. YAEGER:  I believe that they
6       are.
7 Q   And from your perspective, who sent you these
8     maps?
9 A   As I understood it, these actually were not maps.
10    These were files that were sent to me that
11    assigned blocks to districts, and they were
12    prepared by Professor Chen.
13 Q   Okay.  And so that's why I'm a little confused.
14    Did Chen assign the blocks to the districts that
15    he had created that he sent over to you?
16 A   That's what I understood that he did.
17 Q   When did he send them to you?
18 A   I would have to check.  I think it was the end of
19    May, towards the end of May.
20 Q   And these reflected the census geography contained
21    in the demonstration maps or plans by plaintiffs?
22 A   Again, I don't know.  The census geographies were
23    the census blocks that he assigned to particular
24    state legislative, state senate, and U.S. House
25    districts.

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 148-1, PageID.5560   Filed 12/04/18   Page 41 of
53
League of Women Voters of Michigan, et al. v.
Ruth Johnson
Deposition of Kenneth R. Mayer, Ph.D.
August 1, 2018

Page 157

1  Q  Okay.  And as far as you knew, he drew the map or
2     came up with the plan himself?
3  A  That's what I understand it.  That's how I
4     understand it.
5  Q  Do you know who else, if anyone, assisted Dr. Chen
6     in that map drawing exercise?
7  A  I don't.
8  Q  Okay.  Did you ever discuss with him how he
9     created the maps?
10 A  No.
11 Q  Did you ever discuss with him or anybody else what
12    traditional districting principles were used to
13    guide the map?
14 A  No.
15 Q  Okay.  But it's your understanding that these
16    demonstration plans or maps were drawn pursuant to
17    traditional districting principles without any
18    partisan intent to favor republicans or democrats?
19 A  That is my understanding.
20 Q  Okay.  You didn't independently analyze that
21    issue?
22 A  That's correct.
23 Q  Just so I'm clear then, if you could turn to
24    Table A5 on page 91, please.  So this breaks down,
25    for example, the demonstration plan for the

Page 158

1     Michigan lower house; is that right?
2  A  That's correct.
3  Q  Okay.  And you obviously have baseline democratic
4     vote shares assessed under two different election
5     cycles.  Total pop, VAP, and black VAP; right?
6  A  That's correct.
7  Q  For each of these districts?
8  A  That's correct.
9  Q  Okay.  So that information was supplied to you by
10    the census files that Dr. Chen transmitted to you?
11 A  So I wouldn't necessarily characterize them as
12    census files.  These were based on the files that
13    he provided to me that had the information in each
14    census block, which then had an assignment that he
15    had made to a particular district.  So that's what
16    this is based on.
17 Q  Okay.  And did you calculate these percentages or
18    did he?
19 A  I calculated these percentages by aggregating the
20    files that he -- aggregating the census block
21    files into districts.
22 Q  And was this some kind of shapefile that he sent
23    to you?
24 A  No.
25 Q  Well, in what form did he transmit this

Page 159

1     information?
2  A  It was a text file that contained the data.
3  Q  All right.  Do you still have that?
4  A  I believe I do.
5         MR. CARVIN:  All right.  We'd like
6     to request getting a copy of that file.  I
7     think there's been some conversation with
8     Dickinson, right, about getting the
9     shapefiles or other kind of census
10    information on the line of these
11    demonstration plans.  I don't know if you've
12    been involved with that, but I would like to
13    see those text files.
14        MR. YAEGER:  We'll certainly do
15    that.  It may have already been delivered in
16    a very large delivery of data that we made a
17    couple weeks ago perhaps.  But if not, we
18    will absolutely go find it.
19        MR. CARVIN:  I'm not involved in
20    that dispute.  I understand there is a
21    dispute about that, so I'll make the request
22    for the record and won't take up anymore of
23    Professor Mayer's time, but don't get rid of
24    the text file if you have it.
25        MR. YAEGER:  I'm not sure there's a

Page 160

1     dispute at all, but we will certainly work
2     through that.
3         MR. CARVIN:  All right.  Great.
4     Thanks.
5  Q  Again, just to be clear, you don't know which
6     traditional districting principles were followed.
7     Do you know -- for example, you mentioned the Apol
8     Standards.  Do you know if these purport to follow
9     the Apol guidelines?
10 A  I don't.
11 Q  Do you know if the demonstration plans took
12    account of incumbency?
13 A  I do not.
14 Q  Okay.  All right.  So if you could turn to -- you
15    know what, I think there's an easier way to do
16    this.  Let me -- I'm going to keep flipping
17    back -- just to explain what I'm about to do to
18    you between -- with you.
19        MR. CARVIN:  We're going to be
20    flipping between the tables described in the
21    enacted plan and the demonstration plan.  So
22    I thought it might be easier just to give you
23    the excerpts from your report that describe
24    these things.  And so it would be --
25        Counsel, would you like me to make this

Page 161

1　an exhibit?  These are just excerpts from
2　what he's already done just for ease of
3　reference.
4　　　　MR. YAEGER: I don't object to him
5　referring to them if you're telling me
6　they're just pages out of the existing
7　exhibit.
8 Q　What I'm trying to do here, Professor, is stop us
9　from flipping back and forth between the baseline
10　plans and the demonstration maps because you had
11　two things with respect to each of the plans.  One
12　was the enacted plan, and then you did the enacted
13　plan without the majority of minority districts,
14　and then you did the demonstration plans.  So what
15　I've handed to you is the excerpts from the
16　relevant pages of your report analyzing the
17　different plans in that way.
18　　　　MR. YAEGER: Can you just tell us
19　what pages he now has in front of him?
20 Q　Right.  So unless I'm incorrect, these are the
21　ones for congress.  I'm going to subsequently do
22　the others.  It should be page 30 of your report.
23　Tell me if I'm wrong.  Page 36 and 37 of your
24　report and then page 59 of your report.  And 59,
25　60.  Is that correct?

Page 162

1 A　Yes.
2 Q　All right.  So if you put the -- take the
3　demonstration plan, please.  This is for congress,
4　okay, which I believe is contained in 59-60 of
5　your report and then the enacted plan, okay, which
6　is at page 30.  And if you put those two pages
7　together -- right.  Okay.  Do you have that in
8　front of you?
9 A　Yes.
10 Q　Okay.  All right.  If you look first at the
11　republican share of seats, it's a democratic vote
12　share number; right?  Do you have that column in
13　front of you?
14 A　Which table?
15 Q　Well, it would be both on Table 5 and Table 11 and
16　you have a column that says Republican Seats won
17　at Democratic Vote Share; right?
18 A　Okay.
19 Q　And in the enacted plan, republicans would win ten
20　seats at the democratic vote share; right?
21 A　Correct.
22 Q　And under the 2006 to 2010 numbers, the
23　republicans would win 12 seats under the
24　demonstration plan at the democratic vote share?
25 A　Correct.

Page 163

1 Q　So the neutral plan is better for republicans than
2　the enacted plan under this measure; correct?
3 A　Under that measure.
4 Q　Right.  And at 53 percent of the vote, republicans
5　would get 85.7 percent of the seats; correct?
6 A　That's what it shows.
7 Q　That's a huge gap; right?
8 A　That's large.
9 Q　And it's an extreme partisan gerrymandering;
10　right?
11 A　Well, that doesn't exhaust the inquiry because the
12　next column shows --
13 Q　In terms of that measure?
14 A　In terms of that measure.
15 Q　That would be an extreme partisan gerrymandering?
16 A　Under that metric.
17 Q　Okay.  Let's go to the symmetry -- the actual
18　vote; right?  So under the enacted plan under the
19　2012 to 2016 election results -- excuse me.  Under
20　the demonstration plan, under the actual statewide
21　vote, democrats would only win 6 of 14 seats under
22　the demonstration plan; right?
23 A　Again, you're referring to 2012-2016?
24 Q　Yes.  Uh-huh.
25 A　Correct.

Page 164

1 Q　And that's your best estimate of the votes -- of
2　the baseline elections that actually occurred in
3　the decade during the relevant redistricting?
4 A　From 2012 to 2016.
5 Q　Right.  And under that they would have captured
6　52.3 percent of the vote but only 42.9 percent of
7　the seats?
8 A　Correct.
9 Q　And that's a large gerrymander against the
10　democrats?
11 A　So that's a large bias.
12 Q　And it violates the majoritarian principle?
13 A　Yes.
14 Q　Now, if you look at partisan bias at 50 percent,
15　the partisan bias at 50 percent is 14.3 percent
16　against the democrats under either the 2006 to
17　2010 or the 2012 to 2016 elections; right?
18 A　Correct.
19 Q　And that's an unacceptably large partisan bias
20　under that measure; right?
21 A　Well, true.  But, again, if you exclude the Voting
22　Rights Act districts, those biases and asymmetries
23　disappear.
24 Q　We're going to talk about eliminating the Voting
25　Rights Act districts.  But I just want to know --

League of Women Voters of Michigan, et al. v.
Ruth Johnson

Deposition of Kenneth R. Mayer, Ph.D.
August 1, 2018

Page 165

1  let me make it clear.
2      In the real world, you can't eliminate the
3  Voting Rights Act districts; right?  You can't
4  disenfranchise all the black voters in Detroit and
5  Wayne County; right?
6  A  That's not what --
7  Q  We all agree that that's not true; right?  So what
8  I want to do is figure out is the maps in the real
9  world and then we'll go into this hypothetical
10  world where you can disenfranchise all of the
11  black voters in Michigan, which I assume you're
12  not advocating; right?
13      MR. YAEGER: Objection.  Misstates
14      the evidence.
15  Q  You're going to just eliminate the
16  majority-minority districts?
17  A  Wait a second.  What that means is it calculates
18  the metrics for the areas of the state outside of
19  the Voting Rights Act districts, which is
20  different from disenfranchising them.
21  Q  In any event, what I'd like you to do is answer
22  the questions in terms of the enacted plan and the
23  demonstration plan in terms of all of the
24  districts; okay?  And under that metric, the
25  partisan bias at 50 percent is 14.3 percent for

Page 166

1  both the enacted plan and the demonstration plan;
2  right?
3  A  Correct.
4  Q  It's identical.  And that's a large and
5  unacceptable number?
6  A  It's a large number.
7  Q  And is it unacceptable?  Does it reflect an
8  extreme partisan gerrymander?
9  A  That metric does reflect a gerrymander.
10  Q  Let's keep going.  Let's look at the efficiency
11  gap.  The efficiency gap under the demonstration
12  plan is 12.6 percent for the years 2012 to 2016;
13  right?  Is 12.6 too large an efficiency gap to be
14  acceptable in your view?
15  A  That's a large efficiency gap.
16  Q  Exceeds the recommended standard of Stephanopoulos
17  and McGhee?
18  A  That's correct.
19  Q  Now, if you notice, the efficiency gap is nearly
20  perfect if you look at the 2006 through 2010
21  numbers, right, under the demonstration plan?
22  A  That's correct.  Or it's nearly zero.
23  Q  Nearly zero.  And zero means no gap; right?
24  A  Correct.
25  Q  And you look at the same plan, the exact same

Page 167

1  plan, and all you do is put in different years of
2  election data and the efficiency gap goes from
3  zero to 12.6 percent; is that right?
4  A  Yes.
5  Q  Does that reflect that the efficiency gap
6  calculations are highly variable and subject to
7  relatively minor changes in election data?
8  A  So as I explained in the report, the reason for
9  that is that there are a large number of
10  competitive districts where a relatively small
11  swing in the statewide vote causes them to flip
12  control, and the efficiency gap is sensitive to
13  changes in party control because when a district
14  flips from 51 percent to 49 percent for a party,
15  its wasted votes go from 0.5 percent to
16  49 percent.
17  Q  And that's a real problem with the efficiency gap,
18  isn't it?  It penalizes the existence of
19  competitive seats in the plan, doesn't it?
20  A  I don't think penalize is the right word.  It can
21  be sensitive to that.  Again, this is the reason
22  for calculating the multiple metrics.
23  Q  And the reason you have such a large efficiency
24  gap under this neutral demonstration plan is
25  because it's got three competitive districts;

Page 168

1  right?
2  A  That's the conclusion, yes.
3  Q  And that's the correct conclusion.  And the reason
4  is pretty obvious, isn't it?  Do you know what the
5  efficiency gap is for a 51-49 district?  Haven't
6  you wasted 49 votes if you lose 51-49?
7      MR. YAEGER: Objection.
8  Q  And you only wasted 1 percent of votes if you --
9  A  So the efficiency gap is not calculated for a
10  single district.  The efficiency gap is calculated
11  for a plan.
12  Q  Maybe we can answer the question.  What would the
13  efficiency gap be for a 51 to 49 district?
14  A  Well, the number --
15      MR. YAEGER: I object to your
16      characterization.  He did answer the
17      question.  I'm going to object that the
18      question makes no sense as he's explained.
19      You may answer.
20  A  So the number of wasted votes would change from
21  essentially 1 to 49.
22  Q  So it would be a 48 percent efficiency gap.  A
23  huge efficiency gap for that district?
24  A  An efficiency gap is not calculated for a single
25  district.  An efficiency gap is calculated for a

Page 169

1 plan.
2 Q  Yes.  Where you add up the efficiency gaps in each
3    district; correct?
4 A  That's incorrect.  The efficiency gap -- you don't
5    calculate the efficiency gap in a single district.
6    You calculate wasted votes in a single district,
7    and the efficiency gap is the net wasted votes in
8    each district divided by the total number of
9    votes.
10 Q  So you have to add up all of the wasted votes for
11    all of the districts.  I'll make it as easy as I
12    can.  What would be the efficiency gap for ten
13    districts which were 51 percent republican and
14    49 percent democrat?  If you want to do it that
15    way, it would be a huge efficiency gap of, like,
16    48 percent; right?
17 A  It would be large, yes.
18 Q  Right.  Right.  Okay.  And if there was a
19    1 percent swing or a 2 percent swing, the
20    efficiency gap would not -- would either go to
21    zero or -- that's why you have such huge swings
22    when you have competitive districts in efficiency
23    gap; right?
24 A  In this context, yes.
25 Q  And let me ask you this.  What would be the

Page 170

1    efficiency gap for a district with 75 percent
2    democratic vote share for one district?
3          MR. YAEGER: Objection.
4 A  Again, you don't calculate the efficiency gap for
5    a single district.
6 Q  I thought you did and then you added them up and
7    then you did the division; is that not correct?
8          MR. YAEGER: Objection.  Misstates
9       the testimony.
10 A  That's incorrect.  You calculated wasted votes --
11 A  For each district?
12 A  -- for each district.
13 Q  How many wasted votes would be there in a
14    75 percent democratic district?
15 A  So one of the properties of the efficiency gap is
16    that a 75/25 percent district has zero wasted
17    votes.
18 Q  So it finds no efficiency gap in a district that
19    is a clear packing of democrats?
20          MR. YAEGER: Objection.
21 Q  But it finds a huge efficiency gap in a 51 to
22    49 percent district; right?
23          MR. YAEGER: Objection.
24 A  So there are -- in a 75-25 district, there are
25    zero wasted votes.  And in a 51-49, there is a

Page 171

1    larger number of wasted votes although, again, you
2    don't calculate the efficiency gap based on a
3    single district.  It depends on the overall
4    distribution of votes.
5 Q  Right.
6 A  Or the overall aggregation of votes.
7 Q  Right.  So if I had ten 75 percent democratic
8    districts, the efficiency gap would be zero for
9    the plan; right?
10 A  That's correct.
11 Q  Okay.  Whereas if I had ten 51-49 districts, the
12    efficiency gap would be huge?
13 A  That's correct.
14 Q  In the real world, which do you think the
15    democrats would prefer -- or the disadvantaged
16    party -- a bunch of 75-25 or a bunch of 51-49?
17 A  In terms of -- I mean, I don't know that -- that's
18    a hypothetical.  I think a party would prefer a
19    competitive district compared to a noncompetitive
20    district where it was an overwhelming minority.
21 Q  All right.  I'll ask it one last time.  If we were
22    analyzing this plan in 2011, right, this
23    demonstration plan, okay, and let's assume that
24    this was the enacted plan, right, then we would
25    think it would have a 0.1 percent efficiency gap.

Page 172

1    And under that measure, we would think this would
2    be not at all a gerrymander.  But then in practice
3    in the real elections between '12 and '16 under
4    your baseline exogenous results, the efficiency
5    gap would be 12.6, a huge gap; right?
6 A  That's correct.
7 Q  So, again, showing the variability of efficiency
8    gaps when you're in a competitive political
9    situation; right?
10 A  That's the explanation that -- that's correct.
11          MR. CARVIN: Okay.  All right.  And
12       then I'm going to do the same thing with the
13       house districts; okay?  And, Counsel, for the
14       record, I've handed him pages 40, 45, and 46
15       and page 68 from his report; okay?
16          MR. YAEGER: Thank you.
17          MR. CARVIN: Which reflects the
18       various measures of the enacted plan versus
19       the demonstration plans.
20 Q  All right.  Under the enacted plan, which is an
21    extreme partisan gerrymander, right, the democrats
22    win 49 seats; correct?
23 A  Correct.
24 Q  And under the demonstration plan, which is neutral
25    and abides by tradition districting principles,

Page 173

1      the democrats win 48 seats if you look at the 2012
2      through 2016 elections?
3   A   Correct.
4   Q   So is the demonstration plan an extreme partisan
5      gerrymander against democrats?
6   A   Again, I calculated multiple metrics and some of
7      them show large values. Others show smaller
8      values.
9   Q   And under this metric, that would constitute an
10     extreme partisan gerrymander?
11   A   That is a counter-majoritarian result.
12   Q   But not an extreme partisan gerrymander?
13   A   Again, my conclusion about the extreme nature
14     results on the overall indicators.
15   Q   And the fact that you estimate that they won
16     49 seats under the enacted plan doesn't tell you
17     very much about whether or not the enacted plan is
18     an extreme partisan gerrymander?
19   A   Again, that's one indicator.
20   Q   In and by itself, it's not terribly important?
21   A   No. That's incorrect. That's not the only piece
22     of information.
23   Q   Okay. And then -- well, let's look at the other
24     information then. Under the partisan bias, actual
25     measure under the demonstration plan, it's

Page 174

1      8.7 percent for 2012-2016, and it's 7.8 percent
2      for the same races for the enacted plan. So,
3      again, the partisan bias is worse than the enacted
4      plan under that measure?
5   A   That's correct.
6   Q   And the bias is apparent in the enacted plan. Is
7      it equally apparent in the demonstration plan?
8   A   I'm sorry. Which metric are you referring to?
9   Q   The partisan bias, actual.
10   A   Yes.
11   Q   Okay. And then let's look at partisan bias at
12     50 percent. Under the demonstration plan, it's
13     negative 10.9 percent against democrats under the
14     2012-2016 where it's only negative 9.1 percent
15     against the democrats in the enacted plan, so
16     that's yet another metric which shows that the
17     demonstration plan is biassed against democrats?
18   A   Correct.
19   Q   Would you think at this point it's considered an
20     extreme partisan gerrymander?
21   A   So based on the metrics that I used in the
22     Table 7, it does. Again, the contributors to that
23     are often the existence of the Voting Rights Act
24     district, so a number of these metrics improve
25     outside the area of the state outside of the

Page 175

1      Voting Rights Act districts.
2   Q   That's the key point; right? Even when you draw
3      scrupulously adhering to traditional districting
4      principles without any bias against democrats, you
5      achieve bias results largely as a consequence of
6      these Voting Rights Act districts; correct?
7   A   Can you say that again?
8   Q   The demonstration plans were mutual plans with no
9      bias or partisan intent which strictly adhere to
10     traditional districting principles. As you've
11     constantly explained, the reason they're showing
12     apparent bias on the overall plan is because of
13     the effect of the majority-minority districts,
14     which means that even a completely neutral line
15     drawer strictly adhering to traditional
16     districting principles creates an anti-democratic
17     bias largely attributable to the Voting Rights Act
18     districts; correct?
19   A   Well, that's true. But if you look at the metrics
20     compared to the outside of the majority-minority
21     districts in the enacted plan, virtually every one
22     is improved. If you compare the demonstration
23     plan component outside of the Voting Rights Act
24     districts and you compare it to the enacted plan,
25     on virtually all of the metrics, the demonstration

Page 176

1      plan is more neutral.
2   Q   More neutral?
3   A   More neutral.
4   Q   Okay. Is it acceptable?
5   A   As I look at these metrics, I characterize them in
6      the report as mixed but more neutral.
7   Q   More neutral, but, I mean, do you want me to go
8      through it? We can do it that way too. Let's do
9      Table 8. You exclude partisan bias, actual;
10     right? You excluded them, it's 10.6 under the
11     enacted plan. And it's minus 11.6 under the
12     demonstration plan?
13   A   Correct.
14   Q   It's worse. Actual partisan bias is worse?
15   A   But the partisan bias at 50 percent is improved.
16     The symmetry is improved. The democratic share
17     needed to win a majority is improved. The
18     efficiency gap is not improved. The mean-median
19     is improved, and the average republican and
20     democratic wins, that gap is improved.
21   Q   Right.
22   A   So the indicators are mixed, but they are more
23     neutral.
24   Q   More neutral. But we both agree that the main
25     reason that the neutral plan has an apparent

Page 177

1    pro-bias -- democratic bias result is because of
2    the presence of the majority-minority districts
3    since when you eliminate the majority-minority
4    districts, the bias goes down according to you?
5  A  Right.  So I would not use the phrase eliminate
6    the voting rights districts when you calculate the
7    metrics for the area of the state outside of the
8    Voting Rights Act district.  That's how I would
9    phrase it.
10 Q  All right.  Let's go to how you phrase it in your
11   report.  So at the bottom of page 81, you're
12   discussing the demonstration maps.  You say Nearly
13   all the metrics show less asymmetry and bias.
14   We'll figure out whether that's accurate.  But in
15   any event, you then go onto say and when observed
16   are largely the consequence of majority-minority
17   districts.  So you are saying that the asymmetry
18   and the bias contained in the demonstration plans
19   is largely a consequence of majority-minority
20   districts; right?
21 A  Correct.
22 Q  Some measures are also a function of the high
23   degree of competitiveness in the demonstration
24   maps, with many districts very close to 50% of the
25   vote baseline, such that very small changes in the

Page 178

1    vote can flip districts between the parties.  So,
2    again, these various metrics penalize competitive
3    districts because that are very close to
4    50 percent; correct?
5  A  I wouldn't phrase it as penalize.  I would say
6    that the metrics are sensitive to the existence of
7    competitive districts.
8  Q  Right.  And you can have as we described -- for
9    example, the efficiency gap, you can have a very
10   high, meaning negative efficiency gap measure for
11   very competitive districts?
12 A  Well, again, you can have large numbers of wasted
13   votes in competitive districts.
14 Q  Right.  Because they define wasted votes as
15   49 percent in a 51-49 district?
16 A  For the losing party, that's correct.
17 Q  And if you call a district 51-49 and in the real
18   world there's an incumbent from the opposing party
19   or your baseline measures of 51-49 are off by a
20   percentage point or two, then you could
21   misidentify a pro-republican bias when really it's
22   a neutral because all these districts are tossups;
23   right?
24 A  So there's a lot going on in that question.
25 Q  We all agree the party that gets 51 percent under

Page 179

1    the efficiency gap that the other party is viewed
2    to have wasted a lot of votes; correct?
3  A  So the losing party wastes all of the 49 percent.
4  Q  Right.  But the difference between 49 and 51 is so
5    that you may misidentify which party is wasting
6    the votes; right?
7  A  That's possible.
8  Q  In any event, most political scientists would
9    think that 51-49 districts are not the hallmarks
10   of a partisan gerrymander but are the hallmarks of
11   a plan that is competitive and responsive to
12   changes in vote swings; correct?
13 A  Well, again, there are a lot of conditions and
14   qualifications.  So generally speaking, a 51-49
15   district will have many of those characteristics,
16   but it depends on how that district was drawn.  If
17   I am able to draw, convert districts where I have
18   overwhelming majorities in a small number of
19   districts to large number of districts where I
20   have smaller majorities or if I'm able to combine
21   voters in 25 percent into a 51 percent or
22   52 percent district, that those actually could
23   meet the definitions of packing and cracking
24   because it is -- depending on how the districts
25   are drawn, that packing is compared to or relative

Page 180

1    to what an alternative district would look like.
2  Q  Right.  Which is another way of saying that
3    looking at this number for the efficiency gap
4    doesn't begin to answer all those variables that
5    go into whether a district is fair or not.  You
6    need to analyze all of the redistricting
7    alternatives in all of these measures that you
8    discuss; correct?
9  A  So I disagree with the statement that it doesn't
10   begin to answer the question.  And that's one of
11   the reasons why I calculated multiple metrics
12   because other metrics will capture and measure and
13   are less sensitive to competitive districts like
14   the mean-median or the comparison of the average
15   democratic and republican win.  Those actually get
16   better when you have more competitive districts.
17 Q  All right.  Let's go through it then if you want.
18   Are the efficiency gaps for the demonstration plan
19   acceptable or indicative of packing and cracking?
20         MR. YAEGER:  Can you say which page
21      we're looking at?
22         MR. CARVIN:  68.
23 A  So which column are we looking at?
24 Q  I'm starting with the efficiency gap.
25 A  Right.  But which column?

Min-U-Script®

Web Address - FTRMadison.com   /   E-mail - Office@FTRMadison.com   (45) Pages 177 - 180
For the Record, Inc.   /   (608) 833-0392

Page 181

1 Q I'll let you do whichever ones you think are okay.
2    Either the statewide 2012 or statewide 2016.
3        MR. YAEGER: Objection to form.
4 A So those efficiency gaps exceed the proposed
5    thresholds.
6 Q How about the democratic vote share needed to win
7    the majority of seats, is that indicative of
8    strong partisan bias? Strong partisan
9    gerrymandering?
10        MR. YAEGER: Objection. Compound.
11 A So in both the 2006 and 2010 and 2012 and 2016,
12    the vote share that the democrats need to win a
13    majority is smaller than it is in the enacted
14    plan.
15 Q I'm not asking you that.
16 A That's the point of comparison here because we're
17    comparing --
18 Q I'm not asking you that.
19 A I understand that, but that is the relevant point
20    of comparison.
21 Q At some point, your counsel can ask you the
22    questions you want to be asked, but I'm asking you
23    whether or not they're acceptable levels. I
24    understand they're smaller. Are they acceptable?
25 A Well, as I have mentioned before, there is no

Page 182

1    threshold measure that clearly defines what
2    constitutes an acceptable. Numbers that are
3    closer to 50 percent are preferable to numbers
4    that are larger, farther away from 50 percent.
5 Q Oh, okay. Well, maybe I'm misunderstanding this.
6    If you look at the democratic vote share needed to
7    win the majority of seats, in the demonstration
8    plan it's either 54.6 or 53.6; right?
9 A Correct. For statewide.
10 Q And then enacted plan, it's 53.1 -- I'm sorry.
11    That's excluding the majority-minority districts.
12    It's 54.8 or 56.2; right?
13 A Correct.
14 Q And as far as you know, there's no meaningful
15    difference between 54.6 and 53.6 and 54.8 and 56.2
16    because there's no clear dividing line between
17    what's acceptable and what's unacceptable?
18 A Well, but both of those numbers are smaller.
19 Q And 56.1 is smaller than 56.2. Would you say that
20    that's a meaningful difference in terms of it?
21 A I would define one-tenth of a percentage point as
22    not a meaningful difference.
23 Q And is there anywhere on these charts you can
24    point me to a dividing line between what is
25    acceptable and what is not acceptable?

Page 183

1 A Not in terms of comparing two numbers.
2 Q Right. Or how about all of the numbers in
3    aggregate?
4 A So I did not have a threshold in mind when I
5    reached this conclusion.
6 Q You were quite confident in saying that the
7    enacted plan was an extreme partisan gerrymander.
8    Is the demonstration plan sufficiently different
9    from the enacted plan not to constitute an extreme
10    partisan gerrymandering?
11 A Again, I will restate what I said in my report.
12    The metrics are more mixed, and they are generally
13    improved, so it is a more neutral map.
14 Q Yes. Is it sufficiently neutral, or does it still
15    constitute either an extreme partisan gerrymander
16    or a partisan gerrymander?
17 A Again, the conclusion that I reached was that it
18    is a more neutral map.
19 Q I know. And I'm asking you a different question.
20    I understand it's more neutral. Is it
21    sufficiently neutral not to be fairly
22    characterized as a partisan gerrymander?
23 A Again, the fact that the metrics are mixed mean
24    that I reach a different conclusion about the map.
25 Q And what's that conclusion? How would you

Page 184

1    characterize it?
2 A It's a more neutral map than the enacted plan.
3 Q Yes. But I want you to pretend that the enacted
4    plan was never enacted and you were just analyzing
5    this plan. How would you characterize it, as a
6    partisan gerrymander, an extreme partisan
7    gerrymander, or an acceptable level of partisan
8    bias?
9        MR. YAEGER: Objection. Incomplete
10    hypothetical. Compound. You can answer.
11 A You know, again, the demonstration map is
12    understood -- I understood this in comparison to
13    the enacted plan, and the metrics are more mixed,
14    and as I look at this looking at these metrics,
15    that some of them indicate high levels of bias and
16    asymmetry. Others do not.
17 Q Right.
18 A My conclusion is that based on the full set of
19    indicators that this is not one that I would
20    characterize as an extreme partisan gerrymander
21    even though some of the indicators suggest a high
22    degree of bias and asymmetry.
23 Q Is it a partisan gerrymander?
24        MR. YAEGER: Objection.
25 A So in making that conclusion, what I had in mind

---

Page 185

1     was the way that partisan gerrymanders are
2     investigated in the literature that when you --
3     there is a literature that defines partisan
4     gerrymanders as those that emerge from places
5     where you have unified party control, and that is
6     the definition of a partisan gerrymander in the
7     literature as reflected in these metrics.
8         In a map that was neutrally drawn that has a
9     set of mixed indicators where some metrics
10    indicate high levels of asymmetry and bias and
11    others do not, my conclusion is that that was not
12    a partisan gerrymandering. It was not a partisan
13    gerrymander because, again, the essence of a
14    gerrymander is intentionally drawing district
15    lines to benefit one party over the other party.
16    That's what I explained in my report.
17 Q  Right. That's why you need to look at these
18    neutral maps. Is the gap between this neutrally
19    drawn map and the enacted plan significant?
20 A  Again, significant in this context often implies
21    statistical significance. The way that I read
22    this and how I analyzed it is that all of the
23    indicators in the enacted map indicated high
24    levels of bias and asymmetry. Some of them do in
25    the demonstration map, but some don't.

---

Page 186

1 Q  What don't?
2 A  The 2006-2010 partisan bias at 50 percent, the
3    mean-median, the declinations are smaller, and
4    almost all of the metrics are more neutral.
5 Q  Partisan bias at 50 percent is 10.9.
6 A  I meant the democratic share needed to win a
7    majority of seats. And the partisan bias of
8    the --
9 Q  53.6?
10 A  Again --
11 Q  54.6?
12 A  You have to -- it's smaller --
13        MR. YAEGER: Excuse me. Could we
14    just have question and answer.
15 Q  I'm trying to figure out is there any number on
16    this map that shows anything other than at least a
17    mild anti-democratic bias?
18 A  By anti-democratic bias, do you mean large "D"
19    like democratic party bias?
20 Q  Yeah. Sure.
21 A  I would regard the differences in the mean and
22    median as meaningful and the vote share that
23    democrats would need. Again, looking at the
24    statewide, the areas of the state outside the
25    Voting Rights Act districts.

---

Page 187

1 Q  So the mean-median difference is minus 5.2 percent
2    meaning minus to democrats; right?
3 A  Correct.
4 Q  But you think that's de minimis?
5 A  Again, I did not have a threshold in mind when I
6    looked at this.
7 Q  You told me before if they all point in the same
8    direction, there's very powerful evidence that
9    there's an anti-democratic intent going on in the
10    map drawing; right?
11 A  That's incorrect. The intent is not inferred by
12    these numbers.
13 Q  Right. So these numbers don't tell you anything
14    about the intent whether they were trying to crack
15    or pack. They just tell you the results; right?
16 A  There is a small exception with the declination,
17    but for the others, that's generally true.
18 Q  Okay. And now I'm going to ask you if these
19    numbers indicate an anti-democratic bias, that's
20    no reason to infer that the drafters of the
21    demonstration plan were trying to pack or crack
22    democratic voters; correct?
23 A  Well, the metrics combined with the unified party
24    control does give you some information, but the
25    numbers specifically by themselves does not

---

Page 188

1     exhaust the inquiry.
2 Q  So if the republican legislature and the
3    republican governor had passed this plan, the
4    demonstration plan, you would not characterize it
5    as a partisan gerrymander?
6 A  So, again, I would characterize some of the
7    indicators suggesting a degree of asymmetry and
8    bias. So, again, you know, the indicators are
9    what they are.
10 Q  So it at least raises a serious suspicion of a
11    partisan gerrymander?
12 A  The metrics indicate a degree of asymmetry and
13    bias.
14 Q  Which does reflect packing and cracking?
15 A  It can.
16 Q  And if the republicans had passed the
17    demonstration plan, you would infer packing and
18    cracking?
19 A  Well, again, the investigation was identifying
20    competitive districts so, I mean, my report says
21    what it says. I mean, the indicators are mixed
22    and the demonstration plan is more neutral than
23    the enacted plan.
24 Q  And then you have this whole series where you take
25    out the majority-minority districts; right?

---

Page 189

1 A   I do the calculations for the other areas of the
2        state.
3 Q   Oh, what's that mean?  I thought you pretended
4        that majority-minority districts didn't exist?
5 A   No.  You calculate the metrics for the areas of
6        the state other than the majority-minority of
7        Voting Rights Act districts.  I didn't exclude
8        them.
9 Q   You didn't.  So you put down 16 congressional
10      seats when you excluded the majority-minority
11      districts?  You still kept the seats at 16?  Or at
12      14.  Excuse me.
13 A   No.  Those metrics are calculated on the 12
14      districts other than the majority-minority
15      districts.
16 Q   So you took the majority-minority districts out?
17 A   Again, I didn't delete them or eliminate them.
18      What I did was --
19 Q   You eliminated them from the --
20 A   Right.
21 Q   -- analysis of the partisan fairness?
22 A   Those metrics were for the portion of the state
23      outside of the majority-minority districts.  You
24      used the term excluding them.
25 Q   I'm just making the obvious point that obviously

Page 190

1        if you eliminate two of the five democratic seats
2        in the state, then it's hardly surprising that the
3        seats votes analysis is not going to look great
4        for the democrats.  It's 40 percent of their
5        seats; right?
6            MR. YAEGER:  Objection.  Compound.
7        Argumentive.  Assumes facts not in evidence.
8        Misstates his testimony.  You can answer.
9 A   Can you ask that question again?
10 Q   Yes.  Under the normal real world analysis, the
11      democrats have five seats.  Under your excluding
12      the majority-minority districts, you eliminate two
13      of the five democratic districts.  You decrease
14      the democratic seat share, so it's hardly
15      surprising when you compare votes to seats that
16      they don't do particularly well when you take away
17      40 percent of their seats; is it?
18 A   Right.  But they do better under the metrics.  So
19      if you look at the --
20 Q   Who does better?
21 A   The democrats.  So if you look at Table 11 under
22      the demonstration plan -- I'm referring to
23      Table 11.
24 Q   No.  I understand that.  I'm just trying to figure
25      out --

Page 191

1            MR. YAEGER:  Objection.  He's still
2        answering your question, sir.
3 Q   It's not really.  That's because you eliminated
4        the most packed districts in the state.
5            MR. YAEGER:  I object.  This is not
6        a discussion.  This is a deposition.  You
7        need to let him answer his questions.  If
8        you're going to make speeches, you can't be
9        surprised when he is going to answer you in
10      detail.  That's up to you, sir.
11          MR. CARVIN:  That's fine.
12 A   So, I mean, if you look at the part of the state
13      that excludes the democratic districts -- an often
14      offered explanation is that the reason for a bias
15      against -- when we're talking about states like
16      Wisconsin and Michigan, is those metrics that
17      indicate a high degree of bias and asymmetry are a
18      function of highly concentrated democratic
19      districts.  So democrats, minority voters who are
20      heavily democratic, and if you look at the -- the
21      bias and asymmetry in a map is a function of those
22      districts.
23          Now, let me finish.  So if we -- the idea
24      here is if we look at the rest of the state taking
25      the case of congress, the two districts that are

Page 192

1        created to comply with the Voting Rights Act, so
2        we're removing concentrations of democratic voters
3        in this case, and we calculate the metrics as we
4        do -- as I do in Table 6, you still get large
5        indicators of bias.
6 Q   And that's because you've also eliminated two
7        democratic seats so let me --
8 A   Well, you've eliminated two seats that were
9        concentrated and the --
10 Q   Exactly.
11 A   But --
12          MR. YAEGER:  Excuse me.  Excuse me.
13      Forgive me.  I have to object.  First of all,
14      the reporter cannot take this where you're
15      talking over the witness, so I'll ask both of
16      you, please, one at a time and please
17      question and answer.
18 Q   All right.  Let's go back to Q and A.  That's a
19      fair point.  Turn to Table A1, please, of your
20      report.
21          MR. YAEGER:  I'm sorry.  What page?
22          MR. CARVIN:  84.
23          MR. YAEGER:  Thank you.
24 Q   All right.  This is the enacted U.S. House plan,
25      right, in 13 of the 14 majority black districts;

Page 193

1    is that correct?
2 A  That's correct.
3 Q  And those are egregiously packed districts; right?
4    85 plus or 80 plus percent democratic vote share?
5 A  Again, I would -- those are packed districts.
6 Q  Right.  And then if you look at the districts in
7    the house, the same pattern, all of the
8    majority-minority districts have at least 75 to
9    80 percent democratic concentrations?
10 A  Are we talking in the lower house?
11 Q  Yeah.
12 A  I think the smallest concentration 73.3 percent.
13 Q  And a lot of them are up in the 89, 90 percent
14    range?
15 A  Correct.
16 Q  Okay.  So all of the majority black districts in
17    those state house plan are also packed; correct?
18 A  Correct.
19 Q  And the argument is that when you pack these
20    districts because of the Voting Rights Act and
21    other natural clustering of democrats, right, that
22    that will create efficiency gaps and wasted votes
23    even if your intent is not to pack or crack the
24    districts; right?
25 A  That's the argument.

Page 194

1 Q  And you did a demonstration plan where you put
2    that to the test where they didn't try to pack or
3    crack anybody, but the mere existence of the
4    majority-minority districts led to these partisan
5    bias against the democrats.  That's pretty
6    powerful evidence, isn't it, that the Voting
7    Rights Act concentration of democratic voters has
8    a negative effect on wasted votes in Michigan?
9 A  Not exactly.  Because here we need to look at the
10    enacted plan because the argument of a natural
11    concentration of democratic voters leads to these
12    indicia of bias and asymmetry and the idea is that
13    if you remove those from the calculations -- so
14    essentially recalculating the metrics for the
15    portions of the state outside of the Voting Rights
16    Act districts, you should get -- if that argument
17    is true, you should get smaller indicators of bias
18    and asymmetry because you have already -- you are
19    not counting these districts with high levels or
20    high concentrations of democrats.
21 Q  Which means you're not counting 12 seats where
22    democrats actually win elections or two seats.
23 A  Let me try again.
24 Q  I understand what you're saying.
25 A  Actually, you don't.

Page 195

1    MR. YEAGER: Can we take a break?
2    MR. CARVIN: No.  We're almost done
3    here.  I'm just trying to wrap up.  If you
4    want to answer, answer it to whatever length
5    you want.
6    MR. YAEGER: I'll forego the
7    request for a break, but can we just please
8    keep it to question and answer.
9    MR. CARVIN: Go ahead.
10 A  So look at Table 6.
11 Q  Go ahead.
12 A  This is the portion of the state outside of the
13    Voting Rights Act districts.  So these are the
14    areas where you have essentially controlled for
15    the existence of the most democratic districts in
16    the state.  If it was those two districts with the
17    highest concentrations of democratic voters that
18    were driving these metrics, then if you calculate
19    for the areas of the state outside those, those
20    metrics should get smaller.  The maps should
21    become more neutral.
22 Q  Why?  Why?  Because you're not just eliminating
23    the packed democratic districts, you're
24    eliminating the democratic districts.  So you're
25    reducing the democratic seat share.  If you were

Page 196

1    trying to examine what you're saying is what you
2    would do is reduce all the Voting Rights Act
3    districts to, say, 25, 30 percent black
4    population, disperse the votes around, and find
5    out what happens.
6    MR. YAEGER: Okay.  I'm going to
7    object.
8 Q  Isn't that so?
9    MR. YAEGER: Again, it's
10    argumentive.  I would ask you not to raise
11    your voice.  The witness is trying to answer
12    your questions.  He's continually being
13    interrupted, being lectured.
14    That's a compound question which assumes
15    many facts not in evidence.  I think it's an
16    improper question.  If you insist on an
17    answer, he can try to answer it.
18 Q  I will ask you, wouldn't that help analyze the
19    issue that you're looking at, drawing a race blind
20    map that doesn't preserve Voting Rights Act
21    districts with the currently 55 to 60 percent
22    black districts being, say, 25 to 30 percent, then
23    you would have a basis for comparing whether or
24    not the high concentration minorities compelled by
25    the Voting Rights Act had a negative effect on

Page 197

1 democratic forges? Wouldn't that be one way of
2 analyzing it?
3 A  Not the way that I did it. So what I did --
4 Q  Again, please, wouldn't that be one way of
5 figuring it out?
6 A  So I'm not sure I understand the question. What I
7 do know is that --
8          MR. YAEGER: Forgive me. Could you
9      ask him a question that he says he
10     understands. I prefer that he not just
11     answer a question that he says he doesn't
12     understand.
13 Q  What I'm trying to do is avoid an argument. I'll
14 just make a little point here. You say what
15 you've done is test this proposition by
16 eliminating the majority-minority districts. My
17 point is that does eliminate the packed districts,
18 but it also eliminates the democratic seats, so it
19 reduces the democratic vote share in the
20 legislature, okay. So it's got two -- it's
21 pushing the opposite directions.
22     If what all you were trying to figure out was
23 whether the Voting Rights Act district caused a
24 concentration of democrats that hurt them on these
25 various measures, the most direct way of measuring

Page 198

1 that would be to eliminate the packing in those
2 districts, reduce them from 85 percent democratic
3 to 55 percent, and obviously have a correlative
4 diminution in their black VAP. That would be a
5 more direct measure of the consequences of the
6 Voting Rights Act on partisan bias, would it not?
7          MR. YAEGER: Objection to form.
8      Answer.
9 A  I don't think that would necessarily be the most
10 direct way. Again, what I did by looking at the
11 areas of the state outside of those districts is
12 you still find evidence of packing and cracking
13 that cannot be attributable to those districts and
14 you look at the partisan bias in the efficiency
15 gap and democratic vote share needed to win the
16 majority of the seats and the difference between
17 the average democratic and republican win, the
18 declination, all of those point to continued
19 evidence of packing and cracking.
20 Q  I'm not going to repeat my point. I'll just make
21 a simple point. Why did the Voting Rights Act
22 districts contribute to the anti-democratic bias
23 of the demonstration plan but not contribute to
24 the anti-democratic bias of the enacted plan?
25          MR. YAEGER: Assumes facts not in

Page 199

1      evidence. You may answer.
2 A  That has to do with the way the districts outside
3 of the Voting Rights Act were drawn in the
4 demonstration plan.
5 Q  They were drawn neutrally in the demonstration
6 plan, but it nonetheless produced anti-democratic
7 results, which you opined were largely
8 attributable to the Voting Rights Act districts;
9 correct?
10 A  You're comparing apples and oranges because the
11 conclusion about the Voting Rights Act
12 districts -- well, actually, let me put it this
13 way. In the demonstration plan -- I want to make
14 sure that -- so Table 12. Many of the metrics or
15 the indicators of packing and cracking do improve,
16 so what I take is that the existence of those
17 districts does contribute to some of the metrics
18 and indicators of bias and asymmetry in the state
19 house of representatives.
20 Q  When you say those districts, you mean the Voting
21 Rights Act districts?
22 A  Yes.
23 Q  You contribute to the asymmetry and bias?
24 A  In the demonstration plan.
25 Q  Right.

Page 200

1 A  Yes. In the demonstration plan.
2 Q  Right. And the same would presumably be true in
3 the enacted plan; no?
4 A  As an empirical matter, that is not true because I
5 did do those calculations.
6 Q  And what in those calculations leads you to a
7 different conclusion?
8 A  Because the metrics of packing and cracking and
9 asymmetry that exist outside of the Voting Rights
10 Act districts remains.
11 Q  Okay. I'll try it one last time. You do agree
12 that the Voting Rights Act districts contributed
13 to the anti-democratic bias in the demonstration
14 plans; correct?
15 A  Correct.
16 Q  Okay. And do you think that the Voting Rights Act
17 districts contributed to the anti-democratic bias
18 of the enacted plan?
19 A  We can test that proposition directly by looking
20 at, for example, the House of Representatives for
21 what happens when you -- for the entire state and
22 for the portion of the state that is outside of
23 the Voting Rights Act district. And many of the
24 indicators stay about where they are.
25 Q  And those indicators are premised on the notion

Page 201

1    that democrats are winning 3 of 12 seats; right?
2 A  In terms of partisan -- in terms of the partisan
3    bias, that's true.  But the other metrics are
4    agonistic as to which party -- how many seats a
5    party controls.
6 Q  They're agonistic as to whether or not the
7    democrats control nine seats or three seats?
8 A  You know, in terms of -- the efficiency gap does
9    not depend on a particular configuration of which
10   party controls seats.
11 Q  So it's not a measure of cracking or packing?
12 A  It is a measure of cracking or packing but the
13   metrics -- so the partisan bias will change when
14   you remove seats that the minority party or either
15   party controls.  Those metrics, the partisan bias,
16   the partisan bias at 50, those will change as they
17   do.
18 Q  That's just for the efficiency gap; right?  The
19   efficiency gap is agonistic as to how many seats
20   you win; is that your argument?
21 A  I want to make sure I phrase this correctly.  If
22   the efficiency gap remains stable after you remove
23   packed districts, it means that there is packing
24   going on -- other packing and cracking going on in
25   the other districts of democratic voters.

Page 202

1 Q  There could be.  If you pack two districts, then
2    the districts in the general area are going to be
3    defined as cracked; right?  Whereas, if you unpack
4    them, then the adjacent districts might be
5    uncracked and the efficiency gap doesn't recognize
6    that reality?
7         MR. YAEGER: Objection.  Assumes
8       facts not in evidence.  Vague and ambiguous
9       and compound.  You may answer.
10 A  Again, by performing the analysis in the areas
11   outside of the Voting Rights Act districts, you
12   still see indicia of asymmetry and packing and
13   cracking, which cannot be due to the existence of
14   those districts because the analysis is done for
15   the other parts of the state.
16 Q  Okay.  If I passed a law saying you've got to pack
17   five democratic districts, right, and all five of
18   those districts elected democrats and I was trying
19   to figure out if that contributed to the
20   democratic representation in the legislature and I
21   said, well, I'm going to eliminate all five
22   democratic districts and I can see now that
23   they're only winning one seat so the seats votes
24   relationship for the rest of the state is not very
25   good.  Or wouldn't you ask yourself the question

Page 203

1    what happens if I unpack those packed democratic
2    districts and see what the map would look like?
3       If you do the first, then you've eliminated
4    all or virtually all of the democratic seats, so
5    there's no seats votes analysis that will come out
6    as anything but negative to the democrats.
7    Whereas if you ask the question does the packing
8    contribute to the anti-democratic bias, you try
9    and unpack the districts; correct?
10        MR. YAEGER: Objection.  All of the
11       other objections I made before I'll just
12       incorporate.  If you want him to answer the
13       question --
14 A  I can't -- look at Table 11.
15        MR. YAEGER: What page are you on?
16        THE WITNESS: This is page 59.
17 A  So Table 11 is the same method I used for the
18   demonstration plan than for the enacted plan.  One
19   set of calculations on the left-hand columns for
20   the statewide plan.  The other column excluding --
21   or for the other areas of the state.
22       Now, if your argument is correct, conducting
23   the analysis of the demonstration plan outside of
24   the Voting Rights Act districts should still show
25   significant anti-democratic, big "D," bias.  But

Page 204

1    if you look at the democratic share of seats, it's
2    50 percent.  The partisan bias, 1.5 percent.
3    Partisan bias at 50, zero.  The republican seats
4    won at the democratic vote share goes from six to
5    five.  The democratic vote share needed to win a
6    majority of the seats, 50.1.  The efficiency gap,
7    2.3.  The declination is essentially zero.
8       All of those metrics show virtually no
9    asymmetry and bias, so if your approach is
10    correct, this all should have showed similar
11    levels of anti-democratic bias, and it doesn't.
12 Q  Your counsel is right.  There's no point in us
13   debating this point.  I'll make two points.  You
14   didn't just go through all these numbers.  You
15   also reduced the number of seats to 12, eliminated
16   the number of democratic seats by two, and you
17   reduced the democratic share of the statewide vote
18   to 47.6.  So obviously if you reduce the number of
19   democratic seats and democratic vote share, you're
20   going to have a ripple effect on all these other
21   numbers; isn't that true?
22 A  It will affect those, but your previous argument
23   is that that should continue to show a bias and
24   asymmetry against the democrats, which in this
25   case it doesn't.

Page 205

1 Q  I will make the last point.  If these districts
2    are not eliminated but they exist in the real
3    world and they're a contributing factor to the
4    enacted plan, right, they are a contributing
5    factor -- I'm sorry -- to the demonstration plan's
6    bias, why in the world are the same districts not
7    a contributing factor to the anti-democratic bias
8    of the enacted?
9 A  My conclusion is because the enacted plan includes
10   lots of packing and cracking outside of the Voting
11   Rights Act districts.  That's what the metrics
12   show.
13 Q  Right.  But that doesn't change the fact that the
14   Voting Rights Act districts are a contributing
15   factor to the measures on that, just as they are
16   in the demonstration plan; right?
17          MR. YAEGER: Asked and answered.
18      You may answer.
19 A  I'm not -- there's a double negative lurking in
20   there.
21 Q  The demonstration plans preserve all the
22   majority-minority districts essentially the same
23   way as the enacted plan does; correct?
24 A  Correct.
25 Q  You have concluded, for obvious reasons, that the

Page 206

1    Voting Rights Act districts contribute to the
2    anti-democratic bias and asymmetry of the
3    demonstration plan.  Do they also contribute to
4    the bias and asymmetry of the enacted plan?
5 A  Significantly less so because the metrics don't
6    change much in the enacted plans when you look at
7    the areas outside of the Voting Rights Act
8    districts.
9 Q  So what we need to do is a comparison between the
10   demonstration plan and the enacted plan to figure
11   out whether the enacted plan constitutes an
12   impermissible partisan gerrymandering?
13 A  I don't quite understand the question.
14 Q  Well, again, we discussed before about why the
15   relevant measure of a partisan gerrymander is
16   whether they're getting more votes than they would
17   have under a neutral plan.  The demonstration
18   plans are neutral plans, so the relevant
19   comparison is between the enacted plan and the
20   demonstration plan?
21 A  It's not the votes.  It's the excess seats that
22   the party gets.
23 Q  Okay.  So you would compare the seats votes
24   analysis under these various metrics as between
25   the enacted plan and the demonstration plan?

Page 207

1 A  There's too much going on there.  Are we looking
2    at the statewide plan or the portion of the plan
3    outside of the Voting Rights Act districts?
4 Q  Just the generic question at this point.  You
5    would compare the results as you did a minute ago
6    between the statewide enacted plan and the
7    statewide demonstration plan to draw any
8    conclusions about partisan fairness and bias;
9    correct.
10 A  That's not the only thing that you would do.
11 Q  But it's the relevant measure; correct?
12 A  It's not the only one.  The other relevant measure
13   is comparing what happens outside of the Voting
14   Rights Act districts because those are held
15   constant in the two plans.
16 Q  But, again, we're still comparing the enacted plan
17   to the demonstration plan?
18 A  In this case, that's correct.
19          MR. CARVIN: Okay.  I have no
20      further questions.  Thanks.
21          MR. YAEGER: Let's go off.
22      (Recess taken)
23      (Adjourning at 3:40 p.m.)

Page 208

1 STATE OF WISCONSIN )
2 COUNTY OF DANE     ) ss.
3
4      I, Tammy L. Uhl, Certified Realtime Reporter
5 and Notary Public in and for the State of Wisconsin,
6 do hereby certify that the foregoing deposition of
7 KENNETH R. MAYER, Ph.D. was taken before me on
8 August 1, 2018, and reduced to writing by me, a
9 professional court reporter and disinterested person,
10 approved by all parties in interest and thereafter
11 converted to typewriting using computer-aided
12 transcription.
13      I further certify that I am not related to nor
14 an employee of counsel or any of the parties to the
15 action, nor am I in any way financially interested in
16 the outcome of this case.
17      IN WITNESS WHEREOF, I have hereunto set my hand
18 and affixed my notarial seal of office at Madison,
19 Wisconsin, this 2nd day of August, 2018.
20
21                    _____
22                    Notary Public, State of Wisconsin
                      My Commission Expires 8/18/2020
23
24
25