1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF MICHIGAN
3                   SOUTHERN DIVISION
4
5    _____
                                    )
6    LEAGUE OF WOMEN VOTERS OF       )    Case Number
     MICHIGAN, ROGER J. BRDAK,       )
7    FREDERICK C. DURHAL, JR.,       )    17-cv-14148
     JACK E. ELLIS, DONNA E.         )
8    FARRIS, WILLIAM "BILL" J.       )
     GRASHA, ROSA L. HOLLIDAY,       )
9    DIANA L. KETOLA, JON "JACK"     )
     G. LASALLE, RICHARD "DICK"      )
10   W. LONG, LORENZO RIVERA         )
     AND RASHIDA H. TLAIB,           )
11                                   )
             Plaintiffs,             )
12                                   )
     vs.                             )
13                                   )
     RUTH JOHNSON, in her            )
14   official capacity as            )
     Michigan Secretary of State,    )
15                                   )
             Defendant.              )
16   _____)
17
18       DEPOSITION OF CHRISTOPHER WARSHAW, Ph.D.
19                   Washington, D.C.
20              Wednesday, August 8, 2018
21
22
23
24   Reported by:  John L. Harmonson, RPR
25   Job No. 145530



Page 2

1
2
3
4
5    August 8, 2018
6    9:25 a.m.
7
8
9    Deposition of CHRISTOPHER WARSHAW, Ph.D.,
10   held at the offices of Faegre Baker Daniels LLP,
11   1050 K Street, N.W., Washington, D.C., pursuant
12   to the Federal Rules of Civil Procedure, subject
13   to such stipulations as may be recited herein or
14   attached hereto, before John L. Harmonson, a
15   Registered Professional Reporter and Notary
16   Public of the District of Columbia, who
17   officiated in administering the oath to the
18   witness.
19
20
21
22
23
24
25

Page 3

APPEARANCES

1
2
3    On behalf of the Plaintiffs:
4        FAEGRE BAKER DANIELS
5        300 North Meridian Street
6        Indianapolis, IN  46204
7        BY:  JAY YEAGER, JR., ESQ.
8
9
10
11   On behalf of the Defendant:
12       JONES DAY
13       51 Louisiana Avenue, N.W.
14       Washington, D.C.  20001
15       BY:  MICHAEL CARVIN, ESQ.
16
17
18
19
20
21
22
23
24
25

Page 4

1                C. WARSHAW
2    ----------------------------------------------
3           P R O C E E D I N G S
4                9:25 a.m.
5    ----------------------------------------------
6    Whereupon,
7           CHRISTOPHER WARSHAW, Ph.D.,
8    after having been first duly sworn or affirmed,
9    was examined and did testify under oath as
10   follows:
11              EXAMINATION
12   BY MR. CARVIN:
13       Q.   Good morning, Professor.  How are you?
14       A.   Good morning, sir.
15       Q.   My name is Mike Carvin.  I'm
16   representing the defendants in this case.
17            Have you ever had your deposition
18   taken before?
19       A.   I have not.
20       Q.   Okay.  You were not deposed in the
21   Pennsylvania litigation?
22       A.   I was not.
23       Q.   Did you provide in-court testimony in
24   that case?
25       A.   I did.

Page 5

1                C. WARSHAW
2        Q.   Is there any reason, including
3    medications, that you won't be able to testify
4    fully and truthfully today?
5        A.   No.
6        Q.   Okay.  Just so you understand the
7    protocol, I'll need a verbal response to my
8    questions rather than a nod or something like
9    that so the court reporter can get it.  Do you
10   understand that?
11       A.   Thank you.  I understand.
12       Q.   Okay.  And if there's any confusion
13   about the clarity of my questions or whatever,
14   please ask me to clarify.
15       A.   I'll do that.
16       Q.   Thanks.
17            You've been retained as an expert by
18   the plaintiffs in this case?
19       A.   I have.
20       Q.   And when were you retained?
21       A.   I don't know exactly.  I would have to
22   look at my notes.  Probably February, maybe March
23   of this year.  It was sometime in the spring of
24   this year.
25       Q.   Okay.  And who retained you?

Page 6

C. WARSHAW

1
2     A.   Mr. Yeager.
3     Q.   And how much are you being paid for
4  your services?
5     A.   $275 an hour.
6     Q.   $275?
7     A.   Correct.
8     Q.   And you've put in a report in this
9  case?
10    A.   I have, sir.
11    Q.   I'm handing you what's been marked
12  Deposition Exhibit 1.
13         (Exhibit 1 marked for identification
14         and attached hereto.)
15  BY MR. CARVIN:
16    Q.   I know you also provided an errata and
17  a rebuttal report, but this is your initial
18  principal report in this case?
19    A.   Correct.
20    Q.   And your CV is at the end of this
21  report?
22    A.   I believe so, yes.
23    Q.   Okay.  If you could turn to that,
24  please.
25    A.   Sure.

Page 7

C. WARSHAW

1
2     Q.   And I see that you became an assistant
3  professor at George Washington University in
4  2017?
5     A.   Correct.
6     Q.   Prior to that, you were an associate
7  professor at MIT?
8     A.   Correct.  I was an associate professor
9  without tenure.
10    Q.   And is there a higher ranking,
11  associate versus assistant?
12    A.   In general, associate professor means
13  with tenure.  MIT had an unusual system where
14  before tenure you could get promotion to
15  associate professor.  It's very unusual, and
16  George Washington doesn't have that.  So at
17  George Washington, as at most other universities,
18  before tenure you're just called an assistant
19  professor.
20    Q.   Were you up for tenure at MIT?
21    A.   I would have been up this year at MIT,
22  and I'll be up next year at George Washington.
23    Q.   Did anybody make a decision as to your
24  tenure at MIT?
25    A.   No.

Page 8

C. WARSHAW

1
2     Q.   Why did you leave?
3     A.   My wife has a job with the federal
4  government.
5     Q.   Okay.
6     A.   So it's personal reasons that brought
7  us to D.C.
8     Q.   Okay.
9     A.   I was fortunate to find gainful
10  employment here.
11    Q.   In reviewing your articles, I see
12  you've done articles like the 2017 Election Law
13  Journal about gerrymander's effect on roll call
14  voting and the like.  But have you ever done an
15  article on how to best measure a partisan
16  gerrymander or a partisan bias?
17    A.   I have not.
18    Q.   Have you ever done an article
19  comparing various measures of partisan
20  gerrymandering?
21    A.   I have not.
22    Q.   Have you done any articles or
23  testimony about Democratic concentrations
24  throughout a state and the potential effect that
25  has on political advantage to Republicans?

Page 9

C. WARSHAW

1
2     A.   I don't believe so, but it's possible
3  that's a small part of one of my articles.
4     Q.   And the only other case you list is
5  League of Women Voters v. Pennsylvania?
6     A.   Correct.  That's the only other case
7  in which I've provided an expert report.
8     Q.   Okay.  Have you been involved in any
9  way in any other litigation?
10    A.   I have not provided any expert reports
11  in other litigation.
12    Q.   Right.  But have you been involved in
13  ways where you didn't provide an expert report?
14    A.   No.  I may be involved -- I may in the
15  future be involved and may provide expert reports
16  in other cases but I have not been -- I have
17  never been employed and then, like, not provided
18  an expert report.
19    Q.   Okay.  What other cases would those
20  be?
21         MR. YEAGER:  Objection.  I think we
22      have a federal rules issue here because to
23      the extent the professor has been engaged as
24      a consulting expert in other cases, that
25      would be confidential under the rules.

Page 10

C. WARSHAW

1
2     MR. CARVIN:  That's perfectly fair.
3  BY MR. CARVIN:
4     Q.   I'm not asking you to reveal that.
5  I'll just ask, without revealing the name of the
6  case, have you been involved, retained as a
7  consulting expert in any other litigation?
8     A.   Yes.
9     Q.   And when did that occur?
10    MR. YEAGER:  Wait, wait, wait.  I'm
11    going to object to that question as well
12    because given the run of the national cases,
13    I think if he tells you when out loud you're
14    going to be able to draw some inferences
15    that would violate not only his obligations
16    but the Federal Rule 26 boundaries.
17    MR. CARVIN:  That's fine.
18  BY MR. CARVIN:
19    Q.   Really what I was getting at, I take
20  it none of those have evolved to the situation
21  where you have been identified as an expert in
22  the litigation --
23    A.   That's correct.
24    Q.   -- is that correct?
25    A.   That's correct, yeah.

Page 11

C. WARSHAW

1
2     Q.   And what was the topic or scope of
3  your testimony in the Pennsylvania case?
4     A.   The Pennsylvania case focused on their
5  congressional districting plan.  So it focused on
6  the degree of partisan bias in the plan and the
7  consequences for voters in Pennsylvania.
8     Q.   And that was the topic of your
9  testimony, the partisan bias of the plan?
10    A.   Correct.
11    Q.   And how did you calculate that?
12    A.   I calculated that through the
13  efficiency gap.
14    Q.   Did you calculate the efficiency gap
15  in the same way that you did in this case?
16    A.   I did.
17    Q.   You used endogenous selections?
18    A.   I did.
19    Q.   Okay.
20    A.   Although in both cases I used
21  exogenous selections; in other words,
22  presidential elections as a robustness check and
23  found very similar results, especially in the
24  recent election cycles.
25    Q.   Okay.  I'll come back to that.  So you

Page 12

C. WARSHAW

1
2  used the presidential elections as a robustness
3  check on the results that were produced through
4  the endogenous election?
5     A.   Yes.
6     Q.   And endogenous in Pennsylvania was
7  congressional elections?
8     A.   Correct, sir.
9     Q.   And did you supplement that analysis
10  with either a mean-median or a declination
11  analysis --
12    A.   I did not.
13    Q.   -- of partisan bias?
14    MR. YEAGER:  If I could just --
15    MR. CARVIN:  It's very --
16    MR. YEAGER:  Please. you need to let
17    him finish, then answer.
18  BY MR. CARVIN:
19    Q.   This is typical.  Obviously, you know
20  what my question is going to be, but this poor
21  court reporter has to do a Q and A.  So if you
22  could let me finish my question and then answer,
23  I would much appreciate it.  Okay?
24    All right.  If you could turn to
25  page 6 of your expert report, please.  Beginning

Page 13

C. WARSHAW

1
2  on the bottom of page 5 and top of page 6 you
3  make the obvious point that the way to accomplish
4  a gerrymander is through the classic
5  gerrymandering techniques of packing and
6  cracking.  Is that a fair summary?
7     A.   Yes.
8     Q.   And packing is putting one party in
9  districts where they constitute an overwhelming
10  majority?
11    A.   Yes.
12    Q.   What percentage would constitute
13  packing, in your mind?
14    A.   I don't think there is a particular
15  percentage that either I would -- there is no
16  bright line in my head based on the literature.
17  I think it's a little bit of a qualitative
18  assessment.
19    Q.   And would 75 percent constitute
20  packing?
21    A.   Yes.  In my view, that would.
22    Q.   And you say cracking.  Would cracking
23  constitute putting the disadvantaged party in any
24  minority situation -- for example, a 49 percent
25  district -- would that constitute cracking the

Page 14

C. WARSHAW

1
2  disadvantaged party?
3      A.  I think it could.  But I think that
4  would be obviously a risky cracking procedure.
5  So you would be unlikely to see that in the real
6  world because there are obviously small swings in
7  election results.
8      Q.  What's a generally accepted definition
9  in the academic community for what constitutes a
10 competitive district?
11     A.  I don't think there is a consensus on
12 that in the academic literature.  But I think to
13 the extent -- the modal definition would be one
14 between with around a ten point margin.
15     Q.  Meaning 55 to 45?
16     A.  Correct.
17     Q.  And that's not the consensus view?
18     A.  I don't think there is a single -- I
19 don't think -- I haven't looked at this closely.
20 But thinking about the literature that I can
21 imagine, I think that would be the modal way of
22 doing it.
23     Q.  And I don't understand the word
24 "modal."
25     A.  Sorry.  I think that would be the most

Page 15

C. WARSHAW

1
2  likely.  That would be the most common way of
3  doing it.
4      Q.  Okay.
5      A.  But I don't think there's a universal
6  consensus in the literature in part because the
7  notion of a competitive election is a little bit
8  fuzzy by nature.  Which I think is fine, but
9  there can still be different ways of
10 characterizing that that people use.
11     Q.  So depending on the district or the
12 election cycles, the definition of "competitive
13 district" could extend beyond 55/45?
14         MR. YEAGER:  Objection; incomplete
15 hypothetical.
16     You may answer.
17         THE WITNESS:  I don't think I have a
18 view on that.
19 BY MR. CARVIN:
20     Q.  Okay.  Have you looked at whether
21 representatives from competitive districts tend
22 to be more moderate than representatives from
23 safe districts?
24     A.  I have looked at that, and in general
25 they do not.

Page 16

C. WARSHAW

1
2      Q.  In general --
3      A.  They do not.  They are not more
4  moderate.
5      Q.  They are not more moderate.
6      A.  Yes.  In general, the literature has
7  found that representatives across a range of
8  different district compositions take very similar
9  ideological positions.  That's especially true in
10 state legislatures and to a slightly lesser
11 degree it's true in Congress.
12     Q.  And in Congress, for example, is there
13 any correlation between being in a competitive
14 district and --
15     A.  It's a very small -- it's a very --
16         MR. YEAGER:  Wait.
17 BY MR. CARVIN:
18     Q.  -- and how moderate the representative
19 is?
20     A.  I apologize.
21         Yes, there is a slight correlation in
22 Congress.  I believe in state legislatures there
23 is essentially -- I don't want to say no
24 correlation, but a very small correlation in
25 state legislatures.  And in Congress there's

Page 17

C. WARSHAW

1
2  certainly a small correlation but the substantive
3  size of the effect is very small.
4      Q.  Okay.  And is that something you've
5  researched personally or is this a conclusion
6  you've drawn from reading the literature?
7      A.  That is something I have researched
8  personally.
9      Q.  And have you written an article on
10 this?
11     A.  I have.  For state legislatures it's
12 in my Election Law Journal article.  And for
13 members of Congress, I've looked -- a working
14 paper of mine in the Senate that's not for the
15 Senate that's not published.  I don't think I
16 have a published article that looks at this for
17 Congress, but I think this is well known in the
18 literature.
19     Q.  Okay.
20     A.  There is a very famous article by
21 someone Lee which was published in an economics
22 journal in 2008 that essentially argued there's
23 no relationship between the competitiveness of a
24 district and legislators' positions.  I think
25 that's probably not true.  I think there's, as I

Page 18

C. WARSHAW

1  said, I think a slight correlation.  But the
2  consensus in the literature is the relationship
3  between the competitiveness of a district and the
4  positions that legislators take, particularly in
5  the modern era, is very small.
6      Q.   And Lee is spelled L-e-e?
7      A.   Yes.  I would say that's the most
8  prominent article on the subject.
9      Q.   If you could turn to your footnote 4
10 on page 6 of your report, please.
11     A.   Sure.
12     Q.   "The efficiency gap calculations here
13 focus on wasted votes in legislative elections,"
14 italicized, "since these results directly capture
15 voters' preferences in these elections."
16         Just to be clear, when you say
17 "legislative elections," that means when you're
18 calculating the efficiency gap for Congress you
19 looked at congressional elections; when you were
20 looking at elections for the state house you
21 looked at state house elections; and when you
22 were looking at the state senate you looked at
23 state senate elections?
24     A.   Yes.

Page 19

C. WARSHAW

1      Q.   Okay.  And those are known as
2  endogenous elections?
3      A.   Yes.  In the sense that they are
4  endogenous to the districting plan.  Although
5  there is no guarantee that other statewide
6  elections aren't also endogenous in some way.
7  Any election that's measured after a districting
8  plan goes into place is in some way endogenous
9  since it's post-treatment.
10     Q.   Okay.  Well, I'm using the word
11 "endogenous" to mean elections for the office
12 that we're examining.  Is that a generally
13 accepted definition?  I want to avoid any
14 ambiguity.
15     A.   No.  A generally accepted definition
16 for endogenous is an outcome -- when the outcome
17 variable could be affecting the treatment.
18     Q.   So how would you characterize
19 elections for statewide office such as president,
20 governor and senator that don't relate directly
21 to the offices that you're examining?  Would you
22 call them --
23     A.   I would just call them --
24     Q.   Excuse me.  Would you call those

Page 20

C. WARSHAW

1  exogenous elections?
2      A.   I would call them statewide elections
3  or non-legislative elections.  I'm sorry.  I
4  think there is nothing necessarily exogenous
5  about them if they're measured after the
6  redistricting plan.  If they're measured before
7  the redistricting plan goes into place, then I
8  might call them exogenous.  But then also
9  legislative elections would also be exogenous
10 that are measured before the districting plan
11 goes into place.
12     Q.   All right.  All I'm trying to do is
13 clarify the record on what we're talking about.
14 So if it's okay with you, I'm going to refer to
15 elections for the particular legislative offices
16 at issue as legislative elections and elections
17 other than that as statewide elections.  Is that
18 okay?
19     A.   Sure.
20     Q.   Okay.  And you cite -- Why did you
21 choose legislative elections to measure the
22 various measures -- Oh, let me ask you that
23 first.
24         Did you use legislative elections for

Page 21

C. WARSHAW

1  efficiency gap, mean-median, and declination
2  analysis?
3      A.   Yes, sir.
4      Q.   And why did you do that?
5      A.   Well, I believe the goal of a
6  gerrymander is to maximize a party's seats
7  relative to the number of votes they get.  So I
8  think the target of a gerrymander is the
9  legislative elections.  So I think in general, if
10 you're looking at the actual election results, it
11 makes the most sense to use the election that the
12 gerrymander is actually about, which is the
13 legislative elections.
14     Q.   Okay.  But nonetheless you say:  "We
15 might also calculate the efficiency gap using
16 district-level results from presidential
17 elections or other statewide races.  These have
18 the 'advantage of being mostly unaffected by
19 district-level candidate characteristics.'"
20         And then you cite Stephanopoulos and
21 McGhee's 2015 article in the Chicago Law Review
22 for that proposition.  Is that right?
23     A.   Yes.
24     Q.   Okay.  And why is it an advantage to

Page 22

C. WARSHAW

1  
2  be mostly unaffected by candidate
3  characteristics?
4      A.  Well, you might argue there's some
5  idiosyncratic candidate characteristics that
6  affect elections.  So for instance, if one party
7  nominates somebody who is particularly weak or
8  strong, on the margin that could affect elections
9  by a small amount.
10     Q.  Well, if they are affected by those
11  district-level candidate characteristics, why
12  would you want to ignore them?
13     A.  Well, I think if you're looking at the
14  actual election results, in general you wouldn't
15  because those are all a result of the districting
16  plan.  So for instance, if you have a gerrymander
17  that cracks a party's voters across many
18  districts where they're likely to lose, then the
19  disadvantaged party is likely to nominate weak
20  candidates in those districts.  The best
21  candidates are not going to run in districts
22  where they think they're going to lose.
23         So I think that it's not accidental,
24  then, that you might get weak candidates and that
25  the advantaged party would overperform in those

Page 23

C. WARSHAW

1  
2  districts and the disadvantaged party would
3  underperform.  That's actually a direct result of
4  the gerrymander.
5      Q.  Did that occur in Michigan?
6      A.  I haven't looked explicitly at the
7  actual candidates that ran.
8      Q.  But it's a plausible hypothesis?
9      A.  Sure.
10     Q.  Okay.  And the district-level
11  candidate characteristic that would probably have
12  the most profound effect would be incumbency,
13  right?
14     A.  Yes.  Although the effect of
15  incumbency is much smaller than it used to be.
16     Q.  How much is it?
17     A.  There's the general -- I think
18  consensus in the literature is that it's around
19  three or four percentage points now.  There is an
20  article by Gary Jacobson that was published in
21  the Journal of Politics in I believe 2015 or '16
22  that I view as the best recent article on this.
23     Q.  And what was the conventional wisdom
24  prior to the Jacobson article about the effect of
25  the incumbency advantage's magnitude --

Page 24

C. WARSHAW

1  
2      A.  Well, in the 19 -- I'm sorry, I
3  interrupted you.
4         In the 1970s and '80s the incumbency
5  advantage peaked.  Maybe the early '90s as well.
6  The incumbency advantage peaked at probably
7  around eight points.  However, in the modern era,
8  the incumbency advantage has gradually declined
9  so that in recent House elections, you know, as I
10  said, it's probably only three or four points.
11     Q.  And when you use the word "House," you
12  mean congressional elections?
13     A.  Correct.
14     Q.  Okay.  Have you analyzed the
15  incumbency advantage in state legislative
16  elections?
17     A.  I have actually in an unpublished
18  paper.  In general, the incumbency advantage for
19  state legislative elections is very similar to
20  congressional elections.  I don't have an exact
21  point percentage in my head for state
22  legislatures, but I know both in my work and the
23  literature it's very similar.  So I would expect
24  that what Jacobson found for congressional
25  elections to be very similar for state

Page 25

C. WARSHAW

1  
2  legislative elections.
3      Q.  If I could direct your attention to
4  the last sentence in footnote 4, please.  You
5  say:  "The data indicate that the correlation
6  between efficiency gap estimates based on
7  congressional elections and presidential
8  elections is approximately 0.8 for elections held
9  after 2000 and 0.9 for elections held after the
10  2011 redistricting cycle."
11     A.  Uh-huh.
12     Q.  Just to break this down into its
13  component parts, you're talking about efficiency
14  gap estimates that are based strictly on
15  presidential elections versus those strictly
16  based on congressional elections?
17     A.  Correct, sir.
18     Q.  And what does it mean to --
19     A.  Well, one correction to that.  I'm
20  sorry.  The only -- the only slight way the
21  presidential election would influence the
22  efficiency gap estimates for congressional
23  elections is that the presidential election
24  results are used to impute those shares in
25  uncontested districts.  But, for instance, in

Page 26

C. WARSHAW

1
2  Michigan there is essentially -- there's almost
3  no uncontested elections in Michigan.  Nationwide
4  there are some, but that's certainly a small part
5  of the data.
6      Q.  Okay.  But other than the uncontested
7  elections, you're saying that the correlation
8  between efficiency gap estimates based on
9  congressional elections and those based on
10 presidential elections is approximately 0.8 for
11 elections held after 2000, right?
12     A.  That's correct.
13     Q.  What does that mean?
14     A.  Well, it means in -- you know, we can
15 disagree.  And as I think I said in my rebuttal
16 report, I think it's reasonable for different
17 scholars to have different views on whether we
18 should use legislative or statewide elections,
19 particularly if we're using, say, simulations
20 versus actual election results.
21         But I think in reality the choice
22 isn't all that consequential in the modern era
23 because legislative elections are very similar,
24 you know, follow national presidential elections
25 very closely because voters tend to vote based on

Page 27

C. WARSHAW

1
2  their partisanship, and that leads them to vote
3  very similarly across presidential and
4  congressional elections as these elections have
5  become more nationalized.
6      Q.  But I'm just trying to figure out what
7  does it mean that there is a 0.8 correlation.
8      A.  It means that the efficiency gap
9  estimates are very, very similar whether you use
10 congressional or presidential elections.
11     Q.  It means you'll get it right
12 80 percent of the time?
13     A.  No, sir, that's not what a correlation
14 means.  A correlation means that it explains -- a
15 .8 correlation implies that the variation in the
16 efficiency gap using congressional elections
17 predicts about 64 percent of the variation -- if
18 I do my math right -- in the efficiency gaps in
19 presidential elections.  It's a very high
20 correlation.
21     Q.  64 percent?
22     A.  Correct.  And I've also looked -- I
23 think in some of the footnotes in the text I've
24 actually compared efficiency gaps measured using
25 the legislative -- the congressional elections

Page 28

C. WARSHAW

1
2  with those with presidential elections.  You
3  know, the exact numbers you get, particularly
4  after the 2011 plans went into place in recent
5  years, are very, very similar.
6      Q.  And that's 0.9?
7      A.  Correct.
8      Q.  And what would the predictive
9  percentage be for 0.9?
10     A.  81 percent of the variation.
11     Q.  Okay.  And does that include the 2016
12 presidential elections?
13     A.  I believe it does, but I couldn't say
14 for sure.
15     Q.  What literature are you referring to?
16     A.  Sorry.  Literature?
17     Q.  In your thing you say -- oh, I'm
18 sorry.  The data indicate.
19     A.  I made all these calculations myself.
20     Q.  And is that published anywhere?
21     A.  It's in my report.
22     Q.  Did you provide us the underlying
23 data?
24     A.  I did.
25     Q.  Where is it in the report other than

Page 29

C. WARSHAW

1
2  in this footnote?
3      A.  It's in this footnote.
4      Q.  Okay.  So you said "the data
5  indicate."  This is your own study of relevant
6  data, right?
7      A.  Yes, sir.  It's based on the
8  replication data that I provided for my report.
9  However, I think the general assertion that
10 elections have become more nationalized and
11 there's a stronger correlation between
12 congressional elections and presidential
13 elections today than in earlier periods, and
14 indeed today presidential elections are very
15 closely related to congressional elections.
16 It's a consensus view in the literature.
17         So for instance, you could look at the
18 2015 Gary Jacobson article, and that's one of the
19 reasons that the incumbency advantage has
20 declined so much.  Because people tend to vote
21 with their party, you don't have very many people
22 that are, like, switching back and forth between
23 parties.
24     Q.  What's the percentage of
25 ticket-splitters in Michigan?

Page 30

C. WARSHAW

1
2      A.   I don't know the answer to that.  I
3  haven't looked at that explicitly.
4      Q.   Do you know what percentage of voters
5  in Michigan are registered as independents?
6      A.   In my view, that's not very relevant
7  information.
8      Q.   You can tell me whether it's relevant
9  or not, but if you could answer the question
10  before you tell me why it's relevant.
11      A.   I do not, sir.
12      Q.   And what do you do in off-year
13  elections when there is no presidential election?
14      A.   I use the previous year's presidential
15  election.
16      Q.   For example, is it not well
17  established that in the off-year election
18  following the presidential election the
19  president's party tends to do worse --
20      A.   Yes.
21      Q.   -- in congressional elections?
22      A.   Yes.
23      Q.   So in those circumstances there
24  wouldn't be a correlation between the preceding
25  presidential vote and the subsequent off-year

Page 31

C. WARSHAW

1
2  elections, correct?
3      A.   There would be a very strong
4  correlation, but there would be an intercept
5  shift in general against the president's party.
6      Q.   What is an intercept shift?
7      A.   Intercept shift would be, in general,
8  in all districts, the president's party tends to
9  do a little bit worse than they did during the
10  presidential election year, particularly in the
11  president's first midterm.
12      Q.   Do you know whether Stephanopoulos and
13  McGhee used legislative elections to calculate
14  their efficiency gap numbers?
15      A.   I believe they used legislative
16  elections.
17      MR. CARVIN:  If we could mark this as
18  Exhibit 2.
19      (Exhibit 2 marked for identification
20  and attached hereto.)
21  BY MR. CARVIN:
22      Q.   I've handed you what's a Stanford Law
23  Review article by Stephanopoulos and McGhee which
24  also discusses the efficiency gap.  Have you read
25  this article?

Page 32

C. WARSHAW

1
2      A.   I have, sir.
3      Q.   If you could turn to page 1544 of this
4  article, please.
5      A.   Uh-huh.
6      Q.   I'm going to read you the last -- the
7  first two sentences of the last paragraph on
8  1544.  Stephanopoulos and McGhee state, do they
9  not:  "To start, it is poor methodological form
10  to analyze plans using exogenous election
11  results.  Voters may well behave differently in
12  these elections than when casting their ballots
13  for the office actually at issue."
14      Do you agree with that statement?
15      A.   I agree with them that if you're
16  looking at the actual election results, in
17  general we should look at the target of the
18  gerrymander, which is legislative elections.
19  However, as I said, I think empirically it's not
20  a very consequential decision because the
21  estimates you're going to get using presidential
22  elections or other statewide elections are very
23  similar to what you get with legislative
24  elections.
25      Q.   Have you examined the correlation

Page 33

C. WARSHAW

1
2  between other statewide elections and
3  congressional elections besides president?
4      A.   I have not.  I've only looked at
5  presidential.
6      Q.   Have you looked at the correlation
7  between other statewide elections and state
8  legislative elections?
9      A.   Yes, I did.  For the 1970s and '80s I
10  use that in my imputation model.  I couldn't tell
11  you the exact point estimate of the effect but
12  they are closely related.
13      Q.   Did you do that in this case?
14      A.   I haven't done that for the 2010s
15  because there's not good data available on that,
16  on statewide elections at the statewide
17  legislative district level.
18      Q.   So you haven't done it for any state
19  and you've not done it for Michigan either?
20      A.   I haven't for recent years, correct.
21  I've done it for the 1970s and '80s.  But the
22  data is not available to do that calculation
23  across -- all of the calculations in my report
24  are across all states essentially, or all states
25  where I could get data.  So data on statewide

Page 34

C. WARSHAW

1
2  elections are unavailable across all 50 states.
3  It's possible I could have gotten it for
4  Michigan, but I couldn't have gotten it for other
5  states.
6         MR. CARVIN:  If you could mark this as
7  Exhibit 3, please.
8         (Exhibit 3 marked for identification
9         and attached hereto.)
10 BY MR. CARVIN:
11     Q.   Have you seen this draft?  Is this one
12 of the articles listed in your --
13     A.   I don't believe so.  I don't believe I
14 read this article closely.  It's possible I've
15 seen it at some point, but I certainly have not
16 read it closely.
17     Q.   Okay.  If you could turn to page --
18 well, let me just ask you before we do that, the
19 authors of this article are Krasno, Magleby,
20 McDonald, Donahue and Best, correct?
21     A.   Yes.
22     Q.   And McDonald and Best are the ones who
23 came up with this mean-median differences of
24 partisan bias measure?
25     A.   I believe that's right.

Page 35

C. WARSHAW

1
2      Q.   If you could turn to page 5 of this
3  article, please.
4      A.   I'm glad you printed it double-sided.
5      Q.   If you could look at the middle
6  paragraph with me.  And I'm going to read it to
7  you.  "Finally, because the median-mean
8  comparison explicitly uses election results to
9  measure the partisan complexion in districts its
10 promoters insist that jurisdiction-wide elections
11 such as presidential, U.S., senatorial or
12 statewide constitutional offices, hold the most
13 probative value when comparing the median and
14 mean district percentages."
15         Were you aware that the promoters of
16 the mean-median comparison insist that you use
17 jurisdiction-wide elections?
18     A.   I was not.
19     Q.   And in this case, you did not use
20 jurisdiction-wide elections to calculate the
21 mean-median difference, right?
22     A.   I did not.  But I think I would
23 disagree with this assessment.  I think that
24 regardless of what metric we're using, the target
25 of a gerrymander is legislative elections.  So I

Page 36

C. WARSHAW

1
2  think that I would still focus on legislative
3  election results.
4      Q.   Okay.  If we could go back to --
5      A.   Can I answer that more?
6      Q.   I'm going to ask you more questions.
7         MR. YEAGER:  I'm sorry.  If the
8  witness has more to add --
9         THE WITNESS:  I just want to --
10        MR. YEAGER:  Wait, wait.
11        May I ask that the witness be allowed
12 to finish his answer?
13        MR. CARVIN:  I thought he had given a
14 complete answer, but sure.
15        THE WITNESS:  And the reason for that
16 is there's no necessary -- in the modern
17 era, the choice is inconsequential whether
18 you use statewide or legislative elections.
19 But certainly in earlier years this would be
20 a consequential choice.  For instance, in
21 the South in the 1970s and '80s, they would
22 vote Republican in presidential elections
23 and Democratic in legislative elections.
24        In fact, the correlation between
25 presidential and legislative elections was

Page 37

C. WARSHAW

1
2  not zero but it was relatively small.  So in
3  that case it would make no sense for a
4  legislator to target presidential elections
5  as, like, the target of a gerrymander and
6  use that as their main metric when they knew
7  that presidential elections didn't reflect
8  legislative election results.
9  BY MR. CARVIN:
10     Q.   Well, you say "in earlier years."  But
11 Stephanopoulos and McGhee said in 2018 it was not
12 appropriate to use exogenous elections and
13 McDonald and Best said in 2017 or 2018 it was not
14 proper to use endogenous elections.  So they
15 disagree with you even in the modern world,
16 correct?
17        MR. YEAGER:  Objection; argumentative.
18 Misstates the record.
19        You may answer.
20        THE WITNESS:  I believe that
21 legislative elections are appropriate for
22 all of the gerrymandering metrics.
23 BY MR. CARVIN:
24     Q.   So you disagree with McDonald and
25 Best?

Page 38

C. WARSHAW

1
2    A.   Correct.
3    Q.   So if we could go back to your report,
4 please.  If you could turn to page 13.  I'm
5 looking at Figure 2.  And in this figure you look
6 at, do you not, the national distribution of
7 efficiency gaps for congressional elections with
8 states with more than six seats from 1972 to
9 2016?
10    A.   That's correct.
11    Q.   And when you were computing these
12 national efficiency gaps, were you using
13 congressional election results only?
14    A.   Yes.
15    Q.   If you would turn to page 1 of your
16 report.  You use -- the data you used for this
17 was collected by the Constituency-Level Elections
18 Archive?
19    A.   Yes, sir.
20    Q.   And those were all congressional
21 elections?
22    A.   Correct.
23    Q.   And they were adjusted by CLEA you
24 say?
25    A.   Yes.  In some cases there's typos in

Page 39

C. WARSHAW

1
2 the raw ICPSR data or incorrect district numbers
3 that they fixed.
4    Q.   But it was just typos and the like
5 that they changed?
6    A.   Correct.  They didn't -- Sorry for
7 interrupting you.  Correct.  They didn't change
8 any underlying -- any of the underlying data
9 except to fix typos and incorrect district
10 numbers, things like that.
11    Q.   And then the other thing you said you
12 have here is data on presidential elections and
13 incumbency status in congressional elections.
14       Why did you need presidential election
15 returns?
16    A.   Well, I needed it for two reasons.
17 One was to impute the vote -- to estimate what
18 would have happened in uncontested elections, as
19 we briefly discussed earlier.
20       Then the second reason was to check
21 the robustness of the efficiency gap estimates
22 and other -- well, the efficiency gap estimates
23 that I calculate using legislative elections
24 using presidential elections.
25    Q.   So when you say "calculate the

Page 40

C. WARSHAW

1
2 robustness," when you did that calculation,
3 that's the results you put into the footnote we
4 had previously discussed about that 0.8
5 correlation?
6    A.   Yes.
7    Q.   Okay.  And why did you need -- why did
8 you look at incumbency status?
9    A.   Incumbency status, as we -- again, as
10 we briefly discussed earlier, incumbents tend to
11 do a little bit better in elections.  In the
12 modern era it's only three or four points better,
13 but in the earlier eras there was a larger
14 incumbency advantage.  So certainly if you're
15 imputing the vote share, how incumbents would do
16 in congressional elections, you would want to
17 take that into account.
18    Q.   How did you adjust the congressional
19 election returns to account for incumbency
20 status?
21    A.   Yes, I used that in my imputation
22 model for uncontested districts.  I used the
23 incumbency status in my imputation model for
24 uncontested elections.  So I took that into
25 account when I estimated the Democrats and how --

Page 41

C. WARSHAW

1
2 how -- what percentage of the vote Democrats and
3 Republicans would have gotten if the election had
4 been contested.
5    Q.   So you only looked at incumbency
6 status for uncontested?
7    A.   The model I used is based on contested
8 elections, obviously, because that's how I
9 estimate the incumbency advantage.  But I only
10 changed -- I used the raw election returns for
11 all contested districts.  I think -- I don't
12 have -- I can't remember exactly, but I may have,
13 like, for districts where there was -- you know,
14 the loser got, like, less than 3 percent or
15 5 percent, I might have used the imputation
16 model.  But in general, if they got more
17 than a -- if -- if candidates from each party
18 received more than a de minimis share of the
19 vote, I used the actual election returns.
20    Q.   And I apologize.  I may not have
21 understand that last answer.
22       You not only did this for uncontested
23 elections but also elections where one party
24 received only a de minimis vote?
25    A.   Yes, like 1 or 2 percent.

Page 42

C. WARSHAW

1
2    Q.   Okay.
3    A.   Because I assume those are essentially
4  uncontested.  In many cases, the data -- I did
5  that -- and again I can't remember exactly what
6  that percentage is, but I counted those as
7  uncontested because in many cases those are
8  actually write-in candidates that might have a --
9  you know, the data may say they have a party next
10  to them but in fact they're actually write-in
11  candidates.  So that's why they only received 1
12  or 2 percent.
13    Q.   Okay.  And so if I'm understanding
14  this correctly, you used those 1 or 2 percent
15  elections, you imputed the same way you did --
16    A.   Exactly.
17    Q.   -- for formally uncontested elections.
18  Is that correct?
19    A.   Yes, sir.
20    Q.   Okay.  Do you recall at this point
21  what you used as your cutoff for de minimis?
22    A.   I do not.  It's in my replication
23  code, but I do not -- I don't remember.
24    Q.   Okay.  Now, with respect to state
25  legislative elections, if you could turn to the

Page 43

C. WARSHAW

1
2  bottom of page 2, please.  You say here that
3  there is "a large canonical dataset on
4  candidacies and results in state legislative
5  elections.  I obtained results from the 1972-2016
6  collected by Carl Klarner and a large team of
7  collaborators."  Correct?
8    A.   Yes, sir.
9    Q.   And then it says:  "The results from
10  1972-2012 are based on data maintained by
11  Inter-university Consortium for Political and
12  Social Research."
13        So I'm a little confused.  Is that a
14  different dataset than the one that Klarner and
15  his team put together?
16    A.   No.  Essentially what happened is
17  there's a -- there was a series of National
18  Science Foundation grants that a large team of
19  political scientists worked on to put together
20  this canonical data that Klarner in recent
21  years -- this political scientist named Carl
22  Klarner was the lead, the manager -- the lead
23  political scientist on that project.
24        The data from 1972 to 2012 was funded
25  by the National Science Foundation, and that data

Page 44

C. WARSHAW

1
2  is available freely for download on the ICPSR
3  website.
4        The data from 2013 to '16 was
5  collected privately by Klarner, and you have to
6  contact him to obtain it directly.  It's not
7  available freely for download.
8    Q.   And you did contact him?
9    A.   Yes.
10    Q.   And that's how you got the 2013
11  through 2016 data?
12    A.   Correct.
13    Q.   And just to clarify, you're telling me
14  that the 1972 to 2012 data which is maintained by
15  ICPSR was nonetheless compiled by Klarner and his
16  team?
17    A.   Yes, it was compiled and cleaned by
18  Klarner and his team.  The earlier -- It was
19  compiled in a series of -- "waves" is not quite
20  the right term, but in a series of efforts.  So
21  the earlier -- I think the earliest effort was
22  around 1990.  So, obviously, Professor Klarner --
23  not obviously, but Professor Klarner was not a
24  part of the original team that worked on it in
25  1990 for elections in the 1970s and '80s.  I

Page 45

C. WARSHAW

1
2  don't know who led that effort.  But Professor
3  Klarner has been the lead in recent years.
4    Q.   And I don't see anything here about
5  collecting information on incumbency status with
6  respect to state legislative elections like you
7  reference with respect to congressional
8  elections.  Why is that?
9    A.   That data is in the Klarner dataset.
10  It was, I guess, a typographical omission on my
11  part.  But it's in the Klarner dataset.  It's all
12  part of it.  I didn't quite do that for
13  presidential elections because the election
14  results and the incumbency status come from
15  different datasets, whereas here they all come
16  from one integrated dataset.  But I should have
17  said that explicitly.
18    Q.   Just so I understand the general gist
19  of your report, you analyzed the efficiency gap
20  and these other measures for the 2012, 2014, and
21  2016 elections, correct?
22    A.   Yes.  However, I also calculated them
23  for all elections between 1972 and 2016.
24    Q.   Fair enough.  But what I'm getting at
25  is these are backward-looking calculations.  You

Page 46

C. WARSHAW

1  haven't made any projections for vote totals in
2  the 2018 Michigan congressional or state
3  legislative elections, correct?
4       A.   That's correct.
5       Q.   You haven't estimated the Democratic
6  vote share statewide for any of the three offices
7  at issue, right?
8       A.   No.
9       Q.   And you're not making any
10 district-specific projections?
11      A.   I am not.
12      Q.   Okay.  Now, if you could turn to
13 page 6 of your report, please.
14           MR. CARVIN:  Off the record.
15           (Off the record.)
16 BY MR. CARVIN:
17      Q.   So at various points here you produce
18 various estimates of, for example, where the
19 Michigan redistricting compares to the
20 mean-median difference for prior elections
21 throughout the nation and various other things.
22 Are you representing to me that all of the data
23 underlying this analysis has been provided to the
24 defendant?

Page 47

C. WARSHAW

1       A.   Yes, sir.  I believe that all of the
2  figures, numbers, calculations in my report can
3  be easily generated from the data that I
4  provided.
5       Q.   So they could be calculated.  You
6  didn't produce the actual results.  You produced
7  the data from which one could replicate your
8  analysis?
9       A.   I produced the code that I used.  The
10 person -- readable code that any trained
11 political scientist or economist or statistician
12 could read to regenerate my results.
13      Q.   You did at least one supplemental
14 report, your rebuttal report, involving the
15 connection between degree of voter confidence and
16 the efficiency gap where you provided margins of
17 error.  Did you provide the defendants with that
18 data?
19      A.   I did not provide updated code for
20 that.  However, the underlying data for that was
21 part of my original submission.
22           MR. CARVIN:  All right.  Could we get
23      that updated code from you, please?
24           MR. YEAGER:  Sure.

Page 48

C. WARSHAW

1  BY MR. CARVIN:
2       Q.   I'm not going to stop at each point in
3  this analysis and ask you if you provided it
4  because I think we've covered the territory.  So
5  I'll just ask you as generically as I can to save
6  us time.
7           Have you provided all data in the way
8  you just described relative to all the
9  conclusions in your initial report and with the
10 one exception you mentioned in your rebuttal
11 report?
12      A.   I believe so, yes.
13           MR. CARVIN:  If not, we have a
14      standing request to supplement the data.
15           MR. YEAGER:  Understood.
16 BY MR. CARVIN:
17      Q.   All right.  Back to your report,
18 page 6.
19      A.   Page 6, yes, sir.
20      Q.   You say that "There are a number of
21 approaches that have been proposed to measure
22 asymmetries and the efficiency of the vote-seat
23 relationships of the two parties."  Correct?
24      A.   Yes, sir.

Page 49

C. WARSHAW

1       Q.   And in recent years, at least ten
2  different approaches have been proposed, correct?
3       A.   That's what McGhee asserts in this
4  article.  I think -- I believe that's true,
5  although I couldn't name all ten.
6       Q.   But it's fair to say that the
7  profession is striving for some uniform generally
8  accepted measure of partisan asymmetry or
9  partisan bias?
10      A.   I think the profession is trying to
11 improve our metrics.  I think whether we will
12 ever have one single metric remains to be seen.
13      Q.   But we haven't arrived at that point
14 yet?
15      A.   I think there's differences of
16 opinions about whether we've arrived at that
17 point.
18      Q.   Now, previously it was my
19 understanding that the most accepted consensus
20 measure was the partisan symmetry analysis
21 championed largely by Gary King and Grofman.  Is
22 that fair?
23      A.   Yes.
24      Q.   Has that fallen out of favor in recent

Page 50

C. WARSHAW

1  years?
2
3      A.   I think it has, yes.
4      Q.   Do you subscribe to that method of
5  measuring partisan bias or partisan asymmetry?
6      A.   Well, I didn't use it in my report.
7  So in general, I think it's a little bit -- I
8  think I tend to agree with people that it's
9  fallen out of favor.
10     Q.   And you say all these measures have --
11 are not perfect, I take it, right?
12     A.   That's correct.  I think I can -- I
13 think in general that's because the latent
14 variable here, the theoretical concept that we're
15 trying to measure, which is the partisan bias --
16 I know that's one of the terms also that Gary
17 King uses, but I'll use in a more -- I use it in
18 my report in a more general way.
19          In my view, what a gerrymander is
20 trying to do is to -- a party is trying to
21 maximize the number of seats they get relative to
22 the votes.  And there's a -- this leads to this
23 theoretical concept of partisan bias.  And
24 because this is a theoretical concept, I think,
25 you know, all of the empirical measures are just

Page 51

C. WARSHAW

1
2  proxies for this theoretical concept.
3          And indeed, you know, none -- we'll
4  never have an approach that is exactly perfect,
5  but that's true for most political science
6  concepts that we're trying to measure.  You know,
7  all social science measurements are
8  simplifications of some theoretical concept we're
9  trying to measure.
10     Q.   Okay.  And you're using the efficiency
11 gap as your main measure of this theoretical
12 concept?
13     A.   That's correct.
14     Q.   And that was first proposed by
15 Stephanopoulos and McGhee in the 2015 University
16 of Chicago Law Review article?
17     A.   That's not exactly right.  It was
18 actually proposed by Eric McGhee in a
19 peer-reviewed article in the Journal of
20 Legislative Studies Quarterly in 2014.
21     Q.   Okay.  And --
22     A.   And then the Stephanopoulos and McGhee
23 article focused on expanding the description of
24 it and then applying it, trying to build a legal
25 standard that they advocated.  But the

Page 52

C. WARSHAW

1
2  original -- the original measure was actually
3  developed by Eric McGhee.
4      Q.   Okay.  And the Chicago Law Review is
5  not a peer-reviewed journal, right?
6      A.   That's correct.
7      Q.   And during the two and a half years or
8  three years since its proposal it's received a
9  lot of scholarly criticism in the Political
10 Science Academy.  Is that correct?
11     A.   I think there has been a robust
12 discussion of the merits of different measures
13 with some of that centering around criticism of
14 the efficiency gap.
15     Q.   Okay.  If you could turn back to
16 Exhibit 2.
17     A.   Which one is that?
18     Q.   I'm sorry.  The Stanford Law Review
19 article.
20     A.   Great.
21     Q.   And again, this is the Stanford Law
22 Review article by Stephanopoulos and McGhee
23 themselves, right?  And at the top of 1508 they
24 say --
25          MR. YEAGER:  Hold on just one moment,

Page 53

C. WARSHAW

1
2  please.
3          MR. CARVIN:  Sure.
4          MR. YEAGER:  Thank you.
5  BY MR. CARVIN:
6      Q.   Stephanopoulos and McGhee say that
7  "The academic discussion of the efficiency gap
8  includes a number of criticisms of the measure."
9  Is that accurate?
10     A.   Yes.
11     Q.   And then they list, I believe, at
12 least five scholarly articles criticizing the
13 efficiency gap?
14     A.   Yes, that's correct.
15     Q.   And they cite an article by Cho, by
16 Best, by Krasno and colleagues, by John Nagle.
17          Are these critics well-respected
18 political scientists?
19     A.   Yes, sir.
20     Q.   And then also by Christopher Chambers.
21 Is he a well-respected political scientist?
22     A.   I don't know him, to be honest.  I
23 couldn't say.  I assume -- I'll take it as a
24 supposition.
25          MR. YEAGER:  Could I just clarify.  I

Page 54

C. WARSHAW

1
2  don't think the witness was saying he
3  doesn't know Mr. Chambers, to be honest.
4      MR. CARVIN:  I take your point.
5      THE WITNESS:  Outside of this paper,
6  I've never -- outside of this citation, I've
7  never heard of Professor Chambers.
8  BY MR. CARVIN:
9      Q.   Okay.  So Cover says that one
10  criticism is it favors uncompetitive elections.
11  Is that a fair criticism?
12      A.   In my view, it's not.
13      Q.   And why is that?
14      A.   What Stephanopoulos and McGhee show
15  here is there is no empirical correlation,
16  particularly in state legislative elections,
17  between the efficiency gap and the
18  competitiveness of the elections.  Indeed, I
19  think thinking about it beyond the actual data,
20  thinking about it at a more theoretical level,
21  there's many ways in which a state could achieve
22  a neutral efficiency gap.  There's no reason that
23  competitive elections are the only or even the
24  best path to achieve it.
25      Q.   But you say there's no correlation

Page 55

C. WARSHAW

1
2  between competitive election districts and the
3  efficiency gap?
4      A.   Yeah.  That's on page 1523 of this
5  article.
6      Q.   Right.  And in there they're making
7  the point that they're not trying to capture in
8  the efficiency gap whether or not election
9  districts are competitive, right?  That's a
10  separate inquiry?
11      A.   That's correct.
12      Q.   Okay.
13      MR. CARVIN:  If you could mark that
14  Exhibit 4.
15      (Exhibit 4 marked for identification
16  and attached hereto.)
17  BY MR. CARVIN:
18      Q.   Now I've handed you Exhibit 4.  This
19  is an article by Best and others, "Considering
20  the Prospects for Establishing a Packing
21  Gerrymandering Standard."
22      You cite this article in your report,
23  do you not?
24      A.   I can't remember off the top of my
25  head.

Page 56

C. WARSHAW

1
2      Q.   Why don't you go check your report.
3      A.   It looks like I do.
4      Q.   And again, Best and his co-authors are
5  well-respected political scientists?
6      A.   Yes, I believe they are.
7      Q.   And Best and McDonald came up with the
8  median-mean difference that you partially rely on
9  in your report?
10      A.   Yes.
11      Q.   Okay.  If you could turn to page 5 of
12  this article.  I'm reading now from their middle
13  paragraph where they're discussing the efficiency
14  gap, are they not?
15      A.   Yes, I believe so.
16      Q.   And they say:  "It runs into
17  manageability difficulties in two regards (1) it
18  assumes wasted votes are to be counted in an odd
19  way, and (2) it has no secure baseline for
20  establishing the degree of wasted votes that
21  indicates a gerrymander."
22      Do you see that?
23      A.   Yes.
24      Q.   Let's start with the second
25  proposition.  Do you agree that the efficiency

Page 57

C. WARSHAW

1
2  gap has no secure baseline for establishing the
3  degree of wasted votes that indicates a
4  gerrymander?
5      A.   In my view, there's no bright line for
6  any of the metrics that would establish a
7  gerrymander based on one metric alone.
8      Q.   So as to the efficiency gap, the
9  mean-median difference and declination, there's
10  no baseline for separating an impermissible
11  gerrymander from a tolerable result?
12      A.   I think you have to look at a number
13  of different factors.  As in Michigan, I think
14  that all of those point in the same direction,
15  that this is an extreme partisan gerrymander.
16  But there's no single number where I would say
17  above 5 percent or something is definitely a
18  gerrymander.
19      Q.   So there is no well-accepted view in
20  the profession about what efficiency gap score
21  renders a redistricting plan unacceptable or an
22  extreme partisan gerrymander?
23      A.   That's correct.
24      Q.   And the same is true of both the
25  mean-median difference and the declination

Page 58

C. WARSHAW

1
2   scores?
3       A.   That's correct.
4       Q.   Then it discusses effectiveness
5   difficulties -- I'm now back to the preceding
6   paragraph -- arise for three reasons.  And the
7   first reason they give are votes are wasted for
8   reasons other than gerrymandering.
9           Do you agree with that?
10      A.   Yes.  Certainly I think that a number
11  of factors affect election results, and those can
12  influence the efficiency gap estimates as they do
13  any of the other metrics to some degree.
14      Q.   Then it says:  "The wasted vote gap
15  co-varies with a party's vote percentage."
16          Do you agree with that?
17      A.   I don't necessarily agree.  I haven't
18  run a regression that tests that statement,
19  although I certainly -- we certainly -- I
20  certainly could.  My -- I know in the
21  Stephanopoulos and McGhee, in their article they
22  argue that's not necessarily true, in their
23  Stanford Law Review article.
24          And in my qualitative assessment of
25  just spending a lot of time with the data,

Page 59

C. WARSHAW

1
2   there's nothing -- there's nothing in looking at
3   the data and building lots of graphs and running
4   lots of, you know, different types of analyses
5   that would lead me to believe that.  But I
6   haven't done that analysis explicitly, so I
7   couldn't say for sure.
8       Q.   Okay.  And what does that mean in
9   English, that it "co-varies with a party's vote
10  percentage"?
11      A.   Well, I think their assertion here is
12  that there's some necessary relationship between
13  the efficiency gap and the differential and
14  wasted votes and the party's percentage of the
15  statewide vote.  But I certainly mathematically
16  that's not true.  The efficiency gap is not -- is
17  not calculating the vote share.  It's calculating
18  the differential between the number of votes you
19  get and the number of seats you get via the
20  wasted votes.
21          So certainly no mathematical, you
22  know, relationship that would presume -- that
23  would imply this to be true.  And like I said, my
24  understanding of the data does not lead me to
25  think it's true either, but I couldn't say for

Page 60

C. WARSHAW

1
2   sure.
3       Q.   And then the third criticism is:  "The
4   method seeks to cover both cracking and packing
5   gerrymanders in one calculation and thereby can
6   allow some amount of cracking to disguise an
7   undue amount of packing."
8           Do you agree with that?
9       A.   Clearly the method seeks to cover both
10  packing and cracking.  I would have to think more
11  about the second half of that sentence.  I don't
12  have a view on -- a necessary view on the second
13  half of the sentence.  But the first half is
14  certainly true, that the efficiency gap
15  incorporates both packing and cracking.
16      Q.   All right.  To hopefully save some
17  time, I would like you to turn to page 6.  I'm
18  going to give you a chance to read this to
19  yourself beginning with the sentence in the
20  middle of the paragraph "In a three-district
21  state."  If you could read the next couple of
22  sentences, and then I can ask you some questions
23  about that.  Okay?
24          MR. YEAGER:  Just so we're clear,
25  you're talking about two sentences or three

Page 61

C. WARSHAW

1
2   that you want us to focus on here?
3           MR. CARVIN:  Three.
4           MR. YEAGER:  Okay.  Thank you.
5   BY MR. CARVIN:
6       Q.   Professor, have you had an opportunity
7   to read that?
8       A.   I need another minute.
9       Q.   Sure.  Just to be clear, please
10  indicate to me when you've had enough time to
11  digest that.
12      A.   Yes, I'm thinking.
13      Q.   Sure.
14      A.   Okay.
15      Q.   In the example they give, do they not,
16  is they give three relatively competitive
17  districts, and they point out that an 8.3 gap in
18  favor of the majority party turns into an 8.3 gap
19  against the majority party if the vote shifts
20  during the decade four points in one direction.
21  Is that correct?
22      A.   I'm sorry, the four points -- oh,
23  turns into -- yes.  Although I'm not sure -- I'm
24  not sure about the eight-point calculation, if
25  that's correct.  But trying -- I was having a

Page 62

C. WARSHAW

1 
2 tough time doing the math in my head.  But I
3 don't think that's correct.
4         But putting that aside, yes.  I mean,
5 I think the bottom line, their criticism here is
6 that the efficiency gap estimates are sensitive
7 to small variations in who actually wins each
8 seat.  But in my view that's a virtue, not a
9 vice.  I mean, in our single-member -- in our
10 single-member districts with first-past-the-post
11 elections the winner of an election is the person
12 that gets 50 percent plus one.  And that has
13 enormous consequences for the partisan and
14 ideological composition of legislature and
15 therefore the roll call votes that legislators
16 take and the policies that are passed by our
17 government.
18         So I think taking into account who
19 actually wins the election is not necessarily a
20 bad thing.  And yes, if you have uniform swings,
21 that will affect the efficiency gap, but the
22 authors of a gerrymander are aware of the
23 likelihood of different types of uniform swings.
24         So in -- surely you can have uniform
25 swings across elections, but the most likely

Page 63

C. WARSHAW

1 
2 outcome is the one that the authors of a
3 gerrymander are planning based on.  So I think
4 it's a little bit unrelated to the main point
5 here just to point out in various hypothetical
6 scenarios what might happen with different
7 uniform swings.
8     Q.   Well, if you're worried about the
9 durability of a gerrymander, one gerrymandering
10 technique is to have relatively thin majorities
11 for the favored party and then pack the
12 disfavored party into safe districts.  If they
13 miscalculate or the electorate shifts during the
14 decade, then what would be viewed as -- in this
15 case we'll use Republican districts, would become
16 Democratic districts, correct?
17     A.   Yes.
18     Q.   And therefore one of the concerns they
19 raise is that if you attribute a very negative
20 efficiency gap score to districts that are, say,
21 51/49, that will create a false positive where
22 that district could change very rapidly and the
23 efficiency gap score would disappear, indeed
24 shift to the other side, correct?
25         MR. YEAGER:  Objection; incomplete

Page 64

C. WARSHAW

1 
2 hypothetical and misstates the evidence.
3         THE WITNESS:  Well, I'm not sure I
4 completely followed the hypothetical you
5 just said.  But I'll just say at a general
6 level, I think that the -- there is going to
7 be variation within cycles in the efficiency
8 gap, particularly if you only have three
9 districts.  But to my knowledge, there are
10 no state legislators -- legislatures in the
11 United States that only have three
12 districts.
13         And my analysis of congressional
14 districts, I believe following other people
15 that have looked at the efficiency gap,
16 focuses on states with more than five or six
17 congressional districts; in my case, more
18 than six.  For exactly this very reason,
19 that the efficiency gap estimates are going
20 to be more stable when there's more
21 districts.
22         Clearly, if you only have three
23 districts, it's going to -- the efficiency
24 gap could be sensitive to idiosyncratic
25 variation in election results, which is why

Page 65

C. WARSHAW

1 
2 in my analysis I didn't actually look at
3 states with only three districts.
4 BY MR. CARVIN:
5     Q.   Well, that's fair enough.  Perhaps the
6 magnitude of the difference will be different.
7 But let's go to the last sentence on the opposite
8 column.  All right?
9         And the authors say, do they not, that
10 the efficiency gap "overreaches when it offers a
11 false positive reading of gerrymandering by
12 indicting a districting plan as a gerrymander
13 because it has many competitive districts that
14 slightly favor one party..."
15         And since it does indict districts
16 that are competitive, as a gerrymander they may
17 be condemning things as gerrymanders that could
18 shift if these competitive districts shift in the
19 next election.  Is that a fair criticism?
20         MR. YEAGER:  Objection; misstates the
21 record.
22         You may answer.
23         THE WITNESS:  Again, thinking of this
24 at a more abstract level, I think my view is
25 that if a gerrymander were to draw all

17

Page 66

C. WARSHAW

1
2   the -- or to draw a large number of
3   districts where they expected to win
4   54 percent of the vote, those might be
5   termed competitive districts depending on
6   your metric of competitive districts.
7   However, the expected -- the most likely
8   outcome would be that the favored party
9   would win most or all of those districts.
10  BY MR. CARVIN:
11      Q.   Right.
12      A.   So in fact that would be a
13  gerrymander.  Which is why I think that
14  looking -- trying to conflate competitiveness and
15  partisan bias is -- those are two different
16  values.  And the goal of a gerrymander in general
17  is to maximize the partisan bias in terms of the
18  translation of votes to seats.  And they might do
19  that -- one optimal way to do that is to do that
20  by creating many relatively competitive
21  elections.  And on average they're going to be
22  advantaged in the translation of votes to seats.
23          I wouldn't want to throw out that kind
24  of situation merely because we thought that a
25  54 percent election was competitive, because

Page 67

C. WARSHAW

1
2   that's -- that's ignoring the fact that the most
3   likely outcome in most scenarios is the favored
4   party will win that election.
5      Q.   Fair enough.  But just to get to the
6   two points we can agree on, a 52/48 district has
7   a very poor efficiency gap score, right?  It says
8   that the disadvantaged party has wasted 46 votes
9   in that?
10      A.   I think 48 in the hypothetical you
11  just gave.
12      Q.   48.  And in relative terms, 46 because
13  the majority party is only --
14      A.   I see what you're saying.
15      Q.   -- wasting two points.  Is that fair?
16      A.   Yes, sir.
17      Q.   Okay.  So we agree that those kinds of
18  districts perform very poorly in terms of the
19  efficiency gap, correct?
20      A.   Sure.  The disfavored party is wasting
21  a lot of votes in those districts.  Which is one
22  of the reasons why cracking voters across these
23  district is such a good strategy for the favored
24  party.
25      Q.   Right.  Well, it could be a good

Page 68

C. WARSHAW

1
2   strategy in 2012 if an incumbent dies or if there
3   is a relatively minor shift in the state or you
4   have an off-year election following a
5   presidential win.  Then those districts that
6   slightly favor Republicans could favor Democrats
7   and Democrats can win those seats, correct?
8      A.   Surely.
9      Q.   I've got two more questions and then
10  would that be a convenient time for a break?  I'm
11  going to move on to a new topic.
12          MR. YEAGER:  Is that okay with you,
13  Professor?
14          THE WITNESS:  Yes, sir.
15  BY MR. CARVIN:
16      Q.   Did you use the full method efficiency
17  gap?  Are you familiar with that term?
18      A.   I'm not sure -- I can't remember how
19  Stephanopoulos and McGhee -- the terms have
20  shifted a little bit.  But I use what I call the
21  turnout adjusted model that incorporates --
22  accounts for differential turnout across
23  districts.
24      Q.   So you do account for differential
25  turnout --

Page 69

C. WARSHAW

1
2      A.   Correct.
3      Q.   -- in your analysis?
4      A.   I do that for all three legislative
5   chambers.
6      Q.   And then if you could turn to page 15
7   of your report, please.
8      A.   I'm happy to talk -- I should say one
9   of the consequences of that decision is that it
10  means that, compared to a non-turnout adjusted
11  estimated efficiency gap, my estimates are a
12  little bit more pro-Democratic.  So in other
13  words, it gives you -- it's going to create a
14  little bit less, like, pro-Republican
15  gerrymandering or something than if you didn't
16  account for turnout since Democrats tend to have
17  lower turnout in districts they win.
18      Q.   But you think it's the better
19  analysis?
20      A.   Exactly.  I view it -- I view it as
21  the better analysis even though here it certainly
22  cuts against the incumbent conclusions in the
23  report.
24      Q.   At the top of page 15 under the
25  bracket heading you say:  "Of course the

Page 70

C. WARSHAW

1
2  efficiency gap can be nonzero and differ across
3  states for reasons unrelated to the drawing of
4  district lines such as variations in how
5  different demographic groups are distributed
6  across geographic space."
7       Do you see that?
8    A.  Yes.
9    Q.  You didn't analyze how Democratic
10  groups are distributed across geographic spaces
11  in Michigan, did you?
12   A.  No.
13   Q.  "The efficiency gap can also be
14  affected by the intentional drawing of district
15  lines to accomplish goals other than maximizing
16  partisan seat share such as ensuring the
17  representation of racial minorities."
18       Is that right?
19   A.  Yes.
20   Q.  And the reason that is is because, as
21  we can see from the majority black districts in
22  Michigan, all of those are heavily packed
23  Democratic districts, right?
24   A.  I haven't looked at that in my
25  analysis.  But from my knowledge of other states,

Page 71

C. WARSHAW

1
2  I will take that as probably true.
3    Q.  Can you identify the counties or
4  localities or municipalities in Michigan that
5  have the highest Democratic concentrations?
6    A.  At a general level I could.  The city
7  of Detroit I'm sure is heavily Democratic, as in
8  general are other cities, particularly those with
9  many racial minorities or union members and
10  things like that.
11   Q.  Do you know where those are?
12   A.  I could name cities in Michigan, but
13  I'm not -- I'm not -- I don't -- I don't claim to
14  be -- to know the distribution of voter groups
15  across Michigan in detail.
16   Q.  Do you know what county Detroit is in?
17   A.  Wayne County?
18   Q.  Are you asking?
19   A.  I think it's Wayne County.
20   Q.  So if it is true that Democrats are
21  clustered naturally either because of demographic
22  factors or because of the effects of creating
23  majority black districts, the only way to avoid
24  an efficiency gap, an anti-Democratic efficiency
25  gap, would be to draw districts that break up

Page 72

C. WARSHAW

1
2  those natural clusters, right?
3    A.  I don't necessarily agree with that.
4  I haven't analyzed that in depth.  I know other
5  reports -- I know the work of other experts in
6  this case speak to that.  I don't have a view on
7  the matter.
8    Q.  And have you read those reports?
9    A.  I've read parts of Professor Chen's
10  report.  I have not read Professor Mayer -- I
11  think I read the introduction of Professor
12  Mayer's report, but I haven't read his report in
13  any depth.
14       MR. CARVIN:  This would be a
15  convenient time for a break.
16       (Recess taken.)
17  BY MR. CARVIN:
18   Q.  If you could turn in your report to
19  page 18, please, Professor.
20   A.  Sure.
21   Q.  And you're discussing here the
22  efficiency gaps in Congress, and you say these
23  efficiency gaps imply that the Republicans in
24  Michigan won two to three more seats in these
25  elections than they would have if Michigan had no

Page 73

C. WARSHAW

1
2  partisan bias in its efficiency gap.  Then you
3  cite Stephanopoulos and McGhee's 2015 article and
4  say that has similar estimates.  Is that correct?
5    A.  Yes.  I believe both their article and
6  The Brennan Center place seats -- estimate the
7  number of seats that the efficiency gap -- you
8  know, put the efficiency gap in seat terms.
9       (Exhibit 5 marked for identification
10       and attached hereto.)
11  BY MR. CARVIN:
12   Q.  If you could look at Exhibit 5,
13  please, which has just been handed to you.
14   A.  Sure.
15       MR. YEAGER:  Did you send me one?
16       MR. CARVIN:  Sorry.
17  BY MR. CARVIN:
18   Q.  And this is the University of Chicago
19  Law Review article you referenced on page 18?
20   A.  Yes, I believe that's true.
21   Q.  Okay.  Now, it did estimate that the
22  efficiency gap in Michigan was more than two
23  congressional seats, right?  Why don't you turn
24  to page 890.
25   A.  890?  I think 879 is the one where

Page 74

C. WARSHAW

1
2  they showed the efficiency gap in Michigan is
3  three seats, according to their graph.
4      Q.   Okay.  But they nonetheless said that
5  Michigan's congressional map was not crossing
6  their threshold of a presumptively invalid
7  efficiency gap -- and I'm reading from the
8  article -- because "the sensitivity testing shows
9  that plausible shifts in voter sentiment could
10 result in the Michigan, North Carolina, and Texas
11 plan advantaging Democrats instead."
12     Is that true?
13     A.   That's what they say in this article.
14 I haven't analyzed that.
15     Q.   You haven't analyzed whether or what
16 kind of plausible shifts in voter sentiment will
17 occur in Michigan in future congressional
18 elections, right?
19     A.   Correct.
20     Q.   And on page 889 of the same article it
21 says in the second sentence of the first full
22 paragraph:  "We recommend the sensitivity testing
23 because, as we have stressed, a plan's efficiency
24 gap may change substantially from one election to
25 the next."  Correct?

Page 75

C. WARSHAW

1
2      A.   Yes, that's true in theory.  But the
3  efficiency gap in Michigan has stayed relatively
4  stable over the past three election cycles.
5      Q.   We're going to discuss that.
6      But the authors of this article stress
7  that a plan's efficiency gap may change
8  substantially from one election to the next.  Do
9  you disagree with that as a general proposition?
10     A.   No.
11     Q.   We'll come back to how much it's
12 changed in Michigan.
13     They recommend the sensitivity test is
14 to take into account whether under realistic
15 voter shifts the efficiency gap could actually
16 favor in this case the Democrats, correct?
17 That's their sensitivity test?
18     A.   I believe that's true.
19     Q.   And you've not done any sensitivity
20 testing to determine whether or not the
21 efficiency gap could be zero or close to zero in
22 the 2018 or 2020 elections, right?
23     A.   I have not.  My entire report focuses
24 on actual observed elections, where we now have
25 three elections since the 2011 plan went into

Page 76

C. WARSHAW

1
2  place.
3      Q.   Right.
4      A.   I don't look at hypothetical
5  elections.
6      Q.   Right.  Well, the fact that there's
7  elections in 2018 is not hypothetical; they just
8  haven't occurred yet.  Right?
9      A.   Fair.  Yes.
10     Q.   And you're not making any projections
11 about what will happen --
12     A.   That's correct.
13     Q.   -- in future elections?
14     A.   That's correct.
15     Q.   If you turn to page 864 of this
16 article.  If you read the fourth sentence in the
17 first full paragraph on 864, it says:
18 "Specifically, a plan's efficiency gap in one
19 election is a relatively weak predictor of its
20 gap in the next election (coefficient equals
21 0.23) in a model that also includes a variety of
22 other factors."
23     Is that correct?
24     A.   I haven't -- I couldn't say for sure.
25 I haven't looked at -- what I say -- what I show

Page 77

C. WARSHAW

1
2  in my report is that in recent election cycles,
3  the efficiency gap in 2012 is a very good
4  predictor of the efficiency gap in 2016, and
5  that's what I've -- that's what I've looked at.
6      Q.   In Michigan?
7      A.   Not just in Michigan but across the
8  country.
9      Q.   Okay.  So you disagree with the
10 creators and authors of the efficiency gap about
11 whether or not a plan's efficiency gap in one
12 election is a relatively weak predictor of its
13 gap in the next election?
14     A.   Their analysis may be based on all of
15 the elections over the past, you know, 45 years,
16 which I haven't looked at.
17     Q.   Do you know whether or not they were
18 looking at it for the past 45 years?
19     A.   I don't know.  I'd have to -- I assume
20 so.
21     Q.   This article was written in --
22     A.   I think their -- their analysis, like
23 mine, looks at plans, I think over the course of
24 the 1970s, '80s, '90s, 2000 and 2012.  And I did
25 some -- it's not shown in my report, but I did

Page 78

C. WARSHAW

1  
2  some, you know, just exploratory analysis that
3  suggests that the relationship is a little bit
4  weaker in earlier decades.  I couldn't say
5  exactly what it is.  But certainly in recent
6  elections the relationship is quite strong
7  between the efficiency gap after a plan --
8  immediately after a plan goes into place and
9  mid-decade.
10     Q.   And you say you didn't put that in
11  your report?
12     A.   I didn't.  I didn't make -- I thought
13  the most relevant piece was what happens after
14  the 2011 plans went into place since those are
15  the plans that we're focused on.
16     Q.   And the analysis in your report is of
17  the relationship between the 2012 and 2016
18  election results, right?
19     A.   Exactly.
20     Q.   Which you characterize as similar?
21     A.   Yes.
22     Q.   Okay.
23     A.   I believe that's true.
24     Q.   And they went from 19.7 efficiency gap
25  in 2012 to 13.2 in 2016?  We come back to this if

Page 79

C. WARSHAW

1  you want.
2     A.   I would have to look at my report for
3  the precise numbers.
4     Q.   But that's what you considered a very
5  strong correlation?
6     A.   Yes.
7     Q.   6 percent change in efficiency gap?
8     A.   Yeah.  Those are very both very --
9  both very pro-Republican efficiency gaps.  I
10  mean, to be clear, what they talk about in this
11  article is the odds that a pro-Republican
12  efficiency gap would become a pro-Democratic
13  efficiency gap.
14     Q.   Right.
15     A.   And, of course, in Michigan we see
16  nothing like that.  The efficiency gap has
17  fluctuated a little bit, as of course any of
18  these measures will do in real-world election
19  results.  But on balance it shows a very
20  pro-Republican map now as it did in 2012.
21     Q.   But you consider a --
22     A.   I don't have a different view, I
23  should say.  If it had gone -- if the efficiency
24  gap had gone from negative 20 percent to positive

Page 80

C. WARSHAW

1  
2  10 percent or something, I mean, I might have a
3  different view.  But, you know, despite many
4  different election results, 2012 was a very good
5  year for Democrats.  2014 was a very bad year for
6  Democrats.  2016 was somewhere in the middle in
7  terms of their vote share.  Across all of those
8  different scenarios the efficiency gap in
9  Michigan has looked relatively similar.
10     Q.   Relatively similar.  I just want to
11  make sure that you consider 6.5 percent change
12  similar.
13     A.   Yeah.
14     Q.   So 13.2 percent would be similar to
15  6 percent?  That's a 6 percent change,
16  6.5 percent change?
17     A.   I think that -- I don't have a view on
18  that.  But in thinking about it, a couple
19  percentage point change I think is a relatively
20  small change.  I wouldn't want to put a precise
21  number on what I viewed as the small change.
22  Within a couple percentage points is --
23     Q.   What about 6.5 percent?
24     A.   I think -- I think I would view that
25  as relatively similar.

Page 81

C. WARSHAW

1  
2     Q.   Not similar?
3     A.   No, I said I would view them as
4  relatively similar.
5     Q.   But not similar?
6     MR. YEAGER:  Objection; misstates the
7  testimony.  Asked and answered.
8  BY MR. CARVIN:
9     Q.   Would you view them as similar?
10     MR. YEAGER:  Asked and answered.
11     THE WITNESS:  I believe the word
12  "similar" is in my report.  I don't...
13  BY MR. CARVIN:
14     Q.   And you're standing by that?
15     A.   I stand by that.
16     Q.   Okay.  So I'm going to ask you again.
17  Have you analyzed whether a plan's efficiency gap
18  in one year is a weak predictor of gaps in the
19  next election year?  Have you assigned a
20  coefficient from one election to another?
21     A.   No.  What I show in my report, though,
22  is that there is a .78 correlation, I believe, in
23  congressional plans and a .68 correlation in
24  state legislative plans between the efficiency
25  gaps in 2012 and '16, which suggests that the --

Page 82

C. WARSHAW

1   certainly for the congressional plans the
2   majority -- the vast majority -- I don't want to
3   say vast, but the majority of the variation in
4   2016 efficiency gaps can be predicted based on
5   the 2012 gaps.
6       Q.   And you looked at three election
7   cycles?
8       A.   Correct.
9       Q.   Do you disagree with the authors'
10  conclusion with respect to efficiency gaps in
11  general that as a practical matter it tends to
12  fluctuate?
13      A.   Yes.  Because, as we talked about
14  earlier, the efficiency gap is sensitive to, you
15  know, the actual winner of a seat.  So, you know,
16  as the winner of a seat can fluctuate due to
17  election, you know, fluctuation -- uniform swings
18  or idiosyncratic factors the efficiency gap is
19  going to change.  That variation will get
20  smaller, in general, as the number of seats
21  increase.
22      Q.   So you agree with them?
23      A.   Yes.  And that's why -- and that's why
24  I stated in my report that I think no -- no

Page 83

C. WARSHAW

1   metric is perfect, including the efficiency gap.
2       Q.   Right.
3       A.   I think all of these metrics have
4   weaknesses, and that's one of the weakness,
5   perhaps the most important weakness of the
6   efficiency gap.
7       Q.   Okay.  So you agree with the
8   efficiency gap's potentially more important
9   limitation is instability as the authors state at
10  page 864?
11      A.   I do think that's a weakness.  But I
12  think one -- one area where I would disagree with
13  the authors is that elections have consequences.
14  Even if a measure is -- even if -- even if future
15  elections can't be predicted precisely -- and I
16  also think, you know, going back to even the
17  Gelman and King 1994 article, it's
18  longstanding -- it's long been known that the
19  consequences of a gerrymander decay somewhat over
20  time due to changing election circumstances.  No
21  one can predict the future precisely.  So I don't
22  think that's necessarily a new point.
23           So, for instance, in Michigan the
24  efficiency gap decreases a little bit.  And

Page 84

C. WARSHAW

1   that's been a longstanding finding in the
2   literature.  But I think that each election has
3   consequences.
4       Q.   Right.
5       A.   So I don't think we should focus -- I
6   don't think our burden of proof should be that
7   the 2020 -- the efficiency gap in 2020 has to be
8   exactly the same as 2012.
9       Q.   You don't think so?
10      A.   To evaluate a gerrymander.  I think
11  that's not -- when parties are trying to maximize
12  their seats, I think that's not what they're
13  trying to do.  They're trying to -- they can only
14  see so far into the future, and they're trying to
15  maximize their seat share knowing -- with the
16  information they have.
17      Q.   Fair enough.  The court can't do
18  anything about the 2016 elections, right?
19           MR. YEAGER:  Objection; calls for a
20  legal conclusion.
21  BY MR. CARVIN:
22      Q.   You're not advocating or you're not
23  understanding anybody to advocate that we throw
24  out the winners of the 2016 election, right?

Page 85

C. WARSHAW

1       A.   That's correct.
2       Q.   And you don't understand this case to
3   involve enjoining the 2018 elections, right?
4       A.   I don't know.
5       Q.   You don't know?  It's August of 2018.
6   I'm telling you that no one is seeking to stop
7   the 2018 elections in this litigation.  Okay?
8           If that's true, then the only election
9   that matters relative to this litigation is the
10  2020 election, right?
11      A.   (Nodding head.)
12      Q.   I need a verbal response.
13      A.   Yes.
14      Q.   Okay.  So if the efficiency gap has
15  decayed to the point where it is no longer
16  significant or crosses your threshold as an
17  extreme partisan gerrymander in 2020, then there
18  would be no point in enjoining the 2020
19  elections, right?
20      A.   I think that calls for a legal view
21  that I don't have.  But I think that -- What I
22  can say is that the 2016 -- empirically, the 2016
23  efficiency gaps have decayed a little bit but
24  they're similar to the 2012 efficiency gaps.

Page 86

C. WARSHAW

1
2     Q.   And you're making no prediction about
3  how much they're going to decay in 2018 or 2020,
4  correct?
5     A.   I'm not, except to say that they are
6  relatively similar -- they're similar in 2012 and
7  2016.
8     Q.   Right.  But you haven't made any --
9         MR. YEAGER:  Objection.  Let him
10  finish, please.
11  BY MR. CARVIN:
12     Q.   Go ahead.
13     A.   I think as a -- that's correct.  I'm
14  not making -- There's no forecast in my report
15  for what's going to happen in 2020.
16         MR. CARVIN:  Could you mark this as
17  Exhibit 6, please.
18         (Exhibit 6 marked for identification
19  and attached hereto.)
20  BY MR. CARVIN:
21     Q.   All right.  This is the rebuttal
22  report you submitted in this case.  Is that
23  correct?
24     A.   Yes, it is.
25     Q.   If you would turn to page 4, please.

Page 87

C. WARSHAW

1
2  You have a heading of (b).  And you state on
3  page 9: "Dr. Johnson argues that we should not
4  be concerned that Michigan's districts are
5  gerrymandered because it is possible to imagine a
6  3 to 4 percent uniform swing in the two-party
7  vote shares which would give Democrats a majority
8  of Michigan's congressional seats."
9         Do you see that?
10     A.   Yes.
11     Q.   Do you disagree that a 3 to 4 percent
12  swing would give Democrats a majority of seats?
13     A.   I can't remember, to be honest.  I
14  neither agree nor disagree.  I just don't
15  remember.
16     Q.   Have you made any projections for
17  potential swings in 2018?
18     A.   I have not.
19     Q.   You say that there have been
20  relatively large swings in statewide votes since
21  2012 in Michigan, right?
22     A.   Where do I say that?
23     Q.   Do you see the last sentence?  You
24  say: "There have been regionally large swings in
25  the statewide vote."  Second-to-last sentence.

Page 88

C. WARSHAW

1
2     A.   Yes.
3         MR. YEAGER:  Hold on one second.  If I
4  might just read.
5         THE WITNESS:  I say despite --
6         MR. YEAGER:  Stop.  Stop.  Just wait.
7         Okay, no objection.
8  BY MR. CARVIN:
9     Q.   Can you tell me what those reasonably
10  large swings were in 2012, 2014, and 2016?
11     A.   I believe -- I don't have -- Nowhere
12  in my report do I state exact numbers.  I don't
13  have them exact precisely in my head.  But from
14  thinking about the data, I think the Democratic
15  vote share goes from maybe 51 or 52 percent in
16  2012, I think is in what is in my report, to 47
17  percent-ish -- somewhere around 47 percent in
18  2010.  So it goes -- it swings a couple of
19  percentage points.
20     Q.   In whose favor?
21     A.   In the Republicans' favor.  Sorry, in
22  2014.  I might have said 2010.  In 2014 it swung
23  in Republicans' favor.
24     Q.   And how about 2016?
25     A.   It swung a little -- it swung a little

Page 89

C. WARSHAW

1
2  bit back to the Democrats.  I think Democrats had
3  a majority, had a bare majority of the statewide
4  vote, but I can't remember for sure.
5     Q.   So just so I understand it, you think
6  Republicans had a bare majority of the statewide
7  vote in congressional elections in 2014 and
8  Democrats had a bare majority in 2016?  That's
9  your testimony?
10     A.   I think that's true, but I would have
11  to look for -- for precise numbers.
12     Q.   It's well established, is it not, that
13  most congressional plans swing up to 7.5 percent
14  during an election cycle?
15     A.   Well, Stephanopoulos and McGhee assert
16  that in their article.  I wouldn't say it's well
17  established.  I mean, I think -- I couldn't say
18  that for sure.
19     Q.   Do you have contrary analyses?
20     A.   I don't.
21     Q.   So you can't dispute it?
22     A.   I can't dispute it, no.
23     Q.   Back to your rebuttal report.  You
24  say -- you state in your initial report:
25  "Democrats would have needed about 57.5 percent

Page 90

C. WARSHAW

1  of the vote to win a majority of the seats in the
2  Michigan congressional delegation." Right?
3      A.   Yes.
4          MR. YEAGER:  Objection.  Incomplete
5  reading of that sentence.
6  BY MR. CARVIN:
7      Q.   You said that, right?
8      A.   As I stated in my initial report:
9  "Democrats would have needed about 57.5 percent
10 of the vote to win a majority of the seats in the
11 Michigan congressional delegation."
12     Q.   Right.  And you're not suggesting that
13 they would need 57.5 percent to win a majority of
14 the seats in 2018 or 2020, are you?
15     A.   I have not analyzed that, but I have
16 no reason to believe that that wouldn't be true,
17 that it would change dramatically.
18     Q.   So you haven't made any projections
19 about what percentage of the statewide vote would
20 be necessary for Democrats to win a majority of
21 the seats under the current redistricting plan in
22 2018 or 2020, correct?
23     A.   No.  But I don't -- my -- in my -- in
24 my view, the number that was required in 2012

Page 91

C. WARSHAW

1  wouldn't change dramatically over time.
2      Q.   And that's not based on any analysis
3  or conclusion suggested in your report, correct?
4      A.   That's correct.
5      Q.   Let's figure out how you came to this
6  57.5 percent.  If you could turn to footnote 9,
7  page 9 of your initial report.
8      A.   I have to find my report.
9      Q.   The first report.
10     A.   Okay.  What page number are you on?
11     Q.   Page 9, footnote 9 at the bottom.
12     A.   Yes.
13     Q.   So the way you came up with this 57.5
14 was you just added -- you just figured out they
15 needed to win an additional 4.5 percent of the
16 vote in the 3rd District, which would have been
17 the majority district, in that year to get a
18 majority of the seats, right?
19     A.   Correct.
20     Q.   Okay.  And so that wasn't any kind of
21 swing analysis based on election results.  That
22 was just looking at the particular result in
23 District 3 for 2012, right?
24     A.   Yes.  But in this case District 7, 3

Page 92

C. WARSHAW

1  and 11 all have very similar vote shares.  So
2  even if District 3 had changed a little bit, that
3  wouldn't affect this dramatically, this
4  calculation.
5      Q.   Well, let's look --
6      A.   District 7 was the median -- was the
7  district to get the majority rather than District
8  3.
9      Q.   Well, let's look at that.  What
10 increase would it take to give Democrats half the
11 seats even in 2012?
12     A.   About 3.5 percent.
13     Q.   3.5 percent?
14     A.   They would have had to have gone to --
15 they would have had to have gotten 56.5 percent
16 of the statewide vote to get half the seats.
17     Q.   They would have needed a 0.31 percent
18 increase to win District 1, which is hardly
19 anything, right?
20     A.   Correct.
21     Q.   And then they would just need to win
22 District 11 to win half the seats, right?
23     A.   That's correct.
24     Q.   And do you know what the vote share

Page 93

C. WARSHAW

1  was in District 11 in 2014 and 2016?
2      A.   I don't off the top of my head.
3      Q.   Do you know who the incumbent is in
4  District 11?
5      A.   I don't.
6      Q.   Have you made any projections about
7  what the likely result is in District 11 in 2018?
8      A.   I have not.
9      Q.   So in this very close race, if they
10 win that, then they'll win half the seats, right?
11     A.   Sure, if they also win District 1.
12     Q.   Right.  And just so I'm clear, would
13 you think it would be an extreme partisan
14 gerrymander if Democrats won seven of the 14
15 seats in 2018?
16     A.   I would obviously have to --
17          MR. YEAGER:  Objection.  Wait, wait,
18 wait.  Objection; vague and ambiguous.
19          You may answer.
20          THE WITNESS:  You would have to give
21 me more information in order to evaluate
22 that statement.
23 BY MR. CARVIN:
24     Q.   Well, in terms of seats-votes

Page 94

C. WARSHAW

1
2   proportionality, that's pretty proportionate,
3   isn't it?
4          MR. YEAGER:  Objection; vague and
5   ambiguous.
6          You may answer.
7          THE WITNESS:  If the Democrats
8   received 53 percent of the statewide vote
9   and they received half the seats, then I
10  would not view that as necessarily a
11  gerrymander.  I think that would imply -- I
12  think that would imply a pro-Republican
13  efficiency gap of six points, which I think
14  could be due to a number of factors.
15         MR. CARVIN:  If you could mark this.
16         (Exhibit 7 marked for identification
17  and attached hereto.)
18  BY MR. CARVIN:
19     Q.    This is an article by McGhee in 2014
20  in Legislative Studies Quarterly.  I believe this
21  is one of the articles you cited in your report.
22     A.    Yes, that's correct.
23     Q.    And McGhee is one of the co-creators
24  of the efficiency gap?
25     A.    He's the original creator of it.  This

Page 95

C. WARSHAW

1
2   article I believe is the article that creates the
3   efficiency gap, and then the article with
4   Stephanopoulos expanded upon it and applied --
5   developed their proposed legal standard.
6      Q.    If you could turn to page 75 of this
7   article.  If you look at the third full
8   paragraph, McGhee states, does he not:  "These
9   theoretical insights lead to the key empirical
10  finding of the article.  Because efficiency is a
11  function of both vote share and seat share, it is
12  sensitive to changes in party performance.  Thus,
13  the effects of partisan gerrymanders, though
14  real, are easily undone.  The partisan legacy of
15  the last plan is usually gone by the following
16  redistricting..."
17         Do you agree that the partisan legacy
18  of the last plan is usually undone -- is usually
19  gone by the following redistricting?
20     A.    I haven't -- I couldn't evaluate that
21  statement specifically.
22     Q.    Okay.
23     A.    I don't have a view either way.
24     Q.    All right.  If you could turn to your
25  report at the bottom of 17, please.  Just to go

Page 96

C. WARSHAW

1
2   over what I think we've chatted about already, if
3   you look at the bottom of 17, you point out that
4   the efficiency gap in 2012 was a huge Republican
5   efficiency gap of approximately 19.7 percent.
6   Right?
7      A.    Yes.
8      Q.    Okay.  And you say the results in the
9   next two elections were similar to those in 2012.
10  Correct?
11     A.    Yes.
12     Q.    In 2014 and 2016, the efficiency gap
13  was approximately minus 16 in 2014 and minus
14  13.2 percent in 2016.  Correct?
15     A.    Correct.
16     Q.    And you're saying that this
17  6.5 percent difference between 13.2 and 19.7 is
18  similar, correct?
19     A.    Yes.  I think those are both very
20  pro-Republican efficiency gaps.
21     Q.    Would a 6.7 percent efficiency gap be
22  similar to a 13.2 percent efficiency gap?
23         MR. YEAGER:  Objection; incomplete
24  hypothetical.
25         You may answer.

Page 97

C. WARSHAW

1
2          THE WITNESS:  I think quantitatively
3   those are not wholly dissimilar, but I think
4   the context is very different.  Whereas 13.2
5   indicates to me a very clear -- clear
6   evidence of partisan bias, once you go down
7   to 5 or 6 percent then I think that would
8   be -- I would need -- the efficiency gap by
9   itself probably wouldn't be dispositive.  It
10  wouldn't be like -- no piece of evidence is
11  dispositive, but I think it would be less
12  significant evidence in favor of a partisan
13  bias.
14  BY MR. CARVIN:
15     Q.    So if this trend continues of the
16  efficiency gap decreasing by 6.5 percent, then it
17  would be roughly 6.7 percent in 2020, correct, if
18  this trend continues?
19     A.    Yes.  But I think there is no evidence
20  either way that the trend is going to continue,
21  and certainly not that it's going to be linear.
22  In fact, what we've seen in prior decades in
23  Michigan is the efficiency gap -- you know, there
24  hasn't been a linear trend in the efficiency gap.
25         So for instance in the 1990s, in

Page 98

C. WARSHAW

1  Figure 5, the efficiency gap bounced around but
2  it was always pro-Democratic, whereas in the
3  2000s, for instance, the efficiency gap trended
4  toward Republicans and it trended a little bit
5  toward Democrats.
6      So I think the historical evidence in
7  Michigan does not provide any reason to believe
8  the efficiency gap is going to trend linearly in
9  a particular direction over time.
10     Q.   We just don't know?
11     A.   That's correct.  But I think certainly
12 having a hypothetical that assumes it's going to
13 continue in some linear direction toward a
14 neutral or a pro-Democratic efficiency gap isn't
15 supported by the historical evidence.
16     Q.   Why don't we turn to the historical
17 evidence.  If you could turn to page 17.
18     A.   Yes.
19     Q.   See the efficiency gap in the 2000s?
20     A.   Yes.
21     Q.   And the best I can tell in 2006, it
22 was around 14.5 percent?
23     A.   The chart is a little grainy, but that
24 looks roughly right.

Page 99

C. WARSHAW

1  Q.   What was it in 2010?
2  A.   Again, I don't have an exact number in
3  my head.  The chart is a little grainy, but it
4  looks like around 5 percent, negative 5 percent.
5  Q.   5?
6  A.   4 percent.  Negative 4 or 5 percent.
7  I don't know.
8  Q.   Is the line halfway between 5 percent?
9  Is the line halfway between 10 percent and
10 0 percent 5 percent?
11 A.   Fair.  It's probably negative
12 4 percent.
13 Q.   4?  Try again.  In 2008 it was 4,
14 right?
15 A.   Sorry.  That's what I'm looking at.
16 Q.   And then what was it in 2010?
17 A.   Oh, in -- Yeah.  I may have misheard
18 you.  My reading of the chart is a negative --
19 yeah, in 2008, I think I had originally said
20 negative 5, but in looking at it, maybe it's
21 negative 4.  And then in 2010, negative
22 2 percent, maybe.
23     But I think what -- to me, speaking at
24 a little higher level of abstraction, the

Page 100

C. WARSHAW

1  efficiency gap is going to bounce around a little
2  bit.  But in the pre-2011 period, if anything,
3  the efficiency gap was trending -- to the extent
4  there was a trend, it was a trend toward
5  Democrats which was -- that trend was broken
6  after the 2011 plan went into place.  So the plan
7  immediately after the 2011 plan went into place
8  became dramatically more pro-Republican.
9  Q.   Dramatically more pro-Republican?
10 A.   Yeah, going from whatever the 2010
11 number is, maybe negative 2 to the negative 20.
12 Q.   You keep looking at the first year.
13 Right?  But if you look at the midpoint year,
14 2006 relative to 2016, which gap is more
15 pro-Republican?
16 A.   Can you repeat the question?
17 Q.   Which is more pro-Republican, the
18 efficiency gap in 2006 or the efficiency gap in
19 2016?
20 A.   It looks like the efficiency gap in
21 2006.  But I couldn't say for sure.
22 Q.   Okay.  Then you have this analysis of
23 durability, right?
24 A.   What page are you on?

Page 101

C. WARSHAW

1  Q.   16.
2  A.   Great.
3  Q.   Okay.  And you say that this line here
4  somehow shows that the efficiency gap is durable.
5  A.   I --
6      MR. YEAGER:  Wait.  That's not a
7  question.
8  BY MR. CARVIN:
9  Q.   That's the purpose of this chart?  And
10 then I'm going to ask more questions.
11 A.   Yes, the purpose of this chart is to
12 show the durability of the efficiency gaps
13 between 2012 and 2016.
14 Q.   Okay.  And that's where I'm confused.
15 I see "MI" on the line that looks to me like it's
16 around, I don't know, 13 percent.  But I don't
17 see -- I only see one "MI" dot on this line.
18 A.   Got it.  Its position on the x-axis
19 shows it's the efficiency gap in 2012 and the
20 position on the y-axis shows the efficiency gap
21 in 2016.
22 Q.   So what are you --
23 A.   So the fact --
24     MR. YEAGER:  Let him ask a question.

Page 102

C. WARSHAW

1
2    Okay?
3    BY MR. CARVIN:
4        Q.   I'm just trying to figure out what
5    this number means.
6            MR. YEAGER: I'm sorry. Is that a
7    question?
8            MR. CARVIN: Yeah.
9            MR. YEAGER: Do you understand that
10   question?
11           THE WITNESS: Which number are you
12   referring to?
13   BY MR. CARVIN:
14       Q.   You have "MI." You don't have a
15   number assigned to it. I'm going to guess it's
16   around 12.5 percent.
17       A.   Well, I think I state that elsewhere.
18   I say on page 18 that in 2014 the efficiency gap
19   was negative 16 percent.
20       Q.   Right. In 2016?
21       A.   Uh-huh.
22       Q.   I think it was 13.2 percent in --
23       A.   I'm sorry. That was 2014 I'm talking
24   about. You're right. In 2016, I say negative
25   13.2. You're right.

Page 103

C. WARSHAW

1
2        Q.   Is that that number?
3        A.   Yes. The position on the y-axis here
4    is negative 13.2, the y-axis being the left-hand
5    axis is negative 13.2.
6        Q.   Right. And there's no number for the
7    efficiency gap or dot for the efficiency gap in
8    2012?
9        A.   No, that's not correct. The
10   efficiency gap in 2012 is shown on the x-axis,
11   which is the bottom axis. So if you go up from
12   the bottom axis where it says negative 20 percent
13   pro-Republican, the Michigan dot or abbreviation
14   lies just to the right of the negative
15   20 percent, which in fact is I think negative
16   19.7 percent precisely.
17       Q.   So all this chart is showing me is
18   that the efficiency gap in 2016 was 13.2 percent
19   and it was almost 20 percent in 2012?
20       A.   Well, it's showing you that. But it's
21   also showing you across all of the states in the
22   country the efficiency gap in 2016 was extremely
23   closely related to the efficiency gap in 2012.
24   The correlation, as I say -- in this version I
25   said .82. I think in my errata I corrected that

Page 104

C. WARSHAW

1
2    to .78. But that's not a consequential
3    difference.
4        Q.   So maybe I'm misunderstanding this.
5    New Jersey had a, what, 11 percent pro-Republican
6    efficiency gap in 2012?
7        A.   I haven't looked at New Jersey in
8    detail, but I believe that's true based on the
9    chart.
10       Q.   And it had zero in 2016?
11       A.   That's what the chart implies. So
12   that implies that New Jersey -- the efficiency
13   gap in New Jersey, changed more than it did in
14   other states. So it's perhaps less durable in
15   New Jersey than in other states.
16       Q.   Okay. Maybe I'm misunderstanding
17   this. Then you've got, like, a 19 percent
18   efficiency gap in Indiana in 2012 and a
19   5.5 percent in 2016?
20       A.   Sure. There's always going to be
21   observations that are outlier observations. But
22   the general trend here shows that looking across
23   all the states, most of which or many of which, I
24   think most, lie within the confidence interval of
25   the smooth line, essentially the smooth line.

Page 105

C. WARSHAW

1
2    You know, most -- most of these states are
3    similar -- the 2012 and 2016 efficiency gaps are
4    similar, and the 2016 efficiency gap is -- you
5    know, could be predicted based on the 2012
6    efficiency gap.
7        Q.   All right.
8        A.   And that's certainly the case in
9    Michigan. It's the case in states like
10   Pennsylvania or Ohio or North Carolina or
11   Alabama. On the Democratic side, Massachusetts,
12   which had nearly -- you know, roughly identical
13   efficiency gaps, pro-Democratic efficiency gaps
14   in 2012 and 2016.
15       Q.   Are you suggesting that the efficiency
16   gap in Michigan was roughly identical in 2012 and
17   2016?
18       A.   I'm not, but it's similar.
19       Q.   The 6.5 percent conversation we've
20   already had?
21       A.   Yes.
22       Q.   And you put R equals 0.82. You now
23   think it's 0.78?
24       A.   I believe that's true. I think that's
25   in my errata report.

Page 106

C. WARSHAW

1
2    Q.   Okay.
3    A.   That was based on the methodological
4    discussion in that report.
5    Q.   What does that mean?
6    A.   It means that what the correlation is
7    telling us is how much of the variation in the
8    2016 efficiency gaps can be predicted by the 2012
9    efficiency gaps.  So if -- I mean, if we take --
10   suppose the correlation is .82 as it is here.
11   That implies that 67 percent of the variation
12   could be predicted four years later which is --
13   you know, it's a large -- a large, not
14   overwhelming, share of the variation.
15   Q.   Does that mean that there will be a
16   67 percent variation between 2012 and 2016?  What
17   do you mean, it can predict 67 percent of the
18   variation?
19        MR. YEAGER:  Objection; misstates the
20   testimony.
21        MR. CARVIN:  I'm just trying to
22   straighten this out.
23        THE WITNESS:  Well, the statistical --
24   It suggests that it -- or it shows that the
25   efficiency gaps in 2012 statistically

Page 107

C. WARSHAW

1
2    predict 67 percent of the variation four
3    years later if the correlation was .82.
4    BY MR. CARVIN:
5    Q.   So it's off by a third?
6    A.   No.  It's saying that a third of the
7    variation -- roughly a third of the variation
8    cannot be predicted.  It's not saying it's off by
9    a third.
10   Q.   Okay.  And that would be true --
11   that's true for all states?
12   A.   That's true --
13   Q.   For all the states on your chart?
14   A.   On average, that's true.  It's not
15   true for all states individually because
16   obviously there's going to be state-specific
17   errors.  But on average, that's true.
18   Q.   And you can't calculate Michigan
19   individually?  You need all these states to do
20   that?
21   A.   Well, what I was trying to
22   characterize here was the general statistical
23   relationship, so on average how good a predictor
24   is 2012 of the efficiency gap halfway through a
25   plan, which is, you know, the most recent plan we

Page 108

C. WARSHAW

1
2    have data for.  If I had 2018 elections, I would
3    have analyzed that.
4        But I think obviously Michigan -- the
5    number for Michigan is the most probative here.
6    But I think that it's important to also establish
7    the general statistical relationship as well.
8    Q.   Okay.  You say that the 2011
9    efficiency gap has been durable.  Did you look at
10   whether it was durable prior to 2011 in Michigan?
11   A.   I did not specifically.  I guess I'll
12   say I do think the -- I couldn't put a precise
13   number on it, but the stability of the efficiency
14   gaps has increased over time which is probably
15   why there's such a strong relationship today, in
16   part because elections are more predictable.  So
17   as elections are -- particularly the distribution
18   of voters across districts.  You may have uniform
19   swings, but, you know, we sort of -- it's more
20   predictable which voter -- which districts are
21   going to be more Republican or more Democratic
22   than other districts.
23   Q.   And there's a strong correlation
24   between the presidential vote and the
25   congressional vote?

Page 109

C. WARSHAW

1
2    A.   Precisely.
3    Q.   And people predicted in Michigan
4    Trump's victory pretty solidly because it's so
5    predictable these days?
6    A.   The predictability of elections is
7    much greater than it used to be.  Certainly at
8    the individual level, the vast majority of people
9    vote with their party.  And even in Michigan, you
10   know, sure there was a swing, but it was a
11   relatively small swing compared to earlier eras
12   where you might have had Reagan won all but one
13   or two states in the 1984 election.
14        Nixon won an overwhelming victory in
15   1972.  You don't see those kinds of huge swings
16   across elections that we used to.  Elections
17   today are much more stable.
18   Q.   But again, you haven't analyzed how
19   many ticket-splitters there are in Michigan or
20   how many independent voters there are in
21   Michigan, right?
22   A.   No.
23   Q.   All right.  So on page 19 you say that
24   "Michigan had more extreme pro-Republican
25   efficiency gaps than it has ever had before in

Page 110

C. WARSHAW

1  Congress." Right?
2
3          MR. YEAGER: I'm sorry. Could you
4  point to where that is?
5          MR. CARVIN: I apologize. It's the
6  first full sentence at the top of page 19.
7          THE WITNESS: Yes.
8  BY MR. CARVIN:
9      Q.  And then you say: "This further
10 suggests that the geographic factors are unlikely
11 to be the root cause of the large efficiency gaps
12 in Michigan in recent elections." Right?
13     A.  Yes.
14     Q.  So if the pro-Republican efficiency
15 gaps in this decade are in fact similar to the
16 pro-Republican efficiency gaps in the prior
17 decade, that would suggest that geographic
18 factors are likely to be the root cause of a
19 large efficiency gap, correct?
20     A.  Not necessarily. In 2001, there is --
21 I believe there was Republican -- unified
22 Republican control of government. So there could
23 have been a Republican gerrymander in the 2000s
24 as well, although I haven't analyzed that in
25 depth. So I think that the statement -- the

Page 111

C. WARSHAW

1  negative of the statement here I make is not
2  true. Like the --
3
4      Q.  All right. Let me restate it.
5      A.  I think the greater efficiency -- the
6  greater efficiency gaps in Michigan reduced the
7  likelihood that geography is the root cause. But
8  the -- the earlier -- if there were
9  pro-Republican efficiency gaps earlier, I would
10 not say those were necessarily due to geography.
11 I just don't know.
12     Q.  But if the efficiency gaps for this
13 decade or the prior decade were similar, that
14 would not provide evidence that the geographic
15 factors are likely to be the root cause of a
16 large efficiency gap in this decade, right?
17     A.  Correct. It wouldn't necessarily
18 suggest that geography is the root cause, but it
19 would be less probative of the argument -- the
20 conclusion that intentional gerrymandering is the
21 cause.
22     Q.  And if neutral plans drawn according
23 to traditional districting principles and without
24 any partisan considerations produced efficiency
25 gaps similar to the enacted plan's efficiency

Page 112

C. WARSHAW

1  gap, this would be evidence that geographic
2  factors are a root cause of the large efficiency
3  gaps in the plan, right?
4
5          MR. YEAGER: Objection; vague and
6  ambiguous. Incomplete hypothetical.
7          You may answer.
8          THE WITNESS: In general, I haven't --
9  obviously I didn't look at any kind of
10 simulated plans in my report. You know, if
11 you were to look at simulated plans based on
12 some sort of random algorithm and find they
13 were the same as the enacted plan, then I
14 think that would suggest the enacted plan
15 may be due to factors aside from intentional
16 gerrymander.
17 BY MR. CARVIN:
18     Q.  Well, what if you used a benchmark
19 plan that was clearly drawn without partisan
20 intent and strictly adhering to traditional
21 districting principles and that resulted in an
22 efficiency gap similar to that in the enacted
23 plan? Wouldn't that be strong evidence that
24 geographic, demographic factors are the root
25 cause of the efficiency gap in this plan?

Page 113

C. WARSHAW

1          MR. YEAGER: Same objection.
2          THE WITNESS: If the -- I mean, in my
3  view, to evaluate a simulated plan, you
4  should look at a range of simulations rather
5  than one demonstration plan as sort of the
6  arbiter of the one -- the one and only fair
7  and neutrally drawn plan.
8          But certainly if the distribution of
9  simulated plans, as I said, was the same as
10 the enacted plan or nearly the same, then
11 that would weigh against intentional
12 gerrymandering, or weigh against the
13 conclusion that there had been intentional
14 gerrymandering.
15 BY MR. CARVIN:
16     Q.  If you could turn to page 32 of your
17 report, please. You say that "The efficiency
18 gaps in state legislative lower chambers have
19 been quite durable though somewhat" --
20     A.  May --
21     Q.  I apologize.
22     A.  My earlier answer, I think the only
23 thing I would add is I do think that, you know,
24 it's useful to look at the totality of the
25

Page 114

C. WARSHAW

1
2  evidence. And the totality of the evidence here,
3  the extremity of Michigan's plan compared to both
4  other states as well as its own efficiency gaps
5  historically, even without any comparison to some
6  simulated plan, for me strongly suggests -- makes
7  me -- makes me feel very confident that there's a
8  large partisan bias in these plans.
9       And that was why I focused on the
10  historical analysis rather than some comparison
11  to simulated plans. So I think that a comparison
12  to some simulated benchmark is not the only way
13  to evaluate gerrymandering, though it's certainly
14  an indicator.
15      Q.  If you turn to page 32, right
16  underneath your heading "Durability of the
17  Efficiency Gap in State Legislatures," you show
18  that "The efficiency gaps in state legislative
19  lower chambers stemming from the 2011
20  redistricting have been quite durable, though
21  somewhat less durable than congressional plans."
22  Right?
23      A.  Yes, that's what I say here.
24      Q.  And overall there is a 0.68
25  correlation nationwide. Right?

Page 115

C. WARSHAW

1
2      A.  Correct.
3      Q.  And what percentage of the variation
4  is predicted by a 0.68 correlation?
5      A.  I'm not sure I can do the math in my
6  head. It would be -- it would be the square of
7  .68.
8      Q.  The square of --
9      A.  You have to square .68. It would be
10  about half the variation.
11      Q.  About 50 percent?
12      A.  Yes.
13      Q.  Okay. And the same question I guess I
14  have here, on Figure 14, you've already explained
15  in connection with the congressional map what
16  these dots mean. And you would give me the same
17  answer with respect to Figure 14?
18      A.  Correct. This is exactly the same.
19  The style of this chart, the presentation of this
20  chart is exactly the same as the congressional
21  chart. The numbers obviously differ but -- So
22  Michigan here, I believe this suggests has a
23  pro-Republican efficiency gap of whatever I said,
24  negative -- well, I wouldn't want to put numbers
25  on it. But it shows they're highly -- closely

Page 116

C. WARSHAW

1
2  related to each other in 2012 and 2016. They're
3  right on the regression -- the regression line.
4      Q.  Okay. And in -- So we had in 2012 an
5  efficiency gap of 12.3 percent in the state
6  house?
7      A.  I don't have a number in my head.
8  I'll take it as a hypothetical that's what I said
9  in my report.
10      Q.  No, no. Turn to page 34.
11      A.  Great.
12      Q.  12.3 percent?
13      A.  Uh-huh.
14      Q.  And that's unacceptably large both in
15  historical and relative terms?
16      MR. YEAGER:  Objection; calls for a
17  legal conclusion.
18      You may answer.
19      THE WITNESS:  Yeah, I have no legal
20  view of the legal benchmark. But I think in
21  historical terms what I show here is that's
22  large.
23  BY MR. CARVIN:
24      Q.  Excuse me?
25      A.  I said I have no legal -- I have no

Page 117

C. WARSHAW

1
2  view of the legal standard.
3      Q.  I'm not asking you for legal. I'm
4  asking for your view as a political scientist who
5  characterized this as extreme partisan
6  gerrymandering.
7      A.  Yes. I think that's larger than, as I
8  show in my report, the vast majority,
9  overwhelming majority of previous
10  congressional -- or previous state legislative
11  plans.
12      Q.  And therefore is unacceptable?
13      A.  I wouldn't use the word --
14  "unacceptable" suggests a normative benchmark
15  that, you know, as a social scientist I couldn't
16  say what's acceptable or unacceptable. But I
17  think it's very large and I think has pernicious
18  consequences for our democracy.
19      Q.  And the pernicious consequences for
20  democracy, that's not a normative judgment?
21      A.  It is a normative judgment. But I
22  think to say something is acceptable or
23  unacceptable implies having some normative or
24  legal benchmark, and I don't have that in my
25  head.

Page 118

C. WARSHAW

1
2    Q.   Or anywhere else?  You don't have
3  anything that distinguishes an extreme partisan
4  gerrymander from a non-extreme partisan
5  gerrymander in terms of the percentage of the
6  efficiency gap, right?
7    A.   There's no bright line benchmark where
8  I would say if it's more than 7 or 8 percent that
9  it is a -- you know, definitely a partisan
10  gerrymander.
11    Q.   Is there a range?
12    A.   I don't know that I have a precise
13  range.  But I think what I could say is looking
14  at the totality of the circumstances where, you
15  know, the efficiency gap is large relative to
16  other states historically as here and large
17  relative to other states in the current era as
18  here, when the other gerrymandering metrics all
19  show very similar statistics for extremity.  When
20  there's unified control of state government, that
21  suggests, you know, intent to maximize its seat
22  share.  I think all of those are factors for me
23  in making an evaluation.
24    Q.   And I'm --
25    A.   And then I should say also, you know,

Page 119

C. WARSHAW

1
2  as here, I don't know that it's dispositive on
3  its own, but when the efficiency gap increases
4  dramatically when the new gerrymander goes into
5  place I think is also a useful data point.
6    Q.   And just so I'm clear, if we're
7  focusing exclusively on the efficiency gap, there
8  is no consensus or near consensus in the
9  political science community about either a bright
10  line or a range of percentages that crosses some
11  threshold, right?
12    A.   There's not.  But I think this is a
13  case that I don't view as a close call.  I think
14  it's a --
15    Q.   I know you've given your opinion.  I'm
16  just asking you for the political science
17  consensus --
18    A.   There's no --
19    Q.   -- without looking at this case.
20    A.   Correct.  Stephanopoulos and McGhee
21  obviously propose -- what they would propose is
22  some legal standard.  But I don't think there's
23  any bright line in the literature of what --
24    Q.   No.  And you make it clear in your
25  rebuttal report, don't you, that nobody has

Page 120

C. WARSHAW

1
2  accepted Stephanopoulos and McGhee's threshold,
3  correct?
4    A.   Yeah.  To my knowledge, there's no
5  other article that has -- you know, that we
6  should accept, we should -- there's some social
7  science reason to say that should be a bright
8  line threshold.
9    Q.   And so to get back to our point.  In
10  2012 there was an efficiency gap of approximately
11  12.3 percent, right, in the state house?  Do you
12  see that?
13    A.   Yes, that's what I stated here.
14    Q.   Okay.  Now, you don't provide the
15  numbers for the efficiency gap for 2014 or 2016
16  in your report, is that correct, for the state
17  house?
18    A.   It would appear so.  I don't remember.
19    Q.   So we have to guess.  Let's look at
20  the chart and guess.  Okay?
21        What is the efficiency gap in 2014 for
22  the state house?
23        MR. YEAGER:  Object to the
24  characterization.
25        THE WITNESS:  I couldn't say based on

Page 121

C. WARSHAW

1
2  this printout.  It looks like maybe around
3  negative 10, negative --
4  BY MR. CARVIN:
5    Q.   A little under 10?
6    A.   The chart is too grainy.  I couldn't
7  say for sure, but it's in the ballpark of
8  negative 10.
9    Q.   Okay.  And how about 2016?
10    A.   A little bit less than that.
11    Q.   Isn't it about halfway between 5 and
12  10, about 7 percent?
13    A.   I don't know.  I wouldn't want to make
14  a characterization.
15    Q.   Well, you did characterize them as
16  similar.
17    A.   Yeah, I know.  I think they are
18  similar.  I think that -- I think they're
19  within two or three.  I think the 2016 one is
20  certainly within two or three points of the 2008
21  one, which is in turn within two or three points
22  of the 2012 one.
23    Q.   You said 2008?
24    A.   The 2016 one is within three or four
25  points of 2014.  I apologize if I misspoke.  And

Page 122

C. WARSHAW

1
2  the 2014 one is within two, probably two points
3  of the 2012 one.
4      Q.   All right.  And so you're saying that
5  efficiency gaps of 12.3 percent and for
6  discussion sake we'll say 6.5 percent are
7  similar?
8      A.   I wouldn't want to place a number on
9  it.  I just don't know what the number is.
10     Q.   Well, I'm asking.
11     A.   Because I wouldn't want to --
12     Q.   Since you haven't provided the number,
13 we have to look at your chart, and your charts
14 suggest, I'll say, 7 percent.
15          Are you saying that efficiency gaps of
16 12.3 percent and 7 percent are similar?
17          MR. YEAGER:  Objection.  The question
18 misrepresents the fact, which is that the
19 witness has provided all that data.  Defense
20 counsel has had that data for weeks.  If you
21 would like him to refer to that data, you
22 can show it to him.  But please don't
23 represent that he has not provided it.
24          You may answer.
25          THE WITNESS:  Yeah, that's correct.  I

Page 123

C. WARSHAW

1
2  mean, the exact estimate is in the data I
3  provided.  But the -- and I think we stated
4  earlier, I think elections are going to
5  change year to year.  So I think a 4 or 5 or
6  even 6 percent change, I think those are
7  still similar to each other.
8  BY MR. CARVIN:
9      Q.   So you do think an efficiency gap of
10 12.3 percent is similar to an efficiency gap of 7
11 percent?
12          MR. YEAGER:  Asked and answered.
13          THE WITNESS:  Yes.
14 BY MR. CARVIN:
15     Q.   And you think that the efficiency gap
16 in Michigan, until the most recent redistricting,
17 was similar to that in other states?
18     A.   I think it was a little bit more
19 pro-Republican than some other states, but not as
20 much as it is today.
21     Q.   Turn to page 18, please.
22     A.   Page 18, you said?
23     Q.   Yes.  It says:  "The chart shows the
24 efficiency gap in Michigan was generally similar
25 to that of other states until the most recent

Page 124

C. WARSHAW

1
2  redistricting."
3          Do you stand by that assertion?
4      A.   I think in 2008 and '10 it was right
5  in the middle of the distribution of other
6  states.  In 2002, '04 and '06 it was more
7  pro-Republican than other states.  So in that
8  statement I was referring to the years
9  immediately before the redistricting.
10     Q.   So for those purposes you were looking
11 at the efficiency gap at the end of the decade,
12 not the efficiency gap at the beginning of the
13 decade?
14     A.   Can you point me exactly to where
15 you're looking?  Sorry.  On page --
16     Q.   18, at the bottom.  "The chart shows
17 that the efficiency gap in Michigan was generally
18 similar to that of other states until the most
19 recent redistricting."
20     A.   Yes.  The statement was based on the
21 totality of the evidence over the past five
22 decades where Michigan is on average in the
23 middle of distribution of other states, with a
24 couple of exceptions in the early 2000s.  And
25 it's especially true in 2008 and 2010 when

Page 125

C. WARSHAW

1
2  Michigan was right in the middle.
3      Q.   So for purposes of that statement,
4  you're looking at the efficiency gaps at the end
5  of the decade, not the efficiency gap immediately
6  following the decennial redistricting, right?
7      A.   Yes.  I mean, in part because I think
8  the 2002 efficiency gaps could have been
9  pro-Republican because of gerrymandering in 2001.
10     Q.   Right.
11     A.   So I think certainly for any kind of,
12 like, long-term geographic kind of assessment
13 it's useful both to look at the long-term -- the
14 long-term average as well as the average right
15 before the new plan went into place.
16          I think looking at the 2002 efficiency
17 gap, just like so too -- just like the 2012
18 efficiency gap, is going to be the one that's
19 most affected by intentional gerrymandering.
20     Q.   And that will wave over time?
21     A.   Yes.  The literature -- I think the
22 consensus in the literature is that the effects
23 of gerrymandering decay somewhat over time.  They
24 do not decay away completely.  They are still, in
25 general, consequential, as I show, six years

C. WARSHAW

1
2 later, and as previous literature shows eight or
3 ten years later.
4      Q.   What previous literature is that?
5      A.   Gelman and King in their 1994 article
6 they show the effects of gerrymandering on
7 symmetry, which is a slightly different metric
8 than the efficiency gap, but they show that it is
9 persistent across the entire decade but it decays
10 over time.
11           MR. CARVIN:  Go off the record.
12           (Recess taken.)
13
14
15
16
17
18
19
20
21
22
23
24
25

C. WARSHAW

1
2 ----------------------------------------------
3           AFTERNOON SESSION
4               12:52 p.m.
5 ----------------------------------------------
6 BY MR. CARVIN:
7      Q.   Welcome back, Professor.  If you could
8 turn to page 6 of your report, please.
9      A.   Sure.
10      Q.   And in the second sentence in the
11 first full paragraph you say:  "In a packed
12 district the disadvantaged party wins
13 overwhelmingly, wasting a large number of votes
14 above the 50 percent plus one needed to win."
15 Correct?
16      A.   Yes.
17      Q.   That's sort of Political Science 101,
18 right, that a packed district wastes a lot of
19 votes of the packed party?
20      A.   I don't know if I would say Political
21 Science 101, but yeah, I think that's a
22 well-understood concept.
23      Q.   If you could turn to page 7 of your
24 report, please.
25      A.   Uh-huh.

C. WARSHAW

1
2      Q.   And on that, in Table 1 you provide an
3 illustrative example of how the efficiency gap
4 works, right?
5      A.   Yes.
6      Q.   And the way you figure out the
7 efficiency gap is you look at how many votes are
8 wasted in each district and then you add them up
9 at the end and you come up with an overall
10 efficiency gap score.  Is that how that works?
11      A.   I'm sorry.  Can you repeat the
12 question?
13      Q.   You look at the district, figure out
14 how many votes are wasted in those districts in
15 relative terms, and then you add it up for each
16 of the districts and come up with an overall
17 efficiency gap score?
18      A.   Yes.  The final equation -- That's
19 essentially right.  If you do that, you're not
20 adjusting for turnout.  So the way I do it, in
21 equation two it adjusts for turnout.  But if
22 there's equal turnout across districts, then the
23 approach where you add the wasted votes in each
24 district yields exactly the same result as
25 focusing on the statewide vote.

C. WARSHAW

1
2      Q.   And even when you adjust for turnout,
3 the way you do it is add up each of the
4 district's wasted votes and then compare one
5 party to the other?
6      A.   You add up the vote share.  No, you
7 calculate a statewide vote share and a seat share
8 because that enables you to account for the
9 unequal turnout, as I show in equation two.
10      Q.   So on Table 1 here in your
11 illustration of how the efficiency gap works,
12 District 1 is 75 percent Democratic, 25
13 Republican, right?  That's a classic packed
14 district?
15      A.   Yes.
16      Q.   And that would waste a lot of
17 Democratic votes?
18      A.   Yes.
19      Q.   But under the efficiency gap, as you
20 point out, the Republicans waste all 25 of their
21 votes and the Democrats waste 24 of their votes.
22 So it either shows no wasted votes or that in
23 fact Republicans have wasted votes in District 1,
24 right?
25      A.   Yes.  In the first district,

Page 130

C. WARSHAW

1
2  Republicans have wasted more votes than
3  Democrats.
4       Q.   So under the efficiency gap, a
5  district where Democratic votes have classically
6  been wasted suggests that actually Republican
7  votes are wasted in District 1, right?
8       A.   Yes.
9       Q.   And that's contrary to common sense
10  and political science consensus, isn't it?
11      A.   No.  I think the people that are in
12  that district, their votes don't contribute
13  to a -- the way here the wasted votes -- the
14  definition of wasted votes is votes that don't
15  contribute to a victory.
16      Q.   Right.
17      A.   And Republican votes in this seat
18  don't contribute to a Republican victory, and so
19  therefore they're wasted.
20      Q.   But on page 6 you said that the votes
21  that were wasted were the voters of the packed
22  party, the 75 percent.
23           Would you say that a 75 percent
24  Democratic district wastes more Republican votes
25  than Democratic votes?

Page 131

C. WARSHAW

1
2       A.   A 75 percent district -- Sorry, I want
3  to think about it.
4            Well, the math of it is in a 75/25
5  district, here the losing party wastes more votes
6  than the winning party.
7       Q.   That's the math of the efficiency gap.
8       A.   Yes.
9       Q.   What I'm asking you is:  Does the math
10  of the efficiency gap comport with common sense?
11  Would any political scientist say that a 75
12  percent packed Democratic district doesn't waste
13  any Democratic votes; it in fact wastes
14  Republican votes, in relative terms?
15      A.   I don't think there -- I don't have a
16  view on what political scientists would say to
17  that.  I don't think -- I think political
18  scientists would focus -- I mean, I think the
19  reality is political scientists would focus on
20  the statewide number of wasted votes.
21      Q.   We're going to get to that.  But the
22  way you get to the statewide is by adding up each
23  individual district?
24      A.   Roughly speaking, yes.
25      Q.   So if I asked you whether a 75 percent

Page 132

C. WARSHAW

1
2  Democratic district wastes more Democratic votes
3  than Republican votes, what would your answer be?
4       A.   Yeah, the 75/25 district here wastes
5  more Republican votes.  But I think that's an
6  arbitrary feature of, you know, the precise
7  vote share that you picked here.  But sure.
8       Q.   Wholly apart from the efficiency gap,
9  you would never offer the opinion that a packed
10  75 percent Democratic district doesn't waste
11  Democratic votes relative to Republican votes,
12  right?
13      A.   At -- I don't think I thought about
14  it, to be honest, in those terms.
15      Q.   Please think about it.
16           MR. YEAGER:  Could you read the
17  question back, please, sir?
18           (The record was read back by the
19  reporter as follows:
20           "Question:  Wholly apart from the
21  efficiency gap, you would never offer the
22  opinion that a packed 75 percent Democratic
23  district doesn't waste Democratic votes
24  relative to Republican votes, right?")
25           THE WITNESS:  I think in general, a

Page 133

C. WARSHAW

1
2  packed district wastes more of the party
3  that's being packed votes.  And I think that
4  if instead of 75/25 you had a -- you had
5  drawn a hypothetical that was 80/20, I
6  think -- you know, so for instance, in
7  Michigan, two of the seats that are most
8  packed are 84 percent Democratic and
9  86 percent Democratic.  So those seats have
10  more wasted Democratic votes than wasted
11  Republican votes.
12  BY MR. CARVIN:
13      Q.   Right.
14      A.   But I think, you know -- like I said,
15  I haven't thought about it in quite these terms.
16  But I do think this is the quirk of thinking
17  about things district by district, is -- you
18  know, there's no metric, and the efficiency gap
19  included, that is going to be perfect at trying
20  to characterize individual districts and -- you
21  know, for every imaginable vote share, the
22  relative advantaging of each party.
23      Q.   Does a packed 75 percent district
24  waste Democratic votes relative to Republican?
25           MR. YEAGER:  Asked and answered.

Page 134

C. WARSHAW

1
2      THE WITNESS:  The efficiency gap says
3   that if it's roughly equal or it wastes
4   slightly more Republican votes.  I think in
5   general votes waste more of the party
6   that's being packed voters.
7   BY MR. CARVIN:
8      Q.   And that's just as true at 75 percent
9   as it is at 70 percent, right?
10      A.   I don't think -- yeah, I don't think I
11   would try to argue there's a big difference
12   theoretically between 70/30 and 75/25 districts
13   or 80/20 districts.
14      Q.   In fact, a 75 percent Democratic
15   district wastes more Democratic votes than a 70
16   percent Democratic district, right?
17      A.   Correct.  As you pack more, it's going
18   to waste more of the party's voters that are
19   packed.  So the efficiency gap, if there's a
20   90/10 district, that would show that the party
21   that wins 90 percent of the vote is wasting, you
22   know, 39 percent or so of its -- of the vote.
23      Q.   So under the illustrative example you
24   propose, the efficiency gap produces a result
25   contrary to reality, which is it suggests no

Page 135

C. WARSHAW

1
2   wasted votes when in fact Democrats have wasted
3   votes at 75 percent, correct?
4      MR. YEAGER:  Objection; misstates the
5   evidence.
6      You may answer.
7      THE WITNESS:  The illustrative example
8   that I provided I think accurately
9   represents that at the statewide level
10   across these three -- and this is obviously
11   a very stylized three-district system where
12   Democrats win a bare majority of the vote
13   but only win a third of the seats.  I think
14   it illustrates the partisan bias in this
15   plan through the negative 20 percent
16   efficiency gap.
17   BY MR. CARVIN:
18      Q.   Right.  But with respect to District
19   1, it produces a result that is contrary to your
20   view of which party's votes are wasted, right?
21      MR. YEAGER:  Asked and answered.
22      You may answer.
23      THE WITNESS:  I think in general, in a
24   packed district, the party being packed is
25   disadvantaged.

Page 136

C. WARSHAW

1
2   BY MR. CARVIN:
3      Q.   And yet in this illustrative example,
4   it shows that the Democrats didn't waste any
5   votes.  So in that district it produces a result
6   contrary to your general understanding?
7      MR. YEAGER:  Objection; misstates the
8   evidence.
9      THE WITNESS:  I mean, I think here
10   it's not dispositive either way.  I mean,
11   this suggests that each party is wasting
12   roughly 25 voters.
13   BY MR. CARVIN:
14      Q.   Oh, then maybe I misunderstood your
15   prior answer.
16      A.   Right.
17      Q.   You think in a 75 percent Democratic
18   district and a 25 percent Republican district,
19   Republicans have wasted just as many votes as
20   Democrats?  Is that your testimony?
21      A.   No.  I think I -- as I said -- as I
22   stated a couple of times, that's what the
23   efficiency gap says.  I don't have a precise view
24   about the magnitude.
25      This is where I said earlier, that I

Page 137

C. WARSHAW

1
2   think all of these metrics are simplifications of
3   reality.  And at the statewide level, the
4   efficiency gap characterizes a legislative map
5   that is a partisan bias fairly well -- or very
6   well.  But none of these are perfect, and I think
7   the goal of the efficiency gap is not to, you
8   know, precisely characterize which districts are
9   packed.
10      Instead, the goal is to make sure that
11   the metric of gerrymandering at the statewide
12   level comports with what McGhee and
13   Stephanopoulos call the efficiency principle.
14      Q.   Right.
15      A.   Which is that if you win -- you
16   shouldn't win more seats in the legislature
17   without winning more votes.  And if you win more
18   seats in the legislature without winning more
19   votes, then you should have a metric that
20   reflects that.  And the efficiency gap does.
21      Q.   You think the efficiency gap
22   corresponds to a rough equivalence between
23   statewide vote and statewide seat share?
24      A.   No, I do not.  It's not a proportional
25   metric.

Page 138

C. WARSHAW

1
2    Q.   Okay.  Or even a rough equivalence
3  metric?
4    A.   No.  The mathematical, you know,
5  equation in equation two suggests that having an
6  efficiency gap of zero, you should get -- the
7  seat margin should increase at twice the rate of
8  the vote margin, which is in consort with the
9  historical evidence in the United States as well
10 as the math of the wasted vote equation.  But I
11 think at a broader level it reflects the
12 historical elections of the United States.  I
13 would not characterize that as proportional
14 representation.
15   Q.   And one of the imperfections in the
16 efficiency gap is the fact that it would
17 characterize a 75 percent Democratic district as
18 not wasting Democratic votes, correct?
19       MR. YEAGER:  Objection; asked and
20 answered.  Misstates the record.
21       You may answer.
22       THE WITNESS:  I don't have an answer
23 to that beyond what I stated previously.  I
24 think the efficiency gap implies in this
25 particular case that there would be

Page 139

C. WARSHAW

1
2  infinitesimally, you know, .1 or something
3  more wasted Republican votes there than
4  wasted Democratic votes.
5       I don't have -- personally, I don't
6  have a view of exactly what the threshold is
7  for a packed district.  Probably I would say
8  75/25 would be above that threshold.  So it
9  seems that this is a little idiosyncratic as
10 to the efficiency gap in this case.  But the
11 goal of the efficiency gap is to capture
12 gerrymandering at a statewide level; it's
13 not to give a precise characterization of
14 individual districts that are packed or
15 cracked.
16 BY MR. CARVIN:
17   Q.   All right.  Now, in a 51 percent
18 Republican and 49 percent Democratic district,
19 the Democrats have wasted 49 percent of the
20 votes, right?
21   A.   Yes.
22   Q.   And the Republicans have wasted
23 1 percent of the votes?
24   A.   Right.
25   Q.   So the efficiency gap in a 51/49

Page 140

C. WARSHAW

1
2  district is 48, right?
3    A.   Yes.
4    Q.   Okay.  And the efficiency gap in a
5  75 --
6    A.   Well, the difference in wasted votes,
7  to be more precise.  That's not the efficiency
8  gap, but the difference in wasted votes would be
9  48.
10   Q.   And that's an extraordinarily high
11 amount of wasted votes in a district, right?
12   A.   Correct.  Well, it's an
13 extraordinarily high differential in the wasted
14 votes.
15   Q.   And so a 51/49 gets a worse efficiency
16 gap or wasted votes measure than a 75/25
17 district.  Is that right?
18   A.   Well, it certainly suggests that when
19 one party would be much more disadvantaged --
20 there's much more of a differential in the wasted
21 votes than in a 75/25.
22   Q.   Okay.  So let's go back to your
23 example.  The efficiency gap in this plan right
24 now is 20 percent pro-Republican?
25   A.   In this illustrative plan in Table 1,

Page 141

C. WARSHAW

1
2  yes.
3    Q.   What I would like you to do is change
4  the Republican vote shares from 60/40 to 51
5  Republican, 49 Democrat for Districts 2 and 3.
6  Okay?  And just before we calculate the
7  efficiency gap, a 51 Republican, 49 Democratic
8  district is better for Democrats than a 60
9  percent Republican, 40 percent Democratic
10 district, right?
11   A.   Well, it leads to a more competitive
12 district.  But in the end the outcome here is the
13 same, that there's -- if anything now, Democrats
14 have achieved more of the statewide vote without
15 achieving any more seats.  So they would be --
16   Q.   I'm just asking you generally.
17 Obviously, Democrats would prefer in all
18 circumstances a 51 percent Republican district to
19 a 49 percent Democratic district over a
20 60 percent Republican district to a 40 percent
21 Democratic district, right?
22       MR. YEAGER:  Objection; incomplete
23 hypothetical.
24       You may answer.
25       THE WITNESS:  I mean, I think that if

Page 142

C. WARSHAW

1
2    they knew it was going to be 51/49, then
3    they would have no strong preference.  But I
4    think that if you thought that 51/49 might
5    give you a better chance of crossing
6    50 percent, then sure, they would prefer
7    that if they thought there's variation
8    across election cycles, things like that.
9    BY MR. CARVIN:
10    Q.   And a 51/49 district will always give
11    you a better chance of crossing the 50 percent
12    threshold than a 60/40 district, right?
13    A.   I would say in that extreme -- kind of
14    extreme example, yes.  I mean, if it was 55/45 I
15    wouldn't necessarily say that.
16    Q.   So can you do what I asked you to do?
17    Calculate the efficiency gap if you changed 60
18    Republican to 51 Republican, and 60 Republican to
19    51 Republican, and change 40 Democrat to 49
20    Democrat in both of those districts.
21    I'll give you this.
22    MR. YEAGER:  Don't write on the
23    exhibit.
24    THE WITNESS:  Just kidding.
25    MR. YEAGER:  Is it okay if I give the

Page 143

C. WARSHAW

1
2    witness a piece of paper?
3    MR. CARVIN:  Sure.
4    THE WITNESS:  So it's 51 votes in each
5    district for the Republicans now?
6    BY MR. CARVIN:
7    Q.   Yes.  And 49 for the Democrats.
8    A.   Sure.
9    Q.   Calculate the efficiency gap for the
10    entire, all three districts.
11    A.   This is testing me without a
12    calculator.
13    If my math is right, I think it's more
14    around negative 32 percent.
15    Q.   That's right.  So it's gone from
16    20 percent to negative 33 percent, correct?  The
17    efficiency gap has increased in a pro-Republican
18    biased way, right?
19    A.   Yes.
20    Q.   As the districts become more
21    competitive and more accessible to Democratic
22    victories, the efficiency gap does not decrease.
23    It increases, correct?
24    MR. YEAGER:  Objection; incomplete
25    hypothetical.

Page 144

C. WARSHAW

1
2    You may answer.
3    THE WITNESS:  As I said before, I
4    think the --
5    BY MR. CARVIN:
6    Q.   Just answer it and then please --
7    MR. YEAGER:  Excuse me.  I instruct
8    the witness that you may answer the question
9    as you wish in order to truthfully testify.
10    You don't have to take directions from
11    counsel on how to give a truthful answer.
12    Please answer the question.  You may
13    hear it back if you would like to have it
14    put to you again.
15    MR. CARVIN:  Why don't you read it
16    back to him.
17    (The record was read back by the
18    reporter as follows:
19    "Question:  As the districts become
20    more competitive and more accessible to
21    Democratic victories, the efficiency gap
22    does not decrease.  It increases, correct?")
23    THE WITNESS:  In this hypothetical
24    example, that's true.  And I think that in
25    general, as I said before, there's no

Page 145

C. WARSHAW

1
2    necessary relationship or clear empirical
3    relationship between the competitiveness of
4    elections and the efficiency gap.  But
5    surely we could draw hypothetical examples
6    where more competitive elections also
7    correspond to an efficiency gap that's more
8    penalized if it's -- that disfavors the
9    party that gains more competitive elections.
10    And as I said before, I think those
11    are two different metrics for
12    gerrymandering.  In this case, if the
13    Democrats received -- you know, 173 divided
14    by 300 is 58 percent of the statewide vote,
15    and they only received a third of the seats,
16    then I think that would be -- there would be
17    a strong partisan bias in those results
18    against the Democrats.
19    BY MR. CARVIN:
20    Q.   But you would know that without
21    calculating the efficiency, correct?  The
22    percentage of statewide vote needed to capture
23    the majority of the seats.  That's not what the
24    efficiency gap measures, right?
25    A.   Well, there's a mathematical

Page 146

C. WARSHAW

1
2  correspondence.  If you assume equal turnout
3  across districts, then the number of wasted votes
4  exactly equals the equation -- the math in
5  equation two in my report.
6      Q.   Right.  But what I'm trying to figure
7  out is in my hypothetical where there is a 51
8  Republican -- two 51 Republican districts as
9  opposed to two 60 percent districts, that
10  gerrymander would be less durable than the 60/40
11  districts, right?
12      A.   Yes.
13      Q.   Okay.
14      A.   Yes.
15      Q.   Now I'm going to ask you to do one
16  other thing.  I want --
17      A.   I would just expand upon that.  I
18  think neither in my report -- I mean, I haven't
19  analyzed this, but I don't think in my report
20  I've ever stated that there's a necessary
21  correspondence between the magnitude of the
22  efficiency gap and its durability.
23      Q.   And in fact --
24      A.   There could be -- I haven't analyzed
25  this, but I take it there could be tradeoffs that

Page 147

C. WARSHAW

1
2  a party could make.
3      Q.   Right.  In fact, there is no
4  connection between the magnitude of the
5  efficiency gap and the durability of the
6  gerrymander, correct?
7      A.   There is not a necessary theoretical
8  correspondence.  Empirically we know that
9  efficiency gaps are relatively consistent over
10  time, particularly in the modern era, as I show
11  in my report.  But at a hypothetical level, or
12  even theoretical level, there could be tradeoffs
13  that a party would make.  They would sacrifice --
14  you know, as in the example here, they might --
15  they might not want to risk cracked districts
16  that are 51/49.  They might go for 60/40 or 56/44
17  as we see in other states.
18      Q.   All right.  Well, let's figure out the
19  durability.  I'm going to give you another
20  hypothetical.  Okay?
21          Now I want District 3 in your thing to
22  be 51 Democratic, 49 Republican.  Keep District 2
23  as 51 Republican and 49 Democratic and keep
24  District 1 as it is.  What would be the
25  efficiency gap in that plan?

Page 148

C. WARSHAW

1
2      A.   So in this scenario there would
3  be a -- well, the efficiency gap would be
4  essentially zero.
5      Q.   Essentially zero?
6      A.   Yeah.  And the reason for that, the
7  reason we can see that intuitively is that in
8  this scenario the Democrats would get two-thirds
9  of the seats and something close to -- not
10  two-thirds of the vote but 59 percent of the vote
11  or something like that.  58 or 59 percent of the
12  vote.
13      Q.   Right.  But the efficiency gap goes
14  from about 33 percent to 0 percent when Democrats
15  increase their vote share by 2 percent in
16  District 3, right?
17      A.   Sure.  I mean, as I said earlier, I
18  think that's a weakness of the efficiency gap, is
19  that when there's a small number of seats, it's
20  subject to big changes when there's, you know,
21  small changes in election results.  That's why in
22  my analysis I don't use any states with only
23  three congressional districts.
24      Q.   It's also true that the efficiency gap
25  does change quite substantially if the party that

Page 149

C. WARSHAW

1
2  had been winning 49 percent of the vote in a
3  subsequent election wins 51 percent of the vote,
4  correct?
5          MR. YEAGER:  Objection; incomplete
6  hypothetical.
7          You may answer.
8          THE WITNESS:  It depends on the number
9  of seats, but certainly it's going to
10  change.  In a state house with many seats,
11  that wouldn't affect the efficiency gap very
12  much.  In a congressional plan with, you
13  know, three seats, obviously it affects it
14  quite a bit.  And with 14 seats it will
15  affect it somewhat but not nearly as much as
16  with three seats.
17  BY MR. CARVIN:
18      Q.   Well, if two competitive districts
19  went Democratic in 2018, they would win seven of
20  14 seats.  You wouldn't consider that a
21  disproportion between seats and votes in
22  Michigan, would you?
23      A.   No, you might.  Because if Democrats
24  were to win two competitive districts this year,
25  it's probably because they increased their

Page 150

C. WARSHAW

1
2  statewide vote share.  If they were to win 57
3  percent of the statewide vote but only half of
4  the seats.
5      Q.   What if they won 52 percent of the
6  statewide vote and half the seats?
7      A.   I think that -- well, it's certainly
8  possible.  It's not likely.
9      Q.   But if it did happen, you wouldn't
10  view that as --
11     A.   But I think --
12         MR. YEAGER:  Wait.  Let him ask a
13  question.
14 BY MR. CARVIN:
15     Q.   -- an unfair gerrymandering?
16         MR. YEAGER:  Objection; incomplete
17  hypothetical.
18         You may answer.
19         THE WITNESS:  If Democrats were to win
20  52 percent of the statewide vote and half
21  the seats, then that would be a negative
22  efficiency gap of roughly 4 percent.  So
23  that would not be evidence on its own of an
24  indicator of a gerrymander.
25 BY MR. CARVIN:

Page 151

C. WARSHAW

1
2      Q.   Okay.  So switches in competitive
3  districts can have a large effect on the
4  efficiency gap, not as extreme as this three-seat
5  example, but obviously they can have an effect on
6  it, right?
7      A.   They can.  That's why in my report I
8  didn't rely on just the efficiency gap but I
9  relied on both looking at, say, presidential vote
10  with the efficiency gap, looking at the
11  mean-median difference and declination, both of
12  which are arguably less subject to variation due
13  to this 50 percent.
14     Q.   Well, we'll come back to that.
15     A.   Certainly the mean-median I think is
16  substantially less subject to this kind of
17  variation.
18     Q.   Okay.  But in all events, with respect
19  to the efficiency gap, this is what we were
20  talking about before about the volatility of the
21  efficiency gap and what Stephanopoulos and McGhee
22  agreed was the instability was attributable to
23  the fact that changes in the outcomes in
24  competitive districts can have a profound effect
25  on the overall efficiency gap.  Correct?

Page 152

C. WARSHAW

1
2      A.   I would disagree with the "profound"
3  part of that statement.  But certainly it can
4  have an effect in a three-district election.
5  Then it can have a profound effect.
6      Q.   If you can turn back to the Stanford
7  Law Review article by Stephanopoulos and McGhee,
8  which I believe is Exhibit 2.
9      A.   The 2018 article.  Sure.
10     Q.   Do you have that in front of you?  If
11  you could turn to page 1512.  Under "B.
12  Distinctness," they're discussing their criterion
13  for proper measures and they state, do they not:
14  "Our second criterion is that a gerrymandering
15  metric should capture efficiency and only
16  efficiency.  It should not try to gauge other
17  electoral values, nor should it be (in part or in
18  full) a function of those values.  Here the
19  values we have in mind are goals that
20  redistricting plans may be able to promote or
21  impede:  electoral competitiveness (or how
22  close races tend to be), proportional
23  representation (or whether parties' vote shares
24  equal their seat shares)," and then it goes on.
25         Then it says:  "We consider a metric

Page 153

C. WARSHAW

1
2  to be flawed to the extent it reflects these
3  values in addition to, or instead of,
4  efficiency."
5         Correct, that's what it says?
6      A.   Yes.
7      Q.   So they deliberately avoid factoring
8  in electoral competitiveness of their seats into
9  the efficiency gap, right?
10     A.   That's correct.
11     Q.   And they deliberately avoid figuring
12  out whether parties' vote shares are equal to
13  their seat shares as part of the efficiency gap?
14     A.   Correct.
15     Q.   If you turn to page 1513, it says at
16  the bottom, the third paragraph:  "In the
17  academy, scholars appear to be split as to
18  whether a measure should incorporate values other
19  than efficiency," such as competitiveness and
20  equivalence between seats and votes.
21         Do you agree that the academy appears
22  to be split on this question?
23     A.   I think the scholars they quote are
24  split.  I don't know that the people that -- I
25  guess I'm not sure the split is as large as they

Page 154

C. WARSHAW

1  imply it is.  I think they're -- they're trying
2  to distinguish themselves from these scholars
3  that have criticized the efficiency gap.  But I
4  think, you know, most political scientists would
5  say that a measure that purports to be about one
6  thing should be about that thing rather than
7  other things.
8      Q.   Right.
9      A.   So to the extent we're trying -- you
10 know, I would put it a little differently.  I
11 would say to the extent we're trying to capture
12 partisan bias, which I would call partisan bias
13 rather than efficiency, but we're talking about
14 very similar things.  So to the extent we're
15 trying to capture that, I think -- I agree that
16 we should capture that rather than other things.
17 I think most political scientists would agree
18 with that general -- the general concept.
19     Q.   But if someone analyzing a
20 redistricting plan was interested in how many
21 competitive seats it presents, it wouldn't look
22 at the efficiency gap?
23     A.   That's correct.
24     Q.   And if it was considered about the

Page 155

C. WARSHAW

1  equivalence between a party's vote share and
2  their seat shares, it wouldn't look at the
3  efficiency gap for that reason either?
4      A.   That's correct.
5      Q.   If you would turn to page 1524.
6  They're now discussing Cover's objection to the
7  efficiency gap.  They quote Cover as saying "A
8  plan may 'achieve' the ideal of equal wasted
9  votes at the expense of...seats-votes
10 proportionality."
11     I read that correctly, right?
12     A.   Yes.
13     Q.   And do you agree that a plan may
14 achieve the idea of equal wasted votes at the
15 expense of seats-votes proportionality?
16     A.   Yes.
17     Q.   And do you agree with Stephanopoulos
18 and McGhee that a partisan gerrymander measure
19 that is wholly indifferent to whether vote shares
20 are roughly equivalent to seat shares is a good
21 partisan gerrymander measure?
22     MR. YEAGER:  I'm sorry.  Could you
23 point out where you're reading?
24 BY MR. CARVIN:

Page 156

C. WARSHAW

1      Q.   Go ahead.
2      MR. YEAGER:  Objection.
3      THE WITNESS:  Can you repeat it,
4  please?
5  BY MR. CARVIN:
6      Q.   Do you agree with Stephanopoulos and
7  McGhee that a partisan gerrymander measure that
8  is totally indifferent to whether vote shares are
9  roughly equivalent to seat shares is a proper
10 partisan gerrymander measure?
11     MR. YEAGER:  I'm sorry.  Can just tell
12 me where that is that you're reading from?
13     MR. CARVIN:  I just read it.
14     MR. YEAGER:  Well, I object.  I would
15 like to know where in the report so I can
16 determine whether you're accurately
17 reflecting what the report says or not.
18     THE WITNESS:  Well, in my view, I
19 think you are overstating it.  I don't
20 think -- I think their view is that a
21 proportional representation doesn't
22 represent the empirical reality of American
23 elections, which I share.  There has been a
24 wide body of political science that shows

Page 157

C. WARSHAW

1  that there's not a proportional one-to-one
2  relationship between seats and votes in
3  single-member-district legislative
4  elections.  If you wanted to have strict
5  proportionality, you know, probably you
6  would need to have a different system than
7  single-member elections with
8  first-past-the-post.
9      But the empirical reality of American
10 elections over the past 50 years and more is
11 that you tend to have about a two-to-one
12 relationship between the number of seats
13 that you get and the number of -- and the
14 number of seat margin and the vote margin.
15 BY MR. CARVIN:
16     Q.   Just to be clear, you're not
17 suggesting that -- you're suggesting that every
18 percentage over 50 that you get, you roughly get
19 a two percentage point increase in your seat
20 share, right?
21     A.   Exactly.  It's a longstanding -- it's
22 a well-known fact of legislative elections that
23 there tends to be a winner's bonus.
24     Q.   So if you get 53 percent of the vote,

Page 158

C. WARSHAW

1  
2  you would roughly expect 59 percent of the seats,
3  right?
4      A.   No.  You would expect 56 percent of
5  the seats with a two-to-one margin.
6      Q.   Fair point.
7      A.   Correct.  There are legal points as
8  well that I don't have a view on, about whether
9  the Supreme Court favors or disfavors
10  proportional representation.  That's outside my
11  purview of expertise.
12      Q.   Right.  So we don't expect
13  proportional representation, but we do expect a
14  party that gets a majority of the votes to get a
15  majority of the seats under this well-documented
16  expectation, right?
17      A.   Correct.
18      Q.   So if a districting plan violates that
19  majoritarian principle, than it is suggestive of
20  a gerrymander?
21      A.   It's suggestive.  Although if you had
22  a 50 -- you know, if you had 50.1 percent of the
23  statewide vote and 49 percent of the seats, then,
24  you know, obviously there could be idiosyncratic
25  factors that affect that.

Page 159

C. WARSHAW

1  
2      But clearly if you had, you know, as
3  in Michigan, 52, 53, 54 percent of the statewide
4  vote and you get five out of 14 seats, that's a
5  much larger discrepancy.
6      Q.   Right.  And would that be measured
7  directly by the efficiency gap, that equivalence
8  between seats and votes?
9      A.   Yeah.  Yes, the efficiency gap
10  captures that.
11      Q.   Okay.  So is it at the expense of
12  seats-votes proportionality, the efficiency gap?
13  You can have equal wasted votes at the expense of
14  seats-votes proportionality or equivalent?
15      A.   The only place -- the only value where
16  you will have an exactly proportional seats and
17  votes in the efficiency gap and also a zero no
18  efficiency gap is at 50 percent, where they're
19  both 50 percent.  Any other value, you will not
20  have a zero -- a no efficiency gap you will by
21  definition have a two-to-one relationship between
22  the vote margin and the seat margin.
23      Q.   So should we care about the
24  relationship between -- equivalence between seats
25  and votes in analyzing gerrymandering?

Page 160

C. WARSHAW

1  
2      A.   I think if you get -- I mean, I don't
3  have a view about whether we should have exact
4  proportional representation.  As I said, as a
5  scholar of elections, I know that that's
6  unrealistic in single-member districts and you're
7  not going to have proportional representation.
8      Would exact proportional
9  representation be better from a normative sense?
10  I don't know.  But in single-member districts,
11  that's not a reality.  What is a reality is in
12  single-member districts over the past 50 years is
13  having about a two-to-one relationship between
14  the number of seats you get and the number of
15  votes that you get, or the margin of seats and
16  votes.
17      Q.   Should we be worried about departures
18  from that two-to-one relationship?
19      A.   I think that we shouldn't worry about
20  modest departures from it.  Obviously there's
21  lots of things that could lead to modest
22  departures.  But where you have large departures
23  such as that when you get a majority of the
24  statewide vote and a small minority of the seats,
25  or even, you know, you get close to a majority of

Page 161

C. WARSHAW

1  
2  the statewide vote and a very small minority of
3  the seats as in the Michigan state senate, then I
4  think that's problematic.
5      Q.   So you are not advocating proportional
6  representation, but you think it's problematic if
7  a party captures a majority of the vote and a
8  minority of the seats?  Do I understand that
9  correctly?
10      A.   In general, yes.  With the caveat
11  being that if it's a very small majority in a --
12  you know, a bare majority and a bare minority,
13  then I wouldn't find that problematic.  But
14  certainly if it's a large majority of the vote
15  and a small minority of the seats, I think that
16  would be problematic.
17      MR. CARVIN:  If we could mark this as
18  Exhibit 8.
19      (Exhibit 8 marked for identification
20  and attached hereto.)
21  BY MR. CARVIN:
22      Q.   I've handed you Exhibit 8.  This is
23  the Krasno article.  Have you seen this?
24      A.   I've seen this article.  I haven't
25  read this article closely.

Page 162

C. WARSHAW

1
2    Q.   I gave you the draft before, the
3    predecessor to this.  You reference a forthcoming
4    Krasno article in your --
5    A.   I think that's the other article you
6    mentioned.
7    Q.   Yeah.  I'm going to represent to you
8    that this is a refinement or continuation of
9    that.
10   A.   Okay.
11   Q.   In all events, I'm trying to speed
12   this up as much as I can.
13        If you turn to page 27, they're
14   talking about the Wisconsin redistricting.
15   A.   Uh-huh.
16   Q.   And I'm going to give one example that
17   they give.  It's describing the efficiency gap,
18   and in the second sentence in the second full
19   paragraph it says:  "For example, in a contrast
20   where the Democrat wins 50 votes and Republicans
21   winning 45, the disparity in wasted votes is
22   enormously favorable to the Democrats, one wasted
23   Democratic vote versus 49 wasted Republican
24   ones."
25        That's true, isn't it?

Page 163

C. WARSHAW

1
2    A.   Yes.
3    Q.   And then as we've discussed
4    previously, if two Democratic voters change their
5    minds and support the Republicans, the disparity
6    is now equally favorable to the Republicans.
7    Correct?
8    A.   Yes.
9    Q.   Okay.  And then if you could turn to
10   the top of page 28.  It's discussing another
11   measure but in addition to the efficiency gap.
12   It says:  "Both measures are susceptible to big
13   changes from small movements in the vote near 50
14   percent in a district, suggesting that any map
15   with a number of competitive districts will
16   produce unstable results under the efficiency
17   gap."
18        Do you agree with that statement?
19   A.   Can you read it back to me?
20   Q.   "Both measures are susceptible to big
21   changes from small movements in the vote near
22   50 percent in the district, suggesting that any
23   map with a number of competitive districts will
24   produce unstable results."
25        Do you agree with that?

Page 164

C. WARSHAW

1
2    A.   Again, I think it depends how many
3    districts there are.  If there's three districts
4    and two of the three are competitive or one of
5    the three is very close, then results will bounce
6    around.  As the number of districts increases,
7    unless the number of competitive districts
8    increase correspondingly, and even then if --
9    even if there's a larger number of competitive
10   districts, they're not all likely to kind of
11   swing around each election.  You know, there's
12   still going to be a bias toward one party or the
13   other.
14        So in general, as there's more
15   districts, I would expect the efficiency gap to
16   be more stable.
17   Q.   But, say, if there's only 14 seats,
18   then it will be relatively unstable?
19   A.   I think clearly it will be less stable
20   with 14 districts than with 100 or 200 or a
21   thousand.  But I would view 14 districts as
22   providing, you know, reasonable estimates that I
23   think are reliable.
24   Q.   All right.  They're making the point
25   that in Wisconsin there was enough districts

Page 165

C. WARSHAW

1
2    close enough to the 50/50 tipping point that a
3    small shift in the vote moves a relatively large
4    number of districts to the other party's column.
5    Consequently, beyond capturing vote dilution,
6    it's clear that efficiency gap and the other
7    measure also pick up electoral performance
8    rendering them unreliable at detecting
9    gerrymanders.
10        Do you agree with that statement?
11   A.   No.
12   Q.   "Given these measurement properties,
13   we would not use either metric to argue for or
14   against a gerrymander."
15        Do you disagree with that statement?
16   A.   Yes.
17   Q.   "Other scholars have raised similar
18   doubts about the EG in particular," and then it
19   cites some other scholars.
20        Do you agree that scholars have raised
21   similar doubts about the efficiency gap for the
22   reason that I just articulated?
23   A.   Yes.  I think -- I'll state two
24   things.  One is that the Stephanopoulos and
25   McGhee 2018 article largely addresses the

Page 166

C. WARSHAW

1
2  concerns of those scholars.  But at a more
3  general level, I view -- you know, the goal of a
4  gerrymander is to win seats.
5      Q.  Right.
6      A.  So I think having a measure that takes
7  account of actually winning seats, which at the
8  end of the day is what a gerrymander is trying to
9  do, is a feature, not a bug, of the efficiency
10  gap.
11      Q.  Right.
12      A.  I think to the extent that other
13  measures like the mean-median don't actually
14  directly incorporate information about the seats
15  the parties win, I think that's not ideal from a
16  theoretical point of view.
17          And I think the small variation -- the
18  noise in the efficiency gap due to the changes in
19  these competitive elections is a weakness, but I
20  think it is based on the idea that the efficiency
21  gap is actually incorporating the number of seats
22  that parties win.  Which I think is an important
23  thing to incorporate into a measurement of
24  gerrymandering.
25          I'll also say that empirically in

Page 167

C. WARSHAW

1
2  general the -- I think it's important to remember
3  that the measure you use is relatively
4  unimportant.  You know, scholars -- my assessment
5  of this literature -- and as you said earlier, I
6  will readily admit that I am not one who has
7  tried to promote a particular measure of
8  gerrymandering.  You know, I think none of these
9  are perfect.  But at the end of the day all these
10  measures of gerrymandering are extremely highly
11  correlated, particularly in states like Michigan
12  with competitive elections.  And so in general
13  they give you very similar answers.  You can pick
14  around the margin and find one metric in one case
15  gives you slightly different answers.
16          But, you know, in Michigan --
17  certainly in Michigan where I looked the most
18  closely, all of these metrics give you
19  substantively identical answers.
20      Q.  That's, of course, preordained, right?
21  If a party captures more seats with a minority of
22  the votes, the mean-median, the declination, and
23  the efficiency gap are going to give you very
24  similar scores if they're biased against the
25  party with a majority of the statewide votes.

Page 168

C. WARSHAW

1
2  Isn't that true?
3      A.  Yes.
4      Q.  So it hardly reinforces the robustness
5  of the efficiency gap.  It just reflects the fact
6  that all these measures will condemn any plan
7  where a party receives less than 50 percent of
8  the statewide vote and receives more than
9  50 percent of the statewide seats, correct?
10      A.  Yes.  But the magnitude of how much
11  they'll condemn it is going to vary across
12  metrics and across -- well, mostly importantly,
13  it will vary based on the disparity between the
14  number of seats and votes.  And in a state like
15  Michigan where there's a large disparity between
16  the statewide votes and seats, then all of the
17  measures will find an extreme gerrymander.
18      Q.  Can you give me an example of where
19  there is a large efficiency gap and not a large
20  mean-median difference or a large declination
21  anywhere?
22      A.  Yes, I can.  So in the -- I haven't
23  looked closely at why this is, but in the
24  one-party South, in the Democratic South in the
25  1970s and '80s, the efficiency gap -- and I

Page 169

C. WARSHAW

1
2  assume declination although I haven't looked at
3  this -- show that there are very large Democratic
4  gerrymanders.  Which in fact they were.  There's
5  lots of qualitative evidence on this.  Cox and
6  Katz's I think 2002 book which I cite in my
7  report focuses on this at length.  So we know
8  from a large body of evidence that there is
9  certainly an intent to gerrymander by Democrats
10  in the South in the 1970s and '80s, and it
11  appears to have had that effect.  And the
12  efficiency gap captures that extremely well.
13      Q.  And the declination does as well?
14      A.  I believe the declination does as
15  well, whereas the mean-median does not capture
16  that.
17      Q.  So that's a deficiency in the
18  mean-median score?  It doesn't capture what's a
19  well-acknowledged and obvious gerrymander.
20      A.  As I said earlier, I think none of
21  these metrics are perfect.  But in general for --
22  and those are -- and that's partly because those
23  are uncompetitive elections.
24          So what Stephanopoulos and McGhee
25  point out is that in the case of an uncompetitive

Page 170

C. WARSHAW

1  election where one party gets 60 or 65 percent,
2  say, of the statewide vote, you know, then the
3  different metrics will diverge a little bit more.
4  But we don't observe that very much in the modern
5  U.S., and we certainly don't observe it in
6  Michigan.
7      Q.   Right.  So in the modern era, when
8  there are competitive elections, there's
9  virtually never or very rarely any divergence
10 between efficiency gap, mean-median, and
11 declination, correct?
12     A.   I would agree with that.
13     Q.   Okay.  Why don't we discuss the
14 mean-median.  That was first proposed in a 2015
15 Election Law Journal by Best and McDonald?
16     A.   I believe that's true.
17     Q.   And the Election Law Journal, is that
18 a peer-reviewed journal?
19     A.   Generally speaking, it is.  I think
20 they do publish occasionally doctrinal articles
21 that might not be peer-reviewed, but their social
22 science articles are peer-reviewed.
23     Q.   Okay.  There's certainly no wide
24 scholarly acceptance of mean-median as the best

Page 171

C. WARSHAW

1  or proper measure of partisan gerrymanders,
2  correct?
3      A.   Correct.
4      Q.   And it's been subject to serious
5  criticism by respected political scientists?
6      A.   Correct.
7      Q.   Including Stephanopoulos and McGhee?
8      A.   Correct.  I think I discuss some of
9  those criticisms in my report.
10     Q.   Yeah, why don't we turn to that.  If
11 you could turn to page 9 of your report.
12     A.   Yes.
13     Q.   One problem with it is it is possible
14 for packing and cracking to occur without any
15 change in the mean-median difference, right?
16     A.   Correct.  I think McGhee in his 2017
17 article shows this, demonstrates this empirically
18 with simulations.
19     Q.   And therefore a party could gain seats
20 in the legislature without the mean-median gap
21 changing, correct?
22     A.   Correct.
23     Q.   Another problem with it is it's
24 sensitive to the outcome in the median districts?

Page 172

C. WARSHAW

1      A.   Correct.
2      Q.   And it lacks an obvious interpretation
3  in terms of the number of seats that a party
4  gains through gerrymandering, correct?
5      A.   Correct.
6      Q.   So I just want to understand how we
7  compute the mean-median difference.  I think you
8  outline that on page 10 of your report.
9      A.   Yeah, I believe that's true.
10     Q.   And this is for Congress, so there's
11 14 seats, right?
12     A.   Correct.
13     Q.   And so the median is seven seats?
14     A.   It's between the seventh and eighth
15 seat.
16     Q.   Okay.
17     A.   That's why it's 46.1.
18     Q.   And just so I understand, in going
19 from top to bottom in Democratic vote share,
20 District 3 is the seventh district?
21     A.   I'm sorry, District 3 --
22     Q.   Bottom to top, if you want to look at
23 it that way.
24     A.   It's the eighth most

Page 173

C. WARSHAW

1  Democratic-performing district, right,
2  District 3.
3      Q.   Well, it depends how you measure it.
4  Eighth most --
5      A.   Democratic.  It's the seventh --
6      Q.   It's the seventh from the bottom?
7      A.   Well, as I count up, there's seven
8  districts below it.
9      Q.   Okay.  Then I may be misunderstanding
10 it.  I thought you were splitting the difference
11 between 45.6 and 46.6.
12     A.   Correct, between the seventh and
13 eighth districts.
14     Q.   Right.  So 3 would be the seventh at
15 45.6?
16     A.   Sure, okay.  I understand what you're
17 saying now.  Sure.  Yes.
18     Q.   And 46.6 is the eighth?
19     A.   It's the eighth district from the top,
20 not from the bottom.
21     Q.   Oh, you're right.  We do have
22 rhetorical confusion.  You're saying eighth
23 district from the top on your chart.  I meant
24 eighth district from the bottom of Democratic

Page 174

C. WARSHAW

1  vote share because you --
2
3    A.  Yes, fair.
4    Q.  You go from lowest to highest on your
5  chart?
6    A.  Yes.  I think we're in agreement.
7    Q.  Okay.  So what you do is find the
8  seventh and eighth districts in terms of
9  Democratic vote share and you split the
10  percentage difference between them and say that's
11  the median score?
12    A.  Yes.
13    Q.  Okay.  And the mean is 53 percent.  Is
14  that correct?
15    A.  Yes, I believe that's true.
16    Q.  And just so I understand it, that mean
17  is just averaging up the numbers above.  It's not
18  necessarily the Democratic statewide vote share
19  in those districts, correct?
20    A.  Correct.  I think that's the way it's
21  typically done in this literature.
22    Q.  Okay.  And that means, to be specific,
23  you don't factor turnout differentials among the
24  districts?
25    A.  Correct.  The mean-median metric does

Page 175

C. WARSHAW

1  not explicitly factor in -- it does not factor in
2
3  turnout as is typically done.  I'm not sure
4  theoretically the reason for that, that it
5  necessarily needs to be that way.  It seems to me
6  there's no reason you couldn't do it using a
7  statewide vote.  But I think the way it's been
8  proposed, it's looking at the average across the
9  districts, which is what I tried to do here.
10    Q.  So every time the statewide average is
11  above 50 percent and the party has less than
12  50 percent of the vote, there's always going to
13  be a mean-median difference, right?
14    A.  Yes.  There will always be a
15  mean-median difference that disadvantages the
16  party that doesn't get half the seats if they get
17  more than half the votes.  I mean, there also
18  could be a mean-median difference, though, in
19  other values where they could get a majority of
20  the vote and the seats and still have a
21  mean-median difference that disadvantages them.
22  So it doesn't uniquely identify the situation,
23  this hypothetical that you've identified.
24    Q.  But it always identifies -- that will
25  always be condemned by the mean-median difference

Page 176

C. WARSHAW

1  by definition because the median has to be less
2
3  than 50 percent?
4    A.  I think that's true in a situation
5  with equal turnout.
6    Q.  And how about if a party got
7  53 percent of the statewide vote and won all ten
8  of the seats, so 53/47.  53 percent of the vote
9  would capture 100 percent of the seats but the
10  mean-median difference would be zero, correct?
11    A.  If they got -- if the median -- if all
12  of the seats were 53 percent and they had a mean
13  across them of 53 percent, then yes, I believe in
14  that case -- I haven't thought about this before
15  this conversation.  But I believe in that case
16  that would be a mean-median of zero.
17    Q.  Okay.  And this declination theory,
18  this was published this year by this fellow named
19  Warrington?
20    A.  Correct.
21    Q.  Has there been any scholarly
22  commentary on this?
23    A.  No.  I think it's a new metric and
24  there's been -- to my knowledge, there's been no
25  explicit response or critique, although I'm not

Page 177

C. WARSHAW

1  100 percent sure of that.
2
3    Q.  So obviously there hasn't been wide
4  acceptance of this measure in the political
5  science community as a proper measure of partisan
6  bias or gerrymander?
7    A.  Just because it's so new.  I don't
8  think there's a consensus either way.
9    Q.  Okay.  Again, to the extent I can
10  understand this thing, it's you look at the
11  difference between the two vote lines or
12  something like that?
13    A.  Yeah, correct.
14    Q.  All right.  My first question is:  Do
15  you really expect the judges to understand this
16  thing?
17    But in any event, again, if you're
18  getting a minority of the vote and a majority of
19  the seats, this declination is going to be -- is
20  going to show a problem, right?
21    MR. YEAGER:  Object to the prior
22  comment which is part of the question I
23  think.  I'm sure the judges can understand
24  this perfectly well.
25    You can answer.

Page 178

C. WARSHAW

1  BY MR. CARVIN:
2  Q.   Absent your counsel's suck-up, if you
3  want to go ahead and answer the question.
4  A.   I haven't thought about it explicitly.
5  I believe that's true, but I'm not 100 percent
6  sure.
7  Q.   And if you could turn to page 12 of
8  your --
9  A.   Actually, I'm not 100 sure that's true
10  of declination, that there's a necessary
11  correspondence between a majority of the votes
12  and the minority along the lines you laid out.
13  My guess is it would pick it up.  I would have to
14  think about it more.  I'm not 100 percent sure
15  about that.
16  Q.   You don't know one way or the other?
17  A.   Yeah, I don't know.
18  Q.   Because it's not intuitively obvious
19  to me how you could ever not have this --
20  A.   I mean, I think in general the
21  declination is not picking up the number of seats
22  that each party holds.  That's not -- that's why
23  I think it's not a necessary condition that it
24  would necessarily show a bias if you had a

Page 179

C. WARSHAW

1  minority of the votes and a majority of the
2  seats.
3  Q.   Okay.  All right.  Well, why don't you
4  think about that some more.
5  And then you describe candidly the
6  weakness in the declination approach at the top
7  of page 12.  You say:  "A weakness of the
8  declination approach vis-a-vis the efficiency gap
9  is that declination lacks a clear interpretation
10  in terms of the number of seats that a party
11  gains through gerrymandering."
12  Is that correct?
13  A.   Yes.
14  Q.   "It also is somewhat unstable when a
15  party holds a very small number of seats in the
16  legislature."
17  A.   Yes.
18  Q.   Why is that?
19  A.   Well, if you had a very small number
20  of seats, then the center of mass for each party
21  could change substantially election to election.
22  Q.   Okay.  And would five be considered a
23  small number of seats?
24  A.   I don't have a -- I'm not sure that's

Page 180

C. WARSHAW

1  in his article, and I haven't analyzed that
2  myself, how unstable it is, the different values.
3  Q.   You say:  "Some scholars have claimed
4  that it represents a better measure of intent in
5  the gerrymandering process than the efficiency
6  gap."  Correct?
7  A.   Yes.
8  Q.   Can you explain why it would be a
9  better measure of intent?
10  A.   I think the argument is that what the
11  declination is trying to capture is whether the
12  50 percent line of winning a seat is privileged;
13  so in other words, the distribution of vote
14  shares look different above and below the
15  50 percent mark.  And they argue that to the
16  extent they look different, as in Figure 1, that
17  would only happen through intentional
18  gerrymandering rather than through by accident.
19  You know, I'm --
20  Q.   Sorry, go ahead.
21  A.   I mean, I was careful in that
22  statement I think.  I don't have a strong
23  personal view that it is necessarily capturing
24  intent better, but this is -- both Professor

Page 181

C. WARSHAW

1  Warrington and McGhee I think make that
2  assertion.
3  Q.   Well, let's assume you did have this
4  distribution that looked bad under declination.
5  Does declination tell you the cause of that?  If,
6  for example, a state had a large concentration of
7  Democrats in certain areas and a large
8  concentration of Democrats in certain districts
9  because of the Voting Rights Act you would get
10  this gap even if a line drawer with no partisan
11  attempt through the lines, correct?
12  A.   I haven't personally analyzed -- I
13  haven't analyzed that.  I couldn't say for sure.
14  I couldn't say.
15  Q.   Okay.  Now, you did an analysis, a
16  historical analysis of the efficiency gap
17  throughout the last -- I think it was the last 40
18  or 50 years, correct, in various states?
19  A.   Yeah, roughly the last 45 years.
20  Q.   And did you do a similar analysis for
21  mean-median scores?
22  A.   I did.
23  Q.   Is there a graph showing that?
24  A.   No, there isn't.  I think if I were to

Page 182

C. WARSHAW

1  do this again, maybe I would put it in.  I wasn't
2  trying to hide the eight ball.  I wanted to go
3  for succinctness in the report.  What I note,
4  though, on page 19 is the percentage of time that
5  the absolute -- both the absolute mean-median --
6  you know, the absolute mean-median in Michigan is
7  larger than, you know, X percentage historically
8  and then how -- what percentage of the time it's
9  more pro-Republican than other plans.
10     Q.   You say that it's more extreme than
11  the mean-median difference at 78 percent of
12  previous elections, correct?
13     A.   Correct.
14     Q.   And these are the same elections that
15  you looked at relative to the efficiency gap?
16     A.   Correct.
17     Q.   In both congressional and state
18  legislative districts?
19     A.   Yes.  I use the same data to calculate
20  all the metrics.
21     Q.   Okay.  But you didn't either produce a
22  graph or identify the states that constitute
23  either the 78 percent or 22 percent?
24     A.   Well, I think I implied -- I think I

Page 183

C. WARSHAW

1  stated, and if I didn't, I certainly implied that
2  I had done it using the same data as for the
3  efficiency gap.
4     Q.   No, I get that.
5     A.   And if that's ambiguous, I apologize
6  for the ambiguity.
7     Q.   And the reason you didn't produce a
8  graph showing this was you ran out of time?  Ran
9  out of space?
10     A.   No.  I just wanted -- I wanted the
11  report to be succinct.  There's no conceptual
12  reason I couldn't -- I didn't or couldn't.  It
13  would show very similar -- I believe it would
14  show very similar patterns as what's in the
15  efficiency gap graph, but I can't say for sure.
16     Q.   Well, with the efficiency gap graph
17  you could tell the extent of the difference
18  because you created this bell curve and showed
19  where Michigan ranked.
20     A.   Right.
21     Q.   You don't represent that either
22  pictorially or verbally.  You just say it's more
23  extreme than 78 percent of previous elections,
24  correct?  But it could be more extreme by

Page 184

C. WARSHAW

1  0.1 percent of that 78 percent of previous
2  elections, right?
3     A.   I don't present any numbers, anything
4  in the report that would enable us to -- I'm
5  fairly confident that it is not only marginally
6  more larger.  But I don't have the numbers in the
7  report to show that.  It would be in my data that
8  I provided to the other side.
9     Q.   And I think you've answered this, and
10  I apologize.  I just want to clarify the record.
11  This comparison for the mean-median difference
12  relates to the same elections as what you did for
13  the efficiency gap?
14     A.   Correct.
15     Q.   Okay.  All right.  And with respect to
16  prior Michigan redistrictings, do you compare the
17  mean-median difference in the 2011 redistricting
18  cycle to the mean-median difference in the 2001
19  Michigan cycle?
20     A.   I am not.  That would be in the data
21  that I have, but I have not looked at that and I
22  said I don't present it in the report.
23     Q.   And --
24     A.   I think I should just state for the

Page 185

C. WARSHAW

1  record, it's not that I did so and intentionally
2  decided not to present it or something.  I just
3  didn't look at that, didn't focus on that.
4     Q.   Okay.  Now, for the efficiency gaps,
5  you looked at the results for 2014 and 2016 as
6  well as 2012, right?
7     A.   Correct.
8     Q.   On page 19 you just give us the mean
9  and median score for the 2012 elections.
10     A.   I believe that's true.
11     Q.   Is there anywhere in the report that
12  we can see the mean-median difference for 2014
13  and 2016?
14     A.   I don't believe so.
15     Q.   Okay.  Now, you have previously opined
16  that the similar results for the efficiency gap
17  numbers between 2012 and 2016 suggested that this
18  was a durable gerrymander.  You didn't do any
19  such analysis for the mean-median difference,
20  correct?
21     A.   Correct.
22     Q.   Now, for the house, did you give the
23  scores for the mean-median and declination?
24     A.   I don't know whether I gave -- it

Page 186

C. WARSHAW

1
2  would be on page -- Sorry, the state house or
3  Congress?
4      Q.   State house.
5      A.   My analysis there would be on page 36,
6  I believe.
7      Q.   Right.  And I didn't see any --
8      A.   So --
9      Q.   Sorry.  Go ahead.
10     A.   Correct.  I don't think there's a
11  number.  I didn't provide a number in the report,
12  and I don't have it in my head either.  It's in
13  my data.  I could have provided it, but I just --
14  again, I was trying to keep this part of the
15  analysis succinct and not get bogged down in the
16  details of all these different metrics.
17     Q.   Can you give me a rough estimate of
18  what the mean-median score was in 2012?
19     A.   I don't have that in my head for the
20  state house districts.
21     Q.   Okay.  Same question for the
22  declination score.  I don't believe you put that
23  forward in your report.
24     A.   I don't have it in my head.  It's in
25  my data.  I could find it or one could find it,

Page 187

C. WARSHAW

1
2  but it's not in my head.
3      Q.   Okay.  Same question for declination.
4  I don't believe you did any analysis of the
5  declination score for the 2014 and 2016
6  elections.  Is that correct?
7      A.   I did do the analysis.  As I said,
8  it's in my data but it's not in -- I didn't put
9  it in the report.
10     Q.   And you didn't draw any conclusions
11  about whether the 2014 and 2016 declination and
12  mean-median scores were similar to the one that
13  you did report for 2012, correct?
14     A.   That's correct.  Although the
15  declination in particular is extremely highly
16  correlated with the efficiency gap over the past
17  45 years.  So given that the efficiency gap
18  estimate is durable, I would expect that the same
19  would be true of declination.
20     Q.   Okay.  I'm going to ask you
21  essentially the same questions on declination
22  that I just asked you about mean-median.
23          THE WITNESS:  Could we do a short
24  break?
25          MR. CARVIN:  Sure.  Don't worry about

Page 188

C. WARSHAW

1
2  it.
3          (Recess taken.)
4  BY MR. CARVIN:
5      Q.   So just to finish up, I think where we
6  left off, the same questions I think I just asked
7  you about the mean-median I'm going to ask you
8  about the declination.
9          There is no chart in here like that
10  for the efficiency gap showing past declination
11  scores in the nation for Congress or state
12  legislators, correct?
13     A.   That's correct.  And I'll say the
14  reason for that is, again, I wanted the report to
15  be succinct and readable, but I also viewed these
16  measures as robust.  And given the results --
17  really I wanted to show the results are similar,
18  especially for 2012, and that's what I focused
19  on.
20     Q.   And you say at the top of page 20 that
21  the declination scores are more extreme than
22  91 percent of previous elections, right?
23     A.   Correct.
24     Q.   Again, it's the same elections that
25  you referenced in the efficiency gap?

Page 189

C. WARSHAW

1
2      A.   Correct.
3      Q.   And you don't report, however, the
4  difference between 0.56 and these other
5  declination scores?
6      A.   Correct.  No, I don't.
7      Q.   And you didn't look at the prior
8  declination scores for Michigan congressional or
9  Michigan state legislative plans?
10     A.   I didn't.  It's all in the data that I
11  provided to your side, but I didn't reference it
12  in the report.
13     Q.   Okay.  All right.  Let's switch
14  topics.  You go on in this report about the
15  effect of -- well, about roll call votes and the
16  efficiency gap and roll call voting in Congress.
17          If you could turn to page 24 of your
18  report.
19     A.   Uh-huh.
20     Q.   "To be clear, I do not argue that
21  gerrymandering causes more polarization in
22  Congress."  That's what you say on page 24?
23     A.   That's correct.
24     Q.   So you're making no argument that
25  gerrymandering contributes to or causes

Page 190

C. WARSHAW

1
2  polarization in Congress?
3      A.   That's correct.
4      Q.   It's pretty obvious, right, because
5  isn't the U.S. Senate just as polarized as the
6  House of Representatives?
7      A.   It's roughly the same.  I don't know
8  that it's exactly the same.  Yeah, they're very
9  similar, which is one of the pieces of evidence
10  people point to for the lack of a relationship
11  between gerrymandering and polarization.
12      Q.   And then on page 23 --
13      A.   23, so going backwards?
14      Q.   Yeah.
15      A.   Okay.
16      Q.   You say with respect to Michigan
17  specifically that "there has never been any
18  overlap in Congress between the ideology scores
19  of Democrats and Republicans from Michigan."
20  Right?
21      A.   Yes, I believe that's true.
22      Q.   "Republicans are always substantially
23  more conservative than Democrats from Michigan."
24      A.   Yes.  That's in Figure 9A.
25      Q.   And then Figure-- well, let's look at

Page 191

C. WARSHAW

1
2  Figure 8 first, polarization in the U.S. House.
3  Right?
4      A.   Uh-huh.
5      Q.   You say that there's been an increase
6  in partisan polarization in the U.S. House,
7  right?
8      A.   That's correct.
9      Q.   And that occurred -- a lot of that
10  occurred well in advance of 2011?
11      A.   Correct.
12      Q.   And during those years the efficiency
13  gap was not clearly favoring one party over
14  another, and it bounced around a lot, right?
15      A.   Well, as I stated, during the 1970s
16  and '80s the efficiency gap generally favored
17  Democrats actually on average.  During the 1990s
18  there is really no national bias in either
19  direction.
20      Q.   Nonetheless, throughout that time the
21  partisan polarization increased even though there
22  was no favoritism in the efficiency gap?
23      A.   Correct.  But again, I'm not making
24  any assertion that gerrymandering causes
25  polarization.

Page 192

C. WARSHAW

1
2      Q.   Right.  And if you look at Figure 9,
3  the same thing.  The polarization in Michigan has
4  increased from 1975 through the present, and at
5  least for most of that term Michigan's efficiency
6  gap prior to 2011 largely didn't favor one party
7  or another?
8      A.   That's correct.
9      Q.   So then you have this other point
10  which I guess is relatively obvious at the bottom
11  of page 25, which is:  "Citizens are much more
12  likely to agree with the roll call votes of
13  same-party legislators than opposite-party
14  legislators on important policy issues."  Right?
15      A.   They are.  Although you skipped
16  over -- I want to back up.  I think what's
17  important to be clear about is that, no,
18  gerrymandering does not cause polarization.  But
19  the polarization that has happened for a number
20  of reasons in Congress exacerbates the effects of
21  gerrymandering on representation.  And that's
22  really what this section of the report is about.
23      Q.   Right.
24      A.   So you had some questions about
25  whether, you know, I sort of tried to look at the

Page 193

C. WARSHAW

1
2  relationship or lack thereof between
3  gerrymandering and polarization.  But I think
4  that's -- you know, regardless of whether there
5  is or isn't such a relationship, I don't have
6  any -- I don't make any assertions about that in
7  the report.  But I think what is clear is that
8  the growing polarization has magnified the
9  effects of polarization -- or has magnified the
10  effects of gerrymandering.  I'm sorry.
11      Q.   Because now citizens really disagree
12  with opposite-party legislators?
13      A.   To a certain degree.  But I think what
14  I showed in this section of the report is that
15  the ideological views of Democratic and
16  Republican elected officials in particular are
17  much more divergent than they were a generation
18  ago.
19      Q.   Right.
20      A.   So a generation ago it might not have
21  mattered very much whether you got a Republican
22  or Democratic legislator.  Regardless that that
23  was true a generation ago, today there's just a
24  vast difference between electing a Democrat and a
25  Republican.

Page 194

C. WARSHAW

1
2    Q.   Right.
3    A.   So if you bias the maps so that you
4  get more of one party or another compared to what
5  voters want, then that's going to really skew the
6  ideological distribution of the legislature and
7  the policies the legislature produces.
8    Q.   Right.  And that's the point you're
9  making at the top of 26, right?
10   A.   Yes.  I mean, page 26 looks directly,
11 sort of squarely at the congruence between the
12 views of voters and legislators.
13   Q.   And you say it's the voters in the
14 districts where their votes are wasted don't have
15 representatives with whom they agree?
16   A.   Correct.  Well --
17   Q.   What you say, to be precise, is:
18 "People whose votes are artificially wasted due
19 to gerrymandering are deprived of having
20 legislatures that agree with their views."
21 Right?
22   A.   Where are you reading?
23   Q.   The top of 26.
24   A.   Yes.
25   Q.   Okay.  But if they're artificially

Page 195

C. WARSHAW

1
2  wasted through packing, then they do have
3  legislatures that agree with their views, right?
4    A.   Looking across the legislative plan,
5  they're more likely to have a legislator -- if
6  there's more wasted votes, then they are more
7  likely to have a legislator that disagrees with
8  them, is what Figure 10 shows.
9    Q.   A legislator that disagrees with them
10 from a different district?  The legislator that
11 they're voting for is very likely to agree with
12 their views in a packed district, right?
13   A.   That is true.
14   Q.   Some other legislators that they don't
15 vote for might disagree them, but that's not
16 their representative.  Right?
17   A.   Correct.  I do think it's true
18 empirically that the majority, if not the vast
19 majority, of wasted votes are in cracked
20 districts.  So to some extent this focus on
21 packed districts is a little bit sideways.
22   Q.   Okay.  Are you excluding packed
23 districts from your analysis of people who have
24 their votes wasted?
25   A.   I'm not.  I'm just saying on average

Page 196

C. WARSHAW

1
2  in a state where one party or another is more
3  likely to have wasted votes, they're less likely
4  to have views that are congruent with their
5  legislator.
6    Q.   Well, in Michigan you claim there were
7  five Democratic packed districts in Congress,
8  right?
9    A.   I believe that's true.
10   Q.   Okay.  And there was only two or three
11 cracked districts because under any seats-votes
12 analysis they would only be expected to get seven
13 or eight seats, right?
14       MR. YEAGER:  Objection; misstates the
15    record.
16       You may answer.
17       THE WITNESS:  I don't think I made a
18    characterization in my report of which
19    districts precisely were packed and cracked,
20    and I'm reluctant to do so now.
21 BY MR. CARVIN:
22   Q.   So we don't know which districts they
23 are, but whichever they are, there can only be
24 three cracked districts where there's five packed
25 districts, right?  You're not expecting Democrats

Page 197

C. WARSHAW

1
2  to get nine of the 14 seats, right?
3    A.   No, I'm not sure I would -- I'd have
4  to think about it more.  But Districts 9 and 5,
5  I'm not sure I would assert that those are
6  packed.
7    Q.   9 and 5?
8    A.   Yeah.  I would have to think about it
9  more, but I think I would want to look more at
10 the evidence.  Just based on the numbers here,
11 I'm not sure I would assert that.  I would want
12 to think about that more based on the totality of
13 the evidence.  I just don't know either way.
14   Q.   Do you think those are safe Democratic
15 districts?
16   A.   I think they're not -- I think very
17 likely the Democrats would win a district that
18 looks like that.
19   Q.   Okay.  But just to get back to my
20 point, Democratic voters in Democratic districts
21 do agree with their elected representative's
22 views?
23   A.   Correct.
24   Q.   And they're in a very good situation
25 because the chances of their elected

Page 198

C. WARSHAW

1
2  representative being defeated are extraordinarily
3  small, right?
4      A.  I think that's true for their
5  individual legislator.  But I think what people
6  care about is the ideological composition of the
7  legislature.
8      Q.  Right.  What we're really talking
9  about is Democratic representation in the
10  legislature as a whole?
11      A.  I think that's the object that most
12  people care about.  I mean, if you packed all of
13  the Democrats into one district -- I mean, if we
14  go down the hypothetical route, if you pack all
15  Democrats into one malapportioned district and
16  you say, well, now you're 100 percent likely to
17  get a very Democratic legislator because this is
18  a 100 percent Democratic district, surely that
19  wouldn't be an outcome they would prefer, having
20  just one legislator even if they were guaranteed
21  it would be a Democrat.
22      Q.  Even though Democrats in the packed
23  districts are benefited, Democrats in adjacent
24  districts and statewide are hurt by the packing,
25  correct?

Page 199

C. WARSHAW

1
2      A.  Correct.
3      Q.  It's the Republicans in the packed
4  district who are deprived of their voice and
5  having a representative with whom they agree?
6      A.  They are advantaged at the statewide
7  level, the packed Republicans.
8      Q.  But disadvantaged with respect to
9  their own representative?
10      A.  You could argue that, yes.  I would
11  have to think about that more.  But I think in
12  general what people care about is the ideological
13  composition of the legislature.
14      Q.  Okay.  But if we're looking at it from
15  the district-specific level, it's the Republicans
16  in the Democratic packed districts who have been
17  shut out of the process and don't have a voice
18  because their legislator is never going to agree
19  with them, right?
20      A.  So, too, the Democrats in cracked
21  districts are -- lack of voice and the Democrats
22  in the packed districts are disadvantaged in the
23  statewide translation of seats to votes.
24      Q.  Right.
25      A.  And the statewide ideological

Page 200

C. WARSHAW

1
2  composition of the legislature and the policies
3  that the legislature passes.
4      Q.  If you call a cracked district a
5  48 percent Democratic district, those Democrats
6  at least have the ability to get together,
7  increase their vote share, and have a
8  representative who expresses their views; whereas
9  the Republicans in a packed district can never
10  band together enough to get a representative who
11  respects their views.  Correct?
12      A.  I think it's unlikely that a
13  Republican legislator would be elected in a
14  district that is 75 percent or 80 percent
15  Democratic.
16      Q.  But it's not implausible that a
17  Democrat could get elected in a district that's
18  produced 48 percent Democratic vote in the past?
19      A.  Sure.  I think it's certainly more
20  likely than the first scenario.
21      Q.  Particularly in an off-year election
22  following a presidential election where the
23  non-presidential party does quite well?
24      A.  Yes.  I mean, as we talked about,
25  individual seats could certainly shift in a

Page 201

C. WARSHAW

1
2  midterm year like in 2018.  But if that were to
3  happen, the Democratic statewide vote share would
4  also go way up.  So I think thinking about seat
5  shifting and absence of thinking about changes in
6  the statewide vote, you know, is misleading.
7      Q.  So we're looking at the representation
8  of the legislature as a whole, right?  So in
9  Congress, this would mean representatives
10  scattered throughout the nation, right?
11      A.  I think that's the target people care
12  about the most.  I think that in characterizing
13  the effects of the efficiency gap, I focused on
14  the median legislator in each state.  But I think
15  ultimately what we care about is the ideological
16  composition of the chamber as a whole.
17      Q.  So if Democrats in Michigan lost two
18  seats because of a gerrymander but picked up two
19  seats in Massachusetts or California or Maryland,
20  then there would be no effect on the national
21  legislature as a whole?
22      A.  There might no effect on the national
23  ideological composition.  I do think there are
24  reasons to think you want to have a legislator in
25  your state that could represent you.  I don't

Page 202

C. WARSHAW

1
2  think I would argue -- I don't think I would
3  assert that, like, if you're a Democrat in
4  Massachusetts having a Democrat from -- or a
5  legislator in general from Michigan or from some
6  other state or vice versa is the same thing.
7      Q.   You're going to have a lot more in
8  common with a Democrat from Michigan than you're
9  going to have with a Republican from
10  Massachusetts, right?
11          MR. YEAGER:  Objection; vague and
12  ambiguous.
13          THE WITNESS:  I'm not sure who -- Who
14  are we talking about here?
15  BY MR. CARVIN:
16      Q.   Well, I thought you told me that
17  there's such a wide ideological gulf between
18  Democrats and Republicans in this highly
19  polarized environment that Democrats will always
20  associate more with Democrats, even those from
21  other states, than they would with another-party
22  representative from their own state.  Is that
23  correct?
24      A.   I think that's true.  But I think what
25  I wouldn't say is that there's nothing lost by

Page 203

C. WARSHAW

1
2  having, you know, nobody from your party or
3  whatnot that represents you from your own state.
4      Q.   What is the point of all this?  I
5  mean, if two seats are unacceptably
6  gerrymandered, that would be true regardless of
7  whether that makes Congress or the Michigan
8  legislature more conservative, right?
9      A.   Yes.  But I think the point of this
10  part of -- the point of this section of the
11  report is that, you know, election results are
12  not just about the party that represents you.
13  They're about the ideological positions or just
14  the policy positions -- maybe you should think
15  even more about policy positions that your
16  legislators take.  And if the partisan
17  consequences of elections and a partisan
18  gerrymander had no policy consequences, then as a
19  political scientist I would say, you know, maybe
20  we shouldn't really care so much about it.
21          But the reality is that the
22  partisan -- the partisan outcome of elections and
23  disparities in the connection between votes and
24  seats has large and substantial consequences on
25  the political process.  It affects the roll call

Page 204

C. WARSHAW

1
2  positions that legislators take, and certainly in
3  state governments it affects the policies that
4  states produce.
5      Q.   I don't think anybody would disagree
6  that a Nancy Pelosi-led Congress is going to have
7  different roll call votes and policies than one
8  led by Paul Ryan or his successor.
9          But my question is why the federal
10  court in Michigan should care about that.  You're
11  not suggesting that they should favor a Nancy
12  Pelosi-led Democratic Congress over a Paul
13  Ryan-led Republican Congress, right?
14      A.   No.  I think my point is not that they
15  should -- certainly not that they should favor
16  one party over another.
17      Q.   Right.
18      A.   My point, though, is that, you know,
19  elsewhere in the report I state that the 2012
20  gerrymandering, what other people have estimated,
21  and I think what you could use my numbers to
22  estimate as well but I haven't done so, is that
23  the gerrymandering in 2012 cost Democrats
24  nationwide 16 or 17-ish seats in Congress.  And
25  if that was the difference between a Paul

Page 205

C. WARSHAW

1
2  Ryan-led Congress and a Nancy Pelosi-led
3  Congress, then certainly that had vast policy
4  consequences both for voters in Michigan and for
5  voters elsewhere in the country.
6          But even as we saw on the healthcare
7  bill that happened earlier this year, even if it
8  doesn't cost -- if gerrymandering doesn't affect
9  the partisan majority in Congress, if it just
10  affects the margin of each side and, as I said
11  earlier, the ideological composition of the
12  legislature, then it still has vast policy
13  consequences.
14          You know, if Republicans had had five
15  more seats in Congress -- or if Republicans had
16  had five less seats in Congress, then the House
17  wouldn't have passed the healthcare bill.  I
18  can't remember the exact margin of the tax bill,
19  but a couple of seats would have affected that as
20  well.
21      Q.   You make the claim that The Brennan
22  Center, not exactly a nonpartisan group, claimed
23  16, 17 seats in Congress were affected by
24  gerrymanders in other states.
25          My question to you is:  Why would the

Page 206

C. WARSHAW

1
2  court in Michigan resolving this case care about
3  that?  If there had been no gerrymanders outside
4  of Michigan, shouldn't they do exactly the same
5  thing with respect to the gerrymander in
6  Michigan?
7          MR. YEAGER:  Objection; calls for a
8  legal conclusion.
9          You may answer.
10         THE WITNESS:  Yeah, I don't have a
11  legal view, obviously, of how that should
12  affect the court.  But I think the couple
13  seats in Michigan certainly affect the
14  partisan and ideological composition of
15  Congress.  And as we've seen on these close
16  votes, a couple of seats matters.
17  BY MR. CARVIN:
18     Q.   Did it matter?  Did the extra two
19  Michigan congressmen that you claim were
20  accomplished through gerrymander have any effect
21  on either which votes were put to a roll call in
22  Congress or the outcome of those roll call votes?
23     A.   I don't show in this report but I -- I
24  would have to look more specifically at that.
25  But based on my experience as a political

Page 207

C. WARSHAW

1
2  scientist and studying other levels of
3  government, I think it would.
4      Q.   But you don't --
5      A.   I don't have quantitative evidence in
6  this report on that question specifically.
7      Q.   Or anywhere else.  You can't give me
8  an example now?
9      A.   I can't now, no.
10     Q.   And again, let's assume it's true that
11  these congressmen made a difference in the
12  ideological makeup of Congress.  You don't think
13  that the federal court should try and alter the
14  ideological composition of Congress, right?
15         MR. YEAGER:  Calls for a legal
16  conclusion.
17         You may answer.
18         THE WITNESS:  Yeah, I can't say what
19  courts should do.  Again, I have no view and
20  no expertise on the appropriate legal
21  standard.  But speaking as a social
22  scientist, I would come back to the point I
23  made earlier.  You look at election results
24  and it's easy to think this is sort of like
25  baseball and, oh, we're just rooting for the

Page 208

C. WARSHAW

1
2  Phillies or the Mets or the Nationals or
3  something else and it's all kind of fun and
4  games.  But at the end of the day these
5  elections have real policy consequences, and
6  I think it's important to show that.
7  BY MR. CARVIN:
8      Q.   Do you think people are unaware of the
9  fact that elections have consequences and
10  majorities in state houses and federal
11  legislatures have consequences?
12     A.   I don't think the literature on -- I
13  think at a -- in a colloquial sense probably
14  people do have a sense of that, but I think it's
15  not something that's been well studied in the
16  literature, the precise policy consequences.
17         I think this is something that -- I'll
18  just say that some of my academic work has
19  focused on explicitly, and I do think that my
20  work and others has made big strides on this in
21  recent years, particularly looking at the policy
22  consequences in ways that we didn't know before.
23         But I think we can identify now with a
24  precision that we didn't have before that the
25  partisan majority in legislatures has very large

Page 209

C. WARSHAW

1
2  effects on policy.  And to the extent that
3  gerrymandering affects the partisan control of
4  the legislature, my work has shown that there's
5  large and growing policy consequences.
6      Q.   Again, I'll ask you one last time.  Do
7  you think the federal judiciary should take a
8  position on the policy consequences of partisan
9  control or just analyze the fairness of the
10  electoral system without regard to what policy
11  positions are advocated by the competing parties?
12         MR. YEAGER:  Objection; calls for a
13  legal conclusion.  Asked and answered.
14         You may answer.
15         THE WITNESS:  Again, I can't say what
16  I think the legal standard should be as a
17  nonexpert on the law in this matter.  But
18  speaking as a social scientist and -- you
19  know, my academic work focuses largely on
20  the consequences of public opinion,
21  elections and various electoral institutions
22  for democratic performance in the United
23  States.  And speaking as a social scientist,
24  I can say that if elections -- if elections
25  had no policy consequences, then as a

Page 210

C. WARSHAW

1
2  political scientist I would not be very
3  concerned about them, or I would study other
4  things.  Maybe I would try to understand
5  whether they had no policy consequences.
6  That might be a reason for study.  But I
7  wouldn't -- you know, I would focus my work
8  in different ways, and I think others should
9  as well.  But we know that elections, and
10  the partisan consequences of elections, have
11  large and growing consequences.
12        So I think what that means is that
13  gerrymandering has large implications for
14  our democracy.  And that's said not because
15  I necessarily think one side or the other,
16  you know, the courts should try to favor.  I
17  certainly don't think anyone should favor
18  one side versus the other.  But regardless
19  of who is doing the gerrymandering, I think
20  it has pernicious effects on our democracy.
21  BY MR. CARVIN:
22     Q.   Are you aware of any Democratic
23  redistricting plans that have a large
24  anti-Republican efficiency gap?
25     A.   I know the plan in Maryland has been

Page 211

C. WARSHAW

1
2  challenged and I certainly -- I haven't analyzed
3  that explicitly here although -- Well, if you go
4  back to my chart on page 16, certainly the 2016
5  efficiency gap in Maryland is quite large.  It
6  was smaller in 2012.
7        But if you look at a state like
8  Massachusetts, it's not nearly as large as the
9  efficiency gap in Michigan.  But a state like
10  Massachusetts sure looks like it has a large
11  partisan bias in favor of Democrats in the
12  legislature.  And speaking as a social scientist,
13  I think that's a bad thing.
14     Q.   Does The Brennan Center identify any
15  efficiency gaps, pro-Democratic efficiency gaps
16  in its studies?
17     A.   I think they certainly present graphs
18  where you could identify it.  I don't remember if
19  the text -- how much the text focuses on it.  But
20  certainly McGhee and Stephanopoulos talk about
21  pro-Democratic germanders as well.
22     Q.   Are you sure about that?  In the
23  University of Chicago Law Review, in Congress
24  they identify pro-Republican efficiency gaps --
25     A.   Pro-Democratic.

Page 212

C. WARSHAW

1
2     Q.   -- as too large?  Pro-Democratic
3  efficiency gaps as too large for --
4     A.   I'm not 100 percent sure of that, but
5  I would suspect that they do.  I would assume
6  that they do.
7     Q.   Okay.
8     A.   But I guess the only caveat I would
9  say is that what these numbers show is that in
10  the modern era the efficiency gaps in favor of
11  Democrats are smaller so they are a little bit
12  harder to show.  There's nothing that looks
13  anything like Michigan on the Democratic side.
14     Q.   So if there are large pro-Democratic
15  efficiency gaps, then that will balance out the
16  pro-Republican efficiency gaps in Michigan with
17  respect to congressional representation, right?
18     A.   No.  The graph -- For instance, on
19  page 18 it illustrates this well.  There are far
20  more and larger pro-Republican efficiency gaps in
21  recent elections than pro-Democratic efficiency
22  gaps.
23     Q.   So it's --
24     A.   I think --
25        MR. YEAGER:  Objection.

Page 213

C. WARSHAW

1
2        Excuse me.  Counsel, you keep
3  interrupting him; you keep making faces at
4  him; you keep rolling our eyes at him.  I
5  would appreciate it -- You want to engage
6  him, I understand, but I would appreciate it
7  if you would just let him answer the
8  question, please.
9        Now finish your answer, Mr. Witness.
10        THE WITNESS:  Certainly in the wake of
11  the 2011 plans coming into place, there have
12  been far larger and more numerous Republican
13  gerrymanders, and I think that's largely
14  because there are many more states where you
15  had unified Republican control of state
16  government in 2011.
17        You know, I don't think Democrats are
18  saints with this either, and probably if
19  there had been 30 states with unified
20  Democratic control of state government you
21  would have Democratic gerrymanders.
22        But the fact is that after the -- in
23  the recent elections there have been far
24  more and larger Republican gerrymanders than
25  Democratic ones.

Page 214

C. WARSHAW

1
2  BY MR. CARVIN:
3      Q.   But again, you don't think the court
4  should take into account whether it's a
5  pro-Republican or pro-Democratic gerrymander?
6  They should be neutral on that intensely partisan
7  question?
8          MR. YEAGER:  Objection; calls for a
9  legal conclusion.
10         You may answer.
11         THE WITNESS:  Again, I don't have a --
12  I couldn't say what I think a legal standard
13  should be.  But I think speaking as a social
14  scientist, I think both Democratic and
15  Republican gerrymanders have the same
16  pernicious consequences for our democracy.
17  BY MR. CARVIN:
18     Q.   And the pernicious consequence is that
19  fewer voters will be in a district with a
20  same-party legislator than if one party had not
21  gotten more seats than votes, right?  That's the
22  pernicious consequence?
23     A.   That the ideological composition of
24  the legislature and the policies the legislature
25  produces will be biased in favor of one party or

Page 215

C. WARSHAW

1  another, which breaks the --
2
3      Q.   Let's try again.  What if it only
4  affected the partisan composition of the
5  legislature?  Would that be of concern?
6      A.   I think if we randomly assign party
7  labels and party didn't really mean anything
8  aside from whether you rooted for the Phillies or
9  the Nationals, then as a social scientist --
10  again, I don't know what the legal standard would
11  be, but as a social scientist I probably wouldn't
12  be concerned about it.  But what matters for me
13  is that the partisan labels are not just rooting
14  for the Nationals or the Phillies.  They reflect
15  serious ideological disagreements and policy
16  disagreements, and whether we elect more
17  Democrats or more Republicans has large and
18  consequential policy consequences for the state
19  of Michigan as well as for our country.
20     Q.   So it's the change in the ideological
21  partisan composition that should be of concern to
22  the court, not the fact that the parties have
23  different ideologies?
24         MR. YEAGER:  Objection; calls for a
25  legal conclusion.

Page 216

C. WARSHAW

1
2          You may answer.
3          THE WITNESS:  Well, it's the
4  combination of the partisan bias in
5  elections with the large and substantial
6  consequences of that partisan bias.  I mean,
7  obviously the partisan bias is the first
8  step in this representational chain.
9          But I think that what's important for
10  me, again not speaking as a lawyer because I
11  don't know what the legal standard should
12  be, but as a political scientist, you know,
13  what matters about gerrymandering and what's
14  interesting about gerrymandering is not the
15  partisan bias in and of itself but it is
16  this first step in this representational
17  chain that really matters.
18  BY MR. CARVIN:
19     Q.   Right.  So you're telling the court
20  that there are ideological differences between
21  Democrats and Republicans, right?  That's the
22  first thing you're contributing?  But you're not
23  suggesting the court should pay any attention to
24  the fact that there's ideological differences
25  between Democrats and Republicans in resolving

Page 217

C. WARSHAW

1
2  this gerrymandering case, right?
3      A.   I'm not making any legal assessment
4  whatsoever of what -- I'm speaking in this report
5  as a political scientist on what are the -- both
6  how does the -- I mean, the crux of my report is
7  how does Michigan compare to other states in its
8  own efficiency gaps and other gerrymandering
9  metrics over the past 45 years, and then how does
10  it -- then what are the consequences of the
11  gerrymandering that we observe in Michigan on the
12  political process.
13     Q.   Okay.  Let's go to page 24.  "The
14  right column shows" -- I'm reading from the last
15  sentence -- "that in the most recent Congresses,
16  a 10 percent pro-Republican shift in the
17  efficiency gap is associated with a 0.9 shift to
18  the right in DW-Nominate scores."
19     A.   Uh-huh.
20     Q.   Should the court be concerned about
21  the fact that there is a 0.9 shift to the right
22  in the DW-Nominate scores or should it be
23  concerned with the 10 percent Republican shift
24  regardless of whether it affects the ideology of
25  the representatives?

Page 218

C. WARSHAW

1
2    A.   Again, I don't have a legal opinion.
3  I think that's going to be a complicated
4  assessment.  Speaking as a political scientist, I
5  think that the partisan consequences of a
6  gerrymander are consequential because of the
7  ideological bias it introduces into the
8  legislature and the consequent effect on the roll
9  call votes that are taken by the legislature and
10  the policies the government produces.
11    Q.   So you say in the most recent
12  Congresses.  What Congresses are those?
13    A.   I don't know the Congress numbers off
14  the top of my head but the --
15    Q.   What years?
16    A.   The 2013 through '16, I believe is
17  what I analyze here.
18    Q.   You mean the ones that were elected in
19  2012 through 2016?
20    A.   Correct.  That's the idea.
21    Q.   And you did this study yourself?
22    A.   Correct.
23    Q.   And you say a 10 percent
24  pro-Republican shift in the efficiency gap?
25    A.   Correct.

Page 219

C. WARSHAW

1
2    Q.   Is that a 10 percent pro-Republican
3  shift in all states?
4    A.   That is the effect of a 10 percent
5  shift in any state on average on the -- on the
6  average ideological voting pattern or roll call
7  voting pattern of legislators from that state, is
8  what the regression here is telling us.
9    Q.   Okay.  So it would just be these five
10  states that you've identified elsewhere?
11    A.   Five states?  Sorry?
12    Q.   That have more than a 10 percent
13  pro-Republican shift.
14    A.   No, this is looking at all states over
15  the past 45 years, or all states with more than
16  six congressional districts.
17    Q.   Then I'm not really following you.
18  You say that in the most recent Congresses, which
19  is 2012 through 2016, not the last 45.
20    A.   Oh, correct.  That's based on the
21  regression coefficient in the bottom right of the
22  regression table.  It's the .0093.  But the
23  regression here includes all elections.  I just
24  vary -- I allow the effect of the efficiency gap
25  to vary over time.  But the regression model here

Page 220

C. WARSHAW

1
2  includes all congressional elections in states
3  with more than six congressional districts from
4  1972 to 2016.
5    Q.   So you're telling me that --
6    A.   And the point of this table is that
7  the efficiency gap, changes in the efficiency gap
8  within a state, have consequential effects on the
9  ideological -- the roll call positions that
10  legislators take and the effects are growing over
11  time.
12    Q.   All right.
13    A.   That's the bottom line from this
14  table.
15    Q.   If there is a 10 percent
16  pro-Republican shift in any election between 2012
17  and 2016, that will lead to a 0.9 shift to the
18  right in representatives from that state,
19  Republican legislators?
20    A.   0.09 I believe I said.
21    Q.   In Republicans from that state?
22    A.   Correct.
23    Q.   And when are you measuring the 10
24  percent pro-Republican shift?  Between 2010 and
25  2012?

Page 221

C. WARSHAW

1
2    A.   Correct.  This is isolating it within
3  time period.
4    Q.   So what about -- Maybe I don't
5  understand this chart, which I definitely don't.
6  You're saying the efficiency gap -- the first
7  thing you have is 0.073.  What does that
8  represent?
9    A.   That's the average relationship
10  between the efficiency gap and the voting
11  patterns of members of Congress for the past 45
12  years.  So on average it shows that a 10 percent
13  pro-Republican shift in the efficiency gap would
14  correspond with a DW-Nominate score of
15  .7 units -- or .07 units to the right.  I'm
16  sorry, .07.
17    Q.   You have the 1970s, and the 10 percent
18  pro-Republican shift is between the 1970 and the
19  1972 elections because that's when they
20  redistricted?  What's the shift?
21    A.   The shift here is just looking at
22  variation in the efficiency gap.  It's not just
23  isolating the redistricting years.  You could do
24  this differently and I suspect the results would
25  be the same.  But it's not just isolating the

Page 222

C. WARSHAW

1     
2 redistricting years.  It's averaging across all
3 years.
4      Q.    So you're saying a 10 percent
5 pro-Republican shift, meaning that in the 1970s
6 the pro-Republican bias was 10 percent more than
7 the 1960s?
8      A.    No.  This is not making any
9 characterization of the average value of the
10 efficiency gap.  What it's describing is the link
11 between the efficiency gap and the roll call
12 voting in Congress.
13      Q.    Yeah.  But I'm trying to figure out
14 what the word "shift" means.  You say a
15 10 percent pro-Republican shift in the efficiency
16 gap.  A shift from what to what?
17      A.    It's averaging across all values of
18 the efficiency gap.  To make it simple, what it's
19 suggesting is that the efficiency gap went from
20 zero to a 10 percent pro-Republican efficiency
21 gap.
22      Q.    Right.
23      A.    Then the average Nominate score, which
24 is a summary measure of the roll call behavior of
25 legislators, would shift on average .07 to the

Page 223

C. WARSHAW

1 right.
2      Q.    And the zero would be in what year for
3 the 1970s?  Where do I start?
4      A.    Oh, that's -- the left-hand column
5 here is averaging across 1972 to 2016.
6      Q.    Are you telling me that you're not
7 analyzing it for decades?
8      A.    The right-hand column breaks the
9 analysis down by decades and looks at how that
10 relationship varies by decade.
11      Q.    And it's 0.068 in the '70s?
12      A.    Correct.
13      Q.    And there was a 10 percent
14 pro-Republican shift from what year to when?
15      A.    So between 1972 and I think it must
16 have been 1980, although I don't know -- even
17 though I said 1970s, my guess is I did that
18 redistricting cycle.  That would imply that a
19 10 percent change in the efficiency gap, or a ten
20 percentage point change in the efficiency gap
21 would correspond to about a .068 change in
22 Nominate scores.
23      Q.    A change in what efficiency gap?
24      A.    It doesn't matter.  It's assuming a

Page 224

C. WARSHAW

1 linear effect.  So it's assuming it's a --
2      Q.    From when?
3      A.    I'm sorry, what?
4      Q.    You say there's 10 percent more
5 Republican efficiency gap in 1972 and 1980.
6      MR. YEAGER:  Objection; misstates the
7 testimony.
8 BY MR. CARVIN:
9      Q.    Is that not right?
10      A.    No.  There's nothing in this table
11 about the levels of the efficiency gap.  This
12 table is about the relationship between
13 variability in the efficiency gap.
14      Q.    Variability?
15      A.    Or variation in the efficiency gap, I
16 should say, and variation in the roll call voting
17 patterns of members of Congress.
18      Q.    Okay.  I'll try it one last time.
19 When you say a 10 percent pro-Republican shift in
20 the efficiency gap, a shift from what to what and
21 when to when?
22      A.    It could be over any period of time or
23 it could be -- it could between any two
24 absolute values of the efficiency gap.  So this

Page 225

C. WARSHAW

1 regression model is assuming that there is a
2 linear effect of changes in the efficiency gap,
3 which means that a change from negative
4 30 percent to negative 20 percent is the same as
5 a change from, like, 5 to 15 percent.
6      Q.    I got all that.  Where would you get
7 the negative 30 percent?
8      A.    If there was a value -- assuming there
9 was an efficiency gap in the data that was
10 negative 30 percent, that may be outside the
11 range of the data.  So that may be -- that
12 particular example may not be totally reflecting
13 the data.  But this is all based on the data.  I
14 mean, this regression analysis is based on an
15 empirical OLS, an ordinary least squares
16 regression model, of the effect of variation in
17 the efficiency gap on variation in the roll call
18 voting behavior of members of Congress.
19      Q.    Okay.  And in the 2000s, this
20 10 percent pro-Republican shift led to 0.073
21 shift in the DW-Nominate scores?
22      MR. YEAGER:  Objection; misstates the
23 testimony and misstates the chart and the
24 answer.

Page 226

C. WARSHAW

1
2     THE WITNESS:  Well, I think in this
3  case it's a -- a 10 percent change in the
4  efficiency gap during the 2000s would lead
5  to a .073 change in Nominate scores, is what
6  this chart is saying.
7  BY MR. CARVIN:
8     Q.   And now it's gone up to .0093 change?
9     A.   Right.
10    Q.   In the -- is it .00?
11    A.   Well, the .00 is for a 1 percent
12 change.  If you just multiply that by 10, you get
13 a 10 percent change.  That's what I meant by
14 linear effect.  It assumes that the effect of a
15 10 percent change is just ten times the effect of
16 a 1 percent change.
17    Q.   Okay.  And that's the difference
18 between the ideologies of Senator Cornyn and
19 Lindsey Graham?
20    A.   I believe that's what I stated in the
21 report, yes, sir.
22    Q.   And you say that Cornyn is more
23 conservative than Graham?
24    A.   You know, I'm not going to -- I
25 haven't read every roll call vote he's ever

Page 227

C. WARSHAW

1
2  taken.  That's not my personal assessment.
3  That's based on both the nonpartisan National
4  Journal.  But more relevantly -- and I think
5  538.com.  But also more relevantly, based on
6  their DW-Nominate scores which, as I said, are a
7  summary of the ideological -- their ideological
8  positioning based on all of the roll call votes
9  over their entire congressional career.
10    Q.   So we don't factor in Graham's
11 conservative views on foreign policy, then?
12    A.   No.  This is not looking at different
13 dimensions.  But in general, congressional voting
14 behavior is extremely one-dimensional in the
15 modern Congress.  So the vast majority of the
16 time a one-dimensional estimate of their ideology
17 would accurately predict their roll call
18 positions.  Surely there's going to be some
19 idiosyncratic roll call positions, perhaps on
20 foreign policy, where Graham is, you know, to the
21 right of Cornyn.  But on the vast majority of
22 roll call votes where there's a difference in
23 their positions, Cornyn is going to be to the
24 right of Graham.
25    Q.   Okay.  If you would turn to page 28.

Page 228

C. WARSHAW

1
2     A.   Sure.
3     Q.   "Citizens are about 25 percent less
4  likely to believe that their representatives will
5  do what is right in states with a large" -- and I
6  think this was a typographical error.
7     A.   Correct.
8     Q.   You meant to say "absolute efficiency
9  gap than in states with no efficiency gap."  Is
10 that correct?
11    A.   That's correct.  I think I stated that
12 in my rebuttal report, that that was a
13 typographical error.
14    Q.   Okay.  And this is based on the
15 question:  Do you trust your representative to do
16 the right thing?
17    A.   Correct.  I also think, by the way, my
18 rebuttal report provided a supplemental graph
19 that showed all states as well as the confidence
20 intervals around them.
21    Q.   Right.  I'm going to come back to
22 that.
23        And this is based on -- the question
24 was:  Do you trust your district's representative
25 in Congress to do what is right?

Page 229

C. WARSHAW

1
2     A.   Correct.
3     Q.   So they were only being asked about
4  their own representative?
5     A.   Correct.
6     Q.   And obviously if it was Democrats
7  being asked of a Republican representative, then
8  he probably won't answer yes.  Right?
9     A.   Probably not.
10    Q.   Given the stark ideological
11 composition.
12    A.   It's true.  Given only that 20 -- I
13 think in Michigan only 23 percent said they
14 trusted their representatives.  It's clearly not
15 just opposite-party people that are saying they
16 don't trust their representatives.
17    Q.   And the survey was conducted through
18 the Internet by YouGov of Redwood City,
19 California?
20    A.   Yeah.  YouGov is a widely used survey
21 firm.  They conduct a large number of both
22 academic and commercial surveys.  It uses the
23 Internet but it's, I think, widely viewed as one
24 of the most reputable survey firms.
25    Q.   How do they conduct the surveys?  How

Page 230

C. WARSHAW

1
2 do they contact people over the Internet?
3      A.   I believe they do it via a combination
4 of e-mail and text messages.  They have what's
5 called a panel of respondents where people have
6 opted into their surveys, have essentially
7 volunteered to do surveys.  They survey a large
8 number of people that match characteristics of
9 the population.  And then after conducting the
10 survey they further weight the respondents to
11 make sure they're representative of the
12 population.
13      Q.   So they weight the results?
14      A.   Yes.  All surveys weight their
15 results.  There's no academic or government
16 survey that doesn't weight its results, including
17 the government products like the Current
18 Population Survey and the American Community
19 Survey.  All surveys weight their results.
20      Q.   But this one doesn't reach out for
21 people?  They have to preselect?  They have to
22 volunteer to be contacted?
23      A.   Correct.  It's an opt-in panel.  So in
24 a world where everybody responded to surveys,
25 what's called a probability sample would be a

Page 231

C. WARSHAW

1
2 better sampling technique.  But in a world where
3 response rates are in the single digits for phone
4 surveys, I think there's a growing consensus that
5 Internet surveys are just as high quality as
6 phone surveys and yield very representative
7 results.
8      Q.   That's not your area of expertise?
9      A.   No, it is my area of expertise.
10      Q.   Oh.  So what is --
11      A.   I do a lot of work with surveys and
12 survey design.
13      Q.   Okay.  And you looked at this survey
14 design --
15      A.   I have.
16      Q.   -- and you looked at the weighting?
17      A.   I have.  I've used the Cooperative
18 Congressional Election Study extensively in my
19 academic work.
20      Q.   And you noted how they weighted it,
21 the YouGov people?
22      A.   I do understand how they weight it,
23 yes.
24      Q.   And who is YouGov?
25      A.   As I said, YouGov is a commercial

Page 232

C. WARSHAW

1
2 company that does both academic and commercial
3 surveys over the Internet.
4      Q.   And who paid them?
5      A.   In this case, the Cooperative
6 Congressional Election Study was funded by a
7 cooperative, which is the name of academic
8 organizations and colleges and universities.  I
9 think around 50 or 60 colleges and universities
10 funded it.  It also had a -- I believe it had a
11 grant from the National Science Foundation as
12 well that partially funded it.
13      Q.   In your initial report you didn't
14 provide any margins of errors on your estimates,
15 right?
16      A.   I didn't.  Because to be frank, the
17 estimate -- the sample size here is enormous.
18 It's 55,000 or so people across the country.  So
19 I think in Michigan there's a sample of 2,000
20 people.  Which even when you incorporate the
21 design effect that inflates weights due to the
22 survey weighting, or inflates the standard errors
23 essentially, you still have a margin of error of
24 only three points.  So it's a very small margin
25 of error on the estimates in Michigan.

Page 233

C. WARSHAW

1
2      Q.   Okay.  If you could turn to your
3 rebuttal report, which I think is Exhibit 6.
4      A.   But I think as I said in my rebuttal
5 report, I think, you know, that doesn't change my
6 results.  But I think it's certainly reasonable
7 to include the confidence intervals, and it would
8 have been, you know, reasonable to include that.
9      Q.   Do you have that in front of you?
10      A.   My rebuttal report?
11      Q.   Yeah.  It's Exhibit 6.
12      A.   I can find it.  Sure.  Looking at
13 page 9 and 10.
14      Q.   And you claim that in Michigan there's
15 a 3 percent margin of error?
16      A.   I think that's correct.  That's what I
17 stated here.
18      Q.   If you could look at this chart which
19 you've now provided to us.
20      A.   Yes.
21      Q.   What's the upper bound of the
22 confidence interval around Michigan?
23      A.   I don't know.  I can't tell based on
24 the printed version of the chart.
25      Q.   You said the margin of error was about

Page 234

```
                    C. WARSHAW
 1
 2   3 percent and you said your initial estimate was
 3   23 percent Michigan?
 4        A.   Sure.  So you can just add the two,
 5   and it would be about 26 percent would be the
 6   upper bound.
 7        Q.   That doesn't seem to correlate to this
 8   chart.  Where is the upper bound of the
 9   confidence interval?
10        A.   I think about 26 -- Again, it's hard
11   to tell based on the chart, but the lower part of
12   the confidence level is around 20 percent, so
13   that's right.
14             MR. YEAGER:  Counsel, I have the
15        electronic version if you would like me to
16        show it to him.  It will be a better copy.
17             MR. CARVIN:  I don't know.  This is
18        what I got.
19             MR. YEAGER:  This is not what we sent
20        you.  He's asking about the resolution.
21        It's up to you.  I'm just offering.
22             THE WITNESS:  It's hard to tell based
23        on the printed copy, but I will assert that
24        I believe it's true that the chart
25        represents the confidence interval that I
```

Page 235

```
                    C. WARSHAW
 1
 2   cite in the text.
 3   BY MR. CARVIN:
 4        Q.   I'm happy with that.  So it could be
 5   26 percent in Michigan and nationwide it's
 6   30 percent?
 7        A.   Yes.  But the confidence interval is
 8   not saying it's equally likely that it would take
 9   any value within that confidence interval.
10        Q.   But you can't state to a reasonable
11   degree of professional certainty that it's not
12   26 percent, right?
13        A.   It's more likely that it's 23 percent
14   than 26 percent.
15        Q.   That's true.  But you can't state to a
16   reasonable degree of professional certainty that
17   it's not 26 percent, correct?
18        A.   There's a 95 percent chance that the
19   true value is between 20 and 26 percent.
20        Q.   That's exactly right.
21             And so there is a 4 percent difference
22   between Michigan and the rest of the country.
23   What's the confidence interval on the 30 percent?
24        A.   I didn't show that here, but it would
25   be very, very small.  Probably a percentage
```

Page 236

```
                    C. WARSHAW
 1
 2   point.
 3        Q.   If it was two percentage points, then
 4   you couldn't rule out the possibility that it's
 5   28 percent nationwide, right?
 6        A.   That would be true.  Although I'm
 7   almost certain that it's less than 2 percent;
 8   that it would be closer to 1 percent than 2
 9   percent.
10        Q.   So you don't know if the confidence
11   intervals overlap between Michigan and the
12   nationwide average?
13        A.   No.  With a reasonable degree of
14   professional certainty I would be -- I'm
15   comfortable saying that confidence intervals do
16   not overlap between Michigan and the national
17   average.
18        Q.   And you didn't do the margin of error
19   for the national average?
20        A.   I didn't because again it's going to
21   be very, very small.  The survey sample here is
22   56,000 people.  So it will be a very small
23   sampling error on the national level.
24        Q.   Why do you only list about, at most,
25   20 states here?
```

Page 237

```
                    C. WARSHAW
 1
 2        A.   Because as in elsewhere in my report,
 3   I focus on the states with an efficiency gap --
 4   or sorry, with more than six congressional
 5   districts because those are the ones where I
 6   think the efficiency gap can be estimated more
 7   reliably.  So I take the exact same approach here
 8   that I take elsewhere in the report in terms of
 9   the states that I analyzed.
10        Q.   But you did all the state
11   legislatures, right?
12        A.   Correct.  Because all state
13   legislatures have more than six seats.
14        Q.   Right.  But you didn't look at the
15   efficiency gap of state legislatures and that
16   correlation to this 30 percent about whether you
17   trust your representatives, right?
18        A.   That's true.  This question was
19   focused on congressional representatives.  It was
20   not referencing state representatives.
21             And, you know, I would say as a
22   political scientist, it's not clear to me
23   that people are -- I do think people are very
24   aware of what Congress is doing, at least at a
25   general level, and certainly the partisanship of
```

Page 238

C. WARSHAW

1    their member of Congress.  I think at the state
2    legislative people are probably less aware of the
3    details of what's happening.
4        Q.   Right.
5        A.   So I don't know that I would
6    necessarily want to do this analysis at the state
7    legislative level.  I would have to think about
8    that more.
9        Q.   Where is New York on this map?
10       A.   I don't know.  It should be there,
11   though.  It probably looks like -- I see an N.
12   It looks like a V, but that must be a Y, on the
13   left.
14       Q.   So that's not Nevada?
15       A.   I don't think so, because Nevada only
16   has I think -- it doesn't have seven
17   congressional seats in Nevada, I don't believe.
18       Q.   So you didn't do this analysis
19   relative to efficiency gaps in state
20   legislatures --
21       A.   I did not.
22       Q.   -- and its alleged correlation between
23   trusting your representative?
24       A.   I didn't.  Because, again, the

Page 239

C. WARSHAW

1    question asked about trust in your
2    representative, which referred to the U.S. House.
3    It wasn't asking about the state legislature.
4    You know, if I had had data on the state
5    legislature, I could have looked at that.  But I
6    think probably there's going to be a smaller
7    relationship just because people in general are
8    not as aware of what their state governments are
9    doing as they are of Congress.
10       Q.   And then on page 40 of your report --
11       MR. YEAGER:  40?
12       MR. CARVIN:  Yeah.
13       THE WITNESS:  Sure.
14   BY MR. CARVIN:
15       Q.   These estimates referenced in that
16   table indicate that state years in which the
17   efficiency gap was more pro-Republican than
18   average for that state also tended to have more
19   conservative roll call voting behavior in the
20   state house?
21       A.   Yes.
22       Q.   What's a state year?
23       A.   Oh, just Michigan, you know, in 2013.
24   That's it.  A state year is Michigan in -- So I

Page 240

C. WARSHAW

1    measured -- the data here varies across --
2    includes both cross-sectional and temporal
3    variation.
4        Q.   What's a non-state year?
5        A.   Well, I think what it's trying to make
6    clear is that I'm not averaging across time.  I'm
7    not pooling, like, 1972 and 2016 within Michigan.
8    I'm not saying that's all one row in my -- in a
9    regression.
10       Q.   So you're looking at the efficiency
11   gap in Michigan in 2013?
12       A.   Correct.
13       Q.   How can there be an efficiency gap in
14   2013 when there were no elections in 2013?
15       A.   I'm looking at the preceding year.
16   Sorry.  So for policy here, I lagged the
17   efficiency gap.  So it's looking at the effect of
18   the efficiency gap in 2012 on the ideological
19   composition of the legislature and the policies
20   that it produces the following year.
21       Q.   All right.  So you would compare the
22   efficiency gap in 2012 to the roll call votes in
23   2013?
24       A.   Correct.

Page 241

C. WARSHAW

1        Q.   And you would compare -- What would
2    you do with 2014?
3        A.   I can't remember precisely what I did.
4    I think that's probably not in the analysis for
5    the reason that you suggested, that there's no
6    efficiency gap to be calculated in 2013.
7        Q.   Well, wouldn't it be the same
8    legislators?
9        A.   It would.  So I probably could have
10   done that and I wouldn't expect materially
11   different results.  But I don't think that's what
12   I did.  I think I did it the way you suggested
13   initially, or you implicitly suggested, which is
14   I only used the efficiency gap in years where
15   there had been elections.  But I could
16   double-check that.  It would be in my replication
17   code.
18       Q.   Okay.  And you say that the median
19   ideology of the Michigan state house which had a
20   12 percent pro-Republican efficiency gap in 2012
21   would shift nearly half a standard deviation to
22   the left if it adopted a districting plan with no
23   efficiency advantage to either party?
24       A.   Correct.  I believe that's what I say

Page 242

C. WARSHAW

1  here.
2  Q.   What does that mean in the real world?
3  What's half a standard deviation to the left in
4  terms of policy?
5  A.   Well, I think here I'm focused on the
6  roll call voting behavior, so it's not policy.
7  But I think I do link it to policy in the next
8  section where --
9  Q.   All right.  Well, let's do this one
10 first, though.
11 A.   Half a standard deviation is quite
12 consequential.  I mean, I think I show in
13 Figure 17 --
14 Q.   Yeah.
15 A.   In Figure 17, it shows that the
16 difference between Democrats and Republicans in
17 Michigan is about two standard deviations.
18 Q.   What does that mean?
19 A.   It's summarizing the roll call voting
20 behavior.  So two standard deviations --
21 Q.   Does it mean taxes are going up?  Pot
22 is being legalized?  Same-sex marriage?
23 MR. YEAGER:  Wait.  Whoa, whoa.
24 MR. CARVIN:  I'm just trying to

Page 243

C. WARSHAW

1  explain what my question is.
2  BY MR. CARVIN:
3  Q.   How do I know what a standard
4  deviation in ideology means in the real world?
5  MR. YEAGER:  Objection.  Which one of
6  those questions do you want him to answer?
7  You had a speech, then you had some
8  questions, and then you had another
9  question.  It's compound.  It's
10 argumentative.  If you want to tell him
11 which question to answer, that's fine.
12 Otherwise I object.
13 BY MR. CARVIN:
14 Q.   Can you put some meat on the bones of
15 what two standard deviations means in the real
16 world so that I and the court can understand what
17 you're talking about?
18 A.   Well, I don't have an analogous graph
19 in the report for state legislatures.  But for
20 Congress, where I think the substantive meaning
21 is similar, we can analogize it in Figure 7,
22 which shows that in recent years in Congress
23 Republicans are about 60 percent more likely at
24 any given vote to vote in a conservative

Page 244

C. WARSHAW

1  direction than Democrats.  There's a
2  60 percentage point difference between the
3  conservative voting behavior of Democrats and
4  Republicans.  Which means roughly that, like, a
5  Republican might vote in a conservative
6  direction -- actually, I think it's more like
7  65 percent.
8  So a Republican might vote in a
9  conservative direction, you know, 85 percent of
10 the time and a Democrat would only vote in a
11 conservative direction 20 percent of the time.
12 So I think that's one more intuitive
13 way of putting it, which is why I like the Fowler
14 and Hall approach.  It's a little bit more
15 understandable than the Nominate scores or the
16 Shor-McCarty scores that I use for state
17 legislators.
18 But anyway, I think that's very
19 similar for state legislatures.  I will assert
20 that two standard deviations for state
21 legislatures means something similar to here,
22 which is that Republican state legislators are
23 about 60 percentage points or more likely to
24 cast a conservative vote than Democrats.

Page 245

C. WARSHAW

1  Q.   And this is true in every state?
2  A.   That's true on average across states.
3  To the extent there's differences across states
4  it's going to be more so in Michigan because, as,
5  I show in Figure 17, Michigan in fact is more
6  polarized than the average state legislature.  So
7  the consequences in Michigan, to the extent they
8  vary from the national average, are likely to be
9  even larger.
10 Q.   But I'm talking about the connection
11 between the pro-Republican shift and the
12 efficiency gap.  What if it was Massachusetts and
13 there was a pro-Republican shift but the
14 legislature still remained firmly in Democratic
15 hands?  Do you think there would be a change in
16 the median ideology of the roll call votes?
17 A.   Yes, I do think there would be a
18 change in the ideological composition of the
19 legislature.  And I also think there would be a
20 change in the policies that government passes,
21 although I do think that the change -- the policy
22 effects are larger when it affects the partisan
23 control of the legislature.
24 So if there's no chance that it would

Page 246

C. WARSHAW

1
2  change the partisan control of the legislature,
3  then the policy consequences will be smaller than
4  in a situation where it changed the partisan
5  control.  And I show that in my 2017 Election Law
6  Journal article.
7       Q.   But you're saying even if control of
8  the legislature doesn't change hands, Democrats
9  will be more conservative and Republicans will be
10  more liberal?
11      A.   No, I'm not asserting that it's going
12  to change within party composition.
13      Q.   The roll call votes will become more
14  conservative in a liberal state and more liberal
15  in a conservative state depending on the
16  efficiency gap?
17      A.   Yes.  Because what that means is if
18  you have a more, say, pro-Democratic efficiency
19  gap, that implies you're electing more Democrats.
20      Q.   Right.
21      A.   And the consequence of electing more
22  Democrats is having a more liberal legislature
23  which then leads to more liberal policies.
24      Q.   So what you're telling us is the more
25  Democratic the legislature is the more liberal

Page 247

C. WARSHAW

1
2  they're going to be, and the more Republican the
3  legislature is the more conservative they're
4  going to be.  And you reduced that to standard
5  deviations?
6       A.   That's exactly right.
7       Q.   All right.  Then you say, page 39, the
8  fourth sentence in the first paragraph:  "But the
9  magnitude of changes in the position of the
10  median voter is not clear a priori.  That depends
11  on whether additional members of the majority
12  party tend to be moderate (because they are
13  winning closer districts) or typical for their
14  party (when parties are polarized)."
15           So you do think that people tend to be
16  more moderate when their districts are closer?
17      A.   I think that's possible theoretically,
18  although empirically there's no evidence for
19  that.
20      Q.   So why did you say "because they are
21  winning closer districts"?
22           MR. YEAGER:  Objection.  Completely
23      and inaccurately summarizes the document.
24      You may answer.
25           THE WITNESS:  What I'm stating here is

Page 248

C. WARSHAW

1
2  that we don't know a priori.  So I think
3  theoretically there's reasons to think, as
4  perhaps you're suggesting that, you know,
5  the median voter theorem certainly suggests
6  that in a competitive district you should
7  moderate your position in order to win
8  elections.
9           But in fact the empirical evidence
10  suggests that that's generally not the case,
11  particularly in the modern era, that
12  legislators don't actually take much more
13  moderate positions in moderate districts
14  than they do in very extreme districts.
15  BY MR. CARVIN:
16      Q.   You had said, I think in the beginning
17  of your report, that while there was a slight
18  Republican lean in the 2001 redistricting, it was
19  not nearly as extreme as this efficiency gap
20  after 2011?
21      A.   Can you repeat back the question to
22  me?
23      Q.   At the beginning of your report you
24  were comparing the --
25      A.   Where are you quoting from in my

Page 249

C. WARSHAW

1
2  report?
3       Q.   I'm not.  I can go get it for you.
4       A.   I don't know that I state that.
5           MR. YEAGER:  Let him ask a question.
6           MR. CARVIN:  I just thought I would
7      try and save some time.
8  BY MR. CARVIN:
9       Q.   Is it not your opinion that the
10  efficiency gap in 2001 in Michigan was not that
11  extreme while it was extreme after 2011?
12      A.   I don't know that I formed a precise
13  opinion about the 2000 -- the magnitude of the
14  partisan bias in 2002.  I haven't looked at all
15  the different metrics, for instance, for 2002.
16  But certainly the chart in Figure 5 and
17  perhaps -- both Figure 5 and Figure 15 suggest
18  that the partisan bias in 2012 is much larger
19  than in 2002.
20      Q.   Go to page 17.
21      A.   Great.
22      Q.   You say:  "From about 2002 through
23  2010 Republicans had a modest advantage in the
24  efficiency gap.  However, the 2011 redistricting
25  plan led to a large Republican advantage in

Page 250

C. WARSHAW

1
2  Michigan congressional elections."  Correct?
3      A.   Yes.
4      Q.   And then what were you saying,
5  Figure 9 has the similar analysis for the state?
6      A.   Figure 15 on page 34.
7      Q.   What was your conclusion about the
8  2000 efficiency gap?
9      A.   Again, I don't state a conclusion
10  about that in my report.  But just eyeballing
11  these numbers, certainly I don't think the
12  efficiency gap on its own indicates any kind of a
13  large partisan bias in the elections.
14      Q.   And you did an article analyzing
15  Michigan policy initiatives in 2011 and 2012,
16  right?  In your article you discussed that issue
17  specifically?
18      A.   Correct.  I looked at -- Policy
19  initiative is not exactly right.  I looked at the
20  policies that the Michigan state government
21  passed.
22      Q.   And you pointed out that they had a
23  large spending cut, higher taxes on pensions, and
24  lower taxes on corporations.  All those are
25  conservative positions?

Page 251

C. WARSHAW

1
2      A.   I believe that's true.  I would have
3  to look at the article to reference them for
4  sure.
5      Q.   And that they banned benefits for
6  same-sex partners of government employees, gay
7  government employees?
8      A.   Again, I don't have the article in
9  front of me.  I would want to look at the article
10  to see.
11      Q.   And it became a right-to-work state in
12  2011 and 2012?
13      A.   That sounds right.  I couldn't say for
14  sure.  I would want to look at the article.
15      Q.   I'm happy to show you the article.
16  But didn't all those changes happen prior to the
17  2012 redistricting and the people who were
18  elected under that extreme pro-Republican bias,
19  or do you recall?
20      A.   I would want to look at the article.
21  I don't remember what I said precisely in the
22  article.
23          MR. CARVIN:  Could you mark that,
24  please.
25          (Exhibit 9 marked for identification

Page 252

C. WARSHAW

1
2  and attached hereto.)
3          THE WITNESS:  Yes.  So I'm looking at
4  page 467.  We did talk about those being
5  implemented in 2011 and '12.
6  BY MR. CARVIN:
7      Q.   Has there been anything comparably
8  conservative post the large increase in the
9  efficiency gap in the years following 2012?
10      A.   I couldn't say for sure.  I just don't
11  remember.  I would have to have my data in front
12  of me.  It's been a while since I've looked at
13  it.
14      Q.   But it is true that the most
15  conservative things happened in a legislature
16  where the efficiency gap was not that different
17  from the norm?
18      A.   I'm sorry.  Repeat that.
19      Q.   It happened under the 2001
20  redistricting, which we agreed was not nearly as
21  extreme as the pro-Republican efficiency gap in
22  2012 and not that different from the norm?
23      A.   Yes.  In this case, the efficiency gap
24  was pro-Republican but it was not as extreme as
25  we've seen after the 2011 went into place.

Page 253

C. WARSHAW

1
2      Q.   So you haven't asked or followed up on
3  the question on whether the Michigan legislature
4  has pursued more conservative policies after this
5  dramatic shift in the pro-Republican efficiency
6  gap since 2012 than they did prior to 2012?
7      A.   I have not.  I think that would be a
8  reasonable question to examine, but I have not
9  looked at it.
10      Q.   And you have no reason to believe that
11  they've enacted policies as conservative as were
12  enacted in 2011 and 2012?
13      A.   I have no opinion either way.  I just
14  don't know.
15          MR. CARVIN:  I don't have any
16  additional questions.
17          MR. YEAGER:  Let's take a break, and
18  then we'll come back and tell you whether
19  there's more or not.
20          (Recess taken.)
21          MR. YEAGER:  We're done.
22          (Deposition adjourned at 3:37 p.m.)
23
24
25

Page 254

C. WARSHAW

ACKNOWLEDGMENT OF DEPONENT

I, CHRISTOPHER WARSHAW, Ph.D., have read or
have had the foregoing testimony read to me and
hereby certify that it is a true and correct
transcription of my testimony with the exception
of any attached corrections or changes.


_____
CHRISTOPHER WARSHAW, Ph.D.
[ ] No corrections
[ ] Correction sheet(s) enclosed

SUBSCRIBED AND SWORN TO BEFORE ME, the
undersigned authority, by the witness,
CHRISTOPHER WARSHAW, Ph.D., on this the _____ day
of _____, _____.

---

Page 255

C. WARSHAW

C E R T I F I C A T E

DISTRICT OF COLUMBIA
I, JOHN L. HARMONSON, a Notary Public
within and for the District of Columbia, do
hereby certify:
That CHRISTOPHER WARSHAW, the witness
whose deposition is hereinbefore set forth, was
duly sworn or affirmed by me and that such
deposition is a true record of the testimony
given by such witness.
That if the foregoing pertains to a
federal case, before completion of the
proceedings, review and signature of the
transcript [X] was [ ] was not requested.
I further certify that I am not related
to any of the parties to this action by blood or
marriage; and that I am in no way interested in
the outcome of this matter.
IN WITNESS WHEREOF, I have hereunto set
my hand this 15th day of August, 2018.


_____
JOHN L. HARMONSON, RPR

---

Page 256

C. WARSHAW

E X A M I N A T I O N   I N D E X

WITNESS                          PAGE
CHRISTOPHER WARSHAW, Ph.D.
    Examination by Mr. Carvin        4
              * * *


        E X H I B I T   I N D E X
                          PAGE
Exhibit 1  . . . . . . . . . . . . . . . .  6
   Expert Report of Christopher Warshaw
Exhibit 2  . . . . . . . . . . . . . . . .  31
   Stephanopoulos & McGhee reference
Exhibit 3  . . . . . . . . . . . . . . .  34
   Krasno, et al., reference
Exhibit 4  . . . . . . . . . . . . . . . .  55
   Best, et al., reference
Exhibit 5  . . . . . . . . . . . . . . .  73
   Stephanopoulos & McGhee reference
Exhibit 6  . . . . . . . . . . . . . . . .  86
   Rebuttal Report of Christopher Warshaw
Exhibit 7  . . . . . . . . . . . . . . .  94
   McGhee reference

---

Page 257

C. WARSHAW

EXHIBITS (Cont.'d)                  PAGE
Exhibit 8  . . . . . . . . . . . . . . .  161
   Krasno, et al., reference
Exhibit 9  . . . . . . . . . . . . . . .  251
   Caughey, et al., reference