# EXHIBIT 4

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 1

1             UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4    LEAGUE OF WOMEN VOTERS OF

5    MICHIGAN, ROGER J. BRDAK,

6    FREDERICK C. DURHAL, JR., JACK

7    E. ELLIS, DONNA E. FARRIS,        Case No. 2:17-cv-14148-DPH-SDD

8    WILLIAM "BILL" J. GRASHA, ROSA

9    L. HOLLIDAY, DIANA L. KETOLA,

10   JON "JACK" G. LASALLE, RICHARD

11   "DICK" W. LONG, LORENZO RIVERA,

12   and RASHIDA H. TLAIB,

13           Plaintiffs,

14           vs

15   RUTH JOHNSON, in her official

16   capacity as Michigan Secretary

17   Of State,

18           Defendant.

19

20           DEPOSITION OF JOWEI CHEN,

21

22   Taken by the Defendants on Friday, September 7, 2018, at the

23   offices of Dickinson Wright, PLLC, 350 South Main Street,

24   Suite 300, Ann Arbor, Michigan, at 9:34 a.m.

25

**Deposition of Jowei Chen - 9/7/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

## Page 2

1  APPEARANCES:
2
3  Counsel for the Plaintiffs:
   MR. JOSEPH H. YEAGER, JR. (IN 2083-49)
   MR. KEVIN M. TONER
4     Faegre Baker Daniels, LLP
   300 North Meridian Street
5     Suite 2700
   Indianapolis, Indiana 46204
6     317-237-0300
   Jay.Yeager@FaegreBD.com
7     Kevin.Toner@FaegreBD.com
8  Counsel for the Defendant:
9     MR. MICHAEL A. CARVIN
   Jones Day
10    51 Louisiana Avenue, N.W.
   Washington, D.C. 20001-2113
11    202-879-3939
   macarvin@jonesday.com
12
13 Co-Counsel for the Congressional Delegation, Intervener:
   MR. JASON TORCHINSKY
14    45 North Hill Drive
   Suite 100
15    Warrenton, Virginia 20186
   540-341-8808
16    Jtorchinsky@hvjt.law
17
18 Co-Counsel for the Congressional Delegation, Intervener:
   MR. BRIAN D. SHEKELL (P75327)
   Clark Hill
19    500 Woodward Avenue
   Suite 3500
20    Detroit, Michigan 48226
   313-965-8803
21    Bshekell@clarkhill.com
22
   REPORTED BY:   Ms. Marjorie Covey, CSR-2616
23
24
25

## Page 3

1          TABLE OF CONTENTS
2
3
4  WITNESS:             PAGE
5
6  JOWIE CHEN
7     Examination By Mr. Carvin       4
8
9
10
11
12
13 EXHIBITS            MARKED
14    Exhibit 1 (Expert Report of Jowei Chen, Ph.D.)   4
15    Exhibit 2 (Redistricting Plans - Excerpt)   98
16
17
18
19
20    (EXHIBITS WERE RETAINED BY THE COURT REPORTER FOR INCLUSION
21    IN THE TRANSCRIPT.)
22
23
24
25

## Page 4

1        Ann Arbor, Michigan
2        September 7, 2018 - 9:34 a.m.
3        THE REPORTER:  Do you solemnly swear the testimony
4  you are about to give will be the truth, the whole truth and
5  nothing but the truth?
6        MR. JOWIE CHEN:  Yes.
7        JOWIE CHEN,
8  HAVING BEEN CALLED BY THE DEFENDANT AND SWORN:
9        EXAMINATION
10 BY MR. YEAGER:
11 Q.  Good morning, Professor Chen.  How are you?
12 **A.  Good morning, sir, I'm doing well.**
13 Q.  I know you had your deposition taken before, I just want to
14 make two points at the beginning.  The court reporter will
15 need a verbal response, not a nod or something like that to
16 make the record clear.  And if there is any questions that
17 I'm asking that you are confused about, please ask me to
18 clarify.
19       Will you swear on that?
20 **A.  Yes, sir.**
21 Q.  Okay.  Is there any reason, medications or otherwise that you
22 can't testify fully or truthfully today?
23 **A.  No, sir.**
24       **(At 9:35 a.m. Exhibit 1 marked.)**
25 Q.  Okay.  If you could look at what's been marked as Chen

## Page 5

1  Exhibit 1, please.
2        Is that the report you entered in this case?
3  **A.  It appears to be so, sir.**
4  Q.  Okay.  And on the first page you list the cases that you've
5  previously been involved with, is that right, down at the
6  bottom?
7  **A.  Yes, sir.**
8  Q.  Okay.  Let's start with the cases that you provided trial
9  testimony on.
10       MR. YEAGER:  Mike, if I could just interrupt.  On
11 the document there was an errata submitted after the report.
12 I don't know if you have that.
13       MR. CARVIN:  I don't have it, but if it comes up in
14 any way, that stipulation is on the record, and if there is
15 typos or things like that, we'll -- please point it out.
16 BY MR. CARVIN:
17 Q.  So let's start with this, if we could, City of Greensboro
18 versus Guilford County Board of Elections.
19       Was that a situation where they banned Greensboro
20 from participating in referendum?
21 **A.  I just want to see where you're starting -- you're going to**
22 **the middle of the paragraph.**
23 Q.  I'm going to the ones where I think you said you offered the
24 trial testimony.
25 **A.  I see.  Let me get to where that starts.**

**Deposition of Jowei Chen - 9/7/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

## Page 6

1    Q.   Sure.

2    A.   Okay.  The first one listed was Raleigh Wake, but you want to

3         ask about the City of Greensboro.

4    Q.   Yes, please.

5    A.   And if I could just ask you to repeat the question.

6    Q.   What did the case involve?

7    A.   I believe -- I recall that it was a challenge to a newly

8         redrawn Greensboro City Council districting plan for the City

9         of Greensboro.

10             I think you had mentioned a referendum.  I don't

11        recall -- I don't recall or don't know about that.  But I

12        recall that the case, to my recollection the case involved

13        the Greensboro City Council districting plan and that was

14        redrawn.

15   Q.   And what was the alleged flaw in the city council

16        redistricting plan?

17   A.   My recollection, to the best of my knowledge, is that

18        plaintiffs were arguing a violation of one-person one-vote of

19        some sort.  And plaintiffs were alleging that it had been

20        done -- the violation of one-person one-vote had been done in

21        a partisan and racial manner.  That's my recollection.

22   Q.   Now having to refresh your recollection, that was the issue in

23        the Wake County case, the Raleigh Wake Citizens v Wake

24        County, right?  They argued they were underpopulated on a

25        racial and political basis?

## Page 7

1    A.   That is my recollection.  I believe that plaintiffs were

2         making a similar argument regarding one-person one-vote done

3         in a partisan racial manner.

4    Q.   Okay.  And what was your testimony in that case?

5    A.   I -- you're asking now about Raleigh Wake County?

6    Q.   No.  No.  I'm sorry.  I'm trying to keep this clear.

7             No.  I've been asking about City of Greensboro.

8    A.   The Greensboro case, okay, I'll go back to the Greensboro

9         case.

10            Let me try and remember as best as I can.  I just

11        want to qualify it was sometime ago, but I'll do my best

12        here.

13            I ran an expert report in that case where I

14        analyzed, the number one, the population disparities; number

15        two, the partisanship; and then number three, the racial

16        composition of the districts in the enacted plan.

17            I compared those various numbers in various ways to

18        a few hundred computer simulations that I did of Greensboro

19        City Council districting plans.  The computer produced

20        districting plans for Greensboro.

21            And I reported on the differences that I saw

22        between the computer-simulated plans and the enacted city

23        council plans on those various measures.

24   Q.   With respect to its partisan outcome, did you analyze,

25        compare the enacted plan to the simulations in terms of the

## Page 8

1    efficiency gap or the mean-median difference -- median-mean

2    difference?

3    A.   Let me try and remember.  And again, I'm just going to

4         qualify, I'm going to do the best I can to remember, but it's

5         been awhile.

6             MR. YEAGER:  Objection.

7             Don't guess.  You can testify.

8             THE WITNESS:  My recollection is that I analyzed

9    the districts, both the enacted districts and the computer

10   simulated districts in terms of partisanship just by counting

11   up the number of districts and identifying districts as

12   either Republican leaning or Democratic leaning.

13            My recollection is I did not attempt to calculate

14   an efficiency gap for any of those plans.

15            I think you asked me about something other than

16   efficiency gap.  Did I miss something else?

17   BY MR. CARVIN:

18   Q.   Median-mean --

19   A.   Median-mean, thank you.

20            I'm not going to guess, I'm just going to admit

21        that I can't remember precisely.

22   Q.   Okay.

23   A.   I just can't remember everything that I did.

24            I recall that I definitely calculated the number of

25        Republican districts; and I might have, and I might not have

## Page 9

1    reported on, say, the median district partisanship.  So I

2    just can't recall specifically doing that.

3    Q.   All right.  Well let's switch to Wake County, the Raleigh

4         Wake Citizens case.

5             As I understand what you told me a moment ago you

6         did the same kind of analysis of the population differences

7         and whether that reflected partisan differences?

8    A.   Yes, sir.  I did the same fundamental sort of analysis as I

9         just described a moment ago.

10   Q.   Including comparing it to simulated plans?

11   A.   Yes, sir.

12   Q.   Okay.  And in that case, do you recall whether or not one of

13        your measures of the partisan outcome was either the

14        efficiency gap or the mean -- median-mean difference?

15   A.   Okay.  Again, I'm going to qualify that I'll do the best I

16        can to remember.  This was, I think it was a case in 2015 so

17        it's been awhile.

18            My recollection is that I did not calculate the

19        efficiency gap.  It's possible that I calculated the median

20        district in some way using partisanship numbers.  I don't

21        specifically recall doing that, so I'm not going to say for

22        sure that I did or did not.  I don't specifically recall

23        doing so with respect to the mean-median.

24            But I definitely recall that I did not calculate

25        the efficiency gap of either the enacted plan -- let me go

**Deposition of Jowei Chen - 9/7/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

## Page 10

1    back and qualify.

2         When I say enacted plan, we're actually talking

3    about two different enacted plans in that case that I

4    analyzed.  So what I'm saying applies to both of them.  I

5    don't recall analyzing or calculating an efficiency gap for

6    either of those enacted plans.

7         And I can't recall specifically calculating a

8    mean-median.  I'm not going to say for sure that I didn't

9    calculate something like the median.

10   Q.  Okay.  And then let's switch to League of Women Voters versus

11   the Commonwealth of Pennsylvania, that's more recent.

12        Did you do an analysis essentially similar to what

13   you did in this case?

14   A.  I wouldn't call it essentially similar.  I mean obviously

15   there were differences.  But I'll characterize it kind of

16   briefly, and hopefully that will answer your question.

17        In this -- in the Pennsylvania case, I analyzed the

18   enacted Congressional map in Pennsylvania.  I analyzed it on

19   partisan -- on various partisan measures.  And then I

20   performed some number of, I think several hundred

21   computer-simulated plans.  And I compared the partisan

22   numbers, the partisan calculations of the simulated plans to

23   the enacted plan.

24   Q.  In Pennsylvania did you run a second set of simulated plans

25   that were designed to protect incumbents?

## Page 11

1    A.  My recollection is that, yes, I did a second set.  I can't

2    remember if it was labeled as the first or the second.  But I

3    recall doing a set of simulations that did protect incumbents

4    in the following sense, and I'm just going to explain what I

5    meant when I said protect incumbents.

6         In that particular case, I was given, I believe,

7    the residential addresses of incumbents, of incumbent

8    politicians at some point in time.  And I determined what

9    sort of plans would minimize the number of incumbents that

10   were double paired into a single district.

11        So that is the sense in which I mean protecting

12   incumbents.

13   Q.  Just so I'm clear, you used the phrase double paired: if two

14   incumbents are placed in one district, would that be what you

15   would characterize as doubled paired?

16   A.  That is what I -- that is how I operationalized it.  I

17   understand that's not necessarily the only way that that

18   term is used.  But I'm just talking about how I

19   operationalized the term in my report in that case.

20        So I think you characterized it correctly there.  I

21   sought to analyze what sort of districting algorithm -- or

22   what sort of districting plans would emerge from an algorithm

23   that made a conscious effort that intentionally tried to

24   minimize putting two or more incumbent addresses, residential

25   addresses, into the geographic -- within the geographic

## Page 12

1    boundaries of a single district.

2         So if there were two incumbents within a district,

3    that would be double pairing.  I guess if there were three,

4    maybe we would call that triple pairing.  But the point is

5    that the algorithm was trying to intentionally avoid or

6    minimize that from happening.

7    Q.  You have not run any such analysis here in this case,

8    correct?

9    A.  In the Michigan -- in my analysis of the Michigan plans?  And

10   that is correct.  I have not done a comparable analysis on

11   Michigan plans.

12   Q.  Why not?

13   A.  You're asking me about my expert report now?

14   Q.  Right.

15   A.  You're asking me why I didn't do an analysis of that sort of

16   double pairing, double bunking, double pairing avoidance.

17        And the answer is that, number one, Plaintiffs'

18   counsel did not ask me to do such an analysis; and number

19   two, I read the statutory criteria, and I reference those in

20   my report, MCL 4.261 and 3.63, and they do not reference that

21   as a redistricting goal.

22   Q.  And it's your understanding of the statutory criteria that

23   they're exhaustive?

24   A.  That is my understanding.

25   Q.  So if they don't reference avoiding pairing of incumbents,

## Page 13

1    then it would be inconsistent or violative of those statutory

2    criteria for a redistricting plan to avoid pairing

3    incumbents?

4    A.  That is a legal judgement that I'm not qualified to opine on.

5         All I saying a moment ago is that my

6    understanding is that the statutory criteria do not call for

7    explicitly attempting to protect incumbents.

8    Q.  We'll get into this in more detail, but as I understand your

9    report, your understanding is that the listed criteria are

10   the exhaustive criteria, the only ones that can be considered

11   by those drawing plans in Michigan, is that correct?

12   A.  Okay.  I'm just going to clarify that I understand that to be

13   two possibly different questions so I'm going to take them

14   one at a time.

15        So I'm just going to tell you what I understand to

16   mean by the question first.  And then I'll answer the

17   questions so that there is no ambiguity about what I'm trying

18   to answer here.

19        When I understood the term exhaustive, all I meant

20   for that -- all I meant is that I understood that I was going

21   to operationalize and conduct analysis using only an

22   exhaustive list of criteria.

23        I don't understand -- now the second part of your

24   question contained the word can, and that possibly -- I'm not

25   sure what you mean by that question.  It might mean in a

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 14

1  legal sense whether it's legally permissible.  And of course
2  on that I'm not at all qualified to opine as to what the
3  legal meaning might be in this case.
4      I am just telling you that I read the criteria, the
5  statutory criteria, I had conversations with Plaintiffs'
6  counsel, and I understood by the question put forth to me to
7  be to analyze the sort of plans that would emerge if I had --
8  if I analyzed an exhaustive list of criteria.
9      So that's all I meant when I answered your earlier
10  question.
11  Q.  And to be clear the exhausted list of criteria are those
12  referenced in the two statutes that you referred to earlier?
13  A.  Yeah.  That's correct.  I'm following the criteria that I
14  read, that I saw listed in the -- in those two statutes.
15  Q.  Do you have any understanding as to whether or not it would
16  be permissible under those statutes to consider nonpartisan
17  criteria other than those explicitly listed in the statutes?
18  A.  If you mean admissible in any legal sense, again I'm going to
19  give the same answer which is that I'm not qualified to tell
20  you whether it's legally permissible.
21  Q.  Okay.
22  A.  I can tell you how I took those criteria and I built them
23  into my own computer simulation, so I can tell you whether
24  they were permissible in a computer simulation in that sort
25  of technical sense.

## Page 15

1      And as you know, I did not explicitly consider, I
2  didn't build in any partisan considerations.  I instructed
3  the computer to ignore partisan considerations.
4  Q.  I'm talking about nonpartisan considerations.
5  A.  I'm sorry, I misheard you.  I apologize.
6  Q.  For example, avoiding pairing of incumbents, is it your
7  understanding that under the statutory criteria that would be
8  a permissible, traditional districting principle that would
9  be acceptable under the criteria as enumerated in the
10  statute?
11  A.  Okay, I got you, I heard your question this time.  I
12  apologize for that.
13      So I'm going to give the same answer as before
14  which is that if you're asking permissible in any legal
15  sense, I obviously can't tell you whether or not the statute
16  is to be interpreted as making something legally or not
17  legally permissible.  So I can't give you an opinion with
18  respect to the legality, the legal permissibility of a
19  nonpartisan criteria.
20      I can tell you only about the analysis that I did,
21  which is that I obviously did not make it permissible for my
22  computer, for my simulation plans to be drawn with respect to
23  a nonpartisan criterion like avoiding the pairing of
24  incumbents.
25      So I just want to make that distinction.

## Page 16

1  Q.  That's fine.  And in Pennsylvania did you use a compactness
2  measure known as Polsby-Popper?
3  A.  My recollection -- I don't have the report in front of me so
4  I'm going to do my best to remember.
5      My recollection is that I did.  That's my best
6  recollection.
7  Q.  Did you use Polsby-Popper as a measure of compactness in this
8  case?
9  A.  My recollection is that I did not analyze Polsby-Popper
10  measures in my report.
11  Q.  Why not?
12  A.  Well, I analyzed two different measures in my report here.
13      I calculated the Reock score, which is probably a
14  very common, perhaps the most common -- I'm not really saying
15  it's definitely the most common, but it's certainly a very
16  common measure of compactness.
17      And on top of that, I found in reading the statute,
18  that the statutes give what seems to be a precise definition,
19  Michigan specific definition, or a method of calculating the
20  compactness of quantifying the compactness of districts.
21      And so I placed -- because I saw that in the
22  statute, I placed some greater importance on trying to, at
23  least try to follow that calculation or that method of
24  quantifying compactness that I read in the statute.
25      So if you're asking -- I think you're asking about

## Page 17

1  why didn't I do it in Michigan whereas I did in Pennsylvania.
2      And the answer is I had, in Michigan, I had in
3  front of me a statute that laid out a, what to me was a
4  pretty specific quantifiable definition of compactness;
5  whereas in Pennsylvania, I didn't have such a specific --
6  such a specific definition put forth to me.
7  Q.  In addition to the statutory specific definition of
8  compactness, which I'll call the circumscribed circle test,
9  in Michigan you also analyzed compactness under the Reock
10  test, correct?
11  A.  Yes, sir.
12  Q.  Why did you use a measure of compactness in addition to the
13  ones specified in the statute?
14  A.  It's just something that I commonly do.  It's not necessarily
15  something that I thought was based on the statute
16  specifically, but certainly it's been my experience that,
17  number one, compactness is a traditional districting
18  criterion, and so very commonly I'll use Reock as a measure.
19      So it's just because I've done it by practice.
20  Q.  But you've also used Polsby-Popper, and why did you Reock and
21  not do Polsby-Popper in this case?
22  A.  I could well have, but I think that in general I use
23  Polsby-Popper a bit less commonly.  So it's by practice that
24  I included the Reock measure.
25  Q.  Do you recall that you used the median-mean measure of

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 18

1  partisan bias in Pennsylvania?

2  A. It's my recollection that I did include some calculations of

3  mean-median gap -- or I think I called it mean-median

4  difference --

5  Q. Okay.

6  A. -- in my Pennsylvania report.

7  Q. All right. And did you use any efficiency gap measures of

8  partisan bias in Pennsylvania?

9  A. Efficiency gap measures of partisan bias is what you asked

10  about?

11  Q. Yes.

12  A. I'm going to do my best to try to remember. I'll qualify by

13  saying it's been awhile since I have looked at that report.

14  My best recollection right now is that I did, but

15  I'm just trying to do my best to remember.

16  Q. So your best recollection is that you did do an efficiency

17  gap analysis in the Pennsylvania case?

18  A. That's my best recollection right now.

19  Q. Okay. And in --

20  A. And again I'm just qualifying that it's been awhile since I

21  looked at that report.

22  Q. Okay. And North Carolina Rucho?

23  A. The Rucho case?

24  Q. Yes.

25  A. Yes, sir.

## Page 19

1  Q. In that case, did you run simulations that factored in

2  incumbency protection?

3  A. Let me try to remember.

4  My recollection is that in my report in the Rucho

5  case, I conducted several different sets of simulations. I

6  recall I conducted a first set of simulations that, in

7  addition to following traditional redistricting criteria that

8  were set forth in the adopted criteria that the legislature

9  had, I did not program the simulation algorithm in that first

10  set to take into consideration the location of incumbents or

11  any sort of incumbent protection.

12  So that was one set of simulations that I analyzed

13  in the report.

14  I recall that there was another set of simulations

15  that, in addition to the nonpartisan traditional districting

16  criteria, did in fact explicitly attempt to maximize the

17  number of single -- or isolated incumbents. In other words

18  it tried to minimize double or triple pairing of incumbents,

19  tried to separate out incumbents into separate -- into

20  separates districts without pairing or triple pairing -- or

21  tripling any incumbents into a single district.

22  So I took two different approaches there. And

23  that's my best recollection.

24  So again I just want to qualify that when I say

25  protecting incumbents, what I actually did was to avoid

## Page 20

1  double pairing.

2  Q. And did you do a mean-median difference analysis of partisan

3  bias?

4  A. I'm going to try to remember as best I can, I'm going to

5  qualify again by saying it's been a while.

6  Q. That can be a running stipulation, but go ahead.

7  A. I'm going to do my best here.

8  My best recollection right now is that I did not

9  report on the mean-median. That's to the best of my

10  recollection.

11  Q. And how about the efficiency gap?

12  A. My recollection is that I did calculate the efficiency gap of

13  the enacted and in some simulated plans in that report.

14  I'm not recalling that I calculated the efficiency

15  gap for all the simulation, for all sets of simulations. But

16  I do recall doing that calculation for some simulations and

17  perhaps not for others.

18  That's the best of my recollection.

19  Q. Do you have any decisional criteria or policy about when

20  you'll use the mean-median difference and when you will use

21  the efficiency gap?

22  A. I'm not sure exactly what you mean by decisional criteria.

23  Q. Well is there -- I take it from your answers you don't always

24  do both mean-median and efficiency gap, and I'm wondering if

25  -- why you choose one over the other in certain

## Page 21

1  circumstances.

2  A. Oh, well in some cases I choose metrics because -- or I

3  employ metrics because I'm trying to respond to questions

4  that are put forth to me by counsel. So that certainly is

5  part of how I decide what metrics to use. It depends on what

6  questions are put forth to me.

7  Q. So you'll use the measure of partisan bias suggested to you

8  by the Plaintiffs' counsel?

9  A. Well I try to answer questions that are put forth to me. And

10  if those questions are answerable by metrics that I find to

11  be appropriate, then I will do so.

12  Certainly it's not the case that I will employ a

13  particular metric simply because a lawyer tells me to do so.

14  But if a lawyer asks me to answer a question, that I believe

15  can be answered by an appropriate measure, then I'll

16  certainly do so, or at least evaluate the feasibility of

17  doing so.

18  And I would add on top of that, I guess, that

19  certainly it's not been the case that all of these measures

20  have been -- have been widely used or even known by me during

21  my entire career of writing -- or my entire period of writing

22  expert reports. And certainly the efficiency gap is one

23  example of that.

24  Q. Of what?

25  A. Oh, of a measure not being available to me.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 22

1      For example, in 2013 I wrote an expert report in
2  which I didn't use the efficiency gap because there had been
3  no academic literature in political science really discussing
4  the efficiency gap.  So I just wasn't even aware of the
5  formula back then.
6      So that's just an example of what might go into my
7  decision making.
8  Q.  What about since Stephanopolous and McGhee articulated the
9      efficiency gap in the Chicago Law Review and elsewhere, was
10     it known to you then?
11 A.  You mean when that article was written, was it then known to
12     me?
13 Q.  Yes.
14 A.  Well I was generally aware that the article was being
15     published, so of course I was aware of generally what they
16     were describing in that article.
17 Q.  Okay.  And then the rest of these cases -- I'm going to try
18     to get through this as quickly as I can.
19     There is about three cases if you look at page one
20     where the, that are in Florida where Detzner is the
21     defendant, okay?  For example, it says --
22 A.  Yes.
23 Q.  -- Romo v Detzner, League of Women v Detzner.  I believe
24     there is one other.
25     Are those all the same cases, or are those

Page 23

1  different cases?
2  A.  Okay.  You're talking about Rene Romo versus Detzner and then
3      League of Women Voters versus Detzner.
4  Q.  Right.
5  A.  My recollection is that those were different cases.
6      Those were different districting plans that were being
7      challenged.
8  Q.  And what was the difference?
9  A.  Let me try and remember.  Those two cases in fact do have
10     similar names so I'm going to try to keep it straight here.
11     I believe, I'm going to try my best here, to my
12     recollection, the Rene Romo versus Detzner case was a
13     challenge of Florida's then enacted -- then just enacted
14     congressional districting plan.  And then my recollection is
15     that the League of Women Voters versus -- of Florida versus
16     Detzner case was a challenge to the then enacted Senate --
17     State Senate plan.
18 Q.  And how about Corrine Brown v Detzner?
19 A.  Okay.  I see that one.  I believe that that was a case in
20     which Congresswomen Brown challenged the -- challenged
21     something to do with a specific -- a specific congressional
22     district or a set of congressional district lines that
23     obviously involved her congressional district.  So it was a
24     congressional challenge.
25     I don't recall it being -- I don't believe it was a

Page 24

1  statewide challenge.
2  Q.  Okay.  Well let's start with Romo, did you testify on behalf
3      of the plaintiffs in that case?
4  A.  I was deposed, I did not testify at trial.
5  Q.  But did you appear on behalf of the plaintiffs?
6  A.  Did I --
7  Q.  Did you offer a report for the plaintiffs?
8  A.  I authored a report, yes, sir.  Sorry.
9  Q.  What was the gist of that report?
10 A.  Okay.  That was a report in which I had conducted a number
11     of -- first I had evaluated the enacted plan in terms of
12     partisan, its partisanship.  And then I had analyzed a number
13     of various sets of computer-simulated plans that were
14     simulating Florida's congressional districting planning and I
15     evaluated the partisanship of those.
16 Q.  And how about the League of Women Voters, what was the gist
17     of your report in that case?
18 A.  In the League of Women Voters versus Detzner case, I analyzed
19     the partisanship and the racial composition of various -- I
20     believe I analyzed the partisan composition of the entire
21     Senate plan.  I analyzed the racial composition of various
22     districts.
23     And then I performed some number of simulations, I
24     believe more than one set of simulations using differing --
25     differing configurations of districts that were held frozen.

Page 25

1      And I analyzed the partisanship, and I recall that
2  I analyzed the partisanship of those simulated plans.
3  Q.  Okay.  And then in Brown?
4  A.  In the Corrine Brown versus Detzner case -- you're asking
5      what I did in my report, right?
6  Q.  Yes.
7  A.  Okay.  I believe I wrote one report, that's my recollection.
8      And in that report I produced data looking at the
9      partisanship -- I believe using, looking at the voter --
10     using the voter registration files looking at the
11     partisanship, and possibly the racial composition of one or
12     more congressional districts.
13 Q.  Did you run any simulated plans in that report?
14 A.  I did not produce any computer-simulated plans.
15 Q.  And in all of those cases the plaintiffs were challenging a
16     redistricting plan enacted by a Republican legislature?
17 A.  To the best of my knowledge, the Florida legislature was
18     Republican -- was unified Republican controlled during the
19     time of redistricting at the beginning of this decade.
20     So I believe that is an accurate characterization,
21     to the best of my knowledge.
22 Q.  And the plaintiffs in Romo and League of Women Voters were
23     alleging that the Republicans had engaged in an
24     antidemocratic gerrymander, correct?
25 A.  I can't speak to that.  I can tell you that the plaintiffs

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 26

1    were challenging districting plans that had been enacted.

2    Q.   On what grounds?

3    A.   Which case are we talking about now?

4    Q.   I'm trying to put together Romo and League of Women Voters.

5    A.   Okay.

6    Q.   If there is a difference, let me know.

7    A.   There might be, I am not sure.  I'll have to think about

8        this.

9            My best -- to the best of my knowledge, Romo was

10       purely a partisan challenge.  To my knowledge, I don't -- I'm

11       not aware of the Romo plaintiffs alleging racial

12       gerrymandering.

13   Q.   How about League of Women Voters?

14   A.   To the extent that I'm aware, I'm not aware of the League of

15       Women Voters of Florida alleging anything other than a

16       partisan bias in the redistricting.  I'm not aware, for

17       example, that they made a racial challenge.

18   Q.   Just to be clear, they were alleging a partisan bias against

19       Democrats?

20   A.   I'm not sure that they characterized it that way.  And I'm

21       just not going to speak for the League of Women Voters,

22       plaintiffs.

23   Q.   Which party was disadvantaged according to the plaintiffs in

24       the League of Women Voters, Democrats or Republicans?

25   A.   Well I can tell you about my findings.  And certainly I

## Page 27

1    analyzed things in terms of a Republican or Democratic bias.

2    And I'm happy to characterize my own findings as there being

3    a partisan bias that favored the Republicans.

4    Q.   Okay.

5    A.   I'm just saying -- all I'm doing is I'm saying I'm not going

6        to speak for the plaintiffs themselves.

7    Q.   Have you ever been involved in a case where you allege that

8        there was a partisan bias in favor of Democrats?

9    A.   If I could ask you to repeat the question.

10   Q.   Have you ever been involved in a case where you concluded or

11       alleged that there was a partisan bias in favor of Democrats?

12   A.   I can't recall doing that.

13   Q.   Okay.  And you're a Democrat?

14   A.   You're asking about me personally?

15   Q.   Yes.

16   A.   I'm not.

17   Q.   You are not a registered Democrat?

18   A.   My understanding is that in Michigan we don't have partisan

19       registration.

20           We don't have -- my understanding is that Michigan

21       does not allow voters to register as a member of a particular

22       party.

23   Q.   Would you align yourself with the Democratic or Republican

24       party in your voting practices?

25   A.   Neither.

## Page 28

1    Q.   Okay.  Georgia State Conference of the NAACP versus State of

2        Georgia, that's a 2017 case --

3    A.   Well --

4            MR. YEAGER:  Wait, let him ask a question.

5            MR. CARVIN:  That's fair.

6            THE WITNESS:  I see that case.

7            MR. YEAGER:  Wait, Jowie, let him ask the question,

8        then you answer.

9    BY MR. CARVIN:

10   Q.   I take it from the pause that you have seen this case listed

11       now on page one of your report, correct?

12   A.   Yes, sir.

13   Q.   Okay.  So now, what was the issue in that case, and what was

14       the gist of whatever report you authored in that case?

15   A.   Okay.  Sure.

16           To my knowledge, that case is one in which

17       plaintiffs are challenging the drawing of two State House

18       districts, District 105 and 111, in Georgia's state

19       legislature, State House.

20   Q.   And on what grounds are they challenging that?

21   A.   I'm going to do my best to answer the question.  I think this

22       is part of the dispute in that case so I'm just going to do

23       my best to -- and I'm not legally qualified to accurately

24       characterize these sort of cases.

25           But my understanding is that the plaintiffs are

## Page 29

1    alleging racial considerations in the drawing of House

2    Districts 105 and 111.

3    Q.   And what, if anything, have you analyzed in that case?

4    A.   I conducted analysis of the voting patterns in those two

5        districts, which are parts of Gwinett County and Henry

6        County.

7            I looked at voter registration numbers and analyzed

8        voting patterns in terms of candidates preferred, as well as

9        racial -- the racial composition of the electorate, of the

10       turnout of the electorate.

11           And I performed a model -- I may have used the term

12       simulations, but it's still in the sense that I've been

13       discussing simulations here, a model predicting what would

14       have happened in a hypothetical district using voter

15       registration records.

16   Q.   And what was your conclusion?

17   A.   In general my conclusion was that had the two districts that

18       were being challenged, 105 and 111, had they not been redrawn

19       in the way that they were in the middle of the decade, that

20       the election outcomes may well have been different than they

21       actually were.

22   Q.   Different in terms of party or --

23   A.   Different in terms of the candidate who won.

24   Q.   And were you analyzing whether that candidate was the

25       preferred candidate of choice of the black community?

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 30

1    A. I did. I analyzed racially polarized voting --

2    Q. Right.

3    A. -- in my report.

4    Q. And your conclusion was that prior to the re-draw, the black

5    preferred candidate would have been successful: but after the

6    re-draw, he would not have been, or she would not have been?

7    A. That was generally my conclusion.

8    Q. Okay. And where is that at this point? Has there been a

9    trial?

10   A. That case, to my knowledge, has not gone to trial.

11   Q. Okay. Have you submitted a report?

12   A. I have. I wrote a report.

13   Q. Have you been deposed?

14   A. I have.

15   Q. Okay. And NAACP versus St. Louis?

16   A. Actually let me just make sure that my report was correct in

17   describing my involvement in that case.

18        So I listed that Georgia case as one in which I've

19   written an expert report, and as I said, I've been deposed,

20   but have not -- did not -- there has been no trial in which I

21   have testified in that case.

22        I just wanted to make sure I was describing that

23   accurately.

24   Q. Okay. And then at the very top you have Missouri National

25   Association for the Advancement of Colored People versus

## Page 31

1    Ferguson and St. Louis County Board, and that was in 2014.

2    Do you see that case?

3    A. Yes, sir.

4    Q. Okay. And what was your analysis -- what issues did you

5    analyze in that case?

6    A. I was a co-author on a, I believe it was a rebuttal report in

7    which I helped to -- I did some statistical analysis in which

8    I helped to analyze, I recall, the racial composition of a

9    districting plan that I believe had been proposed.

10        That's all that I can specifically remember being

11   my work in that case.

12   Q. Was the issue again racial block voting?

13   A. I'm not sure I know enough to characterize it as that, but I

14   do recall it involved racial issues.

15   Q. Okay. If you could turn to the second page of your report,

16   please. I'd like to direct your attention to footnote one.

17   A. Yes, sir.

18   Q. Okay. You say here, you reviewed the statutory criteria and

19   applied the criterion mandated in these statutes to produce a

20   set of alternative maps for Michigan's Congressional, Senate

21   and House districting plans.

22        To your knowledge are those the plans that were

23   attached to Plaintiffs' complaint in this case?

24   A. Let me just review where I -- where this footnote starts.

25        MR. YEAGER: While he's reviewing, I'm going to

## Page 32

1    object to the extent that the question requires him to

2    disclose conversations with counsel that would be protected

3    by Rule 26 and Work Product Doctrine.

4        You may answer.

5        THE WITNESS: My recollection is that what I'm

6    referring to in this footnote, and when I'm saying

7    alternative maps, I'm talking about the simulated plans that

8    I produced in this report.

9    BY MR. CARVIN:

10   Q. So you draft a footnote, you're referring to all 3000

11   simulated plans?

12   A. That's my recollection of what I meant by that phrase, by

13   that footnote.

14   Q. Did you ever prepare one map for Congress, one map for

15   Senate, and one map for the House, by yourself?

16   A. Oh, by hand? Personally?

17   Q. No. Did you either select among the thousand or create your

18   own map?

19   A. Well --

20        MR. YEAGER: Okay, wait. Just wait.

21        I'm going to object. We'll have to go through this

22   a little bit at a time.

23        The witness is instructed not to testify as to his

24   conversations with counsel, which are protected by Rule 26

25   and the Work Product Doctrine, or other work that he did

## Page 33

1    that's not reflected in his report for the same reason.

2        THE WITNESS: Okay.

3        MR. YEAGER: Go ahead. With that constraint,

4    answer to the extent that you can.

5        THE WITNESS: Okay. And I'm just going to ask you

6    if you could please reask your question.

7    BY MR. CARVIN:

8    Q. Did you produce maps, individual maps to Plaintiffs' counsel

9    and/or Professor Mayer?

10        MR. YEAGER: Same objection and instruction.

11        THE WITNESS: I'm going to follow Plaintiffs'

12   counsel's instruction.

13   BY MR. CARVIN:

14   Q. No, you're going to answer the question.

15        MR. YEAGER: Okay, hold on. Do you want to take a

16   break and talk about this?

17        MR. CARVIN: We can do it on the record. We can do

18   it on the record.

19        MR. YEAGER: Okay.

20        MR. CARVIN: You attached three alternative maps to

21   your complaint.

22        MR. YEAGER: Yes.

23        MR. CARVIN: Professor Mayer has already testified

24   that Professor Chen drew those plans. He also testified that

25   Professor Chen forwarded those plans to him.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 34

1    You stated in the deposition that those were the
2    plans that were attached to Plaintiffs' complaint.
3    I'm simply trying to confirm that reality which is
4    already out there and certainly can't be hidden from the
5    Court.
6    MR. YEAGER:  Okay.  First of all, if you want to
7    play games about hiding things from the Court, that's clever,
8    but not appropriate, number one.
9    Number two, that -- you've not correctly summarized
10   the prior testimony, I object to that.
11   And number three, the witness is going to answer to
12   the extent it's not protected, just as Professor Mayer did.
13   Now if you want to narrow your question to
14   something that is not protected, the witness will answer.
15   MR. CARVIN:  I'll go back to where I started.
16   BY MR. CARVIN:
17   Q.   Are the maps that you -- are you aware of alternative maps
18   being attached to Plaintiffs' complaint?
19   A.   I am generally aware of that.
20   Q.   Did you prepare those maps?
21   THE WITNESS:  What are my instructions?
22   MR. YEAGER:  You can answer that yes or no, to the
23   extent you know.
24   THE WITNESS:  Okay.  The answer is that to the best
25   of my recollection those plans were produced by computer

## Page 35

1    simulations that I programmed.
2    BY MR. CARVIN:
3    Q.   But there was only one map for each office attached to
4    Plaintiffs' complaint, correct, not a thousand.
5    A.   That is my understanding.
6    Q.   Okay.  Did you select the one map for Congress, the one map
7    for Senate, and the one map for the State House that was
8    attached to the Plaintiff's complaint?
9    MR. YEAGER:  Objection.
10   You can answer that yes or no.
11   THE WITNESS:  I did not make that selection.
12   BY MR. CARVIN:
13   Q.   Did you -- well then I'm confused.  They were -- you didn't
14   select among the thousand?
15   MR. YEAGER:  You can answer that yes or no.
16   THE WITNESS:  I did not make the selection.
17   BY MR. CARVIN:
18   Q.   Who made the selection?
19   THE WITNESS:  Can I answer the question?
20   MR. YEAGER:  Well the objection is the same
21   objection about matters protected by Rule 26.
22   I'd like to take a break and talk to the witness to
23   find out what he knows and doesn't know, so that he can
24   answer your question the best that he can.
25   MR. CARVIN:  All right.

## Page 36

1    (At 10:20 a.m. went off the record.)
2    (At 10:26 a.m. went on the record.)
3    MR. CARVIN:  Back on the record.
4    BY MR. CARVIN:
5    Q.   Who chose the alternative maps that were attached to
6    Plaintiffs' complaint?
7    MR. YEAGER:  You may answer that question, to the
8    extent you know.
9    THE WITNESS:  My understanding is that Plaintiffs'
10   counsel did.
11   BY MR. CARVIN:
12   Q.   Okay.  Did you have conversations with him about which map to
13   choose?
14   MR. YEAGER:  You can answer that yes or no.
15   THE WITNESS:  I did not have conversations
16   regarding what map they were going to choose.
17   BY MR. CARVIN:
18   Q.   Did you play any role in selecting the map that was attached
19   to the Plaintiffs' complaints?
20   MR. YEAGER:  You may answer that yes or no.
21   THE WITNESS:  Yes, I did.
22   BY MR. CARVIN:
23   Q.   What was that role?
24   MR. YEAGER:  So I'm going to object to the extent
25   that that would require you to disclose communications

## Page 37

1    between you and us: but to the extent that you can answer the
2    question without referring to communications between us, you
3    may answer the questions.
4    Do you want to hear it back again?
5    THE WITNESS:  Please give me your instructions
6    again.
7    MR. YEAGER:  Okay.  You may answer the question to
8    the extent it does not require you to disclose communications
9    between you and Plaintiffs' counsel.  To the extent it does
10   not require a disclosure of the content of those
11   communications, you may answer.
12   THE WITNESS:  I'm going to do my best to answer as
13   much of the question as I can, while still following Mr.
14   Yeager's instructions that he just gave to me.  So I'm going
15   to do my best to follow both of those things.
16   So my answer is that I produced a number of
17   computer-simulated plans.
18   Now I can't answer any further without violating
19   Mr. Yeager's instructions to me.  So I'm going to follow Mr.
20   Yeager's instructions to me by stopping right there.
21   MR. YEAGER:  And let me clarify my instruction in a
22   way that might make this easier.
23   To the extent that you could answer further without
24   disclosing the content of communications between us, you may
25   answer further.

Deposition of Jowei Chen - 9/7/2018

League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 38

1    THE WITNESS:  I've answered as far as I can while

2    still following Plaintiffs' counsel's instructions to me.

3    BY MR. CARVIN:

4    Q.    Completely unacceptable.

5    MR. CARVIN:  I'll try it another way.  I'll ask

6    you, Mr. Yeager.

7    Who produced the maps that you presented to the

8    Court as part of your complaint?

9    MR. YEAGER:  Well I'm not going to be deposed in

10   the deposition.  I'm pleased to have that conversation with

11   you, but we're not going to have it on the record in a

12   deposition.

13   MR. CARVIN:  I'm not going --

14   MR. YEAGER:  And we can have that conversation

15   right now if you prefer.  We're not going to have it on the

16   record in a deposition.

17   MR. CARVIN:  Okay.  Let's go off the record for a

18   minute.

19   (At 10:30 a.m. went off the record.)

20   (At 10:47 a.m. went on the record.)

21   MR. CARVIN:  Back on the record.

22   BY MR. CARVIN:

23   Q.    I'm going to try to get through this without putting you in

24   an awkward spot in terms of your communication with counsel.

25   I'm not entirely sure where we left off when we were talking.

## Page 39

1    So let me just ask you a couple of questions.  To

2    the extent you can answer them without referencing

3    consultation with counsel, you can tell me -- you can tell me

4    that you got that problem.  But if you can answer it without

5    referencing that, I'd appreciate it if you did.  I think this

6    will be clear once I ask the question.

7    A.    Okay.

8    THE WITNESS:  And if I could just ask, Mr. Yeager,

9    are my instructions the same as before that I am not to

10   reference -- are you instructing me not to answer any

11   questions with reference to conversations with Plaintiffs'

12   counsel.

13   MR. YEAGER:  Well we're going to go question by

14   question.  So let's just listen to the question --

15   BY MR. CARVIN:

16   Q.    Mr. Yeager is right.  I apologize for interrupting.  I don't

17   think this will be an issue as I --

18   THE WITNESS:  Or are my instructions to wait for

19   you?

20   MR. YEAGER:  You have no instructions until you get

21   a question: and then if instructions are needing to be given,

22   you can count on me.

23   THE WITNESS:  Great.

24   BY MR. CARVIN:

25   Q.    Okay.  So did you play any role in selecting the alternative

## Page 40

1    maps that were attached to the complaint?

2    MR. YEAGER:  You can answer that question.

3    THE WITNESS:  I produced a number of simulated

4    maps.

5    BY MR. CARVIN:

6    Q.    Okay.  In your report obviously you produced -- let's use

7    Congress as an example, you produced a thousand alternative

8    maps for Congress?

9    A.    Yes, sir.

10   Q.    Is that, when you say you produced a number are those the

11   maps you're referring to?

12   A.    Yes.

13   Q.    Okay.  One map was attached to the complaint.  Do you know --

14   A.    Oh, let me actually go back and clarify my answer if I could.

15   MR. YEAGER:  Go ahead.

16   THE WITNESS:  So you are correct in that I produced

17   one thousand congressional maps and obviously one thousand

18   Senate maps and one thousand House maps.

19   Even before, I recall as early as 2016, I had

20   already -- I had already produced a, also a number of maps, I

21   recall of the House and Senate plans.  I don't recall the

22   Congressional plans.  But I had produced already a large

23   number of House and Senate maps.

24   BY MR. CARVIN:

25   Q.    In connection with this litigation?

## Page 41

1    A.    They were -- back in 2016 I was just first producing draft

2    simulations.

3    Q.    But why?

4    MR. YEAGER:  Can I just comment?

5    MR. CARVIN:  Yes.

6    MR. YEAGER:  We had engaged him.  He was doing

7    preliminary work that led to this case.

8    MR. CARVIN:  That's what I'm trying to figure out.

9    BY MR. CARVIN:

10   Q.    When you say a large number, for example, how many -- in the

11   rough neighborhood how many House maps did you produce?

12   A.    Definitely over ten.

13   Q.    Okay.

14   A.    I don't recall, and certainly didn't keep record of --

15   Q.    Were those ten produced pursuant to the same algorithm that

16   you later used for the one thousand?

17   A.    No.  An earlier draft.

18   Q.    Okay.  An earlier draft of the algorithm?

19   A.    To my recollection, when I started out I went through

20   multiple drafts, and went through structural changes.  And so

21   certainly I had produced, using earlier drafts of my

22   simulation algorithm, a number of House and Senate plans.

23   Q.    When you use the word draft, do you mean draft simulation

24   algorithms or draft actual maps?

25   A.    Both.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 42

1  Q.  Okay.

2  **A.  In other words, the simulation code, in the draft form,**

3  **produced maps in draft form.**

4  Q.  But you subsequently made changes to the simulation algorithm

5  which produced different maps.  Do I understand that

6  correctly?

7  **A.  Correct.**

8  Q.  Okay.  And at the end of that process you had roughly, say,

9  ten maps for the House?

10  **A.  I don't want to say it as roughly ten, I definitely recall**

11  **at least ten.  I just didn't keep a record, and it was such a**

12  **long time ago.**

13  Q.  Okay.  To your knowledge, were those maps attached to the

14  Plaintiffs' complaint?

15  **A.  I have no idea.**

16  Q.  Okay.

17  **A.  Wait, let me think about that.  I want to think about whether**

18  **I know the answer to that.**

19  Your question was to my knowledge, were they

20  attached to the Plaintiffs' complaint?

21  Q.  Right.  I don't want to wordsmith here.

22  Do you know if the maps that were attached to the

23  Plaintiffs' complaint were among the maps that you had

24  produced in 2016?

25  **A.  I don't know.**

## Page 43

1  Q.  Okay.  Do you know if they came from the one thousand

2  simulated maps that you produced pursuant to your algorithm?

3  **A.  I don't know.**

4  Q.  Okay.  What if anything do you know about the maps that were

5  attached to the Plaintiffs' complaint?

6  THE WITNESS:  What are my instructions?

7  MR. YEAGER:  You're asking about the maps that were

8  attached to the complaint?

9  MR. CARVIN:  Yes.

10  MR. YEAGER:  I believe the witness can answer this

11  question without invading work product or Rule 26 protection.

12  So my instruction to you is to answer the question.

13  If you believe your answer is going to require you

14  to disclose communications with counsel, other than just

15  providing maps, then don't answer that and we can discuss

16  what you may need.

17  Within that constraint, you may answer.

18  THE WITNESS:  Okay.  I'm going to do my best to

19  answer your question while following Mr. Yeager's instruction

20  to me, which puts some limits on how I can answer here.

21  So to my knowledge, I produced a significant number

22  of maps, definitely over five or ten.  And to my knowledge,

23  some of those were attached to Plaintiffs' complaint.

24  BY MR. CARVIN:

25  Q.  Okay.

## Page 44

1  **A.  That's the best of my knowledge.**

2  Q.  And just to be clear, the maps you just referred to, were

3  those among the thousand simulated maps or did they precede

4  the production of those?

5  **A.  You're asking about the maps attached to Plaintiffs'**

6  **complaint.**

7  Q.  Yes.

8  **A.  I don't know.**

9  Q.  Okay.  Do you know whether the five to ten or whatever it was

10  were among the thousand?

11  MR. YEAGER:  Objection, vague, ambiguous.

12  You may answer.

13  THE WITNESS:  I think by five and ten, you're

14  referring to the draft maps that I was talking about from

15  back in 2016.

16  BY MR. CARVIN:

17  Q.  The ones you just referenced in your answer.

18  **A.  Yeah, I think I know what you're talking about, you're**

19  **talking about early drafts.  And that's why I described them**

20  **as early drafts.**

21  **I certainly went through drafts of the algorithm**

22  **and then made more changes and started all over again, and**

23  **ultimately produced one thousand.  So I'm talking about two**

24  **different sets, separate maps.**

25  Q.  I know you did.  But you also said there was a smaller subset

## Page 45

1  that you had produced as well.  Right?

2  You used the phrase five to ten a minute ago.

3  **A.  I was talking about the same thing.  I mean the point is that**

4  **I produced draft maps, draft simulation algorithms years ago,**

5  **produced some maps; and then later on, produced one thousand**

6  **for the purpose of the three sets in my report.**

7  Q.  Just to clarify for the record, I'm now talking about, say,

8  the Congressional map that was attached to the complaint, was

9  that among the draft maps that you had prepared?

10  **A.  Okay.  I gotcha.  I apologize for misunderstanding the**

11  **question.**

12  **And the answer is that I don't know.**

13  Q.  You've never reviewed the maps that were attached to the

14  complaint?

15  THE WITNESS:  What are my instructions?

16  MR. YEAGER:  You can answer that.

17  THE WITNESS:  I can answer that even by making

18  reference to communications with Plaintiffs' counsel?  What

19  are my instructions?

20  MR. YEAGER:  Okay.  Now the witness has expressed a

21  concern about that communication so we're going to have to

22  take a break so I can figure out what it is and figure out if

23  he can answer the question that's on the table.

24  (At 10:55 a.m. went off the record.)

25  (At 11:00 a.m. went on the record.)

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 46

1    MR. CARVIN:  Back on the record.

2  BY MR. CARVIN:

3    Q.   What if anything do you know about where the alternative maps

4         attached to Plaintiffs' complaint came from?

5    A.   **My understanding is that they came from maps that I produced.**

6    Q.   And do you know whether the maps you produced were among the

7         thousand simulated maps, or were they perhaps different, as

8         far as you know?

9    A.   **You're talking about the maps -- about the complaint maps?**

10   Q.   Yes.

11   A.   **I don't know.  I don't know for sure the answer to that.**

12   Q.   Okay.  Fair enough.

13        Did you read Professor Mayer's report?

14   A.   **No, sir.**

15   Q.   Okay.  Do you know that he referenced demonstration plans?

16   A.   **I have been overhearing conversations between you and Mr.**

17        **Yeager this morning, and I gathered that was the case.**

18   Q.   So do you know whether or not the demonstration plans are

19        different from the maps attached to the Plaintiffs'

20        complaint?

21   A.   **To my knowledge, I have not -- well, I have not seen**

22        **Professor Mayer's report, so that's not something I can say**

23        **for sure.  I've just not seen his report.**

24   Q.   Fair enough.  So you don't know if any similarity or lack of

25        similarity between the demonstration plans are analyzed in

## Page 47

1    Professor Mayer's reports and the maps produced, attached to

2    the complaint?

3    A.   **I have not reviewed the maps that Professor Mayer apparently**

4         **reviewed in his report.  I haven't seen the report.  So I**

5         **don't know what those maps are.  I wouldn't have any basis**

6         **for being able to answer that.**

7    Q.   For the same reason, I take it, you don't know the genesis of

8         the plans in the Mayer report?

9    A.   **Not being able to identify those maps, I can't say for sure.**

10   Q.   Okay.  Are you aware of any transmittal of maps to Professor

11        Mayer?

12   A.   **Am I aware of any transmission of maps?**

13   Q.   Yes.

14        MR. YEAGER:  To Professor Mayer?

15        MR. CARVIN:  Correct.

16        THE WITNESS:  From me or from Plaintiffs' counsel?

17   BY MR. CARVIN:

18   Q.   Just anybody.

19   A.   **I can speak for myself.  I have never transmitted any maps to**

20        **Professor Mayer by myself.**

21   Q.   I really think this is just a clean-up question.  You've

22        testified that you haven't seen the demonstration plans, you

23        haven't read the Mayer report.  I'm going to assume from that

24        that you don't know who gave him the plans or anything about

25        the plans.

## Page 48

1    Is that a fair assumption?

2    A.   **That is correct.  I'm just saying I didn't transmit to him**

3         **any maps.**

4        MR. CARVIN:  Counsel, we did have a discussion

5    earlier.  Can you make any representation about where the

6    demonstration plans came from, and whether they're different

7    from the Plaintiffs' alternative map?

8        We are going to make quite an issue of this, if --

9    but you can clarify the situation if you want.

10       MR. YEAGER:  Well I'm not going to do it on the

11   record in this deposition.  I'll be glad to do it in some

12   other appropriate format.

13       I know there is some outstanding discovery about

14   this.  I'm having e-mails right now with your co-counsel

15   regarding files for the maps that we've produced.  And you

16   and I did have that conversation.

17       If there is something, a particular fact that you

18   want stipulated, I'll consider that.

19       MR. CARVIN:  Okay.  Yes.  What we'd like you to

20   stipulate to is that the demonstration maps were either

21   provided by you and/or are different from -- the same as or

22   different from the alternative maps.

23       What I'm trying to figure out is are the

24   alternative maps attached to the complaint different than the

25   demonstration plans in Mayer's report.

## Page 49

1        MR. YEAGER:  As I've told you, those two sets are

2    not identical.  They may not be -- there may be some overlap.

3        MR. CARVIN:  Okay.

4        MR. YEAGER:  I'm just not aware as I sit here

5    because I haven't gone back and reviewed them since you

6    raised that issue this morning.  Again that's all in the

7    materials that have been provided.

8        But that's the answer to the question.

9        MR. CARVIN:  And that's fair.  And I'm assuming

10   from Professor Chen's answer that since he wasn't the source

11   of the provision to Mayer, and Mayer didn't produce the maps,

12   without revealing any confidences, those were provided by

13   Plaintiffs' counsel to him.

14       Is that fair?

15       MR. YEAGER:  I'm sorry, I'm distracted.

16       Would you read that back?

17       (Record read:  Q.  And I'm assuming from Professor

18   Chen's answer that since he wasn't the source of the

19   provision to Mayer, and Mayer didn't produce the maps,

20   without revealing any confidences, those were provided

21   by Plaintiffs' counsel to him.

22       Is that fair?)

23       MR. YEAGER:  The maps that Professor Mayer attached

24   to his report were provided by Plaintiffs' counsel.

25       MR. CARVIN:  Okay.  Thank you.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 50

1   BY MR. CARVIN:
2   Q.  All right.  Hopefully we're not going to get into another
3       sticky discovery issue, but let me wade in here as well.
4           Have you provided Defendants with the source code
5       from which -- well the source code for the use for the
6       thousand simulated maps?
7   A.  The simulated maps in my report is what you're referring to?
8   Q.  Yes.
9   A.  And I have provided to Mr. Yeager, or to Plaintiffs' counsel,
10      a draft code that is substantially the same as the code that
11      I ultimately used --
12  Q.  Okay.
13  A.  -- to produce.
14          So it is structurally identical to the ultimately
15      compiled code that I used to produce the three different sets
16      of simulations in my report.
17  Q.  Where is the code that you ultimately used?
18  A.  The code that I ultimately used was a .JAR, it's a compiled
19      .JAR file.  That's how I ultimately run simulations.
20  Q.  Where is that .JAR file?
21          MR. YEAGER:  That was produced.
22          THE WITNESS:  And well I'll just explain that I
23      believe back in June Mr. Yeager asked me to produce that .JAR
24      file.  And I went back and identified I believe it was three
25      different .JAR files, I can't remember if it was three sets

## Page 51

1       of code that were compiled into one .JAR file, but I gave
2       those to Mr. Yeager.
3   BY MR. CARVIN:
4   Q.  Right.  But in addition to that you provided a source code
5       that you say is substantially the same as your final source
6       code, correct?
7   A.  A draft code, a draft source code of the three sets of
8       simulations.
9   Q.  Okay.
10  A.  That is substantially the same.
11  Q.  All right.  Where is the final draft code?
12          MR. YEAGER:  Objection, vague and ambiguous.
13  BY MR. CARVIN:
14  Q.  Are you really confused by this?
15          MR. YEAGER:  When you say final draft code --
16  BY MR. CARVIN:
17  Q.  You said you provided a draft code that was substantially the
18      same as the final?
19  A.  Yes.
20  Q.  Okay.  Where is the final?
21  A.  That basically is the final draft code.  It is structurally
22      the same as what I actually ran.
23  Q.  Okay.  And you have that, and you were able to provide that
24      to us, correct, the one that's substantially the same?
25  A.  Yes, sir.

## Page 52

1   Q.  Okay.  We want the one that is not substantially the same,
2       but is the one that was actually used.  Can you provide that
3       to us?
4   A.  I save draft code as I make changes to it.  And I went back
5       and looked, and that, to the best of my recollection, and as
6       far as I can tell, is essentially identical.  It is identical
7       in structure to the simulations that I ran.
8   Q.  All right.  But why do you have to give us one that's
9       substantially the same.  Why not give us the one that
10      produced the simulations?  Is it not available?
11  A.  I don't save every single change that I make.
12  Q.  Okay.
13  A.  I save changes from time to time.
14  Q.  Did you not save these?
15  A.  I did.  I made -- I saved it in its -- in its form before I
16      ran the simulations, in the same structural form before I ran
17      the simulations.
18  Q.  Right.  But then you ran the simulations: can you give us the
19      source code for the actual simulations that were run?  Did
20      you save them?
21          MR. YEAGER:  Asked and answered.
22          You may answer.
23          THE WITNESS:  As I said, I turned over, number one,
24      the actual compiled code.
25  BY MR. CARVIN:

## Page 53

1   Q.  Right.
2   A.  That I identified.
3   Q.  Right.
4   A.  And then I turned over the uncompiled draft code in the,
5       substantially the same form as I identified it.
6   Q.  Right.
7   A.  Before producing that compiled -- that compiled JAR file.
8   Q.  Right.  And can you give us the one that's not in
9       substantially the same form, the one that was actually
10      used?
11  A.  I did.
12  Q.  No.  All right.
13          You didn't produce the source code that actually
14      relates to the actual simulations, right?  You produced one
15      that you say is substantially the same and functionally
16      identical.
17          MR. YEAGER:  Objection, misstates the testimony.
18          You may answer.
19          THE WITNESS:  I didn't hear the question.
20  BY MR. CARVIN:
21  Q.  Why don't you tell me what you gave to us in your own words
22      that was substantially the same.
23  A.  Oh, you're asking what that is?
24  Q.  I'm asking you why you have to give us something that's
25      substantially the same as opposed to the actual.

Deposition of Jowei Chen - 9/7/2018

League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 54

1  A. Because that's the only draft code that I've got.

2  Q. And that's why I'm asking.  Did you delete it?

3  A. No.

4  Q. Did you not save it?

5  A. I just did not save every single iteration or every single

6      word that was changed in the code.  I only save code when

7      there is a structural or substantial change made.

8          So I don't change -- I don't save a draft copy of

9      the code after every single function that's added or every

10     single command that's added.

11  Q. And --

12  A. I think I understand your question, the answer is it just

13     doesn't exist.  It never existed.

14  Q. Because you didn't -- well it existed to run the simulations.

15  A. I never saved it is what I'm saying --

16  Q. Right.

17  A. -- when I say it never existed.

18  Q. And you're saying that it's not automatically saved?

19  A. No.  It's not like Microsoft Word where there is something

20     like an autosave function that automatically saves every 30

21     seconds or something like that.

22  Q. Or using Java code?

23  A. Oh, I write code in Java.

24  Q. And doesn't that automatically save?

25  A. Like I said, no.  There is no autosave.

## Page 55

1  Q. Is that your testimony?

2  A. Well, okay.  I'll say this is my testimony to the best of my

3     knowledge.

4          There may well be some kind of Java compiler out

5      there that does in fact have an autosave function by default.

6      I'm not specifically aware of it and certainly I haven't used

7      any such thing before.

8          But in my practice, the way that I write Java code

9      for my research, I don't use any sort of software or any sort

10     of compiler that has an autosave function.

11  Q. All right.  You say they were substantially the same.  How

12     did they differ?

13  A. Sure.  I went back and looked at the various drafts of my

14     Java code that I had actually saved and I identified this one

15     draft as being substantially the same.  But I could see that

16     there were cosmetic changes, there were cosmetic differences

17     that I would -- that, to the best of my recollection, I

18     certainly would have taken out, simply because they're not

19     part of the essential structure of the simulation.

20          So these are cosmetic things that I certainly would

21     not have wanted to really be running in part of the final

22     code because they're cosmetic.

23  Q. Okay.  Can you describe that, what you took out?

24  A. Yeah.  I'll do so to the best of my recollection.  But like I

25     said they're all cosmetic changes.

## Page 56

1          So I'll give an example.  When you run Java code,

2      you have a console that can display output.  It's just, say,

3      numbers or text that pops up on the screen.  And it tells you

4      about the progress, or the status of various variables or

5      various functions, or various classes that are going on in

6      the code.

7          So it's just kind of like a status update.  To put

8      it in the form of analogy, it's like if you download a huge

9      file from the internet, you might have a window that pops up

10     that says it is 98 percent finished or 58 percent finished,

11     like status update.  Those are things that have no meaning,

12     other than displaying the status of a process on the console

13     for the screen to display.

14          Now obviously that doesn't affect the structure of

15     any of the simulations.

16          So that's -- some of those are redundancy checks,

17     some of those are just for the sake of being able to check

18     for the proper running, to check to see how fast the

19     processes are running.  But they have no essential structure

20     in the simulation algorithm.

21          And so, for the purposes of producing a large

22     number of simulations, you don't want -- I'm going to speak

23     for myself, I certainly don't want those taking up processing

24     power, taking up RAM.

25          So those are things that are cosmetic, just are not

## Page 57

1      helpful, and are just going to slow things down.  So that's

2      the sort of cosmetic thing that I'm talking about.

3          I could give you some more examples if you'd like

4      to but I'm just trying to explain what I mean when I say

5      cosmetic.

6  Q. Did you add or subtract any functions?

7  A. I subtracted those cosmetic things.

8  Q. And what does cosmetic mean in this context?

9  A. Okay, sure --

10         MR. YEAGER:  Asked and answered.

11         You may answer.

12         THE WITNESS:  I think I was just trying to answer

13     that with your previous question.  I'll try again, so I

14     apologize if I'm repeating myself here.

15         What I mean by cosmetic changes is changes that are

16     removing things that are not essential to the structure or

17     functioning of the algorithm.

18         So an example is like I was saying a minute ago,

19     when you have to run Java code, there is a console, and that

20     console can display text or numbers.  And so there are

21     various lines of codes that will, say, display the value of a

22     particular variable, display the progress for a particular

23     class that's running, display something that's going on.

24         Those aren't actually helping to create a simulated

25     plan, those are just kind of like status updates.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 58

1    The example I gave you a second ago is you download
2    a file of the internet, a window pops up and says 58 percent
3    of the file has downloaded, downloading still in progress.
4    That's just kind of an analogy.
5    BY MR. CARVIN:
6    Q.   Right.
7    A.   **But these are cosmetics things.  That windows that pops up**
8    **that tells you 58 percent of the file is downloading, that's**
9    **not actually -- that's not actually part of the structure of**
10   **downloading the file.  It's just updating the console,**
11   **updating the window telling you that it has made a certain**
12   **amount of progress.**
13   **That's what I mean by cosmetic.**
14   Q.   Right.  And the version you provided to us will have those
15   cosmetic functions in it?
16   A.   **To my knowledge, I looked in that draft code, and I saw --**
17   **saw some number -- a substantial number of those kind of**
18   **cosmetics things.**
19   Q.   And your testimony is the only difference between what you've
20   provided to us and what went into producing the actual
21   simulated plans, is those cosmetic functions?
22   A.   **Yes.  I saw lots of these cosmetic things that I definitely**
23   **would have taken out.  And to the best of my knowledge, those**
24   **were the changes.**
25   Q.   But you can't provide us when you made those changes because

## Page 59

1    you chose not to save them?
2    A.   **It's just not my normal practice to save after only purely**
3    **cosmetic changes.  Let me just state that more clearly.  I**
4    **don't think all the words got out there.**
5    **It is not my normal practice to save drafts of my**
6    **Java code after every single cosmetic change that makes no**
7    **substantial or structural change.**
8    Q.   Right.
9    A.   **I only save -- I generally save drafts of my Java code, to my**
10   **recollection, when I made structural, substantial changes.**
11   Q.   And it's your testimony that Java does not save these drafts
12   automatically as far as you understand?
13   MR. YEAGER:  Asked and answered.
14   You may answer.
15   THE WITNESS:  Same answer as before.  Obviously I'm
16   not going to testify that I know about all the different Java
17   compilers that there out in the world and what different Java
18   programmers might use or not use.
19   I'm just telling you from my own personal
20   experience and my own personal practice, I do not employ and
21   have never used a Java compiler that has that sort of
22   autosave function that you're describing.
23   If it's there, I don't know how to use it.  I've
24   never made it a practice to do so.  But to my knowledge, I
25   don't know how to.

## Page 60

1    I'm just saying that I don't know how to activate
2    an autosave.
3    BY MR. CARVIN:
4    Q.   What did you use?
5    A.   **I'm sorry?**
6    Q.   Java code, what did you use to run these simulations?
7    A.   **I used Java code.**
8    Q.   And your version of Java code doesn't automatically save
9    different iterations?
10   MR. YEAGER:  Asked and answered.
11   You may answer.
12   THE WITNESS:  I think what I said a minute ago was
13   I don't have a Java compiler or anything on my computer that,
14   to my knowledge, autosaves Java code.
15   BY MR. CARVIN:
16   Q.   Okay.  In the litigation in North Carolina, did you produce
17   your final source code, in the litigation, do you know?
18   A.   **My recollection is that I produced .JAR compiled Java code**
19   **file.**
20   Q.   Right.  But the uncompiled source code?
21   A.   **In the North Carolina case?**
22   Q.   Yes.
23   A.   **No.**
24   Q.   Okay.
25   A.   **My recollection is no.**

## Page 61

1    Q.   How about in Pennsylvania?
2    A.   **My recollection is no.**
3    Q.   Okay.  In any case have you ever produced your final source
4    code?
5    A.   **You're talking again about the uncompiled source code?**
6    Q.   Yes.
7    A.   **And my recollection is, no, except that sometime last month**
8    **Mr. Yeager asked me to look through and identify draft,**
9    **uncompiled source Java code.**
10   Q.   Has anyone beside you ever seen the final source code for any
11   of these analysis that you produced in any of these
12   litigations?
13   A.   **To my knowledge, yes.**
14   Q.   Who?
15   A.   **I'm going to do my best to answer the question, but obviously**
16   **I'm going to qualify that I couldn't possibly know an**
17   **exhaustive list.**
18   **So certainly I know -- I recall that there have**
19   **been -- I recall that there was an expert hired by the**
20   **Defendants in the North Carolina Rucho case that testified**
21   **that he reviewed my Java code, the .JAR file that I turned**
22   **over.**
23   **Now that was his testimony.  Obviously I'm saying**
24   **I'm just taking his word for it.  I don't know whether he**
25   **actually did or not.  But to my knowledge he testified that**

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 62

1    he did.

2    Q.   How did he obtain it?

3    A.   I'm sorry?

4    Q.   How did he obtain it, in North Carolina?

5    A.   How did he obtain that .JAR file?

6    Q.   Oh, now you're back to the .JAR file, right?

7    A.   Yes.

8    Q.   Okay.  The compiled?

9    A.   Yes.

10   Q.   But nobody has ever seen the uncompiled final source code,

11   right?

12   A.   Okay.  In -- let me just go back and explain what I was

13   saying about the North Carolina case.

14          As I said, I turned over a .JAR file in the North

15   Carolina case.  And the expert that I was just referring to,

16   to my knowledge, he testified that he had reviewed that, and

17   testified to some things about it, gave his opinion about it.

18          I do not recall -- to my knowledge, I did not turn

19   over uncompiled code because I wasn't asked to.

20   Q.   Okay.  So again as far as you know, nobody, except you, in

21   any of these litigations on the opposite side of the

22   litigation has ever seen your uncompiled final source code,

23   right?

24   A.   Not to my knowledge.

25   Q.   Okay.  Did you have any health issues between June 1st and

## Page 63

1    mid August of this year?

2    A.   Yes.

3    Q.   What was that?

4          MR. YEAGER:  I'm going to object.

5    BY MR. CARVIN:

6    Q.   I'm going to give you some relevance because obviously this

7    is an atypical question, and I don't want to get involved in

8    your personal privacy.

9          Was there any health issues which prevented you

10   from rapidly responding to discovery requests or providing

11   the kind of code that we've been discussing between, say,

12   June 1st and mid August?

13         MR. YEAGER:  I'm going to let him answer that

14   question, but just to protect his private health information,

15   I'll just ask you to answer yes or no and then we'll go on if

16   counsel would like to go on.

17   BY MR. CARVIN:

18   Q.   Just to reinforce Mr. Yeager's point, I'm not at all

19   interested in your health issues and I understand the privacy

20   concerns.

21         I'm wondering if this was a factor in any potential

22   delays in responding to our discovery requests?

23         MR. YEAGER:  Could you just read back the question

24   that's on the table?

25         (Record read:  Q.  Was there any health issues

## Page 64

1    which prevented you from rapidly responding to discovery

2    requests or providing the kind of code that we've been

3    discussing between, say, June 1st and mid August?)

4          MR. YEAGER:  I think the witness wants to consult

5    with me on answering that question.  Is that okay with you?

6          MR. CARVIN:  Yeah, but we've got a lot of --

7          MR. YEAGER:  We'll make it quick.  We'll step out

8    very quickly.

9          (At 11:23 a.m. went off the record.)

10         (At 11:28 a.m. went on the record.)

11         MR. YEAGER:  Can you read back the question please?

12         (Record read:  Q.  Was there any health issues

13   which prevented you from rapidly responding to discovery

14   requests or providing the kind of code that we've been

15   discussing between, say, June 1st and mid August?)

16         THE WITNESS:  The answer is yes.

17   BY MR. CARVIN:

18   Q.   And can you give me a rough time estimate, how long were you

19   disabled or disadvantaged?

20         MR. YEAGER:  Well that's going to ask him to reveal

21   another bit of health information.

22         MR. CARVIN:  I don't need it.

23         MR. YEAGER:  You don't need it?  Okay.

24         MR. CARVIN:  I got to get through this.

25         MR. YEAGER:  Okay.

## Page 65

1    BY MR. CARVIN:

2    Q.   My last -- what compiler do you use?

3    A.   What Java compiler do I use?

4    Q.   Yes.

5    A.   I use a number of different -- I have used a number of

6    different compilers.  I most commonly use, it's just a piece

7    of software called Eclipse, E-C-L-I-P-S-E.

8          There are others that I've used from time to time.

9    I can't recall names off the top of my head, but there are

10   others.

11   Q.   Which one did you use here?

12   A.   Which compiler did I use for the purpose of the -- for the

13   simulations here in my report?

14   Q.   Yes.

15   A.   Again, I used a number, and Eclipse is certainly one that I

16   used.  I recall that I have certainly used another one

17   that -- I'm trying to think of the name, but I just can't get

18   it off the top of my head.

19         But I have tried using multiple compilers, and

20   Eclipse is the one I most commonly use.

21   Q.   Do you recall which one you used here?

22   A.   Multiple.

23   Q.   So it wasn't just Eclipse?

24   A.   I don't want to say that it was definitely only just Eclipse.

25   I definitely recall at times using other compilers, with

**Deposition of Jowei Chen - 9/7/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

## Page 66

1    Eclipse being the most common one.
2           I recall having definitely used another compiler
3    called -- I believe it's called Netbeans.
4    Q.  Can you spell that, please?
5    A.  I think it's N-E-T-B-E-A-N-S.  That's all I can recall off
6    the top of my head right now.
7    Q.  All right.  If you could turn to page three of your report,
8    please.
9    A.  (Witness complied.)
10   Q.  And you provide a summary of the statutory criteria, that you
11   say the statutes described five criteria to be followed in
12   producing each districting plan, correct?
13   A.  I see that, yes, sir.
14   Q.  And then you list the five criteria, correct?
15   A.  Yes, sir.
16   Q.  Okay.  Then you state, both statutes state that the list of
17   districting guidelines detailed in each statute is
18   exhaustive.
19          Is that right?
20   A.  I see that.
21   Q.  Then you say, hence it is clear that both statutes not only
22   specify the five districting criteria in their order of
23   priority, but they also prohibit any other considerations.
24          Is that correct?
25   A.  I see that.

## Page 67

1    Q.  Okay.  So it's your understanding of the statute that they
2    not only specify the five districting criteria, but they
3    prohibit consideration of other considerations, correct?
4    A.  Yes.  And I'm just going to qualify that obviously, as I
5    relatedly explained earlier today, when I use the word
6    prohibit there I'm talking about prohibit for the purposes of
7    my applying the criteria to my own simulations.  I'm
8    obviously not giving you a legal opinion.
9    Q.  Nor are you commenting on what other map drawers might have
10   understood were the criteria guiding the redistricting in
11   Michigan, is that correct?
12   A.  To my knowledge, I don't know of -- well, I just don't know
13   of what other map drawers may have been, or not been using.
14   So that's -- I think that's a correct statement because I
15   just have no personal knowledge of other map drawers.
16   Q.  So when you use the words, the statute prohibits any other
17   considerations, you were not suggesting that the statute
18   prohibits line drawers in Michigan from considerations in
19   addition to the five listed statutory criteria, is that
20   correct?  You're just saying what you did.
21   A.  I'm talking about how I applied the criteria.  I'm obviously
22   not talking about a legal opinion regarding what other map
23   drawers should do or should not do.
24   Q.  Right.  You're not offering either a legal or layman's
25   opinion about what the statutory criteria require

## Page 68

1    redistricters to do in Michigan, correct?
2    A.  I'm not sure how a layman's opinion would be different than a
3    legal opinion.  But the point is I'm not offering any legal
4    expertise about how this statute would apply to other map
5    drawers, aside from explaining how I imposed these
6    prohibitions and these criteria on my own computer code.
7    Q.  So in your understanding of the statutory criteria, did the
8    statutes prohibit consideration of incumbency protection,
9    preserving the cores of existing districts, preserving
10   communities of interest?
11   A.  Again, same qualification as before, not a legal opinion.
12          And my reading of the statute tells me that there
13   are criteria to be used, and that I interpreted those
14   criteria, and the statute, as telling my simulation algorithm
15   to not use any other criteria not mentioned, such as
16   incumbency protection.
17          MR. YEAGER:  I apologize, just let me turn this off.
18          Go ahead.
19   BY MR. CARVIN:
20   Q.  You described what you used to come up with your simulations.
21   My question is somewhat broader.
22          Do you have an understanding of the statutes that
23   would prohibit as impermissible in Michigan consideration of
24   non-listed criteria such as protecting incumbents, preserving
25   the cores of existing districts, and preserving communities

## Page 69

1    of interest?
2    A.  As impermissible in Michigan, is what your question asked?
3    And I interpret that as asking whether I have a legal
4    opinion, and I don't.
5    Q.  What I'm asking you -- I don't want you to qualify it as a
6    legal opinion.
7          When you're interpreting the statute, do you have
8    any interpretation of the statute which would prohibit
9    consideration of incumbency protection, cores or communities
10   of interest?
11          MR. YEAGER:  Asked and answered.
12          You may answer.
13          THE WITNESS:  Like I said, it's just not part of my
14   expert opinion to say what the statute means for Michigan
15   drawing maps.
16   BY MR. CARVIN:
17   Q.  Okay.
18   A.  I can only tell you what it meant for the purpose of my
19   operationalizing these in simulated plans.
20   Q.  Are you aware that incumbency protection, preserving the
21   cores of existing districts, often play a role in
22   redistricting generically?
23   A.  I'm generally aware that those have been cited and
24   sometimes -- cited or alleged as considerations in other
25   states.  I'm very generally aware of that.  I'm not saying

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 70

1    anything about the legality of it.  Obviously I'm not saying
2    anything about whether that is permissible.
3           But I'm generally aware those are cited or alleged.
4    Q.  And how about is preserving communities of interest a
5    traditional districting --
6    A.  Actually, I want to just make sure that I heard your previous
7    question correctly.  And I apologize for going back, but
8    could I hear the previous question again and make sure that I
9    answered the question that I thought I was answering?
10          (Record read:  Q.  Are you aware that incumbency
11   protection, preserving the cores of existing districts,
12   often play a role in redistricting generically?
13          A.  I'm generally aware that these have been cited
14   and sometimes -- cited or alleged as considerations in
15   other states.  I'm very generally aware of that.  I'm
16   not saying anything about the legality of it.  Obviously
17   I'm not saying anything about whether that is
18   permissible.
19          But I'm generally aware those are cited or
20   alleged.
21          Q.  And how about is preserving communities of
22   interest a traditional districting --)
23   THE WITNESS:  Thank you.
24   I just want to go back to the previous question.
25   And I want to qualify that the answer I gave to the previous

## Page 71

1    questions only applies to the protection of incumbents,
2    which -- that was what I was giving my answer to.
3           With respect to, I think you described it as
4    preservation of the cores, I'm not sure that I'm able to give
5    the same answer to that one.
6    BY MR. CARVIN:
7    Q.  Let's break it up.
8           Is preserving the cores of existing districts in
9    your opinion as a political scientist a traditional
10   districting principle?
11   A.  No, sir.
12   Q.  Why not?
13   A.  Usually what we mean by traditional districting criteria, as
14   a political scientist, is criteria that are commonly
15   enshrined in various state's constitutional or statutory
16   provisions laying out principles to be followed or criteria
17   to be followed in districting.
18   Q.  It's -- I'm sorry.
19   A.  I was just going to add to that by saying that, so it is not
20   the case that, for example -- it is not the case that most
21   states have constitutional or statutory provisions requiring
22   the, some kind of idea of preservation of cores.
23          So that's why we wouldn't call it a traditional
24   districting principle as a political scientist.
25   Q.  So it's your understanding in the political science community

## Page 72

1    they use the word traditional districting principles to only
2    reference criteria that are specifically specified in the
3    constitution or state statute, is that your testimony?
4    A.  That's not quite what I said.
5           What I said was traditional districting criteria is
6    usually what I would refer to as a political scientist as a
7    principle that is commonly or often enshrined in state
8    constitutions or in state statutory guidelines regarding
9    criteria to be followed in redistricting.
10          An example is compactness.  That's one that you
11   very commonly find as being one that's required or a
12   guideline for redistricting in many different states,
13   possibly most states.
14          So that's all.  I just wanted to clarify that.  I
15   don't think what you recounted was quite what I said.
16   Q.  I'll ask it again.  Is it your understanding that traditional
17   districting principles only encompass criteria that are
18   specifically referenced in constitutional or statutes in the
19   particular state?
20   MR. YEAGER:  Asked and answered.
21   You may answer.
22   THE WITNESS:  Right, and my answer again is, no,
23   that was not my understanding.
24   BY MR. CARVIN:
25   Q.  Okay.  So it could include things that are not referenced in

## Page 73

1    constitutions and statutes, correct?
2    A.  That's not -- that's also not what I said.  But I'll take
3    that question by itself.
4           And I think your question was, could traditional
5    districting criteria include things that are not referenced
6    at all in state statutes or in constitutions.
7           Certainly it's possible that if there is one state
8    that does not reference compactness, that certainly doesn't
9    mean that compactness is not a traditional districting
10   criteria.
11          But if, say, in a hypothetical world there were no
12   state constitution, no state statute, no legislative
13   statements regarding redistricting criteria that ever
14   mentioned compactness, then it would be awfully hard to claim
15   that compactness is a traditional redistricting criteria.
16   That's obviously a counterfactual hypothetical.
17          But that's the basis of my answer.
18   Q.  But we agree that traditional districting principles can
19   include factors that are not mentioned in the constitution or
20   statutes, correct?
21   A.  I think that's the question you asked a moment ago, so I'm
22   just going to give the same answer.
23          It certainly is possible that if there is a
24   criteria that is not mentioned in one state's constitution,
25   that fact by itself does not automatically mean that the

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 74

1    criterion is not a traditional districting criterion.

2    Q.   That's not my question.

3         The question, for the fourth time is, do

4    traditional districting principles include criteria that are

5    not mentioned in the state's constitution or the state's

6    statute?

7         MR. YEAGER:  Objection, asked and answered.

8         You may answer.

9         THE WITNESS:  Okay.  I'm going to answer the

10   question that I think I heard, which is the same question

11   that I think I've heard previously.

12        Which is that it certainly is the case that if

13   there is one state's constitution that does not include a

14   specific criterion like compactness, that doesn't

15   automatically mean that compactness is not a traditional

16   districting criteria.

17   BY MR. CARVIN:

18   Q.   Could it include -- I'll try it again.  So it could include

19   criteria that are mentioned in other state's constitutions

20   and statutes, correct?

21   A.   Traditional districting criteria could include criteria that

22   are included in other state's constitutions and statutory

23   criteria.

24        You said could, and I agree with that, that is

25   possible.

## Page 75

1    Q.   Okay.

2    A.   Obviously I'm not saying it's automatically the case, but it

3    is possible.

4    Q.   Do you have a view as to whether or not preserving the cores

5    of existing districts has ever been mentioned in judicial

6    opinions as a traditional districting principle?

7    A.   I'm not specifically aware of that right now.

8    Q.   If they have been referenced as traditional districting

9    principles in judicial opinions, how would that affect your

10   attitude about whether or not it's a traditional districting

11   principle?

12   A.   I'm not sure that it would.

13   Q.   Meaning the fact that the judicial opinions reference it as a

14   traditional districting principle would not suggest to you

15   that preserving the cores of existing districts is a

16   traditional districting principle?

17        MR. YEAGER:  Objection, incomplete hypothetical.

18        You may answer.

19        THE WITNESS:  Yeah, I'm not sure that would affect

20   my opinion.

21   BY MR. CARVIN:

22   Q.   What do you mean you're not sure?

23   A.   I can't say for certain.

24   Q.   One way or the other?

25   A.   Correct.

## Page 76

1    Q.   So it might be a traditional districting principle if it's

2    been mentioned in a traditional opinion in your

3    understanding?

4    A.   As I said earlier, what I mean by the term traditional

5    districting principle is whether it is enshrined in state

6    constitutions and state statutes.

7    Q.   Okay.

8    A.   You're posing evidence that is outside of that.

9    Q.   Is it widely accepted in the political science community that

10   traditional districting principles only include criteria that

11   are -- or usually only include criteria that are mentioned in

12   constitutions and statutes?

13   A.   Oh, I'm telling you how I use the term.  I mean I can only

14   speak about how I understand the term as a political

15   scientist.

16   Q.   Right.

17   A.   I'm not going to testify for you that, say, all political

18   scientists share the same view or that an X percentage of

19   political scientists share the same view.  I'm just here to

20   testify about my own expert opinions.

21   Q.   Right.  So you're not offering any view as to what the

22   political science community would view as traditional

23   districting principles, just your own personal views,

24   correct?

25   A.   Like I said, I've not taken a survey or a poll of other

## Page 77

1    political scientists, so I really can't give you any basis

2    for saying X percent or 75 percent of political scientists

3    share exactly my view or disagree with me.

4    Q.   Okay.  How about communities of interest, is that a

5    traditional districting principle?

6    A.   My understanding is that different jurisdictions have

7    different -- when employing that phrase, have used different

8    meanings of communities of interest.

9         So there is not -- that means that we don't have

10   the ability to issue a blanket statement by saying

11   communities of interest definitely are or definitely are not

12   a traditional districting criteria simply because different

13   jurisdictions often mean different things by that.

14        So I'm not able to give you a straight, absolute

15   yes or no answer.

16   Q.   Okay.  Can you turn to page 59 of your report, please?

17   A.   Yes, sir.

18   Q.   If you'd turn to the third full paragraph, please.

19   A.   Yes.

20   Q.   Just to put this in context, I'm reading from Appendix A

21   where you describe the statutory guidelines and the

22   computer-simulated districting algorithm that you did in this

23   case, is that right?

24   A.   Third full paragraph, I see that.

25   Q.   Okay.  Because, and you state there do you not, because of

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 78

1    the clarity, specificity and exhaustiveness of the referenced
2    statutes regarding the five districting criteria, as well as
3    their order of priority, programming the districting
4    simulation algorithm to produce Congressional, Senate and
5    House plans for Michigan was a purely technical exercise with
6    no subjective judgement or guesswork needed.
7        Is that correct?
8  A.  I see that.
9  Q.  Okay.  And that's what you did?
10 A.  Yes, sir.
11 Q.  It was a purely technical exercise, right?
12 A.  Yes, sir.
13 Q.  And so all one thousand simulations were the same goals with
14   respect to contiguity, equal population, minimizing county
15   and municipal breaks and compactness?
16 A.  Oh, I employed those five criteria, yes, sir.
17 Q.  Right.  And in this technical way, the algorithm was
18   instructing how these simulations were to come about.  Right?
19 A.  Well I don't know that they were instructing how the plans
20   were to be drawn, they were instructing a specific process by
21   which the plans were to be drawn.
22 Q.  Okay.  And the process was, for example, after contiguity and
23   equal population, that they should seek to minimize the
24   number of county and municipal breaks, right?
25 A.  Correct.

## Page 79

1  Q.  And if you could turn to page 15 of your report.
2  A.  Yes, sir.
3  Q.  Okay.  So this is detailing the comparison of the enacted
4    Congressional plans and your computer-simulated Congressional
5    plans, is that right?
6  A.  Yes, sir.  And I'm just going to point out here, now that
7    you've referenced this table, I believe that there was a
8    corrected version --
9  Q.  Okay.
10 A.  -- of this table.  And I'll bring it up again if you ask me
11   about the parts of it that I recall were corrected.
12 Q.  Okay.
13 A.  I just wanted to raise that.
14 Q.  So well it's more of an illustrative point.  You have, for
15   example, that in 22 simulated maps there was nine county
16   breaks, and in 978 simulated maps, there was ten county
17   breaks.
18     That was not part of your errata, was it?
19 A.  You're correct, sir.
20 Q.  All right.  Can you explain to me why that would come about
21   if the criteria encouraged and required minimizing county
22   breaks, why the vast majority of them would have an
23   additional county break that was unnecessary?
24 A.  I'm not sure what you mean by was unnecessary.  If you could
25   just clarify.

## Page 80

1  Q.  We know that it is possible to create a congressional plan
2    with only nine county breaks, right, because 22 simulated
3    maps came up with that?
4  A.  Okay.
5  Q.  Right?  And I'm just wondering why, if it's possible to do
6    that, why the algorithm wouldn't have had all one thousand of
7    the simulated maps do that?
8  A.  Okay.  So you're just generally asking why it is that the
9    computer also produced these 978 congressional plans that did
10   not reduce the number of county breaks to nine.
11     Is that right?
12 Q.  Yes.
13 A.  Okay.  Let me just start by pointing out that when -- I think
14   you're reading the 978 from the second row, if I got that
15   right.
16 Q.  Yes.
17 A.  Okay.  And that second row is describing the number of
18   counties divided into multiple districts.
19 Q.  Okay.
20 A.  So what the second row is telling us is that the enacted plan
21   divided eleven counties into multiple districts in the
22   enacted plan.
23 Q.  Right.
24 A.  And the number of divided counties in the simulated plans was
25   either nine or ten.

## Page 81

1      But your question, I think from a moment ago,
2    unless I misheard you, was about county breaks.
3  Q.  Let's eliminate the ambiguity.  Let's go down to the next
4    one, okay?
5      Municipal breaks, now we're talking about municipal
6    breaks, right?  And 18 simulated maps found nine municipal
7    breaks, and 982 had ten municipal breaks.
8      And I'm wondering why under the algorithm the vast
9    majority would come up with a municipal break that apparently
10   was not -- was avoidable?
11 A.  Okay.  I will answer that question.  But if you could,
12   please, I just want to go back and finish my answer to your
13   previous question.
14 Q.  There is no reason to, we can move on.
15     MR. YEAGER:  Are you withdrawing the prior
16   question?
17     MR. CARVIN:  Yes.
18     MR. YEAGER:  Let's go on then, he's withdrawing the
19   prior question.
20     THE WITNESS:  Okay.  So I think I understand your
21   question.  You're basically asking why it is that there are
22   982 simulated maps that split -- or, sorry, that have ten
23   municipal breaks, when certainly you're saying correctly,
24   that it's possible, in the simulations, to produce only nine
25   municipal breaks.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 82

1    And the answer is that every simulation is a little
2    bit different.  The simulation is within the constraints that
3    are, that I've described, is a random districting process,
4    certainly within constraints, and within goals that are being
5    pursued here.
6         So the algorithm is trying to draw different
7    districts with an eye towards minimizing county breaks, and
8    minimizing municipal breaks, but it's not going to arrive at
9    the exact same plan every single time.  Otherwise we would
10   just end up with one thousand completely identical plans.
11        So there is randomness in the process.  Which is
12   why the plans are going to be a little bit different from one
13   another, and that's why, when -- even when you pursue a
14   specific goal like minimizing county breaks or minimizing
15   municipal breaks, you're not always going to arrive at the
16   exact same plan every single time because of the randomness
17   inherent in the computer simulation process.
18        And another way of putting it is that what the
19   computer is doing is not dictating a certain set of lines to
20   be drawn.  It's not dictating the districts be drawn with
21   particular boundaries, so much as it's saying draw random
22   districts, but when you're drawing these random districts
23   pursue certain criteria.
24        So that's why there is some small amount of
25   variation here in the number of municipal breaks that we see

Page 83

1    in the simulated plans.
2    BY MR. CARVIN:
3    Q.  Well if you could turn to page 40 of your report.
4    A.  Okay.
5    Q.  I'll point you to the number of municipal breaks, this is
6    related to the House plans.  300 simulated maps came up with
7    13 municipal breaks, and 700 came up with 14.
8         Is your answer essentially the same on why the
9    difference between the two?
10   A.  Yeah, I would give the same explanation.
11   Q.  Okay.  Is 14 a de minimis difference from 13, in your view?
12   A.  I'm not sure what you mean by de minimis.
13   Q.  Is it significant to you as a political scientist analyzing
14   these plans?
15   A.  I'm not sure that a political scientist -- I'll just speak
16   for myself.  I don't really have an opinion on whether
17   something is a de minimis difference.
18        All I do is quantify.  I can say it's a difference
19   of one.  I really don't have an expert opinion as to whether
20   one is huge or one is tiny or de minimis.
21   Q.  If a line drawer considered factors other than the five
22   statutory criteria, such as protecting incumbents, preserving
23   the cores of existing districts, and preserving communities
24   of interest, that might explain the departure from the
25   statutory criteria, correct, relative to the simulated plan?

Page 84

1    A.  Well I'm going to try my best to answer your question, and
2    I'll just qualify it by saying that's a hypothetical.  I
3    haven't analyzed it, but I'm going to do my best shot of
4    giving a guess.
5         Certainly I can hypothetically think of, say, if
6    you really wanted to place certain incumbents in certain
7    districts or not pair certain incumbents, you could do that
8    by manipulating district lines and, say, breaking an extra
9    municipality or breaking a county -- breaking an extra
10   county.
11        I mean as a purely hypothetical matter, yes, one
12   could pursue a certain placement of incumbents in a certain
13   configuration and achieve that by breaking more counties or
14   breaking more municipalities.  Just as a purely hypothetical
15   matter, that's possible.
16        But obviously I'm not giving you an opinion as to
17   whether in general this explains that, whether or not a
18   particular criterion that I did not put in my simulated plans
19   would necessarily cause or justify or lead to a certain
20   change in number of municipalities being broken, etcetera.  I
21   just wanted to qualify my answer that way.
22   Q.  Right.  What about preserving the cores of existing
23   districts?  That too could have an effect on the number of
24   county lines broken or the compactness of districts.  So that
25   might well be an explanation from more county line breaks and

Page 85

1    lesser compactness than the simulated plans because they
2    didn't consider that as a criteria, right?
3    A.  Well that is a little bit of a different situation and the
4    answer there is it depends.  So I'm just going to clarify
5    something first and then I'll give you my best shot at
6    answering your question.
7         So I think when you're talking about preservation
8    of cores, my understanding, and please correct me if I'm
9    wrong, is that you're talking about preserving the cores of
10   the districts from the previous decade's plan.  So with that
11   understanding let me try and answer your question.
12        So it really depends.  If we had a previous
13   decade's plan -- or I'll just call it a benchmark plan.  If
14   we had a benchmark plan that did a really poor job of
15   following municipal boundaries, and a really poor job of
16   following county boundaries, let's just hypothetically say
17   they split apart one thousand different municipalities and 50
18   counties, obviously a very extreme hypothetical.  And if that
19   were the existing benchmark plan, and a map drawer came in
20   and said, I would like to preserve the cores of those
21   benchmark plan districts as much as possible, the best way to
22   do that is to draw a plan that similarly breaks apart all of
23   those one thousand municipalities or 50 counties or whatever
24   I said.
25        That is an example, kind of an extreme example, of

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 86

1    where preservation of cores taken to an extreme would lead to
2    a plan that really breaks a part of lot of municipalities or
3    counties.
4    Q.   What if --
5    A.   At the very -- if I could just try a finish my explanation
6    here.
7         At the other sort of extreme, if you had a
8    benchmark plan that does a really good job of not breaking
9    apart counties, not breaking apart municipalities, and you
10   had a map drawer come in and say, I'm going to try and draw a
11   new plan that preserves those cores as much as possible, then
12   it may well be the opposite, that trying to preserve the
13   cores of a benchmark plan that actually minimized county
14   breaks leads to another plan that also minimizes the number
15   of county breaks.
16        So that's why I said it really depends.
17   Q.   And what, for example, in this case, if the 2011 plan largely
18   mimicked the number of county breaks in the benchmark plan,
19   that would suggest that we were trying to achieve the same
20   minimization of county breaks, while preserving the cores of
21   existing districts, right?
22        MR. YEAGER:   Objection, incomplete hypothetical.
23        You may answer.
24        THE WITNESS:   That would not necessarily lead to
25   the conclusion that you're posing.

## Page 87

1    BY MR. CARVIN:
2    Q.   Well have you examined whether or not the 2000 redistricting
3    did a good job, as you said it in terms of preserving county
4    lines?
5    A.   I did not analyze that.
6    Q.   Okay.  Have you analyzed whether or not the existing plan
7    does as good a job as the prior plan in terms of preserving
8    county lines?
9    A.   Because I did not analyze the previous decade's plan for the
10   purpose of my expert report, I can't make that comparison for
11   you here.
12   Q.   So the hypothetical you gave me a minute ago, where the
13   benchmark plan tried to a good job in terms of minimizing
14   county breaks, and the next plan sought to preserve the
15   cores, one very natural explanation would be that they would
16   come out with the same amount of county breaks as the
17   benchmark plan, is that right?
18   A.   No, that would not necessarily be the case.  I'd need to have
19   more information.
20   Q.   But before you said, if they had tried to do a good job in
21   the benchmark plan, and the new plan preserved those cores,
22   then one would expect they would do as good a job?
23   A.   Well I said that it may well be.
24   Q.   Yes.
25   A.   It may well be the case.

## Page 88

1    Q.   And you haven't examined that hypothetical in Michigan, have
2    you?
3    A.   I haven't examined the benchmark or the previous decade's
4    plan.
5         But what I said was that it may well be that
6    preserving --
7    Q.   Right.
8    A.   -- the cores would mean drawing a plan that actually breaks a
9    similarly few number of municipalities and counties.
10        It may well also not be.  There are a lot of other
11   factors such as population changes, redrawing of the
12   municipal boundaries, and probably many other factors that I
13   could think of, but just haven't named yet, that would also
14   affect the source of things.
15        But the point is it could be, and it may not be.
16   Q.   And you haven't sought to answer that --
17   A.   I have not.
18   Q.   Okay.  And you haven't explored the possibility of the fact
19   that preserving the cores of existing districts because that
20   was not among the five enumerated statutory criteria that
21   were programmed in your simulation?
22   A.   Well it just wasn't one of the criteria that I followed.
23   Q.   So you don't know what the effect of somebody who sought to
24   preserve the cores of existing districts would have on the
25   plan here?

## Page 89

1    A.   That's not a question that I have analyzed for my report.
2    Q.   If there was a departure from the simulated plans that was
3    explained by preserving the cores of existing districts, it
4    would be false to assume that the departure from the
5    simulated plans was caused by partisanship, correct?
6         MR. YEAGER:   Objection, incomplete hypothetical,
7    misstates the record, hypothetical.
8         THE WITNESS:   If I could ask you to read back the
9    question.
10        (Record read:  Q.  If there was a departure
11        from the simulated plans that was explained by
12        preserving the cores of existing districts, it would be
13        false to assume that the departure from the simulated
14        plans was caused by partisanship, correct?)
15        THE WITNESS:   Okay.  I think I understand the
16   hypothetical you're asking.
17        And my answer is that it is correct that I just
18   wouldn't automatically assume that conclusion.  I would have
19   to do further analysis.
20        But your question was just whether I would assume
21   that conclusion, and my answer is I would not assume that
22   conclusion.
23   BY MR. CARVIN:
24   Q.   Okay.
25   A.   I would do further analysis if I were to try and answer that

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 90

1    question.

2    Q.  What does your algorithm do with respect to the requirements

3        of the Voting Rights Act?

4    A.  I did not explicitly program the algorithm to try and

5        interpret and account for the Voting Rights Act in any

6        particular way.

7            As you -- as my report explains, I dealt with a

8        number of majority-minority districts in surrounding areas in

9        a particular way.  And obviously I'm happy to go through that

10       if that's responsive to your question.

11   Q.  Basically you just froze all the majority-minority districts

12       in the state and the Senate, House and Congressional plans?

13   A.  That's a part of what I did.

14   Q.  What else did you do?

15   A.  Okay.  I'll start -- I'm going to have to start with each

16       plan individually.  So I'll go through in detail and maybe

17       you can stop me if this isn't responsive to your question.

18           So I guess I'll start with the Congressional plan.

19       And certainly for the Congressional plan --

20   Q.  Maybe this will be simpler, did you do anything other than

21       freezing the majority-minority districts to account for the

22       requirements of the Voting Rights Act?

23           MR. YEAGER:  Just to clarify, are you withdrawing

24       the prior question?

25           MR. CARVIN:  I'm just trying to cut to the chase.

## Page 91

1            MR. YEAGER:  Well, if you're not withdrawing the

2        prior question, you need to let him finish.

3            MR. CARVIN:  Yes, that's my question.

4            MR. YEAGER:  Wait, I'm sorry.  I want to be

5        precise.  Did you withdraw the prior question?

6            MR. CARVIN:  Sure.

7            MR. YEAGER:  Thank you.

8            Now you can answer the question that's on the

9        table.

10           THE WITNESS:  Okay.  I don't have any particular

11       understanding of what I did to be, say, an interpretation or

12       following the Voting Rights Act or not following the Voting

13       Rights Act.

14           I'm happy to tell you what I did with particular

15       frozen districts, and in one case with a Flint area district.

16           So I'm happy to talk about those, but I want to

17       clarify at the outset that I don't have a particular

18       understanding of what I'm doing as necessarily following or

19       not following the Voting Rights Act.

20           So with that, I'm happy to go into specifically

21       what I did.

22   BY MR. CARVIN:

23   Q.  All I'm trying to clarify at this point, Professor, is if you

24       want to tell me how you froze the districts, I'm more than

25       happy to have you elaborate on that.  But I just want to

## Page 92

1        clarify at the outset whether or not you did anything other

2        than freeze the districts to comply with the Voting Rights

3        Act, or was that really what you did was freeze the

4        majority-minority districts?

5    A.  I understand your question.  And I'm going to try to answer

6        it here.  What I'm also trying to be careful to do is not to

7        characterize my answer as being responsive to the part of

8        interpreting the Voting Rights Act.  But I'm trying to give

9        you a complete answer here.

10   Q.  Explain to me, did you freeze all the majority-minority

11       districts?

12   A.  To my knowledge, the districts that I froze includes all of

13       the majority-minority districts in the Congressional, the

14       Senate and the House plans with one exception.

15   Q.  What's that?

16   A.  And there is a different -- so the area is Flint in the House

17       plan.  And I'm going to explain to you what I did.

18           I'm going to qualify again at the outset that I

19       don't take this to either mean following or not following the

20       Voting Rights Act, but I'm going to explain to you what the

21       simulation algorithm does in Flint.

22           In the area of Flint the algorithm, it makes sure

23       that there is -- the simulations make sure that there is a

24       district in the Flint area that has a black voting age

25       population, an African American voting age population of 55

## Page 93

1        percent or higher.

2            I did not freeze any Flint area districts for the

3        purposes of the House plan.

4            So I'm just saying that to explain what I did.  And

5        again, I'm being careful not to characterize that as either

6        following or not following the VRA.

7    Q.  Why didn't you freeze the Flint district?

8    A.  Why didn't you freeze the Flint House district?

9            I took the approach that I just described because

10       Plaintiffs' counsel instructed me to do so.

11   Q.  What was the approach?

12   A.  Okay.  What I was just --

13           MR. YEAGER:  Asked and answered.

14           You may answer.

15           THE WITNESS:  The approach was that the computer

16       requires that there be a district, a House district, a

17       simulated House district in the Flint area that has an

18       African American voting age population of at least 55

19       percent.

20   BY MR. CARVIN:

21   Q.  And could that be different than the 55 percent district in

22       the enacted plan?

23   A.  Could the number -- could the BVAP be different?

24   Q.  No.  Could the district be different even though it achieves

25       the same BVAP?

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 94

1   A.  Okay.  The district doesn't necessarily achieve the same

2   BVAP, the district there just necessarily achieves a 55

3   percent.

4       And the answer is, yes, the district could well be

5   different.

6   Q.  Okay.  As I understood it with respect to, for example, the

7   two minority-majority districts in the Congressional plan you

8   froze the lines.  You didn't come up and say, create a

9   district with an equivalent BVAP or certain minimum BVAP for

10  the Congressional districts.  Do I have that right?

11  A.  The Congressional simulations just freeze the lines for

12  Congressional districts --

13  Q.  Right.

14  A.  -- 13 and 14.

15  Q.  And that's -- you took a different approach with respect to

16  the majority black district in Flint, you did not freeze the

17  lines?

18  A.  With the House plans --

19  Q.  Right.

20  A.  -- in Flint?  That is correct.

21  Q.  Okay.  But you did have some district in the Flint area with

22  a minimum of 55 percent BVAP?

23  A.  There is going to be one district in Flint.

24  Q.  Okay.

25  A.  I don't think it's -- I'm not sure that I ever specifically

## Page 95

1   analyzed this completely, but I don't think it's really

2   possible to draw two or more.

3   Q.  Okay.

4   A.  There is going to be one district in the Flint area, one

5   House district in the Flint area with a 55 percent BVAP.

6   Q.  Was that the only majority black district in all of the plans

7   where you didn't actually freeze the lines, the one with the

8   House district in Flint?

9   A.  To my knowledge, to my recollection, that is.  And my

10  recollection is I analyzed the racial compositions of all the

11  enacted districts in the various plans, and that was the only

12  area in which I did not freeze a majority-minority BVAP

13  district.

14  Q.  And the algorithm did not put in anything about any criteria

15  relating to the Voting Rights Act?

16  A.  The algorithm does not really -- it's a computer.  It's not

17  really capable of making sense of or understanding the Voting

18  Rights Act other than me putting in instructions such as

19  freeze this district, achieve a 55 -- you know, the computer

20  code can certainly calculate the BVAP of a district and apply

21  that, but obviously the algorithm has no idea what the Voting

22  Rights Act means other than me programming it that way.

23  Q.  And you didn't program it with respect, outside of the House

24  Flint district, you didn't program it with respect to BVAP in

25  any other district?

## Page 96

1   A.  I didn't -- there is no analogous place where I said, say,

2   the districts have to have a BVAP of a certain population

3   except obviously when you're freezing certain districts in,

4   say for example in Wayne County, obviously you're going to

5   achieve whatever BVAP was already there in the enacted

6   district.

7   Q.  So your algorithm takes no account of Section 5 of the Voting

8   Rights Act?

9   A.  That is beyond my expertise to tell you that the plans

10  produced by an algorithm either do or do not comply with

11  Section 5.

12      Now I mean obviously the algorithm, it's a

13  computer, it's not able to interpret or understand Section 5

14  beyond the instructions I put in there, which we've been

15  talking about here.

16  Q.  And you gave it no instructions with regard to Section 5 of

17  the Voting Rights Act?

18  A.  I'm just not able to answer that question beyond saying the

19  instructions that we've been talking about are the

20  instructions that I put into the -- or put into the computer

21  code.

22      The algorithm doesn't -- the computer code can't

23  tell you, and I cannot tell you whether a particular plan

24  complies with or doesn't comply with Section 5.

25  Q.  Do you know what Section 5 of the Voting Rights Act requires?

## Page 97

1   A.  I'm generally aware of it, but I can't really give you any

2   legal interpretation --

3   Q.  Give me your best --

4   A.  -- or a precise legal definition.

5   Q.  Give me your best understanding.

6       MR. YEAGER:  Objection, calls for speculation based

7   on the prior answer, lack of foundation.

8       You may answer.

9       THE WITNESS:  Okay.  I'll give you my best shot.

10  I'm going to start again by qualifying that I have no legal

11  expertise on this, on the question that you're asking me.

12  This is not part of my academic expertise to tell you what is

13  required for a particular districting plan.

14      And so with that qualification I'll give you my

15  best shot.

16      My understanding is that -- and I'm going to

17  further qualify by -- well I'll just give you my best shot

18  here.

19      My understanding is that Section 4 and Section 5

20  generally require pre-clearance for certain jurisdictions,

21  when there are changes in things like district boundaries.

22  And that the pre-clearance process requires submission to the

23  Department of Justice.  And that there are various rules that

24  have been applied during that -- during that pre-clearance

25  process.  Sometimes that pre-clearance process leads to Court

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 98

1    cases.

2          So that's generally what I'm aware of.

3    BY MR. CARVIN:

4    Q.   Do you know what the substantive standard of Section 5 is?

5          MR. YEAGER:  Same objection.

6          You may answer.

7          THE WITNESS:  I'll give all the same qualifications

8    again that I'm not qualified -- I'm not legally qualified to

9    answer the question.

10         I have a very general understanding that there is a

11   retrogression standard.  I can't really tell you exactly how

12   it's applied to any particular case.

13         (At 12:13 p.m. went off the record.)

14         (At 1:01 p.m. went on the record.)

15         MR. CARVIN:  Okay.  We can go back on the record.

16         (At 1:01 p.m. Exhibit 2 marked.)

17   BY MR. CARVIN:

18   Q.   Good afternoon, Professor Chen.

19         I'd like to begin by directing your attention to

20   what's been marked as Chen Exhibit 2, and those are the

21   statutory criteria that you referenced, I'll represent to you

22   in your report, MCL 4.261 and MCL 3.63, okay?  And I'd like

23   to ask you a few questions about that.

24         MR. YEAGER:  Do you have extra copies of that?

25         MR. CARVIN:  I apologize, sure.

## Page 99

1          MR. YEAGER:  Thank you.

2    BY MR. CARVIN:

3    Q.   If you could turn to page 59 of your report, please.

4          I'd like to direct your attention to the fourth

5    sentence in the first paragraph.  You state, both statutes

6    are clear that district contiguity is an absolute inviolable

7    principle and that county and municipal lines may be broken

8    only for the purpose of satisfying the district population

9    threshold requirement.

10         That's your understanding of the statutory

11   criteria?

12   A.   I'm just trying to get to where you are.  We're on page 59,

13   and which paragraph?

14   Q.   First paragraph, fourth sentence, begins, both statutes?

15   A.   Both statutes.

16         Okay.  I see that.

17   Q.   Okay.  And that's your understanding that county and

18   municipal lines may be broken for the purpose of

19   satisfying the district population threshold requirements, is

20   that correct?

21   A.   And contiguity.

22   Q.   Yes.

23   A.   Yes.

24   Q.   Okay.  And you cite on page 63 the Congressional statute for

25   that where it says, Congressional district lines shall break

## Page 100

1    as few county boundaries as is reasonably possible.

2          And later down, Congressional district lines shall

3    break as few city and township boundaries as is reasonably

4    possible.  Okay.

5          My question, however, goes to the state legislative

6    lines.  Where does the Act 463 governing state legislative

7    lines say that it shall break as few county, city and

8    township lines as possible?

9    A.   Okay, if you'll give me a moment to review.

10   Q.   Yes.

11   A.   Okay.  We're on 4.261, section (e), and my recollection of

12   what I did is that I read section (e), that states Senate and

13   House of Representative district lines shall preserve county

14   lines with the least cost to the principles of equality of

15   population.

16   Q.   Right.  So that's different language than the Congressional

17   statute which says as few as reasonably possible, but you

18   think it means the same thing?

19   A.   Let me just compare those two.

20         I don't know that it was necessarily my

21   interpretation that they mean the same thing.  I certainly

22   read this part of the 4.261 statute, and obviously I spoke

23   about it with Plaintiffs' counsel and came away with that

24   understanding.

25   Q.   Okay.

## Page 101

1    A.   It wasn't something that I analyzed whether or not it was

2    exactly the same or written the same as the Congressional

3    statute.  I just developed a, my own understanding of 4.261

4    by reading it and consulting with Plaintiffs' counsel.

5    Q.   All right.  What is your understanding of what it means when

6    it says, shall preserve county lines with the least cost to

7    the principle of the equality of population?  What does that

8    mean?

9    A.   My understanding of that section, and of what the statute is

10   calling for, at least as applied to my simulations, was that

11   district lines were going to be drawn in a way so that you

12   were not supposed to -- one was not supposed to, say, violate

13   the general 95 to 105 percent population requirement laid out

14   in (d) in order to break fewer counties or fewer

15   municipalities.

16         So I interpreted least cost of the principle of

17   equality meaning that you could not subordinate the

18   population equality threshold requirement in favor of

19   decreasing the number of county lines broken.

20   Q.   Okay.  So if option one was to, say, have 95 percent

21   population equality, without breaking the county line, but

22   option two was to have 99 percent population equality that

23   does break the county line, then option two would be

24   permissible or required under this section under your

25   understanding?

Deposition of Jowei Chen - 9/7/2018

League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 102

1   A.  I'm not -- I think I heard the question correctly, and so --
2      I don't think that's quite right.
3          What I interpreted, the way I applied this, was to
4      say that the population equality threshold was not somehow
5      compromised by having a 95 rather than a 99 percent populated
6      district.
7          And that certainly if you're choosing between those
8      two sorts of districts, then you want to consider minimizing
9      county breaks.
10  Q.  So you think least cost to the population principle of
11     equality only means don't go below the 95 percent or 105
12     percent threshold?
13  A.  My understanding is that the principle of equality of
14     population refers to those 95 to 105 percent threshold.  So
15     there would be obviously a cost to that principle, were a
16     district to deviate outside of the 95 to 105 percent
17     boundaries.
18  Q.  So what do you think least cost means then?  In neither
19     instance can you go beyond the 95 to 105 percent
20     requirements, so how do you interpret the word least cost?
21  A.  I'm not sure that I made any particular attempt to attribute
22     any meaning to that other than the way that I just described,
23     which is that I applied this principle by saying, it's got to
24     be 95 to 105 percent of the ideal district population.  And
25     then within those boundaries, a district line is to be drawn

## Page 103

1      so as to try to not break, not break counties.
2   Q.  This will be my last question on this.  It's quite clear that
3      the 95 to 105 percent threshold predominates over county
4      lines regardless, right, because of the priorities you said?
5   A.  Well I gather that from (e), among other parts of the statute
6      here.
7   Q.  Okay.  All right.  Let's turn to (f), right after that, okay?
8   A.  Okay.
9   Q.  Do you see (f) right underneath (e) that we were talking
10     about?
11  A.  Yes.
12  Q.  It says, does it not, if it is necessary to break county
13     lines to stay within the range of allowable population
14     divergence provided for in subdivision (d), the fewer whole
15     cities or whole townships necessary shall be shifted between
16     two cities or townships, both of which will bring the
17     districts into compliance with subdivision (d) and (h), the
18     city or township with the lesser population shall be diluted,
19     do you see that?
20  A.  Yes, I see that.
21  Q.  If you could turn to page 62 and 63 of your report.
22  A.  (Witness complied).
23  Q.  This describes what the algorithm does with county and
24     municipal breaks.  But it contains no discussion of the
25     provision, or the concept I just talked about that in the

## Page 104

1      event of a county or municipal line break, the fewest whole
2      cities or whole townships necessary shall be shifted.
3          Was that something you put in your algorithm?
4   A.  What the algorithm does is when it's going through, say,
5      iterative changes and redrawing the boundaries between
6      districts --
7   Q.  Right.
8   A.  -- it will build up a district, first in order to fill up a
9      county.  And then, say, it has to intrude into a neighboring
10     county in order to complete the district, it will start
11     randomly adding municipalities --
12  Q.  Right.
13  A.  -- cities and townships, and add just enough to achieve an
14     equally populated district.  So that's what the algorithm
15     does.
16  Q.  Right.  But it doesn't -- there is nothing in the algorithm
17     that says shift as few as possible, right?  If you had one
18     district -- well, is there any provision that says shift as
19     few as possible?
20  A.  You're asking me to read (f), is that right?
21  Q.  Yes.
22  A.  I see that on the second line there is the phrase, the fewest
23     whole cities or whole townships necessary.
24  Q.  Right.  And is there a provision in the algorithm that
25     requires the shifting of the fewest whole cities or townships

## Page 105

1      when a county line is broken?
2   A.  Well what I'm explaining is what the algorithm does is like I
3      said when it intrudes into a new county, it adds -- it keeps
4      on adding municipalities chosen at random and adds enough to
5      bring it to an equally populated district.
6   Q.  So just so we're clear, you didn't have any specific
7      directions in the algorithm to shift the fewest; you're just
8      saying that's what you think the result --
9   A.  It's not going to, say, create an equally populated district
10     and then keep on adding municipalities is what I'm
11     clarifying.
12  Q.  Right.  Okay.  But there is no specific directive in the
13     algorithm to shift the fewest counties, is that correct?
14  A.  Well I'm just clarifying what the algorithm does.
15  Q.  Right.
16  A.  It adds enough just to get to an equally populated district,
17     and then stops.
18  Q.  Right.  And you're saying --
19  A.  So I think you're asking, are there any extra steps
20     beyond that, the answer is no.
21  Q.  Okay.  Now let's assume that, for example, if you could go to
22     the last sentence of (f), between two cities or townships,
23     both of which will bring the districts into compliance with
24     subdivision (d) and (h), the city or township with the lesser
25     population shall be shifted.

Here

**Deposition of Jowei Chen - 9/7/2018**
**League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan**

## Page 106

1        Was the algorithm directed, when it had a choice,
2  to bring it into the population threshold to choose the city
3  or township with the lesser population?
4  A.  It was not intentionally, say, advantaging the city or the
5  township with the lesser population.
6  Q.  Okay.  All right.  Do you know if you -- so you didn't get
7  into that at all.
8        Do you know how many cities or townships were
9  shifted, for example, in the House plans?
10  A.  You're asking how many cities or townships were shifted in
11  counties that are broken, is that right?
12  Q.  Well obviously, yes, that would be the context in which it
13  would arise.
14  A.  Okay.  And the answer is that I did not systematically go and
15  analyze that with the enacted or simulated maps.
16  Q.  Okay.  With respect to the Senate and the House plans, do you
17  know how close to perfect population equality the simulated
18  plans were?
19  A.  Let me take that one at a time.
20        With respect to the Senate and the House maps,
21  perfect -- how close to perfect population, the simulated or
22  the enacted?
23  Q.  Simulated.
24  A.  The simulated maps.
25        Well, I followed the criteria, the statutory

## Page 107

1  criteria regarding population equality, as I laid out in my
2  report, as I explained.  And so in general, for most
3  districts, that threshold is 95 to 105 percent.
4  Q.  Right.
5  A.  There are a few -- there are some exceptions to that.  But in
6  general it's 95 to 105 percent.
7        So that would be -- the ideal House district in
8  Michigan is something like 89 thousand several hundred
9  people.  And so 95 percent of that is something in the rough
10  ballpark of, I believe, 85 thousand, and maybe several
11  hundred people, up to, I believe 94 thousand several hundred
12  people.  I don't have the exact numbers off the top of my
13  head.  I think some of those numbers are reported in my
14  report.
15        But I think you got the idea.
16  Q.  Right.
17  A.  So in general 95 to 150 percent.  And then there is -- there
18  are specific places where the population equality has got to
19  be more -- has got to be a bit higher than that from 98 to
20  102 percent and for the House plan that applies to Grand
21  Rapids --
22  Q.  Let's put that to the side.
23  A.  Okay.  We won't go into that right now.  We'll talk about
24  that later.
25  Q.  But the 98 to 1 --

## Page 108

1  A.  My point is just that in general it's obviously 95 to 105
2  percent.  And then of course I understand in Detroit it's
3  also got -- you also got that special 98 to 102 percent.
4  Q.  I'm just talking about the general rule.
5        The algorithm would accept plans to use your
6  recollected numbers, either 85,000 or 94,000 in a House plan,
7  because that would be within the plus or minus 5 percent,
8  right?
9  A.  We'll just call it 95 percent to 105 percent.
10  Q.  Right.  And they would accept that?
11  A.  Yes.  That's -- I mean that's the population threshold that
12  the algorithm is using.
13  Q.  And what's the average deviation into the simulated plans
14  from the perfect 89,000 equality?
15  A.  I'm not sure that -- the average deviation district by
16  district?
17  Q.  Well if you sum them altogether, what would be the average
18  deviation?
19  A.  Well I'm just going to try to remember if I ever calculated
20  that.
21        I'm not sure that I ever would have done that
22  calculation other than obviously to verify compliance with
23  the 95 to 105 rule.
24  Q.  And you didn't report that in your report, right?
25  A.  Not to my recollection.

## Page 109

1  Q.  Do you know what the maximum deviation was?  Was it 10
2  percent?
3  A.  Oh, well, I think that the maximum deviation should be 5
4  percent.  The point is you can go all the way up to 105 --
5  Q.  I might not have been clear.
6        The maximum deviation in the simulated plans ran
7  all the way from 95 percent to 105 percent?  There were some
8  plans with 105 percent, some plans with 95 percent?
9  A.  Oh, I see what you're asking.  I'll try to be more precise to
10  the best of my recollection.
11        I think the way the algorithm quantifies the 95 to
12  105 percent threshold is to say you must be over 95 percent
13  and you must be under 105 percent.
14  Q.  Right.
15  A.  So if you are to look at the deviation between the smallest
16  populated district and the largest populated district, it
17  would be a little bit less than that total 10 percent band
18  because I'm not allowing districts to be exactly 95 percent.
19  I mean I think, I'm assuming 95 percent is actually a
20  fraction, I assume.  There is probably a fraction of a person
21  in that number.
22        But the point is that I'm requiring over 95 and
23  under 105 percent to the maximum.  So the total range of the
24  deviation will be a little bit under 10 percent.  I really
25  couldn't give you whether it's 9.9 or 9.8 percent.  And

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 110

1    obviously that number I'm sure differs from plan to plan.

2    Q.   Did you check whether there was a partisan pattern in the

3         over and under population?  For example, were the more

4         Republican districts overpopulated relative to the Democratic

5         districts?

6    A.   To my recollection, I never checked that pattern that you're

7         describing there, saying was there a correlation between,

8         say, more underpopulated districts and whether those

9         districts were more Democratic and more Republican.

10            I would say that the only extent to which I'm aware

11       that there could even potentially be such a pattern, to my

12       knowledge, would be, say, obviously I understand that we got

13       certain tighter population thresholds for the Detroit

14       districts.  Obviously we know that Detroit districts are more

15       Democratic leaning, and so maybe there could be some kind of

16       correlation there in so far as all of those districts are

17       required to be tightly populated, something like that.

18            It's not something that I have systematically

19       analyzed.  But obviously I'm not able to tell you that there

20       is or is not a even small correlation along those lines.

21   Q.   Okay.  And how did you deal with the issue of island

22       townships, that part of the township is wholly within another

23       township, how did the algorithm deal with that?

24   A.   Okay, sure.  I'm going to answer that as completely as I can.

25       I'm going to start by giving you the basis of my answer,

## Page 111

1    which is the details of how I dealt with those township

2    islands, islands within cities, is all captured and performed

3    in my computer code that I turned over.

4        Now having said that, I'm going to try to do my

5    best to try to answer this succinctly without going into too

6    much detail here, and to the best of my recollection.

7        So in general -- and I'll speak generally for all

8    three sets of simulations, at first.  In general, what the

9    code does is my computer code was written to, first, take a

10   noncontiguous township island that are not contiguous from

11   say the main portion of the township, and divide them apart,

12   separate them apart into separate polygons.

13       The background for this is that the shape file for

14   the municipalities that I started with treats every single

15   municipality as a single polygon in the shape file, that it

16   is a single row by itself.  It has the entire land area of

17   the township, with all of its noncontiguous portions

18   encapsulated in a single row, in a single polygon, in a

19   single row of the shape file.

20       Now obviously that means, for example, Ann Arbor

21   Township would be a row consisting of some noncontiguous

22   parts.  So what I did, and my computer code did was take them

23   apart and divide them into separate polygons, each of which

24   itself is contiguous.  So take those islands and separate

25   them apart.

## Page 112

1        Now having separated them apart, they can be

2    treated as a base building block for the simulation so that

3    you can adjoin together those things and not accidentally end

4    up with a noncontiguous district, which is the whole point of

5    having to separate them apart.

6        So in general, that's what I did, I separated them

7    apart.

8        So, for example, Michigan starts with having, I

9    believe, I'm going to try to get the number right, I think

10   it's 1,573 municipalities.  Obviously some of them are

11   townships with islands.  So I separate apart those islands

12   and you end up with more than 1,573 polygons in the end

13   because I've separated apart the township islands from many

14   of the townships.  So I separate them out and treat them

15   separately.

16       Now obviously in the end I have to come back and

17   treat them as a single township for the purpose of counting

18   or identifying municipal breaks.  But just for the purpose of

19   producing a simulated plan, the computer code separates them

20   apart and treats them separately.

21       So that's in general, the approach that the

22   computer code takes.

23       There are then ways that specifically I dealt with

24   this with respect to the House simulated plans.  So after

25   separating the noncontiguous portions of the township

## Page 113

1    islands, in all of the townships, there were certain

2    townships -- there were certain municipalities where I took

3    township islands and integrated them back together with the

4    city surrounding that township.

5        So an example is Ann Arbor Township has a large

6    number of islands, and Pittsfield Township has a large number

7    of islands within the City of Ann Arbor.  I think the same is

8    true of Kalamazoo Township which has a number of

9    noncontiguous islands, and some of them are wholly within the

10   City of Kalamazoo.

11       And for those cases, I took the township islands,

12   say Ann Arbor Township islands, and integrated them, merged

13   them together with the, in Ann Arbor Township -- in the case

14   of Ann Arbor Township, it was the northern portion of the

15   city of Ann Arbor, and for Pittsfield Township it covers the

16   southern portion of Ann Arbor.

17       I merged it together.  And the reason I did that

18   was to allow the algorithm the opportunity to possible see if

19   it was going to be geographically and mathematically possible

20   to create plans that keep, say, all of Ann Arbor Township

21   together or all of Pittsfield Township together without

22   separating the township islands from each other.

23       So those were the different ways --

24   Q.   Can I just follow up on that?

25   A.   Sure.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 114

1   Q.  I just want to ask something specific about that.

2   **A.  Okay.**

3   Q.  Because I think I may have lost your thread.

4        If it was mathematically and geographically

5   possible was the algorithm instructed to, for example, keep

6   the Ann Arbor townships together?

7   **A.  Yes, it treats that as a township that needs to be kept**

8   **together, otherwise it might count as a municipal break.**

9   Q.  Okay.

10  **A.  So the algorithm, in trying to keep townships together, it**

11  **tries to keep all the noncontiguous fragments together.**

12  **And I'm aware that in some cases, it is just**

13  **mathematically impossible to, but in general I set it up so**

14  **the algorithm has the opportunity to try and do so.**

15  Q.  And that would -- for the goal of minimizing the township and

16  city breaks?

17  **A.  Correct.**

18  Q.  Okay.  Did you review the 1982 correspondence between Mr.

19  Apol and the Supreme Court Clerk Pogue and the Supreme Court

20  Justice Charles Levin on the Apol criteria?

21  **A.  To my knowledge, to my recollection I am not aware of that**

22  **correspondence.**

23  Q.  Okay.  If you could turn to page 40 of your report, please?

24  **A.  (Witness complied.)  Yes.**

25  Q.  So I'm just really trying to make sure we're talking about

## Page 115

1   the same things here and this is just an illustrative

2   example.

3        You have a number of county breaks, this is for the

4   enacted plan, you say 17 county breaks?

5   **A.  Let me just --**

6   Q.  Do you see that on the left-hand side?

7   **A.  Yes, sir.  I see that.**

8   Q.  Okay.  So I'm just trying to figure out, does that mean a

9   district line broke a county line?  What I'm getting at, what

10  if a district line broke the county line twice, the same

11  county, would you count that as one or two breaks?

12  **A.  If a district line -- if a single district --**

13  Q.  If there was ambiguity in my question, I apologize.

14       No, let's assume different districts broke -- or

15  the same district broke a county line twice, in two different

16  places, would you count that as one break or two?

17  **A.  I see.  I'm going to ask those two questions separately.**

18  **If it's two different districts causing, each**

19  **causing a county break of the same county, my recollection is**

20  **I would call that -- I would count that as two separate**

21  **breaks.  I can't give you an example off the top of my head,**

22  **but I think I wrapped my head around that sort of situation**

23  **you're describing.**

24  Q.  Okay.  And the second --

25  **A.  I got your second part of your question.**

## Page 116

1   Q.  Okay.

2   **A.  So if it's a single district, but it breaks the county in two**

3   **completely separate noncontiguous -- two completely different**

4   **places of that county, I think that's what some people would**

5   **refer to as double traversal of that county, you kind of**

6   **intrude into the county but at two completely different**

7   **places that don't touch one another except through another**

8   **county, that I counted as a single break, not two separate,**

9   **not an additional county break, but rather one single county**

10  **break.**

11  Q.  Okay.  And then right underneath that you see, the number of

12  counties divided into multiple districts.

13       Again, I'm just trying to clarify, would that mean

14  if, for example, a number of districts were wholly within the

15  county but never broke a county line, would that show up in

16  that tabulation, that 28?

17  **A.  Yes.  And that's why you see including Wayne County there, so**

18  **obviously you're going to have to break Wayne County,**

19  **obviously you're going to have to break Washtenaw County.**

20  **Obviously there are several counties that inevitably will**

21  **show up on this list.  Again Wayne County counts as one**

22  **county that is divided into multiple districts.**

23  Q.  Do you think that's a relevant criteria under the statute,

24  how many districts you have within a county, if it doesn't

25  break a county line?

## Page 117

1   **A.  Do I think it's a relevant criteria for the purpose of**

2   **interpreting the statutes, for what purpose?**

3   Q.  Do you think the statute speaks to the question of how many,

4   the number of districts are within a county without breaking

5   a county line?

6   **A.  Okay.  I would recognize that the statute does not have an**

7   **explicit mention of this sort of number of counties divided**

8   **into multiple districts the way that I calculated that.**

9   Q.  So what information are you conveying on this chart with that

10  column, that row?

11  **A.  The column conveys -- that row conveys exactly what I**

12  **described.**

13  Q.  I know, but do you think it has any relevance to compliance

14  or adherence to the statutory criteria?

15  **A.  That's a legal question that I'm not qualified to answer.**

16  **I'm just explaining what I did.**

17  Q.  From the -- wholly apart from legality, do you think it

18  reflects any divergence from or adherence to what your

19  understanding of the statutory criteria are?

20  **A.  As I said, I recognize that the statute does not have an**

21  **explicit section or line that defines number of counties**

22  **divided in the way that I operationalized it and quantified**

23  **it here.**

24  Q.  Okay.  If there is a choice between breaking a county line a

25  second time, or breaking a different county line, what did

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 160-5, PageID.6546   Filed 12/14/18   Page 32 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 118

1  the algorithm require?

2  A.  I want to try to understand your question.  If there is a

3  choice between breaking a county line a second time --

4  Q.  Right.

5  A.  -- versus breaking another completely different county.

6  Q.  Right.

7  A.  Okay.  So I think the first choice that you're giving there

8  is what we were discussing before, what I had said some

9  people might call a double traversal.

10  Q.  Right.

11  A.  And as I said since my computer code calls that a single

12  break, that would be treated as more preferable to the second

13  scenario where you're saying you're going to break a whole

14  another county, a completely different -- a completely

15  different county.

16  So if I'm understanding the question correctly

17  there, the first would be what is prioritized in terms of

18  decreasing or minimizing the number of county breaks.

19  Q.  Okay.

20  A.  Obviously the caveat being all else being equal, nothing else

21  being violated, no population equality being violated,

22  etcetera.

23  Q.  On page 40, you just referenced the point that the number of

24  counties divided includes Wayne County.  But if you turn to

25  page 27 of your report that's dealing with the Senate plans,

## Page 119

1  you exclude Wayne County from that.  Why is that?

2  A.  Well, I just wrote those lines in there to make clear exactly

3  what I was counting and how I was counting them.

4  As to why I did it one way in one table and another

5  way in the other table, I mean first of all I was just trying

6  to be transparent and explain clearly what I was doing, even

7  if it was slightly different for these two tables.

8  In general, what I did in -- I think I'm going to

9  start with the Senate table, which is the page 27 one you

10  referred to.  What I did in the Senate plan was I froze

11  districts one through seven from the enacted plan, all seven

12  districts covering the entirety of Wayne County.

13  And what that means is that Wayne County is

14  effectively excluded from the simulation process, all of

15  Wayne County is.  And so we all know what happens in

16  districts one through seven.  Wayne County is obviously

17  divided into multiple districts.

18  So it really doesn't matter if you want to include

19  Wayne County or you don't want to include Wayne County.  If

20  you want to include Wayne County, add one to everything; or

21  if you don't want to, subtract one, and that's what I

22  reported.  The point is to do an apples-to-apples comparison

23  when I'm comparing the enacted plan to the computer-simulated

24  plan.

25  But I guess in this particular case, I just -- my

## Page 120

1  recollection is that I excluded Wayne County from the number

2  of divided counties because Wayne was just not really even a

3  part of the simulation process in any random sense, since all

4  of Wayne County was carved up in exactly the same way due to

5  those frozen districts.

6  Now turning to the other table you referenced on

7  page 40, that's Table 4 describing the enacted House plan and

8  the computer-simulated House plans, you noted that I did

9  include Wayne County in this, in this count.

10  And the point here is that I was not freezing every

11  single district, every single House district within the

12  boundaries of Wayne County.  The computer code froze many of

13  them, but not all of them.  So there was actually some real

14  simulation process going on in some parts of Western Wayne

15  County.  So I included them.

16  Again, it's not particularly meaningful if you do

17  or not.  The point is just to do it consistently so there is

18  an apples-to-apples comparison when I'm comparing the enacted

19  House plan to the computer-simulated plans.  And in this case

20  I chose to include Wayne County which meant that there was

21  going to be one more county, Wayne, that was divided in both

22  the enacted House plan as well as the computer-simulated

23  plans.

24  The broader point is as long as you're doing an

25  apples-to-apples comparison using the same rules for the

## Page 121

1  enacted plan and the computer-simulated plans, that's what

2  really matters here.  Obviously Wayne County is always going

3  to be divided up in any equally populated plan that you can

4  draw for Michigan's House district.  So it's really just

5  adding one to both columns there.

6  My recollection is that's generally why I included

7  Wayne County here but not in the other, in the Senate table.

8  Q.  One last question on how you count county breaks.

9  So if you have, if district one and district two

10  split county line between Smith County and Jones County,

11  okay?  In other words all of district one is composed of

12  parts of Smith and parts of Jones, all of district two is

13  composed of parts of Jones and parts of Smith County, do you

14  follow so far?

15  A.  Yes.

16  Q.  Okay.  I assume from your prior answer, that's one -- you

17  count that as one county break?

18  A.  And just to clarify you're telling me that neither district

19  one or two cover any parts of any other county other than

20  these two?

21  Q.  That's the key point, correct.

22  A.  I got you, let me think about that.

23  I'm going to give you my best shot at answering

24  that and I'll start by qualifying it by saying that when I

25  counted up the county breaks in all the 3000 simulated maps,

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 122

1  obviously I wasn't doing it by hand, I was doing it by
2  computer code and that computer code contains the rules that
3  I used, contains the instructions that I used to count county
4  breaks.  So it's all in that computer code that counts county
5  breaks.
6       So what you're asking me to do here is to count,
7  not by hand, but by thinking hypothetically about
8  hypothetical counties, and I'll do my best, but I want to
9  qualify by saying this is obviously not the sort of process I
10  went through in my report to calculate county breaks.
11       So as I think I understand the district one and two
12  Smith and Jones County situation you're setting up, that
13  sounds to me, as I'm sitting here just thinking about it in
14  my mind without any sort of visualization here, that sounds
15  to me like -- that sounds to me like that's two separate
16  county breaks.  It could be thought of as Smith being shifted
17  into Jones or Jones being shifted into Smith for both
18  district one and district two, and so that sounds to me like
19  two different county breaks.
20  Q.  Okay.
21  A.  But again same qualifications as before.  I'm just visually
22  thinking about this sort of removed-from-reality hypothetical
23  here.
24  Q.  Well to follow up here though on your qualification, these
25  issues do arise in the real world.  Do you have a specific

## Page 123

1  recollection of what instructions you gave to the algorithm
2  in these sort of circumstances when the computer is tallying
3  up county breaks?
4  A.  Well I can tell you the sort of prioritization the algorithm
5  would inevitably give to a situation like that, because of
6  how it's trying to minimize county breaks.
7       Inevitably, I'll stick with your example, either
8  Smith or Jones County has the larger population of the two.
9  And if we're talking about House districts, obviously those
10  two counties have to sum up to roughly 180,000 or so in
11  population because they're going to include fully two
12  districts.  And I think you're qualifying, I believe, correct
13  me if I'm wrong, that there are no other districts within
14  these two counties, within Smith and Jones.
15       So those two counties have to end up summing up in
16  total population somewhere around 180,000 in population to be
17  two full House districts.
18       I know you didn't specify House districts, but I'm
19  adding to your hypothetical here.
20       So what the algorithm would do is it would try to
21  only -- to draw those districts by only splitting up one
22  county.  Let's suppose that Smith is the bigger county in
23  terms of population and Jones is the smaller county in terms
24  population.  That definitely means you would be able to fit a
25  full House district within Smith County, and then the

## Page 124

1  remaining population of Smith would have to be combined with
2  all of Jones for the second House district.
3       That sort of configuration is the sort that would
4  be prioritized because, as I'm thinking about that
5  hypothetical, that would be one county break.  That's just a
6  shifting of a small part of Smith into Jones.
7       And so that would be the sort of configuration that
8  would be prioritized when you're trying to minimize county
9  breaks.
10  Q.  I don't want to explore that hypothetical too far.
11       That's true however, if Smith is not big enough for
12  the district, it has to go somewhere to get extra population.
13  One choice is to go into Jones to get the extra population,
14  and whatever you take out of Jones you leave enough in Jones
15  that if Jones went into Smith for the second population, that
16  would be the county break.
17       If you didn't do that, then the excess population
18  in Jones would have to go to another district to get its
19  population.  Do you follow what I'm saying?
20       And I'm just trying to figure out what the
21  algorithm told it to do in those circumstances.
22       MR. YEAGER:  Objection, incomplete hypothetical.
23  Assumes facts not in evidence.
24       You can answer.
25       THE WITNESS:  Okay.  I'm not sure if you are

## Page 125

1  starting to talk a somewhat different hypothetical than what
2  I was talking about a moment ago.
3       What I was saying is that if it is the case that
4  these two counties, Smith and Jones combined together are
5  roughly the size of two House districts --
6  BY MR. CARVIN:
7  Q.  Right.
8  A.  -- then the sort of configuration that the algorithm, that
9  the code is going to prioritize is one in which one of the
10  two districts is fully within the larger of the two counties.
11  And then the smaller of the two counties will obviously have
12  to be combined with the remaining portion of the larger
13  county.
14       And then that would be one total county break, so
15  that would be prioritized.
16  Q.  Okay.  Now assume with me that district one and district two
17  share the Smith and Jones County population, but district one
18  also goes out and gets a third county, whole county, how many
19  breaks does that count?
20       MR. YEAGER:  Same objection.
21       You may answer.
22       THE WITNESS:  I'm starting to have a little more
23  trouble following along.  Is it all right if I take a pen and
24  paper and try --
25  BY MR. CARVIN:

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 126

1  Q.  I will try it again.

2  A.  Okay.

3  Q.  We were initially talking as you just mentioned between Smith

4     and Jones sharing all of the populations of district one and

5     two, but now one of the districts is underpopulated, so it

6     goes out and reaches out and gets Johnson County, okay, as

7     well.

8          And I'm wondering if that changes the amount of

9     county breaks that your computer would count.

10         MR. YEAGER:  Objection, incomplete hypothetical and

11    the witness has asked for paper.

12         Would you like me to give him some?

13         MR. CARVIN:  You can give him all the paper you

14    want.

15  BY MR. CARVIN:

16  Q.  Go ahead.

17  A.  I'm going to try and write down what you said here.

18         We've got Smith County, and we've got Jones County.

19    And if I'm understanding you correctly, districts one and two

20    comprise -- it would comprise all of Smith and Jones County,

21    have I got that right so far?

22  Q.  You do.

23  A.  All right.  Now can you go to the last part of your question

24    where you brought in Johnson County?

25  Q.  Under that hypothetical district one is underpopulated, so it

## Page 127

1     goes out and reaches and brings in all of Johnson County

2     which brings it within the population threshold.  You're not

3     breaking Johnson County line, but you're adding it to the

4     district one you just described.

5          Does that count as an additional county break or do

6     you tally them up the same way as you would have under the

7     original hypothetical?

8          MR. YEAGER:  Same objection.

9          You may answer.

10         THE WITNESS:  Okay.  I think your question is does

11    going out and grabbing Johnson County count as an additional

12    county break?

13  BY MR. CARVIN:

14  Q.  That's exactly right.

15  A.  Okay.  I'm going to try my best to answer your question.  I'm

16    going to first start by qualifying that this seems like such

17    a nonideal situation in terms of optimization of county

18    breaks that it's not the sort of situation that I, to my

19    recollection, I remember seeing in, say, the simulated maps

20    that I analyzed.

21         So my understanding of the situation is that we've

22    got one county break involved with district two, just as

23    before, and then we've got two county breaks involved with

24    district one.  So that's a total of three breaks.

25         And that's -- I'm not sure -- I'm not sure I

## Page 128

1     totally have all the information I need here, but I think I'm

2     able to understand what information you've given me here so

3     far.  And so that's my best shot at it.

4          Again I'll qualify all of this by saying that

5     obviously getting a pen and paper here and doing these little

6     hypotheticals like I'm trying to do right here is not at all

7     how I actually counted breaks in my computer code.  Obviously

8     I've programmed the computer to follow a series of steps to

9     calculate county breaks.  But I'm giving you my best shot

10    here.

11  Q.  But wouldn't the way the computer code counts the county

12    breaks conform with your understanding of how to count the

13    county breaks?

14  A.  To the best of my knowledge.

15  Q.  Okay.  If you could turn to page 64 of your report, please.

16  A.  (Witness complied.)  Yes, sir.

17  Q.  Okay.  So it states, does it not, the simulation algorithm

18    thus seeks to achieve compactness where required only after

19    prioritizing the four aforementioned criteria.  The

20    algorithm, after doing the four, then favors districts that

21    minimize the Michigan land area inside of each district's

22    circumscribing circle but outside of the district itself.

23         Is that correct?

24  A.  Yes.

25  Q.  Okay.  And that is the measure that is specified in the

## Page 129

1     statutory criteria?

2  A.  I tried to -- the criteria is a little -- is maybe -- it's a

3     little bit general, but I tried to faithfully follow what I

4     saw in the criteria in describing this unique sort of

5     compactness quantification that I saw in the statute.

6  Q.  And that's the first measure that you did, but you also did

7     the Reock score in addition to that, right?

8  A.  That is -- well I calculated the Reock score of the

9     districts.

10  Q.  Okay.  And you used that even though it's not in the statute

11    for what reason?

12  A.  Why did I use the Reock score?

13  Q.  Yes.

14         MR. YEAGER:  Asked and answered.

15         You may answer.

16         THE WITNESS:  I think I said earlier this morning I

17    calculated it because it's something -- it's something that I

18    believe I almost always do when I evaluate the compactness of

19    districting plans, enacted plans and computer-simulated

20    plans.

21  BY MR. CARVIN:

22  Q.  If you'd turn to page 40.

23  A.  (Witness complied.)

24  Q.  Okay.  Let's start with the Reock score, because that's more

25    commonly used.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 130

1    The Reock score for the enacted plan is 0.415.  Is
2    there any consensus or dominant view within the political
3    science community on what Reock score would render a plan
4    non-compact?
5    A.  My sense of a general view, and at the very least I'm
6    speaking for myself here, and obviously again, it's not
7    something I've ever taken a survey or a poll on, but there is
8    not really a one-size-fits-all answer that will tell you,
9    say, a .5 is a great score and a .2 is a bad score.
10       When it comes to Reock it's context dependent and
11   geography dependent.  And you can easily see that if you
12   imagine, for example, what sort of Reock score one would get
13   if you were to draw some districts in the State of Hawaii, or
14   say Alaska's Aleutian Islands and then calculate the Reock
15   score by fitting an abounding circle around those districts.
16       Of course the sort of Reock scores that one could
17   reasonably expect from a districting plan in Hawaii or the
18   Alaskan Aleutian Islands would be just of a completely
19   different nature than if you drew, say, a district involving
20   the State of Wyoming, which is just a perfect square.  The
21   state is a perfect square.  And say if you were drawing
22   Wyoming into two districts, you could expect some pretty
23   compact, pretty good Reock scores.
24       But obviously if you're doing that in Hawaii,
25   you're going to expect a completely different sort of Reock

Page 131

1    score.
2        So I think the consensus is that it really is
3    jurisdiction dependent or context dependent.  In other words
4    what we can say about a good Reock score that makes for, say
5    the sort of plans that were clearly prioritizing compactness,
6    what sort of Reock scores would indicate an effort to try and
7    prioritize compactness in Wyoming is completely different
8    than the sort of Reock scores that one would expect to see
9    typical plans drawn in Hawaii.
10       That's what I mean by it's context dependent.  And
11   I think that political scientists who study redistricting
12   recognize that for the most part that you're dealing with
13   different geographies.
14   Q.   So there is no general benchmark under the Reock score, it's
15   geographic specific.  So for example the Reock scores for the
16   House are from .418 to .435, would you suggest that that is
17   the benchmark from separating a compact plan from a
18   non-compact plan?
19   A.   No.  I don't think I'm opining that at all.
20   Q.   You're just telling us that the enacted plan is less compact
21   under the Reock score than the simulated plan?
22   A.   That I'm definitely saying just as a purely statistical
23   matter.
24   Q.   Right.
25   A.   It's -- it's not as if -- and certainly looking at Reock

Page 132

1    scores makes clear there is no such thing as an either or
2    when it comes to compactness.  It's not as if there is a
3    magical cutoff that turns a district from being non-compact
4    into compact or vice versa.
5        The point here is that this is the range, this is
6    the general range of scores that one can expect from a
7    computer simulation algorithm that is prioritizing
8    compactness in the way that I'm trying to do here.
9    Q.   And .415 is outside that range?
10   A.   Yeah.  Mathematically or statistically it's outside that
11   range.
12   Q.   Right.  And I get that statistically.  I'm wondering as a
13   matter of political science or otherwise, is it a significant
14   difference?  Is there any real difference between 0.415 to a
15   0.418 in terms of the goals that redistricting plans are
16   designed to achieve, are you opining on that?
17   A.   Well I'm certainly opining that it's statistically different,
18   obviously.
19   Q.   Right.
20   A.   As to whether this can be characterized as a really, really
21   severe or just a sort of small sacrifice, that's not really
22   the sort of thing that I'm quantifying here beyond just
23   reporting the numerical numbers here, and describing the
24   results in terms of here is the statistical properties of
25   distribution.  This score is a statistical outlier, extreme

Page 133

1    statistical outlier.
2        But I'm not actually taking that statistical
3    conclusion and telling you, for example, that this somehow
4    proves that compactness was only factored one-fifth as much
5    as it should have been or anything like that that would say
6    anything more substantive than just the statistical
7    properties that I've described.
8    Q.   Can you cite an article or a case which has ever attributed
9    significance in a substantive way to the kind of differences
10   we see between 0.415 and 0.418 to 0.435?
11   A.   Well obviously you're giving specific numbers and I'm sure
12   there has never been a scholarly number that has precisely
13   these --
14   Q.   That's a very literal interpretation of my question.  Let me
15   do --
16   A.   I get your question and --
17   Q.   Let me rephrase it since you're going to interpret it
18   literally.
19       Have you ever seen a case or scholarly article that
20   ever ascribed substantive significance to the kinds of
21   differences reflected on page 40 between the simulated and
22   the enacted plans?
23   A.   Sure.  I get the general question you're asking me, you're
24   basically asking me if anybody has ever used this method,
25   this abstract method of comparing.

## Page 134

1  Q.  No.

2  A.  Okay.

3  Q.  Let's assume it's one alternative plan versus another and

4  they have differences analogous to those between the

5  simulated plans and the enacted plans.  Has any Court ever

6  suggested that that's a significant or meaningful difference

7  in compact --

8  MR. YEAGER:  Calls for a legal conclusion.

9  You can answer.

10  THE WITNESS:  I was just going to say that

11  obviously I'm not qualified to tell you if a Court has

12  interpreted something one way or another way.

13  BY MR. CARVIN:

14  Q.  So you're unaware of any Court cases that have done that?

15  A.  Not to my knowledge.

16  Q.  Is there any scholarly article, which is in your area of

17  expertise, that has attributed any substantive significance

18  to the kind of differences between the enacted plans' Reock

19  scores and the Reock scores expressing the range of the

20  simulated plans?

21  A.  Okay.  That was a little bit of a different question than

22  what you asked previously.  So I'll answer that question now.

23  And the answer is, yes, I have done so in my

24  scholarly, in my peer review and academic work.

25  So, yes, I am aware.

## Page 135

1  Q.  Anybody besides you?

2  A.  You know, if you're asking has there been another article

3  that uses some kind of computer-simulation redistricting

4  algorithm and does all, does these sorts of things where you

5  draw a bunch of alternative plans and compare it to an

6  enacted plan, in general I would say that, one, there is just

7  not a whole lot of literature doing that.

8  Q.  So the answer is no?

9  A.  Well I'm going to answer your question.

10  Q.  Maybe if you could answer it yes or no and then explain, that

11  would be good.

12  A.  Okay.  I appreciate that.

13  I'm not specifically aware.  It's possible that it

14  has happened and it's possible it has not.

15  Q.  Let's take out the simulation from the hypothetical.

16  MR. YEAGER:  I object, he wanted to give a longer

17  answer.  You said he could answer yes or no and then explain,

18  so are you going to let him explain?

19  BY MR. CARVIN:

20  Q.  Sure.

21  A.  I was just going to briefly qualify that.  It's not as if

22  there is decades and decades of peer-reviewed articles doing

23  exactly this sort of method that I'm doing here.

24  Q.  Okay.  So let's take that out, forget the simulated plans.

25  Alternative plans that reflect roughly the Reock

## Page 136

1  scores that you found in the simulated plans versus an

2  enacted plan, has any scholarly article attributed

3  substantive significance to that difference?

4  A.  Enacted plans to an alternative plan is what you're asking

5  about now?

6  I can't specifically think of one off the top of my

7  head, but I really don't have much doubt, given what I

8  generally know which is that there is lots of literature

9  describing say the Reock scores, the Polsby-Popper scores,

10  etcetera, of various districting plans, I have no doubt that

11  there certainly have been articles that compare one plan to

12  another.

13  Now was it specifically an enacted plan versus a

14  computer-simulated plan, or a plan proposed by somebody that

15  was not officially enacted?  I don't know that I can

16  specifically answer that precisely or if I could specifically

17  recall of an instance like that.  But I don't doubt in

18  general that there has certainly been articles that have

19  compared one plan to another along Reock or Polsby-Popper or

20  some other similar measure.

21  Q.  And in those articles does it say a difference, analogous to

22  the difference between the enacted plan and the simulated

23  plans would be substantively significant?

24  A.  I'm going to have you ask that again.

25  Q.  Would the differences in the Reock scores between the enacted

## Page 137

1  plan and the simulated plans would be substantively

2  significant, any such articles?

3  A.  I'm still not sure that I understand the question.

4  Q.  Are there any articles which suggest the differences

5  analogous to that between the enacted plan and your range of

6  the simulated plans would be substantively significant?

7  A.  Okay.  You're talking about the difference that we're seeing

8  here on Table 4 on page 40, have I got that right?

9  Q.  Yes.

10  A.  Okay, I got you, I misunderstood what you were asking about

11  earlier.

12  MR. YEAGER:  No, you understood.

13  THE WITNESS:  I can't specifically recall that.

14  I'm sure that there have been articles talking about

15  differences, calculating mathematical differences between two

16  different plans in terms of their Reock score.

17  I can't really give you precisely what those

18  authors might have said about what -- their opinion about

19  what a significance difference is.  I can't specifically

20  recall.

21  BY MR. CARVIN:

22  Q.  How does a 0.415 Reock score compare generally to the

23  compactness of Congressional plans throughout the nation, do

24  you know?

25  A.  Throughout all 435 districts is what you're asking --

## Page 138

1    Q.  No, I didn't think you were giving me Reock scores for

2        individual districts.  You were giving me for the entire

3        Congressional districting plan.  How does 0.415 stack up

4        among analogous Congressional districting plans in the United

5        States, do you know?

6    A.  It's not something I've thoroughly analyzed.  I can generally

7        say, as I said sometime early, that obviously Reock scores

8        are very context and geography dependent.

9            So I can say for example, with pretty good

10       certainty, that say a .415 is a low score in comparison to

11       Wyoming's Congressional district.  That I'm comfortable

12       guessing about even though I've not specifically calculated

13       the Wyoming Reock score.

14           And I'm also pretty comfortable saying --

15   Q.  Do you know how many Congressional districts there are in

16       Wyoming?

17   A.  There is one.

18   Q.  So at this point you're being facetious?

19   A.  No.  I'm just --

20   Q.  I just want to know at this juncture do you have any sense of

21       where this stacks up among comparable redistricting plans?

22   A.  Okay, comparable --

23           MR. YEAGER:  Objection, characterization.

24           You may answer.

25           THE WITNESS:  Okay.  So comparable redistricting

## Page 139

1        plans.  I'm just going to -- I'm trying to understand the

2        question as best as I can.

3    BY MR. CARVIN:

4    Q.  No, you're not.  But go ahead.

5            MR. YEAGER:  Objection.  I object to the

6        characterization.  The witness is answering your questions to

7        the best of his ability and it's inappropriate for you,

8        Counsel, to make comments on what he's trying do.  He's

9        trying to answer your questions to the best he can.

10           If you ask a clear question, and, yes, he will take

11       you literally, and he will give you a clear answer.

12           And I really object to your making comments about

13       his intent that they're inaccurate and they're inappropriate.

14           Now if there is a question on the table, you can

15       answer it: if there is not a question on the table, let's

16       wait for a question.

17           THE WITNESS:  So I think you just clarified by

18       talking about comparable districting plans.  You didn't say

19       exactly what comparable means but I'm going to -- I think you

20       could say comparable in terms of the number of Congressional

21       districts.  So if there were other states that had 14 or say

22       close to 14 Congressional districts.

23           And my answer there is even then, it's still very

24       context dependent, very geography dependent.  Obviously a

25       state like North Carolina has 13 Congressional districts,

## Page 140

1        very similar to the number of districts in Michigan.  But

2        North Carolina's geography, underlying geography is quite

3        different from Michigan.  Michigan has a lot more coast line

4        than North Carolina does.

5            So I'm not sure that comparing Reock scores from

6        Michigan to North Carolina would be terribly helpful.

7            But my overall answer to your question is in the

8        context of that kind of stuff, I haven't down that kind of

9        study.  I haven't really tried to identify states comparable

10       to Michigan and directly compare the Reock scores.  I'm not

11       sure that such a study makes much sense to me.

12   BY MR. CARVIN:

13   Q.  All right.  Could you turn to page 64 of your report, please?

14   A.  (Witness complied.)

15   Q.  Okay.  And this is sort of repeating what I read to you

16       before.  But just to confirm, after the algorithm takes care

17       of the first four factors, the algorithm then favors

18       districts that minimize the Michigan land area inside of each

19       district circumscribing circle but outside of the district

20       itself.

21           Is that right?

22   A.  Oh, it favors districts that are more compact.

23   Q.  Right.  And are you suggesting that the statute favors or

24       requires minimizing Michigan land area inside of each

25       district's circumscribing circle?

## Page 141

1    A.  I'm not giving an opinion about what the statute legally

2        requires or doesn't require.

3            All I'm doing, obviously, is reporting to you --

4        reporting here on what I actually did in the algorithm.

5    Q.  Right.

6    A.  So I'm describing how I operationalized the criteria that I

7        understood.

8    Q.  And you're not suggesting that your, how you operationalized

9        the criteria reflect what the statute uses as operational

10       criteria, right?

11   A.  Well I certainly read the statute.  But I am not giving an

12       opinion on whether a particular reading of the statute that I

13       operationalized it as is legally required or is prohibited or

14       some other legal judgement.  I'm just telling you about what

15       I did, how I operationalized the criteria that I read.

16   Q.  So you're not in any way opining that the statute favors

17       districts that minimize the Michigan land area inside of each

18       district's circumscribing circle, right?

19   A.  I'm not opining on whether something is legally required or

20       not.

21   Q.  Or whether the statute encourages that?

22   A.  You're saying encourages the legislature?  Have I got that

23       right?

24   Q.  I'm just trying to figure out why you put this into your

25       algorithm.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 142

1   A.  Okay.

2   Q.  This idea of minimizing the compactness.  If it doesn't come

3        from the statutory criteria, I assume it's your own personal

4        idiosyncratic view of redistricting.  Am I wrong about that?

5   A.  What I said is that I have no view as to whether the statute

6        requires or even encourages in any legal sense.  Obviously

7        I'm also telling you about what I did in my own computer

8        code.  And I'm saying that I understood the criteria, and I

9        operationalized the criteria in this particular way.

10  Q.  Was your personal --

11  A.  So I --

12  Q.   -- understanding of the criteria that you needed to minimize

13        the compactness --

14  A.  If I could just finish my answer to the question.

15        I am just saying that this is how I operationalized

16        it.  And so I don't know if that -- I don't reach any

17        conclusion regarding, say, require or encouraged beyond this

18        is what I did to operationalize it.

19        I apologize for interrupting you.

20  Q.  Did you do that because your understanding was that the

21        statute encouraged line drawers to minimize the Michigan land

22        area inside of a district's circumscribing circle after

23        taking account of the first four criteria?

24        MR. YEAGER:  Asked and answered.

25        You may answer.

## Page 143

1        THE WITNESS:  I didn't take any opinion -- I don't

2        have an opinion on how the statute affects line drawers,

3        which is the term you just used.

4   BY MR. CARVIN:

5   Q.  Why did you do it in your algorithm?

6   A.  Why did I prioritize compactness, why did I pursue

7        compactness?

8   Q.  In the way -- yes.

9   A.  Okay, sure.  And the answer is the same with respect to

10        compactness as with respect to the other criteria that I

11        operationalized in my code.

12        I read the statute, I consulted with Plaintiffs'

13        counsel, and I determined the criteria that I was going to

14        computerize or build into the computer code.

15  Q.  Did Plaintiffs' counsel tell you that the statute encourages

16        minimizing compactness in districts?

17        MR. YEAGER:  Well I'm going to object.

18        You can testify as to what instructions you were

19        given.  I'm going to object to, and instruct you not to

20        answer as to discussions that may have occurred with counsel

21        that are protected by Rule 26 and work product outside of

22        whatever instructions you were given.

23        You may answer.

24        THE WITNESS:  I can't answer your question and

25        follow Mr. Yeager's instructions to me.

## Page 144

1   BY MR. CARVIN:

2   Q.  Were you instructed to create districts that minimized or

3        maximized compactness as you described it in your report?

4        MR. YEAGER:  You may answer that question.

5        THE WITNESS:  Okay.  My understanding of my

6        discussions with Plaintiffs' counsel was that compactness was

7        to be pursued in the way that I prioritized it here, which

8        obviously again is beyond the -- beyond the first four

9        criteria that we've mentioned earlier.  That beyond that,

10        districts are to be favored when they're more compact rather

11        than less compact.

12        So that was generally my understanding of what I

13        was going to analyze.

14  BY MR. CARVIN:

15  Q.  Okay.  But that's not your understanding of what the statute

16        encouraged?  You were doing that because Plaintiffs' counsel

17        told you to do that, not because you had any independent view

18        that that's what the statute encouraged, right?  Do I

19        understand that correctly?

20  A.  To the best of my recollection, that's correct.

21  Q.  Okay.  We can go through it, but there is nothing in -- and

22        you can review this all you want, in either the congressional

23        or state legislative statute, is there, that says you favor

24        districts that maximize compactness after the first four

25        criteria have been satisfied, right?

## Page 145

1   A.  My understanding is that there are portions in the statutes

2        where drawing -- where maximizing compactness is explicitly

3        called for in some circumstances.

4   Q.  Yes.  Let's identify those circumstances.

5        If you look to the 1999 plan on congressional

6        redistricting, if you look at (c)(vi), it says, within the

7        city or township to which there is apportioned more than one

8        Congressional district, district lines shall be drawn to

9        achieve the maximum compactness possible.

10        So in those circumstances the line shall be drawn

11        to achieve the maximum compactness possible, right?

12  A.  I see that.

13  Q.  Is there any other circumstances where the statute references

14        maximum compactness of districts or lines?

15  A.  Well I see that right after that there is a general provision

16        on compactness and how one is to understand compactness.

17  Q.  All right.  In addition to -- I'll repeat it.  In addition to

18        (c)(vi) is there any other part of the statute which requires

19        or encourages drawing districts to maximum compactness?

20        MR. YEAGER:  Objection, calls for a legal

21        conclusion.

22        You may answer.

23        THE WITNESS:  I can't give you an expert opinion on

24        what the statute requires or encourages.  I can tell you

25        about the words on the statute.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 146

1  BY MR. CARVIN:
2  Q.  Okay.
3  A.  And if that's all you're asking about, I can affirm for you
4      that there is not another place other than where we've just
5      read from that says maximize compactness.
6  Q.  And the one you referenced, because you are able to read the
7      statute, simply tells you how to determine compactness. It
8      doesn't say that they favor compactness relative to other
9      alternatives, right?
10 A.  I see that it just -- that next section just tells us --
11 Q.  Right.
12 A.  -- a quantifiable measure of compactness.
13 Q.  Right.  And those are the only two references to compactness
14     in the Congressional statute, correct?
15 A.  Yes.
16 Q.  Okay.  We can look at the state legislative one, the act of
17     1996.
18 A.  Okay.
19 Q.  I can make this short or long.  Doesn't it essentially say
20     the same thing as the Congressional statute that we just went
21     through?
22 A.  I'm happy to tell you I'll give you all the same answers
23     there.
24 Q.  Okay, great.
25        All right.  If you could turn to page 14 of your

## Page 147

1      report.
2  A.  I just want to point out if there is an opportunity for me to
3      use the restroom, I'd be very appreciative.
4  Q.  Can we go three more minutes?
5  A.  Sure.
6  Q.  I have a few more questions, but just generally whenever you
7      need to take a break, Professor, just raise your hand.
8        MR. YEAGER:  Is that okay, three more minutes?
9        THE WITNESS:  Sure.
10 BY MR. CARVIN:
11 Q.  Okay.  This page, I'll give you a chance to review it,
12     discusses the differences between the compactness of the
13     enacted Congressional plan and the other plans.  And we've
14     already talked about the differences that we identified.
15 A.  I just want to -- I want to orient myself, we're on page 14?
16 Q.  Yes.
17 A.  Which paragraph?
18 Q.  I'm about to direct your attention to the prior paragraph but
19     I want to make sure you understand the context I'm about to
20     read.  So please take your time to read the preceding
21     paragraphs.
22        MR. YEAGER:  I didn't catch that.
23 BY MR. CARVIN:
24 Q.  Please read the two paragraphs above the bottom paragraph to
25     make sure that I'm not misleading you about what the bottom

## Page 148

1      paragraph is talking about.
2  A.  Okay, I gotcha.
3  Q.  The first finding is that the enacted plan is more
4      pro-Republican than the simulations.  Is that correct?
5  A.  That is generally what I'm describing in that
6      third-from-bottom paragraph.
7  Q.  And then the Congressional plan is outside the compactness
8      range of all thousand simulated maps, right?
9  A.  I see that in the next-to-the-last paragraph.
10 Q.  And from that you conclude, these findings suggest that the
11     enacted Congressional plan was drawn under a process in which
12     a partisan goal, the creation of nine Republican districts
13     predominated.  I am thus able to conclude with over 99.9
14     percent statistical certainly that the enacted Congressional
15     plan created districts less compact than what would have
16     reasonably emerge from the districting process not driven by
17     partisan intent.  Is that your conclusion?
18 A.  Yes, I see that.
19 Q.  Okay.  Well, the basis -- what is the Reock score that, or
20     circumscribed scores that would have emerged from a
21     districting process not driven by partisan intent?
22 A.  Okay.  What I mean in that last sentence is a process -- a
23     process that I simulated, that I programmed using my computer
24     code, that's what I'm referring to when I'm talking about a
25     districting process not driven by partisan intent.

## Page 149

1  Q.  And it was also a districting process that was driven by a
2      command to favor the most compact districts, right?
3  A.  I am favoring compactness as one of multiple criteria, we've
4      talked about this before.
5  Q.  Right.
6  A.  Obviously there is a hierarchy of priority, and I think we
7      talked about that before.
8        But I think I understand your question.  You're
9      asking what sort of compactness scores would emerge under
10     such a nonpartisan process such as my computer -- my computer
11     algorithm.
12 Q.  A nonpartisan process that didn't maximize compactness, might
13     well have produced a Reock score similar to the enacted plan,
14     correct?
15 A.  A nonpartisan process that did not maximize compactness, that
16     did not pursue compactness as one of those five goals?
17 Q.  Yes.
18 A.  I did not analyze that, so I really can't give you an expert
19     opinion on what sort of compactness scores would have emerged
20     if my algorithm had completely ignored compactness.  Because
21     you're asking me about essentially a compactness-blind
22     algorithm, not necessarily one that disfavors compactness,
23     but is just completely blind.  That's an empirical question,
24     I haven't tried to answer that --
25 Q.  Have you tried to ask the empirical question that sort of

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 150

1    favors compactness but not as much as your algorithm?
2    Wouldn't that be another explanation for why it departs from
3    the Reock and the other scores produced by the thousand
4    simulated plans?
5    A.  In general I'm not really sure by what's meant by sort of
6    favoring compactness but not totally, whether that means
7    favoring compactness, but only in odd number districts,
8    something like that.  It's not something I've tried to
9    analyze.
10        I wasn't interested in what sort of plans would
11   emerge if only some districts were drawn to be compact, but
12   others were not.  I can't answer that.
13       MR. YEAGER:  So the witness has asked for a break
14   and it's been awhile.  Can we take a break?
15       MR. CARVIN:  Yes.  Thank you.
16       (At 2:17 p.m. went off the record.)
17       (At 2:28 p.m. went on the record.)
18       MR. CARVIN:  Back on the record.
19   BY MR. CARVIN:
20   Q.  Just to follow up on what we were chatting about before the
21   break, Professor, what is the basis for your assertion that
22   the lower Reock and other scores in the enacted plan was
23   driven by partisan intent rather than a decision by whoever
24   drew those plans that they wouldn't maximize compactness to
25   the extent that your algorithm does?

## Page 151

1    A.  Okay, I'll explain the basis of my answer.
2        I am comparing two situations here and putting
3    together two sets of findings.  And obviously I'm putting
4    together findings regarding the partisan outlying nature of
5    the enacted plan as compared to the computer-simulated
6    processed plans.
7        And then I'm putting together that with my finding
8    regarding the statistically outlying nature of the Reock
9    score and the compactness scores as defined by the statutory
10   criteria.  And as we talked about sometime earlier today,
11   those Reock and compactness scores that I calculated, so I'm
12   putting together those two findings.
13       And I'm saying that it is -- how likely it is that
14   the plan that we're seeing here was one that was produced by
15   the sort of nonpartisan process that the computer was
16   programmed to follow, and I'm finding that to be very
17   statistically unlikely because of its partisan outlying
18   nature.
19       So putting those findings together leads me to
20   conclude that it's something to do with the partisan outlying
21   nature of the plan, that was related to the statistically
22   outlying nature of the compactness scores that I was
23   reporting on.
24   Q.  Right.  But they could have lower or worse compactness scores
25   simply because they didn't emphasize compactness as much as

## Page 152

1    your algorithm, right?
2    A.  I wasn't analyzing that hypothetical as a, say an alternative
3    hypothesis.
4    Q.  So the answer to me is, yes, it's certainly possible?
5    A.  I have no basis for saying that it is or is not.  I'm just
6    telling you that I did not analyze that hypothetical that
7    you're putting forward to me.
8    Q.  But nonetheless, you wrote down in your report that you can
9    state with over 99.9 percent statistical certainty that the
10   enacted Congressional plan created districts less compact
11   than that would have reasonably emerged from a districting
12   process not driven by partisan intent.
13   A.  Yes.
14   Q.  Well what if it was a process that was not driven by partisan
15   intent, but wasn't driven by compactness?
16   A.  Same answer as before.  That is not what, the analysis I'm
17   referring to right here.
18       What I was saying before is that what I mean in
19   that last sentence, when I'm saying emerged from a
20   districting process not driven by partisan intent, I'm
21   describing the process I programmed.
22   Q.  So really what you're saying is that reasonably would have
23   emerged from your districting process that was not driven by
24   partisan intent.  Is that right?
25   A.  That's what I said sometime ago and that's what I'm saying

## Page 153

1    now too.
2    Q.  Okay.
3    A.  What I'm referring to here is the analysis that I did
4    comparing the enacted plan to the actual process that I
5    modeled, that I programmed, and I'm drawing conclusions by
6    comparing those two things.
7    Q.  Right.  So it would be accurate to say that you can conclude
8    with over 99.9 percent statistical certainty that the enacted
9    Congressional plan created districts less compact than what
10   would have reasonably emerged from your algorithm, right?
11   A.  That's correct.
12   Q.  Okay.  And throughout this report you make similar comments
13   about you can state with 99.9 percent statistical certainty
14   about the partisan intent of the line drawers, right?  I can
15   point it to you, but the one we just read is a good example.
16   A.  Well I am --
17       MR. YEAGER:  Let him ask a question.
18   BY MR. CARVIN:
19   Q.  So the question is, you don't describe how you computed the
20   level of statistical certainty.  I'm going to assume that you
21   did the sort of normal confidence interval analysis, the 99
22   percent confidence?
23   A.  Well here it is a 99.9 confidence interval, but I think were
24   both talking about the same thing.
25   Q.  Right.  So you look at the thousand simulated plans and you

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 154

1    see the enacted plan as not within the thousand, so you can

2    state to a very, very high degree of statistical certainty

3    that that would not have been produced if somebody followed

4    your algorithm?

5 A.   Okay. Now that you've said that, I think we're talking about

6    slightly different things.

7 Q.   Okay.

8 A.   I'd be happy to clarify that.

9 Q.   Right.

10 A.   It's not literally just looking at the middle 99 or 95

11    percent or whatever, and saying is the enacted plan within.

12    That's certainly one thing that you can do.

13     But when I'm talking about statistical certainty

14    what I'm specifically talking about are basic statistical

15    tests that we would do to characterize a statistical

16    distribution.

17 Q.   Did you describe those statistical tests in your report?

18 A.   I described the results of them by saying --

19 Q.   Okay. It would be helpful if you'd listen to my question.

20    Did you describe those tests in your report?

21 A.   I only described the results of tests.

22 Q.   Right.

23 A.   I didn't describe, say, the underlying methodological

24    foundations of those basic statistical tests.

25 Q.   Okay. And would those differ in any way from the 95 percent

## Page 155

1    confidence interval test? Would they tell you something more

2    statistically?

3 A.   A moment ago when I told you I thought we were talking about

4    the same thing, then you asked another question and I

5    realized you were actually talking about something a little

6    bit different than the sort of statistical tests that I'm

7    referring to.

8     I'm happy to go into in it in some detail here if

9    you feel that's responsive. But I'll let you tell me what to

10    answer.

11 Q.   Well I'm trying to figure out exactly what you're

12    statistically certain about and maybe we can come back to the

13    test, right?

14     You're saying that your algorithm process was

15    nonpartisan, right?

16 A.   Yes.

17 Q.   Okay. And your algorithm process adhered to be statutory

18    criteria as you interpreted them or as Plaintiffs' counsel

19    told you to interpret them, right?

20 A.   As I operationalized them.

21 Q.   All right. And you are saying that that simulation is

22    the only way you could do a nonpartisan redistricting plan

23    not designed to enhance Republican representation?

24 A.   No, I'm not testifying to that, I'm not opining on that. I'm

25    not, say, coming up with an opinion to say here is an

## Page 156

1    exhaustive list of all the possible ways one could produce a

2    nonpartisan plan in compliance with these criteria.

3     I'm designing an algorithm as best as I can using

4    the criteria that's put forth to me, that's all I'm doing

5    here.

6 Q.   Right.

7 A.   I'm not giving you an exhaustive list of, say, if you had a

8    commission draw a redistricting plan it would or would not be

9    nonpartisan, or anything like that. I'm just describing my

10    own computer process.

11 Q.   And that is one subset of nonpartisan plans the way you did

12    it, but it doesn't exhaust the universe of nonpartisan plans,

13    right?

14 A.   Sure. Obviously I recognize it as possible for a human to go

15    out and draw a nonpartisan plan. And I'm not trying to

16    somehow deny that that is a possible way to draw a

17    nonpartisan plan.

18 Q.   For example, a plan that disagreed with your interpretation

19    to statutory criteria, but didn't consider partisanship,

20    wouldn't be captured by your simulated plans, right?

21 A.   Well to the extent that such a process might not be exactly

22    the same as what I programmed in the computer code, obviously

23    those could very well end up with slightly different

24    districting plans.

25 Q.   Sure.

## Page 157

1 A.   The point is obviously not that I am saying that this

2    computer code is the exhaustive list of all possible ways, as

3    somehow the only way that anybody could ever produce a

4    nonpartisan districting plan.

5 Q.   Okay. So then what is your statistical certainty analysis

6    based on, whether it's the 95 percent confidence, other than

7    a comparison of your simulated plans to the enacted plan?

8 A.   Well it actually just that, it's a comparison of a

9    simulated to the enacted plan.

10     Are you asking me about the methodology or are you

11    just asking me about the fact that I'm comparing simulations

12    to the enacted plan?

13 Q.   And that your levels of statistical certainty are based on

14    comparison of the simulated plans to the enacted plan, which

15    I think you just answered.

16 A.   It is. What I was trying to clarify a moment ago is that I

17    don't think you had quite correctly described the statistical

18    methodology by which I'm arriving at, say, the statement on

19    page 14 about 99.9 percent statistical certainty.

20     But I think you got it correct with respect to the

21    fact that I'm obviously comparing simulated plans to the

22    enacted plan.

23 Q.   Okay. Are you contending that the thousand simulations are a

24    random sample of all nonpartisan plans?

25 A.   I was not even interested in characterizing the whole

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 158

1 universe of all possible nonpartisan plans, especially if
2 they're not drawn pursuant to the criteria that I am building
3 into my computer code.
4 So that's not a question I would have been
5 interested in seeking to analyze.
6 Q. So you didn't use any of the methods that people could use to
7 figure out whether your thousand simulated plans are a
8 representative sample of all potential nonpartisan
9 redistricting configurations?
10 MR. YEAGER: Objection, assumes facts not in
11 evidence.
12 You may answer.
13 THE WITNESS: Okay. Compared to all possible
14 nonpartisan redistricting plans.
15 I don't know if your question is seeking to include
16 even plans that are not drawn with pursuit of the criteria
17 that I programmed into my algorithm. Obviously I was only
18 trying to produce the sort of plans that followed the
19 criteria as I've laid out in my computer code and as I've
20 described in my report.
21 So I'm not interested in, for example, the broader
22 set -- the broader universe of plans that are not drawn in
23 pursuit of these criteria. It's just not something I
24 analyzed.
25 BY MR. CARVIN:

## Page 159

1 Q. Okay. And all of your plans have fewer county and municipal
2 breaks then the enacted plan, right?
3 A. Are we talking about the Congressional?
4 Q. I'm actually -- you can look at them all, for the
5 Congressional, Senate and House.
6 A. Okay. And you're asking about county breaks, right?
7 Q. Is it true that the enacted plan has more county breaks in
8 all three plans than in your range of simulated plans?
9 A. I believe so, that's my recollection.
10 Q. Are you contending that they subordinated county breaks in
11 order to achieve partisan end?
12 A. I'm not really contending anything. I'm just reporting on my
13 findings and saying it seems clear from the findings that the
14 enacted plan, for each of these three enacted plans was not
15 drawn under a process like my computer simulation process,
16 that was in fact prioritizing the minimization of county
17 breaks. It's a statistical outlier in that nature.
18 I don't really read anything into it more than
19 that, which is to say that it clearly was not trying to
20 prioritize -- prioritize the minimization of county breaks
21 because there is clearly a difference between that and the
22 sort of computer-simulated plans that emerged.
23 Q. Okay. And I think you've clarified then that when you say
24 that the plan was driven by partisan intent, that inference
25 is based on the fact of the statistical difference between

## Page 160

1 your simulated plans and the enacted plans, right?
2 A. Right. I'm comparing the partisanship of the enacted to the
3 simulated plans.
4 Q. Okay. Did you look -- so let's go back, I guess, to page 40.
5 This would be helpful.
6 So again, we've been over this, the simulated maps
7 have 14 county breaks and the enacted plan according to you
8 has 17, right?
9 A. Yes. I see that row here.
10 Q. Did you compare the number of county breaks or any of the
11 other criteria in the enacted plan to the alternatives that
12 were proposed during the legislative process?
13 A. You're referring to the plans that the legislature drew
14 during the current decade's redistricting process, or
15 proposed?
16 Q. Either proposed by legislators or anybody else.
17 A. I'm not sure that I've ever had access to those maps or those
18 files. So to my recollection, I've not analyzed that
19 question.
20 Q. So you don't know whether or not the number of county breaks
21 and all the other criteria equal or exceeded the proposed
22 alternatives that were available to the legislature at the
23 time?
24 A. To my recollection, I don't believe I had the basis to answer
25 that question. I'm just -- I'm trying to remember as

## Page 161

1 accurately as I can.
2 It may have been that -- it may have been that
3 Plaintiffs may have mentioned something very general about
4 alternative plans that were proposed, but I certainly don't
5 remember myself going and analyzing any such alternative
6 plans.
7 Q. Okay. Have you analyzed -- assume with me that the map
8 drawers for the enacted plan thought that their plan had the
9 fewest number of county breaks, relative to all alternatives.
10 And that your computer algorithm came up with a different
11 way, a better way to minimize county breaks. Would you think
12 that that in any way reflects on the intent underlying the
13 legislature's plan?
14 MR. YEAGER: Objection, calls for speculation and
15 incomplete hypothetical.
16 You may answer.
17 THE WITNESS: Okay. In general I'm not an expert
18 on opining that sort of -- that sort of question because
19 obviously I don't have firsthand knowledge of what was on the
20 legislator's mind. I can't really go further than to give
21 you the general statistical conclusions that I've given you
22 obviously in my report here.
23 I would probably -- at the very least I would need
24 a lot more information.
25 I think you posed it as compared to the other

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 162

1    alternative plans that the legislature was considering, the
2    enacted plan had the fewest number of county breaks, and
3    obviously that's a big unknown there.  What were the
4    alternative plans?  Was there just one alternative or were
5    there a hundred?  And were those alternative plans drawn with
6    an effort towards minimizing the number of county breaks?
7         At a very minimum I'd need to know some answers to
8    those sorts of questions before I could really --
9    BY MR. CARVIN:
10   Q.   So you're really not opining on the partisan intent behind
11   these plans because you haven't examined these relevant
12   issues, right?
13   A.   Well that's not what I just said.
14        I am opining about the partisanship of the enacted
15   plan; but the basis, as I've said, the basis of my opining on
16   it is simply comparing it to these computer-simulated plans.
17   Obviously I've not gotten into the heads of the legislators,
18   figured out what they were considering or any alternatives
19   they were considering.
20   Q.   So you're not opining on their intent, you're simply opining
21   on the results as compared to your simulated plans, right?
22   A.   Well if you mean intent as in have firsthand knowledge of
23   what was in their minds, certainly I'm not.
24        I am opining to their partisan intent insofar as
25   I'm able to say this is the sort of enacted plan -- this

Page 163

1    enacted plan is the sort of plan that has a partisanship that
2    could not be explained or could not have reasonably been
3    expected to emerge from this sort of simulated districting
4    process that prioritizes these things.
5         That's the basis of me saying it seems like there
6    was some kind of partisanship here.
7    Q.   Right.
8    A.   So I mean whether you want to call that partisan intent or
9    not --
10   Q.   That's your phrase.
11   A.   Sure.  I mean I call it partisan intent because I'm
12   comparing --
13   Q.   Right.
14   A.   -- the sort of enacted plan that emerges from another process
15   that I am designing to be ignorant of partisanship.
16   Q.   Right.
17   A.   So I call it partisan intent.
18        I sort of understand that you're sort of meaning
19   something a little bit different when you're asking me about
20   legislators considering alternative plans.  And to the extent
21   that that's a different concept, obviously I'm telling you
22   that I have no firsthand knowledge of anything the
23   legislature -- the legislature was considering.
24   Q.   And your algorithm in all these plans were developed, what,
25   six, seven years after they had already voted on the plan,

Page 164

1    right?
2    A.   I'm not sure it was totally six years, but something in that
3    rough -- obviously several years.  I get your point.
4    Q.   Let me ask you a hypothetical.  In an employment context, the
5    employer hires a white person.  Five years later, a clearly
6    objectively better-qualified black person applies for the
7    job.  Would you infer that the failure to select the
8    objectively better-qualified black person reflects racial
9    intent?
10   A.   I mean obviously it's just going to be beyond my expertise to
11   tell you anything about racial intent in employment.
12        I understand your general point which is that that
13   second candidate was not available at the time of the
14   original hiring, I get where you're going.
15        But obviously I'm going to have to answer that it's
16   beyond my expertise to tell you anything about racial intent
17   and employment.
18   Q.   Okay.  So as far as you know your entire analysis of partisan
19   intent is directly analogous to somebody arguing racial
20   intent based on not selecting a better-qualified black
21   applicant who applied five years after the decision was made?
22        MR. YEAGER:  Objection, misstates the testimony.
23        You may answer.
24   BY MR. CARVIN:
25   Q.   You're not trying to distinguish my hypothetical from the

Page 165

1    analysis used in your report, right?
2         MR. YEAGER:  Same objection.
3         You may answer.
4         THE WITNESS:  I'm not agreeing with that at all,
5    obviously.  I simply said that I understand what you're
6    trying to say with that analogy.
7         I certainly didn't opine at all, and I'm not -- I'm
8    not opining that I think your analogy is completely the same
9    or really --
10   BY MR. CARVIN:
11   Q.   Well you are.
12        MR. YEAGER:  Let him finish.
13   BY MR. CARVIN:
14   Q.   Okay.
15   A.   All I really meant to say was that obviously I'm not agreeing
16   with your statement that those two are perfectly analogous.
17   Q.   Let me make it more general.  You are opining on the partisan
18   intent of the enacted plan: when you're analyzing intent,
19   partisan, racial or any others, the only relevant comparison
20   is between the alternatives available to the decisionmaker at
21   the time, right?
22   A.   No.  I mean obviously that's not the way I'm analyzing
23   partisanship here.
24   Q.   I know.  Can you give me an example of where you're trying to
25   discern intent, you use an example that was not available to

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 166

1    the decisionmaker to infer a negative intent?  We always
2    analyze it in terms of the alternatives reasonably available
3    to the decisionmaker at the time the decision was made, don't
4    we?
5    A.  I'm not qualified to answer that question.
6    Q.  Okay.  So if that is true, then whatever evidence is produced
7    by your plans that were created five years later, doesn't
8    shed any light on intent, correct?
9            MR. YEAGER:  Objection, incomplete hypothetical,
10   misstates the record.
11           You can answer.
12           THE WITNESS:  I'm obviously not agreeing with that.
13   BY MR. CARVIN:
14   Q.  But you're not disagreeing, are you?
15   A.  Well my answer to your previous question was that I'm just
16   not qualified to give you an analogy in another context
17   outside of my academic work, or my academic expertise here
18   with how I evaluate enacted and simulated districting plans.
19           You asked me if I could give you an analogy, I said
20   I'm not qualified to do that.  But I'm not really concluding
21   or giving an opinion drawing from that in any other way.
22   Q.  Your methodology in creating these simulated plans, is this
23   something you -- well how would you characterize the
24   methodology, I guess?  What are you trying to accomplish
25   here?  Is there any commercial or other analogs to what

## Page 167

1    you're doing?
2    A.  Are there commercial analogs to redistricting algorithms?
3    That was the question, right?
4    Q.  Yes.
5    A.  There is nothing quite literally the same, but the general
6    principle of drawing geographic boundaries using a computer
7    algorithm is certainly, I think, pretty widespread.  It's
8    commonly used in the commercial world.
9            I could probably give you a couple of very rough
10   examples off the top of my head if you'd like.
11   Q.  Sure.
12   A.  I'll give some very general examples.
13           Imagine if you are Fed Ex and you want to develop
14   -- UPS, really any shipping company, and you want to
15   develop delivery zones.  You deliver packages in, say, New
16   York City.  And obviously you're not going to have just one
17   driver working for you in New York City, you're going to have
18   hundreds of drivers.  You have to develop delivery zones.
19   You have to draw, in other words, maps that optimize on
20   something.
21           Now obviously those optimization criteria are not
22   the sort of redistricting criteria that we've been talking
23   about here today.  Those optimization criteria are probably
24   something like what sort of delivery zones would allocate
25   drivers in the most efficient way so that each of the hundred

## Page 168

1    drivers employed by Fed Ex in New York City has roughly the
2    same number of packages to deliver, roughly the same miles
3    that they have to drive, something like that.
4            I mean obviously I'm not characterizing it exactly
5    in a precise way, but you get the idea.
6            So Fed Ex has to draw delivery zone maps.  How do
7    they do that?  They wouldn't just have a human go in and draw
8    what looks to be a good idea.  They actually really, really
9    try to optimize those maps to try to save on things like fuel
10   efficiency, reduce the number of say left-hand turns that
11   drivers have to make throughout the day, all kinds of
12   logistical things.  Make it so that the driver can park
13   safely while they're delivering packages, that sort of
14   considerations.
15           And what a programmer in that kind of context is
16   trying to do is optimize a map by building in criteria.
17   There is probably not one perfect map, but certainly with
18   those criteria, some maps are definitely better than others
19   at achieving those criteria.
20           So that's the general idea.  I mean that's just one
21   random example of an industry application that's probably
22   pretty widely used.
23   Q.  Outside of your algorithms for redistricting, have you ever
24   taught or written about this optimization method?
25   A.  Have I ever taught or written about it?  Sure.  I write about

## Page 169

1    it quite a bit in my academic work.
2    Q.  Outside of the redistricting context?
3    A.  Well my academic work is outside of the redistricting
4    context.  The point is --
5    Q.  I know you wrote three articles that talk about the kind of
6    analysis --
7    A.  Or you're asking --
8    Q.  I'm saying more generally in terms -- go ahead.
9    A.  I think you're trying to ask if I use algorithms that
10   optimize something, but not redistricting.
11   Q.  Right.
12   A.  Not redistricting criteria.
13           No.  I mean it's my academic -- it's really one of
14   my core academic areas.  I specialize in writing about
15   legislative districting, political geography.  So this is
16   basically what I focus on.
17   Q.  But the optimization method itself is not something in,
18   anything that you've taught or opined on the correct way to
19   create samples, create random sort of samples?
20   A.  That is what I write about in my redistricting papers.  And I
21   think you're asking do I do any of that same sort of stuff in
22   any area of study outside of redistricting.  I think that was
23   your question.
24           And again, the answer is no.  I primarily write --
25   these days I primarily write about legislative districts and

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 170

1    about political geography.

2    Q.  And you've never been hired as a consultant outside of this

3    context on optimization methods more generally?

4    A.  On optimization methods?

5    Q.  The kind of thing you described with the Fed Ex, for example.

6    A.  Oh, yeah, I'm not a consultant for Fed Ex or any entity like

7    that.

8    Q.  Okay.

9    A.  If I were, I probably couldn't have given you that example.

10    Q.  Right.  So you've presented a number of analyses in your

11    report here of districts, particularly in the past elections,

12    right?  The 2006 through 2010 statewide elections, and the

13    2012 through 2016 elections.

14    My question is are you doing any analysis or making

15    any forecasts about results that will reasonably occur in

16    2018 or 2020 relative to the three offices at issue in this

17    case?

18    A.  I did not make any forecasts regarding specifically what I

19    expect to happen in 2018 or 2020, beyond generally just

20    analyzing the enacted districts.

21    Q.  Right.  But you're not making any predictions in terms of the

22    number of Republican congressman, Republican state

23    legislators that are going to be elected in 2018?

24    A.  Not beyond just generally analyzing the partisan of the

25    districts.  So I think I'm generally not trying to say, for

## Page 171

1    example, that somehow I think that in November 2018, the

2    Republican party will win three more House seats than it has

3    in the previous election, nothing like that where I'm making

4    a new prediction relative to past partisan performance,

5    nothing specific to 2018.

6    Q.  But even generally, you're not making any prediction about

7    whether or not Democrats will achieve at least proportional

8    representation in the Congressional delegation, Senate

9    delegation and House delegation in 2018 or 2020, right?

10    A.  Okay.  That's a little bit of a different question.  I

11    definitely am not analyzing whether either party will achieve

12    proportional representation in any election really.

13    Q.  All right.  And you're not making any predictions about

14    whether Democrats will achieve any level of representation in

15    the 2018 or 2020 elections with respect to the three offices

16    at issue?

17    A.  Again, only insofar as I've generally analyzed and reported

18    on the partisanship of the enacted districting plans.

19    Q.  Right.

20    A.  So I've generally characterized the partisanship of those

21    plans and obviously that is a characterization that could

22    apply in an election like 2018 or 2020.  But it's not a

23    characterization that is specific to 2018, as opposed to

24    2016, as opposed to 2014.

25    Q.  Well all your other things are backward looking, all the

## Page 172

1    analyses are of the elections that have already occurred.  My

2    question is are you inferring from what has occurred in the

3    past any predictions or statements to a reasonable degree of

4    professional certainty about what will occur in the 2018

5    elections under these redistricting plans?

6    MR. YEAGER:  Asked and answered.

7    You may answer.

8    THE WITNESS:  Like I said, all I'm doing is

9    characterizing the general partisan performance of those

10    districts.  That characterization is generally going to be

11    valid as -- if the districting plan continues to be in place.

12    BY MR. CARVIN:

13    Q.  So you are -- what do you mean by likely to be valid?  You're

14    saying that the numbers produced in 2018 will be very similar

15    to, identical to the numbers in your report?

16    MR. YEAGER:  Asked and answered.

17    You may answer.

18    THE WITNESS:  No.  I certainly am not predicting

19    that because -- I'll just throw out a random example.  I

20    calculated that in the enacted Congressional plan, using

21    recent past statewide election results, you can see that nine

22    districts favor Republicans and five favor Democrats.  It's

23    not saying that I'm specifically guarantying or predicting

24    that there will be exactly nine districts going for

25    Republicans in 2018.

## Page 173

1    It's a general characterization of the partisanship

2    of that districting plan which, if that districting plan is

3    still in place in November 2018, then it's still an accurate

4    characterization of that districting plan for the purpose of

5    2018, as it was for 2016, as it was for all earlier years.

6    It's just a characterization.  I'm not saying, for

7    example, that I think there is going to be a two percent

8    Republican tide in 2018 relative to 2016.  That would be I

9    think what an election specific prediction does.

10    BY MR. CARVIN:

11    Q.  I don't want to focus on the word specific.  Are you opining

12    on the likelihood of electing seven Democrats in the

13    Congressional delegation in 2018 based on all the numbers in

14    your report?

15    A.  Only insofar as in general, what I am opining on is that, for

16    example, the enacted Congressional plan is a nine-five plan,

17    meaning that what my opinion is is that the long-run average

18    is going to be, over any number of elections, is going to be

19    that an expectation that the Republicans will win nine

20    districts out of 14 in the Congressional plan.

21    Now I'm not characterizing that as a 2018 specific

22    prediction, but obviously you can see how that prediction

23    could cover the 2018 election year.  I just want to make that

24    distinction.

25    Q.  I'll ask you again.  What percentage likelihood is there of

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 174

1 electing seven Democrats in 2018 or 2020 based on your
2 analysis in this report?  Are you opining on that?
3          MR. YEAGER:  Asked and answered.
4          You can answer.
5          THE WITNESS:  I'm not arriving at a prediction to
6 say there is X percent probability that the Republicans will
7 win seven, Y percent probability that the Republicans will
8 win eight, nothing like that.
9          As I said, I'm characterizing the partisanship
10 which I take to mean -- to say that in the long-run
11 expectations Republicans are going to win in the enacted
12 Congressional plan nine seats and Democrats will win five.
13 BY MR. CARVIN:
14 Q.  The long-run expectation in this case is the 2020 elections,
15 you understand that, right?
16 **A.  Well I'm trying to analyze really all elections for a number**
17 **of years.**
18 **          And I understand that some of those are in the**
19 **past, and I appreciate your making this distinction that we**
20 **only have 2018 and 2020 ahead of us.**
21 Q.  Okay.  But you don't think that this litigation is going to
22 affect the 2018 elections, do you?
23 **A.  That's completely outside of my expertise.**
24 Q.  Do you have a calendar?  You don't really --
25 **A.  All right.  I'll grant you that we're pretty darn close to**

## Page 175

1 **November.  I'll go out of my way to agree with you on that.**
2 Q.  All right.  So all we're talking about 2020, that's the only
3 significance here.
4          I'll ask you again, do you have any general
5 analysis of the likelihood of electing seven Democrats under
6 the enacted plan in 2020?
7 **A.  Same answer as before.  What my numbers are saying is that in**
8 **general we expect the enacted Congressional plan, as an**
9 **example, to be a nine-five plan.  That's a general**
10 **expectation, and sure, you can apply it to the 2020.  And**
11 **that's how I intend for it to be used.**
12 **          Obviously, as I said before, I'm not specifically**
13 **giving you a predicted probability that the Republicans would**
14 **win seven as opposed to six as opposed to eight, nothing like**
15 **that.**
16 Q.  And you're not going to give me a predicted probability that
17 Republicans are going to win nine, right?
18 **A.  I'm not giving you a predicted probability.  All I'm telling**
19 **you is that in general there are nine Republican districts.**
20 Q.  As you defined it.  Okay.
21          Let me ask you about how you do define them.  If
22 you could turn to page 52 of your report, please?
23 **A.  Okay.**
24 Q.  And essentially what you're describing on these pages is you
25 analyzed the durability of the enacted plan's partisan

## Page 176

1 results through a uniform swing analysis.  Do I have that
2 straight?
3 **A.  Yes.**
4 Q.  And your uniform swing analysis was based on actual
5 Congressional elections or House elections or Senate
6 elections that occurred in the last six years, right?
7 **A.  In '12, '14 and '16, yes, so I guess that's -- well I get**
8 **what you're saying.**
9 Q.  You didn't base your uniform swing analysis on the numbers
10 produced by your collection of statewide races from 2006 to
11 2010 and 2012 to 2016, right?  You based it on the real world
12 endogenous elections?
13 **A.  I did not apply uniform swing to the statewide election**
14 **measure.**
15 Q.  Right.  You applied it to real world endogenous elections,
16 right?
17 **A.  I'll just state the real world legislative elections.  I'm**
18 **not going to guess what you mean by the term endogenous, but**
19 **I think we're obviously, we're talking about the actual**
20 **legislative elections that actually occurred in '12, '14 and**
21 **'16.**
22 Q.  Okay.  Just to be clear and maybe save some time, when I say
23 endogenous I mean elections for the office at issue as
24 opposed to exogenous elections for governor, etcetera.
25 **A.  Sure, I got you.**

## Page 177

1 Q.  All right.  And why did you do that?
2 **A.  Why did I analyze the uniform swing here with respect to the**
3 **so-called endogenous elections?**
4 Q.  Right.
5 **A.  Well I wanted to analyze the partisan durability of the**
6 **various enacted plans that I was analyzing.**
7 Q.  But when you were comparing the partisan results of the
8 enacted plan through 2016, you didn't use the real world
9 endogenous election results, you used this collection of
10 statewide races from 2006 -- 2012 through 2016?
11 **A.  Correct.  And obviously '06 to 2010 as well.**
12 Q.  Right.  Why would you use a different set of elections to
13 analyze the durability of a partisan gerrymander going
14 forward, than from whether, analyzing whether or not it was a
15 partisan gerrymander through 2016?
16 **A.  Well it's two different questions.  So I'll speak to the**
17 **durability here and I'm happy to go back to the simulation**
18 **analysis.**
19 **          But it's two different questions here.  What we're**
20 **asking when I'm trying to analyze partisan durability is to**
21 **say, let's suppose you applied a shock, an exogenous shock.**
22 **What sort of swing would it take to, say for example, flip**
23 **around the partisan control or even out the partisan control.**
24 **          It's just a completely different kind of question**
25 **based on actual partisan elections here in the recent past.**

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 178

1    I'm not -- with what I'm doing here, I'm not just
2    trying to characterize -- characterize, say, the enacted
3    plans in terms of their overall partisanship so that I can
4    directly compare it to the simulated plans.  When I'm looking
5    at durability here I'm not doing a direct comparison to the
6    simulated plans.
7        So we don't need to get out of the, out of the
8    realm of the individual districts and come up with a measure
9    of partisanship that can apply to alternative districts.
10   That's off the table here.
11       What I'm doing with durability is nothing but
12   looking at the actual districting plans.  So I'm able to use
13   the so-called endogenous elections because I don't have this
14   sort of issue of trying to come up with an apples-to-apples
15   comparison to simulated districting plans.
16   Q.  Right.
17   A.  So it's just two completely different sorts of analyses.
18   Q.  But if you were, wholly apart from the simulated plans,
19   trying to assess the partisan results of the enacted plan,
20   you would use endogenous elections.  The reason you're using
21   exogenous elections is because you need to compare the plan
22   to these thousand simulated plans.  Do I have that right?
23   A.  I will agree to qualify that's one of the reasons.  There are
24   other reasons as well, but that is certainly one of the
25   reasons.

## Page 179

1    Q.  Okay.  If you were just trying to figure out the partisan
2    effect of a redistricting plan, which is better, endogenous
3    or exogenous elections?
4        THE WITNESS:  If I could ask you to read that back.
5        (Record read:  Q.  If you were just trying to
6    figure out the partisan effect of a redistricting plan,
7    which is better, endogenous or exogenous elections?)
8        THE WITNESS:  The answer is it will depend on what
9    you mean by partisan effect.
10       What I'm trying to answer, which obviously I do in
11   my report, is what is the partisan difference --
12   BY MR. CARVIN:
13   Q.  Right.
14   A.  -- between an enacted plan --
15   Q.  I apologize for interrupting, I really do, but I want to
16   clarify my prior question.
17   A.  Okay.
18   Q.  You're making a very helpful distinction between the partisan
19   difference between an enacted plan and the simulated plans.
20       Now I'm asking you to say you're not examining that
21   question, the partisan differences, you're just simply trying
22   to figure out the partisan effect of the enacted plan in and
23   of itself.
24       In that circumstance, endogenous elections are more
25   probative than exogenous elections, is that right?

## Page 180

1    A.  No, I wouldn't necessarily say so.  Again, it's going to be
2    context dependent.  And there are some various reasons for
3    that and I'm happy to start listing out some of those
4    reasons.
5        But as a general principle, there is no one
6    election that is always going to be the perfect measure.  And
7    in general the reason I use statewide elections when I'm
8    measuring the partisanship of enacted plans and along with
9    the simulated plans, is because using more elections is more
10   helpful, more stable and gives us a more accurate indicator
11   of the long-run partisanship of a district.
12   Q.  What about -- I'm sorry.
13   A.  But to get back to using the endogenous elections, it could
14   be.  But it might not be.  It's really context dependent.
15       It could be that the endogenous elections are
16   really skewed by, say, biases that were present because of
17   the incumbents that were already in place elected from the
18   previous decade's plans.  Those things could skew the mere
19   use of endogenous elections in evaluating the current
20   decade's plan.
21       The point is just that nothing is perfect, and it's
22   context dependent.
23   Q.  What is a better predictor of the results -- the results in
24   the Congressional elections of 2018 and 2020, the results in
25   the Congressional races for 2012 through 2016, or exogenous

## Page 181

1    elections for other offices during that time period?
2    A.  Which is better for the purpose of predicting 2018 to 2020
3    results?  It really depends.  It could be the case that
4    endogenous elections are a more accurate predictor, but
5    that's not necessarily the case.
6        It's context dependent because using endogenous
7    elections brings in inevitably a large number of factors that
8    are not necessarily always going to be present in those same
9    districts.
10       So if there are drastic shifts in say a partisan
11   tide that was present in 2016 that's not present in 2018,
12   that could affect things.  If there were campaign finance
13   differences, if there were incumbency differences, all those
14   factors could mean that using statewide elections is actually
15   a better predictor.
16   Q.  Have you ever written an article on what is a better
17   predictor for the last -- for future elections, the results
18   in prior endogenous elections in the same districts or
19   exogenous results?
20   A.  Let me make sure I understand the question.  Have I ever
21   written an article in which I'm specifically comparing
22   statewide elections versus endogenous elections?
23   Q.  Sure.
24   A.  That's the question?
25   Q.  Yes.

## Page 182

1    A.  Let me think.  I can't recall an article where that was the
2        specific focus of the article was to compare these two
3        methods and to say one is better in these cases or the other
4        is better.
5    Q.  Can you cite me an article that contends that exogenous
6        elections are better predictors of future results in those
7        offices than exogenous elections?
8    A.  Can I cite any academic article that has tried to show using
9        exogenous elections is superior?
10   Q.  Yes.
11   A.  I'm going to try off the top of my head.  I'm generally aware
12       that that's been the subject of some study in the literature,
13       and there is a paper by Simon Jackman, and I believe two
14       co-authors that gets at that question.  And they settle upon
15       using some kind of statewide election.  I believe they settle
16       upon using something like a presidential election based
17       method of predicting Congressional election outcomes.
18           And I think it's limited to just Congressional, not
19       state legislative predictions.
20           It was Jackman and two other authors, I can't
21       remember off the top of my head right now.  I think one of
22       them was Josh Clinton, but I'm kind of blanking on who the
23       last one was.
24           So I'm generally aware of that kind of literature.
25   Q.  Okay.  If you could turn to page six of your report?

## Page 183

1    A.  What page?
2    Q.  Six.  I'd like to direct your attention to the first --
3        second full sentence.  You say, statewide elections are thus
4        a better basis for comparison than the results of legislative
5        elections such as U.S. House and state legislative elections,
6        because the particular outcome of any legislative election
7        may deviate from the long-term partisan voting trends of the
8        constituency, due to factors idiosyncratic to the legislative
9        district as currently constructed.  Right?
10           So you think that the outcome of legislative
11       elections at issue in this litigation may deviate from the
12       long-term partisan voting trends that are reflected in the
13       statewide elections, correct?
14   A.  Like I said earlier, that's always a factor.  Or there are
15       always many such factors when we're looking at legislative
16       election races.
17           And just as a very general principle, like I'm
18       stating here, when we look at a large number of statewide
19       elections, and very often there is more than one statewide
20       election in a particular election year, we get greater
21       stability in our understanding of the partisanship of a
22       particular district.
23   Q.  Right.  And you list legislative specific factors that affect
24       outcomes in the real world, right?  The presence or absence
25       of a quality challenger, anomalous differences between the

## Page 184

1        candidates and campaign efforts, or campaign finances, and
2        incumbency advantage.  Those are the kinds of factors that
3        affect election outcomes in the real world, right?
4    A.  Yes, that's what I said here.
5    Q.  And your analysis of the statewide election doesn't pay any
6        attention to those real world factors that affect elections
7        in the real world, right?
8    A.  No.  That's not true at all.  Obviously these factors, at
9        least some of these factors, are present in any set of
10       statewide election results, or at least they can be present.
11   Q.  All right.  Let's take them one at a time.  You're saying
12       that incumbency advantage is factored into the results for
13       the university and board of trustees in the districts you're
14       analyzing?
15   A.  I'm not specifically saying that about the university board
16       elections.
17   Q.  All right.  Any of the statewide elections don't factor in
18       the House, Senate or Congressional incumbent in their
19       election results?
20   A.  Oh, okay, I get what you're going.  You're going to something
21       a little bit different than what I was thinking about.
22           So all I really meant with my previous statement
23       there was that as a very obvious matter, in a race for the
24       U.S. Senate or the state governor, the incumbency of the
25       current officeholder of that office, obviously can be a

## Page 185

1        factor.  And I'm just admitting that, sure, some of these
2        factors are present too in statewide elections.
3           I obviously didn't mean to imply that what you were
4        kind of getting at which is that somehow the State Senator
5        being an incumbent from State Senate -- State Senate District
6        number five would affect the Michigan gubernatorial race, or
7        how much it would affect.
8           Obviously what I'm talking about is the incumbency
9        of the officeholder in those statewide elections.
10   Q.  Right.
11   A.  And obviously I'm saying that things like campaign finance
12       can certainly affect statewide elections.
13   Q.  Yes, I know.  But when you're analyzing legislative elections
14       on the basis of statewide elections, you will not look at
15       either the incumbent in the district, how well financed he is
16       or the quality of his challenger, none of that will be
17       factored in?  All of those factors will be factored in if you
18       looked at prior elections for the office in the real world
19       district, right?
20   A.  And just to clarify, you're now going back to my statewide
21       measure analysis of the enacted and the simulated plans --
22   Q.  Correct.
23   A.  -- when you're asking that.  Okay.  I get where you're going
24       now.  Obviously I acknowledge that's true.
25           All I'm doing here is adding up the number of

## Page 186

1  Republican and Democratic votes in those statewide elections.
2  I'm not, say, adding a two point boost for a really good
3  campaign fundraiser or something like that.
4  Q.  Nor are you looking at the elections in those districts which
5  included factors such as incumbency, campaign finance and the
6  like?
7  A.  I simply just measured the partisanship with respect to those
8  statewide elections.
9  Q.  Okay.  In North Carolina, in addition to the analysis based
10  on statewide races, you analyzed the simulated plans based on
11  vote shares generated by a regression model that controlled
12  for incumbency and turnout, did you not?
13  A.  Yes, that's correct.
14  Q.  And incumbency and turnout will effect elections in the real
15  world?
16  A.  Well I can characterize my findings in North Carolina, which
17  was that obviously I produced a regression model --
18  Q.  I'm not asking about that.
19  A.  Okay.
20  Q.  I'm asking, does incumbency affect elections in the real
21  world?
22  A.  Okay.  You're just asking as a very general question.
23  Q.  Yes.
24  A.  And my answer is in general we know it does, obviously there
25  is variation in when it does.  But in general.

## Page 187

1  Q.  And turnout affects elections in the real world?
2  A.  Does incumbency affect turnout?
3  Q.  No, does turnout affect election results?
4  A.  Oh, sure.  I mean obviously the relative turn out of
5  Democrats and Republicans in any particular election is
6  obviously going to have influence on who wins.
7  Q.  And you didn't do any similar analysis in this case like you
8  did in North Carolina, is that true?
9  A.  Oh, that's not true at all.  I mean if you'd like to ask me
10  about something specific --
11  Q.  Maybe I misunderstood.  You did --
12  A.  I think you were trying to ask specifically about the
13  regression model.
14  Q.  Yes, did you do a regression model like the one I described
15  in North Carolina in this case?
16  A.  I got you.  And the answer to that question is here I did not
17  do that sort of regression model, I just counted on the
18  statewide election votes.
19  Q.  Okay.  And then if you turn to page ten of your report,
20  well, you breakdown these components into 2012 -- 2002 to
21  2016, and 2006 to 2010, right?  You present them both ways?
22  A.  2006 to 2010 then '12 to '16.
23  Q.  Yes.  And which is more probative of those two, if either?
24  A.  That's not a question that I directly tried to pit one
25  against the other, and tried to adjudicate between the two.

## Page 188

1  In general they're both indicative of the
2  underlying partisanship of the districts.
3  Q.  But you haven't made any analysis or determination as to
4  which of the two sets is more probative of the partisan
5  constituency of the plan?
6  A.  No.  Other than to generally see that they are both pretty
7  highly correlated with the overall partisan performance of
8  the districts during this decade.
9  I didn't, say, calculate whether one produced a
10  slightly higher correlation than the other, other than to
11  generally figure out that they were in fact -- they seemed to
12  be strongly correlated.
13  Q.  Okay.  You say that using recent past statewide elections has
14  been an extremely accurate predictor of actual legislative
15  outcomes in the enacted plan.  Correct?
16  A.  Maybe you could just orient me.
17  Q.  I'm sorry, the second paragraph.  I find that overall, using
18  past statewide elections has been an extremely accurate
19  predictor of actual legislative election outcomes in the
20  enacted plan's districts.
21  A.  Yes, I see that sentence.
22  Q.  Okay.  And then you go on and you say that it's been accurate
23  in Congress because the statewide elections predict nine
24  Republican seats, and that's what happened in the real world.
25  Right?

## Page 189

1  So you got the number -- the statewide elections
2  predict the number of Republican seats in the Congressional
3  elections, right?
4  MR. YEAGER:  Objection, incompletely states the
5  document.
6  You may answer.
7  THE WITNESS:  What I'm reporting here is that there
8  are nine districts that, using the statewide elections, are
9  favoring Republicans over Democrats in both the 2006 and
10  2010, as well as the '12 to '16 statewide elections.  And I
11  can see that obviously nine districts are the same ones
12  that have been electing Republicans.
13  BY MR. CARVIN:
14  Q.  And you would count a Republican district as anything that's
15  a 50.1 percent district under the statewide, correct?
16  A.  That's correct.  I'm simply characterizing them as having
17  more Republican votes or more Democratic votes as a share of
18  the total summed up aggregated two-party votes across all
19  those statewide elections.
20  Q.  So you would equate a 51 percent Republican district as a
21  Republican district, as well as a 65 percent Republican
22  district?
23  A.  I wasn't really equating them other than saying I'm
24  characterizing them as Republicans.
25  Q.  Right.

Deposition of Jowei Chen - 9/7/2018

League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 190

1   **A.   So I guess you could say they were given characterizations**
2   **that were the same.**
3   Q.   What I'm trying to figure out is did you ever look at how
4   close the real world percentages were to the statewide
5   percentages in the individual districts?
6   **A.   Okay.  I see, you're asking if I ever took the difference**
7   **between the results in the endogenous election, and the**
8   **aggregated partisan vote share in the exogenous statewide**
9   **elections.**
10   **To my recollection, I can't specifically remember**
11   **doing that here in this report.  I certainly don't recall**
12   **reporting such numbers here in this report.**
13   **It's something I've generally studied as a**
14   **political scientist in my academic work.**
15   Q.   But you didn't do it here?
16   **A.   I don't recall specifically reporting it here.**
17   Q.   It's not in your report?
18   **A.   I don't recall it being in my report.**
19   Q.   Okay.  And even with respect to whether or not the same
20   results occur in terms of whether a seat is Republican or
21   Democratic, with respect to the House, if you'll go to the
22   last paragraph, you predict in your amalgam of races that the
23   State House elections would be 61 Republicans, right?
24   **A.   I'm basically just counting up and reporting that, yeah, it's**
25   **61 districts that have more Republican than Democratic votes**

## Page 191

1   **during the '6 to '10 and the '12 to '16 elections.**
2   Q.   And that's under both the 2006 to 2010 elections and the 2012
3   to 2016 elections, right?
4   **A.   I see that right there, yes.**
5   Q.   And in the real world there has never been 61 Republicans in
6   the House in 2012, 2014 and 2016?
7   **A.   I can see here in the next sentence that it's basically right**
8   **around 61, it's 59, 63 and 63.  In other words all clustered**
9   **right around 61.**
10   Q.   Right.
11   **A.   Obviously never exactly 61, not one more or one less.**
12   Q.   And every year you were off by at least two seats when you
13   compared the statewide election results that you came up with
14   and the real world elections for the House, right?
15   **A.   Yeah.  I guess you could say 59 is two below and then 63 is**
16   **two above.**
17   Q.   And you consider that an extremely accurate predictor, being
18   within two House seats?  You think that's an extremely
19   accurate predictor?
20   **A.   Well in general when we're predicting, say, state legislative**
21   **districts, from my experience having used similar sorts of**
22   **statewide elections in other states to predict legislative**
23   **elections, this sort of accuracy is about what we expect.**
24   **I mean obviously the point is that not every**
25   **single -- we would never expect -- it would be shocking to**

## Page 192

1   see if over the course of a decade every single State House
2   race produced exactly 61 or 55 districts favoring Republicans
3   with never a deviation.  One would start to probably question
4   the legitimacy of election results if they were that
5   predictable.
6   But the point is that we expect in general to have
7   around 61 out of 110 districts favoring Republicans.  And
8   from the '12, '14 and '16 results that's basically what we
9   see.  They're all clustered right around 61 out of 110.
10   Q.   So you don't expect -- or you do expect to be off by say two
11   seats based on your statewide analysis in terms of predicting
12   election results?
13   A.   I wouldn't say it's in general we expect to be wrong by
14   exactly two seats.
15   Q.   In other words, it wouldn't surprise you?
16   A.   Well, it depends.  In general we obviously know that
17   statewide legislative election results ebb and flow along
18   with whatever partisan tides are going on at the time.
19   So if in 2016 the Republicans have an especially
20   good year, we expect that number to be a little bit above 61.
21   In 2012 when you've got President Obama on the ballots and
22   the Democrats have a relatively good year, we expect that
23   number to be a little bit below 61.  In an even year you
24   might expect it to be closer to the expectation.
25   But the point is that we expect there to be some

## Page 193

1   kind of fluctuation naturally because obviously partisan
2   tides, and obviously other idiosyncratic factors is
3   something that's a constant in these sort of elections.
4   Q.   What would you expect in 2018 in the Congressional elections?
5   A.   Oh, I'm not the sort of forecaster --
6   Q.   But you're a political scientist --
7   A.   But I'm not --
8   MR. YEAGER:  Wait, wait.  We're going to have
9   questions, and we're going to have answers.
10   Professor, let's wait until he asks a question.
11   Please ask a question.
12   THE WITNESS:  I get --
13   MR. YEAGER:  Wait until he asks a question.
14   THE WITNESS:  Okay.
15   MR. YEAGER:  Is there a question on the table?
16   BY MR. CARVIN:
17   Q.   Historically how does the president's party do in the
18   following off-year elections in Congress, better or worse
19   than prior elections?
20   A.   If I could ask, in the following off-year?
21   Q.   Yes.
22   A.   Oh, in the second year of the president's term?
23   Q.   Yes.
24   A.   I'm going to start by qualifying this is not the sort of
25   thing I study.  I don't study political election history, I

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 194

1  don't study historical election results.

2      It is sometimes certainly the case that the

3  president, that the president's party doesn't do as well in

4  the second term -- I'm sorry, in the second year of the

5  president's first term.  But that's not always an absolute.

6  That's a very, very general pattern with lots of exceptions.

7      And more broadly the point is that I'm not an

8  expert in election forecasting.  I'm not the sort of

9  political scientist who tells you that I think that Trump's

10  approval rating is going to translate to a particular

11  performance by Republican or Democratic candidates this

12  November.  That's just not the sort of expertise I have or

13  do.

14  Q.  You're not an expert in what will happen in upcoming

15  elections?

16  A.  Well again that's not quite accurate.  The point is that

17  election forecasters make specific predictions about specific

18  upcoming elections using things like polling data, surveys.

19      I'm able to still characterize the general

20  partisanship of a district or a state jurisdiction, and say

21  over the long term here is what we expect the partisan

22  performance of that district to be.

23      But I'm not the sort of election forecaster who is

24  able to look at a bunch of polls and somehow define these

25  poll numbers are going to translate into really good news for

## Page 195

1  the Republicans or something like that.

2  Q.  So you're not even an expert in making general predictions

3  about the composition of the Congressional or State Senate or

4  State House delegations?

5      MR. YEAGER:  Objection, asked and answered.

6  Misstates the testimony.

7      You may answer.

8      THE WITNESS:  Okay.  That's not what I said, and

9  that is not what I said earlier.

10  BY MR. CARVIN:

11  Q.  Well if you can't forecast specific cases, how in the world

12  can you forecast the general composition of the delegation?

13      MR. YEAGER:  Hold on.  You interrupted the last

14  answer, do you want to withdraw that question?  Or do you

15  want him to answer the rest of the question, the prior

16  question?

17      MR. CARVIN:  Go ahead and answer the question.

18      MR. YEAGER:  The prior question?

19      MR. CARVIN:  Whatever will get us through this

20  quicker.

21      After you filibuster, please answer the question.

22      MR. YEAGER:  Let's stop and take a break.

23      (At 3:32 p.m. went off the record.)

24      (At 3:41 p.m. went on the record.)

25      MR. CARVIN:  Back on the record.

## Page 196

1  BY MR. CARVIN:

2  Q.  Again, I think we left off when we were at page ten of your

3  report.

4  A.  Okay.

5  Q.  And under both your 2006 to 2010 and your 2012 to 2016

6  statewide elections, you assessed that there would be 24 of

7  the 38 districts would have more Republican votes, correct?

8  A.  I see that there, yep.

9  Q.  And then in the real world, the Republicans won 27 seats?

10  A.  Correct.

11  Q.  So again, your analysis based on the statewide elections was

12  off by three votes in a what, 38-seat body, right?

13  A.  From the math there, that's the difference between 27 and 24.

14  Q.  Right.  Three seats is a lot in a 38-seat body, isn't it?

15  A.  It really depends on the context.  And the point is not that

16  if you have one election, that you will somehow predict there

17  to be exactly the number of Republican victories as what the

18  statewide elections would have favored.  That's not the point

19  at all.

20      As I said, when we construct, say, a partisan

21  measure using a long range of statewide elections, it's a

22  long-run expectation.  You expect that over several

23  elections, some will inevitably be a Republican tide, some

24  will inevitably be a Democratic tide, and some will be more

25  even.  But over the long run in expectation there are 24

## Page 197

1  districts that are -- 24 districts is what's most likely to

2  emerge in expectation.

3      That's not making a specific prediction that I know

4  with some degree of certainty that it will be exactly 24 in

5  any particular election.

6      So in other words it doesn't surprise me at all

7  that you can have one election and the deviation from the

8  number 24 could be three.  That's really just to be expected.

9  Q.  So it wouldn't surprise you at all in one Senate election if

10  your predictions based on the statewide analyses was off by

11  three seats, right?

12  A.  I think that's just what I said is that it's really not at

13  all surprising to see that you have election results that,

14  over several elections, cluster around the predicted number

15  which in this case is 24.

16      So clustered around means that there is inevitably

17  going to be some deviation.

18  Q.  Hum-hum.  And that deviation might well occur in 2018 or 2020

19  as far as you know?

20  A.  Yeah.  The same caveats, that I'm not making any specific

21  prediction about 2018.

22      Obviously there is no such thing as saying we can

23  take this statewide measure and say with accurate certainty

24  that the Republicans will win exactly 24 and no more or no

25  less.  That's not the point of measuring the partisanship

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 198

1    using statewide elections like this.

2    Q.   You used efficiency gap and mean-median differences, at least

3    a robustness check on your partisan skew analysis, right?

4    A.   I used them to look at the partisanship of the districting

5    plans.  They are generally robustness checks.

6    Q.   I thought that's how you characterized them.

7    A.   I'm affirming that they are robustness checks.

8    Q.   Okay.  Is there a generally accepted viewed in the political

9    science community about what efficiency gap scores

10   constitutes an extreme or unacceptable partisan bias?

11   A.   I'm not going to characterize -- I'm not sure I'm in a

12   position to characterize the entire literature in the entire

13   political scientist field.

14        Obviously I'm aware that some people have opined

15   about what constitutes an extreme efficiency gap.  It's not

16   something that I take a particular opinion on.  Obviously I'm

17   aware that some others have, and I'm clarifying that I am not

18   taking an opinion.

19   Q.   So it's not a consensus or well-accepted view, it's

20   individual opinions about this?

21   A.   I'm not sure I surveyed the field enough to say for sure

22   whether there is something approaching a consensus.  I'm just

23   not really in a position to do that kind of survey and tell

24   you what the field thinks.

25        Like I said, some people think there is some

## Page 199

1    particular threshold that that person thinks is extreme.  I'm

2    not sure if that's the exact characterization that some

3    people would use and obviously others don't.  I'm

4    acknowledging there is a diversity of opinion.

5    Q.   Can you give me an example?

6    A.   Can I give an example?

7    Q.   Of a number that somebody thinks --

8    A.   Oh, of a number?  I don't want to make something up off the

9    top of my head.  I'm generally aware that some scholars have

10   cited an actual percentage.  And I can't accurately attribute

11   to somebody a precise percentage off the top of my head.  But

12   I'm aware that's been done in different forms.

13   Q.   I can ask you the say questions for the mean-median

14   difference, and I will.  Is there any consensus or

15   well-accepted view about what constitutes an unacceptable or

16   extreme mean-median difference score?

17   A.   Not that I'm aware of.  I think there are recognized methods

18   of -- there are recognized methods of arriving at a way to

19   quantify what might be an extreme mean-median, just as

20   certainly there have been approaches used to try to quantify

21   what sort of efficiency gap one might expect in a particular

22   state.

23        I think sometimes those can be context or geography

24   dependent.  But I'm not aware of any, say, broad consensus

25   that a mean-median gap over X percent is somehow, some sort

## Page 200

1    of an outlier or red flag automatically by virtue of being

2    above X percent.

3    Q.   I can give you examples, but in your report you use the words

4    Democratic districts have been packed and cracked.  And I'm

5    just trying to get your definition of those terms.  What's

6    your definition of a packed district?

7    A.   So because you're talking about when I use those terms at the

8    end of my report, right?

9    Q.   Certainly at the end, but I think there was a couple of

10   occasions before that.  But regardless --

11   A.   Okay.

12   Q.   -- what's your definition

13   A.   Of packing and cracking, okay.

14        I'll give you my best shot.  I'll qualify in

15   general that by saying that as a political scientist I don't

16   understand those terms to mean anything precise in any

17   academic sense.  Meaning that there is no standard or set

18   political science definition of how do you quantify what

19   rises to the level of clear cracking or packing.  There is

20   just not an objective scientific definition of that.

21        And so when I use the term cracking and packing,

22   those are terms that are really just borrowed from what

23   people use colloquially, from what the popular press uses,

24   from what journalists use.  Obviously journalists use those

25   terms.

## Page 201

1        And I generally understand what the popular media

2    means when it uses those terms.  Again, I don't have a

3    precise academic objective definition of crack and packing.

4    But I tried to operationalize that in the context of my

5    analysis here by taking what I understand others to mean by

6    those terms, by the terms crack and packing.

7        So I'll give you now my best shot at explaining how

8    I operationalized and defined those terms here in my report.

9    So I just wanted to make all those qualifications first.

10        What I call a -- we will just start with packing.

11   What I operationalize a packed district to be, and again this

12   is just my best shot at trying to put an operation to what

13   others mean by the term, is to say if there is a district

14   that is a certain percentage Democratic vote share, just as

15   an example, and it's an enacted district, and it has a

16   certain percentage Democratic vote share, and then I go look

17   at alternative computer-simulated districting plans, and look

18   at the same district in that same geographic area, as the

19   enacted district, and I look at several simulated districts

20   in that same geographic area, and I look at the partisan vote

21   share, the Democratic vote share of those alternative

22   computer-simulated districts, and I see that the vast

23   majority of those alternative computer-simulated districts in

24   that same geographic area are less Democratic leaning, have a

25   lower Democratic vote share, in other words, a higher

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 202

1    Republican vote share, than that enacted district, that I
2    just for shorthand call packed.
3         Again, not a scientific term in any way, just
4    trying to operationalize it.
5    Q.  I'm confused.  You're saying that if the alternative plans
6    have a lower Democratic percentage, then anything above that
7    percentage is packed?
8    A.  No.  I got it backwards.  And I apologize if I misspoke and
9    mislead you there.  I'll put some actual numbers to try to
10   make this clearer.
11        So let's suppose that the enacted district number
12   one, hypothetical district, has a 70 percent Democratic vote
13   share.  And then we look at the computer-simulated districts
14   in that same geographic area, covering the same geographic
15   area, and they all have lower than a 70 percent Democratic
16   vote share, that I just label packing.
17   Q.  All right.  Let's assume district one has got a 53 percent
18   Democratic vote share, and all the alternatives are at 52.
19   Are you arguing that the 53 percent is a packed district?
20   A.  If it's one thousand out of one thousand, I'm applying that
21   same shorthand label packing.  It's just a purely
22   mathematical operationalization.
23   Q.  So any time an enacted plan in this case has a higher
24   Democratic percentage than the simulated plans, it's a packed
25   district?

## Page 203

1    A.  Than virtually all the simulated districts in that same
2    geographic area, I'm labeling that packing.
3    Q.  And that's for above 50 percent.
4         For below 50 percent, is the district cracked when
5    the enacted plan has a lower Democratic percentage than the
6    simulated plans?
7    A.  Let me -- if I could, let me just review my report and I want
8    to make sure I get this absolutely right, so if you could
9    allow me a moment.
10   Q.  Yes.
11   A.  Okay, thank you for that.
12        Yeah, I think your characterization there was --
13   basically I'm going to put it in my own terms to make sure I
14   got it right, but I think this is the same thing as what
15   you're saying.
16        So for cracking, what we're describing here is if
17   there was a district where, and I believe I used 95 percent,
18   if 95 percent of the simulated districts are on the other
19   side, in terms of partisan vote share, then it's
20   characterized as, with the label crack, cracking.
21   Q.  Just to be clear, when you say on the other side, you don't
22   necessarily mean that the seat switches, but are on the other
23   side in terms of the higher Democratic percentage?
24   A.  Correct.  I'm not necessarily saying anything about the seat
25   flipping above or over 50 percent.  It's purely relative to

## Page 204

1    the enacted district comparison.
2    Q.  So you would call any Democratic district cracked at 48
3    percent if the middle 95 percent was 48.5 or higher?
4    A.  Right.  The 50 percent cutoff that I think you're thinking
5    about, that's not relevant here.
6    Q.  No, but can you answer my question?
7    A.  Sure, I apologize.  That's right.
8         I mean you're just looking at whether there are,
9    say, something like 95 percent or more of the simulated
10   districts that are all on one side or the other.
11   Q.  Okay.  So you're using packed and cracked in a very specific
12   way that applies only to your simulation analysis.  You're
13   not using it in the way that's used in most political science
14   literature, is that what I understand?
15   A.  Well I'm not going to try to characterize how, quote, most
16   political science literature uses it.  I don't have the basis
17   for answering that.
18        I am acknowledging that this is an
19   operationalization of the cracking and packing terms that is
20   specific to my analysis here.
21   Q.  Do you have an understanding of how the term is generally
22   used in political science, packed for example?
23   A.  Well the reason I gave that caveat, that long caveat at the
24   beginning, I'm saying look, I don't understand the terms
25   packing and cracking to mean anything very precise in

## Page 205

1    political science literature.  I'm obviously aware that other
2    scholars have used it before in academic literature, and I've
3    seen it used in slightly different ways and slightly
4    different contexts.  And to my knowledge or at least to the
5    extent of my expertise, there is not a single objective
6    operationalizable, clearly understood in a scientific manner
7    objective definition of exactly what packing and what
8    cracking is.
9         That's why I gave that very long caveat just to say
10   that what I'm trying to do is just to understand how I think
11   it's popularly used and do my best shot at applying it here.
12   Q.  Do you have a view on what constitutes a competitive
13   district?
14   A.  I don't really have a precise definition.  Again same answer
15   there, I'm aware that --
16   Q.  What would you say the most accepted view in the political
17   science literature is?
18   A.  I really couldn't say.
19   Q.  Would you say 45 to 50?
20   A.  I really couldn't say whether that's somehow the most
21   accepted viewed or not.  I mean I'm generally aware that
22   people have tried to quantify it, but I really couldn't give
23   any sort of informed, precise answer, other than to say
24   obviously I know in the literature people do try to quantify
25   competitive --

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 206

1  Q.  40 to 60, would that be a potential definition of
2  competitive?
3          MR. YEAGER:  Asked and answered.
4          You can answer.
5          THE WITNESS:  Same answer as before.  I'm aware
6  that people have tried to operationalize it by saying
7  something like is this a district that is within X to Y
8  percent of a 50/50 line, something like that.  I'm generally
9  aware that people have tried that.
10         I'm just not comfortable saying that there is any
11  sort of real consensus on the one right way to do it.
12  BY MR. CARVIN:
13  Q.  All right.  If you could turn to page 17 in your report,
14  please.
15  A.  Okay.
16  Q.  The top table, and this reflects the 2006 through 2010
17  statewide elections?
18  A.  Yes.  I see that.
19  Q.  And 32 percent of the simulated maps produce an eight
20  Republican, six Democratic plan for Congress?
21  A.  I see that there, yes.
22  Q.  Okay.  And let me see.  And 77.8 percent produce a plan with
23  at least seven Republicans?
24  A.  I think you're adding up -- sorry, I believe you're adding up
25  45.3 and you're adding 32 to that, so that's 77.3 percent.  I

## Page 207

1  agree with your math.
2  Q.  All right.  So if the enacted plan had produced an
3  eight-Republican delegation, that would not have been a
4  partisan outlier?
5  A.  I didn't do that analysis.  I'm happy to tell you how I would
6  do that analysis in terms of statistical tests.  But I'm just
7  clarifying that I did not analyze that hypothetical.
8  Q.  Okay.  Okay.  But it would be consistent with 32 percent of
9  the plans that were produced without any partisan intent,
10  right?
11  A.  In your hypothetical where the enacted plan is an eight-six
12  plan, right.
13  Q.  Right.
14  A.  Sure.  I mean obviously by definition you're saying would
15  that enacted plan have the same number of Republican seats.
16  Q.  And maybe I am misunderstanding your terminology.
17          Are you saying that if it had, if the enacted plan
18  had predicted an eight Republican seat delegation, you would
19  consider that a partisan outlier based on 2006-2010 statewide
20  elections?
21          MR. YEAGER:  Asked and answered.
22          You can answer.
23          THE WITNESS:  Yeah, I said that I did not do that
24  analysis.
25  BY MR. CARVIN:

## Page 208

1  Q.  Right.
2  A.  I'm happy to -- maybe this isn't responsive to your question,
3  but I would be happy to walk you through and explain
4  statistically how I would analyze such a hypothetical
5  question.
6  Q.  Well I'm just asking in lay terms because it's getting really
7  late and I really don't want to go into extended discourse.
8  How can something that conformed to 32 percent of the
9  nonpartisan plans be viewed as a partisan outlier?
10  A.  Well, okay, you're basically asking me how I would analyze
11  it.  And I'm happy to explain that.
12          So as I said some time ago, what I do when I
13  compare the enacted plan to the computer-simulated plans with
14  respect to any of these measures, and earlier we talked about
15  a compactness measure and now we're referring to a
16  partisanship measure, I would do a statistical confidence
17  interval.  And that's constructed by something called --
18  Q.  I understand.
19  A.  I won't keep going.  I'll stop answering.
20  Q.  Back at the envelope, do you really think this would be
21  outside the 95 percent confidence interval, eight Republican
22  seats?  Honestly, do you really think that could happen with
23  32 percent of the simulated plans coming out --
24          MR. YEAGER:  Incomplete hypothetical, asked and
25  answered, and vague and ambiguous.

## Page 209

1          You may answer.
2          THE WITNESS:  My answer is I won't speculate
3  without doing the calculations.
4          It's not as simple as saying, look, there are 32
5  plans that are at eight, therefore it couldn't possibly be
6  outside of let's say a 95 percent confidence interval.  It's
7  a little bit more involved in the statistical test than just
8  that.
9          I'm happy to go into that, but I don't think you
10  want me to so I won't for now unless you ask me to.
11  BY MR. CARVIN:
12  Q.  So let's stay with this.
13          Do you know what the statewide Democratic vote was
14  for year 2006 to 2010 statewide elections?
15  A.  What the overall Democratic vote share was --
16  Q.  Yes.
17  A.  -- in those elections?
18          I'm sure I calculated that.  I don't recall if I
19  reported it.  Obviously I can't remember off the top of my
20  head.
21  Q.  And I'll stipulate to you that Professor Mayer using these
22  said it was 53.2 percent statewide.  Does that sound about
23  right?
24          MR. YEAGER:  I'm sorry, Democratic or Republican?
25          MR. CARVIN:  Democratic statewide vote sharing.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 210

1      THE WITNESS:  Fair enough, and if you wouldn't mind
2   me asking you, 53.2 percent is the Democratic share of the
3   two-party vote or the --
4   BY MR. CARVIN:
5   Q.  Just two party.
6   A.  So we're throwing out the third party.
7   Q.  Yes.
8   A.  Got it, thank you.
9   Q.  And in those circumstances even with 53.2 percent of the
10  statewide vote, 32 percent of the plans are only giving them
11  six of 14 seats, which comes to 42.9 percent.
12  A.  I'm sorry, where did the 42.9 --
13  Q.  Six out of 14, do you want to do the math?
14  A.  No.  Maybe I just need you to repeat what -- your sentence
15  there.
16  Q.  Even though the Democrats had 53 percent of the statewide
17  vote, 32 percent of the purely nonpartisan simulated plans
18  only gave them 42.9 percent of the seats, six of 14.
19  A.  I gotcha.  So you're doing six divided by 14.
20  Q.  Correct.
21  A.  I'll take your word for it that the math is right.  It sounds
22  roughly right.
23  Q.  Okay.  Have you ever heard the phrase, seats-votes curve, or
24  winner's bonus?
25  A.  I have heard of those terms.

## Page 211

1   Q.  Do you know how that's defined in the political science
2   literature?
3   A.  I'm not right here able to give you a precise definition.
4   I'm happy to give you my best shot.
5      But, you know, not having just reviewed the various
6   literature on those topics, I'm not sure I can give you a
7   precise definition right now.
8   Q.  In broad strokes, isn't it true that what's characterized,
9   the winner bonuses seats-votes curves you would expect a 53
10  percent statewide vote to translate into either 56 or 59
11  percent of the seats, have you ever heard that?
12  A.  It's not quite as precise as saying 56 or 59, and there are a
13  lot of other factors at play.
14      But I get what you're trying to get at which is the
15  general principle that all else being equal, that if your
16  party has greater than -- a little greater than 50 percent of
17  the two-party vote share, then all else equal, cancelling out
18  all other factors such as things like political geography and
19  other factors that affect districting and legislative
20  elections, campaign finance, all those other things, all else
21  being equal, you're going to get a bit of a bonus in terms of
22  obviously 53 percent of the vote wouldn't necessarily
23  translate into exactly 53 percent of the seat share.
24      Now it's not as precise as saying 53 percent of
25  votes translates automatically into a 56 to 59 percent seat

## Page 212

1   share.  It's never that clean at all because there are
2   obviously lots of other factors such as the underlying
3   political geography of a state, and various other districting
4   criteria.
5   Q.  None of which you've analyzed in Michigan, right?
6   A.  Actually I have.
7   Q.  So what is the winner's bonus to be expected in Michigan?
8   A.  Okay.  I was talking about the criteria that was mentioned.
9   Obviously I've analyzed those.
10  Q.  But you haven't analyzed how they affect the seats-votes
11  curve or the winner's bonus in Michigan?
12  A.  I did not try to quantify say an entire seats-to-votes curve
13  insofar as trying to say if the Republicans were to
14  hypothetically win 65 percent of the votes, what seats would
15  they analyze.
16      The underlying concepts are at the heart of the
17  analysis that I did at the end of my report where I'm
18  applying, say, a uniform swing to different elections.
19      Now I'm not saying that's a complete seats-to-vote
20  curve, but the principle is the same there.  So to that
21  limited extent --
22  Q.  We'll come back to that.
23      Isn't the fact that 32 percent of the wholly
24  nonpartisan plans only give Democrats 42.9 percent of the
25  vote, when they get 53 percent of the statewide vote, at

## Page 213

1   least an indication that the state naturally skews Republican
2   even through neutral redistricting?
3   A.  Okay.  Your question there I think you said 42 percent of the
4   vote, and I think you probably meant to say seats.
5   Q.  Seats.  Right.
6   A.  So you're asking is that indicative of political geography?
7   Is that your question?
8   Q.  Doesn't that tend, the natural geography and the
9   concentration of Democratic voters together tend to favor
10  Republicans even in a neutral redistricting scheme?
11  A.  I'm going to answer that the best that I can.
12      And in general, it's certainly the case that there
13  is a political geography in Michigan that clusters Democratic
14  voters.  And as a general principle, that does have some kind
15  of partisan effect as a very, very general matter, before
16  specifically analyzing specific districting criteria.  And
17  that's true of a lot of different states.
18      But one doesn't necessarily lead to the other.  You
19  cannot attribute all of that, or even a quantifiable, a
20  specific portion of that to nothing but political geography
21  in the context of, say, the study that I did here because the
22  point is that I'm accounting for not just political
23  geography, but also all of the specific operationalization of
24  districting criteria that I'm programming into this
25  simulation algorithm here.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 214

1  Q.  But if I understand you correctly, that means the simulated
2  plans are a benchmark for the expected partisan results that
3  would occur under a nonpartisan districting plan, right?
4  A.  There is just a bit of a distinction here between that
5  question and your previous question.
6      The interpretation of the simulation results that I
7  make is simply to say this is, obviously this number of six,
8  seven and eight Republican seats, this is the sort of
9  distribution that we expect from the combined effect of,
10  number one, obviously Michigan's underlying political
11  geography, voter geography, boundary lines, political
12  boundaries, applying them to the specific criteria that I
13  built into the simulation algorithm.  And I won't list all
14  those but we've obviously discussed those at great length
15  today.  Building all those things together, all those combine
16  to produce this particular distribution.  So that's a fair
17  statement.
18      It's not a fair statement to say that a particular
19  set of simulations is obviously skewed in a particular way
20  because of voter geography or something like that.  That's
21  not something that is a fair conclusion from the simulations
22  I'm analyzing here.  It's the combination of all of those
23  things.
24  Q.  Right.  But I'll try again.  The simulated plans, therefore,
25  after taking all those factors into account, are an excellent

## Page 215

1  benchmark for what partisan results should be expected from a
2  nonpartisan redistricting, correct?
3  A.  Oh, what partisan results should be expected from a
4  nonpartisan redistricting process like the one that I
5  programmed.  That is correct.
6  Q.  And we agree that's not the only nonpartisan redistricting
7  program, but certainly in your view it's an excellent
8  benchmark for what results we should expect from a
9  nonpartisan process, right?
10  A.  Well I mean obviously you had asked me earlier today to
11  acknowledge that there can in fact be a map drawer that is
12  nonpartisan outside of my computer.
13      So, again, I'm just qualifying that I'm not
14  speaking for such hypothetical map drawers.
15  Q.  No, but your simulated --
16  A.  I'm speaking for my --
17  Q.  -- are a benchmark for what could be expected to be produced
18  by a nonpartisan process, right?
19  A.  It is a benchmark for what could be expected to emerge from
20  the sort of nonpartisan process that I programmed in my
21  algorithm.
22      I'm qualifying all of that to say that obviously
23  I'm taking very specific criteria and building them into the
24  computer code, and the computer code is just following those
25  very specific criteria.

## Page 216

1  Q.  If you could turn to page 25 of your report.  And you're
2  writing on page 25 at the top about the efficiency gap from
3  the simulated Congressional plans as presented on page 24,
4  okay?
5  A.  I see page 24 here.
6  Q.  Okay.  And you contend that this figure reveals that most of
7  the one thousand simulated districting plans are reasonably
8  neutral with respect to electoral bias, is that correct?
9  A.  Let me see exactly what I said here.
10      I defined that, or I just made a calculation of,
11  are they within 5 percent of zero.  In other words are they
12  between negative 5 to 5 percent.  And I did that calculation.
13  And I found that it was over half.
14  Q.  Right.  And so a gap within 5 percent is minimal electoral
15  bias in your view?
16  A.  It's a relative term here.  I characterized it in that way.
17  I'm not doing it in the absolute sense of saying that you can
18  interpret it in any legal sense.  But relative to other
19  efficiency gaps that we see on this figure, obviously
20  efficiency gaps within negative 5 percent to 5 percent are
21  relatively smaller than some of the others that we see.
22      I really didn't mean that phrase to mean anything
23  more significant than just here is the calculation that I'm
24  doing.
25  Q.  Okay.  And you say 22.5 percent of the simulations produced

## Page 217

1  an efficiency gap between minus one, which hurts Democrats,
2  and plus one, which helps Democrats, using the 2006 to 2010
3  statewide elections.  Do I have that right?
4  A.  And I think that's referring to another figure.  I'll try and
5  identify it here.
6  Q.  It's on page 24.
7  A.  No.  I mean it's not referring -- I don't think it's
8  referring to that figure because that sentence is referring
9  to the 2006 to 2010 statewide elections.
10  Q.  And that's set forth on page 24?
11  A.  I gotcha, I apologize.  I was misreading there.  I apologize
12  for that.
13  Q.  Okay.
14  A.  I see that there.  And I can see that I was characterizing
15  that there are -- I mean I obviously did the calculation and
16  I found that there were 22.5 percent that were within minus
17  one to positive one percent.
18  Q.  And it's only the 2006 to 2010 that fall within that
19  category, right?  None of the 2012 to 2016 fall within that
20  category?
21  A.  Let me go back to the figure.
22      And just eyeballing the figure, and again, I can't
23  do the calculations in front of me, but just eyeballing the
24  figure, I believe that's right.
25      It appears that those, most of those simulated

Deposition of Jowei Chen - 9/7/2018

League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 218

1  plans that are within negative 5 to 5 percent are not within

2  negative one to one percent. And I'm going to guess that

3  that one outlier that we see is also not within one percent.

4       So it does look like none of those are within minus

5  one to one percent on the 2012 to 2016 election measures.

6  Q. All right. In the 2006 to 2010, are there any that are

7  positive? You say between positive 0.1, the best I can see

8  is zero.

9       Is there something above zero? We're all

10  eyeballing this map.

11  A. Yeah, I'm eyeballing it too.

12       It looks to me like -- and I obviously don't have

13  the underlying data file in front of me or I could give you a

14  more precise answer. But it looks from this figure that

15  yeah, there are some that are right above zero and some that

16  are right below zero.

17       But obviously they're all within one percent,

18  they're not very far above. They are all right around that

19  zero percent, that zero percent line, the horizontal line.

20  Q. Well there are certainly none above 0.05?

21  A. That's fair to say.

22  Q. Okay.

23  A. The point is they're all very, very close to zero, and there

24  may well be some that are positive.

25  Q. If you can go back to page 25, please.

## Page 219

1       Referring to the same simulated plans, you say the

2  simulated plans with nearly zero efficiency gap are all plans

3  that contain exactly six Republican and eight Democratic

4  favoring districts as measured by the 2006-2010 statewide

5  election results, right?

6  A. I see that sentence there.

7  Q. Okay. So the only way not to waste Democratic votes in

8  Michigan is to elect eight Democrats.

9  A. Well that's not my conclusion. I'll put it in more -- I'll

10  put that in more precise terms, which would be fair to say

11  that -- it is fair to say that if you were looking among

12  these one thousand Congressional maps and you wanted to find

13  one that has an efficiency gap using specifically the 2006 to

14  2010 statewide election measure, rather than the '12 to '16

15  measure, then you would obviously be talking about plans that

16  are six-eight.

17  Q. Right. And --

18  A. But now that was a little bit more limited than the question

19  I think you were posing.

20  Q. Well if your qualifications on the 2006 to 2010, those are

21  the only ones that are anywhere near zero efficiency gap, and

22  the only way they achieved it was by a plan that you project

23  will elect eight Democrats?

24  A. Okay. So you're basically just saying, look, on the '12 to

25  '16 election measure, we've obviously discussed that there

## Page 220

1  are not any that are right at zero percent. I think that's

2  what you're asking me, right?

3  Q. Right.

4  A. Yeah. I affirm that.

5  Q. It's a lot worse than that actually. For 2012 to 2016, the

6  only results you have are at least 5 percent to 14-and-a-half

7  percent negative efficiency gaps against Democrats, correct?

8  A. Well I'm affirming that there is obviously a bunch of plans

9  around negative 5 percent that we discussed earlier.

10  Q. Well the results --

11  A. I'm just -- I think you started the question by saying it's

12  worse than that, obviously I'm not agreeing to any value

13  judgement about that.

14  Q. The 2012 to 2016 are worse for Democrats than the results

15  measured in 2006 to 2010, correct?

16  A. In terms of what, statewide vote share or --

17  Q. Efficiency gap.

18  A. It's not -- you're going to have to ask me about a specific

19  group of simulations.

20  Q. Isn't it true that the efficiency gap measured by the 2012 to

21  2016 statewide elections have an efficiency gap of at least

22  roughly negative 5 percent to negative 14-and-a-half percent

23  for Democrats?

24  A. The entire range, you know, obviously starts at a little bit

25  above zero percent. But you're correct in characterizing

## Page 221

1  that most of the simulations on that measure, the '12 to '16

2  measure, go from roughly negative 5 to about negative 13 or

3  14 percent.

4       I just want to clarify that there was -- you can

5  see there is one gray circle there that is right around one

6  or 2 percent or so.

7  Q. Okay. And why does it jump from -- why is there nothing

8  between 5 and 14'ish?

9  A. Why is there nothing --

10  Q. Why are there no plans between 5 and 14?

11  A. Well, that was -- those were the calculations on efficiency

12  gap that I did. I mean I just calculated numbers, and I'm

13  happy to tell you how I calculated the efficiency gap. But I

14  just reported the numbers I calculated.

15  Q. No, I'm just asking for a commonsense explanation.

16       My inference is the reason you jumped from five to

17  14 is because if it's say eight or nine, you'd get a

18  different efficiency gap, and therefore you wouldn't have a

19  wide range of numbers in the middle. You'd jump from one to

20  the other because that's how the efficiency gap works.

21       But if you have another intuitive explanation, I'm

22  more than happy to hear it.

23  A. In general what we're seeing there is indeed that there is

24  obviously a correlation between the efficiency gap, a

25  statistical correlation. I mean this is not saying that they

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 222

1    are somehow equated, but that there is a correlation here.

2        So recall that I had discussed -- we had discussed

3    a moment ago that all of those plans that are right around

4    zero percent on the '06 to '10 measure have a six-eight

5    partisan composition.  And that's just the way that the

6    efficiency gap metric works.

7        If it's not a six-eight, but instead a seven-seven

8    plan, it's a different cluster.  And if not a seven-seven,

9    but instead an eight-six, then that's yet a different cluster

10   altogether.

11       I think your intuition was basically right, but I

12   just wanted to clarify that that's what it's coming from.

13   Q.  You didn't produce the numbers for how many of your simulated

14   plans produced the efficiency gaps in the 14 percent range

15   that we're looking at?  I can't figure that out.

16   A.  How many -- you're asking how many --

17   Q.  Yeah.  I just see dots on the page.  You never provided the

18   numbers, right?

19   A.  Oh, how many numbers are in each of those clusters?

20   Q.  How many plans, right.

21   A.  I see that I don't obviously have numbers, precise number of

22   dots in those clusters.

23       Yeah, I'm not sure that I have in front of me right

24   now the data to sort that out.  Obviously my underlying data

25   files report those efficiency gap numbers.

## Page 223

1    Q.  Okay.  And give me your rough guess as to the percentage of

2    efficiency gaps above 13 percent using the 2012 to 2016 on

3    page 24.

4    A.  Above 13 percent?

5    Q.  Right.

6    A.  That's going to be a tough one because I'm going to guess

7    that if you draw a 13 percent line right there, there are a

8    bunch of observations right around 13.  Do you see what I

9    mean?

10   Q.  All right.  Let's make it 12.

11   A.  Okay, great.  So you're basically asking how many are in that

12   range from negative 12 to negative 15 percent?

13   Q.  Right.

14   A.  Let me see if I can try and make a bit of an educated guess

15   from my table here.

16       Okay, I'm going to give you my best guess here.

17   I'll qualify by saying obviously I don't have the underlying

18   data here in front of me.  If I did, I'd be able to actually

19   calculate it.  So what I'm giving you is a very, very rough

20   guess.  And I'm not telling you that this is a calculation

21   that I remember off the top of my head.

22       So I can see that it's going to be roughly around

23   12 percent, something in the ballpark of 12 percent of the

24   thousand simulations that are being depicted here, with all

25   those caveats.

## Page 224

1    Q.  And how many are in the 5 percent range?  You're saying 88

2    percent?

3    A.  You're asking me the same question with respect to the '12 to

4    '16 statewide elections, right?

5    Q.  Yes.  It just strikes me as very odd the notion that the

6    right hand is 88 percent when the virtually visually

7    identical left hand is you're claiming 12 percent.

8    A.  And I'm just doing my best to give you a guess here.

9    Obviously I'm not saying that I remember these numbers off

10   the top of my head.  Same caveats as before, if I had the

11   data in front of me, I'd be able to give you a more precise

12   answer.

13       But my best guess here is that, yeah, it appears to

14   be something in the ballpark of 87 percent.

15       I think what you were alluding to in your question

16   is I think you're saying that it seems odd to you because it

17   looks like there are a bunch of clusters on the left column

18   and there are a bunch of clusters in that middle column and I

19   think you're trying to ask, well how can they be so different

20   in size.

21       But the point here is what I'm doing in this figure

22   is I am stacking on top of one another a fairly large number

23   of gray circles that are clustered at certain intervals.

24       And when you see that clustering, sometimes -- it's

25   hard to precisely count up the circles and see exactly how

## Page 225

1    many there are in each cluster.

2        But again my best guess here is 87 percent.

3    Q.  Okay.  If you could turn back to page 25.

4    A.  Okay.

5    Q.  You say, to produce a map with a significant electoral bias

6    deviating by over 15 percent from a zero efficiency gap would

7    require extraordinary and deliberate partisan map drawing

8    efforts.  Correct?

9        MR. YEAGER:  Can you point out where that is, sir?

10       MR. CARVIN:  The last sentence in the second

11   paragraph.

12   BY MR. CARVIN:

13   Q.  I'm on page 25, Professor.

14   A.  Okay.  I gotcha.  I see it.

15   Q.  And I'm just wondering how you can draw that conclusion since

16   at least a substantial percentage of the maps that had no

17   electoral bias produced an efficiency gap of 13, 14 percent.

18   Why would 15 percent be some demarcation line between a map

19   motivated by extraordinary and deliberate partisan map

20   drawing efforts, and the 13 to 14 percent that's produced by

21   maps wholly devoid from partisan intent?

22   A.  Sure.  The basis for my opinion on that is that I'm looking

23   at these efficiency gaps that are merging using the '12 to

24   '16 measure.  And I'm seeing that there are in fact no maps

25   that have an efficiency gap larger than negative 15 percent.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 226

1    In other words, more negative than negative 15 percent.

2    Q.  So we have -- please finish.

3    A.  I was just generally going to explain that so what I'm

4    looking at here is that distribution.

5         And of course I intuitively know that the sort of

6    plans, because of the clustering that we see in this figure,

7    I intuitively know that you're not going to get a greater

8    than negative 15 percent efficiency gap with an eight-six

9    plan because we're looking at a bunch of eight-six simulated

10   plans here. And all of them have efficiency gaps something

11   in the ballpark of 12 to 13 percent.

12        So that demarcator as you called it of 15 percent,

13   really to get over that line, we'd be talking about plans

14   that are nine-five in their partisan composition.

15   Q.  So it's really the one Congressional seat, the eight versus

16   nine?

17   A.  Yeah.  I'm affirming that it is indeed the case that if you

18   had had a Congressional plan with nine -- with a nine-five

19   partisan composition, you'd be talking about an efficiency

20   gap on this '12 to '16 statewide election measure that would

21   be a bit higher than 15 -- a bit larger than negative 15

22   percent, probably something closer to about maybe negative 19

23   percent or so.

24   Q.  Right.  So again we're talking about an eight-six plan could

25   be produced by a nonpartisan line drawer, but a nine, for all

## Page 227

1    the reasons you previously articulated, requires this

2    partisan intent as you previously described.  So this

3    essentially makes the same point is what you're telling us?

4         MR. YEAGER:  Objection compound.

5         But you can answer.

6         THE WITNESS:  I'll clarify what I am actually

7    concluding here.  I didn't hear anything in your question

8    that I thought was incorrect, but I'll just clarify what I

9    concluded.

10        I'm not sure that I specifically here used the word

11   partisan intent.  But I mean obviously I am reaching a

12   result, reaching a conclusion regarding the partisanship, the

13   way in which the partisan composition of the enacted map

14   emerged.

15        I'm saying here that that sort of plan does not

16   emerge in one thousand simulation tries.  And from a

17   statistical standpoint that would be a -- it would be an

18   extreme statistical outlier.

19        That's all I mean when I say here in this last

20   sentence, would require extraordinary and deliberate partisan

21   map drawing efforts.

22        I'm obviously not speaking to any firsthand

23   knowledge about partisan effort.  I'm simply saying that it

24   could not have resulted from a process like the one that I

25   programmed in my computer simulations.  That's what I mean

## Page 228

1    when I say deliberate partisan map drawing efforts.

2         So I just wanted to qualify that that's what I'm

3    opining about here.

4    Q.  Okay.  If we could turn to page 21, because I want to ask you

5    the same questions about the median-mean difference.

6    A.  Okay.  Let me get there.

7         Okay, I am at page 21 now.

8    Q.  Okay.  And it describes the results of the mean-median

9    difference for the simulated plans, right?

10   A.  Yeah.  I see that's what I'm doing in this paragraph.

11   Q.  And you say, second sentence, second paragraph, almost all

12   the computer-simulated plans have a median-mean difference

13   between 2 percent to 3.8 percent, using the 2006-2010, and

14   between 2 to 3.6 percent using the 2012 to 2016 statewide

15   elections, is that right?

16   A.  I see that sentence.

17   Q.  So every computer-simulated plan has a median-mean difference

18   disfavoring Democrats, right?

19   A.  I'm not sure that I actually characterized it as disfavoring

20   Democrats.  I see what you're getting at which is to point

21   that the median is higher than the mean, and I think that's

22   all I really characterized it as.

23   Q.  Oh, all right.  Are you detracting the notion that a

24   mean-median difference of a positive nature disfavors

25   Democrats?

## Page 229

1    A.  I mean I'll let it qualify that, if that's what you're asking

2    me about.  It obviously -- if you have a mean-median

3    difference or a median-mean difference that is a higher

4    median than mean, obviously that disfavors Democrats in the

5    sense that it makes it harder to win that median district,

6    because that median district is more Republican than the

7    overall statewide.

8         So just in their middle best district, it's a

9    little bit harder, say in the hypothetical 50/50 participant

10   context.

11   Q.  Right.

12   A.  So, sure.  There is certainly an extent to which Democrats

13   are disfavored.  I just didn't want to give a blanket

14   statement that every single district has somehow proven to be

15   disfavoring Democrats because of a particular median-mean

16   difference.  I just wanted to clarify that.

17   Q.  Is a median-mean difference of, say, 3 percent considered a

18   telltale sign of a partisan skew or partisan gerrymander?

19   A.  It's never been --

20        THE WITNESS:  If I could just ask you to repeat?

21        (Record read:  Q.  Is a median-mean difference of,

22   say, 3 percent considered a telltale sign of a partisan

23   skew or partisan gerrymander?)

24        THE WITNESS:  I have never opined, and it's not my

25   opinion, that any one particular threshold of a median-mean

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 230

1      difference, whether 3 percent or anything else that you could

2      name, is somehow a, quote, telltale sign. I always analyze

3      the median-mean difference, the median-mean difference of a

4      plan in the context of the actual states or the actual

5      jurisdiction that we're considering here.

6           Meaning that here obviously I'm considering a

7      particular median-mean difference in the context of a number

8      of computer simulations in the distribution along the

9      median-mean difference.

10 BY MR. CARVIN:

11 Q.   Right. You're always comparing the difference. And I'm just

12      trying to figure out is there anything about the simulated

13      plans' rough average of I'll say 3 to 3.5 percent, do you

14      know how that stacks up nationally?

15 **A.   Do I know how it stacks up nationally? I can't say that I've**

16 **     done a comprehensive national study and can really**

17 **     characterize for you whether the median-mean difference**

18 **     viewed in a particular Michigan plan is at the tail end or**

19 **     well within the middle of the distribution. I really haven't**

20 **     studied that question.**

21 Q.   Do you know how 6.7 percent ranks nationally?

22 **A.   Same answer as before. I don't have -- I don't have**

23 **     empirical basis to say that I've actually looked at the**

24 **     distribution nationally and can rank what a 6.7 percent would**

25 **     rank nationally across all 50 states.**

## Page 231

1 Q.   If you could turn to page 41, please.

2 **A.   Yes, sir.**

3 Q.   Okay. And it's fair to say that looking at 2012 to 2016

4      statewide elections, the vast majority of the simulated plans

5      give Republicans 58 seats?

6 **A.   I report here 74.9 percent, so that is certainly probably the**

7 **     vast majority or at least a very sizable majority.**

8 Q.   And 91.8 percent of the plans give Republicans 58 or more

9      seats, right?

10 **A.   I'm guessing you took 74.9 percent and you added up 16.7**

11 **     percent to that?**

12 Q.   Right.

13 **A.   Roughly in the ballpark of 92 percent. Is that what you**

14 **     said?**

15 Q.   Yes.

16 **A.   Okay. I affirm the math or close enough. I affirm that**

17 **     you're pretty close probably.**

18 Q.   So again, this -- for the record, how many seats are there in

19      that Michigan House?

20 **A.   We're still talking about the 2012 to --**

21 Q.   No. It's 110 seats in the Michigan House.

22 **A.   I gotcha, I apologize for misunderstanding your question.**

23 **     Yes, there are 110 seats or districts in the**

24 **     Michigan State House.**

25 Q.   So even these 90 plus percent of these completely simulated

## Page 232

1      plans would give Republicans a three-seat majority in the

2      Michigan House, even though they are completely devoid of

3      partisan intent, right?

4 **A.   No. I'm not sure that's quite right. I don't really see --**

5 **     okay, you're asking about the 74.9 percent of the**

6 **     simulations, right?**

7 Q.   Or 59 or 60.

8 **A.   Okay. I apologize, I misheard the question.**

9 **     Obviously I agree that if the Republicans have 58**

10 **     out of 110, that's a three-seat majority. And again in 74.9**

11 **     percent of the simulated plans that's what we see. And**

12 **     obviously the same applies to that 92 percent figure we both**

13 **     calculated earlier.**

14 Q.   Right. And in the real world, in 2012, the Republicans won

15      59 seats in the House, right?

16 **A.   In 2012 you said?**

17 Q.   Yes.

18 **A.   To my recollection, that is the case.**

19 Q.   And that was the first year this was implemented. So in the

20      first year after implementation, they achieved a seat share

21      not different from what you would have expected under a

22      totally nonpartisan redistricting plan, right?

23 **A.   No. I mean what you did there is just an apples-to-oranges**

24 **     comparison. You are comparing the actual endogenous**

25 **     elections --**

## Page 233

1 Q.   Yes, but I --

2           MR. YEAGER: Let him finish.

3 BY MR. CARVIN:

4 Q.   Go ahead.

5           MR. YEAGER: Unless you want to withdraw the

6      question.

7 BY MR. CARVIN:

8 Q.   No. I'm perfectly happy to clarify.

9 **A.   I think I understood the question.**

10 **     What you did there in your question was to compare**

11 **     the number of Republican seats in the legislative elections**

12 **     in the House elections themselves.**

13 Q.   Right.

14 **A.   But then you compared that to a distribution here in figure**

15 **     13 where I'm reporting on the distribution with respect to**

16 **     the number of Republican seats using the 2012 to 2016**

17 **     statewide elections aggregated.**

18 Q.   Right.

19 **A.   And so that's -- that's obviously an apples-to-oranges**

20 **     comparison. You can't just say, well there was 58 in the**

21 **     State House legislative election results, and that is somehow**

22 **     equated to the number 58 on this figure, which is calculated**

23 **     using the 2012 to 2016 statewide election results.**

24 Q.   I'm somewhat puzzled why you think your statewide elections,

25      which are designed to predict, or designed to assess

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 234

1  elections in the real world, are apples, and the real world

2  election results are oranges.

3      You're telling me there is not really much -- there

4  is a very significant difference between your statewide

5  elections and elections in the real world?

6  A.  That's not what I'm saying.  What I'm saying is that if you

7  want to directly compare the enacted plan to a distribution

8  of simulated plans --

9  Q.  Right.

10  A.  -- you need to evaluate both of those sets, both of those

11  things using the same statistical metrics, the same

12  quantified metric of partisanship.

13      And so certainly I do that in figure 13.  The

14  question that you had posed a moment ago was not doing that.

15  You were using one set of elections on one side to evaluate

16  the enacted House plan, and then another set of elections to

17  describe the simulated plans.

18  Q.  Right.  You're predicting --

19  A.  That's what is an apples-to-oranges comparison.

20  Q.  You've assigned 61 seats to the House on the basis of

21  statewide elections which were exogenous.  In the real world

22  they got 59, right?

23  A.  Okay.

24  Q.  Is that true?

25  A.  Your characterization was not correct.  So I'm happy to go

## Page 235

1  and correct that here.

2  Q.  Your assessment of the expected Republican seats under the

3  enacted House plan based on the 2012 to 2016 statewide votes

4  is 61, is that correct?

5  A.  The 61 refers to --

6  Q.  Is that correct?

7  A.  I'm not sure that's how I would characterize it.  I'm just

8  going to put it in my own words and I think this is

9  responsive to your question.

10      The 61 for the enacted House plan that we see with

11  the red line, that refers to the number of plans in the

12  enacted House plan out of 110 that have more Republican than

13  Democratic votes in the 2012 statewide elections.

14  Q.  Right.  And in the real world they got 59 in 2012, correct?

15  A.  And now you're talking about --

16  Q.  Is that correct?

17  A.  I'm just -- I just want to clarify my understanding of your

18  question.

19      And now you're talking about the actual State House

20  election results.  And I'm affirming that indeed in the State

21  House election results in 2012, it was 59.

22  Q.  Okay.  And that you think that the comparison of the real

23  world election results and the number that you have assigned

24  61 is a comparison of apples and oranges, is that your

25  testimony?

## Page 236

1  A.  What I said is apples and oranges was to say that somehow

2  taking the number 59 from the endogenous elections, and then

3  comparing that to the 58 or 59 here that we see in this

4  distribution, using the exogenous elections, would be a valid

5  comparison.  That's what the apples-to-oranges comparison

6  that I was referring to is.

7  Q.  Right.  The results produced by the 2012-2016 statewide

8  elections, and the results produced in the real world are

9  apples and oranges?

10  A.  That's not what I said.

11      I said to equate by saying that the enacted House

12  plan is to be evaluated using a different election than the

13  2012 to 2016 statewide election, that comparison of the

14  enacted plan to a distribution would be an inappropriate

15  apples-to-oranges comparison.

16  Q.  Okay.  Now let's assume the result was 62 using the statewide

17  elections.  That would obviously be impossible to do absent a

18  severe partisan intent, correct?

19      MR. YEAGER:  Objection, incomplete hypothetical.

20      You may answer.

21      THE WITNESS:  Okay.  When you're saying 62, I'm not

22  sure if you are referring to a hypothetical State House

23  election result or if you're referring to --

24  BY MR. CARVIN:

25  Q.  Any plan that produces 62 Republican seats as measured by the

## Page 237

1  2012 to 2016 statewide elections is necessarily a product of

2  partisan intent, right?

3  A.  Okay.  So you're asking if I had seen a plan, if I had seen

4  an enacted plan, would I have reached that conclusion?

5      I would look at this distribution.  If we had a

6  plan all the way out at 62, I would have concluded that that

7  creation, that plan's creation of 62 Republican seats is a

8  statistical outlier on partisanship that is not something

9  that generally ever really occurs in these one thousand

10  simulations.

11  Q.  And it wouldn't be possible to produce that result if there

12  was no partisan intent behind the line drawing, right?

13      MR. YEAGER:  Objection, incomplete hypothetical.

14      You may answer.

15      THE WITNESS:  My conclusion is limited to saying

16  the following, that such a plan, a 62 plan, a 62 Republican

17  plan could not plausibly have been the result of a

18  nonpartisan districting process of the sort that I programmed

19  into my, in my expert report, obviously with the nonpartisan

20  criteria that I built into the computer code.

21      So that's what I mean when I say this is a partisan

22  outlier.

23  BY MR. CARVIN:

24  Q.  Okay.  If you could turn to page 51, please.

25      Just to make it clear, we're now talking about the

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 238

1    House plan, because we've been jumping around a little bit.
2    I'm going back to what we were talking about before.
3            And you say, do you not, at the top of page 51,
4    that the mean-median figure reveals that most of the one
5    thousand simulated districting plans reflect a small amount
6    of electoral bias in favor the Republicans -- I apologize,
7    that's referencing the efficiency gap, I may have just misled
8    you.
9            On page 49 you describe what you're looking at in
10   terms of the efficiency gap, and at the top of page 51 you
11   give the example.
12   A.  Okay.  You're at the sentence that says the fact that the one
13   thousand simulated plans in figure 17, is that right?
14   Q.  Yes.  Well I actually think we're looking at figure 18.
15          If I misled you, I want to go to the efficiency gap
16   numbers now in the House.
17   A.  Okay.  I'll just -- if it's helpful I will point you to where
18   the text is and maybe this is where you're trying to point me
19   to.
20          Page 51 --
21   Q.  Right.
22   A.  -- second paragraph, is that where you're going?
23   Q.  Right.  And your description, just so I'm clear is that most
24   of the one thousand simulated districting plans reflect a
25   small electoral bias in favor of Republicans.  Do I have that

## Page 239

1    right?
2    A.  Significantly more wasted Democratic votes than wasted
3    Republican votes, yes.  So, yes, you could characterize that
4    gap as a small bias in favorite of the Republicans.
5    Q.  And if you look at the graph on page 50, the 2012 to 2016
6    numbers?
7    A.  Okay.
8    Q.  It looks to me, given these clusters, that the substantial
9    majority of the plans have an efficiency gap of negative nine
10   to negative ten, is that fair?
11   A.  Around that cluster, I see the two clusters you're talking
12   about.  And, yeah, I can see there with one cluster that's
13   roughly from about, we'll call it maybe about 8.7 to roughly
14   9.3 or so.  And then there is another cluster to the left of
15   that that's around maybe 9.8 or so to about 10.2 or so.
16   Q.  Right.
17   A.  I think those are the two clusters you're referring to.
18   Q.  Right.  Would you say that an efficiency gap of nine or ten
19   reflects a small amount of electoral bias?
20   A.  I wouldn't really ever characterize something in absolute
21   term.  It's all relative.  I have to know small compared to
22   what.
23          I would certainly characterize it as -- I would
24   characterize it as small in relation to the enacted plans,
25   the efficiency gap.  It's small in relation to--

## Page 240

1    Q.  I thought the enacted plan's efficiency gap was 12.1 percent
2    under the '12 to '16 numbers.  Do I have that wrong?
3    A.  That sounds about right.  I see that's right around 12.1
4    percent.  So I was answering the previous question.
5            I was just saying that -- you were asking me if I
6    could characterize that as small, and I usually just need to
7    know small in relation to what.
8            Certainly it's small in relation to a 12.1
9    percent --
10   Q.  Ten is small in relation to 12?
11   A.  Okay.  I just want to try to finish answering your previous
12   question first.
13   Q.  Okay.
14   A.  It's certainly small in relation to the enacted plan's
15   efficiency gap of negative 12.1 percent.  It really just
16   depends on what the context is.
17          So I would characterize in that context as small,
18   but obviously I'm not opining that a general efficiency gap
19   of say, 9 percent is small in any absolute universal sense.
20   Q.  How would you characterize it without reference to the
21   comparison to the enacted plan?
22   A.  Well I would characterize it as just what I've been saying.
23   It's roughly 8 --
24   Q.  Would you characterize it as small?
25          MR. YEAGER:  Asked and answered.

## Page 241

1            THE WITNESS:  What I just said --
2    BY MR. CARVIN:
3    Q.  Without reference to the enacted plan, would you characterize
4    it as small?
5            MR. YEAGER:  Asked and answered.
6            You may answer.
7            THE WITNESS:  Without reference to the enacted plan
8    or any other sort of benchmark or reference points, I'm not
9    really sure that I can really, I can really answer that.
10          It's always within reference to some kind of
11   benchmark.
12          It would be like if I asked you is 58 a big number?
13   And obviously there is no right answer to that, it depends is
14   58 bigger than some other number.  You need a reference
15   point.
16          And I'm just saying if the enacted plan is the
17   reference point, then I'm able to say that.
18   BY MR. CARVIN:
19   Q.  That's entirely right, you need a reference point.  And our
20   reference point for plans that are completely unbiased drawn
21   by your neutral process produce an efficiency gap of 9 to 10
22   percent.  We therefore must analyze the enacted plan as 12.1
23   percent in light of that gap, correct?
24   A.  Well that's certainly what I do.  I analyze the enacted plan
25   in reference to the distribution of the simulations.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 242

1    Q.   Right.  And in other circumstances, a 9 to 10 percent
2         efficiency gap could be characterized as severely
3         anti-Democratic.  You've been involved in litigation where
4         it's been characterized that way, haven't you?
5    A.   I'm not specifically aware of that.  I'm happy to take your
6         word for it.  Obviously I've said that's not the sort of
7         characterization I ever make in my academic work or expert
8         work.  But --
9    Q.   But -- please.
10   A.   I'm happy to take your word for it that out there but other
11        people, may be litigants who like to put those kinds of
12        characterizations.
13   Q.   This number reveals, does it not, that there is a relatively
14        large inherent bias against Democrats under a neutral
15        Michigan redistricting plan that produces a 9 to 10 percent
16        efficiency gap?
17   A.   I'd said what it generally reveals if you're producing a
18        partisan-neutral redistricting plan for Michigan's House
19        districts, and you follow a specific criteria that I followed
20        in my computer code, which we've talked about at length, then
21        you're generally going to end up with efficiency gaps in this
22        range that we've been talking about.  I think that's an
23        accurate characterization.
24   Q.   And even holding apart from partisan intent, you would have a
25        relatively substantial efficiency gap disfavoring Democrats

## Page 243

1         in Michigan, correct?
2    A.   I mean it's fair to characterize that efficiency gap as a
3         range, as one where clearly there are some more number of
4         wasted Democratic votes than wasted Republican votes.  That's
5         how I would characterize an efficiency gap in this sort of
6         range that we're talking about.
7    Q.   All right.  Well let's talk about the mean-median difference
8         from the House, right?
9         You characterized the -- I'm now on page 49.  And
10        you say that the small mean-median differences in the
11        computer-simulated plans reflects a modest skew.  Right?
12        That's how you characterized it, a modest skew?
13   A.   Yes, I see that sentence.
14   Q.   If you'd turn to page 47.
15   A.   I am there.
16   Q.   Okay.  You can see that the mean-median difference using the
17        2012-2016 statewide elections is 4.5 to 6 percent, correct?
18   A.   Okay.  You're in the second paragraph where it says using the
19        2006 to 2010 statewide elections --
20   Q.   I'm actually in between --
21   A.   Right.  I know what you're talking about.  And between 4.5
22        percent to 6.0 percent, using the '12 to '16 statewide
23        elections.  I see that sentence.
24   Q.   And the mean-median difference in the enacted plan is 5.19
25        percent using admittedly the 2006 to 2010 statewide

## Page 244

1         elections, correct?
2    A.   Let me just try and see where I reported that number.  And
3         5.19 percent, I see that, okay.
4    Q.   So that is very much a modest skew, very much in line with
5         the mean-median difference produced by the completely
6         nonpartisan simulated plans, right?
7    A.   No, you're talking about an apples-to-oranges comparison here
8         again.
9    Q.   All right.
10   A.   When we're calculating a median-mean difference, here is the
11        essential points of the mean-median difference.  And I really
12        want to explain this because it's such an important point.
13        The median-mean difference is calculated as the
14        difference between the median district and the mean district
15        vote share.  It's not exactly the same, but it's usually very
16        similar to the overall statewide vote share.  If you take the
17        mean of all 110 House districts, you're getting something
18        close to, not precisely, the overall statewide vote share in
19        all of Michigan.
20        So that is a measurement, this median-mean
21        difference is a measurement that is anchored around, maybe
22        with reference point to, the overall partisanship of the
23        states in whatever set of elections were analyzed.
24        So if there is a difference in the overall
25        partisanship in one set of elections versus another, then

## Page 245

1         you're talking about a somewhat different anchoring point in
2         the median-mean difference.
3    Q.   I got it.
4    A.   So what that means is just that when we're making comparisons
5         between the enacted plan and the simulated plans, using the
6         median-mean difference, you really have to be sure to make an
7         apples-to-apples comparison using the same set of election
8         results.
9    Q.   All right.  But you're not retracting your statement in the
10        report that the 4.5 to 6 percent mean-median difference in
11        the simulated plans is a modest skew, are you?
12   A.   I'm just trying to find where we are here.
13   Q.   I just read it to you from page 49.  You characterized the
14        4.5 percent to 6 percent as a small median-mean difference
15        that reflects a modest skew.
16   A.   Which line are we on where we have the 4 percent?
17   Q.   The 4.5 to 6 percent is on page 47.
18   A.   Okay, I gotcha.
19   Q.   And you characterize that mean-median difference, as well as
20        the other one, you characterized it as small median-mean
21        differences in the computer-simulated plans that has a modest
22        skew.
23        Do you see that on page 49?
24        Now we're back to 49.  I just want to understand where you
25        are, where you're reading from.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 246

1       And can you point me to the line on 49 that you

2  just read from?

3  Q.  The second sentence on page 49.  The small median-mean

4  differences in the computer-simulated plans may also

5  partially reflect a modest skew in Michigan's voter geography

6  that slightly benefits the Republicans in the district.  This

7  modest skew in the simulated district plans, and you go on.

8  A.  I gotcha.  Sure.  I'm happy to explain the basis of that if

9  that's what you're looking for.

10  Q.  I'm not asking that.  I'm asking whether or not the 5.19

11  percent median-mean difference is also a small median-mean

12  difference?

13  A.  No.  I wouldn't characterize that as a small median-mean

14  difference.

15  Q.  Then why is 4.5 to 6 percent a small median-mean difference,

16  but 5.19 percent is not?

17       MR. YEAGER:  Objection, misstates the documents.

18       You may answer.

19       THE WITNESS:  I'm going to try to clarify here.  As

20  I said before when we were distinguishing the efficiency gap

21  at length, to characterize something as small, you do it in

22  the context of some kind of reference point.

23       So when we're talking about the median-mean

24  difference of 5.19 percent using the '06 to 2010 statewide

25  elections, I'm characterizing that as extreme with reference

## Page 247

1  to the distribution of simulations as measured using those

2  exact same statewide elections.

3       So if we switch to another set of elections, then

4  that obviously is talking about a different reference point.

5  BY MR. CARVIN:

6  Q.  Right.

7  A.  So again with a different reference point, what something --

8  what makes something relatively small or relatively large is

9  going to change depending on that reference point.

10       So that's the point I'm trying to clarify here,

11  which is that when you're going to compare, say, the enacted

12  plan's 5.19 percent, it's with reference to the distribution

13  of simulated plans as measured by the same set of elections.

14  Q.  They go up to 4-and-a-half percent.

15  A.  Right.

16  Q.  So the difference between 4-and-a-half percent and 5.19

17  percent you would view as substantively significant?

18  A.  Again, first I'm not -- I'm looking at the figures here and

19  I'm not quite sure they go all the way up to 4-and-a-half

20  percent.  I can see they come sort of close.

21  Q.  It's your number on page 47.

22  A.  Okay.  I appreciate that.  I think they stop a little bit

23  short.

24       But the general point here is I don't really have

25  an opinion on trying to, other than to say it's an

## Page 248

1  apples-to-oranges characterization, I don't really draw any

2  conclusions from trying to compare --

3  Q.  You don't?

4  A.  -- the median-mean gap using one set of elections in an

5  enacted plan directly compared to a set of simulation

6  calculations using another set of elections.

7  Q.  Well I'm --

8  A.  But I'm generally --

9  Q.  But --

10       MR. YEAGER:  We're going to stop until he can just

11  answer.

12       (At 4:55 p.m. went off the record.)

13       (At 5:05 p.m. may on the record.)

14       MR. CARVIN:  Back on the record.

15  BY MR. CARVIN:

16  Q.  If you'd turn to page 52 of your report, please.

17  A.  Yes.

18  Q.  As we alluded to previously you did a uniform swing analysis

19  on the durability of the enacted plan's partisan bias, is

20  that right?

21  A.  Yes.

22  Q.  Okay.  And what you do in those circumstances is you ask what

23  percentage statewide swing would be needed to give Democrats

24  half the seats in each of the relevant bodies?

25  A.  That's right.

## Page 249

1  Q.  Okay.  And basically what you're trying to figure out is

2  whether a party -- I'm now quoting from the last paragraph on

3  page 52, whether a party's majority control over a

4  legislative chamber or congressional delegation is strong

5  enough to withstand a reasonable range of alternative

6  electoral conditions, right?

7  A.  I want to try to find that.

8  Q.  The last paragraph.

9  A.  First sentence, right, first, last paragraph.

10  Q.  Right.

11  A.  I see it, I gotcha.

12  Q.  What would be a reasonable range of alternative electoral

13  condition in Michigan for the rest of the decade?

14  A.  It's not a question that I specifically analyzed.  I didn't

15  look at the distribution of all swings.

16       I was simply characterizing the swing that would be

17  necessary to flip or to tie the partisan control of each

18  chamber.

19  Q.  Well if you turn to the last sentence on page 53, you do

20  state that this Republican majority control would also have

21  been durable even under a reasonable range of alternative

22  electoral conditions.

23       So what did you mean by a reasonable range of

24  electoral conditions in that sentence?

25  A.  Well like I said, I didn't characterize it as a precise

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 250

1    threshold.  I just calculated the various swings that were
2    necessary.
3    Q.  Right.
4    A.  I reported those swings on Table 5.
5    Q.  Right.  But I'm trying -- please.
6    A.  Okay.  Okay.  I reported the numbers on Table 5.  And I don't
7    mean reasonable range in any precise sense other than to say
8    that certainly they all are negative swings that are
9    necessary.  And they're certainly all larger, at least a
10   little bit larger than one percent, and often several more
11   than one percent.
12       I didn't take -- I didn't take a particular
13   threshold and say, if it's above one percent or if it's above
14   two percent, that would be a larger swing or a smaller swing.
15   Q.  Would 3 to 5 percent be a reasonable swing?
16   A.  It really depends on the context.  I would need to have more
17   specific information.
18   Q.  In Michigan.
19   A.  Right.  I understand.
20   Q.  In 2018, would a 3 to 5 percent swing be reasonably expected
21   or quite unreasonable?
22   A.  It's really not just a question I analyzed.
23   Q.  So you don't know.  How about 7 or 8 percent?
24   A.  Same answer there.  I mean it's context dependent even
25   depending on the specific set of elections that we're talking

## Page 251

1    about, but again I'm saying it's not something that I
2    analyzed.
3    Q.  Okay.  If you'd turn to page 65, please.
4    A.  Okay.
5    Q.  This is the, your table showing the past statewide results,
6    right, Congress, etcetera?
7    A.  Yes, I see this.
8    Q.  Okay.  You can see for example in one election between 2008
9    and 2010 the Republican vote share went from 45.65 to 54.15.
10   Right?
11   A.  I see that.
12   Q.  Okay.  So we had a 9 percent -- or 8-and-a-half percent swing
13   in one election cycle.  Is that unusual?
14   A.  Well what you did to get to that 9 percent or 8 percent or so
15   is to take the difference between 2010 and 2008.
16   Q.  Right.
17   A.  That's not necessarily what's -- what you're doing in any
18   sort of uniform swing analysis all the time.
19       Obviously this is an unusual pair of elections in
20   that in general the Democrats did quite well in 2008, and in
21   general the Republicans did quite well in 2010.  There were
22   extreme partisan tides in the opposite directions, but that's
23   not to say that certainly a one election to the next swing of
24   8 percent is to be commonly expected.  That was an unusual
25   pair of elections back to back.

## Page 252

1    Q.  Well what about the next election after that?  What happened
2    then?
3    A.  What happened from --
4    Q.  In 2010.
5    A.  From 54 to 47 --
6    Q.  After we go from 55 to 44 we go from 54 to 47 in the next
7    election cycle.  So you have an 8-and-a-half percent swing
8    and then a 7 percent swing back to back.
9    A.  And you're asking me --
10       MR. YEAGER:  Object, it's not 7 percent.
11       THE WITNESS:  47.6 percent I think is what you're
12   trying to say.
13       Sure.  So I'll answer with respect to that.
14       I mean that actually brings a different set of
15   factors in because obviously what happens in 2012 was not
16   just a change from the 2010 Republican tide year, but there
17   was obviously also redistricting.  So you have a different
18   set of Congressional races that are factoring into the number
19   that's being reported there.
20       So the point is if you just want -- if you're just
21   asking is the math correct, certainly there is a swing there
22   that is something on the order of 6 or 7 percent or so.  But
23   the point here is that there are obviously factors that go
24   into making it not-terribly reliable just to say let's look
25   at the difference from 2010 to 2012 or from '08 to 2010, and

## Page 253

1    characterize that as a typical or not typical uniform swing.
2    BY MR. CARVIN:
3    Q.  Well let's go back to Table 5 on page 57.
4    A.  Okay.
5    Q.  All right.  We see here, if there is a uniform swing of as
6    little as 3.37 percent from the 2012 year, then Democrats
7    will win at one-half of the Congressional districts.
8        Are you opining that a 3.37 diminution in
9    Republican votes share in 2018 or 2020 is unlikely?
10       MR. YEAGER:  Objection, vague and ambiguous.
11       You may answer.
12       THE WITNESS:  Okay.  I'm not giving an opinion as
13   to whether in general a 3.37 percent swing in the Democratic
14   direction is, as an absolute matter categorically likely or
15   unlikely.  It's certainly context dependent.
16       To give a more concrete example, let's suppose we
17   had a really good Republican year, a historically good
18   Republican year, whatever the vote share was in that year.
19   How likely is it that in the next election the Republicans
20   would do even better and have another 3 percent swing in the
21   Republican direction?
22       Well knowing that the benchmark for that was an
23   already good Republican year, that's probably less likely.
24       But let's suppose the converse, that we just had a
25   really good Democratic year, an historically good Democratic

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 254

1    year.  How likely is it that in the next election, from this
2    previous really good Democratic year, will we have a swing of
3    3 percent in the Republican direction.
4         That's obviously a lot more likely.  That's what I
5    mean when I say it's context dependent.  There is no absolute
6    answer when you're trying to compare one election to the
7    next --
8    BY MR. CARVIN:
9    Q.  So you're not opining that a 3.37 percent swing from the
10   Republican vote share in November of 2012 is outside of the
11   range of reasonable alternative electoral conditions for 2018
12   and 2020, correct?
13        MR. YEAGER:  Please finish your prior answer,
14   Professor, unless he withdraws the question.
15        THE WITNESS:  Okay.  I'll finish what I was saying
16   before and then I'll let you ask your next question.
17        My point was just generally that it's context
18   dependent.  And certainly the sort of reasonable swings from
19   a prior election, which is what you were just asking me about
20   that one can expect, depends on whether that prior election
21   was a really good Republican year or really good Democratic
22   year or a neutral year, or whatever.
23        That's the point when I say -- that's what --
24   that's the basis of why I'm saying you can't just give an
25   absolute answer as to this is or is not a large or reasonable

## Page 255

1    uniform swing.
2    BY MR. CARVIN:
3    Q.  And you haven't analyzed any of the contextual factors that
4    would affect the swing in 2018 or 2020, right?
5    A.  I haven't analyzed the 2018 elections at all so I'm not
6    making any predictions or saying what sort of uniform
7    swing --
8    Q.  So you're not opining that a 3.37 percent uniform swing is
9    outside the range of reasonable alternative electoral
10   condition in 2018 or 2020, correct?
11   A.  Swing compared to what?  Are you talking about a swing from
12   2016?
13   Q.  2012.
14   A.  Oh.  From '12.  So you're saying would the difference between
15   the 2012 to 2018 elections, could we see a 3.37 percent
16   uniform swing?  That's the question, right?
17   Q.  Yes.
18   A.  And I haven't specifically analyzed that.  In part because
19   again, to go back to my earlier answer, I'm not an elections
20   forecaster here.  I'm not making a specific prediction about
21   what is the probability that we'll see a particular outcome
22   in the specific 2018 or specifically the 2020 election.
23   Q.  And since you haven't analyzed it you are not making that a
24   3.37 percent uniform swing from the 2012 election results is
25   outside the range of reasonable alternative electoral

## Page 256

1    conditions in 2018 or 2020, correct?
2    A.  With respect to the 2018 elections and the 2020 elections, I
3    am not even forecasting what those elections would, results
4    would be.  So I'm obviously not going to be able to opine on
5    a specific prediction about what kind of uniform swing we
6    might or might not see.  That goes back to election
7    forecasting.
8    Q.  Right.  So you're not making any prediction as to whether or
9    not, in any of the three seats, whether or not Democrats
10   will -- whether Republicans will retain majority control
11   under reasonable alternative electoral conditions?
12   A.  In any of the three seats?
13   Q.  Any of the three chambers at issue.
14   A.  Any of the three chambers?
15   Q.  Sure.
16   A.  Okay.  Am I making a prediction as to whether the Democrats
17   would win one-half or the Republicans would retain control?
18        I mean that's a separate question.  And again I
19   would say that the same caveat as before, I'm obviously not
20   forecasting specific 2018 election outcomes.  But in
21   expectations, we would certainly not expect the Democrats
22   under the current districting plans to win one-half of the
23   current districts in any of those three plans.
24   Q.  Now I have to ask the same question again.
25        So you're saying you certainly would not expect a

## Page 257

1    3.37 percent uniform swing from the 2012 election results in
2    Congress in either 2018 or 2020?
3    A.  I think that's the same question that I just answered so I'm
4    going to answer that question as I understood it.
5        And again what I'm saying here is I'm not making a
6    specific election forecast about 2018.  But again, in the
7    long term, in the long-run expectation over any number of
8    elections, we normally don't expect to see such a uniform
9    swing of a negative 3.37 percent.
10   Q.  You don't?  Why is that?  What's the average swing throughout
11   a decade in state legislative races?
12   A.  I'm not sure I could tell you that off the top of my head.
13   I'd need a definition of what you're talking about.  Are you
14   talking about the change from '12 to '14?  Something like
15   that?
16   Q.  Throughout the decade, what kind of changes in either
17   direction is typical in the majority of state legislative
18   elections?
19        MR. YEAGER:  Objection, vague and ambiguous.
20        You can answer.
21   BY MR. CARVIN:
22   Q.  Do you know?
23   A.  It's not something I can tell you off the top of my head.
24   Q.  What's the range?
25   A.  Same answer as before.  I don't have those numbers in front

## Page 258

1    of me to give you precise numbers.

2    Q.  So you don't know if 3.37 percent is well within the expected

3    range of swings, correct?

4    A.  What I am saying here is that over the long-term average we

5    don't expect to see -- in long-term expectation we don't see

6    it.  And obviously again I'm not saying with respect to a

7    particular election we will or will not see uniform swing of

8    a particular size.

9        If what you mean by uniform swing is the change

10   from say '12 to '14, or the change from '14 to '16, that's a

11   specific -- that's another specific definition of a uniform

12   swing, and certainly we have the numbers in front of us here

13   to at least characterize a little bit of what those swings

14   have been under the current decade.

15       But that's a different analysis altogether.

16   Q.  What is your reasonable expectation in the long term for

17   whether or not there will be a 3.37 percent uniform swing

18   from the 2012 Congressional election results?

19   A.  I'm not sure I understand the question.

20   Q.  You keep saying that you're not making any forecast for 2018

21   or 2020, you're talking about long-term expectations.  What

22   is your long-term expectation for a likely or reasonable

23   uniform swing from 2012 election results for Republicans?

24   A.  Okay.  My answer is going to be that I haven't done that

25   specific study.

## Page 259

1    Q.  All right.  And can you turn to page 57?

2    A.  Okay.

3    Q.  Okay.  For the State Senate, you say they need a 6.4 percent

4    uniform swing, for Democrats to win one-half of the Senate

5    districts, correct?

6    A.  We're talking about November 2014 Congressional --

7    Q.  Right.

8    A.  -- second row?  Yes, I see the 6.45 percent.

9    Q.  And November of 2014 was an excellent year for Republicans in

10   the Senate, right?  Your statewide excellent predictor of

11   seats predicted 23 or 24, when in fact they won 27, is that

12   right?

13   A.  Okay.  We're talking about the State Senate elections now.

14       I agree that the November 2014 elections were good

15   for the Republicans.

16   Q.  Is it an unreasonable alteration in electoral conditions that

17   there will be 6.4 percent worse in any elections during this

18   decade?

19       THE WITNESS:  Could I have that read back?

20       (Record read:  Q.  Is it an unreasonable

21   alteration in electoral conditions that there will do

22   6.4 percent worse in any elections during this decade?)

23       THE WITNESS:  I think it's fair to say that that

24   would be a fairly large gap to overcome.  Again, I'm not

25   forecasting to say that it could never happen.  I'm just

## Page 260

1    saying that in general in expectations we don't expect a

2    uniform swing that large.

3    BY MR. CARVIN:

4    Q.  Who is we?  Why don't you expect that?

5    A.  Sure.  Obviously by we I'm speaking for myself here.

6    Q.  You haven't analyzed the issues so how can you have

7    expectations one way or the other?

8    A.  Sure.  I'm saying I haven't precisely calculated a threshold

9    for each particular set of elections showing a distribution

10   of what sort of uniform swings we would or would not expect.

11       And this is just based on my general looking at

12   election results in Michigan, which I'm not saying that I've

13   done a specific study to calculate a threshold.

14   Q.  Well what's been the most recent history in the Senate in

15   terms of swings statewide?

16   A.  You're asking about a swing from one election to the next?

17   Or you're asking from a long-term average?

18   Q.  Either.

19   A.  I don't have the data here in front of me to be able to give

20   you any sort of precise number.

21   Q.  Turn to page 65, please.

22       Again we see, do we not, between 2006 and 2010, in

23   one election cycle we see a nearly 9 percent increase in

24   Republican vote share?

25   A.  Okay, I got you.  You're pointing to the second part of this

## Page 261

1    table here.

2    Q.  Right.

3    A.  So I appreciate that you're pointing me to some actual

4    election data here.  And, sure, I can affirm your math that

5    from say '06 to 2010 there is a swing of something almost

6    like 9 percent.  That's not necessarily how I would answer

7    the question of what sort of uniform swings we would expect.

8        So I think your question was just about the math,

9    so I'll stop there because I think I answered your question.

10   Q.  Okay.  But you haven't analyzed swings in any way for State

11   Senate elections in Michigan, right?

12   A.  I wouldn't say I haven't analyzed them in anyway.  I haven't

13   analyzed it specifically with an eye towards answering the

14   question that, about what is or is not a reasonable uniform

15   swing.

16       I mean I think in general one wouldn't do so by

17   saying, well, look, we've got a change from '06 to 2010 of

18   about 9 percent, so clearly that's typical.  That wouldn't

19   really be the appropriate way to do it.

20       You might do something like looking at the

21   long-term average.

22   Q.  And -- go ahead.

23   A.  Okay.  I was just going to say one might look at the

24   long-term average --

25   Q.  But you haven't looked at the long-term average, have you?

## Page 262

1    A.   Okay, I'm just going to finish answering the previous

2    question.  And then I'll try to remember this question.

3         So one might do something like looking at the

4    long-term average, and then saying what were the swings

5    during individual elections from that long-term average, and

6    what range was actually possible, or what ranges were

7    observed.

8         And then I think your next question was whether

9    I've done that, and obviously I said, no, I haven't

10   specifically done that.

11   Q.   Okay.  If I ask you what you've looked at, it would be very

12   helpful because we're particularly short on time, if you

13   could answer that question, rather than hypothesize what one

14   could do.  Is that okay?

15   A.   All right.  I appreciate that.

16   Q.   Thank you.  If you could turn to page 57?

17   A.   (Witness complied.)

18   Q.   Okay.  Now the uniform vote swing we need to give Democrats

19   one-half of the House districts, if you look at 2012 would be

20   a change of one percent -- 1.04 percentage points.

21        Are you going to opine that a swing of 1.04

22   percentage points from the results in 2012 is outside the

23   range of reasonable alternative electoral conditions in 2018

24   or 2020?

25   A.   Well the point here is that it hasn't happened.  We've seen

## Page 263

1    three election results and it hasn't happened.  And the same

2    qualification before in that I'm not opining that in general

3    a particular uniform swing is or is not likely.  It's always

4    context dependent here.  But certainly we haven't seen such a

5    uniform swing from the 2012 election results.

6         That is not to say, however, that one would never

7    expect to see a 1.04 percent uniform swing from some election

8    result.  That, again, is another separate -- is a different

9    question altogether.

10        But specifically from the 1.04 percent listed there

11   in November of 2012 row, we haven't seen 1.04 percent swing.

12   Q.   We haven't?  Well let's turn to page 65 again, right?

13        You're saying, I take it, we haven't seen that

14   swing in 2014 and 2016, was that your point?

15   A.   We haven't seen the swing from the 2012 result is what I was

16   saying.

17   Q.   From meaning since?

18   A.   No.  No.  No.  No.  From meaning take the results of the 2012

19   and subtract 1.04 percent from every district.  That's what I

20   mean by from 2012 .

21        I'm not saying was there such a change from '14 to

22   '16.  Obviously there have been swings from one election to

23   the next larger than 1.04 percent.  That's goes without

24   saying.

25   Q.   Right.  For example from between 2010 and 2012 they lost,

## Page 264

1    what, roughly 7 percent in one election cycle?

2    A.   That's right.  2010 was a really strong Republican year.

3    Q.   Right.

4    A.   And then 2012 was kind of a strong Democratic year.

5    Q.   Right.  And if 2016 was a strong Republican year and 2018 was

6    a strong Democratic year, there is no reason not to expect a

7    swing of equal magnitude, or certainly more than the one

8    percent, right?

9    A.   And now we're talking about swings from one election to the

10   next, and you're specifically talking about the 2016

11   election.

12   Q.   Right.

13   A.   We're no longer talking about the 2012 election where that

14   1.04 percent number came from.

15   Q.   Right.

16   A.   And I agree with you that certainly 2016 was obviously a

17   pretty good Republican year.  And if, very hypothetically,

18   there were to be a strong Democratic year next, then

19   certainly we may very well expect a swing of over 1.04

20   percent.

21   Q.   Well let's look at page 57.

22        In this very good Republican year of November 2016

23   a swing from 4 percent, just 4 percent between that and 2018

24   would give Democrats one House -- one-half of the House

25   districts.  You are not opining in any way I take it that a 4

## Page 265

1    percent negative swing against Republicans is at all unlikely

2    from 2016 to 2018, is that right?

3    A.   Did you say unlikely?

4    Q.   Yes.  Is at all unlikely.

5    A.   Is at all unlikely.

6         I'm not sure that I've done the analysis to be able

7    to specifically answer this.  I haven't done the analysis to

8    be able to specifically answer that.

9         But I'm just pointing out that was a very different

10   question from asking whether a particular uniform swing from

11   the 2012 results was likely.

12        Now the response to my different question is that you've done

13   no analysis and cannot opine whether it's likely or unlikely

14   that Republicans will get 4 percent less statewide vote than

15   they got in 2016, right?

16   A.   I agree it's not something I've specifically analyzed.

17   Q.   Or analyzed in general?

18   A.   Well I've generally looked at election results, but I'm

19   agreeing that I have not specifically analyzed the question

20   that you posed to me.

21   Q.   And you're asking the question how much would it take to give

22   Democrats one-half of the House district.  Right?

23   A.   In the bottom --

24   Q.   In the House.

25   A.   Okay, I gotcha.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 266

1  Q.  Why would you ask that question when the non-simulated plans
2  give Republicans roughly 58 percent -- 58 of the House
3  districts?  Isn't the relevant question what swing is
4  necessary to return them to what occurred under the simulated
5  plans?
6  A.  I'm not sure -- you just said in your question when the
7  non-simulated plans gave the Republicans 58.
8  Q.  I'm sorry, if I said -- let me rephrase the question.
9      As we discussed at length the vast majority of the
10  nonpartisan simulated plans would have given Republicans 58
11  seats under the way you analyzed that.  If that is true,
12  shouldn't we ask ourselves what would the vote swing be
13  necessary to give Republicans 58 seats instead of 55 seats?
14  A.  Okay.  I gotcha.
15      I agree that there is a possibility, or one can do
16  that, as a purely statistical matter.  You can certainly take
17  districts from a simulated plan, analyze them using statewide
18  elections, and then apply various uniform swings to see what
19  the effect on the number of Republican seats would be.
20      I didn't do that analysis here.  That analysis
21  wasn't appropriate for the question that was put forth to me
22  here.  So that's why I didn't do it here.
23  Q.  All right.  The uniform swing analysis assumes an equal swing
24  in every district, right?
25  A.  That's essentially what it does.  You're applying various

## Page 267

1  hypothetical swings at an equal percentage in every district.
2  Q.  Right.  And your touchstone for when they achieve half of the
3  House districts or half of the Senate districts or half of
4  the Congressional districts looks at the vote needed in the
5  median district to turn Democrat, right?
6  A.  If I could ask --
7  Q.  You're looking at the median district percentage, right?
8  A.  I gotcha.  You're saying for the purposes of calculating
9  whether or not Democrats are going to be able to win
10  one-half.
11  Q.  Right.
12  A.  It's not quite -- I get why you're saying that.  It's not
13  quite literally the median district.  And it's just a small
14  technical thing, you can feel free to cut me off if you don't
15  want to hear the technical explanation.
16      When I say one-half of the House districts or
17  one-half of the Congressional districts in this table, I'm
18  saying 55 out of 110, or seven out of 14 of the Congressional
19  districts.
20      To win that you don't literally need to win the
21  median district.  The median district is statistically
22  calculated as, for the House plan, the mid point between 55
23  and 56.  Just a small technical point.  That's what we mean
24  by the median.  That's just statistically how you calculate
25  the median.

## Page 268

1      To calculate the median Congressional district,
2  you're calculating the midpoint between number seven and
3  number eight.
4  Q.  You're looking at the vote swing necessary in the 7th
5  district, the 7th most --
6  A.  For the Congressional plan that's what's going on here in
7  this plan.
8  Q.  Okay.
9  A.  It's the 7th ward, in the House, it's the 55th.
10  Q.  Isn't it true that the vote swings in the most competitive
11  districts in state tend to change more than the statewide
12  average?
13  A.  That is not a question I have analyzed in the context of
14  these districts.
15  Q.  Doesn't it make sense that if elections are competitive, the
16  Democrats, the Republicans are going to be putting a lot more
17  resources and candidate recruitment into those districts that
18  are winnable, than they would in either safe Republican or
19  safe Democratic districts in order to achieve a majority?
20  A.  That is not a question that I've analyzed in my work here.
21  Q.  Have you thought about it?
22      I'll just ask you generally.  Do parties put more
23  money into competitive elections that will swing a
24  legislative body in their favor than they do into safe seats
25  that will have no effect on whether or not the body swings?

## Page 269

1  You haven't looked at that?
2  A.  Again I'm going to say that's outside of my expertise.
3      I'm obviously aware of that as a general strategy.
4  I can't say that's within my expertise to say that's a
5  general pattern that's happening in Michigan.
6  Q.  Okay.  If you could turn to page 56, please.
7      Okay.  On page 56 you analyzed -- you say that
8  Congressional Districts 1, 4, 5, 8, 9, 10, 11 and 12 are
9  partisan outliers?
10  A.  I see that paragraph there.
11  Q.  Okay.  And you conclude from that these are the most
12  effectively cracked and packed districts in the enacted maps,
13  on page 56?
14  A.  Where are you referring to on 56?
15  Q.  The last paragraph.
16  A.  Right.  Just with the same caveat that I was just
17  operationalizing those terms cracking and packing in the way
18  we discussed at length earlier today.
19  Q.  I'm just trying to figure out -- we can go through the
20  appendix.  As I understand it, you looked at -- well, maybe
21  it will be helpful to look to -- go to Appendix D5 and D3 on
22  page 74 and 75, okay?  Do have that in front of you?
23  A.  Yes, sir.
24  Q.  First one is titled Comparison of Each Enacted Plan District
25  to the District that Geographically Overlaps Most with the

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 270

1  Enacted District.  And then D3 is a Comparison of the Enacted
2  Plan District to Simulated District Containing at least 50
3  Percent of the Enacted District's Population.
4      I assume from your report that your judgement on
5  the packing and cracking that we just talked about was based
6  on the comparison with the 50 percent of the enacted
7  district's population, not based on the one that
8  geographically overlaps most, but tell me if I'm wrong.
9  A.  That is my recollection of what I did, it was Appendix D3 is
10  the one we're talking about here.
11  Q.  Right.
12  A.  That's my recollection.  I think I spelled out somewhere in
13  the report exactly what I was -- which figure we were looking
14  at.
15  Q.  Right.  And I'm trying to save time, but stop me if you need
16  to.
17      As I understood it what you did is you said it was
18  a partisan outlier and packed and cracked, and was outside
19  that middle 95 percent range that we talked about comprising
20  the districts where you have a 50 percent overlap in
21  population.
22  A.  I think that's basically right.  I was constructing the 95
23  percent interval.
24  Q.  Yes.
25  A.  And then asking whether or not the enacted district in each

## Page 271

1  of these rows was inside or outside of that 95 percent
2  interval.
3  Q.  Okay.  So let's look at D3 in your appendix, D3, okay.  And
4  you may have to go back, I apologize, to make sure I'm not
5  misleading you.  But you listed District 1 on page 56 as one
6  of these partisan outliers.  You can keep going back if you
7  need to, it's page 56.
8  A.  I gotcha.
9  Q.  So I want to ask you some questions about CD-1.
10      The only thing I see on your graph there is a more
11  Republican district, a somewhat safer Republican district.
12  Why would that be a packed or cracked partisan outlier?  Am I
13  misunderstanding?  The star is the enacted plan district,
14  right?
15  A.  Correct.
16  Q.  And the thing to its right, meaning more Republican, is the
17  50 percent of the enacted plan -- the simulated plans that
18  overlap by 50 percent.
19      So how could CD-1, if it's less Republican, be a
20  pro-Republican district?
21  A.  Okay.  Well all I'm doing here as I said a moment ago is I am
22  just looking at -- and this is a purely technical exercise.
23  Q.  Okay.
24  A.  I'm just looking at the middle 95 percent range.  And I'm
25  just asking is that red star representing the enacted

## Page 272

1  Congressional District 1, each Congressional district here,
2  is it inside or outside of that range.  And if it's outside,
3  I'm listing that in that paragraph.
4  Q.  Okay.
5  A.  And all I meant to say is I didn't -- I obviously didn't
6  intend to, and I apologize if I accidentally misled you with
7  that paragraph regarding the partisan direction of the.  I
8  simply said what's a 95 percent interval, and if it was
9  outside of that, then it would be listed.
10  Q.  All right.  So I had a lot of those questions along those
11  lines, but I'm again going to cut to the chase with you.
12      If I understand what you just said correctly, if
13  the enacted plan is outside of the range represented by
14  these, I don't know what else to call it, the concentrated
15  circles, I don't want to call them blobs, but if they're
16  outside of that, then that's the decision-making process that
17  led you to include them among the districts that you
18  categorized as partisan outliers: whereas if the star appears
19  within those districts, within the blobs, then you don't
20  characterize them that way?
21  A.  That's basically right.  Again, it is a purely statistical
22  exercise here.  And obviously you and I talked quite a bit at
23  length earlier today about how I was attempting to just
24  operationalize, even though I don't have a particular
25  scientific understanding of the terms cracking and packing, I

## Page 273

1  just took a very specific statistical identification here
2  where I said, what's the 95 percent interval, that middle 95
3  percent range, and is the enacted district within or outside
4  of it.
5      That's it.  I just wanted to make sure that was
6  clear.
7  Q.  Okay.  Well even in light of that, I thank you because that
8  saved us a boat load of time.
9      I'm still a little confused.
10      If you could turn to Appendix D6 on page 78, right?
11  And again, check me on page 56, but I think you list District
12  8 as one of these partisan outliers, that Senate District 8
13  if you want to check me on page 56?
14  A.  On 56.
15  Q.  I'm representing to you that you listed SD-8 as one of the
16  partisan outliers.  If you want to check my veracity you can
17  look at page 56 and see if I got that right.
18  A.  I gotcha.
19  Q.  So now I have a question about SD-8 based on the thing on
20  page 78.
21      I would have thought that that circle would have
22  been between the two blobs, so it wouldn't have been a
23  partisan outlier under the mechanistic view that you just
24  described.  So how did SD-8 wind up on this list?
25  A.  Right.  I think what you're saying is you're seeing two

## Page 274

1    distinct blobs.

2    Q.  Yes.

3    A.  And you can't understand why 95 percent of them would be on

4    one side rather than the other.  And I get where you're

5    coming from.

6    Q.  Right.

7    A.  The answer again is I actually did just construct a middle 95

8    percent interval.  And I realize that it's difficult to

9    concern how many circles are here, and obviously I don't have

10   the data file in front of me here to be able to prove it to

11   you or verify it right in front of us.  But again what I did

12   here --

13   Q.  So your --

14   A.  Let me just --

15   Q.  Sure.

16   A.  What this figure is doing is just stacking a bunch of gray

17   circles on top of each other, and often it's in a very close

18   cluster.

19          It is actually really to be able to look at one of

20   these clusters and be able to discern and accurately estimate

21   whether that's several hundred or just 50 or 20 or so

22   circles.  That's why it's probably -- it's not a safe bet to

23   try to just look at the blobs and try to estimate out those

24   numbers.

25          But again what I'm saying what I did was I actually

## Page 275

1    did calculate the middle 95 percent range.  And just because

2    you see a blob there doesn't necessarily mean -- on the left,

3    doesn't necessarily mean it's as big as the blob on the

4    right.

5    Q.  Right.  I guess you're going to give me the same answer if

6    you look at SD-27 real quickly?

7          The star is within the blob, but it's at the far

8    end.  So I take it the reason that's identified as an outlier

9    is it's outside the 95 percent middle range?

10   A.  Right.  Same answer as before.

11   Q.  Same answer?

12   A.  Obviously I don't have the data here to verify it right here

13   on the spot.

14   Q.  Right.

15   A.  But you see that blob and it's hard to precisely discern are

16   there really a lot of gray circles at the very left hand, or

17   just a small number.  But my calculation was that that middle

18   95 percent range.

19   Q.  Okay.  And then if you could turn quickly to Appendix D1,

20   please.

21   A.  (Witness complied.)

22   Q.  Okay.

23   A.  Let me just get there.  I gotcha.

24   Q.  So in this one you -- and again I'm trying to cut to the

25   chase here.  You mentioned this in your report, you present

## Page 276

1    this table.  But I didn't see you attach any significance to

2    ranking the Congressional plans or the other plans' districts

3    alined from least to most Republican.  Is that part of your

4    cracking or packing analysis?  Is this part of that?

5    A.  It's a different sort of analysis just looking at outliers.

6    And since you asked about packing and cracking obviously I'm

7    giving the same caveat as before, I don't understand those

8    terms in any sort of scientific, precise, objective way.

9          But this Appendix D1 figure is just generally part

10   of my analysis of district-by-district outliers.  And it's

11   just configured in a slightly different way where I'm lining

12   up the districts from least to most Republican within each

13   plan.  So that's a little bit different than the figures that

14   you and I were just talking about a moment ago because now

15   we're not looking at, say, the simulated districts that

16   geographically overlap with an active Congressional district,

17   but instead we're looking at the most Democratic district at

18   the very bottom.  Then we're looking at the second most

19   Democrat district on the second row.  In the third row, we're

20   looking at the third most Democratic district, and so on.

21          So it's just a somewhat different basis of

22   comparison for looking at partisan outliers in this form.

23   Q.  All right.  If you could turn to page four of your report,

24   please.

25          MR. YEAGER:  Page four?

## Page 277

1          MR. CARVIN:  Four.

2    BY MR. CARVIN:

3    Q.  The only reason I'm directing you to this is the last

4    paragraph where you say, the algorithm freezes the enacted

5    plan's boundaries of House Plans 1 through 10.  Do you

6    see that in the fourth paragraph there?

7    A.  Yes, I see that.

8    Q.  And that's consistent with your recollection, you froze House

9    Districts 1 through 10?

10   A.  Yes, there was more than that.  But House Districts 1 through

11   10 were certainly frozen.

12   Q.  Okay.  And then if you look at HD-2, okay, turn to page 80

13   I'll represent to you that all the other House -- we talked

14   about Flint before, but the other ones, HD-1 through 10 you

15   just see one star and one blob around it, and I assume that's

16   the consequence of the freeze?

17   A.  Yes.

18   Q.  But if you go to HD-2, you see the star at the far end of a

19   big blob, which suggests to me that there was alternative

20   versions of HD-2.  But please explain.

21   A.  No, that's not correct.  You were correct all the way up

22   until the end, so I'll clarify where the misunderstanding I

23   think on your part came from.

24   Q.  Okay.

25   A.  So we're on Appendix D8, right?  I just want to make sure.

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

## Page 278

1    Q.   Right.

2    A.   So HD-2, the row for HD-2 is the 17th row from the bottom,

3         you see that, right?

4    Q.   Yes.

5    A.   So what that means is HD-2 in the enacted plan is the 17th

6         most Democratic district ranked by Republican -- by partisan

7         vote share.  And that is how I ordered the enacted districts

8         along the vertical axis of this figure.

9              Now I rank ordered the districts in the simulated

10        plans, the one thousand simulated plans, using exactly that

11        same measure ranked from --

12   Q.   Please finish.

13   A.   I'm happy to interrupt my explanation there.

14   Q.   Because I'm just going to confirm if I do have it.  If you

15        look at appendix D-4 on page 76?

16   A.   Okay.  Let me get to where you are.

17   Q.   Do you have that?

18   A.   Yes, sir.

19   Q.   Okay.  I'm going to ask you to trust me that you said you

20        froze SD-6 and SD-7, and you had the same kind of

21        configuration that I just identified for the House district.

22             I take it your explanation for SD-6 and SD-7 is

23        essentially the same you just gave me for the House district,

24        why there is blobs and all that because this is a rank

25        ordering exercise?

## Page 279

1    A.   Right.  Same thing again.  So there SD-6, you see that's the

2         tenth row from the bottom, that means SD-6 is listed there

3         along with those gray circles as the tenth most Democratic

4         district in each enacted and simulated plan.

5              So all those gray blobs, all the gray circles that

6         you see on that tenth row, those are not referring to

7         simulated districts in the same geographic area as SD-6,

8         instead they're referring to the tenth most Democratic

9         district.

10   Q.   Whatever -- and it's undoubtedly not the same number, it's a

11        different number.  Whatever it is, it just happens to be the

12        tenth most in your example?

13   A.   Right.  So SD-6, even though it's frozen in every plan, is

14        not necessarily the tenth most Democratic district in each

15        plan.

16   Q.   I'll try it one last time to make sure I got it straight.

17        You're not comparing SD-6 in the enacted plan to the

18        simulated plans, you're comparing SD-6 in the enacted plan to

19        whatever district corresponds with it in the rank ordering of

20        Democratic and Congressional districts?

21   A.   Exactly.

22   Q.   Right.

23   A.   That district may well be in a completely different part of

24        the state.

25   Q.   Okay.

## Page 280

1              MR. CARVIN:  Can you give me one second?

2              (At 5:50 p.m. went off the record.)

3              (At 5:50 p.m. went on the record.)

4              MR. CARVIN:  For your sake as well as my own, I

5         want to end this pleasant exercise.  We have no further

6         questions.

7              THE WITNESS:  Thank you, sir.

8              (Deposition concluded at 5:51 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 281

1          CERTIFICATION OF COURT REPORTER AND NOTARY PUBLIC

2                         _____

3

4     STATE OF MICHIGAN  )

5                      )  SS

6     COUNTY OF MUSKEGON )

7

8          I certify that this transcript, consisting of 281

9     pages, is a complete, true and correct record of the

10    testimony of JOWIE CHEN held in this case on September 7,

11    2018.

12         I also certify that prior to taking this deposition

13    JOWIE CHEN was duly sworn to tell the truth.

14

15

16    DATE:  September 9, 2018

17

18

      _____

19    MARJORIE A. COVEY, CSR-2616

      141 East Michigan Avenue, Suite 206

20    Kalamazoo, MI 49007

      1.800.878.8750

21

           Notary Public Expires:  October 14, 2021, Muskegon

22    County, Michigan/Acting in the State of Michigan.

23

24

25

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 282

**A**

**a.m** 1:24 4:2,24
36:1,2 38:19
38:20 45:24
45:25 64:9
64:10
**ability** 77:10
139:7
**able** 47:6,9
51:23 56:17
71:4 77:14
96:13,18
110:19
123:24 128:2
146:6 148:13
162:25
178:12
194:19,24
211:3 223:18
224:11
241:17 256:4
260:19 265:6
265:8 267:9
274:10,19,20
**abounding**
130:15
**absence**
183:24
**absent** 236:17
**absolute** 77:14
99:6 194:5
216:17
239:20
240:19
253:14 254:5
254:25
**absolutely**
203:8
**abstract**
133:25
**academic** 22:3
97:12 134:24
166:17,17
169:1,3,13,14
182:8 190:14
200:17 201:3
205:2 242:7
**accept** 108:5
108:10
**acceptable**
15:9
**accepted** 76:9
198:8 205:16
205:21
**access** 160:17
**accidentally**
112:3 272:6
**accomplish**
166:24
**account** 90:5
90:21 96:7
142:23
214:25
**accounting**

213:22
**accuracy**
191:23
**accurate** 25:20
153:7 173:3
180:10 181:4
188:14,18,22
191:17,19
194:16
197:23
242:23
**accurately**
28:23 30:23
161:1 199:10
274:20
**achieve** 84:13
86:19 94:1
95:19 96:5
104:13
128:18
132:16 145:9
145:11
159:11 171:7
171:11,14
267:2 268:19
**achieved**
219:22
232:20
**achieves** 93:24
94:2
**achieving**
168:19
**acknowledge**
185:24
215:11
**acknowledging**
199:4 204:18
**act** 90:3,5,22
91:12,13,19
92:3,8,20
95:15,18,22
96:8,17,25
100:6 146:16
**activate** 60:1
**active** 276:16
**actual** 41:24
52:19,24
53:14,25
58:20 153:4
176:4,19
177:25
178:12
188:14,19
199:10 202:9
230:4,4
232:24
235:19 261:3
**add** 21:18 57:6
71:19 104:13
119:20
**added** 54:9,10
231:10
**adding** 104:11
105:4,10

121:5 123:19
127:3 185:25
186:2 206:24
206:24,25
**addition** 17:7
17:12 19:7
19:15 51:4
67:19 129:7
145:17,17
186:9
**additional**
79:23 116:9
127:5,11
**addresses** 11:7
11:24,25
**adds** 105:3,4
105:16
**adhered**
155:17
**adherence**
117:14,18
**adjoin** 112:3
**adjudicate**
187:25
**admissible**
14:18
**admit** 8:20
**admittedly**
243:25
**admitting**
185:1
**adopted** 19:8
**Advancement**
30:25
**advantage**
184:2,12
**advantaging**
106:4
**affect** 56:14
75:9,19
88:14 174:22
181:12
183:23 184:3
184:6 185:6
185:7,12
186:20 187:2
187:3 211:19
212:10 255:4
**affirm** 146:3
220:4 231:16
231:16 261:4
**affirming** 198:7
220:8 226:17
235:20
**aforementio...**
128:19
**African** 92:25
93:18
**afternoon**
98:18
**age** 92:24,25
93:18
**aggregated**
189:18 190:8

233:17
**ago** 7:11 9:5,9
13:5 42:12
45:2,4 57:18
58:1 60:12
73:21 81:1
87:12 125:2
152:25 155:3
157:16
208:12 222:3
234:14
271:21
276:14
**agree** 73:18
74:24 175:1
178:23 207:1
215:6 232:9
259:14
264:16
265:16
266:15
**agreeing** 165:4
165:15
166:12
220:12
265:19
**ahead** 20:6
33:3 40:15
68:18 126:16
139:4 169:8
174:20
195:17 233:4
261:22
**Alaska's**
130:14
**Alaskan** 130:18
**Aleutian**
130:14,18
**algorithm**
11:21,22
12:5 19:9
41:15,18,22
44:21 56:20
57:17 68:14
77:22 78:4
78:17 80:6
81:8 82:6
90:2,4 92:21
92:22 95:14
95:16,21
96:7,10,12,22
103:23 104:3
104:4,14,16
104:24 105:2
105:7,13,14
106:1 108:5
108:12
109:11
110:23
113:18 114:5
114:10,14
118:1 123:1
123:4,20

124:21 125:8
128:17,20
132:7 135:4
140:16,17
141:4,25
143:5 149:11
149:20,22
150:1,25
152:1 153:10
154:4 155:14
155:17 156:3
158:17
161:10
163:24 167:7
213:25
214:13
215:21 277:4
**algorithms**
41:24 45:4
167:2 168:23
169:9
**align** 27:23
**alined** 276:3
**allege** 27:7
**alleged** 6:15
27:11 69:24
70:3,14,20
**alleging** 6:19
25:23 26:11
26:15,18
29:1
**allocate** 167:24
**allow** 27:21
113:18 203:9
**allowable**
103:13
**allowing**
109:18
**alluded** 248:18
**alluding** 224:15
**alteration**
259:16,21
**alternative**
31:20 32:7
33:20 34:17
36:5 39:25
40:7 46:3
48:7,22,24
134:3 135:5
135:25 136:4
152:2 161:4
161:5 162:1
162:4,4,5
163:20 178:9
201:17,21,23
202:5 249:5
249:12,21
254:11 255:9
255:25
256:11
262:23
277:19
**alternatives**
146:9 160:11

160:22 161:9
162:18
165:20 166:2
202:18
**altogether**
108:17
222:10
258:15 263:9
**amalgam**
190:22
**ambiguity**
13:17 81:3
115:13
**ambiguous**
44:11 51:12
208:25
253:10
257:19
**American**
92:25 93:18
**amount** 56:12
82:24 87:16
126:8 238:5
239:19
**analogous** 96:1
134:4 136:21
137:5 138:4
164:19
165:16
**analogs** 166:25
167:2
**analogy** 56:8
58:4 165:6,8
166:16,19
**analyses**
170:10 172:1
178:17
197:10
**analysis** 9:6,8
10:12 12:7,9
12:10,15,18
18:17 20:2
29:4 31:4,7
61:11 89:19
89:25 152:16
153:3,21
157:5 164:18
165:1 169:6
170:14 174:2
175:5 176:1
176:4,9
177:18 184:5
185:21 186:9
187:7 188:3
192:11
196:11 198:3
201:5 204:12
204:20 207:5
207:6,24
212:17
248:18
251:18
258:15 265:6

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 160-5, PageID.6589   Filed 12/14/18   Page 75 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 283

265: 7,13
266: 20,20,23
276: 4,5,10
**analyze** 7:24
11:21 14:7
16:9 31:5,8
87:5,9
106:15
144:13
149:18 150:9
152:6 158:5
166:2 174:16
177:2,5,13,20
207:7 208:4
208:10
212:15 230:2
241:22,24
266:17
**analyzed** 7:14
8:8 10:4,17
10:18 14:8
16:12 17:9
19:12 24:12
24:18,20,21
25:1,2 27:1
29:3,7 30:1
46:25 84:3
87:6 89:1
95:1,10
101:1 110:19
127:20 138:6
158:24
160:18 161:7
171:17
175:25
186:10 212:5
212:9,10
244:23
249:14
250:22 251:2
255:3,5,18,23
260:6 261:10
261:12,13
265:16,17,19
266:11
268:13,20
269:7
**analyzing** 10:5
29:24 83:13
152:2 161:5
165:18,22
170:20,24
171:11 177:6
177:14
184:14
185:13
213:16
214:22
**anchored**
244:21
**anchoring**
245:1
**and/or** 33:9
48:21

**Ann** 1:24 4:1
111:20 113:5
113:7,12,13
113:14,15,16
113:20 114:6
**anomalous**
183:25
**answer** 10:16
12:17 13:16
13:18 14:19
15:13 17:2
21:9,14 28:8
28:21 32:4
33:4,14
34:11,14,22
34:24 35:10
35:15,19,24
36:7,14,20
37:1,3,7,11
37:12,16,18
37:23,25
39:2,4,10
40:2,14
42:18 43:10
43:12,13,15
43:17,19,20
44:12,17
45:12,16,17
45:23 46:11
47:6 49:8,10
49:18 52:22
53:18 54:12
57:11,12
59:14,15
60:11 61:15
63:13,15
64:16 69:12
70:25 71:2,5
72:21,22
73:17,22
74:8,9 75:18
77:15 81:11
81:12 82:1
83:8 84:1,21
85:4,11
86:23 88:16
89:17,21,25
91:8 92:5,7,9
93:14 94:4
96:18 97:7,8
98:6,9
105:20
106:14
110:24,25
111:5 117:15
121:16
124:24
125:21 127:9
127:15
129:15 130:8
134:9,22,23
135:8,9,10,17
135:17
136:16

138:24 139:9
139:11,15,23
140:7 142:14
142:25 143:9
143:20,23,24
144:4 145:22
149:24
150:12 151:1
152:4,16
155:10
158:12
160:24
161:16
164:15,23
165:3 166:5
166:11,15
169:24 172:7
172:17 174:4
175:7 179:8
179:10
186:24
187:16 189:6
195:7,14,15
195:17,21
204:6 205:14
205:23 206:4
206:5 207:22
209:1,2
213:11
218:14
224:12 227:5
230:22
236:20
237:14 241:6
241:9,13
246:18
248:11
250:24
252:13
253:11 254:6
254:13,25
255:19 257:4
257:20,25
258:24 261:6
262:13 265:7
265:8 274:7
275:5,10,11
**answerable**
21:10
**answered** 14:9
21:15 38:1
52:21 57:10
59:13 60:10
69:11 70:9
72:20 74:7
93:13 129:14
142:24
157:15 172:6
172:16 174:3
195:5 206:3
207:21
208:25
240:25 241:5
257:3 261:9

**answering**
64:5 70:9
85:6 121:23
139:6 204:17
208:19 240:4
240:11
261:13 262:1
**answers** 20:23
146:22 162:7
193:9
**anti-Democr...**
242:3
**antidemocratic**
25:24
**anybody** 47:18
133:24 135:1
157:3 160:16
**anyway** 261:12
**apart** 85:17,22
86:9,9
111:11,12,23
111:25 112:1
112:5,7,11,13
112:20
117:17
178:18
242:24
**Apol** 114:19,20
**apologize** 15:5
15:12 39:16
45:10 57:14
68:17 70:7
98:25 115:13
142:19
179:15 202:8
204:7 217:11
217:11
231:22 232:8
238:6 271:4
272:6
**apparently**
47:3 81:9
**appear** 24:5
**APPEARANCES**
2:1
**appears** 5:3
217:25
224:13
272:18
**appendix** 77:20
269:20,21
270:9 271:3
273:10
275:19 276:9
277:25
278:15
**apples** 234:1
235:24 236:1
236:9
**apples-to-ap...**
119:22
120:18,25
178:14 245:7
**apples-to-or...**

232:23
233:19
234:19 236:5
236:15 244:7
248:1
**applicant**
164:21
**application**
168:21
**applied** 31:19
67:21 97:24
98:12 101:10
102:3,23
164:21
176:15
177:21
**applies** 10:4
71:1 107:20
164:6 204:12
232:12
**apply** 68:4
95:20 171:22
175:10
176:13 178:9
266:18
**applying** 67:7
202:20
205:11
212:18
214:12
266:25
**apportioned**
145:7
**appreciate**
39:5 135:12
174:19
247:22 261:3
262:15
**appreciative**
147:3
**approach** 93:9
93:11,15
94:15 112:21
**approaches**
19:22 199:20
**approaching**
198:22
**appropriate**
21:11,15
34:8 48:12
261:19
266:21
**approval**
194:10
**Arbor** 1:24 4:1
111:20 113:5
113:7,12,13
113:14,15,16
113:20 114:6
**area** 91:15
92:16,22,24
93:2,17
94:21 95:4,5
95:12 111:16

128:21
134:16
140:18,24
141:17
142:22
169:22
201:18,20,24
202:14,15
203:2 279:7
**areas** 90:8
169:14
**argued** 6:24
**arguing** 6:18
164:19
202:19
**argument** 7:2
**arrive** 82:8,15
**arriving** 157:18
174:5 199:18
**article** 22:11
22:14,16
133:8,19
134:16 135:2
136:2 181:16
181:21 182:1
182:2,5,8
**articles** 135:22
136:11,18,21
137:2,4,14
169:5
**articulated**
22:8 227:1
**ascribed**
133:20
**aside** 68:5
**asked** 8:15
18:9 50:23
52:21 57:10
59:13 60:10
61:8 62:19
69:2,11
72:20 73:21
74:7 93:13
126:11
129:14
134:22
142:24
150:13 155:4
166:19 172:6
172:16 174:3
195:5 206:3
207:21
208:24
215:10
240:25 241:5
241:12 276:6
**asking** 4:17 7:5
7:7 12:13,15
15:14 16:25
16:25 25:4
27:14 43:7
44:5 53:23
53:24 54:2
69:3,5 80:8

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 160-5, PageID.6590   Filed 12/14/18   Page 76 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 284

81:21 89:16
97:11 104:20
105:19
106:10 109:9
122:6 133:23
133:24 135:2
136:4 137:10
137:25 146:3
149:9,21
157:10,11
159:6 163:19
169:7,21
177:20
179:20
185:23
186:18,20,22
190:6 208:6
208:10 210:2
213:6 220:2
221:15
222:16
223:11 224:3
229:1 232:5
237:3 240:5
246:10,10
252:9,21
254:19
260:16,17
265:10,21
270:25
271:25
**asks** 21:14
193:10,13
**assertion**
150:21
**assess** 178:19
233:25
**assessed** 196:6
**assessment**
235:2
**assigned**
234:20
235:23
**Association**
30:25
**assume** 47:23
89:4,13,18,20
89:21 105:21
109:20
115:14
121:16
125:16 134:3
142:3 153:20
161:7 202:17
236:16 270:4
277:15
**assumes**
124:21
158:10
266:23
**assuming** 49:9
49:17 109:19
**assumption**
48:1

**attach** 276:1
**attached** 31:23
33:20 34:2
34:18 35:3,8
36:5,18 40:1
40:13 42:13
42:20,22
43:5,8,23
44:5 45:8,13
46:4,19 47:1
48:24 49:23
**attempt** 8:13
19:16 102:21
**attempting**
13:7 272:21
**attention** 31:16
98:19 99:4
147:18 183:2
184:6
**attitude** 75:10
**attribute**
102:21
199:10
213:19
**attributed**
133:8 134:17
136:2
**atypical** 63:7
**August** 63:1,12
64:3,15
**authored** 24:8
28:14
**authors** 137:18
182:20
**automatically**
54:18,20,24
59:12 60:8
73:25 74:15
75:2 89:18
200:1 211:25
**autosave** 54:20
54:25 55:5
55:10 59:22
60:2
**autosaves**
60:14
**available** 21:25
52:10 160:22
164:13
165:20,25
166:2
**Avenue** 2:10,19
281:19
**average** 108:13
108:15,17
173:17
230:13
257:10 258:4
260:17
261:21,24,25
262:4,5
268:12
**avoid** 12:5 13:2
19:25

**avoidable**
81:10
**avoidance**
12:16
**avoiding** 12:25
15:6,23
**aware** 22:4,14
22:15 26:11
26:14,14,16
34:17,19
47:10,12
49:4 55:6
69:20,23,25
70:3,10,13,15
70:19 75:7
97:1 98:2
110:10
114:12,21
134:25
135:13
182:11,24
198:14,17
199:9,12,17
199:24 205:1
205:15,21
206:5,9
242:5 269:3
**awfully** 73:14
**awhile** 8:5 9:17
18:13,20
150:14
**awkward** 38:24
**axis** 278:8

**——— B ———**
**back** 7:8 10:1
22:5 34:15
36:3 37:4
38:21 40:14
41:1 44:15
46:1 49:5,16
50:23,24
52:4 55:13
62:6,12
63:23 64:11
70:7,24
81:12 89:8
98:15 112:16
113:3 150:18
155:12 160:4
177:17 179:4
180:13
185:20
195:25
208:20
212:22
217:21
218:25 225:3
238:2 245:24
248:14
251:25,25
252:8,8
253:3 255:19
256:6 259:19

271:4,6
**background**
111:13
**backward**
171:25
**backwards**
202:8
**bad** 130:9
**Baker** 2:4
**ballots** 192:21
**ballpark**
107:10
223:23
224:14
226:11
231:13
**band** 109:17
**banned** 5:19
**base** 112:2
176:9
**based** 17:15
97:6 157:6
157:13
159:25
164:20
173:13 174:1
176:4,11
177:25
182:16 186:9
186:10
192:11
196:11
197:10
207:19 235:3
260:11 270:5
270:7 273:19
**basic** 154:14,24
**basically** 51:21
81:21 90:11
133:24
169:16
190:24 191:7
192:8 203:13
208:10
219:24
222:11
223:11 249:1
270:22
272:21
**basis** 6:25 47:5
73:17 77:1
110:25
148:19
150:21 151:1
152:5 160:24
162:15,15
163:5 183:4
185:14
204:16
225:22
230:23
234:20 246:8
254:24
276:21

**beginning** 4:14
25:19 204:24
**begins** 99:14
**behalf** 24:2,5
**believe** 6:7 7:1
11:6 21:14
22:23 23:11
23:19,25
24:20,24
25:7,9,20
31:6,9 43:10
43:13 50:23
50:24 66:3
79:7 107:10
107:11 112:9
123:12
129:18 159:9
160:24
182:13,15
203:17
206:24
217:24
**benchmark**
85:13,14,19
85:21 86:8
86:13,18
87:13,17,21
88:3 131:14
131:17 214:2
215:1,8,17,19
241:8,11
253:22
**benefits** 246:6
**best** 6:17 7:10
7:11 8:4 9:15
16:4,5 18:12
18:14,15,16
18:18 19:23
20:4,7,8,9,18
23:11 25:17
25:21 26:9,9
28:21,23
34:24 35:24
37:12,15
43:18 44:1
52:5 55:2,17
55:24 58:23
61:15 84:1,3
85:5,21 97:3
97:5,9,15,17
109:10 111:5
111:6 121:23
122:8 127:15
128:3,9,14
139:2,7,9
144:20 156:3
200:14 201:7
201:12
205:11 211:4
213:11 218:7
223:16 224:8
224:13 225:2
229:8
**bet** 274:22

**better** 161:11
168:18 179:2
179:7 180:23
181:2,15,16
182:3,4,6
183:4 193:18
253:20
**better-qualif...**
164:6,8,20
**beyond** 96:9,14
96:18 102:19
105:20
132:22
142:17 144:8
144:8,9
164:10,16
170:19,24
**bias** 18:1,8,9
20:3 21:7
26:16,18
27:1,3,8,11
198:10 216:8
216:15 225:5
225:17 238:6
238:25 239:4
239:19
242:14
248:19
**biases** 180:16
**big** 124:11
162:3 241:12
275:3 277:19
**bigger** 123:22
241:14
**BILL** 1:8
**bit** 17:23 32:22
64:21 82:2
82:12 85:3
107:19
109:17,24
129:3 134:21
155:6 163:19
169:1 171:10
184:21
192:20,23
209:7 211:21
214:4 219:18
220:24
223:14
226:21,21
229:9 238:1
247:22
250:10
258:13
272:22
276:13
**black** 29:25
30:4 92:24
94:16 95:6
164:6,8,20
**blanket** 77:10
229:13
**blanking**
182:22

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 285

**blind** 149:23
**blob** 275:2,3,7
  275:15
  277:15,19
**blobs** 272:15
  272:19
  273:22 274:1
  274:23
  278:24 279:5
**block** 31:12
  112:2
**board** 5:18
  31:1 184:13
  184:15
**boat** 273:8
**bodies** 248:24
**body** 196:12,14
  268:24,25
**bonus** 210:24
  211:21 212:7
  212:11
**bonuses** 211:9
**boost** 186:2
**borrowed**
  200:22
**bottom** 5:6
  147:24,25
  265:23
  276:18 278:2
  279:2
**boundaries**
  12:1 82:21
  85:15,16
  88:12 97:21
  100:1,3
  102:17,25
  104:5 120:12
  167:6 214:12
  277:5
**boundary**
  214:11
**BRDAK** 1:5
**break** 33:16
  35:22 45:22
  71:7 79:23
  81:9 99:25
  100:3,7
  101:14,23
  103:1,1,12
  104:1 114:8
  115:16,19
  116:8,9,10,18
  116:19,25
  118:12,13
  121:17 124:5
  124:16
  125:14 127:5
  127:12,22
  147:7 150:13
  150:14,21
  195:22
**breakdown**
  187:20
**breaking** 84:8

84:9,9,13,14
  86:8,9
  101:21 117:4
  117:24,25
  118:3,5
  127:3
**breaks** 78:15
  78:24 79:16
  79:17,22
  80:2,10 81:2
  81:5,6,7,7,23
  81:25 82:7,8
  82:14,15,25
  83:5,7 84:25
  85:22 86:2
  86:14,15,18
  86:20 87:14
  87:16 88:8
  102:9 103:24
  112:18
  114:16 115:3
  115:4,11,21
  116:2 118:18
  121:8,25
  122:4,5,10,16
  122:19 123:3
  123:6 124:9
  125:19 126:9
  127:18,23,24
  128:7,9,12,13
  159:2,6,7,10
  159:17,20
  160:7,10,20
  161:9,11
  162:2,6
**BRIAN** 2:18
**briefly** 10:16
  135:21
**bring** 79:10
  103:16 105:5
  105:23 106:2
**brings** 127:1,2
  181:7 252:14
**broad** 199:24
  211:8
**broader** 68:21
  120:24
  158:21,22
**broadly** 194:7
**broke** 115:9,10
  115:14,15
  116:15
**broken** 84:20
  84:24 99:7
  99:18 101:19
  105:1 106:11
**brought** 126:24
**Brown** 23:18
  23:20 25:3,4
**Bshekell@cla...**
  2:21
**build** 15:2
  104:8 143:14
**building** 112:2

158:2 168:16
  214:15
  215:23
**built** 14:22
  214:13
  237:20
**bunch** 135:5
  194:24 220:8
  223:8 224:17
  224:18 226:9
  274:16
**bunking** 12:16
**BVAP** 93:23,25
  94:2,9,9,22
  95:5,12,20,24
  96:2,5

------ C ------

**c** 1:6 145:6,18
**calculate** 8:13
  9:18,24 10:9
  20:12 95:20
  122:10 128:9
  130:14 188:9
  223:19
  260:13
  267:24 268:1
  275:1
**calculated** 8:24
  9:19 16:13
  20:14 108:19
  117:8 129:8
  129:17
  138:12
  151:11
  172:20
  209:18
  221:12,13,14
  232:13
  233:22
  244:13 250:1
  260:8 267:22
**calculating**
  10:5,7 16:19
  137:15
  244:10 267:8
  268:2
**calculation**
  16:23 20:16
  108:22
  216:10,12,23
  217:15
  223:20
  275:17
**calculations**
  10:22 18:2
  209:3 217:23
  221:11 248:6
**calendar**
  174:24
**call** 10:14 12:4
  13:6 17:8
  71:23 85:13
  108:9 115:20

118:9 163:8
  163:11,17
  201:10 202:2
  204:2 239:13
  272:14,15
**called** 4:8 18:3
  65:7 66:3,3
  145:3 208:17
  226:12
**calling** 101:10
**calls** 97:6
  118:11 134:8
  145:20
  161:14
**campaign**
  181:12 184:1
  184:1 185:11
  186:3,5
  211:20
**cancelling**
  211:17
**candidate**
  29:23,24,25
  30:5 164:13
  268:17
**candidates**
  29:8 184:1
  194:11
**capable** 95:17
**capacity** 1:16
**captured** 111:2
  156:20
**care** 140:16
**career** 21:21
**careful** 92:6
  93:5
**Carolina** 18:22
  60:16,21
  61:20 62:4
  62:13,15
  139:25 140:4
  140:6 186:9
  186:16 187:8
  187:15
**Carolina's**
  140:2
**carved** 120:4
**Carvin** 2:9 3:7
  5:13,16 8:17
  28:5,9 32:9
  33:7,13,17,20
  33:23 34:15
  34:16 35:2
  35:12,17,25
  36:3,4,11,17
  36:22 38:3,5
  38:13,17,21
  39:24 40:5
  40:24 41:5,8
  41:9 43:9,24
  44:16 46:1,2
  47:15,17
  48:4,19 49:3

49:9,25 50:1
  51:3,13,16
  52:25 53:20
  58:5 60:3,15
  63:5,17 64:6
  64:17,22,24
  65:1 68:19
  69:16 71:6
  72:24 74:17
  75:21 81:17
  83:2 87:1
  89:23 90:25
  91:3,6,22
  93:20 98:3
  98:15,17,25
  99:2 125:6
  125:25
  126:13,15
  127:13
  129:21
  134:13
  135:19
  137:21 139:3
  140:12 143:4
  144:1,14
  146:1 147:10
  147:23
  150:15,18,19
  153:18
  158:25 162:9
  164:24
  165:10,13
  166:13
  172:12
  173:10
  174:13
  179:12
  189:13
  193:16
  195:10,17,19
  195:25 196:1
  206:12
  207:25
  209:11,25
  210:4 225:10
  225:12
  230:10 233:3
  233:7 236:24
  237:23 241:2
  241:18 247:5
  248:14,15
  253:2 254:8
  255:2 257:21
  260:3 277:1
  277:2 280:1
  280:4
**case** 1:7 5:2
  6:6,12,12,23
  7:4,8,9,13
  9:4,12,16
  10:3,13,17
  11:6,19 12:7
  14:3 16:8
  17:21 18:17

18:23 19:1,5
  21:12,19
  23:12,16,19
  24:3,17,18
  25:4 26:3
  27:7,10 28:2
  28:6,10,13,14
  28:16,22
  29:3 30:10
  30:17,18,21
  31:2,5,11,23
  41:7 46:17
  60:21 61:3
  61:20 62:13
  62:15 71:20
  71:20 74:12
  75:2 77:23
  86:17 87:18
  87:25 91:15
  98:12 113:13
  119:25
  120:19 125:3
  133:8,19
  170:17
  174:14 181:3
  181:5 187:7
  187:15 194:2
  197:15
  202:23
  213:12
  226:17
  232:18
  281:10
**cases** 5:4,8
  21:2 22:17
  22:19,25
  23:1,5,9
  25:15 28:24
  98:1 113:11
  114:12
  134:14 182:3
  195:11
**catch** 147:22
**categorically**
  253:14
**categorized**
  272:18
**category**
  217:19,20
**cause** 84:19
**caused** 89:5,14
**causing** 115:18
  115:19
**caveat** 118:20
  204:23,23
  205:9 256:19
  269:16 276:7
**caveats** 197:20
  223:25
  224:10
**CD-1** 271:9,19
**certain** 20:25
  58:11 75:23
  82:19,23

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 286

84:6,6,7,12
84:12,19
94:9 96:2,3
97:20 110:13
113:1,2
155:12
201:14,16
224:23
**certainly** 16:15
17:16 21:4
21:12,16,19
21:22 26:25
34:4 41:14
41:21 44:21
55:6,18,20
56:23 61:18
65:15,16
73:7,8,23
74:12 81:23
82:4 84:5
90:19 95:20
100:21 102:7
131:25
132:17
136:11,18
141:11
148:14 152:4
153:8 154:12
161:4 162:23
165:7 167:7
168:17
172:18
178:24
185:12
190:11 194:2
199:20 200:9
213:12 215:7
218:20
229:12 231:6
234:13
239:23 240:8
240:14
241:24 250:8
250:9 251:23
252:21
253:15
254:18
256:21,25
258:12 263:4
264:7,16,19
266:16
277:11
**certainty**
138:10 152:9
153:13,20
154:2,13
157:5,13,19
172:4 197:4
197:23
**CERTIFICATI...**
281:1
**certify** 281:8
281:12
**challenge** 6:7

23:13,16,24
24:1 26:10
26:17
**challenged**
23:7,20,20
29:18
**challenger**
183:25
185:16
**challenging**
25:15 26:1
28:17,20
**chamber** 249:4
249:18
**chambers**
256:13,14
**chance** 147:11
**change** 52:11
54:7,8 59:6,7
84:20 247:9
252:16
257:14 258:9
258:10
261:17
262:20
263:21
268:11
**changed** 54:6
**changes** 41:20
42:4 44:22
52:4,13
55:16,25
57:15,15
58:24,25
59:3,10
88:11 97:21
104:5 126:8
257:16
**characteriza...**
25:20 138:23
139:6 171:21
171:23
172:10 173:1
173:4,6
199:2 203:12
234:25 242:7
242:23 248:1
**characteriza...**
190:1 242:12
**characterize**
10:15 11:15
27:2 28:24
31:13 92:7
93:5 154:15
166:23 178:2
178:2 186:16
194:19
198:11,12
204:15
230:17 235:7
239:3,20,23
239:24 240:6
240:17,20,22
240:24 241:3

243:2,5
245:19
246:13,21
249:25 253:1
258:13
272:20
**characterized**
11:20 26:20
132:20
171:20 198:6
203:20 211:8
216:16
228:19,22
242:2,4
243:9,12
245:13,20
**characterizing**
157:25 168:4
172:9 173:21
174:9 189:16
189:24
217:14
220:25
246:25
249:16
**Charles** 114:20
**chart** 117:9
**chase** 90:25
272:11
275:25
**chatting**
150:20
**check** 56:17,18
110:2 198:3
273:11,13,16
**checked** 110:6
**checks** 56:16
198:5,7
**Chen** 1:20 3:6
3:14 4:6,7,11
4:25 33:24
33:25 98:18
98:20 281:10
281:13
**Chen's** 49:10
49:18
**Chicago** 22:9
**choice** 29:25
106:1 117:24
118:3,7
124:13
**choose** 20:25
21:2 36:13
36:16 106:2
**choosing** 102:7
**chose** 36:5
59:1 120:20
**chosen** 105:4
**circle** 17:8
128:22
130:15
140:19,25
141:18
142:22 221:5

273:21
**circles** 224:23
224:25
272:15 274:9
274:17,22
275:16 279:3
279:5
**circumscribed**
17:8 148:20
**circumscribing**
128:22
140:19,25
141:18
142:22
**circumstance**
179:24
**circumstances**
21:1 123:2
124:21 145:3
145:4,10,13
210:9 242:1
248:22
**cite** 99:24
133:8 182:5
182:8
**cited** 69:23,24
70:3,13,14,19
199:10
**cities** 103:15
103:16 104:2
104:13,23,25
105:22 106:8
106:10 111:2
**Citizens** 6:23
9:4
**city** 5:17 6:3,8
6:8,13,15 7:7
7:19,22
100:3,7
103:18
105:24 106:2
106:4 113:4
113:7,10,15
114:16 145:7
167:16,17
168:1
**claim** 73:14
**claiming** 224:7
**clarified**
139:17
159:23
**clarify** 4:18
13:12 37:21
40:14 45:7
48:9 72:14
79:25 85:4
90:23 91:17
91:23 92:1
116:13
121:18 154:8
157:16
179:16
185:20 221:4
222:12 227:6

227:8 229:16
233:8 235:17
246:19
247:10
277:22
**clarifying**
105:11,14
198:17 207:7
**clarity** 78:1
**Clark** 2:18
**class** 57:23
**classes** 56:5
**clean** 212:1
**clean-up** 47:21
**clear** 4:16 7:6
11:13 14:11
26:18 39:6
44:2 66:21
99:6 103:2
105:6 109:5
119:2 132:1
139:10,11
159:13
176:22
200:19
203:21
237:25
238:23 273:6
**clearer** 202:10
**clearly** 59:3
119:6 131:5
159:19,21
164:5 205:6
243:3 261:18
**Clerk** 114:19
**clever** 34:7
**Clinton** 182:22
**close** 106:17,21
139:22
174:25 190:4
218:23
231:16,17
244:18
247:20
274:17
**closer** 192:24
226:22
**cluster** 197:14
222:8,9
225:1 239:11
239:12,14
274:18
**clustered**
191:8 192:9
197:16
224:23
**clustering**
224:24 226:6
**clusters** 213:13
222:19,22
224:17,18
239:8,11,17
274:20
**co-author** 31:6

**co-authors**
182:14
**co-counsel**
2:13,17
48:14
**coast** 140:3
**code** 42:2 50:4
50:5,10,10,15
50:17,18
51:1,4,6,7,7
51:11,15,17
51:21 52:4
52:19,24
53:4,13 54:1
54:6,6,9,22
54:23 55:8
55:14,22
56:1,6 57:19
58:16 59:6,9
60:6,7,8,14
60:17,18,20
61:4,5,9,10
61:21 62:10
62:19,22
63:11 64:2
64:14 68:6
95:20 96:21
96:22 111:3
111:9,9,22
112:19,22
118:11
120:12 122:2
122:2,4
125:9 128:7
128:11 142:8
143:11,14
148:24
156:22 157:2
158:3,19
215:24,24
237:20
242:20
**codes** 57:21
**collection**
176:10 177:9
**colloquially**
200:23
**Colored** 30:25
**column** 117:10
117:11
224:17,18
**columns** 121:5
**combination**
214:22
**combine**
214:15
**combined**
124:1 125:4
125:12 214:9
**come** 68:20
78:18 79:20
81:9 86:10
87:16 94:8
112:16 142:2

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 160-5, PageID.6593   Filed 12/14/18   Page 79 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 287

155:12 178:8
178:14
212:22
247:20
comes 5:13
130:10 132:2
210:11
comfortable
138:11,14
206:10
coming 155:25
208:23
222:12 274:5
command
54:10 149:2
comment 41:4
commenting
67:9
comments
139:8,12
153:12
commercial
166:25 167:2
167:8
commission
156:8
common 16:14
16:14,15,16
66:1
commonly
17:14,18,23
65:6,20
71:14 72:7
72:11 129:25
167:8 251:24
commonsense
221:15
Commonwea...
10:11
communicati...
38:24 45:21
communicati...
36:25 37:2,8
37:11,24
43:14 45:18
communities
68:10,25
69:9 70:4,21
77:4,8,11
83:23
community
29:25 71:25
76:9,22
130:3 198:9
compact
130:23
131:17,20
132:4 134:7
140:22
144:10,11
148:15 149:2
150:11
152:10 153:9
compactness

16:1,7,16,20
16:20,24
17:4,8,9,12
17:17 72:10
73:8,9,14,15
74:14,15
78:15 84:24
85:1 128:18
129:5,18
131:5,7
132:2,8
133:4 137:23
142:2,13
143:6,7,10,16
144:3,6,24
145:2,9,11,14
145:16,16,19
146:5,7,8,12
146:13
147:12 148:7
149:3,9,12,15
149:16,19,20
149:22 150:1
150:6,7,24
151:9,11,22
151:24,25
152:15
208:15
compactness...
149:21
company
167:14
comparable
12:10 138:21
138:22,25
139:18,19,20
140:9
compare 7:25
100:19 135:5
136:11
137:22
140:10
160:10 178:4
178:21 182:2
208:13
233:10 234:7
247:11 248:2
254:6
compared 7:17
10:21 136:19
151:5 158:13
161:25
162:21
191:13
233:14
239:21 248:5
255:11
comparing
9:10 119:23
120:18
133:25 140:5
151:2 153:4
153:6 157:11
157:21 160:2

162:16
163:12 177:7
181:21
230:11
232:24 236:3
279:17,18
comparison
79:3 87:10
119:22
120:18,25
138:10 157:7
157:8,14
165:19 178:5
178:15 183:4
204:1 232:24
233:20
234:19
235:22,24
236:5,5,13,15
240:21 244:7
245:7 269:24
270:1,6
276:22
comparisons
245:4
competitive
205:12,25
206:2 268:10
268:15,23
compiled 50:15
50:18 51:1
52:24 53:7,7
60:18 62:8
compiler 55:4
55:10 59:21
60:13 65:2,3
65:12 66:2
compilers
59:17 65:6
65:19,25
complaint
31:23 33:21
34:2,18 35:4
35:8 36:6
38:8 40:1,13
42:14,20,23
43:5,8,23
44:6 45:8,14
46:4,9,20
47:2 48:24
complaints
36:19
complete 92:9
104:10
212:19 281:9
completely
38:4 82:10
95:1 110:24
116:3,3,6
118:5,14,14
130:18,25
131:7 149:20
149:23 165:8
174:23

177:24
178:17
231:25 232:2
241:20 244:5
279:23
compliance
103:17
105:23
108:22
117:13 156:2
complied 66:9
103:22
114:24
128:16
129:23
140:14
262:17
275:21
complies 96:24
comply 92:2
96:10,24
components
187:20
composed
121:11,13
composition
7:16 24:19
24:20,21
25:11 29:9
31:8 195:3
195:12 222:5
226:14,19
227:13
compositions
95:10
compound
227:4
comprehensi...
230:16
comprise
126:20,20
comprising
270:19
compromised
102:5
computed
153:19
computer 7:18
7:19 8:9
14:23,24
15:3,22
34:25 60:13
68:6 80:9
82:17,19
93:15 95:16
95:19 96:13
96:20,22
111:3,9,22
112:19,22
118:11
120:12 122:2
122:2,4
123:2 126:9
128:7,8,11

132:7 142:7
143:14
148:23
149:10,10
151:15
156:10,22
157:2 158:3
158:19
159:15
161:10 167:6
215:12,24,24
227:25 230:8
237:20
242:20
computer-si...
7:22 10:21
24:13 25:14
37:17 77:22
79:4 119:23
120:8,19,22
121:1 129:19
136:14 151:5
159:22
162:16
201:17,22,23
202:13
208:13
228:12,17
243:11
245:21 246:4
computer-si...
135:3
computerize
143:14
concentrated
272:14
concentration
213:9
concept 103:25
163:21
concepts
212:16
concern 45:21
274:9
concerns 63:20
conclude
148:10,13
151:20 153:7
269:11
concluded
27:10 227:9
237:6 280:8
concluding
166:20 227:7
conclusion
29:16,17
30:4,7 86:25
89:18,21,22
133:3 134:8
142:17
145:21
148:17
214:21 219:9
225:15

227:12 237:4
237:15
conclusions
153:5 161:21
248:2
concrete
253:16
condition
249:13
255:10
conditions
249:6,22,24
254:11 256:1
256:11
259:16,21
262:23
conduct 13:21
conducted 19:5
19:6 24:10
29:4
Conference
28:1
confidence
153:21,22,23
155:1 157:6
208:16,21
209:6
confidences
49:12,20
configuration
84:13 124:3
124:7 125:8
278:21
configurations
24:25 158:9
configured
276:11
confirm 34:3
140:16
278:14
conform
128:12
conformed
208:8
confused 4:17
35:13 51:14
202:5 273:9
Congress 32:14
35:6 40:7,8
188:23
193:18
206:20 251:6
257:2
congressional
2:13,17
10:18 23:14
23:21,22,23
23:24 24:14
25:12 31:20
40:17,22
45:8 78:4
79:4,4 80:1,9
90:12,18,19
92:13 94:7

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 160-5, PageID.6594   Filed 12/14/18   Page 80 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 288

94:10,11,12
99:24,25
100:2,16
101:2 137:23
138:3,4,11,15
139:20,22,25
144:22 145:5
145:8 146:14
146:20
147:13 148:7
148:11,14
152:10 153:9
159:3,5
171:8 172:20
173:13,16,20
174:12 175:8
176:5 180:24
180:25
182:17,18
184:18 189:2
193:4 195:3
216:3 219:12
226:15,18
249:4 252:18
253:7 258:18
259:6 267:4
267:17,18
268:1,6
269:8 272:1
272:1 276:2
276:16
279:20
congressman
170:22
Congresswo-
23:20
connection
40:25
conscious
11:23
consensus
130:2 131:2
198:19,22
199:14,24
206:11
consequence
277:16
consider 14:16
15:1 48:18
85:2 102:8
156:19
191:17
207:19
consideration
19:10 67:3
68:8,23 69:9
considerations
15:2,3,4 29:1
66:23 67:3
67:17,18
69:24 70:14
168:14
considered
13:10 83:21

229:17,22
considering
162:1,18,19
163:20,23
230:5,6
consistent
207:8 277:8
consistently
120:17
consisting
111:21 281:8
console 56:2
56:12 57:19
57:20 58:10
constant 193:3
constituency
183:8 188:5
constitutes
198:10,15
199:15
205:12
constitution
72:3 73:12
73:19,24
74:5,13
constitutional
71:15,21
72:18
constitutions
72:8 73:1,6
74:19,22
76:6,12
constraint 33:3
43:17
constraints
82:2,4
construct
196:20 274:7
constructed
183:9 208:17
constructing
270:22
consult 64:4
consultant
170:2,6
consultation
39:3
consulted
143:12
consulting
101:4
contain 219:3
contained
13:24
Containing
270:2
contains
103:24 122:2
122:3
contend 216:6
contending
157:23
159:10,12
contends 182:5

content 37:10
37:24
CONTENTS 3:1
context 57:8
77:20 106:12
130:10 131:3
131:10 138:8
139:24 140:8
147:19 164:4
166:16
168:15 169:2
169:4 170:3
180:2,14,22
181:6 196:15
199:23 201:4
213:21
229:10 230:4
230:7 240:16
240:17
246:22
250:16,24
253:15 254:5
254:17 263:4
268:13
contexts 205:4
contextual
255:3
contiguity
78:14,22
99:6,21
contiguous
111:10,24
continues
172:11
control 177:23
177:23 249:3
249:17,20
256:10,17
controlled
25:18 186:11
conversation
38:10,14
48:16
conversations
14:5 32:2,24
36:12,15
39:11 46:16
converse
253:24
conveying
117:9
conveys 117:11
117:11
copies 98:24
copy 54:8
core 169:14
cores 68:9,25
69:9,21
70:11 71:4,8
71:22 75:4
75:15 83:23
84:22 85:8,9
85:20 86:1
86:11,13,20

87:15,21
88:8,19,24
89:3,12
correct 12:8,10
13:11 14:13
17:10 25:24
28:11 30:16
35:4 40:16
42:7 47:15
48:2 51:6,24
66:12,14,24
67:3,11,14,20
68:1 73:1,20
74:20 75:25
76:24 78:7
78:25 79:19
83:25 85:8
89:5,14,17
94:20 99:20
105:13
114:17
121:21
123:12
128:23
144:20
146:14 148:4
149:14
153:11
157:20 166:8
169:18
177:11
183:13
185:22
186:13
188:15
189:15,16
196:7,10
203:24
210:20 215:2
215:5 216:8
220:7,15,25
225:8 234:25
235:1,4,6,14
235:16
236:18
241:23 243:1
243:17 244:1
252:21
254:12
255:10 256:1
258:3 259:5
271:15
277:21,21
281:9
corrected 79:8
79:11
correctly 11:20
34:9 42:6
70:7 81:23
102:1 118:16
126:19
144:19
157:17 214:1
272:12

correlated
188:7,12
correlation
110:7,16,20
188:10
221:24,25
222:1
corresponde-
114:18,22
corresponds
279:19
Corrine 23:18
25:4
cosmetic 55:16
55:16,20,22
55:25 56:25
57:2,5,7,8,15
58:13,15,21
58:22 59:3,6
cosmetics 58:7
58:18
cost 100:14
101:6,16
102:10,15,18
102:20
council 6:8,13
6:15 7:19,23
counsel 2:2,8
12:18 14:6
21:4,8 32:2
32:24 33:8
36:10 37:9
38:24 39:3
39:12 43:14
45:18 47:16
48:4 49:13
49:21,24
50:9 63:16
93:10 100:23
101:4 139:8
143:13,15,20
144:6,16
155:18
counsel's
33:12 38:2
count 39:22
114:8 115:11
115:16,20
120:9 121:8
121:17 122:3
122:6 125:19
126:9 127:5
127:11
128:12
189:14
224:25
counted 116:8
121:25 128:7
187:17
counterfactual
73:16
counties 80:18
80:21,24
84:13 85:18

85:23 86:3,9
88:9 101:14
103:1 105:13
106:11
116:12,20
117:7,21
118:24 120:2
122:8 123:10
123:14,15
125:4,10,11
counting 8:10
112:17 119:3
119:3 190:24
counts 116:21
122:4 128:11
county 5:18
6:23,24 7:5
9:3 29:5,6
31:1 78:14
78:24 79:15
79:16,21,23
80:2,10 81:2
82:7,14 84:9
84:10,24,25
85:16 86:13
86:15,18,20
87:3,8,14,16
96:4 99:7,17
100:1,7,13
101:6,19,21
101:23 102:9
103:3,12,23
104:1,9,10
105:1,3
115:3,4,9,10
115:11,15,19
115:19 116:2
116:4,5,6,8,9
116:9,15,15
116:17,18,19
116:21,22,24
116:25 117:4
117:5,24,25
118:3,5,14,15
118:18,24
119:1,12,13
119:15,16,19
119:19,20
120:1,4,9,12
120:15,20,21
121:2,7,8,10
121:10,10,13
121:17,19,25
122:3,4,10,12
122:16,19
123:3,6,8,22
123:22,23,25
124:5,8,16
125:13,14,17
125:18,18
126:6,9,18,18
126:20,24
127:1,3,5,11
127:12,17,22

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 289

127:23 128:9
128:11,13
159:1,6,7,10
159:16,20
160:7,10,20
161:9,11
162:2,6
281:6,22
**couple** 39:1
167:9 200:9
**course** 14:1
22:15 108:2
130:16 192:1
226:5
**court** 1:1 3:20
4:14 34:5,7
38:8 97:25
114:19,19
134:5,11,14
281:1
**cover** 121:19
173:23
**covering**
119:12
202:14
**covers** 113:15
**Covey** 2:22
281:19
**crack** 201:3,6
203:20
**cracked** 200:4
203:4 204:2
204:11
269:12
270:18
271:12
**cracking**
200:13,19,21
203:16,20
204:19,25
205:8 269:17
270:5 272:25
276:4,6
**create** 32:17
57:24 80:1
94:8 105:9
113:20 144:2
169:19,19
**created** 148:15
152:10 153:9
166:7
**creating**
166:22
**creation**
148:12 237:7
237:7
**criteria** 12:19
12:22 13:2,6
13:9,10,22
14:4,5,8,11
14:13,17,22
15:7,9,19
19:7,8,16
20:19,22

31:18 66:10
66:11,14,22
67:2,7,10,19
67:21,25
68:6,7,13,14
68:15,24
71:13,14,16
72:2,5,9,17
73:5,10,13,15
73:24 74:4
74:16,19,21
74:21,23
76:10,11
77:12 78:2
78:16 79:21
82:23 83:22
83:25 85:2
88:20,22
95:14 98:21
99:11 106:25
107:1 114:20
116:23 117:1
117:14,19
128:19 129:1
129:2,4
141:6,9,10,15
142:3,8,9,12
142:23
143:10,13
144:9,25
149:3 151:10
155:18 156:2
156:4,19
158:2,16,19
158:23
160:11,21
167:21,22,23
168:16,18,19
169:12 212:4
212:8 213:16
213:24
214:12
215:23,25
237:20
242:19
**criterion** 15:23
17:18 31:19
74:1,1,14
84:18
**CSR-2616** 2:22
281:19
**current** 160:14
180:19
184:25
256:22,23
258:14
**currently** 183:9
**curve** 210:23
212:11,12,20
**curves** 211:9
**cut** 90:25
267:14
272:11
275:24

**cutoff** 132:3
204:4
**cycle** 251:13
252:7 260:23
264:1

———— **D** ————
**d** 2:18 101:14
103:14,17
105:24
**D-4** 278:15
**D.C** 2:10
**D1** 275:19
276:9
**D3** 269:21
270:1,9
271:3,3
**D5** 269:21
**D6** 273:10
**D8** 277:25
**Daniels** 2:4
**darn** 174:25
**data** 25:8
194:18
218:13
222:24,24
223:18
224:11
260:19 261:4
274:10
275:12
**DATE** 281:16
**day** 2:9 168:11
**days** 169:25
**de** 83:11,12,17
83:20
**deal** 110:21,23
**dealing** 118:25
131:12
**dealt** 90:7
111:1 112:23
**decade** 25:19
29:19 188:8
192:1 249:13
257:11,16
258:14
259:18,22
**decade's** 85:10
85:13 87:9
88:3 160:14
180:18,20
**decades**
135:22,22
**decide** 21:5
**decision** 22:7
150:23
164:21 166:3
**decision-ma...**
272:16
**decisional**
20:19,22
**decisionmaker**
165:20 166:1
166:3

**decreasing**
101:19
118:18
**default** 55:5
**defendant** 1:18
2:8 4:8 22:21
**Defendants**
1:22 50:4
61:20
**define** 175:21
194:24
**defined** 151:9
175:20 201:8
211:1 216:10
**defines** 117:21
**definitely** 8:24
9:24 16:15
41:12 42:10
43:22 58:22
65:24,25
66:2 77:11
77:11 123:24
131:22
168:18
171:11
**definition**
16:18,19
17:4,6,7 97:4
200:5,6,12,18
200:20 201:3
205:7,14
206:1 207:14
211:3,7
257:13
258:11
**degree** 154:2
172:3 197:4
**delays** 63:22
**delegation**
2:13,17
171:8,9,9
173:13
195:12 207:3
207:18 249:4
**delegations**
195:4
**delete** 54:2
**deliberate**
225:7,19
227:20 228:1
**deliver** 167:15
168:2
**delivering**
168:13
**delivery** 167:15
167:18,24
168:6
**demarcation**
225:18
**demarcator**
226:12
**Democrat**
27:13,17
267:5 276:19

**Democratic**
8:12 27:1,23
110:4,9,15
186:1 189:17
190:21,25
194:11
196:24 200:4
201:14,16,21
201:24,25
202:6,12,15
202:18,24
203:5,23
204:2 206:20
209:13,15,24
209:25 210:2
213:9,13
219:3,7
235:13 239:2
243:4 253:13
253:25,25
254:2,21
264:4,6,18
268:19
276:17,20
278:6 279:3
279:8,14,20
**Democrats**
26:19,24
27:8,11
171:7,14
172:22
173:12 174:1
174:12 175:5
187:5 189:9
192:22
210:16
212:24 217:1
217:2 219:8
219:23 220:7
220:14,23
228:18,20,25
229:4,12,15
242:14,25
248:23
251:20 253:6
256:9,16,21
259:4 262:18
264:24
265:22 267:9
268:16
**demonstration**
46:15,18,25
47:22 48:6
48:20,25
**deny** 156:16
**Department**
97:23
**departs** 150:2
**departure**
83:24 89:2,4
89:10,13
**depend** 179:8
**dependent**
130:10,11

131:3,3,10
138:8 139:24
139:24 180:2
180:14,22
181:6 199:24
250:24
253:15 254:5
254:18 263:4
**depending**
247:9 250:25
**depends** 21:5
85:4,12
86:16 181:3
192:16
196:15
240:16
241:13
250:16
254:20
**depicted**
223:24
**deposed** 24:4
30:13,19
38:9
**deposition**
1:20 4:13
34:1 38:10
38:12,16
48:11 280:8
281:12
**describe** 55:23
77:21 153:19
154:17,20,23
234:17 238:9
**described** 9:9
44:19 66:11
68:20 71:3
82:3 93:9
102:22
117:12 127:4
133:7 144:3
154:18,21
157:17
158:20 170:5
187:14 227:2
273:24
**describes**
103:23 228:8
**describing**
22:16 30:17
30:22 59:22
80:17 110:7
115:23 120:7
129:4 132:23
136:9 141:6
148:5 152:21
156:9 175:24
203:16
**description**
238:23
**designed** 10:25
132:16
155:23
233:25,25

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 160-5, PageID.6596   Filed 12/14/18   Page 82 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 290

designing
  156:3 163:15
detail 13:8
  90:16 111:6
  155:8
detailed 66:17
detailing 79:3
details 111:1
determination
  188:3
determine
  146:7
determined
  11:8 143:13
detracting
  228:23
Detroit 2:20
  108:2 110:13
  110:14
Detzner 22:20
  22:23,23
  23:2,3,12,16
  23:18 24:18
  25:4
develop 167:13
  167:15,18
developed
  101:3 163:24
deviate 102:16
  183:7,11
deviating
  225:6
deviation
  108:13,15,18
  109:1,3,6,15
  109:24 192:3
  197:7,17,18
devoid 225:21
  232:2
DIANA 1:9
DICK 1:11
Dickinson 1:23
dictating 82:19
  82:20
differ 55:12
  154:25
difference 8:1
  8:2 9:14 18:4
  20:2,20 23:8
  26:6 58:19
  83:9,11,17,18
  132:14,14
  134:6 136:3
  136:21,22
  137:7,19
  159:21,25
  179:11,19
  190:6 196:13
  199:14,16
  228:5,9,12,17
  228:24 229:3
  229:3,16,17
  229:21 230:1
  230:3,3,7,9

230:11,17
234:4 243:7
243:16,24
244:5,10,11
244:13,14,21
244:24 245:2
245:6,10,14
245:19
246:11,12,14
246:15,24
247:16
251:15
252:25
255:14
differences
  7:21 9:6,7
  10:15 55:16
  133:9,21
  134:4,18
  136:25 137:4
  137:15,15
  147:12,14
  179:21
  181:13,13
  183:25 198:2
  243:10
  245:21 246:4
different 10:3
  13:13 16:12
  19:5,22 23:1
  23:5,6 29:20
  29:22,23
  42:5 44:24
  46:7,19 48:6
  48:21,22,24
  50:15,25
  59:16,17
  60:9 65:5,6
  68:2 72:12
  77:6,7,7,12
  77:13 82:2,6
  82:12 85:3
  85:17 92:16
  93:21,23,24
  94:5,15
  100:16
  113:23
  115:14,15,18
  116:3,6
  117:25 118:5
  118:14,15
  119:7 122:19
  125:1 130:19
  130:25 131:7
  131:13
  132:17
  134:21
  137:16 140:3
  154:6 155:6
  156:23
  161:10
  163:19,21
  171:10
  177:12,16,19

177:24
178:17
184:21
199:12 205:3
205:4 212:18
213:17
221:18 222:8
222:9 224:19
232:21
236:12 245:1
247:4,7
252:14,17
258:15 263:8
265:9,12
276:5,11,13
276:21
279:11,23
differing 24:24
  24:25
differs 110:1
difficult 274:8
digression
  208:7
diluted 103:18
diminution
  253:8
direct 31:16
  99:4 147:18
  178:5 183:2
directed 106:1
directing 98:19
  277:3
direction
  253:14,21
  254:3 257:17
  272:7
directions
  105:7 251:22
directive
  105:12
directly 140:10
  164:19 178:4
  187:24 234:7
  248:5
disabled 64:19
disadvantaged
  26:23 64:19
disagree 77:3
disagreed
  156:18
disagreeing
  166:14
discern 165:25
  274:20
  275:15
disclose 32:2
  36:25 37:8
  43:14
disclosing
  37:24
disclosure
  37:10
discovery
  48:13 50:3

63:10,22
64:1,13
discuss 43:15
discussed
  214:14
  219:25 220:9
  222:2,2
  266:9 269:18
discusses
  147:12
discussing
  22:3 29:13
  63:11 64:3
  64:15 118:8
discussion
  48:4 103:24
discussions
  143:20 144:6
disfavored
  229:13
disfavoring
  228:18,19
  229:15
  242:25
disfavors
  149:22
  228:24 229:4
disparities
  7:14
display 56:2,13
  57:20,21,22
  57:23
displaying
  56:12
dispute 28:22
distinct 274:1
distinction
  15:25 173:24
  174:19
  179:18 214:4
distinguish
  164:25
distinguishing
  246:20
distracted
  49:15
distribution
  132:25
  154:16 214:9
  214:16 226:4
  230:8,19,24
  233:14,15
  234:7 236:4
  236:14 237:5
  241:25 247:1
  247:12
  249:15 260:9
district 1:1,2
  9:1,20 11:10
  11:14 12:1,2
  19:21 23:22
  23:22,23
  28:18 29:14
  84:8 91:15

92:24 93:7,8
93:16,16,17
93:21,24
94:1,2,4,9,16
94:21,23
95:4,5,6,8,13
95:19,20,24
95:25 96:6
97:21 99:6,8
99:19,25
100:2,13
101:11 102:6
102:16,24,25
104:8,10,14
104:18 105:5
105:9,16
107:7 108:15
108:16
109:16,16
112:4 115:9
115:10,12,12
115:15 116:2
120:11,11
121:4,9,9,11
121:12,18
122:11,18,18
123:25 124:2
124:12,18
125:16,16,17
126:4,25
127:4,22,24
128:22
130:19 132:3
138:11
140:19,19
145:8,8
180:11 183:9
183:22 185:5
185:15,19
189:14,15,20
189:21,22
194:20,22
200:6 201:11
201:13,15,18
201:19 202:1
202:11,12,17
202:19,25
203:4,17
204:1,2
205:13 206:7
229:5,6,8,14
244:14,14
246:6,7
263:19
265:22
266:24 267:1
267:5,7,13,21
267:21 268:1
268:5 269:24
269:25 270:1
270:2,2,25
271:5,11,11
271:13,20
272:1,1

273:3,11,12
276:16,17,19
276:20 278:6
278:21,23
279:4,9,14,19
279:23
district's
  128:21
  140:25
  141:18
  142:22 270:3
  270:7
district-by-di...
  276:10
districting 6:8
  6:13 7:19,20
  11:21,22
  15:8 17:17
  19:15 23:6
  23:14 24:14
  26:1 31:9,21
  66:12,17,22
  67:2 70:5,22
  71:10,13,17
  71:24 72:1,5
  72:17 73:5,9
  73:18 74:1,4
  74:16,21
  75:6,8,10,14
  75:16 76:1,5
  76:10,23
  77:5,12,22
  78:2,3 82:3
  97:13 129:19
  130:17
  136:10 138:3
  138:4 139:18
  148:16,21,25
  149:1 152:11
  152:20,23
  156:24 157:4
  163:3 166:18
  169:15
  171:18
  172:11 173:2
  173:2,4
  178:12,15
  198:4 201:17
  211:19 212:3
  213:16,24
  214:3 216:7
  237:18 238:5
  238:24
  256:22
districts 7:16
  8:9,9,10,11
  8:11,25
  16:20 19:20
  24:22,25
  25:12 28:18
  29:2,5,17
  68:9,25
  69:21 70:11
  71:8 75:5,15

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 160-5, PageID.6597   Filed 12/14/18   Page 83 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 291

80:18,21
82:7,20,22,22
83:23 84:7
84:23,24
85:10,21
86:21 88:19
88:24 89:3
89:12 90:8
90:11,21
91:15,24
92:2,4,11,12
92:13 93:2
94:7,10,12
95:11 96:2,3
102:8 103:17
104:6 105:23
107:3 109:18
110:4,5,8,9
110:14,14,16
115:14,18
116:12,14,22
116:24 117:4
117:8 119:11
119:12,16,17
120:5 123:9
123:12,13,17
123:18,21
125:5,10
126:5,19
128:20 129:9
130:13,15,22
137:25 138:2
138:15
139:21,22,25
140:1,18,22
141:17
143:16 144:2
144:10,24
145:14,19
148:12,15
149:2 150:7
150:11
152:10 153:9
169:25
170:11,20,25
172:10,22,24
173:20
175:19 178:8
178:9 181:9
181:18
184:13 186:4
188:2,8,20
189:8,11
190:5,25
191:21 192:2
192:7 196:7
197:1,1
200:4 201:19
201:22,23
202:13 203:1
203:18
204:10 219:4
231:23
235:11

242:19
244:17 253:7
256:23 259:5
262:19
264:25 266:3
266:17 267:3
267:3,4,16,17
267:19
268:11,14,17
268:19 269:8
269:12
270:20
272:17,19
276:2,12,15
277:5,9,10
278:7,9
279:7,20
divergence
103:14
117:18
diversity 199:4
divide 111:11
111:23
divided 80:18
80:21,24
116:12,22
117:7,22
118:24
119:17 120:2
120:21 121:3
210:19
DIVISION 1:3
Doctrine 32:3
32:25
document 5:11
189:5
documents
246:17
doing 4:12 9:2
9:21,23 11:3
20:16 21:17
27:5,12 41:6
82:19 91:18
119:6 120:24
122:1,1
128:5,20
130:24 135:7
135:22,23
141:3 144:16
156:4 167:1
170:14 172:8
178:1,5,11
185:25
190:11 209:3
210:19
216:17,24
224:8,21
228:10
234:14
251:17
271:21
274:16
dominant
130:2

DONNA 1:7
dots 222:17,22
double 11:10
11:13 12:3
12:16,16,16
19:18 20:1
116:5 118:9
doubled 11:15
doubt 136:7,10
136:17
download 56:8
58:1
downloaded
58:3
downloading
58:3,8,10
draft 32:10
41:1,17,18,23
41:23,24
42:2,3 44:14
45:4,4,9
50:10 51:7,7
51:11,15,17
51:21 52:4
53:4 54:1,8
55:15 58:16
61:8
drafts 41:20,21
44:19,20,21
55:13 59:5,9
59:11
drastic 181:10
draw 82:6,21
85:22 86:10
95:2 121:4
123:21
130:13 135:5
156:8,15,16
167:19 168:6
168:7 223:7
225:15 248:1
drawer 83:21
85:19 86:10
215:11
226:25
drawers 67:9
67:13,15,18
67:23 68:5
142:21 143:2
153:14 161:8
215:14
drawing 13:11
28:17 29:1
69:15 82:22
88:8 130:21
145:2,19
153:5 166:21
167:6 225:7
225:20
227:21 228:1
237:12
drawn 15:22
78:20,21
82:20,20

101:11
102:25 131:9
145:8,10
148:11
150:11 158:2
158:16,22
159:15 162:5
241:20
drew 33:24
130:19
150:24
160:13
drive 2:14
168:3
driven 148:16
148:21,25
149:1 150:23
152:12,14,15
152:20,23
159:24
driver 167:17
168:12
drivers 167:18
167:25 168:1
168:11
due 120:4
183:8
duly 281:13
durability
175:25 177:5
177:13,17,20
178:5,11
248:19
durable 249:21
DURHAL 1:6

_____

E

e 1:7,7 100:11
100:12 103:5
103:9
E-C-L-I-P-S-E
65:7
e-mails 48:14
earlier 14:9,12
41:17,18,21
48:5 67:5
76:4 129:16
137:11 144:9
151:10 173:5
183:14 195:9
208:14
215:10 220:9
232:13
255:19
269:18
272:23
early 40:19
44:19,20
138:7
easier 37:22
easily 130:11
East 281:19
EASTERN 1:2
ebb 192:17

Eclipse 65:7,15
65:20,23,24
66:1
educated
223:14
effect 84:23
88:23 179:2
179:6,9,22
186:14
213:15 214:9
266:19
268:25
effectively
119:14
269:12
efficiency 8:1
8:14,16 9:14
9:19,25 10:5
18:7,9,16
20:11,12,14
20:21,24
21:22 22:2,4
22:9 168:10
198:2,9,15
199:21 216:2
216:19,20
217:1 219:2
219:13,21
220:7,17,20
220:21
221:11,13,18
221:20,24
222:6,14,25
223:2 225:6
225:17,23,25
226:8,10,19
238:7,10,15
239:9,18,25
240:1,15,18
241:21 242:2
242:16,21,25
243:2,5
246:20
efficient
167:25
effort 11:23
131:6 162:6
227:23
efforts 184:1
225:8,20
227:21 228:1
eight 174:8
175:14
206:19
207:18
208:21 209:5
214:8 219:3
219:8,23
221:17
226:15 268:3
eight-Republ...
207:3
eight-six
207:11 222:9

226:8,9,24
either 8:12
9:13,25 10:6
32:17 48:20
67:24 80:25
92:19 93:5
96:10 108:6
123:7 132:1
144:22
160:16
171:11
185:15
187:23
211:10 257:2
257:16
260:18
268:18
elaborate
91:25
elect 219:8,23
elected 170:23
180:17
electing 173:12
174:1 175:5
189:12
election 29:20
171:3,12,22
172:21 173:9
173:23
176:13 177:9
180:6 182:15
182:16,17
183:6,16,20
183:20 184:3
184:5,10,19
187:3,5,18
188:19 190:7
191:13 192:4
192:12,17
193:25 194:1
194:8,17,23
196:16 197:5
197:7,9,13
218:5 219:5
219:14,25
226:20
233:21,23
234:2 235:20
235:21,23
236:12,13,23
245:7 251:8
251:13,23
252:1,7
253:19 254:1
254:6,19,20
255:22,24
256:6,20
257:1,6
258:7,18,23
262:10,16,23
261:4 263:1
263:5,7,22
264:1,9,11,13
265:18

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 292

**elections** 5:18
170:11,12,13
171:15 172:1
172:5 173:18
174:14,16,22
176:5,5,6,12
176:15,17,20
176:23,24
177:3,12,25
178:13,20,21
179:3,7,24,25
180:7,9,13,15
180:19,24
181:1,4,7,14
181:17,18,22
181:22 182:6
182:7,9
183:3,5,5,11
183:13,19
184:6,16,17
185:2,9,12,13
185:14,18
186:1,4,8,14
186:20 187:1
188:13,18,23
189:1,3,8,10
189:19 190:9
190:23 191:1
191:2,3,14,22
191:23 193:3
193:4,18,19
194:15,18
196:6,11,18
196:21,23
197:14 198:1
206:17
207:20
209:14,17
211:20
212:18 217:3
217:9 220:21
224:4 228:15
231:4 232:25
233:11,12,17
233:24 234:1
234:5,5,15,16
234:21
235:13 236:2
236:4,8,17
237:1 243:17
243:19,23
244:1,23,25
246:25 247:2
247:3,13
248:4,6
250:25
251:19,25
255:5,15,19
256:2,2,3
257:8,18
259:13,14,17
259:22 260:9
261:11 262:5
266:18

268:15,23
**electoral** 216:8
216:14 225:5
225:17 238:6
238:25
239:19 249:6
249:12,22,24
254:11 255:9
255:25
256:11
259:16,21
262:23
**electorate** 29:9
29:10
**eleven** 80:21
**eliminate** 81:3
**ELLIS** 1:7
**emerge** 11:22
14:7 148:16
149:9 150:11
163:3 197:2
215:19
227:16
**emerged**
148:20
149:19
152:11,19,23
153:10
159:22
227:14
**emerges**
163:14
**emphasize**
151:25
**empirical**
149:23,25
230:23
**employ** 21:3,12
59:20
**employed**
78:16 168:1
**employer**
164:5
**employing**
77:7
**employment**
164:4,11,17
**enacted** 7:16
7:22,25 8:9
9:25 10:2,3,6
10:18,23
20:13 23:13
23:13,16
24:11 25:16
26:1 79:3
80:20,22
93:22 95:11
96:5 106:15
106:22 115:4
119:11,23
120:7,18,22
121:1 129:19
130:1 131:20
133:22 134:5

134:18 135:6
136:2,4,13,15
136:22,25
137:5 147:13
148:3,11,14
149:13
150:22 151:5
152:10 153:4
153:8 154:1
154:11 157:7
157:9,12,14
157:22 159:2
159:7,14,14
160:1,2,7,11
161:8 162:2
162:14,25
163:1,14
165:18
166:18
170:20
171:18
172:20
173:16
174:11 175:6
175:8,25
177:6,8
178:2,19
179:14,19,22
180:8 185:21
188:15,20
201:15,19
202:1,11,23
203:5 204:1
207:2,11,15
207:17
208:13
227:13 234:7
234:16 235:3
235:10,12
236:11,14
237:4 239:24
240:1,14,21
241:3,7,16,22
241:24
243:24 245:5
247:11 248:5
248:19
269:12,24
270:1,1,3,6
270:25
271:13,17,25
272:13 273:3
277:4 278:5
278:7 279:4
279:17,18
**encapsulated**
111:18
**encompass**
72:17
**encouraged**
79:21 142:17
142:21
144:16,18
**encourages**

141:21,22
142:6 143:15
145:19,24
**endogenous**
176:12,15,18
176:23 177:3
177:9 178:13
178:20 179:2
179:7,24
180:13,15,19
181:4,6,18,22
190:7 232:24
236:2
**engaged** 25:23
41:6
**enhance**
155:23
**enshrined**
71:15 72:7
76:5
**entered** 5:2
**entire** 21:21,21
24:20 111:16
138:2 164:18
198:12,12
212:12
220:24
**entirely** 38:25
241:19
**entirety** 119:12
**entity** 170:6
**enumerated**
15:9 88:20
**envelope**
208:20
**equal** 78:14,23
118:20
160:21
211:15,17,21
264:7 266:23
267:1
**equality** 100:14
101:7,17,18
101:21,22
102:4,11,13
106:17 107:1
107:18
108:14
118:21
**equally** 104:14
105:5,9,16
121:3
**equate** 189:20
236:11
**equated** 222:1
233:22
**equating**
189:23
**equivalent**
94:9
**errata** 5:11
79:18
**especially**
158:1 192:19

**essential** 55:19
56:19 57:16
244:11
**essentially**
10:12,14
52:6 83:8
146:19
149:21
175:24 227:3
266:25
278:23
**estimate** 64:18
274:20,23
**etcetera** 84:20
118:22
136:10
176:24 251:6
**evaluate** 21:16
129:18
166:18
234:10,15
**evaluated**
24:11,15
236:12
**evaluating**
180:19
**event** 104:1
**evidence** 76:8
124:23
158:11 166:6
**Ex** 167:13
168:1,6
170:5,6
**exact** 82:9,16
107:12 199:2
247:2
**exactly** 20:22
77:3 98:11
101:2 109:18
117:11 119:2
120:4 127:14
135:23
139:19
155:11
156:21 168:4
172:24
191:11 192:2
192:14
196:17 197:4
197:24 205:7
211:23 216:9
219:3 224:25
244:15
270:13
278:10
279:21
**Examination**
3:7 4:9
**examined** 87:2
88:1,3
162:11
**examining**
179:20
**example** 15:6

21:23 22:1,6
22:21 26:17
40:7 41:10
56:1 57:18
58:1 71:20
72:10 78:22
79:15 85:25
85:25 86:17
94:6 96:4
105:21 106:9
110:3 111:20
112:8 113:5
114:5 115:2
115:21
116:14 123:7
130:12
131:15 133:3
138:9 153:15
156:18
158:21
165:24,25
168:21 170:5
170:9 171:1
172:19 173:7
173:16 175:9
177:22 199:5
199:6 201:15
204:22
238:11 251:8
253:16
263:25
279:12
**examples** 57:3
167:10,12
200:3
**exceeded**
160:21
**excellent**
214:25 215:7
259:9,10
**exception**
92:14
**exceptions**
107:5 194:6
**Excerpt** 3:15
**excess** 124:17
**exclude** 119:1
**excluded**
119:14 120:1
**exercise** 78:5
78:11 271:22
272:22
278:25 280:5
**exhaust** 156:12
**exhausted**
14:11
**exhaustive**
12:23 13:10
13:19,22
14:8 61:17
66:18 156:1
156:7 157:2
**exhaustiven...**
78:1

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 293

**Exhibit** 3:14,15
4:24 5:1
98:16,20
**EXHIBITS** 3:13
3:20
**exist** 54:13
**existed** 54:13
54:14,17
**existing** 68:9
68:25 69:21
70:11 71:8
75:5,15
83:23 84:22
85:19 86:21
87:6 88:19
88:24 89:3
89:12
**exogenous**
176:24
177:21
178:21 179:3
179:7,25
180:25
181:19 182:5
182:7,9
190:8 234:21
236:4
**expect** 87:22
130:17,22,25
131:8 132:6
170:19 175:8
191:23,25
192:6,10,10
192:13,20,22
192:24,25
193:4 194:21
196:22
199:21 211:9
214:9 215:8
254:20
256:21,25
257:8 258:5
260:1,4,10
261:7 263:7
264:6,19
**expectation**
173:19
174:14
175:10
192:24
196:22,25
197:2 257:7
258:5,16,22
**expectations**
174:11
256:21
258:21 260:1
260:7
**expected** 163:3
197:8 212:7
214:2 215:1
215:3,17,19
232:21 235:2
250:20

251:24 258:2
**experience**
17:16 59:20
191:21
**expert** 3:14
7:13 12:13
21:22 22:1
30:19 61:19
62:15 69:14
76:20 83:19
87:10 145:23
149:18
161:17 194:8
194:14 195:2
237:19 242:7
**expertise** 68:4
96:9 97:11
97:12 134:17
164:10,16
166:17
174:23
194:12 205:5
269:2,4
**Expires** 281:21
**explain** 11:4
50:22 57:4
62:12 79:20
83:24 92:10
92:17,20
93:4 119:6
135:10,17,18
151:1 208:3
208:11 226:3
244:12 246:8
277:20
**explained** 67:5
89:3,11
107:2 163:2
**explaining**
68:5 105:2
117:16 201:7
**explains** 84:17
90:7
**explanation**
83:10 84:25
86:5 87:15
150:2 221:15
221:21
267:15
278:13,22
**explicit** 117:7
117:21
**explicitly** 13:7
14:17 15:1
19:16 90:4
145:2
**explore** 124:10
**explored** 88:18
**expressed**
45:20
**expressing**
134:19
**extended**
208:7

**extent** 26:14
32:1 33:4
34:12,23
36:8,24 37:1
37:8,9,23
39:2 110:10
150:25
156:21
163:20 205:5
212:21
229:12
**extra** 84:8,9
98:24 105:19
124:12,13
**extraordinary**
225:7,19
227:20
**extreme** 85:18
85:25 86:1,7
132:25
198:10,15
199:1,16,19
227:18
246:25
251:22
**extremely**
188:14,18
191:17,18
**eye** 82:7
261:13
**eyeballing**
217:22,23
218:10,11

———— **F** ————
**f** 103:7,9
104:20
105:22
**facetious**
138:18
**fact** 19:16 23:9
48:17 55:5
73:25 75:13
88:18 157:11
157:21
159:16,25
188:11
212:23
215:11
225:24
238:12
259:11
**factor** 63:21
183:14
184:17 185:1
**factored** 19:1
133:4 184:12
185:17,17
**factoring**
252:18
**factors** 73:19
83:21 88:11
88:12 140:17
181:7,14

183:8,15,23
184:2,6,8,9
185:2,17
186:5 193:2
211:13,18,19
212:2 214:25
252:15,23
255:3
**facts** 124:23
158:10
**Faegre** 2:4
**failure** 164:7
**fair** 28:5 46:12
46:24 48:1
49:9,14,22
210:1 214:16
214:18,21
218:21
219:10,11
231:3 239:10
243:2 259:23
**fairly** 224:22
259:24
**faithfully** 129:3
**fall** 217:18,19
**false** 89:4,13
**far** 38:1 46:8
52:6 59:12
62:20 110:16
121:14
124:10
126:21 128:3
164:18
197:19
218:18 275:7
277:18
**FARRIS** 1:7
**fast** 56:18
**favor** 27:8,11
101:18
144:23 146:8
149:2 172:22
172:22 213:9
238:6,25
268:24
**favored** 27:3
144:10
196:18
**favoring** 149:3
150:6,7
189:9 192:2
192:7 219:4
**favorite** 239:4
**favors** 128:20
140:17,22,23
141:16 150:1
**feasibility**
21:16
**Fed** 167:13
168:1,6
170:5,6
**feel** 155:9
267:14
**Ferguson** 31:1

**fewer** 101:14
101:14
103:14 159:1
**fewest** 104:1
104:22,25
105:7,13
161:9 162:2
**field** 198:13,21
198:24
**figure** 41:8
45:22,22
48:23 115:8
124:20
141:24
155:11 158:7
179:1,6,22
188:11 190:3
216:6,19
217:4,8,21,22
217:24
218:14
222:15
224:21 226:6
230:12
232:12
233:14,22
234:13 238:4
238:13,14
249:1 268:7
269:19
270:13
274:16 276:9
278:8
**figured** 162:18
**figures** 247:18
276:13
**file** 50:19,20,24
51:1 53:7
56:9 58:2,3,8
58:10 60:19
61:21 62:5,6
62:14 111:13
111:15,19
218:13
272:10
**files** 25:10
48:15 50:25
160:18
222:25
**filibuster**
195:21
**fill** 104:8
**final** 51:5,11,15
51:18,20,21
55:21 60:17
61:3,10
62:10,22
**finance** 181:12
185:11 186:5
211:20
**financed**
185:15
**finances** 184:1
**find** 21:10

35:23 72:11
188:17
219:12
245:12 249:7
**finding** 148:3
151:7,16
**findings** 26:25
27:2 148:10
151:3,4,12,19
159:13,13
186:16
**fine** 16:1
**finish** 81:12
86:5 91:2
142:14
165:12 226:2
233:2 240:11
254:13,15
262:1 278:12
**finished** 56:10
56:10
**first** 5:4 6:2
11:2 13:16
19:6,9 24:11
34:6 41:1
85:5 99:5,14
104:8 111:8
111:9 118:7
118:17 119:5
127:16 129:6
140:17
142:23 144:8
144:24 148:3
183:2 194:5
201:9 232:19
232:20
240:12
247:18 249:9
249:9 269:24
**firsthand**
161:19
162:22
163:22
227:22
**fit** 123:24
**fitting** 130:15
**five** 43:22 44:9
44:13 45:2
66:11,14,22
67:2,19 78:2
78:16 83:21
88:20 149:16
164:5,21
166:7 172:22
174:12 185:6
221:16
**flag** 200:1
**flaw** 6:15
**Flint** 91:15
92:16,21,22
92:24 93:2,7
93:8,17
94:16,20,21
94:23 95:4,5

**Benchmark Reporting Agency**
**612.338.3376**

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 294

95:8,24
277:14
flip 177:22
249:17
flipping 203:25
Florida 22:20
23:15 25:17
26:15
Florida's 23:13
24:14
flow 192:17
fluctuation
193:1
focus 169:16
173:11 182:2
follow 16:23
33:11 37:15
37:19 113:24
121:14
122:24
124:19 128:8
129:3 143:25
150:20
151:16
242:19
followed 66:11
71:16,17
72:9 88:22
106:25 154:3
158:18
242:19
following 11:4
14:13 19:7
37:13 38:2
43:19 85:15
85:16 91:12
91:12,18,19
92:19,19
93:6,6
125:23
193:18,20
215:24
237:16
footnote 31:16
31:24 32:6
32:10,13
forecast
195:11,12
257:6 258:20
forecaster
193:5 194:23
255:20
forecasters
194:17
forecasting
194:8 256:3
256:7,20
259:25
forecasts
170:15,18
forget 135:24
form 42:2,3
52:15,16
53:5,9 56:8

276:22
format 48:12
forms 199:12
formula 22:5
forth 14:6 17:6
19:8 21:4,6,9
156:4 217:10
266:21
forward 152:7
177:14
forwarded
33:25
found 16:17
81:6 136:1
216:13
217:16
foundation
97:7
foundations
154:24
four 128:19,20
140:17
142:23 144:8
144:24
276:23,25
277:1
fourth 74:3
99:4,14
277:6
fraction 109:20
109:20
fragments
114:11
FREDERICK 1:6
free 267:14
freeze 92:2,3
92:10 93:2,7
93:8 94:11
94:16 95:7
95:12,19
277:16
freezes 277:4
freezing 90:21
96:3 120:10
Friday 1:22
front 16:3 17:3
217:23
218:13
222:23
223:18
224:11
257:25
258:12
260:19
269:22
274:10,11
froze 90:11
91:24 92:12
94:8 119:10
120:12 277:8
278:20
frozen 24:25
91:15 120:5
277:11

279:13
fuel 168:9
full 77:18,24
123:17,25
183:3
fully 4:22
123:11
125:10
function 54:9
54:20 55:5
55:10 59:22
functionally
53:15
functioning
57:17
functions 56:5
57:6 58:15
58:21
fundamental
9:8
fundraiser
186:3
further 37:18
37:23,25
89:19,25
97:17 161:20
280:5
future 181:17
182:6

_____ G _____

G 1:10
games 34:7
gap 8:1,14,16
9:14,19,25
10:5 18:3,7,9
18:17 20:11
20:12,15,21
20:24 21:22
22:2,4,9
198:2,9,15
199:21,25
216:2,14
217:1 219:2
219:13,21
220:17,20,21
221:12,13,18
221:20,24
222:6,25
225:6,17,25
226:8,20
238:7,10,15
239:4,9,18,25
240:1,15,18
241:21,23
242:2,16,25
243:2,5
246:20 248:4
259:24
gaps 216:19,20
220:7 222:14
223:2 225:23
226:10
242:21

gather 103:5
gathered 46:17
general 17:22
29:17 84:17
98:10 101:13
107:2,6,17
108:1,4
111:7,8
112:6,21
114:13 119:8
129:3 130:5
131:14 132:6
133:23 135:6
136:18
145:15 150:5
161:3,17,21
164:12
165:17 167:5
167:12
168:20 172:9
173:1,15
175:4,8,9,19
180:5,7
183:17
186:22,24,25
188:1 191:20
192:6,13,16
194:6,19
195:2,12
200:15
211:15
213:12,14,15
221:23
240:18
247:24
251:20,21
253:13 260:1
260:11
261:16 263:2
265:17 269:3
269:5
generally
22:14,15
30:7 34:19
59:9 69:23
69:25 70:3
70:13,15,19
80:8 97:1,20
98:2 111:7
121:6 136:8
137:22 138:6
144:12 147:6
148:5 169:8
170:3,19,24
170:25 171:6
171:17,20
172:10
182:11,24
188:6,11
190:13 198:5
198:8 199:9
201:1 204:21
205:21 206:8
226:3 237:9

242:17,21
248:8 254:17
265:18
268:22 276:9
generated
186:11
generically
69:22 70:12
genesis 47:7
geographic
11:25,25
131:15 167:6
201:18,20,24
202:14,14
203:2 279:7
geographically
113:19 114:4
269:25 270:8
276:16
geographies
131:13
geography
130:11 138:8
139:24 140:2
140:2 169:15
170:1 199:23
211:18 212:3
213:6,8,13,20
213:23
214:11,11,20
246:5
Georgia 28:1,2
30:18
Georgia's
28:18
gerrymander
25:24 177:13
177:15
229:18,23
gerrymander...
26:12
getting 115:9
128:5 185:4
208:6 228:20
244:17
gist 24:9,16
28:14
give 4:4 14:19
15:13,17
16:18 37:5
52:8,9,18
53:8,24 56:1
57:3 63:6
64:18 71:4
73:22 77:1
77:14 83:10
85:5 92:8
97:1,3,5,9,14
97:17 98:7
100:9 109:25
115:21
121:23 123:5
126:12,13
135:16

137:17
139:11
145:23
146:22
147:11
149:18
161:20
165:24
166:16,19
167:9,12
175:16 199:5
199:6 200:3
200:14 201:7
205:22 211:3
211:4,6
212:24
218:13 223:1
223:16 224:8
224:11
229:13 231:5
231:8 232:1
238:11
248:23
253:16
254:24 258:1
260:19
262:18
264:24
265:21 266:2
266:13 275:5
280:1
given 11:6
39:21 128:2
136:7 143:19
143:22
161:21 170:9
190:1 239:8
266:10
gives 180:10
giving 67:8
71:2 84:4,16
110:25 118:7
128:9 133:11
138:1,2
141:1,11
156:7 166:21
175:13,18
210:10
223:19
253:12 276:7
glad 48:11
go 7:8 9:25
20:6 22:6
32:21 33:3
34:15 38:17
39:13 40:14
40:15 62:12
63:15,16
68:18 70:24
81:3,12,18
90:9,16
91:20 98:15
102:11,19
105:21

106:14 107:23 109:4 124:12,13,18 126:16,23 139:4 144:21 147:4 155:8 156:14 160:4 161:20 168:7 169:8 175:1 177:17 188:22 190:21 195:17 201:16 208:7 209:9 217:21 218:25 221:2 233:4 234:25 238:15 246:7 247:14,19 252:6,6,23 253:3 255:19 261:22 269:19,21 271:4 277:18
**goal** 12:21 82:14 114:15 148:12
**goals** 78:13 82:4 132:15 149:16
**goes** 100:5 125:18 126:6 127:1 256:6 263:23
**going** 5:21,23 8:3,4,20,20 9:15,21 10:8 11:4 13:12 13:13,15,20 14:18 15:13 16:4 18:12 20:4,4,7 22:17 23:10 23:11 26:21 27:5 28:21 28:22 31:25 32:21 33:5 33:11,14 34:11 36:16 36:24 37:12 37:14,19 38:9,11,13,15 38:23 39:13 43:13,18 45:21 47:23 48:8,10 50:2 56:5,22 57:1 57:23 59:16 61:15,16 63:4,6,13 64:20 67:4 70:7 71:19 73:22 74:9 76:17 79:6 82:8,12,15 84:1,3 85:4 86:10 90:15 92:5,17,18,20 94:23 95:4 96:4 97:10 97:16 101:11 104:4 105:9 108:19 110:24,25 111:4,5 112:9 113:19 115:17 116:18,19 118:13 119:8 120:14,21 121:2,23 123:11 125:9 126:17 127:11,15,16 130:25 133:17 134:10 135:9 135:18,21 136:24 139:1 139:19 143:13,17,19 144:13 153:20 161:5 164:10,14,15 167:16,17 170:23 172:10,24 173:7,18,18 174:11,21 175:16,17 176:18 177:13 180:1 180:6 181:8 182:11 184:20,20 185:20,23 187:6 192:18 193:8,9,24 194:10,25 197:17 198:11 203:13 204:15 208:19 211:21 213:11 218:2 220:18 223:6 223:6,16,22 226:3,7 235:8 238:2 238:22 242:21 246:19 247:9 247:11 248:10 256:4 257:4 258:24 261:23 262:1 262:21 267:9 268:6,16 269:2 271:6 272:11 275:5 278:14,19
**good** 4:11,12 86:8 87:3,7 87:13,20,22 98:18 130:23 131:4 135:11 138:9 153:15 168:8 186:2 192:20,22 194:25 253:17,17,23 253:25,25 254:2,21,21 259:14 264:17,22
**gotcha** 45:10 148:2 210:19 217:11 225:14 231:22 245:18 246:8 249:11 265:25 266:14 267:8 271:8 273:18 275:23
**gotten** 162:17
**governing** 100:6
**governor** 176:24 184:24
**grabbing** 127:11
**Grand** 107:20
**grant** 174:25
**graph** 239:5 271:10
**GRASHA** 1:8
**gray** 221:5 224:23 274:16 275:16 279:3 279:5,5
**great** 39:23 130:9 146:24 214:14 223:11
**greater** 16:22 183:20 211:16,16 226:7
**Greensboro** 5:17,19 6:3,8 6:9,13 7:7,8 7:8,18,20
**grounds** 26:2 28:20
**group** 220:19
**guarantying** 172:23
**gubernatorial** 185:6
**guess** 8:7,20 12:3 21:18 84:4 90:18 119:25 160:4 166:24 176:7 176:18 190:1 191:15 218:2 223:1,6,14,16 223:20 224:8 224:13 225:2 275:5
**guessing** 138:12 231:10
**guesswork** 78:6
**guideline** 72:12
**guidelines** 66:17 72:8 77:21
**guiding** 67:10
**Guilford** 5:18
**Gwinett** 29:5

**H**

**h** 1:12 2:3 103:17 105:24
**half** 216:13 248:24 267:2 267:3,3
**hand** 32:16 122:1,7 147:7 224:6 224:7 275:16
**happen** 170:19 194:14 208:22 259:25
**happened** 29:14 135:14 188:24 252:1 252:3 262:25 263:1
**happening** 12:6 269:5
**happens** 119:15 252:15 279:11
**happy** 27:2 90:9 91:14 91:16,20,25 146:22 154:8 155:8 177:17 180:3 207:5 208:2,3,11 209:9 211:4 221:13,22 233:8 234:25 242:5,10 246:8 278:13
**hard** 73:14 224:25 275:15
**harder** 229:5,9
**Hawaii** 130:13 130:17,24 131:9
**HD-1** 277:14
**HD-2** 277:12,18 277:20 278:2 278:2,5
**head** 65:9,18 66:6 107:13 115:21,22 136:7 167:10 182:11,21 199:9,11 209:20 223:21 224:10 257:12,23
**heads** 162:17
**health** 62:25 63:9,14,19,25 64:12,21
**hear** 37:4 53:19 70:8 221:22 227:7 267:15
**heard** 15:11 70:6 74:10 74:11 102:1 210:23,25 211:11
**heart** 212:16
**held** 24:25 281:10
**help** 188:16
**helped** 31:7,8
**helpful** 57:1 140:6 154:19 160:5 179:18 180:10 238:17 262:12 269:21
**helping** 57:24
**helps** 217:2
**Henry** 29:5
**hidden** 34:4
**hiding** 34:7
**hierarchy** 149:6
**high** 154:2
**higher** 93:1 107:19 188:10 201:25 202:23 203:23 204:3 226:21 228:21 229:3
**highly** 188:7
**Hill** 2:14,18
**hired** 61:19 170:2
**hires** 164:5
**hiring** 164:14
**historical** 194:1
**historically** 193:17 253:17,25
**history** 193:25 260:14
**hold** 33:15 195:13
**holding** 242:24
**HOLLIDAY** 1:9
**Honestly** 208:22
**hopefully** 10:16 50:2
**horizontal** 218:19
**House** 28:17,19 29:1 31:21 32:15 35:7 40:18,21,23 41:11,22 42:9 78:5 83:6 90:12 92:14,16 93:3,8,16,17 94:18 95:5,8 95:23 100:13 106:9,16,20 107:7,20 108:6 112:24 120:7,8,11,19 120:22 121:4 123:9,17,18 123:25 124:2 125:5 131:16 159:5 171:2 171:9 176:5 183:5 184:18 190:21,23 191:6,14,18 192:1 195:4 231:19,21,24 232:2,15 233:12,21 234:16,20 235:3,10,12 235:19,21 236:11,22 238:1,16 242:18 243:8 244:17 262:19 264:24,24 265:22,24 266:2 267:3 267:16,22 268:9 277:5 277:8,10,13 278:21,23

Case 2:17-cv-14148-ELC-DPH-GJQ   ECF No. 160-5, PageID.6602   Filed 12/14/18   Page 88 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 296

**huge** 56:8 83:20
**Hum-hum** 197:18
**human** 156:14 168:7
**hundred** 7:18 10:20 107:8 107:11,11 162:5 167:25 274:21
**hundreds** 167:18
**hurts** 217:1
**hypothesis** 152:3
**hypothesize** 262:13
**hypothetical** 29:14 73:11 73:16 75:17 84:2,11,14 85:18 86:22 87:12 88:1 89:6,7,16 122:8,22 123:19 124:5 124:10,22 125:1 126:10 126:25 127:7 135:15 152:2 152:6 161:15 164:4,25 166:9 202:12 207:7,11 208:4,24 215:14 229:9 236:19,22 237:13 267:1
**hypothetically** 84:5 85:16 122:7 212:14 264:17
**hypotheticals** 128:6

**I**

**idea** 42:15 71:22 95:21 107:15 142:2 168:5,8,20
**ideal** 102:24 107:7
**identical** 49:2 50:14 52:6,6 53:16 82:10 172:15 224:7
**identification** 273:1
**identified** 50:24 53:2,5 55:14 147:14 275:8 278:21
**identify** 47:9

61:8 140:9 145:4 217:5
**identifying** 8:11 112:18
**idiosyncratic** 142:4 183:8 193:2
**ignorant** 163:15
**ignore** 15:3
**ignored** 149:20
**illustrative** 79:14 115:1
**imagine** 130:12 167:13
**impermissible** 68:23 69:2
**implementat…** 232:20
**implemented** 232:19
**imply** 185:3
**importance** 16:22
**important** 244:12
**imposed** 68:5
**impossible** 114:13 236:17
**inaccurate** 139:13
**inappropriate** 139:7,13 236:14
**include** 18:2 72:25 73:5 73:19 74:4 74:13,18,18 74:21 76:10 76:11 119:18 119:19,20 120:9,20 123:11 158:15 272:17
**included** 17:24 74:22 120:15 121:6 186:5
**includes** 92:12 118:24
**including** 9:10 116:17
**INCLUSION** 3:20
**incomplete** 75:17 86:22 89:6 124:22 126:10 161:15 166:9 208:24 236:19 237:13
**incompletely**

189:4
**inconsistent** 13:1
**incorrect** 227:8
**increase** 260:23
**incumbency** 19:2 68:8,16 69:9,20 70:10 181:13 184:2,12,24 185:8 186:5 186:12,14,20 187:2
**incumbent** 11:7,24 19:11 184:18 185:5,15
**incumbents** 10:25 11:3,5 11:7,9,12,14 12:2,25 13:3 13:7 15:6,24 19:10,17,18 19:19,21,25 68:24 71:1 83:22 84:6,7 84:12 180:17
**independent** 144:17
**Indiana** 2:5
**Indianapolis** 2:5
**indicate** 131:6
**indication** 213:1
**indicative** 188:1 213:6
**indicator** 180:10
**individual** 33:8 138:2 178:8 190:5 198:20 262:5
**individually** 90:16
**industry** 168:21
**inevitably** 116:20 123:5 123:7 181:7 196:23,24 197:16
**infer** 164:7 166:1
**inference** 159:24 221:16
**inferring** 172:2
**influence** 187:6
**information** 63:14 64:21 87:19 117:9 128:1,2

161:24 250:17
**informed** 205:23
**inherent** 82:17 242:14
**initially** 126:3
**inside** 128:21 140:18,24 141:17 142:22 271:1 272:2
**insofar** 162:24 171:17 173:15 212:13
**instance** 102:19 136:17
**instruct** 143:19
**instructed** 15:2 32:23 93:10 114:5 144:2
**instructing** 39:10 78:18 78:19,20
**instruction** 33:10,12 37:21 43:12 43:19
**instructions** 34:21 37:5 37:14,19,20 38:2 39:9,18 39:20,21 43:6 45:15 45:19 95:18 96:14,16,19 96:20 122:3 123:1 143:18 143:22,25
**integrated** 113:3,12
**intend** 175:11 272:6
**intent** 139:13 148:17,21,25 150:23 152:12,15,20 152:24 153:14 159:24 161:12 162:10,20,22 162:24 163:8 163:11,17 164:9,11,16 164:19,20 165:18,18,25 166:1,8 207:9 225:21 227:2,11 232:3 236:18 237:2,12

242:24
**intentionally** 11:23 12:5 106:4
**interest** 68:10 69:1,10 70:4 70:22 77:4,8 77:11 83:24
**interested** 63:19 150:10 157:25 158:5 158:21
**internet** 56:9 58:2
**interpret** 69:3 90:5 96:13 102:20 133:17 155:19 216:18
**interpretation** 69:8 91:11 97:2 100:21 133:14 156:18 214:6
**interpreted** 15:16 68:13 101:16 102:3 134:12 155:18
**interpreting** 69:7 92:8 117:2
**interrupt** 5:10 278:13
**interrupted** 195:13
**interrupting** 39:16 142:19 179:15
**interval** 153:21 153:23 155:1 208:17,21 209:6 270:23 271:2 272:8 273:2 274:8
**intervals** 224:23
**Intervener** 2:13,17
**intrude** 104:9 116:6
**intrudes** 105:3
**intuition** 222:11
**intuitive** 221:21
**intuitively** 226:5,7
**invading** 43:11
**inviolable** 99:6
**involve** 6:6
**involved** 5:5 6:12 23:23

27:7,10
31:14 63:7 127:22,23 209:7 242:3
**involvement** 30:17
**involving** 130:19
**island** 110:21 111:10
**islands** 111:2,2 111:24 112:11,11,13 113:1,3,6,7,9 113:11,12,22 130:14,18
**isolated** 19:17
**issue** 6:22 28:13 31:12 39:17 48:8 49:6 50:3 77:10 110:21 170:16 171:16 176:23 178:14 183:11 256:13
**issues** 31:4,14 62:25 63:9 63:19,25 64:12 122:25 162:12 260:6
**iteration** 54:5
**iterations** 60:9
**iterative** 104:5

**J**

**J** 1:5,8
**JACK** 1:6,10
**Jackman** 182:13,20
**JAR** 50:18,19 50:20,23,25 51:1 53:7 60:18 61:21 62:5,6,14
**JASON** 2:13
**Java** 54:22,23 55:4,8,14 56:1 57:19 59:6,9,11,16 59:17,21 60:6,7,8,13 60:14,18 61:9,21 65:3
**Jay.Yeager@…** 2:6
**job** 85:14,15 86:8 87:3,7 87:13,20,22 164:7
**Johnson** 1:15 126:6,24

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

127:1,3,11
JON 1:10
Jones 2:9
  121:10,12,13
  122:12,17,17
  123:8,14,23
  124:2,6,13,14
  124:14,15,18
  125:4,17
  126:4,18,20
JOSEPH 2:3
Josh 182:22
journalists
  200:24,24
Jowei 1:20
  3:14
Jowie 3:6 4:6,7
  28:7 281:10
  281:13
JR 1:6 2:3
Jtorchinsky...
  2:16
judgement
  13:4 78:6
  141:14
  220:13 270:4
judicial 75:5,9
  75:13
jump 221:7,19
jumped 221:16
jumping 238:1
juncture
  138:20
June 50:23
  62:25 63:12
  64:3,15
jurisdiction
  131:3 194:20
  230:5
jurisdictions
  77:6,13
  97:20
Justice 97:23
  114:20
justify 84:19

_____ K _____

Kalamazoo
  113:8,10
  281:20
keep 7:6 23:10
  41:14 42:11
  105:10
  113:20 114:5
  114:10,11
  208:19
  258:20 271:6
keeps 105:3
kept 114:7
KETOLA 1:9
KEVIN 2:3
Kevin.Toner...
  2:7
key 121:21

kind 9:6 10:15
  55:4 56:7
  57:25 58:4
  58:17 63:11
  64:2,14
  71:22 85:25
  110:15 116:5
  133:9 134:18
  135:3 140:8
  140:8 163:6
  168:15 169:5
  170:5 177:24
  182:15,22,24
  185:4 193:1
  198:23
  213:14
  241:10
  246:22 256:5
  257:16 264:4
  278:20
kinds 133:20
  168:11 184:2
  242:11
know 4:13 5:12
  6:11 15:1
  26:6 31:13
  34:23 35:23
  36:8 40:13
  42:18,22,25
  43:1,3,4 44:8
  44:9,18,25
  45:12 46:3,6
  46:8,11,11,15
  46:18,24
  47:5,7,24
  48:13 59:16
  59:23,25
  60:1,17
  61:16,18,24
  62:20 67:12
  67:12 78:19
  80:1 88:23
  95:19 96:25
  98:4 100:20
  106:6,8,17
  109:1 110:14
  117:13
  119:15
  123:18 135:2
  136:8,15
  137:24 138:5
  138:15,20
  142:16
  158:15
  160:20 162:7
  164:18
  165:24 169:5
  185:13
  186:24
  192:16 197:3
  197:19
  205:24
  209:13 211:1
  211:5 220:24

226:5,7
  230:14,15,21
  239:21 240:7
  243:21
  250:23
  257:22 258:2
  272:14
knowing
  253:22
knowledge
  6:17 25:17
  25:21 26:9
  26:10 28:16
  30:10 31:22
  42:13,19
  43:21,22
  44:1 46:21
  55:3 58:16
  58:23 59:24
  60:14 61:13
  61:25 62:16
  62:18,24
  67:12,15
  92:12 95:9
  110:12
  114:21
  128:14
  134:15
  161:19
  162:22
  163:22 205:4
  227:23
known 16:2
  21:20 22:10
  22:11
knows 35:23

_____ L _____

L 1:9,9
label 202:16,21
  203:20
labeled 11:2
labeling 203:2
lack 46:24 97:7
laid 17:3
  101:13 107:1
  158:19
land 111:16
  128:21
  140:18,24
  141:17
  142:21
language
  100:16
large 40:22
  41:10 56:21
  113:5,6
  181:7 183:18
  224:22
  242:14 247:8
  254:25
  259:24 260:2
largely 86:17
larger 123:8

125:10,12
  225:25
  226:21 250:9
  250:10,14
  263:23
largest 109:16
LASALLE 1:10
late 208:7
Law 22:9
lawyer 21:13
  21:14
lay 208:6
laying 71:16
layman's 67:24
  68:2
lead 84:19 86:1
  86:24 213:18
leads 86:14
  97:25 151:19
League 1:4
  10:10 22:23
  23:3,15
  24:16,18
  25:22 26:4
  26:13,14,21
  26:24
leaning 8:12,12
  110:15
  201:24
leave 124:14
led 41:7 272:17
left 38:25
  196:2 224:7
  224:17
  239:14 275:2
  275:16
left-hand 115:6
  168:10
legal 13:4 14:1
  14:3,18
  15:14,18
  67:8,22,24
  68:3,3,11
  69:3,6 97:2,4
  97:10 117:15
  134:8 141:14
  142:6 145:20
  216:18
legality 15:18
  70:1,16
  117:17
legally 14:1,20
  15:16,17
  28:23 98:8
  141:1,13,19
legislative
  73:12 100:5
  100:6 144:23
  146:16
  160:12
  169:15,25
  176:17,20
  182:19 183:4
  183:5,6,8,10

183:15,23
  185:13
  188:14,19
  191:20,22
  192:17
  211:19
  233:11,21
  249:4 257:11
  257:17
  268:24
legislator's
  161:20
legislators
  160:16
  162:17
  163:20
  170:23
legislature
  19:8 25:16
  25:17 28:19
  141:22
  160:13,22
  162:1 163:23
  163:23
legislature's
  161:13
legitimacy
  192:4
length 214:14
  242:20
  246:21 266:9
  269:18
  272:23
lesser 85:1
  103:18
  105:24 106:3
  106:5
let's 5:8,17 9:3
  10:10 24:2
  38:17 39:14
  40:6 71:7
  81:3,3,18
  85:16 103:7
  105:21
  107:22
  115:14
  123:22
  129:24 134:3
  135:15,24
  139:15 145:4
  160:4 177:21
  184:11
  193:10
  195:22
  202:11,17
  209:6,12
  223:10
  236:16 243:7
  252:24 253:3
  253:16,24
  263:12
  264:21 271:3
level 153:20
  171:14

200:19
levels 157:13
Levin 114:20
light 166:8
  241:23 273:7
likelihood
  173:12,25
  175:5
limited 182:18
  212:21
  219:18
  237:15
limits 43:20
line 67:18
  83:21 84:25
  101:21,23
  102:25 104:1
  104:22 105:1
  115:9,9,10,10
  115:12,15
  116:15,25
  117:5,21,24
  117:25 118:3
  121:10 127:3
  140:3 142:21
  143:2 145:10
  153:14 206:8
  218:19,19
  223:7 225:18
  226:13,25
  235:11
  237:12 244:4
  245:16 246:1
lines 23:22
  57:21 82:19
  84:8,24 87:4
  87:8 94:8,11
  94:17 95:7
  99:7,18,25
  100:2,6,7,8
  100:13,14
  101:6,11,19
  103:4,13
  110:20 119:2
  145:8,14
  214:11
  272:11
lining 276:11
list 5:4 13:22
  14:8,11
  61:17 66:14
  66:16 116:21
  156:1,7
  157:2 183:23
  214:13
  273:11,24
listed 6:2 13:9
  14:14,17
  28:10 30:18
  67:19 263:10
  271:5 272:9
  273:15 279:2
listen 39:14
  154:19

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 298

listing 180:3
272:3
literal 133:14
literally 133:18
139:11
154:10 167:5
267:13,20
literature 22:3
135:7 136:8
182:12,24
198:12
204:14,16
205:1,2,17,24
211:2,6
litigants
242:11
litigation 40:25
60:16,17
62:22 174:21
183:11 242:3
litigations
61:12 62:21
little 32:22
82:1,12 85:3
109:17,24
125:22 128:5
129:2,3
134:21 155:5
163:19
171:10
184:21
192:20,23
209:7 211:16
219:18
220:24 229:9
238:1 247:22
250:10 253:6
258:13 273:9
276:13
LLP 2:4
load 273:8
location 19:10
logistical
168:12
long 1:11 42:12
64:18 120:24
146:19
194:21
196:21,25
204:23 205:9
257:7 258:16
long-run
173:17
174:10,14
180:11
196:22 257:7
long-term
183:7,12
258:4,5,21,22
260:17
261:21,24,25
262:4,5
longer 135:16
264:13

look 4:25 22:19
61:8 109:15
145:5,6
146:16
153:25 159:4
160:4 183:18
185:14 190:3
194:24 198:4
201:16,17,19
201:20
202:13
204:24 209:4
218:4 219:24
237:5 239:5
249:15
252:24
261:17,23
262:19
264:21
269:21 271:3
273:17
274:19,23
275:6 277:12
278:15
looked 18:13
18:21 29:7
52:5 55:13
58:16 185:18
230:23
261:25
262:11
265:18 269:1
269:20
looking 25:8,9
25:10 131:25
154:10
171:25 178:4
178:12
183:15 186:4
204:8 219:11
222:15
225:22 226:4
226:9 231:3
238:9,14
246:9 247:18
260:11
261:20 262:3
267:7 268:4
270:13
271:22,24
276:5,15,17
276:18,20,22
looks 168:8
218:12,14
224:17 239:8
267:4
LORENZO 1:11
lost 114:3
263:25
lot 64:6 86:2
88:10 135:7
140:3 161:24
196:14
211:13

213:17 220:5
254:4 268:16
272:10
275:16
lots 58:22
136:8 194:6
212:2
Louis 30:15
31:1
Louisiana 2:10
low 138:10
lower 150:22
151:24
201:25 202:6
202:15 203:5

_____
M
_____

M 2:3
macarvin@jo...
2:11
magical 132:3
magnitude
264:7
main 1:23
111:11
majority 79:22
81:9 94:16
95:6 201:23
231:4,7,7
232:1,10
239:9 249:3
249:20
256:10
257:17 266:9
268:19
majority-min...
90:8,11,21
92:4,10,13
95:12
making 7:2
15:16 22:7
45:17 95:17
139:12
170:14,21
171:3,6,13
174:19
179:18 195:2
197:3,20
245:4 252:24
255:6,20
256:8,16
257:5 258:20
mandated
31:19
manipulating
84:8
manner 6:21
7:3 205:6
map 10:18
32:14,14,15
32:18 35:3,6
35:6,7 36:12
36:16,18
40:13 45:8

48:7 67:9,13
67:15,22
68:4 85:19
86:10 161:7
168:16,17
215:11,14
218:10 225:5
225:7,18,19
227:13,21
228:1
maps 31:20
32:7 33:8,8
33:20 34:17
34:17,20
36:5 38:7
40:1,4,8,11
40:17,18,18
40:20,23
41:11,24
42:3,5,9,13
42:22,23
43:2,4,7,15
43:22 44:2,3
44:5,14,24
45:4,5,9,13
46:3,5,6,7,9
46:9,19 47:1
47:3,5,9,10
47:12,19
48:3,15,20,22
48:24 49:11
49:19,23
50:6,7 69:15
79:15,16
80:3,7 81:6
81:22 83:6
106:15,20,24
121:25
127:19 148:8
160:6,17
167:19 168:6
168:9,18
206:19
219:12
225:16,21,24
269:12
Marjorie 2:22
281:19
marked 3:13
4:24,25
98:16,20
materials 49:7
math 196:13
207:1 210:13
210:21
231:16
252:21 261:4
261:8
mathematical
137:15
202:22
mathematica...
113:19 114:4
114:13

132:10
matter 84:11
84:15 119:18
131:23
132:13
184:23
213:15
253:14
266:16
matters 35:21
121:2
maximize
19:16 144:24
146:5 149:12
149:15
150:24
maximized
144:3
maximizing
145:2
maximum
109:1,3,6,23
145:9,11,14
145:19
Mayer 33:9,23
34:12 47:3,8
47:11,14,20
47:23 49:11
49:11,19,19
49:23 209:21
Mayer's 46:13
46:22 47:1
48:25
McGhee 22:8
MCL 12:20
98:22,22
mean 9:14
10:14 11:11
13:16,25,25
14:18 20:22
22:11 41:23
45:3 57:4,8
57:15 58:13
71:13 73:9
73:25 74:15
75:22 76:4
76:13 77:13
79:24 83:12
84:11 88:8
92:19 96:12
100:21 101:8
108:11
109:19 115:8
116:13 119:5
131:10
148:22
152:18
162:22 163:8
163:11
164:10
165:22 168:4
168:20
169:13
172:13

174:10
176:18,23
179:9 181:14
185:3 187:4
187:9 191:24
200:16 201:5
201:13
203:22 204:8
204:25
205:21
207:14
215:10
216:22,23
217:7,15
221:12,25
223:9 227:11
227:19,25
228:21 229:1
229:4 232:23
237:21 243:2
244:14,17
249:23 250:7
250:24
252:14 254:5
256:18 258:9
261:16
263:20
267:23 275:2
275:3
mean-median
8:1 9:23 10:8
18:3,3 20:2,9
20:20,24
198:2 199:13
199:16,19,25
228:8,24
229:2 238:4
243:7,10,16
243:24 244:5
244:11
245:10,19
meaning 14:3
56:11 75:13
101:17
102:22
163:18
173:17
200:17 230:6
263:17,18
271:16
meaningful
120:16 134:6
meanings 77:8
means 69:14
77:9 95:22
100:18 101:5
102:11,18
111:20
119:13
123:24
139:19 150:6
197:16 201:2
214:1 245:4
278:5 279:2

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 299

meant 11:5
13:19,20
14:9 32:12
69:18 120:20
150:5 165:15
184:22 213:4
272:5
measure 16:2
16:7,16
17:12,18,24
17:25 21:7
21:15,25
128:25 129:6
136:20
146:12
176:14 178:8
180:6 185:21
196:21
197:23
208:15,16
219:14,15,25
221:1,2
222:4 225:24
226:20
278:11
measured
186:7 219:4
220:15,20
236:25 247:1
247:13
measurement
244:20,21
measures 7:23
9:13 10:19
16:10,12
18:7,9 21:19
208:14 218:5
measuring
180:8 197:25
mechanistic
273:23
media 201:1
median 9:1,19
10:9 228:21
229:4,5,6
244:14 267:5
267:7,13,21
267:21,24,25
268:1
median-mean
8:1,18,19
9:14 17:25
228:5,12,17
229:3,15,17
229:21,25
230:3,3,7,9
230:17
244:10,13,20
245:2,6,14,20
246:3,11,11
246:13,15,23
248:4
medications
4:21

member 27:21
mention 117:7
mentioned
6:10 68:15
73:14,19,24
74:5,19 75:5
76:2,11
126:3 144:9
161:3 212:8
275:25
mere 180:18
merged 113:12
113:17
merging
225:23
Meridian 2:4
method 16:19
16:23 133:24
133:25
135:23
168:24
169:17
182:17
methodologi...
154:23
methodology
157:10,18
166:22,24
methods 158:6
170:3,4
182:3 199:17
199:18
metric 21:13
222:6 234:12
metrics 21:2,3
21:5,10
234:11
MI 281:20
MICHAEL 2:9
Michigan 1:2,5
1:16,24 2:20
4:1 12:9,9,11
13:11 16:19
17:1,2,9
27:18,20
67:11,18
68:1,23 69:2
69:14 78:5
88:1 107:8
112:8 128:21
140:1,3,3,6
140:10,18,24
141:17
142:21 185:6
212:5,7,11
213:13 219:8
230:18
231:19,21,24
232:2 242:15
243:1 244:19
249:13
250:18
260:12
261:11 269:5

281:4,19,22
Michigan's
31:20 121:4
214:10
242:18 246:5
Michigan/Ac...
281:22
Microsoft
54:19
mid 63:1,12
64:3,15
267:22
middle 5:22
29:19 154:10
204:3 221:19
224:18 229:8
230:19
270:19
271:24 273:2
274:7 275:1
275:9,17
midpoint 268:2
Mike 5:10
miles 168:2
mimicked
86:18
mind 122:14
161:20 210:1
minds 162:23
minimal 216:14
minimis 83:11
83:12,17,20
minimization
86:20 159:16
159:20
minimize 11:9
11:24 12:6
19:18 78:23
123:6 124:8
128:21
140:18
141:17
142:12,21
161:11
minimized
86:13 144:2
minimizes
86:14
minimizing
78:14 79:21
82:7,8,14,14
87:13 102:8
114:15
118:18
140:24 142:2
143:16 162:6
minimum 94:9
94:22 162:7
minority-maj...
94:7
minus 108:7
217:1,16
218:4
minute 38:18

45:2 57:18
60:12 87:12
minutes 147:4
147:8
misheard 15:5
81:2 232:8
mislead 202:9
misleading
147:25 271:5
misled 238:7
238:15 272:6
misreading
217:11
Missouri 30:24
misspoke
202:8
misstates
53:17 89:7
164:22
166:10 195:6
246:17
misundersta...
45:10 207:16
231:22
271:13
277:22
misunderstood
137:10
187:11
model 29:11,13
186:11,17
187:13,14,17
modeled 153:5
modest 243:11
243:12 244:4
245:11,15,21
246:5,7
moment 9:5,9
13:5 73:21
81:1 100:9
125:2 155:3
157:16 203:9
222:3 234:14
271:21
276:14
money 268:23
month 61:7
morning 4:11
4:12 46:17
49:6 129:16
motivated
225:19
move 81:14
multiple 41:20
65:19,22
80:18,21
116:12,22
117:8 119:17
149:3
municipal
78:15,24
81:5,5,6,7,9
81:23,25
82:8,15,25

83:5,7 85:15
88:12 99:7
99:18 103:24
104:1 112:18
114:8 159:1
municipalities
84:14,20
85:17,23
86:2,9 88:9
101:15
104:11 105:4
105:10
111:14
112:10 113:2
municipality
84:9 111:15
Muskegon
281:6,21

_____

N

N-E-T-B-E-A-...
66:5
N.W 2:10
NAACP 28:1
30:15
name 65:17
230:2
named 88:13
names 23:10
65:9
narrow 34:13
nation 137:23
national 30:24
230:16
nationally
230:14,15,21
230:24,25
natural 87:15
213:8
naturally 193:1
213:1
nature 130:19
151:4,8,18,21
151:22
159:17
228:24
near 219:21
nearly 219:2
260:23
necessarily
11:17 17:14
84:19 86:24
87:18 91:18
94:1,2
100:20
149:22 180:1
181:5,8
203:22,24
211:22
213:18 237:1
251:17 261:6
275:2,3
279:14
necessary

103:12,15
104:2,23
249:17 250:2
250:9 266:4
266:13 268:4
need 4:15
43:16 64:22
64:23 87:18
91:2 128:1
147:7 161:23
162:7 178:7
178:21
210:14
234:10 240:6
241:14,19
250:16
257:13 259:3
262:18
267:20
270:15 271:7
needed 78:6
142:12
248:23 267:4
needing 39:21
needs 114:7
negative 166:1
216:12,20
218:1,2
220:7,9,22,22
221:2,2
223:12,12
225:25 226:1
226:1,8,21,22
239:9,10
240:15 250:8
257:9 265:1
neighborhood
41:11
neighboring
104:9
neither 27:25
102:18
121:18
Netbeans 66:3
neutral 213:2
213:10 216:8
241:21
242:14
254:22
never 45:13
47:19 54:13
54:15,17
59:21,24
110:6 116:15
133:12 170:2
191:5,11,25
192:3 212:1
222:17
229:19,24
259:25 263:6
new 86:11
87:21 105:3
167:15,17
168:1 171:4

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 300

newly 6:7
news 194:25
next-to-the-l...
148:9
nine 79:15 80:2
80:10,25
81:6,24
148:12
172:21,24
173:19
174:12
175:17,19
188:23 189:8
189:11
221:17
226:16,18,25
239:9,18
nine-five
173:16 175:9
226:14,18
nod 4:15
non-compact
130:4 131:18
132:3
non-listed
68:24
non-simulated
266:1,7
noncontiguous
111:10,17,21
112:4,25
113:9 114:11
116:3
nonideal
127:17
nonpartisan
14:16 15:4
15:19,23
19:15 149:10
149:12,15
151:15
155:15,22
156:2,9,11,12
156:15,17
157:4,24
158:1,8,14
208:9 210:17
212:24 214:3
215:2,4,6,9
215:12,18,20
226:25
232:22
237:18,19
244:6 266:10
normal 59:2,5
153:21
normally 257:8
North 2:4,14
18:22 60:16
60:21 61:20
62:4,13,14
139:25 140:2
140:4,6
186:9,16

187:8,15
northern
113:14
not-terribly
252:24
Notary 281:1
281:21
noted 120:8
notion 224:5
228:23
November
171:1 173:3
175:1 194:12
254:10 259:6
259:9,14
263:11
264:22
number 7:14
7:14,15 8:11
8:24 10:20
11:9 12:17
12:18 17:17
19:17 24:10
24:12,23
34:8,9,11
37:16 40:3
40:10,20,23
41:10,22
43:21 52:23
56:22 58:17
58:17 65:5,5
65:15 78:24
80:10,17,24
82:25 83:5
84:20,23
86:14,18
88:9 90:8
93:23 101:19
109:21 110:1
112:9 113:6
113:6,8
115:3 116:11
116:14 117:4
117:7,21
118:18,23
120:1 133:12
139:20 140:1
150:7 160:10
160:20 161:9
162:2,6
168:2,10
170:10,22
173:18
174:16 181:7
183:18 185:6
185:25 189:1
189:2 192:20
192:23
196:17 197:8
197:14 199:7
199:8 202:11
207:15 214:7
214:10
222:21

224:22 230:7
233:11,16,22
235:11,23
236:2 241:12
241:14
242:13 243:3
244:2 247:21
252:18 257:7
260:20
264:14
266:19 268:2
268:3 275:17
279:10,11
numbers 7:17
9:20 10:22
29:7 56:3
57:20 107:12
107:13 108:6
132:23
133:11
172:14,15
173:13 175:7
176:9 190:12
194:25 202:9
221:12,14,19
222:13,18,19
222:21,25
224:9 238:16
239:6 240:2
250:6 257:25
258:1,12
274:24
numerical
132:23

_____
O
Obama 192:21
object 32:1,21
34:10 36:24
63:4 135:16
139:5,12
143:17,19
252:10
objection 8:6
33:10 35:9
35:20,21
44:11 51:12
53:17 74:7
75:17 86:22
89:6 97:6
98:5 124:22
125:20
126:10 127:8
138:23 139:5
145:20
158:10
161:14
164:22 165:2
166:9 189:4
195:5 227:4
236:19
237:13
246:17
253:10

257:19
objective
200:20 201:3
205:5,7
276:8
objectively
164:6,8
observations
223:8
observed 262:7
obtain 62:2,4,5
obvious 184:23
obviously
10:14 15:15
15:21 23:23
40:6,17
56:14 59:15
61:15,23
63:6 67:4,8
67:21 70:1
70:16 73:16
75:2 84:16
85:18 90:9
95:21 96:3,4
96:12 100:22
102:15
106:12 108:1
108:22 110:1
110:12,14,19
111:20
112:10,16
116:18,19,20
118:20
119:16 121:2
122:1,9
123:9 125:11
128:5,7
130:6,24
132:18
133:11
134:11 138:7
139:24 141:3
142:6 144:8
149:6 151:3
156:14,22
157:1,21
158:17
161:19,22
162:3,17
163:21 164:3
164:10,15
165:5,15,22
166:12
167:16,21
168:4 171:21
173:22
175:12
176:19
177:11
179:10 184:8
184:25 185:3
185:8,11,24
186:17,24
187:4,6

189:11
191:11,24
192:16 193:1
193:2 197:22
198:14,16
199:3 200:24
205:1,24
207:14
209:19
211:22 212:2
212:9 214:7
214:10,14,19
215:10,22
216:19
217:15
218:12,17
219:15,25
220:8,12,24
221:24
222:21,24
223:17 224:9
227:11,22
229:2,4
230:6 232:9
232:12
233:19
236:17
237:19
240:18
241:13 242:6
247:4 251:19
252:15,17,23
254:4 256:4
256:19 258:6
260:5 262:9
263:22
264:16 269:3
272:5,22
274:9 275:12
276:6
occasions
200:10
occur 170:15
172:4 190:20
197:18 214:3
occurred
143:20 172:1
172:2 176:6
176:20 266:4
occurs 237:9
October 281:21
224:5,16
odd 150:7
off-year 193:18
193:20
offer 24:7
offered 5:23
offering 67:24
68:3 76:21
office 35:3
176:23
184:25
185:18
officeholder

184:25 185:9
offices 1:23
170:16
171:15 181:1
182:7
official 1:15
officially
136:15
Oh 21:2,25
32:16 40:14
53:23 54:23
62:6 76:13
78:16 109:3
109:9 140:22
170:6 184:20
187:4,9
193:5,22
199:8 215:3
222:19
228:23
255:14
okay 4:21,25
5:4,8 6:2 7:4
7:8 8:22 9:12
9:15 10:10
13:12 14:21
15:11 18:5
18:19,22
22:17,21
23:2,5,19
24:2,10 25:3
25:7 26:5
27:4,13 28:1
28:13,15
30:8,11,15,24
31:4,15,18
32:20 33:2,5
33:15,19
34:6,24 35:6
36:12 37:7
38:17 39:7
39:25 40:6
40:13 41:13
41:18 42:1,8
42:13,16
43:1,4,18,25
44:9 45:10
45:20 46:12
46:15 47:10
48:19 49:3
49:25 50:12
51:9,20,23
52:1,12 55:2
55:23 57:9
60:16,24
61:3 62:8,12
62:20,25
64:5,23,25
66:16 67:1
69:17 72:25
74:9 75:1
76:7 77:4,16
77:25 78:9
78:22 79:3,9

Benchmark Reporting Agency
612.338.3376

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 301

79:12 80:4,8
80:13,17,19
81:4,11,20
83:4,11 87:6
88:18 89:15
89:24 90:15
91:10 93:12
94:1,6,21,24
95:3 97:9
98:15,22
99:16,17,24
100:4,9,11,25
101:20 103:7
103:7,8
105:12,21
106:6,14,16
107:23
110:21,24
114:2,9,18,23
115:8,24
116:1,11
117:6,24
118:7,19
121:11,16
122:20
124:25
125:16 126:2
126:6 127:10
127:15
128:15,17,25
129:10,24
134:2,21
135:12,24
137:7,10
138:22,25
140:15 142:1
143:9 144:5
144:15,21
146:2,16,18
146:24 147:8
147:11 148:2
148:19,22
151:1 153:2
153:12 154:5
154:7,19,25
155:17 157:5
157:23
158:13 159:1
159:6,23
160:4 161:7
161:17
164:18
165:14 166:6
170:8 171:10
174:21
175:20,23
176:22 179:1
179:17
182:25
184:20
185:23 186:9
186:19,22
187:19
188:13,22

190:6,19
193:14 195:8
196:4 198:8
200:11,13
203:11
204:11
206:15,22
207:8,8
208:10
210:23 212:8
213:3 216:4
216:6,25
217:13
218:22 219:7
219:24 221:7
223:1,11,16
225:3,4,14
228:4,6,7,8
231:3,16
232:5,8
234:23
235:22
236:16,21
237:3,24
238:12,17
239:7 240:11
240:13
243:16,18
244:3 245:18
247:22
248:22 249:1
250:6,6
251:3,4,8,12
253:4,12
254:15
256:16
258:24 259:2
259:3,13
260:25
261:10,23
262:1,11,14
262:18
265:25
266:14 268:8
269:6,7,11,22
271:3,3,21,23
272:4 273:7
275:19,22
277:12,12,24
278:16,19
279:25
once 39:6
one-fifth 133:4
one-half 253:7
256:17,22
259:4 262:19
264:24
265:22
267:10,16,17
one-person
6:18,20 7:2
one-size-fits...
130:8
one-vote 6:18

6:20 7:2
ones 5:23
13:10 17:13
44:17 189:11
219:21
277:14
operation
201:12
operational
141:9
operationaliz...
205:6
operationaliz...
202:22
204:19
213:23
operationalize
13:21 142:18
201:4,11
202:4 206:6
272:24
operationaliz...
11:16,19
117:22 141:6
141:8,13,15
142:9,15
143:11
155:20 201:8
operationaliz...
69:19 269:17
opine 13:4 14:2
165:7 256:4
262:21
265:13
opined 169:18
198:14
229:24
opining 131:19
132:16,17
141:16,19
155:24
161:18
162:10,14,15
162:20,20,24
165:8,17
173:11,15
174:2 228:3
240:18 253:8
254:9 255:8
255:23 263:2
264:25
opinion 15:17
62:17 67:8
67:22,25
68:2,3,11
69:4,6,14
71:9 75:20
76:2 83:16
83:19 84:16
137:18 141:1
141:12 143:1
143:2 145:23
149:19
155:25

166:21
173:17
198:16,18
199:4 225:22
229:25
247:25
253:12
opinions 75:6,9
75:13 76:20
198:20
opportunity
113:18
114:14 147:2
opposed 53:25
171:23,24
175:14,14
176:24
opposite 62:21
86:12 251:22
optimization
127:17
167:21,23
168:24
169:17 170:3
170:4
optimize
167:19 168:9
168:16
169:10
option 101:20
101:22,23
oranges 234:2
235:24 236:1
236:9
order 66:22
78:3 101:14
104:8,10
159:11
252:22
268:19
ordered 278:7
278:9
ordering
278:25
279:19
orient 147:15
188:16
original 127:7
164:14
outcome 7:24
9:13 183:6
183:10
255:21
outcomes
29:20 182:17
183:24 184:3
188:15,19
256:20
outlier 132:25
133:1 159:17
200:1 207:4
207:19 208:9
218:3 227:18
237:8,22

270:18
271:12
273:23 275:8
outliers 269:9
271:6 272:18
273:12,16
276:5,10,22
outlying 151:4
151:8,17,20
151:22
output 56:2
outset 91:17
92:1,18
outside 76:8
95:23 102:16
128:22 132:9
132:10
140:19
143:21 148:7
166:17
168:23 169:2
169:3,22
170:2 174:23
208:21 209:6
215:12
254:10 255:9
255:25
262:22 269:2
270:18 271:1
272:2,2,9,13
272:16 273:3
275:9
outstanding
48:13
overall 140:7
178:3 188:7
188:17
209:15 229:7
244:16,18,22
244:24
overcome
259:24
overhearing
46:16
overlap 49:2
270:20
271:18
276:16
overlaps
269:25 270:8
overpopulated
110:4

_____
          P
_____

p.m 98:13,14
98:16 150:16
150:17
195:23,24
248:12,13
280:2,3,8
P75327 2:18
packages
167:15 168:2
168:13

packed 200:4,6
201:11 202:2
202:7,19,24
204:11,22
269:12
270:18
271:12
packing 200:13
200:19,21
201:3,6,10
202:16,21
203:2 204:19
204:25 205:7
269:17 270:5
272:25 276:4
276:6
page 3:4 5:4
22:19 28:11
31:15 66:7
77:16 79:1
83:3 99:3,12
99:24 103:21
114:23
118:23,25
119:9 120:7
128:15
129:22
133:21 137:8
140:13
146:25
147:11,15
157:19 160:4
175:22
182:25 183:1
187:19 196:2
206:13 216:1
216:2,3,5
217:6,10
218:25
222:17 223:3
225:3,13
228:4,7
231:1 237:24
238:3,9,10,20
239:5 243:9
243:14
245:13,17,23
246:3 247:21
248:16 249:3
249:19 251:3
253:3 259:1
260:21
262:16
263:12
264:21 269:6
269:7,13,22
271:5,7
273:10,11,13
273:17,20
276:23,25
277:12
278:15
pages 175:24
281:9

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 302

pair 84:7
 251:19,25
paired 11:10
 11:13,15
pairing 12:3,4
 12:16,16,25
 13:2 15:6,23
 19:18,20,20
 20:1
paper 125:24
 126:11,13
 128:5 182:13
papers 169:20
paragraph 5:22
 77:18,24
 99:5,13,14
 147:17,18,24
 148:1,6,9
 188:17
 190:22
 225:11
 228:10,11
 238:22
 243:18 249:2
 249:8,9
 269:10,15
 272:3,7
 277:4,6
paragraphs
 147:21,24
park 168:12
part 13:23 21:5
 28:22 38:8
 55:19,21
 58:9 69:13
 79:18 86:2
 90:13 92:7
 97:12 100:22
 110:22
 115:25 120:3
 124:6 126:23
 131:12
 145:18
 255:18
 260:25 276:3
 276:4,9
 277:23
 279:23
partially 246:5
participant
 229:9
participating
 5:20
particular 11:6
 21:13 27:21
 48:17 57:22
 57:22 72:19
 82:21 84:18
 90:6,9 91:10
 91:14,17
 96:23 97:13
 98:12 102:21
 119:25
 141:12 142:9

183:6,20,22
187:5 194:10
197:5 198:16
199:1,21
214:16,18,19
229:15,25
230:7,18
250:12
255:21 258:7
258:8 260:9
263:3 265:10
272:24
particularly
 120:16
 170:11
 262:12
parties 268:22
partisan 6:21
 7:3,24 9:7,13
 10:19,19,21
 10:22 15:2,3
 18:1,8,9 20:2
 21:7 24:12
 24:20 26:10
 26:16,18
 27:3,8,11,18
 110:2 148:12
 148:17,21,25
 150:23 151:4
 151:17,20
 152:12,14,20
 152:24
 153:14
 159:11,24
 162:10,24
 163:8,11,17
 164:18
 165:17,19
 170:24 171:4
 172:9 175:25
 177:5,7,13,15
 177:20,23,23
 177:25
 178:19 179:1
 179:6,9,11,18
 179:21,22
 181:10 183:7
 183:12 188:4
 188:7 190:8
 192:18 193:1
 194:21
 196:20 198:3
 198:10
 201:20
 203:19 207:4
 207:9,19
 208:9 213:15
 214:2 215:1
 215:3 222:5
 225:7,19,21
 226:14,19
 227:2,11,13
 227:20,23
 228:1 229:18

229:18,22,23
232:3 236:18
237:2,12,21
242:24
248:19
249:17
251:22 269:9
270:18 271:6
271:12 272:7
272:18
273:12,16,23
276:22 278:6
partisan-neu...
 242:18
partisanship
 7:15 8:10 9:1
 9:20 24:12
 24:15,19
 25:1,2,9,11
 156:19 160:2
 162:14 163:1
 163:6,15
 165:23
 171:18,20
 173:1 174:9
 178:3,9
 180:8,11
 183:21 186:7
 188:2 194:20
 197:25 198:4
 208:16
 227:12
 234:12 237:8
 244:22,25
parts 29:5
 79:11 103:5
 111:22
 120:14
 121:12,12,13
 121:13,19
party 26:23
 27:22,24
 29:22 171:2
 171:11
 193:17 194:3
 210:5,6
 211:16 249:2
party's 249:3
pattern 110:2,6
 110:11 194:6
 269:5
patterns 29:4,8
pause 28:10
pay 184:5
peer 134:24
peer-reviewed
 135:22
pen 125:23
 128:5
Pennsylvania
 10:11,17,18
 10:24 16:1
 17:1,5 18:1,6

18:8,17 61:1
people 30:25
 107:9,11,12
 116:4 118:9
 158:6 198:14
 198:25 199:3
 200:23
 205:22,24
 206:6,9
 242:11
percent 56:10
 56:10 58:2,8
 77:2,2 93:1
 93:19,21
 94:3,22 95:5
 101:13,20,22
 102:5,11,12
 102:14,16,19
 102:24 103:3
 107:3,6,9,17
 107:20 108:2
 108:3,7,9,9
 109:8,12,12
 109:13,17,18
 109:19,23,24
 109:25
 148:14 152:9
 153:8,13,22
 154:11,25
 157:6,19
 173:7 174:6
 174:7 189:15
 189:20,21
 199:25 200:2
 202:12,15,17
 202:19 203:3
 203:4,17,18
 203:25 204:3
 204:3,4,9
 206:8,19,22
 206:25 207:8
 208:8,21,23
 209:6,22
 210:2,9,10,11
 210:16,17,18
 211:10,11,16
 211:22,23,24
 211:25
 212:14,23,24
 212:25 213:3
 216:11,12,14
 216:20,20,25
 217:16,17
 218:1,2,3,5
 218:17,19,19
 220:1,6,7,9
 220:22,22,25
 221:3,6
 222:4,14
 223:2,4,7,12
 223:23,23
 224:1,2,6,7
 224:14 225:2

225:6,17,18
225:20,25
226:1,8,11,12
226:22,23
228:13,13,14
229:17,22
230:1,13,21
230:24 231:6
231:8,10,11
231:13,25
232:5,11,12
240:1,4,9,15
240:19
241:22,23
242:1,15
243:17,22,22
243:25 244:3
245:10,14,14
245:16,17
246:11,15,16
246:24
247:12,14,16
247:17,20
250:10,11,13
250:14,15,20
250:23
251:12,12,14
251:14,24
252:7,8,10,11
252:22 253:6
253:13,20
254:3,9
255:8,15,24
257:1,9
258:2,17
259:3,8,17,22
260:23 261:6
261:18
262:20 263:7
263:10,11,19
263:23 264:1
264:8,14,20
264:23,23
265:1,14
266:2 270:3
270:6,19,20
270:23 271:1
271:17,18,24
272:8 273:2
273:3 274:3
274:8 275:1
275:9,18
percentage
 76:18 173:25
 199:10,11
 201:14,16
 202:6,7,24
 203:5,23
 223:1 225:16
 248:23
 262:20,22
 267:1,7
percentages
 190:4,5

perfect 106:17
 106:21,21
 108:14
 130:20,21
 168:17 180:6
 180:21
perfectly
 165:16 233:8
performance
 171:4 172:9
 188:7 194:11
 194:22
performed
 10:20 24:23
 29:11 111:2
period 21:21
 181:1
permissibility
 15:18
permissible
 14:1,16,20,24
 15:8,14,17,21
 70:2,18
 101:24
person 109:20
 164:5,6,8
 199:1
personal 59:19
 59:20 63:8
 67:15 76:23
 142:3,10
personally
 27:14 32:16
Ph.D 3:14
phrase 11:13
 32:12 45:2
 77:7 104:22
 163:10
 210:23
 216:22
piece 65:6
pit 187:24
Pittsfield 113:6
 113:15,21
place 84:6 96:1
 146:4 172:11
 173:3 180:17
placed 11:14
 16:21,22
placement
 84:12
places 107:18
 115:16 116:4
 116:7
Plaintiff's 35:8
plaintiffs 1:13
 2:2 6:18,19
 7:1 24:3,5,7
 25:15,22,25
 26:11,22,23
 27:6 28:17
 28:25 161:3
Plaintiffs'
 12:17 14:5

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 303

21:8 31:23
33:8,11 34:2
34:18 35:4
36:6,9,19
37:9 38:2
39:11 42:14
42:20,23
43:5,23 44:5
45:18 46:4
46:19 47:16
48:7 49:13
49:21,24
50:9 93:10
100:23 101:4
143:12,15
144:6,16
155:18
plan 6:8,13,16
7:16,25 9:25
10:2,23 13:2
23:14,17
24:11,21
25:16 31:9
57:25 66:12
80:1,20,22
82:9,16
83:25 85:10
85:13,13,14
85:19,21,22
86:2,8,11,13
86:14,17,18
87:6,7,9,13
87:14,17,21
87:21 88:4,8
88:25 90:16
90:18,19
92:17 93:3
93:22 94:7
96:23 97:13
107:20 108:6
110:1,1
112:19 115:4
119:10,11,23
119:24 120:7
120:19,22
121:1,3
130:1,3,17
131:17,18,20
131:21 134:3
135:6 136:2
136:4,11,13
136:14,14,19
136:22 137:1
137:5 138:3
145:5 147:13
148:3,7,11,15
149:13
150:22 151:5
151:14,21
152:10 153:4
153:9 154:1
154:11
155:22 156:2
156:8,15,17

156:18 157:4
157:7,9,12,14
157:22 159:2
159:7,14,24
160:7,11
161:8,8,13
162:2,15,25
163:1,1,14,25
165:18
172:11,20
173:2,2,4,16
173:16,20
174:12 175:6
175:8,9
177:8 178:19
178:21 179:2
179:6,14,19
179:22
180:20 188:5
188:15
202:23 203:5
206:20,22
207:2,11,12
207:15,17
208:13 214:3
219:22 222:8
226:9,18,24
227:15
228:17 230:4
230:18
232:22 234:7
234:16 235:3
235:10,12
236:12,14,25
237:3,4,6,16
237:16,17
238:1 240:21
241:3,7,16,22
241:24
242:15,18
243:24 245:5
248:5 266:17
267:22 268:6
269:24 270:2
271:13,17
272:13
276:13 278:5
279:4,13,15
279:17,18
plan's 175:25
188:20 237:7
240:1,14
247:12
248:19 277:5
planning 24:14
plans 3:15 7:19
7:20,22,23
8:14 9:10
10:3,6,21,22
10:24 11:9
11:22 12:9
12:11 13:11
14:7 15:22
20:13 23:6

24:13 25:2
25:13,14
26:1 31:21
31:22 32:7
32:11 33:24
33:25 34:2
34:25 37:17
40:21,22
41:22 46:15
46:18,25
47:8,22,24,25
48:6,25
58:21 69:19
78:5,19,21
79:4,5 80:9
80:24 82:10
82:12 83:1,6
83:14 84:18
85:1 89:2,5
89:11,14
90:12 92:14
94:18 95:6
95:11 96:9
106:9,16,18
108:5,13
109:6,8,8
112:24
113:20
118:25 120:8
120:19,23
121:1 129:19
129:19,20
131:5,9
132:15
133:22 134:5
134:5,20
135:5,24,25
136:1,4,10,23
137:1,6,16,23
138:4,21
139:1,18
147:13 150:4
150:10,24
151:6 153:25
156:11,12,20
156:24 157:7
157:14,21,24
158:1,7,14,16
158:18,22
159:1,8,8,14
159:22 160:1
160:1,3,13
161:4,6
162:1,4,5,11
162:16,21
163:20,24
166:7,18,22
171:18,21
172:5 177:6
178:3,4,6,12
178:15,18,22
179:19 180:8
180:9,18
185:21

186:10 198:5
201:17 202:5
202:24 203:6
207:9 208:9
208:13,23
209:5 210:10
210:17
212:24 214:2
214:24 216:3
216:7 218:1
219:1,2,2,15
220:8 221:10
222:3,14,20
226:6,10,13
228:9,12
231:4,8
232:1,11
234:8,17
238:5,13,24
239:9,24
241:20
243:11 244:6
245:5,11,21
246:4,7
247:13
256:22,23
266:1,5,7,10
271:17 276:2
278:10,10
279:18
plans' 134:18
230:13 276:2
plausibly
237:17
play 34:7 36:18
39:25 69:21
70:12 211:13
pleasant 280:5
please 4:17 5:1
5:15 6:4
31:16 33:6
37:5 64:11
66:4,8 77:16
77:18 81:12
85:8 99:3
114:23
128:15
140:13
147:20,24
175:22
193:11
195:21
206:14
218:25 226:2
231:1 237:24
242:9 248:16
250:5 251:3
254:13
260:21 269:6
275:20
276:24
277:20
278:12
pleased 38:10

PLLC 1:23
plus 108:7
217:2 231:25
Pogue 114:19
point 5:15 11:8
12:4 30:8
45:3 63:18
68:3 79:6,14
83:5 88:15
91:23 108:1
109:4,22
112:4 118:23
119:22
120:10,17,24
121:21 132:5
138:18 147:2
153:15 157:1
164:3,12
169:4 180:21
186:2 191:24
192:6,25
194:7,16
196:15,18
197:25
213:22
218:23
224:21 225:9
227:3 228:20
238:17,18
241:15,17,19
241:20
244:12,22
245:1 246:1
246:22 247:4
247:7,9,10,24
252:20,23
254:17,23
262:25
263:14
267:22,23
pointing 80:13
260:25 261:3
265:9
points 4:14
241:8 244:11
262:20,22
polarized 30:1
policy 20:19
political 6:25
22:3 71:9,14
71:24,25
72:6 76:9,14
76:17,19,22
77:1,2 83:13
83:15 130:2
131:11
132:13
169:15 170:1
190:14 193:6
193:25 194:9
198:8,13
200:15,18
204:13,16,22
205:1,16

211:1,18
212:3 213:6
213:13,20,22
214:10,11
politicians 11:8
poll 76:25
130:7 194:25
polling 194:18
polls 194:24
Polsby-Popper
16:2,7,9
17:20,21,23
136:9,19
polygon 111:15
111:18
polygons
111:12,23
112:12
poor 85:14,15
pops 56:3,9
58:2,7
popular 200:23
201:1
popularly
205:11
populated
102:5 104:14
105:5,9,16
109:16,16
110:17 121:3
population
7:14 9:6
78:14,23
88:11 92:25
92:25 93:18
96:2 99:8,19
100:15 101:7
101:13,18,21
101:22 102:4
102:10,14,24
103:13,18
105:25 106:2
106:3,5,17,21
107:1,18
108:11 110:3
110:13
118:21 123:8
123:11,16,16
123:23,24
124:1,12,13
124:15,17,19
125:17 127:2
270:3,7,21
populations
126:4
portion 111:11
113:14,16
125:12
213:20
portions
111:17
112:25 145:1
posed 161:25
234:14

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 304

265:20
**posing** 76:8
  86:25 219:19
**position** 198:12
  198:23
**positive** 217:17
  218:7,7,24
  228:24
**possibility**
  88:18 266:15
**possible** 9:19
  73:7,23
  74:25 75:3
  80:1,5 81:24
  84:15 85:21
  86:11 95:2
  100:1,4,8,17
  104:17,19
  113:18,19
  114:5 135:13
  135:14 145:9
  145:11 152:4
  156:1,14,16
  157:2 158:1
  158:13
  237:11 262:6
**possibly** 13:13
  13:24 25:11
  61:16 72:13
  209:5
**potential** 63:21
  158:8 206:1
**potentially**
  110:11
**power** 56:24
**practice** 17:19
  17:23 55:8
  59:2,5,20,24
**practices** 27:24
**pre-clearance**
  97:20,22,24
  97:25
**precede** 44:3
**preceding**
  147:20
**precise** 16:18
  91:5 97:4
  109:9 168:5
  199:11
  200:16 201:3
  204:25
  205:14,23
  211:3,7,12,24
  218:14
  219:10
  222:21
  224:11
  249:25 250:7
  258:1 260:20
  276:8
**precisely** 8:21
  133:12
  136:16
  137:17

224:25
  244:18 260:8
  275:15
**predict** 188:23
  189:2 190:22
  191:22
  196:16
  233:25
**predictable**
  192:5
**predicted**
  175:13,16,18
  197:14
  207:18
  259:11
**predicting**
  29:13 172:18
  172:23 181:2
  182:17
  191:20
  192:11
  234:18
**prediction**
  171:4,6
  173:9,22,22
  174:5 197:3
  197:21
  255:20 256:5
  256:8,16
**predictions**
  170:21
  171:13 172:3
  182:19
  194:17 195:2
  197:10 255:6
**predictor**
  180:23 181:4
  181:15,17
  188:14,19
  191:17,19
  259:10
**predictors**
  182:6
**predominated**
  148:13
**predominates**
  103:3
**prefer** 38:15
**preferable**
  118:12
**preferred** 29:8
  29:25 30:5
**preliminary**
  41:7
**prepare** 32:14
  34:20
**prepared** 45:9
**presence**
  183:24
**present** 180:16
  181:8,11,11
  184:9,10
  185:2 187:21
  275:25

**presented** 38:7
  170:10 216:3
**preservation**
  71:4,22 85:7
  86:1
**preserve** 85:20
  86:12 87:14
  88:24 100:13
  101:6
**preserved**
  87:21
**preserves**
  86:11
**preserving**
  68:9,9,24,25
  69:20 70:4
  70:11,21
  71:8 75:4,15
  83:22,23
  84:22 85:9
  86:20 87:3,7
  88:6,19 89:3
  89:12
**president**
  192:21 194:3
**president's**
  193:17,22
  194:3,5
**presidential**
  182:16
**press** 200:23
**pretty** 17:4
  130:22,23
  138:9,14
  167:7 168:22
  174:25 188:6
  231:17
  264:17
**prevented** 63:9
  64:1,13
**previous** 57:13
  70:6,8,24,25
  81:13 85:10
  85:12 87:9
  88:3 166:15
  171:3 180:18
  184:22 214:5
  240:4,11
  254:2 262:1
**previously** 5:5
  74:11 134:22
  227:1,2
  248:18
**primarily**
  169:24,25
**principle** 15:8
  71:10,24
  72:7 75:6,11
  75:14,16
  76:1,5 77:5
  99:7 101:7
  101:16
  102:10,13,15
  102:23 167:6

180:5 183:17
  211:15
  212:20
  213:14
**principles**
  71:16 72:1
  72:17 73:18
  74:4 75:9
  76:10,23
  100:14
**prior** 30:4
  34:10 81:15
  81:19 87:7
  90:24 91:2,5
  97:7 121:16
  147:18
  179:16
  181:18
  185:18
  193:19
  195:15,18
  254:13,19,20
  281:12
**priorities** 103:4
**prioritization**
  123:4
**prioritize** 125:9
  131:7 143:6
  159:20,20
**prioritized**
  118:17 124:4
  124:8 125:15
  144:7
**prioritizes**
  163:4
**prioritizing**
  128:19 131:5
  132:7 159:16
**priority** 66:23
  78:3 149:6
**privacy** 63:8,19
**private** 63:14
**pro-Republic-**
  148:4 271:20
**probability**
  174:6,7
  175:13,16,18
  255:21
**probably** 16:13
  88:12 109:20
  161:23 167:9
  167:23
  168:17,21
  170:9 192:3
  213:4 226:22
  231:6,17
  253:23
  274:22
**probative**
  179:25
  187:23 188:4
**problem** 39:4
**process** 42:8
  56:12 78:20

78:22 82:3
  82:11,17
  97:22,25,25
  119:14 120:3
  120:14 122:9
  148:11,16,21
  148:22,23,25
  149:1,10,12
  149:15
  151:15
  152:12,14,20
  152:21,23
  153:4 155:14
  155:17
  156:10,21
  159:15,15
  160:12,14
  163:4,14
  215:4,9,18,20
  227:24
  237:18
  241:21
  272:16
**processed**
  151:6
**processes**
  56:19
**processing**
  56:23
**produce** 25:14
  31:19 33:8
  41:11 49:11
  49:19 50:13
  50:15,23
  53:13 60:16
  78:4 81:24
  156:1 157:3
  158:18
  206:19,22
  214:16
  222:13 225:5
  237:11
  241:21
**produced** 7:19
  25:8 32:8
  34:25 37:16
  38:7 40:3,6,7
  40:10,16,20
  40:22 41:15
  41:21 42:3,5
  42:24 43:2
  43:21 44:23
  45:1,4,5,5
  46:5,6 47:1
  48:15 50:21
  52:10 53:14
  60:18 61:3
  61:11 80:9
  96:10 149:13
  150:3 151:14
  154:3 166:6
  172:14
  176:10
  186:17 188:9

192:2 207:2
  207:9 215:17
  216:25
  222:14
  225:17,20
  226:25 236:7
  236:8 244:5
**produces**
  236:25
  242:15
**producing** 41:1
  53:7 56:21
  58:20 66:12
  112:19
  242:17
**product** 32:3
  32:25 43:11
  143:21 237:1
**production**
  44:4
**professional**
  172:4
**Professor** 4:11
  33:9,23,24,25
  34:12 46:13
  46:22 47:1,3
  47:10,14,20
  49:10,17,23
  91:23 98:18
  147:7 150:21
  193:10
  209:21
  225:13
  254:14
**program** 19:9
  90:4 95:23
  95:24 215:7
**programmed**
  35:1 88:21
  128:8 148:23
  151:16
  152:21 153:5
  156:22
  158:17 215:5
  215:20
  227:25
  237:18
**programmer**
  168:15
**programmers**
  59:18
**programming**
  78:3 95:22
  213:24
**progress** 56:4
  57:22 58:3
  58:12
**prohibit** 66:23
  67:3,6,6 68:8
  68:23 69:8
**prohibited**
  141:13
**prohibitions**
  68:6

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 305

prohibits 67:16
  67:18
project 219:22
proper 56:18
properties
  132:24 133:7
proportional
  171:7,12
proposed 31:9
  136:14
  160:12,15,16
  160:21 161:4
protect 10:25
  11:3,5 13:7
  63:14
protected 32:2
  32:24 34:12
  34:14 35:21
  143:21
protecting
  11:11 19:25
  68:24 83:22
protection 19:2
  19:11 43:11
  68:8,16 69:9
  69:20 70:11
  71:1
prove 274:10
proven 229:14
proves 133:4
provide 51:23
  52:2 58:25
  66:10
provided 5:8
  48:21 49:7
  49:12,20,24
  50:4,9 51:4
  51:17 58:14
  58:20 103:14
  222:17
providing
  43:15 63:10
  64:2,14
provision
  49:11,19
  103:25
  104:18,24
  145:15
provisions
  71:16,21
Public 281:1,21
published
  22:15
purely 26:10
  59:2 78:5,11
  84:11,14
  131:22
  202:21
  203:25
  210:17
  266:16
  271:22
  272:21
purpose 45:6

65:12 69:18
  87:10 99:8
  99:18 112:17
  112:18 117:1
  117:2 173:4
  181:2
purposes 56:21
  67:6 93:3
  267:8
pursuant 41:15
  43:2 158:2
pursue 82:13
  82:23 84:12
  143:6 149:16
pursued 82:5
  144:7
pursuit 158:16
  158:23
put 14:6 17:6
  21:4,6,9 26:4
  56:7 77:20
  84:18 95:14
  96:14,20,20
  104:3 107:22
  141:24 156:4
  201:12 202:9
  203:13 219:9
  219:10 235:8
  242:11
  266:21
  268:22
puts 43:20
putting 11:24
  38:23 82:18
  95:18 151:2
  151:3,7,12,19
  152:7 268:16
puzzled 233:24

_____
Q

qualification
  68:11 97:14
  122:24 263:2
qualifications
  98:7 122:21
  201:9 219:20
qualified 13:4
  14:2,19
  28:23 98:8,8
  117:15
  134:11 166:5
  166:16,20
qualify 7:11
  8:4 9:15 10:1
  18:12 19:24
  20:5 61:16
  67:4 69:5
  70:25 84:2
  84:21 92:18
  97:17 122:9
  128:4 135:21
  178:23
  200:14
  223:17 228:2

229:1
qualifying
  18:20 97:10
  121:24
  123:12
  127:16
  193:24
  215:13,22
quality 183:25
  185:16
quantifiable
  17:4 146:12
  213:19
quantification
  129:5
quantified
  117:22
  234:12
quantifies
  109:11
quantify 83:18
  199:19,20
  200:18
  205:22,24
  212:12
quantifying
  16:20,24
  132:22
question 6:5
  10:16 13:16
  13:24,25
  14:6,10
  15:11 21:14
  27:9 28:4,7
  28:21 32:1
  33:6,14
  34:13 35:19
  35:24 36:7
  37:2,7,13
  39:6,13,14,14
  39:21 40:2
  42:19 43:11
  43:12,19
  45:11,23
  47:21 49:8
  53:19 54:12
  57:13 61:15
  63:7,14,23
  64:5,11
  68:21 69:2
  70:7,8,9,24
  73:3,4,21
  74:2,3,10,10
  81:1,11,13,16
  81:19,21
  84:1 85:6,11
  89:1,9,20
  90:1,10,17,24
  91:2,3,5,8
  92:5 96:18
  97:11 98:9
  100:5 102:1
  103:2 115:13
  115:25 117:3

117:15 118:2
  118:16 121:8
  126:23
  127:10,15
  133:14,16,23
  134:21,22
  135:9 137:3
  139:2,10,14
  139:15,16
  140:7 142:14
  143:24 144:4
  149:8,23,25
  153:17,19
  154:19 155:4
  158:4,15
  160:19,25
  161:18 166:5
  166:15 167:3
  169:23
  170:14
  171:10 172:2
  177:24
  179:16,21
  181:20,24
  182:14
  186:22
  187:16,24
  192:3 193:10
  193:11,13,15
  195:14,15,16
  195:17,18,21
  204:6 208:2
  208:5 213:3
  213:7 214:5
  214:5 219:18
  220:11 224:3
  224:15 227:7
  230:20
  231:22 232:8
  233:6,9,10
  234:14 235:9
  235:18 240:4
  240:12
  249:14
  250:22
  254:14,16
  255:16
  256:18,24
  257:3,4
  258:19 261:7
  261:8,9,14
  262:2,2,8,13
  263:9 265:10
  265:12,19,21
  266:1,3,6,8
  266:21
  268:13,20
  273:19
questions 4:16
  13:13,17
  21:3,6,9,10
  37:3 39:1,11
  71:1 98:23
  115:17 139:6

139:9 147:6
  162:8 177:16
  177:19 193:9
  199:13 228:5
  271:9 272:10
  280:6
quick 64:7
quicker 195:20
quickly 22:18
  64:8 275:6
  275:19
quite 48:8 72:4
  72:15 102:2
  103:2 140:2
  157:17 167:5
  169:1 194:16
  211:12 232:4
  247:19
  250:21
  251:20,21
  267:12,13
  272:22
quote 204:15
  230:2
quoting 249:2

_____
R

race 184:23
  185:6 192:2
races 176:10
  177:10
  180:25
  183:16
  186:10
  190:22
  252:18
  257:11
racial 6:21,25
  7:3,15 24:19
  24:21 25:11
  26:11,17
  29:1,9,9 31:8
  31:12,14
  95:10 164:8
  164:11,16,19
  165:19
racially 30:1
raise 79:13
  147:7
raised 49:6
Raleigh 6:2,23
  7:5 9:3
RAM 56:24
ran 7:13 51:22
  52:7,16,16,18
  109:6
random 82:3
  82:21,22
  105:4 120:3
  157:24
  168:21
  169:19
  172:19
randomly

104:11
randomness
  82:11,16
range 103:13
  109:23 132:5
  132:6,9,11
  134:19 137:5
  148:8 159:8
  196:21
  220:24
  221:19
  222:14
  223:12 224:1
  242:22 243:3
  243:6 249:5
  249:12,21,23
  250:7 254:11
  255:9,25
  257:24 258:3
  262:6,23
  270:19
  271:24 272:2
  272:13 273:3
  275:1,9,18
ranges 262:6
rank 230:24,25
  278:9,24
  279:19
ranked 278:6
  278:11
ranking 276:2
ranks 230:21
rapidly 63:10
  64:1,13
Rapids 107:21
RASHIDA 1:12
rating 194:10
re-draw 30:4,6
reach 142:16
reached 237:4
reaches 126:6
  127:1
reaching
  227:11,12
read 12:19
  14:4,14
  16:24 46:13
  47:23 49:16
  49:17 63:23
  63:25 64:11
  64:12 70:10
  89:8,10
  100:12,22
  104:20
  140:15
  141:11,15
  143:12 146:5
  146:6 147:20
  147:20,24
  153:15
  159:18 179:4
  179:5 229:21
  245:13 246:2
  259:19,20

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 306

reading 16:17
68:12 77:20
80:14 101:4
141:12
245:25
real 120:13
122:25
132:14
176:11,15,17
177:8 183:24
184:3,6,7
185:18
186:14,20
187:1 188:24
190:4 191:5
191:14 196:9
206:11
232:14 234:1
234:1,5,21
235:14,22
236:8 275:6
reality 34:3
realize 274:8
realized 155:5
really 16:14
22:3 47:21
51:14 55:21
77:1 83:16
83:19 84:6
85:12,14,15
86:2,8,16
92:3 95:1,16
95:17 97:1
98:11 109:24
114:25
119:18 120:2
121:2,4
130:8 131:2
132:20,20,21
136:7 137:17
139:12 140:9
142:16
149:18 150:5
152:22
159:12,18
161:20 162:8
162:10 165:9
165:15
166:20
167:14 168:8
168:8 169:13
171:12
174:16,24
179:15
180:14,16
181:3 184:22
186:2 189:23
194:25
196:15 197:8
197:12
198:23
200:22
205:14,18,20
205:22 208:6

208:7,20,22
216:22
226:13,15
228:22
230:16,19
232:4 234:3
237:9 239:20
240:15 241:9
241:9,9
244:11 245:6
247:24 248:1
250:16,22
253:17,25
254:2,21,21
261:19 264:2
274:19
275:16
realm 178:8
reask 33:6
reason 4:21
33:1 47:7
81:14 113:17
129:11
178:20 180:7
204:23
221:16 264:6
275:8 277:3
reasonable
172:3 249:5
249:12,21,23
250:7,15
254:11,18,25
255:9,25
256:11
258:16,22
261:14
262:23
reasonably
100:1,3,17
130:17
148:16
152:11,22
153:10 163:2
166:2 170:15
216:7 250:20
reasons 178:23
178:24,25
180:2,4
227:1
rebuttal 31:6
recall 6:7,11,11
6:12 8:24 9:2
9:12,21,22,24
10:5,7 11:3
17:25 19:6
19:14 20:16
23:25 25:1
27:12 31:8
31:14 40:19
40:21,21
41:14 42:10
61:18,19
62:18 65:9
65:16,21,25

66:2,5 79:11
136:17
137:13,20
182:1 190:11
190:16,18
209:18 222:2
recalling 20:14
recognize
117:6,20
131:12
156:14
recognized
199:17,18
recollected
108:6
recollection
6:12,17,21,22
7:1 8:8,13
9:18 11:1
16:3,5,6,9
18:2,14,16,18
19:4,23 20:8
20:10,12,18
23:5,12,14
25:7 32:5,12
34:25 41:19
52:5 55:17
55:24 59:10
60:18,25
61:2,7 95:9
95:10 100:11
108:25
109:10 110:6
111:6 114:21
115:19 120:1
121:6 123:1
127:19
144:20 159:9
160:18,24
190:10
232:18 270:9
270:12 277:8
record 4:16
5:14 33:17
33:18 36:1,2
36:3 38:11
38:16,17,19
38:20,21
41:14 42:11
45:7,24,25
46:1 48:11
49:17 63:25
64:9,10,12
70:10 89:7
89:10 98:13
98:14,15
150:16,17,18
166:10 179:5
195:23,24,25
229:21
231:18
248:12,13,14
259:20 280:2
280:3 281:9

records 29:15
recounted
72:15
recruitment
268:17
red 200:1
235:11
271:25
redistricters
68:1
redistricting
3:15 6:16
12:21 13:2
19:7 25:16
25:19 26:16
67:10 69:22
70:12 72:9
72:12 73:13
73:15 87:2
131:11
132:15 135:3
138:21,25
142:4 145:6
155:22 156:8
158:9,14
160:14 167:2
167:22
168:23 169:2
169:3,10,12
169:20,22
172:5 179:2
179:6 213:2
213:10 215:2
215:4,6
232:22
242:15,18
252:17
redrawing
88:11 104:5
redrawn 6:8,14
29:18
reduce 80:10
168:10
redundancy
56:16
refer 72:6
116:5
reference
12:19,20,25
39:10,11
45:18 72:2
73:8 75:13
240:20 241:3
241:7,8,10,14
241:17,19,20
241:25
244:22
246:22,25
247:4,7,9,12
referenced
14:12 44:17
46:15 72:18
72:25 73:5
75:8 78:1

79:7 98:21
118:23 120:6
146:6
references
145:13
146:13
referencing
39:2,5 238:7
referendum
5:20 6:10
referred 14:12
44:2 119:10
referring 32:6
32:10 37:2
40:11 44:14
50:7 62:15
148:24
152:17 153:3
155:7 160:13
208:15 217:4
217:7,8,8
219:1 236:6
236:22,23
239:17
269:14 279:6
279:8
refers 102:14
235:5,11
reflect 135:25
141:9 238:5
238:24 246:5
reflected 9:7
33:1 133:21
183:12
reflects 117:18
161:12 164:8
206:16
239:19
243:11
245:15
refresh 6:22
regard 96:16
regarding 7:2
36:16 48:15
67:22 72:8
73:13 78:2
107:1 142:17
151:4,8
170:18
227:12 272:7
regardless
103:4 200:10
register 27:21
registered
27:17
registration
25:10 27:19
29:7,15
regression
186:11,17
187:13,14,17
reinforce 63:18
related 83:6
151:21

relatedly 67:5
relates 53:14
relating 95:15
relation 239:24
239:25 240:7
240:8,10,14
relative 83:25
110:4 146:8
161:9 170:16
171:4 173:8
187:4 203:25
216:16,18
239:21
relatively
192:22
216:21
242:13,25
247:8,8
relevance 63:6
117:13
relevant
116:23 117:1
162:11
165:19 204:5
248:24 266:3
reliable 252:24
remaining
124:1 125:12
remember 7:10
8:3,4,21,23
9:16 11:2
16:4 18:12
18:15 19:3
20:4 23:9
31:10 50:25
108:19
127:19
160:25 161:5
182:21
190:10
209:19
223:21 224:9
262:2
removed-fro...
122:22
removing
57:16
render 130:3
Rene 23:2,12
Reock 16:13
17:9,18,20,24
129:7,8,12,24
130:1,3,10,12
130:14,16,23
130:25 131:4
131:6,8,14,15
131:21,25
134:18,19
135:25 136:9
136:19,25
137:16,22
138:1,7,13
140:5,10
148:19

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

149:13 150:3
150:22 151:8
151:11
**repeat** 6:5 27:9
145:17
210:14
229:20
**repeating**
57:14 140:15
**rephrase**
133:17 266:8
**report** 3:14 5:2
5:11 7:13
11:19 12:13
12:20 13:9
16:3,10,12
18:6,13,21
19:4,13 20:9
20:13 22:1
24:7,8,9,10
24:17 25:5,7
25:8,13
28:11,14
30:3,11,12,16
30:19 31:6
31:15 32:8
33:1 40:6
45:6 46:13
46:22,23
47:4,4,8,23
48:25 49:24
50:7,16
65:13 66:7
77:16 79:1
83:3 87:10
89:1 90:7
98:22 99:3
103:21 107:2
107:14
108:24,24
114:23
118:25
122:10
128:15
140:13 144:3
147:1 152:8
153:12
154:17,20
158:20
161:22 165:1
170:11
172:15
173:14 174:2
175:22
179:11
182:25
187:19
190:11,12,17
190:18 196:3
200:3,8
201:8 203:7
206:13
212:17 216:1
222:25 231:6

237:19
245:10
248:16 270:4
270:13
275:25
276:23
**reported** 2:22
7:21 9:1
107:13
119:22
171:17
209:19
221:14 244:2
250:4,6
252:19
**reporter** 3:20
4:3,14 281:1
**reporting**
132:23 141:3
141:4 151:23
159:12 189:7
190:12,16,24
233:15
**reports** 21:22
47:1
**represent**
98:21 277:13
**representation**
48:5 155:23
171:8,12,14
**representative**
100:13 158:8
**represented**
272:13
**representing**
271:25
273:15
**Republican**
8:12,25
25:16,18,18
27:1,23
110:4,9
148:12
155:23
170:22,22
171:2 173:8
175:19 186:1
188:24 189:2
189:14,17,20
189:21,21
190:20,25
194:11 196:7
196:17,23
202:1 206:20
207:15,18
208:21
209:24 213:1
214:8 219:3
229:6 233:11
233:16 235:2
235:12
236:25 237:7
237:16 239:3
243:4 249:20

251:9 252:16
253:9,17,18
253:21,23
254:3,10,21
260:24 264:2
264:5,17,22
266:19
268:18
271:11,11,16
271:19 276:3
276:12 278:6
**Republicans**
25:23 26:24
27:3 172:22
172:25
173:19 174:6
174:7,11
175:13,17
187:5 189:9
189:12,24
190:23 191:5
192:2,7,19
195:1 196:9
197:24
206:23
212:13
213:10 231:5
231:8 232:1
232:9,14
238:6,25
239:4 246:6
251:21
253:19
256:10,17
258:23 259:9
259:15 265:1
265:14 266:2
266:7,10,13
268:16
**requests** 63:10
63:22 64:2
64:14
**require** 36:25
37:8,10
43:13 67:25
97:20 118:1
141:2 142:17
225:7 227:20
**required** 72:11
79:21 97:13
101:24
110:17
128:18
141:13,19
**requirement**
99:9 101:13
101:18
**requirements**
90:2,22
99:19 102:20
**requires** 32:1
93:16 96:25
97:22 104:25
140:24 141:2

142:6 145:18
145:24 227:1
**requiring** 71:21
109:22
**research** 55:9
**residential**
11:7,24
**resources**
268:17
**respect** 7:24
9:23 15:18
15:22 71:3
78:14 90:2
94:6,15
95:23,24
106:16,20
112:24 143:9
143:10
157:20
171:15 177:2
186:7 190:19
190:21
208:14 216:8
224:3 233:15
252:13 256:2
258:6
**respond** 21:3
**responding**
63:10,22
64:1,13
**response** 4:15
265:12
**responsive**
90:10,17
92:7 155:9
208:2 235:9
**rest** 22:17
195:15
249:13
**restroom** 147:3
**result** 105:8
227:12
236:16,23
237:11,17
263:8,15
**resulted**
227:24
**results** 132:24
154:18,21
162:21
170:15
172:21 176:1
177:7,9
178:19
180:23,23,24
181:3,17,19
182:6 183:4
184:10,12,19
187:3 190:7
190:20
191:13 192:4
192:8,12,17
194:1 197:13
214:2,6

215:1,3,8
219:5 220:6
220:10,14
228:8 233:21
233:23 234:2
235:20,21,23
236:7,8
245:8 251:5
255:24 256:3
257:1 258:18
258:23
260:12
262:22 263:1
263:5,18
265:11,18
**retain** 256:10
256:17
**RETAINED**
3:20
**retracting**
245:9
**retrogression**
98:11
**return** 266:4
**reveal** 64:20
**revealing**
49:12,20
**reveals** 216:6
238:4 242:13
242:17
**review** 22:9
31:24 100:9
114:18
134:24
144:22
147:11 203:7
**reviewed** 31:18
45:13 47:3,4
49:5 61:21
62:16 211:5
**reviewing**
31:25
**RICHARD** 1:10
**right** 5:5 6:24
9:3 12:14
18:7,14,18
20:8 23:4
25:5 30:2
35:25 37:20
38:15 39:16
42:21 45:1
48:14 50:2
51:4,11 52:8
52:18 53:1,3
53:6,8,12,14
54:16 55:11
58:6,14 59:8
60:20 62:6
62:11,23
66:6,7,19
67:24 72:22
75:7 76:16
76:21 77:23
78:11,17,18

78:24 79:5
79:20 80:2,5
80:11,15,23
81:6 84:22
85:2 86:21
87:17 88:7
94:10,13,19
100:16 101:5
102:2 103:4
103:7,7,9
104:7,12,16
104:17,20,24
105:12,15,18
106:6,11
107:4,16,23
108:8,10,24
109:14 112:9
116:11 118:4
118:6,10
125:7,23
126:21,23
127:14 128:6
129:7 131:24
132:12,19
137:8 140:13
140:21,23
141:5,10,18
141:23
144:18,25
145:11,15,17
146:9,11,13
146:25 148:8
149:2,5
151:24 152:1
152:17,24
153:7,10,14
153:25 154:9
154:22
155:13,15,19
155:21 156:6
156:13,20
159:2,6
160:1,2,8
162:12,21
163:7,13,16
164:1 165:1
165:21 167:3
169:11
170:10,12,21
171:9,13,19
174:15,25
175:2,17
176:6,11,15
176:16 177:1
177:4,12
178:16,22
179:13,25
182:21 183:9
183:23,24
184:3,7,11,17
185:10,19
187:21
188:25 189:3
189:25

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 308

190:23 191:3
191:4,7,9,10
191:14 192:9
196:12,14
197:11 198:3
200:8 202:17
203:8,14
204:4,7
206:11,13
207:2,10,12
207:13 208:1
209:23
210:21,22
211:3,7
212:5 213:5
214:3,24
215:9,18
216:14 217:3
217:19,24
218:6,15,16
218:18 219:5
219:17 220:1
220:2,3
221:5 222:3
222:11,18,20
222:23 223:5
223:7,8,10,13
224:4,6
226:24 228:9
228:15,18,23
229:11
230:11 231:9
231:12 232:3
232:4,6,14,15
232:22
233:13,18
234:9,18,22
235:14 236:7
237:2,12
238:13,21,23
239:1,16,18
240:3,3
241:13,19
242:1 243:7
243:8,11,21
244:6,9
245:9 247:6
247:15
248:20,25
249:6,9,10
250:3,5,19
251:6,10,16
253:5 255:4
255:16 256:8
259:1,7,10,12
261:2,11
262:15
263:12,25
264:2,3,5,8
264:12,15
265:2,15,22
266:23,24
267:2,5,7,11
269:16

270:11,15,22
271:14,16
272:10,21
273:10,17,25
274:6,11
275:4,5,10,12
275:14
276:23
277:25 278:1
278:3 279:1
279:13,22
**Rights** 90:3,5
90:22 91:12
91:13,19
92:2,8,20
95:15,18,22
96:8,17,25
**rises** 200:19
**RIVERA** 1:11
**robustness**
198:3,5,7
**ROGER** 1:5
**role** 36:18,23
39:25 69:21
70:12
**Romo** 22:23
23:2,12 24:2
25:22 26:4,9
26:11
**ROSA** 1:8
**rough** 41:11
64:18 107:9
164:3 167:9
223:1,19
230:13
**roughly** 42:8
42:10 123:10
125:5 135:25
168:1,2
210:22
220:22 221:2
223:22
231:13
239:13,13
240:23 264:1
266:2
**row** 80:14,17
80:20 111:16
111:18,19,21
117:10,11
160:9 259:8
263:11
276:19,19
278:2,2
279:2,6
**rows** 271:1
**Rucho** 18:22,23
19:4 61:20
**rule** 32:3,24
35:21 43:11
108:4,23
143:21
**rules** 97:23
120:25 122:2

**run** 10:24 12:7
19:1 25:13
50:19 52:19
54:14 56:1
57:19 60:6
196:25
**running** 20:6
55:21 56:18
56:19 57:23
**RUTH** 1:15

___ S ___

**sacrifice**
132:21
**safe** 268:18,19
268:24
274:22
**safely** 168:13
**safer** 271:11
**sake** 56:17
280:4
**sample** 157:24
158:8
**samples**
169:19,19
**satisfied**
144:25
**satisfying** 99:8
99:19
**save** 52:4,11
52:13,14,20
54:4,5,6,8,24
59:1,2,5,9,9
59:11 60:8
168:9 176:22
270:15
**saved** 52:15
54:15,18
55:14 273:8
**saves** 54:20
**saw** 7:21 14:14
16:21 58:16
58:17,22
129:4,5
**saying** 10:4
13:5 16:14
18:13 20:5
27:5,5 32:6
48:2 54:15
54:18 57:18
60:1 61:23
62:13 67:20
69:25 70:1
70:16,17
71:19 75:2
77:2,10
81:23 82:21
84:2 93:4
96:18 102:23
105:8,18
110:7 118:13
121:24 122:9
124:19 125:3
128:4 131:22

138:14
141:22 142:8
142:15
151:13 152:5
152:18,19,22
152:25
154:11,18
155:14,21
157:1 159:13
163:5 169:8
172:14,23
173:6 175:7
176:8 184:11
184:15
185:11
189:23
197:22
200:15 202:5
203:15,24
204:24 206:6
206:10
207:14,17
209:4 211:12
211:24
212:19
216:17
219:24
220:11
221:25
223:17 224:1
224:9,16
227:15,23
234:6,6
236:11,21
237:15 240:5
240:22
241:16 251:1
254:15,24
255:6,14
256:25 257:5
258:4,6,20
260:1,8,12
261:17 262:4
263:13,16,21
263:24 267:8
267:12,18
273:25
274:25
**says** 22:21
56:10 58:2
99:25 100:17
101:6 103:12
104:17,18
144:23 145:6
146:5 238:12
243:18
**scenario**
118:13
**scheme** 213:10
**scholarly**
133:12,19
134:16,24
136:2
**scholars** 199:9

205:2
**science** 22:3
71:25 76:9
76:22 130:3
132:13 198:9
200:18
204:13,16,22
205:1,17
211:1
**scientific**
200:20 202:3
205:6 272:25
276:8
**scientist** 71:9
71:14,24
72:6 76:15
83:13,15
190:14 193:6
194:9 198:13
200:15
**scientists**
76:18,19
77:1,2
131:11
**score** 16:13
129:7,8,12,24
130:1,3,9,9
130:12,15
131:1,4,14,21
132:25
137:16,22
138:10,13
148:19
149:13 151:9
199:16
**scores** 130:16
130:23 131:6
131:8,15
132:1,6
134:19,19
136:1,9,9,25
138:1,7
140:5,10
148:20 149:9
149:19 150:3
150:22 151:9
151:11,22,24
198:9
**screen** 56:3,13
**SD-27** 275:6
**SD-6** 278:20,22
279:1,2,7,13
279:17,18
**SD-7** 278:20,22
**SD-8** 273:15,19
273:24
**seat** 190:20
203:22,24
207:18
211:23,25
226:15
232:20
**seats** 171:2
174:12

188:24 189:2
191:12,18
192:11,14
196:9,14
197:11
207:15
208:22
210:11,18
211:11
212:14 213:4
213:5 214:8
231:5,9,18,21
231:23
232:15
233:11,16
234:20 235:2
236:25 237:7
248:24 256:9
256:12
259:11
266:11,13,13
266:19
263:24
**seats-to-vote**
212:19
**seats-to-votes**
212:12
**seats-votes**
210:23 211:9
212:10
**second** 10:24
11:1,2 13:23
31:15 58:1
80:14,17,20
104:22
115:24,25
117:25 118:3
118:12 124:2
124:15
164:13 183:3
188:17
193:22 194:4
194:4 225:10
228:11,11
238:22
243:18 246:3
259:8 260:25
276:18,19
280:1
**seconds** 54:21
**Secretary** 1:16
**section** 96:7,11
96:13,16,24
96:25 97:19
97:19 98:4
100:11,12
101:9,24
117:21
146:10
**see** 5:21,25
23:19 28:6
31:2 55:15
56:18 66:13
66:20,25

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 309

77:24 78:8
82:25 99:16
103:9,19,20
104:22 109:9
113:18 115:6
115:7,17
116:11,17
130:11 131:8
133:10
145:12,15
146:10 148:9
148:18 154:1
160:9 172:21
173:22 188:6
188:21
189:11 190:6
191:4,7
192:1,9
196:8 197:13
201:22
206:18,21,22
216:5,9,19,21
217:14,14
218:3,7
219:6 221:5
222:17,21
223:8,14,22
224:24,25
225:14 226:6
228:10,16,20
232:4,11
235:10 236:3
239:11,12
240:3 243:13
243:16,23
244:2,3
245:23
247:20
249:11 251:7
251:8,11
253:5 255:15
255:21 256:6
257:8 258:5
258:5,7
259:8 260:22
260:23 263:7
266:18
269:10
271:10
273:17 275:2
275:15 276:1
277:6,7,15,18
278:3 279:1
279:6
**seeing** 127:19
137:7 151:14
221:23
225:24
273:25
**seek** 78:23
**seeking** 158:5
158:15
**seeks** 128:18
**seen** 28:10

46:21,23
47:4,22
61:10 62:10
62:22 133:19
205:3 237:3
237:3 262:25
263:4,11,13
263:15
**select** 32:17
35:6,14
164:7
**selecting** 36:18
39:25 164:20
**selection** 35:11
35:16,18
**Senate** 23:16
23:17 24:21
31:20 32:15
35:7 40:18
40:21,23
41:22 78:4
90:12 92:14
100:12
106:16,20
118:25 119:9
119:10 121:7
159:5 171:8
176:5 184:18
184:24 185:5
185:5 195:3
197:9 259:3
259:4,10,13
260:14
261:11 267:3
273:12
**Senator** 185:4
**sense** 11:4,11
14:1,18,25
15:15 29:12
95:17 120:3
130:5 138:20
140:11 142:6
200:17
216:17,18
229:5 240:19
250:7 268:15
**sentence** 99:5
99:14 105:22
148:22
152:19 183:3
188:21 191:7
210:14 217:8
219:6 225:10
227:20
228:11,16
238:12
243:13,23
246:3 249:9
249:19,24
**separate** 19:19
19:19 44:24
111:12,12,23
111:24 112:5
112:11,14

115:20 116:3
116:8 122:15
256:18 263:8
**separated**
112:1,6,13
**separately**
112:15,20
115:17
**separates**
19:20 112:19
**separating**
112:25
113:22
131:17
**September**
1:22 4:2
281:10,16
**series** 128:8
**set** 10:24 11:1
11:3 19:6,8
19:10,12,14
23:22 24:24
31:20 82:19
114:13
158:22
177:12 184:9
200:17
214:19
217:10
234:15,16
244:23,25
245:7 247:3
247:13 248:4
248:5,6
250:25
252:14,18
260:9
**sets** 19:5 20:15
24:13 44:24
45:6 49:1
50:15,25
51:7 111:8
151:3 188:4
234:10
**setting** 122:12
**settle** 182:14
182:15
**seven** 119:11
119:11,16
163:25
173:12 174:1
174:7 175:5
175:14
206:23 214:8
267:18 268:2
**seven-seven**
222:7,8
**severe** 132:21
236:18
**severely** 242:2
**shape** 111:13
111:15,19
**share** 76:18,19
77:3 125:17

189:17 190:8
201:14,16,21
201:21,25
202:1,13,16
202:18
203:19
209:15 210:2
211:17,23
212:1 220:16
232:20
244:15,16,18
251:9 253:9
253:18
254:10
260:24 278:7
**shares** 186:11
**sharing** 126:4
209:25
**shed** 166:8
**SHEKELL** 2:18
**shift** 104:17,18
105:7,13
**shifted** 103:15
104:2 105:25
106:9,10
122:16,17
**shifting** 104:25
124:6
**shifts** 181:10
**shipping**
167:14
**shock** 177:21
177:21
**shocking**
191:25
**short** 146:19
247:23
262:12
**shorthand**
202:2,21
**shot** 84:3 85:5
97:9,15,17
121:23 128:3
128:9 200:14
201:7,12
205:11 211:4
**show** 116:15
116:21 182:8
**showing** 251:5
260:9
**side** 62:21
107:22 115:6
203:19,21,23
204:10
234:15 274:4
**sign** 229:18,22
230:2
**significance**
133:9,20
134:17 136:3
137:19 175:3
276:1
**significant**
43:21 83:13

132:13 134:6
136:23 137:2
137:6 216:23
225:5 234:4
247:17
**Significantly**
239:2
**similar** 7:2
10:12,14
23:10 136:20
140:1 149:13
153:12
172:14 187:7
191:21
244:16
**similarity**
46:24,25
**similarly** 85:22
88:9
**Simon** 182:13
**simple** 209:4
**simpler** 90:20
**simply** 21:13
34:3 55:18
77:12 146:7
151:25
162:16,20
165:5 179:21
186:7 189:16
214:7 227:23
249:16 272:8
**simulated** 8:10
9:10 10:22
10:24 20:13
25:2,13 32:7
32:11 40:3
43:2 44:3
46:7 50:6,7
57:24 58:21
69:19 79:15
79:16 80:2,7
80:24 81:6
81:22 83:1,6
83:25 84:18
85:1 89:2,5
89:11,13
93:17 106:15
106:17,21,23
106:24
108:13 109:6
112:19,24
121:25
127:19
131:21
133:21 134:5
134:20
135:24 136:1
136:22 137:1
137:6 148:8
148:23 150:4
153:25
156:20 157:7
157:9,14,21
158:7 159:8

160:1,3,6
162:21 163:3
166:18,22
178:4,6,15,18
178:22
179:19 180:9
185:21
186:10
201:19
202:24 203:1
203:6,18
204:9 206:19
208:23
210:17 214:1
214:24
215:15 216:3
216:7 217:25
219:1,2
222:13 226:9
228:9 230:12
231:4,25
232:11 234:8
234:17 238:5
238:13,24
244:6 245:5
245:11 246:7
247:13 266:4
266:10,17
270:2 271:17
276:15 278:9
278:10 279:4
279:7,18
**simulating**
24:14
**simulation**
14:23,24
15:22 19:9
20:15 41:22
41:23 42:2,4
45:4 55:19
56:20 68:14
78:4 82:1,2
82:17 88:21
92:21 112:2
119:14 120:3
120:14
128:17 132:7
135:15
155:21
159:15
177:17
204:12
213:25 214:6
214:13
227:16 248:5
**simulations**
7:18,25 11:3
19:1,5,6,12
19:14 20:15
20:16 24:23
24:24 29:12
29:13 35:1
41:2 50:16
50:19 51:8

Benchmark Reporting Agency
612.338.3376

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 310

52:7,10,16,17
52:18,19
53:14 54:14
56:15,22
60:6 65:13
67:7 68:20
78:13,18
81:24 92:23
94:11 101:10
111:8 148:4
157:11,23
214:19,21
216:25
220:19 221:1
223:24
227:25 230:8
232:6 237:10
241:25 247:1
**single** 11:10
12:1 19:17
19:21 52:11
54:5,5,9,10
59:6 82:9,16
111:14,15,16
111:18,18,19
112:17
115:12 116:2
116:8,9
118:11
120:11,11
191:25 192:1
205:5 229:14
**sir** 4:12,20,23
5:3,7 9:8,11
17:11 18:25
24:8 28:12
31:3,17 40:9
46:14 51:25
66:13,15
71:11 77:17
78:10,12,16
79:2,6,19
115:7 128:16
225:9 231:2
269:23
278:18 280:7
**sit** 49:4
**sitting** 122:13
**situation** 5:19
48:9 85:3
115:22
122:12 123:5
127:17,18,21
**situations**
151:2
**six** 163:25
164:2 175:14
176:6 182:25
183:2 206:20
210:11,13,18
210:19 214:7
219:3
**six-eight**
219:16 222:4

222:7
**sizable** 231:7
**size** 125:5
224:20 258:8
**skew** 180:18
198:3 229:18
229:23
243:11,12
244:4 245:11
245:15,22
246:5,7
**skewed** 180:16
214:19
**skews** 213:1
**slightly** 119:7
154:6 156:23
188:10 205:3
205:3 246:6
276:11
**slow** 57:1
**small** 82:24
110:20 124:6
132:21 238:5
238:25 239:4
239:19,21,24
239:25 240:6
240:7,8,10,14
240:17,19,24
241:4 243:10
245:14,20
246:3,11,13
246:15,21
247:8 267:13
267:23
275:17
**smaller** 44:25
123:23
125:11
216:21
250:14
**smallest**
109:15
**Smith** 121:10
121:12,13
122:12,16,17
123:8,14,22
123:25 124:1
124:6,11,15
125:4,17
126:3,18,20
**so-called** 177:3
178:13
**software** 55:9
65:7
**solemnly** 4:3
**somebody**
88:23 136:14
154:3 164:19
199:7,11
**somewhat**
68:21 125:1
233:24 245:1
271:11
276:21

**sorry** 7:6 15:5
24:8 49:15
60:5 62:3
71:18 81:22
91:4 180:12
188:17 194:4
206:24
209:24
210:12 266:8
**sort** 6:19 9:8
11:9,21,22
12:15 14:7
14:24 19:11
28:24 55:9,9
57:2 59:21
86:7 115:22
117:7 122:9
122:14,22
123:2,4
124:3,3,7
125:8 127:18
129:4 130:12
130:16,25
131:5,6,8
132:21,22
135:23
140:15 149:9
149:19,25
150:5,10
151:15
153:21 155:6
158:18
159:22
161:18,18
162:25 163:1
163:3,14,18
163:18
167:22,24
168:13
169:19,21
177:22
178:14
187:17
191:23 193:3
193:5,24
194:8,12,23
199:21,25
205:23
206:11 214:8
215:20
222:24 226:5
227:15
237:18 241:8
242:6 243:5
247:20
251:18
254:18 255:6
260:10,20
261:7 276:5
276:8
**sorts** 102:8
135:4 162:8
178:17
191:21

**sought** 11:21
87:14 88:16
88:23
**sound** 209:22
**sounds** 122:13
122:14,15,18
210:21 240:3
**source** 49:10
49:18 50:4,5
51:4,5,7
52:19 53:13
60:17,20
61:3,5,9,10
62:10,22
88:14
**South** 1:23
**southern** 1:3
113:16
**speak** 25:25
26:21 27:6
47:19 56:22
76:14 83:15
111:7 177:16
**speaking** 130:6
215:14,16
227:22 260:5
**speaks** 117:3
**special** 108:3
**specialize**
169:14
**specific** 16:19
17:4,5,6,7
23:21,21
74:14 78:20
82:14 105:6
105:12
107:18 114:1
122:25
131:15
133:11 171:5
171:23 173:9
173:11,21
182:2 183:23
187:10
194:17,17
195:11 197:3
197:20
204:11,20
213:16,20,23
214:12
215:23,25
220:18
242:19
250:17,25
255:20,22
256:5,20
257:6 258:11
258:11,25
260:13 273:1
**specifically** 9:2
9:21,22 10:7
17:16 31:10
55:6 72:2,18
75:7 91:20

94:25 112:23
135:13 136:6
136:13,16,16
137:13,19
138:12
154:14
170:18
172:23
175:12
181:21
184:15
187:12
190:10,16
213:16
219:13
227:10 242:5
249:14
255:18,22
261:13
262:10
263:10
264:10 265:7
265:8,16,19
**specificity** 78:1
**specified** 17:13
72:2 128:25
**specify** 66:22
67:2 123:18
**speculate**
209:2
**speculation**
97:6 161:14
**spell** 66:4
**spelled** 270:12
**split** 81:22
85:17 121:10
**splitting**
123:21
**spoke** 100:22
**spot** 38:24
275:13
**square** 130:20
130:21
**SS** 281:5
**St** 30:15 31:1
**stability**
183:21
**stable** 180:10
**stack** 138:3
**stacking**
224:22
274:16
**stacks** 138:21
230:14,15
**standard** 98:4
98:11 200:17
**standpoint**
227:17
**star** 271:13,25
272:18 275:7
277:15,18
**start** 5:8,17
24:2 80:13
90:15,15,18

97:10 104:10
110:25 119:9
121:24
127:16
129:24 180:3
192:3 193:24
201:10
**started** 34:15
41:19 44:22
111:14
220:11
**starting** 5:21
125:1,22
**starts** 5:25
31:24 112:8
220:24
**state** 1:17
23:17 28:1,1
28:17,18,19
35:7 59:3
66:16,16
72:3,7,8,19
73:6,7,12,12
76:5,6 77:25
90:12 99:5
100:5,6
130:13,20,21
139:25
144:23
146:16 152:9
153:13 154:2
170:22
176:17
182:19 183:5
184:24 185:4
185:5,5
190:23
191:20 192:1
194:20 195:3
195:4 199:22
212:3 213:1
231:24
233:21
235:19,20
236:22
249:20
257:11,17
259:3,13
261:10
268:11
279:24 281:4
281:22
**state's** 71:15
73:24 74:5,5
74:13,19,22
**stated** 34:1
**statement**
67:14 77:10
157:18
165:16
184:22
214:17,18
229:14 245:9
**statements**

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 311

73:13 172:3
**states** 1:1
69:25 70:15
71:21 72:12
72:13 100:12
128:17 138:5
139:21 140:9
189:4 191:22
213:17 230:4
230:25
244:23
**statewide** 24:1
170:12
172:21
176:10,13
177:10 180:7
181:14,22
182:15 183:3
183:13,18,19
184:5,10,17
185:2,9,12,14
185:20 186:1
186:8,10
187:18
188:13,18,23
189:1,8,10,15
189:19 190:4
190:8 191:13
191:22
192:11,17
196:6,11,18
196:21
197:10,23
198:1 206:17
207:19
209:13,14,22
209:25
210:10,16
211:10
212:25 217:3
217:9 219:4
219:14
220:16,21
224:4 226:20
228:14 229:7
231:4 233:17
233:23,24
234:4,21
235:3,13
236:7,13,16
237:1 243:17
243:19,22,25
244:16,18
246:24 247:2
248:23 251:5
259:10
260:15
265:14
266:17
268:11
**stating** 183:18
**statistical** 31:7
131:22
132:24,25

133:1,2,6
148:14 152:9
153:8,13,20
154:2,13,14
154:15,17,24
155:6 157:5
157:13,17,19
159:17,25
161:21 207:6
208:16 209:7
221:25
227:17,18
234:11 237:8
266:16
272:21 273:1
**statistically**
132:10,12,17
151:8,17,21
155:2,12
208:4 267:21
267:24
**status** 56:4,7
56:11,12
57:25
**statute** 15:10
15:15 16:17
16:22,24
17:3,13,15
66:17 67:1
67:16,17
68:4,12,14
69:7,8,14
72:3 73:12
74:6 99:24
100:17,22
101:3,9
103:5 116:23
117:3,6,20
129:5,10
140:23 141:1
141:9,11,12
141:16,21
142:5,21
143:2,12,15
144:15,18,23
145:13,18,24
145:25 146:7
146:14,20
**statutes** 14:12
14:14,16,17
16:18 31:19
66:11,16,21
68:8,22
72:18 73:1,6
73:20 74:20
76:6,12 78:2
99:5,14,15
117:2 145:1
**statutory**
12:19,22
13:1,6 14:5
15:7 17:7
31:18 66:10
67:19,25

68:7 71:15
71:21 72:8
74:22 77:21
83:22,25
88:20 98:21
99:10 106:25
117:14,19
129:1 142:3
151:9 155:17
156:19
**stay** 103:13
209:12
**step** 64:7
Stephanopol...
22:8
**steps** 105:19
128:8
**stick** 123:7
**sticky** 50:3
**stipulate** 48:20
209:21
**stipulated**
48:18
**stipulation**
5:14 20:6
**stop** 90:17
195:22
208:19
247:22
248:10 261:9
270:15
**stopping** 37:20
**stops** 105:17
**straight** 23:10
77:14 176:2
279:16
**strategy** 269:3
**Street** 1:23 2:4
**strikes** 224:5
**strokes** 211:8
**strong** 249:4
264:2,4,5,6
264:18
**strongly**
188:12
**structural**
41:20 52:16
54:7 59:7,10
**structurally**
50:14 51:21
**structure** 52:7
55:19 56:14
56:19 57:16
58:9
**studied** 190:13
230:20
**study** 131:11
140:9,11
169:22
182:12
193:25,25
194:1 213:21
230:16
258:25

260:13
**stuff** 140:8
169:21
**subdivision**
103:14,17
103:20
**subject** 182:12
**subjective** 78:6
**submission**
97:22
**submitted** 5:11
30:11
**subordinate**
101:17
**subordinated**
159:10
**subsequently**
42:4
**subset** 44:25
156:11
**substantial**
54:7 58:17
59:7,10
225:16 239:8
242:25
**substantially**
50:10 51:5
51:10,17,24
52:1,9 53:5,9
53:15,22,25
55:11,15
**substantive**
98:4 133:6,9
133:20
134:17 136:3
**substantively**
136:23 137:1
137:6 247:17
**subtract** 57:6
119:21
263:19
**subtracted**
57:7
**successful** 30:5
**succinctly**
111:5
**suggest** 75:14
86:19 131:16
137:4 148:10
**suggested** 21:7
134:6
**suggesting**
67:17 140:23
141:8
**suggests**
277:19
**Suite** 1:24 2:5
2:14,19
281:19
**sum** 108:17
123:10
**summarized**
34:9
**summary**

66:10
**summed**
189:18
**summing**
123:15
**superior** 182:9
**suppose**
123:22
177:21
202:11
253:16,24
**supposed**
101:12,12
**Supreme**
114:19,19
**sure** 6:1 9:22
10:8 13:25
20:22 26:7
26:20 28:15
30:16,22
31:13 38:25
46:11,23
47:9 55:13
57:9 68:2
70:6,8 71:4
75:12,19,22
79:24 83:12
83:15 91:6
92:22,23
94:25 98:25
102:21
108:15,21
110:1,24
113:25
114:25
124:25
127:25,25
133:11,23
135:20 137:3
137:14 140:5
140:11 143:9
147:5,9,19,25
150:5 156:14
156:25
160:17
163:11 164:2
167:11
168:25
175:10
176:25
181:20,23
185:1 187:4
198:11,21,21
199:2 203:8
203:13 204:7
207:14
209:18 211:6
222:23
225:22
227:10
228:19
229:12 232:4
235:7 236:22
241:9 245:6

246:8 247:19
252:13
256:15
257:12
258:19 260:5
260:8 261:4
265:6 266:6
271:4 273:5
274:15
277:25
279:16
**surprise**
192:15 197:6
197:9
**surprising**
197:13
**surrounding**
90:8 113:4
**survey** 76:25
130:7 198:23
**surveyed**
198:21
**surveys** 194:18
**swear** 4:3,19
**swing** 176:1,4
176:9,13
177:2,22
212:18
248:18,23
249:16
250:14,14,15
250:20
251:12,18,23
252:7,8,21
253:1,5,13,20
254:2,9
255:1,4,7,8
255:11,11,16
255:24 256:5
258:7,9,12,17
258:23 259:4
260:2,16
261:5,15
262:18,21
263:3,5,7,11
263:14,15
264:7,19,23
265:1,10
266:3,12,23
266:23 268:4
268:23
**swings** 249:15
250:1,4,8
254:18 258:3
258:13
260:10,15
261:7,10
262:4 263:22
264:9 266:18
267:1 268:10
268:25
**switch** 9:3
10:10 247:3

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 312

switches
  203:22
sworn 4:8
  281:13
systematically
  106:14
  110:18

**T**
table 3:1 45:23
  63:24 79:7
  79:10 91:9
  119:4,5,9
  120:6,7
  121:7 137:8
  139:14,15
  178:10
  193:15
  206:16
  223:15 250:4
  250:6 251:5
  253:3 261:1
  267:17 276:1
tables 119:7
tabulation
  116:16
tail 230:18
take 13:13
  19:10 20:23
  28:10 33:15
  35:22 45:22
  47:7 73:2
  92:19 106:19
  111:9,22,24
  124:14
  125:23
  135:15,24
  139:10 143:1
  147:7,20
  150:14
  174:10
  177:22
  184:11
  195:22
  197:23
  198:16
  210:21 242:5
  242:10
  244:16
  250:12,12
  251:15
  263:13,18
  264:25
  265:21
  266:16 275:8
  275:17
  278:22
taken 1:22
  4:13 55:18
  58:23 76:25
  86:1 130:7
takes 96:7
  112:22
  140:16

talk 33:16
  35:22 91:16
  107:23 125:1
  169:5 243:7
talked 103:25
  147:14 149:4
  149:7 151:10
  208:14
  242:20 270:5
  270:19
  272:22
  277:13
talking 10:2
  11:18 15:4
  23:2 26:3
  32:7 38:25
  44:14,18,19
  44:23 45:3,7
  46:9 57:2
  61:5 67:6,21
  67:22 81:5
  85:7,9 96:15
  96:19 103:9
  108:4 114:25
  123:9 125:2
  126:3 137:7
  137:14
  139:18 148:1
  148:24
  153:24 154:5
  154:13,14
  155:3,5
  159:3 167:22
  175:2 176:19
  185:8 200:7
  212:8 219:15
  226:13,19,24
  231:20
  235:15,19
  237:25 238:2
  239:11
  242:22 243:6
  243:21 244:7
  245:1 246:23
  247:4 250:25
  255:11
  257:13,14
  258:21 259:6
  259:13 264:9
  264:10,13
  270:10
  276:14
tally 127:6
tallying 123:2
taught 168:24
  168:25
  169:18
technical 14:25
  78:5,11,17
  267:14,15,23
  271:22
tell 13:15 14:19
  14:22,23
  15:15,20

25:25 26:25
  39:3,3 52:6
  53:21 69:18
  91:14,24
  96:9,23,23
  97:12 98:11
  110:19 123:4
  130:8 134:11
  143:15
  145:24
  146:22 155:1
  155:9 164:11
  164:16
  198:23 207:5
  221:13
  257:12,23
  270:8 281:13
telling 14:4
  58:11 59:19
  68:14 76:13
  80:20 121:18
  131:20 133:3
  141:14 142:7
  152:6 163:21
  175:18
  223:20 227:3
  234:3
tells 21:13 56:3
  58:8 68:12
  146:7,10
  194:9
telltale 229:18
  229:22 230:2
ten 41:12,15
  42:9,10,11
  43:22 44:9
  44:13 45:2
  79:16 80:25
  81:7,22
  187:19 196:2
  239:10,18
  240:10
tend 213:8,9
  268:11
tenth 279:2,3,6
  279:8,12,14
term 11:18,19
  13:19 29:11
  76:4,13,14
  143:3 176:18
  193:22 194:4
  194:5,21
  200:21
  201:13 202:3
  204:21
  216:16
  239:21 257:7
  258:16
terminology
  207:16
terms 7:25
  8:10 24:11
  27:1 29:8,22
  29:23 38:24

87:3,7,13
  118:17
  123:23,23
  127:17
  132:15,24
  137:16
  139:20 166:2
  169:8 170:21
  178:3 190:20
  192:11 200:5
  200:7,16,22
  200:25 201:2
  201:6,6,8
  203:13,19,23
  204:19,24
  207:6 208:6
  210:25
  211:21
  219:10
  220:16
  238:10
  260:15
  269:17
  272:25 276:8
terribly 140:6
test 17:8,10
  155:1,13
  209:7
testified 30:21
  33:23,24
  47:22 61:20
  61:25 62:16
  62:17
testify 4:22 8:7
  24:2,4 32:23
  59:16 76:17
  76:20 143:18
testifying
  155:24
testimony 4:3
  5:9,24 7:4
  34:10 53:17
  55:1,2 58:19
  59:11 61:23
  72:3 164:22
  195:6 235:25
  281:10
tests 154:15,17
  154:20,21,24
  155:6 207:6
text 56:3 57:20
  238:18
thank 8:19
  49:25 70:23
  91:7 99:1
  150:15
  203:11 210:8
  262:16 273:7
  280:7
thing 45:3 55:7
  57:2 100:18
  100:21 132:1
  132:22
  146:20

153:24
  154:12 155:4
  170:5 193:25
  197:22
  203:14
  267:14
  271:10,16
  273:19 279:1
things 5:15
  27:1 34:7
  37:15 55:20
  56:11,25
  57:1,7,16
  58:7,18,22
  62:17 72:25
  73:5 77:13
  88:14 97:21
  112:3 115:1
  135:4 153:6
  154:6 163:4
  168:9,12
  171:25
  180:18
  181:12
  185:11
  194:18
  211:18,20
  214:15,23
  234:11
think 5:23 6:10
  8:15 9:16
  10:20 11:20
  16:25 17:22
  18:3 26:7
  28:21 39:5
  39:17 42:17
  42:17 44:13
  44:18 47:21
  54:12 57:12
  59:4 60:12
  64:4 65:17
  66:5 67:14
  71:3 72:15
  73:4,21
  74:10,11
  80:13 81:1
  81:20 84:5
  85:7 88:13
  89:15 94:25
  95:1 100:18
  102:1,2,10,18
  105:8,19
  107:13,15
  109:3,11,19
  112:9 113:7
  114:3 115:22
  116:4,23
  117:1,3,13,17
  118:7 119:8
  121:22
  122:11
  123:12
  127:10 128:1
  129:16 131:2

131:11,19
  136:6 138:1
  139:17,19
  149:6,8
  153:23 154:5
  157:15,17,20
  159:23
  161:11,25
  165:8 167:7
  169:9,21,22
  170:25 171:1
  173:7,9
  174:21
  176:19 182:1
  182:18,21
  183:10
  187:12
  191:18 194:9
  196:2 197:12
  198:25
  199:17,23
  200:9 203:12
  203:14 204:4
  205:10
  206:24
  208:20,22
  209:9 213:3
  213:4 217:4
  217:7 219:19
  220:1,11
  222:11
  224:15,16,19
  228:21 233:9
  233:24 235:8
  235:22
  238:14
  239:17
  242:22
  247:22
  252:11 257:3
  259:23 261:8
  261:9,16
  262:8 270:12
  270:22
  273:11,25
  277:23
thinking 122:7
  122:13,22
  124:4 184:21
  204:4
thinks 198:24
  199:1,7
third 77:18,24
  125:18 210:6
  276:19,20
third-from-b...
  148:6
thoroughly
  138:6
thought 17:15
  70:9 122:16
  155:3 161:8
  198:6 227:8
  240:1 268:21

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 313

273:21
**thousand**
32:17 35:4
35:14 40:7
40:17,17,18
41:16 43:1
44:3,10,23
45:5 46:7
50:6 78:13
80:6 82:10
85:17,23
107:8,10,11
148:8 150:3
153:25 154:1
157:23 158:7
178:22
202:20,20
216:7 219:12
223:24
227:16 237:9
238:5,13,24
278:10
**thread** 114:3
**three** 7:15 12:3
22:19 33:20
34:11 45:6
50:15,24,25
51:7 66:7
111:8 127:24
147:4,8
159:8,14
169:5 170:16
171:2,15
196:12,14
197:8,11
256:9,12,13
256:14,23
263:1
**three-seat**
232:1,10
**threshold** 99:9
99:19 101:18
102:4,12,14
103:3 106:2
107:3 108:11
109:12 127:2
199:1 229:25
250:1,13
260:8,13
**thresholds**
110:13
**throw** 172:19
**throwing** 210:6
**tide** 173:8
181:11
196:23,24
252:16
**tides** 192:18
193:2 251:22
**tie** 249:17
**tighter** 110:13
**tightly** 110:17
**time** 11:8
13:14 15:11

25:19 32:22
42:12 52:13
52:13 64:18
65:8,8 74:3
82:9,16
106:19
117:25 118:3
147:20
160:23
164:13
165:21 166:3
176:22 181:1
184:11
192:18
202:23
208:12
251:18
262:12
270:15 273:8
279:16
**times** 65:25
**tiny** 83:20
**titled** 269:24
**TLAIB** 1:12
**to--** 239:25
**today** 4:22
67:5 151:10
167:23
214:15
215:10
269:18
272:23
**told** 9:5 49:1
124:21
144:17 155:3
155:19
**TONER** 2:3
**top** 16:17
21:18 30:24
65:9,18 66:6
107:12
115:21 136:6
167:10
182:11,21
199:9,11
206:16
209:19 216:2
223:21
224:10,22
238:3,10
257:12,23
274:17
**topics** 211:6
**TORCHINSKY**
2:13
**total** 109:17,23
123:16
125:14
127:24
189:18
**totally** 128:1
150:6 164:2
232:22
**touch** 116:7

**touchstone**
267:2
**tough** 223:6
**township** 100:3
100:8 103:18
105:24 106:3
106:5 110:22
110:23 111:1
111:10,11,17
111:21
112:13,17,25
113:3,4,5,6,8
113:11,12,13
113:14,15,20
113:21,22
114:7,15
145:7
**townships**
103:15,16
104:2,13,23
104:25
105:22 106:8
106:10
110:22
112:11,14
113:1,2
114:6,10
**traditional**
15:8 17:17
19:7,15 70:5
70:22 71:9
71:13,23
72:1,5,16
73:4,9,15,18
74:1,4,15,21
75:6,8,10,14
75:16 76:1,2
76:4,10,22
77:5,12
**transcript** 3:21
281:8
**translate**
194:10,25
211:10,23
**translates**
211:25
**transmission**
47:12
**transmit** 48:2
**transmittal**
47:10
**transmitted**
47:19
**transparent**
119:6
**traversal** 116:5
118:9
**treat** 112:14,17
**treated** 112:2
118:12
**treats** 111:14
112:20 114:7
**trends** 183:7
183:12

**trial** 5:8,24
24:4 30:9,10
30:20
**tried** 11:23
19:18,19
65:19 87:13
87:20 129:2
129:3 140:9
149:24,25
150:8 182:8
187:24,25
201:4 205:22
206:6,9
**tries** 114:11
227:16
**triple** 12:4
19:18,20
**tripling** 19:21
**trouble** 125:23
**true** 113:8
124:11 159:7
166:6 184:8
185:24 187:8
187:9 211:8
213:17
220:20
234:24
266:11
268:10 281:9
**Trump's** 194:9
**trust** 278:19
**trustees**
184:13
**truth** 4:4,4,5
281:13
**truthfully** 4:22
**try** 7:10 8:3
16:23 18:12
19:3 20:4
21:9 22:17
23:9,10,11
38:5,23
57:13 74:18
84:1 85:11
86:5,10
89:25 90:4
92:5 103:1
108:19 109:9
111:4,5
112:9 114:14
118:2 123:20
125:24 126:1
126:17
127:15 131:6
168:9,9
182:11
199:20 202:9
204:15
205:24
212:12
214:24 217:4
223:14
240:11 244:2
246:19 249:7

262:2 274:23
274:23
279:16
**trying** 7:6 12:5
13:17 16:22
18:15 21:3
26:4 34:3
41:8 48:23
57:4,12
65:17 82:6
86:12,19
90:25 91:23
92:6,8 99:12
114:10,25
115:8 116:13
119:5 123:6
124:8,20
128:6 132:8
139:1,8,9
141:24
155:11
156:15
157:16
158:18
159:19
160:25
164:25 165:6
165:24
166:24
168:16 169:9
170:25
174:16
177:20 178:2
178:14,19
179:1,5,10,21
187:12 190:3
200:5 201:12
202:4 205:10
211:14
212:13
224:19
230:12
238:18
245:12
247:10,25
248:2 249:1
250:5 252:12
254:6 269:19
270:15
275:24
**turn** 31:15
62:18 66:7
68:17 77:16
77:18 79:1
83:3 99:3
103:7,21
114:23
118:24
128:15
129:22
140:13
146:25
175:22
182:25 187:4

187:19
206:13 216:1
225:3 228:4
231:1 237:24
243:14
248:16
249:19 251:3
259:1 260:21
262:16
263:12 267:5
269:6 273:10
275:19
276:23
277:12
**turned** 52:23
53:4 61:21
62:14 111:3
**turning** 120:6
**turnout** 29:10
186:12,14
187:1,2,3
**turns** 132:3
168:10
**twice** 115:10
115:15
**two** 4:14 7:15
10:3 11:13
11:24 12:2
12:19 13:13
14:12,14
16:12 19:22
23:9 28:17
29:4,17 34:9
44:23 49:1
83:9 94:7
95:2 100:19
101:22,23
102:8 103:16
105:22
115:11,15,16
115:17,18,20
116:2,3,6,8
119:7 121:9
121:12,19,20
122:11,15,18
122:19 123:8
123:10,11,14
123:15,17
125:4,5,10,10
125:11,16
126:5,19
127:22,23
130:22
137:15
146:13
147:24 151:2
151:3,12
153:6 165:16
173:7 177:16
177:19
178:17 182:2
182:13,20
186:2 187:23
187:25 188:4

Case 2:17-cv-14148-ELC-DPH-GJQ ECF No. 160-5, PageID.6620 Filed 12/14/18 Page 106 of 109

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 314

191:12,15,16
191:18
192:10,14
210:5 239:11
239:17
250:14
273:22,25
two-party
189:18 210:3
211:17
typical 131:9
253:1,1
257:17
261:18
typos 5:15

**U**

U.S 183:5
184:24
ultimately
44:23 50:11
50:14,17,18
50:19
unacceptable
38:4 198:10
199:15
unaware
134:14
unbiased
241:20
uncompiled
53:4 60:20
61:5,9 62:10
62:19,22
underlying
140:2 154:23
161:12 188:2
212:2,16
214:10
218:13
222:24
223:17
underneath
103:9 116:11
underpopula...
6:24 110:8
126:5,25
understand 9:5
11:17 13:8
13:12,15,23
42:5 54:12
59:12 63:19
76:14 81:20
89:15 92:5
96:13 108:2
110:12 118:2
122:11 128:2
137:3 139:1
144:19
145:16
147:19 149:8
163:18
164:12 165:5
174:15,18

181:20
200:16 201:1
201:5 204:14
204:24
205:10
208:18 214:1
245:24
250:19
258:19
269:20
272:12 274:3
276:7
understanding
12:22,24
13:6,9 14:15
15:7 27:18
27:20 28:25
35:5 36:9
46:5 67:1
68:7,22
71:25 72:16
72:23 76:3
77:6 85:8,11
91:11,18
95:17 97:5
97:16,19
98:10 99:10
99:17 100:24
101:3,5,9,25
102:13
117:19
118:16
126:19
127:21
128:12
142:12,20
144:5,12,15
145:1 183:21
204:21
235:17
272:25
understood
13:19,20
14:6 67:10
94:6 137:12
141:7 142:8
205:6 233:9
257:4 270:17
undoubtedly
279:10
unified 25:18
uniform 176:1
176:4,9,13
177:2 212:18
248:18
251:18 253:1
253:5 255:1
255:6,8,16,24
256:5 257:1
257:8 258:7
258:9,11,17
258:23 259:4
260:2,10
261:7,14

262:18 263:3
263:5,7
265:10
266:18,23
unique 129:4
United 1:1
138:4
universal
240:19
universe
156:12 158:1
158:22
university
184:13,15
unknown
162:3
unnecessary
79:23,24
unreasonable
250:21
259:16,20
unusual 251:13
251:19,24
upcoming
194:14,18
update 56:7,11
updates 57:25
updating 58:10
58:11
UPS 167:14
use 16:1,7
17:12,18,22
18:7 20:20
20:20 21:5,7
22:2 40:6
41:23 50:5
55:9 59:18
59:18,23
60:4,6 65:2,3
65:5,6,11,12
65:20 67:5
67:16 68:15
72:1 76:13
108:5 129:12
147:3 158:6
158:6 165:25
169:9 177:8
177:12
178:12,20
180:7,19
199:3 200:3
200:7,21,23
200:24,24
uses 135:3
141:9 200:23
201:2 204:16
usually 71:13
72:6 76:11
240:6 244:15

**V**

v 6:23 22:23,23
23:18
vague 44:11

51:12 208:25
253:10
257:19
valid 172:11,13
236:4
value 57:22
220:12
variable 57:22
variables 56:4
variation 82:25
186:25
various 7:17,17
7:23 10:19
24:13,19,21
55:13 56:4,5
56:5 57:21
71:15 95:11
97:23 136:10
177:6 180:2
211:5 212:3
250:1 266:18
266:25
vast 79:22 81:8
201:22 231:4
231:7 266:9
veracity 273:16
verbal 4:15
verify 108:22
274:11
275:12
versa 132:4
version 58:14
60:8 79:8
versions
277:20
versus 5:18
10:10 23:2,3
23:12,15,15
24:18 25:4
28:1 30:15
30:25 118:5
134:3 136:1
136:13
181:22
226:15
244:25
vertical 278:8
vi 145:6,18
vice 132:4
victories
196:17
view 75:4
76:18,19,21
76:22 77:3
83:11 130:2
130:5 142:4
142:5 144:17
198:19
199:15
205:12,16
215:7 216:15
247:17
273:23
viewed 198:8

205:21 208:9
230:18
views 76:23
violate 101:12
violated 118:21
118:21
violating 37:18
violation 6:18
6:20
violative 13:1
Virginia 2:15
virtually 203:1
224:6
virtue 200:1
visualization
122:14
visually 122:21
224:6
vote 186:11
190:8 201:14
201:16,20,21
201:25 202:1
202:12,16,18
203:19
209:13,15,25
210:3,10,17
211:10,17,22
212:25,25
213:4 220:16
244:15,16,18
251:9 253:18
254:10
260:24
262:18
265:14
266:12 267:4
268:4,10
278:7
voted 163:25
voter 25:9,10
29:7,14
214:11,20
246:5
voters 1:4
10:10 23:3
23:15 24:16
24:18 25:22
26:4,13,15,21
26:24 27:21
213:9,14
votes 186:1
187:18
189:17,17,18
190:25 196:7
196:12
211:25
212:14 219:7
235:3,13
239:2,3
243:4,4
253:9
voting 27:24
29:4,8 30:1
31:12 90:3,5

90:22 91:12
91:12,19
92:2,8,20,24
92:25 93:18
95:15,17,21
96:7,17,25
183:7,12
VRA 93:6
vs 1:14

**W**

W 1:11
wade 50:3
wait 28:4,7
32:20,20
39:18 42:17
91:4 139:16
193:8,8,10,13
Wake 6:2,23,23
6:23 7:5 9:3
9:4
walk 208:3
want 4:13 5:21
6:2 7:11
15:25 19:24
33:15 34:6
34:13 37:4
42:10,17,21
48:9,18 52:1
56:22,23
63:7 65:24
69:5 70:6,24
70:25 81:12
91:4,16,24,25
102:8 114:1
118:2 119:18
119:19,20,21
122:8 124:10
126:14
138:20
144:22 147:2
147:15,15,19
163:8 167:13
167:14
173:11,23
179:15
195:14,15
199:8 203:7
208:7 209:10
210:13 221:4
228:4 229:13
233:5 234:7
235:17
238:15
240:11
244:12
245:24 249:7
252:20
267:15 271:9
272:15
273:13,16
277:25 280:5
wanted 30:22
55:21 72:14

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 315

79:13 84:6
84:21 135:16
177:5 201:9
219:12
222:12 228:2
229:16 273:5
**wants** 64:4
**ward** 268:9
**Warrenton**
2:15
**Washington**
2:10
**Washtenaw**
116:19
**wasn't** 22:4
49:10,18
62:19 65:23
88:22 101:1
122:1 150:10
152:2,15
189:23
266:21
**waste** 219:7
**wasted** 239:2,2
243:4,4
**way** 5:14 9:20
11:17 26:20
29:19 37:22
38:5 55:8
75:24 78:17
82:18 84:21
85:21 90:6,9
95:22 101:11
102:3,22
109:4,7,11
117:8,22
119:4,5
120:4 127:6
128:11 132:8
133:9 134:12
134:12
141:16 142:9
143:8 144:7
154:25
155:22
156:11,16
157:3 161:11
161:11,12
165:22
166:21
167:25 168:5
169:18 175:1
199:18 202:3
204:12,13
206:11
214:19
216:16 219:7
219:22 222:5
227:13 237:6
242:4 247:19
260:7 261:10
261:19
264:25
266:11

269:17
272:20 276:8
276:11
277:21
**Wayne** 96:4
116:17,18,21
118:24 119:1
119:12,13,15
119:16,19,19
119:20 120:1
120:2,4,9,12
120:14,20,21
121:2,7
**ways** 7:17
112:23
113:23 156:1
157:2 187:21
205:3
**we'll** 5:15 13:8
32:21 63:15
64:7,7
107:23 108:9
212:22
239:13
255:21
**we're** 10:2
38:11,15
39:13 45:21
50:2 81:5
99:12 100:11
105:6 114:25
123:9 137:7
147:15
151:14 154:5
174:25 175:2
176:19,19
177:19
183:15
191:20 193:8
193:9 203:16
208:15 210:6
218:9 221:23
222:15 226:9
226:24 230:5
231:20
237:25
238:14 243:6
244:10 245:4
245:24
246:23
248:10
250:25 259:6
259:13
262:12 264:9
264:13
270:10
276:15,17,18
276:19
277:25
**we've** 48:15
63:11 64:2,6
64:14 96:14
96:19 126:18
126:18

127:21,23
144:9 146:4
147:13 149:3
160:6 167:22
214:14
219:25 238:1
242:20,22
261:17
262:25
**well-accepted**
198:19
199:15
**went** 36:1,2
38:19,20
41:19,20
44:21 45:24
45:25 50:24
52:4 55:13
58:20 64:9
64:10 98:13
98:14 122:10
124:15
146:20
150:16,17
195:23,24
248:12,13
251:9 280:2
280:3
**Western**
120:14
**white** 164:5
**wholly** 110:22
113:9 116:14
117:17
178:18
212:23
225:21
**wide** 221:19
**widely** 21:20
76:9 168:22
**widespread**
167:7
**WILLIAM** 1:8
**win** 171:2
173:19 174:7
174:8,11,12
175:14,17
197:24
212:14 229:5
253:7 256:17
256:22 259:4
267:9,20,20
**wind** 273:24
**window** 56:9
58:2,11
**windows** 58:7
**winnable**
268:18
**winner** 211:9
**winner's**
210:24 212:7
212:11
**wins** 187:6
**withdraw** 91:5

195:14 233:5
**withdrawing**
81:15,18
90:23 91:1
**withdraws**
254:14
**withstand**
249:5
**witness** 3:4 8:8
28:6 32:5,23
33:2,5,11
34:11,14,21
34:24 35:11
35:16,19,22
36:9,15,21
37:5,12 38:1
39:8,18,23
40:3,16 43:6
44:13 45:15
45:17,20
47:16 50:22
52:23 53:19
57:12 59:15
60:12 64:4
64:16 66:9
69:13 70:23
72:22 74:9
75:19 81:20
86:24 89:8
89:15 91:10
93:15 97:9
98:7 103:22
114:24
124:25
125:22
126:11
127:10
128:16
129:16,23
134:10
137:13
138:25 139:6
139:17
140:14 143:1
143:24 144:5
145:23 147:9
150:13
158:13
161:17 165:4
166:12 172:8
172:18 174:5
179:4,8
189:7 193:12
193:14 195:8
206:5 207:23
209:2 210:1
227:6 229:20
229:24
236:21
237:15 241:1
241:7 246:19
252:11
253:12

254:15
259:19,23
262:17
275:21 280:7
**Women** 1:4
10:10 22:23
23:3,15
24:16,18
25:22 26:4
26:13,15,21
26:24
**won** 29:23
196:9 232:14
259:11
**wondering**
20:24 63:21
80:5 81:8
126:8 132:12
225:15
**Woodward**
2:19
**word** 13:24
41:23 54:6
54:19 61:24
67:5 72:1
102:20
173:11
210:21
227:10 242:6
242:10
**words** 19:17
42:2 53:21
59:4 67:16
121:11 131:3
145:25
167:19 191:8
192:15 197:6
200:3 201:25
216:11 226:1
235:8
**wordsmith**
42:21
**work** 31:11
32:3,25,25
41:7 43:11
134:24
143:21
166:17 169:1
169:3 190:14
242:7,8
268:20
**working**
167:17
**works** 221:20
222:6
**world** 59:17
73:11 122:25
167:8 176:11
176:15,17
177:8 183:24
184:3,6,7
185:18
186:15,21
187:1 188:24

190:4 191:5
191:14
195:11 196:9
232:14 234:1
234:1,5,21
235:14,23
236:8
**worse** 151:24
193:18 220:5
220:12,14
259:17,22
**wouldn't** 10:14
47:5 71:23
80:6 89:18
128:11 150:2
150:24
156:20 168:7
180:1 192:13
192:15 197:9
210:1 211:22
221:18
237:11
239:20
246:13
261:12,16,18
273:22
**wrapped**
115:22
**Wright** 1:23
**write** 54:23
55:8 126:17
168:25
169:20,24,25
**writing** 21:21
21:21 169:14
216:2
**written** 22:11
30:19 101:2
111:9 168:24
168:25
181:16,21
**wrong** 85:9
123:13 142:4
192:13 240:2
270:8
**wrote** 22:1
25:7 30:12
119:2 152:8
169:5
**Wyoming**
130:20,22
131:7 138:13
138:16
**Wyoming's**
138:11

___ **X** ___
**X** 76:18 77:2
174:6 199:25
200:2 206:7

___ **Y** ___
**Y** 174:7 206:7
**Yeager** 2:3

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 316

4:10 5:10 8:6
28:4,7 31:25
32:20 33:3
33:10,15,19
33:22 34:6
34:22 35:9
35:15,20
36:7,14,20,24
37:7,21 38:6
38:9,14 39:8
39:13,16,20
40:2,15 41:4
41:6 43:7,10
44:11 45:16
45:20 46:17
47:14 48:10
49:1,4,15,23
50:9,21,23
51:2,12,15
52:21 53:17
57:10 59:13
60:10 61:8
63:4,13,23
64:4,7,11,20
64:23,25
68:17 69:11
72:20 74:7
75:17 81:15
81:18 86:22
89:6 90:23
91:1,4,7
93:13 97:6
98:5,24 99:1
124:22
125:20
126:10 127:8
129:14 134:8
135:16
137:12
138:23 139:5
142:24
143:17 144:4
145:20 147:8
147:22
150:13
153:17
158:10
161:14
164:22 165:2
165:12 166:9
172:6,16
174:3 189:4
193:8,13,15
195:5,13,18
195:22 206:3
207:21
208:24
209:24 225:9
227:4 233:2
233:5 236:19
237:13
240:25 241:5
246:17
248:10

252:10
253:10
254:13
257:19
276:25
**Yeager's** 37:14
37:19,20
43:19 63:18
143:25
**yeah** 14:13
44:18 55:24
64:6 75:19
83:10 132:10
170:6 190:24
191:15
197:20
203:12
207:23
218:11,15
220:4 222:17
222:23
224:13
226:17
228:10
239:12
**year** 63:1
173:23
183:20
191:12
192:20,22,23
193:22 194:4
209:14
232:19,20
252:16 253:6
253:17,18,18
253:23,25
254:1,2,21,22
254:22 259:9
264:2,4,5,6
264:17,18,22
**years** 45:4
163:25 164:2
164:3,5,21
166:7 173:5
174:17 176:6
**yep** 196:8
**York** 167:16,17
168:1

_____ **Z** _____

**zero** 216:11
218:8,9,15,16
218:19,19,23
219:2,21
220:1,25
222:4 225:6
**zone** 168:6
**zones** 167:15
167:18,24

_____ **O** _____

**0.05** 218:20
**0.1** 218:7
**0.415** 130:1

132:14
133:10
137:22 138:3
**0.418** 132:15
133:10
**0.435** 133:10
**06** 177:11
222:4 246:24
261:5,17
**08** 252:25

_____ **1** _____

**1** 3:14 4:24 5:1
107:25 269:8
271:5 272:1
277:5,9,10
**1,573** 112:10
112:12
**1.04** 262:20,21
263:7,10,11
263:19,23
264:14,19
**1.800.878.8...**
281:20
**1:01** 98:14,16
**10** 109:1,17,24
191:1 222:4
241:21 242:1
242:15 269:8
277:5,9,11,14
**10.2** 239:15
**10:20** 36:1
**10:26** 36:2
**10:30** 38:19
**10:47** 38:20
**10:55** 45:24
**100** 2:14
**102** 107:20
108:3
**105** 28:18 29:2
29:18 101:13
102:11,14,16
102:19,24
103:3 107:3
107:6 108:1
108:9,23
109:4,7,8,12
109:13,23
**11** 269:8
**11:00** 45:25
**11:23** 64:9
**11:28** 64:10
**110** 192:7,9
231:21,23
232:10
235:12
244:17
267:18
**111** 28:18 29:2
29:18
**12** 176:7,20
187:22
189:10 191:1
192:8 219:14

219:24 221:1
223:10,12,23
223:23 224:3
224:7 225:23
226:11,20
240:2,10
243:22
255:14
257:14
258:10 269:8
**12.1** 240:1,3,8
240:15
241:22
**12:13** 98:13
**13** 83:7,11
94:14 139:25
221:2 223:2
223:4,7,8
225:17,20
226:11
233:15
234:13
**14** 83:7,11
94:14 139:21
139:22
146:25
147:15
157:19 160:7
173:20 176:7
176:20 192:8
210:11,13,18
210:19 221:3
221:10,17
222:14
225:17,20
257:14
258:10,10
263:21
267:18
281:21
**14'ish** 221:8
**14-and-a-half**
220:6,22
**141** 281:19
**15** 79:1 223:12
225:6,18,25
226:1,8,12,21
226:21
**150** 107:17
**16** 176:7,21
187:22
189:10 191:1
192:8 219:14
219:25 221:1
224:4 225:24
226:20 240:2
243:22
258:10
263:22
**16.7** 231:10
**17** 115:4 160:8
206:13
238:13
**17th** 278:2,5

**18** 81:6 238:14
**180,000**
123:10,16
**19** 226:22
**1982** 114:18
**1996** 146:17
**1999** 145:5
**1st** 62:25 63:12
64:3,15

_____ **2** _____

**2** 3:15 98:16,20
130:9 221:6
228:13,14
**2:17** 150:16
**2:17-cv-141...**
1:7
**2:28** 150:17
**20** 274:21
**2000** 87:2
**20001-2113**
2:10
**2002** 187:20
**2006** 170:12
176:10
177:10
187:21,22
189:9 191:2
196:5 206:16
209:14 217:2
217:9,18
218:6 219:13
219:20
220:15
243:19,25
260:22
**2006-2010**
207:19 219:4
228:13
**2008** 251:8,15
251:20
**2010** 170:12
176:11
177:11
187:21,22
189:10 191:2
196:5 206:16
209:14 217:2
217:9,18
218:6 219:14
219:20
220:15
243:19,25
246:24 251:9
251:15,21
252:4,16,25
252:25
260:22 261:5
261:17
263:25 264:2
**2011** 86:17
**2012** 170:13
176:11
177:10

180:25
187:20 191:2
191:6 192:21
196:5 217:19
218:5 220:5
220:14,20
223:2 228:14
231:3,20
232:14,16
233:16,23
235:3,13,14
235:21
236:13 237:1
239:5 252:15
252:25 253:6
254:10
255:13,15,24
257:1 258:18
258:23
262:19,22
263:5,11,15
263:18,20,25
264:4,13
265:11
**2012-2016**
236:7 243:17
**2013** 22:1
**2014** 31:1
171:24 191:6
259:6,9,14
263:14
**2015** 9:16
**2016** 40:19
41:1 42:24
44:15 170:13
171:24 173:5
173:8 176:11
177:8,10,15
180:25
181:11
187:21 191:3
191:6 192:19
196:5 217:19
218:5 220:5
220:14,21
223:2 228:14
231:3 233:16
233:23 235:3
236:13 237:1
239:5 255:12
263:14 264:5
264:10,16,22
265:2,15
**2017** 28:2
**2018** 1:22 4:2
170:16,19,23
171:1,5,9,15
171:22,23
172:4,14,25
173:3,5,8,13
173:21,23
174:1,20,22
180:24 181:2
181:11 193:4

Deposition of Jowei Chen - 9/7/2018
League of Women Voters of Michigan, et al. v. Ruth Johnson, Secretary of the State of Michigan

Page 317

197:18,21
250:20 253:9
254:11 255:4
255:5,10,15
255:22 256:1
256:2,20
257:2,6
258:20
262:23 264:5
264:23 265:2
281:11,16
**20186** 2:15
**202-879-3939**
2:11
**2020** 170:16,19
171:9,15,22
174:1,14,20
175:2,6,10
180:24 181:2
197:18 253:9
254:12 255:4
255:10,22
256:1,2
257:2 258:21
262:24
**2021** 281:21
**206** 281:19
**2083-49** 2:3
**21** 228:4,7
**22** 79:15 80:2
**22.5** 216:25
217:16
**23** 259:11
**24** 196:6,13,25
197:1,4,8,15
197:24 216:3
216:5 217:6
217:10 223:3
259:11
**25** 216:1,2
218:25 225:3
225:13
**26** 32:3,24
35:21 43:11
143:21
**27** 118:25
119:9 196:9
196:13
259:11
**2700** 2:5
**28** 116:16
**281** 281:8

_____
**3**
**3** 229:17,22
230:1,13
250:15,20
253:20 254:3
**3.37** 253:6,8,13
254:9 255:8
255:15,24
257:1,9
258:2,17
**3.5** 230:13

**3.6** 228:14
**3.63** 12:20
98:22
**3.8** 228:13
**3:32** 195:23
**3:41** 195:24
**30** 54:20
**300** 1:24 2:4
83:6
**3000** 32:10
121:25
**313-965-8803**
2:20
**317-237-0300**
2:6
**32** 206:19,25
207:8 208:8
208:23 209:4
210:10,17
212:23
**350** 1:23
**3500** 2:19
**38** 196:7
**38-seat** 196:12
196:14

_____
**4**
**4** 3:7,14 97:19
120:7 137:8
245:16
264:23,23,25
265:14 269:8
**4-and-a-half**
247:14,16,19
**4.261** 12:20
98:22 100:11
100:22 101:3
**4.5** 243:17,21
245:10,14,17
246:15
**4:55** 248:12
**40** 83:3 114:23
118:23 120:7
129:22
133:21 137:8
160:4 206:1
**41** 231:1
**415** 132:9
138:10
**418** 131:16
**42** 213:3
**42.9** 210:11,12
210:18
212:24
**435** 131:16
137:25
**44** 252:6
**45** 2:14 205:19
**45.3** 206:25
**45.65** 251:9
**46204** 2:5
**463** 100:6
**47** 243:14
245:17

247:21 252:5
252:6
**47.6** 252:11
**48** 204:2
**48.5** 204:3
**48226** 2:20
**49** 238:9 243:9
245:13,23,24
246:1,3
**49007** 281:20

_____
**5**
**5** 96:7,11,13,16
96:24,25
97:19 98:4
108:7 109:3
130:9 216:11
216:12,12,14
216:20,20
218:1,1
220:6,9,22
221:2,8,10
224:1 250:4
250:6,15,20
253:3 269:8
**5.19** 243:24
244:3 246:10
246:16,24
247:12,16
**5:05** 248:13
**5:50** 280:2,3
**5:51** 280:8
**50** 85:17,23
203:3,4,25
204:4 205:19
211:16
230:25 239:5
270:2,6,20
271:17,18
274:21
**50.1** 189:15
**50/50** 206:8
229:9
**500** 2:19
**51** 2:10 189:20
237:24 238:3
238:10,20
**52** 175:22
202:18
248:16 249:3
**53** 202:17,19
210:16 211:9
211:22,23,24
212:25
249:19
**53.2** 209:22
210:2,9
**54** 252:5,6
**54.15** 251:9
**540-341-8808**
2:15
**55** 92:25 93:18
93:21 94:2
94:22 95:5

95:19 192:2
252:6 266:13
267:18,22
**55th** 268:9
**56** 211:10,12
211:25
267:23 269:6
269:7,13,14
271:5,7
273:11,13,14
273:17
**57** 253:3 259:1
262:16
264:21
**58** 56:10 58:2,8
231:5,8
232:9 233:20
233:22 236:3
241:12,14
266:2,2,7,10
266:13
**59** 77:16 99:3
99:12 191:8
191:15
211:10,12,25
232:7,15
234:22
235:14,21
236:2,3

_____
**6**
**6** 191:1 243:17
245:10,14,17
246:15
252:22
**6.0** 243:22
**6.4** 259:3,17,22
**6.45** 259:8
**6.7** 230:21,24
**60** 206:1 232:7
**61** 190:23,25
191:5,8,9,11
192:2,7,9,20
192:23
234:20 235:4
235:5,10,24
**62** 103:21
236:16,21,25
237:6,7,16,16
**63** 99:24
103:21 191:8
191:8,15
**64** 128:15
140:13
**65** 189:21
212:14 251:3
260:21
263:12

_____
**7**
**7** 1:22 4:2
250:23 252:8
252:10,22
264:1 281:10

**70** 202:12,15
**700** 83:7
**74** 269:22
**74.9** 231:6,10
232:5,10
**75** 77:2 269:22
**76** 278:15
**77.3** 206:25
**77.8** 206:22
**78** 273:10,20
**7th** 268:4,5,9

_____
**8**
**8** 240:23
250:23
251:14,24
269:8 273:12
273:12
**8-and-a-half**
251:12 252:7
**8.7** 239:13
**80** 277:12
**85** 107:10
**85,000** 108:6
**87** 224:14
225:2
**88** 224:1,6
**89** 107:8
**89,000** 108:14

_____
**9**
**9** 240:19
241:21 242:1
242:15
251:12,14
260:23 261:6
261:18 269:8
281:16
**9.3** 239:14
**9.8** 109:25
239:15
**9.9** 109:25
**9:34** 1:24 4:2
**9:35** 4:24
**90** 231:25
**91.8** 231:8
**92** 231:13
232:12
**94** 107:11
**94,000** 108:6
**95** 101:13,20
102:5,11,14
102:16,19,24
103:3 107:3
107:6,9,17
108:1,9,23
109:7,8,11,12
109:18,19,22
154:10,25
157:6 203:17
203:18 204:3
204:9 208:21
209:6 270:19
270:22 271:1

271:24 272:8
273:2,2
274:3,7
275:1,9,18
**978** 79:16 80:9
80:14
**98** 3:15 56:10
107:19,25
108:3
**982** 81:7,22
**99** 101:22
102:5 153:21
154:10
**99.9** 148:13
152:9 153:8
153:13,23
157:19

**Benchmark Reporting Agency**
**612.338.3376**