# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LEAGUE OF WOMEN VOTERS   )
OF MICHIGAN, et al.,   )     Case No. 2:17-cv-14148
  )
       Plaintiffs,   )     Hon. Eric L. Clay
  )     Hon. Denise Page Hood
  )     Hon. Gordon J. Quist
     v.   )
  )     **VOTERS' RESPONSE TO**
  )     **THE SECRETARY'S MOTION**
RUTH JOHNSON, in her official   )     **IN LIMINE TO EXCLUDE**
Capacity as Michigan   )     **TESTIMONY CONCERNING**
Secretary of State, et al.,   )     **VARIOUS PROFFERED**
  )     **GERRYMANDERING METRICS**
       Defendants.   )

Joseph H. Yeager, Jr. (IN 2083-49)
Kevin M. Toner (IN 11343-49)
Harmony A. Mappes (IN 27237-49)
Jeffrey P. Justman (MN 390413)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Jay.Yeager@FaegreBD.com
Kevin.Toner@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
MBrewer@GoodmanAcker.com

*Counsel for Voters*

## **Voters' Response To The Secretary's Motion In Limine To Exclude Testimony Concerning Proffered Gerrymandering Metrics**

Defendant Secretary argues that five quantitative analytical tools used by Plaintiffs' experts should be ignored in this case because, according to the Secretary, they are not sufficiently accepted in the political science community.  The Secretary overstates both the very limited importance of *Daubert* in a non-jury setting and the degree of consensus required before expert testimony satisfies *Daubert*.  Conversely, the Secretary understates the evidence, and the degree to which these particular metrics are accepted and do—especially collectively—provide helpful evidence regarding the extent to which a particular legislative map favors one party over another.

The Secretary's critique should be reserved for trial regarding the weight—not the admissibility—of Plaintiff' expert testimony.  For the reasons set forth in the accompanying brief, the Plaintiffs respectfully request that the Secretary's Motion in Limine be denied.

Respectfully submitted,

Date:  December 14, 2018                  */s/ Joseph H. Yeager, Jr.*

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
Fax: 248-483-3131
MBrewer@goodmanacker.com

Joseph H. Yeager, Jr. (IN Bar No. 2083-49)
Kevin M. Toner (IN Bar No. 11343-49)
Harmony A. Mappes (IN Bar No. 27237-49)
Jeffrey P. Justman (MN Bar No. 390413)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Fax: 317-237-1000
Jay.Yeager@FaegreBD.com
Kevin.Toner@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

*Counsel for Plaintiffs*

## Certificate of Service

I hereby certify that on December 14, 2018, I caused to have electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

Respectfully submitted,


*/s/ Joseph H. Yeager, Jr.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS | ) | |
| OF MICHIGAN, et al., | ) | Case No. 2:17-cv-14148 |
| | ) | |
| Plaintiffs, | ) | Hon. Eric L. Clay |
| | ) | Hon. Denise Page Hood |
| | ) | Hon. Gordon J. Quist |
| v. | ) | |
| | ) | **VOTERS' BRIEF IN** |
| RUTH JOHNSON, in her official | ) | **RESPONSE TO THE** |
| Capacity as Michigan | ) | **SECRETARY'S MOTION IN** |
| Secretary of State, et al., | ) | **LIMINE TO EXCLUDE** |
| | ) | **TESTIMONY CONCERNING** |
| Defendants. | ) | **VARIOUS PROFERRED** |
| . | ) | **GERRYMANDERING METRICS** |

Joseph H. Yeager, Jr. (IN 2083-49)
Kevin M. Toner (IN 11343-49)
Harmony A. Mappes (IN 27237-49)
Jeffrey P. Justman (MN 390413)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Jay.Yeager@FaegreBD.com
Kevin.Toner@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
MBrewer@GoodmanAcker.com

*Counsel for Voters*

## <u>CONCISE STATEMENT OF THE ISSUE PRESENTED</u>

Whether this Court should exclude from evidence at the upcoming *bench trial* (where *Daubert* has an extremely limited role) the metrics used by Plaintiffs' experts to identify and quantify gerrymandering even though those metrics have been rigorously tested by the academic community and the Secretary's opposing experts and are otherwise reliable and will help the Court adjudicate this dispute.

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Rules**

Federal Rule of Evidence 702

**Cases**

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)

*Deal v Hamilton Cnty Bd. of Ed.*, 392 F.3d 840 (6th Cir. 2004), *cert den.* 546 U.S. 936 (2005)

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)

## **<u>Table of Contents</u>**

I.    Relevant Factual Background ................................................................ 1

    A.   Dr. Chen .................................................................................... 1

    B.   Dr. Warshaw .............................................................................. 3

    C.   Dr. Mayer .................................................................................. 4

II.   Argument ............................................................................................ 4

    A.   The *Daubert* Standard Is Generally Inapplicable For Bench Trials .......... 5

    B.   Even If Daubert Applies, The Gerrymandering Metrics Satisfy Rule 702. ................................................................................... 6

        1.   Standard Of Review .......................................................... 6

        2.   The Gerrymandering Metrics Are Sufficiently Reliable Under Rule 702 ......................................................................... 8

            i.   *General Acceptance Is Not Dispositive Under Daubert* ..................... 8

            ii.  *General Acceptance Does Not Require Uniformity* ........................... 12

            iii.  *Gerrymandering Threshold* ................................................. 14

III.  Conclusion ......................................................................................... 15

<u>**Table of Authorities**</u>

**Page(s)**

**FEDERAL CASES**

*Bloomfield Hills Country Club v. Travelers Property Casualty Co. of America,* Case No. 15-11290, 2016 WL 4523576 (E.D. Mich. Aug. 30, 2016) ...............................................................................9, 10

*Common Cause v. Rucho,*
   279 F. Supp. 3d 587 (M.D.N.C. 2018) ...............................................11

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 479 (1993).................................................................*passim*

*Deal v Hamilton Cnty. Bd. Of Ed.,*
   392 F.3d 840 (6th Cir. 2004), *cert den.* 546 U.S. 936 (2005) .............................5

*Frye v. United States,*
   293 F. 1013 (D.C. Cir. 1923)...........................................................8, 9

*Greenwell v. Boatwright,*
   184 F.3d 492 (6th Cir. 1999) ...............................................................7

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)........................................................................6, 7

*Henrickson v. ConocoPhillips Co.,*
   605 F. Supp.2d 1142 (E.D. Wash. 2009).........................................13

*LULAC v. Perry,*
   548 U.S. 399 (2006).............................................................................8

*Mich. State A. Philip Randolph Inst. v. Johnson,*
   No. 16-CV-11844, 2018 WL 1180886 (E.D. Mich. Mar. 7, 2018)..................5, 6

*Ne. Ohio Coal. for the Homeless v. Husted,*
   Case No. 2:06-cv-896, 2016 WL 1047130 (S.D. Ohio Mar. 16, 2016) ............................................................................................5

*Static Control Components, Inc. v. Lexmark Int'l, Inc.,*
   No. CIVA5:02-571, 2007 WL 7083655 (E.D. Ky. May 12, 2007) ..................10

*United States v. Bonds*,
  12 F.3d 540 (6th Cir. 1993) ....................................................................7, 13, 14

*Whitford v. Gill*,
  218 F. Supp. 3d 837 (W.D. Wis. 2016), vacated and remanded, 138
  S. Ct. 1916 (2018)..............................................................................................11

*Whiting v. Boston Edison Co.*,
  891 F. Supp. 12 (D. Mass. 1995)........................................................................13

**RULES**

Federal Rule of Evidence 702.........................................................................*passim*

**Voters' Brief In Response To Secretary's Motion In Limine To Exclude
Testimony Concerning Various Proferred Gerrymandering Metrics**

## I.     Relevant Factual Background

At bench trial, Plaintiffs intend to offer the testimony of three experts: Drs.

Jowei Chen, Christopher Warshaw, and Kenneth R. Mayer.

### A.     Dr. Chen

Dr. Chen is an Associate Professor in the Department of Political Science at

the University of Michigan, Ann Arbor.  He is a leading political science expert in the

country regarding gerrymandering.  *See* Chen Expert Report, Ex. A (hereinafter "Chen

Report") (detailing his experience, research expertise, and publications).

Dr. Chen explains the following in his expert report:

> In conducting my academic research on legislative districting, partisan
> and racial gerrymandering, and electoral bias, I have developed various
> computer simulation programming techniques that allow me to produce
> a large number of non-partisan districting plans that adhere to traditional
> districting criteria using US Census geographies as building blocks.  This
> simulation process is non-partisan in the sense that the computer ignores
> all partisan and racial considerations when drawing districts.  Instead, the
> computer simulations are programmed to optimize districts with respect
> to various traditional districting goals, such as equalizing population,
> maximizing geographic compactness, and preserving county, municipal,
> and ward boundaries.  By generating a large number of randomly drawn
> districting plans that closely follow and optimize on these traditional
> districting criteria, I am able to assess any enacted plan drawn by a state
> legislature and determine whether the enacted plan produces a partisan
> outcome that deviates from computer-simulated plans that follow
> traditional, partisan-neutral districting criteria.

(*Id.* at 2.)  Dr. Chen goes on to explain that he used this simulation approach by

"conduct[ing] 3,000 independent simulations, instructing the computer to generate

1,000 House, 1,000 Senate, and 1,000 Congressional districting plans for Michigan that strictly follow the non-partisan districting [requirements] outlined [by Michigan law] and are reasonably geographically compact.." (*Id.*) Based on these simulations, Dr. Chen found that "each of the enacted plans was a partisan outlier when compared to the computer-simulated plans." (*Id.* at 3.) Dr. Chen based his conclusions, in part, on the Efficiency Gap[1] and the Mean-Median[2] metric, each of which is described by Dr. Chen as a "common quantitative measure" of political bias: *See, e.g.* Chen Report at 21 ("I thus conclude, with extremely strong statistical certainty, that the enacted plan's extreme Median-Mean Difference is clearly not the result of Michigan's natural political geography, combined with the application of Michigan's statutory redistricting guidelines. It is the result of partisan intent."); *id.* at 25 ("[T]he level of electoral bias in the enacted congressional plan … is far more biased than even the 1,000 simulated plans."); *id.* at 26 (reaching parallel conclusions with respect to the Michigan Senate, that with high statistical certainty, is a map driven by partisan intent);

---

[1] *See* Nicholas O. Stephanopoulos & Eric M. McGhee, *The Measure of a Metric: The Debate over Quantifying Partisan Gerrymandering*, 70 Stan. L. Rev. 1503, 1506 (2018) ("The efficiency gap is simply one party's total wasted votes in an election, minus the other party's total wasted votes, divided by the total number of votes cast. It captures in a single figure the extent to which district lines crack and pack one party's voters more than the other's."); *see also* see Eric McGhee, *Measuring Partisan Bias in Single-Member District Electoral Systems*, 39 Legis. Stud. Q. 55 (2014); Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015).

[2] *See* Warshaw Expert Report at 9-10, 19, Ex. B (describing the mean-median metric); Mayer Report, Dkt. 129-52 at 32-34, 42-43 (same)

*id.* at 43 (reaching parallel conclusions with respect to the Michigan House, that with high statistical certainty, is a map driven by partisan intent).

To form his conclusions, Dr. Chen assessed, in part, a database consisting of the results of 40 Michigan statewide races over two time frames: 2016 through 2010, and 2012 through 2016. (Chen Report at 5–9.)

## B.    Dr. Warshaw

Dr. Christopher Warshaw is an Assistant Professor of Political Science at George Washington University and a former Associate Professor at the Massachusetts Institute of Technology.  Dr. Warshaw is a leading political science expert on public opinion, representation, elections, and polarization in American politics.  His experience, research expertise, and publications are detailed in his expert report. (Ex. B (hereinafter "Warshaw Report").)

After analyzing an extensive dataset, as detailed in his expert report (*id.* at 1-3), Dr. Warshaw concluded that Michigan's current redistricting plans have led to a substantial and durable pro-Republican bias in the translation of votes to seats in congressional and state legislative elections in Michigan.  Dr. Warshaw based his conclusions, in part, on the Efficiency Gap, Mean-Median, and Declination[3] metrics.

---

[3] *See* Warshaw Report at 10-12, 19-20 (describing the declination metric); *see also* Mayer Report, Dkt. 129-52 at 25-27 (same).

### C.    Dr. Mayer

Dr. Kenneth R. Mayer has been a Professor in the Department of Political Science at the University of Wisconsin–Madison since 1989.  (Mayer Expert Report at 96, Ex. C (hereinafter "Mayer Report").)  Dr. Mayer is a leading political science expert on election administration.

After analyzing an extensive dataset, as detailed in his expert report (*id.* at 23), Dr. Mayer concluded that "[b]y every metric used to evaluate the partisan effects of district plans and detect the presence of partisan gerrymandering—Partisan Bias,[4] Seat-Bias, Vote-Bias, Partisan Symmetry,[5] the Efficiency Gap, Mean-Median, and Declination—the Michigan district plans for all levels of elected offices are extreme gerrymanders."  *Id.* at 4, 81 ("[W]ithout exception in any of the plans, Democratic voters have been packed into districts where they constitute safe majorities, while they have been cracked in others to allow Republicans to win with comfortable but not overwhelming margins.").

## II.   Argument

The Secretary argues that *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), requires the Court to act as gatekeeper to exclude any and all testimony related to the Gerrymandering Metrics employed by Plaintiffs' experts—including Partisan Bias, Partisan Symmetry, Mean-Median Test, the Efficiency Gap, and Declination

---

[4] *See* Mayer Report at 15-17 (describing the partisan bias metric).
[5] *See* Mayer Report at 17-18 (describing the partisan symmetry metric).

(hereinafter "Gerrymandering Metrics")—because, according to the Secretary, they are not sufficiently reliable under Fed. R. Evid. 702.  As explained below, the Secretary's arguments are nothing more than a premature attempt to influence the Court's weighing of the evidence and, in any event, are without merit.

### A.   The *Daubert* Standard Is Generally Inapplicable For Bench Trials

As a preliminary matter, it is well settled in this Circuit that *Daubert* is of limited relevance where the matter is not tried before a jury.  *Deal v. Hamilton Cnty. Bd. Of Ed.*, 392 F.3d 840 (6th Cir. 2004), *cert den*. 546 U.S. 936 (2005) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *see Daubert*, 509 U.S. 592-93 (noting that district courts act as gatekeepers to protect *juries* from misleading or unreliable testimony).

In this District, for example, a court recently denied a *Daubert* motion brought by the Secretary in another voting rights case, holding that because the matter would proceed to a bench trial, "[t]he proper course of action . . . is to admit the [expert testimony] and then afford it whatever weight the Court deems appropriate."  *Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-CV-11844, 2018 WL 1180886, at *2 (E.D. Mich. Mar. 7, 2018); *see Ne. Ohio Coal. for the Homeless v. Husted*, Case No. 2:06-cv-896, 2016 WL 1047130, at *1 (S.D. Ohio Mar. 16, 2016) (citing *Deal*, 392 F.3d at 852) (exercising discretion to consider what amount of weight to give an expert opinion after the bench trial, explaining that "[i]n the context of a bench trial . . . *Daubert* and its progeny are largely irrelevant").

This case will be heard before a panel of three judges, who collectively have dozens of years of experience adjudicating and weighing the merits of expert testimony.  "The proper course of action," is to "admit [testimony as to the Analytical Metrics] and then afford [them] whatever weight the Court deems appropriate." *Mich. State*, 2018 WL 1180886, at *2.  *Daubert* simply does not apply here—and the Secretary's Motion should be rejected on this basis alone.

**B.    Even If Daubert Applies, The Gerrymandering Metrics Satisfy Rule 702.**

1.    Standard Of Review

Pursuant to Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Thus, expert testimony may only be admitted into evidence if: (1) the witness qualifies as an expert; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact to understand the evidence or determine a fact in issue.  *Id.*; *Daubert*, 509 U.S. at 589-91.

*Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) require a two-step inquiry that involves an analysis of the "relevance and the reliability" of an expert's

opinion. *Greenwell v. Boatwright,* 184 F.3d 492, 496 (6th Cir. 1999). The relevance step of the inquiry is designed to ensure that "there is a 'fit' between the testimony and the issue to be resolved by the trial." *Id.* (citing *United States v. Bonds,* 12 F.3d 540, 555 (6th Cir. 1993)). The reliability step focuses on the "methodology and principles" that form the basis for the testimony. *Id.* A trial court must inquire as to whether the methodology underlying the proffered expert testimony is valid and whether the methodology may be properly applied to the facts at issue in a particular case. *Daubert,* 509 U.S. at 592-93.

The Secretary appears to be challenging reliability, not relevance.

To determine reliability, *Daubert* sets forth five factors for a court to consider: (1) whether the expert's technique or theory can be and has been tested, (2) whether the technique or theory has been subjected to peer review and publication, (3) the known or potential rate of error of the technique when applied, (4) the existence and maintenance of standards and controls, and (5) whether the technique or theory is generally accepted in the scientific community. *Id.* at 593-94. The court's inquiry under *Daubert* is flexible. *Id.* at 594. These factors are not a definitive test or checklist but are merely instructive. *Id.* at 593; *Kumho*, 526 U.S. at 150 ("*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.' And

*Daubert* adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" (citations and quotations omitted)).[6]

> 2. The Gerrymandering Metrics Are Sufficiently Reliable Under Rule 702.

The Secretary claims the Gerrymandering Metrics lack "general acceptance in the social science or political science academic communities." Mot. at 1. Characterizing the study of partisan gerrymandering as a "field in flux," the Secretary posits that a uniform standard for identifying and measuring partisan gerrymandering is currently lacking, particularly in the wake of *LULAC v. Perry*, 548 U.S. 399, 420 (2006) (opinion of Kennedy, J.). This "lack of consensus," says the Secretary, necessarily precludes admissibility under *Daubert*. Second, the Secretary argues that the Gerrymandering Metrics should be excluded because they do not establish a definitive "threshold" for determining partisan gerrymandering in the first instance.

> i. *General Acceptance Is Not Dispositive Under Daubert*

First off, the Secretary's "general acceptance" argument is premised on a flawed—and outdated—conception of the Federal Rules of Evidence. Indeed, in rejecting the evidentiary standard first enunciated in *Frye v. United States*, 293 F. 1013

---

[6] Indeed, *Daubert*'s flexible guidelines align with the Court's clear preference for the admission of expert testimony under Rule 702. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking . . . admissible evidence.").

(D.C. Cir. 1923),[7] the *Daubert* Court found that a threshold finding of "general

acceptance" is incompatible with the "liberal thrust" of the Federal Rules:

> Nothing in the text of [Fed. R. Evid. 702] establishes "general
> acceptance" as an absolute prerequisite to admissibility.  Nor does
> respondent present any clear indication that Rule 702 or the Rules as a
> whole were intended to incorporate a "general acceptance" standard. . .
> [A] rigid "general acceptance" requirement would be at odds with the
> "liberal thrust" of the Federal Rules and their "general approach of
> relaxing the traditional barriers to 'opinion' testimony".

*Daubert*, 509 U.S. at 587.  Rather, to be admissible under Rule 702, expert testimony

must meet a standard of "evidentiary reliability". *Id.* at 590 (explaining that

"evidentiary reliability" requires that proposed expert testimony be "supported by

appropriate validation—i.e., 'good grounds', based on what is known.").

A recent case in this District—*Bloomfield Hills Country Club v. Travelers Property

Casualty Co. of America*—demonstrates the distinction.  Case No. 15-11290, 2016 WL

4523576, at *3 (E.D. Mich. Aug. 30, 2016).  In *Bloomfield*, defendants lodged a *Daubert*

challenge in advance of jury trial against plaintiff's expert (a professor of plant

pathology) who opined that damage to a golf course was caused by ice that prohibited

gaseous exchange.  2016 WL 4523576 at *3.  Defendants claimed that the expert's

opinion was unreliable because he admitted there was no authoritative support for

aspects of his opinion, and he could identify no peer-reviewed research results,

scientific articles, and other scientific evidence to support his opinion.  *Id.* at *3.

---

[7] *Frye* established the rule that expert opinion based on a scientific technique is
inadmissible unless the technique is "generally accepted" as reliable in the relevant
scientific community.  293 F. at 1014.

Rejecting the defendants' argument, the court found that while the expert's opinion is "possibly novel," it is nevertheless reliable (and admissible) because it was based on over 40 years of experience with plant pathology, and an extrapolation of the information he had about the plaintiffs' golf courses.  *Id.*; *see also Static Control Components, Inc. v. Lexmark Int'l, Inc.*, No. CIVA5:02-571, 2007 WL 7083655, at *11 (E.D. Ky. May 12, 2007) ("[S]o long as the methodology itself appears valid and reliable, the conclusions are presumed reliable, at least for purposes of admissibility[.]").

In contrast to *Bloomfield*—where, again, the court found an expert's "possibly novel" opinion to be admissible for purposes of a jury trial—Plaintiffs' experts are prepared to present analytical gerrymandering metrics that have not only been vigorously debated and tested, but have been the subject of an "unprecedented outpouring of scholarship."  Stephanopoulos, *The Measure of a Metric*, 70 Stan. L. Rev. at 1503.

For example, as the Secretary acknowledges, the Efficiency Gap has been the subject of vigorous academic discussion since at least 2014.  Mot. at 7-11; *see, e.g.*, Wendy K. Tam Cho, *Measuring Partisan Fairness: How Well Does the Efficiency Gap Guard Against Sophisticated as Well as Simple Minded Modes of Partisan Discrimination?*, 166 U. Pa. L. Rev. Online 17 (2017); John F. Nagle, *How Competitive Should a Fair Single Member Districting Plan Be?*, 16 Election L.J. 196, 199-203 (2017); Benjamin Plener Cover, *Quantifying Partisan Gerrymandering: An Evaluation of the Efficiency Gap Proposal*, 70 Stan. L.

Rev. 1131, 1181-84, 1215-22 (2018).  It is no surprise, then, that Efficiency Gap

evidence was admitted into evidence (and, in fact, served as an analytical

underpinning) in the partisan gerrymandering challenges in both Wisconsin and

North Carolina.  *See Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016), vacated

and remanded, 138 S. Ct. 1916 (2018); *Common Cause v. Rucho*, 279 F. Supp. 3d 587

(M.D.N.C. 2018), stay granted, 138 S. Ct. 923 (U.S. 2018), and appeal docketed, No.

17-1295 (U.S. Mar. 14, 2018).[8]  As the Secretary must also acknowledge, the vigorous

academic scrutiny and testing is not exclusive to the Efficiency Gap, but extends to *all*

of the Gerrymandering Metrics referenced in Plaintiffs' expert report:

- Partisan Bias:  *See, e.g.*, John F. Nagle, *Measures of Partisan Bias for Legislating Fair Elections*, 14 Election L.J. 346, 351-52 (2015) (suggesting plotting the regular seat-vote curve and its inverse and determining the space between them); Nicholas Goedert, *Research Note, The Case of the Disappearing Bias: A 2014 Update to the "Gerrymandering or Geography" Debate*, Res. & Pol. 2-3 (2015)(seeking to measure gerrymandering by determining a plan's deviation from the historical seat-vote curve)); Nicholas Goedert, *Gerrymandering or Geography?: How Democrats Won the Popular Vote but Lost the Congress in 2012*, Res. & Pol. 2-3 (2014) (seeking to measure gerrymandering by determining a plan's deviation from the historical seat-vote curve).

- Partisan Symmetry:  *See, e.g.*, Bernard Grofman & Gary King, *The Future of Partisan Symmetry as a Judicial Test for Partisan Gerrymandering After LULAC v. Perry*, 6 Election L.J. 2, 6 (2007).

- Mean-Median Vote Test:  *See, e.g.*, Michael D. McDonald & Robin E. Best, *Unfair Partisan Gerrymanders in Politics and Law: A Diagnostic Applied to Six Cases*, 14 Election L.J. 312, 318-19 (2015) (arguing that mean-median

---

[8] Though the Gill Court observed the efficiency gap provided no district-specific evidence, there was no rejection of its admission as state-wide evidence.

works well in politically competitive districts); *Samuel S.-H Wang, Three
Tests for Practical Evaluation of Partisan Gerrymandering*, 68 Stan. L. Rev. 163,
1303 (2016) (arguing for the simplicity of the mean-median difference
test); Edward B. Foley, *The Gerrymander and the Constitution: Two Avenues of
Analysis and the Quest for a Durable Precedent*, 59 William & Mary L. Rev.
1729.

- <u>Declination</u>:  *See, e.g.*, Craig G. Merrill, *An Introduction to Partisan
  Gerrymandering Metrics, League of Women Voters of North Carolina*,
  (December 2017) available at https://www.lwvwake.org/redistricting/
  (praising declination for not relying on artificial data and providing a
  manageable standard); Gregory S. Warrington, *Quantifying gerrymandering
  using the vote distribution*, 17 Election L.J. 39 (March 2018) (advocating for
  the use of declination and its advantages in the context of partisan
  gerrymandering); Eric McGhee, *Assessing California's Redistricting
  Commission: Effects on Partisan Fairness and Competitiveness, Public Policy
  Institute of California* (March 2018), available at https://www.ppic.org/wp-
  content/uploads/r-0317emr.pdf (utilizing declination for examining
  California redistricting).

Standing alone, this evidence fully demonstrates that the Gerrymandering

Metrics satisfy multiple reliability factors under *Daubert*, including general acceptance,

testability, and peer review.  Any argument from the Secretary that says otherwise is a

premature attempt to influence the Court's weighing of the evidence at trial.

ii.      *General Acceptance Does Not Require Uniformity*

Moreover, the Secretary's suggestion that *Daubert's* "general acceptance"

guideline requires uniform acceptance of the Gerrymandering Metrics is erroneous.

The law in the Sixth Circuit is clear on this point:

> [T]here may be several different theories or procedures used concerning
> one type of scientific evidence, all of which are generally accepted.
> None may have the backing of the majority of scientists, yet the theory
> or procedure can still be generally accepted.  *And even substantial criticism
> as to one theory or procedure will not be enough to find that the theory/procedure is*

> *not generally accepted*.  Only when a theory or procedure does not have the acceptance of most of the pertinent scientific community, and in fact a substantial part of the scientific community disfavors the principle or procedure, will it not be generally accepted.

*Bond*, 12 F.3d at 563 (emphasis added) (noting that "[d]isputes about specific techniques used or the accuracy of the results generated go to the weight, not the admissibility of the scientific evidence.")

The Secretary's own cited cases are illustrative here.  *See* Mot. at 14 (citing *Henrickson v. ConocoPhillips Co.*, 605 F. Supp.2d 1142, 1165-1166 (E.D. Wash. 2009) & *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 25 (D. Mass. 1995)).  In *Henrickson*, the court held that the opinion of plaintiffs' causation expert (related to the exposure of benzene) was unreliable, in part, because the expert relied on methodology that "flies in the face of the tox[i]cological law of dose-response" and "has been rejected by the overwhelming majority of the scientific community."  605 F. Supp.2d at 1166.  The same goes for *Whiting*.  The court found that the opinions of plaintiffs' experts were unreliable, in part, because they are "not based on scientific knowledge" and instead, premised on a methodology that that has been uniformly rejected by the scientific community.  891 F. Supp. at 25.

By contrast, Secretary does not—and indeed cannot—claim that the Gerrymandering Metrics have been rejected by even a meaningful segment of the academic community—let alone an "overwhelming majority."  That's because it cannot be reasonably disputed that the Gerrymandering Metrics have been employed

as acceptable metrics of partisan gerrymandering by a number of prominent experts in the field, including Plaintiffs' own experts. *See* Chen Report at 3; Mayer Report at 19-27; Warshaw Report at 12-20; *see also* Grofman, *The Future of Partisan Symmetry*, 6 Election L.J. at 6 (noting the scholarly acceptance of "partisan symmetry" as a "standard for partisan fairness in plurality-based American elections"); Foley, *The Gerrymander and the Constitution,* 59 William & Mary L. Rev. at 1729 (discussing the appeal of universalistic approaches like mean-median difference compared with the particularistic approach that may have appealed to Justice Kennedy); Gregory S. Warrington, *Quantifying Gerrymandering Using the Vote Distribution*, 17 Election L.J. 39 (March 2018) (advocating for the use of declination and its advantages in the context of partisan gerrymandering).

The Secretary's only assertion in this vein is that the Gerrymandering Metrics have been subject to various levels of academic "criticism" at a time when the field of gerrymandering metrics is "in [f]lux." Mot. at 10, 14, 17, 19. It is undoubtedly true that each of the Gerrymandering Metrics has been subject to academic criticism—but unfortunately for the Secretary, that by no means equates to a lack of "general acceptance" under *Daubert*. *See Bond*, 12 F.3d at 562. Again, the Secretary's singular basis for exclusion should be rejected.

### iii.       *Gerrymandering Threshold*

The Secretary's final point is no more valid. There is no authority—nor should there be—for the notion that a metric is not reliable because, although it measures the

extent of partisan asymmetry, it does not describe the ultimate legal line between what is, and what is not, within the State's constitutional authority

Plaintiffs' experts supply extensive data to measure the Michigan gerrymander, and to compare it to other gerrymanders nationwide.  Warshaw Report at 34-36.  The data shows how far the individual districts digress from a sample of randomly-drawn districts following the same criteria as the Legislature but for the partisanship.

By any measure this gerrymander is extreme.  But it is up to the Court, not experts and metrics, to decide whether it crosses the line of acceptability.

## III.   Conclusion

For all of the foregoing reasons, the Secretary's Motion in Limine should be denied.

Respectfully submitted,

Date:  December 14, 2018         /s/ *Joseph H. Yeager, Jr.*

Mark Brewer (P35661)
GOODMAN ACKER P.C.
17000 West Ten Mile, Second Floor
Southfield, MI 48075
Telephone: 248-483-5000
Fax: 248-483-3131
MBrewer@goodmanacker.com

Joseph H. Yeager, Jr. (IN Bar No. 2083-49)
Kevin M. Toner (IN Bar No. 11343-49)
Harmony A. Mappes (IN Bar No. 27237-49)
Jeffrey P. Justman (MN Bar No. 390413)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: 317-237-0300
Jay.Yeager@FaegreBD.com
Kevin.Toner@FaegreBD.com
Harmony.Mappes@FaegreBD.com
Jeff.Justman@FaegreBD.com

*Counsel for Voters*

16

**<u>Certificate of Service</u>**

I certify that December 14, 2018, I have electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of filing to all counsel of record in this matter.

Respectfully submitted,

/s/ *Joseph H. Yeager, Jr.*

17